Exhibit 1

# Demand for Arbitration Form

## Instructions for Submittal of Arbitration to JAMS

📞 **1-800-352-JAMS**
🖥 **www.jamsadr.com**

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

A. **Demand for Arbitration** *(2 copies)*

B. **Proof of service of the Demand on the appropriate party** *(2 copies)*

C. **Entire contract containing the arbitration clause** *(2 copies)*
   - *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

D. **Administrative Fees**
   - *For two-party matters, the Filing Fee is $1,500. For matters involving three or more parties, the filing fee is $2,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,500 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.*

   - *A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| RESPONDENT NAME | BYTON North America Corporation |
| ADDRESS | 4201 Burton Drive |

| CITY | STATE | ZIP |
|---|---|---|
| Santa Clara | CA | 95054 |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Matt Barter; Jonathan Ye |
| FIRM/COMPANY | BYTON North America Corporation |
| ADDRESS | 401 Burton Drive |

| CITY | STATE | ZIP |
|---|---|---|
| Santa Clara | CA | 95054 |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | matt.barter@byton.com; jonathan.ye@byton.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| CLAIMANT NAME | EDAG Engineering GmbH |
| ADDRESS | Kreuzberger Ring 40 |

| CITY | STATE | ZIP |
|---|---|---|
| 65205 Wiesbaden | Germany | |

| PHONE | FAX | EMAIL |
|---|---|---|
| | | |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Evangeline Burbidge; Marc Lewis; Nathalie Fayad |
| FIRM/COMPANY | Lewis & Llewellyn LLP |
| ADDRESS | 505 Montgomery Street, Suite 1300 |

| CITY | STATE | ZIP |
|---|---|---|
| San Francisco | CA | 94111 |

| PHONE | FAX | EMAIL |
|---|---|---|
| (415) 762-0908 | (415) 390-2127 | eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com |



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

 If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

On June 1, 2017, EDAG Engineering GmbH ("EDAG") and BYTON North America Corporation ("BYTON") entered into a Technology and License Agreement ("Agreement"), attached as Exhibit A. Under the Agreement, BYTON agreed to pay EDAG over $50 million USD in exchange for deliverables and services, as set forth in Attachment 1 of the Agreement, Statement of Work ("SOW").

To date, EDAG has performed under the contract and there has been no dispute that BYTON received EDAG's deliverables and services. In return, however, BYTON has failed to pay (see Exhibit B). In acknowledgment of BYTON's failure, the parties entered into a payment plan in August 2019, attached as Exhibit C.

Even with this grant of additional time, BYTON has still failed to pay EDAG what it is owed. In fact, despite repeated attempts by EDAG's management to contact BYTON and resolve this issue, BYTON has remained substantively silent. This has left EDAG with no choice but to file this arbitration demand.

To date, BYTON has an outstanding balance of 19,799,805.04 Euros, which amounts up to estimated $22.5 million USD, owed pursuant to the August 2019 payment plan entered into between EDAG and BYTON. This amount does not yet include the fees for September 2019, nor any termination fees or other expenses to be covered under the Agreement, which will add up to at least 25,807,650.74 Euros (resulting into approximately $28.5 million USD).

As a result of the above, BYTON is liable to EDAG for (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing. Pursuant to these claims, EDAG is entitled to compensatory damages, pre-judgment and post-judgment interest under California law, and such other relief as the arbitrator may deem just and proper.

We look forward to JAMS' assistance in resolving this matter.

AMOUNT IN CONTROVERSY (US DOLLARS)   at least $28.5 million USD

# Demand for Arbitration Form (continued)

### Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.*

**ARBITRATION PROVISION LOCATION**

This demand is being made pursuant to an arbitration provision in the Technology Development and License Agreement executed by all parties and effective June 1, 2017. See Exhibit A § 14.4.b.

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   San Francisco, CA

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: Comprehensive Rule 16.1*

☑ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE |  | DATE | 10/22/2019 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Evangeline A.Z. Burbidge |
|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

**Completion of this section is _required for all consumer or employment claims_.**

## CONSUMER AND EMPLOYMENT ARBITRATION

**Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by _California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)_, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:**

☐ **YES**, this **is** a CONSUMER ARBITRATION.

☑ **NO**, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

In addition, JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ **Less than $100,000**   ☐ **$100,000 to $250,000**   ☐ **More than $250,000**   ☐ **Decline to State**

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

### RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | |
| ADDRESS | |

| | | | |
|---|---|---|---|
| CITY | | STATE | ZIP |

| | | | |
|---|---|---|---|
| PHONE | FAX | EMAIL | |

#### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| | | | |
|---|---|---|---|
| CITY | | STATE | ZIP |

| | | | |
|---|---|---|---|
| PHONE | FAX | EMAIL | |

### RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | |
| ADDRESS | |

| | | | |
|---|---|---|---|
| CITY | | STATE | ZIP |

| | | | |
|---|---|---|---|
| PHONE | FAX | EMAIL | |

#### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/ COMPANY | |
| ADDRESS | |

| | | | |
|---|---|---|---|
| CITY | | STATE | ZIP |

| | | | |
|---|---|---|---|
| PHONE | FAX | EMAIL | |

 # Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | | | |
|---|---|---|---|

| FIRM/ COMPANY | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | | | |
|---|---|---|---|

| FIRM/ COMPANY | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

# Exhibit A

## TECHNOLOGY DEVELOPMENT AND
## LICENSE AGREEMENT

This Technology Development and License Agreement (the "Agreement") is effective as of the 1st day of June, 2017 (the "Effective Date") and is made this 20th day of October, 2018  by and among BYTON North America Corporation, a Delaware corporation with offices at 4201 Burton Drive, Santa Clara, California, 95054, on behalf of itself and its Affiliates (collectively, "BYTON") and EDAG Engineering GmbH ("Supplier"), located at Kreuzberger Ring 40, 65205 Germany (BYTON and Supplier are individually a "Party" and collectively, "Parties").

WITNEESETH

WHEREAS, BYTON is in the business of designing, developing, manufacturing, and delivering electric vehicles, which will be initially manufactured and sold in China, and thereafter in the United States, Europe and other countries, and requires certain services and support; and

WHEREAS, Supplier is able to provide such services and support, and both BYTON and Supplier now desire to memorialize the terms and conditions relating thereto;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.0 DEFINITIONS

When used herein, the following terms shall be defined as follows:

1.1 "Acceptance Requirements" means the Specifications, the acceptance criteria relative to the Deliverables, and the plan and associated test environment against which BYTON will test conformance of the Deliverables in accordance with the documents set forth in a Statement of Work or as otherwise agreed by the parties in writing.

1.2 "Affiliates" shall mean with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity. For purposes of the Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

1.3 "Background Technology" means all Technology that (i) is owned or otherwise controlled by Supplier and (ii) is either (1) in existence on or prior to the Effective Date or (2) conceived, created, developed, reduced to practice or made by or on behalf of Supplier after the Effective Date independently of the activities contemplated by this Agreement.

1.4 "BYTON Product(s)" means any product(s) made by or for BYTON that incorporates or is distributed for use in conjunction with the Deliverables or a portion thereof.

1.5 "Confidential Information" means information which if disclosed (i) in tangible form, is clearly marked as "confidential" or "proprietary" at the time of disclosure, or (ii) in intangible form (such as orally or visually), the disclosing Party clearly identifies as "confidential" or "proprietary" at the time of disclosure and summarizes in writing and delivers to the receiving Party within thirty (30) days of disclosure.

1.6 "Deliverables" means the specific deliverables which Supplier is to provide to BYTON under a Statement of Work

C_BYTON_EDAG_V10_20_18



and such other Background Technology which Supplier provides to or makes available to BYTON in connection with a Statement of Work.

1.7 "Derivative Matter" means any work or invention, new material, information or data which is based in whole or in part upon the Background Technology and Foreground Technology, (including, if applicable, any BYTON Products) and any Intellectual Property Rights associated therewith, including any derivative work, improvement, extension, revision, modification, translation, abridgment, condensation, expansion, collection, compilation, Error Correction, or any other form in which the Background Technology and Foreground Technology may be recast, transformed or adapted, including any changes thereto or that is an implementation of the functionality described in any Specifications or similar documentation developed by or for BYTON pursuant to this Agreement.

1.8 "Documentation" means collectively the technical documentation, training materials, support materials, and end-user documentation associated with the Deliverables.

1.9 "Error" means with respect to the Deliverables, a failure to meet the Acceptance Requirements, including any defect or deficiency or failure to conform to the then-current functional, operational and performance Specifications and Documentation. It is not an Error when the functional, operational and performance Specifications and Documentation are met but the Specifications prove to be erroneous or dysfunctional or when target adjustments have to be made during the development process.

1.10 "Error Correction" means a modification, addition or procedure to correct an Error.

1.11 "Foreground Technology" means all Technology which is created, developed, or otherwise generated by Supplier under this Agreement.

1.12 "Intellectual Property Rights" means worldwide common law and statutory rights associated with (i) patents and patent applications; (ii) works of authorship, including mask work rights, copyrights, copyright applications, copyright registrations and "moral" rights; (iii) the protection of trade and industrial secrets and confidential information; (iv) other proprietary rights relating to intangible intellectual property (specifically excluding trademarks, tradenames and service marks); (v) analogous rights to those set forth above; and (vi) divisions, continuations, renewals, reissuances and extensions of the foregoing (as applicable) now existing or hereafter filed, issued or acquired.

1.13 "Services" means any task performed, such as consultancy services, to complete the project in accordance with the agreed responsibilities pursuant to a Statement of Work.

1.14 "Source Code" means program code in high-level computer language readable by humans skilled in the language, and includes available related Documentation and tools, including comments, internal development tools and build environments.

1.15 "Specifications" means the functional, operational and performance requirements for the Deliverables.

1.16 "Statement of Work" means the development plan, including deliverables and associated milestones, and the development schedule set forth in a written document. The Parties may enter into multiple individual Statements of Work under this Agreement. Each Statement of Work entered into by the Parties shall be part of the Agreement, as defined.

1.17 "Technology" means inventions, business, marketing, engineering, technical and manufacturing information, know-how and materials, including technology, software, instrumentation, specifications, designs, devices, data, compositions, formulas, , assays, reagents, constructs, compounds, discoveries, procedures, processes, practices,

C_BYTON_FDAG_V10_20_18

protocols, methods, techniques, results of experimentation or testing, knowledge, trade secrets, skill and experience, in each case whether or not patentable or copyrightable; the foregoing may be in both tangible and intangible form.

## 2.0 DEVELOPMENT

2.1 <u>Development Undertaking</u>.  Supplier will design, develop and create the Deliverables and perform all Services, conforming to the Acceptance Requirements and in accordance with the applicable Statement of Work created under this Agreement. For the avoidance of doubt, Supplier will not be an exclusive supplier of the services regarding the project as a whole, but only with respect to the agreed Deliverables and Services pursuant to this contract. BYTON carries the overall responsibility for the Project as a whole.
Should the development process show that target adjustments are necessary in order to achieve the overall target of a functional vehicle fit for homologation in the jurisdiction of the European Union, the United States of America and China, these target adjustments are not considered erroneous.

2.2 <u>Obligations in Support of Development</u>.  To ensure the timely and satisfactory completion of Supplier's development work under the Statement of Work, Supplier will deploy throughout the development sufficient and qualified personnel, equipment and other necessary resources to complete Supplier's development work. BYTON will provide all necessary data and perform all duties in accordance with FPDP Gate Deliverables Full Checklist to enable Supplier's performance.  For all of Supplier's development work and provision of Services, Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement.  Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement.  Supplier may employ individual independent contractors as part of its workforce but shall not be permitted to delegate or subcontract the performance of its duties and obligations to any third party without the prior written consent of BYTON.  Supplier remains responsible for compliance with the terms and conditions of the Agreement whether performed by Supplier or an authorized third party.

For Supplier personnel who are visiting and onsite at BYTON facilities, the additional obligations set forth in Section 13 below shall apply.

2.3 <u>Status Reports</u>.  Supplier will provide to BYTON written engineering status reports, on an every-other-week basis (or as requested basis) detailing the status of the development work described in the Statement of Work.  Supplier shall provide more frequent updates and status reports upon BYTON's request.

2.4 <u>Change Requests</u>.  Some evolution of the Specifications and the Statement of Work based upon interaction between the Parties is expected and minor modifications which will not impact full compliance with the Statement of Work (including milestones) or fees due under this Agreement may be mutually agreed to by the Parties and need not be achieved by a formal change mechanism. However, changes impacting full compliance with the Statement of Work or fees payable are only valid if implemented in accordance with the following change request procedure.  BYTON may request any change to the Specifications or the Statement of Work by setting forth the proposed change in reasonable detail in a writing (including email) submitted to Supplier ("Change Request").  Supplier shall respond in writing to Change Requests within three (3) workdays of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, the impact on the Statement of Work and any additional fees which Supplier would require in order to make the requested change ("Change Response").  BYTON shall respond promptly informing Supplier whether it agrees with Supplier's description of the anticipated impact and additional terms, if any, proposed in the Change Response.  Once an authorized representative of BYTON agrees in writing to the terms and conditions outlined in the Change Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Change Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance

3/15                                                              C_BYTON_EDAG_V10_20_18

with previous agreed terms during these 48 hours as time is of essence.

2.5 <u>Enhancements</u>.  BYTON, at its option, may request enhancements to the Deliverables by setting forth the proposed change in reasonable detail (including email) submitted to Supplier ("Enhancement Request").  Supplier shall respond in writing to Enhancement Requests within ten (10) days of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, any additional fees which Supplier would require in order to make the requested change ("Enhancement Request Response").  BYTON shall respond promptly within 48 hours, informing Supplier whether it agrees with Supplier's additional terms, if any, proposed in the Enhancement Request Response.  Once an authorized representative of BYTON agrees in writing to the Enhancement Request Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Enhancement Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance with previous agreed terms during these 48 hours as time is of essence.

2.6 <u>BYTON's and Supplier's Obligations</u>.  In furtherance of this Agreement, BYTON and Supplier shall (a) cooperate and work together in all matters relating to the services provided hereunder; (b) respond promptly to a Party's request to provide direction, information, approvals, authorizations or decisions that are reasonably necessary for or related to a Statement of Work in a timely manner.

## 3.0 TRANSFER AND DELIVERY

3.1 <u>Background Technology</u>.  If required under a Statement of Work in accordance with 1.5, Supplier will deliver to BYTON the Background Technology (including without limitation Documentation thereto) within five (5) days if feasible, or as otherwise agreed to by the parties if not feasible,  after payment pursuant to the agreed payment schedule.

3.2 <u>Deliverables and the Developed Technology</u>.  Supplier will deliver to BYTON each Deliverable (including the Foreground Technology therein and related Documentation), in the form(s) set forth in a Statement of Work, not later than the date set forth therein for testing in accordance with the Acceptance Requirements. In addition, Supplier will provide to BYTON such technical documentation as may be reasonably required to enable BYTON to install and test each Deliverable as anticipated by the Acceptance Requirements.

3.3 <u>Delays</u>.  TIME IS OF THE ESSENCE. Supplier's delivery to BYTON of the Deliverables in accordance with this Section 3.0 ("Transfer and Delivery") and Supplier's completion of all Deliverables, Foreground Technology and Documentation thereto in accordance with the schedule set forth in the Statement of Work are key to the success of the BYTON Product(s).  BYTON will provide all necessary information and perform all duties in a timely fashion to enable Supplier performing in accordance with the master timing.

3.4 <u>Means of Delivery</u>.  All deliveries to BYTON shall be made DDP Destination (INCO Terms, 2010) and pursuant to BYTON's written instructions with respect to form (physical or electronic) and location.  For the delivery of any physical items, taxes or duties, fees, charges, stamp taxes, etc. of any kind are borne by BYTON. Supplier agrees to support BYTON where possible and is entitled to charge these services in accordance with its offer.

## 4.0 TESTING AND ACCEPTANCE

4.1 <u>Test Method</u>.  The Deliverables requiring machine execution will be tested in the test environment described in the Acceptance Requirements.  The Foreground Technology and Deliverables not requiring machine execution will be compared to the requirements of the Acceptance Requirements.

C_BYTON_EDAG_V10_20_18



4.2 <u>Acceptance Procedure</u>.

    a.  BYTON may, in BYTON's sole discretion, reject the Deliverables or any component thereof, if it contains any Error. BYTON will promptly notify Supplier in writing of BYTON's acceptance or rejection ("Error Notice"). In each Error Notice, BYTON will set forth, in reasonable detail, the reason for the rejection.

    b.  Upon rejection of the Deliverables, Supplier shall either (i) create and implement an Error Correction for each identified Error and resubmit the relevant portion of the Deliverable to BYTON for retesting within three (3) workdays of BYTON's Error Notice, or (ii) if it is impracticable to provide an Error Correction in such three (3) workday period, within three (3) workdays of BYTON's Error Notice, provide to BYTON a written plan to correct the identified Error(s), including a schedule therefor ("Correction Plan").

Failure of the Deliverables to pass BYTON's acceptance tests following implementation of Error Correction(s) as contemplated above, or failure of Supplier and BYTON to agree upon a Correction Plan within three (3) days after Supplier provides such Correction Plan to BYTON or Supplier's failure to fully comply with an agreed upon Correction Plan, will entitle BYTON, in BYTON's sole discretion, to (i) require Supplier to again undertake creation and implementation of an Error Correction for resubmission and testing pursuant to this Section; (ii) accept the relevant portion of the Deliverables and correct the Error itself offsetting its reasonable costs against any associated fees; (iii) accept the relevant portion of the Deliverables, reserving BYTON's rights to require Supplier to correct the Error; or (iv) deem such event a material breach of this Agreement which cannot be cured, immediately terminate this Agreement in accordance with Section 9.2 ("Breach and Termination"), and Supplier shall refund any fees that have been paid (for any noncompliant Deliverables) under the Statement of Work in Question for this particular item.

## 5.0 LICENSE GRANTS AND RESTRICTIONS

5.1 <u>Supplier's License Grants and Restrictions</u>.

    a.  <u>Background Technology License</u>.  Supplier hereby grants to BYTON, a royalty-free, fully paid up, non-exclusive, perpetual, irrevocable and worldwide license under Supplier's Intellectual Property Rights to, in any fashion BYTON may choose (including, but not limited to, community source and/or open source licensing), (i) use, reproduce, modify, prepare Derivative Matter of, compile, publicly perform, publicly display, demonstrate, Background Technology and Derivative Matter thereof (including in Source Code or object code form) on any media or via any electronic or other method now known or later discovered; (ii) make, have made, use, sell, offer to sell, import and otherwise exploit the Background Technology and Derivative Matter thereof (including in Source Code or object code form) in any manner and on any media or via any electronic or other method now known or later discovered; (iii) disclose, distribute and otherwise exploit the Background Technology and Derivative Matter and (iv) sublicense the foregoing rights to third parties through multiple tiers of sublicensees or other licensing mechanisms at BYTON's option for Background Technology and Derivative Matters necessary for the Project.

    b.  <u>Third Party Licenses</u>.  Supplier shall not incorporate any third-party materials, information or intellectual property, including without limitation, any open source software (Source Code or object code form) made generally available to the public under open source licenses (collectively, "Third Party Materials") into any of the Deliverables unless Supplier has obtained for BYTON license rights consistent with the rights mentioned under Section 5.1(a) herein.  Supplier shall identify and disclose to BYTON, all Third Party Materials to be incorporated into the Deliverables, prior to doing so, and the Parties shall discuss the same if necessary.

5.2 <u>BYTON's License Grant and Restrictions</u>.

C_BYTON_EDAG_V10_20_18

a. <u>License Grant</u>.  Subject to the terms and conditions of this Agreement, BYTON grants Supplier a personal, non-exclusive, non-transferable, limited license to internally use the Foreground Technology and prepare and use Derivative Matter thereof, solely for the purpose of performing maintenance and support services to BYTON in accordance with the terms of this Agreement.

b. <u>Restrictions</u>.  Supplier shall have no right to use the Foreground Technology for productive or commercial uses.  Supplier may not sell, rent, loan or otherwise encumber or transfer the Foreground Technology, in whole or in part, to any third party.  No right, title or interest in or to any trademark, service mark, logo or trade name of BYTON or its Suppliers is granted under this Agreement.

## 6.0 OWNERSHIP AND PROPRIETARY NOTICES

6.1 <u>Background Technology</u>.  Supplier asserts that Supplier and/or Supplier's suppliers own the Background Technology and associated Intellectual Property Rights or owns the proper non-exclusive licenses.  BYTON agrees that, to the extent Supplier owns the Background Technology and associated Intellectual Property Rights, Supplier will retain such ownership.  Except as expressly stated in this Agreement, nothing herein shall be deemed a transfer or license by BYTON of any Intellectual Property Rights that BYTON may now possess or acquire in the future which may cover any aspect of the Deliverables.

6.2 <u>Deliverables; Foreground Technology</u>.

a. <u>Foreground Technology; Deliverables</u>.  BYTON retains all right, title and interest in and to: (i) the BYTON Products; (ii) Deliverables except to the extent such Deliverables constitutes Background Technology; and (iii) Foreground Technology.

b. <u>Assignment of Rights</u>.  Subject to Supplier's underlying Intellectual Property Rights in the Background Technology and in exchange for the fees set forth in section 4 of SOW, Supplier shall and does hereby assign to BYTON, Supplier's entire right, title and interest in and to the Deliverables created for BYTON, the Foreground Technology, and all associated Intellectual Property Rights therein.  The Parties hereby agree that all development work performed by Supplier hereunder shall be deemed works made for hire.  Before any employee or contractor of Supplier ("Personnel") performs development work hereunder, such Personnel and Supplier must enter into a written agreement expressly for the benefit of BYTON and containing provisions substantially equivalent to this Section 6.2 ("Deliverables; Foreground Technology") and Section 10 ("Confidential Information") or enter into an agreement as close as legally possible to it under the laws of the country in which task is performed. Supplier (i) may only use the Foreground Technology in accordance with Section 5.2 ("BYTON's License Grant and Restrictions"), and (ii) agrees not to challenge the validity of BYTON's ownership in the Foreground Technology. In addition, BYTON shall own all Derivative Matter and associated Intellectual Property Rights.  BYTON may register the copyright in the Deliverables and Foreground Technology in its own name, identifying Supplier's interest in the Background Technology as required by applicable Copyright Office rules and regulations.

c. <u>Cooperation in Perfecting Rights</u>.  Supplier agrees to cooperate with BYTON and cause Supplier's employees to cooperate with BYTON and to perform all acts, at BYTON's request on reasonable notice, as reasonably necessary to facilitate the preparation, filing, prosecution and enforcement of the Intellectual Property Rights associated with the Deliverables and Foreground Technology. In addition, Supplier shall, upon BYTON's request and at BYTON's costs, enter into any assignments, waivers or licenses of the Deliverables, Foreground Technology or the Intellectual Property Rights related to any of the foregoing as BYTON deems necessary and appropriate.  In the event that BYTON is unable for any reason to secure Supplier's signature to any document required to apply for or execute any patent, copyright, trademark registration or other application with respect to the Deliverables and Foreground Technology, Supplier hereby irrevocably designates and appoints BYTON and

its duly authorized officers and agents as Supplier's agents and attorneys-in-fact to act for and on Supplier's behalf and instead of Supplier, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, trademarks or other rights thereon with the same legal force and effect as if executed by Supplier.

6.3 Moral Rights. Supplier agrees that with respect to any "moral" or equivalent rights (including, without limitation, rights of attribution, integrity, disclosure, and withdrawal) Supplier hereby: (i) assigns such rights to BYTON as described above, (ii) waives such rights and (iii) agrees and covenants never to assert, either during or following the term of this Agreement, such rights or to institute or maintain any action against BYTON relative to any such rights in the Foreground Technology or Derivative Matter.  To the extent that such rights cannot be assigned or waived by operation of law, Supplier grants to BYTON, a royalty-free, fully paid-up, perpetual, irrevocable and worldwide license to fully exercise all such rights, with rights to sublicense through multiple levels of sublicensees and further, Supplier consents to BYTON's use sufficient to allow BYTON to exercise the rights granted in this Agreement.

## 7.0 PAYMENTS, INSURANCE AND ACCOUNTING

7.1 Fees. BYTON shall pay Supplier the fees set forth in Section 4 in SOW accordance with the schedule and requirements set forth therein and, in the case of fees due in connection with the Deliverables, upon acceptance of Deliverable by BYTON in accordance with Section 4.2 ("Acceptance Procedure").  Following such acceptance, Supplier shall provide a correct invoice to BYTON, and such invoice will be due, in Euro, within either sixty (60) days following BYTON's receipt of such invoice.  BYTON sent per the agreed payment schedule highlighted in the Statement Work to this Agreement.

7.2 Taxes.  All prices quoted by Supplier are exclusive of any taxes.  Supplier shall include on its invoices the actual taxes payable for the services provided to BYTON.  However, Supplier shall pay all taxes, levies or duties associated with fees and royalties payable by BYTON hereunder, whether based on gross revenue or otherwise; and any business, occupational or similar taxes relating to its general business activities.   Supplier shall also be responsible for all employer related taxes relating to its Personnel including employee taxes, workers compensation, and unemployment insurance.

7.3 Insurance. Supplier will be insured pursuant to laws in Germany and provide a copy of the certificate of insurance and will maintain such insurance for the time of the Agreement.

## 8.0 MAINTENANCE AND SUPPORT SERVICES

8.1 Supplier shall provide to BYTON the maintenance and support services, as set forth in a Statement of Work, or if thereafter subsequently requested by BYTON as subsequently, mutually agreed by the parties.

## 9.0 TERM AND TERMINATION

9.1 Term of Agreement.  The term of this Agreement begins on the Effective Date and continues for a period of seven (7) years (but in no event earlier than the expiration or earlier termination of the last Statement of Work created hereunder), unless this Agreement is earlier terminated sooner in accordance herewith.

9.2 Breach and Termination.  If either Party fails to comply with any material term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such notice, all breaches specified therein are remedied.  If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall

C_BYTON_EDAG_V10_20_18

undertake reasonable, diligent and good faith efforts to promptly remedy the breach. If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement. If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice. Notwithstanding anything to the contrary herein, BYTON may immediately terminate this Agreement, without a cure period, if Supplier fails to comply with any of its obligations under Sections 3.3 ("Delays") or 4.2 ("Acceptance Procedure").

9.3 <u>Supplier's Insolvency</u>. In the event Supplier becomes insolvent, enters into voluntary or involuntary bankruptcy, ceases to conduct business or assigns its interests in this Agreement to a third party creditor, (i) BYTON may immediately terminate this Agreement; or (ii) BYTON may (a) continue to exercise the license rights granted to BYTON hereunder, and (b) reserve all rights in the Background Technology and related materials to protect BYTON's interests therein pursuant to Section 365(n) (and any amendment thereto) of the U.S. Bankruptcy Code, or equivalent legislation in other applicable jurisdictions. The parties acknowledge that the Background Technology and Foreground Technology are "intellectual property" for purposes of Section 365(n) of the U.S. Bankruptcy Code and that BYTON will have the right to exercise all rights provided by Section 365(n) with respect to the Background Technology and Foreground Technology. In the event that the Supplier materially breaches any provision under this Agreement, BYTON will have the right to require the delivery by Supplier (or in the event of a filing of bankruptcy by or against Supplier, by the trustee) to BYTON of all Background Technology and Deliverables (including all embodiments thereof).

9.4 <u>BYTON Termination</u>. BYTON, at BYTON's sole option, prior to acceptance of the final deliverable, shall be permitted to terminate this Agreement, a Statement of Work or any part thereof, without cause upon 30 (30) days prior written notice to Supplier. In such an event, BYTON shall pay the applicable fees through the next milestone following notice of such termination or as otherwise agreed between the Parties. If BYTON terminates this Agreement or a Statement of Work (in whole or in part) pursuant to this Section 9.4, then the Parties shall promptly discuss what transition of work, if any, may occur, the plans for accomplishing such, and the proposed timetable, among other things ("Transition Plan"), which will include a transition period for employees of the Supplier allocated for on this project. Based on BYTON's plans and objectives and under consideration of Supplier's allocations with respect to this Agreement, the Parties shall cooperate and mutually agree on a Transition Plan, which shall be completed within sixty (60) days after the Parties reach agreement.

9.5 <u>Effect of Termination or Expiration</u>. Neither party will be liable for any damages arising out of the expiration of this Agreement. Termination as a result of a breach of this Agreement will not affect any right to recover damages sustained by reason of breach; or any payments which may be owing in respect of this Agreement. Subject to Supplier making best efforts to mitigate any costs and payments, Supplier is entitled to all payments in accordance with agreed payment plans/fee schedule for already initiated work at the time Supplier received the notice from BYTON to terminate for convenience. This includes payments for costs incurred with respect to subsequent milestones (such as e.g. visa fees, contractual obligations to employees traveling abroad, testing facilities rented, etc.).

9.6 <u>Survival</u>. Sections 1.0 ("Definitions"), 3.0 ("Transfer and Delivery"), 5.1 ("Supplier's License Grants and Restrictions"), 5.2(b) ("Restrictions"), 6.0 ("Ownership and Proprietary Notices"), 8.0 ("Maintenance and Support Services"), 9.0 ("Term and Termination"), 10.0 ("Confidential Information"), 11.0 ("Warranties and Disclaimer of Warranty"), 12.0 ("Indemnification"), and 13.0 ("Miscellaneous") of this Agreement shall survive any termination or expiration of the Agreement.

## 10.0 CONFIDENTIAL INFORMATION

10.1 <u>Obligation</u>. Except as provided in this Agreement, neither Party may use, reproduce, distribute or disclose Confidential Information it receives from the other Party under this Agreement, without the prior written authorization

C_BYTON_EDAG_V10_20_18

of the disclosing Party.  Each Party must hold in confidence Confidential Information received from the other Party and must protect the confidentiality thereof with the same degree of care that it exercises with respect to its own information of like importance, but in no event less than reasonable care, during the term of this Agreement and for a period of three (3) years after the expiration or earlier termination of this Agreement.  Neither Party shall be liable for any inadvertent or unauthorized disclosure of Confidential Information, provided that it exercises at least the standard of care set forth above to prevent disclosure and takes reasonable steps to mitigate any damage and prevent further disclosure.  For purposes of this Section, use, reproduction, distribution or disclosure by BYTON of the Background Technology or Foreground Technology thereof under a community source or open source licensing model, pursuant to the license granted by Supplier herein, will not be a breach of this Agreement.

10.2 Exceptions.  Section 10.1 ("Obligation") does not apply to any portion of the Confidential Information which the receiving Party can demonstrate:

a.  is now, or hereafter becomes, through no act or failure to act on the part of the receiving Party, generally known in the automobile industry;

b.  was possessed by the receiving Party without an obligation of confidentiality at the time of receiving such Confidential Information;

c.  is rightfully obtained by the receiving Party without restriction on disclosure; or

d.  is independently developed by the receiving Party not in breach of this Agreement.

10.3 Employee Access.  Each Party must inform its employees and contractors having access to the other Party's Confidential Information of restrictions under this Agreement and shall contractually require such contractors to comply with the requirements of this Section 10.0 ("Confidential Information") and Section 6.0 ("Ownership and Proprietary Notices").

10.4 Legally Compelled Disclosure.  In the event that either Party is requested or becomes legally compelled (including without limitation, pursuant to securities laws and regulations) to disclose the existence or any of the terms of this Agreement, in contravention of the provisions of this Section 10, such Party (the "Disclosing Party")  shall provide the other Party (the "Non-Disclosing Party") with prompt written notice of that fact before such disclosure and will use reasonable efforts to fully cooperate with the Non-Disclosing Party to seek a protective order, confidential treatment, or other appropriate remedy with respect to the disclosure.  In the case of disclosure in connection with rules or regulations of any entity regulating securities ("SEC"), if confidential treatment is requested by the Non-Disclosing Party, the Disclosing Party agrees to use reasonable efforts to file such a request on the Non-Disclosing Party's behalf and to respond to any SEC comments to pursue assurance that confidential treatment will be granted, in both cases fully informing the Non-Disclosing Party of any such comments and cooperating with the reasonable requests of the Non-Disclosing Party.

10.5 Independent Development.  Each Party understands that the other Party may develop or receive information similar to the Confidential Information.  Subject to copyrights and patent rights of each Party, (i) either Party may develop or acquire technology or products, for itself or others, that are similar to or competitive with the technology or products of the disclosing Party, and (ii) each Party is free to use and disclose information which may be retained in the unaided memory of the receiving Party's employees or contractors who have had access to the Confidential Information of the other Party disclosed hereunder.

10.6 Publicity.  Neither Party shall disclose the existence or the terms and conditions of this Agreement to any third Party, except as may be required (i) to implement or enforce the terms of this Agreement; or (ii) by an existing or

C_BYTON_EDAG_V10_20_18

potential investor, acquiring company, bank or other financial institution, under appropriate non-disclosure terms in connection with a merger, acquisition, financing, loan agreement or similar corporate transaction. Supplier shall not, without first obtaining the prior written consent of BYTON, announce this Agreement. Once the written consent is obtained, Supplier may mention BYTON publicly as reference.

## 11.0 WARRANTIES AND DISCLAIMER OF WARRANTY

11.1 Ownership. Supplier represents and warrants that (i) the Background Technology, Foreground Technology and Deliverables will not infringe or misappropriate any Intellectual Property Rights or trademarks of any third Party; (ii) Supplier has the right and power to enter into this Agreement and grant the assignment and the licenses set forth herein; (iii) the Deliverables will be free from defects in design, material and workmanship and in accordance with the Specifications agreed upon by the parties; (iv) the Deliverables will conform to all applicable laws of the United States, European Union, and China, including those applicable to the design and  engineering of vehicles in such countries and regions to achieve homologation; (v) and all services provided will be provided in a professional and workmanlike manner, using qualified personnel with appropriate training, education and experience to perform the services as required hereunder.

11.2 Conformance. Supplier represents and warrants that following the date of acceptance, the Background Technology, Foreground Technology and Deliverables will continue to conform to the Acceptance Requirements without degradation.

11.3 Virus. Supplier represents and warrants that the Background Technology, Foreground Technology and Deliverables and associated media contain no computer instructions designed to (i) disrupt, damage or interfere with use of computer or telecommunications equipment or facilities, or (ii) disrupt or corrupt the use, operation or results of any computer program to the (technical) extent it can be reasonably expected.

11.4 Additional Remedies. In the event of a material breach by Supplier of any representation or warranty herein, BYTON shall have, in addition to and without limitation of any other right or remedy available to BYTON at law or in equity, the right, in BYTON's sole discretion, to take any and all actions reasonably necessary to mitigate BYTON's damages and/or any damages to BYTON's customers arising from such breach, including but not limited to: (i) modifying any form of the Background Technology, Foreground Technology and Deliverables ; (ii) requiring Supplier to fix any necessary form of the Background Technology, Foreground Technology and Deliverables ; (iii) contracting with others to modify any necessary form of the Background Technology, Foreground Technology and Deliverables ; and (iv) distributing to BYTON's customers any such modification, up to an amount equal to greater of: a. EUR15,000,000.00; or b. amounts payable under insurance coverage available to Supplier. Any additional insurance requests by BYTON will be charged to BYTON.  This includes BYTON's right to charge to Supplier and Supplier shall be obligated to pay to BYTON all direct costs and expenses, excluding legal fees of any kind, incurred by BYTON in connection with any such mitigation efforts.

11.5 Disclaimer.  EXCEPT AS PROVIDED IN THIS AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF DESIGN, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

## 12.0 INDEMNIFICATION

12.1 Obligation to Indemnify.

C_BYTON_FDAG_V10_20_18

a.  Supplier's Obligation to Indemnify BYTON.  Supplier will indemnify, defend and hold harmless BYTON from and against any and all claims, demands, or actions ("Claims"), and all liabilities, settlements, costs, damages and fees (including reasonable attorneys' fees and costs) ("Losses") incurred or suffered by BYTON arising out of any Claim which arises from: (a) any gross negligent or intentional act or omission of Supplier or its employees, agents or representatives in providing the services under a Statement of Work; (b) Supplier's breach of its obligations under the Agreement; (c) any Claim by or on behalf of Supplier Personnel and their family and relatives against BYTON arising out of the services performed by Supplier Personnel under the Agreement unless they are related to local, hazardous work conditions at a BYTON facility; (d) a Claim that Background Technology, Foreground Technology or Deliverable provided by Supplier hereunder infringes or misappropriates the Intellectual Property Rights of unaffiliated third party. Supplier is not responsible for background technology, foreground technology or deliverables provided by BYTON for the purpose of this Agreement.

b.  In the event of any third person or Governmental Body claim ("Third Party Claim"), action or suit against BYTON as to which BYTON seeks indemnification against Supplier hereunder, and BYTON fails to notify Supplier within a reasonable timeframe of the claim or  acknowledges its obligation in writing and elects to defend against, compromise, or, settle any Third Party Claim which relates to any Losses indemnified by this agreement without seeking permission of Supplier beforehand, BYTON accepts to be solely liable for all claims, losses, expenses including legal expenses regardless of actual liability for this claim. Neither Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or consent to entry of any judgment unless the claimant or claimants and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim.

12.2 Remedies. Should the Deliverables become, or in Supplier's reasonable opinion be likely to become, the subject of a claim of infringement or misappropriation of any Intellectual Property Rights in accordance with 12.1, Supplier shall, at its sole expense, either (i) procure for BYTON the right to continue to use the Deliverables, or (ii) replace or modify the Deliverables to make it non-infringing, provided that the same functions are performed by the replaced or modified Deliverables.

## 13.0 SUPPLIER PERSONNEL

13.1    General Requirements for Supplier Personnel.

a.  Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement.  Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement.  Supplier is responsible for validating the identity of and ensuring that Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) be subject and conform to all applicable BYTON policies, rules and procedures with respect to personal and professional conduct (including the wearing of an identification badge; use of computer systems; and adhering to general safety, dress, behavior, and security practices).

b.  Supplier is the employer of the Personnel and shall be responsible for all compensation and benefits payable to them; Personnel are not employees of BYTON and are not entitled to any compensation or benefits which are provided to its employees, including without limitation health insurance; paid vacation; sick leave; or retirement benefits.  Supplier shall also be responsible for complying with all tax laws applicable to Personnel, including withholding taxes for all compensation payable; and for complying with all applicable labor and employment requirements including worker's compensation insurance requirements, and immigration and work visa requirements.

13.2    Key Supplier Positions.  "Key Supplier Positions" means those positions designated as such in the applicable SOW.  Supplier will cause each of the Supplier Personnel filling the Key Supplier Positions to devote substantially full time and effort to the provision of the Services during the period of assignment.

*LP*

13.3   Approval and Removal of Supplier Personnel.   BYTON may approve all Personnel assigned to perform Services, and may require Supplier to replace any Personnel whose performance, in BYTON's reasonable judgment, has been unsatisfactory.

**14.0 MISCELLANEOUS**

14.1 Force Majeure.   Neither Party shall be liable for any failure or delay in performance of this Agreement a. to the extent the failure or delay is caused by fire, flood, earthquake or other acts of God or nature; civil disorder, war, riots; or any other similar cause or event beyond the reasonable control of a party; and b. provided the non-performing Party is without fault in causing such failure or delay, and it could not have been prevented by reasonable precautions or other alternative means.  If the foregoing failures or delays occur which prevent performance of a Party's obligations under this Agreement, the affected Party shall promptly discuss the impact of such failure or delay, the period of time such may continue for, and the plans for a work around solution, among other things; the affected Party shall update the non-affected Party and keep them apprised of the situation. The affected Party's obligations of the Parties shall be suspended for so long as the events mean that performance of the agreement is impossible.  If the failure or delay continues for more than twenty (20) work days, then the non-affected Party may terminate the specific SOW under this Agreement.

14.2 Severability.  In the event that any part of this Agreement is found to be unenforceable, the remainder shall continue in effect, to the extent permissible by law and consistent with the intent of the parties as of the Effective Date of this Agreement.

14.3 Relationship of the Parties.  This Agreement does not create a partnership, franchise, joint venture, agency, or fiduciary or employment relationship.  Neither Party may bind the other Party by contract or otherwise to any obligation or act in a manner which expresses or implies a relationship other than that of independent contractor.

14.4 Governing Law.

a.   Disputes; Governing Law & amicable settlement.  If there is a dispute between the Parties which cannot be resolved through good faith negotiations, then a Party may request escalation to discussions with senior management of both Parties.  Within five (5) days of a Party's request, a meeting or telephone call shall be held with such senior management in an attempt to resolve such dispute.  If the Parties cannot resolve such dispute within a reasonable time period, then the Parties retain all rights hereunder, including pursuing arbitration as below stated.  Any action related to this Agreement will be governed by the laws of the State of California (except that body of law controlling conflict of laws) and the United Nations Convention on the International Sale of Goods will not apply).

b.   Arbitration.   Any dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS"). The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, if the Parties cannot agree, an arbitrator appointed in accordance with the JAMS rules who shall be experienced in the type of dispute at issue.  The Parties, their representatives, the arbitrator, and other participants shall keep confidential the existence, content, and result of the arbitration. Any demand for arbitration and any counterclaim must specify in reasonable detail the facts and legal grounds forming the basis for the claimant's claims and include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant. The arbitration will be conducted in the English language; the location of such arbitration shall be in San Francisco, California. Each Party will bear its own costs in the arbitration, The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the provisions of the agreement documents and to fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (1) in excess of the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (2) to award damages in excess of the types and limitation of

C_BYTON_EDAG_V10_20_18

damages found in the Agreement; or (3) to modify the terms of this Agreement. The arbitrator shall issue an award within 30 days after completion of the hearing and any post-hearing briefing. The award must be in writing and must state the reasoning on which the award is based. Judgment upon the award may be entered in any court of competent jurisdiction. Notwithstanding the agreement to arbitrate, each Party may apply at any time to a court of competent jurisdiction for appropriate injunctive relief or for other interim or conservatory measures, and by doing so will not breach or waive the agreement to arbitrate or impair the powers of the arbitrator.

14.5 <u>Import and Export Laws</u>. The Background Technology, Foreground Technology and Deliverables, including without limitation, technical data, may be subject to U.S. export controls or to export or import regulations of other countries. The Parties agree to comply with all such regulations and acknowledge that they have the responsibility to obtain such licenses to export, re-export or import the Background Technology, Foreground Technology and Deliverables as may be required.

14.6 <u>Notices</u>. All notices required hereunder must be in writing, sent to the Party's address set forth below and receipt must be confirmed. Notices required with respect to Sections 9.0 ("Term and Termination") and 12.0 ("Indemnification") must be provided by express courier.

BYTON:

BYTON North America Corporation
4201 Burton Drive
Santa Clara, California, 95054

Attn: General Counsel

Supplier:
Supplier's Name:    EDAG Engineering GmbH
Supplier's Address:   Kreuzberger Ring 40
                      65205 Wiesbaden
                      Germany

14.7 <u>No Exclusive Remedy</u>. Unless specifically designated, nothing in this Agreement shall be construed as an exclusive remedy.

14.8 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one agreement.

14.9 <u>Construction; Order of Precedence</u>. This Agreement has been negotiated by the parties and their respective counsel. This Agreement will be interpreted without any strict construction in favor of or against either Party. The original of this Agreement has been written in English, and such version shall be the governing version of the Agreement. To the extent permitted under applicable law, Supplier waives any right it may have, if any, under any law or regulation to have this Agreement written in a language other than English. In the event of a conflict between this Agreement and any other document that references this Agreement, the order of precedence shall be: (i) the most recent written document signed by the Parties amending the subject Statement of Work; (ii) the Statement of Work; (iii) any other exhibits or attachments to, or documents referenced by the Statement of Work; and (iv) this Agreement.

14.10 <u>Amendment and Waiver</u>. Unless otherwise provided herein, this Agreement may not be modified unless in writing and signed by an authorized representative of each Party. Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

C_BYTON_EDAG_V10_20_18

14.11 <u>Assignment</u>.  Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement (whether by operation of law, merger, change of control, or otherwise), without the prior written consent of the other Party, (i) to an Affiliate, or (ii) in the event of a merger, acquisition or sale of all or substantially all of the assets of a Party or a business unit. Any assignment or transfer in breach of this Section shall be void.

14.12 <u>No Rights in Third Parties</u>.  This Agreement is made for the benefit of the Parties and not for the benefit of any third party.

14.13 <u>Entire Agreement</u>.  This Agreement, including all Attachments hereto, constitutes the Parties' entire agreement with respect to its subject matter, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  No terms in any Supplier or BYTON documents (including purchase orders, acknowledgments, emails, or documents incorporated by reference (including but not limited to EDAG's or BYTON's General Terms and Conditions) which vary from, add to, modify or eliminate any terms herein, are expressly rejected and are not part of this Agreement or any Statement of Work.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives.

**BYTON NORTH AMERICA CORPORATION**

By: _____

Name: __DAVID TWOHIG_____
       (print)

Title: __VP/CHIEF VEHICLE ENGINEER__

Date: __2019-1-9_____

**EDAG Engineering GmbH**

By: _____

Name: __Cosimo De Carlo_____
       (print)

Title: __CEO_____

Date: __2018-12-18_____

By: __ppa._____

Name: __Harald Keller_____

Title: __Executive Vice President
         Vehicle Development__

Date: __2018-12-18_____

C_BYTON_EDAG_V10_20_18

ATTACHMENT 1
STATEMENT OF WORK No. 1

1) <u>Introduction</u>. This Statement of Work ("SOW") is issued under the Technology Development and License Agreement by and between BYTON and Supplier. The term of this SOW shall be from June 1st, 2017 ("SOW Effective Date") until terminated by either Party pursuant to section 9.0 of this Agreement.

2) <u>Scope and nature of development work to be performed</u>.

- EDAG_191610D000_Project Description FMC_SAV_CTC-PS (Exhibit A)
- RFQ for CTC Gateway to SOP plus 90 days (Exhibit B)
- Timing Overview for RFQ 20170706 (Exhibit C)
- FPDP_Gate_Deliverables_Full_Checklist 20170701 (Exhibit D)

3) <u>Description of Deliverables</u>.

- EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
- RFQ for CTC Gateway to SOP plus 90 days
- Timing Overview for RFQ 20170706
- FPDP_Gate_Deliverables_Full_Checklist 20170701

4) <u>Development fees and Charges</u>.

- Per page 74 of the 19610D000 Project Description
- Travel will be billed at cost + 6%

5) <u>Schedule for Development and Deliverables</u>. Supplier shall perform the following development work and deliver the following deliverables by the dates set forth below.

- Per EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
- Per the following PO's agreed to by the Parties:

| Byton PO | Topic | Order Value | SOW | BYTON Lead |
|---|---|---|---|---|
| 665 | Interim PO for Enf Services Aug 2018 | 1,850,000 € | 191610D000_Project description FMC CTC-PS | Shawn / Paul |
| 761 | Interim PO for Enf Services Sep 2018 | 1,850,000 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 866 | Material Cards Creation (S) | 170,198 € | 18826A000_Proposal creation of material cards_20170505 | Antonio |
| 942 | Engineering Services CTC-PS | 45,460,677 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 943 | Blanket Travel PO CTC-PS | 732,260 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 1512 | Battery Pack Design Sep-Dec 2017 | 137,244 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |
| 1810 | Drop tower tests Steering Column | 20,000 € | 198677A000 Steering Column Testing | Shawn |
| 1930 | EuroNCAP 2020 Study | 77,782 € | 198676A001 Investigation EuroNCAP 2020 | Paul |
| 2082 | Battery Pack Design Jan/Feb 2018 | 149,884 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |

50,448,045 €

C_BYTON_EDAG_V10_20_18

6) <u>Acceptance Criteria and Acceptance Test Plan for the Foreground Technology and Deliverables.</u>

   o   As agreed between the parties in the Proposal or otherwise as agreed in writing.

**BYTON NORTH AMERICA CORPORATION**          **EDAG Engineering GmbH**

By: _(signature)_                            By: _(signature)_

Name: DAVID TWOHIG                           Name: Cosimo De Carlo
      (print)                                      (print)

Title: VP/CHIEF VEHICLE ENGINEER            Title: CEO

Date: 2019-1-9                                Date: 2018-12-18


                                             By: _(signature)_ ppa.

                                             Name: Harald Keller

                                             Title: Executive Vice President
                                                    Vehicle Development

                                             Date: 2018-12-18

# Exhibit B

BYTON

BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA 95054

July 28, 2019

To:
**EDAG Engineering GmbH**
Att. Mr. Holger Merz
Kreuzberger Ring 40
65205 Wiesbaden
Germany

Via Email to: holger.merz@edag.com

**Letter of Confirmation**

Dear Mr. Merz:

Byton North America Corporation, Inc. ("Byton") herewith confirms the maturity and legality of the (over-) due receivables as attached hereto.

Byton herewith confirms that these dues are to be paid in full as soon as the "bridging loan" is accomplished and the funds have been received by Byton.  Byton confirms it will fulfill this payment amounting to EUR 19,779,825.21 (overdues until August 17th, 2019, interests included) before other creditors are paid.  Byton plans on fulfilling this payment latest August 18th, 2019.

Best regards,

Teresa Shi
Vice president of Finance

Tom Wessner
Senior Vice President Global Supply Chain

Attachment: Overdues to EDAG Engineering GmbH

# Exhibit C



To:

**EDAG Engineering GmbH**
Att. Mr. Cosimo De Carlo
Kreuzberger Ring 40
65205 Wiesbaden
Germany

Via Email to: cosimo.de.carlo@edag.com

Santa Clara, August 26, 2019

**Payment Plan Confirmation**

Dear Mr. De Carlo,

Thank you for taking the time to discuss our payment plan and investment status with me today. Below is a record of what we discussed:

1.) Byton and FAW have signed C-round SPA (share purchasing agreement) today.  FAW's new investment in Byton is 150M USD.

2.) Byton is also in advanced stage of finalizing agreements with other C-round investors, including Jiangsu provincial government, Nanjing city government, and some other co-investors. We will close C-round for more than 400M USD in total.

3.) The money will hit Byton account in the second half of September.

I also look forward to meeting you at the IAA in Frankfurt and staying in close contact on these matters.

Best regards

_____
Dr. Daniel Kirchert
Chief Executive Officer, Byton



To:
**EDAG Engineering GmbH**
Att. Mr. Holger Merz
Kreuzberger Ring 40
65205 Wiesbaden
Germany

Via Email to: holger.merz@edag.com

Santa Clara, August 23, 2019

**Payment Plan Confirmation**

Dear Mr. Merz,
Byton North America Corporation, Inc. ("Byton") herewith confirms the attached payment plan.
Basis for the payment plan is the signed letter of confirmation about the maturity and legality of
the (over-) due receivables from July 28, 2019.

**Payment Plan:**

| Payment Date | EUR | USD |
|---|---|---|
| Sep 20th | 1,769,911.50 | 2,000,000.00 |
| Oct 4th | 5,309,734.51 | 6,000,000.00 |
| Oct 18th | 12,700,179.19 | 14,351,202.49 |
| **Total** | **19,779,825.21** | **22,351,202.49** |

Byton commits to do everything in its power to pay whatever more it can prior to these dates;
but for planning purposes, this is the most-likely proposal.

Best regards

Dr. Daniel Kirchert
Chief Executive Officer

Tom E. Wessner
Tom Wessner
Senior Vice President Global Supply Chain

1

2

## PROOF OF SERVICE

3      I, the undersigned, am employed in the City and County of San Francisco, State of
California.  I am over the age of 18 years and not a party to this action.  My business address

4  is Lewis & Llewellyn LLP, 505 Montgomery Street, Suite 1300, San Francisco, CA  94111.
I am familiar with the office practice of Lewis & Llewellyn LLP for collecting and

5  processing documents for delivery.

6      On the date provided below, in accordance with the office practices of Lewis &
Llewellyn LLP, I served a true copy of the following document(s):

7                              **DEMAND FOR ARBITRATION**

8      The foregoing document(s) were served by the following means:

9  ☒    (**By Overnight Mail Delivery**)  I deposited the document(s) listed above in a
collection box, or else they were picked up at the offices of Lewis & Llewellyn

10  LLP, for overnight mail delivery, with delivery fees thereon fully prepaid.

11          C T Corporation System
818 West Seventh Street, Suite 930

12          Los Angeles, CA 90017

13  ☒    (**By Electronic Mail**)  I emailed courtesy copies of the document(s) listed above to
the electronic mail address(es) shown below.

14

15          Matt Barter                    Jonathan Ye
matt.barter@byton.com          jonathan.ye@byton.com

16  ☒    (**By Hand Delivery**)  I caused a copy of the document(s) to be hand delivered to the
address(es) shown below.

17

18          JAMS San Francisco Resolution Center
Two Embarcadero Center

19          Suite 1500
San Francisco, CA 94111

20          Tel: (415) 982-5267
Fax: (415) 982-5287

21      I declare under penalty of perjury under the laws of the State of California the
foregoing is true and correct.  Executed on **October 22, 2019** at San Francisco, California.

22

23                                        *Charlotte Hayward*

24                                        Charlotte Hayward

25

26

27

28