Exhibit 4

Hon. William J. Cahill (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, California 94111
Tel: 415-982-5267
sschreiber@jamsadr.com

JAMS REFERENCE NO. 1100107291

| | |
|---|---|
| EDAG Engineering GmbH,<br><br>    Claimant,<br><br>  v.<br><br>BYTON North America Corporation,<br><br>    Respondent,<br><br>———————————————————<br><br>AND RELATED CROSS-CLAIM. | **FINAL ARBITRATION AWARD** |

<u>Counsel</u>:  Evangeline A.Z. Burbidge, Marc R. Lewis, and Brad Estes of Lewis & Llewellyn LLP for Claimant; Keith Sipprelle of Van Etten Sipprelle LLP for Respondent.

<u>Arbitrator</u>: Hon. William J. Cahill (Ret.)

<u>Place of Arbitration:</u>  Remotely via Zoom.

<u>Dates of Arbitration Hearing:</u>  February 8-12, 2021 and February 16-19, 2021

<u>Date of Post Hearing Oral Argument</u>:  April 7, 2021

<u>Date of Interim Award:</u>  May 4, 2021

<u>Date of EDAG letter to Arbitrator re: Typos in Interim Order</u>:  May 11, 2021

<u>Date of Byton Letter to Arbitrator Objecting to Costs:</u>  May 11, 2021

Date of EDAG Letter responding to Byton letter Objecting to Costs:  May 18, 2021.

## I.  <u>INTRODUCTION</u>

The undersigned arbitrator, Judge William J. Cahill (Ret.) of JAMS, was appointed as arbitrator to this proceeding in accordance with Paragraph 14.4b of the Technology Development and License Agreement, which states that "[a]ny dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS")." (*See* Scheduling Order No. 7 ("SO No. 7"), ¶ 4; Joint Exhibits ("JT") 3, p. 12.) The parties further agreed that the substantive law of California shall apply. (*Id.* ¶ 6.)

The Arbitrator has considered all pleadings, testimony, and exhibits and makes the following findings of facts and law. Any discrepancy between the Arbitrator's findings and the position of the parties is the result of the Arbitrator determination of factual disputes, credibility of witnesses, relevancy of evidence, burden of proof and weight of the evidence presented.

## II.  <u>BACKGROUND.</u>

Claimant and Cross-Respondent EDAG Engineering GmbH ("EDAG") is an engineering services provider to the automotive industry. (Reporter's Transcript ("RT") 44:17-25.) Respondent and Cross-Claimant BYTON North America Corporation Inc. ("BYTON") is an electric vehicle start-up company created in 2016 for the purpose of designing, developing, manufacturing, and delivering an all-electric, battery-powered sport utility vehicle called the M-BYTE. (RT 793:2-4; 795:9-796:1.)

In November of 2016, BYTON and EDAG began working together on projects related to developing the M-BYTE. (RT 200:5-19; Ex. 216.) Effective June 1, 2018, the parties executed the Technology Development and License Agreement ("TDLA"). (Joint Exhibit ("Ex.") 3; RT 48:24-49:21, 204:4-24, 843:6-12.) Under the TDLA, BYTON was obligated to pay EDAG €50,448,045

Euros in regular, fixed installments. (Id.) In mid-2018, BYTON experienced difficulties paying EDAG under the TDLA. (RT 236:12-237:2.) BYTON caught up on amounts it owed EDAG in December of 2018, but by January of 2019, BYTON once again defaulted on payments under the TDLA. (RT 56:8-57:8, 239:19-25, 799:24-800:3, 846:14-18). BYTON stated that it could not pay due to funding issues, but informed EDAG that it was seeking C-Round investment and would pay the outstanding balance as soon as additional funding was secured. (*See, e.g*., Exs. 131, 132.) The parties suggested multiple payment plans for the amounts in arrears but BYTON never made payments under any of the plans suggested.

By August of 2019, BYTON had still not secured C-Round funding and made no further payments to EDAG after that date. (BYTON Post Arbitration Brief 5:6-9.) In October of 2019, EDAG terminated the TDLA and filed its Demand for Arbitration. EDAG alleged claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.

BYTON admits that it did not pay $28.2 million due under the TDLA but asserts that it is entitled to offset amounts owed with the costs BYTON incurred to remedied defects in certain design components delivered by EDAG. BYTON contends that EDAG's defective designs caused BYTON to incur $31 million in costs, which exceeds the amount BYTON failed to pay under the TDLA. Thus, BYTON requests that neither party receive recovery in this proceeding.[1]

EDAG maintains that there were no serious defects in its deliverables and, even if there were, the TDLA required BYTON to notify EDAG of these defects and provide EDAG with an opportunity to cure, which BYTON failed to do. Furthermore, EDAG declares that BYTON repeatedly promised to pay amounts due under the TDLA and never informed EDAG that it was withholding sums due to errors in EDAG's deliverables until after EDAG terminated the TDLA and initiated this proceeding. EDAG seeks the remaining amounts due under the TDLA plus post-

---

[1] BYTON also alleged claims for breach of contract and negligence against EDAG, but ultimately did not pursue those claims in its post arbitration brief.

judgment interest, $294,144.18 in costs, $1.4 million in attorney fees, and the issuance of an injunction preventing BYTON from selling or transferring any asset without first paying EDAG.

The Arbitrator presided over a nine-day hearing on this matter on February 8-12 and 16-19, 2021. The parties submitted post-hearing briefs to the Arbitrator on March 15, 2021, and closing arguments were heard on April 7, 2021 and the record was closed as of that date. In accordance with Scheduling Order No. 7, the Arbitrator issues this Interim Award with thirty (30) days of the close of the evidentiary record.

### A. The Terms of the TDLA

Under the TDLA, EDAG agreed to design and deliver certain components of the M-BYTE to BYTON. (Ex. 3 at 3, 15, 23, 24, 51, 53, 55, 58-59, 61-62; Tr. at 714:10-15, 1107:8-1108:25.) EDAG was not obligated to build the components it designed, but rather to deliver "virtual" or "soft" electronic intellectual property data. (Ex. 3 at 23-24; RT 495:4-21, 816:23-817:14, 1024:1-6.) Gateway deliverables, or certain steps in the program that needed to be fulfilled at a certain time to be able to launch the car, were set forth in the TDLA. (RT 207:6-11, 207:24-208:5; Ex. 3, p. 15.) BYTON had the authority and responsibility for signing off on milestones. (RT 208:19-21, 1115:15-1116:2.)

In exchange for EDAG's work, BYTON agreed to pay a fixed price of approximately €50 million, broken into monthly payments. (Ex. 3, p. 15.) EDAG was required to correct any errors or deficiencies in the components EDAG delivered without additional compensation. (*Id.*; RT 209:5-25, 805:25-806:12.)

Section 4.2 of the TDLA set forth the "Acceptance Procedure" for EDAG's deliverables. BYTON had the "sole discretion" to reject deliverables "or any component thereof" if the deliverables contained "any Error." (Ex. 3, §4.2.) Upon EDAG's delivery of a component, BYTON was required to "promptly notify" EDAG in writing of its "acceptance or rejection." (Id.) If BYTON issued an "Error Notice," BYTON was required to "set forth, in reasonable detail,

4

the reason for the rejections." (Id.) Upon BYTON's rejection of a deliverable, EDAG was

required to either create and implement an Error Correction within three days of the Error Notice

or, if three days was impractical, provide a Correction Plan within three days. (Ex. 3 at 2, 5.)

     If EDAG's Error Correction in response to a defect failed or if the parties could not agree

on a Correction Plan, BYTON had four options under the TDLA: BYTON could, in its "sole

discretion," (1) require another Error Correction, (2) accept the deliverable and offset BYTON's

reasonable costs, (3) accept the deliverables and reserve BYTON's right to require correction, or

(4) deem the event a material breach and immediately terminate the TDLA. (Ex. 3 at 5.)

     Under Section 9.2, if EDAG failed to comply with any material term of the TDLA,

BYTON could terminate the TDLA following written notice specifying the breach and a cure

period. BYTON was further able to terminate the TDLA, without a cure period, if EDAG failed to

comply with certain obligations. (Ex. 3 at 7.)  Under Section 9.4, BYTON was also permitted to

terminate the TDLA without cause upon 30 days prior written notice to EDAG. (Ex. 3 at 8.)

     If BYTON accepted a deliverable "in accordance with Section 4.2," EDAG was required

to provide an invoice to BYTON, upon which BYTON was required to pay the invoice "within

either [sic] sixty (60) days following BYTON's receipt of such invoice." (*Id*. at §7.1.) If BYTON

terminated the TDLA, EDAG was entitled to receive "all payments in accordance with agreed

payment plans/fee schedule for already initiated work at the time [EDAG] received notice from

BYTON" of the termination. (*Id.* at §9.5.)

### B. The Parties' Performance under the TDLA

     Initially, the project moved forward without issue. EDAG met the gateways set forth in the

TDLA and BYTON signed off on EDAG's designs using Engineering Release Authorizations

("Releases").  (*See, e.g.,* Ex. 102.) When BYTON signed off on a Release, the virtual data

designed by EDAG was approved and the production of the tools would commence. (RT 260:25-

261:18, 331:1-9.) BYTON's engineer testified that the Release process, under which all necessary

BYTON stakeholders would review the requirements and obligatory specifications to ensure they were met, was implemented to alleviate as many problems as possible before the production of tools because cutting tools is expensive. (RT 749:23-24, 750:1-16, 752:5-18.) Hundreds of Release forms were authorized by BYTON and by August of 2018, a prototype of the M-BYTE was tooled. (Ex. 161.)

Initially, BYTON also paid EDAG's invoices. BYTON reviewed EDAG's invoices after deliverables were received, asked questions, sought adjustments, and escalated questions to EDAG when it "couldn't judge the quality of the deliverable." (RT 235:12-15, 361:20-24, 365:5-13, 681:17-682:20, 728:14-729:8, 739:10-20, 836:3-6, 841:2-7.) BYTON's Mr. Slovesko was responsible for approving EDAG's invoices from 2017 until he left BYTON in 2020. (RT 784:17-21). Mr. Slovesko testified that when quality of work issues arose regarding an EDAG invoice, he would escalate the issue to EDAG employees Volker Amelung or Kai Uwe-Salzmann, and EDAG would investigate and make efforts to improve or fix the design. (RT 683:17-684:25.) Mr. Slovesko stated that he reviewed invoices carefully for accuracy and signed off on only accurate invoices. (RT 739:21-740:8). At least two individuals from Mr. Slovesko's team also reviewed invoices before he signed them and any corrections to invoices occurred shortly after BYTON received and reviewed them. (RT 228:10-13, 741:12-19.)

After Mr. Slovesko approved an invoice, he would send it to David Twohig, BYTON's Chief Vehicle Engineer/Chief Technical Officer. (RT 729:9-17, 740:10-20.) Mr. Twohig signed off on invoices after speaking with managers and confirming that they were reasonably satisfied with the services provided. (RT 627:4-21, 729:19-23.) Performance Documentation, or multi-page summaries of the work EDAG had performed in connection with the invoice, accompanied every EDAG invoice and had to be signed by BYTON as part of the invoice approval process. (RT 230:22-232:7, 233:16-24, 363:24-364:1, 364:19-23.) If adjustments or modifications were needed, EDAG and BYTON's Supply Chain team would discuss and BYTON and EDAG would work out

an appropriate solution. (RT 742:13-743:2.)

EDAG stated that it interpreted BYTON's approval of invoices as BYTON's approval of EDAG's deliverables, which EDAG stated was standard practice in the engineering services industry. (RT 395:14-16, 902:24-903:8, 903:9-15, 1106:6-15, 1125:12-1126:13.) BYTON's witnesses testified that if BYTON signed a Performance Document, it meant BYTON had approved it. (RT 753:4-12.) Ultimately, all EDAG invoices issued to BYTON were approved by BYTON. (RT 226:1-6, 226:11-21, 227:22-228:9, 228:22-25, 366:13-15, 841:2-13.) Even after BYTON stopped paying EDAG's invoices, BYTON continued to review, sign, and approve each of EDAG's invoices. (RT 239:9-18.)

### C. BYTON Fails to Pay EDAG Invoices

BYTON employee Mr. Sadha Kameswaran testified that in 2019, BYTON needed additional funding but was having difficulties obtaining it due to the "perfect storm" of strained foreign relations between the US and China, bureaucratic changes within the Chinese government that slowed approvals of funding from Chinese investors, and shutdowns in response to the COVID-19 pandemic. (RT 799:24-801:15.) BYTON also stopped paying the installments due to EDAG under the TDLA.

When EDAG demanded payment, BYTON informed EDAG that it could not make the payments because of funding issues and repeatedly promised that it would pay all outstanding amounts due as soon as it secured additional financing. (RT 54:15-22, 55:5-12, 56:19-25, 79:2-9, 142:25-143:23, 169:14-18, 275:7-15, 275:19-21, 368:2-369:15, 516:7-10, 638:13-639:15, 832:12-14, 846:3-13, 854:3-10, 1124:4-25.) BYTON never informed EDAG that it was withholding payment because of EDAG's engineering errors. (RT 55:5-12, 57:1-4, 0:24-71:3, 78:12-15, 78:21-79:1, 832:22-833:1, 854:3-10, 888:24-889:1.) While the parties operated under the TDLA, BYTON never requested a reduction, discount, offset, or write off from EDAG's invoices due to engineering errors. (RT 57:1-4, 60:21-23, 63:16-18), 65:9-11, 68:2-4, 70:1-3, 70:24-71:3, 72:19-22, 78:16-20,

370:4-12, 395:11-12, 628:9-12, 629:15-23, 637:7-18, 855;18-21, 918:18-22, 1125:1-3.)

Beginning in March of 2019, BYTON and EDAG exchanged a series of emails and letters regarding BYTON's payment issues. None of these communications indicated that BYTON believed EDAG's deliverables contained engineering errors. In late March of 2019, EDAG's Executive Vice President Vehicle Engineering, Harald Keller, emailed Daniel Kirchert of BYTON, requesting that BYTON immediately pay "6,738 Mio EUR" in outstanding payments from invoices dating back to November of 2018. (Ex. 131.) In mid-April of 2019, BYTON apologized for its delay in making payments, stated that it "fully intend[ed] to catch up and return to normal payment conditions as soon as we close our C-round of funding," and proposed a payment plan under which BYTON would make weekly payments of $500,000 USD to EDAG. (*Id*.; RT 59:16-61:1.) When EDAG insisted that BYTON instead pay $1 million weekly, BYTON responded that its "cash position" had "only worsened since our last proposal" and that until BYTON's C-round of funding closed, it was "very unlikely that BYTON will even be able to make the US$500k per week payment plan that we proposed to EDAG on April 13th." (JT 132.) Nonetheless, BYTON affirmed that:

> We absolutely intend to fully pay for the services that EDAG has provided when the C-Round closes. We will also make partial payments when cash becomes available as close as we can to either or our proposals. We appreciate all that EDAG has done, and continues to do, for the success of BYTON. Nevertheless, BYTON will respect EDAG's possible choice to limit its exposure by reducing its support to BYTON until we recover from our present financial constraints.

(*Id*.) In closing, BYTON thanked EDAG for its "patience and trust" in BYTON. (RT 62:12-23; Ex. 132.)

Three months later, BYTON emailed EDAG, stating that there were "recent developments around our . . . funding that are looking more promising, as we are ever closer to closing our C-round, plus have some bridge financing and other potential major funding sources that look very promising." (Ex. 146; RT 63:25-64:5.) BYTON stated that its "first intent" was "to

completely clear our arrears and restart this program," and stated that there was "a good chance that this will be the path shortly." (*Id.*) Regarding the payment plan, BYTON stated: "[i]f BYTON must continue to conserve cash, but we have enough to follow your prior payment proposal, then we will follow that." (*Id.*) Again, BYTON stated that the "the patience and support that EDAG" continued to give to BYTON was "GREATLY appreciated." (*Id.*)

Later that month, BYTON agreed to confirm the "maturity and legality of the (over-) due receivables" and promised to pay €19,889,825.21 on or before August 18th, 2019. (RT 148:24-149:3, 149:6-12, 847:10-20, 850:22-851:7; Exs. 147, 151.) However, BYTON did not pay EDAG on August 18, 2019. Instead, BYTON informed EDAG that it experienced a delay in the deposit of the first tranche of bridge financing and proposed a revised payment plan. (Exs. 156, 157; RT 152:15-17, 851:8-10, 852:7-22.) EDAG rejected BTYON's proposed payment plan. (Ex. 156.)

On August 19, 2019, BYTON stated that it was "arranging 2M USD to be sent to you this week as soon as possible while the remaining 6M will be sent to you early September as soon as our funds hit our overseas account." (Ex. 157.) These payments were never made. (RT 157:9-14). Instead, BYTON sent EDAG another revised payment plan. (Ex. 162; RT 158:18-25, 159:18-24, 854:11-21, 854:23-855:3). BYTON also informed EDAG that BYTON was able to build a prototype in Nanjing and "was pleasantly surprised to see how good the quality was" on the parts. (Ex. 161.) BYTON stated that its accomplishment:

> . . . would not have been possible without all of the help and support that you have given to myself and my team over the past 3 years. Thank you! My hope is that you feel just as proud of this accomplishment as I do. There is still a lot of hard work ahead to achieve the quality level required to be competitive at SOP with the German brands as well as Nio and Tesla. Your continued support will be a big factor for us to get there.

(*Id.*)

On August 26, 2019, BYTON informed EDAG that it had obtained $150 million in C-round funding, was "in advanced stage of finalizing agreements with other C-round investors" for an additional $400 million, and that funds would "hit Byton account in the second half of September"

9

2019. (Ex. 163; RT 65:14-66:3, 66:23-67:14).

In early September of 2019 EDAG informed BYTON that it:

. . found a way not to start writing off the project yet. I think we can hold through it for the month of September without a stoppage. I will reduce the cost as much as I can during this time without sacrificing the basics. So your hope that we continue through the month of September is still in place now. I hope the time is sufficient for Byton to close the C-Round, get the funds and pay and return to normal business within the month of September.

(Ex. 166.) BYTON responded:

. . you guys have been our partners in the true sense of the word from Day One and we thank you for that. Do whatever you need to do as a business to protect yourselves - if you need to pull out the whole team we will *fully* understand. If you can see your way clear to leaving a 'skeleton crew' to help out Shawn in particular, we will consider that a great bonus and a great help. We *will* get the money, as we have a superb product, but we all need a lot of patience now. We will keep you informed through September and believe me, you will know if and when we have good news as you'll probably hear the cheers from Santa Clara from where you are sitting - without needing the telephone!

(*Id.*)

BYTON continued to represent to EDAG that it was close to closing additional funding that would resolve BYTON's financial issues and allow BYTON to become current on its payments. (RT 1126:14-1127:21.) BYTON also continued to acknowledge the amounts it owed to EDAG and never requested an offset. (*See, e.g.,* Ex. 177; RT 75:19-77:3, 77:12-78:1, 146:23-147:5, 147:23-25.) Although an internal BYTON email (inadvertently copied to EDAG) stated that BYTON could pay EDAG "1-1.5M" in September of 2019, BYTON paid no additional amounts due after August of 2019. (Ex. 172; RT 68:12-18, 69:23-25, 162:25-163:8, 858:25-859:6, 859:7-22.)

EDAG testified that because BYTON represented that it could not pay due to funding issues, and never stated that the quality of EDAG's deliverables was a reason for BYTON's non-payment, EDAG expected that its work on the M-BYTE would continue into 2020. (RT 370:13-371:5, 745:5-8; 747:17-748:2), 748:4-8, 748:11-20, 764:23-765:4.)

Ultimately, EDAG terminated the TDLA and filed an arbitration demand against BYTON in October of 2019, asserting claims for breach of contract and breach of the covenant of good

faith and fair dealing due to BYTON's failure to pay EDAG's overdue invoices and for BYTON's bad faith and unfair inducement of EDAG's work. On November 19, 2019, BYTON filed its response and cross-claims, asserting a claim for breach of contract and for negligence, alleging that EDAG committed substantial engineering errors in its work on the M-BYTE.

## III. <u>ANALYSIS</u>

### A. *EDAG's Breach of Contract Claim*

To establish its claim for breach of contract, EDAG must prove that: (1) BYTON and EDAG entered into a contract; (2) EDAG did all, or substantively all the significant things that the contract required or that EDAG was excused from performance; (3) BYTON failed to do something the contract required it to do; (4) EDAG was harmed; and (4) BYTON's breach of contract was a substantial factor in causing EDAG's harm. (*See* CACI 303.)

It is undisputed that BYTON and EDAG entered into the TDLA under which BYTON agreed to pay EDAG a flat rate of €50,448,045 Euros. It is also undisputed that BYTON did not pay the full amount due under the TDLA. However, BYTON contends that EDAG's engineering errors breached the standard of care in the industry, *i.e.*, the "knowledge, skill, and care ordinarily possessed and employed" by automotive engineers. (*Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997-98 (1994).) BTYON contends that it incurred "roughly 20% additional work" or approximately $31 million, in costs to "heavily 'rework' the design[s]" delivered by EDAG. (Exs. 206, 208, ¶12.) Because BYTON's estimated offset exceeds the amount due to EDAG under the TDLA, BYTON requests that the Arbitrator determine that neither party is entitled to recovery.

#### 1. *EDAG's Performance*

##### a. *Front Engine Compartment*

The primary engineering deficiency that BYTON claims accounts for $31 million in damages, and which BYTON asserts as its justification for an offset to EDAG's damages, is the design of the front or "under hood" area of the M-BYTE. BYTON maintains that the front

compartment of the electric car (where the engine would be placed) was "inadequate, with fundamental items not correctly packaged (most notably, the design lacked a front motor that was required for the all-wheel drive version of the vehicle)." (BYTON Resp. and Cross-Claims at 6.)

In support, BYTON submitted the Declaration of David Twohig, BYTON's former Chief Vehicle Engineer/Chief Technical Officer. Mr. Twohig declared that:

> The key item where EDAG underperformed was . . . in fundamental engine bay/front-end packaging. The errors in basic layout of items like the 12V battery, omission of the front traction motor, and other errors associated with crash protection, obliged the BYTON teams to re-engineer the engine bay area not once, but twice. The initial layout was so poor that the redesign had to be undertaken in two steps (Step 1 from pre-APP to AP, and an additional correction step from AP to VP). Conservatively estimating the cost of engineering an engine compartment of this complexity 'from scratch' at $156 million approximately, BYTON incurred roughly 20% additional work (or the equivalent of approximately $31 million) in having to heavily "rework" the design *(ie.*, re-design, prototyping, testing, tooling, etc. for BYTON employees as well as various suppliers).

(Ex. 208, ¶12.) Mr. Twohig affirmed his declaration in deposition testimony and stating that the quality of EDAG's work on the front engine bay fell below the standard of care of the industry. (RT 583:5-11.)

BYTON also read into the record the deposition testimony of Shawn Slovesko, a former BYTON employee who led the vehicle development activities for body structures, closures, exteriors, interior trim, restraints and airbags. (RT 666:14-667:5.) Mr. Slovesko reviewed Mr. Twohig's Declaration and stated that he agreed with Mr. Twohig's description of the engineering problems BYTON had with EDAG's deliverables. (RT 709:24-710:12.)

EDAG submitted the testimony of EDAG employee Volker Amelung and engineering expert Dave McLellan to contest BYTON's claims that EDAG's design of the front-end packaging contained serious engineering errors. (RT 949:19-25, 1059:20-1060:21; Ex. 178 at 2-3.) Mr. Amelung submitted a demonstrative indicating that the front motor bay development was complex, iterative, and required inputs from many others aside from just EDAG. (Ex. 223; RT 965:25-969:9.) BYTON had input on where the 12-volt battery was placed and approved the design as of

February 2018. (RT 922:25-923:6.) Mr. Amelung testified that he spent two weeks searching for evidence that EDAG positioned the 12-volt battery beneath the HVAC unit, only to find nothing. (RT 919:23-921:2.)

   EDAG also submitted evidence of a BYTON presentation created one month before EDAG allegedly misplaced the 12-volt battery that indicates that the 12-volt battery was not buried under the HVAC unit. (Ex. 30; RT 391:19-24, 921:3-4, 921:25-922:24.) Additionally, Mr. Kameswaran, who testified as BYTON's most qualified witness, stated that BYTON was not aware of any identifiable issues with the packaging of the front hood area in existence at the time EDAG stopped the project in 2019. (RT 871:19-24.) Lastly, EDAG presented evidence indicating that both before and after Mr. Twohig joined BYTON, BYTON approved EDAG's work regarding the front-end packaging. (RT 944:10-15).

   BYTON produced no contemporaneous documentary evidence to support its claim that it encountered significant problems with EDAG's front end design, which EDAG failed to fix and thus required BYTON to spend $31 million to redesign. (RT 962:8-17). The only evidence that BYTON presented in support of its claim is Mr. Twohig's Declaration and deposition testimony and a document stating that a "Top Down Estimate of Re-Engineering Costs Incurred through Inadequate Initial Engine Bay" indicates that an "[a]pproximation of 'rework' costs incurred to redesign twice - from pre-AP to AP and again from AP to VP = 20% additional "effort" is $31 million. (Ex. 206.)

### b. Other Defects

   The second error raised by BYTON was that EDAG's "design contained some fundamental errors in the high-voltage battery/floor systems interfaces" and that the design of the battery enclosure was lacking. (BYTON Resp. and Cross-Claims at 6.)

   EDAG states that its initial design for the battery enclosure utilized weld nuts but that BYTON manufacturing wanted to use cage nuts/swim nuts instead. Mr. McLellan, EDAG's

expert, testified that EDAG's original solution was a competent proposal and both the BYTON and EDAG engineering teams agreed that weld nuts would work perfectly. (RT 1062:14-1063:18, 1063:20-1064:4.) Furthermore, BYTON's witnesses agreed that EDAG's ultimate design solved any issues BYTON had with the battery enclosure. (RT 758:4-18, 758:20-25, 876:21-24, 877:6-10, 993:24-994:10, 994:11-13, 1063:20-1064:4; Ex. 178 at 4-5.)

The third error BYTON raised was that "the A-pillar in the EDAG design did not meet basic legal vision requirements." (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that it corrected the A-pillar issue, at no cost to BYTON, and BYTON admitted that in the most recent EDAG design before the project was terminated, there were no deficiencies in the A-pillar. (Ex. 84; RT 876:15-19, 958:1-14, 995:2-9; 956:4-957:25, 1064:6-24, 1065:11-18.)

The fourth claimed error was that "the front door in the EDAG design lacked adequate system engineering for the door swing (creating interference with the front fender)." (BYTON Resp. and Cross-Claims at 6.) Mr. Twohig asserted that a custom hinge was required due to interferences in the door swing. (RT 759:10-20, 959:17-960:15, 995:15-21.)

EDAG submitted evidence that there was, indeed, a problem with the door swing, but the problem was caused by the lower section of the fender. (RT 875:23-876:2, 960:16-961:23, 995:22-24.) EDAG corrected the issue for approximately $6,000 and BYTON signed off on the cost without complaint. (RT 961:24-962:1, 995:25-996:3.) EDAG's engineering expert, Mr. McLellan, reviewed the documentation and determined that there was interference with the fender in EDAG's design, EDAG proposed a solution, and the solution resolved the problem. (RT 1065:20-1066:21.) BYTON confirmed that at the time EDAG stopped the project, the EDAG design did not have deficiencies in the front door. (RT 875:14-17.)

The fifth error raised by BYTON was that "the front of the vehicle in the EDAG design lacked adequate system engineering to achieve the documented targets between PedPro and other system performance requirements;" BYTON asserts that EDAG should have used a steel hood

instead of an aluminum hood. (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that it originally proposed that BYTON use a steel hood, but EDAG changed the hood to aluminum, at BYTON's request, so that the M-BYTE would achieve a Five Star rating for its Pedestrian Protection system. (RT 398:6-13, 925:1-23, 925:1-23, 927:17-928:13, 1060:23-1062:1.) Mr. Amelung testified that the hood was ultimately changed to steel because of requirements from BYTON's styling department. (RT 558:5-8, 702:18-703:2, 996:13-997:21.) In any event, the evidence indicates that hood deficiencies were corrected by the time the project was terminated. (RT 873:2-7.)

The sixth claimed error is that the front and rear bumper systems lacked adequate system engineering to achieve targets between low-speed bumper compliance and other system performance requirements. (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that changes to bumper compliance were due to conflicting requirements from BYTON's styling department and the legal safety requirements; low-speed bumper compliance creates a stiffer bumper, whereas pedestrian protection requires a softer bumper system. (RT 998:1-1000:3, 1069:3-16.) BYTON failed to produce evidence that changes to bumper compliance caused BYTON to incur additional costs due to late tooling. (RT 998:1-1000:3.)

The seventh error claimed by BYTON is that the M-BYTE's lift gate system design was inefficient and could not meet entry-level luxury vehicle appearance requirements. (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that changes to the lift gate system design were the result of competing requirements from BYTON's styling and engineering departments (BYTON's styling department wanted a heavier lift gate than did engineering.) (RT 1000:8-1002:13.)

EDAG also submitted evidence that BYTON requested styling of the tailgate created an over slam issue on the tailgate to body interface. (RT 1069:17-1071:9.) BYTON utilized spot welding, which is less expensive than laser welding, and which resulted in a bigger gap between

the tailgate and the body of the vehicle. (RT 1002:14-1003:2, 1069:17-1071:9.) The evidence indicates that the over slam issue was not the result of an engineering error, but a result of decisions BYTON made when they styled the car. (RT1071:10-1072:3.) Regardless, BYTON signed off on the final lift gate. (RT 1003:3-6.)

The eighth error raised by BYTON is that the front and rear center console system in the EDAG design were inefficient and infeasible to manufacture, leading to a late design "freeze." (BYTON Resp. and Cross-Claims at 6.) The evidence indicated that EDAG's design of the center console required high strength steel to make the console stiff enough so that the customer could not move it. (RT 1003:22-1005:15, 1120:4-9.). BYTON was unhappy with the costs and changed the specifications, lowering the stiffness requirement, so that high-strength steel would not be required. (RT 1003:22-1005:15.) BYTON also changed suppliers and added more features and components, which required further design. (*Id.*) EDAG submitted evidence that it worked with the new supplier and successfully redesigned the center console to BYTON's new requirements. (*Id.*) Mr. Slovesko's testified that the center console issue was addressed with EDAG at the time he raised it or shortly thereafter. (RT 743:4-11; *see also* Ex. 196.) Mr. Slovesko also testified that the center console was not tooled prior to the project's termination. (RT 757:5-16.)

### c.  *Impact of Alleged Defects on EDAG's Performance*

As detailed above, EDAG was required to provide design components to BYTON under the TDLA for a fixed cost of  €50,448,045 Euros. If there were errors or other issues with EDAG's deliverables, the TDLA set forth procedures under which BYTON could reject the deliverables and require EDAG to cure the defects. BYTON admitted that it never availed itself of those procedures. BYTON never issued any "Error Notices" and never rejected EDAG's invoices. Additionally, in the only communications between the parties that were admitted into the record, BYTON repeatedly admitted that it owed EDGA the remaining amounts due under the TDLA and that the only reason it did not pay was because BYTON lacked the funds. There is no evidence that

BYTON ever raised the issue of EDAG engineering errors as a justification for reducing the amounts BYTON owed to EDAG.

BYTON admits that it never issued any "formal" Error Notices to EDAG but asserts that its failure to do so does not mean that BYTON accepted EDAG's deliverables. Because EDAG's deliverables were "soft" intellectual property, BYTON maintains that it could not finally accept any deliverable until it had been fully vetting via validation testing. The project was terminated before validation testing occurred, however, and thus, according to BYTON's logic, it would *never* be able to finally "accept" EDAG's deliverables. (RT 820:20-821:2.)

Under §4.2 of the TDLA, BYTON was required to "promptly notify" EDAG "in writing of BYTON's acceptance or rejection" of a deliverable. (Ex. 3, p. 5.) Upon receipt of a rejection notice from BYTON, EDAG was obligated to create an Error Correction within three (3) workdays or provide BYTON with a "written plan to correct the identified Error." (*Id*.) Before BYTON had the right to deem any error "a material breach" of the TDLA and demand a refund of "any fees that have been paid" the defective item, BYTON was required to allow EDAG an opportunity to implement an Error Correction or to work with BYTON to develop a "Correction Plan." (*Id*.) BYTON's admission that it never implemented the "Acceptance Procedures" under §4.2 for any of the eight errors it raised indicates that BYTON cannot rely upon these errors as evidence that EDAG did not substantially perform under the TDLA.

Because BYTON failed to comply with the rejection procedures set forth under §4.2 of the TDLA, BYTON failed to demonstrate that EDAG failed to perform under the TDLA.

### 2. *BYTON's Breach and EDAG's Resulting Damages*

There is no dispute that BYTON failed to pay the full amount due to EDAG under the TDLA.

EDAG seeks payment of its overdue invoices as stated in the August 23, 2012 payment plan (€ 19,779,825.21) plus total amounts due under four outstanding invoices issued thereafter

(€4,151,073), or €23,446,649.00. EDAG further requests statutory prejudgment interest of 10% compounded annual as of August 23, 2019. The total amount of interest-related damages sought by EDAG is €2,719,367.00.

### a. BYTON's Request for Off-Set

BYTON seeks to offset EDAG's damages by $31 million to account for BYTON's claimed damages resulting from EDAG's purported failure to deliver an acceptable front compartment/engine bay.

As discussed above, BYTON's damages for rejected deliverables, if BYTON had triggered §4.2 of the TDLA, would be limited to the right to a cure from EDAG or the right to a refund of fees paid for defective deliverables. BYTON does not request a refund of the fees EDAG charged for the front engine compartment. BYTON requests that EDAG pay for *BYTON's* costs to design an alternative front engine bay compartment. Even if BYTON had properly invoked the "Acceptance Procedure" under §4.2 in response to the alleged defects in the front compartment, BYTON would not have the right to obtain the damages it claims.

Even if the TDLA could be interpreted as allowing BYTON to recover its costs to redesign defective components, BYTON failed to submit evidence sufficient to prove that BYTON did, in fact, incur $31 million in such costs.

Damages must be proved "with a reasonable degree of certainty." (*Automatic Poultry Feeder Co. v. Wedel*, 213 Cal. App. 2d 509, 516 (1963).) "[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." (*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1132 (2012) (quoting *Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (Ct. App. 1963)); *see also* Civ. Code § 3301 ("No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.").)

Mr. Twohig, BYTON's sole expert on "costs," testified that it would be "pure speculation" for him to offer testimony on the cost of any errors aside from the engine bay. (RT 571:19-572:4, 655:11-16.) With regard to the costs incurred to redesign the engine bay, the only document BYTON produced in support of its claimed costs is a chart created by Mr. Twohig in which he estimates, or provides an approximate guess, as to the costs BYTON incurred.[2] (Ex. 206; RT 877:23-878:1.) No other BYTON witness could substantiate or support Mr. Twohig's estimate. (*See, e.g.,* RT 770:21-24 (could not opine on accuracy of $31 million damages estimate), 877:11-18 (not personally involved in creation of damages estimate).)

BYTON did not provide any underlying documents to support Mr. Twohig's one-page damages estimate. BYTON's most qualified witness on damages, Mr. Kameswaran, did not know which documents were used to pull together Mr. Twohig's estimate. (RT 880:25-881:12.)

BYTON also asserted that EDAG's engineering errors caused BYTON to be delayed in getting the M-BYTE to market, but BYTON offered no testimony or documents to quantify the delay attributable to the purportedly defective engineering errors. (RT 799:24-801:15, 870:1-17 (M-BYTE delayed due to "perfect storm" of factors having nothing to do with EDAG).)

BYTON failed to prove that it was entitled to a $31 million offset of EDAG's damages.

### b. *EDAG's Request for Compound Interest as of August 23, 2019*

California Code of Civil Procedure §3287(a) states that a "person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." If a party "is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated," that party may "also recover interest thereon from a

---

[2] BYTON conceded it has no evidence of any amount of damages for five of its eight claimed engineering errors in the following areas: errors in the high-voltage battery/floor systems interfaces, the A-pillar, the system engineering of the front door, the system engineering of the front and rear bumper systems, and the design of the lift gate system. (*See* RT 558:9-12, 656:22-657:4, 567:7-12, 569:11-15, 571:11-18, 860:13-21, 861:8-12, 862:11-15, 863:22-864:1, 864:18-22, 865:14-25, 866:13-19, 874:14-19.)

date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." Cal. Code of Civ. Proc. §3287(b). The test for determining "certainty" is whether the defendant knows the amount owed or could have computed the amount from reasonably available information. (*Wisper Corp. v. California Commerce Bank,* 49 Cal.App.4th 948, 960 (1996).) However, where the amount of damages is in dispute (*e.g.*, cannot be resolved except by verdict or judgment), an award of prejudgment interest is inappropriate. (*Id.*) In *Iverson v. Spang Industries*, 45 Cal.App.3d 303 (1975), a landlord sued a former tenant for damages to the rented premises. (*Id.* at 306-307.) The tenant disputed the cost of repair. (*Id.*) The court ruled that the landlord was entitled to damages as of the date of judgment because the amount owed by the tenant was not certain until the court determined the parties' dispute over the costs of the repairs:

> It is established that under section 3287 of the Civil Code, "... interest cannot be awarded prior to judgment when the amount of damages cannot be ascertained except on conflicting evidence. [Citations.] The rationale of such rule is that where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it.

*(Id.* at 311.)

The amount BYTON owed under the TDLA was uncertain until the Arbitrator determined the parties' dispute over EDAG's deliverables under the TDLA. Thus, EDAG is entitled to recover statutory interest at of the date of the issuance of this Interim Award.

BYTON contends that EDAG is entitled to interest of 6%, not 10%, because the parties agreed to a 6% interest rate for payments under the proposed payment plan of August 23, 2019. But EDAG did not sue to enforce the payment plan. EDAG sued to enforce the TDLA, which does not specify an interest rate for prejudgment interest. Therefore, Code of Civil Procedure §3287 applies and EDAG is entitled to the statutory rate of 10%.

Lastly EDAG seeks compound interest. Code of Civil Procedure §3287 provides for simple interest and EDAG has demonstrated no reasonable basis for its request to obtain 10% interest under §3287 that is compounded as of the date of the proposed August 23, 2019 payment plan.

EDAG is entitled to simple interest at the rate of 10% as of the date of this Interim Award.

### B. EDAG's Claim for Breach of the Covenant of Good Faith and Fair Dealing

To prevail on its claim for breach of the covenant of good faith and fair dealing, EDAG must prove: (1) BYTON and EDAG entered into a contract; (2) EDAG did all, or substantively all the significant things that the contract required or that EDAG was excused from having to perform certain other requirements due to BYTON's failure to pay; (3) all conditions for BYTON's performance occurred; (4) BYTON frustrated EDAG from receiving the benefits due under the contract; (5) by doing so, BYTON did not act fairly and in good faith; and (6) EDAG was harmed by BYTON's conduct. (*See*, CACI 325.)

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." (*Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 349-350 (2000).) The "covenant . . . requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes." (*Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013).) "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." (*Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 291 (2019), *reh'g denied* (Sept. 26, 2019).)

As discussed above, there is no dispute that the parties entered into the TDLA and although EDAG's performance was not without issue, the weight of the evidence indicates that EDAG substantially performed under the TDLA.

EDAG argues that BYTON frustrated EDAG's ability to obtain its benefits under the TDLA because when BYTON failed to pay EDAG, BYTON praised EDAG's work and promised to make

payment as soon as additional funding came through. EDAG argues that BYTON enticed EDAG to continue to perform and forgo exercising its right to terminate the agreement. BYTON's behavior was egregious, according to EDAG, because even after promising that it would pay EDAG whatever sums it could, BYTON failed to pay EDAG $1.5 million in 2019 when BYTON had sufficient cash on hand to do so. (*See* Ex. 172.)

Lastly, EDAG maintains that BYTON's defense in this proceeding demonstrates BYTON's bad faith. BYTON claims that EDAG's deliverables contained such significant errors that BYTON was forced to spend more than half the amount BYTON owed EDAG under the TDLA to remedy the defects. BYTON also claims that it was aware of these defects as early as 2018, but BYTON never implement the procedures under the TDLA to notify EDAG of the errors. Although BYTON claims that it discussed the errors with EDAG in oral communications, these significant engineering errors were never mentioned in written correspondence or in documented in-person meetings. As late as January and February of 2020, after BYTON filed its counterclaims, BYTON had still not informed EDAG that it believed BYTON was owed an offset for the alleged engineering errors.

EDAG seeks its attorney fees incurred to collect on the amounts BYTON owes under the TDLA as an appropriate measure of the harm EDAG suffered from BYTON's breach of the covenant of good faith and fair dealing.

A close examination of the communications between the parties indicates that EDAG cannot meet its burden of proving BTYON promises to pay under the TDLA constitute bad faith, or that BYTON misled EDAG into continuing to perform under the TDLA. As early as first quarter 2019, BYTON informed EDAG that it could not pay contractual installments because it needed more funding. (*See*, Ex. 131 ("We sincerely apologize for our delay in payments and fully intend to catch up and return to normal payment conditions as soon as we close our C-round of funding.")) BTYON clearly communicated that the future of the project was dependent on whether BYTON succeeded in obtaining more funding. On April 30, 2019, in response to EDAG's demand

that BYTON pay €1 million per week to catch up on amounts in arrears, BYTON's Tom Wessner responded:

> I wish that we were able to respond favorably to your request, however, Byton's present cash position has only worsened since our last proposal. Frankly speaking, until the C-Round is closed and funded, it is very unlikely that Byton will even be able to make the US$500k per week payment plan that we proposed to EDAG on April 13th.

(Ex. 132.) On September 1, 2019, BTYON informed EDAG that BYTON had:

> . . . put a moratorium on issuing new POs due to Byton's present financial situation. When the C-round closes, and additional funding comes in, we will get back to regular business practices and we will be able to then issue POs. This is the present situation.

(Ex. 166.)

Although BYTON expressed optimism to EDAG regarding its ultimate ability to obtain C-Round funding and pay amounts owed, BYTON made it clear to EDAG that its ability to continue with the M-BYTE project was contingent on whether BYTON's financial condition improved. (*See, e.g.*, Ex. 166 (*emphasis added*), "[w]e will get the money, as we have a superb product, but we all need a lot of patience now. We will keep you informed through September and believe me, you will know *if and when* we have good news.") As a large, sophisticated, multinational organization, EDAG knew or should have known that its decision to continue working with BYTON carried a significant risk. BYTON acknowledged the difficult choice that EDAG had to make with regards to EDAG's participation on the project, informing EDAG that it did "not fault EDAG for managing its risk." (Ex 146.) In early September of 2019, Mr. Twohig told EDAG to:

> Do whatever you need to do as a business to protect yourselves - if you need to pull out the whole team we will fully understand. If you can see your way clear to leaving a 'skeleton crew' to help out Shawn in particular, we will consider that a great bonus and a great help.

(Ex. 166.)

EDAG's objection that BYTON did not pay EDAG $1.5 million in 2019 also fails to demonstrate bad faith as BYTON had other obligations, including payroll expenses to employees, competing for its limited funds. Although BYTON's defense in this arbitration is inconsistent with

BYTON's behavior prior to EDAG's initiation of this proceeding, EDAG terminated the TDLA in October of 2019 and cannot rely upon BYTON's actions occurring after the contract was no longer operational to support its claim that BYTON performed under the TDLA in bad faith.

EDAG failed to prove that BYTON breached the implied covenant of good faith and fair dealing.

## IV.  EDAG's REQUEST FOR COSTS AND ATTORNEY FEES.

### A. Introduction.

First of all, the Arbitrator finds that EDAG is the prevailing party in this arbitration proceeding.

Second, the TDLA does not provide for an award of attorney fees to a prevailing party in a dispute over the agreement and therefore each party is required to pay its own attorney fees. *See* California Code of Civil Procedure §1021.

### B. EDAG's Request for Costs.

EDAG, in its closing brief, sought costs pursuant to California Code of Civil Procedure §§ 1032 and 1033 for the following items:

- $ 145,600.00 for the JAMS deposit;

- $ 1,500.00, EDAG's filing fees;

- $ 4,500.00, JAMS hearing fees for discovery disputes;

- $ 6,270.00, interpreter fees for hearing witnesses;

- $ 35,604.00, arbitration hearing court reporter fees, including transcript fees;

- $ 33,494.43, deposition costs;

- $ 645.75, service of process costs;

- $ 20,000.00, costs of EDAG's electronically presented demonstratives;

- $ 1,530.00, costs of technical time to hyperlink evidence in EDAG's opening/closing briefs (as reasonably helpful to aid the trier of fact)

### C. Byton's Objection to the Arbitrator Relying on the CCP in Awarding Costs Is Sustained.

In his Interim Award the Arbitrator erroneously awarded $249,144.18 in costs. As is pointed out by Byton's May 11, 2021, letter, the Arbitrator in his Interim Ruling erred in that he awarded costs under the CCP and failed to follow the terms of the parties' arbitration contract. In that regard, Byton's objection raised in its May 18, 2021, letter regarding the use of the CCP in awarding costs is SUSTAINED.

In this Final Arbitration Award the arbitrator will rely on JAMS Rules and Section 14.4(b) of the TDLA which reads as follows:

> b. <u>Arbitration.</u> Any dispute between the parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration. * * * *Each party will bear its own costs in the arbitration,* * * * The Arbitrator will not have any right or authority: * * * (3) to modify the terms of this Agreement.

### D. Analysis of Costs Under Sec. 14.4(b) and JAMS Rules

In its May 18, 2021, letter EBAG recognizes that the Interim Award failed to take into account Sec. 14.4(b) and it requests the Arbitrator to be awarded the costs it advanced Byton and all those expenses of which it paid more than its fair share. What follows are the items requested in its Conclusion of its letter. Only those items are discussed below and the other items requested in EDAG's closing brief and listed in the Interim Award are DENIED.

#### 1. JAMS Hearing fees.

Section 14.4(b) requires that each party shall bear their own costs in the arbitration. In its May 15, 2021, letter EDAG submitted evidence that it paid $72,800 for its share of the arbitration fees. It concedes that it must bear those costs.

However, Byton did not pay its share of the JAMS hearing fees, EDAG advanced $72,800 on Byton's behalf. Byton is responsible to pay its own costs under the TDLA and under JAMS Rule 6(c) the Arbitrator may allocate the non-paying Party's share of the costs.

Therefore, the Arbitrator awards $72,800.00 to EDAG to reimburse it for the fees it paid on behalf of Byton.

### 2. Interpreter Fees.

EDAG requests that it be awarded $3,135.00 for Byton's share of the interpreter who helped during the hearing. That seems reasonable because everyone benefited from the use of the court reporter and EDAG should not be responsible for Byton's use of the reporter.

Therefore, pursuant to JAMS Rule 24(c) the Arbitrator awards EDAG $3,135.00 to reimburse it for the Byton's use of the interpreter.

### 3. Court Reporter and Transcript Fees.

EDAG seeks reimbursement of $17,802.00 for Byton's share of the Arbitration Hearing Court Reporter. Byton objects on the ground that the arbitrator did not order a court reporter, it did not have a role in choosing the court reporter and CCP Sec 1033.5(b)(5) prohibits recovery of court reporter costs not ordered by the court.

The Arbitrator did not specifically order the parties to engage a court reporter to transcribe the hearing testimony, but the arbitrator and all parties benefited from the transcript. EDAG informed Byton it was going to engage a court reporter and if Byton did not share in the costs EDAG would seek reimbursement (Ex. B to EDAG's May 18 letter). Apparently, Byton chose not to ask for a reporter.

All parties and the arbitrator found value in having a court reporter transcript available, but because it was not ordered by the arbitrator, the CCP would prohibit awarding these fees if we were in court. JAMS Rule 24(c) permits an arbitrator to grant any remedies within the scope of the parties' agreement, but Sec.14.4(b) requires each side to bear their own costs. These fees are not incurred by Byton and are EDAG's costs. Therefore, the Arbitrator will DENY EDAG's request for reimbursement of the reporter fees.

### 4. Mr. Slovesko and Mr. Twohig Deposition Costs.

Byton submitted Mr. Slovesko's and Mr. Twohig's deposition transcripts in place of in person testimony at the hearing. It is "just and equitable" that the costs incurred for those depositions be borne by Byton and the Arbitrator orders that Byton be responsible for the $13,507.85 incurred in those depositions (JAMS Rule 24(c))[3].

In addition, Byton had an extra day of deposition per the Arbitrator's Order when certain questions were not answered during an earlier deposition.

### 5. PMQ Deposition Costs.

The Arbitrator issued an order requiring this deposition (Ex. F. to EDAG's May 15 letter), and EDAG requests it be awarded $3,144.10 pursuant to JAMS Rule 6(c). EDAG's request is DENIED, this was a deposition it conducted at its request and the fact that the Arbitrator ordered it does not mean it's not a EDAG cost and under Sec. 14.4(b) it cannot be awarded to EDAG.

---

[3] Twohig Deposition cost: $7,159.25. Slovesko Deposition cost: $6,348.60. (See EDAG Ex. A.4 to EDAG's May 15, 2021, letter for Veritext invoices)

FINAL ARBITRATION AWARD, JAMS CASE NO. 1100107291

### 6. JAMS fees for Discovery Disputes

EDAG's May 18, 2021, letter does not explain in detail what this request relates to and the invoice attached as Ex.A.1 does not give any further detail. Therefore, EDAG's request to be awarded $4,500 for Hearing Fees for Discovery Disputes is DENIED.

### 7. Summary of Costs Awarded.

A. JAMS Hearing fees: $72,800.00

B. Interpreter Fees: $ 3,135.00

C. Depositions: $13,507.85

TOTAL $89,442.85

These costs are awarded under the TDLA and JAMS Rules and were reasonable and necessary incurred by EDAG.

### E. Final Arbitration Award.

1. EDAG is awarded €23,446,649 (or the equivocal in U.S. dollars, calculated by the then exchange rate as of the date of the final order) on its breach of contract claim and simple interest of 10% as of the date of this Final Arbitration Award.

2. EDAG is awarded $89,442.85 in costs pursuant to the TDLA and JAMS Rules.

3. BYTON shall recover nothing on its claims for breach of contract and negligence.

IT IS SO ORDERED.

Dated: June 2, 2021

_____

Hon. William J. Cahill (Ret.)
Arbitrator

## PROOF OF SERVICE BY E-Mail

Re: EDAG Engineering GmbH vs. BYTON North America Corporation
Reference No. 1100107291

I, Scott Schreiber, not a party to the within action, hereby declare that on June 3, 2021, I served the attached Final Arbitration Award on the parties in the within action by electronic mail at San Francisco, CALIFORNIA, addressed as follows:

Evangeline Burbidge Esq.
Marc R. Lewis Esq.
Mr. Brad Estes
Lewis & Llewellyn LLP
601 Montgomery Street
Suite 2000
San Francisco, CA   94111
Phone: 415-800-0590
eburbidge@lewisllewellyn.com
mlewis@lewisllewellyn.com
bestes@lewisllewellyn.com
    Parties Represented:
    EDAG Engineering GmbH

Keith A. Sipprelle Esq.
David B. Van Etten Esq.
Van Etten Sipprelle LLP
2945 Townsgate Road
Suite 200
Westlake Village, CA   91361
Phone: 805-719-4900
ksipprelle@vstriallaw.com
dvanetten@vstriallaw.com
    Parties Represented:
    BYTON North America Corporation

Ms. Lillian Xu
Evelyn Shimazaki Esq.
BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA   95054
lillian.xu@byton.com
evelyn.shimazaki@byton.com
    Parties Represented:
    BYTON North America Corporation

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on June 3, 2021.

//s// Scott Schreiber

_____
Scott Schreiber
JAMS
sschreiber@jamsadr.com