EXHIBIT "A"

From: Sadha Kameswaran <sadha.kameswaran@byton.com>
Sent: Friday, October 05, 2018 11:12 AM EDT
To: Volker Amelung <volker.amelung@edag.de>
Subject: RE: Antwort: RE: Antwort: RE: Payment update required

Hi Volker,

The fundamental issue is the ODI clearance from China Government to allow FAW to deposit moneys to us. Once we have the money, and particularly deposited in USD, the issue should be minor to transfer to US or Germany as required.

Thanks

Sadha Kameswaran
+1 (510) 505 4946

From: Volker Amelung <volker.amelung@edag.de>
Sent: Friday, October 5, 2018 6:02 AM
To: Sadha Kameswaran <sadha.kameswaran@byton.com>
Subject: Antwort: RE: Antwort: RE: Payment update required

Hi Sadha,

Have you ever considered to funnel the funds to Germany?
I have heard from sources in China that this is easier because it is not affected by the current spat between US and China.
Do you have any forecast when you will have the funds?

Mit freundlichen Grüßen / Best Regards

Volker Amelung
Senior Project Manager
PD/Project Management

EDAG Engineering GmbH
Max - Diamand Strasse 7
D-80937 München
T: +49 (89) 350989 202
M: +49 171 868 3750
E: volker.amelung@edag.de
Internet: http://www.edag.de

| Von: | Sadha Kameswaran <sadha.kameswaran@byton.com> |
|---|---|
| An: | Volker Amelung <volker.amelung@edag.de> |
| Datum: | 04.10.2018 17:10 |
| Betreff: | RE: Antwort: RE: Payment update required |

Hi Volker,

To be totally honest with you, it is very likely that we will miss the Oct 15th payment. I know this is not what you want to hear but based on how slow things are moving in China at the moment, I want to be totally transparent with you.

Thanks

Sadha Kameswaran
+1 (510) 505 4946

From: Volker Amelung <volker.amelung@edag.de>
Sent: Thursday, October 4, 2018 7:05 AM
To: Sadha Kameswaran <sadha.kameswaran@byton.com>
Subject: Antwort: RE: Payment update required

Hi Sadha,

Still worried though- You think you miss the Oct 15 day for payment?

Mit freundlichen Grüßen / Best Regards

Volker Amelung
Senior Project Manager
PD/Project Management

EDAG Engineering GmbH
Max - Diamand Strasse 7
D-80937 München
T: +49 (89) 350989 202
M: +49 171 868 3750
E: volker.amelung@edag.de
Internet: http://www.edag.de

Von:   Sadha Kameswaran <sadha.kameswaran@byton.com>

**EXHIBIT**
**83**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0041998

83-001

An:      Volker Amelung <volker.amelung@edag.de>
Datum:   01.10.2018 19:15
Betreff: RE: Payment update required

Hi Volker,

While there has been a lot of work that happened in China, the ODI clearance is still awaited from Chinese Government. I will let you know once the clearance is received and funds start coming through.

With China on vacation this week, I don't expect to hear anything until sometime next week. Appreciate your patience and ongoing support.

Thanks

Sadha Kameswaran
+1 (510) 505 4946

From: Volker Amelung <volker.amelung@edag.de>
Sent: Monday, October 1, 2018 4:36 AM
To: Sadha Kameswaran <sadha.kameswaran@byton.com>
Subject: Payment update required

Hi Sadha,

any news?
Can we expect the payment of the past due invoices by Oct. 15, 2018?

Mit freundlichen Grüßen / Best Regards

Volker Amelung
Senior Project Manager
PD/Project Management

EDAG Engineering GmbH
Max - Diamand Strasse 7
D-80937 München
T: +49 (89) 350989 202
M: +49 171 868 3750
E: volker.amelung@edag.de
Internet: http://www.edag.de

**Der EDAG Newsletter "Entwicklungsimpulse" ist erschienen. Erfahren Sie mehr über unsere neuen Mobilitätskonzepte und weitere News und Stories aus der EDAG Welt!**
**Zum EDAG Newsletter**
EDAG's latest newsletter "Engineering Impulses" has appeared. Find out more about our most recent mobility concepts and other news and stories from the EDAG world.
**To EDAG's Newsletter**

**Die nächsten Messeauftritte der EDAG Group finden Sie hier**
**The EDAG Group's next exhibitions you will find here**

Registergericht / Court of jurisdiction: Amtsgericht Wiesbaden, HRB 28257 USt.-Id: DE 292 939 239
Geschäftsführung / Board of Managing Directors: Cosimo De Carlo - CEO, Harald Poeschke - COO, Jürgen Vogt - CFO
Aufsichtsratsvorsitzender / Chairman of the Supervisory Board: Georg Denoke
Hauptsitz / Headquarters: EDAG Engineering GmbH, Kreuzberger Ring 40, 65205 Wiesbaden Deutschland/Germany / http://www.edag.de
---
This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

**Der EDAG Newsletter "Entwicklungsimpulse" ist erschienen. Erfahren Sie mehr über unsere neuen Mobilitätskonzepte und weitere News und Stories aus der EDAG Welt!**
**Zum EDAG Newsletter**
EDAG's latest newsletter "Engineering Impulses" has appeared. Find out more about our most recent mobility concepts and other news and stories from the EDAG world.
**To EDAG's Newsletter**

**Die nächsten Messeauftritte der EDAG Group finden Sie hier**
**The EDAG Group's next exhibitions you will find here**

Registergericht / Court of jurisdiction: Amtsgericht Wiesbaden, HRB 28257 USt.-Id: DE 292 939 239
Geschäftsführung / Board of Managing Directors: Cosimo De Carlo - CEO, Harald Poeschke - COO, Jürgen Vogt - CFO
Aufsichtsratsvorsitzender / Chairman of the Supervisory Board: Georg Denoke
Hauptsitz / Headquarters: EDAG Engineering GmbH, Kreuzberger Ring 40, 65205 Wiesbaden Deutschland/Germany / http://www.edag.de
---
This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0041999

Der EDAG Newsletter "Entwicklungsimpulse" ist erschienen. Erfahren Sie mehr über unsere neuen Mobilitätskonzepte und weitere News und Stories aus der EDAG Welt!
Zum EDAG Newsletter
EDAG's latest newsletter "Engineering Impulses" has appeared. Find out more about our most recent mobility concepts and other news and stories from the EDAG world.
To EDAG's Newsletter

Die nächsten Messeauftritte der EDAG Group finden Sie hier
The EDAG Group's next exhibitions you will find here

Registergericht / Court of Jurisdiction: Amtsgericht Wiesbaden, HRB 28257 USt.-Id: DE 292 939 239
Geschäftsführung / Board of Managing Directors: Cosimo De Carlo - CEO, Harald Poeschke - COO, Jürgen Vogt - CFO
Aufsichtsratsvorsitzender / Chairman of the Supervisory Board: Georg Denoke
Hauptsitz / Headquarters: EDAG Engineering GmbH, Kreuzberger Ring 40, 65205 Wiesbaden Deutschland/Germany /   http://www.edag.de
---
This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and
destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0042000

**From:** Volker Amelung <volker.amelung@edag.com>
**Sent:** Tuesday, March 05, 2019 1:14 PM EST
**To:** Sadha Kameswaran <sadha.kameswaran@byton.com>
**Subject:** Re: Open payments 2018

Thanks, Sadha,
Awaiting some good news.


BR
Volker


Send from my iPhone


Am 05.03.2019 um 18:02 schrieb Sadha Kameswaran <sadha.kameswaran@byton.com>:

> Volker,
>
> Let me check the status and get back to you in the next day or so. Appreciate your patience.
>
> Thanks
>
> Sadha Kameswaran
> +1 (510) 505 4946
> ----------------------------------------------------------------------
> **From:** Volker Amelung <volker.amelung@edag.com>
> **Sent:** Tuesday, March 5, 2019 12:35 AM
> **To:** Sadha Kameswaran <sadha.kameswaran@byton.com>
> **Subject:** WG: Open payments 2018
>
> [EXTERNAL]
> HI Sadha,
>
> It would be very good to get a status and payment plan as requested.
> My management is getting quite active right now, not sure how good I can control.
>
> Here is the overview of open invoices.
> I also like to understand if someone is sitting on the pipeline so I can react to the specific  problem.
>
> <image001.gif>
>
> Past due are now 5,155,155,00 €
>
> Furthermore, I am still waiting on the PO for the Santa Clara & Nanjing EDAG resources. The request is also increasing there.
> At this time I have not invoiced for Jan and Feb 2019 and I cannot wait much longer to do so.
>
> I think I can invoice against the old payment plan and adjust later when the new one is ready.
>
> Please advise.
>
>
>
> Mit freundlichen Grüßen / Best Regards
>
> Volker Amelung
> Senior Project Manager
> PD/Project Management
>
> EDAG Engineering GmbH
> Max - Diamand Strasse 7
> D-80937 München
> T: +49 (89) 350989 202
> M: +49 171 868 3750
> E: volker.amelung@edag.com
> Internet: http://www.edag.de
>
> <image002.gif>  <image003.gif>  <image004.gif>  <image005.gif>  <image006.gif>  <image007.gif>
>   <image008.gif>  <image009.gif>
>
> *EDAG – The leading complete vehicle and production engineering specialist for future mobility.*
>
> You will find EDAG Group's next exhibitions here.
>
> Hauptsitz / Headquarters: EDAG Engineering GmbH, Kreuzberger Ring 40, 65205 Wiesbaden, Germany
> Registergericht / Court of Jurisdiction: Amtsgericht Wiesbaden, HRB 28257
> Geschäftsführung / Board of Managing Directors: Cosimo De Carlo - CEO, Holger Merz - COO, Jürgen Vogt - CFO



**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 116**

EDG-0049769

Aufsichtsratsvorsitzender / Chairman of the Supervisory Board: Georg Denoke

Please consider the environment before printing this e-mail.

This e-mail may contain confidential and / or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

----- Weitergeleitet von Volker Amelung/Muenchen/edag am 05.03.2019 09:25 -----

| | |
|---|---|
| Von: | Volker Amelung/Muenchen/edag |
| An: | "Sadha Kameswaran" <sadha.kameswaran@byton.com> |
| Kopie: | "Faheem Lord" <faheem.lord@byton.com>, Christopher Kattola/USA/edag@EDAG, Kai Uwe Salzmann/USA/edag@EDAG |
| Datum: | 04.03.2019 12:07 |
| Betreff: | Open payments 2018 |

HI Sadha,

Please let me know the status of the open payments.
I like to know when they are paid and if there are any hold ups.

My CFO is already searching for Albert.

Mit freundlichen Grüßen / Best Regards

Volker Amelung
Senior Project Manager
PD/Project Management

EDAG Engineering GmbH
Max - Diamand Strasse 7
D-80937 München
T: +49 (89) 350989 202
M: +49 171 868 3750
E: volker.amelung@edag.com
Internet: http://www.edag.de

**From:** Tom Wessner <tom.wessner@byton.com>
**Sent:** Thursday, July 25, 2019 11:55 PM EDT
**To:** De Carlo, Cosimo <cosimo.de.carlo@edag.com>
**CC:** Dr. Daniel Kirchert <daniel@byton.com>; Twohig, David <david.twohig@byton.com>; Lord, Faheem <faheem.lord@byton.com>; Sadha Kameswaran <sadha.kameswaran@byton.com>; Keller, Harald <harald.keller@edag.com>; Amelung, Volker <volker.amelung@edag.com>
**Subject:** EDAG Payment Status

Dear Cosimo and EDAG Team:

There are recent developments around our Byton funding that are looking more promising, as we are ever closer to closing our C-round, plus have some bridge financing and other potential major funding sources that look very promising.

Meanwhile, the patience and support that EDAG continues to give to Byton is GREATLY appreciated.  We do not fault EDAG for managing its risk and we intend to work even harder at our partnership when we can get back to normal business.

Our first intent is to completely clear our arrears and restart this program; and there is a good chance that this will be the path shortly.  If Byton must continue to conserve cash, but we have enough to follow your prior payment proposal, then we will follow that.

Either way, we will continue to make ourselves available to work through this difficult time so we can meet all of our objectives.  I am traveling in Asia for another week, but I will gladly take a call at any time to answer your questions (my mobile number is below).


Best regards,




TOM WESSNER
Senior Vice President Global Supply Chain

**BYTON**
D4 Building, Maple Science Park(MSP), Nanjing Economic and Technological
Development Zone, Nanjing, P.R. China
USA: 4201 Burton Dr. Santa Clara, CA 9504

+1 808-352-6069
tom.wessner@byton.com
www.byton.com

魏思沔
供应链管理部总裁

拜腾
南京市南京经济技术开发区枫树科技
园D4栋

This e-mail message may contain confidential and/or privileged information. If you are not an addressee or otherwise authorized to receive this message, you should not use, copy, disclose or take any action based on this e-mail or any information contained in the message. If you have received this material in error, please advise the sender immediately by reply e-mail and delete this message. Thank you.

EXHIBIT
**148**

EXHIBIT
0026

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0000138



BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA 95054

July 28, 2019

To:
**EDAG Engineering GmbH**
**Att. Mr. Holger Merz**
**Kreuzberger Ring 40**
**65205 Wiesbaden**
**Germany**

Via Email to: holger.merz@edag.com

**Letter of Confirmation**

Dear Mr. Merz:

Byton North America Corporation, Inc. ("Byton") herewith confirms the maturity and legality of the (over-) due receivables as attached hereto.

Byton herewith confirms that these dues are to be paid in full as soon as the "bridging loan" is accomplished and the funds have been received by Byton.  Byton confirms it will fulfill this payment amounting to EUR 19,779,825.21 (overdues until August 17th, 2019, interests included) before other creditors are paid.  Byton plans on fulfilling this payment latest August 18th, 2019.

Best regards,

Teresa Shi
Vice president of Finance

Tom Wessner
Senior Vice President Global Supply Chain

Attachment: Overdues to EDAG Engineering GmbH

**EXHIBIT**
**150**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0000166

**From:** holger.merz@edag.com <holger.merz@edag.com>
**Sent:** Friday, August 16, 2019 12:58 PM EDT
**To:** Wessner, Tom <tom.wessner@byton.com>
**CC:** De Carlo, Cosimo <cosimo.de.carlo@edag.com>; Dr. Daniel Kirchert <daniel@byton.com>; Keller, Harald <harald.keller@edag.com>; Teresa Shi <teresa.shi@byton.com>
**Subject:** Antwort: RE: Antwort: RE: Antwort: Byton_ EDAG confirmation of payments
**Attachment(s):** "IMG_4594.JPG"

Hello Tom,

I have just talked to my auditors (Deloitte). We do not need to mention our Byton risk in our half-year financial statement. if we receive a payment of 35% of all past due. Furthermore, all overdues should be paid until 30th September. That is very important for our Q3 figures 2019.
Here is my proposal. Please let me know, if you can realize it.

EDAG Overdue Payment Schedule

| Date | Currency | | USD |
|---|---|---|---|
| Aug 19th | EUR | 7.079.646,01 | 8.000.000,00 |
| Sept 3rd | EUR | 6.000.000,00 | 6.780.000,00 |
| Sept 20th | EUR | 6.700.179,19 | 7.571.202,49 |
| **Total** | **EUR** | **19.779.825,21** | **22.351.202,49** |

Mit freundlichen Grüßen / Best regards

Holger Merz
Geschäftsführer / Managing Director (CFO)

EDAG Engineering GmbH
Reesbergstraße 1 / D - 36039 Fulda
Tel.:    +49-661-6000-200 / Mobil:  +49-175-2283053
Email: Holger.Merz@edag.com

Von:     Tom Wessner <tom.wessner@byton.com>
An:       Holger Merz <holger.merz@edag.com>, "Dr. Daniel Kirchert" <daniel@byton.com>
Kopie:   Teresa Shi <teresa.shi@byton.com>, "cosimo.de.carlo@edag.com" <cosimo.de.carlo@edag.com>, Harald Keller <harald.keller@edag.com>
Datum:   16.08.2019 17:21
Betreff:   RE: Antwort: RE: Antwort: Byton_ EDAG confirmation of payments

Holger:

We sincerely appreciate the difficulty of the situation Byton is putting EDAG into. Unfortunately, our new investor situation is still developing and taking longer than expected. I am attaching a revised payment plan which is realistic given our present cash outlook; hopefully conservative given the opportunities we have to close known investment rounds.

I am not sure what accounting conventions you must follow for your reporting, however if Byton can get EDAG the EUR 1.8 million next week according to the attached plan, then perhaps that is enough to show Byton's good faith to pay all past dues so that EDAG does not have to write-off the entire payable.

Please consider this moving forward. Let us know if this is acceptable, or if there is anything else Byton can do to demonstrate its commitment to meeting all of our obligations and continuing our partnership moving forward.

Best regards,

**EXHIBIT**

**155**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0000096



Tom Wessner                                    魏思涛
Senior Vice President Global Supply Chain       供应链高级副总裁

**BYTON**                                        拜腾
D4 Building, Maple Science Park(MSP), Nanjing Economic and 南京市南京经济技术
Technological Development Zone, Nanjing, P.R. China        开发区红枫科技
                                                园D4栋

USA: 4201 Burton Dr, Santa Clara, CA 9504

+1 808-352-6069
tom.wessner@byton.com
www.byton.com

This e-mail message may contain confidential and/or privileged information. If you are not an addressee or otherwise authorized to receive this message, you should not use, copy, disclose or take any action based on this e-mail or any information contained in the message. If you have received this material in error, please advise the sender immediately by reply e-mail and delete this message. Thank you.

**From:** Holger Merz <holger.merz@edag.com>
**Sent:** Friday, August 16, 2019 9:54 AM
**To:** Tom Wessner <tom.wessner@byton.com>; Dr. Daniel Kirchert <daniel@byton.com>
**Cc:** Teresa Shi <teresa.shi@byton.com>; cosimo.de.carlo@edag.com; Harald Keller <harald.keller@edag.com>
**Subject:** Antwort: RE: Antwort: Byton_ EDAG confirmation of payments

[EXTERNAL]
Hello Daniel, hello Tom

thank you for sending me your payment plan. But, your proposal is not satisfactory and acceptable for us. As we mentioned serveral times before, we publish our half-year financials on 28th August 2019. Therefore, we need a strong sign in the form of cash from Byton, no later than 23th August 2019. Otherwise, we will have to communicate our shareholders and analysts. and as a result, any negative information about Byton's financial difficulties will be made public. All this will negatively impact the reputation of EDAG and Byton. Against the background of the Auto Show in Frankfurt, such negative news are not helpful for both companies. We also want to avoid initiating the legal dunning procedure, as we had a trusted relationship between customer and supplier in the past.
I hope you understand our common problem. So please make sure that EDAG receives the full amount by 23th August 2019 at the latest.
I am looking forward to receiving your feedback soon.


Best regards

Holger Merz
Geschäftsführer / Managing Director (CFO)

EDAG Engineering GmbH
Reesbergstraße 1 / D - 36039 Fulda
Tel.:    +49-661-6000-200 / Mobil:  +49-175-2283053
Email: Holger.Merz@edag.com


**Von:**      Tom Wessner <tom.wessner@byton.com>
**An:**       Holger Merz <holger.merz@edag.com>, "Dr. Daniel Kirchert" <daniel@byton.com>
**Kopie:**    Teresa Shi <teresa.shi@byton.com>
**Datum:**    15.08.2019 19:58

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Betreff:     RE: Antwort: Byton_ EDAG confirmation of payments

Holger:

There continues to be a delay in the deposit of our first tranche. According to our best finance projection to date it appears that we should be able to realize the attached payment plan to EDAG. Of course, if we can get current any faster, we will.

If you have any questions, I think it would be best to speak directly to our CEO, Daniel Kirchert for any additional color that he can add to our situation.

Best regards,



Tom Wessner                                      魏思涛
Senior Vice President Global Supply Chain        供应链高级副总裁
**BYTON**                                         拜腾
D4 Building, Maple Science Park(MSP), Nanjing Economic and  南京市南京经济技术
Technological Development Zone, Nanjing, P.R. China  开发区红枫科技
                                                 园D4栋
USA: 4201 Burton Dr, Santa Clara, CA 9504

+1 808-352-6069
tom.wessner@byton.com
www.byton.com

This e-mail message may contain confidential and/or privileged information. If you are not an addressee or otherwise authorized to receive this message, you should not use, copy, disclose or take any action based on this e-mail or any information contained in the message. If you have received this material in error, please advise the sender immediately by reply e-mail and delete this message. Thank you.

**From:** Holger Merz <holger.merz@edag.com>
**Sent:** Wednesday, August 14, 2019 2:32 AM
**To:** Tom Wessner <tom.wessner@byton.com>; Teresa Shi <teresa.shi@byton.com>
**Subject:** Antwort: Byton_ EDAG confirmation of payments

[EXTERNAL]
Hello Tom, hello Teresa,

I hope the bridge financing is well advanced. Did you receive the first tranche? Can you already give me a specific date on which we get the overdue receivables paid?
As you already know, it is extremely important for us to have the money in our bank account before publishing our half-year interims financial statement..
For a short-term feedback, I would be grateful.

Best regards

Holger Merz
Geschäftsführer / Managing Director (CFO)

EDAG Engineering GmbH
Reesbergstraße 1 / D - 36039 Fulda
Tel.:   +49-661-6000-200 / Mobil:  +49-175-2283053
Email: Holger.Merz@edag.com

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0000098



*EDAG – The leading complete vehicle and production engineering specialist for future mobility.*



**#50yearsEDAG - tomorrow now**
**www.50yearsedag.com**

You will find EDAG Group's next exhibitions here.

Hauptsitz / Headquarters: EDAG Engineering GmbH, Kreuzberger Ring 40, 65205 Wiesbaden, Germany
Registergericht / Court of Jurisdiction: Amtsgericht Wiesbaden, HRB 28257
Geschäftsführung / Board of Managing Directors: Cosimo De Carlo - CEO, Harald Keller - COO, Holger Merz - CFO
Aufsichtsratsvorsitzender / Chairman of the Supervisory Board: Georg Denoke

Please consider the environment before printing this e-mail.

This e-mail may contain confidential and / or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden.



*EDAG – The leading complete vehicle and production engineering specialist for future mobility.*



**#50yearsEDAG - tomorrow now**
**www.50yearsedag.com**

You will find EDAG Group's next exhibitions here.

Hauptsitz / Headquarters: EDAG Engineering GmbH, Kreuzberger Ring 40, 65205 Wiesbaden, Germany
Registergericht / Court of Jurisdiction: Amtsgericht Wiesbaden, HRB 28257
Geschäftsführung / Board of Managing Directors: Cosimo De Carlo - CEO, Harald Keller - COO, Holger Merz - CFO
Aufsichtsratsvorsitzender / Chairman of the Supervisory Board: Georg Denoke

Please consider the environment before printing this e-mail.

This e-mail may contain confidential and / or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

—— Weitergeleitet von Holger Merz/Fulda/edag am 08/14/2019 08:17 AM -----

Von:       Tom Wessner <tom.wessner@byton.com>
An:        Holger Merz <holger.merz@edag.com>
Kopie:     Teresa Shi <teresa.shi@byton.com>, "cosimo.de.carlo@edag.com" <cosimo.de.carlo@edag.com>, "juergen.vogt@edag.com" <juergen.vogt@edag.com>, Harald Keller <harald.keller@edag.com>
Datum:     07/29/2019 07:22 AM
Betreff:   Re: Byton_ EDAG confirmation of payments

Holger:

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0000099

155-004

Please find attached Byton's confirmation of payment.
[attachment "fb_short_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "instagram_24px_grau.gif" deleted by Holger Merz/Fulda/edag] [attachment "linkedin_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "twitter_vogel_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "ytube_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "kununu_short_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "xing_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "watchado_short_grau_24px.gif" deleted by Holger Merz/Fulda/edag] [attachment "50yearsedag_logo_75.jpg" deleted by Holger Merz/Fulda/edag] [attachment "{80BDA66F-7D20-4480-A77D-2DEB8A781FF1}.pdf" deleted by Holger Merz/Fulda/edag] [attachment "ATT00001.htm" deleted by Holger Merz/Fulda/edag]

| | |
|---|---|
| Von: | Holger Merz/Fulda/edag |
| An: | tom.wessner@byton.com |
| Kopie: | teresa.shi@byton.com, cosimo.de.carlo@edag.com, juergen.vogt@edag.com, Harald Keller/Fulda/edag@EDAG |
| Datum: | 07/26/2019 11:19 AM |
| Betreff: | Byton_ EDAG confirmation of payments |

Hello Tom,

first of all thank you for the phone call just made. As agreed I send you our confirmation of payments.
We talked intensively the reasons why EDAG needs this confirmation. Please sign it together with Daniel or alternative with Theresa and send it back to me this Saturday.
Looking forward to continue our trustful customer-supplier relationship.

@Theresa for your information:
I am the successor of Juergen Vogt with whom you have been in contact before. Juergen has gone into well-deserved retirement as CFO, but will accompany EDAG until end of the year.

If you have any futher question, please contact me whenever you want.

Best regards

Holger Merz
Geschäftsführer / Managing Director (CFO)

EDAG Engineering GmbH
Reesbergstraße 1 / D - 36039 Fulda
Tel.:    +49-661-6000-200 / Mobil: +49-175-2283053
Email: Holger.Merz@edag.com

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| EDAG Overdue Payment Schedule | | | |
| --- | --- | --- | --- |
| Date | Currency | | USD |
| Aug 19th | EUR | 1,769,911.50 | 2,000,000.00 |
| Sep 3rd | EUR | 5,309,734.51 | 6,000,000.00 |
| Sep 20th | EUR | 6,000,000.00 | 6,780,000.00 |
| Oct 11th | EUR | 6,700,179.19 | 7,571,202.49 |
| Total | EUR | 19,779,825.21 | 22,351,202.49 |

EXHIBIT "B"

CONFIDENTIAL

```
 1              IN ARBITRATION PROCEEDINGS OF

 2     JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC.

 3

 4    EDAG Engineering GmbH,

 5                     Claimant,

 6       vs.                        JAMS No. 1100107291

 7    Byton North America Corp.,

 8                     Respondent.

      _____/

 9

10                  *** CONFIDENTIAL ***

11             DEPOSITION OF SADHA KAMESWARAN

12          Person Most Qualified witness for

13               Byton North America Corp.

14       appearing remotely at Menlo Park, California

15                Tuesday, November 17, 2020

16

17

18

19

20

21

22    Job No. 4290795

23    Reported by:

      Natalie Y. Botelho

24    CSR No. 9897

25    Pages:  1 - 248
```

                                            Page 1

CONFIDENTIAL

```
 1  people?                    10:53:47
 2       MR. SIPPRELLE: Object; I think he said   10:53:51
 3  "IT person," not "people." Go ahead,    10:53:52
 4  Mr. Kameswaran.              10:53:55
 5       THE WITNESS: I believe I had -- in my   10:54:00
 6  last deposition I had incorrectly stated that we   10:54:05
 7  didn't have access to some of the databases, so I   10:54:10
 8  verified few things with the IT person on the level   10:54:15
 9  of access that we had on those JIRA and Confluence   10:54:20
10  databases because I wanted to correct my previous   10:54:34
11  deposition.                 10:54:39
12       MR. ESTES: All right. We've been going   10:54:47
13  for about an hour. Why don't we take a ten-minute   10:54:48
14  break, come back at five after.        10:54:51
15       MR. SIPPRELLE: All right. Does that   10:54:55
16  help? Is that okay?            10:54:56
17       THE WITNESS: Yeah, that's good.      10:54:59
18       THE VIDEOGRAPHER: Off the record. The   10:55:01
19  time is 10:55 a.m.             10:55:01
20       (Recess taken from 10:55 a.m. to     11:05:23
21       11:05 a.m.)             11:05:23
22       THE VIDEOGRAPHER: Back on the record.   11:05:30
23  The time is 11:05 a.m.           11:05:31
24       MR. ESTES: Q. Sir, you understand you're   11:05:38
25  still under oath?              11:05:40
                                Page 286
```

```
 1  A.   Yes, I do.              11:05:41
 2  Q.   Did you talk with anyone regarding this   11:05:42
 3  deposition over the break?         11:05:44
 4  A.   No.                  11:05:48
 5  Q.   If you go back to Exhibit 84, in paragraph   11:05:51
 6  5 it says, "Byton had begun searching for and   11:05:55
 7  collecting documents several months prior to its   11:06:03
 8  August 2020 production," correct?      11:06:07
 9  A.   Correct.               11:06:15
10  Q.   In what month did Byton begin searching   11:06:24
11  for and collecting relevant documents?    11:06:27
12  A.   I recall from November 2019, early   11:06:34
13  November 2019.               11:06:38
14  Q.   Can you please describe the steps Byton   11:06:47
15  took to search for documents for production in this   11:06:49
16  matter?                    11:06:51
17  A.   I was not personally involved in the   11:07:04
18  search at the time, so I wouldn't know specific   11:07:06
19  steps that were taken, but I do know and I have seen   11:07:10
20  e-mail correspondence from that time where a number   11:07:14
21  of documents were collected and provided.   11:07:20
22       MR. SIPPRELLE: Mr. Kameswaran, I think   11:07:27
23  he's asking you -- it was kind of a broad question   11:07:28
24  over the entire time of the litigation, at least as   11:07:30
25  I understood the question. Not focused specifically   11:07:35
                                Page 287
```

```
 1  on November 2019. So I think he was asking you to   11:07:37
 2  broadly describe everything you know generally that   11:07:46
 3  has been done.               11:07:48
 4       THE WITNESS: Oh, right from     11:07:51
 5  November 2019, I know that a lot of effort and a lot   11:07:52
 6  of time was spent in collecting every single   11:07:55
 7  EDAG-related document and provided to EDAG right   11:07:59
 8  until couple of weeks back, at the end of December   11:08:05
 9  and the last documents were provided. And we had   11:08:10
10  limitations after a certain time because of no   11:08:15
11  personnel available in the company, but until such   11:08:18
12  time, every effort was made to provide everything.   11:08:21
13  And even after that, with the people available,   11:08:26
14  Byton took every effort to provide every document   11:08:30
15  that was relevant to this topic.       11:08:36
16       MR. ESTES: Q. You said you had     11:08:37
17  limitations after a certain time. When was that   11:08:42
18  time that the limitations began?       11:08:45
19  A.   From around end of March time frame, when   11:08:53
20  we were furlough -- when we had furloughed people.   11:08:57
21  Q.   And that's March 2020?         11:09:01
22  A.   Correct.               11:09:05
23  Q.   You testified at your individual     11:09:17
24  deposition that you personally were never asked by   11:09:19
25  Byton for documents in your possession that were   11:09:22
                                Page 288
```

```
 1  relevant to the lawsuit, correct?      11:09:24
 2       MR. SIPPRELLE: Well, I --       11:09:29
 3       THE WITNESS: Correct.         11:09:30
 4       MR. SIPPRELLE: I'll object to that, but   11:09:31
 5  go ahead. I'm not sure that's exactly what he   11:09:31
 6  testified to, but that's fine.        11:09:36
 7       MR. ESTES: Q. Now testifying as Byton's   11:09:40
 8  most qualified witness, did Byton ask any individual   11:09:42
 9  employee to search for or turn over documents   11:09:45
10  related to this lawsuit that were in their   11:09:48
11  possession?                 11:09:50
12  A.   I'm not sure I'm understanding the   11:09:58
13  question. Could you please elaborate?    11:09:59
14  Q.   Sure. You said you were never asked   11:10:03
15  personally by Byton for documents related to this   11:10:06
16  lawsuit that you possessed, correct?     11:10:09
17  A.   Yes.                  11:10:15
18  Q.   Did Byton ask any individual employee to   11:10:18
19  provide documents that were in their possession   11:10:23
20  related to this lawsuit?           11:10:25
21  A.   So as I had mentioned before, the various   11:10:36
22  functions and relevant documents, whichever function   11:10:41
23  it belonged to, were collected. I do not know the   11:10:44
24  specific people who were contacted, but the relevant   11:10:47
25  documents were all collected to aid in the purpose   11:10:50
                                Page 289
```

11 (Pages 286 - 289)

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. SIPPRELLE: All right. | 12:03:42 |
| 2 | THE WITNESS: Okay. | 12:03:45 |
| 3 | THE VIDEOGRAPHER: Off the record. The | 12:03:46 |
| 4 | time is 12:03 p.m. | 12:03:46 |
| 5 | (Recess taken from 12:03 p.m. to | 12:14:12 |
| 6 | 12:15 p.m.) | 12:14:12 |
| 7 | THE VIDEOGRAPHER: On the record. The | 12:15:26 |
| 8 | time is 12:15 p.m. | 12:15:26 |
| 9 | MR. ESTES: Q. Sir, you understand you're | 12:15:32 |
| 10 | still under oath? | 12:15:33 |
| 11 | A. Yes, I do. | 12:15:34 |
| 12 | Q. Did you speak with anyone about this | 12:15:35 |
| 13 | deposition during the break? | 12:15:37 |
| 14 | A. No, I did not. | 12:15:40 |
| 15 | Q. All right. Going back to Exhibit 84, your | 12:15:43 |
| 16 | declaration, paragraph 8 begins with, "In addition | 12:15:45 |
| 17 | to employee laptops, Byton documents have been | 12:15:50 |
| 18 | stored on various servers (JAMA, JIRA and | 12:15:52 |
| 19 | Confluence) over the course of the company's | 12:15:55 |
| 20 | existence." Did I read that correctly? | 12:15:58 |
| 21 | A. Correct. | 12:16:01 |
| 22 | Q. And you said earlier that Byton documents | 12:16:02 |
| 23 | have not been stored on any other third-party | 12:16:06 |
| 24 | servers aside from JAMA, JIRA, and Confluence? | 12:16:09 |
| 25 | A. That's correct. | 12:16:14 |

Page 322

| | | |
|---|---|---|
| 1 | Q. What kinds of documents were stored on the | 12:16:17 |
| 2 | JAMA database? | 12:16:18 |
| 3 | A. Sorry. Could you repeat that? You were | 12:16:24 |
| 4 | cutting out there. | 12:16:26 |
| 5 | Q. What kinds of documents were stored on the | 12:16:28 |
| 6 | JAMA database? | 12:16:31 |
| 7 | A. Typically product attributes, | 12:16:33 |
| 8 | requirements, and product feature metrics, as in the | 12:16:43 |
| 9 | vehicle specifications provided by marketing to the | 12:16:49 |
| 10 | engineering team. | 12:16:52 |
| 11 | Q. What kind of documents are stored on the | 12:16:55 |
| 12 | JIRA database? | 12:16:57 |
| 13 | A. JIRA is basically a engineering change | 12:17:02 |
| 14 | management system. So all the engineering change -- | 12:17:05 |
| 15 | changes that have gone through would go through the | 12:17:11 |
| 16 | JIRA database. | 12:17:14 |
| 17 | Q. What kinds of documents are stored on the | 12:17:19 |
| 18 | Confluence database? | 12:17:21 |
| 19 | A. Confluence is where the project | 12:17:25 |
| 20 | directories for the different functions were. That | 12:17:28 |
| 21 | is for a collaboration database, including the | 12:17:38 |
| 22 | project circles and meetings and so on. | 12:17:43 |
| 23 | Q. The second sentence of paragraph 8 states, | 12:17:52 |
| 24 | "I recently gave deposition testimony in this matter | 12:17:55 |
| 25 | during which I referenced JAMA, JIRA and Confluence | 12:17:58 |

Page 323

| | | |
|---|---|---|
| 1 | databases. In my deposition, I indicated that I | 12:18:00 |
| 2 | believe that Byton no longer had access to these | 12:18:04 |
| 3 | databases due to non-payment of the third-party | 12:18:07 |
| 4 | vendors who administer these databases." Did I read | 12:18:09 |
| 5 | that correctly? | 12:18:13 |
| 6 | A. Correct. | 12:18:14 |
| 7 | Q. Why did you think Byton no longer had | 12:18:16 |
| 8 | access to the JAMA, JIRA, and Confluence databases? | 12:18:18 |
| 9 | A. Because from a financial point of view, I | 12:18:24 |
| 10 | knew that we owed money to those third-party | 12:18:26 |
| 11 | providers. | 12:18:30 |
| 12 | Q. And -- | 12:18:32 |
| 13 | A. And there was -- and there was protests | 12:18:33 |
| 14 | from those vendors and threatening of | 12:18:36 |
| 15 | discontinuation of service. | 12:18:42 |
| 16 | Q. And is a third-party vendor different from | 12:18:46 |
| 17 | the company that actually owns the -- owns or | 12:18:50 |
| 18 | created the JAMA and JIRA and Confluence products | 12:18:54 |
| 19 | themselves? | 12:18:56 |
| 20 | A. I do not know exactly which database goes | 12:19:02 |
| 21 | through which vendor. Sometimes the licenses are | 12:19:05 |
| 22 | sold by some onsellers for one of those companies, | 12:19:09 |
| 23 | so I do not know. | 12:19:16 |
| 24 | Q. So you don't know the third-party vendor | 12:19:18 |
| 25 | that administers the JAMA database, correct? | 12:19:21 |

Page 324

| | | |
|---|---|---|
| 1 | A. Not sure whether it was JAMA themselves or | 12:19:29 |
| 2 | someone else. | 12:19:31 |
| 3 | Q. Do you know when Byton stopped paying the | 12:19:35 |
| 4 | third-party vendor who administers the JAMA | 12:19:36 |
| 5 | database? | 12:19:39 |
| 6 | A. I do not recall a specific date, but all | 12:19:45 |
| 7 | our payments to vendors started getting affected | 12:19:47 |
| 8 | from about late 2019 time frame. | 12:19:53 |
| 9 | Q. And do you know the third-party vendor | 12:20:22 |
| 10 | that administers the JIRA database? | 12:20:24 |
| 11 | A. No, I do not know. | 12:20:30 |
| 12 | Q. Do you recall approximately when Byton | 12:20:32 |
| 13 | stopped paying the third-party vendor who | 12:20:33 |
| 14 | administers the JIRA database? | 12:20:35 |
| 15 | A. No, I do not know. | 12:20:44 |
| 16 | Q. And do you know who the third-party vendor | 12:20:47 |
| 17 | who administers the Confluence database is? | 12:20:49 |
| 18 | A. No, do not know the specific name. | 12:20:57 |
| 19 | Q. Do you know approximately when Byton | 12:20:59 |
| 20 | stopped paying the third-party vendor who | 12:21:00 |
| 21 | administers the Confluence database? | 12:21:02 |
| 22 | A. As I said earlier, 2020. | 12:21:07 |
| 23 | Q. Would you estimate that late 2019 or early | 12:21:16 |
| 24 | 2020 is the best approximation of when Byton stopped | 12:21:18 |
| 25 | paying the third-party vendor who administers the | 12:21:21 |

Page 325

20 (Pages 322 - 325)

CONFIDENTIAL

1  JIRA database?                        12:21:24
2  A.      That would be a good estimate.      12:21:30
3  Q.      Paragraph 8 of Exhibit 84 goes on to say   12:21:34
4  that "Subsequent to my deposition, I learned that   12:21:37
5  Byton's remaining IT employee has access to the JIRA   12:21:40
6  and Confluence databases." Did I read that   12:21:42
7  correctly?                            12:21:45
8  A.      Correct.                       12:21:46
9  Q.      How did you learn that Byton had access to   12:21:48
10  its JIRA and Confluence databases?     12:21:50
11  A.      I spoke to the IT person after my   12:21:55
12  deposition to confirm, because I was not hundred   12:21:58
13  percent sure when I made the deposition, so I   12:22:02
14  checked with IT person at that time.   12:22:05
15  Q.      Did anyone ask you to check with the IT   12:22:10
16  person?                               12:22:12
17  A.      No. After the deposition, I felt that I   12:22:17
18  was not hundred percent sure about that, so I should   12:22:19
19  check it, so I did that on my own. And I reached   12:22:23
20  out to the counsel to change my --     12:22:26
21       MR. SIPPRELLE: All right. Hold on,   12:22:30
22  Mr. -- don't talk about anything with your attorney.   12:22:31
23  Okay? That's privileged.              12:22:35
24       MR. ESTES: Q. And so then your      12:22:40
25  declaration stated that Byton would undertake a   12:22:42

Page 326

1  reasonable search of these two databases it has   12:22:44
2  access to, correct?                   12:22:49
3  A.      Correct.                       12:22:51
4  Q.      Did Byton search the Confluence database   12:22:51
5  to collect relevant documents prior to August 2020?   12:22:53
6  A.      Would have done if the database was   12:23:10
7  active. I do not know exactly -- exactly when   12:23:13
8  accesses were removed or reinstalled, reinstated.   12:23:21
9  Q.      So access to Confluence and JIRA were   12:23:29
10  removed and then reinstated at some time?   12:23:35
11  A.      I do not know the specifics, but the IT   12:23:38
12  person had access to the backup server.   12:23:40
13  Q.      So the Confluence and JIRA databases   12:23:46
14  searched by Byton were from the backup server rather   12:23:48
15  than in the existing databases themselves?   12:23:51
16  A.      The mirrored server, as we call it, which   12:24:01
17  resides in our network.               12:24:04
18  Q.      And that's what Byton searched, rather   12:24:06
19  than the Confluence or JIRA database that access had   12:24:13
20  been revoked from?                    12:24:18
21  A.      I do not know the specific search.   12:24:30
22  Q.      So it is correct that you do not know   12:24:49
23  whether Byton searched the Confluence database to   12:24:52
24  collect relevant documents prior to August 2020?   12:24:55
25  A.      Could you repeat that, please?   12:25:07

Page 327

1  Q.      It is correct that you do not know whether   12:25:09
2  Byton searched the Confluence database to collect   12:25:11
3  relevant documents prior to August 2020?   12:25:14
4  A.      When you said "prior to August 2020," like   12:25:30
5  from November 2019, documents have been searched, so   12:25:33
6  at any point in time, those databases would have   12:25:37
7  been searched until when we had issues.   12:25:40
8  Q.      So Byton searched the Confluence database   12:25:49
9  at some point from November 20 -- at some point   12:25:51
10  between November 2019 until when access was revoked?   12:25:55
11  A.      I would be guessing.              12:26:10
12  Q.      So sitting here today, you don't know   12:26:13
13  whether Byton searched the Confluence database at   12:26:14
14  some point from November 2019 until when access was   12:26:17
15  revoked?                              12:26:20
16  A.      I wouldn't know.                12:26:24
17  Q.      And then Byton searched the mirrored   12:26:25
18  server in approximately November or December of   12:26:28
19  2020?                                 12:26:32
20  A.      Correct.                       12:26:35
21  Q.      Why didn't Byton search the Confluence   12:26:37
22  database at some point after this lawsuit was filed   12:26:39
23  until access was revoked?             12:26:43
24       MR. SIPPRELLE: Well, object; assumes   12:26:46
25  facts not in evidence, misstates his testimony. I   12:26:48

Page 328

1  think he said, as he sits here today, he doesn't   12:26:51
2  know if it was or was not. Go ahead,   12:26:55
3  Mr. Kameswaran.                        12:27:06
4       THE WITNESS: No, that's correct. And as   12:27:09
5  I said before, I wouldn't know what was searched   12:27:10
6  from November time frame and when exactly we had   12:27:14
7  issues with access or anything like that. So any   12:27:20
8  statement I make, I would be guessing.   12:27:23
9       MR. ESTES: Q. Is there anyone still at   12:27:27
10  Byton who would know whether or not the Confluence   12:27:28
11  and JIRA databases were searched from -- strike   12:27:31
12  that.                                 12:27:36
13       Does any -- is there anyone currently at   12:27:37
14  Byton who would know whether the Confluence database   12:27:40
15  was searched from November 2019 until access was   12:27:42
16  revoked?                              12:27:44
17  A.      There is -- there is no one else.   12:27:51
18  Q.      Do you know whether or not Byton searched   12:27:57
19  the JIRA database to collect relevant documents from   12:27:58
20  after this lawsuit was filed -- in the period from   12:28:03
21  when after this lawsuit was filed until access was   12:28:06
22  revoked?                              12:28:08
23  A.      Again, same thing. Wouldn't the --   12:28:13
24  sitting here today, I wouldn't know what was   12:28:17
25  searched at what time frame, but an additional   12:28:19

Page 329

21 (Pages 326 - 329)

CONFIDENTIAL

1 supply chain.                                 17:04:21
2 Q.   Byton had authority to terminate a       17:04:22
3 supplier from the M-Byte project, correct?    17:04:23
4 A.   Who in Byton?                            17:04:30
5 Q.   Byton as a company had final authority to 17:04:32
6 terminate a supplier from the M-Byte project, 17:04:35
7 correct?                                      17:04:37
8 A.   Correct.                                 17:04:38
9 Q.   EDAG did not have the ability to hire a  17:04:41
10 supplier for the M-Byte project, correct?    17:04:43
11 A.   No.                                     17:04:52
12 A.   EDAG didn't -- sorry.                    17:04:54
13 A.   Correct.  Your statement is correct.    17:04:55
14 Q.   And EDAG did not have the ability to    17:04:59
15 terminate Byton's other suppliers, correct?  17:05:01
16 A.   Correct.                                17:05:06
17 Q.   Did Byton ever terminate a supplier from 17:05:07
18 the M-Byte project?                          17:05:10
19 A.   I'm sure there has been some terminations. 17:05:18
20 Q.   Sitting here today, can you recall any -- 17:05:23
21 can Byton recall any suppliers it has terminated 17:05:27
22 from the M-Byte project previously?          17:05:30
23 A.   Yes, I do recall.                       17:05:43
24 Q.   Which ones do you recall?               17:05:45
25 A.   I recall a supplier by the name         17:05:51
Page 230

1 Constellium, and there may have been other Chinese 17:05:54
2 suppliers.  I don't remember the name.       17:06:08
3 Q.   What part of the project was Constellium 17:06:11
4 contracted to provide services for?          17:06:15
5 A.   I think it was a cross car beam.         17:06:22
6 Q.   Has Byton paid all of its suppliers     17:06:27
7 besides EDAG?                                 17:06:31
8 A.   No.                                      17:06:33
9 Q.   When did Byton stop paying its other    17:06:34
10 suppliers besides EDAG?                       17:06:36
11 A.   From around the middle of 2019.         17:06:47
12 Q.   At the time Byton stopped paying EDAG, did 17:06:53
13 it stop also paying its other suppliers?     17:06:55
14 A.   That's absolutely correct.              17:06:59
15 Q.   What's the -- what is Byton's estimate of 17:07:03
16 the total amount its other suppliers besides EDAG 17:07:06
17 claim they are owed?                          17:07:09
18 A.   Besides EDAG in North America?          17:07:23
19 Q.   Correct.                                17:07:25
20 A.   I would say roughly $60 million.        17:07:33
21 Q.   What about besides EDAG outside of North 17:07:36
22 America?                                      17:07:40
23 A.   120 to $140 million.                    17:07:53
24 Q.   Byton is presently being sued by other  17:07:59
25 suppliers besides EDAG?                       17:08:02
Page 231

1    THE WITNESS:  Can I answer that question, 17:08:12
2 Keith?                                        17:08:12
3    MR. SIPPRELLE:  I'm sorry.  Can you hear  17:08:20
4 me?  Sorry.  I was on mute.  Yeah, you can answer 17:08:21
5 the question.  It's all a matter of public record. 17:08:25
6    THE WITNESS:  Yes, there are other        17:08:30
7 lawsuits in progress.                         17:08:33
8    MR. ESTES:  Q.  About how many other      17:08:37
9 lawsuits are in progress from other suppliers? 17:08:38
10 A.   I would say another three or four.      17:08:50
11 Q.   And what is the amount total of the three 17:08:58
12 to four lawsuits those suppliers are claiming they 17:09:01
13 are owed by Byton?                            17:09:04
14 A.   Well, I don't know the exact figure.  I've 17:09:12
15 not reviewed that detail.                     17:09:16
16 Q.   Do you know in which cities or states   17:09:18
17 these lawsuits are happening?                 17:09:20
18 A.   In California, as far as I'm aware.     17:09:29
19 Q.   Who is CH Reynolds Electric Inc.?       17:09:33
20 A.   Could you repeat that name?             17:09:41
21 Q.   Sure.  Who is CH Reynolds Electric Inc.? 17:09:42
22 A.   Would not have a clue because it's      17:09:51
23 probably a smaller indirect supplier and not a 17:09:56
24 production direct parts supplier.             17:10:03
25 Q.   Who is Groupware?                       17:10:07
Page 232

1 A.   I think that was a SAS provider, from    17:10:17
2 memory.                                       17:10:26
3 Q.   Groupware sued Byton for $466,000 for    17:10:29
4 breach of contract for failing to pay for IT goods 17:10:32
5 and services?                                 17:10:35
6    MR. SIPPRELLE:  Object; lacks foundation. 17:10:41
7    THE WITNESS:  Sorry, Keith.  I couldn't   17:10:48
8 hear you properly.                            17:10:49
9    MR. SIPPRELLE:  Oh.  I said I object as    17:10:50
10 lacks foundation.  You can answer if you have the 17:10:52
11 information.                                  17:10:58
12    THE WITNESS:  Again, I don't know the     17:10:59
13 exact dollar value, but it was -- it was in that 17:11:00
14 order.                                        17:11:06
15    MR. ESTES:  Q.  And Groupware has a writ  17:11:09
16 of attachment issued against Byton for that amount, 17:11:10
17 correct?                                      17:11:14
18    MR. SIPPRELLE:  Object; lacks foundation. 17:11:16
19    THE WITNESS:  I do not know the detail.   17:11:24
20 Sorry.                                        17:11:26
21    MR. ESTES:  Q.  Did Byton post a bond for 17:11:27
22 Groupware's writ of attachment?               17:11:29
23 A.   Did Byton post what?                     17:11:38
24 Q.   A bond, B-O-N-D.                         17:11:39
25 A.   Not that --                              17:11:48
Page 233

59 (Pages 230 - 233)

EXHIBIT "C"

CONFIDENTIAL

```
 1                    JAMS ARBITRATION
 2
 3
 4   EDAG ENGINEERING GMBH,            )
                                       )
 5                Claimant,            )
                                       )
 6   v.                                ) JAMS Reference No.
                                       )    1100107291
 7   BYTON NORTH AMERICA CORPORATION, )
                                       )
 8                Respondent.          )
     _____  )
 9                                     )
     BYTON NORTH AMERICA CORPORATION, )
10                                     )
                  Counter-Claimant,    )
11                                     )
     v.                                )
12                                     )
     EDAG ENGINEERING GMBH,            )
13                                     )
                  Counter-Respondent.)
14   _____  )
15
16              C O N F I D E N T I A L
17
18     REPORTER'S TRANSCRIPT OF ARBITRATION PROCEEDINGS
19        ALL PARTIES APPEARING REMOTELY VIA ZOOM
20                  FEBRUARY 17, 2021
21        ARBITRATOR:  HON. WILLIAM J. CAHILL (RET.)
22
23
24   VOLUME VII               REPORTED BY:
25   PAGES 788 TO 936         SUSAN E. LANSING, CSR NO. 6355
```

Page 788

CONFIDENTIAL

1  M-Byte out into the market?
2     A.  Yes.  As I understood, the program timing at
3  that time was to launch the car in the fourth quarter of
4  2019.
5     Q.  And was there a plan at that time as to where
6  it would be sold first?
7     A.  Yes.  The initial launch was planned to be in
8  China.  As I said, with the start of production in Q4 of
9  2019, with start of sales in China in the first quarter
10 of 2020, and then, in the summer of 2020 the vehicle was
11 planned to be launched in U.S. and Europe
12 simultaneously.  So there was a six-month gap between
13 the China launch and the subsequent launches in U.S. and
14 Europe.
15    Q.  All right, and when did you join Byton, sir?
16    A.  In July 2017.
17    Q.  And would you please tell us about the various
18 positions you have held at Byton and your duties and
19 responsibilities in each position?
20    A.  So I -- my current title, which is also the
21 title at the time of me joining Byton, I was responsible
22 for product control and was hired to be responsible for
23 the product control and business operations function.  I
24 was focused more on the product finance side initially
25 when I joined, and then, as there was some people

Page 797

1  transitioning to other roles within Byton, somewhere
2  around -- I can't remember exactly, maybe late
3  2017/early 2018, I also took responsibility, full
4  responsibility for the North American finance
5  operations.
6     Q.  And currently what are your duties and
7  responsibilities at Byton North America?
8     A.  Currently it's a lot broader than what I signed
9  up for, what my title shows, because there's hardly
10 anyone left at Byton and I'm managing a lot of things
11 from facilities to covering a lot of areas where we do
12 not have people.
13    Q.  And how many employees does Byton North America
14 currently have, active employees?
15    A.  Unfortunately, the current full-time headcount
16 is about four, and then we have two people in part-time
17 capacity on an as-required basis.
18    Q.  At its peak of employment, approximately how
19 many employees did Byton North America have?
20    A.  If I recall correctly, at its peak we had
21 somewhere around 550 people.
22    Q.  And now there's you said about four full-time
23 employees?
24    A.  Correct.
25    Q.  At its peak, of those 550 approximately

Page 798

1  employees, how many were engineers?
2     A.  I would say 400 to 420 were engineers.
3     Q.  Why did you join Byton, sir?
4     A.  So I'm an automotive nut, been in the
5  automotive world for a long long time, and the EV
6  industry was just picking up in the time I came to the
7  U.S. and I looked at this opportunity as an opportunity
8  to transition and grow my career in the EV industry.
9  And so then I was looking at various companies.
10       Byton approached me around that same time and I
11 saw the challenge of working in a startup environment,
12 the experience I did not have before, as well as being
13 part of an EV revolution, along with -- it was changing
14 from, I should say, an automotive sector to an auto tech
15 sector, if you understand what I mean, so it was getting
16 more to the technology side of it rather than just the
17 automotive part of it.  So I saw that that's a good
18 career opportunity.
19    Q.  You mentioned that Byton had around 550
20 employees at its peak level of employment.  When was
21 that approximately that it reached its peak of
22 employment?
23    A.  I would say May 2019.
24    Q.  And so what happened with the company going
25 from 550 employees down to four active employees, what

Page 799

1  happened?
2     A.  So in 2018, December, we closed our B-round
3  funding, we were getting ready to launch the car in
4  2019, so we were accelerating our employment of
5  resources and everything to support the launch related
6  to final design and development activities.  So we got
7  to this point in, say, mid-2019 when we got to 550.  And
8  we were also around the same time planning to close our
9  C-round of funding somewhere between April and June time
10 frame in 2019.  So it was all positive and we were
11 working through the various funding rounds and the
12 relations at that time to close the C-round by middle of
13 2019.
14       Unfortunately, there was quite a few issues
15 that came up around that time.  One was -- I should say,
16 it was a perfect storm.  One was we were finding it
17 difficult to close the funding because of, I should say,
18 intercontinental relations between U.S. and China.
19 There was a lot of speculation on the China side as to
20 what would happen and how the -- and the U.S. government
21 at the time would be with Chinese-owned companies and so
22 on.  So a lot of the investors were worried about
23 putting money and that dragged along a bit.
24       And then we had some investor options from
25 within China who were interested in putting money, they

Page 800

4 (Pages 797 - 800)

CONFIDENTIAL

1     MR. ESTES: Kristin, you can pull that down.
2     Q.  And you didn't speak to Mr. Tom Wessner to
3  prepare as Byton's most qualified witness; right?
4     A.  No.
5     Q.  You didn't seek to Mr. David Twohig to prepare
6  to testify as Byton's most qualified witness; right?
7     A.  I did read the depositions and declarations,
8  but I don't recall talking to him specifically.
9     Q.  And same with Mr. Shawn Slovesko: You didn't
10 speak with him to prepare to testify as Byton's most
11 qualified witness; right?
12     MR. SIPPRELLE: I'm sorry, we lost the sound
13 there.
14     MR. ESTES: I'll ask the question again.
15     Q.  You didn't speak with Shawn Slovesko to prepare
16 to testify as Byton's most qualified witness; right?
17     A.  So you are referring to the November
18 deposition?
19     Q.  Correct.
20     A.  That is correct.  Again, I did read his
21 deposition and any other details, but not -- did not
22 speak with him.
23     Q.  Dr. Daniel Kirchert is a former Byton CEO?
24     A.  Correct.
25     Q.  You didn't speak with Daniel Kirchert to

Page 849

1  confirms it will fulfill this payment amounting to
2  EUR 19,779,825.21 (overdues until August 17th, 2019,
3  interests included) before other creditors are paid.
4  Byton plans on fulfilling this payment latest August
5  18th, 2019."
6     Did I read that correctly?
7     A.  Yes.
8     Q.  Byton did not fulfill the 19.7 million euro
9  payment to EDAG on or before August 18th, 2019; right?
10     A.  That is correct.
11     Q.  Byton North America Corporation hasn't paid any
12 creditors other than fundamental site operational costs
13 and payroll costs since signing the July 28, 2019 Letter
14 of Confirmation?
15     A.  That's correct.
16     Q.  Byton says nothing about EDAG engineering
17 errors in this July 28, 2019 Letter of Confirmation,
18 right?
19     MR. SIPPRELLE: Object; argumentative, document
20 speaks for itself.
21     THE ARBITRATOR: No, go ahead and answer that,
22 yeah.
23     THE WITNESS: Could you slow down, please?
24 You're going too fast there.
25     Q.  BY MR. ESTES: Byton says nothing about EDAG

Page 851

1  prepare to testify as Byton's most qualified witness at
2  deposition; right?
3     A.  That is correct.
4     Q.  Carsten Breitfeld is a former Byton CEO?
5     A.  Yes.
6     Q.  You didn't speak with Mr. Breitfeld to prepare
7  to testify as Byton's most qualified witness; right?
8     A.  That's correct.
9     Q.  And in fact, you didn't speak with anyone at
10 Byton other than attorneys to prepare for your testimony
11 as Byton's most qualified witness; right?
12     A.  And, yeah, internal, internal Legal Team.
13     MR. ESTES: All right, Kristin if we could put
14 up Exhibit 151 again, please.
15     THE WITNESS: Just to clarify my last answer,
16 most of these people that you mentioned were not with
17 the company by the time I testified so I did not have
18 access to those people except for Ms. Teresa Shi who was
19 still with the company at that time.
20     MR. ESTES: If we can turn back to the third
21 page, Kristin, please.
22     Q.  Second paragraph of this document states,
23 "Byton herewith confirms that these dues are to be paid
24 in full as soon as the 'bridging loan' is accomplished
25 and the funds have been received by Byton.  Byton

Page 850

1  engineering errors in this July 28, 2019 Letter of
2  Confirmation; correct?
3     A.  Correct.
4     Q.  Byton never asked EDAG to discount the amount
5  it was owed because of engineering errors or otherwise?
6     A.  That is correct.
7     MR. ESTES: Kristin, can we pull up Exhibit
8  156, please.
9     Q.  Sir, are you familiar with this document?
10     A.  Can you make it a little bit bigger, please, so
11 that I can read it?
12     Yes, I am.
13     Q.  This is an August 16, 2019 e-mail from Tom
14 Wessner to Holger Merz, and he says he's attaching a
15 revised payment plan.
16     A.  Okay.
17     Q.  And if we go to the last page, page 5, that's
18 Mr. Wessner's payment plan; correct?
19     A.  Yes, as I recall, yes.
20     Q.  It's entitled "EDAG Overdue Payment Schedule";
21 right?
22     A.  Yes.
23     Q.  Byton never paid EDAG 1.7 million euro on
24 August 19th; right?
25     A.  No.

Page 852

17 (Pages 849 - 852)

EXHIBIT "D"

E-FILED
10/8/2019 4:43 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
19CV356373
Reviewed By: Yuet Lai

1   Ernest M. Malaspina (State Bar No. 187946)
emalaspina@hopkinscarley.com
2   Jedidiah L. Dooley (State Bar No. 240105)
jdooley@hopkinscarley.com
3   HOPKINS & CARLEY
A Law Corporation
4   The Letitia Building
70 S First Street
5   San Jose, CA  95113-2406

6   *mailing address:*
P.O. Box 1469
7   San Jose, CA 95109-1469
Telephone:    (408) 286-9800
8   Facsimile:    (408) 998-4790

9   Attorneys for Plaintiff
GROUPWARE TECHNOLOGY, INC.

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                      COUNTY OF SANTA CLARA

13

14   GROUPWARE TECHNOLOGY, INC., a          CASE NO. 19CV356373
California corporation,
15                                          **COMPLAINT FOR:**
                    Plaintiff,
16                                          **1. BREACH OF CONTRACT; AND**
        v.                                  **2. COMMON COUNTS**
17
BYTON NORTH AMERICA                         UNLIMITED JURISDICTION
18   CORPORATION, a Delaware corporation;
and DOES 1 through 10, inclusive
19
                    Defendants.
20

21

22

23

24

25

26

27

28

530\3358304.1

COMPLAINT FOR (1) BREACH OF CONTRACT; AND (2) COMMON COUNTS

Plaintiff Groupware Technology, Inc. complains of Defendants, and each of them, and alleges:

## PARTIES

1.     Plaintiff Groupware Technology, Inc. ("GTI" or "Plaintiff") is a company organized and existing under the laws of the State of California and has its principal place of business in Santa Clara County, State of California.

2.     GTI is informed and believes, and so alleges, that Defendant Byton North America Corporation ("Byton" or "Defendant") is a corporation organized and existing under the laws of the State of California with its principal place of business at 4201 Burton Drive, Santa Clara, CA 95054.

3.     The true names and capacities of DOES 1 through 10 are unknown to GTI, who therefore sues them by such fictitious names.  GTI prays leave to amend this Complaint to show the true names and capacities of said DOES when the same has been ascertained.  GTI is informed and believes, and so alleges, that each of said DOES is responsible for GTI's damages as hereinafter alleged and described.

4.     GTI is informed and believes, and based thereon alleges, that Defendants, and each of them, are, at all times herein mentioned were, the agents, servants, employees, and representatives of their Co-Defendants, and were at all times herein mentioned acting within the scope, purpose, and authority of such agency, service, employment, and representation, and with the permission, knowledge, and consent of their Co-Defendants; any reference hereinafter to "Defendants" is intended by GTI to refer to "Defendants, and each of them."

5.     GTI is informed and believes, and so alleges, that the Defendants, and each of them, were the agent, partner, employee and/or alter ego of one or more of the remaining Defendants and in doing the things herein alleged was acting within the course and scope of said agency, partnership, and/or employment.

## GENERAL ALLEGATIONS

6.     GTI is a company that provides IT goods and services, including subscriptions to various software programs designed to enhance its customers IT capabilities.

7. All products and services GTI offers for sale are subject to the GTI's Terms and Conditions for the Sales of Goods and Services (the "Terms & Conditions"). A true and correct copy of GTI's Terms & Conditions is attached hereto as **Exhibit A** and is incorporated by reference.

8. Between February 2019 and March 2019, Byton placed 7 purchase orders with GTI for goods and services (the "Purchase Orders"). The Purchase Orders are attached hereto as **Exhibit B** and incorporated by reference. As reflected in the purchase orders, in total Byton ordered $466,562.03 worth of goods and services from GTI.

9. GTI timely delivered all goods and services that Byton ordered in the Purchase Orders.

10. Additionally, pursuant to GTI's Terms and Conditions, GTI issued invoices to Byton for the amounts due and owing (the "Invoices"). The Invoices are attached hereto as **Exhibit C**.

11. While GTI complied with the parties' contract and provided the goods and services requested, Byton has failed and refused to make any payment to GTI. As a result, Byton's outstanding balance for the goods and services provided is $466,562.03.

12. Despite GTI's demands for payment, Byton has refused, and continues to refuse, to pay GTI the $466,562.03 due and owing.

### FIRST CAUSE OF ACTION
#### (Breach Of Contract)

13. GTI incorporates herein by reference, as though separately set forth herein, the allegations contained in paragraphs 1 through 12 above, inclusive.

14. GTI and Byton entered into a written agreement, comprised of the Purchase Orders, Invoices, and Terms & Conditions, wherein GTI was to provide the products and services ordered in exchange for payment by Byton.

15. GTI has performed all conditions, covenants and promises under the parties' agreement, except for those terms, covenants, and conditions that were excused or otherwise discharged as a result of Byton's breach, non-performance or waiver.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

530\3358304.1

- 2 -

COMPLAINT FOR (1) BREACH OF CONTRACT; AND (2) COMMON COUNTS

16. Byton breached the parties' agreement by, among other things, failing to pay for the goods and services provided by GTI.

17. As a direct and proximate result of Byton's breach of the parties' agreement, GTI has sustained damages in an amount to be determined at trial, but not less than $466,562.03.

18. Pursuant to the Terms & Conditions, GTI is entitled to recover attorneys' fees and costs in connection with this dispute.  As a direct and proximate cause of Byton's aforementioned breaches of the parties' agreement, GTI has retained Hopkins & Carley and has incurred and will continue to incur attorneys' fees and costs of suit in connection therewith, according to proof at trial.

WHEREFORE, GTI prays for judgment against Byton as set forth below.

## SECOND CAUSE OF ACTION
### (Common Counts – Quantum Meruit)

19. GTI incorporates herein by reference, as though separately set forth herein, the allegations contained in paragraphs 1 through 18 above, inclusive.

20. Within the last two (2) years, in Santa Clara County, California, at the instance and request of Byton, GTI provided goods and services to Byton, in the total amount of at least $466,562.03.  Said sum constitutes the reasonable value of the goods and services provided to Byton by GTI.

21. Byton promised to pay GTI for the reasonable value of said goods and services goods.

22. There remains due, owing, and unpaid to GTI from Byton the amount of not less than $466,562.03, plus interest thereon at the maximum legal rate, all according to proof at the time of trial.

23. Although demand has been made for the amounts due and owing, none of the balance has been paid.

1    WHEREFORE, GTI prays for judgment against Byton as set forth below.

2    **<u>PRAYER FOR RELIEF</u>**

3    1.    For damages in an amount to be proven at trial according to proof, but not less

4    than $466,562.03;

5    2.    For interest, according to proof;

6    3.    For reasonable attorney's fees and costs as provided for in the parties' agreement;

7    3.    For costs of suit herein; and

8    4.    For such other and further relief as the Court deemed just and proper.

9    Dated: October 7, 2019                    HOPKINS & CARLEY
                                              A Law Corporation
10

11

12    By: _____
                Ernest M. Malaspina
13              Jedidiah L. Dooley
                Attorneys for Plaintiff
14              GROUPWARE TECHNOLOGY, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

530\3358304.1                        - 4 -
COMPLAINT FOR (1) BREACH OF CONTRACT; AND (2) COMMON COUNTS

EXHIBIT "E"

```
              C O N F I D E N T I A L
 1                 JAMS ARBITRATION
 2
 3   EDAG ENGINEERING GmbH,            )
                                       )
 4             Claimant,               )
                                       )
 5   v.                                )  JAMS Reference No.
                                       )      1100107291
 6   BYTON NORTH AMERICA CORPORATION,  )
                                       )
 7             Respondent.             )
     _____ )
 8                                     )
     BYTON NORTH AMERICA CORPORATION,  )
 9                                     )
               Counter-Claimant,       )
10                                     )
     v.                                )
11                                     )
     EDAG ENGINEERING GmbH,            )
12                                     )
               Counter-Respondent.)
13   _____ )
14
15              C O N F I D E N T I A L
16
17     REPORTER'S TRANSCRIPT OF ARBITRATION PROCEEDINGS
18        ALL PARTIES APPEARING REMOTELY VIA ZOOM
19              MONDAY, FEBRUARY 8, 2021
20        ARBITRATOR:  HON. WILLIAM J. CAHILL (RET.)
21                    VOLUME I
22
23   JOB NO. 4384677
24   REPORTED BY: SUSAN E. LANSING, CSR NO. 6355
25   PAGES 1 - 100
```

Page 1

CONFIDENTIAL

1   THE ARBITRATOR:  Thanks for asking me.  You
2 want the contract price plus interest.  Is there an
3 attorneys' fees clause in this?
4   MS. BURBIDGE:  There is not an attorneys' fees
5 clause.  We are seeking the statutory interest as well,
6 your Honor.
7   THE ARBITRATOR:  Okay.  All right.  All right.
8 I've got it.  So, thank you.
9   Mr. Sipprelle, are you going to be next?
10   MR. SIPPRELLE:  I will be next, your Honor.
11 Could we take a five-minute break?  I just need to run
12 to the restroom.
13   THE ARBITRATOR:  If you run it's okay.
14   MR. SIPPRELLE:  I'm going to run, yes.
15   THE ARBITRATOR:  9:30 we'll be back.
16   MR. SIPPRELLE:  9:30?
17   THE ARBITRATOR:  9:30.  Fifteen minutes.
18   (A recess was taken.)
19   MR. SIPPRELLE:  Good morning, your Honor.  My
20 name is Keith Sipprelle and I will be trying this case
21 along with my co-counsel and partner David Van Etten.
22 We represent Byton North America Corporation, and I'll
23 refer to Byton North America during the hearing as Byton
24 just to keep things a little simpler.  One of Byton's
25 senior employees, Mr. Sadha Kameswaran, is attending

Page 26

CONFIDENTIAL

1 today along with Evelyn Shimazaki, one of the in-house
2 attorneys.
3   Let me start by talking a little about the
4 parties.  And I don't want to repeat things that
5 Ms. Burbidge said, but I'll fill in a few gaps.  So
6 let's talk about Byton first of all.  Byton is an
7 electric car startup company.  It's located in Santa
8 Clara, California, and it was created in 2016 for the
9 purpose of designing, developing, manufacturing and
10 delivering electric automobiles for the consumer market.
11 It was originally known by another name, "Future
12 Mobility," but the name was changed to "Byton" in around
13 2017.
14   So Byton's initial electric vehicle was called
15 the "M-Byte."  It was an all-electric, battery-powered
16 sport utility vehicle, and Byton's plan was to launch
17 the M-Byte in China initially by 2021, this year, and
18 subsequently to sell the M-Byte in the United States and
19 Europe.  As Ms. Burbidge indicated, Byton was a startup
20 company.  It had no product, no sales revenue, and was
21 dependent upon outside funding to get the M-Byte built
22 and into the consumer market.
23   Ms. Burbidge talked about EDAG, her client, and
24 EDAG, as Ms. Burbidge indicated, is an engineering
25 company, large public company, based in Germany.  The

Page 27

CONFIDENTIAL

1 EDAG entity involved in this case is part of the EDAG
2 Group which is one of the world's largest independent
3 development partners for the automotive industry.
4   I want to spend a little time talking about who
5 I believe is going to be one of the key witnesses,
6 perhaps the key witness in this case, and that's
7 Mr. David Twohig.
8   THE ARBITRATOR:  David what?
9   MR. SIPPRELLE:  David Twohig.  And let me spell
10 the name for you.  It's spelled a little bit different
11 than it sounds.  T-w-o-h-i-g, pronounced "Twohig."
12   THE ARBITRATOR:  Okay.
13   MR. SIPPRELLE:  So, Mr. Twohig is an electrical
14 engineer with extensive experience in the automotive
15 industry.  Mr. Twohig joined Byton in March of 2018 as
16 the company's Chief Vehicle Engineer and he was later
17 promoted to Chief Technical Officer.  But he left Byton
18 in February of 2020, approximately a year ago.  He's now
19 working at another company.
20   During his tenure at Byton Mr. Twohig was
21 essentially in charge of Byton's engineering effort with
22 respect to the development of the M-Byte.  Mr. Twohig
23 has a long history in the automotive industry.  Prior to
24 joining Byton he was employed at a number of large
25 automotive companies including Nissan and Renault.  His

Page 28

CONFIDENTIAL

1 experience at Renault is particularly germain to this
2 proceeding.
3   At Renault Mr. Twohig was responsible for
4 engineering the development of Renault's Zoe, pronounced
5 "Zoe" but spelled Z-o-e, Zoe, battery electric vehicle
6 which was one of the world's first true and usable and
7 affordable electric vehicles.  It was launched in 2012
8 in France and then in 2013 in much of the rest of
9 Europe.
10   And if we could pull up trial Exhibit 212,
11 David, just to show this.  This is Mr. Twohig's LinkedIn
12 profile.  It's Trial Exhibit 212 so it may take a moment
13 for that to come up.
14   So we can see here, if you can scroll down,
15 David, just to the portion that I've highlighted, which
16 is Mr. Twohig's, I believe it's on the second page,
17 Mr. Twohig's work at Renault on the Zoe electric
18 vehicle.  Dave, can you scroll that down.
19   MR. VAN ETTEN:  It is scrolled on my screen.
20   MR. SIPPRELLE:  We're not seeing it.  We're
21 seeing it off to the right but we don't see the --
22   THE ARBITRATOR:  We'll all get better at this.
23   MR. SIPPRELLE:  Here we go.  So that's a little
24 small, I don't know if you can expand the view a little
25 bit.

Page 29

8 (Pages 26 - 29)

EXHIBIT "F"

Jonathan D. Baker (SBN 196062)
jdbaker@dickinsonwright.com
Craig Y. Allison (SBN 161175)
callison@dickinsonwright.com
DICKINSON WRIGHT RLLP
800 W. California Avenue, Suite 110
Sunnyvale, CA 94086
Phone: 408-701-6200
Fax: 844-670-6009

*Attorneys for Plaintiffs Hanon Systems,*
*Hanon Systems USA, LLC,*
*Hanon Systems Deutschland GmbH,*
*Hanon Systems (Dalian) Co., Ltd., and*
*Hanon Jie Xi Si Systems (Nanjing) Co., Ltd.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| HANON SYSTEMS, HANON SYSTEMS USA, LLC, HANON SYSTEMS DEUTSCHLAND GMBH, HANON SYSTEMS (DALIAN) CO., LTD., and HANON JIE XI SI SYSTEMS (NANJING) CO., LTD.<br><br>Plaintiffs,<br><br>v.<br><br>BYTON NORTH AMERICA CORPORATION,<br><br>Defendant. | Case No. 5:20-cv-01983<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**1. BREACH OF CONTRACT**<br>**2. PROMISSORY ESTOPPEL**<br>**3. UNJUST ENRICHMENT** |

Plaintiffs Hanon Systems, Hanon Systems USA, LLC ("Hanon USA"), Hanon Systems Deutschland GmbH ("Hanon Germany"), Hanon Systems (Dalian) Co., Ltd. ("Hanon Dalian"), and Hanon Jie Xi Si Systems (Nanjing) Co., Ltd. ("Hanon Nanjing"), for their complaint against Defendant Byton North America Corporation ("Byton"), allege as follows:

## NATURE OF THE ACTION

This is an action for damages caused by Defendant's breaches of automotive supply contracts between Plaintiffs and Defendant, including recovery of all amounts owed for goods and services ordered by and received by Defendant, and for which Defendant has failed to pay. Plaintiffs also seeks to recover interest, attorney fees and costs.

## PARTIES

1. Plaintiff Hanon Systems is a South Korean corporation whose principal place of business is in South Korea.

2. Plaintiff Hanon USA is a Delaware limited liability company. Hanon USA's sole member is Hanon Systems. Hanon USA is therefore a citizen of South Korea for purposes of diversity jurisdiction.

3. Plaintiff Hanon Germany is a German corporation whose principal place of business is located in Germany.

4. Plaintiff Hanon Dalian is a Chinese corporation whose principal place of business is located in China.

5. Plaintiff Hanon Nanjing is a Chinese corporation whose principal place of business is located in China.

6. Defendant Byton is a Delaware corporation whose principal place of business is located in Santa Clara, California. Byton is therefore a citizen of Delaware and California for purposes of diversity jurisdiction.

7. The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because Plaintiffs are all citizens of foreign states and Defendant is a citizen of a state, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. This Court is the appropriate venue for this action under 28 U.S.C. § 1391(b)(1) because Byton resides in this judicial district.

9. This Court is also the appropriate venue for this action based on the venue provisions of three different contract awards issued by Byton to Hanon Systems (as further detailed below).

10. Byton is subject to personal jurisdiction in this Court.

## INTRADISTRICT ASSIGNMENT

11. Pursuant to Civil L.R. 3-2(c), this action should be assigned to the San Jose Division because Byton's principal place of business is located in Santa Clara County and a substantial part of the events or omissions giving rise to the claims occurred within Santa Clara County.

## GENERAL BACKGROUND

12. Hanon Systems and its subsidiaries and affiliates operate as leading global supplier of automotive thermal and energy management solutions.

13. Byton holds itself out as "a manufacturer of intelligent electric cars."

14. On July 1, 2018, Byton issued a contract award to Hanon Systems to design, develop, manufacture and supply 100% of Byton's requirements for certain automotive parts over a seven year period, with production expected to begin in October of 2019 ("Contract Award #1").

15. On July 1, 2018, Byton also issued a second contract award to Hanon Systems to design, develop, manufacture and supply 100% of Byton's requirements for certain other automotive parts over a seven year period, with production expected to begin in October of 2019 ("Contract Award #2").

16. On September 24, 2018, Byton issued a third contract award to Hanon Systems to design, develop, manufacture and supply 100% of Byton's requirements for certain other automotive parts over a seven year period, with production expected to begin in October of 2019 ("Contract Award #3").

COMPLAINT FOR DAMAGES                    3

17. Contract Award #1, Contract Award #2, and Contract Award #3 are hereinafter collectively referred to as the "Contract Awards".[1]

18. In reliance on the Contract Awards (and subsequent purchase orders detailed below), and in order to be able to timely meet its obligations to Byton, Hanon Systems and its subsidiaries, including Hanon USA, Hanon Germany, and Hanon Dalian, made substantial capital and other investments.

19. Byton knew, or should have reasonably expected, that Plaintiffs would be induced and required to make such investments in order to timely perform their obligations.

20. Byton issued a series of purchase orders to Hanon USA and Hanon Germany pursuant to the Contract Awards, requesting that Hanon Systems and its subsidiaries and affiliates provide certain engineering, design and development services, and prototype parts, to Byton that would assist Byton in the development of its vehicles (collectively, the "Part Purchase Orders").

21. Byton also issued a series of purchase orders to Hanon USA, Hanon Germany, Hanon Dalian, and Hanon Nanjing pursuant to the Contract Awards to develop and manufacture certain tooling needed to supply the parts to Byton under the Contract Awards and which was intended to be owned by Byton once manufactured (collectively, the "Tooling Purchase Orders").

22. The Part Purchase Orders and Tooling Purchase Orders are hereinafter referred to collectively as the "Purchase Orders".

23. Plaintiffs performed their obligations under the Contract Awards and Purchase Orders and otherwise met all conditions precedent, if any, to payment and performance of Byton's reciprocal obligations.

24. Plaintiffs submitted invoices to Byton.

25. For a time, Byton paid Plaintiffs' invoices.

26. However, starting around April of 2019, Byton began to become severely delinquent in payments to Plaintiffs.

---

[1] All of the documents referenced in this Complaint are in the possession of Byton and are, or may be, subject to an existing non-disclosure agreement between the parties. Plaintiffs will seek to file them under seal following entry of an appropriate protective order by the Court.

COMPLAINT FOR DAMAGES                    4

27. On June 11, 2019, Plaintiffs formally notified Byton that if Byton did not bring its account current by June 18, 2019 or provide other adequate assurance of performance, Plaintiffs would be required to suspend further performance under the Contract Awards and Purchase Orders, which could impact the expected start of production.

28. Byton did not dispute the invoices but claimed financial inability to perform its own payment and performance obligations under the Contract Awards and Purchase Orders.

29. Accordingly, Plaintiffs suspended further performance.

30. On August 9, 2019, Byton advised Plaintiffs that Byton was expecting to receive funding imminently that would allow Byton to bring its account current so that Plaintiffs could resume performance. However, thereafter Byton failed to make any payments to bring its account current.

31. Due to its own financial difficulties and/or operational difficulties, Byton delayed the expected start of production of its vehicles in October of 2019, and to this day Byton has still not started production of the vehicles for which the Contract Awards and Purchase Orders were issued to Plaintiffs.

32. On January 5, 2020, Byton publicly announced that its "Series C financing" was entering its "final stage", and Byton again advised Plaintiffs that Byton would soon be in a financial position to bring its account with Plaintiffs current and to start production. However, again Byton failed to make any payments whatsoever.

33. On March 4, 2020, Plaintiffs' counsel issued Byton a letter demanding payment of the past due invoices issued against the Part Purchase Orders in full by no later than March 19, 2020, and Plaintiff's counsel further advised Byton that failure to comply would result in legal action to recover all damages caused by Byton's breaches of contract.

34. Byton did not comply with Plaintiffs' demand, thereby necessitating this lawsuit.

**COUNT I – BREACH OF CONTRACT**

35. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 33 above as though fully set forth herein.

COMPLAINT FOR DAMAGES       5

36. The Contract Awards and Purchase Orders constitute binding contracts between Plaintiffs and Byton.

37. Byton's actions above constitute a total breach of the Contract Awards and Purchase Orders, which have caused Plaintiffs millions of dollars in damages.

38. More specifically, Byton's breaches of contract have caused Plaintiffs the following damages in the total amount of at least $2,018,937[2] (exclusive of lost future profits):

     a. $718,840 = amount due and owing to Plaintiffs under the Part Purchase Orders for goods and services delivered;

     b. $27,111 = amount due and owing to Plaintiffs under the Part Purchase Orders for goods assembled but not yet delivered pending adequate assurance of payment (which Plaintiffs have not received);

     c. $398,572 = balance remaining under Tooling Purchase Orders; and

     d. $874,414 = Plaintiffs' unrecovered capital and other investments incurred in reliance on, and in order to perform, the Contract Awards and Purchase Orders.

39. Accordingly, Plaintiffs are entitled to recover from Byton all damages caused by Byton's breaches of contract, in an amount not less than $2,018,937, plus interest, attorney fees and costs as provided by law.

## COUNT II – PROMISSORY ESTOPPEL

40. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 39 above as though fully set forth herein.

41. In the alternative, the Contract Awards and Purchase Orders constitute promises by Byton to Plaintiffs which Byton should have reasonably expected to induce action on the part of Plaintiffs.

42. In reasonable reliance on the Contract Awards and Purchase Orders, Plaintiffs were induced to take the actions set forth in paragraphs 18 through 23 above.

43. The circumstances are such that injustice can be avoided only by enforcement of Byton's promises.

---

[2] Some of Plaintiffs' invoices and investments were in currencies other than U.S. dollars. For purposes of this Complaint, damages have been estimated in equivalent U.S. dollars based on recent conversion rates.

44. Accordingly, Plaintiffs are entitled to recover from Byton all reliance and other damages caused by Byton's breaches of its promises, in an amount not less than $2,018,937, plus interest, attorney fees and costs as provided by law.

## COUNT III – UNJUST ENRICHMENT

45. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 44 above as though fully set forth herein.

46. In the alternative, Byton has been unjustly enriched at the expense of Plaintiffs because Plaintiffs provided engineering, design and development services, and provided prototype parts and manufactured tooling for Byton, for which Plaintiffs have not been fully compensated.

47. The circumstances are such that it would be inequitable for Byton to retain the benefit of Plaintiffs' efforts without payment to Plaintiffs for the value provided.

48. Accordingly, Plaintiffs are entitled to recover from Byton quantum meruit or restitution damages in an amount not less than $2,018,937, plus interest, attorney fees and costs as provided by law.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendant Byton as follows:

1. For compensatory damages, reliance damages, quantum meruit and/or restitution in the amount of at least $2,018,937;

2. For all other direct, indirect, incidental and consequential damages incurred;

3. For interest as provided by law;

4. For attorney fees and costs as provided by law; and

5. For such further relief as the Court deems just and equitable.

Dated:  March 20, 2020

Respectfully submitted,

DICKINSON WRIGHT RLLP

/s/ *Jonathan D. Baker*
Jonathan D. Baker (SBN 196062)
jdbaker@dickinsonwright.com
800 W. California Avenue, Suite 110
Sunnyvale, CA 94086
Phone: 408-701-6180
Fax: 844-670-6009

*Attorneys for Plaintiffs*

4836-3931-1543 v12 [65113-1]

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HANON SYSTEMS, HANON SYSTEMS USA, LLC, HANON SYSTEMS DEUTSCHLAND GMBH, HANON SYSTEMS (DALIAN) CO., LTD., and HANON JIE XI SI SYSTEMS (NANJING) CO., LTD.

## DEFENDANTS

BYTON NORTH AMERICA CORPORATION

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Santa Clara
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jonathan D. Baker (SBN 196062)
DICKINSON WRIGHT RLLP, 800 W. California Avenue, Suite 110,
Sunnyvale, CA 94086, Telephone: 408-701-6180

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC § 881 | ☐ 422 Appeal 28 USC § 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury – Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC § 157 | ☐ 376 Qui Tam (31 USC § 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **LABOR** | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment Of Veteran's Benefits | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 830 Patent | ☐ 430 Banks and Banking |
| | ☐ 340 Marine | | ☐ 720 Labor/Management Relations | ☐ 835 Patent—Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 740 Railway Labor Act | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced & Corrupt Organizations |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury -Medical Malpractice | ☐ 385 Property Damage Product Liability | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | | | **IMMIGRATION** | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 462 Naturalization Application | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 440 Other Civil Rights | **HABEAS CORPUS** | ☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS–Third Party 26 USC § 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 445 Amer. w/Disabilities– Employment | ☐ 535 Death Penalty | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| ☐ 245 Tort Product Liability | ☐ 448 Education | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation–Transfer    ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)(2)

Brief description of cause:
This is a collection action for damages caused by Defendant's breaches of automotive supply contracts.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.    DEMAND $ 2,018,937.00    CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☐ Yes    ☒ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE _____    DOCKET NUMBER _____

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**    ☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

DATE    03/20/2020    SIGNATURE OF ATTORNEY OF RECORD    /s/ Jonathan D. Baker

EXHIBIT "G"

| Loan Number | Date Approved | SBA Office Code | Processing Method | Borrower Name | Borrower Address | Borrower City | Borrower State | Borrower Zip | Loan StatusDate | LoanStatus | Term | SBA Guaranty Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1746277202 | 4/15/2020 | 912 | PPP | BYTON NORTH AMERICA CORPORATION | 4201 BURTON DR | SANTA CLARA | CA | 95054-1512 | | Exemption 4 | 24 | 100 |

| Initial ApprovalAmount | Current ApprovalAmount | Undisbursed Amount | FranchiseName | ServicingLender Location ID | ServicingLender Name | ServicingLender Address | ServicingLender City | ServicingLender State | ServicingLender Zip | Rural Urban Indicator | Hubzone Indicator | LMI Indicator |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10000000 | 10000000 | 0 | | 378617 | HSBC Bank USA, National Association | 1800 Tysons Blvd, Ste 50 Tysons II | MCLEAN | VA | 22102-4267 | U | N | N |

| BusinessAge Description | Project City | Project County Name | Project State | Project Zip | CD | Jobs Reported | NAICSCode | Race | Ethnicity | UTILITIES_PROCEED | PAYROLL_PROCEED | MORTGAGE_INTEREST_PROCEED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Existing or more than 2 years old | SANTA CLARA | SANTA CLARA | CA | 95054-1512 | CA-17 | 397 | 336111 | Unanswered | Unknown/NotStated | | 10000000 | |

| RENT_PROCEED | REFINANCE_EIDL_PROCEED | HEALTH_CARE_PROCEED | DEBT_INTEREST_PROCEED | BusinessType | OriginatingLenderLocationID | OriginatingLender | OriginatingLenderCity | OriginatingLenderState | Gender | Veteran | NonProfit | ForgivenessAmount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Corporation | 378617 | HSBC Bank USA, National Association | MCLEAN | VA | Unanswered | Unanswered | | 10,113,055.56 |
| Forgiveness Date | | | | | | | | | | | | |
| 6/11/2021 | | | | | | | | | | | | |

** ALL DATA IS PULLED FROM THE SBC AND CONDENSED INTO THIS EXCEL SHEET

EXHIBIT "H"

Bing Zhang Ryan (Bar No.: 228641)
ZHANG LAW GROUP
16 Southwood Drive
Orinda, CA  94563
Telephone: (925) 257-3097
Email: bzhanglaw@gmail.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

POWERLAND TECHNOLOGY INC., a Chinese corporation,

    Plaintiff,

    v.

BYTON NORTH AMERICA CORPORATION, a Delaware corporation, and DOES 1 through 10, inclusive,

    Defendant.

Civil Case No.: _____

**COMPLAINT**

COMPLAINT

## I.     INTRODUCTION

1.     This action arises from Byton North America Corporation's ("Byton" or "Defendant") failure to pay for the products and services provided by Powerland Technology Inc. ("Powerland" or "Plaintiff") from late 2018 to October 2019.

2.     Although Defendant admitted on numerous occasions that they received the products and services provided by Plaintiff, it refused to pay for the amount of $616,412.00 despite Plaintiff's repeated efforts in collecting this amount from Defendant.

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d).  The requirement of minimal diversity is met as the amount in controversy exceeds the amount of $75,000, exclusive of interest and costs, and the dispute is between citizens of a state and a citizen of a foreign state.  *See* 28 U.S.C. § 1332(d)(2).

4.     This Court has personal jurisdiction over Defendant in that Defendant, a Delaware corporation, is registered to conduct business as a foreign corporation in the state of California and has its principal place of business in Santa Clara, California.  Defendant also engaged in the misconduct alleged herein in Santa Clara, California.

5.     Venue for this action is proper in this District pursuant to 28 U.S.C. §1391(b) in that Defendant's principal place of business is located in this judicial district and Defendant regularly conducts business in this district.  The causes of action also arose, at least in part, in this district.

## III.     THE PARTIES

6.     Plaintiff is a corporation registered in the People's Republic of China ("China") in 2009.  It maintains its principal office in Nanjing, China.  It designs and manufactures high-end power electronic products featuring high efficiency, high reliability, super long life, and high power density.  It provides green power products and related services to customers around the world.  The Chinese name of Plaintiff is "南京博兰得电子科技有限公司".

7. Defendant is a corporation registered in the State of Delaware on November 21, 2016 and registered in the State of California as a foreign corporation on November 28, 2016. Its headquarters are located in Santa Clara, California.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Defendant Received the Products and Services Provided by Plaintiff from Late 2018 to October 2019

8. Defendant is an electric car startup. It designs and manufactures electric cars with advanced technologies.

9. On December 13, 2018, Defendant issued a purpose order (#13841) to Plaintiff relating to products and services described as "11kw OBC Development" for the amount of $519,340 ("PO 13841"). A true and correct copy of the purchase order # 13841 is attached hereto as **Exhibit 1**.

10. On February 8, 2019, Defendant issued a purpose order (#14270) to Plaintiff, relating to products and services described as "DCDC ED&T" for the amount of $800,300. A true and correct copy of the purchase order # 14270 is attached hereto as **Exhibit 2**.

11. In April 2019, Defendant requested that Plaintiff made modifications relating to the ED&T project. On April 23, 2019, Plaintiff replied that the estimated cost of the modifications as requested by Plaintiff would be $160,000.00. On the same date, Thomas Riedell, an engineer of Defendant, replied to Plaintiff via an email, confirming the cost estimate and demanding Plaintiff to work on the modifications as soon as possible. A true and correct copy of the relevant emails are attached hereto as **Exhibit 3**.

12. Plaintiff worked on the modifications of the ED&T project and incurred $160,000 under the instruction of Defendant.

### B. Defendant Failed to Make a Payment for the Amount of $616,412.00 Upon Repeated Demands from Plaintiff

13. By December 2019, Defendant still owed Plaintiff $616,412.00 for the products and services already provided by Plaintiff.

14. Plaintiff made numerous requests for the payment of $616,412.00 from December 2019 to June 2020. Although Defendant admitted that it received the relevant products and services, it refused to make any payment.

15. On July 16, 2020, Plaintiff sent a demand letter to Defendant, again requesting for an immediate payment of $616,412.00. A true and correct copy of the demand letter is attached hereto as **Exhibit 4**. In the demand letter, Plaintiff informed Defendant that if Defendant failed to make the payment by July 23, 2020, Plaintiff would file a civil lawsuit in an appropriate venue against Defendant.

16. As of the date of this filing, Defendant has not replied to Plaintiff's July 16, 2020 demand letter and has not made any payment to Plaintiff.

## V. FIRST CLAIM FOR RELIEF

### Breach of Contract

17. Plaintiff repeats all previous allegations as if set forth in full herein.

18. The parties entered into valid contracts (*i.e.* purchase order # 13841 and purchase order # 14279) concerning the products and services ordered by Defendant. Plaintiff delivered the products and services pursuant to the purchase orders. Defendant does not dispute the amount owed to Plaintiff or whether it has received the products and services from Plaintiff.

19. Defendant materially breached the contract by failing to make the payment of $616,412.00 regarding the products and services provided by Plaintiff.

20. Defendant's breach caused a loss to Plaintiff.

## VI. SECOND CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

21. Plaintiff repeats all previous allegations as if set forth in full herein.

22. It is implied in every contract that the parties to a contract will deal with each other honestly, fairly, and in good faith, so as not to destroy the right of the other party to receive the benefits of the contract and to reinforce the express covenants or promises of the contract. Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

23. By entering into the two contracts with Plaintiff, Defendant is subject to the implied covenant of good faith and fair dealing. Thus, in carrying out its obligations under the contract with Plaintiff, Defendant must act in good faith and deal fairly with Plaintiff.

24. Defendant breached its obligations to Plaintiff under the contracts by failing to make any payment upon numerous requests by Plaintiff.

25. Defendant has refused to pay for the products and services without reasonable justification. As a result of Defendant's breach, Plaintiff has suffered damages.

## VII. THIRD CLAIM FOR RELIEF

### Unjust Enrichment

### (Against All Defendants)

26. Plaintiff repeats all previous allegations as if set forth in full herein.

27. Defendant has received a benefit of the products and services provided by Plaintiff. Defendants' retention of the products and services without payment would be unjust to Plaintiff.

28. Plaintiff expected remuneration from Defendant at the time Plaintiff delivered the products and services to Defendant.

29. However, Defendant has refused to pay for the products and services without reasonable justification. As a result of Defendant's breach, Plaintiff has suffered damages.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Directing Defendant to pay Plaintiff for the amount of $616,412.00 for the products and services provided by Plaintiff, plus any interest as accrued;

B. Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

C. Granting such other or further relief as the Court may deem just and proper.

DATED:  July 31, 2020                    ZHANG LAW GROUP


                                         _____/s/ Bing Zhang Ryan_____
                                         Bing Zhang Ryan (Bar No.: 228641)
                                         16 Southwood Drive
                                         Orinda, CA  94563
                                         Telephone: (925) 257-3097
                                         Email: bzhanglaw@gmail.com

                                         *Attorney for Plaintiff*

EXHIBIT "I"

E-FILED
10/14/2020 6:08 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV372211
Reviewed By: D Harris

1  RON CHOW, Esq.        (Bar No. 241946)
   GARDENER, RIECHMANN & CHOW
2  Attorneys at Law
   438 E. KATELLA AVE., SUITE 202
3  ORANGE, CA  92867
   Telephone:  (714) 972-8989
4  Facsimile:  (714) 972-3928
   *E-Mail: ron@grclawfirm.com*

5

6  Attorneys for Plaintiff

7

8        SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

9          DOWNTOWN SUPERIOR COURTHOUSE - CIVIL DIVISION

10

11  BLUE ARC ELECTRIC, INC.,              )   CASE NO.:  20CV372211
                                          )
12                          Plaintiff,    )
                                          )   COMPLAINT FOR MONEY
13  vs                                    )
                                          )   **LIMITED CIVIL**
14  BYTON NORTH AMERICA                   )
    CORPORATION, a Delaware corporation,  )
15                                        )
                                          )
16  DOES 1 TO 10,                         )
                                          )
17                          Defendants.   )
                                          )
18  _____     )

19  Amount of Demand:  $13,115.75

20        COMES NOW the plaintiff, and for cause of action against the defendant(s), and each of

21  them, alleges as follows:

22                        FIRST CAUSE OF ACTION
                            OPEN BOOK ACCOUNT
23                         AS TO ALL DEFENDANTS

24        1.  That plaintiff is unaware of the true names or capacities, whether individual, associate,

25  corporate or otherwise, of defendants DOES 1 TO 10, and therefore sues them by such fictitious

26  names, and leave of court will be asked to insert their true names and capacities when same have

27  been ascertained.

28        2.  That this judicial district is the proper venue for this action because the defendant(s)

                                        1
                            **COMPLAINT FOR MONEY**

1    maintains his/her/its business in the within judicial district, and/or the debt was incurred and/or is

2    payable in the within judicial district.  That defendant does business at 4201 Burton Dr., Santa

3    Clara, CA 95054.  That the within action is not subject to the provisions of Civil Code Sections

4    1812.10 or 2984.4.

5          3.  That plaintiff is a corporation, authorized to do business in the State of California.

6          4.  That within four years last past and on or about February 14, 2020, the defendant(s), and

7    each of them, became indebted to plaintiff on an open book account, for a balance due for goods,

8    wares and merchandise sold and/or services rendered in the sum of $13,115.75.

9          5.  That although demand for payment of said sum has been made, defendant(s), and each

10   of them, have failed and refused to pay said sum, and the whole thereof is now due, owing and

11   unpaid, together with interest thereon at the rate of 10% per annum, from and after February 14,

12   2020.

13                                    SECOND CAUSE OF ACTION
                                      ACCOUNT STATED
14                                    AS TO ALL DEFENDANTS

15         6.  Plaintiff refers to all of the allegations contained in paragraphs 1, 2, 3, and 5 of the First

16   Cause of Action, and by this reference incorporates them herein as though fully set forth.

17         7.  That on February 14, 2020, there was an account stated between plaintiff and

18   defendant(s), and each of them, upon which account stated the sum of $13,115.75, and was agreed

19   upon as the balance due plaintiff.

20                                    THIRD CAUSE OF ACTION
                                      REASONABLE VALUE OF SERVICES RECEIVED
21                                    AS TO ALL DEFENDANTS

22         8.  Plaintiff refers to all of the allegations contained in paragraphs 1, 2, 3, and 5 of the First

23   Cause of Action, and by this reference incorporates them herein as though fully set forth.

24         9.  That within four years last past and on or about February 14, 2020, defendant(s), and

25   each of them, became indebted to plaintiff in the sum of $13,115.75 for goods, wares and

26   merchandise sold and/or services rendered to defendant(s), and each of them, at their special

27   instance and request, and the reasonable value of same in the sum of $13,115.75.

28   / / /

**COMPLAINT FOR MONEY**

FOURTH CAUSE OF ACTION
UNJUST ENRICHMENT
AS TO ALL DEFENDANTS

10.  Plaintiff incorporates by reference paragraphs 1 through 9, inclusive, of this Complaint as though fully set forth.

11.  Defendant(s) have/had benefited from moneys, goods, wares and merchandise sold and/or services rendered provided by the Plaintiff and not repaid.  Given Defendant(s) failure to make payments for the outstanding balance owed with respect to the accounts, and the fact that Defendant(s) was/were the beneficiary of funds provided on the accounts, Defendant(s) would be unjustly enriched unless the judgment is entered for the full balance due owing on the accounts.

12.  By reason of the foregoing, Plaintiff is entitled to judgment against Defendant(s) for unjust enrichment in an amount to be determined at trial, plus court costs.

13.  That within four years last past and on or about February 14, 2020, defendant(s), and each of them, became indebted to plaintiff in the sum of $13,115.75 for goods, wares and merchandise sold and/or services rendered to defendant(s), and each of them, at their special instance and request, and the reasonable value of same in the sum of $13,115.75.

WHEREFORE, plaintiff prays for judgment against defendant(s), and each of them, as follows:

1.  For the principal sum of $13,115.75, together with interest thereon at the rate of 10% per annum from February 14, 2020;

2.  For costs of suit incurred herein;

3.  For reasonable attorney's fees pursuant to C.C.P. Section 1717.5, in a sum according to proof; and

4.  For such other and further relief as the court may deem just and equitable.

DATED:   October 13, 2020

_____
RON CHOW, Esq.
A Member of Gardener, Riechmann & Chow
Attorneys for Plaintiff

3

**COMPLAINT FOR MONEY**

EXHIBIT "J"

E-FILED
10/22/2020 2:43 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV372607
Reviewed By: D Harris

1  ELLEN RUTH FENICHEL (Bar No. 172142)
   PATRICK T. FREEMAN (Bar No. 307329)
2  VALLE MAKOFF LLP
   388 Market Street, Suite 1300
3  San Francisco, California 94111
   Telephone: (415) 986-8001
4  Facsimile: (415) 986-8003
   Email: efenichel@vallemakoff.com,
5         pfreeman@vallemakoff.com

6  Attorneys for Plaintiff
   AIR INTERNATIONAL (US) INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SANTA CLARA

10

11 AIR INTERNATIONAL (US) INC., a          Case No.  20CV372607
   Delaware corporation,
12                                          **COMPLAINT FOR:**
13              Plaintiff,
                                                (1) **ACCOUNT STATED**
14       v.
                                                (2) **BREACH OF CONTRACT**
15 BYTON NORTH AMERICA
   CORPORATION, a Delaware corporation,     **JURY TRIAL DEMANDED**
16 AND DOES 1-10, inclusively,
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

---

**COMPLAINT**

Plaintiff Air International (US) Inc., for its Complaint, alleges on knowledge with respect to its own acts and on information and belief with respect to all other matters as follows:

1.     Plaintiff Air International (US) Inc. ("AIUS") manufactures automotive HVAC systems that it sells to automobile manufacturers.

2.     Defendant Byton North America Corporation ("Byton") manufactures automobiles.

3.     AIUS brings this suit because Byton has failed to pay for the development and manufacture of certain HVAC systems that Byton contracted for.

## JURISDICTION, VENUE AND PARTIES

4.     This is a civil action arising under the statutory and common law of the State of California.

5.     AIUS is a Delaware corporation with its principal place of business in Auburn Hills, Oakland County, Michigan.

6.     Byton is a Delaware corporation with its principal place of business in Santa Clara, Santa Clara County, California.

7.     Jurisdiction and venue are proper in this Court because, at all times relevant, Byton has conducted business in the County of Santa Clara, California, the relevant contracts between the parties were substantially negotiated, performed and/or breached in the County of Santa Clara, California, and the amount in controversy exceeds $25,000.

8.     AIUS is ignorant of the true names and capacities of the defendants sued in this Complaint as DOES 1 through 10, inclusive, and therefore sues these defendants by such fictitious names in accordance with California Code of Civil Procedure § 474.  AIUS will amend this Complaint to allege the true names and capacities of the Doe defendants when ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged in this Complaint, and AIUS's damages are actually and proximately caused by the conduct of such defendants.

9.     AIUS is informed and believes and thereon alleges that each of the defendants

1

**COMPLAINT**

is and at all relevant times was the agent of the other defendants.  In the course of doing the things alleged in this Complaint, each defendant was acting in the course and scope of that authority and/or agency.

### Byton Contracts for HVAC Systems from AIUS

10.     AIUS and Byton agreed that AIUS would develop and manufacture an HVAC system for use in Byton vehicles.  The agreement was documented in a series of purchase orders issued by Byton to AIUS and by invoices issued by AIUS to Byton, as well as other communications between the parties.  Each purchase order incorporated the applicable terms and conditions ("Byton Terms").  The purchase orders and invoices are attached to this Complaint as Exhibits 1 through 16 and are summarized as follows:

| Activity | Original Invoice Date | Total Invoice ($) | Byton PO # | PO Ex. # | AI Invoice # | Inv. Ex. # |
|---|---|---|---|---|---|---|
| Bracket Tooling Pre-AP | 7/20/2018 | 29,010 | 16508 | 1 | 18000091 | Included in Ex. 1 |
|  |  |  |  |  | 19000074 | 3 |
| TCU/SW Development | 11/14/2018 | 1,329,706 | 16524 | 2 | 19000075 | 4 |
| AP Component Delivery | 12/12/2018 | 920,774 | 15274 | 5 | 19000071 | 6 |
| AP Component Delivery | 12/12/2018 | 9,931 | 12399 | 7 | 19000070 | Included in Ex. 7 |
| AP Rain Covers | 12/12/2018 | 23,100 | 16509 | 8 | 19000069 | 9 |
| System Integration | 12/31/2018 | 1,147,500 | 14515 | 10 | 18000196 | 11 |
| AP Brackets | 12/31/2018 | 258,443 | 16553 | 12 | 19000077 | 13 |
| AP Brackets | 12/31/2018 | 6,229 | 12693 | 14 | 19000072 | Included in Ex. 14 |
| TCU Scope Changes | 2/1/2020 | 557,811 | 17387 | 15 | 20000025 | 16 |
| AI Onsite Engineer | None | 220,000 | None |  | None |  |

11.     Each purchase order was accepted by AIUS and thereby gave rise to a contract between the parties as set forth in the purchase orders and the incorporated Byton Terms.

12.     In addition to the agreements set forth in the purchase orders, Byton entered

2

**COMPLAINT**

into one additional agreement.  Specifically, it requested that AIUS provide an additional "Onsite Engineer" and to pay $220,000 for those services.

13.     AIUS performed all conditions to Byton's payment.  To the extent that any condition was not performed, performance was excused and/or prevented by Byton's breaches.

14.     Until December 2019 Byton made a single $700,500 payment to AIUS, but otherwise failed to perform its obligations to AIUS including, *inter alia*, failing to pay the remaining amounts owed to AIUS.

15.     A series of communications between AIUS and Byton regarding the indebtedness culminated in a December 6, 2019 email from Byton, attached as Exhibit 17 to this Complaint, in which Byton acknowledged its indebtedness and agreed to pay $3,556,063, as follows: (a) immediately pay $451,000; (b) pay $1,549,000 by December 31, 2019; and (c) pay an additional $1,556,063 in 2020 in installments, to be completed by June 2020.

16.     Byton made the 2019 payments, but has failed to make any of the 2020 payments.

## FIRST CAUSE OF ACTION

### (Account Stated)

17.     AIUS repeats and realleges each of the allegations contained in the previous paragraphs 1 through 16 by this reference as though fully set forth herein.

18.     Byton's December 6, 2019 email referenced in paragraph 16 of this Complaint shows an account stated in the amount of $3,556,063.

19.     $1,556,063 remains unpaid on that account.

20.     Payment is overdue and owing.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

21.     AIUS repeats and realleges each of the allegations contained in the previous paragraphs 1 through 20 by this reference as though fully set forth herein.

3

**COMPLAINT**

22.     AIUS performed all terms and conditions precedent to Byton's payment.  To the extent that any condition was not performed, performance was excused and prevented by Byton's breaches.

23.     Byton has breached its contracts with AIUS by failing to pay all amounts due under the parties' written agreements.

24.     AIUS has been damaged in the amount of Byton's payment failures.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff AIUS demands that judgment be entered against Defendants Byton and Does 1-10 as follows:

1.     For the sum of $1,556,063, the unpaid balance;

2.     Pre-judgment and post-judgment interest to the full extent allowed by law;

3.     Reasonable attorneys' fees and costs of suit to the full extent allowed by law; and

4.     Such other and further equitable, legal, or other relief as this Court deems just and appropriate.


Dated: October 22, 2020.                    VALLE MAKOFF LLP

                                            By: _____
                                                 Patrick T. Freeman
                                                 Attorneys for Plaintiff

4

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all matters and issues so triable, including all triable matters or issues raised in this Complaint.

Dated: October 22, 2020.                    VALLE MAKOFF LLP

By: _____
                    Patrick T. Freeman
                    Attorneys for Plaintiff

**COMPLAINT**

EXHIBIT "K"

| Item# | Application # | Patent # | Invention Title | Patent Application | Assignment Date | Assinor/ Assignee |
|---|---|---|---|---|---|---|
| 1 | 16031264 | 10332495 | In Vehicle Karaoke | Application Date: July 10, 2018 | exec: 05/16/2019 rec: 05/17/2019 | Assignor: BNA   Assignee: BYTON LIMITED |
| 2 | 29700749 | D917538 | Display Screen or Portion Thereof With a Graphical User Interface | Application Date: August 5, 2019 | exec: 06/13/2019 Rec: 03/30/2021 | Assignor: BNA   Assignee: BYTON LIMITED |
| 3 | 29616345 | D864227 | Display Screen with an Animated Graphical User Interface | Application Date: September 5, 2017 | exec: 09/19/2019 rec: 09/20/2019 | Assignor: BNA   Assignee: BYTON LIMITED |
| 4 | 15669693 | 10518732 | Airbag Devices Designed to Utilize a Reduced Interior Surface Area of a Vehicle | Application Date: August 4, 2017 | exec: 11/19/2019 rec: 11/25/2019 | Assignor: BNA   Assignee: BYTON LIMITED |
| 5 | 16172551 | 10559794 | Battery Sealing Enclosure | Application Date: October 26, 2018 | exec: 01/02/2020 rec: 01/02/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 6 | 29616340 | D907653 | Display Screen or Portion Thereof With a Graphical User Interface | Application Date: September 5, 2017 | exec: 01/09/2020 rec: 01/29/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 7 | 15863834 | | HVAC Unit Placement Configuration for a Vehicle | Application Date: Jan 5, 2018 | exec: 02/01/2020 rec: 02/03/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 8 | 29616344 | D879121 | Display Screen with a Graphical User Interface | Application Date: September 5, 2017 | exec: 02/18/2020 rec:02/20/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 9 | 15863707 | 10887349 | System and Method for Enforcing Security with a Vehicle Gateway | Application Date: Jan 5, 2018 | exec: 03/17/2020 rec: 11/25/2020 | Assignor: BNA   Assignee: BYTON LIMITED |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10 | 16136052 | 10745018 | Hybrid User Recognition Systems for Vehicle Access and Control | Application Date: September 19, 2018 | exec: 03/18/2020 rec: 03/18/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 11 | 15863831 | 10676067 | User Capture Device Configuration for a Vehicle | Application Date: Jan 5, 2018 | exec: 05/04/2020 rec: 05/04/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 12 | 29675745 | D892693 | Door Panel | Application Date: Jan 4, 2019 | exec: 07/06/2020 rec: 07/06/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 13 | 15696018 | 10746560 | Interactive Mapping | Application Date: September 5, 2017 | exec:  07/13/2020 rec: 07/13/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 14 | 15863686 | 10759362 | Harness for Assissted Driving | Application Date: Jan 5, 2018 | exec: 07/28/2020 rec: 07/28/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 15 | 16240706 | 10860208 | Multi-Window Display Controller | Application Date: January 4, 2019 | exec: 11/02/2020 rec:11/02/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 16 | 29679905 | D904232 | Vehicle | Application Date: February 11, 2019 | exec: 11/03/2020 rec: 11/03/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 17 | 29616346 | D907054 | Display Screen or Portion Thereof With a Graphical User Interface | Application Date: September 5, 2017 | exec: 11/25/2020 rec: 11/25/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 18 | 16240701 | 10891921 | Separate Operating Systems for Dashboard Display | Application Date: January 4, 2019 | exec: 12/09/2020 rec: 12/10/2020 | Assignor: BNA   Assignee: BYTON LIMITED |

| | | | | | | |
|---|---|---|---|---|---|---|
| 19 | 16042847 | 10911949 | Systems and Methods for a Vehicle Authenticating and Enrolling a Wireless Device | Application Date: July 23, 2018 | exec: 12/28/2020 rec: 12/28/2020 | Assignor: BNA   Assignee: BYTON LIMITED |
| 20 | 15957837 | | Door Opening Clearance Detection | Application Date: April 19, 2018 | exec: 01/07/2021 rec: 01/07/2021 | Assignor: BNA   Assignee: BYTON LIMITED |
| 21 | 29675750 | D922932 | Middle Console | Application Date: January 4, 2019 | exec: 05/19/2021 rec: 05/19/2021 | Assignor: BNA   Assignee: BYTON LIMITED |
| 22 | 15975737 | 11117484 | Safe and Secure Charging of a Vehicle | Application Date: May 9, 2018 | exec: 08/11/2021 rec: 08/11/2021 | Assignor: BNA   Assignee: BYTON LIMITED |

EXHIBIT "L"

| Application # | Patent # | Invention Title | Application Date |
|---|---|---|---|
| 16240703 | 11042341 | Integrated Functionality Of Center Display, Driver Display, and Shared-Experience Display | Jan 4 , 2019 |
| 16272849 | 11107354 | Systems and Methods to Recognize Parking | Feb 11,  2019 |
| 16272756 | 11110821 | Sliding Center Module System For Vehicle | Feb 11 , 2019 |

EXHIBIT "M"

1  MAYER BROWN LLP
   JOHN NADOLENCO (SBN 181128)
2   *jnadolenco@mayerbrown.com*
   RUTH ZADIKANY (SBN 260288)
3   *rzadikany@mayerbrown.com*
   ALEXANDER VITRUK (SBN 315756)
4   *avitruk@mayerbrown.com*
   350 South Grand Avenue, 25th Floor
5  Los Angeles, CA 90071
   Telephone: (213) 229-9500
6  Facsimile: (213) 625-0248

7  Attorneys for Plaintiffs
   Byton North America Corporation and
8  Byton Limited

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                    **WESTERN DIVISION**

13

14  BYTON NORTH AMERICA              Case No.: 2-19-cv-10563-DMG-JEM
    CORPORATION, a Delaware
15  corporation; and BYTON LIMITED, a
    Hong Kong company,
16                                   **PLAINTIFF BYTON NORTH**
                    Plaintiffs,      **AMERICA CORPORATION'S**
17                                   **CORPORATE DISCLOSURE**
           v.                        **STATEMENT PURSUANT TO FED.**
18                                   **R. CIV. PROC. R. 7.1**
    ICONIQ MOTORS NORTH
19  AMERICA, INC., a California
    corporation; CARSTEN BREITFELD,
20  an individual; and DOES 1 THROUGH
    25 INCLUSIVE,
21
                    Defendants.
22

23

24

25

26

27

28

1      Plaintiff Byton North America Corporation submits, pursuant to Rule 7.1 of

2  the Federal Rules of Civil Procedure, the following corporate disclosure statement:

3      The parent corporation of Byton North America Corporation is Byton

4  Limited, a privately-held Hong Kong company. No publicly-held corporation owns

5  10% or more of Byton North America Corporation's stock.

6

7

8  Dated: December 19, 2019          MAYER BROWN LLP

9

10                       By: /s/ John Nadolenco
                          John Nadolenco

11                     Attorneys for Plaintiffs

12                     Byton North America Corporation and
                     Byton Limited

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "N"

## David J. Cook

| | |
|---|---|
| **From:** | David J. Cook [davidcook@cookcollectionattorneys.com] |
| **Sent:** | Friday, December 10, 2021 11:36 AM |
| **To:** | 'ksipprelle@vstriallaw.com'; 'lester.vincent@wbd-US.com'; 'enrique.garcia@wbd-US.com' |
| **Cc:** | 'Evangeline A.Z. Burbidge'; 'Kenneth M. Walczak' |
| **Subject:** | NOTICE OF EX PARTE FOR SHORTENING TIME FOR HEARING ON MOTION FOR APPOINTEMENT OF RECEIVER, AND ISSUANCE OF INJUNCTION PURSUANT TO CIVIL CODE SECTION 3439.07(a)(3)(A) |

Mr. Sipprelle:

Please take notice as follows:

        A.      Ex parte motion to set a hearing on motion for appointment of a receiver to take possession and sale of the 20 Patents ("BNA Patents #1") that were transferred by Byton North America ("BNA") to BYTON Limited ("BY LTD"), and vacate, extinguish and set aside the conveyance to BY LTD under Civil Code Section 3439.07(c), 3439.07(a)(3)(B), FRCP 66, C.C.P. Section 708.620, C.C.P. Section 564 etc., and related basis thereof, and the other 3 patents (BNA Patents #2)

        B.      Ex parte motion to issue an injunction from the sale, assignment, transfer, encumbrance, lien, change of name or title, or disposition pursuant to Civil Code Section 3439.07(a)(3)(A) of BNA Patents #1 and BNA Patents #2.

        C.      Ex parte motion to compel BNA and its officer, directors, shareholders and agent to turn over all financial records including all banking records, the records for the use and disposition of the $10,000,000 PPP loan, all records that document the transfer of the BNA Patents #1, all payroll records for all employees of BNA, such as, and including the 550 engineers, of which approximately 400 engineers discussed in the Deposition(s), or the arbitration transcript, all PG&E, water, trash, and cable records and bills for 4201 Burton Drive, Santa Clara, CA 95054, and all records for proof of payment of lease payment due to the landlord for the premises.

As of this moment, the court has not handed down the judgment which is subject to immediate enforcement. We are presuming that the BNA is NOT going to post a bond. Please advise to the contrary.

We anticipate the filing of our moving papers on Monday, December 13, 2021.

We request that you provide us with the current address, telephone number and email for Mr. Gong L. Chen, Esq. who executed the 20 assignments for the transfers of the BNA Patents #1.

We are aware of the $10,000,000 from the PPP loan through the SBA/HSBC and that the BNA received a forgiveness on the PPP Loan. Are you going to advise BNA to turn over the $10,000,000 to EDAG? Are you going to identify the person or entity who has possession of the $10,000,000?

Please inform us upon receipt of this email. If we do not hear from you upon receipt of this email and turn over the $10,000,000, we likewise will seek the issuance of a turnover order pursuant to C.C.P. Section 699.040(a)&(b).

If the $10,000,000 has been sent offshore to Byton Limited or related entities, or any officer, director, shareholder or third party, we will seek relief under Civil Code Section 3439.04(a), Section 3439.05, and California common law as part of the pending relief. The fact of the offshore transfer of the $10,000,000 is very strong evidence of a going pattern of fraudulent conduct for the purpose defrauding EDAG. I remind you the fraudulent conveyance is a common law fraud.

David J. Cook, Esq. Cook Collection Attorneys PLC., 165 Fell Street, San Francisco, CA 94102 (415) 989 4730

.

1

I,   Michael Berg, hereby declare and state as follows:

1.        I am a California licensed certified public accountant since 1982 and a member of the American Institute of Certified Public Accountants (AICPA). I am Certified in Financial Forensics (CFF) by the AICPA and am an advisor and consultant to clients, attorneys and third parties in the area of financial, tax and estate planning, and business litigation.

2.        I was a manager in the audit practice of PWC (formerly Coopers and Lybrand), co-founder and owner of PMB Helin Donovan, a medium sized CPA firm with offices in California and Texas where I was Partner in Charge of the firm's audit practice. I sold my interest in the firm and retired from public accounting. I served as the Chair of the Audit Committee for Marathon Digital Holdings, a NASDAQ traded financial services firm, during 2021 and continue to consult with small public companies. My resume is attached hereto, marked "**Exhibit A**" and incorporated by reference.

3.        I have been deposed on multiple occasions as an expert witness in Bankruptcy Court and in State Court. Particularly, I have been determined by courts as an expert in the business issues related to fraud.A list of litigation matters to which I have attended is attached hereto, marked "**Exhibit B**" and incorporated by reference.

4.        I have been engaged by Mr. David Cook, Esq. in the Matter of EDAG Engineering GMBH vs. Byton North America, a Delaware Corp. to review the transfer of certain patents between Byton North America and Byton Limited (the Hong Kong parent company of Byton North America) and to determine if such transfers were made for a legitimate business purpose.

5.        As part of my review I have been provided the following documents by Mr.

Cook's office:

A.      Petitioners EDAG's Notice of Entry of Judgment by Arbitrator, Jun 23, 2021 and

the Final Arbitration Award confirming the $29,972,239 owed to EDAG.

B.      Order granting Claimant EDAG's Motion for Preliminary Injunction, November

8, 2021.

C.      Declaration of Volker Amelung regarding Patent Valuation, December 9, 2021

D.      Complaint filed in "*BYTON NA and BYTON LIMITED v. ICONIQ MOTORS*

*NORTH AMERICA,INC.*", December 13, 2019.

E.      Declaration of Matt Barter of behalf of BYTON NA and BYTON LIMITED,

September 18, 2020.

F.      Declaration of Gong Lin Chen, December 9, 2021.

G.      BytonPatent Assignment Sheet, provided by Cook.

H.      Byton PPP Government Loan datasheet obtained from the SBA, provided by

Cook.

I.      Byton Activity Timeline, provided by Cook.

J.      Deposition of Sadha Kamesran, November 17, 2020

6.   After a review of these documents, I can only conclude that the transfers of the patents

from Byton NA to Byton Limited, which occurred between May 16, 2019 and August 11,

2021, had no business purpose other than to shield these assets from the creditors of Byton

NA and the United States Government. The patent assignments were a series of fraudulent

transfers intended to delay and defraud the Company's creditors. I reach this conclusion

after noting the following facts andevident badges of fraudulent transfer:

a.   **The patents were very valuable and in fact may have been one of few**

**assetsremaining on the books of Byton NA.** The declaration of Volker Amelung suggests that the patents had a value of almost $84 million dollars and the Arbitrator's Final Award to EDAG was $29,972,239, for unpaid services. The Arbitrator Hon. William Cahill cites evidence that Byton Limited continued to pursue the intellectual property created by EDAG throughJAMA, a cloud based provider, and had sufficient money to regain access to the patent database ( $500,000is estimated as owed to all cloud based providers used by Byton NA). Judge Cahill notes that the payments were made to JAMA even though Byton did not have the money to pay EDAG, the vendor that helped develop the intellectual property.

b. **Byton NA was insolvent at the time of the transfers**. Byton NAhas judgments outstanding by vendors and employees. Byton NA stopped paying vendors and suppliers by middle of 2019; failed to pay their law firm sometime in 2020, stopped paying another vendor specifically in March 2020. During the same period Byton NAapparently fled California and the Company President Daniel I Kirchertwas located in Hong Kong. CT Corporation resigned as the agent for service of process, presumably for lack of payment. Byton also let go of all California based employees  before or during the  transfer of Patents from May, 2019 to August, 2021.

c. **Byton Limited, a separate corporation, is the corporate parent for Byton NA.** As noted by Byton NA and Byton Limitedin its complaint against ICONIQ Motors:   Byton Limited is a Hong Kong company that develops electric vehicles and Byton NA, Byton Limited's wholly owned subsidiarity, provides research and

development and software design services. The use of separate wholly owned

corporations to hide nefarious activities is a common badge of fraud.

d. **The patent transfers were made without consideration**. Gong Lin Chen, the

Director of IP for Byton group of companies alleges that the transfers were made

by a "long standing inter-company agreement" between Byton NA and Byton

LIMITED and that Byton LIMITED would be the ultimate owner of these

patents. Such an agreement is in violation of generally accepted accounting rules

that require that any transfer between separate corporations be supported by the

concurrent payment of fair market value.

e. **There is no legitimate business purpose for the patent transfers**.The Byton

companies have not provided any related financial information, valuations,

corporate minutes, or board resolutions that would be a necessary part of any

normal corporate asset transfer. There are no compelling busines strategies, tax

planning opportunities, or other reasons for the patent transfer. The timing of the

transfers coincide with the financial collapse of Byton NA.

7. **The patent transfers suggest tax evasion and fraud perpetuated against the United

States Government**. ProPublica documents reveal that Byton NA received debt

forgiveness in the amount of $10,113,056 for a loan received under the PPP program

designed to help businesses during the COVID epidemic. This loan was received at the

same time that Byton NA was transferring over $80 million in assets to China, effectively

making its US subsidiary insolvent,suggesting that the debt forgiveness was fraudulently

obtained.Also, a transfer of assets can result in US based income to the recipient when

equivalent consideration is not paid. Byton Group may owe millions in unpaid taxes to the

US government.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 14th day of December, 2021 at Napa,California.


Michael Berg, CPA

EXHIBIT "O"



# Michael C. Berg, CPA

Mr. Michael Berg has been a practicing accountant for over 30 years.  He was an audit manager for Coopers & Lybrand (now PWC) in San Francisco and is the co-founder and served as the West Coast PIC of PMB Helin Donovan, a 100+ person CPA firm. Michael was the CFO of a public real estate company and a high tech manufacturer and a research and development company.  Michael has worked extensively with public companies and has participated in many public offerings in national markets.  Michael helped a local pharmaceutical company as it raised $30 million from various investor groups, took a Vietnamese Company public on the NASDAQ exchange, and worked with several companies merging with public shells.

Mr. Berg provides a variety of forensic and litigation support services including expert witness testimony and consulting support in Federal, State, and Bankruptcy Court. He is certified in Financial Forensics by the AICPA and was a Diplomat of American College of Forensic Examiners and completed the AICPA Business Valuation School. Michael's litigation support specialties include lost profits analysis, forensic and financial investigation, fraud, valuation and other business damage claims.

Michael, who is an excellent public presenter, taught several popular accounting courses at San Francisco State University and served as a panelist for the UC Berkeley-Hass Business School Entrepreneurship Program.

Michael was the President of the Board of Directors of The Names Project and formed a not-for-profit called the Permanent Display aimed at creating a San Francisco landmark for the AIDs Quilt.  Michael also helped found Welcome, a 501 C (3) that provided homeless outreach in the Upper Polk Street area of San Francisco.  Michael currently serves on the Board of Directors of the Lincoln Theater and is a board member and chair of the audit committee of Marathon Patent Group which is traded on the NASDAQ.

## Education & Professional Associations

B.A. Accounting with Honors, San Francisco State University
Certified Public Accountant, California
Member, American Institute of Certified Public Accountants,  Forensic and
Valuation Services, Certified in Financial Forensics (CFF)
AICPA Valuation School, 2012
Lecturer, San Francisco State University School of Business 1987-1992, Hass
School of Business, 2010,
Past Board of Directors, San Francisco Education Fund and Welcome.
Past Board President, The Names Project Foundation
Elder, Old First Presbyterian Church 1998-2019; Co-Founder Welcome
Board Member, Marathon Patent Group, Lincoln Theater 2021

**Exhibit B Declaration of Michael Berg, December 14, 2021**


**Michael C. Berg**
**Litigation Engagements**                                                    **12/1/2021**


**Benz v. Castelluci   JAMS San Francisco Judge Eugene Lynch**

Contractor misrepresented construction costs to client of private homes.  Applied funds to other projects and provided client false and misleading accounting records.

Report on damages, deposition and trial testimony.  Client prevailed.

**Cobra v. City and County of San Francisco     JAMS San Francisco**

City of San Francisco accused of harming a minority owned business which provided business services to various City departments.

Report on damages, deposition and trial testimony.  Defendant prevailed.

**Luc v. Chiu        San Francisco Superior Court    Judge David Garcia**

Lost business opportunity regarding real estate. Fraudulent transactions and misrepresentations.

Report on damages, deposition and trial testimony.  Client prevailed

**De Lage Landen v. Premier     Los Angeles County Superior Court   Judge Paul Guttman**

Creditor claim involving lease transactions.  Contract and "ordinary" course of business issues.

Report on damages, deposition and trial testimony.  Client lost.

**Newsom v. Brown   San Francisco Superior Court     Judge Lucy McCabe**

Fraudulent conveyance of house within an estate.  Trustee fiduciary issues.  Exclusion principal applied to purpose of transaction.  Badges of fraud.

Report on damages, deposition and trial testimony.  Client prevailed.

**De Saracho v. McNeil Machinery  San Joaquin County Judge Elizabeth Humphreys**

Fraudulent conveyance of business.  Issues involving badges of fraud and alter ego.

Report on damages, deposition and trial testimony.  Client prevailed.

**Exhibit B Declaration of Michael Berg, December 14, 2021**

**Michael Berg CPA, Litigation assignments , Page 2**

**Pivirotto v. Belkin      San Mateo Superior Court    Judge Allan Bollhoffer**

Commissions dispute.  Unwinding of complex financial transactions through several alter ego entities. Demonstration of fraudulent conveyance. Case upheld on appeal and appellate court cites forensic accounting.

Report on damages, deposition and trial testimony.  Client prevailed.

**Broe Companies v. Leslie Fields   San Mateo Superior Court Judge Quentin Kopp**

Conveyance of property to trust. Application of exclusion principal in determining fraudulent nature of conveyance.

Report on damages deposition and trial testimony.  Client prevailed.

**Interstate Scaffolding v. Dillingham    JAMS San Francisco**

Creditor claim. Accounting for construction payrolls and cost allocations.

Report on damages.  Client prevailed in settlement.

**De Anza Interiors v. Hsu   San Mateo Municipal Court**

Fire destroyed business.  Calculation of property loss and business income loss.

Report on damages, deposition and trial testimony.  Client prevailed.

**USCF Vice Chancellor v. UCSF   Venue pending.**

Unfair employment practices. Calculation of lost salary benefits and pension.

Report on damages. Case settled

**Simpson v. Simpson   San Diego County Superior Court**

Assessment of corporate holdings in a marital dissolution. Ownership among a group of related entities.

Report on assets.  Case settled.

**Exhibit B Declaration of Michael Berg, December 14, 2021**

**Peinado v. Schnitzer   Settlement discussion and deposition**

Dispute over marital support agreement. Review of records and spousal expenses.. Case settled.

**Securities and Exchange Commission v. Eadgear et al San Francisco Superior Count Settlement Conference**

Securities and Exchange action against China/US based internet company. Report quantified cash activity and amounts raised from "dealers" in a highly complex environment. Defense attorney credited report with helping determine a more reasonable outcome for defendants. SEC prevailed.

**MEEDL, LLC v. Anthony March Superior Court County of San Diego**

Forensic report detailing the fraudulent activities of an investment broker who invested client's fiduciary funds into investments he controlled.  The funds were then transferred to the broker for his own benefit.  After reviewing my report and being briefed on my deposition by his attorney, the defendant filed personal bankruptcy

**Warehouse Way v. Julian Lischiz US Bankruptcy Court Northern California**

Motion for Summary Judgement. Trustee challenges purchase of Partner Interest in real estate partnership.  Declaration supporting defendant noting badges of fraud.

**County of Ventura v. Wayne Fishback Superior Court County of Ventura**

Calculation of revenue generated at illegal dumpsite.  Review of entity status and testimony regarding nature of business and defendants campaign of concealment of business records. County prevailed.

**Pillet v. Kendrick Superior Court County of San Francisco**

Decades long scheme to hinder, delay and defraud creditor.  Patriarch transfers property subject to liens to family members in attempt to avoid payment.  Patriarch dies and property lost to senior creditors. Plaintiff attempts to collect debt from children but court rules that the loss of the property effectively stopped plaintiff claim.

**Gregory R. Dougald, an individual debtor, United States Bankruptcy Court, Northern California Division.**

Declaration opposing approval of a bankruptcy plan which attempted to delay collection of judgement. Calculation of amounts actually provided under plan demonstrated that the payments did not meet Chapter 7 distribution test.

**Exhibit B Declaration of Michael Berg, December 14, 2021**

Plan rejected and estate liquidated.

EXHIBIT "P"

## PATENTS TRANSFERRED FROM BYTON BNA TO BYTON LIMITED

| Application # | Patent # | Invention Title | Assignment Date | Assignee |
|---|---|---|---|---|
| 16031264 | 10332495 | In Vehicle Karaoke | exec: 05/16/2019 rec: 05/17/2019 | BYTON LIMITED |
| 29700749 | D917538 | Display Screen or Portion Thereof With a Graphical User Interface | exec: 06/13/2019 Rec: 03/30/2021 | BYTON LIMITED |
| 29616345 | D864227 | Display Screen with an Animated Graphical User Interface | exec: 09/19/2019 rec: 09/20/2019 | BYTON LIMITED |
| 15669693 | 10518732 | Airbag Devices Designed to Utilize a Reduced Interior Surface Area of a Vehicle | exec: 11/19/2019 rec: 11/25/2019 | BYTON LIMITED |
| 16172551 | 10559794 | Battery Sealing Enclosure | exec: 01/02/2020 rec: 01/02/2020 | BYTON LIMITED |
| 29616340 | D907653 | Display Screen or Portion Thereof With a Graphical User Interface | exec: 01/09/2020 rec: 01/29/2020 | BYTON LIMITED |
| 15863834 | | HVAC Unit Placement Configuration for a Vehicle | exec: 02/01/2020 rec: 02/03/2020 | BYTON LIMITED |
| 29616344 | D879121 | Display Screen with a Graphical User Interface | exec: 02/18/2020 rec:02/20/2020 | BYTON LIMITED |
| 15863707 | 10887349 | System and Method for Enforcing Security with a Vehicle Gateway | exec: 03/17/2020 rec: 11/25/2020 | BYTON LIMITED |
| 16136052 | 10745018 | Hybrid User Recognition Systems for Vehicle Access and Control | exec: 03/18/2020 rec: 03/18/2020 | BYTON LIMITED |
| 15863831 | 10676067 | User Capture Device Configuration for a Vehicle | exec: 05/04/2020 rec: 05/04/2020 | BYTON LIMITED |
| 29675745 | D892693 | Door Panel | exec: 07/06/2020 rec: 07/06/2020 | BYTON LIMITED |
| 15696018 | 10746560 | Interactive Mapping | exec:  07/13/2020 rec: 07/13/2020 | BYTON LIMITED |
| 15863686 | 10759362 | Harness for Assissted Driving | exec: 07/28/2020 rec: 07/28/2020 | BYTON LIMITED |
| 16240706 | 10860208 | Multi-Window Display Controller | exec: 11/02/2020 rec:11/02/2020 | BYTON LIMITED |
| 29679905 | D904232 | Vehicle | exec: 11/03/2020 rec: 11/03/2020 | BYTON LIMITED |
| 29616346 | D907054 | Display Screen or Portion Thereof With a Graphical User Interface | exec: 11/25/2020 rec: 11/25/2020 | BYTON LIMITED |

| 16240701 | 10891921 | Separate Operating Systems for Dashboard Display | exec: 12/09/2020 rec: 12/10/2020 | BYTON LIMITED |
|---|---|---|---|---|
| 16042847 | 10911949 | Systems and Methods for a Vehicle Authenticating and Enrolling a Wireless Device | exec: 12/28/2020 rec: 12/28/2020 | BYTON LIMITED |
| 15957837 | | Door Opening Clearance Detection | exec: 01/07/2021 rec: 01/07/2021 | BYTON LIMITED |
| 29675750 | D922932 | Middle Console | exec: 05/19/2021 rec: 05/19/2021 | BYTON LIMITED |
| 15975737 | 11117484 | Safe and Secure Charging of a Vehicle | exec: 08/11/2021 rec: 08/11/2021 | BYTON LIMITED |

## BYTON BNA PATENTS

| Application # | Patent # | Invention Title | Application Date | |
|---|---|---|---|---|
| 16240703 | 11042341 | Integrated Functionality Of Center Display, Driver Display, and Shared-Experience Display | 1/4/2019 | |
| 16272849 | 11107354 | Systems and Methods to Recognize Parking | 2/11/2019 | |
| 16272756 | 11110821 | Sliding Center Module System For Vehicle | 2/11/2019 | |