1   **David J. Cook (SBN 60859)**
    **COOK COLLECTION ATTORNEYS, PLC**
2   ATTORNEYS AT LAW
    165 Fell Street
3   San Francisco, CA 94102
    Telephone: (415) 989-4730
4   Facsimile: (415) 989-0491
    Cook@CookCollectionAttorneys.com
5
6   **LEWIS & LLEWELLYN LLP**
7   Evangeline A.Z. Burbidge (Bar No. 266966)
    eburbidge@lewisllewellyn.com
8   **Marc R. Lewis (**Bar No. 233306)
    mlewis@lewisllewellyn.com
9   **Kenneth M. Walczak** (Bar No. 247389)
    kwalczak@lewisllewellyn.com
10  **Bradley E. Estes** (Bar No. 298766)
11  bestes@lewisllewellyn.com
    601 Montgomery Street, Suite 2000
12  San Francisco, California 94111
    Telephone:  (415) 800-0590
13  Facsimile:   (415) 390-2127
14
    Attorneys for Petitioner EDAG Engineering GmbH,
15  a corporation organized and existing under the laws
    of the Republic of Germany
16
                    UNITED STATES DISTRICT COURT
17
          NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
18

19  EDAG Engineering GmbH,                    Case No. 3:21-cv-04736-EMC

20          Petitioner,                       **TRANSCRIPT FOR DEBTOR EXAM**
                                              **HELD ON MARCH 11, 2022**
21          v.

22  BYTON North America Corporation,          **\*TRANSCRIPT ATTACHED**

23          Respondent.                       _____/s/ David J. Cook_____
                                                **David J. Cook Esq.**
24
                                              Petition Filed: June 23, 2021
25
26
27
28

# UNITED  STATES  DISTRICT  COURT
## NORTHERN  DISTRICT  OF  CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| EDAG Engineering GmbH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) **CASE NO.** 3:21-cv-04736-EMC |
| | ) |
| BYTON North America Corporation, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

## JUDGMENT DEBTOR'S EXAMINATION OF
### SADHA KAMESWARAN

**DATE:**  Friday, March 11, 2022

**REPORTER:**  Sonseraye C. Anderson, CSR No. 14187

## VIA REMOTE VIDEO TECHNOLOGY



## HINES REPORTERS
**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

**866.432.4300; 213.688.7887**

**WWW.HINESREPORTERS.COM**

1              UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA- SAN FRANCISCO DIVISION

3

4

5   EDAG Engineering GmbH,        )
                                  )
6                 Petitioner,     )
                                  )
7         v.                      ) Case No. 3:21-cv-04736-EMC
                                  )
8   BYTON North America           )
    Corporation,                  )
9                                 )
                  Respondent.     )
10  _____)

11

12

13

14

15

16         JUDGMENT DEBTOR'S EXAMINATION OF

17              SADHA  KAMESWARAN

18

19

                FRIDAY, MARCH 11, 2022
20
                    9:00 a.m.
21

22

23

24

                      REMOTE
25

**H I N E S   R E P O R T E R S**                    1

1    Remote Judgment Debtor's Examination of SADHA

2    KAMESWARAN, called as a witness by the Judgment

3    Creditor, SONSERAYE ANDERSON, Certified Shorthand

4    Reporter, Number 14187, for the State of California,

5    with principal office in the County of San Francisco,

6    commencing at 9:00 a.m., Friday, March 11, 2022, at Los

7    Angeles, California.

8                         *   *   *

9    APPEARANCES:

10

     FOR THE PETITIONER EDAG ENGINEERING GmbH:
11
          COOK COLLECTION ATTORNEYS, PLC
12        BY:  DAVID J. COOK, ESQ.
          165 Fell Street
13        San Francisco, California 94102
          (415) 989-4730
14        cook@cookcollectionattorneys.com
          cook@squeezebloodfromturnip.com
15

16   FOR THE RESPONDENT BYTON NORTH AMERICA CORPORATION AND
     THE WITNESS SADHA KAMESWARAN:
17
          VAN ETTEN SIPPRELLE, LLP
18        BY:  KEITH A. SIPPRELLE, ESQ.
          2945 Townsgate Road
19        Suite 200
          Westlake Village, California 91361
20        (805) 719-4900
          ksipprelle@vstriallaw.com
21

22

23   ALSO PRESENT:  ROSE MAHER, COURTROOM DEPUTY

24

25

# H I N E S   R E P O R T E R S                           2

```
1                         I N D E X

2

3    Examination                              Page
     By Mr. Cook                               6
4

5

6                    PETITIONER'S EXHIBITS
7

8                        (None.)

9

10

11

12             JUDGMENT CREDITOR'S EXHIBITS

13                       (None.)

14

15

16      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

17                       (None.)

18

19               INFORMATION REQUESTED

20                       (None.)

21

22

23

24

25
```

**H I N E S   R E P O R T E R S**                          3

1          THE CLERK:  Okay.  Good morning, everyone.  We

2     are calling the calendar of United States Magistrate

3     Thomas S. Hixson for the Northern District of San

4     Francisco on this 11th day of March in the case of EDAG

5     Engineering GmbH versus Byton North America Corporation.

6          Let the record reflect that the Magistrate

7     Judge is not present, but is available if needed.

8          Counsel, please state your appearances.  Let's

9     start for -- counsel for EDAG.

10         MR. COOK:  Thank you very much.

11         This is David Cook on behalf of EDAG

12    Engineering GmbH, who is the petitioner and judgment

13    creditor.

14         THE CLERK:  Thank you.

15         MR. COOK:  You're very --

16         THE CLERK:  And --

17         MR. COOK:  -- welcome.

18         THE CLERK:  -- now I need for the judgment

19    debtor, please.

20         MR. SIPPRELLE:  Yes.  Good morning.

21         Keith Sipprelle on behalf of the Respondent,

22    Byton North America Corporation and also representing as

23    counsel for the witness, Mr. -- Mr. Kameswaran, a former

24    employee of Byton North America.

25         THE CLERK:  Okay.  Thank you very much.

1          So I need the witness to raise his right hand,

2   please.

3          Do you solemnly swear that the testimony you

4   will give in this judgment debtor's examination is the

5   truth, the whole truth and nothing but the truth?

6          THE WITNESS:  Yes, I do.

7          MR. COOK:  Thank you.  You've been sworn.

8          THE WITNESS:  Thank you.

9          THE CLERK:  Okay.  And can I have the court

10  reporter please state her appearance as well.

11         THE COURT REPORTER:  My name is Sonseraye

12  Anderson, CSR No. 14187.  I'm here on behalf of the --

13  EDAG -- who's representing EDAG, Mr. Cook.

14         MR. COOK:  Thank you.

15         THE CLERK:  Okay.  And can I have the court

16  reporter raise your right hand?

17         THE COURT REPORTER:  Sure.

18         THE CLERK:  Sure.

19         Do you solemnly swear and affirm that you will

20  correctly take down, to the best of your knowledge and

21  understanding, the testimony of the witness about to

22  testify -- testify in this hearing?

23         THE COURT REPORTER:  I do.

24         THE CLERK:  Thank you.

25         All right, everyone.

**H I N E S   R E P O R T E R S**                    5

1          We can get started, Mr. Cook.

2          MR. COOK:  Thank you.

3          THE CLERK:  Just to let you know, I'm going to

4     let you all take it from here.  I am -- I'm just going

5     to put you up in my corner.

6          If you need the judge or you need me, just

7     stop and let me know.  I -- I'm going to be on my

8     computer the whole time.

9          MR. COOK:  Thank you very much.

10         THE CLERK:  Okay.  Thank you.

11

12                    SADHA KAMESWARAN,

13    called as a witness by and on behalf of the Judgment

14    Creditor, having been first duly sworn, was examined and

15    testified as follows:

16

17                      EXAMINATION

18

19    BY MR. COOK:

20         Q.   Okay.  If I may start, Mr. Sadha Kameswaran,

21    how can -- how -- you're going to have to help me with

22    you last name, sir, so I don't --

23         A.   Kameswaran.

24         Q.   -- say something silly?

25              How's that?

**H I N E S   R E P O R T E R S**                    **6**

1        A.    Kameswaran.

2        Q.    Kameswaran?

3        A.    Kameswaran.

4        Q.    If I -- If I don't do that right, then you'll

5    have to forgive me --

6        A.    Just call me --

7        Q.    Okay?

8        A.    -- me -- just call me Sadha.  That's fine.

9        Q.    I was going to ask you that?

10            How's that?  That is --

11        A.    Just call me Sadha.

12        Q.    Okay.  Thank you.  You're very kind?

13            Okay.  As you know, I'm the attorney for EDAG.

14    We're going to call it EDAG Engineering GmbH.

15            Do you mind if we just call them EDAG?  Is

16    that all right?

17        A.    That's fine.

18        Q.    And unless we say otherwise, it's going to be

19    Byton North America Corporation?

20            Can we call that BNA?  Do you -- do you mind?

21        A.    That's fine.

22        Q.    Okay.  Good.  Thank you, sir?

23            Okay.  Were you, at one time, an employee for

24    BNA?

25        A.    I'm sorry.

**H I N E S   R E P O R T E R S**                    7

```
 1              Sir, could you repeat that?

 2      Q.   Oh, yeah.  I'm sorry.  If -- if want me to

 3  speak up, you -- I will not be embarrassed?

 4              But were you, at one time, an employee for

 5  BNA?

 6      A.   Yes, I was.

 7      Q.   And are you no longer an employee for DNA

 8  [sic]?

 9      A.   That's correct.

10      Q.   And when did you become an employee of BNA,

11  sir?

12      A.   Middle of 2017.

13      Q.   And when did you stop being an employee for

14  BNA, sir?

15      A.   End of December 2021.

16      Q.   So starting from, let's say, 2017 to this

17  date, can you give us your roles as either an officer,

18  manager, or employee, sir?

19      A.    I -- I joined Byton to take care of the

20  product finance and the product business operation's

21  group.  That is in 2017.

22              And then, some time late 2018, the original

23  responsibility of North America Finance Operations was

24  given to me because some personnel left.

25              So just to be clear, I was responsible for
```

**H I N E S   R E P O R T E R S**                     **8**

1    more of the product finance, which -- which means the

2    finance related to the funding of the project and so on

3    and, later on, to be responsible for the operation of

4    the finance.

5        Q.   Do you have a degree in finance?

6        A.   I do not have a degree in finance.

7        Q.   Okay.  Do you have a college degree here?

8        A.   I have an engineering degree and an MBA.

9        Q.   And do you have any background -- let's go

10   back for the last ten years of what your job history

11   was, sir?

12       A.   So I was in various roles with an Australian

13   company heading up the business development and the

14   program delivery operations for the company.

15           And finance was sort of -- the product finance

16   group was sitting under me in the responsibility in my

17   previous job, prior to Byton.

18           And I was with the Australian company for ten

19   years, four or so, which in -- in -- six years in the

20   Australia, and the other time here in the U.S.

21       Q.   All right.  And you're generally familiar with

22   accounting matters, such as balance sheets, profit and

23   loss statements, journals, ledgers, stuff we all like

24   when we want to see whether we're making money or losing

25   money?  How's that?  Are you familiar with that?

1          A.    Yes.

2          Q.    Okay.  And you're generally familiar with

3     whatever it would be with an audited financial

4     statement, things like that?

5          A.    Yes.

6          Q.    Okay.  And you're generally familiar with --

7     with financial statements, say on -- on all sorts of

8     start -- startups where the first thing they ship out

9     would be a financial statement, things like that?

10               You've seen those before, sir?

11          A.    Yes.

12          Q.    Okay.  You're familiar with accounts payable

13     and accounts receivable, stuff like that?

14          A.    Yes.

15          Q.    Okay.  And generally in a business, if you are

16     running a business, the first thing you would want to do

17     is see if are you making money and losing money and,

18     therefore, looking at a profit and loss?

19               Is that a fair statement?

20               MR. SIPPRELLE:  Objection.  Vague and

21     ambiguous.

22     BY MR. COOK:

23          Q.    You can answer that?

24               MR. SIPPRELLE:  So Mr. Kameswaran, unless

25     you -- I instruct you not to answer it on privilege, you

**H I N E S   R E P O R T E R S**                              10

1  can answer, if understand the question.

2       Go ahead, sir.

3       THE WITNESS:  Mr. Cook, could you please

4  repeat the question.

5  BY MR. COOK:

6       Q.   The question is:  You are familiar with a

7  profit and loss statement -- am I correct? -- with any

8  business?

9       A.   Yes.

10      Q.   Okay.  So since I have you here, I'm going to

11  read into the record that, "Byton NA does not currently

12  have any officers, directors, managing agents or

13  employees who are familiar with Byton N/A's profit and

14  debts?"

15      That's -- that's a reasonably accurate

16  statement, sir?

17      MR. SIPPRELLE:  Object.  It lacks -- lacks

18  foundation.  He's not a current employee.  I think

19  you're reading from something that was submitted after

20  he left the company.

21  BY MR. COOK:

22      Q.   Can you answer that question, sir?

23      A.   There are no current employees in Byton North

24  America.

25      Q.   Okay.  Well, does BNA have a current officer,

1   any officers at this time, if you know?

2       A.   Sorry.  I do not know.

3       Q.   Well, when you left the company in December of

4   2013 -- 20- -- 2021, who was -- who were the officers

5   then?

6       A.   The last known officer was Mr. Daniel Kirsch.

7   And since he left, I'm -- I'm not sure whether anyone

8   else was appointed.

9       Q.   Well, I was going to ask you that.  You --

10  you -- you got my question for me?

11          How's that, which is when Mr. Kirsch -- did I

12  get that right, sir?

13      A.   Yeah.

14      Q.   Okay.  And Mr. Kirsch left some time in --

15  what was it? -- the third month of 2020, something like

16  that?  Does that sound about right?

17      A.   I do not know the exact dates, sir.

18      Q.   Sometime in 2020; is that correct?

19      A.   Sometime in 2020.

20      Q.   Well, who are -- there -- was there a

21  replacement corporate officer, such as the president, if

22  you know?

23      A.   Not that I know of.

24      Q.   Okay.  As of -- as of, say, 2020, do you know

25  who the directors were of BNA?

```
 1        A.    No.

 2        Q.    Okay.   How -- who were the managing agents as

 3   of 2020?

 4              MR. SIPPRELLE:   Object -- object to the term

 5   "managing agent."   That's a -- kind of a legal

 6   conclusion.   It calls for speculation.

 7              You can answer --

 8   BY MR. COOK:

 9        Q.    You can answer?

10              MR. SIPPRELLE:   -- if you understand.

11   BY MR. COOK:

12        Q.    You can answer it?

13        A.    I do not understand what a managing agent is.

14        Q.    After Mr. Kirsch left, who was running BNA?

15              MR. SIPPRELLE:   Object to the term "running"

16   as vague and ambiguous.

17   BY MR. COOK:

18        Q.    You can answer that question?

19              You know what that means, who's running the

20   place?

21              MR. SIPPRELLE:   Mr. Cook, don't -- don't tell

22   him what he knows and doesn't know.   Just let him

23   respond --

24              MR. COOK:   Thanks, Counsel.

25              MR. SIPPRELLE:   -- to stuff he can.
```

1  BY MR. COOK:

2      Q.   You can answer that question, sir?

3      A.   There were -- there were no senior leadership

4  team here in -- in North America that was actually

5  running the -- running the operation.

6      Q.   Well, was there anybody running the place?

7  Anybody such as paying for the payroll and paying for

8  workers comp, and paying for PG&E and doing what they --

9  what BNA was doing, which was doing whatever it was

10  doing?  Who was -- who was running the place?

11         MR. SIPPRELLE:  Objection.  Vague.  Ambiguous

12  compound.

13         Go ahead.

14  BY MR. COOK:

15      Q.   You can answer that?

16         MR. SIPPRELLE:  You can answer it.

17  BY MR. COOK:

18      Q.   Yeah, you can answer that?

19      A.   From an operational point of view --

20      Q.   Any- --

21      A.   -- yes, I was.

22      Q.   Anybody else?

23      A.   There was a treasury person who was making

24  some of those payments.

25      Q.   Okay.  Who's Teresa Shi, S-h-i?

**H I N E S   R E P O R T E R S**                    14

1        A.   She was a formal -- former employee of Byton

2   based in China.   She was the VP of finance.

3        Q.   Okay.   And when did she stop being an employee

4   of BNI [sic]?

5        A.   She was not an employee of BNA.

6        Q.   Who was she an employee of?

7        A.   She was an employee of another entity in -- in

8   the Byton corporate sector.

9        Q.   Was that Byton Limited; is that correct?

10       A.   To be honest, I -- I wouldn't know where her

11  employment was, whether it was -- I -- I'm sorry.   I

12  wouldn't know.

13       Q.   All right.   But she wasn't an employee of BNA;

14  is that correct, sir?

15       A.   She was not an employee of BNA.

16       Q.   Okay.   So let's move on to a -- a real easy

17  one here, and these are copies, which I'm -- I'm going

18  to -- you can see them?

19            I've already given copies of these to

20  Mr. Sipprelle, but I'll just tell you what they say.

21  And can you -- can you see this here?   Any part of it?

22       A.   Yeah, I can see a bit of it.

23       Q.   Well -- well, let me describe it.   And

24  we'll -- and we'll mark it at least for my record here.

25  We'll just mark it No. 1?

```
 1                    THE WITNESS:  Is --

 2                    MR. SIPPRELLE:  Yeah.  And, Mr. Cook, I would

 3     ask, if you're going to ask him about a document, if you

 4     can share it on your screen so we can see --

 5                    MR. COOK:  I will --

 6                    MR. SIPPRELLE:  -- it.

 7                    MR. COOK:  -- happy to.  I would be honored

 8     to.  How's that?

 9                    MR. SIPPRELLE:  That's not really sharing it

10     on the screen.

11                    MR. COOK:  Well --

12                    THE WITNESS:  Electronic -- can you -- can you

13     electronic --

14                    MR. SIPPRELLE:  Do you know how to do screen

15     share -- screen share on the Zoom platform?

16                    MR. COOK:  Hold on a second.  Hold on.  Wait.

17     My -- hold is --

18                    Can we put this in some way that somebody can

19     see it?

20                    MS. SECRETARY:  I don't know.  How are we

21     going to --

22                    MR. COOK:  Or we can just e-mail the -- we can

23     just e-mail this to counsel and to the witness, and they

24     can look at it on their own screen.

25                    THE SECRETARY:  Yeah.  But then they would
```

```
 1   have to ger access to their e-mail -- we can e-mail

 2   to -- we can e-mail to -- as an attachment.

 3            MR. COOK:  Yeah.  Well, they can get it.

 4            THE SECRETARY:  Yeah.  Yeah.

 5            MR. COOK:  Well -- okay.  So why don't you

 6   make a picture and see what you can do.

 7            THE SECRETARY:  E-mail this -- this one?

 8            MR. COOK:  Yeah.

 9            THE SECRETARY:  -- To Keith?  And I have

10   Keith's --

11            MR. COOK:  What -- what do you need?

12            What do you need?

13            THE SECRETARY:  Just e-mail as an attachment

14   to him?

15            MR. COOK:  Yeah.

16            THE SECRETARY:  Okay.

17            MR. COOK:  Okay.  If you can, bear with me for

18   a second.

19            THE WITNESS:  Um-hum.

20   BY MR. COOK:

21       Q.   So -- you know -- okay.  It will get to us in

22   a second here.  And there's another one?

23            You're familiar with Silicon Valley Bank in

24   this case?

25       A.   Yes.
```

**HINES REPORTERS**      17

```
 1          Q.   And that was the primary bank for BNA; is that
 2   correct?
 3          A.   Was until sometime in 2018.
 4          Q.   Okay?
 5          A.   Late 2018, I think it was.
 6          Q.   So I don't have to dig it up?
 7               You -- you also were a signatory to that bank
 8   account; is that correct?
 9          A.   Correct.
10          Q.   Okay.  And -- and you -- and -- and that was
11   your right to write a check; is that correct?
12          A.   Correct.
13          Q.   So tell me what happened to the 500 laptops?
14               MR. SIPPRELLE:  Object -- object.  Vague and
15   ambiguous.  Argumentative.
16               MR. COOK:  So -- so --
17               MR. SIPPRELLE:  What are you talking about,
18   Counsel?
19               MR. COOK:  So the witness knows what it is,
20   because that's what he testified in his deposition
21   about, the 500 laptops that -- that BNA bought for the
22   employees.
23   BY MR. COOK:
24          Q.   So I'm a collection lawyer.  Tell me where it
25   is so I can pick it up, sell it and start paying down
```

**H I N E S   R E P O R T E R S**                             **18**

1  the stents?

2  So where are the 500 laptops?

3  A.  The laptops were sold in auction starting from

4  late 2020 and sometime through 2021, as most of the

5  employees left.

6  We did not have any need for those laptops,

7  and those laptops were sold in auction.

8  Q.  And what's the name of the auction -- the

9  auctioneer?

10  A.  I've forgotten the name of the auction

11  company.  It's a Silicon Valley company.  I cannot

12  remember the exact name right now, sir.

13  Q.  Is that -- okay.  I'm sorry?

14  Is that something you can get for me later on

15  and e-mail it to me through your lawyer?

16  MR. SIPPRELLE:  Counsel, he's here to answer

17  questions, not -- not to do a follow-up.  If he doesn't

18  remember, he doesn't remember.

19  MR. COOK:  Well, we'll just continue it to

20  see -- make sure I get that information.

21  MR. SIPPRELLE:  Well, you're not going to --

22  we're not going to continue anything, unless --

23  MR. COOK:  That's what you said --

24  MR. SIPPRELLE:  -- the judge --

25  MR. COOK:  -- sir.

**HINES REPORTERS**                    19

```
 1              MR. SIPPRELLE:  -- unless --

 2              MR. COOK:  Sir --

 3              MR. SIPPRELLE:  -- the judge --

 4              MR. COOK:  Sir --

 5              MR. SIPPRELLE:  -- agrees --

 6              MR. COOK:  Sir --

 7              MR. SIPPRELLE:  Mr. Cook, don't cut me off

 8    when I'm talking, and I'll try to give you the same

 9    courtesy.

10              MR. COOK:  Good.  So --

11    BY MR. COOK:

12         Q.   By the way, when you auctioned them off, what

13    did you do with the memory in each of these, you know,

14    laptops?

15              MR. SIPPRELLE:  Object.  Vague and ambiguous.

16              Go ahead and answer, Mr. Kameswaran.

17    BY MR. COOK:

18         Q.   You can answer?

19              MR. SIPPRELLE:  It's argumentative as well.

20              Go ahead.

21    BY MR. COOK:

22         Q.   What did you do with the memory of all those

23    500 laptops?

24              MR. SIPPRELLE:  Object.  Vague and ambiguous.

25    Argumentative.
```

**HINES REPORTERS**                                   20

1          Go ahead, Mr. Kameswaran.

2          Remember, just give me a moment to object if I

3    need to before you answer.

4          But go ahead, if you understand the question.

5          THE WITNESS:  It's standard practice for

6    anything before it is sold for the hard disk to be

7    wiped.

8    BY MR. COOK:

9       Q.   Was that done?

10      A.   Sorry.

11      Q.   Was that done?

12      A.   Yes.

13      Q.   Was it wiped out?

14      A.   Yes.

15      Q.   You know that?

16      A.   Yes.

17      Q.   Did you do that yourself?

18      A.   No.

19      Q.   Who did it?

20      A.   It -- the auction company was responsible to

21   do that on our behalf.

22      Q.   By the way, for the ad, did the auction

23   company put that in an ad or something like that?

24          MR. SIPPRELLE:  Object.  Vague and ambiguous.

25          Put what in an ad?

**H I N E S   R E P O R T E R S**                    21

1          MR. COOK:  The sale of the laptops.

2          THE WITNESS:  Sorry, Mr. Cook.  I'm -- I'm

3    having a little bit of trouble hearing your complete

4    sentence.

5          Your last sentence --

6    BY MR. COOK:

7     Q.   Okay.  I'm sorry?

8     A.   -- was --

9     Q.   Tell me, what there --

10    A.   Your last words --

11    Q.   -- was --

12    A.   -- were getting cut.

13    Q.   -- for the laptops?

14          Was there some type of ad?

15    A.   What do you mean, "some type of ad".

16    Q.   Ad, you know, on the internet, in the

17    newspapers, eBay, whatever it would be?

18          But was there some type of advertising for

19    these 500 laptops?

20    A.   The auction company had their open website

21    where they are selling them through.

22    Q.   Okay.  So let's go back to the following:  Are

23    you aware that, between 2018 to 2020, that BNA received

24    2549- -- pardon me -- 254,9- -- $254,900,000?  Are you

25    aware of that?

**H I N E S   R E P O R T E R S**                    22

 1          MR. SIPPRELLE:  Objection.  Assumes facts not
 2  in evidence.
 3          You can answer, if you understand.
 4          THE WITNESS:  Yeah.  Byton North America was
 5  doing R&D work, and it was getting paid for it.  So
 6  whether it was exactly that amount, I don't know.  But
 7  Byton North America did receive money for doing work.
 8  BY MR. COOK:
 9      Q.   Well -- so the 254,000 [sic] was work done by
10  BNA for FMC Cayman; is that correct?
11          MR. SIPPRELLE:  Object.  Assumes facts not in
12  evidence.  Argumentative.  Misstates testimony.
13  BY MR. COOK:
14      Q.   You can answer that?
15      A.   The work was done for Byton's entity in China.
16      Q.   I'm --
17      A.   More specifically, for FMC Cayman.
18      Q.   Well, it says -- we know that the money was
19  sent -- was for FMC Cayman?
20          Is Cayman -- is that entity somewhere in
21  China?
22          MR. SIPPRELLE:  Object.  Compound.  Assumes
23  facts not in evidence.  Misstates the evidence.
24  BY MR. COOK:
25      Q.   You can answer that question, sir?

1      A.   From my understanding, Cayman is the holding

2 entity in Cayman Island.

3      Q.   Okay.  So -- so for the $254,900 [sic] that

4 was for work that was done -- is that correct? -- by

5 BNA?

6           MR. SIPPRELLE:  Object.  Assumes facts not in

7 evidence.  Misstates the evidence.

8 BY MR. COOK:

9      Q.   You can answer that question?

10      A.   Yeah.  Byton -- Byton North America is an R&D

11 entity that was doing work and getting paid for the work

12 done.

13      Q.   So I presume that BNA sent out an invoice to

14 FMC Cayman; is that correct?

15      A.   We -- we are repeating the same error here.

16 The work was not for FMC Cayman.  The work was for the

17 Nanjing New Energy Company.

18      Q.   So I'm looking here.  The -- the person who

19 received this money was BNA?

20           And my question is:  Did BNA invoice FMC

21 Caymans -- Cayman for the work that was done that you

22 testified to?

23      A.   That's not -- I keep repeating myself that

24 FM- -- the work was not done for FMC Cayman, so the

25 invoice is not sent to FMC Cayman.  The invoice was sent

**H I N E S   R E P O R T E R S**                            24

1    to the company that -- for which the work was being

2    done.

3        Q.   Okay.  Who was -- work -- well, what company

4    was that?

5        A.   That's one of their entities in -- in China.

6        Q.   What's the name of that entity?

7        A.   Nanjing New Energy Company.

8        Q.   Well, geez, wouldn't there be an invoice

9    that -- a BNA invoice for that entity; is that correct?

10        A.   That would be correct.

11        Q.   So where's the invoice for $254,900,000?

12             MR. SIPPRELLE:  Object.  Assumes facts not in

13    evidence.  Argumentative.

14             THE WITNESS:  Mr. Cook, I wouldn't have access

15    to those documents at this stage.

16    BY MR. COOK:

17        Q.   Excuse me here?

18             It would be 254,900 [sic] of which it goes to

19    FMC Cayman, it goes to Byton Limited, and you're telling

20    me it's for services?

21             And all I want to know is, I guess, there

22    would be some invoices; am I correct?  They did --

23             MR. SIPPRELLE:  Object.

24    BY MR. COOK:

25        Q.   -- work -- and they got paid --

1          MR. SIPPRELLE:  Object.  Argue --

2    BY MR. COOK:

3        Q.   -- for it?

4          MR. SIPPRELLE:  Object.  Argumentative.

5    Compound.  Misstates his testimony.

6    BY MR. COOK:

7        Q.   You can answer that question, sir?

8        A.   So --

9          MR. SIPPRELLE:  It was about -- it was about

10   three questions, but go ahead, Mr. Kameswaran, if you

11   understand.

12          THE WITNESS:  To be honest, Mr. Cook, I'm

13   getting confused with the numbers here.  There was a

14   $254,000,000, and then there's the $254,900.

15   BY MR. COOK:

16       Q.   Oh, I'm sorry?

17       A.   You're talking about money sent to FMC.

18   You're talking about money sent to -- somewhere else.

19   So without seeing the document, I'm not able to make

20   sense of the questions.

21       Q.   Well, good.  It's 254,900,000.  It's

22   254,900,000?

23          And I'd like to know if this is payment due

24   BNA, right, and that's the work that BNA -- BNA would

25   have sent an invoice saying, "This is the work I've

```
 1   done, and this is the work I got," where are those
 2   invoices?
 3           MR. SIPPRELLE:  Object.  Argumentative.
 4   Compound.  Misstates evidence.  You're -- you're
 5   referring to a document, apparently, that we don't see.
 6           So it's -- it's really a grossly-inappropriate
 7   question, but go ahead, Mr. Kameswaran.  Do the best you
 8   can.
 9           THE WITNESS:  Sorry, Mr. Cook, without seeing,
10   is it a single transfer, or is it multiple transfer that
11   you're summing up and calling it 254,000,000?  I'm not
12   able to see the documents, so I'm unable to respond
13   properly.  I would love to --
14   BY MR. COOK:
15       Q.   Okay.  Well, let's be more specific here?
16           Okay.  Do you know what an invoice is, sir?
17       A.   Yes.
18       Q.   Okay.  You know what a 1099 is, sir?
19       A.   Yes.
20       Q.   Yeah?
21           You know what a statement is; is --
22       A.   Yes.
23       Q.   -- that correct?
24           So tell me the name of the person who is
25   running the accounts receivable department of BNA.
```

**H I N E S   R E P O R T E R S**                    27

1          A.    There was no accounts receivable person at

2     BNA.

3          Q.    Wasn't -- the accounting department of BNA in

4     China; isn't that correct?

5          A.    The accounting department of BNA, it is a

6     shared service group that was, yes, in China.

7          Q.    Really?  It was -- it -- so, in fact, the

8     entire accounting department was -- of BNA was in China;

9     isn't that correct?

10         A.    There was one accounting manager here in North

11    America, but she was reporting to the -- to the group in

12    China, yes.

13         Q.    So was that Ronita -- was it Ronita,

14    R-o-n-i-t-a; is that correct?

15         A.    Correct.

16         Q.    Okay.  And -- but -- and she was the only

17    accounting person; isn't that correct?

18              MR. SIPPRELLE:  Object.

19    BY MR. COOK:

20         Q.    Correct?

21              MR. SIPPRELLE:  Misstates -- misstates the

22    testimony.

23    BY MR. COOK:

24         Q.    You can answer that.  That's pretty clear to

25    me?

**HINES  REPORTERS**                    28

1            MR. SIPPRELLE:  Well, it may be clear to you.

2  I'm not sure it's clear to the witness, Counsel.

3            MR. COOK:  Well, the --

4            MR. SIPPRELLE:  And --

5            MR. COOK:  -- witness can --

6            MR. SIPPRELLE:  And --

7            MR. COOK: -- answer it.

8            MR. SIPPRELLE:  And I would ask you, let's --

9  let's try to stay professional.  You don't need to be

10 argumentative or --

11           MR. COOK:  Oh, absolutely not.

12           MR. SIPPRELLE:  -- with the -- with the

13 witness.  Let's just professionally answer -- ask

14 questions, and Mr. Kameswaran will do his best to

15 respond.

16           Go ahead, Mr. Kameswaran.

17           THE WITNESS:  There was Ronita Oto and maybe

18 one supporting person in her group.

19 BY MR. COOK:

20      Q.   Okay.  What's her name or his name?

21      A.   Sorry.  I do not -- I do not remember.

22      Q.   Well, you know, I've got some statement here

23 from a -- from this fellow, Zhang Ying?

24           Do you know who he is?  Z-h-a-n-g, Y-i-n-g.

25 Do you know who he is?

```
 1        A.   I've -- I've heard the name, and I have not
 2   had any direct interaction with him.
 3        Q.   You never spoke to him; is that correct?
 4        A.   Sorry.
 5             MR. SIPPRELLE:  Mr. -- Mr. Kameswaran, you're
 6   --
 7   BY MR. COOK:
 8        Q.   You never -- I'm sorry?
 9             You never spoke to the guy; is that correct,
10   sir?
11        A.   No.
12        Q.   Good.  Thank you?
13             So -- and I'm reading what he's sworn to, and
14   he says, "BNA and Byton Limited are independent legal
15   entities, and each company has maintained separate
16   financial books and records."
17             So why don't you tell me about the financial
18   books of BNA.
19             MR. SIPPRELLE:  Object.  Vague.  Overbroad.
20             Go ahead.  Do your best, Mr. Kameswaran.  I'm
21   not sure what that means, but go ahead.
22             THE WITNESS:  The -- the financial books were
23   the input of Byton North America were being maintained
24   by the corporate finance group in China.
25   ///
```

**HINES REPORTERS**                                          30

1  BY MR. COOK:

2      Q.   Okay.  And what was the name of that company

3  with the man- -- managing or whatever, the financial

4  books in China?  Was that -- is that BNA?  Was BNA with

5  a business in China?

6      A.   No.

7      Q.   So who was -- who was running the corporate

8  finance records in China?  Who is that?

9      A.   Ms. Shi's group.

10     Q.   And what was the name of that group?

11     A.   The corporate finance group.

12     Q.   Is that a corporation?

13     A.   No, it's not a -- it's not a corporation, no.

14     Q.   Was it run by Byton Limited?

15     A.   Not to my knowledge.

16     Q.   Was Nanjing run -- run by it; is that correct?

17     A.   Correct.  That -- that -- yeah.  I think the

18  finance -- the corporate finance group was within

19  Nanjing.

20     Q.   Nanjing, okay?

21     A.   Yeah.

22     Q.   Could you be so kind and spell that for my

23  court reporter there?

24     A.   Nanjing is, N-a-n-j-i-n-g, New Energy Company.

25     Q.   Okay.  So -- so when I read this here -- so it

**H I N E S   R E P O R T E R S**                    31

1  says, "Byton NA and Byton Limited are independent legal

2  entities, and each company has maintained separate books

3  and records," but the books and records are not managed

4  by Byton Limited, but by Nanjing?

5          Is that a more correct statement?

6          MR. SIPPRELLE:  Object.  Argumentative.

7          You -- you've just read a portion of a

8  declaration and then added something to it that is not

9  in the declaration, so --

10         MR. COOK:  You can answer --

11         MR. SIPPRELLE:  -- it's argumentative --

12  BY MR. COOK:

13     Q.  -- that?

14         MR. SIPPRELLE:  -- and misleading.

15  BY MR. COOK:

16     Q.  You can -- you can answer that, sir?

17     A.  As I've said, the corporate services of this

18  was done by one company which belonged to the group.

19  That's how the company was organized right from the

20  beginning.  Like, some of the shared services were done

21  out of the lower cost entity in China.

22     Q.  Are you telling me -- listening to exactly

23  what you said -- that Byton Limited is really Nanjing,

24  or it may be somebody else and we really don't know who

25  it is?  Is that correct?  That's what you're telling me?

1          MR. SIPPRELLE:  Object.  Argumentative.

2     Misstates his testimony.

3          And, again, Mr. Cook, you're lapsing into kind

4     of an obnoxious, argumentative approach with this

5     witness, and I would just ask you, please, just ask

6     questions professional.

7          Let's keep it on a professional level.  I know

8     you're frustrated, but that's --

9          MR. COOK:  Oh, no.

10         MR. SIPPRELLE:  -- not a reason to take things

11    out on the witness.

12         Go ahead, Mr. Kameswaran.

13         MR. COOK:  We're going to get Mr. Ying and

14    find out how truthful he is really shortly because

15    there's --

16         MR. SIPPRELLE:  Okay.  Well, we'll --

17         MR. COOK:  -- apparently -- apparently this is

18    a fraudulent statement.

19    BY MR. COOK:

20      Q.   So why don't you explain to me why, if it's

21    Nanjing is the one that's holding these records, why

22    don't I see Nanjing on Page 2, Paragraph 7?  Can you

23    explain that to me?

24         MR. SIPPRELLE:  Object.  Argumentative.

25    Compound.  Unprofessional questioning.

**H I N E S   R E P O R T E R S**                    33

1          Go ahead, Mr. -- Mr. Kameswaran.

2          THE WITNESS:  So -- and, again, you referred

3     to Page 2, Paragraph 2 -- Page 7, something like that.

4     I don't know what document.

5     BY MR. COOK:

6          Q.   I'll -- I'll read it for you again.  It's only

7     two lines.  It says, "BNA and Byton Limited are

8     independent legal entities, and each company has

9     maintained separate finance books and records?"

10         And I just want to know, after you explained

11    to me, why these records are not -- not managed by Byton

12    Limited, but by Nanjing.

13         Is that a correct statement, sir?

14         MR. SIPPRELLE:  Object.  Argumentative.

15    Misstates testimony.

16         Go ahead, Mr. Kameswaran.

17         THE WITNESS:  Byton Limited has a number of

18    entities under it, and one of the entities had the

19    shared services group that was providing the service to

20    the different entities.  So that is how it was

21    organized.

22    BY MR. COOK:

23         Q.   Well, let's talk about this document?

24         Why didn't -- why isn't that statement in

25    Mr. Ying's declaration?  Do you know why?

**HINES  REPORTERS**                                    34

```
 1              MR. SIPPRELLE:  Object.  Argumentative.
 2  BY MR. COOK:
 3        Q.   No.  You can really answer that?
 4              MR. SIPPRELLE:  Argumentative.  Speculation.
 5              You're -- you're referring to a document you
 6  haven't shown the witness.
 7              MR. COOK:  Yeah, okay.
 8              MR. SIPPRELLE:  It's a really -- grossly-
 9  inappropriate question, but go -- go ahead,
10  Mr. Kameswaran.
11              THE WITNESS:  So, Mr. Cook, I -- I wouldn't
12  even know when that declaration was done by Mr. --
13  BY MR. COOK:
14        Q.   Yeah?
15        A.   -- Ying, and -- and I -- and what input he --
16  he took when he wrote that declaration.
17        Q.   By the way, Teresa Shi, she was -- she was
18  never vice -- VP of finance for BNA; isn't that correct?
19        A.   No.  She was not the VP of finance for BNA.
20        Q.   Do you know why she signed -- this we'll mark
21  No. 2, a certified copy of corporate board resolution
22  for Byton Northern America Corporation, where she signed
23  it as Teresa Shi as VP of finance, phone number 86
24  156-26073895?
25              MR. SIPPRELLE:  Speculation.  Object --
```

1  objection.  Argumentative.  Speculation.

2          You're referring to a document that you

3  haven't shown the witness, and you're asking him to

4  comment on something you're not showing him, so...

5  BY MR. COOK:

6      Q.   You can answer that question?

7          Was -- was --

8          MR. SIPPRELLE:  It's a compound question.

9          MR. COOK:  Good.

10 BY MR. COOK:

11     Q.   Was Teresa Shi -- well, you actually tell

12 me -- so why did you sign a certified copy of a

13 corporate board resolution, if you know or don't know?

14         MR. SIPPRELLE:  Objection.  Argumentative.

15 Speculation.  Misstates evidence.

16         Go ahead, Mr. Kameswaran.

17         THE WITNESS:  I wouldn't know, Mr. Cook.

18     Q.   Okay.  By the way, did you ever fill out some

19 forms with HSBC Bank USA on the PPP loan?

20     A.   I helped fill out an application for a PPP

21 loan.

22     Q.   Okay.  We'll get to that in a minute.  So

23 let's go back to the following?

24         So tell me, where are the records, which would

25 include profit and loss statements, balance sheets,

1  invoices, contracts, things like that?  Where are those

2  records, as we sit here today?

3          MR. SIPPRELLE:  Objection.  Vague.  Overbroad.

4  Calls for speculation.  It lacks foundation.

5          Go ahead, Mr. Kameswaran.

6          THE WITNESS:  So the records for the profit

7  and loss and balance sheet would be with the corporate

8  finance group in -- in China.

9  BY MR. COOK:

10      Q.   Okay.  And they are in some computerized

11  (inaudible)?  In other words, they can just punch it up

12  and then I would have everything; isn't that correct?

13          MR. SIPPRELLE:  Object.  Argumentative.

14  Speculation.  Lacks foundation.

15  BY MR. COOK:

16      Q.   Are they in some way that I can ask for and

17  deliver all of the finance records of BNA?  Can that be

18  done easily?

19          MR. SIPPRELLE:  Object.  Argumentative.

20  Speculation.  Lacks foundation.

21          Go ahead, Mr. Kameswaran.

22          THE WITNESS:  I'm not aware of how documents

23  are stored in the -- in the China entity so it's

24  difficult for me to comment.

25  BY MR. COOK:

```
 1        Q.   Isn't it true that, in fact, Nanjing has at

 2   all times the financial records of BNA; isn't that

 3   correct?

 4             MR. SIPPRELLE:  Object.  Speculation.  Lacks

 5   foundation.  Overbroad.  Argumentative.

 6             You can answer, if understand or if you know.

 7             THE WITNESS:  Nanjing had access to the Byton

 8   North America records.

 9   BY MR. COOK:

10        Q.   Had access to?  I'm sorry?

11             BNA had access, or Nanjing had access?

12             MR. SIPPRELLE:  Object.  Vague and ambiguous.

13   Lacks foundation.

14             THE WITNESS:  Nanjing was doing the work from

15   a shared services point of view.  And yes, they had

16   access.

17   BY MR. COOK:

18        Q.   Who had access?

19        A.   Corporate finance team.

20        Q.   I'm sorry.  I'm going to make it real -- I'm

21   getting -- you're not giving me at least an answer I

22   understand?

23             Does Nanjing, the entity, is the person or

24   entity who holds all of the finance -- financial records

25   or any records of BNA?  It's just that simple.
```

**HINES  REPORTERS**                                    38

```
 1              MR. SIPPRELLE:  Object.  Lacks foundation.
 2    Speculation.
 3              THE WITNESS:  Nanjing has the financial
 4    records for the corporate finance activities that they
 5    were managing.
 6    BY MR. COOK:
 7         Q.   And the managing records of whom?
 8         A.   As I've mentioned, it's a shared services
 9    group.  They were managing it for all of the entities.
10         Q.   The Shay Group [sic]?  Who's the Shay Group?
11    I don't know who they are?
12         A.   The shared -- the corporate finance group is
13    the shared services group.  So --
14         Q.   Okay.  Is that a company?
15         A.   No, it's not a company.
16         Q.   Who do they work for?
17              MR. SIPPRELLE:  Object.  Asked and answered
18    several times.
19              Go ahead --
20              MR. COOK:  Okay.
21              MR. SIPPRELLE:  -- Mr. Kameswaran.
22              THE WITNESS:  I mentioned it before, Mr. Cook,
23    that the -- there is a corporate finance team that were
24    offering shared services to all the companies in -- in
25    the group.
```

**HINES REPORTERS**                                    39

1  BY MR. COOK:

2      Q.   Keep going?

3          Ms. Shi was employed by whom?  By Nanjing or

4  somebody else?

5          MR. SIPPRELLE:  Object.  Asked and answered.

6  I think he's answered that several times.

7          But go ahead, Mr. Kameswaran.

8          MR. COOK:  It could be clearer.

9          THE WITNESS:  Sorry?  Who was...

10  BY MR. COOK:

11      Q.   Ms. Shi, who was she working for?  Her

12  employer?

13      A.   I don't know her employment contract details,

14  but she was based in our Nanjing office.

15      Q.   What office?

16      A.   Our Nanjing office.

17      Q.   Okay.  Was she an employee of that company?

18          MR. SIPPRELLE:  Object.  Asked and answered.

19  Lacks foundation.

20          Go ahead, Mr. Kameswaran.  You can tell him

21  again.

22          THE WITNESS:  She was an employee of one of

23  the companies in the group, but I don't know exactly her

24  contractual relationship.

25  BY MR. COOK:

1        Q.   She's -- but she's not an employee of BNA;

2   isn't that correct?

3            MR. SIPPRELLE:  Asked and answered.

4            Go ahead.

5            THE WITNESS:  She is not an employee of BNA.

6   BY MR. COOK:

7        Q.   Now, let's move on to the next one here.  Hold

8   on.  Let's take No. 2 here?

9            Can you tell me, for HSBC here, we have

10  another record, which we'll attach to it, No. 2, which

11  says that $18,830,981.23 of money went from -- from --

12  as we see -- Nanjing, Byton, GmbH, FMC, went to Byton

13  North America.

14           So that was for work that Byton performed; is

15  that correct?

16           MR. SIPPRELLE:  Object.  Object.  Lacks

17  foundation.  Speculation.  It assumes facts not in

18  evidence.

19           You're -- you're again referring to something.

20  We don't know what.  We -- it hasn't been shared with

21  the witness.

22           So you're asking him to answer a question

23  based on something you're looking at, but you won't

24  share it with the witness.

25           Go ahead --

**H I N E S   R E P O R T E R S**                    41

```
1   BY MR. COOK:

2        Q.   Well, you can --

3             MR. SIPPRELLE:  -- Mr. Kameswaran.

4   BY MR. COOK:

5        Q.   -- answer the question?

6             Am I correct?  The $18 million?

7        A.   So -- so Mr. Cook, it's very difficult to

8   answer these questions without seeing what record you're

9   referring to.  I'm -- you're quickly talking about the

10  money that is on the plans action from -- between

11  entities.  And if I'm not able to see it, I can't

12  recollect it.

13       Q.   That's terrific?

14            What about the invoices that Byton would be,

15  you know, issued for approximately $18 million?  Where

16  are the invoices?

17            MR. SIPPRELLE:  Object.  Argumentative.

18  Assumes facts not in evidence.  Again, you're referring

19  to a number and a document without showing him and

20  asking him to respond to that.  I think that's

21  inappropriate.

22            Go ahead, Mr. Kameswaran.

23            THE WITNESS:  I really need to see the -- the

24  document for me to be able to comment.

25  BY MR. COOK:
```

1          Q.   Well, since -- there seems to be somewhere

2    about $300 million?

3               So, tell me, what was the sales for BNA for

4    2017?

5          A.   BNA did not sell product to any external

6    customers.  The only work BNA was doing was R&D work for

7    the -- the sister entity in China and getting paid for

8    it.

9               So BNA did not have any other revenue stream,

10   other than getting paid for the work that was being done

11   by the -- the R&D engineers.

12         Q.   Any -- any income for the year of 2018?

13         A.   Again, it would be whatever work was done, we

14   were getting paid for.  I wouldn't remember the exact

15   numbers for any one of the years, for that matter.

16         Q.   So how about 2019?  Was any income due from --

17   due to BNA?

18         A.   There -- there was work that was happening

19   still 2019 until the later part of 2019 when things had

20   to be -- a lot of the work had to be slowed down and

21   stopped.

22         Q.   Okay.  Well, was there any income?

23         A.   So 2019 there have been some payments for the

24   work that was done during 2019.

25         Q.   Okay.  Well, was this -- was there a -- was it

**H I N E S   R E P O R T E R S**                          43

```
1   only between these related entities, or was it to the
2   person walking up and down the street?  Was a sale to a
3   non-Byton entity?
4            That's my question, to make it really easy for
5   you.
6        A.   I cannot recollect any sale to any non-Byton
7   entities -- when -- (inaudible) -- time (inaudible.)
8        Q.   Of the --
9            THE COURT REPORTER:  In the what?  To any
10  Byton entities in the -- I'm sorry, Mr. Sadha --
11           MR. SIPPRELLE:  I think he said "in that
12  timeframe."
13           THE COURT REPORTER:  Thank you so much.
14  BY MR. COOK:
15       Q.   How about 2021?  Were there any sales to --
16  other than sales to other related entities?
17       A.   2021, there -- there was virtually no
18  engineering work done from memory.
19       Q.   So did -- did BNA send out a 1099 to the other
20  entities?  Do you know that?
21       A.   The other entities are not U.S. registered
22  entities, so I'm not aware of any requirement to send a
23  1099.
24           They are not U.S. tax paying entities, so I'm
25  not aware of any -- sending out any 1099s to other
```

**H I N E S   R E P O R T E R S**                           44

```
 1   entities.

 2        Q.   So in your many years, did you ever get ahold

 3   of, say, the balance sheet for BNA?  Ever see one of

 4   those?

 5        A.   Like -- as I said, I was more managing the

 6   operational finance, and I was not involved in the

 7   corporate finance activities.

 8        Q.   Okay.  And did you ever see a profit and loss

 9   sheet -- profit and loss sheet for BNA between 2017 to

10   the end of 2021?

11        A.   No.  I would not have.

12        Q.   Did the company ever keep and maintain a

13   balance sheet?

14             MR. SIPPRELLE:  Object.  Lacks foundation.

15   Speculation.

16             THE WITNESS:  Obviously, we -- we were filing

17   taxes, so those details have to be maintained as a

18   corporate entity.

19   BY MR. COOK:

20        Q.   And I presume that BNA did, in fact, complete

21   a tax return for -- to the IRS for 2017, 2018, 2019,

22   2020 and 2021; is that correct?

23             MR. SIPPRELLE:  Object.  Lacks foundation.

24             Go ahead, Mr. Kameswaran.

25             THE WITNESS:  I'm aware that the taxes were
```

**HINES REPORTERS**                          45

1  filed -- the tax returns were filed for '17, '18, '19

2  and '20.  Not -- '21 has not been done.

3  BY MR. COOK:

4      Q.   By the way, what's the name of the accountant

5  who did the tax returns?

6      A.   It --

7          MR. SIPPRELLE:  Don't -- don't speculate.  If

8  you know, but don't speculate.

9          THE WITNESS:  Sorry, Mr. Cook.  I cannot

10  recollect.

11  BY MR. COOK:

12      Q.   Well, let's talk about -- for 2021?

13          Are you going to -- I'm sorry.

14          Did you file -- in filing the return, are you

15  going to sign the tax return?

16      A.   No, I don't intend to sign the tax return.

17      Q.   Who's going to sign it?

18          MR. SIPPRELLE:  Object.  Speculation.  Lacks

19  foundation.

20  BY MR. COOK:

21      Q.   No.  You can answer that?

22          Who's going to -- who's going to sign their

23  name to the tax return?

24          MR. SIPPRELLE:  Object.  Speculation.  Lacks

25  foundation.

**HINES  REPORTERS**                              46

1                Mr. Kameswaran is a former employee, and

2       you're asking him what a company is going to do now?

3       That's --

4                MR. COOK:  That's --

5                MR. SIPPRELLE:  -- an --

6                MR. COOK:  -- why I'm asking --

7                MR. SIPPRELLE:  That's an interesting

8       question, Mr. Cook.

9                MR. COOK:  Good.

10               MR. SIPPRELLE:  But go ahead.

11      BY MR. COOK:

12          Q.   Let's talk about 20- -- 2020?

13               Did you sign the tax return, sir?

14          A.   For 2020, I signed the -- the tax return at

15      the inception of -- with the -- with the power of

16      attorney that was given to me to sign it.

17          Q.   Who gave you the power of attorney?

18          A.   The -- the legal team.

19          Q.   Who in the legal team?

20          A.   Um --

21               MR. SIPPRELLE:  Now, Mr. Kameswaran, be -- be

22      cautious.  We don't want you to disclose any

23      attorney-client communication.

24               But if you can answer that without disclosing

25      discussions with counsel, you can answer.

**H I N E S   R E P O R T E R S**                    47

```
 1   BY MR. COOK:
 2        Q.   Let me rephrase it?
 3             Who signed the power of attorney?
 4        A.   I -- I wouldn't know, Mr. Cook.
 5        Q.   Well, you were given a power of attorney?
 6             Didn't you see who gave you those powers and
 7   rights?
 8        A.   It -- it was signed in Chinese with a Chinese
 9   stamp, and I wouldn't know who that person was.
10        Q.   Oh, so the power of attorney was not -- by
11   somebody in China, the name of which you do not know; is
12   that correct?
13             MR. SIPPRELLE:  Object.  Argumentative.
14   Misstates testimony.
15   BY MR. COOK:
16        Q.   You can answer that question?
17        A.   As I mentioned, it was signed by someone
18   from -- or organized through our legal team.  Someone in
19   China signed it.  I wouldn't know who that person was.
20        Q.   Well, was that person an officer of -- on
21   behalf of BNA?
22             MR. SIPPRELLE:  Object.  Speculation.  Lacks
23   foundation.
24   BY MR. COOK:
25        Q.   "No"?
```

1          A.    I -- I wouldn't know, Mr. Cook.

2          Q.    Well, if you're signing a tax return for BNA,

3    the person giving you the power of attorney would be, I

4    presume, the -- the president of BNA?

5               Is that a fair statement, as far as you know?

6               MR. SIPPRELLE:  Object.  Argumentative.  Lacks

7    foundation.  Calls for speculation.

8               THE WITNESS:  Again, I -- I wouldn't know.

9    BY MR. COOK:

10         Q.    By the way, was that power of attorney in

11   English, or was it in Chinese?

12         A.    It may have been in English.

13         Q.    Oh, so the person who signed it presumably

14   speaks English, obviously?

15              So he knew what he was signing; isn't that

16   correct?

17              MR. SIPPRELLE:  Object.  Argumentative.  Lacks

18   foundation.

19   BY MR. COOK:

20         Q.    You can answer that?

21         A.    I -- I wouldn't know.  I don't who the person

22   is.  How do I know whether that person knows English or

23   not.

24         Q.    Well, did you ever meet him?

25         A.    No.

**H I N E S   R E P O R T E R S**                              49

```
 1              MR. SIPPRELLE:  Object.  It's --
 2              Go ahead.
 3   BY MR. COOK:
 4        Q.   No.  No?
 5              Okay.  So let's move on to the next one here,
 6   which is Ronita.
 7              She was an employee there; is that correct?
 8        A.   Correct.
 9        Q.   All right.  So I'll just -- I'll just read it
10   to you.  A note on April 22.  She sends a note to a
11   collection person in Group Waretech, G-o- -- G-r-o-u-p,
12   W-a-r-e-t-e-c-h, dot, com?
13              And she says, "We are experiencing some delays
14   in transfer of funds from our China HQ."
15              What's the China HQ?  Do you know?
16              MR. SIPPRELLE:  Object.  Speculation.
17              Again, you're asking him to comment on a
18   document that you apparently are reading from, but
19   you're not sharing with it us.
20              And we don't know if it's -- what you're
21   reading is accurate or not, but go ahead,
22   Mr. Kameswaran.
23              THE WITNESS:  H- -- HQ, in general terms,
24   stands for headquarters.
25   BY MR. COOK:
```

**HINES  REPORTERS**                                    50

1      Q.   It says "China headquarters?"

2           Isn't it true that BNA's headquarters are in

3    China headquarters?  Isn't that correct?

4           MR. SIPPRELLE:  Object.  Argumentative.

5    Misstates testimony.

6    BY MR. COOK:

7      Q.   You can answer that question?

8      A.   There is a headquarter -- there is a

9    headquarter entity in -- in China, but BNA -- I -- I

10   don't know the exact relationship between the entities,

11   other than being sister entities.

12     Q.   Well, it says, "Our China HQ?"

13          What is that, if you know?

14          MR. SIPPRELLE:  Object.  Speculation.  Lacks

15   foundation.  Argumentative.  Again, you're asking him to

16   comment on a document he hasn't seen, and it's written

17   by somebody else, so...

18   BY MR. COOK:

19     Q.   You can answer that question?

20     A.   The work was being done for the China HQ, so

21   Ronita may have been referring to payment from that

22   entity for the work being done.

23          So I can't really comment on this without

24   understanding more details of the document you're

25   referring to.

1      Q.   So this Mr. Ying -- Yang -- Ying.  Zhang Ying,

2   Z-h-a-n-g, he says -- he says this -- it says, "Until

3   recently, Byton's NA's principal place of business were

4   located at 4201 Burton Drive, Santa Clara, CA 95054?"

5           Is that -- is that a true statement, sir?

6      A.   Yes, it is a true statement.

7      Q.   So if its principal place of business is at

8   2401 Burton Drive, Santa Clara 9504 [sic], why am I

9   reading something from an employee that their

10  headquarters is "our China headquarters"?

11          Which one is it, China or Santa Clara?

12          MR. SIPPRELLE:  Object.  Argumentative.

13  BY MR. COOK:

14     Q.   You can answer that question?

15          MR. COOK:  Counsel, you can --

16          MR. SIPPRELLE:  Argue- --

17          MR. COOK:  Sorry.

18          MR. SIPPRELLE:  Hey.  Hey.  Hey.

19          MR. COOK:  The witness can answer it.

20          MR. SIPPRELLE:  I am going to interpose my

21  objections to your inappropriate questions, Mr. Cook.

22  That's an argumentative question.  It's misstating

23  testimony.  It's misstating a document that you have not

24  shown the witness.

25          And I -- I don't understand, Mr. Cook, why you

**HINES REPORTERS**                                      52

```
 1   continue to read -- apparently read from documents

 2   that -- and -- and put your spin on a document, and you

 3   won't show the witness the document.

 4              MR. COOK:  I --

 5              MR. SIPPRELLE:  Go -- go ahead,

 6   Mr. Kameswaran.

 7   BY MR. COOK:

 8       Q.   Why don't you explain that to me, why I seem

 9   to have Byton is -- BNA as their -- as their -- as we

10   say, their principal place of business is in Santa Clara

11   when the employee seems to call it the China

12   headquarters?

13              I'd like to see if you can answer that.

14              MR. SIPPRELLE:  Object.  Misstating the

15   document you're reading from.

16              Go ahead, Mr. Kameswaran.

17              THE WITNESS:  So BNA is a separate entity, and

18   BNA is doing work for another entity, which could have

19   been called anything in China.  But BNA does not have a

20   headquarters in China.

21   BY MR. COOK:

22       Q.   So Ronita's is wrong; is that correct?

23              MR. SIPPRELLE:  Object.  Argumentative.

24   Misstating, mischaracterizing the document that you

25   won't show to the witness.
```

```
 1            MR. COOK:  He can answer --

 2            MR. SIPPRELLE:  Go ahead.

 3            MR. COOK:  -- the question.

 4            THE WITNESS:  Mr. Cook, here, you are

 5   referring to an e-mail where she is -- maybe

 6   inadvertently used the words "China HQ" instead of

 7   saying the China entity, so I -- I don't know.

 8   BY MR. COOK:

 9       Q.   It was her -- her my mistake; is that correct?

10            MR. SIPPRELLE:  Object.  Argumentative.  Lacks

11   foundation.  Mischaracterizes the document.

12            THE WITNESS:  I explained the relationship

13   between the different entities that are standalone.  And

14   Byton NA is -- the only way Byton NA gets money is

15   getting paid for the work that is done by the engineers

16   here in the North American operation.

17   BY MR. COOK:

18       Q.   Well, you know, Ronita seems to be mistaken on

19   May 3, 2019, "I'm afraid I will" -- "I will have" --

20   sorry.  "I'm afraid I will have to give you the same

21   answer as last week, this week China was on holiday, so

22   there was no updated/activities in HQ?"

23            Was that HQ for who?

24            MR. SIPPRELLE:  Object.  It lacks --

25   BY MR. COOK:
```

1           Q.   (Inaudible?)

2           MR. SIPPRELLE:   Object.   It lacks foundation.

3   Speculation.

4           You're -- you're reading from -- apparently,

5   reading from a document that he didn't write, that you

6   won't show him, that is not authenticated, but go ahead,

7   Mr. Kameswaran.

8           THE WITNESS:   Mr. Cook, I -- I explained the

9   relationship between the different entities.   What she

10  mentioned in her e-mail and -- and what she was

11  referring to, I really cannot comment on that.

12          As I said, the only source of money for Byton

13  North America was getting paid by -- paid for the work

14  done by the engineers here.

15          And that money had to -- could have come from

16  the -- the China entity or if we did any work for the --

17  for another entity.   In Germany, we could have been

18  paying for that entity.   I -- I can't really comment.

19  BY MR. COOK:

20          Q.   Okay.   Let's take a look on June 11.   The --

21  this is Ronita, your accounting the manager, "Apologies

22  for delay.   We are currently experiencing a small-cash

23  crunch as we are going through" -- "going through delays

24  in transfer of funds from our China HQ?"

25          So who's the -- who is the "our China HQ," in

1  the June 11 --

2      A.   So --

3      Q.   -- e-mail?

4      A.   -- she --

5          MR. SIPPRELLE:  Let -- let -- hold -- hold on

6  a second, Mr. Kameswaran.

7          Again, you're asking -- it calls for

8  speculation.  Lacks foundation.  You're asking him to

9  comment on a document you hadn't shown him, that he

10  didn't write, that has not been authenticated.

11          So it's -- it's really an inappropriate

12  question, but go ahead, if you understand,

13  Mr. Kameswaran.

14          THE WITNESS:  So Mr. Cook, from what you have

15  read, all I can understand is that she's explaining the

16  typical issues that we have had in transfer of the money

17  from China because there was a significant crunch on

18  foreign exchange from the foreign change bureau in

19  China, and they were not allowing money to get out of

20  the Country.

21          And the trade relations between U.S. and China

22  were strained at the time, and so they were always

23  delayed.  And that's what she was referring to in her

24  e-mail.

25  BY MR. COOK:

1          Q.   So I have a statement here by Mr. Ying, and

2    maybe you can comment on it.  "During the time it was a

3    fully-operating entity, Byton NA managed its own

4    operations, departments, offices and research facilities

5    and employed hundreds of people in the United States?"

6               Is that a true statement?

7          A.   Yes, it's a true statement.

8          Q.   And the departments -- just to make sure I

9    understand it, the departments would be the finance

10   department; isn't that correct?

11              MR. SIPPRELLE:  Object.  Argumentative.

12   Misstates his testimony.

13              Go ahead --

14   BY MR. COOK:

15         Q.   Yeah, you can answer?

16              MR. SIPPRELLE:  -- and answer, Mr. Kameswaran.

17              THE WITNESS:  So from an operational point of

18   view, you're saying engineering work was being done

19   here, and all the -- the functional departments to

20   support the engineering activities were based here in

21   the U.S., other than any of the shared services

22   facilities that we were using from our other entities

23   around the world.

24   BY MR. COOK:

25         Q.   So I -- I'm sorry.  So it says, "During the

**HINES  REPORTERS**                                    57

1  time it was a fully-operational entity, Byton NA managed

2  its own operation's department?"

3          So was BNA managing the finance department in

4  China?

5          MR. SIPPRELLE:  Objection.  Vague.

6  Argumentative.  Asked and answered.

7          Go ahead, Mr. Kameswaran.

8          THE WITNESS:  So there was an operational

9  finance operation here in the -- in the U.S. that was

10  paying the bills and that were due in the U.S. to take

11  care of normal utilities and payroll and those kind of

12  things, but the overall financial documents and things

13  were managed by the corporate finance shared services

14  group.

15  BY MR. COOK:

16      Q.   Maybe you can explain?

17          There were accounting people at -- for BNA in

18  Santa Clara; is that correct?

19          MR. SIPPRELLE:  Object to the term "accounting

20  people" as vague and ambiguous.

21  BY MR. COOK:

22      Q.   Whatever it would be?

23          MR. SIPPRELLE:  You can answer.

24  BY MR. COOK:

25      Q.   You can answer that one?

1          A.    So there was one accounting person, Ronita,

2     with maybe an assistant that she had for a period of

3     time.  I can't recall, and she was liaising with the

4     corporate finance team in our shared services group.

5          Q.    Okay.  I'm sorry.  What group is that?  Is

6     that -- is that --

7          A.    Shared --

8          Q.    -- a group?  That -- the Shay Group [sic] is

9     in China; isn't that correct?

10               MR. SIPPRELLE:  He said, "shared group,"

11     Mr. Cook.

12     BY MR. COOK:

13          Q.    Shared?

14               What's "shared" means?

15               MR. SIPPRELLE:  Go.  My God.

16               Go ahead, Mr. Kameswaran.

17               THE WITNESS:  It is -- it's common terms used

18     when you're using a low-cost country entity to support

19     some of the activities across different entities around

20     the world.

21               If you're going to be doing all work here in

22     the -- in the U.S. and in Germany and other locations,

23     when the same work can be done in a low-cost country in

24     another location.

25     BY MR. COOK:

**HINES  REPORTERS**                                    59

1        Q.   What's --

2        A.   And --

3        Q.   -- the name of this -- sorry.  Go on?

4             What's the name of this shared company?

5        A.   It's not a company, Mr. Kameswaran.  I keep

6   repeating myself here.  That -- the shared services

7   group is part of the corporate finance team based in

8   China.  All they're doing is offering the service to the

9   different entities in the group.

10        Q.   So -- but is the entity owned and run by

11   Nanjing; isn't that correct, sir?

12             MR. SIPPRELLE:  Objection.  Misstates his

13   prior testimony.  Asked and answered.

14   BY MR. COOK:

15        Q.   Well, you can answer that?

16        A.   It's -- it's a group that is located in -- in

17   the Nanjing office.  That's about it.

18        Q.   In China; is that correct?

19        A.   Correct.

20        Q.   Okay.  So why don't explain to me what we call

21   service fees?

22             You familiar with service fees?

23        A.   Yes.

24        Q.   Okay.  What are service fees?

25        A.   Fees that you pay for services that you

**HINES REPORTERS**                              60

1  received.

2       Q.    Okay.  Have you ever read a contract called

3  "Research and Develop Services Agreement"?

4            Ever heard of that agreement?

5            MR. SIPPRELLE:  Object.  Vague and ambiguous.

6  Overbroad.

7            Again, Mr. Cook, if you're going to ask him

8  about a document, you really should show it to him.

9  BY MR. COOK:

10      Q.    Well, you tell me:  Have you ever heard of a

11 document called "Research and Development Services

12 Agreement"?

13      A.    Are you able to show me the document, then I

14 can say whether I have seen the document or not.

15      Q.    No.  Actually, your -- your lawyer handed it

16 to me or filed it with this court attached to Zhang

17 Ying?

18            Do you know that?

19            MR. SIPPRELLE:  Object.  Speculation.  Lacks

20 foundation.

21 BY MR. COOK:

22      Q.    Did you know that, one way or another?

23      A.    No.

24      Q.    Okay.  Now, this is something that Mr. Ying

25 says, "Pursuant to a contract effective November 30,

**H I N E S   R E P O R T E R S**          **61**

1  2016 between Byton NA and Byton Limited, Byton NA agreed

2  to provide Byton Limited with research and development

3  services to design and develop electric vehicles that

4  are smart, connected and feature innovative technology,

5  enhanced driving experiences, in exchange for service

6  fee and intellectual -- intellectual property lines --

7  licensed grants," et cetera -- oh, pardon me?

8          Ever heard that before?  Anything like this?

9          MR. SIPPRELLE:  Vague.  Vague.  Ambiguous.

10          Go ahead, Mr. Kameswaran.

11          THE WITNESS:  So I'm aware of an agreement

12  between R&D agreement between Byton North America and

13  Byton Limited, but this precedes my employment time, so

14  I have not seen the actual document.

15  BY MR. COOK:

16      Q.   Okay.  Now, looking at the agreement, it does

17  say the following -- well, it says here that -- that

18  there are service fees which are due from BNA to Byton

19  Limited?

20          Do you know anything about these service fees,

21  sir?

22          MR. SIPPRELLE:  Object.  Misstates the

23  document.  Calls for speculation.  You're -- you

24  indicated he's never seen the document that proceeded

25  his employment.

**H I N E S   R E P O R T E R S**                    62

1          Go ahead, Mr. Kameswaran.

2          THE WITNESS:  So could you repeat the last

3   sentence, Mr. Cook, there?

4   BY MR. COOK:

5      Q.   Sure.  I'll read it again.  I just want to

6   know whether or not there are any service fees here?

7          It did get filed in this case.

8          "Pursuant to a contract effective November 30,

9   2016 between Byton NA and Byton Limited, Byton NA agreed

10  to provide Byton Limited with research and development

11  services to design and develop electric vehicles that

12  are smart, connected and feature innovative technology,

13  enhanced driving experiences in exchange for service

14  fees and intellectual licensed grants from Byton

15  Limited."

16         So where are the -- where's the service fees?

17  Did you get their money?

18         MR. SIPPRELLE:  Argumentative.  Vague and

19  ambiguous.  Calls for speculation.  Lacks foundation.

20         Go ahead, Mr. Kameswaran.

21         THE WITNESS:  So as I mentioned before,

22  Mr. Cook, Byton was getting paid for the services

23  provided by Byton North America, and -- and that's part

24  of the agreement you're referring to.

25         So there was monies that were paid to Byton

1   North America for the work done by the team in North

2   America.

3   BY MR. COOK:

4       Q.   So we'd have some records for those; isn't

5   that correct?

6           MR. SIPPRELLE:  Object.  Speculation.  Vague

7   and ambiguous.

8   BY MR. COOK:

9       Q.   You can answer that question?

10          MR. SIPPRELLE:  Lacks foundation.

11          THE CLERK:  Excuse me.  This is the courtroom

12  deputy.  I think we've been going a little over an hour.

13  I would think that the court reporter might need a

14  little break.

15          MR. COOK:  That will be fine.  Actually, I --

16  I was going to -- I was going to raise my hand anyway on

17  that one.

18          THE CLERK:  Okay.  So how long would you like

19  to take, gentlemen?

20          MR. COOK:  Ten minutes?

21          THE CLERK:  Ten minutes --

22          THE WITNESS:  Fifteen.

23          MR. COOK:  What?

24          THE CLERK:  Ten minutes is fine.  Ten or

25  fifteen.

**H I N E S   R E P O R T E R S**                    **64**

1          THE WITNESS:  Come back at 10:30?

2          MR. SIPPRELLE:  How long do you need,

3   Mr. Kameswaran?

4          THE WITNESS:  Can we go back at 10:30?

5          MR. SIPPRELLE:  At 10:30, so that's about 19

6   minutes.

7          Is -- is that okay?

8          MR. COOK:  Yeah.  10- -- 10:30's fine.

9          THE CLERK:  Okay.

10          MR. COOK:  So will everybody --

11          THE CLERK:  We're off the record until 10:30.

12          MR. COOK:  Thank you very much.  Thank you.

13          (Whereupon a recess was taken.)

14          THE CLERK:  We're back on the record in --

15          MR. COOK:  Thank you.

16          THE CLERK:  -- Civil Action 21:4736.

17          Go ahead, Mr. Cook.

18          MR. COOK:  Thank you.

19   BY MR. COOK:

20     Q.   Maybe you can explain to me why, between 2018

21   to 2019, that -- to make sure I understand this, that

22   BNA sent to FMC Cayman 167,139,906?

23          Any explanation for that?

24          MR. SIPPRELLE:  Object.  Assumes facts not in

25   evidence.

**H I N E S   R E P O R T E R S**                      65

```
 1              THE WITNESS:  So from what I can recall, the
 2    B-down funding that we went through -- some of the
 3    funding was received in U.S. dollars, because, at that
 4    time, as I mentioned before, it was really difficult to
 5    get money transferred between China and -- and the U.S.
 6              And so we wanted to get some of the funding in
 7    U.S. dollars.  And the B-down investors put some of the
 8    money in U.S. dollars, and -- and Byton North America
 9    was justify facilitating the receipt of that money in
10    U.S. and transferring it to the FMC entity where the
11    money is due to go to.
12              And -- and if you -- I think if you're
13    referring to probably one side of the book in the bank
14    transactions where the money has gone out to FMC Cayman,
15    but you're probably missing the fact that there is money
16    that has come into Byton North America before that from
17    investors.
18    BY MR. COOK:
19        Q.   I -- I'm -- I'm sorry.  I'm not understanding
20    that 167,139,000 of money belonging to BNA --
21        A.   No.  That's --
22              MR. SIPPRELLE:  Hold on.  Let him finish,
23    Mr. Kameswaran --
24              THE WITNESS:  I'm sorry.
25              MR. SIPPRELLE:  -- and then -- before you
```

**H I N E S   R E P O R T E R S**                              66

1  answer.

2  BY MR. COOK:

3     Q.   Which says it was money of BNA and resent to

4  FMC Cayman.  And I'm not sure why?

5          I don't understand.

6          Was it money sent for -- to buy something or

7  to do what?  I don't understand.

8          MR. SIPPRELLE:  Okay.  Yeah.  I'll object --

9          MR. COOK:  Explain that.

10         MR. SIPPRELLE:  Yeah.  Object.  Asked and

11 answered.  Assumes facts not in evidence, which is the

12 money belonged to BNA, which he told you it did not.

13         But go ahead, Mr. Kameswaran.  You can explain

14 again, without -- without having the benefit of the

15 documents that Mr. Cook is looking at.  Your

16 recollection.

17         THE WITNESS:  Yeah.  As -- as for my prior

18 statement, the money never belonged to BNA in the first

19 place.

20         The money was being received to facilitate a

21 transfer to FMC because we did -- we wanted to avoid

22 some of the transfer of -- or the conversion of money

23 from Chinese Renminbi to U.S. dollars.

24         So we facilitated the investors to put the

25 money in U.S. dollars into a U.S. bank account so that

1  FMC could have the money in U.S dollars and make it a

2  little bit easier for future payments.

3  BY MR. COOK:

4      Q.   But the --

5      A.   The money never belonged to FM- -- BNA in the

6  first place.

7      Q.   But the money was BNA's money; isn't that

8  correct?

9      A.   That's incorrect.

10         MR. SIPPRELLE:  Object.  Asked and answered.

11 BY MR. COOK:

12     Q.   Whose -- whose money was 167,000 --

13 167,000,000?  Who was that?

14     A.   FMC's money.

15     Q.   So it was FMC's money in -- in the bank

16 account of BNA; is that correct?

17         MR. SIPPRELLE:  Object.  Asked and answered.

18 Argumentative.

19         THE WITNESS:  Yeah.

20         MR. SIPPRELLE:  You can explain again,

21 Mr. Kameswaran.

22         THE WITNESS:  As --

23 BY MR. COOK:

24     Q.   Explain it again?

25     A.   As I mentioned before, before, BNA was just

**HINES REPORTERS**                                    **68**

```
 1   facilitating the transfer of this money to FMC, which

 2   belonged to FMC.  We were trying to avoid some of the

 3   transactional issues and -- and that is why it -- why it

 4   was facilitated that way.

 5        Q.   So, originally, the money belonged to FMC; is

 6   that correct?

 7        A.   Correct.  The investors investing money in

 8   FMC.

 9        Q.   So the money -- the money -- this $167,000,000

10   never belonged to BNA?

11             It belonged to FMC; is that correct?  But it

12   ended up in the BNA bank account; is that correct?

13             MR. SIPPRELLE:  Argumentative.  Compound.

14   Asked and answered.

15             Go ahead, Mr. Kameswaran, explain again for

16   the third or fourth time.

17             THE WITNESS:  The money did not belong to BNA.

18   The money belonged to FMC, the investors depositing the

19   money through an account in the U.S. to ensure that

20   money is coming in U.S. dollars to make it easier for

21   future transactions.

22   ///

23   BY MR. COOK:

24        Q.   To make sure you understand, this is money

25   117,000,000 [sic] went from a -- a bank account of BNA
```

**H I N E S   R E P O R T E R S**                                   69

```
 1   to FMC Cayman, and 117- -- 117,000,000 [sic] didn't --
 2   was not -- didn't belong to BNA, but belonged to FMC
 3   Cayman; is that correct?  That's the whole deal?
 4             MR. SIPPRELLE:  Object.  Asked and answered.
 5   Argumentative.
 6   BY MR. COOK:
 7        Q.   Is that correct?
 8        A.   That is correct.  The money belonged to FMC.
 9        Q.   Why did it get in the hands of BNA, to begin
10   with?
11             MR. SIPPRELLE:  Object.  Asked and answered at
12   least three or four times, but go ahead.
13             Apparently, Mr. Cook doesn't understand or --
14             MR. COOK:  Explain --
15             MR. SIPPRELLE:  -- or is feigning not to
16   understand.
17             Go -- go ahead, Mr. Kameswaran.  Tell him
18   again.
19   BY MR. COOK:
20        Q.   How did it end up there to begin with?
21        A.   So these are investors that who willing to pay
22   the money in U.S. dollars to avoid some of the
23   transactional issues of transferring money between China
24   and the U.S. due to the trade issues and everything at
25   that time.
```

**HINES REPORTERS**                                      **70**

1          So we requested the investors to deposit the

2     money in U.S. dollars in a U.S. bank account, which

3     happened to be BNA's account.

4          And -- and the money was, accordingly,

5     transferred to FMC because it belonged to FMC in the

6     first place.

7          Q.   So the -- to make sure I -- I get this here?

8          Originally, this FMC money was Chinese money?

9          MR. SIPPRELLE:  Object.  Argumentative.  Vague

10    and ambiguous.

11         You can answer.

12         THE WITNESS:  Well, I don't know who the

13    investors were.  Whether they were Chinese money or U.S.

14    investors, I don't know the details, or I don't

15    recollect the details of the investors.

16    BY MR. COOK:

17         Q.   Well, you're saying, originally, the money was

18    FMC Cayman.  And I'm trying to figure out:  What's the

19    origin of that money?  Was it in China or some other

20    place?

21         MR. SIPPRELLE:  Object.  Argumentative.

22    Misstates his prior testimony.  He said the money

23    belonged to FMC.  It came from investors.

24    BY MR. COOK:

25         Q.   Well, that -- that's saying investors?

**HINES REPORTERS**                                        71

 1            What banks?

 2        A.   I don't --

 3            MR. SIPPRELLE:  Object.  Lacks foundation.

 4            Go ahead.

 5            THE WITNESS:  I -- I wouldn't know, Mr. Cook,

 6    where the investors were.

 7    BY MR. COOK:

 8        Q.   Well, was it offshore?

 9            MR. SIPPRELLE:  Object.  Lacks foundation.

10    Argumentative.

11            THE WITNESS:  I -- I don't know.

12    BY MR. COOK:

13        Q.   How do you know any of this information?  Who

14    told you?

15        A.   These -- like, during this time, I was still

16    overseeing the monies that were coming into the account

17    and going into the account and actually approving the

18    transfer of those monies, and there was nothing illegal

19    that was done under my watch, as far as I know.

20        Q.   Well, as far as you know; is that correct?

21            MR. SIPPRELLE:  Argumentative.

22    BY MR. COOK:

23        Q.   By the way, the money -- was the money for the

24    117, was that money belonging to FMC Cayman's, or was

25    that to investors?  Which one?

**HINES REPORTERS**                              72

1          MR. SIPPRELLE:  Object.  Vague and ambiguous.

2    Vague as to time.

3          You can explain, again, your recollection.

4          THE WITNESS:  That was money that the

5    investors were putting into the FMC entity.  They were

6    investing in the company, and they were paying for their

7    investment in U.S. dollars.

8    BY MR. COOK:

9       Q.   Why -- who are those investors?  Do you know

10   who they were?

11         MR. SIPPRELLE:  Object.  Asked and answered.

12   Calls for speculation.  Lacks foundation.

13         THE WITNESS:  I'm sorry, Mr. Cook.  I wouldn't

14   know who the investors were at that time.

15   BY MR. COOK:

16      Q.   Well, did -- did somebody tell you that this

17   was money from an investor?

18      A.   I'm -- I'm sure there were correspondence

19   between FMC and -- also at that time to facilitate this.

20      Q.   So tell me, there must be some e-mail traffic

21   concerning all of these transactions; isn't that

22   correct?  You must have been e-mailing somebody?

23         MR. SIPPRELLE:  Object.  Lacks foundation.

24         THE WITNESS:  Yeah -- yes, there would have

25   been e-mail correspondence.

**HINES  REPORTERS**                          73

1  BY MR. COOK:

2      Q.   And so where's the e-mail traffic for all of

3  the -- all of these transactions here?

4           MR. SIPPRELLE:  Object.  Lacks foundation.

5           THE WITNESS:  I -- I wouldn't know.  I

6  wouldn't have access to those e-mails, Mr. Cook.

7  BY MR. COOK:

8      Q.   Well, these are the e-mails that you were

9  writing; isn't that correct?

10           MR. SIPPRELLE:  Object.  Vague and ambiguous.

11  Argumentative.

12           THE WITNESS:  I may have responded to a

13  request by e-mail from FMC to facilitate this transfer,

14  but I do not have access to my Byton e-mails anymore.  I

15  left the company last year.

16  BY MR. COOK:

17      Q.   As -- as you're telling me?

18           But where are those -- are those e-mails in,

19  like -- are they accessible here, or are they in China?

20           MR. SIPPRELLE:  Lacks foundation.

21  Speculation.

22           THE WITNESS:  The e-mail server was a

23  Cloud-based server.  I -- I don't know where it is.  Not

24  that savvy with the IT stuff.

25  BY MR. COOK:

```
 1          Q.   Well, we've been informed that all of the --
 2   all of the e-mails are in a Cloud server somewhere in
 3   China?
 4          Is that a correct statement?
 5          MR. SIPPRELLE:  Well, objection.
 6          You were not so informed of that, Mr. Cook.
 7   So you're -- you're putting -- you're mischaracterizing
 8   what was indicated during the litigation, and then
 9   you're asking a former employee to speculate about where
10   something might be.
11          But go ahead, Mr. Kameswaran.
12   BY MR. COOK:
13          Q.   You can answer that question, sir?
14          A.   I don't know where the server resides.
15          Q.   Well, I'm -- I seem to be having some
16   confusion here.
17          You're -- we're getting information here that
18   all of the records of BNA is somewhere in the server,
19   which is a mess, by somebody, and that there are no
20   records here in the United States.
21          So what I want to know is:  Is all of your
22   traffic dealing with, apparently, half a billion
23   dollars, that all of those records are now somewhere in
24   China; is that correct?
25          MR. SIPPRELLE:  Object.  Compound.  Calls for
```

**HINES REPORTERS**                                    75

1   speculation.  Misstates information.

2   BY MR. COOK:

3       Q.   You can answer that?

4            MR. SIPPRELLE:  You can -- you can answer, if

5   understand the question and if you know an answer to it.

6            THE WITNESS:  It -- it -- they're in a Cloud

7   server.  I don't know where the server is.

8   BY MR. COOK:

9       Q.   Well, what do you mean you don't know where it

10  is?

11           MR. SIPPRELLE:  He -- he just said he doesn't

12  know where it is.

13  BY MR. COOK:

14      Q.   You can -- you can answer the question?

15           MR. SIPPRELLE:  How more clearly can you be,

16  Mr. Cook?

17  BY MR. COOK:

18      Q.   Where's the ser- -- a server is a piece of

19  hardware.

20           Is it somewhere in California?

21      A.   It's not a --

22           MR. SIPPRELLE:  Object.  Object.

23  Argumentative.  Argumentative.

24           MR. COOK:  Let the witness answer his -- the

25  question to him.

**HINES  REPORTERS**                          76

```
 1              MR. SIPPRELLE:  Mr. Kameswaran, do not inter-
 2   -- interrupt me when I'm objecting to your harassing
 3   questions --
 4              MR. COOK:  Well --
 5              MR. SIPPRELLE:  -- of this witness.
 6              Okay.  I'm going to object to your
 7   inappropriate questions, then the witness can answer if
 8   he can.
 9              Go ahead, Mr. Kameswaran.
10              THE WITNESS:  It's -- it's a Cloud server.
11   It's not a physical server.
12   BY MR. COOK:
13      Q.   And who's managing that Cloud server?  Is that
14   in China?
15              MR. SIPPRELLE:  Object.  Lacks foundation.
16   BY MR. COOK:
17      Q.   If you know?
18      A.   It's managed by the IT group in China.
19      Q.   Okay.  That -- that's what I want to know.
20              So if I wanted to figure out what's going on
21   with a half a billion dollars, I have to get the
22   information from Nanjing, the corporate finance people;
23   isn't that correct?
24              MR. SIPPRELLE:  Object.  Argumentative.  Lacks
25   foundation.
```

**HINES REPORTERS**                                      77

```
 1                    THE WITNESS:  I don't know.  I don't know what
 2      to say.  A 2018 document --
 3                    MR. SIPPRELLE:  Don't -- don't speculate about
 4      it.
 5                    THE WITNESS:  I'm sorry.  I'm not going to
 6      answer that.
 7      BY MR. COOK:
 8           Q.   Why not?  Isn't it true that all of the
 9      records dealing with a half billion dollars is in some
10      type of Cloud in China somewhere; isn't that correct?
11                    MR. SIPPRELLE:  Object.  Lacks foundation.
12      Speculation.
13      BY MR. COOK:
14           Q.   You can answer that?
15           A.   As I said, it's a Cloud server.  I don't know
16      where the server is.  It's -- it's not a physical
17      server.  So it's -- it's truly in the Cloud, so I don't
18      know which company manages that.  And I -- I wouldn't
19      know.
20           Q.   All right.  But it's -- you don't have control
21      over it; isn't that correct?
22           A.   I never had.
23           Q.   Okay.  And it is fair to say that the
24      corporate finance team has control over it?
25                    MR. SIPPRELLE:  Object.  Speculation.  Vague
```

**H I N E S   R E P O R T E R S**                                    78

1  and ambiguous.

2          THE WITNESS:  I -- I don't know how much

3  access they have of the archives.

4  BY MR. COOK:

5      Q.   Okay.  Now, just to make sure I really

6  understand what you're doing here, in looking at all of

7  this money which is going between one and the other, is

8  it a fair statement that there is no paperwork one way

9  or another that would -- to explain the transaction?

10          In other words, there's not a invoice, there's

11  not a statement, there's not service fee, there's

12  nothing.

13          Isn't that a fair statement?

14          MR. SIPPRELLE:  Object.  Argumentative.

15  Argumentative.  Vague and ambiguous.

16  BY MR. COOK:

17      Q.   You can answer that?

18      A.   That's not a fair statement.  All the work

19  that was done was properly invoiced against the -- the

20  contract, and Byton North America was paid for it.  They

21  were all arm-length transactions, and there was proper

22  invoicing and proper payments.

23      Q.   So where are the invoices?

24          MR. SIPPRELLE:  Object.  Lacks foundation.

25          Mr. Cook, you keep asking a former employee

1  who hasn't been at the company for months where things

2  are.

3  BY MR. COOK:

4      Q.   Well, you can answer that?

5          MR. SIPPRELLE:  But you can -- based on your

6  current knowledge, Mr. Kameswaran, you can answer to the

7  best of your ability.

8          THE WITNESS:  The invoices would -- would be

9  in digital form.

10  BY MR. COOK:

11      Q.   Digital?

12          And how do I get them?

13          MR. SIPPRELLE:  Object.  Lacks foundation.

14  Speculation.

15          THE WITNESS:  Yeah.  As I said, who -- I don't

16  know who manages the -- the storage of those, so I

17  wouldn't be able to comment.

18  BY MR. COOK:

19      Q.   Okay.  And how about any -- any type of

20  contract, any such contracts regarding the movement of

21  $467,000,000, almost -- almost half a billion?  Do you

22  have any of that paperwork?

23          MR. SIPPRELLE:  Well, objection.

24  Argumentative.  Assumes facts not in evidence that

25  there's some connection between this number you threw

**HINES REPORTERS**                          80

1  out and a contract, but go ahead, Mr. Kameswaran.

2          THE WITNESS:  Yeah.  There will be contractual

3  documents for -- for the work that was done by Byton

4  North America.

5  BY MR. COOK:

6      Q.   Where's -- where's the contracts?

7          MR. SIPPRELLE:  Object.  Lacks foundation.

8  Speculation.

9          MR. COOK:  No.  He said the contracts.

10 BY MR. COOK:

11     Q.   Where are the contracts?  That's what you

12 said --

13         MR. SIPPRELLE:  Lacks found- --

14 BY MR. COOK:

15     Q.   -- under oath.  That's what you're telling us

16 under oath.  So tell me where the contracts are, and the

17 invoices --

18         MR. SIPPRELLE:  Lacks foundation.

19 BY MR. COOK:

20     Q.   -- and everything else.  That's what I expect

21 from you, sir?

22         MR. SIPPRELLE:  Mr. Kameswaran is not a

23 current employee.  And you're asking him where documents

24 are at the present time, so --

25         But go ahead, Mr. Kameswaran.  If you can

```
 1   answer, if you have information.

 2              THE WITNESS:  No.  I -- I wouldn't know where

 3   those documents are.  But I know that -- that there were

 4   documents that existed.

 5   BY MR. COOK:

 6        Q.   And they are somewhere in the Cloud; is that

 7   right?

 8              MR. SIPPRELLE:  Object.  Lacks foundation.

 9   Speculation.

10   BY MR. COOK:

11        Q.   Is that correct?

12        A.   They -- yeah, Byton typically used digital

13   storage of documents, so yeah.  I wouldn't know where

14   those are.

15        Q.   Well, who -- who can I contact who might be

16   able to help me and find out where those documents are?

17              Can you tell me where?

18              MR. SIPPRELLE:  Object.  Lacks foundation.

19   Speculation.

20              THE WITNESS:  Sorry, Mr. Cook.  I -- I don't

21   know which employees are still left in the company in

22   the different locations, so I wouldn't be able to name a

23   person.

24   BY MR. COOK:

25        Q.   Where is Eidee, E-i-d-e-e; Zhou, Z-h-o-u?
```

**H I N E S   R E P O R T E R S**                                           **82**

1  Who's that person?

2      A.   She's a former employee of one of our entities

3  in China.

4      Q.   But she is not a senior manager of treasury or

5  finance of BNA; isn't that correct, too?

6      A.   No.  She -- she was not an employee of BNA.

7      Q.   Okay.  And one more time, Teresa Shi, she is,

8  likewise, not an -- not a person holding a title to

9  HSBC; is that correct?

10          MR. SIPPRELLE:  Object.  Vague and ambiguous.

11  BY MR. COOK:

12      Q.   Can you answer that question?

13      A.   Sorry.  Could you restate that question --

14      Q.   Okay?

15      A.   -- please.

16      Q.   She -- her name's Teresa, T-e-r-e-s-a; Shi,

17  S-h-i.  She's listed as a VP of finance in the business

18  deposit account agreement?

19          And all I want to know is:  Is she a VP of

20  finance of BNA?  It's a "yes" or "no."

21      A.   No.

22      Q.   Okay.  So if she's not why, did she sign the

23  "Business Deposit Account Agreement" when her title is

24  VP of finance?  Do you know why?

25      A.   I wouldn't know.

**H I N E S   R E P O R T E R S**                    83

1      Q.   When did you find out that her name appeared
2  as VP of finance?
3      A.   I knew that she was a VP of finance.  Her
4  title was VP of finance, but not VP of finance with BNA.
5      Q.   Did you remember going over this topic when
6  you were deposed?
7           MR. SIPPRELLE:  Don't speculate.  If you
8  remember.
9  BY MR. COOK:
10     Q.   If you remember?
11          No?
12     A.   We may have.
13     Q.   We're going to -- so let's go change a little
14  bit here.
15          Do you know what a PPP loan is?
16     A.   Yes, sir.
17     Q.   In fact, you're the -- you're the one who was
18  part of that; isn't that correct?
19     A.   I helped apply for that loan.
20     Q.   And when the loan -- there was a total U.S.
21  employees of 397; isn't that correct?
22     A.   That's sounds about right.
23     Q.   Okay.  So -- and the loan was taken out in --
24  in -- what? -- April of 2020; is that correct?
25     A.   Correct.

1          Q.   And, in fact, there was forgiveness in 2021;

2     isn't that correct?

3          A.   Correct.

4          Q.   And the amount of forgiveness was a little

5     over $10,000,000; isn't that correct?

6          A.   The amount of forgiveness was exactly

7     $10,000,000 from memory.

8          Q.   Okay.  And where was that money -- and what

9     bank was that $10,000,000 deposited?

10          A.   The loan was processed by HSBC, so it was

11     deposited by HSBC into our HSBC account.

12          Q.   HSBC; correct?

13          A.   Correct.

14          Q.   Okay.  So what did you guys do with the money?

15          A.   We paid employees.  We paid payroll.  We paid

16     rent and utilities, as were the guidelines of the PPP

17     loan.

18          Q.   So for the -- for the year of 20- -- 2020, for

19     each month, what was the average number of employees

20     that you had?

21          A.   From memory, it -- it was around 400 employees

22     sometime through middle of 2020 and -- and difficult for

23     me to comment because we were losing a lot of people.

24     There was a lot of turnover at that time.

25          Q.   Did you -- didn't BNA stop paying the vendors

**H I N E S   R E P O R T E R S**                    85

1    somewhere in earlier 2019?

2              MR. SIPPRELLE:  Object.  Vague and overbroad.

3              THE WITNESS:  I cannot recall the exact time,

4    but it was sometime in 2019.

5    BY MR. COOK:

6         Q.   And when you stopped getting -- when you

7    stopped paying bills, that people stopped providing

8    services; isn't that correct?

9              MR. SIPPRELLE:  Object.  Overbroad.  Vague.

10   BY MR. COOK:

11        Q.   You can answer that?

12        A.   Could you rephrase that question, please.

13        Q.   If you weren't getting any product from things

14   that -- from people that you were buying, what happened

15   to your employees?  They weren't getting anything to do?

16             MR. SIPPRELLE:  Objection.  Vague and

17   overbroad.

18             THE WITNESS:  We -- we were providing

19   engineering services for our own group/company in China.

20   So the engineers continued to do the work in -- in 2019.

21   ///

22   BY MR. COOK:

23        Q.   Let's talk about 2020?

24             Was engineering work done in 2020?

25        A.   There was work -- work done in 2020.  It

**H I N E S   R E P O R T E R S**                              86

1  become difficult after about March 2020 due to COVID

2  restrictions.  And around the same time we were running

3  out of money as well as -- in spite of the PPP loan, so

4  we had a huge turnover of people.  And a lot of the

5  people left maybe around the middle of that year.

6      Q.   So there weren't -- throughout 2020, you

7  didn't have 397 people every -- each and every month;

8  isn't that correct?

9      A.   That number stayed around that -- between

10 March or June or July or whatever timeframe before we

11 started losing a lot of people.

12     Q.   Did you know that you have to pay taxes on the

13 forgiveness for this $10,000,000?

14          MR. SIPPRELLE:  Object.  It calls for a legal

15 opinion from a nonlawyer and a non-accountant.

16 BY MR. COOK:

17     Q.   You know that (inaudible) --

18          (Overlapping.)

19          MR. SIPPRELLE:  And who is -- is "you"?  Is

20 that Byton North America, or you're talking about

21 Mr. Kameswaran, personally?

22          MR. COOK:  I'm asking whether -- does he know

23 that -- that he may have to pay taxes on this for the

24 $10,000,000 --

25          MR. SIPPRELLE:  "He," being --

**H I N E S   R E P O R T E R S**                    **87**

1          MR. COOK:  -- for the forgiveness --

2          MR. SIPPRELLE:  -- Mr. Kameswaran?

3          MR. COOK:  If he does, he doesn't know.  If he

4  doesn't know, he doesn't know.

5          MR. SIPPRELLE:  Object.  Argumentative.  Calls

6  for a legal conclusion.  A tax opinion.

7  BY MR. COOK:

8     Q.   Go ahead?

9          MR. SIPPRELLE:  Go ahead, Mr. Kameswaran.

10         THE WITNESS:  Yeah, I don't know.  That is why

11  we get tax advice.

12  BY MR. COOK:

13    Q.   By the way, did you pay workers' comp for the

14  employees during 2020?

15         MR. SIPPRELLE:  Object.  Vague and ambiguous.

16         By "you," you're talking about Byton North

17  America; correct?

18         MR. COOK:  BNA.

19         MR. SIPPRELLE:  BNA, okay.

20  BY MR. COOK:

21    Q.   Did BNA pay for workers' comp?

22    A.   Yeah, I'm sure we would have paid workers'

23  comp.

24    Q.   What's the name of the workers' comp company?

25    A.   All of that was organized through some agency

**H I N E S   R E P O R T E R S**                              88

1   from agents, so I wouldn't remember the name.

2       Q.   What's the name of the agency?

3       A.   I -- I'm sorry, Mr. Cook.  I was not sort of

4   directly involved in some of these.  It was managed by

5   our HR people.

6       Q.   By HR people; is that correct?

7       A.   Correct.

8       Q.   And so -- and who is in charge of HR?

9            MR. SIPPRELLE:  Objection.  Vague as to time.

10  BY MR. COOK:

11      Q.   Tell me, when you were there, who was in

12  charge of HR, so they can tell me who the workers' comp

13  was and that will tell me how many people were working?

14      A.   There -- there was a -- there was a lady.  She

15  was not an HR manager because, again, we had lost a lot

16  of the people, and there was a lady who was supporting

17  us with the HR activities.

18      Q.   Was it a usual practice of BNA to have people

19  sign on the business card or the -- the bank deposit and

20  agreement to have who were not people employees?  Is

21  that common?

22           MR. SIPPRELLE:  Object.  Vague and ambiguous.

23  Argumentative.

24           MR. COOK:  I'll rephrase it.

25  BY MR. COOK:

**HINES  REPORTERS**                                    89

1    Q.   Was it usual practice of BNA to put on bank

2    deposit agreements, better known as signature cards, of

3    people who are not employees of BNA?

4              MR. SIPPRELLE:  Object.  Vague and ambiguous.

5              THE WITNESS:  I -- I was not involved in

6    setting up the bank accounts.  I wouldn't know.

7    BY MR. COOK:

8         Q.   Was it the usual practice that -- that people

9    who would be signing you up on the business deposit

10   account agreement were the people who could sign on the

11   card, as we say, and anyone?  It didn't take two?

12             Did you know that?

13        A.   No, sir.

14        Q.   Did you know that Teresa Shi was entitled to

15   sign off on the HSBC on a check of only one person, not

16   two people?

17        A.   No, I wouldn't know.

18        Q.   Do you know whether or not it was practice

19   that people who were not employees could write checks on

20   accounts of BNA?  Did you know that?

21             MR. SIPPRELLE:  Object.  Vague and ambiguous.

22             THE WITNESS:  Yeah, could -- could you repeat

23   that, please.

24   BY MR. COOK:

25        Q.   What?

**H I N E S   R E P O R T E R S**                    **90**

```
 1              MR. SIPPRELLE:  Could you repeat that.  He
 2  said --
 3              THE WITNESS:  (Inaudible.)
 4  BY MR. COOK:
 5      Q.   Did you know --
 6              MR. SIPPRELLE:  -- could you repeat --
 7  BY MR. COOK:
 8      Q.   -- that -- did you know that non-employees of
 9  BNA could sign their name on a BNA account?
10      A.   I don't know.
11      Q.   Well, did you ever learn that, other than
12  sitting here?
13              MR. SIPPRELLE:  I'm not sure he's learned it
14  sitting here.  You're making a representation.  So it
15  assumes facts not in evidence.  But -- and asked and
16  answered.  But go ahead, Mr. Kameswaran.
17              THE WITNESS:  No, I -- I don't know.
18  BY MR. COOK:
19      Q.   Would that surprise you?
20              MR. SIPPRELLE:  Object.  Argumentative.
21              THE WITNESS:  I don't know what document
22  you're referring to, so it's difficult for me to
23  comment, Mr. Cook.
24  BY MR. COOK:
25      Q.   Well, Mr. Ying says, "Byton Limited has never
```

1    maintained any bank accounts in the State of California

2    or other assets within the state."  That's what it says

3    here.

4              But it's true that non-BNA employees have

5    access to the BNA accounts?

6              Do you know?

7              MR. SIPPRELLE:  Object.  Compound.  Misstates

8    the evidence.  Calls for speculation.  Lacks foundation.

9    BY MR. COOK:

10        Q.   You can answer that question?

11        A.   I don't know that they had access to the

12   accounts.

13        Q.   Okay.  No.  It's the same person here?

14             Who's Cars- -- Carsten, C-e-a --

15   C-a-r-s-t-e-n; Breifeld, B-r-e-i-f-e-l-d?  Do you know

16   who he is?

17        A.   Yes.  The former CEO.

18        Q.   Okay.  And can you tell me who Rul, R-u-l;

19   S-u-n is?  Do you know who that person is?

20        A.   No, I don't recall her.

21        Q.   Or -- and in 2007 [sic], do you know whether

22   or not -- I think, it was -- I think, it was Ms. Shi,

23   but it was Fang Shi, head of finance?

24             Was there such a person who was head of

25   finance of BNA on June -- July 11, 2017?

1          A.    Could you repeat the name again, please.

2          Q.    All right.  Her last name is Shi, S-h i, and I

3    believe her name is listed as Fang, F-a-n-g?

4          A.    No, I wouldn't know, Mr. Cook.  I was very new

5    in the company at that time.

6          Q.    Okay.  So I take that back.  Here it is.  A

7    better one here.

8                As of July 11th, that -- the same one; the

9    same one -- that she was listed as head of finance.

10               Was Fang -- Teresa Shi the head of finance of

11   BNA as of July 11th, 2017, if you know?

12               MR. SIPPRELLE:  Object.  Speculation.  Lacks

13   foundation.

14               THE WITNESS:  I -- I don't know.  I was

15   probably only a week in the company at this time.

16   BY MR. COOK:

17         Q.    Okay.  And as of -- this one is May 18,

18   2018 -- it says, "Fang Teresa Shi, VP of finance," but

19   she was not VP of finance of -- of BNA?

20               Is that a fair statement?

21         A.    No, she was not a VP of finance of --

22         Q.    Okay.  R-u-i-n- --

23               MR. SIPPRELLE:  Hold -- hold on.

24               Mr. Cook, you need to let him finish his

25   answer.

1    BY MR. COOK:

2        Q.   Please, if you can?

3            MR. SIPPRELLE:  Would you finish your answer?

4            THE WITNESS:  She was not an employee of BNA.

5    BY MR. COOK:

6        Q.   The next one is Rui, R-u-i; Sun, senior

7    finance manager?

8            Is she an employee of BNA?

9        A.   Well, I do not recollect that name,

10   Mr. Kameswaran.

11       Q.   Okay.  How about Aidi, A-i-d-i; Z-h-o-u,

12   senior treasury manager?

13           Does that ring a bell to you?

14       A.   She was not an employee of BNA.

15       Q.   But this is listed here that's a senior

16   treasury manager?

17           Was she a treasury manager of BNA or some

18   other company?

19           MR. SIPPRELLE:  Object.  Lacks foundation.

20           THE WITNESS:  I -- I can't recall that she was

21   the treasury manager for BNA.

22   BY MR. COOK:

23       Q.   Who is the Robert James Bauchat,

24   B-a-u-c-h-a-t?  Who's he?

25       A.   He was an employee of BNA.

**HINES REPORTERS**                                    94

1        Q.   What was his job?

2        A.   He was looking after the financial planning.

3        Q.   And does he still -- and when did he leave

4    BNA?

5        A.   I can't recall.  But maybe in -- sometime in

6    2020.  2019.  I don't recall the exact time.

7        Q.   And you become a signatory on June 8th, 2018;

8    isn't that correct?

9        A.   Yes.

10       Q.   Okay.  And your title was director of

11   production; is that correct?

12       A.   No.  My -- my -- my title was director of

13   product control.

14       Q.   It is what it is?

15            Now -- and then we have in -- in November 2nd.

16   Now, this one's -- November 2nd, another one.  And here

17   we have Rul Sun, the senior finance manager, but he's

18   not a -- but Rul Sun is not an employee of BN [sic].

19            Is that a fair statement, sir?

20       A.   I -- as I mentioned before, I don't even

21   recall the name.

22       Q.   Aidi, A-i-d-i; new word, Z-h-o-u, senior

23   treasurer manager?

24            We agree that he's not an employee; is that

25   correct?

**HINES  REPORTERS**                                    95

1        A.    Not to my knowledge.

2        Q.    Okay.  And your name, Sadha?

3              You are an employee; is that correct?

4        A.    Correct.

5        Q.    And then Ronita Oto, accounting manager?

6              She is an employee; is that correct?

7        A.    She was an employee.

8        Q.    When did she quit or left or whatever?

9        A.    I don't know what her circumstances were,

10   and -- and, as I've said, she must have had a better

11   opportunity.

12       Q.    So I have here for the Silicon Valley Bank,

13   "Bank Depositor Agreement" here, and it -- well, the

14   person who signs this is Fang Teresa Shi, VP of finance?

15             Why did she sign this document?

16             MR. SIPPRELLE:  Object.  Speculation.  Lacks

17   foundation.

18             THE WITNESS:  Well, I -- I do not know,

19   Mr. Cook.

20   BY MR. COOK:

21       Q.    Was she physically in -- in California at the

22   time?

23             MR. SIPPRELLE:  Object.  Speculation.  Lacks

24   foundation.

25             THE WITNESS:  I -- I wouldn't know.

**HINES  REPORTERS**                                    96

1  BY MR. COOK:

2      Q.   Okay.  Who is Mally Chen [phonetically]?  Do

3  you know who that person is?

4      A.   Manly Chen, she was an employee of Byton North

5  America, a former employee of Byton North America.

6      Q.   And she had -- she signed off on a check for

7  Chase National -- sorry -- JPMorgan Chase Bank you know;

8  is that correct?

9      A.   I don't know.  I don't know what document

10 you're referring to.  I can't comment.

11     Q.   I'm interested in what you know here, okay?

12          Who is Orlando Reyes Ortiz?  Do you know who

13 that is?

14     A.   He used to be an employee of Byton North

15 America in -- in -- in the purchasing group.

16     Q.   Is he still with the company?

17     A.   No.

18     Q.   When did he leave?

19     A.   I don't know.  Quite some time back.

20     Q.   Well, when you were working, who -- with BNA,

21 who was your immediate supervisor, if you had one?

22          MR. SIPPRELLE:  Object.  Vague as to time.

23 BY MR. COOK:

24     Q.   Let's start with 2017?

25          Who was your supervisor?

```
 1          A.   My supervisor was the CFO, Mr. Albert Li.

 2          Q.   And -- and Mr. -- what was his title?

 3          A.   CFO.

 4          Q.   Oh, CFO?

 5               And his name one more time?  I missed it.

 6          A.   Albert Li, L-i.

 7          Q.   And when did he leave?

 8          A.   Sometime in 2018 or 2019.

 9          Q.   Okay.  And who was your -- after that, did you

10     have a supervisor?

11          A.   There was another CFO who I previously

12     reported to.  I don't -- I can't remember how to

13     pronounce his last name.  His first name was Gordon.

14          Q.   All right.  And how long was he your

15     supervisor?

16          A.   Only for a short period of time.

17          Q.   What happened -- and was there a supervisor

18     after that?

19          A.   No.  It -- it was, basically -- I was

20     reporting to the CEO.

21          Q.   Okay.  Now, there's an entity called a

22     corporate finance team; is that correct?

23          A.   It's not an entity.  It's a team.  It's just,

24     like, another function.  Corporate finance function.

25          Q.   Okay.  But it's a team, but the corporate
```

**H I N E S   R E P O R T E R S**                    98

1   finance team is run by Nanjing, not by -- not by BNA?

2          Is that a fair statement, sir?

3          MR. SIPPRELLE:  Object.  Argumentative.  Vague

4   and ambiguous.  Asked and answered.

5          I think he explained this several times,

6   Mr. Cook.

7          Go ahead, Mr. Kameswaran.

8          THE WITNESS:  The corporate finance team was

9   part of one of the entities in Nanjing.

10  BY MR. COOK:

11     Q.   And Nanjing is an entity which is in China;

12  isn't that correct?

13     A.   Correct.

14     Q.   Okay.  Now -- and who -- and -- and Teresa Shi

15  is the person in charge of the corporate finance team;

16  isn't that correct?

17         MR. SIPPRELLE:  Object.  Vague as to time.

18  You're talking about now or at some time?

19         MR. COOK:  Then.

20         MR. SIPPRELLE:  Then.  When is then?

21         MR. COOK:  Well, let's start with 2018.

22         MR. SIPPRELLE:  Okay.

23         THE WITNESS:  In 2018, she was.

24  BY MR. COOK:

25     Q.   How about 2019?

1        A.    I think she was still there in 2019.

2        Q.    How about 2020?

3        A.    I -- I know she left sometime in 2020.  I

4    can't recall the time.

5        Q.    Now, as to -- as to -- as to access, did you

6    have access to the digital records held by the corporate

7    finance team?

8              MR. SIPPRELLE:  Object.  Vague.  Overbroad.

9              Go ahead.

10             THE WITNESS:  I -- I had access to some

11   folders in -- in the corporate finance group.

12   BY MR. COOK:

13       Q.    Why say "some"?  Why not everything?

14       A.    Because I was not part of the corporate

15   finance team.

16       Q.    Oh, but the corporate finance team was the

17   finances for BNA; isn't that correct?

18             MR. SIPPRELLE:  Object.  Argumentative.

19   Misstates the evidence.  Vague and overbroad.

20             THE WITNESS:  They were providing the services

21   for Byton North America.

22   BY MR. COOK:

23       Q.    Didn't you have access to all of the records

24   held by corporate finance as opposed to some type of

25   restriction?

**H I N E S   R E P O R T E R S**                              **100**

1          MR. SIPPRELLE:  Object.  Vague and ambiguous.

2     Asked and answered.

3          Mr. Cook, you keep asking the same questions

4     that he's already answered.

5          Go ahead, Mr. Kameswaran.

6          THE WITNESS:  I had access to the relevant

7     folders that was required to do my job.

8     BY MR. COOK:

9          Q.   What about the --

10         A.   (Inaudible.)

11         Q.   I'm sorry.  Go on?

12         A.   Access to relevant folders to do my job from

13    an operational finance point of view.

14         Q.   What folders were those?

15         A.   Accounts payable, the payment records and

16    things like that where there were large invoices in

17    those folders, and then the shared services team would

18    take that and process it for us, payments and so on.

19         Q.   Did you have access to the balance sheet?

20         A.   I did not have the access to the balance

21    sheet.

22         Q.   Did you have the access on profit and loss?

23         A.   I did not have access to profit and loss.

24         Q.   Do you have what's called an accounting for

25    cash distribution of the way -- the way -- the way that

**H I N E S   R E P O R T E R S**                    101

1  an entity would disburse cash and/or make expenditures,

2  things like that?  Cash --

3      A.   I had --

4      Q.   -- benefits?

5      A.   -- I had access to the financial planning

6  where we would focus the -- the money required for

7  payments and so on.

8      Q.   But did you have access to any type of

9  drafting for purposes of payment taxes?  In other words,

10  "This is what we're going to do to pay our taxes,"

11  things like that?

12     A.   They -- no, I did not.  They provided that

13  information directly to the tax consultants who managed

14  it.

15     Q.   Do you know what the word "restricted" means,

16  when it came with corporate finance team?

17         Restrictions --

18         MR. SIPPRELLE:  Objection.  Vague and

19  ambiguous.

20         MR. COOK:  He knows what it is because I read

21  his deposition.

22         MR. SIPPRELLE:  Well, that's great.

23  Congratulations.

24         Go ahead, Mr. Kameswaran.

25  BY MR. COOK:

1      Q.   You can answer the question?

2           Is it restricted?

3      A.   What do you mean, "restricted".

4      Q.   That your access to the corporate finance

5  corporate team was restricted; isn't that correct?

6      A.   Yeah, as I mentioned before, restricted to

7  certain folders and restricted -- and -- and I had

8  access to certain folders that was required for me to do

9  the job.

10     Q.   Did anybody else have access to the corporate

11 team, other than you?

12     A.   The accounting manager, Ms. Ronita, had access

13 to that folder because she -- she was logging those

14 documents in those folders.

15     Q.   And when did she -- when did she leave again?

16     A.   Sometime in late 2019 or earlier 2020.  I

17 cannot recall.

18     Q.   So who was in charge of the finances of BNA

19 for 2020 going forward?

20     A.   2020 until the end of 2021, I was responsible

21 for that.

22     Q.   Well, during that period of time, did you have

23 absolute access to everything from the corporate finance

24 team?

25           MR. SIPPRELLE:  Object.  Asked and answered

**H I N E S   R E P O R T E R S**                          103

1   multiple types, Mr. Cook.

2           THE WITNESS:  No, I do not have unrestricted

3   access to the corporate finance folders.  As I

4   mentioned, I only had access to the folders that was

5   required for me to do the job.

6   BY MR. COOK:

7       Q.   Well, did -- did somebody else at BNA have

8   access to the corporate team finance unrestricted?

9       A.   I -- I don't know.  I -- I don't control the

10  access to those folders.

11      Q.   Well, let's talk about finance.

12           Other than you, who else had control of the

13  finances of BNA in the year of 2020?

14      A.   So in 2020 either -- by the time most of the

15  people had left, so there was only one other person in

16  my group, she was managing the -- the bank transactions.

17      Q.   Managing the -- what was it again?  The last

18  word?

19      A.   The bank transactions.

20      Q.   Okay.  Aside from that -- aside from that, was

21  there anybody in, say, 2020 who had unfettered --

22  unfettered access to the finances kept by the

23  corporate -- the corporate finance team?

24      A.   I -- I don't know.  As I said, I don't control

25  the accesses, so I don't know.

**HINES REPORTERS**                                    **104**

```
 1          Q.    Is this anybody else that you know that would

 2    have access of the corporate finance team --

 3               MR. SIPPRELLE:  Object.  Asked and answered.

 4    BY MR. COOK:

 5          Q.    -- in 2020?

 6               MR. SIPPRELLE:  Asked and answered.

 7               THE WITNESS:  No, I don't know, Mr. Cook.

 8    BY MR. COOK:

 9          Q.    Okay.  What is -- what is the word "archive"?

10    What does that mean in terms of the records of BNA?

11          A.    It's -- it's a repository for hold documents.

12          Q.    Why don't you explain that to me?

13          A.    Any documents where activities are complete,

14    are stored in an archive for access at a later time for

15    this --

16          Q.    Is that electronic, or is that paper?

17          A.    It would -- it would have been mostly digital,

18    as I mentioned, but I don't know how the corporate

19    finance team was storing all of the -- it could have

20    been a combination of digital and the physical.  I don't

21    know.

22          Q.    Well -- well, we're all here.  Where are --

23    where's -- are you aware of or have knowledge of any

24    type of paper, whatever it would be, which would have

25    any type of accounting records?
```

**HINES REPORTERS**                                    **105**

1          MR. SIPPRELLE:  Object.  Lacks foundation.

2    Speculation.

3          Again, you're asking a former employee months

4    after he's left the company about records, but go ahead,

5    Mr. Kameswaran.

6          THE WITNESS:  The only documents that I used

7    to see was, typically, purchase order invoices signed

8    off by engineering people --

9    BY MR. COOK:

10        Q.   Is that records?

11        A.   -- to -- to authorize -- to process it for

12   payment.

13        Q.   And if you can tell me, where are those

14   records now?

15        MR. SIPPRELLE:  Object.  Speculation.  Lacks

16   foundation.

17        THE WITNESS:  I -- I wouldn't know, Mr. Cook.

18   BY MR. COOK:

19        Q.   When's the last time you saw any type of

20   paper, finance documents, be it bills, invoices,

21   financial statements, whatever it would be?

22        A.   Yeah.  Some of those invoices were stored in

23   some folders in -- in the Byton North America office.

24        Q.   Say that again?

25        A.   The Byton North America invoices would have

**HINES REPORTERS**                              106

1  been sold in the -- they were in physical cabinets or

2  whatever you call it, in -- in the Byton North America

3  office.

4       Q.   Where are these file cabinets?

5            MR. SIPPRELLE:  Object.  Lacks foundation.

6  Speculation.

7            THE WITNESS:  I -- I don't know, Mr. Cook.

8  Like, since I left the company, I haven't contacted

9  anyone or kept track of any of these.

10 BY MR. COOK:

11      Q.   Could somebody call you up and say, "We have

12 these records; how would you like to pick them up"?

13      A.   Sorry.

14      Q.   Did somebody ever call you up and say, "Well,

15 you know, why don't you pick up these records?"  Anybody

16 do that?

17      A.   No.

18      Q.   Did you ever come out and say, "I'll pick up

19 these records"?

20      A.   Sorry.  I didn't understand the question.

21      Q.   Did you ever say to anybody at BNI -- BNA,

22 "Look, I'll pick up these records, and I'll hold them"?

23 Did you ever do that?

24      A.   No.

25      Q.   So do you know the names of people here who

```
1   work at the corporate finance team, besides Ms. Shi?
2        A.   In -- in China, you mean.
3        Q.   Well, I don't know.  Whatever they are?
4             For the corporate -- for the corporate finance
5   team, do you know the names of the people working there?
6        A.   The last person I knew was Ms. Teresa Shi.
7        Q.   Anyone else?
8        A.   Ms. Aidi Zhou.  And that's -- that's all I can
9   recall.
10       Q.   Did you have an e-mail to the corporate
11  finance team?
12       A.   A public e-mail to the corporate finance team.
13       Q.   Any e-mail?
14            You -- when you were with BNA and you had this
15  corporate finance and -- you know, I guess, you wanted
16  information, was there an e-mail?
17            MR. SIPPRELLE:  Object.  Vague and ambiguous.
18            You can answer, if you understand.
19            THE WITNESS:  There is nothing that I can
20  recollect.
21  BY MR. COOK:
22       Q.   Well, was it -- was it -- did it have, like,
23  .Byton and it would say, "corporate finance team at
24  Byton" or anything like that?  Any type of e-mail where
25  you can communicate with them?
```

**HINES REPORTERS**                                          **108**

 1         A.    No.  We only had Byton.com as a common domain,

 2    and then there were people's names that we were

 3    communicating with.  I can't recall specifically.

 4         Q.    And did they ever send to you some type of

 5    explanation of what documents they want?  Anything like

 6    that?  "This is what we want, and this is how we want to

 7    manage it"?

 8              MR. SIPPRELLE:  Object.  Vague and ambiguous.

 9              THE WITNESS:  Regarding what, Mr. Cook?  I

10    didn't understand the question.

11    BY MR. COOK:

12         Q.    Well, did they explain -- say, "We want this

13    record here, and this record here, and this -- and we

14    want to -- so we can keep them in good order"?  Did they

15    do that?

16         A.    There was always communication between the

17    teams and -- and it may not be directly with me.  It may

18    have been with the -- the accounting manager, Ms. Oto.

19         Q.    So just going through this here, if -- if the

20    corporate finance -- were these the folks who would come

21    up with enough records so that the CPAs could file a tax

22    return?  Is that what they did?

23              MR. SIPPRELLE:  Object.  Lacks foundation.

24    Speculation.  Argumentative.  Vague and ambiguous.

25              THE WITNESS:  Yes, the corporate finance team

**H I N E S   R E P O R T E R S**                          109

```
 1   provided the information for tax filing purposes.

 2   BY MR. COOK:

 3       Q.   They did that every year; isn't that correct?

 4       A.   Correct.

 5       Q.   Now, you're generally familiar with a tax

 6   return?

 7       A.   Yes.

 8       Q.   You know what a Schedule L is, don't you?

 9       A.   I don't remember what a Schedule L is.

10       Q.   A Schedule L is a financial statement for the

11   taxpayer?

12       A.   Um-hum.

13       Q.   Yes?  You're aware of that now?

14            MR. SIPPRELLE:  Well, he's -- object.  Object.

15   Misstates -- misstates evidence.  You're -- you're

16   telling him what you say it is, but he's not going to

17   necessarily --

18   BY MR. COOK:

19       Q.   So it's true, then, that the corporate finance

20   team would be, every year, filling out a Schedule L;

21   isn't that correct?

22            MR. SIPPRELLE:  Object.  Argumentative.  Lacks

23   foundation.  Speculation.

24   BY MR. COOK:

25       Q.   Correct?
```

**H I N E S   R E P O R T E R S**                              110

1      A.   If it was a tax filing requirement, they would

2  have provided the necessary documents.

3      Q.   And you're the one that signed off on the tax

4  return; isn't that correct?

5           MR. SIPPRELLE:  Object.  Overbroad.  Vague as

6  to time.

7           THE WITNESS:  I only signed off for 2020 tax

8  return.

9  BY MR. COOK:

10     Q.   Okay.  For 2020, you signed off?

11          Did you read the tax return?

12     A.   At that time, I would -- I would have read the

13  tax return.

14     Q.   And you presume that, when you got it, the tax

15  return was correct; isn't that -- is that correct?

16     A.   It was done by a professional CPA, so I had to

17  trust the work done by them.

18     Q.   You signed it; isn't that correct?

19          MR. SIPPRELLE:  Object.  Argumentative.

20  Harassing.  Asked and answered.

21  BY MR. COOK:

22     Q.   You can answer that question, sir?

23     A.   Yes, I --

24          MR. SIPPRELLE:  He -- he -- he answered it.

25          MR. COOK:  No, he didn't answer it.

**H I N E S   R E P O R T E R S**                        111

1    BY MR. COOK:

2        Q.   You signed the tax return; isn't that correct?

3    For the 2020 tax return; isn't that correct?

4            MR. SIPPRELLE:  Asked and answered.

5            THE WITNESS:  Yes.

6    BY MR. COOK:

7        Q.   Okay.  And you've relied on the corporate

8    finance team that they gave you accurate information,

9    including -- including Schedule L and everything that

10   followed it; isn't that correct?

11           MR. SIPPRELLE:  Object.  Misstates testimony.

12   They didn't give him anything.  It was given to the tax

13   preparer as he indicated.

14   BY MR. COOK:

15       Q.   Of which you signed; isn't that correct?

16           MR. SIPPRELLE:  Asked and answered.

17   BY MR. COOK:

18       Q.   You can answer that question?

19       A.   Yes, I signed the tax return.

20       Q.   Okay.  Did -- did anybody inform you that the

21   records somewhere in the Cloud were chaotic, a mess,

22   difficult to determine?

23           Anybody tell you something like that?

24           MR. SIPPRELLE:  Object.  Vague.

25   Argumentative.

**H I N E S   R E P O R T E R S**                    **112**

1   BY MR. COOK:

2       Q.   You can answer that question?

3       A.   No, no one specifically told me that the

4   information was vague or a mess or anything like that.

5       Q.   So as far as you knew, for the schedule -- for

6   the 20-- 2020 tax return, you believe that it was

7   accurate and well done before you signed your name;

8   isn't that correct?

9            MR. SIPPRELLE:  Object.  Argumentative.  Asked

10  and answered.

11           I think he explained why he signed it,

12  Mr. Cook.

13           Go ahead, Mr. Kameswaran.

14  BY MR. COOK:

15      Q.   You can answer the question?

16      A.   The information was prepared by our CPA who's

17  been doing the work for us for a few years, and so I

18  trusted the work done by them and -- and signed the

19  document at the request of power of attorney because I

20  didn't have even authorization to sign the document.

21      Q.   Did the CPA tell you that the records were a

22  mess?

23           MR. SIPPRELLE:  Object.  Vague.

24  Argumentative.

25           THE WITNESS:  The CPA didn't say anything

**H I N E S   R E P O R T E R S**                              113

1  about the records being a mess.

2  BY MR. COOK:

3      Q.   Did any of these people say that -- that --

4  the -- that there was something wrong with the Cloud,

5  that they -- that it was very difficult to find the

6  information?  Did they ever tell you that?

7          MR. SIPPRELLE:  Object.  Vague.

8  Argumentative.

9          THE WITNESS:  No.

10 BY MR. COOK:

11     Q.   Did -- did the CPA tell you that it would take

12 some period of time to locate the information, so that

13 they could file a tax return, including a Schedule L?

14 Did they tell you that?

15     A.   We -- if -- if I remember correctly, Mr. Cook,

16 we had a lot of difficulties with a lot of people

17 turnover.

18          So we did -- because I asked for an extension.

19 And the 2020 taxes, instead of being filed in March,

20 were filed in October 2020.

21     Q.   Okay.  Let's talk about -- about the '21 --

22 are those -- have the 2019 -- have the 2021 returns been

23 filled?

24          MR. SIPPRELLE:  Objection.  Lacks foundation.

25          THE WITNESS:  Sorry.  I missed that question,

1    Mr. Cook.  Please read it --

2    BY MR. COOK:

3        Q.   Have the returns been filed for 2021, if you

4    know?

5        A.   I wouldn't know.

6        Q.   Okay.  Is somebody going to file them?

7            MR. SIPPRELLE:  Object.  Lacks foundation.

8            You're asking a former employee about whether

9    his former employer is going to file taxes -- tax

10   returns, Mr. Kameswaran.  Really?  It --

11   BY MR. COOK:

12       Q.   Well, if you don't --

13           MR. SIPPRELLE:  -- lacks foundation.

14   BY MR. COOK:

15       Q.   -- know, you don't know; is that correct?

16       A.   Do I care?  I don't.

17       Q.   By the way, have you ever met Teresa Shi?

18       A.   Yes, I have.

19       Q.   Okay.  She came here; is that correct?

20       A.   She has visited a few times, yeah.

21       Q.   And what year was that?

22       A.   Sorry?

23       Q.   What year was that?

24       A.   It would have been 2018/2019 timeframe.  And

25   then, in 2020, all travel stopped.

**H I N E S   R E P O R T E R S**                    115

1        Q.   Now, she had complete access to the corporate

2    finance team; isn't that correct?

3             MR. SIPPRELLE:  Object.  Vague and ambiguous.

4    Lacks foundation.

5             You can answer.

6             THE WITNESS:  She was head of the corporate

7    finance team, but I don't know what accesses she had to

8    what folders.

9    BY MR. COOK:

10       Q.   So to -- to make sure I -- I get this, that

11   she is not in control of the corporate finance team; is

12   that correct?  Somebody else is?

13            MR. SIPPRELLE:  Object.  Misstates testimony.

14   Argumentative.  Lacks foundation.

15            THE WITNESS:  She was the head of the

16   corporate finance team.

17   BY MR. COOK:

18       Q.   Okay.  And who did she work for?  Who was

19   above her, if you knew?

20       A.   She work for the CFO.

21       Q.   She was the CFO, or is somebody above her?  Is

22   that correct?

23       A.   She worked for the CFO.

24       Q.   But who is -- what's the name of the person

25   above her, if anybody?

1        A.    It was Mr. Albert Li.  And after that, it was

2   Gordon.

3        Q.    Where are these people?  Are they in China, or

4   are they here?

5        A.    They've all left the company.  They don't

6   exist in the company anymore.

7        Q.    Well, actually, who -- who runs FMC Cayman?

8            MR. SIPPRELLE:  Object to the term "run" as

9   vague and ambiguous, and also lacks foundation.

10  BY MR. COOK:

11       Q.    Well, you can tell me?

12       A.    I -- I don't know the operational structure of

13  FMC Cayman.

14       Q.    So -- so let's -- let's go back to, say, 2021?

15            Is it a fair statement that you are based --

16  you were in control of BNA because nobody else was

17  there?  Is that a fair statement?

18            MR. SIPPRELLE:  Object to the term "in

19  control" as vague and ambiguous.

20  BY MR. COOK:

21       Q.    You can answer the question?

22       A.    I was responsible for managing the operational

23  activities of BNA.

24       Q.    Did you ever, say, in 2021 -- make sure I get

25  this correctly.

**HINES REPORTERS**                                117

1              Did you have any decisions with a Zhang Ying

2    concerning the corporate documents and records of BNI

3    [sic]?

4         A.   No.

5         Q.   Do you know of anybody who told you that they

6    were in contact with Zhang Ying concerning the -- the

7    finances of BNA?

8         A.   No.

9         Q.   Now, let's deal with what's called "my review

10   of corporate documents and records?"

11             During the year, say, of '20, did you turn

12   over any records to Zhang Ying?

13        A.   I do not even know the person, Mr. Cook.

14        Q.   For the year 2021, did you know of the

15   turnover of any records to Zhang Ying?

16             And that is turning over corporate documents

17   and records.  Did you do that?

18        A.   No.

19        Q.   Did anybody, whoever it would be, ask you,

20   while you were in charge for the corporate record -- the

21   corporate documents and records of BNI [sic]?  Anybody

22   ask you?

23        A.   No.

24        Q.   Okay.  Do you have access yourself -- well,

25   actually, the year of '21, nobody asked you for

**H I N E S   R E P O R T E R S**                          118

1   corporate documents and records of BNA?  Isn't that

2   correct also?

3       A.   So I'm sort of trying to understanding what is

4   your reference regarding corporate documents.

5       Q.   Well, I'm just reading what Mr. Zhang --

6   Mr. Zhang is saying, that he has -- quote -- "my review

7   of the corporate documents and records?"

8            And, let's say, for 2021, do you know whether

9   or not you gave him or somebody on his behalf of --

10  quote -- "corporate documents and records of BNA"?

11      A.   I did not personally provide it, but I don't

12  know if anyone else did.

13      Q.   During the years of, say, '20 and '21, in

14  fact, the records you -- pardon me -- the records you

15  have were related to some type of restriction; isn't

16  that correct?

17           MR. SIPPRELLE:  Object.  Assumes facts not in

18  evidence.  Lacks foundation.

19           THE WITNESS:  Um --

20           MR. SIPPRELLE:  It's vague and ambiguous as to

21  "restriction."

22           You can answer if you understand the question,

23  Mr. Cook.

24           THE WITNESS:  Could -- could you please repeat

25  that.

**HINES REPORTERS**                            119

1    BY MR. COOK:

2        Q.   During the year of 2021 -- make it really

3    easy -- did you -- make it one at a time?

4             Did you provide anybody information regarding

5    corporate documents and records of BNA -- make it that

6    simple -- to anybody?

7             MR. SIPPRELLE:  Object.  Vague and ambiguous.

8             THE WITNESS:  Yeah.

9             MR. SIPPRELLE:  Are you -- are you leaving

10   aside communications with counsel?

11            Mr. Kameswaran, I don't want you to disclose

12   any communications that you may have had with counsel.

13   But apart from counsel, can you answer the question?

14            THE WITNESS:  Again, the term "corporate

15   documents" is very broad and vague for me.  So my answer

16   is no.

17   BY MR. COOK:

18       Q.   No, that you didn't turn these records over?

19   Is that a fair statement here?

20            MR. SIPPRELLE:  Object.  Asked and answered.

21   Vague ambiguous.

22            THE WITNESS:  No, I did not.

23   BY MR. COOK:

24       Q.   Okay.  Let's move on here?

25            That -- do you know -- is there anybody else

1  in the BNA organization, which, other than you, would

2  have access to the corporate finance team?

3          MR. SIPPRELLE:  Object.  Vague as to time,

4  Mr. Cook.

5          MR. COOK:  Anytime.

6          MR. SIPPRELLE:  At anytime?

7          MR. COOK:  Yeah.

8          MR. SIPPRELLE:  Okay.

9          THE WITNESS:  Yeah.  There were other people

10  who had access to the corporate finance team.

11  BY MR. COOK:

12      Q.  Who are they?

13      A.  The -- the person who was managing the bank

14  account here, and the senior -- and -- and the

15  finance -- or the accounting manager, Ms. -- Ms. Oto.

16      Q.  Anybody else?

17      A.  And the -- and also other functions of --

18  someone who contacts a shared service function.

19      Q.  Okay.  But as of 2020, you're the only person

20  who had access to the -- to the corporate finance team;

21  isn't that correct?

22          MR. SIPPRELLE:  That misstates the testimony.

23          Go ahead.

24          THE WITNESS:  That's not correct.  There were

25  two people in finance, myself and another person who was

**HINES REPORTERS**                            121

1    manager -- the -- the bank transactions.  And we both

2    had access to the corporate finance team.

3    BY MR. COOK:

4        Q.   We're dealing with 2020?

5             Did they have access -- full access to the

6    corporate finance team?

7             MR. SIPPRELLE:  Object to the term "full

8    access" as vague and ambiguous.

9    BY MR. COOK:

10       Q.   Everything.  Finance statements.  Profit and

11   loss, whatever there would be.  Accounts payable.

12   Accounts receivable.  Journals.  Ledgers.  Everything?

13       A.   So --

14            MR. SIPPRELLE:  Objection.  Asked and

15   answered.

16            Go ahead.

17            THE WITNESS:  Yeah.  So as I mentioned before,

18   we had access to certain folders that were required for

19   us to do the job, in terms of our account payables and

20   invoices and banking transactions and things like that.

21   BY MR. COOK:

22       Q.   Well, what about a finance -- let's deal with

23   2020.

24            Did anyone at BNA have access to a finance

25   statement, being a balance sheet, profit and loss,

**HINES REPORTERS**                                    122

1    journals, ledgers, AP, AR, things like that?

2           MR. SIPPRELLE:  Object.  Overbroad.  Asked and

3    answered.

4           You can answer.

5           THE WITNESS:  I said no to all of those,

6    except accounts payable in your list of documents that

7    you mentioned.

8    BY MR. COOK:

9       Q.   Okay.  Let's go back a little bit to your tax

10   returns?

11          Was there a tax return filed for the State of

12   California?

13          MR. SIPPRELLE:  Object.  Vague as to time.

14   BY MR. COOK:

15      Q.   2020?

16          MR. SIPPRELLE:  What year?

17          MR. COOK:  2020.

18          MR. SIPPRELLE:  Okay.

19          THE WITNESS:  Yes, it was filed.

20   BY MR. COOK:

21      Q.   Who signed it?

22      A.   I signed it.

23      Q.   Okay.  And -- and the CPA -- what was the name

24   of the CPA who did the return?

25          MR. SIPPRELLE:  Object.  Asked and answered.

**H I N E S   R E P O R T E R S**                    123

```
 1              I believe he said previously he couldn't
 2  recall.
 3              Go ahead, Mr. Kameswaran.
 4              THE WITNESS:  Yeah.  I -- I don't recall the
 5  name of the firm, but it was done by the CPA.
 6  BY MR. COOK:
 7       Q.    And did you meet that CPA personally?
 8       A.    Honestly, I've never met the CPA in person.
 9       Q.    For 2020, what was the cost of the return?
10       A.    Sorry.  I do not recall.
11       Q.    $10,000?
12              MR. SIPPRELLE:  Sorry.  Mr. Cook, you're
13  breaking up.  You keep moving away from your microphone.
14              MR. COOK:  No.  No.  I'm waiting.
15              MR. SIPPRELLE:  So you're cutting off.
16              MR. COOK:  I was waiting for the return --
17  waiting for the answer.
18              MR. SIPPRELLE:  Well, I didn't hear -- your --
19  your question got clipped off there.  I didn't hear it.
20              MR. COOK:  What?  What?  Let me move on.
21  BY MR. COOK:
22       Q.    As to -- as to the return for California --
23  it's very easy -- is, what was the cost?
24              Let's deal with that.  Go backwards.
25              MR. COOK:  I think we lost him.
```

**HINES REPORTERS**                                    124

1          MR. SIPPRELLE:  Oh, he's back.  Okay.

2    BY MR. COOK:

3          Q.   Okay.

4          A.   Yes.  Sorry.  Could you please repeat that?  I

5    missed the last bit.

6          Q.   What -- what was the cost for the -- for the

7    return for California?  What was it that cost?

8          A.   I do not recall the exact amount,

9    Mr. Kameswaran.

10         Q.   How about the IRS?  What was the cost for the

11   2020 IRS return?

12         A.   I -- I do not recall.

13         Q.   Did -- did the corporate finance team ever do

14   an audit?

15         A.   An audit of what.

16         Q.   An audit of the finance of BNA?

17         A.   They -- there was an audit team that used to

18   request access to the payments and the bank transaction

19   and things, and those were shared with them.

20         Q.   What was the name of that company or was

21   that -- was that corporate finance?

22         A.   That was part of the corporate finance team.

23         Q.   Was there an outside -- an outside CPA,

24   whoever did an audit for BNA?

25         A.   I do not recall.

**H I N E S   R E P O R T E R S**                           125

1        Q.   Now, isn't it true that BNA was getting funds

2   from investors?  Isn't that correct?

3        A.   Sorry, Mr. Cook.  BNA was not getting funds

4   from the investors.  BNA was doing the work for the

5   China entity.  The investors were investing in FMC

6   Cayman.

7        Q.   I'm -- I'm sorry.

8             Did BNA seek money from investors?

9        A.   No.

10       Q.   Did FMC Cayman get money from investors?

11       A.   Correct.

12       Q.   And was that done publicly?

13            MR. SIPPRELLE:  Object.  Vague and ambiguous

14   as to "publicly."

15            Go ahead.

16            THE WITNESS:  Yeah.

17            What do you mean, "publicly"?

18   BY MR. COOK:

19       Q.   Well, in other words, you -- you'd put it with

20   a broker.  You would have advertising.  You would put it

21   on the web.  Whatever it would be?

22       A.   It was done through normal -- I don't know

23   what process was followed by FMC, but it was not -- I

24   mean, if your question was, was it a public place, it

25   was not a public place.  It was individual companies

**H I N E S   R E P O R T E R S**                    **126**

1  investing as private investors.

2      Q.   Okay.  Well, these investors would be U.S.

3  investors or from where?

4          MR. SIPPRELLE:  Object.  Lacks foundation.

5          You can answer.

6          THE WITNESS:  Could have been from anywhere in

7  the world.  I wouldn't know.

8  BY MR. COOK:

9      Q.   Let's go backwards here.  That -- the person

10 who was -- that was FMC Caymans, that was the entity

11 which was soliciting for investors; is that correct?

12     A.   Correct.

13     Q.   And what -- what does FMC Caymans do, by the

14 way?

15     A.   FMC Cayman is the holding company for the

16 group.

17     Q.   Okay.  And one of the groups was BNA; isn't

18 that correct?

19     A.   BNA was not part of FMC.  BNA was a part of --

20 so Byton -- Byton Limited was a part of FMC.

21     Q.   I'm sorry?

22          Could you repeat that.

23     A.   Byton Limited was a part of the -- FMC was the

24 holding company for the whole Byton group.

25     Q.   Which -- which entity was the entities?  Which

1  was soliciting investors?  Which one was it?

2          MR. SIPPRELLE:  Object.  Asked and answered.

3          You can tell him again.

4          THE WITNESS:  FMC.

5  BY MR. COOK:

6      Q.   FMC Cayman; is that correct?

7      A.   Correct.

8      Q.   And people would be investing their money into

9  that entity; is that correct?

10     A.   That's my understanding.

11     Q.   And FMC -- what's the address of that company?

12     A.   I wouldn't know off the top of my head.

13     Q.   Well, did you BNA provide its finance

14  statement to FMC for the benefit of the -- of the

15  investors?

16         MR. SIPPRELLE:  Object.  Vague.

17  Argumentative.

18         Go ahead.

19         THE WITNESS:  BNA did not directly provide

20  finance statements to FMC.

21  BY MR. COOK:

22     Q.   But did FMC provide final statements to its

23  investors?

24         MR. SIPPRELLE:  Object.  Speculation.  Lacks

25  foundation.

**HINES  REPORTERS**                    128

1          THE WITNESS:  FMC used to share information

2    through their regular board meetings, as any corporation

3    would do.

4    BY MR. COOK:

5       Q.    Sorry.  Can you repeat that?

6          So they -- I want to know:  How did they

7    communicate that to third parties, like investors?

8          MR. SIPPRELLE:  Object.  Speculation.  Lacks

9    foundation.

10          If you know, Mr. Cook.

11          THE WITNESS:  Through -- through the board

12    meetings.

13    BY MR. COOK:

14       Q.    And what -- through the board meetings, what

15    was said there?  Was that -- the purpose of that to

16    providing a finance statement of BNA or that there was

17    no financial statement or no records or nothing?

18          MR. SIPPRELLE:  Object.  Argumentative.

19    Overbroad.  Unintelligible.

20          Go ahead.

21    BY MR. COOK:

22       Q.    You can answer that question?

23       A.    Sorry, Mr. Kameswaran.  Well above my pay

24    grade.  I did not know what was shared in these board

25    meetings.

**HINES  REPORTERS**                          129

1      Q.   Did -- at some point, BNA stop paying its

2   bills owed to EDAG; isn't that correct?

3      A.   Not just to EDAG.   To all its vendors.

4      Q.   Well, just EDAG?

5           Did -- did the BNA folks say something to EDAG

6   saying, "Gee, we don't have any money where -- we can't

7   raise, but we're not raising any money; it's FMC Cayman

8   who's raising the money"; isn't that correct?

9           MR. SIPPRELLE:   Object.   Vague.   Overbroad.

10  Unintelligible.   Compound.

11  BY MR. COOK:

12     Q.   You can answer that question?

13     A.   I was not having those conversations with

14  EDAG, so I wouldn't know.

15     Q.   Well, I'm asking you:   Did -- are you aware of

16  any letters or e-mails or anything by BNA to EDAG, which

17  says, "Gee whiz, GMC [sic] Cayman is not raising

18  sufficient funds to the investors"?

19          MR. SIPPRELLE:   Object.   Vague and ambiguous.

20          Good ahead.

21          THE WITNESS:   There was communication to EDAG

22  that we had finance issues, and -- and we were unable to

23  raise the funds as we expected to in a timely manner, so

24  that was -- yeah.   That was communicated to EDAG.

25  BY MR. COOK:

**H I N E S   R E P O R T E R S**                          130

1          Q.   Okay.  Let's talk about the "we."  You said

2     the word "we?"

3               And is "we" FMC Cayman?

4          A.   I'm -- I'm referring to "we" as in Byton North

5     America communicated that we have finance issues, and we

6     were unable to make their payments.

7          Q.   Well, you told me five minutes ago that BNA

8     did not raise any money, that the money was raised by

9     FMC.  And now we have a lot of letters and e-mails and

10    what -- unless you correct me -- they say -- they --

11    they say that BNA is raising this money when, in fact,

12    that's not the case.

13              FMC is the one who's raising this money; isn't

14    that correct?

15              MR. SIPPRELLE:  Object.  Mr. Cook, mis- --

16    totally misstates the evidence.  I assume you've looked

17    at the documents from arbitration.  You know exactly

18    what documents say.  They all say "BNA."

19              MR. COOK:  (Inaudible.)

20              MR. SIPPRELLE:  So -- so you're -- you're

21    mischaracterizing things that were -- have been in

22    evidence in the arbitration for a long time.

23              But go ahead, Mr. Kameswaran.  Enlighten

24    Mr. Cook.

25              THE WITNESS:  EDAG knew very well that BNA was

**H I N E S   R E P O R T E R S**                          131

1  dependent on funds coming from -- for the work that was

2  being done.  And -- and, without that, they -- they have

3  issues making payment.  And they were well aware of the

4  sort of corporate relationships.

5  BY MR. COOK:

6      Q.   Are you aware of any communication by BNA to

7  EDAG that the person or entity raising the money was not

8  BNA, but rather FMC Cayman?

9      A.   I do not recall any specific communication.

10     Q.   Okay.  Let's keep -- keep going?

11          You -- you would the agree with me that, for

12  its entire lifetime, that BNA, other than providing

13  something, if anything, did not provide either goods or

14  services to the public; isn't that correct?

15     A.   BNA did not provide any goods or services to

16  the public.

17     Q.   And -- and for its entire life, it -- other

18  than any money that it got from other like entities,

19  that it did not receive any money from the public for

20  paying things; isn't that correct?

21     A.   Other than any bank loans or the PPP loan or

22  things like that.

23     Q.   Do you know what a -- you know what a board of

24  education is -- pardon me -- SBC, State Board of

25  Equalization?

**HINES  REPORTERS**                                    132

1        A.    SBA, you mean, or...

2        Q.    Yeah.  SBE, or Board of -- Board of

3   Equalization?

4        A.    No, I'm not aware of it.

5        Q.    Did BNA have a sales tax permit?

6        A.    BNA did have a tax permit registration, yes.

7        Q.    Okay.  What you -- what you call the SBE or

8   BOE, there was a sales tax permit; is that correct?

9              MR. SIPPRELLE:  Object.  Lacks foundation.

10             Go ahead.

11             THE WITNESS:  I -- I presume, yes.

12  BY MR. COOK:

13       Q.    So for the -- each year, what type of money

14  did you pay out to the State Board of Equalization for

15  any sales?

16       A.    I don't recall paying any money because we did

17  not have any direct sales.

18       Q.    Zero sales; isn't that correct?

19       A.    Sorry.

20       Q.    Zero.  Zero sales --

21       A.    Zero --

22       Q.    -- referring to the public?

23       A.    -- zero sales to the public, yeah.

24       Q.    And -- but just to make sure, I -- I

25  thought -- maybe I'm confused here, but all of what --

**H I N E S   R E P O R T E R S**                    133

1    all of what BNA did, it did sell -- am I correct? -- to

2    other entities?  That's why it got all of this hundred

3    of millions of dollars?  Am I correct?

4            MR. SIPPRELLE:  Object.  Vague and ambiguous.

5    Overbroad.

6            THE WITNESS:  So --

7    BY MR. COOK:

8        Q.    Somewhere about 250 or 60 million dollars, and

9    it -- it sold all of that to other Byton entities; isn't

10   that correct?

11           MR. SIPPRELLE:  Object.  Vague and ambiguous.

12   Overbroad.  Misstates the witness.

13           Good ahead, Mr. Kameswaran.

14           THE WITNESS:  So --

15           MR. SIPPRELLE:  You can explain again what --

16   what BNA did.

17           THE WITNESS:  So BNA was an R&D service

18   provider for the other entities within the Byton group,

19   so we employed people to provide those services.

20           And their times were paid by whoever was

21   receiving the services, and -- with an arms-length

22   contract and a profit margin.

23   BY MR. COOK:

24       Q.    Did you have to pay sales tax on that?

25           MR. SIPPRELLE:  Objection.  Lacks foundation.

**H I N E S   R E P O R T E R S**                          134

1  Calls for a -- some kind of a tax opinion from a non-tax

2  lawyer.

3  BY MR. COOK:

4      Q.   You can answer that?

5      A.   I'm -- I'm not aware of that -- I'm -- I'm not

6  a corporate finance person, so I'm not aware of that.

7      Q.   Okay.  You don't know one way or another

8  whether or not they're on a tax return?  The -- that was

9  tax to pay; isn't that correct?

10     A.   Taxes is paid for Federal and California State

11 tax requirements for the revenue earned by Byton North

12 America.  That's what I'm aware of.

13     Q.   Let me move on to the next one here.  Hold on.

14          As to FMC, other than Ying -- pardon -- Zhang

15 Ying, it says that he's chairman of the board of

16 directors of CMC [sic] Cayman.

17          Do you know the names of any of the board of

18 directors of FMC Cayman?

19     A.   No, sir, I wouldn't.

20     Q.   And he says FMC owes 100 percent of the shares

21 of Byton Limited?

22          Is -- that's correct, of course?

23          MR. SIPPRELLE:  Object.  Lacks foundation.

24          You're reading from somebody else's

25 declaration.

**H I N E S   R E P O R T E R S**                    135

```
 1   BY MR. COOK:
 2        Q.   You can answer that?
 3             MR. SIPPRELLE:  If you know, Mr. Cook.
 4             THE WITNESS:  I -- I don't know.
 5   BY MR. COOK:
 6        Q.   You don't know one way or another; is that
 7   correct?
 8        A.   That's a statement.  That's a statement.
 9        Q.   By the way, what do you do for a living now?
10        A.   I work for another company.
11        Q.   What's the name of it?
12        A.   I would prefer not to disclose it.  I just
13   recently started with that company, and they haven't
14   made a public announcement.  So they've requested me to
15   keep that confidential at this stage.
16        Q.   Is that a company dealing with electric
17   vehicles?
18        A.   No, it does not.
19        Q.   Does it deal with a company with a name
20   "Byton" relating to it?
21        A.   No.
22        Q.   Including any of the LLCs bearing the name of
23   Byton; is that correct?
24        A.   This company has got nothing to do with Byton.
25        Q.   And you didn't take or receive anything of
```

**H I N E S   R E P O R T E R S**                    136

1  value from BNA, Byton Limited, FMC Cayman?  You didn't

2  receive anything of value?

3        MR. SIPPRELLE:  Object.  Vague and ambiguous.

4  Argumentative.

5        What does that -- he -- he was employed there?

6  So what do you mean?

7        THE WITNESS:  Yeah.

8        MR. COOK:  Aside from wages here.

9  BY MR. COOK:

10     Q.  Did you receive anything of value?

11     A.  I -- I was an employee, and I was getting paid

12  my wages by Byton North America until my employment

13  ceased.

14     Q.  I'll get back to this in a second here.

15  Excuse me.

16        By the way, you were deposed twice; isn't that

17  correct?

18     A.  Correct.

19     Q.  Okay.  And you had an opportunity to review

20  the -- the transcript to make any -- for any

21  corrections; isn't that correct?

22        MR. SIPPRELLE:  If you recall whether you did

23  or not.

24  BY MR. COOK:

25     Q.  Do you remember?

**HINES REPORTERS**                    137

1        A.    After my first deposition, there were a couple

2    of things that I had probably answered without fully

3    understanding the question, so I did go back with a

4    declaration to correct those.

5        Q.    Well, so as of -- as of November 17, 2020, you

6    were the most qualified witness on behalf the BNA; isn't

7    that correct?

8            MR. SIPPRELLE:  Object.  Vague and overbroad.

9    He was produced as the most qualified witness on certain

10   subjects, as I recall; not on everything.

11   BY MR. COOK:

12       Q.    Well, I'll read it.  "You are here testifying

13   as the most qualified witness on behalf of Byton North

14   America Corporation; correct?"

15            Answer:  "Correct."

16            Is that a correct answer?

17            MR. SIPPRELLE:  Well, Mr. Cook, you're reading

18   from something that we don't have in front of us, so

19   the -- the deposition says what it says, you know.

20            MR. COOK:  That's right.  It says what it

21   says.

22            MR. SIPPRELLE:  Right.

23            And so why are you reading it to him?

24   BY MR. COOK:

25       Q.    And by the way -- good?

1          And you -- you agree that, before this

2   deposition, that you didn't speak to Teresa Shi; is that

3   correct?

4          A.   Sorry.

5               Before this deposition?

6          Q.   No.  I'm talking about the November

7   deposition, which said, "Did you speak with Teresa Shi

8   to prepare for today's deposition?"

9               Did you do that?

10         A.   I cannot recall.

11         Q.   Okay.  Now -- so to make sure we all

12  understand here, it says, "I" -- "As I mentioned, I have

13  been involved in managing the R&D finance, and I have a

14  close association with the engineering team -- team in

15  terms of what the engineering costs are and what the

16  deliverables are in any inadequate delivery of the

17  engineering deliverable effects the R&D budget for the

18  whole vehicle?"

19              So did you have access to the corporate -- the

20  corporate finance team for the R&D budget?

21         A.   Yes, for the R&D finance, yes.

22         Q.   Well, other than the corporate finance team

23  for the R&D finance, did you have access for the

24  corporate finance team?

25              MR. SIPPRELLE:  Object.  Asked and answered.

**H I N E S   R E P O R T E R S**                    139

1   I think we covered this repeatedly, but go ahead.

2          THE WITNESS:  As I mentioned before, I had

3   access to those specific documents and records, which

4   were required for me to do the job.

5   BY MR. COOK:

6      Q.   Okay.  Anything else?

7          MR. SIPPRELLE:  Object.  Vague and overbroad.

8   BY MR. COOK:

9      Q.   You can answer the question?

10     A.   No.

11     Q.   That was your answer?

12          "No," is your answer, sir?

13     A.   Yes.

14     Q.   Okay.  Now -- now, you said also, "I think the

15  answer is the same to every question here.  There is no

16  engineering person currently on the Byton North American

17  [sic] payroll that is qualified -- that is available to

18  answer the question?"

19          That is you; is that correct, sir?

20          MR. SIPPRELLE:  What's your question?  Are you

21  asking him if that was his testimony?

22          MR. COOK:  No.

23  BY MR. COOK:

24     Q.   It says -- it says, "there is no other

25  engineering person?"

**H I N E S   R E P O R T E R S**                    140

1          Are you that engineering person?

2          MR. SIPPRELLE:  Well, let me just object.

3   What you're doing, Counsel, is you're reading from a

4   deposition from November of 2020, when my recollection

5   is all of the engineers had left the company.

6          So Mr. Kameswaran was the best we could do at

7   that time to answer these questions.

8          So if you're asking him if his testimony was

9   accurate or whether -- he's here as an engineering --

10  I'm not sure I understand your question.

11  BY MR. COOK:

12      Q.   We'll take this as a correct statement?

13      A.   Whatever I said in the testimony at the time

14  is a correct statement.

15      Q.   Okay.  It says -- and you said previously that

16  your business operations role and responsibilities for

17  North America finance prepared you to testify as to the

18  most qualified witness at Byton regarding Byton's

19  payment for EDAG services; correct?

20          Is that correct, sir?

21          MR. SIPPRELLE:  Well, let me -- are you asking

22  him if that was his testimony?

23          MR. COOK:  No.  I'm asking it right now.

24          MR. SIPPRELLE:  If that was correct testimony

25  at the time?  Is that -- that's your question?

**H I N E S   R E P O R T E R S**                     141

1          MR. COOK:  I'm asking right now.

2          MR. SIPPRELLE:  Right now what?

3          MR. COOK:  The question which I posed in front

4   of him.

5          MR. SIPPRELLE:  Okay.  Vague and ambiguous.

6          Do you understand the question, Mr. Cook?

7          THE WITNESS:  If you're asking me whether I

8   was responsible for Byton North American finance

9   operations at that time for dealing with the EDAG

10  payments, the answer was yes.

11  BY MR. COOK:

12      Q.   EDAG -- the EDAG payments?

13      A.   The answer is yes.

14      Q.   What?  The answer is "yes"?

15      A.   Yes.  Yes, as for my testimony.

16      Q.   Okay.  Now, in fact --

17          THE COURT REPORTER:  Mr. Cook, can we take a

18  break soon?  We've been on for about an hour and 40

19  minutes.

20          MR. COOK:  Sure.  I'll be happy -- do you

21  want -- when do you want a break?  Now?

22          THE COURT REPORTER:  Sure.

23          MR. COOK:  Okay.  When would you like to come

24  back?  You tell me.

25          THE WITNESS:  Let's say 1:00 o'clock.

**HINES  REPORTERS**                                    142

```
 1              THE COURT REPORTER:  About --
 2              MR. SIPPRELLE:  Let's say 1:00 o'clock, so we
 3  can get some lunch.
 4              How's that sound?
 5              MR. COOK:  1:00 o'clock is fine.
 6              What would -- ma'am, what would you like?
 7              THE COURT REPORTER:  Yeah, that -- that would
 8  be fine.  It seems like we --
 9              MR. COOK:  1:00 o'clock?
10              THE COURT REPORTER:  -- have a lot more to
11  cover.  So, yeah, a lunch would be good at this time.
12              MR. COOK:  Thank you.  1:00 o'clock.
13              MR. SIPPRELLE:  1:00 0'clock.
14              MR. COOK:  Thank you very much.
15              THE CLERK:  Thank you, everyone.  We're off
16  the record.
17              (Whereupon a lunch recess was taken.)
18              THE CLERK:  Okay.  We're back on the record in
19  Civil Action 21:4736.
20              Go ahead and proceed, Mr. Cook.
21              MR. COOK:  Thank you very much.
22  BY MR. COOK:
23      Q.  Starting off at -- at the 1:00 o'clock
24  rollout.
25              Okay.  Let me ask -- the question here is on
```

**HINES REPORTERS**                                    143

1  Page -- Page 61:  "Sir, who is the most qualified

2  witness to testify regarding Byton's payment to

3  suppliers?"

4          And your response is, "I am, as the

5  responsible person for Finance North America."

6          Was that a correct statement, sir, at the

7  time?

8      A.   You said you're reading from a prior

9  testimony.

10     Q.   Absolutely?

11         MR. SIPPRELLE:  What's the date of that

12  deposition, Mr. Kameswaran?

13         MR. COOK:  You attended it.  The date of the

14  deposition was November 17, 2020.

15         MR. SIPPRELLE:  So I think he's asking you,

16  was that accurate as of that date, Mr. Kameswaran.

17         MR. COOK:  That's fine.

18         THE WITNESS:  Yes, it was accurate as of that

19  date, yes.

20  BY MR. COOK:

21     Q.   Thank you.

22         And then on Page 62 -- make sure we have

23  everything here, "How did your work on the M" -- M as in

24  Mary -- "dash, Byte" -- B-y-t-e -- "project prepare you

25  to testify as the most qualified witness at Byton

HINES REPORTERS                                    144

1  regarding Byton's use of suppliers on the project"?

2            Answer:  "As the most qualified current

3  employee -- current employee and as my investment in the

4  finance operations and business operations."

5            Is that true as of November 2020?

6       A.   Yes, sir.

7       Q.   Thank you?

8            Now -- then at Page 63 -- hold on.  It starts

9  as follows, "And this is a signed version of the letter

10  Mr. Merz, M-e-r-z, had sent in Exhibit 60 that we just

11  looked at, like you said; correct?"

12            And the next page is on Page 164, you say,

13  "Correct."

14            "Okay.  The letter of confirmation is signed

15  by Teresa Shi and Tom Wesner on behalf of Byton;

16  correct?"

17            Answer:  "Correct."

18            Question:  "Is -- who is Teresa Shi?"

19            Answer:  "Teresa Shi is a VP -- is a VP of

20  finance based in our China office."

21            Question:  "Is she still employed by Byton?"

22            Answer:  "Yes, she is."

23            Is that correct?

24            MR. SIPPRELLE:  Well, hold on.  Objection.

25            You've got a whole bunch of stuff in there.

**HINES REPORTERS**                                   145

```
 1   And there were multiple questions and multiple answers,

 2   so I think -- it's compound and confusing, so I'm not

 3   sure what you're asking about and whether --

 4            MR. COOK:  It's real simple.  Let me repeat it

 5   here, sir.  It says --

 6            MR. SIPPRELLE:  Just ask the -- question.

 7            MR. COOK:  -- on Page 164 --

 8            MR. SIPPRELLE:  Why don't you --

 9            MR. COOK:  You're not listening.

10   BY MR. COOK:

11       Q.   "Who is Teresa Shi?"

12            Answer:  "Teresa Shi is a VP of finance based

13   in our -- in our China office."

14            So is that correct, sir?

15       A.   Yes, she was based in our China office.  One

16   of our China offices.

17       Q.   And "ours" is who?

18       A.   As in Byton, as a group.

19       Q.   Byton -- Byton group or Byton?

20            MR. SIPPRELLE:  Asked and answered.

21            He just told you what he meant by that.

22            Go ahead and explain it again.

23   BY MR. COOK:

24       Q.   No.  You can answer my question, here?

25       A.   She -- she was employed by one of the Byton
```

**H I N E S   R E P O R T E R S**                                    146

1  entities and was based in China.

2      Q.   Question:  "Is she still employed by Byton?"

3           Answer:  "Yes, she is."

4           Is that a true statement as it stands?

5           MR. SIPPRELLE:  Object.  Vague and ambiguous

6  as it stands.

7           You can answer.

8           THE WITNESS:  You -- it would have been true

9  at the time if that's what I answered.  Now, I cannot

10 recollect when she left or exactly what time she -- how

11 long she was with our organization.

12 BY MR. COOK:

13     Q.   Is this statement true as in November 2020?

14          MR. SIPPRELLE:  Object.  Asked and answered.

15          THE WITNESS:  If -- if that was my testimony,

16 yes.

17 ///

18 BY MR. COOK:

19     Q.   That she was an employee of Byton as of

20 November 2020; correct?

21          MR. SIPPRELLE:  Object to the term "Byton" as

22 vague and ambiguous.  It depends on what you mean by

23 Byton.

24          Go ahead, Mr. Kameswaran.

25          THE WITNESS:  She was an employee of one of

**H I N E S   R E P O R T E R S**                                    147

```
1   the Byton entities based in China.

2   BY MR. COOK:

3       Q.   Wait.  Wait a second?

4            Well, you didn't say that.  It says, "Is she

5   still employed?"

6            Your response was, "Yes, she is"; not -- not

7   some imaginations of many entities.

8            Why didn't you tell the lawyer that it

9   wasn't -- it wasn't just Byton.  It was many entities

10  just like you --

11           MR. SIPPRELLE:  Object.

12  BY MR. COOK:

13      Q.   -- just like you told me right now?

14           MR. SIPPRELLE:  Object.  Argue --

15  BY MR. COOK:

16      Q.   Why didn't you say that?

17           MR. SIPPRELLE:  Object.  Argumentative.

18  Compound.  Vague and ambiguous.

19  BY MR. COOK:

20      Q.   No.  You can answer that one?

21           MR. SIPPRELLE:  He'll answer it --

22           MR. COOK:  Laugh -- you can laugh --

23           MR. SIPPRELLE:  -- when he understands --

24           MR. COOK:  -- all you want.

25           MR. SIPPRELLE:  Mr. Cook.
```

1          MR. COOK:  Yeah.

2          MR. SIPPRELLE:  You've got this Perry Mason

3   approach to things, which, frankly, is a little bit

4   ridiculous and unprofessional.

5          Just ask a direct question.  You don't have to

6   wave and shout and engage in histrionics, okay.  Just

7   ask him a direct question.

8          Go ahead, Mr. Kameswaran.

9   BY MR. COOK:

10      Q.   You understand that you swore to tell the

11   truth; isn't that correct, sir?  Yes?

12      A.   Yes.  Correct.

13      Q.   That's right.

14          Now, it says -- it says, "Is she employed by

15   Byton?"

16          And you said, "Yes, she is."

17          Now you're telling me, then, that this is --

18   at the time is a false statement because she was

19   employed by another Byton entity?

20          MR. SIPPRELLE:  Objection.

21          Mr. Cook, you're misstating his testimony.

22   The question was that the attorney used the term

23   "Byton."  But the attorney did not explain what Byton

24   meant.

25          Mr. Kameswaran is telling you what his

**H I N E S   R E P O R T E R S**                    149

```
 1  understanding is and what his understanding was when he

 2  answered the question.

 3          So go ahead, Mr. Kameswaran.

 4          THE WITNESS:  Now that's -- that's exactly

 5  correct, as mentioned by my attorney here.

 6          Byton has a number of entities.  If someone

 7  asked me, is she an employee of Byton, then I'm going to

 8  say, yes, she -- she was an employee of Byton at the

 9  time; unless, it specifically asks me, if she was an

10  employee of Byton North America, then I would have said

11  no.

12  BY MR. COOK:

13      Q.   No, sir.  You got that all wrong.

14          It says, "Is she employed by Byton?"

15          There's only one Byton discussed in this -- in

16  this transcript here.

17          You know that?

18          MR. SIPPRELLE:  Oh, no.  He doesn't know that.

19  BY MR. COOK:

20      Q.   Is that correct?

21          MR. COOK:  Excuse me.

22  BY MR. COOK:

23      Q.   You know that?  Isn't that correct, sir?

24          MR. SIPPRELLE:  And that is absolutely false.

25  You are -- you are putting false -- you are lying on the
```

 1   record, Mr. Cook.  There were numerous different Byton

 2   entities discussed during the deposition.  You know

 3   that.

 4           So why are you -- why are you misrepresenting

 5   that?  That is outrageous, unprofessional, unethical,

 6   and, frankly, probably should be brought to the Court's

 7   attention.  And you've done this repeatedly throughout

 8   this case.

 9           You've accused people of falsifying

10   information, of hiding things, of fleeing the

11   jurisdiction.

12           Maybe that's your approach to things, but I've

13   got to tell you, that is incredibly unprofessional and

14   unethical, so I would ask you to refrain from that kind

15   of misconduct, frankly, and just ask direct questions.

16           MR. COOK:  Okay.

17           MR. SIPPRELLE:  Now, Mr. Kameswaran, do you

18   have the question in mind?  You can explain again to

19   Mr. Cook what you're an- -- what you meant by your

20   answer in your deposition.

21           MR. COOK:  No.  No.  I didn't say for him to

22   fabricate an answer.  It says, "Is she still employed by

23   Byton?"  "Yes, she is."

24           That's it.  Let's move on.

25   BY MR. COOK:

1          Q.   That's what you said, even though you said

2     something else contrary about two hours ago; isn't that

3     correct?

4               You said --

5               MR. SIPPRELLE:  Object.  Object.

6     BY MR. COOK:

7          Q.   You said last time, sir --

8               MR. SIPPRELLE:  Misstates.

9     BY MR. COOK:

10         Q.   -- you said last time, "No, she's not employed

11    by Byton."  That's what you said.  Now you said

12    something else?

13              Can't you tell the truth here, sir?

14              MR. SIPPRELLE:  And you, Mr. Cook, are once

15    again --

16              MR. COOK:  Look.  Here --

17              MR. SIPPRELLE:  -- are fabricating.

18              MR. COOK:  No.  Let's hear it from the

19    witness.

20              You can --

21              MR. SIPPRELLE:  What he testified was she was

22    not employed by Byton North America.  That's what's in

23    the record.  And you've just again -- you've just

24    fabricated and mischaracterized Mr. Kameswaran's

25    testimony.

**HINES REPORTERS**                              152

```
 1              And I would ask you to please be professional,
 2     Counsel.  Please tell the truth.  Please don't put
 3     misstatements on the record; okay?  I know you're
 4     frustrated.
 5              MR. COOK:  I'm not frustrated.
 6              MR. SIPPRELLE:  I know you're not -- I know
 7     you're not getting what you want.  I know you had this
 8     case on a contingency.
 9              And it's -- you know, so you're very, very
10     frustrated about this whole process.  But, please, let's
11     be professional.
12              There's no need to engage in histrionics or
13     misstating things on the record and mischaracterizing
14     testimony.
15              That's unethical and unprofessional.  Please
16     do not do that.  Just ask direct questions.
17              MR. COOK:  Yeah, okay.  You're done.
18     BY MR. COOK:
19         Q.   186 --
20              THE WITNESS:  Before -- before.
21     BY MR. COOK:
22         Q.   Why don't you -- you have an answer for me,
23     sir?
24         A.   Before we continue, just to tag onto what
25     Mr. Sipprelle just said.
```

**H I N E S   R E P O R T E R S**                    153

1           I'm really, really frustrated with the tone of

2   the questioning here and the accusations and all of

3   that.

4           Here I am trying to help you out in this

5   questioning here or examination for a former employee

6   that I have no connection with anymore.

7           And I really do not really appreciate the --

8   the kind of tone and the kind of questioning that is

9   going on here.

10          You ask me a direct question; I'm going to

11  give you a direct answer to the best of my ability.

12          MR. SIPPRELLE:  Go ahead, Mr. Kameswaran.

13          THE WITNESS:  So if somebody asked me, "Was

14  Daniel Kirsch was employed by Byton," I was going to

15  say, "Yes, Daniel Kirsch was employed by Byton."  That

16  doesn't mean he was an employee of Byton North America.

17          So along the same lines was Teresa.  Was she

18  an employee of Byton?  She was an employee of Byton.

19  Another entity of Byton in China.

20  BY MR. COOK:

21      Q.   So let's take a look at 186, "And then if you

22  go to the very top of the first page of Exhibit 63,

23  there is a September 23, 2009 e-mail from Teresa Shi;

24  okay?"

25          Answer:  "Yes."

**H I N E S   R E P O R T E R S**                    154

1            And then it says:  "She writes, 'We're able to
2     pay them 1 to 1.5 million now, but the 6-mill for
3     October 5, can't be met.'"
4            I read that correctly.  The answer's correct.
5            So Ms. Shi was representing who?
6            MR. SIPPRELLE:  Object.  It's vague and
7     ambiguous.  Lacks foundation.
8            You're not showing him the document you're
9     reading from or the testimony, and you're asking him to
10    speculate about something that he's not looking in.
11           But go ahead and -- so that's an inappropriate
12    question.
13           Go ahead, Mr. Kameswaran.
14           THE WITNESS:  If this is communication from
15    that time, whatever was said in the e-mail was whatever
16    was said in the e-mail.  And without really looking at
17    the document of something, I can't really comment on
18    these things.
19    BY MR. COOK:
20      Q.   Okay.  187, "Okay.  Ms. Shi writes that Byton
21    would pay one to 1.5 million in this e-mail; correct?"
22           And you say:  "Correct."
23           But is this a misstate here?
24           MR. SIPPRELLE:  Object.  Vague and --
25           Is what a misstate?

**H I N E S   R E P O R T E R S**                              155

1  BY MR. COOK:

2       Q.   It says, "She writes that Byton would pay 1 to

3  1.5 million in this e-mail?"

4            Did you make a mistake?

5            MR. SIPPRELLE:  Object.  Vague and ambiguous.

6  Unintelligible.

7            Do you understand the question?

8  BY MR. COOK:

9       Q.   Well, who's --

10           No.  Yeah.  Tell me, who's Byton here?  There

11  must be many Byton's.  Which one is it?

12      A.   There are different Byton entities, as I

13  mentioned to you.

14      Q.   I'm looked in this answer.  It says:  "Okay.

15  Ms. Shi writes that Byton would pay?"

16           And you put:  "Correct."

17           Is your answer wrong?  There might be more

18  Bytons?  Which ones are they?

19           MR. SIPPRELLE:  Well -- well, objection.

20           Again, you're asking him to comment on

21  testimony you're not showing him, but I think the

22  question was, he was asked to -- to comment on what

23  Ms. Shi said, and I think he just said, "Correct."

24  That's what she said, so what --

25  BY MR. COOK:

**HINES  REPORTERS**                              156

1      Q.   Which Byton?  Was it -- which Byton?

2           MR. SIPPRELLE:  Object.  Speculation.

3           He didn't write the e-mail.

4           Go ahead, Mr. Kameswaran.

5           THE WITNESS:  It's a --

6  BY MR. COOK:

7      Q.   Which -- which Byton were you meaning, by the

8  way?

9      A.   The contact was between Byton North America

10  and EDAG.

11      Q.   Okay.  And then it says, on 188, "And then,

12  three days later, Teresa Shi, she says, 'We could pay 1

13  to 1.5 million right now; correct?'"

14           And then we have a bunch of objections, and

15  then it says, you -- it says, "That's correct."  It's

16  stated in the document.

17           Is that correct?

18           THE WITNESS:  Yeah.  You have to --

19           MR. SIPPRELLE:  Vague and ambiguous.

20           THE WITNESS:  -- understand that was flashed

21  up to me as the testimony and asked whether what's

22  written in her e-mail, correct.

23           My answer will be, yes, that it's correct.

24  It's written in the e-mail.

25  BY MR. COOK:

**H I N E S   R E P O R T E R S**                    157

1       Q.   So maybe I missed it.  Forgive me for that?

2            Byton was not raising any money; correct?  It

3  was -- it was FMC or Cayman?  They were raising the

4  money; am I correct?

5            MR. SIPPRELLE:  Object.  Vague and ambiguous.

6  Misstates testimony.

7  BY MR. COOK:

8       Q.   You can -- you can answer my question?

9       A.   FMC Cayman was the holding company.

10      Q.   I want to know whether or not -- whether or

11 not FMC Cayman was raising the funds?

12      A.   FMC Cayman was raising the funds.

13      Q.   Excuse me.  Repeat that.  I'm sorry?

14      A.   FMC Cayman was raising the funds.

15      Q.   Okay.  And it wasn't Byton; is that correct?

16           MR. SIPPRELLE:  Object to the term "Byton" as

17 vague and ambiguous.

18           What Byton entity are you referring to,

19 Counsel?

20 BY MR. COOK:

21      Q.   You can --

22           MR. SIPPRELLE:  Byton North America?

23           MR. COOK:  No.

24 BY MR. COOK:

25      Q.   You can --

**H I N E S   R E P O R T E R S**                  158

1          MR. COOK:  No.  It's BNA.

2          MR. SIPPRELLE:  BNA.  Okay.

3          THE WITNESS:  Okay.  Let's stay with BNA, so

4     that it is clear.

5          BNA was not raising the funds.

6     BY MR. COOK:

7     Q.   All right.  And then, apparently, at 190, it

8     says, "When Byton and EDAG signed its contract, did

9     Byton tell EDAG that payment would be conditioned upon

10    its ability to raise funds from the investors?"

11         And then there's an objection.  This is the

12    witness, "I was going to say EDAG working with a

13    start-up company like Byton with -- would have very

14    have -- would have very well-known that the contract is

15    subject to funds available."

16         Is that correct, sir?

17    A.   EDAG knew that Byton North America was a part

18    of a start-up organization, and they were dependent on

19    funds.  And so they knew very well the risk involved

20    with working with a start-up.

21    Q.   Okay.  And was -- so was BNA obligated to

22    raise money from the investors?

23         MR. SIPPRELLE:  Objection.  Vague and

24    ambiguous --

25    BY MR. COOK:

HINES REPORTERS                                        159

1      Q.   You can answer?

2           MR. SIPPRELLE:  -- to the term "obligated."

3 BY MR. COOK:

4      Q.   You can answer that?

5      A.   BNA -- BNA was not obligated to raise funds.

6 BNA was not asked to raise funds or it was not BNA's

7 business to raise funds.  BNA's responsibility was to

8 provide engineering services.

9      Q.   So -- so Byton -- BNA was not obligated to

10 raise any funds; is that correct?

11          MR. SIPPRELLE:  Object.  Vague and ambiguous.

12          THE WITNESS:  Yeah.  I don't know what you

13 mean "obligated," but BNA was not responsible for

14 raising funds.

15 BY MR. COOK:

16     Q.   All right.  So on Page 189, "Sitting here

17 today, you can't identify any specific communications

18 from Mr. Wesner or anyone at Byton telling EDAG -- EDAG

19 that payment would be conditioned upon the ability to

20 raise funds?"

21          And you say, "I think some of Mr. Wizman's

22 [sic] correspondents communicates that in the form of

23 money expected from investors implies that payment is

24 based upon receiving the investors' funds."

25          Okay.  And who's -- who's the person -- pardon

**H I N E S   R E P O R T E R S**                    **160**

1   me.

2          Would Byton be the one raising the funds, or

3   would it be FMC?

4          MR. SIPPRELLE:  Object.  Vague and ambiguous.

5   BY MR. COOK:

6      Q.   Can you answer the question?

7          MR. SIPPRELLE:  Asked and answered.

8          THE WITNESS:  FMC was raising the funds.

9   BY MR. COOK:

10     Q.   Not Byton?

11         MR. SIPPRELLE:  Object to the term "Byton" as

12  vague and Ambiguous.

13         THE WITNESS:  Byton North America.

14  BY MR. COOK:

15     Q.   Is there somewhere here where you told the --

16  the EDAG people that the person raising the funds would

17  be FMC and not -- not Byton?

18         MR. SIPPRELLE:  You're asking -- you're asking

19  him if he remembers if that question was asked in his

20  deposition from over a year ago?

21         Wow.  Okay.

22  BY MR. COOK:

23     Q.   Well, I want to know whether or not somebody

24  at BNA told EDAG that the person who's going to raise

25  this money is FMC?

**H I N E S   R E P O R T E R S**                            161

```
1              Can you tell me whether that occurred?

2              MR. SIPPRELLE:  Lacks foundation.

3              THE WITNESS:  I do not know.

4    BY MR. COOK:

5         Q.   What?

6         A.   I do not know, sir.

7         Q.   You don't remember, or you don't know?

8         A.   I don't know.

9         Q.   You don't -- you don't remember or you don't

10   know whether you told the people at EDAG that FMC would

11   be the person responsible to raise the money; is that

12   correct?

13             MR. SIPPRELLE:  Object.  Asked and answered.

14   BY MR. COOK:

15        Q.   He can answer that one?

16        A.   I don't know that there was any questioning

17   from EDAG as to who -- who was rasing the funds, and I

18   don't know.  And -- and I don't know if it was a

19   question raised or an answer provided.

20        Q.   Well, actually, I do have one.  Yours.  It

21   says, "So I'll go back to my original question, then.

22   When buy back -- EDAG signed its contract, did Byton

23   tell EDAG specifically that payment would be conditioned

24   upon Byton's ability to raise funds from investors?"

25             And then the answer is:  "Objection.  Lacks
```

**HINES REPORTERS**                                    162

 1    foundation."

 2           And then the witness, "EDAG working with a

 3    start-up company would, in their experience, know the

 4    staged payments are based on incoming funds were

 5    dependent on incoming funds."

 6           Is that what you meant to say?

 7           MR. SIPPRELLE:  I'm not sure what the

 8    question -- are you asking if that was his testimony?

 9           Was that your testimony, Mr. Kameswaran?

10    BY MR. COOK:

11      Q.   I'm telling -- I'm telling you that you are

12    telling the -- the EDAG people that the only people

13    raising the money would be -- guess who, BNA? -- but

14    you're telling me that's not true?

15      A.   No.

16      Q.   No, that's not true?

17      A.   I -- I never used the term Byton North America

18    was raising the funds.  I never used the term Byton

19    North America was raising the funds, and I did testify

20    that Byton North America is dependent on incoming funds

21    to make its vendor payments.

22           Incoming funds does not mean directly from

23    investors.  Incoming funds means funds required for us

24    to run the operation.

25           MR. COOK:  Well -- Pauline --

**H I N E S   R E P O R T E R S**                    163

1          THE SECRETARY:  Yeah.

2          MR. COOK:  -- I need your help.  My internet

3    is unstable.  I didn't do it.

4          THE SECRETARY:  Okay.  Then we're back.

5          MR. COOK:  Okay.

6          THE SECRETARY:  You're back.

7          MR. COOK:  All right.  Can you hear me?  No?

8          THE WITNESS:  Yes, I can.

9          MR. COOK:  Okay.  Can you hear me?  Hello?

10          THE WITNESS:  Yeah.  Yeah.

11   BY MR. COOK:

12      Q.   Well, again, I'll make it really simple?

13          Did you ever tell anybody at EDAG that, if

14   they wanted to get paid, that the only way they're going

15   to get paid is FMC Cayman raising funds from investors?

16          MR. SIPPRELLE:  Did you, personally, ever say

17   that, Mr. Kameswaran?

18          THE WITNESS:  I did not.

19   BY MR. COOK:

20      Q.   All right.  Did you ever tell the people at

21   EDAG that Byton NA would raise funds to -- for purposes

22   of payment of the debt due to EDAG?

23      A.   Did not ever say Byton NA was raising funds to

24   make payments.

25      Q.   How about to raise funds generally for the

**H I N E S   R E P O R T E R S**                        164

1   benefit of -- of BNA?

2        A.   Byton NA was not in the business of raising

3   funds.  Byton NA was in the business of providing R&D

4   service.

5        Q.   So how -- how -- how was EDAG supposed to know

6   or actually what -- who was supposed to raise money to

7   pay EDAG?

8             MR. SIPPRELLE:  Object.  Asked and answered.

9   Argumentative.  Speculation.

10  BY MR. COOK:

11       Q.   Tell me who.  It wasn't EDAG -- I'm sorry.  It

12  wasn't BNA and, apparently, not FMC was told that to the

13  folks at -- at EDAG?

14            So did anybody tell them they were going to

15  get paid from a source?

16            MR. SIPPRELLE:  Object.  Vague and ambiguous.

17            THE WITNESS:  I do not know, Mr. Cook.  The

18  engagement of EDAG preceded my employment at Byton in

19  2016 timeframe or so.

20            And I don't know what decisions were had

21  between EDAG and Byton North America at that time to

22  explain the -- explain the contractual arrangement.

23            And, obviously, the contractual -- the

24  contract was signed between Byton North America and

25  EDAG.

**H I N E S   R E P O R T E R S**                    165

1  BY MR. COOK:

2      Q.  Did the BNA take any efforts to raise money to

3  payoff EDAG, if you know?

4      A.  As I said, BNA is an R&D company.  It does not

5  sell products or anything else.

6          So why would anyone invest in a company that

7  doesn't ultimately sell a product and generate revenue?

8          Knowing this, still would be willing to invest

9  money into Byton North America, which is pure R&D

10  service provider.

11      Q.  So you can read.  Now, answer my question?

12          MR. SIPPRELLE:  He did answer your question.

13          THE WITNESS:  I --

14          MR. SIPPRELLE:  You don't like --

15          THE WITNESS:  I did.

16          MR. SIPPRELLE:  -- the answer, but you --

17          MR. COOK:  No.  No.  The answers just go round

18  and round and round.

19          MR. SIPPRELLE:  Yes.  He answered your

20  question.

21  BY MR. COOK:

22      Q.  No.  Answer my question?

23          MR. SIPPRELLE:  Asked and answered.

24          THE WITNESS:  Why did --

25          MR. SIPPRELLE:  Go ahead.  Explain it again.

**H I N E S   R E P O R T E R S**                    166

```
 1              THE WITNESS:  BNA did not make any effort to

 2    raise funds.

 3    BY MR. COOK:

 4        Q.   Okay.  And all the -- and -- an I'm sure, in

 5    all the letters that was sent by BNA said that; is that

 6    correct, sir?

 7              MR. SIPPRELLE:  Object.  Argumentative.

 8    BY MR. COOK:

 9        Q.   No.  You can answer the question?

10        A.   Sorry.  I couldn't hear the last bit.

11        Q.   Oh, you -- I'm sure that the letters that were

12    sent out by BNA all said, "We're not paying you."

13    That's -- that's what I should look for?  "We're not

14    paying" --

15              MR. SIPPRELLE:  Object.  Argue --

16    BY MR. COOK:

17        Q.   -- "you"?  That's what -- that's what --

18              MR. SIPPRELLE:  Argumentative.

19    BY MR. COOK:

20        Q.   -- it said?  Am I correct?

21              MR. SIPPRELLE:  Object.  Argumentative.

22    Overbroad.  Vague and ambiguous.

23    BY MR. COOK:

24        Q.   You can answer that one.  I want to make sure,

25    when I go through the letters again that, my goodness,
```

**H I N E S   R E P O R T E R S**                                      167

1  you're right, BNA never said that money would be raised;

2  is that correct?  That's what I expect?

3        MR. SIPPRELLE:  Object.  Argumentative.  Vague

4  and ambiguous.

5  BY MR. COOK:

6    Q.  You can answer the question.

7    A.  BNA never said to EDAG that BNA was raising

8  funds.

9    Q.  You're going to stick to that?  It's your

10  sworn testimony?

11        MR. SIPPRELLE:  Mr. Cook, stop.

12  BY MR. COOK:

13    Q.  And are you going to answer my question?

14        MR. SIPPRELLE:  Stop the harassment.  He

15  answered your question.

16  BY MR. COOK:

17    Q.  You can answer my question, sir?

18        MR. SIPPRELLE:  He just answered it.  The fact

19  that you didn't --

20        THE WITNESS:  I --

21        MR. SIPPRELLE:  -- the fact that you didn't

22  like the answer doesn't mean he didn't answer it.

23        Move on, Mr. Kameswaran.

24  BY MR. COOK:

25    Q.  So when did -- when did BNA shut its doors?

1           MR. SIPPRELLE:  Object to the term "shut its

2  doors" as vague and ambiguous.

3           You can answer to the extent --

4  BY MR. COOK:

5     Q.   Doors -- "doors" mean that there were no

6  further employees on the premises?

7           When?  You can --

8     A.   End --

9     Q.   -- answer?

10          What?

11    A.   The end of December of last year.

12    Q.   Okay.  And the -- that would be between

13  January 1, 2011 to December of 2020 -- pardon me.

14  2000- -- January 2021 to December of 2021, how many

15  employees were on the premies?

16    A.   Between -- less than ten.  Don't remember the

17  exact number of when people left and so on, so less than

18  ten.

19    Q.   And what work was done between January 2001

20  [sic] to December 2001 [sic]?

21          MR. SIPPRELLE:  2021, Mr. Cook?

22  BY MR. COOK:

23    Q.   Sorry.  2020 -- January 20,000 -- January 2021

24  to December 2020 -- 2021, and what work were these

25  people doing?

1        A.    These people were basically supporting the

2   operation with -- like, with employees leaving and

3   existed to support FMC in its fundraising activities, if

4   there was any support required.

5        Q.    What's the rent for the building?

6        A.    Sorry.

7        Q.    What's the rent for the building?  You were

8   paying rent on the building?

9        A.    Roughly $250,000.

10        Q.    A month?

11        A.    Correct.

12        Q.    For 200,000 to support -- am I correct? -- ten

13   people?

14              MR. SIPPRELLE:  Object.  Argumentative.

15   BY MR. COOK:

16        Q.    You can answer the question?

17        A.    Correct, Mr. Kameswaran.  Yes.  It was the

18   rent we paid, and, unfortunately, we were tied to a

19   long-term lease.

20        Q.    And let me ask -- and who was paying the rent?

21        A.    We were not.

22        Q.    Okay.  What months did you stop paying rent?

23        A.    I cannot recall.  We stopped paying rent

24   sometime in 2020 after we had used up the PPP funds.

25   After that, we were unable to pay, and then -- yeah.

**H I N E S   R E P O R T E R S**                    170

1         We -- we were not paying rent beyond that

2  point.  So there was a collateral account from which the

3  landlord was growing money.  And then, when that ran out

4  completely, well, we had not paid rent since.

5       Q.   So who's paying PG&E?

6       A.   We were -- Byton North America was paying

7  PG&E.

8       Q.   And where did that money come from?

9       A.   That money came from the portion of PPP amount

10  written in that recovered period.  And, beyond that, it

11  was from the sale of any of those laptops and things.

12         We had to -- furniture and things that we did

13  not need.  We sold those items and kept the operation

14  afloat.

15       Q.   And the PPP money, what bank did that go into?

16       A.   PPP loan was processed by HSBC.  The money was

17  paid into the HSBC bank account by them.

18       Q.   What's -- what's the name of the bank?

19       A.   HSBC.

20       Q.   HSBC?

21       A.   Yes.

22       Q.   And that was deposited into that account?

23       A.   That was deposited in the account in April of

24  2020.

25       Q.   Why didn't you pay the bill for some of your

**H I N E S   R E P O R T E R S**       171

1   vendors?

2           MR. SIPPRELLE:  How about -- how about for

3   most of the vendors?

4           Go ahead, Mr. Kameswaran.

5           THE WITNESS:  We -- we didn't pay any vendors.

6   We paid to keep the lights on.  PG&E was not -- was not

7   a vendor.  PG&E was a utility company we had to pay.

8           We did use the PPP money to pay any vendors.

9   We only used the PPP money for the exact purpose that it

10  was meant for, in terms of paying payroll, and until the

11  time when people left the organization.  And for

12  utilities, office expenses, to rent, until that money

13  ran out.

14  BY MR. COOK:

15      Q.   Okay.  And maybe if I go back a little bit

16  here, just so we can move this on, we -- we were talking

17  about a corporate finance team?

18           Does that ring a bell, sir?

19      A.   Yeah.

20      Q.   Okay.  And it says in page 62 here, "Could you

21  describe a little more your involvement in the business

22  and financial operations that prepared you to testify as

23  the most qualified witness regarding the Byton's use of

24  suppliers?"

25           And then you say, "Yes.  My role is as a

**HINES REPORTERS**                              172

1  product finance role where I'm responsibile for the R&D

2  budgets and the R&D related finance."

3          "And then the North America Finance operations

4  is more of the day-to-day operations in terms of

5  processing payments or approving payments for suppliers.

6  The actual processing was done by our -- by our

7  corporate finance team in China."

8          Can you tell me who this corporate finance --

9  corporate finance team is in China?

10          MR. SIPPRELLE:  Object.  Asked and answered at

11  least half a dozen times.

12          But go ahead again, Mr. Kameswaran.

13          THE WITNESS:  To the corporate finance team

14  based in -- in China was headed by Ms. Shi at that time.

15  BY MR. COOK:

16      Q.  It's not your -- and, at that time, was she an

17  employee of BNA?

18          MR. SIPPRELLE:  Object.  Asked and answered.

19          THE WITNESS:  She was not an employee of the

20  BNA.

21  BY MR. COOK:

22      Q.  And now in looking at this here, it says on

23  Page 61.  "Sure.  Who is the most qualified witness to

24  testify regarding Byton's payments and suppliers?"

25          Answer:  "I am, as the responsible person for

**H I N E S   R E P O R T E R S**                                    173

```
 1   Finance North America."

 2           That's -- that's a correct statement at the

 3   time?

 4       A.   Yes.  At that time for the operational finance

 5   activities of North America, yes, I was responsible.

 6       Q.   Moving on here.  Hold on?

 7           Now, who was in charge of paying accounts

 8   payable?

 9           MR. SIPPRELLE:  Object as to time.

10   BY MR. COOK:

11       Q.   Who was in charge of payment -- of BNA AP?

12           MR. SIPPRELLE:  Vague as to time.

13   BY MR. COOK:

14       Q.   Do you know?

15       A.   Yeah.  Again, accounts payable at that time

16   was managed by the -- Ms. Oto in earlier -- yeah, at the

17   time.  I can't remember the exact timeframe Ms. Oto was

18   responsible for accounts payable.

19       Q.   Okay.  It went like this -- was the supply --

20   by the way, what is the supply chain team?  Who are

21   they?

22       A.   The purchasing team.

23       Q.   And where are they?  Are they -- are they in

24   Santa Clara, or are they in China something?

25       A.   There was a purchasing team based in Santa
```

HINES REPORTERS                                    174

1    Clara.

2         Q.   It says, "Was the supply chain involved in --

3    with you or approval of EDAG's invoices?

4              Answer:  "I'm not sure exactly how it worked.

5    I think supply chain team and engineering jointly

6    reviewed the invoices."

7              Question:  "Were you personally involved in

8    the review of EDAG's invoices?"

9              Answer:  "No."

10             "Were you" -- "No."

11             "Were you personally involved in the payment

12   to EDAG for its invoices?"

13             "Yes.  I was personally involved in the

14   payment to EDAG after it was -- after the invoices were

15   processed and approved by the accounts paying team in

16   China."

17             Who is the accounts payable team in China?

18             MR. SIPPRELLE:  Object.  Asked and answered.

19             Go ahead.

20             THE WITNESS:  The accounts payable team was

21   part of the corporate finance team, and it was a shared

22   service that they were offering for the different

23   entities.

24   BY MR. COOK:

25        Q.   Okay.  What did the people in China do in

**HINES REPORTERS**                                    175

1    approving the accounts payable?

2         A.   So, typically, the invoices would be sent by

3    e-mail by the supplier, and the accounts payable team

4    will receive it, they will look at it for accuracy

5    against the purchase order in terms of purchase order

6    number and -- and the qualities or whatever it is of

7    services provided.

8              And then they would pass it on to the supply

9    chain team to verify the accuracy of the invoice.  And

10   the supply chain team would work with engineering to see

11   whether the work was completed, done, whether the

12   supplier should be paid.

13             And then, on that basis, the -- the feedback

14   would go to the accounts payable team to say, "Yes.

15   This invoice is authorized to pay."  And then the

16   accounts payable team will queue it up for payment.

17        Q.   Well, who are the -- who was in charge of

18   approving the EDAG invoices?

19        A.   Primarily engineering.

20        Q.   Who were they?

21        A.   EDAG provided services to various engineering

22   teams, so it could be various engineering teams within

23   Byton North America.

24        Q.   Okay.  And would that be Shawn Celesco?  Does

25   that sound about right?

1          A.   He would have been one of the approvers.

2          Q.   What is a USA e-mail box?

3               MR. SIPPRELLE:  Objection.  Vague.  Overbroad.

4               MR. COOK:  This is Sadha's answer.  I got it

5     from him.

6               THE WITNESS:  I'm sorry, Mr. Cook.  I do not

7     understand the question.

8     BY MR. COOK:

9          Q.   It says, "So the first step was this

10    engineering team were to take an invoice and sign it and

11    send it through accounts payable; correct?"

12              "As I said, I don't know exactly how the

13    process works with EDAG, but with certain -- with --

14    with the invoice -- normal invoices, the invoices would

15    go to what we call an account payable USA e-mail box."

16              So what is that?

17         A.   So that is just a common e-mail address for

18    the accounts payable team to receive the invoices.  That

19    is what that was.

20              It was just a -- a single e-mail address so

21    that suppliers could -- instead of sending it to four

22    people, you send it to a single e-mail box.

23         Q.   So I guess, even as of today, the people in

24    China would have copies of all of the USA e-mails; is

25    that correct?

**HINES   REPORTERS**                                    177

1           MR. SIPPRELLE:  Object.  Lacks foundation.

2    Speculation.

3    BY MR. COOK:

4        Q.   You can answer that?

5        A.   If the e-mail box is operational, yes.

6        Q.   Why wouldn't they be operational?

7        A.   I wouldn't know.  So I shouldn't comment.

8        Q.   Then, we said, "Did sign invoices when you

9    reviewed them and submitted a payment?"

10           Answer:  "No.  I do not sign the invoices.

11   The invoices were being held in the corporate finance

12   group by the accounts payable team."

13           Is that correct?

14       A.   That's correct.  As I explained, the signed

15   invoices will be -- will be sent back to the accounts

16   payable team in corporate finance, who would then queue

17   it up for payment.

18       Q.   But you didn't sign any invoices; is that

19   correct?

20       A.   I did not sign any invoices.

21       Q.   And accounts payable team, those are the folks

22   in China; is that correct?

23       A.   The accounts payable team was not signing the

24   invoices.  The invoices were being signed by the

25   engineering teams who were approving the work for the

**H I N E S   R E P O R T E R S**                                178

1   quality of the work being completed.  They are

2   requesting --

3        Q.   But --

4        A.   -- the service, so they are the ones signing

5   it.

6        Q.   No.  I'm saying, it says, "account payable

7   team," which is your words?

8             Are those people in China, or are those people

9   in Santa Clara?

10       A.   So the accounts payable team was in China.

11       Q.   How many people were in the accounts payable

12  team, by the way?

13            MR. SIPPRELLE:  Object.  Vague as to time.

14  Lacks foundation.

15  BY MR. COOK:

16       Q.   Well, how about -- how about -- let's see,

17  what it would be?

18            How about January 1, 2019?

19       A.   So in which location, Mr. Cook.

20       Q.   In China, how many people were there?

21       A.   I don't know the exact number, but maybe 15

22  people.  We had -- we had a number of vendors, so...

23       Q.   And then -- hold on.  And then somebody asked

24  you, "Where did Byton ordinarily store the signed and

25  approved EDAG invoices?"

```
 1              And then you said, the witness, "The
 2   electronic copies would be with our corporate finance
 3   team in Cina, and any physical copies -- signed copies
 4   by the engineering team would be either in the U.S. --
 5   would be either in the U.S. office archives."
 6              And then it says, "Where was the U.S. office
 7   archives?  In what city and state?"
 8              Answer:  "Santa Clara."
 9              "Is that archive still maintained today?"
10              Answer:  "Yes."
11              So are those records available today?
12              MR. SIPPRELLE:  Object.  Lacks foundation.
13              THE WITNESS:  That is accurate at the time of
14   my testimony.  I don't know where the records are at the
15   moment since I left the --
16              MR. SIPPRELLE:  Yeah.
17              THE WITNESS:  -- company.
18              MR. SIPPRELLE:  And, Counsel, those were
19   produced in the arbitration, so I would assume you have
20   those records.  If not, I suggest you get them from your
21   client.
22   BY MR. COOK:
23       Q.   Okay.  So and then we go to another one here.
24   "And" -- Question:  "And what are the job duties of the
25   eight people who are still on payroll?"
```

**H I N E S   R E P O R T E R S**                              180

1      Answer:  "There's myself in finance.  We have

2  one person in legal.  We have one person in IT.  We have

3  one person in HR -- I'm sorry -- in finance.  Other than

4  me, there's one more -- one more person who does

5  banking-related activities."

6      Have you been in touch with anybody concerning

7  the condition of the records of BNA as of this day?

8      MR. SIPPRELLE:  Objection.  Vague and

9  ambiguous.

10      Go ahead.

11      THE WITNESS:  I've left the company, Mr. Cook.

12  I don't have any interest in -- in Byton North America.

13  I've got enough on my plate with my new job.

14  BY MR. COOK:

15      Q.   Okay.  As of -- as of the day you left, before

16  that time, were you in touch with anybody concerning the

17  condition of the records of BNA?

18      MR. SIPPRELLE:  Object to the term "condition

19  of the records" as vague and ambiguous.

20      Go ahead.  It's overbroad.

21  BY MR. COOK:

22      Q.   You can answer it?

23      A.   No, I've not been in touch.

24      Q.   Other than you, anybody else have knowledge of

25  the condition of the records of BNA as of, say, December

**H I N E S   R E P O R T E R S**                    **181**

1    2021?  Anybody else who would know?

2            MR. SIPPRELLE:  Object.  Vague.  Overbroad.

3    Lacks foundation.

4    BY MR. COOK:

5        Q.   What's your answer?

6        A.   No, I don't know.

7        Q.   Okay.  And then it says, "It is quite possible

8    there are documents that are not accessible because we

9    do not have access issues on some portals that we were

10   locked out because of payment issues?"

11           Would those payment issues be the finance

12   records of BNA?

13           MR. SIPPRELLE:  Object.  Vague and ambiguous.

14   BY MR. COOK:

15       Q.   You can answer that?

16       A.   I'm sorry.  Mr. Kameswaran, could you rephrase

17   that question, please.

18       Q.   In other words, apparently, there are some

19   portals where BNA was locked out; isn't that correct?

20           MR. SIPPRELLE:  As of the date of the

21   deposition?  Is that what you're asking?

22           MR. COOK:  Yeah.

23   BY MR. COOK:

24       Q.   Just as of that date November 2020?

25       A.   As of November 2020, yes, we were locked out

**H I N E S   R E P O R T E R S**                    **182**

1   of some portals.

2        Q.   And was that -- some of those records include

3   finance records of BNA?

4        A.   Possibly.  I don't know.

5        Q.   You don't know or you're guessing or it's a

6   good guess or bad guess?  Or no guess?

7             MR. SIPPRELLE:  Object.  Asked and answered.

8             He answered the question.  He said, he didn't

9   know.

10            MR. COOK:  (Inaudible.)

11  BY MR. COOK:

12       Q.   Were any of the lockouts including financial

13  records of BNA?

14            MR. SIPPRELLE:  Object.  Asked and answered.

15            THE WITNESS:  I don't know.

16  BY MR. COOK:

17       Q.   They asked you, "And you -- and you -- would

18  your answer regarding why you are the person most

19  qualified to testify regarding Byton's document

20  preservation also be -- also be because you are the most

21  knowledgeable of the four people left at the company?"

22            Answer:  "That's correct."

23            So as of that date, were you -- were you the

24  person who had the best skills of preservation, whatever

25  you want to call it?

1          MR. SIPPRELLE:  Object to the -- to the

2     question "best skills" as vague and ambiguous.

3     BY MR. COOK:

4          Q.   Can you answer that question, or shall I

5     repeat it for you?

6          A.   If the question is about the physical

7     documents at the Byton North America site, yes, I was

8     the most qualified person to know where those documents

9     were at the time.

10         Q.   Would that include electronic conservation of

11    those documents?

12         A.   The -- the electronic conservation of the

13    documents, Mr. Cook, as I testified before, they are on

14    various Cloud servers, so I wouldn't -- or portals, so I

15    wouldn't know what was sitting where.

16         Q.   How about the finance records, including

17    e-mails of BNA?  Was -- to the extent it was electronic,

18    did you do anything to preserve those records?

19              MR. SIPPRELLE:  Object.  Argumentative.

20              THE WITNESS:  Not my responsibility.

21    BY MR. COOK:

22         Q.   What?

23         A.   Not my responsibility to store or preserve

24    those documents.

25         Q.   Whose responsibility was it?

**H I N E S   R E P O R T E R S**                              184

1          MR. SIPPRELLE:  Object.  Calls for a legal

2    opinion.  Lacks foundation.

3    BY MR. COOK:

4          Q.   You can answer this?

5          A.   Documents in the company were -- like, those

6    were managed by the IT group.

7          Q.   Whose IT group?

8          A.   There was a central IT group in China, and

9    there were one or two support staff in the different

10   locations who were the liaison person for those IT

11   activities.

12         Q.   Sorry.  Maybe I didn't make it clear.

13         Who -- besides IT in China, who else had

14   control or preservation of the records of BNA, at least

15   that they were electronic?

16         MR. SIPPRELLE:  Object.  Misstates his

17   testimony.  Lacks foundation.

18   BY MR. COOK:

19         Q.   Why don't you -- why don't you restate your

20   answer, because I don't get it from you?

21         A.   I've stated that those records were managed --

22   the servers or whatever were managed by the IT group.

23   And there were some support staff in different locations

24   who were liaising with the central IT team to make sure

25   that any of the data transfer was working.

1      Q.   And those would be people in China; is that

2  correct?

3      A.   The -- the IT -- the central IT team was based

4  in China.

5      Q.   Okay.  And what's the name of the person in

6  charge of that?

7      A.   There -- there have been so many people in and

8  out, Mr. Kameswaran.  I would not know who was currently

9  there.

10          Just like Byton North America went through

11  financial troubles, so was Byton China.  So there's been

12  a lot of people down all over.

13     Q.   By the way, let's go back to the 2020 tax

14  return?

15          Were you the person who contacted the people

16  at the IT department in China --

17          MR. SIPPRELLE:  Object.  Vague.

18  BY MR. COOK:

19     Q.   -- to obtain these records so we can do our

20  tax return?

21          MR. SIPPRELLE:  Object.  Vague and ambiguous.

22          THE WITNESS:  No.  The corporation finance

23  team provided the information with a tax consultant in

24  the U.S. to do the tax.

25          And I only got involved when it came to --

**H I N E S   R E P O R T E R S**                    186

1 normally, I wouldn't sign off on those tax returns, and

2 I only got involved in 2020 because there was not -- not

3 a person to sign it.

4        And I specifically requested a power of

5 attorney to sign that tax return, so that we could file

6 those in time.

7 BY MR. COOK:

8    Q.   Maybe I missed something here?

9        Who contacted the IT people in China for

10 purposes of doing a tax return?

11       MR. SIPPRELLE:  Object.  Lacks foundation.

12 Assumes facts not in evidence.

13       THE WITNESS:  I -- I don't know, Mr. Cook.

14 BY MR. COOK:

15   Q.   Did you do it?

16   A.   No.

17   Q.   How would they know to generate sufficient

18 funds to do a tax return?

19       MR. SIPPRELLE:  Object.  Speculation.  Vague

20 and ambiguous.  Lacks foundation.

21       THE WITNESS:  I don't understand the question.

22 How would they know how much funds to raise?

23 BY MR. COOK:

24   Q.   Who -- who contacted the IT people in China to

25 provide sufficient information to complete a tax return?

1          MR. SIPPRELLE:  Object.  Lacks foundation.

2  Speculation.

3          THE WITNESS:  As I've mentioned before, the

4  corporate finance team submitted the information for tax

5  preparation purposes to the tax consultant directly.

6          So I don't know whom they contacted.  I don't

7  know who contacted who in the IT team.  I wouldn't know.

8  BY MR. COOK:

9      Q.   And the corporate -- is that the corporate

10  finance team that contacted the IT team in China to

11  produce sufficient information to do a tax return; is

12  that correct?

13          MR. SIPPRELLE:  Object.  Lacks foundation.  I

14  don't know.  I'm speculating here.

15  ///

16  BY MR. COOK:

17      Q.   Well, how -- how did corporate finance --

18  pardon me -- the corporate finance team know to contact

19  the IT team to do a tax return?

20          MR. SIPPRELLE:  Object.  Assumes facts not in

21  evidence.  Speculation.  Lacks foundation.

22          THE WITNESS:  The corporate finance team knows

23  the timetable for filing taxes in the U.S., and it's an

24  annual process.  So they don't need to know specifically

25  that they need to go and file taxes.

**HINES  REPORTERS**                    188

```
 1            They -- they know when the taxes are due.
 2    Maybe the tax consultant contacted them.  I -- I don't
 3    know.
 4    BY MR. COOK:
 5         Q.   How do you know -- how do you know that they
 6    know that?  How do you know that?
 7              MR. SIPPRELLE:  Object.  Misstates his
 8    testimony.
 9              He says, he doesn't know.  Not that he does
10    know.
11    BY MR. COOK:
12         Q.   No.  You're just -- you're just guessing that
13    maybe the corporate finance -- maybe they know IT and
14    maybe they would know to return and whatever would come
15    there to do the return?
16              Is that what you're telling me?
17              MR. SIPPRELLE:  Object.  Argumentative.
18    Harassing.
19    BY MR. COOK:
20         Q.   No.  You can --
21              MR. SIPPRELLE:  Lacks foundation.
22    BY MR. COOK:
23         Q.   -- answer that one.  No.  You can answer that
24    one, so --
25              MR. SIPPRELLE:  Do your best, Mr. Kameswaran.
```

**HINES  REPORTERS**                              189

1          THE WITNESS:  Maybe I should have said "I

2   don't know" and stopped right there.  My bad that I was

3   speculating the process that would normally work.

4   BY MR. COOK:

5        Q.   And -- and by the way, the people in IT, are

6   these people an -- experts in accounting?

7          MR. SIPPRELLE:  Object.  Lacks foundation.

8   Speculation.

9   BY MR. COOK:

10       Q.   You can answer that?

11       A.   The people in IT are not -- they're not

12   accountants.

13       Q.   Okay.  What are they trained in?

14          MR. SIPPRELLE:  Object.

15          THE WITNESS:  They are --

16          MR. SIPPRELLE:  -- Lacks --

17          THE WITNESS:  -- trained --

18          MR. SIPPRELLE:  -- foundation.

19          Go ahead.

20          THE WITNESS:  They are trained to manage IT

21   equipment and servers and software.

22   BY MR. COOK:

23       Q.   Which means what?

24       A.   Which means what I mentioned.  They're trained

25   to make sure that the computer hardware is working and

**HINES   REPORTERS**                            190

1  the software is working, and that any servers or

2  services that we are paying for IT, those services are

3  working.  That's their job.

4      Q.   So you -- you would agree with me that, if I'm

5  sitting here and I'm saying, "Well, gee whiz, why don't

6  you give me the -- the accounting records and all the

7  records of this that based on what you're telling me, I

8  should have them delivered to me by tomorrow from the --

9  the IT department?"  Isn't that correct?  That's what

10 you just --

11         MR. SIPPRELLE:  Object.

12 BY MR. COOK:

13     Q.   -- told me?

14         MR. SIPPRELLE:  Object.  Argumentative.

15 ///

16 BY MR. COOK:

17     Q.   You told me -- you just told me they have the

18 records, so why don't I have them tomorrow?

19         MR. SIPPRELLE:  Object.  Misstates testimony.

20 Argumentative.  Harassing.  Lacks foundation.

21 Speculation.

22 BY MR. COOK:

23     Q.   You can answer that one.  That's what you

24 said?

25     A.   They're not --

**H I N E S   R E P O R T E R S**                              191

1          MR. SIPPRELLE:  That's not what he said,

2     Mr. Cook.

3          Go ahead, Mr. Kameswaran.

4          THE WITNESS:  That's -- that's right.  That's

5     not what I said.  I said that they are responsible for

6     managing the IT hardware and software.

7          And they're not qualified accountants, and if

8     there are any documents or something that's requested of

9     them, someone needs to give them very clear instructions

10    on what is required and where they were stored and --

11    before they can help.

12    BY MR. COOK:

13       Q.   They -- they -- so what do they have?  Do they

14    have any of records, this IT department, or they don't

15    have the records?

16          MR. SIPPRELLE:  Object.  Vague and ambiguous.

17    Speculation.  Lacks foundation.

18          Again, you're asking -- you're asking a former

19    employee about the state of records for a company he

20    hasn't worked at for months.

21    BY MR. COOK:

22       Q.   You can answer the question.  As of whatever

23    date you were there and somebody wanted the records from

24    listening to you, I guess we'd have them in a day or

25    two; isn't that correct?

**H I N E S   R E P O R T E R S**                         192

```
 1              MR. SIPPRELLE:  Object.  Argumentative.
 2    Misstates the testimony.
 3    BY MR. COOK:
 4         Q.   You can answer that?
 5         A.   I -- I don't know.  As I mentioned before, I
 6    don't know?  What is the state of access to some of
 7    those Cloud-based servers and things, so it -- it will
 8    not be an easy job.
 9         Q.   But it was an easy enough job to file the
10    return for the tax year of 2020 -- isn't that
11    correct? -- of which you --
12              MR. SIPPRELLE:  Object.
13    BY MR. COOK:
14         Q.   -- signed?
15              MR. SIPPRELLE:  Object.  Argumentative.
16    BY MR. COOK:
17         Q.   Correct?
18              MR. SIPPRELLE:  Argumentative.  Misstates his
19    testimony, Mr. Cook.
20    BY MR. COOK:
21         Q.   Oh, you can answer that?
22         A.   It was not an easy enough job, and that is why
23    it took us an extension and another six months before we
24    were ready to file the taxes.
25         Q.   You did file -- you did file an accurate and
```

HINES REPORTERS                                              193

1  truthful return; isn't that correct?

2          MR. SIPPRELLE:  Object.  Asked and answered.

3  BY MR. COOK:

4      Q.   You can answer that?

5          MR. SIPPRELLE:  Lacks foundation.

6  BY MR. COOK:

7      Q.   You can answer that.

8      A.   We -- we filed a truthful return on the basis

9  of what we knew at that time.

10     Q.   Okay.  And then it says -- this one, I don't

11 understand -- it says, "And other than Byton's lawyers,

12 did you speak with anyone to prepare as the most

13 qualified witness especially on Byton document

14 preservation?"

15         Answer:  "No."

16         "And other than your prior testimony and your

17 internal e-mails you mentioned, did you review any other

18 documents to prepare as the most qualified witness on

19 Byton's document preservation?"

20         And the answer is, "No."

21         Is that correct?

22         MR. SIPPRELLE:  Objection.  Is what --

23         Again, I guess he's asking you if that was

24 correct as of your deposition.

25         THE WITNESS:  That was correct as of the

**H I N E S   R E P O R T E R S**                                    194

1    deposition in November 2020.

2    BY MR. COOK:

3        Q.   Did you change your mind in that deposition?

4        A.   I'm sorry.

5        Q.   Isn't it true you made -- when you made --

6    came back for the second deposition, you changed your

7    mind in some of your testimony; isn't that correct?

8             MR. SIPPRELLE:  Object.  Misstates --

9    misstates his second deposition.  Argumentative.

10            THE WITNESS:  Specific to certain engineering

11   documents, I had made an error in my first -- or I made

12   an assumption in my first deposition, which was

13   corrected with a declaration before the deposition.

14   BY MR. COOK:

15       Q.   By the way, who -- who was in charge of

16   engineering employees at BNA?

17            MR. SIPPRELLE:  Objection.  Vague as to time.

18   BY MR. COOK:

19       Q.   Let's say, about, 2019?

20            Who was in charge?

21       A.   There were various engineering teams.  They

22   all reported to our chief engineer.

23       Q.   Who was that?

24       A.   Mr. Toric.

25       Q.   Now, when did he leave BNA?

**HINES REPORTERS**                              195

1        A.   I don't recall the exact time, but maybe early

2   2020.

3        Q.   Somebody asked you, "What about nonengineering

4   employees?  What was the normal process for

5   nonengineering employees document storage?"

6             And you said, "Again, every function had their

7   own way of storing documents in the different

8   repositories, but anything that was project-related were

9   stored in project locations under differential

10  functional directories."

11            So, in fact, wasn't it true that all of the

12  records, whatever they are, finance statements and the

13  like, wasn't that digitized and then stored somewhere;

14  is that correct?

15            MR. SIPPRELLE:  Object.  Vague.  Overbroad.

16  Misstates prior testimony.

17            The question -- the question you read was

18  asking about engineering records, but go head,

19  Mr. Kameswaran.

20  BY MR. COOK:

21       Q.   You can answer the question?

22       A.   Yeah, at that time, the answer was specific

23  to, I think, engineering records as to where they were

24  stored.

25            And -- and the nonengineering documents, as

**HINES REPORTERS**                                    196

```
1    from my previous testimony, were stored in different
2    folders.
3              And again, as to those -- to the locations of
4    those servers or Cloud servers or whatever it was, I
5    wouldn't know the particulars behind that.
6         Q.   And then it says, "Now, testifying as to
7    Byton's person most qualified and Byton's policies
8    regarding document retention, preservation, search,
9    collect -- and collection after EDAG filed this suit --
10   filed its lawsuit, were Byton employees instructed to
11   take special measures to preserve electronically-stored
12   information related the lawsuit?"
13             And your answer is, "No."
14             Is that correct?  So everybody sit tight;
15   don't do anything?
16        A.   That was the testimony at that time.
17        Q.   Now -- and then we asked you or somebody asked
18   you, "How are Byton's e-mails stored?"
19             Answer:  "Claud" -- probably, "Cloud-based
20   Outlook."
21             Is that correct?
22        A.   Yeah.  At that time it was a Cloud-based
23   Outlook server.
24        Q.   What did you do with the e-mails?
25        A.   That was the e-mails, yes.
```

**H I N E S   R E P O R T E R S**                                197

1    Q.   Did you delete them?

2    A.   Sorry.

3    Q.   Did you delete them?

4         MR. SIPPRELLE:  Did you, personally, delete

5    the e-mails?

6  BY MR. COOK:

7    Q.   Anybody at BNA?

8         Did anybody delete them?

9    A.   No.

10   Q.   Okay.  So when you sold, were those e-mails on

11   the 500 laptops?

12   A.   No.  As I mentioned, the laptops were backed

13   up, erased before they were sold.

14   Q.   Okay.  And then it says, "And Byton still has

15   access today to the Cloud-based e-mail backups;

16   correct?"

17        Answer:  "Yes."

18        Was that correct even as of -- even the day

19   you left your employment?

20   A.   There was a transition from Outlook to another

21   e-mail provider or an e-mail software sometime in 2021.

22   So I don't know the exact situation.

23   Q.   Then it says, "Did Byton search any employee

24   e-mail accounts to create relevant documents for this

25   case?"

**HINES REPORTERS**                    198

1          Answer:  "Yes, that's my understanding."

2          Question:  "Which employee e- -- e-mail

3    accounts were searched?"

4          Answer:  "The people who had any direct --

5    leadership-level people who are directly in contact with

6    EDAG, as well as the key engineering and supply chain

7    people."

8          So wouldn't all of these e-mails be sitting

9    around someplace, at least as of the time you left?

10          MR. SIPPRELLE:  Object.  Lacks -- lacks

11    foundation.

12    BY MR. COOK:

13      Q.   You can answer that?

14          MR. SIPPRELLE:  And, again, Counsel, for --

15    just so -- apparently, you're not aware of it, but all

16    of those were produced during the course of the

17    arbitration.  So you have those -- or at least your

18    client has them.

19          But go ahead, Mr. Kameswaran.

20          THE WITNESS:  So as for my previous statement,

21    at the time of my testimony in November 2020, those

22    e-mails were accessible.  And all those e-mails were

23    searched for all the people who were in direct contact

24    with EDAG.  And those were produced.  In terms of access

25    to the e-mails now, I do not know the situation.

```
 1   BY MR. COOK:
 2        Q.   As of -- oh, I'm sorry.  Hold on.  Bear with
 3   me?
 4             As of January 8th, 2000- -- 2021, your
 5   deposition was taken, and then they asked you -- and
 6   you -- "It is correct that you -- you do not know what,
 7   if any, search terms were used to -- to search Carsten
 8   Breifeld's e-mail account?"
 9             Answer:  "Correct."
10             Question:  "Teresa Shi is still employed
11   Byton; correct?"
12             Answer:  "Correct.
13             Well, was Ms. Shi, as of January 2021, an
14   employee of BNA?
15             MR. SIPPRELLE:  Object.  Asked and answered at
16   least five or ten times, but go ahead.
17             THE WITNESS:  I -- I -- I know she left the
18   business at some time, Mr. Cook.  But I'm not aware of
19   the exact timing of when she left.
20             And if my testimony at that time was yes, she
21   was an employee, then maybe she was an employee at that
22   time.
23             I do not know the exact time when she left.
24   You're trying to ask me to recall something from 15
25   months back.
```

**H I N E S   R E P O R T E R S**                    **200**

1  BY MR. COOK:

2      Q.   He asked you is -- was she an employee of BNA

3  at that time?

4      A.   She was never an employee of BNA.

5      Q.   Let's take a look at No. 301.  "But when you

6  say 'they,' who asked you for specific documents related

7  to invoices?"

8           Answer:  "Internal counsels.  No, no not from

9  my -- not my e-mails, you but from the department

10  repository -- but from the finance department repository

11  hard copies and so on."

12          So what's the finance department repository?

13      A.   The finance department's repository was

14  digital locations for storing the documents as for some

15  physical filing cabinets where we had copies of supply

16  invoices and so on.

17      Q.   I'm looking at the word -- your words,

18  "finance department repository?"

19          Is that electronic, or is that paper?

20      A.   It's both.

21      Q.   Okay.  So was it -- was that in the computer

22  system that you had in Santa Clara, or was that in

23  China?

24      A.   As I said, I do not know the location of the

25  Cloud servers to where they were.  Whether they were in

1   China or India or the Philippines or -- I -- I do not

2   know.

3        Q.   Well, it says "repository?"

4             What's "repository" mean?

5        A.   A repository means a location where the

6   documents are stored.

7        Q.   Well, that would be paper documents; is that

8   correct?

9        A.   It could be.

10            MR. SIPPRELLE:  Object.  Asked and answered.

11            THE WITNESS:  These are paper documents.

12   BY MR. COOK:

13        Q.   It says, "But the finance department

14   repository, hard copies and so on?"

15            So where are the copies of the finance

16   department repository?

17            MR. SIPPRELLE:  Object.  Asked and answered.

18   Lacks foundation.  At this point, no longer being at the

19   company.

20            Go ahead.

21            THE WITNESS:  It's stored both digitally

22   and -- and physically.  That -- that's what I've said

23   twice -- twice now.

24   BY MR. COOK:

25        Q.   It says, "and hard copies on?"

1          What -- what happened to the hard copies?

2      A.    The hard copies were in -- were in filing

3  cabinets in the Santa Clara office.

4      Q.    Where are they now?

5          MR. SIPPRELLE:  Object.  Lacks foundation.

6          THE WITNESS:  I do not know, sir.

7  BY MR. COOK:

8      Q.    Well, when you left before -- when you were an

9  employee there, what happened to the hard copies of the

10  finance department repository?

11      A.    When I was an employee there, the cabinets

12  were in the building.

13      Q.    What happened to them?

14          MR. SIPPRELLE:  Object.  Lacks foundation.

15          THE WITNESS:  I don't know.

16  BY MR. COOK:

17      Q.    Somebody stole them?

18          MR. SIPPRELLE:  Counsel, he said he doesn't

19  know.

20          What, do you want him to start speculating if

21  somebody broke into --

22          (Overlapping.)

23          MR. COOK:  Well, I'm (inaudible.)

24          MR. SIPPRELLE:  -- the building?

25  BY MR. COOK:

1      Q.   Do you have any explanation what happened to

2  the -- quote -- finance department repository, hard

3  copies and so on?

4           MR. SIPPRELLE:  Object.  Asked and answered.

5           He said he doesn't know.

6           THE WITNESS:  The documents, they existed

7  while I was there, and I don't know where they are now.

8  BY MR. COOK:

9      Q.   Has it ever come across your mind that records

10  like that might be important for any reasons, including

11  just simply filing tax returns?

12           MR. SIPPRELLE:  Object.  Argumentative.

13           Go ahead.

14           THE WITNESS:  The physical records were not

15  really important for filing tax returns because we did

16  have digital copies of those.

17           As I said, the physical records were really

18  the signed piece of paper from the engineering group,

19  which was more for internal records to say that it was

20  approved by an engineering people before payments were

21  made.

22           But if you saw my prior testimony, we said

23  that we scanned those documents and sent them for

24  payment processing, right.

25           So those documents existed digitally as well.

**HINES REPORTERS**                           204

1  So the physical documents were not super critical for

2  tax filing purposes.

3  BY MR. COOK:

4      Q.   It's a fair statement that -- well, you -- for

5  whatever reason that -- so you're telling me that the

6  finance department repository hard copies were not

7  apparently important because you thought that the

8  digital version of the records would be sufficient;

9  isn't that correct?

10          MR. SIPPRELLE:  Object.  Argumentative.

11  Misstates his testimony.

12  BY MR. COOK:

13      Q.   You can answer that one?

14      A.   Just from what we call a risk mitigation point

15  of view, it was important to keep the documents

16  digitally because if we kept all the documents as just

17  physically documents, if there is a fire or something,

18  we would have nothing.

19      Q.   But you say -- your judgment, in listening to

20  you, it was important to have the -- the finance records

21  at least in some digital form, which is better than a

22  paper form?

23          That seems to be a good view -- a good

24  recitation of this matter.

25          MR. SIPPRELLE:  Object.  Misstates his

 1   testimony.

 2           Go ahead.  You can answer.

 3           THE WITNESS:  Yeah.  I said documents resided

 4   in digital and physical form.

 5   BY MR. COOK:

 6       Q.   Your belief is that the digital form would be

 7   accurate; is that correct?

 8           MR. SIPPRELLE:  Object.  Misstates his

 9   testimony.

10           THE WITNESS:  The -- the -- if -- the digital

11   form is a copy of the document that's in the physical

12   form.  Both are accurate.

13   BY MR. COOK:

14       Q.   Okay.  And, obviously, it's better to have --

15   is it better to have the digital form than the paper

16   form; is that true?

17       A.   From this point of view, yes.

18       Q.   The answer's "yes," am I correct?

19       A.   Correct.

20           MR. SIPPRELLE:  Object.  Asked and answered.

21   BY MR. COOK:

22       Q.   Okay?

23           MR. SIPPRELLE:  So -- and, again, Mr. Cook,

24   those documents were produced in the arbitration.  If

25   you want them again, I'll get them to you.  I'm

**HINES  REPORTERS**                                    206

1  surprised your client hasn't given you those documents.

2  BY MR. COOK:

3       Q.   What is an s-drive?

4       A.   An s-drive is a drive that is -- a drive name

5  that is in one of the servers.

6       Q.   What was in the s drive?

7       A.   An s-drive -- "s" just stand for shared drive,

8  so all kinds of documents would be an s-drive.

9       Q.   Would the s-drive include the financial

10  records on behalf of BNA?

11       A.   I cannot recollect whether the finance

12  documents reside on an s-drive or -- or another drive.

13  I cannot remember.

14       Q.   Well, let me -- I'll read this to you.  It

15  says, "What kind of documents are stored on the

16  s-drive?"

17           Answer:  "Some of the company's financial

18  details and so on, which has restricted access, company

19  finances, which has restricted access."

20           So does that refresh your recollection sitting

21  here that, in fact, the s-drive did include company

22  financial details and so on?

23       A.   Okay.  That may be correct.

24       Q.   Okay?

25       A.   Yeah.

1        Q.   Okay.  And then it says, "Which has restricted

2   access?"

3             What's "restricted access"?

4        A.   So, again, as for my prior statement, there

5   was some directories that we had access to in Byton

6   North America, and there were some directories that we

7   did not.  That is what it means by restricted access.

8        Q.   I'm sorry.  Could you -- I'm sorry?

9             The restricted access means that -- did you

10  have access to the -- to these records here?

11            It says, "Some of the company's financial

12  details and so on, which has restricted access --

13  company financials which has restricted access."

14            Is that -- did I get that correctly?

15       A.   No.  What I mentioned is there are various

16  documents stored in s-drive.  There are certain folders

17  that we have access to or certain people have access to.

18  And there are certain folders that are restricted in

19  terms of access.

20       Q.   But I'm looking at this short sentence.  It

21  says, "Company financials, which has restricted access?"

22            Does that means that -- that the -- that there

23  was restricted access to you that you didn't have access

24  to company financials?

25            MR. SIPPRELLE:  Object.  Asked and answered.

1  Explained repeatedly throughout the depo- -- throughout

2  the testimony.

3          Go ahead, Mr. Kameswaran.  I guess you can

4  explain it to him again.

5          THE WITNESS:  That's correct that I did not

6  have access to all the company's financials.  I had

7  access to -- only to certain folders, which was required

8  for me to do the job.

9          Company financial information is confidential,

10  and it was only available to some very senior leadership

11  people in the finance team.  And I don't know even

12  whether the CEO had access.

13  BY MR. COOK:

14      Q.  I'm sorry?

15          The CEO didn't even have access to the

16  company's financials?  Is that what you're telling me?

17          MR. SIPPRELLE:  I think what he said is he

18  doesn't even know if he did or did not.

19          Go ahead, Mr. Kameswaran.

20          MR. COOK:  Oh, I'm sorry.

21          THE WITNESS:  Yes.  These -- these folders

22  were confidential -- contained confidential information,

23  so the access was restricted to very few people in the

24  company.

25      Q.  The company's BNA; is that correct?

**H I N E S   R E P O R T E R S**                          209

1      A.    Sorry.

2      Q.    You said -- you said, restricted to the people

3  in the company?

4            "The company" being BNA; isn't that correct?

5      A.    The shared drive is a global shared drive.

6  It's not a BNA specific shared drive.

7            So corporate finance documents that are stored

8  in there had restricted access and was accessible to

9  only to very few people in the company for

10 confidentiality reasons.

11     Q.    I'm looking at the words "Company financials?"

12           Who's the company?  That's what it says on

13 Page 304, Line 19.  It says, "Company financials."

14           Who is "the company"?

15     A.    The -- the different entities of FMC Cayman.

16     Q.    That would be who?

17     A.    That would be Byton North America and Byton

18 Hong Kong, Nanjing New Energy entities.  I don't

19 remember the names of all the entities.

20     Q.    Well, did -- whoever was the, you know,

21 running BNA, was he blocked out of access to the company

22 financials called "restricted access"?

23           MR. SIPPRELLE:  Object.  Lacks foundation.

24           THE WITNESS:  What do you mean by "who was

25 running"?

**HINES REPORTERS**                              210

 1  BY MR. COOK:

 2       Q.   Well, who -- who -- who -- let's -- let's just

 3  deal with January -- of thousand -- January 2021, and

 4  maybe you can tell me who was running the company?

 5            MR. SIPPRELLE:  Object.  Vague and ambiguous.

 6            You're referring to Byton North America,

 7  Counsel?

 8            MR. COOK:  (Inaudible.)

 9            MR. SIPPRELLE:  Go ahead, Mr. Kameswaran.

10            THE WITNESS:  Yes, Mr. Cook, are you talking

11  about Byton North America?

12  BY MR. COOK:

13       Q.   Yeah?

14            Byton North -- did somebody at BNA have access

15  to the company financials?

16            MR. SIPPRELLE:  Object.  Asked and answered.

17            THE WITNESS:  No.

18  BY MR. COOK:

19       Q.   Does that include everybody, including who the

20  CA- -- CEO was; is that correct?

21            MR. SIPPRELLE:  Assuming there was a CEO in

22  2021.

23            You can answer.  Go ahead.  Assumes facts not

24  in evidence.

25            THE WITNESS:  Yes.

1  BY MR. COOK:

2     Q.  What's your answer, sir?

3     A.  I -- I can't remember who had access.

4         A CEO would not -- yeah.  A CEO would not be

5  going into the company financial information himself or

6  herself.

7         They would be requesting the information from

8  the corporation finance team to present the information

9  to them.  So I -- I do not know.

10     Q.  Okay.  And then this says, "Does the s-drive

11  itself have restricted access or certain files have or

12  folders have restricted access?"

13         And your answer is:  "Most of the s-drive has

14  restricted access.  And that restriction would include

15  BNA."

16         Is that a fair statement, sir?

17     A.  That's correct.

18     Q.  Okay.  And -- okay.  And then it says, "So the

19  s-drive was not searched to identify relevant documents

20  for this litigation?"

21         And the answer is:  "No."

22         So we got that right?  Is that correct?  Do

23  you want me to reread it to you, sir?

24     A.  Are you reading -- I mean, that's based on my

25  testimony from --

**HINES REPORTERS**      212

1        Q.   Yes.   That's correct?

2        A.   It was right at that time.

3        Q.   Hold on.   Bear with me.

4             What is an HR team, by the way?

5        A.   What is an HR team.

6        Q.   Yeah.

7             It says -- it says, "So the I-team would have

8    an asset register of what IT equipment issued to the

9    employee.   The HR team, when they get notified of the

10   person living, would notify IT and get access to that

11   particular asset and detail.   And as part of the

12   checklist, they would make -- they would make sure that

13   the employee returns those assets back to Byton."

14            That's a correct statement, sir?

15       A.   Yes, that's a correct statement.

16       Q.   Then it says, "So you testified as Byton's

17   most qualified witness previously that Byton -- Byton

18   China's corporation finance team stored the electronic

19   version of EDAG invoices; is that correct?"

20            The answer's correct?   Is that -- is that

21   correct?

22       A.   Yes.

23       Q.   Okay.   And then it says, "And then you

24   testified as Byton's most-qualified witness that the

25   signed copies as you just mentioned would be in the U.S.

**H I N E S   R E P O R T E R S**                                213

1  office archives of the Santa -- of the Santa Clara Byton

2  office?"

3          Is that correct?  And that's correct?  Is that

4  correct?

5      A.   That's correct.

6      Q.   Okay.  And U.S. -- just to make sure, U.S.

7  office archives, those would be office archives in Santa

8  Clara, or would those be in China?

9      A.   The Santa Clara office archives were in Santa

10 Clara.

11     Q.   And did anybody else look for the U.S. office

12 archives than what you got -- then what was done as part

13 of the litigation?

14     A.   I didn't understand that.

15     Q.   What -- what work was done to locate records?

16         MR. SIPPRELLE:  Object.  Vague as to time.

17 BY MR. COOK:

18     Q.   As of November 2020?

19     A.   So all documents pertaining to the EDAG

20 litigation were handed over as Mr. Sipprelle mentioned

21 before to the EDAG legal team.

22     Q.   And then you say -- our guy says -- or you --

23 or you testify that you're not sure whether or not the

24 hard copy file at the U.S archives was searched prior to

25 November or December of 2020?

**H I N E S   R E P O R T E R S**                    214

 1          Answer:  "Yes, I'm not aware."

 2          Question:  "How did you learn that the hard

 3  copy file in the finance department has not been

 4  previously reviewed?"

 5          And then there's an objection.  And then the

 6  witness says, "I cannot answer the question."

 7          So what happened to the hard copy in the

 8  finance department?  Do you know?

 9          MR. SIPPRELLE:  Object.  Asked and answered.

10  Lacks --

11  BY MR. COOK:

12      Q.   You can answer --

13          MR. SIPPRELLE:  -- foundation.

14  ///

15  BY MR. COOK:

16      Q.   -- that one?

17          MR. SIPPRELLE:  Asked and answered.  Lacks

18  foundation.

19          Go ahead.

20          THE WITNESS:  Any documents relevant to EDAG

21  invoices were collected and handed over to the EDAG

22  legal team as -- per their request.

23  BY MR. COOK:

24      Q.   Now, let me move on to -- we're getting near

25  the end of this?

**H I N E S   R E P O R T E R S**                    **215**

```
 1              THE COURT REPORTER:  Can we take a quick
 2   break?
 3              MR. COOK:  Sure.  By all means.
 4              THE COURT REPORTER:  Thank you.
 5              MR. COOK:  How would you like -- you tell me.
 6              THE COURT REPORTER:  Ten or fifteen.
 7              MR. COOK:  Why don't we make it -- if you
 8   want, it's -- we're near -- we need about an hour or
 9   less.  So why don't we see you at 3:00?  Is that okay?
10              THE COURT REPORTER:  Yeah, that sounds good.
11              MR. COOK:  Okay.  That way, everybody can, you
12   know, do whatever they want to do.
13              See you guys at 3:00.
14              MR. SIPPRELLE:  Okay.
15              MR. COOK:  All right.
16              THE CLERK:  Okay.  We're --
17              MR. COOK:  Thank you.
18              THE CLERK:  -- off the record.
19              MR. COOK:  Thank you.
20              (Whereupon a recess was taken.)
21              THE CLERK:  Okay.  Everyone, we're back on the
22   record in 21:4736.
23              Go ahead, Mr. Cook.
24              MR. COOK:  Thank you, very much.
25   BY MR. COOK:
```

1      Q.   You know what?  I'm looking for the -- I seem
2  to not have it here -- FC- -- FMC Cayman?
3           So do you have an address for them?
4      A.   No, I do not have an address for them.
5      Q.   Anybody who would know -- have an address for
6  this person?
7           MR. SIPPRELLE:  Object.  Foundation.  I don't
8  think it's a person, Mr. Kameswaran.  I think it's a
9  company.
10  BY MR. COOK:
11     Q.   How about an lL- -- whatever it is.  Let's
12  deal with that and then we'll try the individual?
13          Can you tell me where the company is, if you
14  know?
15          MR. SIPPRELLE:  Object.  Asked and answered.
16  BY MR. COOK:
17     Q.   No?
18          MR. SIPPRELLE:  Go ahead.
19  BY MR. COOK:
20     Q.   What?
21     A.   The company is registered in Cayman.
22     Q.   That's all you know?
23     A.   That's all I know.
24     Q.   And Zhang Ying -- Z-h-a-n-g, Y-i-c-k [sic] --
25  Do you know where he's located?

**H I N E S   R E P O R T E R S**                    217

1         A.   No, I don't.  I wouldn't know.

2         Q.   Do you have an e-mail for him?

3         A.   Definitely not.

4         Q.   How about Byton Limited?  Do you have an

5    address for them?

6         A.   I do not remember the address.  It's a lot of

7    global locations, Mr. Cook.

8         Q.   By the way -- if I asked you before, forgive

9    me -- for Byton Limited, who is the chief executive

10   officer of that one?

11             MR. SIPPRELLE:  Object.  Lacks foundation.

12             THE WITNESS:  I -- I don't know who's the

13   current CEO of Byton Limited.

14   ///

15   BY MR. COOK:

16        Q.   The last one.  I'll take him?

17             MR. SIPPRELLE:  Lacks foundation.

18             You can answer, if you know.

19             THE WITNESS:  I'm not aware.

20   BY MR. COOK:

21        Q.   Okay.  So let's make this real easy?

22             Who is the Matt Barter?  Do you know?

23        A.   Matt Barter was the head of the legal

24   department.  A former employee that left the company

25   quite some time back.

**H I N E S   R E P O R T E R S**                     218

1       Q.   The lawyer; am I correct?

2       A.   Yes.

3       Q.   And there was some lawsuit filed by Byton

4  North America, and the defendant Iconiq -- I- --

5  I-c-o-n-i-q -- Motors North America?

6       Do you have anything to do with that lawsuit?

7       A.   Nothing at all.

8       Q.   It says here -- and Mr. Barter is apparently

9  the chief counsel.  But he says, "As a result of my

10  employment with Byton Limited, my review of corporate

11  records and statements from employees with personal

12  knowledge, I could and would testify to all of the

13  following statements?"

14       So given that he represents here BNA and Byton

15  Limited, do you know what corporate records he might be

16  talking about?

17       MR. SIPPRELLE:  Object.  Calls for

18  speculation.

19       I -- I think -- I think -- hold on.  And what

20  you read is -- he represent -- he -- he was employed by

21  Byton Limited, not BNA.

22       But go ahead, Mr. Kameswaran, you can answer

23  the question.

24       THE WITNESS:  I wouldn't know anything about

25  that particular litigation or -- or the background to

**H I N E S   R E P O R T E R S**       219

1    that.  Sorry.

2    BY MR. COOK:

3        Q.  Well, you know what?  I was looking at the --

4    the s- -- whatever the -- make sure I get this thing

5    straight -- in the s-drive, I think, which you have it

6    here.  They called it the -- I'm sorry.  Going too fast.

7            S-drives.

8            Does the s-drive include records of Byton

9    Limited?

10           MR. SIPPRELLE:  Object.  Calls for

11   speculation.  Lacks foundation.

12           THE WITNESS:  All I know, and as I mentioned,

13   the s-drive was a global drive.  Which entity uses that

14   drive, I wouldn't be aware of that.

15   BY MR. COOK:

16       Q.  And global, would that include Byton Limited?

17           MR. SIPPRELLE:  Object.  Lacks foundation.

18           THE WITNESS:  I wouldn't know, sir.

19   BY MR. COOK:

20       Q.  Well, we have another one from Gong Chen,

21   C-h-e-n, in this litigation.  And he says pretty much

22   the same.  "As a result of my role with the Byton group

23   of companies and my review of corporate records and

24   statements from current and former employees, with

25   personal knowledge, I could and competently testify to

1   all of the following statements?"

2         So he's talking about my review of the

3   corporate records that would appear to be corporate

4   records of BNA.

5         How did -- how did Mr. Chen get the s-drive?

6         MR. SIPPRELLE:  Object.  Lacks foundation.

7   Speculation.  Assumes facts not in evidence.

8   BY MR. COOK:

9      Q.   You can answer?

10        MR. SIPPRELLE:  Argumentative.

11        THE WITNESS:  Sorry.  I don't know when he

12  wrote that declaration.  He was an employee of the Byton

13  North America at a point in time.

14  ///

15  BY MR. COOK:

16     Q.   Well, it says here September 1, 2021?

17        But nonetheless, how did -- how did Mr. Chen

18  get into the s-drive?

19        MR. SIPPRELLE:  Object.  It lacks foundation.

20  Assumes facts not in evidence that he got into the

21  s-drive.  A complete speculation on the part of

22  Mr. Kameswaran.

23        Go ahead.

24        THE WITNESS:  Again, people have access to

25  s-drive for their relevant folders.  Just because

**H I N E S   R E P O R T E R S**                               221

 1  someone had access to a s-drive does not mean that they

 2  had access -- I don't know.  You're generalizing it by

 3  saying "corporate records."  So it -- it could be

 4  anything.  I -- I don't know.

 5  BY MR. COOK:

 6      Q.   So it's possible he has access to it; is that

 7  correct?

 8           MR. SIPPRELLE:  Object.  Speculation.  Lacks

 9  foundation.

10           Don't guess about things, Mr. Kameswaran.

11           THE WITNESS:  I -- I don't know.

12  BY MR. COOK:

13      Q.   Well -- and then I have another one from Zhang

14  Ying dated on December -- January 12, '22 approximately.

15  And he says something pretty much the same?

16           "As a chairman of the board of directors of

17  FMC Cayman, I have acquired personal knowledge of the

18  history, structure and operations of Byton Limited and

19  Byton NA, which are both these guys, based upon my

20  review of corporate documents and records as well as

21  discussion with other individuals with personal

22  knowledge."

23           So is Mr. Ying -- does he have access to the

24  s-drive?

25           MR. SIPPRELLE:  Object.  Lacks foundation.

**H I N E S   R E P O R T E R S**                    222

1  Speculation.

2         THE WITNESS:  I -- I don't even know the

3  person, Mr. Cook, so I don't know.

4  BY MR. COOK:

5     Q.  Well, they say all they have review of

6  corporate -- to corporate documents that would be

7  Mr. Ying, and that would be Mr. Chen, and that would be

8  Mr. Barter.  They seem to have access to some records?

9         Do you have any idea -- do you think I can get

10 access to it if -- if -- let's see -- if the lawyer

11 Barter gets it and Mr. Chen gets it and Mr. Ying gets

12 it?

13        So to -- any -- do you know in your -- up to

14 the time you left, any reason why I wouldn't get those

15 records?  Apparently, three people got them.

16        MR. SIPPRELLE:  Objection.  Argumentative.

17 Harassing.  Calling for speculation.  It lacks

18 foundation.

19        THE WITNESS:  So Mr. Barter left the company

20 quite some time back, and I know that Mr. Chen's no

21 longer an employee of Byton either.  So I -- I don't

22 know how they would have access to any of the records.

23 BY MR. COOK:

24    Q.  Well, Mr. Chen -- well, when he signed his

25 name, this is September 1, he said -- it's very

1    interesting.  He said of this one, "I am the director."

2    This thing is dated -- oh, this is good.  This is in

3    September.  He was still an employee of -- you know, "I

4    am the director of intellectual property for the Byton

5    group of companies?"

6              So he's an employee for all of these

7    companies?

8              MR. SIPPRELLE:  Object.  Lacks foundation.

9    Speculation.

10   BY MR. COOK:

11       Q.   So isn't it true that, if he's the director of

12   intellectual property for the Byton group of companies,

13   that he would have knowledge of everything here; isn't

14   that correct?

15             MR. SIPPRELLE:  Object.  Speculation.  Lacks

16   foundation.  Overbroad.  Vague and ambiguous.

17   BY MR. COOK:

18       Q.   You can answer that?

19       A.   So I -- I wouldn't know his contractual

20   relationship.  He -- he was an employee of Byton North

21   America, to my knowledge, and that would be it.

22       Q.   Do you know whether he quit or left or where

23   he went?

24       A.   Um --

25             MR. SIPPRELLE:  Object.  Compound.  That's

1    like three -- three questions, but go ahead.

2          THE WITNESS:  Sorry.  I wouldn't know.

3    BY MR. COOK:

4      Q.   Do you know whether he quit BNA?

5      A.   I know that he's no longer an employee of BNA,

6    and I don't know where he went or...

7      Q.   Well, did he -- is it working for another of

8    the Byton group of companies?

9          MR. SIPPRELLE:  Object.  Lacks foundation.

10          THE WITNESS:  Sorry, sir.  I wouldn't know.

11    BY MR. COOK:

12      Q.   Okay.  Well, apparently, these three people

13    have access at some time towards -- quote -- "A review

14    of corporate records?"

15          Is there anybody else you can share with me

16    who would have access to the corporate records and

17    statements from statements and former employees?

18          Who -- tell me who else.

19          MR. SIPPRELLE:  Object.  Lacks foundation.

20    Speculation.

21          THE WITNESS:  "Corporate records" is a very

22    open statement.  I mean, so I wouldn't know who else

23    would have access to corporate records.  I don't -- or I

24    never did control any of those accesses.  I wouldn't

25    know.

**H I N E S   R E P O R T E R S**                        **225**

```
 1   BY MR. COOK:
 2       Q.   But you don't have any access to the s-drive;
 3   isn't that correct?
 4       A.   No, not since I left employment.
 5       Q.   Well, the answer is, you don't have answer --
 6   isn't that correct? -- to the s-drive?
 7       A.   Correct.
 8       Q.   Okay.  Do you know why -- if you know, why BNA
 9   did not file a statement of information, which was --
10   would be due, approximately, November of 2020, if you
11   know?
12       A.   No, sir.  I'm not familiar with it.
13       Q.   Who's Jonathan Ye?
14            That's J-o-n-a-t-h-a-n, Y-e.
15            Do you know who he is?
16       A.   He was an employee of Byton North America.  He
17   left the company, again, sometime in 2020, I would say.
18       Q.   Okay.  And do you know why he left?
19       A.   I -- I don't know.
20       Q.   Okay.  And we're getting very near to the end
21   here.  Be patient with me.  Here we go.
22            Now, Mr. Ying -- Mr. Ying does state -- and
23   just to make sure I didn't misstate myself here, he
24   says, "Byton Limited has never received monetary
25   proceeds from any business activities of Byton NA in the
```

1  United States," which is his declaration of 85-1,

2  Page 3.

3          Is that a correct statement, sir?

4      A.   If that was a declaration, that's his

5  declaration.

6      Q.   I'm asking you whether it's correct?

7          MR. SIPPRELLE:  Object.  Lacks foundation.

8  Speculation.

9  BY MR. COOK:

10     Q.   Well, can you answer it?

11     A.   No.

12     Q.   Why?  Is it -- you -- do you believe it's --

13 do you believe it's false?

14     A.   I'm sorry.  I think your question was whether

15 Byton received -- Byton Limited received anything from

16 Byton NA, you know, or -- could you please repeat the

17 question.  Sorry.

18     Q.   Okay.  I'll read it again.

19          "Byton Limited has never received monetary

20 proceeds from any business activities of -- of Byton NA

21 in the United States."

22          And is that a true statement, as far as you

23 know?

24     A.   That's a true statement.

25     Q.   Okay.  And I -- I turned over all of our

HINES  REPORTERS                               227

1  records from Silicon Valley, and we found -- without too

2  much effort here -- actually, I shouldn't say that.  It

3  was a lot of effort?

4          November 1, 2018, it was $3,239,906.  And then

5  it was 11/16, it was 2,700,000.  And then the next one

6  was May 21, 2019 for $3,000,000.  June 17, 2019 for

7  800,000.  June 21, 2019 for 2,200,000.  Next one is

8  August 5, 2019 for 1500.

9          Hold on.  No.  That's going the other way.

10          And let me see if I have anybody else.

11          No, I think that's it.  Hold on.  I think

12  those are enough.

13          So maybe you can -- if you know -- know

14  anything here, why does Mr. Ying say, under oath, that

15  "Byton Limited has never received monetary proceeds from

16  any business activities of Byton NA in the United

17  States" when the bank records say something else?

18  Million of dollars?  Do you have any explanation for

19  that?

20          MR. SIPPRELLE:  Object.  Argumentative.

21          You're misstating -- you're equating wire

22  transfers with transfers of funds with business

23  activities.

24          So you're misstating -- first of all, you're

25  not showing him the bank records, so it's a little

1  unfair to ask him about these transfers.  But you're

2  also mischaracterizing the transfers, so it's an

3  inappropriate question.

4        But go ahead, Mr. Kameswaran, if you

5  understand what he's asking.

6        THE WITNESS:  Without seeing those specific

7  bank transactions, it's difficult for me to comment on

8  what those specification transfers were.

9        And -- but any money that was moved between

10 Byton NA or paid from Byton NA to any of the other

11 entities was for specific activities that was completed

12 by another entity in another location, be it Germany or

13 Hong Kong.

14       There were activities happening in all

15 locations, and Byton NA would have paid for those.  And

16 also, you need to look at the bank records to see what

17 money was coming into Byton NA before it went to any of

18 the other locations for -- for payment.

19       Byton NA was getting funds in for the work

20 that was being done by Byton NA itself, as well paying

21 some of the other entities if Byton NA asked some of the

22 other entities to do any work for them.

23 BY MR. COOK:

24       Q.   Didn't you use the word, record -- "records"

25 in your answer?

1          A.    I said "bank statements."

2          Q.    You didn't say "records"?  You said "bank

3     statements"?

4          A.    I said you should look at the bank records or

5     the bank statements to see what money was coming in,

6     because Byton NA did not have its own source of funds,

7     so it was getting money in -- into the Byton NA account.

8               And then it was making payments to other

9     entities for work completed or, if it was facilitating

10    money transfers, like the example we used this morning,

11    where we had issues with transferring U.S. dollars.

12              So it was either facilitating or making

13    payments for work done by other entities.

14              MR. COOK:  Could I ask my court reporter to

15    restate the first answer?

16              Could you do that kindly for me?

17              THE COURT REPORTER:  The answer you just gave

18    right now?

19              MR. COOK:  No, not the -- the one -- the first

20    answer to the question.

21              THE COURT REPORTER:  I'm --

22              MR. COOK:  But mainly the word "record."

23              THE COURT REPORTER:  I'm not quite sure what

24    you're asking me exactly.  I can read back -- a few

25    questions back.

1           MR. COOK:  I think it's this question here.
2   And he gave the answer two -- two answers.
3           THE COURT REPORTER:  One -- one second,
4   please.
5           MR. COOK:  I can't hear you, ma'am.
6           THE COURT REPORTER:  Oh, I'm sorry about that.
7           MR. COOK:  Don't worry.  I have one.
8               (The previous answer was read back by the
9               court reporter as follows:
10              "A  Without seeing those specific bank
11              transactions, it's difficult for me to
12              comment on what those specific transfers
13              were, and -- but any money that was moved
14              between Byton NA or paid from Byton NA to
15              any of the other entities for specific
16              activities that was completed by another
17              entity in another location.")
18          THE COURT REPORTER:  Sorry about that.  I have
19   an untranslate right there.
20          If you can -- if we can go off the record, I
21   can clean it up, but I have a little bit of untranslates
22   right here.
23          MR. COOK:  I tell you what.  We can come back
24   to that; okay?  Do that in a moment.  That will be fine;
25   okay?

**H I N E S   R E P O R T E R S**                          231

1          THE COURT REPORTER:  Okay.

2    BY MR. COOK:

3          Q.   So let's move down here?

4               And the next one, just to make sure, no

5    director, officer, employee or team -- team at Byton

6    Limited has ever controlled or had the right to control,

7    the day-to-day business activities of BNA?

8               Is -- sir, would Byton Limited also mean

9    Nanjing, or does it have to be Byton Limited?  Which

10   one?

11              MR. SIPPRELLE:  Vague and ambiguous.

12              Are you asking are those separate companies

13   or...

14   ///

15   BY MR. COOK:

16         Q.   That's good enough.  I'll buy that?

17         A.   Sorry.  Sir, I didn't understand the question.

18         Q.   Well, I mean, there's a company called

19   Nanjing, N-a-n-j-i-e -- something like that?

20              Is that correct?

21         A.   There is a Nanjing New Energy Company, yes.

22         Q.   Okay, Nanjing?

23              Okay.  So Nanjing -- what's the difference

24   between Nanjing and Byton Limited?

25         A.   Byton Limited is a separate entity, and

**H I N E S   R E P O R T E R S**                              232

1   Nanjing New Energy is a separate entity in China.

2       Q.   And who's -- who's in charge of Nanjing?

3           MR. SIPPRELLE:  Object.  Lacks foundation.

4   Speculation.

5           THE WITNESS:  I do not know who's in charge of

6   Nanjing.

7   BY MR. COOK:

8       Q.   And who's the owner of that entity?

9           MR. SIPPRELLE:  Object.  Lacks foundation.

10  Speculation.

11          THE WITNESS:  Nanjing New Energy was another

12  entity that sat under the FMC corporate structure.  I

13  don't know what the --

14  ///

15  BY MR. COOK:

16      Q.   Isn't it true that FMC Cayman controls all of

17  these entities?  Isn't that true?

18          MR. SIPPRELLE:  Object to the term "control"

19  as vague and ambiguous.

20          THE WITNESS:  FMC Cayman was the holding

21  entity.

22  BY MR. COOK:

23      Q.   For all of them; isn't that correct?

24      A.   I do not know the complete corporate

25  structure, Mr. Cook, so I can't comment.

**H I N E S   R E P O R T E R S**                    233

 1          Q.   Well, FMC Cayman owns 100 percent of the

 2     shares of Byton Limited; isn't that correct?

 3               MR. SIPPRELLE:  Object.  Lacks foundation, but

 4     if you know.

 5               THE WITNESS:  FMC Cayman owns 100 percent of

 6     Byton Limited.  I think that's correct.

 7     BY MR. COOK:

 8          Q.   Byton Limited owns 100 percent of the shares

 9     of Byton North America Corporation; isn't that correct?

10          A.   I'm not sure about the exact percentages, but

11     there is a relationship.

12          Q.   Going back to my -- we're getting very close

13     to end, as to that last question?

14               MR. COOK:  Could you look for the word

15     "record" or "records"?

16               THE COURT REPORTER:  Sure.

17               It's in the question, you're saying?

18               MR. COOK:  No.  It's in the answer.

19               THE COURT REPORTER:  Yes, I found it.

20               MR. COOK:  So what's the answer, please.

21               THE COURT REPORTER:  Okay.  One second.  Let

22     me -- I'm just doing a little bit of cleaning up.

23               So he says it twice.  I think you're asking

24     about -- not the very last question, but the question

25     before that.

**H I N E S   R E P O R T E R S**                     234

1          MR. COOK:  Thank you.

2                (The previous answer was read back by the

3                court reporter as follows:

4                "A  Without seeing those specific bank

5                transactions, it's difficult for me to

6                comment on what those specification

7                transfers were, and -- but any money that

8                was moved between Byton NA or paid from

9                Byton NA to any of the other entities was

10                for specific activities that was

11                completed by another entity in another

12                location, be it Germany or Hong Kong.

13                There were activities happening in all

14                locations, and Byton NA would have paid

15                for those.  And also, you need to look at

16                the bank records to see what money was

17                coming into Byton NA before it went to

18                any of the other locations for -- for

19                payment.  Byton N/A was getting funds in

20                for the work that was being done by Byton

21                NA itself, as well paying some of the

22                other entities, if Byton NA asked some of

23                the other entities to do any work for

24                them.")

25          MR. COOK:  Okay.  That's good enough.

 1                    Okay.  Do you mind?  We'll take a two minute

 2       break.

 3                    Do you mind?

 4                    THE COURT REPORTER:  Not at all.

 5                    MR. SIPPRELLE:  Sure.  Two minutes.  Two

 6       minutes.  No problem.

 7                    MR. COOK:  Okay.

 8                    (Whereupon a recess was taken.)

 9                    THE CLERK:  Okay.  We are back on the record,

10       in Civil Action 21:4736.

11                    Mr. Kameswaran, please, proceed.

12                    MR. COOK:  Thank you.

13       BY MR. COOK:

14            Q.   So let me -- I'm near the end here.

15                 So where are the payroll records --

16                    MR. SIPPRELLE:  Object.  Vague and --

17       BY MR. COOK:

18            Q.   -- as of now?

19                    MR. SIPPRELLE:  Object.  Vague and ambiguous.

20       Lacks foundation.

21       BY MR. COOK:

22            Q.   So the payroll records --

23            A.   The payroll records was managed by our payroll

24       provider.

25            Q.   Who again?

**H I N E S   R E P O R T E R S**                               **236**

1      A.   The payroll records were managed by our

2 payroll provider.

3      Q.   And what's a payroll provider?

4      A.   An external company that was helping us with

5 the processing of payroll.

6      Q.   Payroll, but what about the payroll -- the

7 payroll employees who you were paying that is -- that

8 you have employees there, when they become your

9 employee, when you discharged them, if there was a

10 problem with the employee, when you gave them a raise,

11 or you didn't give them a raise or things like that?

12 Where are those records?

13           MR. SIPPRELLE:  Object.  It lacks foundation.

14           THE WITNESS:  Let's see.  A lot of questions

15 there.

16           MR. SIPPRELLE:  Yeah.  It's -- it's compound

17 too, so...

18           Go ahead, if you understand it.

19           THE WITNESS:  Yeah.  So the payroll was

20 processed by an external service provider.  Any other

21 payroll records in terms of employment termination or

22 anything related to that was maintained by our human

23 resources department.

24           MR. SIPPRELLE:  Mr. Cook, you're breaking --

25 you're muting.

1           MR. COOK:  I'm sorry.

2    BY MR. COOK:

3        Q.   Could you speak up a little louder?  What's

4    the name of the company?

5        A.   The payroll service's provider is ADP.

6        Q.   We know -- all they do -- all they do is for

7    paying -- paying the payroll, not the agreement.  That

8    is the original agreement?

9            That is usually an NDA, that is the terms of

10   their disclosure, that's discipline matters, all of

11   those records.

12           Where are those records?

13       A.   Those records were retained by the human

14   resources group.

15       Q.   What group?

16       A.   The human resources -- HR group.  Human

17   resources group.

18       Q.   And where are they located?

19       A.   We had an HR department in our Santa Clara

20   office.

21       Q.   Where are those -- where are those records?

22           MR. SIPPRELLE:  Lacks foundation.

23           Go ahead, if you know.

24           THE WITNESS:  Those records, again, were a

25   combination of digital records as well as physical

1    records.

2              And when I left the company, those were

3    maintained by the human resources group or human

4    resources person.  There was only one person.

5    BY MR. COOK:

6         Q.   Okay.  And was she an employee at Santa Clara?

7         A.   Yes, she was an employee at Santa Clara.

8         Q.   So for your 400 employees, you must have had

9    400 employment files?

10             So what happens to those 400 files?

11             MR. SIPPRELLE:  Object.  Lacks foundation.

12             THE WITNESS:  So -- well, all the records

13   should be intact.

14   ///

15   BY MR. COOK:

16        Q.   Where -- where are they?

17             MR. SIPPRELLE:  Lacks -- lacks foundation.

18   Speculation.

19             THE WITNESS:  I just answered the question

20   before saying they were records in digital form as well

21   as physical form, so I don't know where those records

22   are.

23   BY MR. COOK:

24        Q.   So, by digital, now they're in the hands of

25   the corporate finance team in China; is that correct?

**H I N E S   R E P O R T E R S**                           239

1          MR. SIPPRELLE:  Object.  Lacks foundation.

2          THE WITNESS:  Employment records were very

3     confidential information, and they were not in the hands

4     of the corporate finance team.

5     BY MR. COOK:

6          Q.   So where -- who has them in China?

7          MR. SIPPRELLE:  If you know.

8          THE WITNESS:  I don't know.

9     BY MR. COOK:

10         Q.   Is that where they are?  Somewhere in China?

11         MR. SIPPRELLE:  Lacks foundation.

12         THE WITNESS:  Again, there were Cloud servers

13    and -- and physical records, so I can't comment on that.

14    ///

15    BY MR. COOK:

16         Q.   Well, wait a sec.  These are confidential

17    records of employees, which is when they come there and

18    when they go and any discipline issues and the NDA and

19    everything there?

20         Are you telling me that those records were

21    destroyed?

22         MR. SIPPRELLE:  Object.  Argumentative.

23         THE WITNESS:  I never said --

24         MR. SIPPRELLE:  No.  Misstates his testimony.

25         THE WITNESS:  I -- I never said the documents

**H I N E S   R E P O R T E R S**                    240

1  were destroyed.

2  BY MR. COOK:

3      Q.   Well, where are they?

4      MR. SIPPRELLE:  Asked and answered.  I think

5  he said he doesn't know, but go ahead, Mr. Kameswaran.

6      THE WITNESS:  I -- I said, I don't know where

7  the documents are, but I know that the documents existed

8  in digital and physical format.

9  BY MR. COOK:

10     Q.   And so who has the -- the digital format?

11      MR. SIPPRELLE:  Lacks foundation.

12      If you know.

13      THE WITNESS:  I -- I don't know.

14  ///

15  BY MR. COOK:

16     Q.   Well -- well, did you tell these employees

17  that their employment records are in digital form and

18  nobody knows who has them; is that correct?

19      MR. SIPPRELLE:  Objection.  Argumentative.

20  Misstates his testimony.

21  BY MR. COOK:

22     Q.   Well, you can answer that one?

23      MR. SIPPRELLE:  I'm not saying he can't answer

24  it.  It's just --

25      MR. COOK:  He said --

```
1           MR. SIPPRELLE:  --  a bad question.
2           (Overlapping.)
3           MR. COOK:  (Inaudible) then I expected -- you
4  told me that it's digital, and you don't know.  And, I
5  guess, there are 400 people.  You told me that.  And I'd
6  like to say, "Well, did you tell all 400 that they're
7  digital, but you don't know where they are?"
8           MR. SIPPRELLE:  Object.  Argumentative.
9  Harassing.  An unintelligible question.
10          Go ahead and answer, Mr. Kameswaran.
11 BY MR. COOK:
12      Q.   Let's hear it?
13      A.   I never managed the human resources group, and
14 what the human resources group told any of the
15 employees, I have no idea.
16          But I -- but I maintained my statement that
17 the digital records were -- the digital and physical
18 records were maintained by the human resources group in
19 an appropriate manner as it is required -- required by
20 the company's policies.
21      Q.   The company would be BNA; isn't that correct?
22      A.   As required by Byton North America, yes.
23      Q.   So, I guess, if there was an employee who
24 wanted her records, for whatever reason, and she was,
25 say, in some litigation or just a demand, I guess she
```

HINES REPORTERS                                    242

1    wouldn't have too many -- or she or he wouldn't have too

2    much problem about, I guess, receiving a subpoena on

3    somebody, saying, give me my employment records?

4            Is that something that could be done?

5            MR. SIPPRELLE:  Argumentative.  Calls for

6    speculation, particularly since there are no current

7    employees.

8            That's an interesting question.  I'm not sure

9    I know the answer.

10           Go ahead, Mr. Kameswaran.

11   BY MR. COOK:

12       Q.   You can answer them when your 400 per -- per

13   month -- that's what you tell -- that's what you signed

14   off to the United States government?

15           So during that period of time when -- until

16   now, up to the time you fired everybody, I'd like to

17   know:  How are you going to get records to all these

18   people?

19           MR. SIPPRELLE:  Object.  Argumentative.

20   Harassing.  Irrelevant to -- to this case.

21           But go ahead, Mr. Kameswaran.

22           THE WITNESS:  The documents were stored

23   appropriately.  As for my prior testimony, and -- I

24   don't know what effort would be required to access those

25   documents.

HINES REPORTERS                    243

1          But I do know -- do know for a fact that, when
2     I left the company, the documents were stored
3     appropriately, as they should be.
4     BY MR. COOK:
5          Q.   By whom?
6          A.   The human resources person that was
7     responsible for Byton North America.
8          Q.   And that's an individual?
9          A.   Correct.
10         Q.   And so are you telling me that the ex-employee
11    of BNA took home with her approximately 400 files?  Is
12    that what you're telling me?
13              MR. SIPPRELLE:  Object.  Misstates his
14    testimony.  Argumentative.
15              THE WITNESS:  I never said that.
16    BY MR. COOK:
17         Q.   So -- so other than this employee, tell me who
18    else has it?  She doesn't have it, or he doesn't have
19    it?
20              MR. SIPPRELLE:  Object.  Speculation.
21              Go ahead, if you know.
22              THE WITNESS:  I don't know.
23    BY MR. COOK:
24         Q.   Okay.  I'll take "I don't know?"
25              So for the building there, did BNA have

**H I N E S   R E P O R T E R S**                                    244

1   insurance for the building?

2        A.   BNA --

3             MR. SIPPRELLE:  Object to the term -- object

4   to the term "insurance for the building."

5             I'm not -- I -- are you talking about fire

6   insurance?

7             MR. COOK:  Insurance for the -- for -- as

8   there is renter's insurance, whatever you want to call

9   it.

10            MR. SIPPRELLE:  Oh, okay.

11  BY MR. COOK:

12       Q.   Liability insurance.  Insurance for the

13  interior, whatever it would be.  Liability insurance, et

14  cetera?

15            Was there insurance?

16            MR. SIPPRELLE:  Object as compound.  Those are

17  a lot of different insurances, but go ahead,

18  Mr. Kameswaran.

19  BY MR. COOK:

20       Q.   You can answer that one.

21       A.   So BNA had renter's insurance, as it was

22  required by the lease agreement with the landlord.

23       Q.   Okay.  So did you terminate the insurance?

24       A.   I do not recall.

25       Q.   Okay.  And can you tell me who was the

```
 1   insurance carrier?
 2         A.   Again, it was through an agent that I don't --
 3   do not remember.
 4         Q.   Like, a workers' comp; is that correct?
 5         A.   Correct.
 6         Q.   So tell me, where are those policies, the
 7   insurance policy and the workers' comp policy?
 8              MR. SIPPRELLE:  Object.  Lacks foundation.
 9              If you know.
10              THE WITNESS:  I -- I wouldn't know.
11   BY MR. COOK:
12         Q.   You don't know at all?
13              Okay.
14              MR. SIPPRELLE:  Asked and answered.
15   BY MR. COOK:
16         Q.   Did you keep --
17              MR. SIPPRELLE:  He said he didn't know.
18   BY MR. COOK:
19         Q.   Did you keep records from ADP?
20         A.   I'm sorry.
21         Q.   Did you keep records for ADP?
22         A.   ADP?  ADP kept the records for us.  We never
23   kept any ADP records.
24         Q.   But didn't you -- but because they have --
25   whatever they have -- but do you have that on your
```

1    screen?

2          Occasionally, these people come up, and they

3    say, "We want these records."  Do you even keep any of

4    those records on your own system?

5          A.   Anything related to ADP was maintained by ADP

6    on our behalf.  So any employee that's left the company

7    can easily contact ADP for those records.

8          Q.   By the way, did BNA own any vehicles?

9          MR. SIPPRELLE:  Object.  Vague as to time.

10          Ever?

11   BY MR. COOK:

12          Q.   Let's start in the last three years?

13          A.   BNA did own some vehicles, yes.

14          Q.   Those were electric vehicles; isn't that

15   correct?

16          A.   There were some test vehicles, but I don't

17   know whether there were any electronic vehicles.

18          Q.   And isn't -- isn't it true that -- what BNA

19   did was shipped all of those vehicles back starting in

20   2018, 2019 and -- and 2020?  They shipped it back to

21   China?

22          A.   That's incorrect.

23          Q.   Really?

24          MR. SIPPRELLE:  Yes, really, Mr. Cook.  That's

25   his testimony.

1   BY MR. COOK:

2       Q.   Did you get sued -- you -- you remember there

3   was a lawsuit by the freight forwarder that you

4   defaulted on?

5       A.   I -- I was not specifically aware of that.

6       Q.   Okay.  I thought you might have known of a

7   lawsuit filed by the shipper who took possession of the

8   vehicle -- vehicles and then returned them or sent them

9   somewhere in China?

10          Do you know anything about that?

11      A.   So, from my knowledge, those vehicles were

12  owned by Byton in China.  They came to U.S. for testing

13  in Arizona approving grounds, and they were shipped

14  back.

15      Q.   By the way, did BNA pay for the shipping cost?

16      A.   I -- I do not know.

17      Q.   Okay.  Did -- did BNA pay for the Las Vegas

18  services there when there were some type of party,

19  something like that?  Kanarsky, or something along that

20  order?  Does that ring a bell?

21      A.   Sorry.

22          MR. SIPPRELLE:  Vague.  Vague and ambiguous.

23  BY MR. COOK:

24      Q.   Services where -- services where they did it

25  for, you know, I -- I can't use carnivals.  The -- the

**H I N E S   R E P O R T E R S**                    248

```
 1   services when they held up the people from coming in and

 2   looking at the vehicles?

 3       A.    I'm not aware of it, sir.

 4             MR. COOK:  All right.  Okay.  I'm going to let

 5   you guys go.

 6             All right.

 7             MR. SIPPRELLE:  All right.  Thank you.

 8             THE WITNESS:  Thank you.

 9             MR. COOK:  Okay.

10             THE CLERK:  All right.  Okay.  Everyone, we're

11   off the record.

12             (Whereupon a recess was taken.)

13             THE CLERK:  We're back on the record for Civil

14   Action 21:4736.

15             THE WITNESS:  Am I okay to go?

16             MR. COOK:  What?

17             MR. SIPPRELLE:  Madame Clerk, may the witness

18   be excused?  I think this is just bookkeeping, but --

19             THE CLERK:  Yes.

20             Mr. Kameswaran, you don't need him anymore;

21   right?

22             MR. COOK:  That's correct.

23             THE CLERK:  Correct.

24             Okay.  You may be excused.

25             THE WITNESS:  Thank you.
```

**H I N E S   R E P O R T E R S**                                    249

```
 1              MR. SIPPRELLE:  Thank you, Mr. Kameswaran.

 2              MR. COOK:  I think I just had two here.

 3              MR. SIPPRELLE:  And I -- just for the record,

 4   Byton North America is going to object to any exhibits

 5   being attached.  Nothing was shown to the witness.

 6   Nothing was put into evidence, nothing was

 7   authenticated, so I'm not sure what these exhibits are.

 8              So we -- my client and I object to that.

 9              THE CLERK:  Okay.  Thank you.

10              MR. COOK:  I'm waiting for something here.

11              THE CLERK:  Okay.  Mr. Cook, why don't you

12   proceed with your exhibit attachments?

13              MR. COOK:  I think my only exhibit -- now,

14   could you go back, Ma'am Court Reporter, where we talked

15   about it.

16              THE COURT REPORTER:  Say that one more time.

17              What do you want me to go look at?

18              MR. COOK:  I think there's one or two we have

19   here, which were from Silicon Valley bank, and the other

20   one from HSBC.

21              THE COURT REPORTER:  You didn't -- I don't

22   believe you quite referred to them as exhibits.  You

23   were just reading off on them.  You did mention a

24   Silicon Valley --

25              MR. COOK:  Yes.  That's the one.  Yeah.
```

1    Silicon Valley.  Yeah, that's one.

2            THE COURT REPORTER:  And then you were reading

3    from a transcript.  I don't know if you wanted to attach

4    any of that.

5            MR. COOK:  I don't need it.

6            THE COURT REPORTER:  I'm sorry.  I'm not going

7    to be able to tell you because you didn't actually say

8    exhibit, the word "exhibit."

9            MR. COOK:  That's fine.  Everybody already has

10   a copy of it anyway.

11           THE COURT REPORTER:  Okay.

12           MR. COOK:  That's fine.

13           THE CLERK:  Okay.  So are we done?

14           MR. COOK:  We're done.

15           THE CLERK:  Okay.  We're off the record.

16   Court is in recess.

17           MR. COOK:  Thank you.

18           THE CLERK:  Thank you, everyone.

19           (Whereupon the proceeding concluded

20           at 3:55 p.m.)

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15  STATE OF CALIFORNIA       )

16                           )   ss

17  COUNTY OF LOS ANGELES     )

18

19          I, SONSERAYE ANDERSON, Certified Shorthand

20  Reporter qualified in and for the State of California,

21  do hereby certify:

22          That the foregoing transcript is a true and

23  correct transcription of my original stenographic notes.

24          I further certify that I am neither attorney

25  or counsel for nor related to or employed by any of the

1  parties to the action in which this proceeding was

2  taken; and furthermore, that I am not a relative or

3  employee of any attorney or counsel employed by the

4  parties hereto or financially interested in the action.

5          IN WITNESS WHEREOF, I have hereunto set my

6                  hand this 18th day of March, 2022.

7

8

9

10  *Sonseraye Anderson*

11  SONSERAYE ANDERSON

12  CSR No. 14187

13

14

15

16

17

18

19

20

21

22

23

24

25

## WORD INDEX

**< ' >**
**'** 157:*13*

**< $ >**
**$10,000** 124:*11*
**$10,000,000** 85:*5, 7, 9*
87:*13, 24*
**$167,000,000** 69:*9*
**$18** 42:*6, 15*
**$18,830,981.23** 41:*11*
**$250,000** 170:*9*
**$254,000,000** 26:*14*
**$254,900** 24:*3* 26:*14*
**$254,900,000** 22:*24*
25:*11*
**$3,000,000** 228:*6*
**$3,239,906** 228:*4*
**$300** 43:*2*
**$467,000,000** 80:*21*

**< 0 >**
**0'clock** 143:*13*

**< 1 >**
**1** 15:*25* 155:*2* 156:*2*
157:*12* 169:*13*
179:*18* 221:*16*
223:*25* 228:*4*
**1.5** 155:*2, 21* 156:*3*
157:*13*
**1:00** 142:*25* 143:*2, 5,*
*9, 12, 13, 23*
**10** 65:*8*
**10:30** 65:*1, 4, 5, 11*
**10:30's** 65:*8*
**100** 135:*20* 234:*1, 5, 8*
**1099** 27:*18* 44:*19, 23*
**1099s** 44:*25*
**11** 1:*17* 2:*6* 55:*20*
56:*1* 92:*25* 228:*5*
**117** 70:*1* 72:*24*
**117,000,000** 69:*25*
70:*1*
**11th** 4:*4* 93:*8, 11*
**12** 222:*14*
**14187** 2:*4* 5:*12*
253:*12*

**15** 179:*21* 200:*24*
**1500** 228:*8*
**156-26073895** 35:*24*
**16** 228:*5*
**164** 145:*12* 146:*7*
**165** 2:*12*
**167,000** 68:*12*
**167,000,000** 68:*13*
**167,139,000** 66:*20*
**167,139,906** 65:*22*
**17** 46:*1* 138:*5*
144:*14* 228:*6*
**18** 46:*1* 93:*17*
**186** 153:*19* 154:*21*
**187** 155:*20*
**188** 157:*11*
**189** 160:*16*
**19** 46:*1* 65:*5* 210:*13*
**190** 159:*7*

**< 2 >**
**2** 33:*22* 34:*3, 3*
35:*21* 41:*8, 10*
**2,200,000** 228:*7*
**2,700,000** 228:*5*
**20** 12:*4* 46:*2* 47:*12*
85:*18* 113:*6* 118:*11*
119:*13*
**20,000** 169:*23*
**200** 2:*19*
**200,000** 170:*12*
**2000** 169:*14* 200:*4*
**2001** 169:*19, 20*
**2007** 92:*21*
**2009** 154:*23*
**2011** 169:*13*
**2013** 12:*4*
**2016** 62:*1* 63:*9*
165:*19*
**2017** 8:*12, 16, 21*
43:*4* 45:*9, 21* 92:*25*
93:*11* 97:*24*
**2018** 8:*22* 18:*3, 5*
22:*23* 43:*12* 45:*21*
65:*20* 78:*2* 93:*18*
95:*7* 98:*8* 99:*21, 23*
115:*24* 228:*4* 247:*20*
**2019** 43:*16, 19, 19, 23,*
*24* 45:*21* 54:*19*
65:*21* 86:*1, 4, 20*

**95:***6* 98:*8* 99:*25*
100:*1* 103:*16* 114:*22*
115:*24* 179:*18*
195:*19* 228:*6, 6, 7, 8*
247:*20*
**2020** 12:*15, 18, 19, 24*
13:*3* 19:*4* 22:*23*
45:*22* 47:*12, 14*
84:*24* 85:*18, 22*
86:*23, 24, 25* 87:*1, 6*
88:*14* 95:*6* 100:*2, 3*
103:*16, 19, 20* 104:*13,*
*14, 21* 105:*5* 111:*7,*
*10* 112:*3* 113:*6*
114:*19, 20* 115:*25*
121:*19* 122:*4, 23*
123:*15, 17* 124:*9*
125:*11* 138:*5* 141:*4*
144:*14* 145:*5* 147:*13,*
*20* 169:*13, 23, 24*
170:*24* 171:*24*
182:*24, 25* 186:*13*
187:*2* 193:*10* 195:*1*
196:*2* 199:*21* 214:*18,*
*25* 226:*10, 17* 247:*20*
**2021** 8:*15* 12:*4* 19:*4*
44:*15, 17* 45:*10, 22*
46:*12* 85:*1* 103:*20*
114:*22* 115:*3* 117:*14,*
*24* 118:*14* 119:*8*
120:*2* 169:*14, 14, 21,*
*23, 24* 182:*1* 198:*21*
200:*4, 13* 211:*3, 22*
221:*16*
**2022** 1:*17* 2:*6* 253:*6*
**21** 46:*2* 114:*21*
118:*25* 119:*13* 228:*6,*
*7*
**21:4736** 65:*16*
143:*19* 216:*22*
236:*10* 249:*14*
**22** 50:*10* 222:*14*
**23** 154:*23*
**2401** 52:*8*
**250** 134:*8*
**254,000** 23:*9*
**254,000,000** 27:*11*
**254,9** 22:*24*
**254,900** 25:*18*

**95:6** 98:*8* 99:*25*
**254,900,000** 26:*21, 22*
**2549** 22:*24*
**2945** 2:*18*
**2nd** 95:*15, 16*

**< 3 >**
**3** 54:*19* 227:*2*
**3:00** 216:*9, 13*
**3:21-cv-04736-EMC**
1:*7*
**3:55** 251:*20*
**30** 61:*25* 63:*8*
**301** 201:*5*
**304** 210:*13*
**397** 84:*21* 87:*7*

**< 4 >**
**40** 142:*18*
**400** 85:*21* 239:*8, 9,*
*10* 242:*5, 6* 243:*12*
244:*11*
**415** 2:*13*
**4201** 52:*4*

**< 5 >**
**5** 155:*3* 228:*8*
**500** 18:*13, 21* 19:*2*
20:*23* 22:*19* 198:*11*

**< 6 >**
**6** 3:*3*
**60** 134:*8* 145:*10*
**61** 144:*1* 173:*23*
**62** 144:*22* 172:*20*
**63** 145:*8* 154:*22*
**6-mill** 155:*2*

**< 7 >**
**7** 33:*22* 34:*3*
**719-4900** 2:*20*

**< 8 >**
**800,000** 228:*7*
**805** 2:*20*
**85-1** 227:*1*
**86** 35:*23*
**8th** 95:*7* 200:*4*

**< 9 >**

**9:00**  1:*17*  2:*6*
**91361**  2:*19*
**94102**  2:*13*
**9504**  52:*8*
**95054**  52:*4*
**989-4730**  2:*13*

**< A >**
**a.m**  1:*17*  2:*6*
**ability**  80:*7*  154:*11*
159:*10*  160:*19*
162:*24*
**able**  26:*19*  27:*12*
42:*11, 24*  61:*13*
80:*17*  82:*16, 22*
155:*1*  251:*7*
**absolute**  103:*23*
**absolutely**  29:*11*
144:*10*  150:*24*
**access**  17:*1*  25:*14*
38:*7, 10, 11, 11, 16, 18*
74:*6, 14*  79:*3*  92:*5,*
*11*  100:*5, 6, 10, 23*
101:*6, 12, 19, 20, 22,*
*23*  102:*5, 8*  103:*4, 8,*
*10, 12, 23*  104:*3, 4, 8,*
*10, 22*  105:*2, 14*
116:*1*  118:*24*  121:*2,*
*10, 20*  122:*2, 5, 5, 8,*
*18, 24*  125:*18*  139:*19,*
*23*  140:*3*  182:*9*
193:*6*  198:*15*  199:*24*
207:*18, 19*  208:*2, 3, 5,*
*7, 9, 10, 12, 13, 17, 17,*
*19, 21, 23, 23*  209:*6, 7,*
*12, 15, 23*  210:*8, 21,*
*22*  211:*14*  212:*3, 11,*
*12, 14*  213:*10*  221:*24*
222:*1, 2, 6, 23*  223:*8,*
*10, 22*  225:*13, 16, 23*
226:*2*  243:*24*
**accesses**  104:*25*
116:*7*  225:*24*
**accessible**  74:*19*
182:*8*  199:*22*  210:*8*
**account**  18:*8*  67:*25*
68:*16*  69:*12, 19, 25*
71:*2, 3*  72:*16, 17*
83:*18, 23*  85:*11*
90:*10*  91:*9*  121:*14*

122:*19*  171:*2, 17, 22,*
*23*  177:*15*  179:*6*
200:*8*  230:*7*
**accountant**  46:*4*
**accountants**  190:*12*
192:*7*
**accounting**  9:*22*  28:*3,*
*5, 8, 10, 17*  55:*21*
58:*17, 19*  59:*1*  96:*5*
101:*24*  103:*12*
105:*25*  109:*18*
121:*15*  190:*6*  191:*6*
**accounts**  10:*12, 13*
27:*25*  28:*1*  90:*6, 20*
92:*1, 5, 12*  101:*15*
122:*11, 12*  123:*6*
174:*7, 15, 18*  175:*15,*
*17, 20*  176:*1, 3, 14, 16*
177:*11, 18*  178:*12, 15,*
*21, 23*  179:*10, 11*
198:*24*  199:*3*
**accuracy**  176:*4, 9*
**accurate**  11:*15*  50:*21*
112:*8*  113:*7*  141:*9*
144:*16, 18*  180:*13*
193:*25*  206:*7, 12*
**accusations**  154:*2*
**accused**  151:*9*
**acquired**  222:*17*
**action**  42:*10*  65:*16*
143:*19*  236:*10*
249:*14*  253:*1, 4*
**activities**  39:*4*  45:*7*
54:*22*  57:*20*  59:*19*
89:*17*  105:*13*  117:*23*
170:*3*  174:*5*  181:*5*
185:*11*  226:*25*
227:*20*  228:*16, 23*
229:*11, 14*  231:*16*
232:*7*  235:*10, 13*
**actual**  62:*14*  173:*6*
**ad**  21:*22, 23, 25*
22:*14, 15, 16*
**added**  32:*8*
**address**  128:*11*
177:*17, 20*  217:*3, 4, 5*
218:*5, 6*
**ADP**  238:*5*  246:*19,*
*21, 22, 22, 23*  247:*5, 5,*
*7*

**advertising**  22:*18*
126:*20*
**advice**  88:*11*
**affirm**  5:*19*
**afloat**  171:*14*
**afraid**  54:*19, 20*
**agency**  88:*25*  89:*2*
**agent**  13:*5, 13*  246:*2*
**agents**  11:*12*  13:*2*
89:*1*
**ago**  131:*7*  152:*2*
161:*20*
**agree**  95:*24*  132:*11*
139:*1*  191:*4*
**agreed**  62:*1*  63:*9*
**Agreement**  61:*3, 4, 12*
62:*11, 12, 16*  63:*24*
83:*18, 23*  89:*20*
90:*10*  96:*13*  238:*7, 8*
245:*22*
**agreements**  90:*2*
**agrees**  20:*5*
**ahead**  11:*2*  14:*13*
20:*16, 20*  21:*1, 4*
26:*10*  27:*7*  29:*16*
30:*20, 21*  33:*12*  34:*1,*
*16*  35:*9*  36:*16*  37:*5,*
*21*  39:*19*  40:*7, 20*
41:*4, 25*  42:*22*  45:*24*
47:*10*  50:*2, 21*  53:*5,*
*16*  54:*2*  55:*6*  56:*12*
57:*13*  58:*7*  59:*16*
62:*10*  63:*1, 20*  65:*17*
67:*13*  69:*15*  70:*12,*
*17*  72:*4*  75:*11*  77:*9*
81:*1, 25*  88:*8, 9*
91:*16*  99:*7*  100:*9*
101:*5*  102:*24*  106:*4*
113:*13*  121:*23*
122:*16*  124:*3*  126:*15*
128:*18*  129:*20*
130:*20*  131:*23*
133:*10*  134:*13*  140:*1*
143:*20*  146:*22*
147:*24*  149:*8*  150:*3*
154:*12*  155:*11, 13*
157:*4*  166:*25*  172:*4*
173:*12*  175:*19*
181:*10, 20*  190:*19*
192:*3*  199:*19*  200:*16*

202:*20*  204:*13*  206:*2*
209:*3, 19*  211:*9, 23*
215:*19*  216:*23*
217:*18*  219:*22*
221:*23*  225:*1*  229:*4*
237:*18*  238:*23*  241:*5*
242:*10*  243:*10, 21*
244:*21*  245:*17*
**ahold**  45:*2*
**Aidi**  94:*11*  95:*22*
108:*8*
**A-i-d-i**  94:*11*  95:*22*
**Albert**  98:*1, 6*  117:*1*
**allowing**  56:*19*
**ambiguous**  10:*21*
13:*16*  14:*11*  18:*15*
20:*15, 24*  21:*24*
38:*12*  58:*20*  61:*5*
62:*9*  63:*19*  64:*7*
71:*10*  73:*1*  74:*10*
79:*1, 15*  83:*10*  88:*15*
89:*22*  90:*4, 21*  99:*4*
101:*1*  102:*19*  108:*17*
109:*8, 24*  116:*3*
117:*9, 19*  119:*20*
120:*7, 21*  122:*8*
126:*13*  130:*19*  134:*4,*
*11*  137:*3*  142:*5*
147:*5, 22*  148:*18*
155:*7*  156:*5*  157:*19*
158:*5, 17*  159:*24*
160:*11*  161:*4, 12*
165:*16*  167:*22*  168:*4*
169:*2*  181:*9, 19*
182:*13*  184:*2*  186:*21*
187:*20*  192:*16*  211:*5*
224:*16*  232:*11*
233:*19*  236:*19*
248:*22*
**America**  1:*8*  2:*16*
4:*5, 22, 24*  7:*19*  8:*23*
11:*24*  14:*4*  23:*4, 7*
24:*10*  28:*11*  30:*23*
35:*22*  38:*8*  41:*13*
55:*13*  62:*12*  63:*23*
64:*1, 2*  66:*8, 16*
79:*20*  81:*4*  87:*20*
88:*17*  97:*5, 5, 15*
100:*21*  106:*23, 25*
107:*2*  131:*5*  135:*12*

137:*12*  138:*14*
141:*17*  144:*5*  150:*10*
152:22  154:*16*  157:9
158:22  159:*17*
161:*13*  163:*17, 19, 20*
165:*21, 24*  166:9
171:6  173:*3*  174:*1, 5*
176:23  181:*12*  184:7
186:*10*  208:6  210:*17*
211:6, *11*  219:4, 5
221:*13*  224:*21*
226:*16*  234:9  242:22
244:7  250:*4*
**American**  54:*16*
140:*16*  142:8
**amount**  23:6  85:4, 6
125:8  171:9
**ANDERSON**  2:*3*
5:*12*  252:*19*  253:*11*
**Angeles**  2:7  252:*17*
**announcement**  136:*14*
**annual**  188:*24*
**ANSWER**  3:*13*
10:*23, 25*  11:*1, 22*
13:7, 9, *12, 18*  14:2,
*15, 16, 18*  19:*16*
20:*16, 18*  21:*3*  23:*3,
14, 25*  24:9  26:7
28:*24*  29:7, *13*  32:*10,
16*  35:*3*  36:6  38:6,
*21*  41:22  42:5, 8
46:*21*  47:*24, 25*
48:*16*  49:20  51:7, *19*
52:*14, 19*  53:*13*  54:*1,
21*  57:*15, 16*  58:*23,
25*  60:*15*  64:9  67:*1*
71:*11*  75:*13*  76:*3, 4,
5, 14, 24*  77:7  78:*6,
14*  79:*17*  80:*4, 6*
82:*1*  83:*12*  86:*11*
92:*10*  93:25  94:*3*
103:*1*  108:*18*  111:22,
*25*  112:*18*  113:2, *15*
116:5  117:*21*  119:22
120:*13, 15*  123:4
124:*17*  127:5  129:22
130:*12*  135:4  136:2
138:*15, 16*  140:9, *11,
12, 15, 18*  141:7
142:*10, 13, 14*  145:2,

17, *19, 22*  146:*12, 24*
147:*3, 7*  148:*20, 21*
151:*20, 22*  153:22
154:*11, 25*  156:*14, 17*
157:*23*  158:8  160:*1,
4*  161:6  162:*15, 19,
25*  166:*11, 12, 16, 22*
167:9, *24*  168:6, *13,
17, 22, 22*  169:*3, 9*
170:*16*  173:25  175:*4,
9*  177:*4*  178:*4, 10*
180:8, *10*  181:*1, 22*
182:5, *15*  183:*18, 22*
184:*4*  185:*4, 20*
189:*23, 23*  190:*10*
191:*23*  192:22  193:*4,
21*  194:*4, 7, 15, 20*
196:*21, 22*  197:*13, 19*
198:*17*  199:*1, 4, 13*
200:9, *12*  201:8
205:*13*  206:2  207:*17*
211:*23*  212:*2, 13, 21*
215:*1, 6, 12*  218:*18*
219:22  221:9  224:*18*
226:5, *5*  227:*10*
229:25  230:*15, 17, 20*
231:2, *8*  234:*18, 20*
235:2  241:22, *23*
242:*10*  243:9, *12*
245:*20*
**answered**  39:*17*  40:5,
6, *18*  41:*3*  58:6
60:*13*  67:*11*  68:*10,
17*  69:*14*  70:*4, 11*
73:*11*  91:*16*  99:*4*
101:2, *4*  103:*25*
105:3, *6*  111:*20, 24*
112:*4, 16*  113:*10*
120:*20*  122:*15*  123:*3,
25*  128:2  138:2
139:*25*  146:*20*  147:9,
*14*  150:2  161:7
162:*13*  165:8  166:*19,
23*  168:*15, 18*  173:*10,
18*  175:*18*  183:7, 8,
*14*  194:2  200:*15*
202:*10, 17*  204:*4*
206:*20*  208:*25*
211:*16*  215:9, *17*

217:*15*  239:*19*  241:4
246:*14*
**answers**  146:*1*
166:*17*  231:2
**answer's**  155:*4*
206:*18*  213:*20*
**anybody**  14:6, 7, *22*
103:*10*  104:*21*  105:*1*
107:*15, 21*  112:*20, 23*
116:*25*  118:5, *19, 21*
120:*4, 6, 25*  121:*16*
164:*13*  165:*14*  181:*6,
16, 24*  182:*1*  198:7, 8
214:*11*  217:5  225:*15*
228:*10*
**anymore**  74:*14*  117:6
154:6  249:*20*
**Anytime**  121:5, *6*
**anyway**  64:*16*  251:*10*
**AP**  123:*1*  174:*11*
**apart**  120:*13*
**Apologies**  55:*21*
**apparently**  27:5
33:*17, 17*  50:*18*  53:*1*
55:4  70:*13*  75:22
159:7  165:*12*  182:*18*
199:*15*  205:7  219:8
223:*15*  225:*12*
**appear**  221:*3*
**appearance**  5:*10*
**APPEARANCES**  2:9
4:8
**appeared**  84:*1*
**application**  36:*20*
**apply**  84:*19*
**appointed**  12:8
**appreciate**  154:7
**approach**  33:4  149:*3*
151:*12*
**appropriate**  242:*19*
**appropriately**  243:*23*
244:*3*
**approval**  175:*3*
**approved**  175:*15*
179:25  204:*20*
**approvers**  177:*1*
**approving**  72:*17*
173:5  176:*1, 18*
178:25  248:*13*

**approximately**  42:*15*
222:*14*  226:*10*
244:*11*
**April**  50:*10*  84:*24*
171:*23*
**AR**  123:*1*
**arbitration**  131:*17, 22*
180:*19*  199:*17*
206:*24*
**archive**  105:9, *14*
180:9
**archives**  79:*3*  180:5,
7  214:*1, 7, 7, 9, 12, 24*
**Argue**  26:*1*  52:*16*
148:*14*  167:*15*
**Argumentative**  18:*15*
20:*19, 25*  23:*12*
25:*13*  26:*4*  27:*3*
29:*10*  32:6, *11*  33:*1,
4, 24*  34:*14*  35:*1, 4*
36:*1, 14*  37:*13, 19*
38:5  42:*17*  48:*13*
49:6, *17*  51:*4, 15*
52:*12, 22*  53:*23*
54:*10*  57:*11*  58:6
63:*18*  68:*18*  69:*13*
70:5  71:9, *21*  72:*10,
21*  74:*11*  76:23, *23*
77:*24*  79:*14, 15*
80:*24*  88:5  89:*23*
91:*20*  99:*3*  100:*18*
109:*24*  110:22
111:*19*  112:*25*  113:*9,
24*  114:8  116:*14*
128:*17*  129:*18*  137:*4*
148:*17*  165:9  167:7,
*18, 21*  168:*3*  170:*14*
184:*19*  189:*17*
191:*14, 20*  193:*1, 15,
18*  195:9  204:*12*
205:*10*  221:*10*
223:*16*  228:*20*
240:22  241:*19*  242:8
243:5, *19*  244:*14*
**Arizona**  248:*13*
**arm-length**  79:*21*
**arms-length**  134:*21*
**arrangement**  165:22
**A's**  11:*13*

**Aside** 104:*20, 20*
120:*10* 137:*8*
**Asked** 39:*17* 40:*5, 18*
41:*3* 58:6 60:*13*
67:*10* 68:*10, 17*
69:*14* 70:*4, 11* 73:*11*
91:*15* 99:*4* 101:2
103:*25* 105:*3, 6*
111:*20* 112:*4, 16*
113:9 114:*18* 118:*25*
120:*20* 122:*14* 123:2,
*25* 128:2 139:*25*
146:*20* 147:*14* 150:*7*
154:*13* 156:22
157:*21* 160:6 161:*7,
19* 162:*13* 165:*8*
166:*23* 173:*10, 18*
175:*18* 179:*23* 183:*7,
14, 17* 194:2 196:*3*
197:*17, 17* 200:*5, 15*
201:*2, 6* 202:*10, 17*
204:*4* 206:*20* 208:*25*
211:*16* 215:*9, 17*
217:*15* 218:*8* 229:*21*
235:*22* 241:*4* 246:*14*
**asking** 36:*3* 41:*22*
42:*20* 47:*2, 6* 50:*17*
51:*15* 56:*7, 8* 75:*9*
79:*25* 81:*23* 87:*22*
101:*3* 106:*3* 115:*8*
130:*15* 140:*21* 141:*8,
21, 23* 142:*1, 7*
144:*15* 146:*3* 155:*9*
156:*20* 161:*18, 18*
163:*8* 182:*21* 192:*18,
18* 194:*23* 196:*18*
227:6 229:*5* 230:*24*
232:*12* 234:*23*
**asks** 150:*9*
**asset** 213:*8, 11*
**assets** 92:2 213:*13*
**assistant** 59:2
**association** 139:*14*
**assume** 131:*16*
180:*19*
**Assumes** 23:*1, 11, 22*
24:6 25:*12* 41:*17*
42:*18* 65:*24* 67:*11*
80:*24* 91:*15* 119:*17*

187:*12* 188:*20*
211:*23* 221:*7, 20*
**Assuming** 211:*21*
**assumption** 195:*12*
**attach** 41:*10* 251:*3*
**attached** 61:*16* 250:*5*
**attachment** 17:*2, 13*
**attachments** 250:*12*
**attended** 144:*13*
**attention** 151:*7*
**attorney** 7:*13* 47:*16,
17* 48:*3, 5, 10* 49:*3,
10* 113:*19* 149:*22, 23*
150:*5* 187:*5* 252:*24*
253:*3*
**attorney-client** 47:*23*
**ATTORNEYS** 2:*9*
**auction** 19:*3, 7, 8, 10*
21:*20, 22* 22:*20*
**auctioned** 20:*12*
**auctioneer** 19:*9*
**audit** 125:*14, 15, 16,
17, 24*
**audited** 10:*3*
**August** 228:*8*
**Australia** 9:*20*
**Australian** 9:*12, 18*
**authenticated** 55:*6*
56:*10* 250:*7*
**authorization** 113:*20*
**authorize** 106:*11*
**authorized** 176:*15*
**available** 4:*7* 140:*17*
159:*15* 180:*11*
209:*10*
**average** 85:*19*
**avoid** 67:*21* 69:2
70:*22*
**aware** 22:*23, 25*
37:*22* 44:*22, 25*
45:*25* 62:*11* 105:*23*
110:*13* 130:*15* 132:*3,
6* 133:*4* 135:*5, 6, 12*
199:*15* 200:*18* 215:*1*
218:*19* 220:*14* 248:*5*
249:*3*

**< B >**
**back** 9:*10* 22:*22*
36:*23* 65:*1, 4, 14*

93:6 97:*19* 117:*14*
123:9 125:*1* 137:*14*
138:*3* 142:*24* 143:*18*
162:*21, 22* 164:*4, 6*
172:*15* 178:*15*
186:*13* 195:6 200:*25*
213:*13* 216:*21*
218:*25* 223:*20*
230:*24, 25* 231:*8, 23*
234:*12* 235:2 236:9
247:*19, 20* 248:*14*
249:*13* 250:*14*
**backed** 198:*12*
**background** 9:9
219:*25*
**backups** 198:*15*
**backwards** 124:*24*
127:9
**bad** 183:6 190:2
242:*1*
**balance** 9:*22* 36:*25*
37:*7* 45:*3, 13* 101:*19,
20* 122:*25*
**Bank** 17:*23* 18:*1, 7*
36:*19* 66:*13* 67:*25*
68:*15* 69:*12, 25* 71:2
85:9 89:*19* 90:*1, 6*
92:*1* 96:*12, 13* 97:*7*
104:*16, 19* 121:*13*
122:*1* 125:*18* 132:*21*
171:*15, 17, 18* 228:*17,
25* 229:*7, 16* 230:*1, 2,
4, 5* 231:*10* 235:*4, 16*
250:*19*
**banking** 122:*20*
**banking-related** 181:*5*
**banks** 72:*1*
**Barter** 218:*22, 23*
219:*8* 223:*8, 11, 19*
**based** 15:2 40:*14*
41:*23* 57:*20* 60:*7*
80:*5* 117:*15* 145:*20*
146:*12, 15* 147:*1*
148:*1* 160:*24* 163:*4*
173:*14* 174:*25* 186:*3*
191:*7* 212:*24* 222:*19*
**basically** 98:*19* 170:*1*
**basis** 176:*13* 194:*8*
**Bauchat** 94:*23*

**B-a-u-c-h-a-t** 94:*24*
**B-down** 66:*2, 7*
**bear** 17:*17* 200:2
213:*3*
**bearing** 136:22
**beginning** 32:*20*
**behalf** 4:*11, 21* 5:*12*
6:*13* 21:*21* 48:*21*
119:9 138:*6, 13*
145:*15* 207:*10* 247:6
**belief** 206:*6*
**believe** 93:*3* 113:*6*
124:*1* 227:*12, 13*
250:22
**bell** 94:*13* 172:*18*
248:*20*
**belong** 69:*17* 70:2
**belonged** 32:*18*
67:*12, 18* 68:*5* 69:2,
5, 10, 11, 18* 70:*2, 8*
71:*5, 23*
**belonging** 66:*20*
72:*24*
**benefit** 67:*14* 128:*14*
165:*1*
**benefits** 102:*4*
**best** 5:*20* 27:*7* 29:*14*
30:*20* 80:*7* 141:*6*
154:*11* 183:*24* 184:*2*
189:*25*
**better** 90:2 93:*7*
96:*10* 205:*21* 206:*14,
15*
**beyond** 171:*1, 10*
**bill** 171:*25*
**billion** 75:*22* 77:*21*
78:9 80:*21*
**bills** 58:*10* 86:*7*
106:*20* 130:*2*
**bit** 15:*22* 22:*3* 68:2
84:*14* 123:9 125:*5*
149:*3* 167:*10* 172:*15*
231:*21* 234:22
**blocked** 210:*21*
**BN** 95:*18*
**BNA** 7:*20, 24* 8:*5, 10,
14* 11:*25* 12:*25*
13:*14* 14:9 15:*5, 13,
15* 18:*1, 21* 22:*23*
23:*10* 24:*5, 13, 19, 20*

25:9  26:24, 24, 24
27:25  28:2, 3, 5, 8
30:14, 18  31:4, 4
34:7  35:18, 19  37:17
38:2, 11, 25  41:1, 5
43:3, 5, 6, 9, 17  44:19
45:3, 9, 20  48:21
49:2, 4  51:9  53:9, 17,
18, 19  58:3, 17  62:18
65:22  66:20  67:3, 12,
18  68:5, 16, 25  69:10,
12, 17, 25  70:2, 9
75:18  83:5, 6, 20
84:4  85:25  88:18, 19,
21  89:18  90:1, 3, 20
91:9, 9  92:5, 25
93:11, 19  94:4, 8, 14,
17, 21, 25  95:4  97:20
99:1  100:17  103:18
104:7, 13  105:10
107:21  108:14
117:16, 23  118:7
119:1, 10  120:5
121:1  122:24  125:16,
24  126:1, 3, 4, 8
127:17, 19, 19  128:13,
19  129:16  130:1, 5,
16  131:7, 11, 18, 25
132:6, 8, 12, 15  133:5,
6  134:1, 16, 17  137:1
138:6  159:1, 2, 3, 5,
21  160:5, 5, 6, 9, 13
161:24  163:13  165:1,
12  166:2, 4  167:1, 5,
12  168:1, 7, 7, 25
173:17, 20  174:11
181:7, 17, 25  182:12,
19  183:3, 13  184:17
185:14  195:16, 25
198:7  200:14  201:2,
4  207:10  209:25
210:4, 6, 21  211:14
212:15  219:14, 21
221:4  225:4, 5  226:8
232:7  242:21  244:11,
25  245:2, 21  247:8,
13, 18  248:15, 17
**BNA's** 51:2  68:7
71:3  160:6, 7

**BNI** 15:4  107:21
118:2, 21
**board** 35:21  36:13
129:2, 11, 14, 24
132:23, 24  133:2, 2,
14  135:15, 17  222:16
**BOE** 133:8
**book** 66:13
**bookkeeping** 249:18
**books** 30:16, 18, 22
31:4  32:2, 3  34:9
**bought** 18:21
**box** 177:2, 15, 22
178:5
**break** 64:14  142:18,
21  216:2  236:2
**breaking** 124:13
237:24
**Breifeld** 92:15
**B-r-e-i-f-e-l-d** 92:15
**Breifeld's** 200:8
**broad** 120:15
**broke** 203:21
**broker** 126:20
**brought** 151:6
**budget** 139:17, 20
**budgets** 173:2
**building** 170:5, 7, 8
203:12, 24  244:25
245:1, 4
**bunch** 145:25  157:14
**bureau** 56:18
**Burton** 52:4, 8
**business** 8:20  9:13
10:15, 16  11:8  31:5
52:3, 7  53:10  83:17,
23  89:19  90:9
141:16  145:4  160:7
165:2, 3  172:21
200:18  226:25
227:20  228:16, 22
232:7
**buy** 67:6  162:22
232:16
**buying** 86:14
**Byte** 144:24
**B-y-t-e** 144:24
**BYTON** 1:8  2:16
4:5, 22, 24  7:19  8:19
9:17  11:11, 13, 23

15:1, 8, 9  23:4, 7
24:10, 10  25:19
30:14, 23  31:14  32:1,
1, 4, 23  34:7, 11, 17
35:22  38:7  41:12, 12,
14  42:14  44:10  53:9
54:14, 14  55:12  57:3
58:1  62:1, 1, 1, 2, 12,
13, 18  63:9, 9, 9, 10,
14, 22, 23, 25  66:8, 16
74:14  79:20  81:3
82:12  87:20  88:16
91:25  97:4, 5, 14
100:21  106:23, 25
107:2  108:23, 24
127:20, 20, 23, 24
131:4  134:9, 18
135:11, 21  136:20, 23,
24  137:1, 12  138:13
140:16  141:18  142:8
144:25  145:15, 21
146:18, 19, 19, 19, 25
147:2, 19, 21, 23
148:1, 9  149:15, 19,
23, 23  150:6, 7, 8, 10,
14, 15  151:1, 23
152:11, 22  154:15, 16,
18, 18, 19  155:20
156:2, 10, 12, 15
157:1, 1, 7, 9  158:2,
15, 16, 18, 22  159:8, 9,
13, 17  160:9, 18
161:2, 10, 11, 13, 17
162:22  163:17, 18, 20
164:21, 23  165:2, 3,
18, 21, 24  166:9
171:6  176:23  179:24
181:12  184:7  186:10,
11  194:13  197:10
198:14, 23  200:11
208:5  210:17, 17
211:6, 11, 14  213:13,
17, 17  214:1  218:4, 9,
13  219:3, 10, 14, 21
220:8, 16, 22  221:12
222:18, 19  223:21
224:4, 12, 20  225:8
226:16, 24, 25  227:15,
15, 16, 19, 20  228:15,
16  229:10, 10, 15, 17,

19, 20, 21  230:6, 7
231:14, 14  232:5, 8, 9,
24, 25  234:2, 6, 8, 9
235:8, 9, 14, 17, 19, 20,
22  242:22  244:7
248:12  250:4
**Byton,** 154:14
**Byton.com** 109:1
**Bytons** 156:18
**Byton's** 23:15  52:3
141:18  144:2  145:1
156:11  162:24
172:23  173:24
183:19  194:11, 19
197:7, 7, 18  213:16, 24

**< C >**
**CA** 52:4  211:20
**cabinets** 107:1, 4
201:15  203:3, 11
**calendar** 4:2
**CALIFORNIA** 1:2
2:4, 7, 13, 19  76:20
92:1  96:21  123:12
124:22  125:7  135:10
252:15, 20
**call** 7:6, 8, 11, 14, 15,
20  53:11  60:20
107:2, 11, 14  133:7
177:15  183:25
205:14  245:8
**called** 2:2  6:13
53:19  61:2, 11  98:21
101:24  118:9  210:22
220:6  232:18
**calling** 4:2  27:11
223:17
**calls** 13:6  37:4  49:7
56:7  62:23  63:19
73:12  75:25  87:14
88:5  92:8  135:1
185:1  219:17  220:10
243:5
**can't** 42:11  51:23
55:18  59:3  94:20
95:5  97:10  98:12
100:4  109:3  130:6
152:13  155:3, 17
160:17  174:17  212:3

231:*5* 233:*25* 240:*13*
241:*23* 248:*25*
**card** 89:*19* 90:*11*
**cards** 90:*2*
**care** 8:*19* 58:*11*
115:*16*
**carnivals** 248:*25*
**carrier** 246:*1*
**Cars** 92:*14*
**Carsten** 92:*14* 200:*7*
**C-a-r-s-t-e-n** 92:*15*
**Case** 1:*7* 4:*4* 17:*24*
63:*7* 131:*12* 151:*8*
153:*8* 198:*25* 243:*20*
**cash** 101:*25* 102:*1, 2*
**cautious** 47:*22*
**Cayman** 23:*10, 17, 19,
20* 24:*1, 2, 14, 16, 21,
24, 25* 25:*19* 65:*22*
66:*14* 67:*4* 70:*1, 3*
71:*18* 117:*7, 13*
126:*6, 10* 127:*15*
128:*6* 130:*7, 17*
131:*3* 132:*8* 135:*16,
18* 137:*1* 158:*3, 9, 11,
12, 14* 164:*15* 210:*15*
217:*2, 21* 222:*17*
233:*16, 20* 234:*1, 5*
**Caymans** 24:*21*
127:*10, 13*
**Cayman's** 72:*24*
**C-e-a** 92:*14*
**ceased** 137:*13*
**Celesco** 176:*24*
**central** 185:*8, 24*
186:*3*
**CEO** 92:*17* 98:*20*
209:*12, 15* 211:*20, 21*
212:*4, 4* 218:*13*
**certain** 103:*7, 8*
122:*18* 138:*9* 177:*13*
195:*10* 208:*16, 17, 18*
209:*7* 212:*11*
**Certified** 2:*3* 35:*21*
36:*12* 252:*19*
**certify** 252:*21, 24*
**cetera** 62:*7* 245:*14*
**CFO** 98:*1, 3, 4, 11*
116:*20, 21, 23*

**chain** 174:*20* 175:*2,
5* 176:*9, 10* 199:*6*
**chairman** 135:*15*
222:*16*
**change** 56:*18* 84:*13*
195:*3*
**changed** 195:*6*
**chaotic** 112:*21*
**charge** 89:*8, 12*
99:*15* 103:*18* 118:*20*
174:*7, 11* 176:*17*
186:*6* 195:*15, 20*
233:*2, 5*
**Chase** 97:*7, 7*
**check** 18:*11* 90:*15*
97:*6*
**checklist** 213:*12*
**checks** 90:*19*
**Chen** 97:*2, 4* 220:*20*
221:*5, 17* 223:*7, 11, 24*
**C-h-e-n** 220:*21*
**Chen's** 223:*20*
**chief** 195:*22* 218:*9*
219:*9*
**China** 15:*2* 23:*15, 21*
25:*5* 28:*4, 6, 8, 12*
30:*24* 31:*4, 5, 8*
32:*21* 37:*8, 23* 43:*7*
48:*11, 19* 50:*14, 15*
51:*1, 3, 9, 12, 20*
52:*10, 11* 53:*11, 19,
20* 54:*6, 7, 21* 55:*16,
24, 25* 56:*17, 19, 21*
58:*4* 59:*9* 60:*8, 18*
66:*5* 70:*23* 71:*19*
74:*19* 75:*3, 24* 77:*14,
18* 78:*10* 83:*3* 86:*19*
99:*11* 108:*2* 117:*3*
126:*5* 145:*20* 146:*13,
15, 16* 147:*1* 148:*1*
154:*19* 173:*7, 9, 14*
174:*24* 175:*16, 17, 25*
177:*24* 178:*22* 179:*8,
10, 20* 185:*8, 13*
186:*1, 4, 11, 16* 187:*9,
24* 188:*10* 201:*23*
202:*1* 214:*8* 233:*1*
239:*25* 240:*6, 10*
247:*21* 248:*9, 12*
**China's** 213:*18*

**Chinese** 48:*8, 8*
49:*11* 67:*23* 71:*8, 13*
**Cina** 180:*3*
**circumstances** 96:*9*
**city** 180:*7*
**Civil** 65:*16* 143:*19*
236:*10* 249:*13*
**Clara** 52:*4, 8, 11*
53:*10* 58:*18* 174:*24*
175:*1* 179:*9* 180:*8*
201:*22* 203:*3* 214:*1,
8, 9, 10* 238:*19* 239:*6,
7*
**Claud** 197:*19*
**clean** 231:*21*
**cleaning** 234:*22*
**clear** 8:*25* 28:*24*
29:*1, 2* 159:*4* 185:*12*
192:*9*
**clearer** 40:*8*
**clearly** 76:*15*
**CLERK** 4:*1, 14, 16,
18, 25* 5:*9, 15, 18, 24*
6:*3, 10* 64:*11, 18, 21,
24* 65:*9, 11, 14, 16*
143:*15, 18* 216:*16, 18,
21* 236:*9* 249:*10, 13,
17, 19, 23* 250:*9, 11*
251:*13, 15, 18*
**client** 180:*21* 199:*18*
207:*1* 250:*8*
**clipped** 124:*19*
**close** 139:*14* 234:*12*
**Cloud** 75:*2* 76:*6*
77:*10, 13* 78:*10, 15,
17* 82:*6* 112:*21*
114:*4* 184:*14* 197:*4*
201:*25* 240:*12*
**Cloud-based** 74:*23*
193:*7* 197:*19, 22*
198:*15*
**CMC** 135:*16*
**collateral** 171:*2*
**collect** 197:*9*
**collected** 215:*21*
**COLLECTION** 2:*9*
18:*24* 50:*11* 197:*9*
**college** 9:*7*
**com** 50:*12*

**combination** 105:*20*
238:*25*
**come** 55:*15* 65:*1*
66:*16* 107:*18* 109:*20*
142:*23* 171:*8* 189:*14*
204:*9* 231:*23* 240:*17*
247:*2*
**coming** 69:*20* 72:*16*
132:*1* 229:*17* 230:*5*
235:*17* 249:*1*
**commencing** 2:*6*
**comment** 36:*4* 37:*24*
42:*24* 50:*17* 51:*16,
23* 55:*11, 18* 56:*9*
57:*2* 80:*17* 85:*23*
91:*23* 97:*10* 155:*17*
156:*20, 22* 178:*7*
229:*7* 231:*12* 233:*25*
235:*6* 240:*13*
**common** 59:*17* 89:*21*
109:*1* 177:*17*
**communicate** 108:*25*
129:*7*
**communicated** 130:*24*
131:*5*
**communicates** 160:*22*
**communicating** 109:*3*
**communication** 47:*23*
109:*16* 130:*21* 132:*6,
9* 155:*14*
**communications**
120:*10, 12* 160:*17*
**comp** 14:*8* 88:*13, 21,
23, 24* 89:*12* 246:*4, 7*
**companies** 39:*24*
40:*23* 126:*25* 220:*23*
224:*5, 7, 12* 225:*8*
232:*12*
**company** 9:*13, 14, 18*
11:*20* 12:*3* 19:*11, 11*
21:*20, 23* 22:*20*
24:*17* 25:*1, 3, 7*
30:*15* 31:*2, 24* 32:*2,
18, 19* 34:*8* 39:*14, 15*
40:*17* 45:*12* 47:*2*
60:*4, 5* 73:*6* 74:*15*
78:*18* 80:*1* 82:*21*
86:*19* 88:*24* 93:*5, 15*
94:*18* 97:*16* 106:*4*
107:*8* 117:*5, 6*

125:20  127:15, 24
128:11  136:10, 13, 16,
19, 24  141:5  158:9
159:13  163:3  166:4,
6  172:7  180:17
181:11  183:21  185:5
192:19  202:19
207:18, 21  208:13, 21,
24  209:9, 24  210:3, 4,
9, 11, 12, 13, 14, 21
211:4, 15  212:5
217:9, 13, 21  218:24
223:19  226:17
232:18, 21  237:4
238:4  239:2  242:21
244:2  247:6
**company's** 207:17
208:11  209:6, 16, 25
242:20
**competently** 220:25
**complete** 22:3  45:20
105:13  116:1  187:25
221:21  233:24
**completed** 176:11
179:1  229:11  230:9
231:16  235:11
**completely** 171:4
**compound** 14:12
23:22  26:5  27:4
33:25  36:8  69:13
75:25  92:7  130:10
146:2  148:18  224:25
237:16  245:16
**computer** 6:8  190:25
201:21
**computerized** 37:10
**concerning** 73:21
118:2, 6  181:6, 16
**concluded** 251:19
**conclusion** 13:6  88:6
**condition** 181:7, 17,
18, 25
**conditioned** 159:9
160:19  162:23
**confidential** 136:15
209:9, 22, 22  240:3, 16
**confidentiality** 210:10
**confirmation** 145:14
**confused** 26:13

133:25
**confusing** 146:2
**confusion** 75:16
**Congratulations**
102:23
**connected** 62:4  63:12
**connection** 80:25
154:6
**conservation** 184:10,
12
**consultant** 186:23
188:5  189:2
**consultants** 102:13
**contact** 82:15  118:6
157:9  188:18  199:5,
23  247:7
**contacted** 107:8
186:15  187:9, 24
188:6, 7, 10  189:2
**contacts** 121:18
**contained** 209:22
**contingency** 153:8
**continue** 19:19, 22
53:1  153:24
**continued** 86:20
**contract** 40:13  61:2,
25  63:8  79:20  80:20
81:1  134:22  159:8,
14  162:22  165:24
**contracts** 37:1  80:20
81:6, 9, 11, 16
**contractual** 40:24
81:2  165:22, 23
224:19
**contrary** 152:2
**control** 78:20, 24
95:13  104:9, 12, 24
116:11  117:16, 19
185:14  225:24  232:6
233:18
**controlled** 232:6
**controls** 233:16
**conversations** 130:13
**conversion** 67:22
**COOK** 2:9, 12  3:3
4:10, 11, 15, 17  5:7,
13, 14  6:1, 2, 9, 19
10:22  11:3, 5, 21
13:8, 11, 17, 21, 24
14:1, 14, 17  16:2, 5, 7,

11, 16, 22  17:3, 5, 8,
11, 15, 17, 20  18:16,
19, 23  19:19, 23, 25
20:2, 4, 6, 7, 10, 11, 17,
21  23:8  22:1, 2, 6
23:8, 13, 24  24:8
25:14, 16, 24  26:2, 6,
12, 15  27:9, 14  28:19,
23  29:3, 5, 7, 11, 19
30:7  31:1  32:10, 12,
15  33:3, 9, 13, 17, 19
34:5, 22  35:2, 7, 11,
13  36:5, 9, 10, 17
37:9, 15, 25  38:9, 17
39:6, 20, 22  40:1, 8,
10, 25  41:6  42:1, 4, 7,
25  44:14  45:19  46:3,
9, 11, 20  47:4, 6, 8, 9,
11  48:1, 4, 15, 24
49:1, 9, 19  50:3, 25
51:6, 18  52:13, 15, 17,
19, 21, 25  53:4, 7, 21
54:1, 3, 4, 8, 17, 25
55:8, 19  56:14, 25
57:14, 24  58:15, 21,
24  59:11, 12, 25
60:14  61:7, 9, 21
62:15  63:3, 4, 22
64:3, 8, 15, 20, 23
65:8, 10, 12, 15, 17, 18,
19  66:18  67:2, 9, 15
68:3, 11, 23  69:23
70:6, 13, 14, 19  71:16,
24  72:5, 7, 12, 22
73:8, 13, 15  74:1, 6, 7,
16, 25  75:6, 12  76:2,
8, 13, 16, 17, 24  77:4,
12, 16  78:7, 13  79:4,
16, 25  80:3, 10, 18
81:5, 9, 10, 14, 19
82:5, 10, 20, 24  83:11
84:9  86:5, 10, 22
87:16, 22  88:1, 3, 7,
12, 18, 20  89:3, 10, 24,
25  90:7, 24  91:4, 7,
18, 23, 24  92:9  93:4,
16, 24  94:1, 5, 22
96:19, 20  97:1, 23
99:6, 10, 19, 21, 24
100:12, 22  101:3, 8

102:20, 25  104:1, 6
105:4, 7, 8  106:9, 17,
18  107:7, 10  108:21
109:9, 11  110:2, 18,
24  111:9, 21, 25
112:1, 6, 14, 17  113:1,
12, 14  114:2, 10, 15
115:1, 2, 11, 14  116:9,
17  117:10, 20  118:13
119:23  120:1, 17, 23
121:4, 5, 7, 11  122:3,
9, 21  123:8, 14, 17, 20
124:6, 12, 14, 16, 20,
21, 25  125:2  126:3,
18  127:8  128:5, 21
129:4, 10, 13, 21
130:11, 25  131:15, 19,
24  132:5  133:12
134:7, 23  135:3
136:1, 3, 5  137:8, 9,
24  138:11, 17, 20, 24
140:5, 8, 22, 23
141:11, 23  142:1, 3, 6,
11, 17, 20, 23  143:5, 9,
12, 14, 20, 21, 22
144:13, 17, 20  146:4,
7, 9, 10, 23  147:12, 18
148:2, 12, 15, 19, 22,
24, 25  149:1, 9, 21
150:12, 19, 21, 22
151:1, 16, 19, 21, 25
152:6, 9, 14, 16, 18
153:5, 17, 18, 21
154:20  155:19  156:1,
8, 25  157:6, 25  158:7,
20, 23, 24  159:1, 6, 25
160:3, 15  161:5, 9, 14,
22  162:4, 14  163:10,
25  164:2, 5, 7, 9, 11,
19  165:10, 17  166:1,
17, 21  167:3, 8, 16, 19,
23  168:5, 11, 12, 16,
24  169:4, 21, 22
170:15  172:14
173:15, 21  174:10, 13
175:24  177:4, 6, 8
178:3  179:15, 19
180:22  181:11, 14, 21
182:4, 14, 22, 23
183:10, 11, 16  184:3,

*13, 21* 185:*3, 18*
186:*18* 187:*7, 13, 14,
23* 188:*8, 16* 189:*4,
11, 19, 22* 190:*4, 9, 22*
191:*12, 16, 22* 192:*2,
12, 21* 193:*3, 13, 16,
19, 20* 194:*3, 6* 195:*2,
14, 18* 196:*20* 198:*6*
199:*12* 200:*1, 18*
201:*1* 202:*12, 24*
203:*7, 16, 23, 25*
204:*8* 205:*3, 12*
206:*5, 13, 21, 23*
207:*2* 209:*13, 20*
211:*1, 8, 10, 12, 18*
212:*1* 214:*17* 215:*11,
15, 23* 216:*3, 5, 7, 11,
15, 17, 19, 23, 24, 25*
217:*10, 16, 19* 218:*7,
15, 20* 220:*2, 15, 19*
221:*8, 15* 222:*5, 12*
223:*3, 4, 23* 224:*10,
17* 225:*3, 11* 226:*1*
227:*9* 229:*23* 230:*14,
19, 22* 231:*1, 5, 7, 23*
232:*2, 15* 233:*7, 15,
22, 25* 234:*7, 14, 18,
20* 235:*1, 25* 236:*7,
12, 13, 17, 21* 237:*24*
238:*1, 2* 239:*5, 15, 23*
240:*5, 9, 15* 241:*2, 9,
15, 21, 25* 242:*3, 11*
243:*11* 244:*4, 16, 23*
245:*7, 11, 19* 246:*11,
15, 18* 247:*11, 24*
248:*1, 23* 249:*4, 9, 16,
22* 250:*2, 10, 11, 13,
18, 25* 251:*5, 9, 12, 14,
17*
**cook@cookcollectionat**
**torneys.com** 2:*14*
**cook@squeezebloodfro**
**mturnip.com** 2:*14*
**copies** 15:*17, 19*
177:*24* 180:*2, 3, 3*
201:*11, 15* 202:*14, 15,
25* 203:*1, 2, 9* 204:*3,
16* 205:*6* 213:*25*

**copy** 35:*21* 36:*12*
206:*11* 214:*24* 215:*3,
7* 251:*10*
**corner** 6:*5*
**corporate** 12:*21* 15:*8*
30:*24* 31:*7, 11, 18*
32:*17* 35:*21* 36:*13*
37:*7* 38:*19* 39:*4, 12,
23* 45:*7, 18* 58:*13*
59:*4* 60:*7* 77:*22*
78:*24* 98:*22, 24, 25*
99:*8, 15* 100:*6, 11, 14,
16, 24* 102:*16* 103:*4,
5, 10, 23* 104:*3, 8, 23,
23* 105:*2, 18* 108:*1, 4,
4, 10, 12, 15, 23*
109:*20, 25* 110:*19*
112:*7* 116:*1, 6, 11, 16*
118:*2, 10, 16, 20, 21*
119:*1, 4, 7, 10* 120:*5,
14* 121:*2, 10, 20*
122:*2, 6* 125:*13, 21,
22* 132:*4* 135:*6*
139:*19, 20, 22, 24*
172:*17* 173:*7, 8, 9, 13*
175:*21* 178:*11, 16*
180:*2* 188:*4, 9, 9, 17,
18, 22* 189:*13* 210:*7*
219:*10, 15* 220:*23*
221:*3, 3* 222:*3, 20*
223:*6, 6* 225:*14, 16,
21, 23* 233:*12, 24*
239:*25* 240:*4*
**Corporation** 1:*8*
2:*16* 4:*5, 22* 7:*19*
31:*12, 13* 35:*22*
129:*2* 138:*14* 186:*22*
212:*8* 213:*18* 234:*9*
**correct** 8:*9* 11:*7*
12:*18* 15:*9, 14* 18:*2,
8, 9, 11, 12* 23:*10*
24:*4, 14* 25:*9, 10, 22*
27:*23* 28:*4, 9, 14, 15,
17, 20* 30:*3, 9* 31:*16,
17* 32:*5, 25* 34:*13*
35:*18* 37:*12* 38:*3*
41:*2, 15* 42:*6* 45:*22*
48:*12* 49:*16* 50:*7, 8*
51:*3* 53:*22* 54:*9*
57:*10* 58:*18* 59:*9*

60:*11, 18, 19* 64:*5*
68:*8, 16* 69:*6, 7, 11,
12* 70:*3, 7, 8* 72:*20*
73:*22* 74:*9* 75:*4, 24*
77:*23* 78:*10, 21*
82:*11* 83:*5, 9* 84:*18,
21, 24, 25* 85:*2, 3, 5,
12, 13* 86:*8* 87:*8*
88:*17* 89:*6, 7* 95:*8,
11, 25* 96:*3, 4, 6* 97:*8*
98:*22* 99:*12, 13, 16*
100:*17* 103:*5* 110:*3,
4, 21, 25* 111:*4, 15, 15,
18* 112:*2, 3, 10, 15*
113:*8* 115:*15, 19*
116:*2, 12, 22* 119:*2,
16* 121:*21, 24* 126:*2,
11* 127:*11, 12, 18*
128:*6, 7, 9* 130:*2, 8*
131:*10, 14* 132:*14, 20*
133:*8, 18* 134:*1, 3, 10*
135:*9, 22* 136:*5, 23*
137:*17, 18, 21* 138:*4,
7, 14, 15, 16* 139:*3*
140:*19* 141:*12, 14, 19,
20, 24* 144:*6* 145:*11,
13, 16, 17, 23* 146:*14*
147:*20* 149:*11, 12*
150:*5, 20, 23* 152:*3*
155:*4, 21, 22* 156:*16,
23* 157:*13, 15, 17, 22,
23* 158:*2, 4, 15*
159:*16* 160:*10*
162:*12* 167:*6, 20*
168:*2* 170:*11, 12, 17*
174:*2* 177:*11, 25*
178:*13, 14, 19, 22*
182:*19* 183:*22* 186:*2*
188:*12* 191:*9* 192:*25*
193:*11, 17* 194:*1, 21,
24, 25* 195:*7* 196:*14*
197:*14, 21* 198:*16, 18*
200:*6, 9, 11, 12* 202:*8*
205:*9* 206:*7, 18, 19*
207:*23* 209:*5, 25*
210:*4* 211:*20* 212:*17,
22* 213:*1, 14, 15, 19,
20, 21* 214:*3, 3, 4, 5*
219:*1* 222:*7* 224:*14*
226:*3, 6, 7* 227:*3, 6*

232:*20* 233:*23* 234:*2,
6, 9* 239:*25* 241:*18*
242:*21* 244:*9* 246:*4,
5* 247:*15* 249:*22, 23*
252:*23*
**corrected** 195:*13*
**corrections** 137:*21*
**correctly** 5:*20*
114:*15* 117:*25* 155:*4*
208:*14*
**correspondence** 73:*18,
25*
**correspondents** 160:*22*
**cost** 32:*21* 124:*9, 23*
125:*6, 7, 10* 248:*15*
**costs** 139:*15*
**Counsel** 4:*8, 9, 23*
13:*24* 16:*23* 18:*18*
19:*16* 29:*2* 47:*25*
52:*15* 120:*10, 12, 13*
141:*3* 153:*2* 158:*19*
180:*18* 199:*14*
203:*18* 211:*7* 219:*9*
252:*25* 253:*3*
**counsels** 201:*8*
**Country** 56:*20* 59:*18,
23*
**County** 2:*5* 252:*17*
**couple** 138:*1*
**course** 135:*22* 199:*16*
**COURT** 1:*1* 5:*9, 11,
15, 17, 23* 31:*23* 44:*9,
13* 61:*16* 64:*13*
142:*17, 22* 143:*1, 7,
10* 216:*1, 4, 6, 10*
230:*14, 17, 21, 23*
231:*3, 6, 9, 18* 232:*1*
234:*16, 19, 21* 235:*3*
236:*4* 250:*14, 16, 21*
251:*2, 6, 11, 16*
**courtesy** 20:*9*
**COURTROOM** 2:*23*
64:*11*
**Court's** 151:*6*
**cover** 143:*11*
**covered** 140:*1*
**COVID** 87:*1*
**CPA** 111:*16* 113:*16,
21, 25* 114:*11* 123:*23,*

*24* 124:*5, 7, 8* 125:*23*
**CPAs** 109:*21*
**create** 198:*24*
**Creditor** 2:*3* 4:*13*
6:*14*
**CREDITOR'S** 3:*12*
**critical** 205:*1*
**crunch** 55:*23* 56:*17*
**CSR** 5:*12* 253:*12*
**current** 11:*18, 23, 25*
80:*6* 81:*23* 145:*2, 3*
218:*13* 220:*24* 243:*6*
**currently** 11:*11*
55:*22* 140:*16* 186:*8*
**customers** 43:*6*
**cut** 20:*7* 22:*12*
**cutting** 124:*15*

**< D >**
**Daniel** 12:*6* 154:*14,
15*
**dash** 144:*24*
**data** 185:*25*
**date** 8:*17* 144:*11, 13,
16, 19* 182:*20, 24*
183:*23* 192:*23*
**dated** 222:*14* 224:*2*
**dates** 12:*17*
**DAVID** 2:*12* 4:*11*
**day** 4:*4* 181:*7, 15*
192:*24* 198:*18* 253:*6*
**days** 157:*12*
**day-to-day** 173:*4*
232:*7*
**deal** 70:*3* 118:*9*
122:*22* 124:*24*
136:*19* 211:*3* 217:*12*
**dealing** 75:*22* 78:*9*
122:*4* 136:*16* 142:*9*
**debt** 164:*22*
**debtor** 4:*19*
**DEBTOR'S** 1:*16* 2:*1*
5:*4*
**debts** 11:*14*
**December** 8:*15* 12:*3*
169:*11, 13, 14, 20, 24*
181:*25* 214:*25*
222:*14*
**decisions** 118:*1*
165:*20*

**declaration** 32:*8, 9*
34:*25* 35:*12, 16*
135:*25* 138:*4* 195:*13*
221:*12* 227:*1, 4, 5*
**defaulted** 248:*4*
**defendant** 219:*4*
**Definitely** 218:*3*
**degree** 9:*5, 6, 7, 8*
**delay** 55:*22*
**delayed** 56:*23*
**delays** 50:*13* 55:*23*
**delete** 198:*1, 3, 4, 8*
**deliver** 37:*17*
**deliverable** 139:*17*
**deliverables** 139:*16*
**delivered** 191:*8*
**delivery** 9:*14* 139:*16*
**demand** 242:*25*
**department** 27:*25*
28:*3, 5, 8* 57:*10* 58:*2,
3* 186:*16* 191:*9*
192:*14* 201:*9, 10, 12,
18* 202:*13, 16* 203:*10*
204:*2* 205:*6* 215:*3, 8*
218:*24* 237:*23*
238:*19*
**departments** 57:*4, 8,
9, 19*
**department's** 201:*13*
**dependent** 132:*1*
159:*18* 163:*5, 20*
**depends** 147:*22*
**depo** 209:*1*
**deposed** 84:*6* 137:*16*
**deposit** 71:*1* 83:*18,
23* 89:*19* 90:*2, 9*
**deposited** 85:*9, 11*
171:*22, 23*
**depositing** 69:*18*
**deposition** 18:*20*
102:*21* 138:*1, 19*
139:*2, 5, 7, 8* 141:*4*
144:*12, 14* 151:*2, 20*
161:*20* 182:*21*
194:*24* 195:*1, 3, 6, 9,
12, 13* 200:*5*
**Depositor** 96:*13*
**DEPUTY** 2:*23* 64:*12*
**describe** 15:*23*

172:*21*
**design** 62:*3* 63:*11*
**destroyed** 240:*21*
241:*1*
**detail** 213:*11*
**details** 40:*13* 45:*17*
51:*24* 71:*14, 15*
207:*18, 22* 208:*12*
**determine** 112:*22*
**Develop** 61:*3* 62:*3*
63:*11*
**development** 9:*13*
61:*11* 62:*2* 63:*10*
**difference** 232:*23*
**different** 34:*20* 54:*13*
55:*9* 59:*19* 60:*9*
82:*22* 151:*1* 156:*12*
175:*22* 185:*9, 23*
196:*7* 197:*1* 210:*15*
245:*17*
**differential** 196:*9*
**difficult** 37:*24* 42:*7*
66:*4* 85:*22* 87:*1*
91:*22* 112:*22* 114:*5*
229:*7* 231:*11* 235:*5*
**difficulties** 114:*16*
**dig** 18:*6*
**digital** 80:*9, 11* 82:*12*
100:*6* 105:*17, 20*
201:*14* 204:*16* 205:*8,
21* 206:*4, 6, 10, 15*
238:*25* 239:*20, 24*
241:*8, 10, 17* 242:*4, 7,
17, 17*
**digitally** 202:*21*
204:*25* 205:*16*
**digitized** 196:*13*
**direct** 30:*2* 133:*17*
149:*5, 7* 151:*15*
153:*16* 154:*10, 11*
199:*4, 23*
**directly** 89:*4* 102:*13*
109:*17* 128:*19*
163:*22* 188:*5* 199:*5*
**director** 95:*10, 12*
224:*1, 4, 11* 232:*5*
**directories** 196:*10*
208:*5, 6*

**directors** 11:*12*
12:*25* 135:*16, 18*
222:*16*
**disburse** 102:*1*
**discharged** 237:*9*
**discipline** 238:*10*
240:*18*
**disclose** 47:*22*
120:*11* 136:*12*
**disclosing** 47:*24*
**disclosure** 238:*10*
**discussed** 150:*15*
151:*2*
**discussion** 222:*21*
**discussions** 47:*25*
**disk** 21:*6*
**distribution** 101:*25*
**DISTRICT** 1:*1, 2* 4:*3*
**DIVISION** 1:*2*
**DNA** 8:*7*
**document** 16:*3* 26:*19*
27:*5* 34:*4, 23* 35:*5*
36:*2* 42:*19, 24* 50:*18*
51:*16, 24* 52:*23* 53:*2,
3, 15, 24* 54:*11* 55:*5*
56:*9* 61:*8, 11, 13, 14*
62:*14, 23, 24* 78:*2*
91:*21* 96:*15* 97:*9*
113:*19, 20* 155:*8, 17*
157:*16* 183:*19*
194:*13, 19* 196:*5*
197:*8* 206:*11*
**documents** 25:*15*
27:*12* 37:*22* 53:*1*
58:*12* 67:*15* 81:*3, 23*
82:*3, 4, 13, 16* 103:*14*
105:*11, 13* 106:*6, 20*
109:*5* 111:*2* 118:*2,
10, 16, 21* 119:*1, 4, 7,
10* 120:*5, 15* 123:*6*
131:*17, 18* 140:*3*
182:*8* 184:*7, 8, 11, 13,
24* 185:*5* 192:*8*
194:*18* 195:*11* 196:*7,
25* 198:*24* 201:*6, 14*
202:*6, 7, 11* 204:*6, 23,
25* 205:*1, 15, 16, 17*
206:*3, 24* 207:*1, 8, 12,
15* 208:*16* 210:*7*
212:*19* 214:*19*

215:*20* 222:*20* 223:6
240:*25* 241:*7, 7*
243:*22, 25* 244:2
**doing** 14:*8, 9, 9, 10*
23:*5, 7* 24:*11* 38:*14*
43:6 53:*18* 59:*21*
60:8 79:6 113:*17*
126:4 141:*3* 169:*25*
187:*10* 234:22
**dollars** 66:*3, 7, 8*
67:*23, 25* 68:*1* 69:*20*
70:22 71:2 73:7
75:*23* 77:*21* 78:9
134:*3, 8* 228:*18*
230:*11*
**domain** 109:*1*
**doors** 168:*25* 169:*2,
5, 5*
**dot** 50:*12*
**dozen** 173:*11*
**drafting** 102:9
**Drive** 52:*4, 8* 207:*4,
4, 6, 7, 12* 210:*5, 5, 6*
220:*13, 14*
**driving** 62:5 63:*13*
**due** 26:*23* 43:*16, 17*
58:*10* 62:*18* 66:*11*
70:*24* 87:*1* 164:22
189:*1* 226:*10*
**duly** 6:*14*
**duties** 180:*24*

< E >
**earlier** 86:*1* 103:*16*
174:*16*
**early** 196:*1*
**earned** 135:*11*
**easier** 68:2 69:*20*
**easily** 37:*18* 247:7
**easy** 15:*16* 44:*4*
120:*3* 124:*23* 193:*8,
9, 22* 218:*21*
**eBay** 22:*17*
**EDAG** 1:5 2:*9* 4:*4,
9, 11* 5:*13, 13* 7:*13,
14, 15* 130:*2, 3, 4, 5,
14, 16, 21, 24* 131:*25*
132:7 141:*19* 142:*9,
12, 12* 157:*10* 159:*8,
9, 12, 17* 160:*18, 18*

161:*16, 24* 162:*10, 17,
22, 23* 163:*2, 12*
164:*13, 21, 22* 165:*5,
7, 11, 13, 18, 21, 25*
166:*3* 168:7 175:*12,
14* 176:*18, 21* 177:*13*
179:*25* 197:*9* 199:*6,
24* 213:*19* 214:*19, 21*
215:*20, 21*
**EDAG's** 175:*3, 8*
**education** 132:*24*
**effective** 61:*25* 63:8
**effects** 139:*17*
**effort** 167:*1* 228:*2, 3*
243:*24*
**efforts** 166:2
**Eidee** 82:*25*
**E-i-d-e-e** 82:*25*
**eight** 180:*25*
**either** 8:*17* 104:*14*
132:*13* 180:*4, 5*
223:*21* 230:*12*
**electric** 62:*3* 63:*11*
136:*16* 247:*14*
**Electronic** 16:*12, 13*
105:*16* 180:2 184:*10,
12, 17* 185:*15* 201:*19*
213:*18* 247:*17*
**electronically-stored**
197:*11*
**else's** 135:*24*
**e-mail** 16:*22, 23* 17:*1,
1, 2, 7, 13* 19:*15* 54:5
55:*10* 56:*3, 24* 73:*20,
25* 74:*2, 13, 22*
108:*10, 12, 13, 16, 24*
154:*23* 155:*15, 16, 21*
156:*3* 157:*3, 22, 24*
176:*3* 177:*2, 15, 17,
20, 22* 178:5 198:*15,
21, 21, 24* 199:*2*
200:8 218:2
**e-mailing** 73:*22*
**e-mails** 74:*6, 8, 14, 18*
75:2 130:*16* 131:9
177:*24* 184:*17*
194:*17* 197:*18, 24, 25*
198:*5, 10* 199:*8, 22,
22, 25* 201:*9*
**embarrassed** 8:*3*

**employed** 40:*3* 57:5
134:*19* 137:5 145:*21*
146:*25* 147:2 148:*5*
149:*14, 19* 150:*14*
151:22 152:*10, 22*
154:*14, 15* 200:*10*
219:*20* 252:*25* 253:*3*
**employee** 4:*24* 7:*23*
8:*4, 7, 10, 13, 18*
11:*18* 15:*1, 3, 5, 6, 7,
13, 15* 40:*17, 22* 41:*1,
5* 47:*1* 50:7 52:9
53:*11* 75:9 79:25
81:*23* 83:*2, 6* 94:*4, 8,
14, 25* 95:*18, 24* 96:*3,
6, 7* 97:*4, 5, 14* 106:*3*
115:8 137:*11* 145:*3,
3* 147:*19, 25* 150:*7, 8,
10* 154:*5, 16, 18, 18*
173:*17, 19* 192:*19*
198:*23* 199:2 200:*14,
21, 21* 201:*2, 4* 203:9,
11* 213:*9, 13* 218:*24*
221:*12* 223:*21* 224:*3,
6, 20* 225:5 226:*16*
232:5 237:*9, 10*
239:*6, 7* 242:*23*
244:*17* 247:6 253:*3*
**employees** 11:*13, 23*
18:22 19:5 82:*21*
84:*21* 85:*15, 19, 21*
86:*15* 88:*14* 89:*20*
90:*3, 19* 92:*4* 169:*6,
15* 170:2 195:*16*
196:*4, 5* 197:*10*
219:*11* 220:*24*
225:*17* 237:*7, 8*
239:8 240:*17* 241:*16*
242:*15* 243:7
**employer** 40:*12* 115:9
**employment** 15:*11*
40:*13* 62:*13, 25*
137:*12* 165:*18*
198:*19* 219:*10* 226:*4*
237:*21* 239:9 240:2
241:*17* 243:*3*
**ended** 69:*12*
**Energy** 24:*17* 25:7
31:*24* 210:*18* 232:*21*

233:*1, 11*
**engage** 149:6 153:*12*
**engagement** 165:*18*
**engineer** 195:22
**Engineering** 1:5 2:*9*
4:*5, 12* 7:*14* 9:8
44:*18* 57:*18, 20*
86:*19, 24* 106:8
139:*14, 15, 17* 140:*16,
25* 141:*1, 9* 160:8
175:5 176:*10, 19, 21,
22* 177:*10* 178:*25*
180:*4* 195:*10, 16, 21*
196:*18, 23* 199:6
204:*18, 20*
**engineers** 43:*11*
54:*15* 55:*14* 86:*20*
141:5
**English** 49:*11, 12, 14,
22*
**enhanced** 62:5 63:*13*
**Enlighten** 131:*12*
**ensure** 69:*19*
**entire** 28:8 132:*12, 17*
**entities** 25:5 30:*15*
32:2 34:*8, 18, 18, 20*
39:9 42:*11* 44:*1, 7,
10, 16, 20, 21, 22, 24*
45:*1* 51:*10, 11* 54:*13*
55:9 57:22 59:*19*
60:9 83:2 99:9
127:*25* 132:*18* 134:*2,
9, 18* 147:*1* 148:*1, 7,
9* 150:6 151:2
156:*12* 175:23
210:*15, 18, 19* 229:*11,
21, 22* 230:*9, 13*
231:*15* 233:*17* 235:*9,
22, 23*
**entitled** 90:*14*
**entity** 15:7 23:*15, 20*
24:*2, 11* 25:*6, 9*
32:*21* 37:*23* 38:*23,
24* 43:7 44:*3* 45:*18*
51:*9, 22* 53:*17, 18*
54:7 55:*16, 17, 18*
57:*3* 58:*1* 59:*18*
60:*10* 66:*10* 73:5
98:*21, 23* 99:*11*
102:*1* 126:5 127:*10,*

25 128:9 132:7
  149:19 154:19
  158:18 220:13
  229:12 231:17
  232:25 233:1, 8, 12,
  21 235:11
**Equalization** 132:25
  133:3, 14
equating 228:21
**equipment** 190:21
  213:8
erased 198:13
error 24:15 195:11
especially 194:13
**ESQ** 2:12, 18
et 62:7 245:13
**ETTEN** 2:16
everybody 65:10
  197:14 211:19
  216:11 243:16 251:9
evidence 23:2, 12, 23,
  23 24:7, 7 25:13
  27:4 36:15 41:18
  42:18 65:25 67:11
  80:24 91:15 92:8
  100:19 110:15
  119:18 131:16, 22
  187:12 188:21
  211:24 221:7, 20
  250:6
exact 12:17 19:12
  43:14 51:10 86:3
  95:6 125:8 169:17
  172:9 174:17 179:21
  196:1 198:22 200:19,
  23 234:10
exactly 23:6 32:22
  40:23 85:6 131:17
  147:10 150:4 175:4
  177:12 230:24
**EXAMINATION**
  1:16 2:1 3:3 5:4
  6:17 154:5
examined 6:14
example 230:10
exchange 56:18 62:5
  63:13
**Excuse** 25:17 64:11
  137:15 150:21

158:13
excused 249:18, 24
executive 218:9
ex-employee 244:10
**Exhibit** 145:10
  154:22 250:12, 13
  251:8, 8
**EXHIBITS** 3:3, 12
  250:4, 7, 22
exist 117:6
existed 82:4 170:3
  204:6, 25 241:7
expect 81:20 168:2
expected 130:23
  160:23 242:3
expenditures 102:1
expenses 172:12
experience 163:3
experiences 62:5
  63:13
experiencing 50:13
  55:22
experts 190:6
explain 33:20, 23
  53:8 58:16 60:20
  65:20 67:9, 13 68:20,
  24 69:15 70:14 73:3
  79:9 105:12 109:12
  134:15 146:22
  149:23 151:18
  165:22, 22 166:25
  209:4
explained 34:10
  54:12 55:8 99:5
  113:11 178:14 209:1
explaining 56:15
explanation 65:23
  109:5 204:1 228:18
extension 114:18
  193:23
extent 169:3 184:17
external 43:5 237:4,
  20

< F >
fabricate 151:22
fabricated 152:24
fabricating 152:17
facilitate 67:20 73:19

74:13
facilitated 67:24 69:4
facilitating 66:9 69:1
  230:9, 12
facilities 57:4, 22
fact 28:7 38:1 45:20
  66:15 84:17 85:1
  119:14 131:11
  142:16 168:18, 21
  196:11 207:21 244:1
facts 23:1, 11, 23
  24:6 25:12 41:17
  42:18 65:24 67:11
  80:24 91:15 119:17
  187:12 188:20
  211:23 221:7, 20
fair 10:19 49:5
  78:23 79:8, 13, 18
  93:20 95:19 99:2
  117:15, 17 120:19
  205:4 212:16
false 149:18 150:24,
  25 227:13
falsifying 151:9
familiar 9:21, 25
  10:2, 6, 12 11:6, 13
  17:23 60:22 110:5
  226:12
**Fang** 92:23 93:3, 10,
  18 96:14
**F-a-n-g** 93:3
far 49:5 72:19, 20
  113:5 227:22
fast 220:6
**FC** 217:2
feature 62:4 63:12
**Federal** 135:10
fee 62:6 79:11
feedback 176:13
fees 60:21, 22, 24, 25
  62:18, 20 63:6, 14, 16
feigning 70:15
**Fell** 2:12
fellow 29:23
**Fifteen** 64:22, 25
  216:6
figure 71:18 77:20
file 46:14 107:4
  109:21 114:13 115:6,
  9 187:5 188:25

193:9, 24, 25, 25
  214:24 215:3 226:9
**filed** 46:1, 1 61:16
  63:7 114:19, 20
  115:3 123:11, 19
  194:8 197:9, 10
  219:3 248:7
files 212:11 239:9, 10
  244:11
filing 45:16 46:14
  110:1 111:1 188:23
  201:15 203:2 204:11,
  15 205:2
fill 36:18, 20
filled 114:23
filling 110:20
final 128:22
finance 8:20, 23 9:1,
  2, 4, 5, 6, 15, 15 15:2
  30:24 31:8, 11, 18, 18
  34:9 35:18, 19, 23
  37:8, 17 38:19, 24
  39:4, 12, 23 45:6, 7
  57:9 58:3, 9, 13 59:4
  60:7 77:22 78:24
  83:5, 17, 20, 24 84:2,
  3, 4, 4 92:23, 25 93:9,
  10, 19, 21 94:7 95:17
  96:14 98:22, 24 99:1,
  8, 15 100:7, 11, 15, 16,
  24 101:13 102:16
  103:4, 23 104:3, 8, 11,
  23 105:2, 19 106:20
  108:1, 4, 11, 12, 15, 23
  109:20, 25 110:19
  112:8 116:2, 7, 11, 16
  121:2, 10, 15, 20, 25
  122:2, 6, 10, 22, 24
  125:13, 16, 21, 22
  128:13, 20 129:16
  130:22 131:5 135:6
  139:13, 20, 21, 22, 23,
  24 141:17 142:8
  144:5 145:4, 20
  146:12 172:17 173:1,
  2, 3, 7, 8, 9, 13 174:1,
  4 175:21 178:11, 16
  180:2 181:1, 3
  182:11 183:3 184:16
  186:22 188:4, 10, 17,

*18, 22* 189:*13* 196:*12*
201:*10, 12, 13, 18*
202:*13, 15* 203:*10*
204:*2* 205:*6, 20*
207:*11* 209:*11* 210:*7*
212:*8* 213:*18* 215:*3,*
*8* 239:*25* 240:*4*
**finance,** 93:*18*
**finances** 100:*17*
103:*18* 104:*13, 22*
118:*7* 207:*19*
**financial** 10:*3, 7, 9*
30:*16, 17, 22* 31:*3*
38:*2, 24* 39:*3* 58:*12*
95:*2* 102:*5* 106:*21*
110:*10* 129:*17*
172:*22* 183:*12*
186:*11* 207:*9, 17, 22*
208:*11* 209:*9* 212:*5*
**financially** 253:*4*
**financials** 208:*13, 21,*
*24* 209:*6, 16* 210:*11,*
*13, 22* 211:*15*
**find** 33:*14* 82:*16*
84:*1* 114:*5*
**fine** 7:*8, 17, 21* 64:*15,*
*24* 65:*8* 143:*5, 8*
144:*17* 231:*24* 251:*9,*
*12*
**finish** 66:*22* 93:*24*
94:*3*
**fire** 205:*17* 245:*5*
**fired** 243:*16*
**firm** 124:*5*
**first** 6:*14* 10:*8, 16*
67:*18* 68:*6* 71:*6*
98:*13* 138:*1* 154:*22*
177:*9* 195:*11, 12*
228:*24* 230:*15, 19*
**five** 131:*7* 200:*16*
**flashed** 157:*20*
**fleeing** 151:*10*
**FM** 24:*24* 68:*5*
**FMC** 23:*10, 17, 19*
24:*14, 16, 20, 24, 25*
25:*19* 26:*17* 41:*12*
65:*22* 66:*10, 14* 67:*4,*
*21* 68:*1* 69:*1, 2, 5, 8,*
*11, 18* 70:*1, 2, 8* 71:*5,*
*5, 8, 18, 23* 72:*24*

73:*5, 19* 74:*13* 117:*7,*
*13* 126:*5, 10, 23*
127:*10, 13, 15, 19, 20,*
*23* 128:*4, 6, 11, 14, 20,*
*22* 129:*1* 130:*7*
131:*3, 9, 13* 132:*8*
135:*14, 18, 20* 137:*1*
158:*3, 9, 11, 12, 14*
161:*3, 8, 17, 25*
162:*10* 164:*15*
165:*12* 170:*3* 210:*15*
217:*2* 222:*17* 233:*12,*
*16, 20* 234:*1, 5*
**FMC's** 68:*14, 15*
**focus** 102:*6*
**folder** 103:*13*
**folders** 100:*11* 101:*7,*
*12, 14, 17* 103:*7, 8, 14*
104:*3, 4, 10* 106:*23*
116:*8* 122:*18* 197:*2*
208:*16, 18* 209:*7, 21*
212:*12* 221:*25*
**folks** 109:*20* 130:*5*
165:*13* 178:*21*
**followed** 112:*10*
126:*23*
**following** 22:*22*
36:*23* 62:*17* 219:*13*
221:*1*
**follows** 6:*15* 145:*9*
231:*9* 235:*3*
**follow-up** 19:*17*
**foregoing** 252:*22*
**foreign** 56:*18, 18*
**forgive** 7:*5* 158:*1*
218:*8*
**forgiveness** 85:*1, 4, 6*
87:*13* 88:*1*
**forgotten** 19:*10*
**form** 80:*9* 160:*22*
205:*21, 22* 206:*4, 6,*
*11, 12, 15, 16* 239:*20,*
*21* 241:*17*
**formal** 15:*1*
**format** 241:*8, 10*
**former** 4:*23* 15:*1*
47:*1* 75:*9* 79:*25*
83:*2* 92:*17* 97:*5*
106:*3* 115:*8, 9* 154:*5*

192:*18* 218:*24*
220:*24* 225:*17*
**forms** 36:*19*
**forward** 103:*19*
**forwarder** 248:*3*
**found** 81:*13* 228:*1*
234:*19*
**foundation** 11:*18*
37:*4, 14, 20* 38:*5, 13*
39:*1* 40:*19* 41:*17*
45:*14, 23* 46:*19, 25*
48:*23* 49:*7, 18* 51:*15*
54:*11* 55:*2* 56:*8*
61:*20* 63:*19* 64:*10*
72:*3, 9* 73:*12, 23*
74:*4, 20* 77:*15, 25*
78:*11* 79:*24* 80:*13*
81:*7, 18* 82:*8, 18*
92:*8* 93:*13* 94:*19*
96:*17, 24* 106:*1, 16*
107:*5* 109:*23* 110:*23*
114:*24* 115:*7, 13*
116:*4, 14* 117:*9*
119:*18* 127:*4* 128:*25*
129:*9* 133:*9* 134:*25*
135:*23* 155:*7* 162:*2*
163:*1* 178:*1* 179:*14*
180:*12* 182:*3* 185:*2,*
*17* 187:*11, 20* 188:*1,*
*13, 21* 189:*21* 190:*7,*
*18* 191:*20* 192:*17*
194:*5* 199:*11* 202:*18*
203:*5, 14* 210:*23*
215:*13, 18* 217:*7*
218:*11, 17* 220:*11, 17*
221:*6, 19* 222:*9, 25*
223:*18* 224:*8, 16*
225:*9, 19* 227:*7*
233:*3, 9* 234:*3*
236:*20* 237:*13*
238:*22* 239:*11, 17*
240:*1, 11* 241:*11*
246:*8*
**four** 9:*19* 70:*12*
177:*21* 183:*21*
**fourth** 69:*16*
**FRANCISCO** 1:*2*
2:*5, 13* 4:*4*
**frankly** 149:*3* 151:*6,*

*15*
**fraudulent** 33:*18*
**freight** 248:*3*
**FRIDAY** 1:*17* 2:*6*
**front** 138:*18* 142:*3*
**frustrated** 33:*8*
153:*4, 5, 10* 154:*1*
**full** 122:*5, 7*
**fully** 138:*2*
**fully-operating** 57:*3*
**fully-operational** 58:*1*
**function** 98:*24, 24*
121:*18* 196:*6*
**functional** 57:*19*
196:*10*
**functions** 121:*17*
**funding** 9:*2* 66:*2, 3, 6*
**fundraising** 170:*3*
**funds** 50:*14* 55:*24*
126:*1, 3* 130:*18, 23*
132:*1* 158:*11, 12, 14*
159:*5, 10, 15, 19*
160:*5, 6, 7, 10, 14, 20,*
*24* 161:*2, 8, 16*
162:*17, 24* 163:*4, 5,*
*18, 19, 20, 22, 23, 23*
164:*15, 21, 23, 25*
165:*3* 167:*2* 168:*8*
170:*24* 187:*18, 22*
228:*22* 229:*19* 230:*6*
235:*19*
**furniture** 171:*12*
**further** 169:*6* 252:*24*
**furthermore** 253:*2*
**future** 68:*2* 69:*21*

**< G >**
**Gee** 130:*6, 17* 191:*5*
**geez** 25:*8*
**general** 50:*23*
**generalizing** 222:*2*
**generally** 9:*21* 10:*2,*
*6, 15* 110:*5* 164:*25*
**generate** 166:*7*
187:*17*
**gentlemen** 64:*19*
**ger** 17:*1*
**Germany** 55:*17*
59:*22* 229:*12* 235:*12*

**getting** 22:*12* 23:*5* 24:*11* 26:*13* 38:*21* 43:*7, 10, 14* 54:*15* 55:*13* 63:22 75:*17* 86:*6, 13, 15* 126:*1, 3* 137:*11* 153:7 215:*24* 226:*20* 229:*19* 230:7 234:*12* 235:*19*

**give** 5:*4* 8:*17* 20:*8* 21:*2* 54:*20* 112:*12* 154:*11* 191:6 192:*9* 237:*11* 243:*3*

**given** 8:*24* 15:*19* 47:*16* 48:*5* 112:*12* 207:*1* 219:*14*

**giving** 38:*21* 49:*3*

**global** 210:*5* 218:7 220:*13, 16*

**GmbH** 1:*5* 2:*9* 4:*5, 12* 7:*14* 41:*12*

**GMC** 130:*17*

**go** 9:*9* 11:2 14:*13* 20:*16, 20* 21:*1, 4* 22:*22* 26:*10* 27:7 33:*12* 34:*1, 16* 35:*9, 9* 36:*16, 23* 37:5, *21* 39:*19* 40:*7, 20* 41:*4, 25* 42:22 45:*24* 47:*10* 50:2, *21* 53:*5, 5, 16* 54:2 55:6 56:*12* 57:*13* 58:7 59:*15, 16* 60:3 62:*10* 63:*1, 20* 65:*4, 17* 66:*11* 67:*13* 69:*15* 70:*12, 17, 17* 72:*4* 75:*11* 77:*9* 81:*1, 25* 84:*13* 88:*8, 9* 91:*16* 99:7 100:*9* 101:*5, 11* 102:*24* 106:*4* 113:*13* 117:*14* 121:*23* 122:*16* 123:*9* 124:*3, 24* 126:*15* 127:*9* 128:*18* 129:*20* 131:*23* 133:*10* 138:*3* 140:*1* 143:*20* 146:22 147:*24* 149:*8* 150:*3* 154:*12, 22* 155:*11, 13* 157:*4* 162:*21* 166:*17, 25* 167:*25* 171:*15*

172:*4, 15* 173:*12* 175:*19* 176:*14* 177:*15* 180:*23* 181:*10, 20* 186:*13* 188:*25* 190:*19* 192:*3* 196:*18* 199:*19* 200:*16* 202:*20* 204:*13* 206:2 209:*3, 19* 211:*9, 23* 215:*19* 216:*23* 217:*18* 219:22 221:*23* 225:*1* 226:*21* 229:*4* 231:*20* 237:*18* 238:*23* 240:*18* 241:*5* 242:*10* 243:*10, 21* 244:*21* 245:*17* 249:*5, 15* 250:*14, 17*

**G-o** 50:*11*

**God** 59:*15*

**goes** 25:*18, 19*

**going** 6:*3, 4, 7, 21* 7:*9, 14, 18* 11:*10* 12:*9* 15:*17* 16:*3, 21* 19:*21, 22* 33:*13* 38:*20* 40:2 46:*13, 15, 17, 22, 22* 47:2 52:*20* 55:*23, 23* 59:*21* 61:7 64:*12, 16, 16* 72:*17* 77:*6, 20* 78:5 79:7 84:*5, 13* 102:*10* 103:*19* 109:*19* 110:*16* 115:6, *9* 132:*10* 150:7 154:*9, 10, 14* 159:*12* 161:24 164:*14* 165:*14* 168:*9, 13* 212:5 220:*6* 228:9 234:*12* 243:*17* 249:*4* 250:*4* 251:*6*

**Gong** 220:*20*

**Good** 4:*1, 20* 7:22 20:*10* 26:*21* 30:*12* 36:*9* 47:*9* 109:*14* 130:*20* 134:*13* 138:*25* 143:*11* 183:6 205:*23, 23* 216:*10* 224:2 232:*16* 235:*25*

**goodness** 167:*25*

**goods** 132:*13, 15*

**Gordon** 98:*13* 117:2

**got,** 27:*1*

**government** 243:*14*

**grade** 129:*24*

**grants** 63:*14*

**grants,** 62:7

**great** 102:22

**grossly** 35:*8*

**grossly-inappropriate** 27:6

**grounds** 248:*13*

**group** 8:*21* 9:*16* 28:*6, 11* 29:*18* 30:24 31:*9, 10, 11, 18* 32:*18* 34:*19* 37:*8* 39:*9, 10, 10, 12, 13, 25* 40:*23* 50:*11* 58:*14* 59:*4, 5, 8, 8* 60:*7, 9, 16* 77:*18* 86:*19* 97:*15* 100:*11* 104:*16* 127:*16, 24* 134:*18* 146:*18, 19* 178:*12* 185:*6, 7, 8, 22* 204:*18* 220:22 224:*5, 12* 225:*8* 238:*14, 15, 16, 17* 239:*3* 242:*13, 14, 18*

**G-r-o-u-p** 50:*11*

**group,** 59:*10*

**groups** 127:*17*

**growing** 171:*3*

**guess** 25:*21* 108:*15* 163:*13* 177:*23* 183:*6, 6, 6* 192:*24* 194:*23* 209:*3* 222:*10* 242:*5, 23, 25* 243:2

**guessing** 183:5 189:*12*

**guidelines** 85:*16*

**guy** 30:*9* 214:22

**guys** 85:*14* 216:*13* 222:*19* 249:*5*

**< H >**

**half** 75:22 77:*21* 78:*9* 80:*21* 173:*11*

**hand** 5:*1, 16* 64:*16* 253:*6*

**handed** 61:*15* 214:*20* 215:*21*

**hands** 70:*9* 239:*24* 240:*3*

**happened** 18:*13* 71:*3* 86:*14* 98:*17* 203:*1, 9, 13* 204:*1* 215:7

**happening** 43:*18* 229:*14* 235:*13*

**happens** 239:*10*

**happy** 16:7 142:*20*

**harassing** 77:2 111:*20* 189:*18* 191:*20* 223:*17* 242:*9* 243:*20*

**harassment** 168:*14*

**hard** 21:6 201:*11* 202:*14, 25* 203:*1, 2, 9* 204:2 205:*6* 214:*24* 215:2, 7

**hardware** 76:*19* 190:*25* 192:6

**He,** 87:*25*

**head** 92:*23, 24* 93:*9, 10* 116:*6, 15* 128:*12* 196:*18* 218:*23*

**headed** 173:*14*

**heading** 9:*13*

**headquarter** 51:*8, 9*

**headquarters** 50:*24* 51:*1, 2, 3* 52:*10, 10* 53:*12, 20*

**hear** 124:*18, 19* 152:*18* 164:*7, 9* 167:*10* 231:*5* 242:*12*

**heard** 30:*1* 61:*4, 10* 62:*8*

**hearing** 5:22 22:*3*

**held** 100:*6, 24* 178:*11* 249:*1*

**He'll** 148:*21*

**Hello** 164:*9*

**help** 6:*21* 82:*16* 154:*4* 164:2 192:*11*

**helped** 36:*20* 84:*19*

**helping** 237:*4*

**hereto** 253:*4*

**hereunto** 253:*5*

**Hey** 52:*18, 18, 18*

**hiding** 151:*10*

**history** 9:*10* 222:*18*

**histrionics** 149:6 153:*12*

**Hixson** 4:*3*

**Hold**   16:*16, 16, 17*
*41:7   56:5, 5   66:22*
*93:23, 23   105:11*
*107:22   135:13   145:8,*
*24   174:6   179:23*
*200:2   213:3   219:19*
*228:9, 11*
**holding**   24:*1   33:21*
*83:8   127:15, 24*
*158:9   233:20*
**holds**   38:*24*
**holiday**   54:*21*
**home**   244:*11*
**honest**   15:*10   26:12*
**Honestly**   124:*8*
**Hong**   210:*18   229:13*
*235:12*
**honored**   16:*7*
**hour**   64:*12   142:18*
*216:8*
**hours**   152:*2*
**How's**   6:*25   7:10*
*9:25   12:11   16:8*
*143:4*
**HQ**   50:*14, 15, 23*
*51:12, 20   54:6, 22, 23*
*55:24*
**HQ,**   55:*25*
**HR**   89:*5, 6, 8, 12, 15,*
*17   181:3   213:4, 5, 9*
*238:16, 19*
**HSBC**   36:*19   41:9*
*83:9   85:10, 11, 11, 12*
*90:15   171:16, 17, 19,*
*20   250:20*
**huge**   87:*4*
**human**   237:*22*
*238:13, 16, 16   239:3,*
*3   242:13, 14, 18   244:6*
**hundred**   134:*2*
**hundreds**   57:*5*

**< I >**
**Iconiq**   219:*4*
**I-c-o-n-i-q**   219:*5*
**idea**   223:*9   242:15*
**identify**   160:*17*
*212:19*
**illegal**   72:*18*

**imaginations**   148:*7*
**immediate**   97:*21*
**implies**   160:*23*
**important**   204:*10, 15*
*205:7, 15, 20*
**inadequate**   139:*16*
**inadvertently**   54:*6*
**inappropriate**   35:*9*
*42:21   52:21   56:11*
*77:7   155:11   229:3*
**inaudible**   37:*11   44:7,*
*7   55:1   87:17   91:3*
*101:10   131:19*
*183:10   203:23   211:8*
*242:3*
**inception**   47:*15*
**include**   36:*25   183:2*
*184:10   207:9, 21*
*211:19   212:14   220:8,*
*16*
**including**   112:*9, 9*
*114:13   136:22*
*183:12   184:16*
*204:10   211:19*
**income**   43:*12, 16, 22*
**incoming**   163:*4, 5, 20,*
*22, 23*
**incorrect**   68:*9   247:22*
**incredibly**   151:*13*
**independent**   30:*14*
*32:1   34:8*
**India**   202:*1*
**indicated**   62:*24   75:8*
*112:13*
**individual**   126:*25*
*217:12   244:8*
**individuals**   222:*21*
**inform**   112:*20*
**INFORMATION**
*3:19   19:20   72:13*
*75:17   76:1   77:22*
*82:1   102:13   108:16*
*110:1   112:8   113:4,*
*16   114:6, 12   120:4*
*129:1   151:10   186:23*
*187:25   188:4, 11*
*197:12   209:9, 22*
*212:5, 7, 8   226:9*
*240:3*

**informed**   75:*1, 6*
**innovative**   62:*4   63:12*
**input**   30:*23   35:15*
**instruct**   10:*25*
**INSTRUCTED**   3:*13*
*197:10*
**instructions**   192:*9*
**insurance**   245:*1, 4, 6,*
*7, 8, 12, 12, 13, 15, 21,*
*23   246:1, 7*
**insurances**   245:*17*
**intact**   239:*13*
**intellectual**   62:*6, 6*
*63:14   224:4, 12*
**intend**   46:*16*
**inter**   77:*1*
**interaction**   30:*2*
**interest**   181:*12*
**interested**   97:*11*
*253:4*
**interesting**   47:*7*
*224:1   243:8*
**interior**   245:*13*
**internal**   194:*17*
*201:8   204:19*
**internet**   22:*16   164:2*
**interpose**   52:*20*
**interrupt**   77:*2*
**invest**   166:*6, 8*
**investing**   69:*7   73:6*
*126:5   127:1   128:8*
**investment**   73:*7*
*145:3*
**investor**   73:*17*
**investors**   66:*7, 17*
*67:24   69:7, 18   70:21*
*71:1, 13, 14, 15, 23, 25*
*72:6, 25   73:5, 9, 14*
*126:2, 4, 5, 8, 10*
*127:1, 2, 3, 11   128:1,*
*15, 23   129:7   130:18*
*159:10, 22   160:23, 24*
*162:24   163:23*
*164:15*
**invoice**   24:*13, 20, 25,*
*25   25:8, 9, 11   26:25*
*27:16   79:10   176:9,*
*15   177:10, 14*
**invoiced**   79:*19*

**invoices**   25:*22   27:2*
*37:1   42:14, 16   79:23*
*80:8   81:17   101:16*
*106:7, 20, 22, 25*
*122:20   175:3, 6, 8, 12,*
*14   176:2, 18   177:14,*
*14, 18   178:8, 10, 11,*
*15, 18, 20, 24, 24*
*179:25   201:7, 16*
*213:19   215:21*
**invoicing**   79:*22*
**involved**   45:*6   89:4*
*90:5   139:13   159:19*
*175:2, 7, 11, 13*
*186:25   187:2*
**involvement**   172:*21*
**Irrelevant**   243:*20*
**IRS**   45:*21   125:10, 11*
**Island**   24:*2*
**issued**   42:*15   213:8*
**issues**   56:*16   69:3*
*70:23, 24   130:22*
*131:5   132:3   182:9,*
*10, 11   230:11   240:18*
**I-team**   213:*7*
**items**   171:*13*
**its**   52:*7   57:3   58:2*
*128:13, 22   130:1, 3*
*132:12, 17   159:8, 10*
*162:22   163:21*
*168:25   169:1   170:3*
*175:12   197:10   230:6*

**< J >**
**James**   94:*23*
**January**   169:*13, 14,*
*19, 23, 23   179:18*
*200:4, 13   211:3, 3*
*222:14*
**job**   9:*10, 17   95:1*
*101:7, 12   103:9*
*104:5   122:19   140:4*
*180:24   181:13   191:3*
*193:8, 9, 22   209:8*
**joined**   8:*19*
**jointly**   175:*5*
**Jonathan**   226:*13*
**J-o-n-a-t-h-a-n**   226:*14*
**journals**   9:*23   122:12*

123:*1*
**JPMorgan** 97:*7*
**Judge** 4:*7* 6:*6* 19:*24*
20:*3*
**JUDGMENT** 1:*16*
2:*1, 2* 3:*12* 4:*12, 18*
5:*4* 6:*13* 205:*19*
**July** 87:*10* 92:*25*
93:*8, 11*
**June** 55:*20* 56:*1*
87:*10* 92:*25* 95:*7*
228:*6, 7*
**jurisdiction** 151:*11*
**justify** 66:*9*

**< K >**
**KAMESWARAN**
1:*17* 2:*2, 16* 4:*23*
6:*12, 20, 23* 7:*1, 2, 3*
10:*24* 20:*16* 21:*1*
26:*10* 27:*7* 29:*14, 16*
30:*5, 20* 33:*12* 34:*1,*
*16* 35:*10* 36:*16* 37:*5,*
*21* 39:*21* 40:*7, 20*
42:*3, 22* 45:*24* 47:*1,*
*21* 50:*22* 53:*6, 16*
55:*7* 56:*6, 13* 57:*16*
58:*7* 59:*16* 60:*5*
62:*10* 63:*1, 20* 65:*3*
66:*23* 67:*13* 68:*21*
69:*15* 70:*17* 75:*11*
77:*1, 9* 80:*6* 81:*1, 22,*
*25* 87:*21* 88:*2, 9*
91:*16* 94:*10* 99:*7*
101:*5* 102:*24* 106:*5*
113:*13* 115:*10*
120:*11* 124:*3* 125:*9*
129:*23* 131:*23*
134:*13* 141:*6* 144:*12,*
*16* 147:*24* 149:*8, 25*
150:*3* 151:*17* 154:*12*
155:*13* 157:*4* 163:*9*
164:*17* 168:*23*
170:*17* 172:*4* 173:*12*
182:*16* 186:*8* 189:*25*
192:*3* 196:*19* 199:*19*
209:*3, 19* 211:*9*
217:*8* 219:*22* 221:*22*
222:*10* 229:*4* 236:*11*
241:*5* 242:*10* 243:*10,*

*21* 245:*18* 249:*20*
250:*1*
**Kameswaran's** 152:*24*
**Kanarsky** 248:*19*
**keep** 24:*23* 33:*7*
40:*2* 45:*12* 60:*5*
79:*25* 101:*3* 109:*14*
124:*13* 132:*10, 10*
136:*15* 172:*6* 205:*15*
246:*16, 19, 21* 247:*3*
**KEITH** 2:*18* 4:*21*
17:*9*
**Keith's** 17:*10*
**kept** 104:*22* 107:*9*
171:*13* 205:*16*
246:*22, 23*
**key** 199:*6*
**kind** 7:*12* 13:*5*
31:*22* 33:*3* 58:*11*
135:*1* 151:*14* 154:*8,*
*8* 207:*15*
**kindly** 230:*16*
**kinds** 207:*8*
**Kirsch** 12:*6, 11, 14*
13:*14* 154:*14, 15*
**knew** 49:*15* 84:*3*
108:*6* 113:*5* 116:*19*
131:*25* 159:*17, 19*
194:*9*
**know** 6:*3, 7* 7:*13*
12:*1, 2, 17, 22, 23, 24*
13:*19, 22* 15:*10, 12*
16:*14, 20* 17:*21*
20:*13* 21:*15* 22:*16*
23:*6, 18* 25:*21* 26:*23*
27:*16, 18, 21* 29:*22,*
*24, 25* 32:*24* 33:*7*
34:*4, 10, 25* 35:*12, 20*
36:*13, 13, 17* 38:*6*
39:*11* 40:*13, 23*
41:*20* 42:*15* 44:*20*
46:*8* 48:*4, 9, 11, 19*
49:*1, 5, 8, 21, 22*
50:*15, 20* 51:*10, 13*
54:*7, 18* 61:*18, 22*
62:*20* 63:*6* 71:*12, 14*
72:*5, 11, 13, 19, 20*
73:*9, 14* 74:*5, 23*
75:*14, 21* 76:*5, 7, 9,*
*12* 77:*17, 19* 78:*1, 1,*

*15, 18, 19* 79:*2* 80:*16*
82:*2, 3, 13, 21* 83:*19,*
*24, 25* 84:*15* 87:*12,*
*17, 22* 88:*3, 4, 4, 10*
90:*6, 12, 14, 17, 18, 20*
91:*5, 8, 10, 17, 21*
92:*6, 11, 15, 19, 21*
93:*4, 11, 14* 96:*9, 18,*
*25* 97:*3, 7, 9, 9, 11, 12,*
*19* 100:*3* 102:*15*
104:*9, 24, 25* 105:*1, 7,*
*18, 21* 106:*17* 107:*7,*
*15, 25* 108:*3, 5, 15*
110:*8* 115:*4, 5, 15, 15*
116:*7* 117:*12* 118:*5,*
*13, 14* 119:*8, 12*
120:*25* 126:*22* 127:*7*
128:*12* 129:*6, 10, 24*
130:*14* 131:*17*
132:*23, 23* 135:*7, 17*
136:*3, 4, 6* 138:*19*
150:*17, 18, 23* 151:*2*
153:*3, 6, 6, 7, 9*
158:*10* 160:*12*
161:*23* 162:*3, 6, 7, 8,*
*10, 16, 18, 18* 163:*3*
165:*5, 17, 20* 166:*3*
174:*14* 177:*12* 178:*7*
179:*21* 180:*14* 182:*1,*
*6* 183:*4, 5, 9, 15*
184:*8, 15* 186:*8*
187:*13, 17, 22* 188:*6,*
*7, 7, 14, 18, 24* 189:*1,*
*3, 5, 5, 6, 6, 9, 10, 13,*
*14* 190:*2* 193:*5, 6*
197:*5* 198:*22* 199:*25*
200:*6, 17, 23* 201:*24*
202:*2* 203:*6, 15, 19*
204:*5, 7* 209:*11, 18*
210:*20* 212:*9* 215:*8*
216:*12* 217:*1, 5, 14,*
*22, 23, 25* 218:*1, 12,*
*18, 22* 219:*15, 24*
220:*3, 12, 18* 221:*11*
222:*2, 4, 11* 223:*2, 3,*
*13, 20, 22* 224:*3, 19,*
*22* 225:*2, 4, 5, 6, 10,*
*22, 25* 226:*8, 8, 11, 15,*
*18, 19* 227:*16, 23*
228:*13, 13* 233:*5, 13,*

*24* 234:*4* 238:*6, 23*
239:*21* 240:*7, 8*
241:*5, 6, 7, 12, 13*
242:*4, 7* 243:*9, 17, 24*
244:*1, 1, 21, 22, 24*
246:*9, 10, 12, 17*
247:*17* 248:*10, 16, 25*
251:*3*
**Knowing** 166:*8*
**knowledge** 5:*20*
31:*15* 80:*6* 96:*1*
105:*23* 181:*24*
219:*12* 220:*25*
222:*17, 22* 224:*13, 21*
248:*11*
**knowledgeable** 183:*21*
**known** 12:*6* 90:*2*
248:*6*
**knows** 13:*22* 18:*19*
49:*22* 102:*20* 188:*22*
241:*18*
**Kong** 210:*18* 229:*13*
235:*12*
**ksipprelle@vstriallaw.c
om** 2:*20*

**< L >**
**lacks** 11:*17, 17* 37:*4,*
*14, 20* 38:*4, 13* 39:*1*
40:*19* 41:*16* 45:*14,*
*23* 46:*18, 24* 48:*22*
49:*6, 17* 51:*14* 54:*10,*
*24* 55:*2* 56:*8* 61:*19*
63:*19* 64:*10* 72:*3, 9*
73:*12, 23* 74:*4, 20*
77:*15, 24* 78:*11*
79:*24* 80:*13* 81:*7, 13,*
*18* 82:*8, 18* 92:*8*
93:*12* 94:*19* 96:*16,*
*23* 106:*1, 15* 107:*5*
109:*23* 110:*22*
114:*24* 115:*7, 13*
116:*4, 14* 117:*9*
119:*18* 127:*4* 128:*24*
129:*8* 133:*9* 134:*25*
135:*23* 155:*7* 162:*2,*
*25* 178:*1* 179:*14*
180:*12* 182:*3* 185:*2,*
*17* 187:*11, 20* 188:*1,*
*13, 21* 189:*21* 190:*7,*

*16* 191:*20* 192:*17*
194:*5* 199:*10, 10*
202:*18* 203:5, *14*
210:*23* 215:*10, 17*
218:*11, 17* 220:*11, 17*
221:6, *19* 222:8, *25*
223:*17* 224:8, *15*
225:9, *19* 227:*7*
233:3, *9* 234:*3*
236:*20* 237:*13*
238:*22* 239:*11, 17, 17*
240:*1, 11* 241:*11*
246:*8*
**lady** 89:*14, 16*
**landlord** 171:*3*
245:*22*
**lapsing** 33:*3*
**laptops** 18:*13, 21*
19:*2, 3, 6, 7* 20:*14, 23*
22:*1, 13, 19* 171:*11*
198:*11, 12*
**large** 101:*16*
**Las** 248:*17*
**late** 8:*22* 18:*5* 19:*4*
103:*16*
**Laugh** 148:*22, 22*
**lawsuit** 197:*10, 12*
219:3, *6* 248:*3, 7*
**lawyer** 18:*24* 19:*15*
61:*15* 135:2 148:*8*
219:*1* 223:*10*
**lawyers** 194:*11*
**leadership** 14:*3*
209:*10*
**leadership-level** 199:*5*
**learn** 91:*11* 215:2
**learned** 91:*13*
**lease** 170:*19* 245:*22*
**leave** 95:*3* 97:*18*
98:*7* 103:*15* 195:*25*
**leaving** 120:*9* 170:2
**ledgers** 9:*23* 122:*12*
123:*1*
**left** 8:*24* 11:*20* 12:*3,
7, 14* 13:*14* 19:*5*
74:*15* 82:*21* 87:*5*
96:*8* 100:*3* 104:*15*
106:*4* 107:*8* 117:*5*
141:*5* 147:*10* 169:*17*
172:*11* 180:*15*

181:*11, 15* 183:*21*
198:*19* 199:*9* 200:*17,
19, 23* 203:*8* 218:*24*
223:*14, 19* 224:*22*
226:*4, 17, 18* 239:2
244:*2* 247:*6*
**legal** 13:*5* 30:*14*
32:*1* 34:*8* 47:*18, 19*
48:*18* 87:*14* 88:*6*
181:2 185:*1* 214:*21*
215:*22* 218:*23*
**letter** 145:*9, 14*
**letters** 130:*16* 131:*9*
167:*5, 11, 25*
**level** 33:*7*
**Li** 98:*1, 6* 117:*1*
**L-i** 98:*6*
**Liability** 245:*12, 13*
**liaising** 59:*3* 185:*24*
**liaison** 185:*10*
**licensed** 62:*7* 63:*14*
**life** 132:*17*
**lifetime** 132:*12*
**lights** 172:*6*
**likewise** 83:*8*
**Limited** 15:*9* 25:*19*
30:*14* 31:*14* 32:*1, 4,
23* 34:*7, 12, 17* 62:*1,
2, 13, 19* 63:*9, 10, 15*
91:*25* 127:*20, 23*
135:*21* 137:*1* 218:*4,
9, 13* 219:*10, 15, 21*
220:*9, 16* 222:*18*
226:*24* 227:*15, 19*
228:*15* 232:*6, 8, 9, 24,
25* 234:*2, 6, 8*
**Line** 210:*13*
**lines** 34:7 62:*6*
154:*17*
**list** 123:*6*
**listed** 83:*17* 93:*3, 9*
94:*15*
**listening** 32:*22* 146:*9*
192:*24* 205:*19*
**litigation** 75:*8*
212:*20* 214:*13, 20*
219:*25* 220:*21*
242:*25*
**little** 22:*3* 64:*12, 14*
68:2 84:*13* 85:*4*

123:*9* 149:*3* 172:*15,
21* 228:*25* 231:*21*
234:*22* 238:*3*
**living** 136:*9* 213:*10*
**LLCs** 136:*22*
**LLP** 2:*16*
**loan** 36:*19, 21* 84:*15,
19, 20, 23* 85:*10, 17*
87:*3* 132:*21* 171:*16*
**loans** 132:*21*
**locate** 114:*12* 214:*15*
**located** 52:*4* 60:*16*
217:*25* 238:*18*
**location** 59:*24*
179:*19* 201:*24* 202:*5*
229:*12* 231:*17*
235:*12*
**locations** 59:*22*
82:*22* 185:*10, 23*
196:*9* 197:*3* 201:*14*
218:*7* 229:*15, 18*
235:*14, 18*
**locked** 182:*10, 19, 25*
**lockouts** 183:*12*
**logging** 103:*13*
**long** 64:*18* 65:2
98:*14* 131:*22* 147:*11*
**longer** 8:*7* 202:*18*
223:*21* 225:*5*
**long-term** 170:*19*
**look** 16:*24* 55:*20*
107:*22* 152:*16*
154:*21* 167:*13* 176:*4*
201:*5* 214:*11* 229:*16*
230:*4* 234:*14* 235:*15*
250:*17*
**looked** 131:*16*
145:*11* 156:*14*
**looking** 10:*18* 24:*18*
41:*23* 62:*16* 67:*15*
79:*6* 95:2 155:*10, 16*
173:*22* 201:*17*
208:*20* 210:*11* 217:*1*
220:*3* 249:2
**Los** 2:*6* 252:*17*
**losing** 9:*24* 10:*17*
85:*23* 87:*11*
**loss** 9:*23* 10:*18* 11:*7*
36:*25* 37:*7* 45:*8, 9*

101:*22, 23* 122:*11, 25*
**lost** 89:*15* 124:*25*
**lot** 43:*20* 85:*23, 24*
87:*4, 11* 89:*15*
114:*16, 16* 131:*9*
143:*10* 186:*12* 218:*6*
228:*3* 237:*14* 245:*17*
**louder** 238:*3*
**love** 27:*13*
**low-cost** 59:*18, 23*
**lower** 32:*21*
**lunch** 143:*3, 11, 17*
**lying** 150:*25*

< M >
**ma'am** 143:*6* 231:*5*
250:*14*
**Madame** 249:*17*
**Magistrate** 4:*2, 6*
**MAHER** 2:*23*
**maintain** 45:*12*
**maintained** 30:*15, 23*
32:2 34:*9* 45:*17*
92:*1* 180:*9* 237:*22*
239:*3* 242:*16, 18*
247:*5*
**making** 9:*24* 10:*17*
14:*23* 91:*14* 132:*3*
230:*8, 12*
**Mally** 97:2
**man** 31:*3*
**manage** 109:*7* 190:*20*
**managed** 32:*3* 34:*11*
57:*3* 58:*1, 13* 77:*18*
89:*4* 102:*13* 174:*16*
185:*6, 21, 22* 236:*23*
237:*1* 242:*13*
**manager** 8:*18* 28:*10*
55:*21* 83:*4* 89:*15*
94:*7, 12, 16, 17, 21*
95:*17, 23* 96:*5*
103:*12* 109:*18*
121:*15* 122:*1*
**manages** 78:*18* 80:*16*
**managing** 11:*12* 13:*2,
5, 13* 31:*3* 39:*5, 7, 9*
45:*5* 58:*3* 77:*13*
104:*16, 17* 117:*22*
121:*13* 139:*13* 192:*6*
**Manly** 97:*4*

**manner** 130:*23* 242:*19*

**MARCH** 1:*17* 2:*6* 4:*4* 87:*1, 10* 114:*19*

**margin** 134:*22*

**mark** 15:*24, 25* 35:*20*

**Mary** 144:*24*

**Mason** 149:*2*

**Matt** 218:*22, 23*

**matter** 43:*15* 205:*24*

**matters** 9:*22* 238:*10*

**MBA** 9:*8*

**mean** 22:*15* 76:*9* 103:*3* 105:*10* 108:*2* 126:*17, 24* 133:*1* 137:*6* 147:*22* 154:*16* 160:*13* 163:*22* 168:*22* 169:*5* 202:*4* 210:*24* 212:*24* 222:*1* 225:*22* 232:*8, 18*

**meaning** 157:*7*

**means** 9:*1* 13:*19* 30:*21* 59:*14* 102:*15* 163:*23* 190:*23, 24* 202:*5* 208:*7, 9, 22* 216:*3*

**meant** 146:*21* 149:*24* 151:*19* 163:*6* 172:*10*

**measures** 197:*11*

**meet** 49:*24* 124:*7*

**meetings** 129:*2, 12, 14, 25*

**memory** 20:*13, 22* 44:*18* 85:*7, 21*

**mention** 250:*23*

**mentioned** 39:*8, 22* 48:*17* 55:*10* 63:*21* 66:*4* 68:*25* 95:*20* 103:*6* 104:*4* 105:*18* 122:*17* 123:*7* 139:*12* 140:*2* 150:*5* 156:*13* 188:*3* 190:*24* 193:*5* 194:*17* 198:*12* 208:*15* 213:*25* 214:*20* 220:*12*

**Merz** 145:*10*

**M-e-r-z** 145:*10*

**mess** 75:*19* 112:*21* 113:*4, 22* 114:*1*

**met** 115:*17* 124:*8*

**met.'** 155:*3*

**microphone** 124:*13*

**Middle** 8:*12* 85:*22* 87:*5*

**million** 42:*6, 15* 43:*2* 134:*8* 155:*2, 21* 156:*3* 157:*13* 228:*18*

**millions** 134:*3*

**mind** 7:*15, 20* 151:*18* 195:*3, 7* 204:*9* 236:*1, 3*

**minute** 36:*22* 236:*1*

**minutes** 64:*20, 21, 24* 65:*6* 131:*7* 142:*19* 236:*5, 6*

**mis** 131:*15*

**mischaracterized** 152:*24*

**Mischaracterizes** 54:*11*

**mischaracterizing** 53:*24* 75:*7* 131:*21* 153:*13* 229:*2*

**misconduct** 151:*15*

**misleading** 32:*14*

**misrepresenting** 151:*4*

**missed** 98:*5* 114:*25* 125:*5* 158:*1* 187:*8*

**missing** 66:*15*

**misstate** 155:*23, 25* 226:*23*

**misstatements** 153:*3*

**Misstates** 23:*12, 23* 24:*7* 26:*5* 27:*4* 28:*21, 21* 33:*2* 34:*15* 36:*15* 48:*14* 51:*5* 57:*12* 60:*12* 62:*22* 71:*22* 76:*1* 92:*7* 100:*19* 110:*15, 15* 112:*11* 116:*13* 121:*22* 131:*16* 134:*12* 152:*8* 158:*6* 185:*16* 189:*7* 191:*19* 193:*2, 18* 195:*8, 9* 196:*16* 205:*11, 25* 206:*8* 240:*24* 241:*20* 244:*13*

**misstating** 52:*22, 23* 53:*14, 24* 149:*21* 153:*13* 228:*21, 24*

**mistake** 54:*9* 156:*4*

**mistaken** 54:*18*

**mitigation** 205:*14*

**moment** 21:*2* 180:*15* 231:*24*

**monetary** 226:*24* 227:*19* 228:*15*

**money** 9:*24, 25* 10:*17, 17* 23:*7, 18* 24:*19* 26:*17, 18* 41:*11* 42:*10* 54:*14* 55:*12, 15* 56:*16, 19* 63:*17* 66:*5, 8, 9, 11, 14, 15, 20* 67:*3, 6, 12, 18, 20, 22, 25* 68:*1, 5, 7, 7, 12, 14, 15* 69:*1, 5, 7, 9, 9, 17, 18, 19, 20, 24* 70:*8, 22, 23* 71:*2, 4, 8, 8, 13, 17, 19, 22* 72:*23, 23, 24* 73:*4, 17* 79:*7* 85:*8, 14* 87:*3* 102:*6* 126:*8, 10* 128:*8* 130:*6, 7, 8* 131:*8, 8, 11, 13* 132:*7, 18, 19* 133:*13, 16* 158:*2, 4* 159:*22* 160:*23* 161:*25* 162:*11* 163:*13* 165:*6* 166:*2, 9* 168:*1* 171:*3, 8, 9, 15, 16* 172:*8, 9, 12* 229:*9, 17* 230:*5, 7, 10* 231:*13* 235:*7, 16*

**monies** 63:*25* 72:*16, 18*

**month** 12:*15* 85:*19* 87:*7* 170:*10* 243:*13*

**months** 80:*1* 106:*3* 170:*22* 192:*20* 193:*23* 200:*25*

**morning** 4:*1, 20* 230:*10*

**most-qualified** 213:*24*

**Motors** 219:*5*

**move** 15:*16* 41:*7* 50:*5* 120:*24* 124:*20* 135:*13* 151:*24*

**moved** 229:*9* 231:*13* 235:*8*

**movement** 80:*20*

**moving** 124:*13* 174:*6*

**multiple** 27:*10* 104:*1* 146:*1, 1*

**muting** 237:*25*

**< N >**

**name** 5:*11* 6:*22* 19:*8, 10, 12* 25:*6* 27:*24* 29:*20, 20* 30:*1* 31:*2, 10* 46:*4, 23* 48:*11* 60:*3, 4* 82:*22* 84:*1* 88:*24* 89:*1, 2* 91:*9* 93:*1, 2, 3* 94:*9* 95:*21* 96:*2* 98:*5, 13, 13* 113:*7* 116:*24* 123:*23* 124:*5* 125:*20* 136:*11, 19, 22* 171:*18* 186:*5* 207:*4* 223:*25* 238:*4*

**names** 107:*25* 108:*5* 109:*2* 135:*17* 210:*19*

**name's** 83:*16*

**N-a-n-j-i-e** 232:*19*

**Nanjing** 24:*17* 25:*7* 31:*16, 19, 20, 24* 32:*4, 23* 33:*21, 22* 34:*12* 38:*1, 7, 11, 14, 23* 39:*3* 40:*3, 14, 16* 41:*12* 60:*11, 17* 77:*22* 99:*1, 9, 11* 210:*18* 232:*9, 19, 21, 22, 23, 24* 233:*1, 2, 6, 11*

**N-a-n-j-i-n-g** 31:*24*

**NA's** 52:*3*

**National** 97:*7*

**NDA** 238:*9* 240:*18*

**near** 215:*24* 216:*8* 226:*20* 236:*14*

**necessarily** 110:*17*

**necessary** 111:*2*

**need** 4:*18* 5:*1* 6:*6, 6* 17:*11, 12* 19:*6* 21:*3* 29:*9* 42:*23* 64:*13* 65:*2* 93:*24* 153:*12*

164:2 171:*13* 188:*24*, *25* 216:*8* 229:*16* 235:*15* 249:*20* 251:*5*
**needed**  4:*7*
**needs**  192:*9*
**neither**  252:*24*
**never**  30:*3, 8, 9* 35:*18* 62:*24* 67:*18* 68:*5* 69:*10* 78:*22* 91:*25* 124:*8* 163:*17, 18* 168:*1, 7* 201:*4* 225:*24* 226:*24* 227:*19* 228:*15* 240:*23, 25* 242:*13* 244:*15* 246:*22*
**New**  24:*17* 25:*7* 31:*24* 93:*4* 95:*22* 181:*13* 210:*18* 232:*21* 233:*1, 11*
**newspapers**  22:*17*
**No,**  140:*12*
**non-accountant**  87:*15*
**non-BNA**  92:*4*
**non-Byton**  44:*3, 6*
**non-employees**  91:*8*
**nonengineering**  196:*3, 5, 25*
**nonlawyer**  87:*15*
**non-tax**  135:*1*
**normal**  58:*11* 126:*22* 177:*14* 196:*4*
**normally**  187:*1* 190:*3*
**North**  1:*8* 2:*16* 4:*5, 22, 24* 7:*19* 8:*23* 11:*23* 14:*4* 23:*4, 7* 24:*10* 28:*10* 30:*23* 38:*8* 41:*13* 54:*16* 55:*13* 62:*12* 63:*23* 64:*1, 1* 66:*8, 16* 79:*20* 81:*4* 87:*20* 88:*16* 97:*4, 5, 14* 100:*21* 106:*23, 25* 107:*2* 131:*4* 135:*11* 137:*12* 138:*13* 140:*16* 141:*17* 142:*8* 144:*5* 150:*10* 152:*22* 154:*16* 157:*9* 158:*22* 159:*17* 161:*13* 163:*17, 19, 20* 165:*21, 24* 166:*9* 171:*6*

173:*3* 174:*1, 5* 176:*23* 181:*12* 184:*7* 186:*10* 208:*6* 210:*17* 211:*6, 11, 14* 219:*4, 5* 221:*13* 224:*20* 226:*16* 234:*9* 242:*22* 244:*7* 250:*4*
**NORTHERN**  1:*2* 4:*3* 35:*22*
**note**  50:*10, 10*
**notes**  252:*23*
**notified**  213:*9*
**notify**  213:*10*
**November**  61:*25* 63:*8* 95:*15, 16* 138:*5* 139:*6* 141:*4* 144:*14* 145:*5* 147:*13, 20* 182:*24, 25* 195:*1* 199:*21* 214:*18, 25* 226:*10* 228:*4*
**Number**  2:*4* 34:*17* 35:*23* 42:*19* 80:*25* 85:*19* 87:*9* 150:*6* 169:*17* 176:*6* 179:*21, 22*
**numbers**  26:*13* 43:*15*
**numerous**  151:*1*

**< O >**
**oath**  81:*15, 16* 228:*14*
**Object**  11:*17* 13:*4, 4, 15* 18:*14, 14* 20:*15, 24* 21:*2, 24* 23:*11, 22* 24:*6* 25:*12, 23* 26:*1, 4* 27:*3* 28:*18* 30:*19* 32:*6* 33:*1, 24* 34:*14* 35:*1, 25* 37:*13, 19* 38:*4, 12* 39:*1, 17* 40:*5, 18* 41:*16, 16* 42:*17* 45:*14, 23* 46:*18, 24* 48:*13, 22* 49:*6, 17* 50:*1, 16* 51:*4, 14* 52:*12* 53:*14, 23* 54:*10, 24* 55:*2* 57:*11* 58:*19* 61:*5, 19* 62:*22* 64:*6* 65:*24* 67:*8, 10* 68:*10, 17* 70:*4, 11* 71:*9, 21* 72:*3, 9* 73:*1, 11, 23* 74:*4, 10* 75:*25* 76:*22,*

22  77:*6, 15, 24* 78:*11, 25* 79:*14, 24* 80:*13* 81:*7* 82:*8, 18* 83:*10* 86:*2, 9* 87:*14* 88:*5, 15* 89:*22* 90:*4, 21* 91:*20* 92:*7* 93:*12* 94:*19* 96:*16, 23* 97:*22* 99:*3, 17* 100:*8, 18* 101:*1* 103:*25* 105:*3* 106:*1, 15* 107:*5* 108:*17* 109:*8, 23* 110:*14, 14, 22* 111:*5, 19* 112:*11, 24* 113:*9, 23* 114:*7* 115:*7* 116:*3, 13* 117:*8, 18* 119:*17* 120:*7, 20* 121:*3* 122:*7* 123:*2, 13, 25* 126:*13* 127:*4* 128:*2, 16, 24* 129:*8, 18* 130:*9, 19* 131:*15* 133:*9* 134:*4, 11* 135:*23* 137:*3* 138:*8* 139:*25* 140:*7* 141:*2* 147:*5, 14, 21* 148:*11, 14, 17* 152:*5, 5* 155:*6, 24* 156:*5* 157:*2* 158:*5, 16* 160:*11* 161:*4, 11* 162:*13* 165:*8, 16* 167:*7, 15, 21* 168:*3* 169:*1* 170:*14* 173:*10, 18* 174:*9* 175:*18* 178:*1* 179:*13* 180:*12* 181:*18* 182:*2, 13* 183:*7, 14* 184:*1, 19* 185:*1, 16* 186:*17, 21* 187:*11, 19* 188:*1, 13, 20* 189:*7, 17* 190:*7, 14* 191:*11, 14, 19* 192:*16* 193:*1, 12, 15* 194:*2* 195:*8* 196:*15* 199:*10* 200:*15* 202:*10, 17* 203:*5, 14* 204:*4, 12* 205:*10, 25* 206:*8, 20* 208:*25* 210:*23* 211:*5, 16* 214:*16* 215:*9* 217:*7, 15* 218:*11* 219:*17* 220:*10, 17* 221:*6, 19*

222:*8, 25* 224:*8, 15, 25* 225:*9, 19* 227:*7* 228:*20* 233:*3, 9, 18* 234:*3* 236:*16, 19* 237:*13* 239:*11* 240:*1, 22* 242:*8* 243:*19* 244:*13, 20* 245:*3, 3, 16* 246:*8* 247:*9* 250:*4, 8*
**objecting**  77:*2*
**Objection**  10:*20* 14:*11* 23:*1* 36:*1, 14* 37:*3* 58:*5* 60:*12* 75:*5* 80:*23* 86:*16* 89:*9* 102:*18* 114:*24* 122:*14* 134:*25* 145:*24* 149:*20* 156:*19* 159:*11, 23* 162:*25* 177:*3* 181:*8* 194:*22* 195:*17* 215:*5* 223:*16* 241:*19*
**objections**  52:*21* 157:*14*
**obligated**  159:*21* 160:*2, 5, 9*
**obligated,**  160:*13*
**obnoxious**  33:*4*
**obtain**  186:*19*
**Obviously**  45:*16* 49:*14* 165:*23* 206:*14*
**Occasionally**  247:*2*
**occurred**  162:*1*
**o'clock**  142:*25* 143:*2, 5, 9, 12, 23*
**October**  114:*20* 155:*3*
**offering**  39:*24* 60:*8* 175:*22*
**office**  2:*5* 40:*14, 15, 16* 60:*17* 106:*23* 107:*3* 145:*20* 146:*13, 15* 172:*12* 180:*5, 6* 203:*3* 214:*1, 2, 7, 7, 9, 11* 238:*20*
**officer**  8:*17* 11:*25* 12:*6, 21* 48:*20* 218:*10* 232:*5*
**officers**  11:*12* 12:*1, 4*
**offices**  57:*4* 146:*16*
**offshore**  72:*8*

**Oh** 8:*2* 26:*16* 29:*11*
33:*9* 48:*10* 49:*13*
62:*7* 98:*4* 100:*16*
125:*1* 150:*18* 167:*11*
193:*21* 200:*2* 209:*20*
224:*2* 231:*6* 245:*10*
**Okay** 4:*1, 25* 5:*9, 15*
6:*10, 20* 7:*7, 12, 13,
22, 23* 9:*7* 10:*2, 6, 12,
15* 11:*10, 25* 12:*14,
24* 13:*2* 14:*25* 15:*3,
16* 17:*5, 16, 17, 21*
18:*4, 10* 19:*13* 22:*7,
22* 24:*3* 25:*3* 27:*15,
16, 18* 28:*16* 29:*20*
31:*2, 20, 25* 33:*16*
35:*7* 36:*18, 22* 37:*10*
39:*14, 20* 40:*17*
43:*22, 25* 45:*8* 50:*5*
55:*20* 59:*5* 60:*20, 24*
61:*2, 24* 62:*16* 64:*18*
65:*7, 9* 67:*8* 77:*6, 19*
78:*23* 79:*5* 80:*19*
83:*7, 14, 22* 84:*23*
85:*8, 14* 88:*19* 92:*13,
18* 93:*6, 17, 22* 94:*11*
95:*10* 96:*2* 97:*2, 11*
98:*9, 21, 25* 99:*14, 22*
104:*20* 105:*9* 111:*10*
112:*7, 20* 114:*21*
115:*6, 19* 116:*18*
118:*24* 120:*24* 121:*8,
19* 123:*9, 18, 23*
125:*1, 3* 127:*2, 17*
131:*1* 132:*10* 133:*7*
135:*7* 137:*19* 139:*11*
140:*6, 14* 141:*15*
142:*5, 16, 23* 143:*18,
25* 145:*14* 149:*6*
151:*16* 153:*3, 17*
154:*24* 155:*20, 20*
156:*14* 157:*11*
158:*15* 159:*2, 3, 21*
160:*25* 161:*21* 164:*4,
5, 9* 167:*4* 169:*12*
170:*22* 172:*15, 20*
174:*19* 175:*25*
176:*24* 180:*23*
181:*15* 182:*7* 186:*5*
190:*13* 194:*10*

198:*10, 14* 201:*21*
206:*14, 22* 207:*23, 24*
208:*1* 212:*10, 18, 18*
213:*23* 214:*6* 216:*9,
11, 14, 16, 21* 218:*21*
225:*12* 226:*8, 18, 20*
227:*18, 25* 231:*24, 25*
232:*1, 22, 23* 234:*21*
235:*25* 236:*1, 7, 9*
239:*6* 244:*24* 245:*10,
23, 25* 246:*13* 248:*6,
17* 249:*4, 9, 10, 15, 24*
250:*9, 11* 251:*11, 13,
15*
**once** 152:*14*
**ones** 156:*18* 179:*4*
**one's** 95:*16*
**open** 22:*20* 225:*22*
**operation** 9:*3* 14:*5*
54:*16* 58:*9* 163:*24*
170:*2* 171:*13*
**operational** 14:*19*
45:*6* 57:*17* 58:*8*
101:*13* 117:*12, 22*
174:*4* 178:*5, 6*
**Operations** 8:*23*
9:*14* 57:*4* 141:*16*
142:*9* 145:*4, 4*
172:*22* 173:*3, 4*
222:*18*
**operation's** 8:*20* 58:*2*
**opinion** 87:*15* 88:*6*
135:*1* 185:*2*
**opportunity** 96:*11*
137:*19*
**opposed** 100:*24*
**order** 106:*7* 109:*14*
176:*5, 5* 248:*20*
**ordinarily** 179:*24*
**organization** 121:*1*
147:*11* 159:*18*
172:*11*
**organized** 32:*19*
34:*21* 48:*18* 88:*25*
**origin** 71:*19*
**original** 8:*22* 162:*21*
238:*8* 252:*23*
**originally** 69:*5* 71:*8,
17*

**Orlando** 97:*12*
**Ortiz** 97:*12*
**Oto** 29:*17* 96:*5*
109:*18* 121:*15*
174:*16, 17*
**Outlook** 197:*20, 23*
198:*20*
**outrageous** 151:*5*
**outside** 125:*23, 23*
**overall** 58:*12*
**Overbroad** 30:*19*
37:*3* 38:*5* 61:*6* 86:*2,
9, 17* 100:*8, 19* 111:*5*
123:*2* 129:*19* 130:*9*
134:*5, 12* 138:*8*
140:*7* 167:*22* 177:*3*
181:*20* 182:*2* 196:*15*
224:*16*
**Overlapping** 87:*18*
203:*22* 242:*2*
**overseeing** 72:*16*
**owed** 130:*2*
**owes** 135:*20*
**owned** 60:*10* 248:*12*
**owner** 233:*8*
**owns** 234:*1, 5, 8*

**< P >**
**p.m** 251:*20*
**Page** 3:*3* 33:*22* 34:*3,
3* 144:*1, 1, 22* 145:*8,
12, 12* 146:*7* 154:*22*
160:*16* 172:*20*
173:*23* 210:*13* 227:*2*
**paid** 23:*5* 24:*11*
25:*25* 43:*7, 10, 14*
54:*15* 55:*13, 13*
63:*22, 25* 79:*20*
85:*15, 15, 15* 88:*22*
134:*20* 135:*10*
137:*11* 164:*14, 15*
165:*15* 170:*18* 171:*4,
17* 172:*6* 176:*12*
229:*10, 15* 231:*14*
235:*8, 14*
**paper** 105:*16, 24*
106:*20* 201:*19* 202:*7,
11* 204:*18* 205:*22*
206:*15*

**paperwork** 79:*8*
80:*22*
**Paragraph** 33:*22*
34:*3*
**pardon** 22:*24* 62:*7*
119:*14* 132:*24*
135:*14* 160:*25*
169:*13* 188:*18*
**part** 15:*21* 43:*19*
60:*7* 63:*23* 84:*18*
99:*9* 100:*14* 125:*22*
127:*19, 19, 20, 23*
159:*17* 175:*21*
213:*11* 214:*12*
221:*21*
**particular** 213:*11*
219:*25*
**particularly** 243:*6*
**particulars** 197:*5*
**parties** 129:*7* 253:*1, 4*
**party** 248:*18*
**pass** 176:*8*
**patient** 226:*21*
**Pauline** 163:*25*
**pay** 60:*25* 70:*21*
87:*12, 23* 88:*13, 21*
102:*10* 129:*23*
133:*14* 134:*24* 135:*9*
155:*2, 21* 156:*2, 15*
157:*12* 165:*7* 170:*25*
171:*25* 172:*5, 7, 8*
176:*15* 248:*15, 17*
**payable** 10:*12*
101:*15* 122:*11* 123:*6*
174:*8, 15, 18* 175:*17,
20* 176:*1, 3, 14, 16*
177:*11, 15, 18* 178:*12,
16, 21, 23* 179:*6, 10, 11*
**payables** 122:*19*
**paying** 14:*7, 7, 8*
18:*25* 44:*24* 55:*18*
58:*10* 73:*6* 85:*25*
86:*7* 130:*1* 132:*20*
133:*16* 167:*12, 14*
170:*8, 20, 22, 23*
171:*1, 5, 6* 172:*10*
174:*7* 175:*15* 191:*2*
229:*20* 235:*21* 237:*7*
238:*7, 7*

**payment** 26:*23* 51:*21*
101:*15* 102:*9* 106:*12*
132:*3* 141:*19* 144:*2*
159:*9* 160:*19, 23*
162:*23* 164:*22*
174:*11* 175:*11, 14*
176:*16* 178:*9, 17*
182:*10, 11* 204:*24*
229:*18* 235:*19*
**payments** 14:*24*
43:*23* 68:*2* 79:*22*
101:*18* 102:*7* 125:*18*
131:*6* 142:*10, 12*
163:*4, 21* 164:*24*
173:*5, 5, 24* 204:*20*
230:*8, 13*
**payoff** 166:*3*
**payroll** 14:*7* 58:*11*
85:*15* 140:*17* 172:*10*
180:*25* 236:*15, 22, 23,*
*23* 237:*1, 2, 3, 5, 6, 6,*
*7, 19, 21* 238:*5, 7*
**people** 57:*5* 58:*17,*
*20* 77:*22* 85:*23* 86:*7,*
*14* 87:*4, 5, 7, 11* 89:*5,*
*6, 13, 16, 18, 20* 90:*3,*
*8, 10, 16, 19* 104:*15*
106:*8* 107:*25* 108:*5*
114:*3, 16* 117:*3*
121:*9, 25* 128:*8*
134:*19* 151:*9* 161:*16*
162:*10* 163:*12, 12*
164:*20* 169:*17, 25*
170:*1, 13* 172:*11*
175:*25* 177:*22, 23*
179:*8, 8, 11, 20, 22*
180:*25* 183:*21* 186:*1,*
*7, 12, 15* 187:*9, 24*
190:*5, 6, 11* 199:*4, 5,*
*7, 23* 204:*20* 208:*17*
209:*11, 23* 210:*2, 9*
221:*24* 223:*15*
225:*12* 242:*5* 243:*18*
247:*2* 249:*1*
**people's** 109:*2*
**percent** 135:*20* 234:*1,*
*5, 8*
**percentages** 234:*10*
**performed** 41:*14*

**period** 59:*2* 98:*16*
103:*22* 114:*12*
171:*10* 243:*15*
**permit** 133:*5, 6, 8*
**Perry** 149:*2*
**person** 14:*23* 24:*18*
27:*24* 28:*1, 17* 29:*18*
38:*23* 44:*2* 48:*9, 19,*
*20* 49:*3, 13, 21, 22*
50:*11* 59:*1* 82:*23*
83:*1, 8* 90:*15* 92:*13,*
*19, 24* 96:*14* 97:*3*
99:*15* 104:*15* 108:*6*
116:*24* 118:*13*
121:*13, 19, 25* 124:*8*
127:*9* 132:*7* 135:*6*
140:*16, 25* 141:*1*
144:*5* 160:*25* 161:*16,*
*24* 162:*11* 173:*25*
181:*2, 2, 3, 4* 183:*18,*
*24* 184:*8* 185:*10*
186:*5, 15* 187:*3*
197:*7* 213:*10* 217:*6,*
*8* 223:*3* 239:*4, 4*
244:*6*
**personal** 219:*11*
220:*25* 222:*17, 21*
**personally** 87:*21*
119:*11* 124:*7* 164:*16*
175:*7, 11, 13* 198:*4*
**personnel** 8:*24*
**pertaining** 214:*19*
**Petitioner** 1:*6* 2:*9*
4:*12*
**PETITIONER'S** 3:*3*
**PG** 14:*8* 171:*5, 7*
172:*6, 7*
**Philippines** 202:*1*
**phone** 35:*23*
**phonetically** 97:*2*
**physical** 77:*11* 78:*16*
105:*20* 107:*1* 180:*3*
184:*6* 201:*15* 204:*14,*
*17* 205:*1* 206:*4, 11*
238:*25* 239:*21*
240:*13* 241:*8* 242:*17*
**physically** 96:*21*
202:*22* 205:*17*
**pick** 18:*25* 107:*12,*

*15, 18, 22*
**picture** 17:*6*
**piece** 76:*18* 204:*18*
**place** 13:*20* 14:*6, 10*
52:*3, 7* 53:*10* 67:*19*
68:*6* 71:*6, 20* 126:*24,*
*25*
**planning** 95:*2* 102:*5*
**plans** 42:*10*
**plate** 181:*13*
**platform** 16:*15*
**PLC** 2:*9*
**please** 4:*8, 19* 5:*2, 10*
11:*3* 33:*5* 83:*15*
86:*12* 90:*23* 93:*1*
94:*2* 115:*1* 119:*24*
125:*4* 153:*1, 2, 2, 10,*
*15* 182:*17* 227:*16*
231:*4* 234:*20* 236:*11*
**point** 14:*19* 38:*15*
57:*17* 101:*13* 130:*1*
171:*2* 202:*18* 205:*14*
206:*17* 221:*13*
**policies** 197:*7* 242:*20*
246:*6*
**policy** 246:*7, 7*
**portals** 182:*9, 19*
183:*1* 184:*14*
**portion** 32:*7* 171:*9*
**posed** 142:*3*
**possession** 248:*7*
**possible** 182:*7* 222:*6*
**Possibly** 183:*4*
**power** 47:*15, 17* 48:*3,*
*5, 10* 49:*3, 10* 113:*19*
187:*4*
**powers** 48:*6*
**PPP** 36:*19, 20* 84:*15*
85:*16* 87:*3* 132:*21*
170:*24* 171:*9, 15, 16*
172:*8, 9*
**practice** 21:*5* 89:*18*
90:*1, 8, 18*
**preceded** 165:*18*
**precedes** 62:*13*
**prefer** 136:*12*
**premies** 169:*15*
**premises** 169:*6*
**preparation** 188:*5*

**prepare** 139:*8*
144:*24* 194:*12, 18*
**prepared** 113:*16*
141:*17* 172:*22*
**preparer** 112:*13*
**PRESENT** 2:*23* 4:*7*
81:*24* 212:*8*
**preservation** 183:*20,*
*24* 185:*14* 194:*14, 19*
197:*8*
**preserve** 184:*18, 23*
197:*11*
**president** 12:*21* 49:*4*
**presumably** 49:*13*
**presume** 24:*13* 45:*20*
49:*4* 111:*14* 133:*11*
**pretty** 28:*24* 220:*21*
222:*15*
**previous** 9:*17* 197:*1*
199:*20* 231:*8* 235:*2*
**previously** 98:*11*
124:*1* 141:*15* 213:*17*
215:*4*
**Primarily** 176:*19*
**primary** 18:*1*
**principal** 2:*5* 52:*3, 7*
53:*10*
**prior** 9:*17* 60:*13*
67:*17* 71:*22* 144:*8*
194:*16* 196:*16*
204:*22* 208:*4* 214:*24*
243:*23*
**private** 127:*1*
**privilege** 10:*25*
**probably** 66:*13, 15*
93:*15* 138:*2* 151:*6*
197:*19*
**problem** 236:*6*
237:*10* 243:*2*
**proceed** 143:*20*
236:*11* 250:*12*
**proceeded** 62:*24*
**proceeding** 251:*19*
253:*1*
**proceeds** 226:*25*
227:*20* 228:*15*
**process** 101:*18*
106:*11* 126:*23*
153:*10* 177:*13*
188:*24* 190:*3* 196:*4*

processed  85:*10*
171:*16*  175:*15*
237:*20*
processing  173:*5, 6*
204:*24*  237:*5*
produce  188:*11*
produced  138:*9*
180:*19*  199:*16, 24*
206:*24*
product  8:*20, 20*  9:*1,*
*15*  43:*5*  86:*13*  95:*13*
166:*7*  173:*1*
production  95:*11*
products  166:*5*
professional  29:*9*
33:*6, 7*  111:*16*  153:*1,*
*11*
professionally  29:*13*
profit  9:*22*  10:*18*
11:*7, 13*  36:*25*  37:*6*
45:*8, 9*  101:*22, 23*
122:*10, 25*  134:*22*
program  9:*14*
project  9:*2*  144:*24*
145:*1*  196:*9*
project-related  196:*8*
pronounce  98:*13*
proper  79:*21, 22*
properly  27:*13*  79:*19*
property  62:*6*  224:*4,*
*12*
provide  62:*2*  63:*10*
119:*11*  120:*4*  128:*13,*
*19, 22*  132:*13, 15*
134:*19*  160:*8*  187:*25*
provided  63:*23*
102:*12*  110:*1*  111:*2*
162:*19*  176:*7, 21*
186:*23*
provider  134:*18*
166:*10*  198:*21*
236:*24*  237:*2, 3, 20*
238:*5*
providing  34:*19*  86:*7,*
*18*  100:*20*  129:*16*
132:*12*  165:*3*
public  108:*12*  126:*24,*
*25*  132:*14, 16, 19*
133:*22, 23*  136:*14*

publicly  126:*12, 14, 17*
punch  37:*11*
purchase  106:*7*
176:*5, 5*
purchasing  97:*15*
174:*22, 25*
pure  166:*9*
purpose  129:*15*  172:*9*
purposes  102:*9*
110:*1*  164:*21*  187:*10*
188:*5*  205:*2*
Pursuant  61:*25*  63:*8*
put  6:*5*  16:*18*  21:*23,*
*25*  53:*2*  66:*7*  67:*24*
90:*1*  126:*19, 20*
153:*2*  156:*16*  250:*6*
putting  73:*5*  75:*7*
150:*25*

< Q >

qualified  138:*6, 9, 13*
140:*17*  141:*18*  144:*1,*
*25*  145:*2*  172:*23*
173:*23*  183:*19*  184:*8*
192:*7*  194:*13, 18*
197:*7*  213:*17*  252:*20*
qualities  176:*6*
quality  179:*1*
question  11:*1, 4, 6, 22*
12:*10*  13:*18*  14:*2*
21:*4*  23:*25*  24:*9, 20*
26:*7*  27:*7*  35:*9*  36:*6,*
*8*  41:*22*  42:*5*  44:*4*
47:*8*  48:*16*  51:*7, 19*
52:*14, 22*  54:*3*  56:*12*
64:*9*  75:*13*  76:*5, 14,*
*25*  83:*12, 13*  86:*12*
92:*10*  103:*1*  107:*20*
109:*10*  111:*22*
112:*18*  113:*2, 15*
114:*25*  117:*21*
119:*22*  120:*13*
124:*19*  126:*24*
129:*22*  130:*12*  138:*3*
140:*9, 15, 18, 20*
141:*10, 25*  142:*3, 6*
143:*25*  145:*18, 21*
146:*6, 24*  147:*2*
149:*5, 7, 22*  150:*2*
151:*18*  154:*10*

155:*12*  156:*7, 22*
158:*8*  161:*6, 19*
162:*19, 21*  163:*8*
166:*11, 12, 20, 22*
167:*9*  168:*6, 13, 15,*
*17*  170:*16*  175:*7*
177:*7*  180:*24*  182:*17*
183:*8*  184:*2, 4, 6*
187:*21*  192:*22*
196:*17, 17, 21*  199:*2*
200:*10*  215:*2, 6*
219:*23*  227:*14, 17*
229:*3*  230:*20*  231:*1*
232:*17*  234:*13, 17, 24,*
*24*  239:*19*  242:*1, 9*
243:*8*
questioning  33:*25*
154:*2, 5, 8*  162:*16*
QUESTIONS  3:*13*
19:*17*  26:*10, 20*
29:*14*  33:*6*  42:*8*
52:*21*  77:*3, 7*  101:*3*
141:*7*  146:*1*  151:*15*
153:*16*  225:*1*  230:*25*
237:*14*
queue  176:*16*  178:*16*
quick  216:*1*
quickly  42:*9*
quit  96:*8*  224:*22*
225:*4*
Quite  97:*19*  182:*7*
218:*25*  223:*20*
230:*23*  250:*22*
quote  119:*6, 10*
204:*2*  225:*13*

< R >

raise  5:*1, 16*  64:*16*
130:*7, 23*  131:*8*
159:*10, 22*  160:*5, 6, 7,*
*10, 20*  161:*24*  162:*11,*
*24*  164:*21, 25*  165:*6*
166:*2*  167:*2*  187:*22*
237:*10, 11*
raised  131:*8*  162:*19*
168:*1*
raising  130:*7, 8, 17*
131:*11, 13*  132:*7*
158:*2, 3, 11, 12, 14*
159:*5*  160:*14*  161:*2,*

8, *16*  163:*13, 18, 19*
164:*15, 23*  165:*2*
168:*7*
ran  171:*3*  172:*13*
rasing  162:*17*
read  11:*11*  31:*25*
32:*7*  34:*6*  50:*9*  53:*1,*
*1*  56:*15*  61:*2*  63:*5*
102:*20*  111:*11, 12*
115:*1*  138:*12*  155:*4*
166:*11*  196:*17*
207:*14*  219:*20*
227:*18*  230:*24*  231:*8*
235:*2*
reading  11:*19*  30:*13*
50:*18, 21*  52:*9*  53:*15*
55:*4, 5*  119:*5*  135:*24*
138:*17, 23*  141:*3*
144:*8*  155:*9*  212:*24*
250:*23*  251:*2*
ready  193:*24*
real  15:*16*  38:*20*
146:*4*  218:*21*
really  16:*9*  27:*6*
28:*7*  32:*23, 24*  33:*14*
35:*3, 8*  42:*23*  44:*4*
51:*23*  55:*11, 18*
56:*11*  61:*8*  66:*4*
79:*5*  115:*10*  120:*2*
154:*1, 1, 7, 7*  155:*16,*
*17*  164:*12*  204:*15, 17*
247:*23, 24*
reason  33:*10*  205:*5*
223:*14*  242:*24*
reasonably  11:*15*
reasons  204:*10*
210:*10*
recall  59:*3*  66:*1*
86:*3*  92:*20*  94:*20*
95:*5, 6, 21*  100:*4*
103:*17*  108:*9*  109:*3*
124:*2, 4, 10*  125:*8, 12,*
*25*  132:*9*  133:*16*
137:*22*  138:*10*
139:*10*  170:*23*  196:*1*
200:*24*  245:*24*
receipt  66:*9*
receivable  10:*13*
27:*25*  28:*1*  122:*12*

**receive** 23:7 132:*19*
136:25  137:2, *10*
176:4  177:18
**received** 22:23  24:19
61:*1*  66:*3*  67:20
226:*24*  227:15, 15, 19
228:15
**receiving** 134:*21*
160:24  243:2
**recess** 65:13  143:17
216:20  236:8  249:12
251:16
**recitation** 205:*24*
**recollect** 42:*12*  44:6
46:*10*  71:15  94:9
108:2*0*  147:*10*
207:*11*
**recollection** 67:*16*
73:*3*  141:4  207:20
**record** 4:6  11:*11*
15:*24*  41:*10*  42:8
65:*11*, *14*  109:*13*, *13*
118:2*0*  143:*16*, *18*
151:*1*  152:*23*  153:*3*,
*13*  216:18, 22  229:24
230:22  231:20
234:*15*  236:9  249:*11*,
*13*  250:*3*  251:*15*
**records** 30:*16*  31:8
32:*3*  33:*21*  34:9, *11*
36:*24*  37:2, 6, *17*
38:2, 8, 24, 25  39:4, 7
64:*4*  75:*18*, *20*, *23*
78:9  100:6, *23*
101:*15*  105:*10*, 25
106:*4*, *10*, *14*  107:*12*,
*15*, *19*, 22  109:*21*
112:*21*  113:*21*  114:*1*
118:*2*, *10*, *12*, *15*, *17*,
*21*  119:*1*, *7*, *10*, *14*, *14*
120:*5*, *18*  129:*17*
140:*3*  180:*11*, *14*, *20*
181:*7*, *17*, *19*, *25*
182:*12*  183:*2*, *3*, *13*
184:*16*, *18*  185:*14*, *21*
186:*19*  191:*6*, *7*, *18*
192:*14*, *15*, *19*, *23*
196:*12*, *18*, *23*  204:*9*,
*14*, *17*, *19*  205:*8*, *20*
207:*10*  208:*10*

214:*15*  219:*11*, *15*
220:*8*, *23*  221:*3*, *4*
222:*3*, *20*  223:*8*, *15*,
*22*  225:*14*, *16*, *21*, *23*
228:*1*, *17*, *25*  229:*16*,
*24*  230:*2*, *4*  234:*15*
235:*16*  236:*15*, *22*, *23*
237:*1*, *12*, *21*  238:*11*,
*12*, *13*, *21*, *24*, *25*
239:*1*, *12*, *20*, *21*
240:*2*, *13*, *17*, *20*
241:*17*  242:*17*, *18*, *24*
243:*3*, *17*  246:*19*, *21*,
*22*, *23*  247:*3*, *4*, *7*
**records,** 32:*3*
**recovered** 171:*10*
**reference** 119:*4*
**referred** 34:2  250:22
**referring** 27:5  35:5
36:2  41:*19*  42:9, *18*
51:*21*, 25  54:5  55:*11*
56:*23*  63:24  66:*13*
91:22  97:*10*  131:*4*
133:22  158:*18*  211:6
**reflect** 4:6
**refrain** 151:*14*
**refresh** 207:*20*
**regarding** 80:2*0*
109:9  119:*4*  120:*4*
141:*18*  144:2  145:*1*
172:*23*  173:*24*
183:*18*, *19*  197:8
**register** 213:8
**registered** 44:*21*
217:*21*
**registration** 133:6
**regular** 129:2
**related** 9:2  44:*1*, *16*
119:*15*  173:2  197:*12*
201:6  237:22  247:5
252:25
**relating** 136:2*0*
**relations** 56:*21*
**relationship** 40:*24*
51:*10*  54:*12*  55:9
224:*20*  234:*11*
**relationships** 132:*4*
**relative** 253:2

**relevant** 101:6, *12*
198:24  212:*19*
215:2*0*  221:25
**relied** 112:7
**remember** 19:*12*, *18*,
*18*  21:2  29:*21*  43:*14*
84:*5*, *8*, *10*  89:*1*
98:*12*  110:*19*  114:*15*
137:*25*  162:*7*, *9*
169:*16*  174:*17*
207:*13*  210:*19*  212:*3*
218:6  246:*3*  248:2
**remembers** 161:*19*
**REMOTE** 1:*17*  2:*1*
**Renminbi** 67:*23*
**rent** 85:*16*  170:5, *7*, *8*,
*18*, *20*, *22*, *23*  171:*1*, *4*
172:*12*
**renter's** 245:8, *21*
**repeat** 8:*1*  11:*4*  63:2
90:22  91:*1*, *6*  93:*1*
119:*24*  125:*4*  127:22
129:*5*  146:*4*  158:*13*
184:*5*  227:*16*
**repeatedly** 140:*1*
151:*7*  209:*1*
**repeating** 24:*15*, *23*
60:*6*
**rephrase** 48:2  86:*12*
89:*24*  182:*16*
**replacement** 12:*21*
**reported** 98:*12*
195:22
**Reporter** 2:*4*  5:*10*,
*11*, *16*, *17*, *23*  31:*23*
44:*9*, *13*  64:*13*
142:*17*, *22*  143:*1*, *7*,
*10*  216:*1*, *4*, *6*, *10*
230:*14*, *17*, *21*, *23*
231:*3*, *6*, *9*, *18*  232:*1*
234:*16*, *19*, *21*  235:*3*
236:*4*  250:*14*, *16*, *21*
251:*2*, *6*, *11*  252:*20*
**reporting** 28:*11*
98:*20*
**repositories** 196:8
**repository** 105:*11*
201:*10*, *10*, *12*, *13*, *18*
202:*3*, *4*, *5*, *14*, *16*

203:*10*  204:2  205:6
**represent** 219:2*0*
**representation** 91:*14*
**representing** 4:22
5:*13*  155:5
**represents** 219:*14*
**request** 74:*13*  113:*19*
125:*18*  215:22
**REQUESTED** 3:*19*
71:*1*  136:*14*  187:4
192:8
**requesting** 179:2
212:7
**required** 101:7  102:6
103:8  104:5  122:*18*
140:*4*  163:*23*  170:4
192:*10*  209:7  242:*19*,
*19*, *22*  243:24  245:22
**requirement** 44:22
111:*1*
**requirements** 135:*11*
**reread** 212:*23*
**research** 57:4  61:*3*,
*11*  62:2  63:*10*
**resent** 67:*3*
**reside** 207:*12*
**resided** 206:*3*
**resides** 75:*14*
**resolution** 35:*21*
36:*13*
**resources** 237:*23*
238:*14*, *16*, *17*  239:*3*,
*4*  242:*13*, *14*, *18*  244:6
**respond** 13:*23*  27:*12*
29:*15*  42:*20*
**responded** 74:*12*
**Respondent** 1:*9*  2:*16*
4:*21*
**response** 144:*4*  148:6
**responsibile** 173:*1*
**responsibilities** 141:*16*
**responsibility** 8:*23*
9:*16*  160:7  184:2*0*,
*23*, *25*
**responsible** 8:*25*  9:*3*
21:2*0*  103:2*0*  117:22
142:8  144:5  160:*13*
162:*11*  173:*25*  174:5,
*18*  192:5  244:7

**restate** 83:*13* 185:*19*
230:*15*
**restricted** 102:*15*
103:*2, 3, 5, 6, 7*
207:*18, 19* 208:*1, 3, 7,*
*9, 12, 13, 18, 21, 23*
209:*23* 210:*2, 8, 22*
212:*11, 12, 14*
**restriction** 100:*25*
119:*15, 21* 212:*14*
**restrictions** 87:*2*
102:*17*
**result** 219:*9* 220:*22*
**retained** 238:*13*
**retention** 197:*8*
**return** 45:*21* 46:*14,*
*15, 16, 23* 47:*13, 14*
49:*2* 109:*22* 110:*6*
111:*4, 8, 11, 13, 15*
112:*2, 3, 19* 113:*6*
114:*13* 123:*11, 24*
124:*9, 16, 22* 125:*7,*
*11* 135:*8* 186:*14, 20*
187:*5, 10, 18, 25*
188:*11, 19* 189:*14, 15*
193:*10* 194:*1, 8*
**returned** 248:*8*
**returns** 46:*1, 5*
114:*22* 115:*3, 10*
123:*10* 187:*1* 204:*11,*
*15* 213:*13*
**revenue** 43:*9* 135:*11*
166:*7*
**review** 118:*9* 119:*6*
137:*19* 175:*8* 194:*17*
219:*10* 220:*23* 221:*2*
222:*20* 223:*5* 225:*13*
**reviewed** 175:*6*
178:*9* 215:*4*
**Reyes** 97:*12*
**ridiculous** 149:*4*
**right** 5:*1, 16, 25* 7:*4,*
*16* 9:*21* 12:*12, 16*
15:*13* 18:*11* 19:*12*
26:*24* 32:*19* 50:*9*
78:*20* 82:*7* 84:*22*
93:*2* 98:*14* 138:*20,*
*22* 141:*23* 142:*1, 2*
148:*13* 149:*13*
157:*13* 159:*7* 160:*16*

164:*7, 20* 168:*1*
176:*25* 190:*2* 192:*4*
204:*24* 212:*22* 213:*2*
216:*15* 230:*18*
231:*19, 22* 232:*6*
249:*4, 6, 7, 10, 21*
**rights** 48:*7*
**ring** 94:*13* 172:*18*
248:*20*
**risk** 159:*19* 205:*14*
**Road** 2:*18*
**Robert** 94:*23*
**role** 141:*16* 172:*25*
173:*1* 220:*22*
**roles** 8:*17* 9:*12*
**rollout** 143:*24*
**Ronita** 28:*13, 13*
29:*17* 50:*6* 51:*21*
54:*18* 55:*21* 59:*1*
96:*5* 103:*12*
**R-o-n-i-t-a** 28:*14*
**Ronita's** 53:*22*
**ROSE** 2:*23*
**Roughly** 170:*9*
**round** 166:*17, 18, 18*
**Rui** 94:*6*
**R-u-i** 94:*6*
**R-u-i-n** 93:*22*
**Rul** 92:*18* 95:*17, 18*
**R-u-l** 92:*18*
**run** 31:*14, 16, 16*
60:*10* 99:*1* 117:*8*
163:*24*
**running** 10:*16* 13:*14,*
*15, 19* 14:*5, 5, 6, 10*
27:*5* 31:*7* 87:*2*
210:*21, 25* 211:*4*
**runs** 117:*7*

**< S >**
**SADHA** 1:*17* 2:*1, 16*
6:*12, 20* 7:*8, 11*
44:*10* 96:*2*
**Sadha's** 177:*4*
**sale** 22:*1* 44:*2, 6*
171:*11*
**sales** 43:*3* 44:*15, 16*
133:*5, 8, 15, 17, 18, 20,*
*23* 134:*24*
**SAN** 1:*2* 2:*5, 13* 4:*3*

**Santa** 52:*4, 8, 11*
53:*10* 58:*18* 174:*24,*
*25* 179:*9* 180:*8*
201:*22* 203:*3* 214:*1,*
*1, 7, 9, 9* 238:*19*
239:*6, 7*
**sat** 233:*12*
**savvy** 74:*24*
**saw** 106:*19* 204:*22*
**saying** 26:*25* 54:*7*
57:*18* 71:*17, 25*
119:*6* 130:*6* 179:*6*
191:*5* 222:*3* 234:*17*
239:*20* 241:*23* 243:*3*
**says** 23:*18* 30:*14*
32:*1* 34:*7* 41:*11*
50:*13* 51:*1, 12* 52:*2,*
*2, 2* 57:*25* 61:*25*
62:*17* 67:*3* 91:*25*
92:*2* 93:*18* 130:*17*
135:*15, 20* 138:*19, 19,*
*20, 21* 139:*12* 140:*24,*
*24* 141:*15* 146:*5*
148:*4* 149:*14, 14*
150:*14* 151:*22* 155:*1*
156:*2, 14* 157:*11, 12,*
*15, 15* 159:*8* 162:*21*
172:*20* 173:*22* 175:*2*
177:*9* 179:*6* 180:*6*
182:*7* 189:*9* 194:*10,*
*11* 197:*6* 198:*14, 23*
202:*3, 13, 25* 207:*15*
208:*1, 11, 21* 210:*12,*
*13* 212:*10, 18* 213:*7,*
*7, 16, 23* 214:*22*
215:*6* 219:*8, 9*
220:*21* 221:*16*
222:*15* 226:*24*
234:*23*
**SBA** 133:*1*
**SBC** 132:*24*
**SBE** 133:*2, 7*
**scanned** 204:*23*
**Schedule** 110:*8, 9, 10,*
*20* 112:*9* 113:*5*
114:*13*
**screen** 16:*4, 10, 14, 15,*
*24* 247:*1*
**s-drive** 207:*3, 4, 7, 8,*
*9, 12, 16, 21* 208:*16*

212:*10, 13, 19* 220:*5,*
*8, 13* 221:*5, 18, 21, 25*
222:*1, 24* 226:*2, 6*
**S-drives** 220:*7*
**search** 197:*8* 198:*23*
200:*7, 7*
**searched** 199:*3, 23*
212:*19* 214:*24*
**sec** 240:*16*
**second** 16:*16* 17:*18,*
*22* 56:*6* 137:*14*
148:*3* 195:*6, 9* 231:*3*
234:*21*
**SECRETARY** 16:*20,*
*25* 17:*4, 7, 9, 13, 16*
164:*1, 4, 6*
**sector** 15:*8*
**see** 9:*24* 10:*17*
15:*18, 21, 22* 16:*4, 19*
17:*6* 19:*20* 27:*5, 12*
33:*22* 41:*12* 42:*11,*
*23* 45:*3, 8* 48:*6*
53:*13* 106:*7* 176:*10*
179:*16* 216:*9, 13*
223:*10* 228:*10*
229:*16* 230:*5* 235:*16*
237:*14*
**seeing** 26:*19* 27:*9*
42:*8* 229:*6* 231:*10*
235:*4*
**seek** 126:*8*
**seen** 10:*10* 51:*16*
61:*14* 62:*14, 24*
**sell** 18:*25* 43:*5*
134:*1* 166:*5, 7*
**selling** 22:*21*
**send** 44:*19, 22* 109:*4*
177:*11, 22*
**sending** 44:*25* 177:*21*
**sends** 50:*10*
**senior** 14:*3* 83:*4*
94:*6, 12, 15* 95:*17, 22*
121:*14* 209:*10*
**sense** 26:*20*
**sent** 23:*19* 24:*13, 25,*
*25* 26:*17, 18, 25*
65:*22* 67:*6* 145:*10*
167:*5, 12* 176:*2*
178:*15* 204:*23* 248:*8*

**sentence**  22:*4*, *5*  63:*3*
208:*20*
**separate**  30:*15*  32:2
34:*9*  53:*17*  232:*12*,
*25*  233:*1*
**September**  154:*23*
221:*16*  223:25  224:*3*
**ser**  76:*18*
**server**  74:22, *23*  75:2,
*14*, *16*  76:7, *7*, *18*
77:*10*, *11*, *13*  78:*15*,
*16*, *17*  197:*23*
**servers**  184:*14*
185:22  190:*21*  191:*1*
193:7  197:*4*, *4*
201:*25*  207:5  240:*12*
**service**  28:6  34:*19*
60:*8*, *21*, *22*, *24*  62:*5*,
*18*, *20*  63:6, *13*, *16*
79:*11*  121:*18*  134:*17*
165:4  166:*10*  175:22
179:*4*  237:*20*
**services**  25:*20*  32:*17*,
*20*  34:*19*  38:*15*  39:*8*,
*13*, *24*  57:*21*  58:*13*
59:*4*  60:6, *25*  61:*3*,
*11*  62:*3*  63:*11*, *22*
86:*8*, *19*  100:*20*
101:*17*  132:*14*, *15*
134:*19*, *21*  141:*19*
160:*8*  176:7, *21*
191:2, *2*  248:*18*, *24*,
*24*  249:*1*
**service's**  238:*5*
**set**  253:*5*
**setting**  90:*6*
**S-h**  93:2
**share**  16:*4*, *15*, *15*
41:*24*  129:*1*  225:*15*
**shared**  28:6  32:*20*
34:*19*  38:*15*  39:*8*, *12*,
*13*, *24*  41:*20*  57:*21*
58:*13*  59:*4*, *7*, *10*, *13*,
*14*  60:*4*, *6*  101:*17*
121:*18*  125:*19*
129:*24*  175:*21*  207:7
210:*5*, *5*, *6*
**shares**  135:*20*  234:2,
*8*

**sharing**  16:*9*  50:*19*
**Shawn**  176:*24*
**Shay**  39:*10*, *10*  59:*8*
**sheet**  37:7  45:*3*, *9*, *9*,
*13*  101:*19*, *21*  122:*25*
**sheets**  9:22  36:25
**Shi**  14:*25*  35:*17*, *23*
36:*11*  40:*3*, *11*  83:7,
*16*  90:*14*  92:*22*, *23*
93:2, *10*, *18*  96:*14*
99:*14*  108:*1*, *6*
115:*17*  139:2, *7*
145:*15*, *18*, *19*  146:*11*,
*12*  154:*23*  155:*5*, *20*
156:*15*, *23*  157:*12*
173:*14*  200:*10*, *13*
**S-h-i**  14:*25*  83:*17*
**ship**  10:*8*
**shipped**  247:*19*, *20*
248:*13*
**shipper**  248:*7*
**shipping**  248:*15*
**Shi's**  31:*9*
**short**  98:*16*  208:*20*
**Shorthand**  2:*3*
252:*19*
**shortly**  33:*14*
**shout**  149:*6*
**show**  53:*3*, *25*  55:6
61:*8*, *13*
**showing**  36:4  42:*19*
155:*8*  156:*21*  228:25
**shown**  35:6  36:*3*
52:*24*  56:9  250:*5*
**shut**  168:*25*  169:*1*
**sic**  8:*8*  15:*4*  23:9
24:*3*  25:*18*  39:*10*
52:*8*  59:*8*  69:*25*
70:*1*  92:*21*  95:*18*
118:*3*, *21*  130:*17*
135:*16*  140:*17*
160:22  169:*20*, *20*
217:*24*
**side**  66:*13*
**sign**  36:*12*  46:*15*, *16*,
*17*, *22*  47:*13*, *16*
83:22  89:*19*  90:*10*,
*15*  91:9  96:*15*
113:*20*  177:*10*  178:*8*,

*10*, *18*, *20*  187:*1*, *3*, *5*
**signatory**  18:7  95:7
**signature**  90:2
**signed**  35:*20*, *22*
47:*14*  48:*3*, *8*, *17*, *19*
49:*13*  97:6  106:7
111:*3*, *7*, *10*, *18*  112:2,
*15*, *19*  113:7, *11*, *18*
123:*21*, *22*  145:*9*, *14*
159:*8*  162:*22*  165:*24*
178:*14*, *24*  179:*24*
180:*3*  193:*14*  204:*18*
213:*25*  223:*24*
243:*13*
**significant**  56:*17*
**signing**  49:2, *15*  90:*9*
178:*23*  179:*4*
**signs**  96:*14*
**Silicon**  17:*23*  19:*11*
96:*12*  228:*1*  250:*19*,
*24*  251:*1*
**silly**  6:*24*
**simple**  38:*25*  120:6
146:*4*  164:*12*
**simply**  204:*11*
**single**  27:*10*  177:*20*,
22
**SIPPRELLE**  2:*16*, *18*
4:*20*, *21*  10:*20*, *24*
11:*17*  13:*4*, *10*, *15*, *21*,
*25*  14:*11*, *16*  15:*20*
16:2, *6*, *9*, *14*  18:*14*,
*17*  19:*16*, *21*, *24*  20:*1*,
*3*, *5*, *7*, *15*, *19*, *24*
21:*24*  23:*1*, *11*, *22*
24:*6*  25:*12*, *23*  26:*1*,
*4*, *9*  27:*3*  28:*18*, *21*
29:*1*, *4*, *6*, *8*, *12*  30:*5*,
*19*  32:*6*, *11*, *14*  33:*1*,
*10*, *16*, *24*  34:*14*  35:*1*,
*4*, *8*, *25*  36:*8*, *14*  37:*3*,
*13*, *19*  38:*4*, *12*  39:*1*,
*17*, *21*  40:*5*, *18*  41:*3*,
*16*  42:*3*, *17*  44:*11*
45:*14*, *23*  46:7, *18*, *24*
47:*5*, *7*, *10*, *21*  48:*13*,
*22*  49:*6*, *17*  50:*1*, *16*
51:*4*, *14*  52:*12*, *16*, *18*,
*20*  53:*5*, *14*, *23*  54:2,
*10*, *24*  55:2  56:5

57:*11*, *16*  58:*5*, *19*, *23*
59:*10*, *15*  60:*12*  61:*5*,
*19*  62:*9*, *22*  63:*18*
64:*6*, *10*  65:*2*, *5*, *24*
66:22, *25*  67:*8*, *10*
68:*10*, *17*, *20*  69:*13*
70:*4*, *11*, *15*  71:*9*, *21*
72:*3*, *9*, *21*  73:*1*, *11*,
*23*  74:*4*, *10*, *20*  75:*5*,
*25*  76:*4*, *11*, *15*, *22*
77:*1*, *5*, *15*, *24*  78:*3*,
*11*, *25*  79:*14*, *24*  80:*5*,
*13*, *23*  81:*7*, *13*, *18*, *22*
82:*8*, *18*  83:*10*  84:*7*
86:*2*, *9*, *16*  87:*14*, *19*,
*25*  88:*2*, *5*, *9*, *15*, *19*
89:*9*, *22*  90:*4*, *21*
91:*1*, *6*, *13*, *20*  92:*7*
93:*12*, *23*  94:*3*, *19*
96:*16*, *23*  97:22  99:*3*,
*17*, *20*, *22*  100:*8*, *18*
101:*1*  102:*18*, *22*
103:*25*  105:*3*, *6*
106:*1*, *15*  107:*5*
108:*17*  109:*8*, *23*
110:*14*, *22*  111:*5*, *19*,
*24*  112:*4*, *11*, *16*, *24*
113:*9*, *23*  114:*7*, *24*
115:*7*, *13*  116:*3*, *13*
117:*8*, *18*  119:*17*, *20*
120:*7*, *9*, *20*  121:*3*, *6*,
*8*, *22*  122:*7*, *14*  123:*2*,
*13*, *16*, *18*, *25*  124:*12*,
*15*, *18*  125:*1*  126:*13*
127:*4*  128:*2*, *16*, *24*
129:*8*, *18*  130:*9*, *19*
131:*15*, *20*  133:*9*
134:*4*, *11*, *15*, *25*
135:*23*  136:*3*  137:*3*,
*22*  138:*8*, *17*, *22*
139:*25*  140:*7*, *20*
141:*2*, *21*, *24*  142:*2*, *5*
143:*2*, *13*  144:*11*, *15*
145:*24*  146:*6*, *8*, *20*
147:*5*, *14*, *21*  148:*11*,
*14*, *17*, *21*, *23*, *25*
149:*2*, *20*  150:*18*, *24*
151:*17*  152:*5*, *8*, *14*,
*17*, *21*  153:*6*, *25*
154:*12*  155:*6*, *24*

156:*5, 19* 157:*2, 19*
158:*5, 16, 22* 159:*2,
23* 160:*2, 11* 161:*4, 7,
11, 18* 162:*2, 13*
163:*7* 164:*16* 165:*8,
16* 166:*12, 14, 16, 19,
23, 25* 167:*7, 15, 18,
21* 168:*3, 11, 14, 18,
21* 169:*1, 21* 170:*14*
172:*2* 173:*10, 18*
174:*9, 12* 175:*18*
177:*3* 178:*1* 179:*13*
180:*12, 16, 18* 181:*8,
18* 182:*2, 13, 20*
183:*7, 14* 184:*1, 19*
185:*1, 16* 186:*17, 21*
187:*11, 19* 188:*1, 13,
20* 189:*7, 17, 21, 25*
190:*7, 14, 16, 18*
191:*11, 14, 19* 192:*1,
16* 193:*1, 12, 15, 18*
194:*2, 5, 22* 195:*8, 17*
196:*15* 198:*4* 199:*10,
14* 200:*15* 202:*10, 17*
203:*5, 14, 18, 24*
204:*4, 12* 205:*10, 25*
206:*8, 20, 23* 208:*25*
209:*17* 210:*23* 211:*5,
9, 16, 21* 214:*16, 20*
215:*9, 13, 17* 216:*14*
217:*7, 15, 18* 218:*11,
17* 219:*17* 220:*10, 17*
221:*6, 10, 19* 222:*8,
25* 223:*16* 224:*8, 15,
25* 225:*9, 19* 227:*7*
228:*20* 232:*11* 233:*3,
9, 18* 234:*3* 236:*5, 16,
19* 237:*13, 16, 24*
238:*22* 239:*11, 17*
240:*1, 7, 11, 22, 24*
241:*4, 11, 19, 23*
242:*1, 8* 243:*5, 19*
244:*13, 20* 245:*3, 10,
16* 246:*8, 14, 17*
247:*9, 24* 248:*22*
249:*7, 17* 250:*1, 3*
**sir** 6:*22* 7:*22* 8:*1, 11,
14, 18* 9:*11* 10:*10*
11:*2, 16, 22* 12:*12, 17*
14:*2* 15:*14* 19:*12, 25*

20:*2, 4, 6* 23:*25* 26:*7*
27:*16, 18* 30:*10*
32:*16* 34:*13* 47:*13*
52:*5* 60:*11* 62:*21*
75:*13* 81:*21* 84:*16*
90:*13* 95:*19* 99:*2*
111:*22* 135:*19*
140:*12, 19* 141:*20*
144:*1, 6* 145:*6* 146:*5,
14* 149:*11* 150:*13, 23*
152:*7, 13* 153:*23*
159:*16* 162:*6* 167:*6*
168:*17* 172:*18* 203:*6*
212:*2, 16, 23* 213:*14*
220:*18* 225:*10*
226:*12* 227:*3* 232:*8,
17* 249:*3*
**sister** 43:*7* 51:*11*
**sit** 37:*2* 197:*14*
**site** 184:*7*
**sitting** 9:*16* 91:*12, 14*
160:*16* 184:*15* 191:*5*
199:*8* 207:*20*
**situation** 198:*22*
199:*25*
**six** 9:*19* 193:*23*
**skills** 183:*24* 184:*2*
**slowed** 43:*20*
**small-cash** 55:*22*
**smart** 62:*4* 63:*12*
**software** 190:*21*
191:*1* 192:*6* 198:*21*
**sold** 19:*3, 7* 21:*6*
107:*1* 134:*9* 171:*13*
198:*10, 13*
**solemnly** 5:*3, 19*
**soliciting** 127:*11*
128:*1*
**somebody** 16:*18*
32:*24* 40:*4* 48:*11*
51:*17* 73:*16, 22*
75:*19* 104:*7* 107:*11,
14* 115:*6* 116:*12, 21*
119:*9* 135:*24* 154:*13*
161:*23* 179:*23*
192:*23* 196:*3* 197:*17*
203:*17, 21* 211:*14*
243:*3*
**someplace** 199:*9*

**SONSERAYE** 2:*3*
5:*11* 252:*19* 253:*11*
**soon** 142:*18*
**sorry** 7:*25* 8:*2* 12:*2*
15:*11* 19:*13* 21:*10*
22:*2, 7* 26:*16* 27:*9*
29:*21* 30:*4, 8* 38:*10,
20* 40:*9* 44:*10* 46:*9,
13* 52:*17* 54:*20*
57:*25* 59:*5* 60:*3*
66:*19, 24* 73:*13* 78:*5*
82:*20* 83:*13* 89:*3*
97:*7* 101:*11* 107:*13,
20* 114:*25* 115:*22*
124:*10, 12* 125:*4*
126:*3, 7* 127:*21*
129:*5, 23* 133:*19*
139:*4* 158:*13* 165:*11*
167:*10* 169:*23* 170:*6*
177:*6* 181:*3* 182:*16*
185:*12* 195:*4* 198:*2*
200:*2* 208:*8, 8*
209:*14, 20* 210:*1*
220:*1, 6* 221:*11*
225:*2, 10* 227:*14, 17*
231:*6, 18* 232:*17*
238:*1* 246:*20* 248:*21*
251:*6*
**sort** 9:*15* 89:*3* 119:*3*
132:*4*
**sorts** 10:*7*
**sound** 12:*16* 143:*4*
176:*25*
**sounds** 84:*22* 216:*10*
**source** 55:*12* 165:*15*
230:*6*
**speak** 8:*3* 139:*2, 7*
194:*12* 238:*3*
**speaks** 49:*14*
**special** 197:*11*
**specific** 27:*15* 132:*9*
140:*3* 160:*17* 195:*10*
196:*22* 201:*6* 210:*6*
229:*6, 11* 231:*10, 12,
15* 235:*4, 10*
**specifically** 23:*17*
109:*3* 113:*3* 150:*9*
162:*23* 187:*4* 188:*24*
248:*5*

**specification** 229:*8*
235:*6*
**speculate** 46:*7, 8*
75:*9* 78:*3* 84:*7*
155:*10*
**speculating** 188:*14*
190:*3* 203:*20*
**speculation** 13:*6*
35:*4, 25* 36:*1, 15*
37:*4, 14, 20* 38:*4*
39:*2* 41:*17* 45:*15*
46:*18, 24* 48:*22* 49:*7*
50:*16* 51:*14* 55:*3*
56:*8* 61:*19* 62:*23*
63:*19* 64:*6* 73:*12*
74:*21* 76:*1* 78:*12, 25*
80:*14* 81:*8* 82:*9, 19*
92:*8* 93:*12* 96:*16, 23*
106:*2, 15* 107:*6*
109:*24* 110:*23*
128:*24* 129:*8* 157:*2*
165:*9* 178:*2* 187:*19*
188:*2, 21* 190:*8*
191:*21* 192:*17*
219:*18* 220:*11* 221:*7,
21* 222:*8* 223:*1, 17*
224:*9, 15* 225:*20*
227:*8* 233:*4, 10*
239:*18* 243:*6* 244:*20*
**spell** 31:*22*
**spin** 53:*2*
**spite** 87:*3*
**spoke** 30:*3, 9*
**ss** 252:*16*
**staff** 185:*9, 23*
**stage** 25:*15* 136:*15*
**staged** 163:*4*
**stamp** 48:*9*
**stand** 207:*7*
**standalone** 54:*13*
**standard** 21:*5*
**stands** 50:*24* 147:*4, 6*
**start** 4:*9* 6:*20* 10:*8*
18:*25* 97:*24* 99:*21*
203:*20* 247:*12*
**started** 6:*1* 87:*11*
136:*13*
**starting** 8:*16* 19:*3*
143:*23* 247:*19*
**starts** 145:*8*

**start-up** 159:*13, 18, 20* 163:*3*

**startups** 10:*8*

**State** 2:*4* 4:*8* 5:*10* 92:*1, 2* 123:*11* 132:*24* 133:*14* 135:*10* 180:*7* 192:*19* 193:*6* 226:*22* 252:*15, 20*

**stated** 157:*16* 185:*21*

**statement** 10:*4, 9, 19* 11:*7, 16* 27:*21* 29:*22* 32:*5* 33:*18* 34:*13, 24* 49:*5* 52:*5, 6* 57:*1, 6, 7* 67:*18* 75:*4* 79:*8, 11, 13, 18* 93:*20* 95:*19* 99:*2* 110:*10* 117:*15, 17* 120:*19* 122:*25* 128:*14* 129:*16, 17* 136:*8, 8* 141:*12, 14* 144:*6* 147:*4, 13* 149:*18* 174:*2* 199:*20* 205:*4* 208:*4* 212:*16* 213:*14, 15* 225:*22* 226:*9* 227:*3, 22, 24* 242:*16*

**statements** 9:*23* 10:*7* 36:*25* 106:*21* 122:*10* 128:*20, 22* 196:*12* 219:*11, 13* 220:*24* 221:*1* 225:*17, 17* 230:*1, 3, 5*

**STATES** 1:*1* 4:*2* 57:*5* 75:*20* 227:*21* 228:*17* 243:*14*

**States,** 227:*1*

**stay** 29:*9* 159:*3*

**stayed** 87:*9*

**stenographic** 252:*23*

**stents** 19:*1*

**step** 177:*9*

**stick** 168:*9*

**stole** 203:*17*

**stop** 6:*7* 8:*13* 15:*3* 85:*25* 130:*1* 168:*11, 14* 170:*22*

**stopped** 43:*21* 86:*6, 7, 7* 115:*25* 170:*23* 190:*2*

**storage** 80:*16* 82:*13* 196:*5*

**store** 179:*24* 184:*23*

**stored** 37:*23* 105:*14* 106:*22* 192:*10* 196:*9, 13, 24* 197:*1, 18* 202:*6, 21* 207:*15* 208:*16* 210:*7* 213:*18* 243:*22* 244:*2*

**storing** 105:*19* 196:*7* 201:*14*

**straight** 220:*5*

**strained** 56:*22*

**stream** 43:*9*

**Street** 2:*12* 44:*2*

**structure** 117:*12* 222:*18* 233:*12, 25*

**stuff** 9:*23* 10:*13* 13:*25* 74:*24* 145:*25*

**subject** 159:*15*

**subjects** 138:*10*

**submitted** 11:*19* 178:*9* 188:*4*

**subpoena** 243:*2*

**sued** 248:*2*

**sufficient** 130:*18* 187:*17, 25* 188:*11* 205:*8*

**suggest** 180:*20*

**suit** 197:*9*

**Suite** 2:*19*

**summing** 27:*11*

**Sun** 94:*6* 95:*17, 18*

**S-u-n** 92:*19*

**super** 205:*1*

**supervisor** 97:*21, 25* 98:*1, 10, 15, 17*

**supplier** 176:*3, 12*

**suppliers** 144:*3* 145:*1* 172:*24* 173:*5, 24* 177:*21*

**supply** 174:*19, 20* 175:*2, 5* 176:*8, 10* 199:*6* 201:*15*

**support** 57:*20* 59:*18* 170:*3, 4, 12* 185:*9, 23*

**supporting** 29:*18* 89:*16* 170:*1*

**supposed** 165:*5, 6*

**Sure** 5:*17, 18* 12:*7* 19:*20* 29:*2* 30:*21* 57:*8* 63:*5* 65:*21* 67:*4* 69:*24* 71:*7* 73:*18* 79:*5* 88:*22* 91:*13* 116:*10* 117:*24* 133:*24* 139:*11* 141:*10* 142:*20, 22* 144:*22* 146:*3* 163:*7* 167:*4, 11, 24* 173:*23* 175:*4* 185:*24* 190:*25* 213:*12* 214:*6, 23* 216:*3* 220:*4* 226:*23* 230:*23* 232:*4* 234:*10, 16* 236:*5* 243:*8* 250:*7*

**surprise** 91:*19*

**surprised** 207:*1*

**swear** 5:*3, 19*

**swore** 149:*10*

**sworn** 5:*7* 6:*14* 30:*13* 168:*10*

**system** 201:*22* 247:*4*

**< T >**

**tag** 153:*24*

**take** 5:*20* 6:*4* 8:*19* 33:*10* 41:*8* 55:*20* 58:*10* 64:*19* 90:*11* 93:*6* 101:*18* 114:*11* 136:*25* 141:*12* 142:*17* 154:*21* 166:*2* 177:*10* 197:*11* 201:*5* 216:*1* 218:*16* 236:*1* 244:*24*

**taken** 65:*13* 84:*23* 143:*17* 200:*5* 216:*20* 236:*8* 249:*12* 253:*2*

**talk** 34:*23* 46:*12* 47:*12* 86:*23* 104:*11* 114:*21* 131:*1*

**talked** 250:*14*

**talking** 18:*17* 20:*8* 26:*17, 18* 42:*9* 87:*20* 88:*16* 99:*18* 139:*6* 172:*16* 211:*10* 219:*16* 221:*2* 245:*5*

**tax** 44:*24* 45:*21* 46:*1, 5, 15, 16, 23* 47:*13, 14* 49:*2* 88:*6,*

**11** 102:*13* 109:*21* 110:*1, 5* 111:*1, 3, 7, 11, 13, 14* 112:*2, 3, 12, 19* 113:*6* 114:*13* 115:*9* 123:*9, 11* 133:*5, 6, 8* 134:*24* 135:*1, 8, 9, 11* 186:*13, 20, 23, 24* 187:*1, 5, 10, 18, 25* 188:*4, 5, 11, 19* 189:*2* 193:*10* 204:*11, 15* 205:*2*

**taxes** 45:*17, 25* 87:*12, 23* 102:*9* 114:*19* 115:*9* 135:*10* 188:*23, 25* 189:*1* 193:*24*

**taxes,** 102:*10*

**taxpayer** 110:*11*

**team** 14:*4* 38:*19* 39:*23* 47:*18, 19* 48:*18* 59:*4* 60:*7* 64:*1* 78:*24* 98:*22, 23, 25* 99:*1, 8, 15* 100:*7, 15, 16* 101:*17* 102:*16* 103:*5, 11, 24* 104:*8, 23* 105:*2, 19* 108:*1, 5, 11, 12, 23* 109:*25* 110:*20* 112:*8* 116:*2, 7, 11, 16* 121:*2, 10, 20* 122:*2, 6* 125:*13, 17, 22* 139:*14, 14, 20, 22, 24* 172:*17* 173:*7, 9, 13* 174:*20, 22, 25* 175:*5, 15, 17, 20, 21* 176:*3, 9, 10, 14, 16* 177:*10, 18* 178:*12, 16, 21, 23* 179:*10, 12* 180:*3, 4* 185:*24* 186:*3, 23* 188:*4, 7, 10, 10, 18, 19, 22* 209:*11* 212:*8* 213:*4, 5, 9, 18* 214:*21* 215:*22* 232:*5, 5* 239:*25* 240:*4*

**team,** 179:*7*

**teams** 109:*17* 176:*22, 22* 178:*25* 195:*21*

**technology** 62:*4* 63:*12*

**tell** 13:*21* 15:*20* 18:*13, 24* 22:*9* 27:*24* 30:*17* 36:*11, 24*

40:*20* 41:*9* 43:*3*
61:*10* 70:*17* 73:*16*,
*20* 81:*16* 82:*17*
89:*11, 12, 13* 92:*18*
106:*13* 112:*23*
113:*21* 114:*6, 11, 14*
117:*11* 128:*3* 142:*24*
148:*8* 149:*10* 151:*13*
152:*13* 153:*2* 156:*10*
159:*9* 162:*1, 23*
164:*13, 20* 165:*11, 14*
173:*8* 211:*4* 216:*5*
217:*13* 225:*18*
231:*23* 241:*16* 242:*6*
243:*13* 244:*17*
245:*25* 246:*6* 251:*7*
**telling** 25:*19* 32:*22,
25* 74:*17* 81:*15*
110:*16* 149:*17, 25*
160:*18* 163:*11, 11, 12,
14* 189:*16* 191:*7*
205:*5* 209:*16* 240:*20*
244:*10, 12*
**ten** 9:*10, 18* 64:*20,
21, 24, 24* 169:*16, 18*
170:*12* 200:*16* 216:*6*
**Teresa** 14:*25* 35:*17,
23* 36:*11* 83:*7, 16*
90:*14* 93:*10, 18*
96:*14* 99:*14* 108:*6*
115:*17* 139:*2, 7*
145:*15, 18, 19* 146:*11,
12* 154:*17, 23* 157:*12*
200:*10*
**T-e-r-e-s-a** 83:*16*
**term** 13:*4, 15* 58:*19*
117:*8, 18* 120:*14*
122:*7* 147:*21* 149:*22*
158:*16* 160:*2* 161:*11*
163:*17, 18* 169:*1*
181:*18* 233:*18* 245:*3,
4*
**terminate** 245:*23*
**termination** 237:*21*
**terms** 50:*23* 59:*17*
105:*10* 122:*19*
139:*15* 172:*10* 173:*4*
176:*5* 199:*24* 200:*7*
208:*19* 237:*21* 238:*9*

**terrific** 42:*13*
**test** 247:*16*
**testified** 6:*15* 18:*20*
24:*22* 152:*21* 184:*13*
213:*16, 24*
**testify** 5:*22, 22*
141:*17* 144:*2, 25*
163:*19* 172:*22*
173:*24* 183:*19*
214:*23* 219:*12*
220:*25*
**testifying** 138:*12*
197:*6*
**testimony** 5:*3, 21*
23:*12* 26:*5* 28:*22*
33:*2* 34:*15* 48:*14*
51:*5* 52:*23* 57:*12*
60:*13* 71:*22* 112:*11*
116:*13* 121:*22*
140:*21* 141:*8, 13, 22,
24* 142:*15* 144:*9*
147:*15* 149:*21*
152:*25* 153:*14* 155:*9*
156:*21* 157:*21* 158:*6*
163:*8, 9* 168:*10*
180:*14* 185:*17* 189:*8*
191:*19* 193:*2, 19*
194:*16* 195:*7* 196:*16*
197:*1, 16* 199:*21*
200:*20* 204:*22*
205:*11* 206:*1, 9*
209:*2* 212:*25* 240:*24*
241:*20* 243:*23*
244:*14* 247:*25*
**testing** 248:*12*
**Thank** 4:*10, 14, 25*
5:*7, 8, 14, 24* 6:*2, 9,
10* 7:*12, 22* 30:*12*
44:*13* 65:*12, 12, 15,
18* 143:*12, 14, 15, 21*
144:*21* 145:*7* 216:*4,
17, 19, 24* 235:*1*
236:*12* 249:*7, 8, 25*
250:*1, 9* 251:*17, 18*
**Thanks** 13:*24*
**they,** 201:*6*
**thing** 10:*8, 16* 220:*4*
224:*2*
**things** 10:*4, 9* 33:*10*
37:*1* 43:*19* 58:*12, 12*

80:*1* 86:*13* 101:*16*
102:*2, 11* 122:*20*
123:*1* 125:*19* 131:*21*
132:*20, 22* 138:*2*
149:*3* 151:*10, 12*
153:*13* 155:*18*
171:*11, 12* 193:*7*
222:*10* 237:*11*
**think** 11:*18* 18:*5*
31:*17* 40:*6* 42:*20*
44:*11* 64:*12, 13*
66:*12* 92:*22, 22* 99:*5*
100:*1* 113:*11* 124:*25*
140:*1, 14* 144:*15*
146:*2* 156:*21, 23*
160:*21* 175:*5* 196:*23*
209:*17* 217:*8, 8*
219:*19, 19* 220:*5*
223:*9* 227:*14* 228:*11,
11* 231:*1* 234:*6, 23*
241:*4* 249:*18* 250:*2,
13, 18*
**third** 12:*15* 69:*16*
129:*7*
**Thomas** 4:*3*
**thought** 133:*25*
205:*7* 248:*6*
**thousand** 211:*3*
**three** 26:*10* 70:*12*
157:*12* 223:*15* 225:*1,
1, 12* 247:*12*
**threw** 80:*25*
**tied** 170:*18*
**tight** 197:*14*
**time** 6:*8* 7:*23* 8:*4,
22* 9:*20* 12:*1, 14*
44:*7* 56:*22* 57:*2*
58:*1* 59:*3* 62:*13*
66:*4* 69:*16* 70:*25*
72:*15* 73:*2, 14, 19*
81:*24* 83:*7* 85:*24*
86:*3* 87:*2* 89:*9* 93:*5,
15* 95:*6* 96:*22* 97:*19,
22* 98:*5, 16* 99:*17, 18*
100:*4* 103:*22* 104:*14*
105:*14* 106:*19* 111:*6,
12* 114:*12* 120:*3*
121:*3* 123:*13* 131:*22*
141:*7, 13, 25* 142:*9*
143:*11* 144:*7* 147:*9,

*10* 149:*18* 150:*9*
152:*7, 10* 155:*15*
165:*21* 172:*11*
173:*14, 16* 174:*3, 4, 9,
12, 15, 17* 179:*13*
180:*13* 181:*16* 184:*9*
187:*6* 194:*9* 195:*17*
196:*1, 22* 197:*16, 22*
199:*9, 21* 200:*18, 20,
22, 23* 201:*3* 213:*2*
214:*16* 218:*25*
221:*13* 223:*14, 20*
225:*13* 243:*15, 16*
247:*9* 250:*16*
**timeframe** 44:*12*
87:*10* 115:*24* 165:*19*
174:*17*
**timely** 130:*23*
**times** 38:*2* 39:*18*
40:*6* 70:*12* 99:*5*
115:*20* 134:*20*
173:*11* 200:*16*
**timetable** 188:*23*
**timing** 200:*19*
**title** 83:*8, 23* 84:*4*
95:*10, 12* 98:*2*
**today** 37:*2* 160:*17*
177:*23* 180:*9, 11*
198:*15*
**today's** 139:*8*
**told** 67:*12* 72:*14*
113:*3* 118:*5* 131:*7*
146:*21* 148:*13*
161:*15, 24* 162:*10*
165:*12* 191:*13, 17, 17*
242:*4, 5, 14*
**Tom** 145:*15*
**tomorrow** 191:*8, 18*
**tone** 154:*1, 8*
**top** 128:*12* 154:*22*
**topic** 84:*5*
**Toric** 195:*24*
**total** 84:*20*
**totally** 131:*16*
**touch** 181:*6, 16, 23*
**Townsgate** 2:*18*
**track** 107:*9*
**trade** 56:*21* 70:*24*
**traffic** 73:*20* 74:*2*
75:*22*

**trained** 190:*13, 17, 20, 24*

**transaction** 79:*9* 125:*18*

**transactional** 69:*3* 70:*23*

**transactions** 66:*14* 69:*21* 73:21 74:*3* 79:*21* 104:*16, 19* 122:*1, 20* 229:7 231:*11* 235:5

**transcript** 137:*20* 150:*16* 251:*3* 252:22

**transcription** 252:*23*

**transfer** 27:*10, 10* 50:*14* 55:24 56:*16* 67:*21, 22* 69:*1* 72:18 74:*13* 185:25

**transferred** 66:5 71:5

**transferring** 66:*10* 70:*23* 230:*11*

**transfers** 228:22, 22 229:*1, 2, 8* 230:*10* 231:*12* 235:7

**transition** 198:*20*

**travel** 115:25

**treasurer** 95:*23*

**treasury** 14:*23* 83:4 94:*12, 16, 17, 21*

**trouble** 22:*3*

**troubles** 186:*11*

**true** 38:*1* 51:2 52:5, 6 57:6, 7 78:8 92:4 110:*19* 126:*1* 145:5 147:4, 8, 13 163:*14, 16* 195:5 196:*11* 206:*16* 224:*11* 227:22, 24 233:*16, 17* 247:*18* 252:22

**truly** 78:*17*

**trust** 111:*17*

**trusted** 113:*18*

**truth** 5:5, 5, 5 149:*11* 152:*13* 153:2

**truthful** 33:*14* 194:*1, 8*

**try** 20:*8* 29:9 217:*12*

**trying** 69:2 71:*18* 119:*3* 154:4 200:24

**turn** 118:*11* 120:*18*

**turned** 227:25

**turning** 118:*16*

**turnover** 85:*24* 87:4 114:*17* 118:*15*

**twice** 137:*16* 202:*23, 23* 234:*23*

**two** 34:7 90:*11, 16* 121:*25* 152:2 185:*9* 192:*25* 231:2, 2 236:*1, 5, 5* 250:2, *18*

**type** 22:*14, 15, 18* 78:*10* 80:*19* 100:24 102:*8* 105:*24, 25* 106:*19* 108:*24* 109:4 119:*15* 133:*13* 248:*18*

**types** 104:*1*

**typical** 56:*16*

**typically** 82:*12* 106:7 176:2

**< U >**

**U.S** 9:*20* 44:*21, 24* 56:*21* 57:*21* 58:*9, 10* 59:*22* 66:*3, 5, 7, 8, 10* 67:*23, 25, 25* 68:*1* 69:*19, 20* 70:*22, 24* 71:2, *2, 13* 73:7 84:*20* 127:2 180:*4, 5, 6* 186:*24* 188:*23* 213:*25* 214:6, *6, 11, 24* 230:*11* 248:*12*

**ultimately** 166:7

**Um** 47:*20* 119:*19* 224:*24*

**Um-hum** 17:*19* 110:*12*

**unable** 27:*12* 130:22 131:*6* 170:*25*

**understand** 11:*1* 13:*10, 13* 21:4 23:*3* 26:*11* 38:6, 22 52:25 56:*12, 15* 57:9 65:*21* 67:5, 7 69:*24* 70:*13, 16* 76:5 79:6 107:20 108:*18* 109:*10* 119:*22* 139:*12* 141:*10* 142:6 149:*10* 156:7 157:*20* 177:7

**understanding** 5:*21* 24:*1* 51:*24* 66:*19* 119:*3* 128:*10* 138:*3* 150:*1, 1* 199:*1*

**understands** 148:*23*

**unethical** 151:*5, 14* 153:*15*

**unfair** 229:*1*

**unfettered** 104:*21, 22*

**unfortunately** 170:*18*

**Unintelligible** 129:*19* 130:*10* 156:*16* 242:9

**UNITED** 1:*1* 4:*2* 57:*5* 75:*20* 227:*1, 21* 228:*16* 243:*14*

**Unprofessional** 33:*25* 149:*4* 151:*5, 13* 153:*15*

**unrestricted** 104:*2, 8*

**unstable** 164:*3*

**untranslate** 231:*19*

**untranslates** 231:*21*

**updated** 54:22

**USA** 36:*19* 177:*2, 15, 24*

**use** 145:*1* 172:*8, 23* 229:*24* 248:*25*

**uses** 220:*13*

**usual** 89:*18* 90:*1, 8*

**usually** 238:*9*

**utilities** 58:*11* 85:*16* 172:*12*

**utility** 172:*7*

**< V >**

**Vague** 10:*20* 13:*16* 14:*11* 18:*14* 20:*15, 24* 21:*24* 30:*19* 37:*3* 38:*12* 58:*5, 20* 61:*5* 62:*9, 9* 63:*18* 64:6 71:*9* 73:*1, 2* 74:*10* 78:*25* 79:*15* 83:*10* 86:*2, 9, 16* 88:*15* 89:*9, 22* 90:*4, 21* 97:*22* 99:*3, 17* 100:*8, 19* 101:*1* 102:*18* 108:*17* 109:*8, 24*

**111**:5 112:*24* 113:*4, 23* 114:7 116:*3* 117:*9, 19* 119:*20* 120:*7, 15, 21* 121:*3* 122:*8* 123:*13* 126:*13* 128:*16* 130:*9, 19* 134:*4, 11* 137:*3* 138:*8* 140:*7* 142:*5* 147:*5, 22* 148:*18* 155:*6, 24* 156:*5* 157:*19* 158:*5, 17* 159:*23* 160:*11* 161:*4, 12* 165:*16* 167:*22* 168:*3* 169:*2* 174:*12* 177:*3* 179:*13* 181:*8, 19* 182:*2, 13* 184:*2* 186:*17, 21* 187:*19* 192:*16* 195:*17* 196:*15* 211:*5* 214:*16* 224:*16* 232:*11* 233:*19* 236:*16, 19* 247:*9* 248:*22, 22*

**Valley** 17:*23* 19:*11* 96:*12* 228:*1* 250:*19, 24* 251:*1*

**value** 137:*1, 2, 10*

**VAN** 2:*16*

**various** 9:*12* 176:*21, 22* 184:*14* 195:*21* 208:*15*

**Vegas** 248:*17*

**vehicle** 139:*18* 248:*8*

**vehicles** 62:*3* 63:*11* 136:*17* 247:*8, 13, 14, 16, 17, 19* 248:*8, 11* 249:*2*

**vendor** 163:*21* 172:*7*

**vendors** 85:*25* 130:*3* 172:*1, 3, 5, 8* 179:*22*

**verify** 176:*9*

**version** 145:*9* 205:*8* 213:*19*

**versus** 4:*5*

**vice** 35:*18*

**view** 14:*19* 38:*15* 57:*18* 101:*13* 205:*15, 23* 206:*17*

**Village** 2:*19*

**virtually** 44:*17*

**visited** 115:*20*

**VP** 15:2 35:*18, 19,
23* 83:*17, 19, 24* 84:*2,
3, 4, 4* 93:*18, 19, 21*
96:*14* 145:*19, 19*
146:*12*

**< W >**
**wages** 137:*8, 12*
**Wait** 16:*16* 148:*3, 3*
240:*16*
**waiting** 124:*14, 16, 17*
250:*10*
**walking** 44:*2*
**want** 8:*2* 9:*24* 10:*16*
25:*21* 34:*10* 47:*22*
63:*5* 75:*21* 77:*19*
83:*19* 109:*5, 6, 6, 12,
14* 120:*11* 129:*6*
142:*21, 21* 148:*24*
153:*7* 158:*10* 161:*23*
167:*24* 183:*25*
203:*20* 206:*25*
212:*23* 216:*8, 12*
245:*8* 247:*3* 250:*17*
**wanted** 66:*6* 67:*21*
77:*20* 108:*15* 164:*14*
192:*23* 242:*24* 251:*3*
**Waretech** 50:*11*
**W-a-r-e-t-e-c-h** 50:*12*
**watch** 72:*19*
**wave** 149:*6*
**way** 16:*18* 20:*12*
21:*22* 35:*17* 36:*18*
37:*16* 46:*4* 49:*10*
54:*14* 61:*22* 69:*4*
72:*23* 79:*8* 88:*13*
101:*25, 25, 25* 115:*17*
127:*14* 135:*7* 136:*6,
9* 137:*16* 138:*25*
157:*8* 164:*14* 174:*20*
179:*12* 186:*13* 190:*5*
195:*15* 196:*7* 213:*4*
216:*11* 218:*8* 228:*9*
247:*8* 248:*15*
**web** 126:*21*
**website** 22:*20*
**week** 54:*21, 21* 93:*15*
**welcome** 4:*17*
**well** 5:*10* 11:*25* 12:*3,
9, 20* 14:*6* 15:*23, 23*

16:*11* 17:*3, 5* 19:*19,
21* 20:*19* 23:*9, 18*
25:*3, 8* 26:*21* 27:*15*
29:*1, 3, 22* 33:*16*
34:*23* 36:*11* 42:*2*
43:*1, 22, 25* 46:*12*
48:*5, 20* 49:*2, 24*
51:*12* 54:*18* 60:*15*
61:*10* 62:*17* 71:*12,
17, 25* 72:*8, 20* 73:*16*
74:*8* 75:*1, 5, 15* 76:*9*
77:*4* 80:*4, 23* 82:*15*
87:*3* 91:*11, 25* 94:*9*
96:*13, 18* 97:*20*
99:*21* 102:*22* 103:*22*
104:*7, 11* 105:*22, 22*
107:*14* 108:*3, 22*
109:*12* 110:*14* 113:*7*
115:*12* 117:*7, 11*
118:*24* 119:*5* 122:*22*
124:*18* 126:*19* 127:*2*
128:*13* 129:*23* 130:*4,
15* 131:*7, 25* 132:*3*
138:*5, 12, 17* 139:*22*
141:*2, 21* 145:*24*
148:*4* 156:*9, 19, 19*
159:*19* 161:*23*
162:*20* 163:*25*
164:*12* 171:*4* 176:*17*
179:*16* 188:*17* 191:*5*
199:*6* 200:*13* 202:*3,
7* 203:*8, 23* 204:*25*
205:*4* 207:*14* 210:*20*
211:*2* 220:*3, 20*
221:*16* 222:*13, 20*
223:*5, 24, 24* 225:*7,
12* 226:*5* 227:*10*
229:*20* 232:*18* 234:*1*
235:*21* 238:*25*
239:*12, 20* 240:*16*
241:*3, 16, 16, 22* 242:*6*
**well-known** 159:*14*
**went** 41:*11, 12* 66:*2*
69:*25* 174:*19* 186:*10*
224:*23* 225:*6* 229:*17*
235:*17*
**We're** 7:*14* 9:*24*
19:*22* 33:*13* 65:*11,
14* 75:*17* 84:*13*
102:*10* 105:*22* 122:*4*

130:*7* 143:*15, 18*
155:*1* 164:*4* 167:*12,
13* 215:*24* 216:*8, 16,
21* 226:*20* 234:*12*
249:*10, 13* 251:*14, 15*
**Wesner** 145:*15*
160:*18*
**Westlake** 2:*19*
**we've** 64:*12* 75:*1*
142:*18*
**When's** 106:*19*
**WHEREOF** 253:*5*
**whiz** 130:*17* 191:*5*
**willing** 70:*21* 166:*8*
**wiped** 21:*7, 13*
**wire** 228:*21*
**witness** 2:*2, 16* 3:*13*
4:*23* 5:*1, 6, 8, 21*
6:*13* 11:*3* 16:*1, 12,
23* 17:*19* 18:*19* 21:*5*
22:*2* 23:*4* 25:*14*
26:*12* 27:*9* 29:*2, 5,
13, 17* 30:*22* 33:*5, 11*
34:*2, 17* 35:*6, 11*
36:*3, 17* 37:*6, 22*
38:*7, 14* 39:*3, 22*
40:*9, 22* 41:*5, 21, 24*
42:*23* 45:*16, 25* 46:*9*
49:*8* 50:*23* 52:*19, 24*
53:*3, 17, 25* 54:*4, 12*
55:*8* 56:*14* 57:*17*
58:*8* 59:*17* 62:*11*
63:*2, 21* 64:*22* 65:*1,
4* 66:*1, 24* 67:*17*
68:*19, 22* 69:*17*
71:*12* 72:*5, 11* 73:*4,
13, 24* 74:*5, 12, 22*
76:*6, 24* 77:*5, 7, 10*
78:*1, 5* 79:*2* 80:*8, 15*
81:*2* 82:*2, 20* 86:*3,
18* 88:*10* 90:*5, 22*
91:*3, 17, 21* 93:*14*
94:*4, 20* 96:*18, 25*
99:*8, 23* 100:*10, 20*
101:*6* 104:*2* 105:*7*
106:*6, 17* 107:*7*
108:*19* 109:*9, 25*
111:*7* 112:*5* 113:*25*
114:*9, 25* 116:*6, 15*
119:*19, 24* 120:*8, 14,*

22* 121:*9, 24* 122:*17*
123:*5, 19* 124:*4*
126:*16* 127:*6* 128:*4,
19* 129:*1, 11* 130:*21*
131:*25* 133:*11* 134:*6,
12, 14, 17* 136:*4*
137:*7* 138:*6, 9, 13*
140:*2* 141:*18* 142:*7,
25* 144:*2, 18, 25*
147:*8, 15, 25* 150:*4*
152:*19* 153:*20*
154:*13* 155:*14* 157:*5,
18, 20* 159:*3, 12*
160:*12* 161:*8, 13*
162:*3* 163:*2* 164:*8,
10, 18* 165:*17* 166:*13,
15, 24* 167:*1* 168:*20*
172:*5, 23* 173:*13, 19,
23* 175:*20* 177:*6*
180:*1, 13, 17* 181:*11*
183:*15* 184:*20*
186:*22* 187:*13, 21*
188:*3, 22* 190:*1, 15,
17, 20* 192:*4* 194:*13,
18, 25* 195:*10* 199:*20*
200:*17* 202:*11, 21*
203:*6, 15* 204:*6, 14*
206:*3, 10* 209:*5, 21*
210:*24* 211:*10, 17, 25*
213:*17, 24* 215:*6, 20*
218:*12, 19* 219:*24*
220:*12, 18* 221:*11, 24*
222:*11* 223:*2, 19*
225:*2, 10, 21* 229:*6*
233:*5, 11, 20* 234:*5*
237:*14, 19* 238:*24*
239:*12, 19* 240:*2, 8,
12, 23, 25* 241:*6, 13*
243:*22* 244:*15, 22*
246:*10* 249:*8, 15, 17,
25* 250:*5* 253:*5*
**Wizman's** 160:*21*
**word** 95:*22* 102:*15*
104:*18* 105:*9* 131:*2*
201:*17* 229:*24*
230:*22* 234:*14* 251:*8*
**words** 22:*10* 37:*11*
54:*6* 79:*10* 102:*9*
126:*19* 179:*7* 182:*18*
201:*17* 210:*11*

**work**  23:*5, 7, 9, 15*
24:*4, 11, 11, 16, 16, 21,*
*24*  25:*1, 3, 25*  26:*24,*
*25*  27:*1*  38:*14*  39:*16*
41:*14*  43:*6, 6, 10, 13,*
*18, 20, 24*  44:*18*
51:*20, 22*  53:*18*
54:*15*  55:*13, 16*
57:*18*  59:*21, 23*  64:*1*
79:*18*  81:*3*  86:*20, 24,*
*25, 25*  108:*1*  111:*17*
113:*17, 18*  116:*18, 20*
126:*4*  132:*1*  136:*10*
144:*23*  169:*19, 24*
176:*10, 11*  178:*25*
179:*1*  190:*3*  214:*15*
229:*19, 22*  230:*9, 13*
235:*20, 23*
**worked**  116:*23*  175:*4*
192:*20*
**workers**  14:*8*  88:*13,*
*21, 22, 24*  89:*12*
246:*4, 7*
**working**  40:*11*  89:*13*
97:*20*  108:*5*  159:*12,*
*20*  163:*2*  185:*25*
190:*25*  191:*1, 3*
225:*7*
**works**  177:*13*
**world**  57:*23*  59:*20*
127:*7*
**worry**  231:*7*
**Wow**  161:*21*
**write**  18:*11*  55:*5*
56:*10*  90:*19*  157:*3*
**writes**  155:*1, 20*
156:*2, 15*
**writing**  74:*9*
**written**  51:*16*  157:*22,*
*24*  171:*10*
**wrong**  53:*22*  114:*4*
150:*13*  156:*17*
**wrote**  35:*16*  221:*12*

**< Y >**
**Yang**  52:*1*
**Ye**  226:*13*
**Y-e**  226:*14*
**yeah**  8:*2*  12:*13*
14:*18*  15:*22*  16:*2, 25*

17:*3, 4, 4, 8, 15*  23:*4*
24:*10*  27:*20*  31:*17,*
*21*  35:*7, 14*  57:*15*
65:*8*  67:*8, 10, 17*
68:*19*  73:*24*  80:*15*
81:*2*  82:*12, 13*  88:*10,*
*22*  90:*22*  103:*6*
106:*22*  115:*20*  120:*8*
121:*7, 9*  122:*17*
124:*4*  126:*16*  130:*24*
133:*2, 23*  137:*7*
143:*7, 11*  149:*1*
153:*17*  156:*10*
157:*18*  160:*12*  164:*1,*
*10, 10*  170:*25*  172:*19*
174:*15, 16*  180:*16*
182:*22*  196:*22*
197:*22*  206:*3*  207:*25*
211:*13*  212:*4*  213:*6*
216:*10*  237:*16, 19*
250:*25*  251:*1*
**year**  43:*12*  74:*15*
85:*18*  87:*5*  104:*13*
110:*3, 20*  115:*21, 23*
118:*11, 14, 25*  120:*2*
123:*16*  133:*13*
161:*20*  169:*11*
193:*10*
**years**  9:*10, 19, 19*
43:*15*  45:*2*  113:*17*
119:*13*  247:*12*
**yes,**  206:*18*
**Y-i-c-k**  217:*24*
**Ying**  29:*23*  33:*13*
35:*15*  52:*1, 1, 1*  57:*1*
61:*17, 24*  91:*25*
118:*1, 6, 12, 15*
135:*14, 15*  217:*24*
222:*14, 23*  223:*7, 11*
226:*22, 22*  228:*14*
**Y-i-n-g**  29:*24*
**Ying's**  34:*25*
**you,**  88:*16*
**yourself**  21:*17*  118:*24*

**< Z >**
**Zero**  133:*18, 20, 20,*
*21, 23*
**Zhang**  29:*23*  52:*1*
61:*16*  118:*1, 6, 12, 15*

119:*5, 6*  135:*14*
217:*24*  222:*13*
**Z-h-a-n-g**  29:*24*  52:*2*
217:*24*
**Zhou**  82:*25*  108:*8*
**Z-h-o-u**  82:*25*  94:*11*
95:*22*
**Zoom**  16:*15*