LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (Bar No. 266966)
eburbidge@lewisllewellyn.com
Marc R. Lewis (Bar No. 233306)
mlewis@lewisllewellyn.com
Kenneth M. Walczak (Bar No. 247389)
kwalczak@lewisllewellyn.com
Bradley E. Estes (Bar No. 298766)
bestes@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile:  (415) 390-2127

David J. Cook (SBN 60859)
COOK COLLECTION ATTORNEYS, PLC
ATTORNEYS AT LAW
165 Fell Street
San Francisco, CA 94102
Telephone: (415) 989-4730
Facsimile: (415) 989-0491
Cook@CookCollectionAttorneys.com

Attorneys for Petitioner EDAG Engineering GmbH,
a corporation organized and existing under the laws
of the Republic of Germany  ("EDAG")

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| EDAG Engineering GmbH,<br><br>Petitioner,<br><br>v.<br><br>BYTON North America Corporation,<br><br>Respondent. | CASE NO: 3:21-cv-04736-EMC<br><br>**DECLARATION OF KENNETH M. WALCZAK IN SUPPORT OF EDAG'S REPLY IN SUPPORT OF MOTION TO CONFIRM THE ARBITRATOR'S NOVEMBER 8, 2021 ORDER**<br><br>Date:        June 30, 2022<br>Time:        1:30 p.m.<br>Location:   via Judge Chen's<br>               Videoconference – Link<br>Judge:       Hon. Edward M. Chen |

1    I, Kenneth M. Walczak, declare as follows:

2    1.    I am over 18 years of age.  I am an attorney at the law firm Lewis & Llewellyn LLP

3    and counsel for Petitioner EDAG Engineering GmbH ("EDAG").  I submit this declaration in

4    support of EDAG'S Reply in Support of Motion to Confirm the Arbitrator's November 8, 2021

5    Order.

6    2.    I participated in the request for, argument related to, and hearing before Judge

7    William Cahill (Ret.) regarding BYTON North America Corporation's ("BYTON NA") attempts

8    to move intellectual property to China during and following the Arbitrator's award of

9    $28.6 million to EDAG Engineering GmbH ("EDAG") on June 2, 2021 for BYTON NA's breach

10   of contract.  These events resulted in the issuance of the November 8, 2021 order ("11/8/21

11   Order") that is the subject of the current motions.  I have personal knowledge of the facts set forth

12   herein.  If called upon to testify, I could and would do so competently.

13   3.    On June 2, 2021, the Arbitrator issued an award in favor of EDAG, awarding it over

14   $28.6 million dollars in damages, plus costs and interest, as a result of BYTON NA's breach of

15   contract.  That award was confirmed by this Court.  A copy of this Court's order can be found at

16   Docket No. 49.

17   4.    In mid-September 2021, counsel for EDAG learned that BYTON NA had been

18   attempting to move the intellectual property that EDAG had helped create under the contract—and

19   one of the only things of value in BYTON NA's possession—overseas to China, where it would

20   have been inaccessible.  Shortly thereafter, on **September 17, 2021**, counsel for EDAG submitted

21   a letter to Judge Cahill, cc'ing counsel for BYTON NA, requesting the ability to seek a restraining

22   order and outlining the reasons for this request.  Attached as **Exhibit A** is a true and correct copy

23   of this correspondence.

24   5.    On **September 19, 2021**, Judge Cahill responded and asked both EDAG and

25   BYTON NA to brief certain issues for him and to stipulate to a schedule.  Attached as **Exhibit B** is

26   a true and correct copy of this correspondence.

27   6.    On **September 21, 2021**, Judge Cahill signed a stipulation and order, agreed to and

28   signed by counsel for EDAG and BYTON NA, regarding the briefing schedule related to the

1    restraining order request.  Attached as **Exhibit C** is a true and correct copy of this stipulation and

2    order.

3         7.    On **September 24, 2021**, EDAG submitted its Memorandum of Points and

4    Authorities in Support of its Motion for a Temporary Restraining Order to the Arbitrator Judge

5    Cahill, copying counsel for BYTON NA.  This submission included two declarations and

6    approximately 300 pages of supporting materials.  Attached as **Exhibit D** is a true and correct copy

7    of EDAG's Memorandum of Points and Authorities and the supporting materials.

8         8.    On **October 4, 2021**, in response, BYTON NA submitted its Memorandum of

9    Points and Authorities in Opposition to EDAG's Motion for a Temporary Restraining Order to

10   Judge Cahill, copying EDAG's counsel, along with its own supporting declaration.  Attached as

11   **Exhibit E** is a true and correct copy of BYTON NA's Opposition and supporting materials.

12        9.    On **October 6, 2021**, EDAG submitted its Reply in Support of its Motion to Judge

13   Cahill, along with supporting material, copying BYTON NA's counsel.  Attached as **Exhibit F** is a

14   true and correct copy of EDAG's Reply and supporting materials.

15        10.   On **October 14, 2021**, Judge Cahill held a hearing for approximately two hours

16   regarding the materials submitted by both parties.  Evangeline A.Z. Burbidge and I, from Lewis &

17   Llewellyn LLP, appeared on behalf of EDAG; Keith Sipprelle of Van Etten Sipprelle LLP

18   appeared on behalf of BYTON NA.

19        11.   Following the hearing, on **November 8, 2021**, the parties were served with Judge

20   Cahill's order regarding the issues briefed, which granted EDAG's request.  A copy of this order

21   was filed with the Court at Docket No. 25.

22        12.   On **December 9, 2021**, this Court heard EDAG's Motion to Confirm Arbitration

23   Award and Issue Judgment, regarding the June 2, 2021 award of over $28.6 million to EDAG

24   issued by Judge Cahill.  Attached as **Exhibit G** is a true and correct copy of the transcript for that

25   proceeding.

26   / / /

27   / / /

28   / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 21st day of March, 2022 at San Francisco, California.

_Kenneth Walczak_

Kenneth M. Walczak

# EXHIBIT A

| | |
|---|---|
| **From:** | Kristin Orrantia |
| **To:** | Scott Schreiber; Jayli Miller; ksipprelle@vstriallaw.com; dvanetten@vstriallaw.com |
| **Cc:** | Evangeline A.Z. Burbidge; Marc R. Lewis; Brad Estes; Kenneth M. Walczak; Diana DeFrancesco |
| **Subject:** | EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291 |
| **Date:** | Friday, September 17, 2021 1:28:48 PM |
| **Attachments:** | 2021_09-17 - Letter to Judge Cahill re Leave to Request TRO-Injunction.pdf |

Good afternoon Scott:

Attached please find Petitioner EDAG Engineering GmbH's Request for Leave to File a TRO or Injunction for submission to Judge Cahill.

Respectfully submitted,

Kristin Orrantia

**Kristin Orrantia**

**Lewis & Llewellyn LLP** | Senior Paralegal

601 Montgomery Street, Suite 2000
San Francisco, CA 94111
415-843-4832
**www.lewisllewellyn.com**

This email may contain confidential and/or privileged information. If you received this email in error please delete and notify sender.



601 Montgomery Street, Suite 2000
San Francisco, CA 94111

Direct 415-762-0908
eburbidge@lewisllewellyn.com

www.lewisllewellyn.com

*VIA EMAIL*

September 17, 2021

Hon. William Cahill (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

      **Re:**    **EDAG v. BYTON – REF# 1100107291**

Dear Judge Cahill,

      EDAG Engineering GmbH ("EDAG") has learned of a fraudulent scheme by BYTON North America ("BYTON") to transfer assets—including EDAG's intellectual property—overseas to BYTON's Chinese parent company (or a Chinese affiliate) and out of reach of U.S. authorities. Because this scheme imperils EDAG's ability to obtain the relief ordered by Your Honor, EDAG must seek a temporary restraining order ("TRO") or preliminary injunction enjoining BYTON's conduct.

      EDAG believes Your Honor has full authority to grant the relief sought, under the terms of the contract between EDAG and BYTON and the relevant case law. EDAG is prepared to submit formal briefing within one calendar week from the date of this letter.

      If Your Honor disagrees, and determines that JAMS no longer has jurisdiction over the matter or that JAMS specifically lacks authority to issue a TRO or a preliminary injunction, EDAG respectfully requests written confirmation of that determination within the next five (5) calendar days, by or before Wednesday, September 22, so that EDAG can swiftly seek relief from the Court.

## I.    Procedural History.

      Your Honor conducted the arbitration between EDAG and BYTON between February 8-12 and 16-19, 2021. On June 10, 2021, after closing arguments and the issuance of two preliminary rulings, Your Honor issued a 29-page Final Award finding in favor of EDAG's breach of contract claim and awarding EDAG the sum of €23,446,649, plus 10% statutory interest and costs.

      On June 23, 2021, EDAG filed a Petition to Confirm the Final Award and enter judgment in its favor in the Northern District of California. On July 16, 2021, BYTON filed a reply indicating that it intends to challenge the Final Award.

/ / /



## II.   New Evidence of BYTON's Improper Attempt to Transfer Assets Overseas, Misappropriate EDAG's Intellectual Property, and Avoid Payment of the Final Award.

EDAG has just learned that BYTON—who has not paid one cent of the over €23.4 million Final Award—has paid other vendors so that it and a related Chinese entity (which BYTON has referred to as "BYTON China") can access EDAG's intellectual property and spend resources building its M-BYTE vehicle in China.  *See, e.g.,* Ex. A ("Byton is alive! M-Byte EV was spotted in the wild for the first time," CAR NEWS CHINA, Aug. 20, 2021).

A few days ago, EDAG also learned that from August 2020 to May 2021, BYTON was attempting to transfer EDAG's intellectual property from a cloud-based system held by Jama Software in the United States to a local Chinese server that would render the information inaccessible from the United States.  Under the terms of the contract between EDAG and BYTON, BYTON has no right to access or make use of EDAG's intellectual property because it has not paid the money it owes EDAG for EDAG's work.[1]  Such a transfer threatens EDAG's ability to recover its intellectual property or the money it is owed.  And it remains a very real possibility in the absence of a TRO or injunction.

## III.   This Arbitrator Has Authority to Issue Injunctive Relief.

Federal law protects the right of a party to seek injunctive relief to preserve the *status quo* and protect its ability to receive the benefit of an arbitrator's award.  *See .  Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) ("*Toyo*") (Interim relief is available to parties where "necessary to preserve the status quo and the meaningfulness of the arbitration process—provided, of course, that the requirements for granting injunctive relief are otherwise satisfied.")  (copious citations omitted).

That protection extends to proceedings like this one, in which EDAG has obtained an arbitration award but requires an injunction "to ensure [its] arbitration award is not rendered ineffectual." *Smagin v. Yegiazaryan*, No. CV 14-9764-R, 2015 WL 13757706, *2 (C.D. Cal. Sept. 28, 2015) ("*Smagin*") (affirming injunction freezing assets of Respondent who "regularly conceals the true ownership of his assets through the use of shell corporations in offshore jurisdictions and through the use of nominees who hold assets on his behalf and act according to his discretion" in action where Petitioner had received an arbitration award).  "This is not the beginning stage of a breach of contract claim, but instead the end stages of a protracted arbitration in which the merits of all claims and defenses have been fully presented and adjudicated."  *Smagin*, 2015 WL 13757706 at *1, citing *Toyo* (additional citation omitted).

While a United States District Court ordered the injunctive relief in *Smagin*, the Ninth Circuit has specifically affirmed the rights of parties to confer that same authority on an

---

[1] Under the "Assignment of Rights" contained Section 6.2(b) of the Technology Development and License Agreement it states: "Subject to [EDAG's] underlying Intellectual Property Rights in the Background Technology and **in exchange for the fees** set forth in section 4 of SOW, [EDAG] shall and does hereby assign to BYTON, [EDAG's] entire right, title and interest in and to the Deliverables created for BYTON, the Foreground Technology, and all associated Intellectual Property Rights therein. […]" (emphasis added).  Ex. B (Tr. Ex. 2, Technology Development and License Agreement, without schedules, by and among BYTON North America Corporation and EDAG Engineering GmbH, effective June 1, 2017).



arbitrator.  "[A]n arbitrator generally has the authority to enter injunctive relief against a party that has entered into an arbitration agreement [with the] caveat, however, is that an arbitrator may do so only if the arbitration agreement at issue permits it." *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013) *See also Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Disease & Related Disorders Ass'n of San Diego, Inc.*, No. 17-CV-1690-BTM-JLB, 2018 WL 1562012, at *4 (S.D. Cal. Mar. 29, 2018) (collecting cases demonstrating "courts have recognized an arbitrator's power to award equitable relief, including injunctive relief against a party to an arbitration agreement."; *Toyo*, 609 F.3d at 981 (ICC Rules, which *Toyo* parties agreed would govern, allowed parties to seek "interim or conservatory relief" from a court of competent jurisdiction, both before and after arbitration).

EDAG and BYTON did just that, in the Technology and Development Licensing Agreement ("TDLA") that binds the parties.  TDLA Section 14.4b specifically grants Your Honor "full power and authority … to interpret or construe the provisions of the agreement documents and to fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief)."  *See* Ex. B (Tr. Ex. 2, Technology Development and License Agreement, without schedules, by and among BYTON North America Corporation and EDAG Engineering GmbH, effective June 1, 2017).

## IV.    Conclusion.

EDAG respectfully requests that Your Honor respond within five (5) calendar days, by or before September 22.  If Your Honor agrees that JAMS has authority to hear this matter and grant relief, EDAG requests permission to submit its papers in support of a TRO or injunctive relief two (2) calendar days thereafter.

Respectfully submitted,

LEWIS & LLEWELLYN LLP

By: _____
      Evangeline A.Z. Burbidge
      Marc R. Lewis
      Brad Estes
      Kenneth M. Walczak

Attorneys for EDAG Engineering GMBH

Enclosures

cc: Keith Sipprelle, Esq. (via email)
      David Van Etten, Esq. (via email)

3

# EXHIBIT A

Case 3:21-cv-04736-EMC   Document 143-1   Filed 03/22/82   Page 1 of 61

ARTICLE   EV   INDUSTRY

# Byton is alive! M-Byte EV was spotted in the wild for the first time [Spy Photos]

Jiri Opletal August 20, 2021



*Byton M-Byte spy photos*

If you are among those who thought Byton would never produce a car, you are not alone. Byton is a Chinese automotive soap opera – 5 years of bankruptcies, reorganizations, politics, 8.4 billion yuan burned ($1.3 billion), and still no car in mass production.

Today CNC received the set of spy photos taken in Hainan by our friend Bob. Despite the heavy camouflage, we can tell it is the Byton M-Byte concept. Bob almost got in a fight with the Byton test crew while making the pictures. Thanks to his bravery, we can now see electric SUV M-Byte is not dead and undergoing road tests.

9/14/21, 12:41 PM
Byton is alive! M-Byte EV was spotted in the wild for the first time, Spy Photos - CarNewsChina.com

Case 3:21-cv-04736-EMC   Document 143-1   Filed 03/22/82   Page 12 of 611



Byton was founded in 2016 by a team of mostly German [edit – they deleted the webpage with team members] executives who mostly used to work for BMW. M-Byte was introduced in 2018 at CES in Las Vegas. Mass production was supposed to start in 2019, but Byton has kept silent since then. Upon launch, Byton claimed it is SUV and SIV, which stands for Smart Intuitive Vehicle. We assumed it was because of lots of technology Byton planned to stuff inside.



The company was headquartered in Nanjing with offices in Beijing, Shanghai, Hong Kong, San Jose (US), and Munich (Germany). The Byton's subsidiary operating Munich branch was sent into insolvency on April 2021 after not paying salaries to its employees for several months. Both co-founders, together with most of the German team located in China, also left the company. First was Carsten Breitfeld in 2019, who later claimed he quit because of Chinese

Byton is alive: M-Byte EV was spotted in the wild for the first time - spy photos - CarNewsChina.com

government interferences. The largest Byton investor was state-owned automaker First Auto Works (FAW).

**Exodus of founders**

According to The Verge, Breitfeld said he *didn't realize enough* what it meant to take investment from a state-owned automaker like FAW. He also claimed FAW took away his responsibilities.

A year later, in 2020, the second co-founder Daniel Kirchert left Byton. His new destination was Evergrande Auto, where he worked as Vice Executive President. For Mr. Kirchert, it was the second job for the automaker that didn't produce a car. And while Byton might yet succeed, Evergrande's fate seems a bit darker.

In 2019 Evergrande announced it plans to invest $6.4 billion over the next three years into its EV unit.  In August 2020, they announced six new cars under the Hengchi brand (Hengchi 1-6). Backstage, we heard many rumors about their struggle to put cars into production. Finally, Reuters reported that Evergrande is in talks with Xiaomi to sell their EV unit this week. The original business of Evergrande is real estate.

**FAW taking control of Byton, pushing Foxconn away**

Back to Byton. Despite the ups and downs, it got some powerful backers, including FAW, Tencent, and Foxconn, which signed a strategic partnership in January 2021. Foxconn bet a lot on EV, aiming to copy-paste its business model with smartphone vendors and provide manufacturing services to EV startups. However, FAW, the biggest Byton creditor, started taking management control of Byton and installing its people into high management positions, Bloomberg reported in July this year.

The reorganization resulted in Chinese state-owned automaker FAW being heavily involved in the project, reportedly leading to conflicts with Foxconn. According to TechTaiwan, Foxconn confirmed that its team had left Byton plants, and further cooperation would depend on the outcome of Byton's reorganization.

**M-Byte EV**

According to previous information, the SIV SUV will be 4800 mm long and have a wheelbase of 2950 mm. Upon launch, the Byton SIV will be equipped for level 3 (L3) autonomous driving, including Lidar and millimeter-wave radar. There will be two battery packs available: 60 kWh for a 350 km range and 90 kWh for a 500-kilometer range. 0-100 will take "5 to 6" seconds.

Case 3:21-cv-04736-EMC Document 143-1 Filed 03/22/22 Page 14 of 61



Byton M-Byte Concept from 2018

It's nice to see M-Byte is still alive, and chances we might see it in mass production are getting higher. We will keep an eye on that.

# EXHIBIT B

## TECHNOLOGY DEVELOPMENT AND
## LICENSE AGREEMENT

This Technology Development and License Agreement (the "Agreement") is effective as of the 1ˢᵗ day of June, 2017 (the "Effective Date") and is made this 20th day of October, 2018  by and among BYTON North America Corporation, a Delaware corporation with offices at 4201 Burton Drive, Santa Clara, California, 95054, on behalf of itself and its Affiliates (collectively, "BYTON") and EDAG Engineering GmbH ("Supplier"), located at Kreuzberger Ring 40, 65205 Germany (BYTON and Supplier are individually a "Party" and collectively, "Parties").

### WITNEESETH

WHEREAS, BYTON is in the business of designing, developing, manufacturing, and delivering electric vehicles, which will be initially manufactured and sold in China, and thereafter in the United States, Europe and other countries, and requires certain services and support; and

WHEREAS, Supplier is able to provide such services and support, and both BYTON and Supplier now desire to memorialize the terms and conditions relating thereto;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### 1.0 DEFINITIONS

When used herein, the following terms shall be defined as follows:

1.1 "Acceptance Requirements" means the Specifications, the acceptance criteria relative to the Deliverables, and the plan and associated test environment against which BYTON will test conformance of the Deliverables in accordance with the documents set forth in a Statement of Work or as otherwise agreed by the parties in writing.

1.2 "Affiliates" shall mean with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity. For purposes of the Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

1.3 "Background Technology" means all Technology that (i) is owned or otherwise controlled by Supplier and (ii) is either (1) in existence on or prior to the Effective Date or (2) conceived, created, developed, reduced to practice or made by or on behalf of Supplier after the Effective Date independently of the activities contemplated by this Agreement.

1.4 "BYTON Product(s)" means any product(s) made by or for BYTON that incorporates or is distributed for use in conjunction with the Deliverables or a portion thereof.

1.5 "Confidential Information" means information which if disclosed (i) in tangible form, is clearly marked as "confidential" or "proprietary" at the time of disclosure, or (ii) in intangible form (such as orally or visually), the disclosing Party clearly identifies as "confidential" or "proprietary" at the time of disclosure and summarizes in writing and delivers to the receiving Party within thirty (30) days of disclosure.

1.6 "Deliverables" means the specific deliverables which Supplier is to provide to BYTON under a Statement of Work

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EXHIBIT
3

EDG-0035531

3-001

and such other Background Technology which Supplier provides to or makes available to BYTON in connection with a Statement of Work.

1.7 "Derivative Matter" means any work or invention, new material, information or data which is based in whole or in part upon the Background Technology and Foreground Technology, (including, if applicable, any BYTON Products) and any Intellectual Property Rights associated therewith, including any derivative work, improvement, extension, revision, modification, translation, abridgment, condensation, expansion, collection, compilation, Error Correction, or any other form in which the Background Technology and Foreground Technology may be recast, transformed or adapted, including any changes thereto or that is an implementation of the functionality described in any Specifications or similar documentation developed by or for BYTON pursuant to this Agreement.

1.8 "Documentation" means collectively the technical documentation, training materials, support materials, and end-user documentation associated with the Deliverables.

1.9 "Error" means with respect to the Deliverables, a failure to meet the Acceptance Requirements, including any defect or deficiency or failure to conform to the then-current functional, operational and performance Specifications and Documentation. It is not an Error when the functional, operational and performance Specifications and Documentation are met but the Specifications prove to be erroneous or dysfunctional or when target adjustments have to be made during the development process.

1.10 "Error Correction" means a modification, addition or procedure to correct an Error.

1.11 "Foreground Technology" means all Technology which is created, developed, or otherwise generated by Supplier under this Agreement.

1.12 "Intellectual Property Rights" means worldwide common law and statutory rights associated with (i) patents and patent applications; (ii) works of authorship, including mask work rights, copyrights, copyright applications, copyright registrations and "moral" rights; (iii) the protection of trade and industrial secrets and confidential information; (iv) other proprietary rights relating to intangible intellectual property (specifically excluding trademarks, tradenames and service marks); (v) analogous rights to those set forth above; and (vi) divisions, continuations, renewals, reissuances and extensions of the foregoing (as applicable) now existing or hereafter filed, issued or acquired.

1.13 "Services" means any task performed, such as consultancy services, to complete the project in accordance with the agreed responsibilities pursuant to a Statement of Work.

1.14 "Source Code" means program code in high-level computer language readable by humans skilled in the language, and includes available related Documentation and tools, including comments, internal development tools and build environments.

1.15 "Specifications" means the functional, operational and performance requirements for the Deliverables.

1.16 "Statement of Work" means the development plan, including deliverables and associated milestones, and the development schedule set forth in a written document. The Parties may enter into multiple individual Statements of Work under this Agreement. Each Statement of Work entered into by the Parties shall be part of the Agreement, as defined.

1.17 "Technology" means inventions, business, marketing, engineering, technical and manufacturing information, know-how and materials, including technology, software, instrumentation, specifications, designs, devices, data, compositions, formulas, , assays, reagents, constructs, compounds, discoveries, procedures, processes, practices,

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                          EDG-0035532

protocols, methods, techniques, results of experimentation or testing, knowledge, trade secrets, skill and experience, in each case whether or not patentable or copyrightable; the foregoing may be in both tangible and intangible form.

## 2.0 DEVELOPMENT

2.1 Development Undertaking. Supplier will design, develop and create the Deliverables and perform all Services, conforming to the Acceptance Requirements and in accordance with the applicable Statement of Work created under this Agreement. For the avoidance of doubt, Supplier will not be an exclusive supplier of the services regarding the project as a whole, but only with respect to the agreed Deliverables and Services pursuant to this contract. BYTON carries the overall responsibility for the Project as a whole.

Should the development process show that target adjustments are necessary in order to achieve the overall target of a functional vehicle fit for homologation in the jurisdiction of the European Union, the United States of America and China, these target adjustments are not considered erroneous.

2.2 Obligations in Support of Development. To ensure the timely and satisfactory completion of Supplier's development work under the Statement of Work, Supplier will deploy throughout the development sufficient and qualified personnel, equipment and other necessary resources to complete Supplier's development work. BYTON will provide all necessary data and perform all duties in accordance with FPDP Gate Deliverables Full Checklist to enable Supplier's performance. For all of Supplier's development work and provision of Services, Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement. Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement. Supplier may employ individual independent contractors as part of its workforce but shall not be permitted to delegate or subcontract the performance of its duties and obligations to any third party without the prior written consent of BYTON. Supplier remains responsible for compliance with the terms and conditions of the Agreement whether performed by Supplier or an authorized third party.

For Supplier personnel who are visiting and onsite at BYTON facilities, the additional obligations set forth in Section 13 below shall apply.

2.3 Status Reports. Supplier will provide to BYTON written engineering status reports, on an every-other-week basis (or as requested basis) detailing the status of the development work described in the Statement of Work. Supplier shall provide more frequent updates and status reports upon BYTON's request.

2.4 Change Requests. Some evolution of the Specifications and the Statement of Work based upon interaction between the Parties is expected and minor modifications which will not impact full compliance with the Statement of Work (including milestones) or fees due under this Agreement may be mutually agreed to by the Parties and need not be achieved by a formal change mechanism. However, changes impacting full compliance with the Statement of Work or fees payable are only valid if implemented in accordance with the following change request procedure. BYTON may request any change to the Specifications or the Statement of Work by setting forth the proposed change in reasonable detail in a writing (including email) submitted to Supplier ("Change Request"). Supplier shall respond in writing to Change Requests within three (3) workdays of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, the impact on the Statement of Work and any additional fees which Supplier would require in order to make the requested change ("Change Response"). BYTON shall respond promptly informing Supplier whether it agrees with Supplier's description of the anticipated impact and additional terms, if any, proposed in the Change Response. Once an authorized representative of BYTON agrees in writing to the terms and conditions outlined in the Change Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Change Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance

3/15

Lf

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**EDG-0035533**

**3-003**

with previous agreed terms during these 48 hours as time is of essence.

2.5 Enhancements. BYTON, at its option, may request enhancements to the Deliverables by setting forth the proposed change in reasonable detail (including email) submitted to Supplier ("Enhancement Request"). Supplier shall respond in writing to Enhancement Requests within ten (10) days of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, any additional fees which Supplier would require in order to make the requested change ("Enhancement Request Response"). BYTON shall respond promptly within 48 hours, informing Supplier whether it agrees with Supplier's additional terms, if any, proposed in the Enhancement Request Response. Once an authorized representative of BYTON agrees in writing to the Enhancement Request Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Enhancement Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance with previous agreed terms during these 48 hours as time is of essence.

2.6 BYTON's and Supplier's Obligations. In furtherance of this Agreement, BYTON and Supplier shall (a) cooperate and work together in all matters relating to the services provided hereunder; (b) respond promptly to a Party's request to provide direction, information, approvals, authorizations or decisions that are reasonably necessary for or related to a Statement of Work in a timely manner.

## 3.0 TRANSFER AND DELIVERY

3.1 Background Technology. If required under a Statement of Work in accordance with 1.5, Supplier will deliver to BYTON the Background Technology (including without limitation Documentation thereto) within five (5) days if feasible, or as otherwise agreed to by the parties if not feasible, after payment pursuant to the agreed payment schedule.

3.2 Deliverables and the Developed Technology. Supplier will deliver to BYTON each Deliverable (including the Foreground Technology therein and related Documentation), in the form(s) set forth in a Statement of Work, not later than the date set forth therein for testing in accordance with the Acceptance Requirements. In addition, Supplier will provide to BYTON such technical documentation as may be reasonably required to enable BYTON to install and test each Deliverable as anticipated by the Acceptance Requirements.

3.3 Delays. TIME IS OF THE ESSENCE. Supplier's delivery to BYTON of the Deliverables in accordance with this Section 3.0 ("Transfer and Delivery") and Supplier's completion of all Deliverables, Foreground Technology and Documentation thereto in accordance with the schedule set forth in the Statement of Work are key to the success of the BYTON Product(s). BYTON will provide all necessary information and perform all duties in a timely fashion to enable Supplier performing in accordance with the master timing.

3.4 Means of Delivery. All deliveries to BYTON shall be made DDP Destination (INCO Terms, 2010) and pursuant to BYTON's written instructions with respect to form (physical or electronic) and location. For the delivery of any physical items, taxes or duties, fees, charges, stamp taxes, etc. of any kind are borne by BYTON. Supplier agrees to support BYTON where possible and is entitled to charge these services in accordance with its offer.

## 4.0 TESTING AND ACCEPTANCE

4.1 Test Method. The Deliverables requiring machine execution will be tested in the test environment described in the Acceptance Requirements. The Foreground Technology and Deliverables not requiring machine execution will be compared to the requirements of the Acceptance Requirements.

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                                    **EDG-0035534**

**3-004**

4.2 Acceptance Procedure.

  a. BYTON may, in BYTON's sole discretion, reject the Deliverables or any component thereof, if it contains any Error. BYTON will promptly notify Supplier in writing of BYTON's acceptance or rejection ("Error Notice"). In each Error Notice, BYTON will set forth, in reasonable detail, the reason for the rejection.

  b. Upon rejection of the Deliverables, Supplier shall either (i) create and implement an Error Correction for each identified Error and resubmit the relevant portion of the Deliverable to BYTON for retesting within three (3) workdays of BYTON's Error Notice, or (ii) if it is impracticable to provide an Error Correction in such three (3) workday period, within three (3)workdays of BYTON's Error Notice, provide to BYTON a written plan to correct the identified Error(s), including a schedule therefor ("Correction Plan").

Failure of the Deliverables to pass BYTON's acceptance tests following implementation of Error Correction(s) as contemplated above, or failure of Supplier and BYTON to agree upon a Correction Plan within three (3) days after Supplier provides such Correction Plan to BYTON or Supplier's failure to fully comply with an agreed upon Correction Plan, will entitle BYTON, in BYTON's sole discretion, to (i) require Supplier to again undertake creation and implementation of an Error Correction for resubmission and testing pursuant to this Section; (ii) accept the relevant portion of the Deliverables and correct the Error itself offsetting its reasonable costs against any associated fees; (iii) accept the relevant portion of the Deliverables, reserving BYTON's rights to require Supplier to correct the Error; or (iv) deem such event a material breach of this Agreement which cannot be cured, immediately terminate this Agreement in accordance with Section 9.2 ("Breach and Termination"), and Supplier shall refund any fees that have been paid (for any noncompliant Deliverables) under the Statement of Work in Question for this particular item.

**5.0 LICENSE GRANTS AND RESTRICTIONS**

5.1 Supplier's License Grants and Restrictions.

  a. Background Technology License. Supplier hereby grants to BYTON, a royalty-free, fully paid up, non-exclusive, perpetual, irrevocable and worldwide license under Supplier's Intellectual Property Rights to, in any fashion BYTON may choose (including, but not limited to, community source and/or open source licensing), (i) use, reproduce, modify, prepare Derivative Matter of, compile, publicly perform, publicly display, demonstrate, Background Technology and Derivative Matter thereof (including in Source Code or object code form) on any media or via any electronic or other method now known or later discovered; (ii) make, have made, use, sell, offer to sell, import and otherwise exploit the Background Technology and Derivative Matter thereof (including in Source Code or object code form) in any manner and on any media or via any electronic or other method now known or later discovered; (iii) disclose, distribute and otherwise exploit the Background Technology and Derivative Matter and (iv) sublicense the foregoing rights to third parties through multiple tiers of sublicensees or other licensing mechanisms at BYTON's option for Background Technology and Derivative Matters necessary for the Project.

  b. Third Party Licenses. Supplier shall not incorporate any third-party materials, information or intellectual property, including without limitation, any open source software (Source Code or object code form) made generally available to the public under open source licenses (collectively, "Third Party Materials") into any of the Deliverables unless Supplier has obtained for BYTON license rights consistent with the rights mentioned under Section 5.1(a) herein. Supplier shall identify and disclose to BYTON, all Third Party Materials to be incorporated into the Deliverables, prior to doing so, and the Parties shall discuss the same if necessary.

5.2 BYTON's License Grant and Restrictions.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035535

3-005

a. License Grant. Subject to the terms and conditions of this Agreement, BYTON grants Supplier a personal, non-exclusive, non-transferable, limited license to internally use the Foreground Technology and prepare and use Derivative Matter thereof, solely for the purpose of performing maintenance and support services to BYTON in accordance with the terms of this Agreement.

b. Restrictions. Supplier shall have no right to use the Foreground Technology for productive or commercial uses. Supplier may not sell, rent, loan or otherwise encumber or transfer the Foreground Technology, in whole or in part, to any third party. No right, title or interest in or to any trademark, service mark, logo or trade name of BYTON or its Suppliers is granted under this Agreement.

## 6.0 OWNERSHIP AND PROPRIETARY NOTICES

6.1 Background Technology. Supplier asserts that Supplier and/or Supplier's suppliers own the Background Technology and associated Intellectual Property Rights or owns the proper non-exclusive licenses. BYTON agrees that, to the extent Supplier owns the Background Technology and associated Intellectual Property Rights, Supplier will retain such ownership. Except as expressly stated in this Agreement, nothing herein shall be deemed a transfer or license by BYTON of any Intellectual Property Rights that BYTON may now possess or acquire in the future which may cover any aspect of the Deliverables.

6.2 Deliverables; Foreground Technology.

a. Foreground Technology; Deliverables. BYTON retains all right, title and interest in and to: (i) the BYTON Products; (ii) Deliverables except to the extent such Deliverables constitutes Background Technology; and (iii) Foreground Technology.

b. Assignment of Rights. Subject to Supplier's underlying Intellectual Property Rights in the Background Technology and in exchange for the fees set forth in section 4 of SOW, Supplier shall and does hereby assign to BYTON, Supplier's entire right, title and interest in and to the Deliverables created for BYTON, the Foreground Technology, and all associated Intellectual Property Rights therein. The Parties hereby agree that all development work performed by Supplier hereunder shall be deemed works made for hire. Before any employee or contractor of Supplier ("Personnel") performs development work hereunder, such Personnel and Supplier must enter into a written agreement expressly for the benefit of BYTON and containing provisions substantially equivalent to this Section 6.2 ("Deliverables; Foreground Technology") and Section 10 ("Confidential Information") or enter into an agreement as close as legally possible to it under the laws of the country in which task is performed. Supplier (i) may only use the Foreground Technology in accordance with Section 5.2 ("BYTON's License Grant and Restrictions"), and (ii) agrees not to challenge the validity of BYTON's ownership in the Foreground Technology. In addition, BYTON shall own all Derivative Matter and associated Intellectual Property Rights. BYTON may register the copyright in the Deliverables and Foreground Technology in its own name, identifying Supplier's interest in the Background Technology as required by applicable Copyright Office rules and regulations.

c. Cooperation in Perfecting Rights. Supplier agrees to cooperate with BYTON and cause Supplier's employees to cooperate with BYTON and to perform all acts, at BYTON's request on reasonable notice, as reasonably necessary to facilitate the preparation, filing, prosecution and enforcement of the Intellectual Property Rights associated with the Deliverables and Foreground Technology. In addition, Supplier shall, upon BYTON's request and at BYTON's costs, enter into any assignments, waivers or licenses of the Deliverables, Foreground Technology or the Intellectual Property Rights related to any of the foregoing as BYTON deems necessary and appropriate. In the event that BYTON is unable for any reason to secure Supplier's signature to any document required to apply for or execute any patent, copyright, trademark registration or other application with respect to the Deliverables and Foreground Technology, Supplier hereby irrevocably designates and appoints BYTON and

6/15

C_BYTON_EDAG_V10_20_18

its duly authorized officers and agents as Supplier's agents and attorneys-in-fact to act for and on Supplier's behalf and instead of Supplier, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, trademarks or other rights thereon with the same legal force and effect as if executed by Supplier.

6.3 Moral Rights. Supplier agrees that with respect to any "moral" or equivalent rights (including, without limitation, rights of attribution, integrity, disclosure, and withdrawal) Supplier hereby: (i) assigns such rights to BYTON as described above, (ii) waives such rights and (iii) agrees and covenants never to assert, either during or following the term of this Agreement, such rights or to institute or maintain any action against BYTON relative to any such rights in the Foreground Technology or Derivative Matter. To the extent that such rights cannot be assigned or waived by operation of law, Supplier grants to BYTON, a royalty-free, fully paid-up, perpetual, irrevocable and worldwide license to fully exercise all such rights, with rights to sublicense through multiple levels of sublicensees and further, Supplier consents to BYTON's use sufficient to allow BYTON to exercise the rights granted in this Agreement.

## 7.0 PAYMENTS, INSURANCE AND ACCOUNTING

7.1 Fees. BYTON shall pay Supplier the fees set forth in Section 4 in SOW accordance with the schedule and requirements set forth therein and, in the case of fees due in connection with the Deliverables, upon acceptance of Deliverable by BYTON in accordance with Section 4.2 ("Acceptance Procedure"). Following such acceptance, Supplier shall provide a correct invoice to BYTON, and such invoice will be due, in Euro, within either sixty (60) days following BYTON's receipt of such invoice. BYTON sent per the agreed payment schedule highlighted in the Statement Work to this Agreement.

7.2 Taxes. All prices quoted by Supplier are exclusive of any taxes. Supplier shall include on its invoices the actual taxes payable for the services provided to BYTON. However, Supplier shall pay all taxes, levies or duties associated with fees and royalties payable by BYTON hereunder, whether based on gross revenue or otherwise; and any business, occupational or similar taxes relating to its general business activities. Supplier shall also be responsible for all employer related taxes relating to its Personnel including employee taxes, workers compensation, and unemployment insurance.

7.3 Insurance. Supplier will be insured pursuant to laws in Germany and provide a copy of the certificate of insurance and will maintain such insurance for the time of the Agreement.

## 8.0 MAINTENANCE AND SUPPORT SERVICES

8.1 Supplier shall provide to BYTON the maintenance and support services, as set forth in a Statement of Work, or if thereafter subsequently requested by BYTON as subsequently, mutually agreed by the parties.

## 9.0 TERM AND TERMINATION

9.1 Term of Agreement. The term of this Agreement begins on the Effective Date and continues for a period of seven (7) years (but in no event earlier than the expiration or earlier termination of the last Statement of Work created hereunder), unless this Agreement is earlier terminated sooner in accordance herewith.

9.2 Breach and Termination. If either Party fails to comply with any material term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such notice, all breaches specified therein are remedied. If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall

7/15                                                    C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035537

3-007

undertake reasonable, diligent and good faith efforts to promptly remedy the breach. If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement. If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice. Notwithstanding anything to the contrary herein, BYTON may immediately terminate this Agreement, without a cure period, if Supplier fails to comply with any of its obligations under Sections 3.3 ("Delays") or 4.2 ("Acceptance Procedure").

9.3 Supplier's Insolvency.  In the event Supplier becomes insolvent, enters into voluntary or involuntary bankruptcy, ceases to conduct business or assigns its interests in this Agreement to a third party creditor, (i) BYTON may immediately terminate this Agreement; or (ii) BYTON may (a) continue to exercise the license rights granted to BYTON hereunder, and (b) reserve all rights in the Background Technology and related materials to protect BYTON's interests therein pursuant to Section 365(n) (and any amendment thereto) of the U.S. Bankruptcy Code, or equivalent legislation in other applicable jurisdictions.  The parties acknowledge that the Background Technology and Foreground Technology are "intellectual property" for purposes of Section 365(n) of the U.S. Bankruptcy Code and that BYTON will have the right to exercise all rights provided by Section 365(n) with respect to the Background Technology and Foreground Technology.  In the event that the Supplier materially breaches any provision under this Agreement, BYTON will have the right to require the delivery by Supplier (or in the event of a filing of bankruptcy by or against Supplier, by the trustee) to BYTON of all Background Technology and Deliverables (including all embodiments thereof).

9.4 BYTON Termination.  BYTON, at BYTON's sole option, prior to acceptance of the final deliverable, shall be permitted to terminate this Agreement, a Statement of Work or any part thereof, without cause upon 30 (30) days prior written notice to Supplier. In such an event, BYTON shall pay the applicable fees through the next milestone following notice of such termination or as otherwise agreed between the Parties. If BYTON terminates this Agreement or a Statement of Work (in whole or in part) pursuant to this Section 9.4, then the Parties shall promptly discuss what transition of work, if any, may occur, the plans for accomplishing such, and the proposed timetable, among other things ("Transition Plan"), which will include a transition period for employees of the Supplier allocated for on this project.  Based on BYTON's plans and objectives and under consideration of Supplier's allocations with respect to this Agreement, the Parties shall cooperate and mutually agree on a Transition Plan, which shall be completed within sixty (60) days after the Parties reach agreement.

9.5 Effect of Termination or Expiration.  Neither party will be liable for any damages arising out of the expiration of this Agreement.  Termination as a result of a breach of this Agreement will not affect any right to recover damages sustained by reason of breach; or any payments which may be owing in respect of this Agreement. Subject to Supplier making best efforts to mitigate any costs and payments, Supplier is entitled to all payments in accordance with agreed payment plans/fee schedule for already initiated work at the time Supplier received the notice from BYTON to terminate for convenience. This includes payments for costs incurred with respect to subsequent milestones (such as e.g. visa fees, contractual obligations to employees traveling abroad, testing facilities rented, etc.).

9.6 Survival.  Sections 1.0 ("Definitions"), 3.0 ("Transfer and Delivery"), 5.1 ("Supplier's License Grants and Restrictions"), 5.2(b) ("Restrictions"), 6.0 ("Ownership and Proprietary Notices"), 8.0 ("Maintenance and Support Services"), 9.0 ("Term and Termination"), 10.0 ("Confidential Information"), 11.0 ("Warranties and Disclaimer of Warranty"), 12.0 ("Indemnification"),  and 13.0 ("Miscellaneous") of this Agreement  shall survive any termination or expiration of the Agreement.

## 10.0 CONFIDENTIAL INFORMATION

10.1 Obligation.  Except as provided in this Agreement, neither Party may use, reproduce, distribute or disclose Confidential Information it receives from the other Party under this Agreement, without the prior written authorization

C_BYTON_EDAG_VI0_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035538

3-008

of the disclosing Party. Each Party must hold in confidence Confidential Information received from the other Party and must protect the confidentiality thereof with the same degree of care that it exercises with respect to its own information of like importance, but in no event less than reasonable care, during the term of this Agreement and for a period of three (3) years after the expiration or earlier termination of this Agreement. Neither Party shall be liable for any inadvertent or unauthorized disclosure of Confidential Information, provided that it exercises at least the standard of care set forth above to prevent disclosure and takes reasonable steps to mitigate any damage and prevent further disclosure. For purposes of this Section, use, reproduction, distribution or disclosure by BYTON of the Background Technology or Foreground Technology thereof under a community source or open source licensing model, pursuant to the license granted by Supplier herein, will not be a breach of this Agreement.

10.2 Exceptions. Section 10.1 ("Obligation") does not apply to any portion of the Confidential Information which the receiving Party can demonstrate:

a. is now, or hereafter becomes, through no act or failure to act on the part of the receiving Party, generally known in the automobile industry;

b. was possessed by the receiving Party without an obligation of confidentiality at the time of receiving such Confidential Information;

c. is rightfully obtained by the receiving Party without restriction on disclosure; or

d. is independently developed by the receiving Party not in breach of this Agreement.

10.3 Employee Access. Each Party must inform its employees and contractors having access to the other Party's Confidential Information of restrictions under this Agreement and shall contractually require such contractors to comply with the requirements of this Section 10.0 ("Confidential Information") and Section 6.0 ("Ownership and Proprietary Notices").

10.4 Legally Compelled Disclosure. In the event that either Party is requested or becomes legally compelled (including without limitation, pursuant to securities laws and regulations) to disclose the existence or any of the terms of this Agreement, in contravention of the provisions of this Section 10, such Party (the "Disclosing Party") shall provide the other Party (the "Non-Disclosing Party") with prompt written notice of that fact before such disclosure and will use reasonable efforts to fully cooperate with the Non-Disclosing Party to seek a protective order, confidential treatment, or other appropriate remedy with respect to the disclosure. In the case of disclosure in connection with rules or regulations of any entity regulating securities ("SEC"), if confidential treatment is requested by the Non-Disclosing Party, the Disclosing Party agrees to use reasonable efforts to file such a request on the Non-Disclosing Party's behalf and to respond to any SEC comments to pursue assurance that confidential treatment will be granted, in both cases fully informing the Non-Disclosing Party of any such comments and cooperating with the reasonable requests of the Non-Disclosing Party.

10.5 Independent Development. Each Party understands that the other Party may develop or receive information similar to the Confidential Information. Subject to copyrights and patent rights of each Party, (i) either Party may develop or acquire technology or products, for itself or others, that are similar to or competitive with the technology or products of the disclosing Party, and (ii) each Party is free to use and disclose information which may be retained in the unaided memory of the receiving Party's employees or contractors who have had access to the Confidential Information of the other Party disclosed hereunder.

10.6 Publicity. Neither Party shall disclose the existence or the terms and conditions of this Agreement to any third Party, except as may be required (i) to implement or enforce the terms of this Agreement; or (ii) by an existing or

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                    **EDG-0035539**

3-009

potential investor, acquiring company, bank or other financial institution, under appropriate non-disclosure terms in connection with a merger, acquisition, financing, loan agreement or similar corporate transaction. Supplier shall not, without first obtaining the prior written consent of BYTON, announce this Agreement. Once the written consent is obtained, Supplier may mention BYTON publicly as reference.

## 11.0 WARRANTIES AND DISCLAIMER OF WARRANTY

11.1 Ownership. Supplier represents and warrants that (i) the Background Technology, Foreground Technology and Deliverables will not infringe or misappropriate any Intellectual Property Rights or trademarks of any third Party; (ii) Supplier has the right and power to enter into this Agreement and grant the assignment and the licenses set forth herein; (iii) the Deliverables will be free from defects in design, material and workmanship and in accordance with the Specifications agreed upon by the parties; (iv) the Deliverables will conform to all applicable laws of the United States, European Union, and China, including those applicable to the design and engineering of vehicles in such countries and regions to achieve homologation; (v) and all services provided will be provided in a professional and workmanlike manner, using qualified personnel with appropriate training, education and experience to perform the services as required hereunder.

11.2 Conformance. Supplier represents and warrants that following the date of acceptance, the Background Technology, Foreground Technology and Deliverables will continue to conform to the Acceptance Requirements without degradation.

11.3 Virus. Supplier represents and warrants that the Background Technology, Foreground Technology and Deliverables and associated media contain no computer instructions designed to (i) disrupt, damage or interfere with use of computer or telecommunications equipment or facilities, or (ii) disrupt or corrupt the use, operation or results of any computer program to the (technical) extent it can be reasonably expected.

11.4 Additional Remedies. In the event of a material breach by Supplier of any representation or warranty herein, BYTON shall have, in addition to and without limitation of any other right or remedy available to BYTON at law or in equity, the right, in BYTON's sole discretion, to take any and all actions reasonably necessary to mitigate BYTON's damages and/or any damages to BYTON's customers arising from such breach, including but not limited to: (i) modifying any form of the Background Technology, Foreground Technology and Deliverables ; (ii) requiring Supplier to fix any necessary form of the Background Technology, Foreground Technology and Deliverables ; (iii) contracting with others to modify any necessary form of the Background Technology, Foreground Technology and Deliverables ; and (iv) distributing to BYTON's customers any such modification, up to an amount equal to greater of: a. EUR15,000,000.00; or b. amounts payable under insurance coverage available to Supplier. Any additional insurance requests by BYTON will be charged to BYTON. This includes BYTON's right to charge to Supplier and Supplier shall be obligated to pay to BYTON all direct costs and expenses, excluding legal fees of any kind, incurred by BYTON in connection with any such mitigation efforts.

11.5 Disclaimer. EXCEPT AS PROVIDED IN THIS AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF DESIGN, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

## 12.0 INDEMNIFICATION

12.1 Obligation to Indemnify.

C_BYTON_BDAG_V10_20_18

$\mu_{b}$

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035540

a.   Supplier's Obligation to Indemnify BYTON. Supplier will indemnify, defend and hold harmless BYTON from and against any and all claims, demands, or actions ("Claims"), and all liabilities, settlements, costs, damages and fees (including reasonable attorneys' fees and costs) ("Losses") incurred or suffered by BYTON arising out of any Claim which arises from: (a) any gross negligent or intentional act or omission of Supplier or its employees, agents or representatives in providing the services under a Statement of Work; (b) Supplier's breach of its obligations under the Agreement; (c) any Claim by or on behalf of Supplier Personnel and their family and relatives against BYTON arising out of the services performed by Supplier Personnel under the Agreement unless they are related to local, hazardous work conditions at a BYTON facility; (d) a Claim that Background Technology, Foreground Technology or Deliverable provided by Supplier hereunder infringes or misappropriates the Intellectual Property Rights of unaffiliated third party. Supplier is not responsible for background technology, foreground technology or deliverables provided by BYTON for the purpose of this Agreement.

b.   In the event of any third person or Governmental Body claim ("Third Party Claim"), action or suit against BYTON as to which BYTON seeks indemnification against Supplier hereunder, and BYTON fails to notify Supplier within a reasonable timeframe of the claim or acknowledges its obligation in writing and elects to defend against, compromise, or, settle any Third Party Claim which relates to any Losses indemnified by this agreement without seeking permission of Supplier beforehand, BYTON accepts to be solely liable for all claims, losses, expenses including legal expenses regardless of actual liability for this claim. Neither Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or consent to entry of any judgment unless the claimant or claimants and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim.

12.2 Remedies.   Should the Deliverables become, or in Supplier's reasonable opinion be likely to become, the subject of a claim of infringement or misappropriation of any Intellectual Property Rights in accordance with 12.1, Supplier shall, at its sole expense, either (i) procure for BYTON the right to continue to use the Deliverables, or (ii) replace or modify the Deliverables to make it non-infringing, provided that the same functions are performed by the replaced or modified Deliverables.

### 13.0 SUPPLIER PERSONNEL

13.1   General Requirements for Supplier Personnel.

a.   Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement. Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement. Supplier is responsible for validating the identity of and ensuring that Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) be subject and conform to all applicable BYTON policies, rules and procedures with respect to personal and professional conduct (including the wearing of an identification badge; use of computer systems; and adhering to general safety, dress, behavior, and security practices).

b.   Supplier is the employer of the Personnel and shall be responsible for all compensation and benefits payable to them; Personnel are not employees of BYTON and are not entitled to any compensation or benefits which are provided to its employees, including without limitation health insurance; paid vacation; sick leave; or retirement benefits. Supplier shall also be responsible for complying with all tax laws applicable to Personnel, including withholding taxes for all compensation payable; and for complying with all applicable labor and employment requirements including worker's compensation insurance requirements, and immigration and work visa requirements.

13.2   Key Supplier Positions.   "Key Supplier Positions" means those positions designated as such in the applicable SOW. Supplier will cause each of the Supplier Personnel filling the Key Supplier Positions to devote substantially full time and effort to the provision of the Services during the period of assignment.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035541

13.3    Approval and Removal of Supplier Personnel.  BYTON may approve all Personnel assigned to perform Services, and may require Supplier to replace any Personnel whose performance, in BYTON's reasonable judgment, has been unsatisfactory.

## 14.0 MISCELLANEOUS

14.1 Force Majeure.  Neither Party shall be liable for any failure or delay in performance of this Agreement a. to the extent the failure or delay is caused by fire, flood, earthquake or other acts of God or nature; civil disorder, war, riots; or any other similar cause or event beyond the reasonable control of a party; and b. provided the non-performing Party is without fault in causing such failure or delay, and it could not have been prevented by reasonable precautions or other alternative means. If the foregoing failures or delays occur which prevent performance of a Party's obligations under this Agreement, the affected Party shall promptly discuss the impact of such failure or delay, the period of time such may continue for, and the plans for a work around solution, among other things; the affected Party shall update the non-affected Party and keep them apprised of the situation. The affected Party's obligations of the Parties shall be suspended for so long as the events mean that performance of the agreement is impossible. If the failure or delay continues for more than twenty (20) work days, then the non-affected Party may terminate the specific SOW under this Agreement.

14.2 Severability.  In the event that any part of this Agreement is found to be unenforceable, the remainder shall continue in effect, to the extent permissible by law and consistent with the intent of the parties as of the Effective Date of this Agreement.

14.3 Relationship of the Parties.  This Agreement does not create a partnership, franchise, joint venture, agency, or fiduciary or employment relationship. Neither Party may bind the other Party by contract or otherwise to any obligation or act in a manner which expresses or implies a relationship other than that of independent contractor.

14.4 Governing Law.
a.    Disputes; Governing Law & amicable settlement.  If there is a dispute between the Parties which cannot be resolved through good faith negotiations, then a Party may request escalation to discussions with senior management of both Parties.  Within five (5) days of a Party's request, a meeting or telephone call shall be held with such senior management in an attempt to resolve such dispute. If the Parties cannot resolve such dispute within a reasonable time period, then the Parties retain all rights hereunder, including pursuing arbitration as below stated.  Any action related to this Agreement will be governed by the laws of the State of California (except that body of law controlling conflict of laws) and the United Nations Convention on the International Sale of Goods will not apply).

b.    Arbitration.  Any dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS"). The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, if the Parties cannot agree, an arbitrator appointed in accordance with the JAMS rules who shall be experienced in the type of dispute at issue.  The Parties, their representatives, the arbitrator, and other participants shall keep confidential the existence, content, and result of the arbitration. Any demand for arbitration and any counterclaim must specify in reasonable detail the facts and legal grounds forming the basis for the claimant's claims and include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant. The arbitration will be conducted in the English language; the location of such arbitration shall be in San Francisco, California. Each Party will bear its own costs in the arbitration, The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the provisions of the agreement documents and to fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (1) in excess of the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (2) to award damages in excess of the types and limitation of

12/15                                                C_BYTON_BDAG_V10_20_18

VE

damages found in the Agreement; or (3) to modify the terms of this Agreement. The arbitrator shall issue an award within 30 days after completion of the hearing and any post-hearing briefing. The award must be in writing and must state the reasoning on which the award is based. Judgment upon the award may be entered in any court of competent jurisdiction. Notwithstanding the agreement to arbitrate, each Party may apply at any time to a court of competent jurisdiction for appropriate injunctive relief or for other interim or conservatory measures, and by doing so will not breach or waive the agreement to arbitrate or impair the powers of the arbitrator.

14.5 Import and Export Laws. The Background Technology, Foreground Technology and Deliverables, including without limitation, technical data, may be subject to U.S. export controls or to export or import regulations of other countries. The Parties agree to comply with all such regulations and acknowledge that they have the responsibility to obtain such licenses to export, re-export or import the Background Technology, Foreground Technology and Deliverables as may be required.

14.6 Notices. All notices required hereunder must be in writing, sent to the Party's address set forth below and receipt must be confirmed. Notices required with respect to Sections 9.0 ("Term and Termination") and 12.0 ("Indemnification") must be provided by express courier.

BYTON:

BYTON North America Corporation
4201 Burton Drive
Santa Clara, California, 95054

Attn: General Counsel

Supplier:
Supplier's Name:    EDAG Engineering GmbH
Supplier's Address:  Kreuzberger Ring 40
                     65205 Wiesbaden
                     Germany

14.7 No Exclusive Remedy. Unless specifically designated, nothing in this Agreement shall be construed as an exclusive remedy.

14.8 Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one agreement.

14.9 Construction; Order of Precedence. This Agreement has been negotiated by the parties and their respective counsel. This Agreement will be interpreted without any strict construction in favor of or against either Party. The original of this Agreement has been written in English, and such version shall be the governing version of the Agreement. To the extent permitted under applicable law, Supplier waives any right it may have, if any, under any law or regulation to have this Agreement written in a language other than English. In the event of a conflict between this Agreement and any other document that references this Agreement, the order of precedence shall be: (i) the most recent written document signed by the Parties amending the subject Statement of Work; (ii) the Statement of Work; (iii) any other exhibits or attachments to, or documents referenced by the Statement of Work; and (iv) this Agreement.

14.10 Amendment and Waiver. Unless otherwise provided herein, this Agreement may not be modified unless in writing and signed by an authorized representative of each Party. Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

13/15                                                                   C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                          EDG-0035543

3-013

14.11 Assignment. Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement (whether by operation of law, merger, change of control, or otherwise), without the prior written consent of the other Party, (i) to an Affiliate, or (ii) in the event of a merger, acquisition or sale of all or substantially all of the assets of a Party or a business unit. Any assignment or transfer in breach of this Section shall be void.

14.12 No Rights in Third Parties. This Agreement is made for the benefit of the Parties and not for the benefit of any third party.

14.13 Entire Agreement. This Agreement, including all Attachments hereto, constitutes the Parties' entire agreement with respect to its subject matter, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. No terms in any Supplier or BYTON documents (including purchase orders, acknowledgments, emails, or documents incorporated by reference (including but not limited to EDAG's or BYTON's General Terms and Conditions) which vary from, add to, modify or eliminate any terms herein, are expressly rejected and are not part of this Agreement or any Statement of Work.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives.

**BYTON NORTH AMERICA CORPORATION**

By: _David A. Twohig_

Name: **DAVID TWOHIG**
(print)

Title: **VP/CHIEF VEHICLE ENGINEER**

Date: **2019-1-9**

**EDAG Engineering GmbH**

By: _____

Name: Cosimo De Carlo
(print)

Title: CEO

Date: 2018-12-18

By: ppa- _____

Name: Harald Keller

Title: Executive Vice President
Vehicle Development

Date: 2018-12-18

14/15

C_BYTON_EDAG_V10_20_18

Lf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**                    **EDG-0035544**

ATTACHMENT 1
STATEMENT OF WORK No. 1

1) Introduction. This Statement of Work ("SOW") is issued under the Technology Development and License Agreement by and between BYTON and Supplier. The term of this SOW shall be from June 1st, 2017 ("SOW Effective Date") until terminated by either Party pursuant to section 9.0 of this Agreement.

2) Scope and nature of development work to be performed.

- EDAG_191610D000_Project Description FMC_SAV_CTC-PS (Exhibit A)
- RFQ for CTC Gateway to SOP plus 90 days (Exhibit B)
- Timing Overview for RFQ 20170706 (Exhibit C)
- FPDP_Gate_Deliverables_Full_Checklist 20170701 (Exhibit D)

3) Description of Deliverables.

- EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
- RFQ for CTC Gateway to SOP plus 90 days
- Timing Overview for RFQ 20170706
- FPDP_Gate_Deliverables_Full_Checklist 20170701

4) Development fees and Charges.

- Per page 74 of the 19610D000 Project Description
- Travel will be billed at cost + 6%

5) Schedule for Development and Deliverables. Supplier shall perform the following development work and deliver the following deliverables by the dates set forth below.

- Per EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
- Per the following PO's agreed to by the Parties:

| Byton PO | Topic | Order Value | SOW | BYTON Lead |
|---|---|---|---|---|
| 665 | Interim PO for Enf Services Aug 2018 | 1,850,000 € | 1916100000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 761 | Interim PO for Enf Services Sep 2018 | 1,850,000 € | 1916100000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 866 | Material Cards Creation (S) | 170,198 € | 38826A4000_Proposal creation of material cards_20170505 | Antonio |
| 942 | Engineering Services CTC-PS | 45,450,677 € | 1916100000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 943 | Blanket Travel PO CTC-PS | 733,260 € | 1316100000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 1512 | Battery Pack Design Sep-Dec 2017 | 137,244 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |
| 1810 | Drop tower tests Steering Column | 30,000 € | 198677A000 Steering Column Testing | Shawn |
| 1930 | EuroNCAP 2020 Study | 27,782 € | 198670A001 Investigation EuroNCAP 2020 | Paul |
| 2082 | Battery Pack Design Jan/Feb 2018 | 149,864 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |

50,648,045 €

15/15

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

6) Acceptance Criteria and Acceptance Test Plan for the Foreground Technology and Deliverables.

   ° As agreed between the parties in the Proposal or otherwise as agreed in writing.

BYTON NORTH AMERICA CORPORATION

By: _____

Name: DAVID TWOHIG
          (print)

Title: VP/CHIEF VEHICLE ENGINEER

Date: 2019 - 1 - 9

EDAG Engineering GmbH

By: _____

Name: Cosimo De Carlo
          (print)

Title: CEO

Date: 2018 - 12 - 18

By: ppa. _____

Name: Harald Keller

Title: Executive Vice President
        Vehicle Development

Date: 2018 - 12 - 18

16/15

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035546

3-016

# EXHIBIT B

| From: | William Cahill |
|---|---|
| To: | Kristin Orrantia; Scott Schreiber; jaylimiller@gmail.com; ksipprelle@vstriallaw.com; David B. Van Etten; Evangeline A.Z. Burbidge; Marc R. Lewis; Brad Estes; Kenneth M. Walczak |
| Subject: | EDAG v. Byton Response to EDAG"s Request to File TRO |
| Date: | Sunday, September 19, 2021 5:49:43 PM |

Counsel,

On Sept 17, 2021, Claimant EDAG, delivered a "letter brief" to the Arbitrator asking if the Arbitrator believed he still retained jurisdiction over the parties in this arbitration so that he can hear, on shortened time, a EDAG motion for issuance of a TR0 and Preliminary Injunction against Byton.

The answer to EDAG's question is "I don't know".  This is an issue of first impression to me and before I opine, I want to at least get briefing from Byton on the jurisdictional question.

The question is when does an arbitrator's jurisdiction end?  Does it end when the Final Award is issued (June 3, 2021) or a party files in Federal Court a motion to approve the Award (June 23, 2021), or does the arbitrator's jurisdiction to issue interim rulings extend until the Trial court grants the motion (indefinite)?  And does the Arbitrator still have jurisdiction if the trial court's decision is appealed.  What about overturned?

In order to resolve the TRO issue jurisdiction must exist and if so we can decide the TRO motion. I believe that both issues can be briefed and decided by the arbitrator in one hearing.

## ARBITRATOR PROPOSED STIPULATION FOR RESOLUTION.

1.  EDAG agrees that its TRO motion is filed and served by the close of business, September 24, 2021.
2.  In those moving papers, EDAG is to add, if it chooses, any futher argument or legal authority supporting its statement in its "letter brief" that it "believes Your Honor has full authority to grant the relief sought."
3.  Byton files its opposition to the TRO and the Jurisdictional

argruments by October 4, 2021.
4.  EDAG files its Reply by October 6, and hearing on October 8.

The arbitrator will initially decide the jurisdictional issues.  Then he will rule on the TRO.

**Obviously, all this is very tentative.  If you all can meet and confer and get a schedule that works better for everyone, its going to be approved.**

**But if the parties can't agree, my office will set up a call either Tues or Wednesday to sort stuff out.**

**EDAG has asked me a jurisdictional question that I can answer only after briefing,**

Bill

_____

**Hon. William Cahill (Ret.)**
JAMS San Francisco, Ca
Cell:  415-845-6564

**Scott Schreiber**, Sr. Case Mgr.
Direct: 415.774.2615

- Chambers *USA* ranked as a *National Mediator*, 2017-2021
- California SuperLawyers in the *ADR Category*, 2006-2021
- Top *500 Leading Judges in America* by Lawdragon Magazine, 2006
- Mediation Article, Learning from My Mediator mistakes:  https://abtl.org/report/nc/abtlnorcalvol25no3.pdf
- https://www.jamsadr.com/cahill/

EXHIBIT C

1   **LEWIS & LLEWELLYN LLP**
    Evangeline Burbidge (SNB 266966)
2   eburbidge@lewisllewellyn.com
    Marc R. Lewis (SBN 233306)
3   mlewis@lewisllewellyn.com
    Kenneth M. Walczak (Bar No. 247389)
4   kwalczak@lewisllewellyn.com
    601 Montgomery Street, Suite 2000
5   San Francisco, California 94111
    Telephone:  (415) 800-0590
6   Facsimile:   (415) 390-2127

7   Attorneys for Claimant and Counter-Respondent
    EDAG ENGINEERING GMBH
8

9   **VAN ETTEN SIPPRELLE LLP**
    KEITH A. SIPPRELLE (SBN 143358)
10  DAVID VAN ETTEN (SBN 119049)
    2945 Townsgate Road, Suite 200
11  Westlake Village, California 91361
    Telephone: (805) 719-4900
12  Facsimile: (805) 719-4950
    ksipprelle@vstriallaw.com
13

14  Attorneys for Respondent and Cross-Claimant
    BYTON NORTH AMERICA CORPORATION
15

16              **JUDICIAL ARBITRATION AND MEDIATION SERVICES**

17                  **SAN FRANCISCO, CALIFORNIA OFFICE**

18

19  EDAG ENGINEERING GMBH,                  JAMS Reference No. 1100107291

20          Claimant,                       **STIPULATION AND [PROPOSED]**
                                            **ORDER REGARDING BRIEFING ON**
21          vs.                             **JURISDICTIONAL QUESTION AND**
                                            **TRO/PRELIMINARY INJUNCTION**
22
    BYTON NORTH AMERICA                      Arbitrator: Hon. William J. Cahill (ret.)
23  CORPORATION,

24          Respondent.                     Arbitration:  February 8, 2021
                                            Final Judgment: June 3, 2021
25

26  AND RELATED CROSS-CLAIM.

27

28

    STIPULATION AND [PROPOSED] ORDER REGARDING BRIEFING ON
    JURISDICTIONAL QUESTION AND TRO/PI, JAMS Reference No. 1100107291

1  **WHEREAS** EDAG Engineering GmbH sent a letter to the Arbitrator in this matter on

2  September 17, 2021 seeking Leave to file a TRO/Preliminary Injunction;

3  **WHEREAS** the Arbitrator responded seeking further briefing and proposing a

4  briefing schedule;

5  **WHEREAS,** at the suggestion of the Arbitrator, the Parties respectfully submit the

6  following proposed briefing schedule and hearing date;

7
| Event | Deadline |
|---|---|
| EDAG'S Motion regarding Jurisdictional question and TRO/Preliminary Injunction | 9/24/2021 |
| Byton's Opposition to the Motion | 10/4/2021 |
| EDAG's Reply | 10/6/2021 |
| Hearing | 10/14/2021 from 10:00 AM to 12:00 PM |

15

16  **IT IS SO STIPULATED.**

17  Respectfully submitted,

18  Dated:  September 21, 2021  LEWIS & LLEWELLYN LLP

19

20  By: _____

21  Evangeline A.Z. Burbidge

22  Attorneys for Claimant and Counter-Respondent
   EDAG ENGINEERING GMBH

23

24

25

26

27

28

STIPULATION AND [PROPOSED] ORDER REGARDING BRIEFING ON
JURISDICTIONAL QUESTION AND TRO/PI. JAMS Reference No. 1100107291

1

2   Dated:  September 21, 2021          VAN ETTEN SIPPRELLE LLP

3

4                      By:   *Keith A. Sipprelle*

5                         Keith A. Sipprelle

6                       Attorneys for Respondent and Cross-Claimant

7                       BYTON NORTH AMERICA CORPORATION

8

9     **PURSUANT TO THE PARTIES' STIPULATION, IT IS SO ORDERED.**

10

11   Dated: Sept. 21, 2021

12

13                       HON. WILLIAM J. CAHILL (ret.)
ARBITRATOR

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND [PROPOSED] ORDER REGARDING BRIEFING ON
JURISDICTIONAL QUESTION AND TRO/PI, JAMS Reference No. 1100107291

## PROOF OF SERVICE BY E-Mail

Re: EDAG Engineering GmbH vs. BYTON North America Corporation
Reference No. 1100107291

I, Scott Schreiber, not a party to the within action, hereby declare that on September 21, 2021, I served the attached Stipulation and Order re Briefing on Jurisdictional Question and TRO/Preliminary Injunction on the parties in the within action by electronic mail at San Francisco, CALIFORNIA, addressed as follows:

Evangeline Burbidge Esq.
Marc R. Lewis Esq.
Mr. Brad Estes
Lewis & Llewellyn LLP
601 Montgomery Street
Suite 2000
San Francisco, CA   94111
Phone: 415-800-0590
eburbidge@lewisllewellyn.com
mlewis@lewisllewellyn.com
bestes@lewisllewellyn.com
    Parties Represented:
    EDAG Engineering GmbH

Keith A. Sipprelle Esq.
David B. Van Etten Esq.
Van Etten Sipprelle LLP
2945 Townsgate Road
Suite 200
Westlake Village, CA   91361
Phone: 805-719-4900
ksipprelle@vstriallaw.com
dvanetten@vstriallaw.com
    Parties Represented:
    BYTON North America Corporation

Ms. Lillian Xu
Evelyn Shimazaki Esq.
BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA   95054
lillian.xu@byton.com
evelyn.shimazaki@byton.com
    Parties Represented:
    BYTON North America Corporation

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on  September 21, 2021.

//s// Scott Schreiber
_____
Scott Schreiber
JAMS
sschreiber@jamsadr.com

# EXHIBIT D

LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (Bar No. 266966)
eburbidge@lewisllewellyn.com
Marc R. Lewis (Bar No. 233306)
mlewis@lewisllewellyn.com
Kenneth M. Walczak (Bar No. 247389)
kwalczak@lewisllewellyn.com
Bradley E. Estes (Bar No. 298766)
bestes@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:  (415) 800-0590
Facsimile:   (415) 390-2127

Attorneys for Claimant
EDAG Engineering GmbH

JAMS REFERENCE NO. 1100107291

IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

| | |
|---|---|
| EDAG Engineering GmbH,<br><br>        Claimant,<br><br>        v.<br><br>BYTON North America Corporation,<br><br>        Respondent.<br><br>_____<br><br>AND RELATED CROSS-CLAIM | **CLAIMANT EDAG'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. William J. Cahill (ret.)<br><br>Arbitration:  February 8, 2021<br>Final Judgment:  June 3, 2021 |

LEWIS +
LLEWELLYN
LLP

1

**TABLE OF CONTENTS**

2
Page

3    I.      INTRODUCTION. ...................................................................................................... 6

4    II.     RELEVANT FACTS AND PROCEDURAL HISTORY. ........................................... 7

5            A.      EDAG's Work For BYTON. ......................................................................... 7

6            B.      Arbitration Proceedings. ............................................................................... 7

7            C.      BYTON's Misuse of EDAG's Intellectual Property. .................................. 8

8    III.    ARGUMENT. ........................................................................................................... 9

9            A.      Your Honor Has The Authority to Issue Injunctive Relief. ....................... 9

10           B.      A Preliminary Injunction Should Issue, to Stop Byton From
                     Transferring EDAG's Data, And to Preserve EDAG's Ability to
11                   Recover on a Judgment. ............................................................................. 12

12           C.      EDAG Is Likely to Succeed on the Merits. ............................................... 13

13           D.      EDAG Will Suffer Irreparable Harm Absent Injunctive Relief. ............. 14

14           E.      The Balance of Equities Strongly Favors EDAG. ..................................... 15

15           F.      A Preliminary Injunction Serves the Public Interest. .............................. 16

16   IV.     NO BOND IS NECESSARY. ................................................................................ 17

17   V.      THE TDLA REQUIRES THE PARTIES TO SPLIT ARBITRATION FEES. ................. 17

18   VI.     CONCLUSION. ...................................................................................................... 18

19

20

21

22

23

24

25

26

27

28

MPA IN SUPPORT OF EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Alliance for the Wild Rockies v. Cottrell*
   632 F. 3d 1127 (9th Cir. 2011) ................................................................. 13

5

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Disease &*
6
   *Related Disorders Ass'n of San Diego, Inc.*
   No. 17-CV-1690-BTM-JLB, 2018 WL 1562012 (S.D. Cal. Mar. 29, 2018) ............................... 12
7

8

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*
   750 F. 2d 1470 (9th Cir. 1985) ................................................................. 15

9

*Arauyo v. Loc. 13*
10
   No. CV 97-6574 ABC(RNBX), 1997 WL 912927 (C.D. Cal. Nov. 22, 1997) ................. 16

11

*Bullock v. City & Cty. of San Francisco*
   221 Cal. App. 3d (1990) ........................................................................ 15
12

13

*Butt v. State of California*
   4 Cal. 4th 668 (1992) ........................................................................... 12

14

*Cadence Design Systems, Inc. v. Avant! Corp.*
15
   125 F. 3d 824 (9th Cir. 1997) ................................................................. 16

16

*China National Metal Products Import/Export Co. v. Apex Digital, Inc.*
   155 F. Supp. 2d 1174 (C.D. Cal. 2001) .............................................. 10, 11
17

18

*DHL Info. Servs. (Americas), Inc. v. Infinite Software Corp.*
   502 F. Supp. 2d 1082 (C.D. Cal. 2007) ................................................... 11

19

*DISH Network L.L.C. v. Fineman*
20
   No. CV 16-3488-R, 2017 WL 2060010 (C.D. Cal. Mar. 22, 2017) ................. 17

21

*Doran v. Salem Inn, Inc.*
   422 U.S. 922 (1975) ............................................................................. 15
22

23

*Earth Island Inst. v. Carlton*
   626 F. 3d 462 (9th Cir. 2010) ................................................................. 15

24

*eBay, Inc. v. Bidder's Edge, Inc.*
   100 F. Supp. 2d 1058 (N.D.Cal.2000) ..................................................... 15
25

26

*Ferguson v. Corinthian Colleges, Inc.*
   733 F. 3d 928 (9th Cir. 2013) ............................................................. 9, 10

27

*Ficek v. S. Pac. Co.*
28
   338 F. 2d 655 (9th Cir. 1964) ................................................................. 14

LEWIS +
LLEWELLYN
LLP

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Fid. Brokerage Servs. LLC v. McNamara*
  2011 WL 2117546 (S.D. Cal. May 27, 2011) ................................................................. 17

*Fid. Fed. Bank, FSB v. Durga Ma Corp.*
  386 F. 3d 1306 (9th Cir.2004) ...................................................................................... 10

*French v. Merrill Lynch*
  784 F. 2d 902 (9th Cir. 1986) ...................................................................................... 14

*G.C. & K.B. Invs., Inc. v. Wilson*
  326 F. 3d 1096 (9th Cir. 2003) .............................................................................. 10, 14

*Johnson v. Gruma Corp.*
  614 F. 3d 1062 (9th Cir. 2010) ...................................................................................... 10

*Jorgensen v. Cassiday*
  320 F. 3d 906 (9th Cir. 2003) ...................................................................................... 17

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*
  341 F. 3d 987 (9th Cir. 2003) ...................................................................................... 13

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.*
  363 F. 3d 1010 (9th Cir. 2004) ...................................................................................... 13

*MCA Recs., Inc. v. Newton-John*
  90 Cal. App. 3d 18 (1979) ...................................................................................... 15

*MGM Prods. Grp., Inc. v. Aeroflot Russian Airlines*
  573 F. Supp. 2d 772 (S.D.N.Y. 2003) ...................................................................................... 12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*
  460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) .................................................... 10

*N.D. v. Haw. Dep't of Educ.*
  600 F. 3d 1104 (9th Cir.2010) ...................................................................................... 16

*Napa Valley Publ'g Co. v. City of Calistoga*
  225 F. Supp. 2d 1176 (N.D. Cal. 2002) ...................................................................................... 16

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*
  323 F. Supp. 2d 1037 (N.D. Cal. 2004) ...................................................................................... 15

*Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*
  935 F. 2d 1019 (9th Cir. 1991) ...................................................................................... 12

LEWIS +
LLEWELLYN

1

**TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3

*Right Site Coal. v. Los Angeles Unified Sch. Dist.*

4
   160 Cal. App. 4th 336 (2008) ...................................................................................................... 15

5

*Sarhank Group v. Oracle Corp.*
   01 Civ. 1285, 2002 WL 31268635 (S.D.N.Y. Oct. 9, 2002) .................................................... 12

6

7

*Shanghai Lan Cai Asset Mgmt. Co. v. Jia Yueting*
   No. 2:18-CV-10255 SJO MR WX, 2019 WL 11273229 (C.D. Cal. Sept. 3, 2019) ...................... 12

8

*Simula, Inc. v. Autoliv, Inc.*

9
   175 F. 3d 716 (9th Cir. 1999) ........................................................................................... 10, 11

10

*Smagin v. Yegiazaryan,*
   No. CV 14-9764-R, 2015 WL 13757706 (C.D. Cal. Sept. 28, 2015) ........................................ 11

11

12

*Small v. Avanti Health Sys.,* LLC
   661 F. 3d 1180 (9th Cir. 2011) ................................................................................................. 16

13

*SMC Promotions, Inc. v. SMC Promotions*

14
   No. CV047107JFWVBKX, 2006 WL 6219155 (C.D. Cal. Jan. 19, 2006) ................................. 13

15

*Sovak v. Chugai Pharm. Co.*
   280 F. 3d 1266 (9th Cir. 2002) ................................................................................................. 10

16

17

*Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*
   609 F. 3d 975 (9th Cir. 2010) ............................................................................................ 11, 13

18

*Triad Systems Corp. v. Southeastern Exp. Co.*

19
   64 F. 3d 1330 (9th Cir.1995) .................................................................................................... 16

20

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) .................................................................................... 16

21

**Statutes**

22

9 U.S.C. § 2 ....................................................................................................................... 9, 10

23

24

25

26

27

28

LEWIS +
LLEWELLYN LLP

## I.    INTRODUCTION.

EDAG Engineering GmbH ("EDAG") is one of the world's leading providers of automotive engineering services.  Start-up BYTON North America Corporation ("BYTON") hired EDAG to assist with BYTON's ambitious goal of building an all-electric vehicle (called the M-BYTE) from scratch.  As was addressed in detail during the two-week hearing, by late 2018 BYTON owed EDAG millions of dollars.  EDAG initiated arbitration over BYTON's breach of contract and, on June 3, 2021, Your Honor issued a 29-page Final Award finding in favor of EDAG and awarding it €23,446,649, plus 10% statutory interest and costs.

EDAG has recently learned that BYTON, which has not paid one cent of the over €23.4 million Final Award, has paid *other* vendors so that it and a related Chinese entity (which BYTON has referred to as "BYTON China") can access EDAG's intellectual property and spend resources building its M-BYTE vehicle in China.  Based on the evidence, it appears that BYTON is engaged in a scheme to transfer assets—including EDAG's intellectual property—overseas and out of the reach of U.S. authorities.  BYTON has no right to do so; under the express terms of the parties' contract, its failure to pay means EDAG still owns all of the intellectual property EDAG created.  BYTON has no right to access, let alone transfer, said property, which may be the only asset of value in its possession.  Indeed, BYTON claims that it cannot even pay the $8,400 required for Your Honor to hear this matter.

Should BYTON shunt all assets of value overseas and, perhaps, declare bankruptcy, it would render EDAG even more unlikely to recover any of the amount BYTON owes.  And BYTON may succeed in this shell game, unless EDAG obtains injunctive relief.

The Arbitrator has full power and authority to grant EDAG a preliminary injunction.  Based on the immediate risk of asset transfer, EDAG meets the standard for issuance of injunctive relief.  EDAG is not only "likely to succeed" in this action, it has already obtained a significant award from Your Honor.  While BYTON has indicated that it will file a motion to vacate the award, until the time that the matter is decided by the Court, the Final Award remains in force.  Further, BYTON is very unlikely to prevent entry of judgment in EDAG's favor.

EDAG will suffer irreparable harm from the loss of its intellectual property, and potentially

LEWIS +
LLEWELLYN

1  its entire ability to recover from BYTON, in the absence of injunctive relief.  The balance of harms

2  also favors EDAG.  Because EDAG's entire award is at significant risk, the company continues to

3  suffer significant harm in the absence of an injunction.  Whereas enjoining BYTON from

4  transferring EDAG's property would cause it no harm—it would simply preserve the status quo

5  BYTON itself created.

6       BYTON has repeatedly represented, year after year and month after month, that it has no

7  money.  The intellectual property that EDAG created is the only thing of value that remains.  If

8  BYTON is able to improperly transfer this asset to China, it will not only have breached the contract

9  with EDAG, but also flouted the law and principles of fairness and equity.

10  **II.  RELEVANT FACTS AND PROCEDURAL HISTORY.**

11       **A.  EDAG's Work For BYTON.**

12       The Arbitrator is well acquainted with the facts of this matter, and with the parties'

13  relationship.  *See* Arbitrator's Award ("AA"), Exhibit A to Declaration of Evangeline A.Z. Burbidge

14  filed herewith ("Burbidge Decl.") at 2- 11.  From 2016 to 2019, EDAG provided engineering

15  services to BYTON as part of BYTON's project to design and manufacture the all-electric M-BYTE

16  vehicle.  AA 6-7.  In 2018, BYTON stopped paying EDAG's invoices, forcing EDAG to initiate the

17  underlying arbitration pursuant to the parties' contract.  AA 7.

18       **B.  Arbitration Proceedings.**

19       On October 22, 2019, EDAG initiated arbitration proceedings against BYTON.  Your Honor

20  conducted an evidentiary hearing between February 8-12 and 16-19, 2021.

21       On June 25, 2021, Your Honor found in favor of EDAG's breach of contract claim and

22  awarded EDAG the sum of €23,446,649, plus 10% statutory interest and costs.  AA 28.  As Your

23  Honor noted, BYTON repeatedly represented that it lacks the money to pay EDAG.  *See, e.g.,* AA 3,

24  7-10.

25       On June 23, 2021, EDAG petitioned the Court to confirm the Arbitrator's Award and enter

26  judgment in its favor.  On July 16, 2021, BYTON filed a reply indicating that it intends to challenge

27  the Award.

28  / / /

LEWIS +
LLEWELLYN
LLP

**C.      BYTON's Misuse of EDAG's Intellectual Property.**

The parties' agreement, the Technology and Development Licensing Agreement ("TDLA"), required EDAG to give BYTON all associated intellectual property rights for EDAG's deliverables, ***in exchange for*** BYTON's obligation to pay certain fees.  TDLA ¶ 6.2b, AA 6.

As Your Honor's Award made clear, BYTON breached the parties' agreement when it failed to pay those fees; BYTON owes EDAG over 23 million Euros.  AA 7-21, 28.

EDAG is informed and believes that its intellectual property for the M-BYTE vehicle is currently in the possession, custody, and control of Jama Software ("Jama").  *See* Burbidge Decl. ¶ 8.  As EDAG knew first-hand, BYTON used Jama's browser-based database to store all of the work performed by EDAG to build BYTON's product, *i.e.* the M-BYTE vehicle.  *See* Amelung Decl. ¶ 16; *see also* Burbidge Decl. ¶ 8.

BYTON's corporate witness testified that BYTON owed Jama Software (among other vendors) money for use of its cloud-based platform, and that Jama had shut off BYTON's access to that platform.  *See* Burbidge Decl. ¶ 8(a) & Ex. D (Nov. 17, 2020 BYTON Most Qualified Witness Dep.) at 242:24-245:21.  BYTON's corporate witness further testified that BYTON could not muster the roughly $500,000 it owed to its various cloud-based providers.  *See* Burbidge Decl. ¶ 8(b) & Ex. D (Nov. 17, 2020 BYTON Most Qualified Witness Dep.) at 244:4-17.  Before, during, and after the underlying arbitration, BYTON's witnesses and counsel represented that BYTON did not have any money to pay what it owed EDAG, nor the ability to pay its portion of the contractually agreed upon JAMS fees.  *See* Burbidge Decl. ¶¶ 6(a) - (f).  Those representations continued into this week.  *See* Burbidge Decl. ¶6(g).

Nonetheless, EDAG has learned that BYTON and a Chinese affiliate have spent the last nine months—including during the arbitration hearing, when BYTON pleaded poverty—attempting to regain access to the Jama database and the intellectual property EDAG created.  *See* Burbidge Decl. ¶¶ 8(e) – (g).  On September 1, 2021, EDAG learned for the first time that BYTON paid all past due invoices to Jama several months ago.  By paying for a year of access to Jama's services, BYTON has obtained access to EDAG's data.  *Id*. ¶ 8(f).

Thus, BYTON has managed to circumvent to the TDLA, which expressly states that

8

LEWIS +
LLEWELLYN

1  BYTON may only to receive intellectual property rights by paying ***EDAG***.  BYTON now has

2  improper access to intellectual property it does not own, and for which it has not paid.

3          Moreover, BYTON appears to be transferring its operations and any assets of value to

4  Chinese affiliate companies, which operate outside the reach of United States courts.  On August 20,

5  2021, automotive journalists reported that BYTON's M-BYTE was photographed undergoing road

6  tests in Hainan, China, despite BYTON's efforts to hide those tests.  *See* Burbidge Declaration ¶ 7;

7  Amelung Declaration Ex. D.  There can be no doubt that the test vehicle is the car that EDAG

8  designed and that it contains the work that EDAG performed and has not been paid for.  *See*

9  Amelung Declaration Ex. E.

10          On September 15, 2021, EDAG also learned that BYTON and a Chinese affiliate had been

11  actively working to transfer the IP for the M-BYTE—possibly the only thing of value left at

12  BYTON North America—from a U.S.-based cloud storage facility held by Jama to a China-only

13  server.  *See* Burbidge Declaration ¶ 8(g).  While that transfer was unsuccessful, in the absence of an

14  injunction there is nothing to stop BYTON from attempting to do it again.

15          If BYTON is successful in moving its assets overseas, it could very well load up the U.S.

16  entity with all of its debt, declare bankruptcy, and allow its Chinese affiliate to use the intellectual

17  property that EDAG built without paying a cent of the €23.4 million that EDAG is currently owed.

18  **III.    ARGUMENT.**

19          **A.    Your Honor Has The Authority to Issue Injunctive Relief.**

20          In the Ninth Circuit, "an arbitrator generally has the authority to enter injunctive relief

21  against a party that has entered into an arbitration agreement."  *Ferguson v. Corinthian Colleges,*

22  *Inc.*, 733 F.3d 928, 937 (9th Cir. 2013)[1].  However, "an arbitrator may do so only if the arbitration

---

[1] The arbitrator's authority to grant injunctive relief is a procedural issue, *i.e.* an issue concerning the "rules for arbitration," to which federal law applies.  The Ninth Circuit discussed the lay of the land as follows:

> The agreement in this case is a contract "evidencing a transaction involving commerce" that comes within the purview of the FAA.  *See* 9 U.S.C. § 2. "The FAA, while it does not itself create independent federal jurisdiction, 'creates a body of federal substantive law establishing and regulating' arbitration agreements that come within the FAA's

LEWIS +
LLEWELLYN

agreement at issue permits it." *Ibid*.  Here, the TDLA explicitly permits it.  "The arbitrator will have full power and authority to … fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief)."  TDLA ¶ 14.4b, Amelung Decl., Ex. B at 12.

In fact, arbitration is generally the preferred forum for parties to seek such relief.

> The Ninth Circuit has recognized the wisdom of sending interim relief issues to arbitration. In *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999), the court held "Because the district court concluded that all of Simula's claims were arbitrable and the ICC arbitral tribunal is authorized to grant the equivalent of an injunction pendente lite, it would have been inappropriate for the district court to grant preliminary injunctive relief." In *China National Metal Products Import/Export Co. v. Apex Digital, Inc.*, 155 F.Supp.2d 1174, 1182 (C.D. Cal. 2001), the district court applied the holding in *Simula* to reverse the magistrate court. In *China National*, the parties agreed to submit all disputes "in connection with" the challenged contract to arbitration in China with the China International Economic and Trade Arbitration Commission under the Commission's applicable arbitration rules. *China National*, 155 F.Supp.2d at 1176. After the parties had submitted their claims to arbitration, the plaintiff sought a writ of attachment from a magistrate

---

> purview." *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th Cir. 2003) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). When an agreement falls within the purview of the FAA, there is a "strong default presumption ... that the FAA, not state law, supplies the rules for arbitration." *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269 (9th Cir. 2002). "To overcome that presumption, parties to an arbitration agreement must evidence a 'clear intent' to incorporate state law rules for arbitration." *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir.2004) (quoting *Sovak*, 280 F.3d at 1269).
>
> "[A] general choice-of-law clause within an arbitration provision does not trump the presumption that the FAA supplies the rules for arbitration." *Sovak*, 280 F.3d at 1270; *see also Fid. Fed. Bank*, 386 F.3d at 1312. In *Fidelity Federal Bank*, we considered an arbitration clause providing that controversies were to be resolved "in accordance with the laws of the State of California and the rules of the American Arbitration Association." 386 F.3d at 1312 (internal quotation marks omitted). We saw no "clear intent" to incorporate California arbitration rules and therefore read the agreement as electing state substantive law and federal procedural rules. *Id.* at 1311–12; *see also Sovak*, 280 F.3d at 1270 (reaching the same conclusion under a similar arbitration provision).

*Johnson v. Gruma Corp.*, 614 F.3d 1062, 1066–67 (9th Cir. 2010).

10

LEWIS +
LLEWELLYN LLP

court.  *Id*. at 1177.  The district court found that the arbitral rules authorized provisional relief.  *Id*. at 1182.  Accordingly, under the Ninth Circuit precedent of *Simula*, the district court held that it must respect the parties' agreement "and refrain from awarding provisional relief when the parties have provided for another means to obtain such relief." *Id*.

*DHL Info. Servs. (Americas), Inc. v. Infinite Software Corp.*, 502 F. Supp. 2d 1082, 1083–84 (C.D. Cal. 2007).

Your Honor's authority extends as far as "the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement."  TDLA ¶ 14.4b, Amelung Decl., Ex. B at 12.  That authority includes the ability to issue a temporary restraining order or preliminary injunction to protect EDAG's rights, pending confirmation of the Arbitrator's award and entry of judgment.  "[A] district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process—provided, of course, that the requirements for granting injunctive relief are otherwise satisfied."  *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) ("*Toyo*") (copious citations omitted).

Here, injunctive relief is necessary to get EDAG the final mile to judgment.  EDAG has obtained an arbitration award in its favor but requires an injunction "to ensure [its] arbitration award is not rendered ineffectual."  *Smagin v. Yegiazaryan*, No. CV 14-9764-R, 2015 WL 13757706, *2 (C.D. Cal. Sept. 28, 2015) ("*Smagin*") (affirming injunction freezing assets of Respondent who "regularly conceals the true ownership of his assets through the use of shell corporations in offshore jurisdictions and through the use of nominees who hold assets on his behalf and act according to his discretion" in action where Petitioner had received an arbitration award).  "This is not the beginning stage of a breach of contract claim, but instead the end stages of a protracted arbitration in which the merits of all claims and defenses have been fully presented and adjudicated."  *Smagin*, 2015 WL 13757706 at *1, citing *Toyo* (additional citation omitted).

Your Honor also retains authority over this matter—and Your Honor's Final Award remains binding—while BYTON's future motion to vacate the award is pending; otherwise, arbitration awards would be meaningless.  *See, e.g., Sarhank Group v. Oracle Corp.*, 01 Civ. 1285, 2002 WL

11

LEWIS + LLEWELLYN LLP

31268635, at *3 (S.D.N.Y. Oct. 9, 2002) ("The confirmation of an arbitration award is characterized as a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."); *MGM Prods. Grp., Inc. v. Aeroflot Russian Airlines*, 573 F.Supp.2d 772, 774 (S.D.N.Y. 2003), *aff'd*, 91 F. App'x 716 (2nd Cir. 2004) (crediting argument that an "arbitral award is sufficiently final for confirmation purposes provided that no further recourse may be had to the appeals division of the arbitral tribunal.... [T]he mere fact that recourse may somehow be had in another court of law does not prevent the Award from being 'binding.'")

**B.    A Preliminary Injunction Should Issue, to Stop BYTON From Transferring EDAG's Data, And to Preserve EDAG's Ability to Recover on a Judgment.**

A preliminary injunction is the appropriate remedy for BYTON's attempts to circumvent the Arbitrator's Final Award, and the Court's eventual judgment, by transferring assets or otherwise avoiding U.S. jurisdiction.  "[E]quitable relief in arbitration may be essential to preserve assets or enforce performance which, if not preserved or enforced, may render a final award meaningless." *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022–23 (9th Cir. 1991). *See also Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Disease & Related Disorders Ass'n of San Diego, Inc.*, No. 17-CV-1690-BTM-JLB, 2018 WL 1562012, at *4 (S.D. Cal. Mar. 29, 2018) (confirming arbitration award and affirming order enjoining party from "dissipating or otherwise encumbering Currently Available Assets before such transfer for any purpose, including to satisfy outstanding bills, invoices or other debts, whether for attorney fees or for any other purpose."); *Shanghai Lan Cai Asset Mgmt. Co. v. Jia Yueting*, No. 2:18-CV-10255 SJO MR WX, 2019 WL 11273229, at *3 (C.D. Cal. Sept. 3, 2019) (issuing a "a preliminary injunction, enjoining Respondent from taking any step to transfer, conceal, reduce, encumber, or otherwise make unavailable—either personally or through instructions to another—any non-exempt assets up to the value of this Court's judgment against Respondent").

To obtain injunctive relief, EDAG "must establish (1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest. *Toyo*, 609 F.3d at 982.  *See also Butt v. State of California*, 4 Cal. 4th 668, 677-678 (1992) (under state

LEWIS +
LLEWELLYN

law, a preliminary injunction is proper where moving party proves (1) likelihood of success and (2) that the relative interim harm to the parties from issuance of the injunction weighs in its favor). A party that satisfies the latter three elements may obtain preliminary injunctive relief by showing the existence of "serious questions going to the merits" rather than a likelihood of success on the merits. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131–32 (9th Cir. 2011).

EDAG easily satisfies all four elements. Having already obtained a thorough and well-reasoned opinion granting an award in its favor, EDAG is extremely likely to succeed on the merits of this action. In the absence of injunctive relief, EDAG will forever lose its ability to recover its own intellectual property, and may forfeit any ability to recover the sum the Arbitrator awarded. As BYTON will suffer no cognizable harm from maintaining the status quo until entry of judgment, the equities are firmly in EDAG's favor. And a preliminary injunction would promote the strong public policy that a wrongdoer may not benefit from its misconduct, or misappropriate the property of another to avoid complying with the judgment of a United States district court.

## C.  EDAG Is Likely to Succeed on the Merits.

EDAG has already successfully proved its claim for breach of contract. Your Honor found that: BYTON agreed to pay EDAG a flat fee of €50,448,045, AA 11; EDAG performed its obligations to BYTON under the TDLA, for which it properly invoiced BYTON, *id*. 11-17; and BYTON failed to pay invoices totaling €23,446,649. *Id*. 11, 17-18.

EDAG will therefore prevail in the litigation as a whole, once the Court confirms the Arbitrator's award. Confirmation of the award, and entry of judgment in EDAG's favor, are mandatory under 9 U.S.C. § 9.

BYTON has indicated it will move to vacate the Arbitrator's decision, but the standard is highly deferential and BYTON will fail. The FAA "gives federal courts only limited authority to review arbitration decisions, because broad judicial review would diminish the benefits of arbitration." *SMC Promotions, Inc. v. SMC Promotions*, No. CV047107JFWVBKX, 2006 WL 6219155, at *1 (C.D. Cal. Jan. 19, 2006) (*"SMC"*), quoting *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004), citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003) (*en banc*). "Confirmation is required even in the face

13

LEWIS + LLEWELLYN LLP

1   of erroneous findings of fact or misinterpretations of law." *Ibid.*, quoting *French v. Merrill Lynch*,

2   784 F.2d 902, 906 (9th Cir. 1986) (additional quotations and internal quotation marks omitted).

3       In fact, "[i]t is not even enough that the [arbitrator] may have failed to understand or apply

4   the law.  An arbitrator's decision must be upheld unless it is completely irrational or it constitutes a

5   manifest disregard for law."  *Ibid.*, quoting *G.C. and K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1105

6   (9th Cir. 2003) (additional citation omitted).

7           Therefore, the federal district court's role in an arbitration confirmation
    proceeding is severely limited, and for the most part, the court defers to

8           the arbitrator's determination of the award. Furthermore, "[a] claimant
    may not voluntarily submit his claim to arbitration, await the outcome,

9           and, if the decision is unfavorable, then challenge the authority of the

10          arbitrator's act."

11  *Ibid.*, quoting *Ficek v. S. Pac. Co.*, 338 F.2d 655, 657 (9th Cir. 1964), *cert. denied*, 380 U.S. 988

12  (1965) (additional citation omitted).

13      Your Honor did not misunderstand or misapply the law, but painstakingly reviewed a

14  mountain of evidence, applied the relevant standards, and appropriately analyzed each of the parties'

15  arguments.  No grounds exist for the Court to refuse to recognize or enforce the Award.  *See* Petition

16  to Confirm Arbitration Award, p. 8.

17      **D.**    **EDAG Will Suffer Irreparable Harm Absent Injunctive Relief.**

18      EDAG files this motion specifically because it has a direct and immediate need for relief, to

19  enjoin BYTON from improperly accessing and transferring EDAG's data and intellectual property

20  overseas.  As the Arbitrator's decision plainly establishes, BYTON has no right to the intellectual

21  property in question, because BYTON breached its obligation to pay EDAG for it.  AA 17-18.

22      In the absence of an injunction, BYTON will be free to complete the scheme detailed in the

23  declarations filed herewith.  *See* Burbidge Decl. ¶¶ 8(a) - (g); Amelung Decl. ¶¶ 16 - 20.  As

24  evidenced by its actions to date, BYTON will access the intellectual property held by Jama and

25  transfer that valuable asset to its affiliate in China.  Worse still, it will remove any vestige of that

26  intellectual property from the United States—as it appears to have already attempted—making it

27  impossible for EDAG to recover.  Having obtained the benefit of its bargain with EDAG <u>without</u>

28  making payments totaling more than 20 million Euros, BYTON will have no remaining incentive to

14

LEWIS +
LLEWELLYN
LLP

comply with the Arbitrator's Award or the resulting judgment.  Photographs of M-BYTE prototypes in China suggest that BYTON may already be making use of EDAG's proprietary technology, directly contravening the Arbitrator's decision.   Burbidge Decl. ¶ 7; Amelung Decl. ¶ 20.

The loss of the ability to monetize EDAG's work product, and the associated inability to recover a judgment from BYTON, constitutes irreparable harm.  *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1066 (N.D.Cal.2000) ("*eBay*") ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief."); *MCA Recs., Inc. v. Newton-John*, 90 Cal. App. 3d 18, 23 (1979).  As in *eBay*, BYTON's unauthorized access and transfer of EDAG's property constitutes a form of trespass, for which there is no adequate monetary compensation.  As in *eBay*, BYTON would deprive EDAG "of the ability to use [a] portion of its personal property for its own purposes.  The law recognizes no such right to use another's personal property. Accordingly, [BYTON]'s actions appear to have caused injury to [EDAG] and appear likely to continue to cause injury to [EDAG]."  *Id*. at 1071.

Moreover, the inability to collect on a judgment of this size imperils EDAG's continued viability as a business.  Irreparable harm exists "where the conduct of [Respondent] threatens the existence of the [Petitioner's] business itself." *Optinrealbig.com, LLC v. Ironport Sys., Inc*., 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004).  The "threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[S]ubstantial loss of business and perhaps even bankruptcy" constitutes irreparable harm.); *Bullock v. City & Cty. of San Francisco*, 221 Cal. App. 3d (1990) (plaintiff who filed for bankruptcy during pending proceeding suffered irreparable harm).

### E.     The Balance of Equities Strongly Favors EDAG.

In balancing equities between parties, Your Honor must use his discretion to weigh the relative harm to each party.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010); *Right Site Coal. v. Los Angeles Unified Sch. Dist*., 160 Cal. App. 4th 336, 342 (2008).

This factor strongly favors EDAG.  In the absence of an injunction, EDAG will suffer the

15

LEWIS +
LLEWELLYN

1  harms to its property, its reputation, and its bottom line detailed in the preceding section.

2  Whereas maintaining the status quo will do no cognizable harm to BYTON.  BYTON's only

3  de facto injury would result from Your Honor halting its unauthorized and illegitimate scheme to

4  misappropriate EDAG's intellectual property and avoid complying with the Arbitrator's Award or

5  paying a judgment.

6  As a matter of law, that harm does not count.  "Defendants cannot complain of the harm that

7  will befall them when properly forced to desist from their infringing activities." *Warner Bros. Ent.*

8  *Inc. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1014–15 (C.D. Cal. 2011), quoting *Triad Systems Corp.*

9  *v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir.1995) (quotation and alteration marks

10  removed).  "Where the only hardship that the defendant will suffer is lost profits from an activity

11  which has been shown likely to be infringing, such an argument in defense merits little equitable

12  consideration[.]" *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997)

13  (citation omitted; quotation and alteration marks removed).  *See also Napa Valley Publ'g Co. v. City*

14  *of Calistoga*, 225 F.Supp.2d 1176, 1180 (N.D. Cal. 2002) (granting injunction to "preserve the status

15  quo" and "prevent irreparable loss of rights prior to final disposition of the litigation"); *Arauyo v.*

16  *Loc. 13*, No. CV 97-6574 ABC(RNBX), 1997 WL 912927, at *4 n.4 (C.D. Cal. Nov. 22, 1997)

17  (injunctive relief would be proper under "traditional equitable criteria" because "the proposed

18  injunction will maintain the status quo and will not impose any affirmative duty on Respondents or

19  prohibit Respondents from actions that they are entitled to undertake.").

20  The analysis is the same here: an injunction barring unauthorized access or removal of

21  EDAG's intellectual property would preserve the *status quo* without imposing any affirmative duty

22  on BYTON or prohibiting BYTON from any action it is entitled to undertake.  And if BYTON

23  claims that it is not, in fact, attempting to transfer its assets overseas, it will have no issue with

24  stipulating to the injunction.

25  **F.    A Preliminary Injunction Serves the Public Interest.**

26  The public has an interest in compliance with the law and enforcement of federal court

27  judgments.  *Small v. Avanti Health Sys.*, LLC, 661 F.3d 1180, 1197 (9th Cir. 2011) ("the public

28  interest favors applying federal law correctly"); *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113

16

LEWIS +
LLEWELLYN

1   (9th Cir.2010) ("[I]t is obvious that compliance with the law is in the public interest."); *DISH*

2   *Network L.L.C. v. Fineman*, No. CV 16-3488-R, 2017 WL 2060010, at *3 (C.D. Cal. Mar. 22, 2017)

3   ("the public interest will be served by a permanent injunction because it will ensure compliance with

4   federal law").

5         EDAG moves to enjoin a scheme to misappropriate its intellectual property and avoid U.S.

6   jurisdiction, as well as compliance with the Arbitrator's Award and any subsequent judgment.

7   Foiling that scheme can only serve the public interest.

8   **IV.      NO BOND IS NECESSARY.**

9         The arbitrator "may dispense with the filing of a bond when it concludes there is no realistic

10  likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320

11  F.3d 906, 919 (9th Cir. 2003).  *See also Fid. Brokerage Servs. LLC v. McNamara*, 2011 WL

12  2117546, at *8 (S.D. Cal. May 27, 2011) (declining to issue bond requested by defendants).

13        Preserving the status quo until satisfaction of a judgment in EDAG's favor poses no realistic

14  likelihood of harm to BYTON.  As discussed above, BYTON has no protectable interest in being

15  permitted to misappropriate EDAG's intellectual property.  And BYTON will not be able to prove

16  that it suffered compensable harm from entry of an order requiring it to refrain from using EDAG's

17  work to complete the M-BYTE until EDAG has been compensated for that work.

18  **V.      THE TDLA REQUIRES THE PARTIES TO SPLIT ARBITRATION FEES.**

19        As the Arbitrator is aware, the TDLA provides that "[e]ach party will bear its own costs in

20  the arbitration."  TDLA ¶ 14.4(b), Amelung Decl. Exh. B at 12.  That provision is clear and

21  unambiguous.  There is no provision modifying it, and none requiring a party who brings a motion

22  to pay any greater share or additional amount.

23        Prior to this filing, JAMS case manager Scott Schreiber reached out to counsel for both

24  parties regarding payment of a deposit to the Arbitrator.  Burbidge Decl. Exh. H at 2 (9/22/21

25  email).  Counsel for BYTON responded as follows: "Hi, Scott. Unfortunately, my client is not in a

26  position to pay JAMS anything in connection with this matter. Presumably, EDAG will cover the

27  full cost (which would be appropriate in any event as EDAG has brought this matter to Judge Cahill

28  for resolution)."  *Id*. at 1 (Sipprelle 9/22/21 email).

17

LEWIS +
LLEWELLYN

1    In order to move things forward and obtain a ruling, EDAG has advanced the entire deposit.

2    Because BYTON's position contravenes the TDLA and has no basis in law, and because BYTON

3    duly owes half of that deposit, EDAG respectfully requests that the Arbitrator include in his order

4    resolving this motion a requirement that BYTON reimburse EDAG for its half of the deposit.

5    **VI.    CONCLUSION.**

6    For the foregoing reasons, EDAG respectfully request that Your Honor issue a preliminary

7    injunction and order BYTON to pay its portion of the costs associated with this hearing, in

8    accordance with the [Proposed] Order submitted concurrently herewith.

9                                              Respectfully submitted,

10   Dated:  September 24, 2021               LEWIS & LLEWELLYN LLP

11

12                                      By: _Evangeline A.Z. Burbidge_

13                                          Evangeline A.Z. Burbidge
                                            Marc R. Lewis
14                                          Kenneth M. Walczak

15                                          Attorneys for Petitioner EDAG
                                            ENGINEERING GMBH
16

17

18

19

20

21

22

23

24

25

26

27

28

MPA IN SUPPORT OF EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN

LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (Bar No. 266966)
eburbidge@lewisllewellyn.com
Marc R. Lewis (Bar No. 233306)
mlewis@lewisllewellyn.com
Bradley E. Estes (Bar No. 298766)
bestes@lewisllewellyn.com
Kenneth M. Walczak (Bar No. 247389)
kwalczak@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile:  (415) 390-2127

Attorneys for Claimant
EDAG Engineering GmbH

JAMS REFERENCE NO. 1100107291

IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

| | |
|---|---|
| EDAG Engineering GmbH, | **DECLARATION OF EVANGELINE A.Z. BURBIDGE IN SUPPORT OF PLAINTIFF EDAG'S *EX PARTE* MOTION FOR PRELIMINARY INJUNCTION** |
| Claimant, | |
| v. | |
| BYTON North America Corporation, | Hon. William J. Cahill (ret.) |
| Respondent. | Arbitration:  February 8, 2021 |
| AND RELATED CROSS-CLAIM | |

LEWIS +
LLEWELLYN
LLP

I, Evangeline A.Z. Burbidge, declare as follows:

1.      I am over 18 years of age.  I am a partner at the law firm Lewis & Llewellyn LLP and counsel for Petitioner EDAG Engineering GmbH ("EDAG" or "Petitioner").  I submit this declaration in support of EDAG's Motion for a Temporary Restraining Order and Order to Show Cause.

2.      I participated in the day-to-day management of this action.  I have personal knowledge of the facts set forth herein.

3.      On October 22, 2019, EDAG submitted a Demand for Arbitration to JAMS ADR Services pursuant to the terms of the Arbitration clause in the Settlement Agreement, alleging it was owed over €23,000,000 as a result of a breach of contract between EDAG and BYTON North America Corporation.  On November 19, 2019, BYTON North America filed its Response to EDAG's Arbitration Demand and Cross-Claims, alleging approximately $31,000,000 USD in damages.

4.      The Arbitrator rendered a written Final Arbitration Award on June 2, 2021, awarding EDAG €23,446,649 (or the equivocal in U.S. dollars, calculated by the then-exchange rate as of the date of the final order) on its breach of contract claim and simple interest of 10% as of the date of the Final Arbitration Award, costs, and finding EDAG to be the prevailing party.  BYTON North America was awarded nothing on its claims.  A true and correct copy of the Final Arbitration Award is attached hereto as **Exhibit A**.

5.      On June 18, 2021, EDAG emailed BYTON to request payment in accordance with the Final Arbitration Award.  To date, BYTON has not paid any portion of the Final Arbitration Award.

6.      Before and during the arbitration, BYTON's witnesses and representatives repeatedly represented that it did not have any money to pay what it owed.

     a.   During pre-arbitration discovery, BYTON's counsel represented that BYTON lacked funds to perform discovery obligations.

         i.   For example, in correspondence to myself and other counsel for EDAG, on November 10, 2020, BYTON's counsel stated, "As I believe you are aware,

LEWIS +
LLEWELLYN LLP

Byton North America has largely ceased operations and has only a skeletal staff remaining." A true and correct copy of this email, omitting the prior correspondence, is attached as **Exhibit B**.

ii.   Similarly, on November 20, 2020, in an email to myself, other counsel for EDAG, and JAMS, BYTON's counsel stated that BYTON lacked funds to reinstate access to Jama Software, a cloud-based storage platform.   A true and correct copy of this email, omitting the prior correspondence, is attached as **Exhibit C**.

b.   On November 17, 2020, BYTON's corporate witness testified at deposition that BYTON only made token payments in 2019 and eventually stopped paying EDAG because BYTON did not have enough money.  *See* Nov. 17, 2020 Deposition of BYTON at 159:7-22, a true and correct copy of which is attached hereto as **Exhibit D**.  BYTON's corporate witness further testified that it had not paid any creditors, and only paid payroll and operational costs such as rent and utility bills as of the date of that deposition. *Id.* at 166:3-13.

c.   On November, 18, 2020, BYTON's employee Sadha Kameswaran testified at deposition that BYTON barely had enough money at the present time to cover payroll and was not covering operational costs. *See* Nov. 18, 2020 Deposition of S. Kameswaran at 131:5-132:2, 133:8-16, a true and correct copy of which is attached hereto as **Exhibit E**.

d.   On December 10, 2020, BYTON's counsel informed JAMS that "BYTON North America is not in a position to make its [arbitration hearing] deposit at this time."  A true and correct copy of which is attached hereto as **Exhibit F**.  EDAG was required to advance BYTON's portion of the arbitration hearing fee, as noted by the Arbitrator in his costs award.

e.   On February 17, 2021, during the arbitration, BYTON's corporate representative testified that "BYTON was interested in EDAG's work" but "BYTON could not pay as per those payment plans that were provided to EDAG." *See* Feb. 18, 2021 Hr'g

2

LEWIS +
LLEWELLYN

1    Tr. at 858:5-11.  A true and correct copy is attached hereto as **Exhibit G**

2    f.    On June 2, 2021, the Arbitrator's Final Award found that that by August 2019,

3          BYTON had limited funds to cover its obligations, including its payroll to

4          employees.  *See* **Ex. A at 23**.  The Final Award described BYTON's financial

5          difficulties in detail.  *See id.* at 7-11, 16-17.

6    g.    On September 22, 2021, when JAMS issued an invoice to BYTON for $8,400,

7          counsel for BYTON stated "Unfortunately, my client is not in a position to pay

8          JAMS anything in connection with this matter."  A true and correct copy of that

9          correspondence is attached hereto as **Exhibit H**

10   7.    On August 20, 2021, automotive journalists reported that BYTON's M-BYTE was

11   photographed undergoing road tests in Hainan, China, despite BYTON's efforts to hide the tests.

12   *See Byton is alive! M-Byte EV was spotted in the wild for the first time [Spy Photos]*, China Car

13   News, https://carnewschina.com/2021/08/20/byton-is-alive-m-byte-ev-was-spotted-in-the-wild-for-

14   the-first-time-spy-photos/ (Accessed Sept. 14, 2021).

15   8.    Jama Software ("Jama") is a company that provides solutions for requirements, risk,

16   and test management.  *See* Jama Connect, https://www.jamasoftware.com/platform/jama-connect/

17   (Accessed Sept. 15, 2021).  BYTON used Jama's browser-based database to store all BYTON build

18   BYTON's product, *i.e.* the M-BYTE vehicle.

19   a.    BYTON's corporate witness testified that BYTON owed Jama Software, among

20         other vendors, money for its cloud-based platform and BYTON's access had been

21         shut off.  *See* **Ex. D** (Nov. 17, 2020 BYTON Most Qualified Witness Dep.) at

22         242:24-245:21.

23   b.    BYTON's corporate witness further testified that BYTON could not even come up

24         with the roughly half million owed to all to its various cloud-based providers.  **Ex. D**

25         (Nov. 17, 2020 BYTON Most Qualified Witness Dep.) at 244:4-17.

26   c.    On November 20, 2020, EDAG issued a subpoena to Jama requesting documents

27         related its claims against BYTON.

28   d.    On December 23, 2020, corporate counsel for Jama ("Jama's Counsel"), emailed me

3

LEWIS +
LLEWELLYN

1      to request an extension to respond to the subpoena.

2      e.   On or around December 23, 2020, I had a telephone call with Jama's Counsel.  She

3            stated that Jama holds design and intellectual property information for BYTON.  She

4            further informed me that a non-U.S. company claiming to be a related entity to

5            BYTON wanted to obtain access to Jama's system and the data held by BYTON

6            North America.  She further stated that Jama asked for documentation permitting this

7            request and did not receive it.  She informed me that Jama would institute a litigation

8            hold, preserving the BYTON data which was the subject of the third-party subpoena.

9      f.   On September 1, 2021, following the publication of the article in China Car News, I

10           spoke with Jama's Counsel again.  She informed me that BYTON North America, in

11           coordination with a China-based BYTON entity, had paid all past due invoices to

12           Jama in May 2021, so Jama reinstated BYTON North America's account on the

13           cloud.  She also explained that BYTON now had active access to the requirements

14           database and the intellectual property for the M-BYTE vehicle.

15     g.   On September 15, 2021, Jama's Counsel stated that from August 2020 to May 2021,

16           a Chinese company claiming to be a related entity to BYTON, referred to as

17           "BYTON China," had repeatedly asked for access to Jama's system and, specifically,

18           BYTON North America's data.  She stated that BYTON China asked to open a new

19           account, held on the ground in China instead of in the cloud, and wanted Jama to

20           migrate the data from BYTON North America to this Chinese-only based account.

21           She explained that this would mean no one in the United States—including Jama

22           itself—could access the data.  This migration ultimately did not happen.

23

24     I declare under penalty of perjury under the laws of the United States that the foregoing is

25 true and correct.  Executed on this 24th day of September, 2021 at Salt Lake City, Utah.

26

27     
       _____
       Evangeline A.Z. Burbidge

28

4

LEWIS +
LLEWELLYN

# EXHIBIT A

Hon. William J. Cahill (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, California 94111
Tel: 415-982-5267
sschreiber@jamsadr.com

JAMS REFERENCE NO. 1100107291

EDAG Engineering GmbH,

     Claimant,

  v.

BYTON North America Corporation,

     Respondent,

**FINAL ARBITRATION AWARD**

AND RELATED CROSS-CLAIM.

Counsel:  Evangeline A.Z. Burbidge, Marc R. Lewis, and Brad Estes of Lewis & Llewellyn LLP for Claimant; Keith Sipprelle of Van Etten Sipprelle LLP for Respondent.

Arbitrator: Hon. William J. Cahill (Ret.)

Place of Arbitration:  Remotely via Zoom.

Dates of Arbitration Hearing:  February 8-12, 2021 and February 16-19, 2021

Date of Post Hearing Oral Argument:  April 7, 2021

Date of Interim Award:  May 4, 2021

Date of EDAG letter to Arbitrator re: Typos in Interim Order:  May 11, 2021

Date of Byton Letter to Arbitrator Objecting to Costs:  May 11, 2021

Date of EDAG Letter responding to Byton letter Objecting to Costs:  May 18, 2021.

## I.  <u>INTRODUCTION</u>

The undersigned arbitrator, Judge William J. Cahill (Ret.) of JAMS, was appointed as arbitrator to this proceeding in accordance with Paragraph 14.4b of the Technology Development and License Agreement, which states that "[a]ny dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS")." (*See* Scheduling Order No. 7 ("SO No. 7"), ¶ 4; Joint Exhibits ("JT") 3, p. 12.) The parties further agreed that the substantive law of California shall apply. (*Id.* ¶ 6.)

The Arbitrator has considered all pleadings, testimony, and exhibits and makes the following findings of facts and law. Any discrepancy between the Arbitrator's findings and the position of the parties is the result of the Arbitrator determination of factual disputes, credibility of witnesses, relevancy of evidence, burden of proof and weight of the evidence presented.

## II.  <u>BACKGROUND.</u>

Claimant and Cross-Respondent EDAG Engineering GmbH ("EDAG") is an engineering services provider to the automotive industry. (Reporter's Transcript ("RT") 44:17-25.) Respondent and Cross-Claimant BYTON North America Corporation Inc. ("BYTON") is an electric vehicle start-up company created in 2016 for the purpose of designing, developing, manufacturing, and delivering an all-electric, battery-powered sport utility vehicle called the M-BYTE. (RT 793:2-4; 795:9-796:1.)

In November of 2016, BYTON and EDAG began working together on projects related to developing the M-BYTE. (RT 200:5-19; Ex. 216.) Effective June 1, 2018, the parties executed the Technology Development and License Agreement ("TDLA"). (Joint Exhibit ("Ex.") 3; RT 48:24-49:21, 204:4-24, 843:6-12.) Under the TDLA, BYTON was obligated to pay EDAG €50,448,045

Euros in regular, fixed installments. (Id.) In mid-2018, BYTON experienced difficulties paying EDAG under the TDLA. (RT 236:12-237:2.) BYTON caught up on amounts it owed EDAG in December of 2018, but by January of 2019, BYTON once again defaulted on payments under the TDLA. (RT 56:8-57:8, 239:19-25, 799:24-800:3, 846:14-18). BYTON stated that it could not pay due to funding issues, but informed EDAG that it was seeking C-Round investment and would pay the outstanding balance as soon as additional funding was secured. (*See, e.g.*, Exs. 131, 132.) The parties suggested multiple payment plans for the amounts in arrears but BYTON never made payments under any of the plans suggested.

By August of 2019, BYTON had still not secured C-Round funding and made no further payments to EDAG after that date. (BYTON Post Arbitration Brief 5:6-9.) In October of 2019, EDAG terminated the TDLA and filed its Demand for Arbitration. EDAG alleged claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.

BYTON admits that it did not pay $28.2 million due under the TDLA but asserts that it is entitled to offset amounts owed with the costs BYTON incurred to remedied defects in certain design components delivered by EDAG. BYTON contends that EDAG's defective designs caused BYTON to incur $31 million in costs, which exceeds the amount BYTON failed to pay under the TDLA. Thus, BYTON requests that neither party receive recovery in this proceeding.[1]

EDAG maintains that there were no serious defects in its deliverables and, even if there were, the TDLA required BYTON to notify EDAG of these defects and provide EDAG with an opportunity to cure, which BYTON failed to do. Furthermore, EDAG declares that BYTON repeatedly promised to pay amounts due under the TDLA and never informed EDAG that it was withholding sums due to errors in EDAG's deliverables until after EDAG terminated the TDLA and initiated this proceeding. EDAG seeks the remaining amounts due under the TDLA plus post-

[1] BYTON also alleged claims for breach of contract and negligence against EDAG, but ultimately did not pursue those claims in its post arbitration brief.

judgment interest, $294,144.18 in costs, $1.4 million in attorney fees, and the issuance of an injunction preventing BYTON from selling or transferring any asset without first paying EDAG.

The Arbitrator presided over a nine-day hearing on this matter on February 8-12 and 16-19, 2021.  The parties submitted post-hearing briefs to the Arbitrator on March 15, 2021, and closing arguments were heard on April 7, 2021 and the record was closed as of that date. In accordance with Scheduling Order No. 7, the Arbitrator issues this Interim Award with thirty (30) days of the close of the evidentiary record.

### A.      The Terms of the TDLA

Under the TDLA, EDAG agreed to design and deliver certain components of the M-BYTE to BYTON. (Ex. 3 at 3, 15, 23, 24, 51, 53, 55, 58-59, 61-62; Tr. at 714:10-15, 1107:8-1108:25.) EDAG was not obligated to build the components it designed, but rather to deliver "virtual" or "soft" electronic intellectual property data. (Ex. 3 at 23-24; RT 495:4-21, 816:23-817:14, 1024:1-6.) Gateway deliverables, or certain steps in the program that needed to be fulfilled at a certain time to be able to launch the car, were set forth in the TDLA. (RT 207:6-11, 207:24-208:5; Ex. 3, p. 15.) BYTON had the authority and responsibility for signing off on milestones. (RT 208:19-21, 1115:15-1116:2.)

In exchange for EDAG's work, BYTON agreed to pay a fixed price of approximately €50 million, broken into monthly payments. (Ex. 3, p. 15.) EDAG was required to correct any errors or deficiencies in the components EDAG delivered without additional compensation. (*Id.*; RT 209:5-25, 805:25-806:12.)

Section 4.2 of the TDLA set forth the "Acceptance Procedure" for EDAG's deliverables. BYTON had the "sole discretion" to reject deliverables "or any component thereof" if the deliverables contained "any Error." (Ex. 3, §4.2.) Upon EDAG's delivery of a component, BYTON was required to "promptly notify" EDAG in writing of its "acceptance or rejection." (Id.) If BYTON issued an "Error Notice," BYTON was required to "set forth, in reasonable detail,

the reason for the rejections." (Id.) Upon BYTON's rejection of a deliverable, EDAG was required to either create and implement an Error Correction within three days of the Error Notice or, if three days was impractical, provide a Correction Plan within three days. (Ex. 3 at 2, 5.)

If EDAG's Error Correction in response to a defect failed or if the parties could not agree on a Correction Plan, BYTON had four options under the TDLA: BYTON could, in its "sole discretion," (1) require another Error Correction, (2) accept the deliverable and offset BYTON's reasonable costs, (3) accept the deliverables and reserve BYTON's right to require correction, or (4) deem the event a material breach and immediately terminate the TDLA. (Ex. 3 at 5.)

Under Section 9.2, if EDAG failed to comply with any material term of the TDLA, BYTON could terminate the TDLA following written notice specifying the breach and a cure period. BYTON was further able to terminate the TDLA, without a cure period, if EDAG failed to comply with certain obligations. (Ex. 3 at 7.)  Under Section 9.4, BYTON was also permitted to terminate the TDLA without cause upon 30 days prior written notice to EDAG. (Ex. 3 at 8.)

If BYTON accepted a deliverable "in accordance with Section 4.2," EDAG was required to provide an invoice to BYTON, upon which BYTON was required to pay the invoice "within either [sic] sixty (60) days following BYTON's receipt of such invoice." (Id. at §7.1.) If BYTON terminated the TDLA, EDAG was entitled to receive "all payments in accordance with agreed payment plans/fee schedule for already initiated work at the time [EDAG] received notice from BYTON" of the termination. (Id. at §9.5.)

### B. The Parties' Performance under the TDLA

Initially, the project moved forward without issue. EDAG met the gateways set forth in the TDLA and BYTON signed off on EDAG's designs using Engineering Release Authorizations ("Releases").  (See, e.g., Ex. 102.) When BYTON signed off on a Release, the virtual data designed by EDAG was approved and the production of the tools would commence. (RT 260:25-261:18, 331:1-9.) BYTON's engineer testified that the Release process, under which all necessary

BYTON stakeholders would review the requirements and obligatory specifications to ensure they were met, was implemented to alleviate as many problems as possible before the production of tools because cutting tools is expensive. (RT 749:23-24, 750:1-16, 752:5-18.) Hundreds of Release forms were authorized by BYTON and by August of 2018, a prototype of the M-BYTE was tooled. (Ex. 161.)

Initially, BYTON also paid EDAG's invoices. BYTON reviewed EDAG's invoices after deliverables were received, asked questions, sought adjustments, and escalated questions to EDAG when it "couldn't judge the quality of the deliverable." (RT 235:12-15, 361:20-24, 365:5-13, 681:17-682:20, 728:14-729:8, 739:10-20, 836:3-6, 841:2-7.) BYTON's Mr. Slovesko was responsible for approving EDAG's invoices from 2017 until he left BYTON in 2020. (RT 784:17-21). Mr. Slovesko testified that when quality of work issues arose regarding an EDAG invoice, he would escalate the issue to EDAG employees Volker Amelung or Kai Uwe-Salzmann, and EDAG would investigate and make efforts to improve or fix the design. (RT 683:17-684:25.) Mr. Slovesko stated that he reviewed invoices carefully for accuracy and signed off on only accurate invoices. (RT 739:21-740:8). At least two individuals from Mr. Slovesko's team also reviewed invoices before he signed them and any corrections to invoices occurred shortly after BYTON received and reviewed them. (RT 228:10-13, 741:12-19.)

After Mr. Slovesko approved an invoice, he would send it to David Twohig, BYTON's Chief Vehicle Engineer/Chief Technical Officer. (RT 729:9-17, 740:10-20.) Mr. Twohig signed off on invoices after speaking with managers and confirming that they were reasonably satisfied with the services provided. (RT 627:4-21, 729:19-23.) Performance Documentation, or multi-page summaries of the work EDAG had performed in connection with the invoice, accompanied every EDAG invoice and had to be signed by BYTON as part of the invoice approval process. (RT 230:22-232:7, 233:16-24, 363:24-364:1, 364:19-23.) If adjustments or modifications were needed, EDAG and BYTON's Supply Chain team would discuss and BYTON and EDAG would work out

an appropriate solution. (RT 742:13-743:2.)

EDAG stated that it interpreted BYTON's approval of invoices as BYTON's approval of EDAG's deliverables, which EDAG stated was standard practice in the engineering services industry. (RT 395:14-16, 902:24-903:8, 903:9-15, 1106:6-15, 1125:12-1126:13.) BYTON's witnesses testified that if BYTON signed a Performance Document, it meant BYTON had approved it. (RT 753:4-12.) Ultimately, all EDAG invoices issued to BYTON were approved by BYTON. (RT 226:1-6, 226:11-21, 227:22-228:9, 228:22-25, 366:13-15, 841:2-13.) Even after BYTON stopped paying EDAG's invoices, BYTON continued to review, sign, and approve each of EDAG's invoices. (RT 239:9-18.)

### C.     BYTON Fails to Pay EDAG Invoices

BYTON employee Mr. Sadha Kameswaran testified that in 2019, BYTON needed additional funding but was having difficulties obtaining it due to the "perfect storm" of strained foreign relations between the US and China, bureaucratic changes within the Chinese government that slowed approvals of funding from Chinese investors, and shutdowns in response to the COVID-19 pandemic. (RT 799:24-801:15.) BYTON also stopped paying the installments due to EDAG under the TDLA.

When EDAG demanded payment, BYTON informed EDAG that it could not make the payments because of funding issues and repeatedly promised that it would pay all outstanding amounts due as soon as it secured additional financing. (RT 54:15-22, 55:5-12, 56:19-25, 79:2-9, 142:25-143:23, 169:14-18, 275:7-15, 275:19-21, 368:2-369:15, 516:7-10, 638:13-639:15, 832:12-14, 846:3-13, 854:3-10, 1124:4-25.) BYTON never informed EDAG that it was withholding payment because of EDAG's engineering errors. (RT 55:5-12, 57:1-4, 0:24-71:3, 78:12-15, 78:21-79:1, 832:22-833:1, 854:3-10, 888:24-889:1.) While the parties operated under the TDLA, BYTON never requested a reduction, discount, offset, or write off from EDAG's invoices due to engineering errors. (RT 57:1-4, 60:21-23, 63:16-18), 65:9-11, 68:2-4, 70:1-3, 70:24-71:3, 72:19-22, 78:16-20,

370:4-12, 395:11-12, 628:9-12, 629:15-23, 637:7-18, 855;18-21, 918:18-22, 1125:1-3.)

Beginning in March of 2019, BYTON and EDAG exchanged a series of emails and letters regarding BYTON's payment issues. None of these communications indicated that BYTON believed EDAG's deliverables contained engineering errors. In late March of 2019, EDAG's Executive Vice President Vehicle Engineering, Harald Keller, emailed Daniel Kirchert of BYTON, requesting that BYTON immediately pay "6,738 Mio EUR" in outstanding payments from invoices dating back to November of 2018. (Ex. 131.) In mid-April of 2019, BYTON apologized for its delay in making payments, stated that it "fully intend[ed] to catch up and return to normal payment conditions as soon as we close our C-round of funding," and proposed a payment plan under which BYTON would make weekly payments of $500,000 USD to EDAG. (*Id*.; RT 59:16-61:1.) When EDAG insisted that BYTON instead pay $1 million weekly, BYTON responded that its "cash position" had "only worsened since our last proposal" and that until BYTON's C-round of funding closed, it was "very unlikely that BYTON will even be able to make the US$500k per week payment plan that we proposed to EDAG on April 13th." (JT 132.) Nonetheless, BYTON affirmed that:

> We absolutely intend to fully pay for the services that EDAG has provided when the C-Round closes. We will also make partial payments when cash becomes available as close as we can to either or our proposals. We appreciate all that EDAG has done, and continues to do, for the success of BYTON. Nevertheless, BYTON will respect EDAG's possible choice to limit its exposure by reducing its support to BYTON until we recover from our present financial constraints.

(*Id*.) In closing, BYTON thanked EDAG for its "patience and trust" in BYTON. (RT 62:12-23; Ex. 132.)

Three months later, BYTON emailed EDAG, stating that there were "recent developments around our . . . funding that are looking more promising, as we are ever closer to closing our C-round, plus have some bridge financing and other potential major funding sources that look very promising." (Ex. 146; RT 63:25-64:5.) BYTON stated that its "first intent" was "to

completely clear our arrears and restart this program," and stated that there was "a good chance that this will be the path shortly." (*Id.*)  Regarding the payment plan, BYTON stated: "[i]f BYTON must continue to conserve cash, but we have enough to follow your prior payment proposal, then we will follow that." (*Id.*) Again, BYTON stated that the "the patience and support that EDAG" continued to give to BYTON was "GREATLY appreciated." (*Id.*)

Later that month, BYTON agreed to confirm the "maturity and legality of the (over-) due receivables" and promised to pay €19,889,825.21 on or before August 18th, 2019. (RT 148:24-149:3, 149:6-12, 847:10-20, 850:22-851:7; Exs. 147, 151.) However, BYTON did not pay EDAG on August 18, 2019. Instead, BYTON informed EDAG that it experienced a delay in the deposit of the first tranche of bridge financing and proposed a revised payment plan. (Exs. 156, 157; RT 152:15-17, 851:8-10, 852:7-22.) EDAG rejected BTYON's proposed payment plan. (Ex. 156.)

 On August 19, 2019, BYTON stated that it was "arranging 2M USD to be sent to you this week as soon as possible while the remaining 6M will be sent to you early September as soon as our funds hit our overseas account." (Ex. 157.) These payments were never made. (RT 157:9-14). Instead, BYTON sent EDAG another revised payment plan. (Ex. 162; RT 158:18-25, 159:18-24, 854:11-21, 854:23-855:3). BYTON also informed EDAG that BYTON was able to build a prototype in Nanjing and "was pleasantly surprised to see how good the quality was" on the parts. (Ex. 161.) BYTON stated that its accomplishment:

> . . . would not have been possible without all of the help and support that you have given to myself and my team over the past 3 years. Thank you! My hope is that you feel just as proud of this accomplishment as I do. There is still a lot of hard work ahead to achieve the quality level required to be competitive at SOP with the German brands as well as Nio and Tesla. Your continued support will be a big factor for us to get there.

(*Id.*)

On August 26, 2019, BYTON informed EDAG that it had obtained $150 million in C-round funding, was "in advanced stage of finalizing agreements with other C-round investors" for an additional $400 million, and that funds would "hit Byton account in the second half of September"

2019. (Ex. 163; RT 65:14-66:3, 66:23-67:14).

In early September of 2019 EDAG informed BYTON that it:

. . found a way not to start writing off the project yet. I think we can hold through it for the month of September without a stoppage. I will reduce the cost as much as I can during this time without sacrificing the basics. So your hope that we continue through the month of September is still in place now. I hope the time is sufficient for Byton to close the C-Round, get the funds and pay and return to normal business within the month of September.

(Ex. 166.) BYTON responded:

. . you guys have been our partners in the true sense of the word from Day One and we thank you for that. Do whatever you need to do as a business to protect yourselves - if you need to pull out the whole team we will *fully* understand. If you can see your way clear to leaving a 'skeleton crew' to help out Shawn in particular, we will consider that a great bonus and a great help. We *will* get the money, as we have a superb product, but we all need a lot of patience now. We will keep you informed through September and believe me, you will know if and when we have good news as you'll probably hear the cheers from Santa Clara from where you are sitting - without needing the telephone!

(*Id.*)

BYTON continued to represent to EDAG that it was close to closing additional funding that would resolve BYTON's financial issues and allow BYTON to become current on its payments. (RT 1126:14-1127:21.) BYTON also continued to acknowledge the amounts it owed to EDAG and never requested an offset. (*See, e.g.,* Ex. 177; RT 75:19-77:3, 77:12-78:1, 146:23-147:5, 147:23-25.) Although an internal BYTON email (inadvertently copied to EDAG) stated that BYTON could pay EDAG "1-1.5M" in September of 2019, BYTON paid no additional amounts due after August of 2019. (Ex. 172; RT 68:12-18, 69:23-25, 162:25-163:8, 858:25-859:6, 859:7-22.)

EDAG testified that because BYTON represented that it could not pay due to funding issues, and never stated that the quality of EDAG's deliverables was a reason for BYTON's non-payment, EDAG expected that its work on the M-BYTE would continue into 2020. (RT 370:13-371:5, 745:5-8; 747:17-748:2), 748:4-8, 748:11-20, 764:23-765:4.)

Ultimately, EDAG terminated the TDLA and filed an arbitration demand against BYTON in October of 2019, asserting claims for breach of contract and breach of the covenant of good

faith and fair dealing due to BYTON's failure to pay EDAG's overdue invoices and for BYTON's bad faith and unfair inducement of EDAG's work. On November 19, 2019, BYTON filed its response and cross-claims, asserting a claim for breach of contract and for negligence, alleging that EDAG committed substantial engineering errors in its work on the M-BYTE.

## III.  ANALYSIS

### A.    *EDAG's Breach of Contract Claim*

To establish its claim for breach of contract, EDAG must prove that: (1) BYTON and EDAG entered into a contract; (2) EDAG did all, or substantively all the significant things that the contract required or that EDAG was excused from performance; (3) BYTON failed to do something the contract required it to do; (4) EDAG was harmed; and (4) BYTON's breach of contract was a substantial factor in causing EDAG's harm. (*See* CACI 303.)

It is undisputed that BYTON and EDAG entered into the TDLA under which BYTON agreed to pay EDAG a flat rate of €50,448,045 Euros. It is also undisputed that BYTON did not pay the full amount due under the TDLA. However, BYTON contends that EDAG's engineering errors breached the standard of care in the industry, *i.e.*, the "knowledge, skill, and care ordinarily possessed and employed" by automotive engineers.  (*Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997-98 (1994).) BTYON contends that it incurred "roughly 20% additional work" or approximately $31 million, in costs to "heavily 'rework' the design[s]" delivered by EDAG. (Exs. 206, 208, ¶12.) Because BYTON's estimated offset exceeds the amount due to EDAG under the TDLA, BYTON requests that the Arbitrator determine that neither party is entitled to recovery.

### 1.    *EDAG's Performance*

### a.  *Front Engine Compartment*

The primary engineering deficiency that BYTON claims accounts for $31 million in damages, and which BYTON asserts as its justification for an offset to EDAG's damages, is the design of the front or "under hood" area of the M-BYTE. BYTON maintains that the front

compartment of the electric car (where the engine would be placed) was "inadequate, with fundamental items not correctly packaged (most notably, the design lacked a front motor that was required for the all-wheel drive version of the vehicle)." (BYTON Resp. and Cross-Claims at 6.)

In support, BYTON submitted the Declaration of David Twohig, BYTON's former Chief Vehicle Engineer/Chief Technical Officer. Mr. Twohig declared that:

> The key item where EDAG underperformed was . . . in fundamental engine bay/front-end packaging. The errors in basic layout of items like the 12V battery, omission of the front traction motor, and other errors associated with crash protection, obliged the BYTON teams to re-engineer the engine bay area not once, but twice. The initial layout was so poor that the redesign had to be undertaken in two steps (Step 1 from pre-APP to AP, and an additional correction step from AP to VP). Conservatively estimating the cost of engineering an engine compartment of this complexity 'from scratch' at $156 million approximately, BYTON incurred roughly 20% additional work (or the equivalent of approximately $31 million) in having to heavily "rework" the design *(ie.,* re-design, prototyping, testing, tooling, etc. for BYTON employees as well as various suppliers).

(Ex. 208, ¶12.) Mr. Twohig affirmed his declaration in deposition testimony and stating that the quality of EDAG's work on the front engine bay fell below the standard of care of the industry. (RT 583:5-11.)

BYTON also read into the record the deposition testimony of Shawn Slovesko, a former BYTON employee who led the vehicle development activities for body structures, closures, exteriors, interior trim, restraints and airbags. (RT 666:14-667:5.) Mr. Slovesko reviewed Mr. Twohig's Declaration and stated that he agreed with Mr. Twohig's description of the engineering problems BYTON had with EDAG's deliverables. (RT 709:24-710:12.)

EDAG submitted the testimony of EDAG employee Volker Amelung and engineering expert Dave McLellan to contest BYTON's claims that EDAG's design of the front-end packaging contained serious engineering errors. (RT 949:19-25, 1059:20-1060:21; Ex. 178 at 2-3.) Mr. Amelung submitted a demonstrative indicating that the front motor bay development was complex, iterative, and required inputs from many others aside from just EDAG. (Ex. 223; RT 965:25-969:9.) BYTON had input on where the 12-volt battery was placed and approved the design as of

February 2018. (RT 922:25-923:6.) Mr. Amelung testified that he spent two weeks searching for evidence that EDAG positioned the 12-volt battery beneath the HVAC unit, only to find nothing. (RT 919:23-921:2.)

EDAG also submitted evidence of a BYTON presentation created one month before EDAG allegedly misplaced the 12-volt battery that indicates that the 12-volt battery was not buried under the HVAC unit. (Ex. 30; RT 391:19-24, 921:3-4, 921:25-922:24.) Additionally, Mr. Kameswaran, who testified as BYTON's most qualified witness, stated that BYTON was not aware of any identifiable issues with the packaging of the front hood area in existence at the time EDAG stopped the project in 2019. (RT 871:19-24.) Lastly, EDAG presented evidence indicating that both before and after Mr. Twohig joined BYTON, BYTON approved EDAG's work regarding the front-end packaging. (RT 944:10-15).

BYTON produced no contemporaneous documentary evidence to support its claim that it encountered significant problems with EDAG's front end design, which EDAG failed to fix and thus required BYTON to spend $31 million to redesign. (RT 962:8-17). The only evidence that BYTON presented in support of its claim is Mr. Twohig's Declaration and deposition testimony and a document stating that a "Top Down Estimate of Re-Engineering Costs Incurred through Inadequate Initial Engine Bay" indicates that an "[a]pproximation of 'rework' costs incurred to redesign twice - from pre-AP to AP and again from AP to VP = 20% additional "effort" is $31 million. (Ex. 206.)

### b. Other Defects

The second error raised by BYTON was that EDAG's "design contained some fundamental errors in the high-voltage battery/floor systems interfaces" and that the design of the battery enclosure was lacking. (BYTON Resp. and Cross-Claims at 6.)

EDAG states that its initial design for the battery enclosure utilized weld nuts but that BYTON manufacturing wanted to use cage nuts/swim nuts instead. Mr. McLellan, EDAG's

expert, testified that EDAG's original solution was a competent proposal and both the BYTON and EDAG engineering teams agreed that weld nuts would work perfectly. (RT 1062:14-1063:18, 1063:20-1064:4.) Furthermore, BYTON's witnesses agreed that EDAG's ultimate design solved any issues BYTON had with the battery enclosure. (RT 758:4-18, 758:20-25, 876:21-24, 877:6-10, 993:24-994:10, 994:11-13, 1063:20-1064:4; Ex. 178 at 4-5.)

The third error BYTON raised was that "the A-pillar in the EDAG design did not meet basic legal vision requirements." (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that it corrected the A-pillar issue, at no cost to BYTON, and BYTON admitted that in the most recent EDAG design before the project was terminated, there were no deficiencies in the A-pillar. (Ex. 84; RT 876:15-19, 958:1-14, 995:2-9; 956:4-957:25, 1064:6-24, 1065:11-18.)

The fourth claimed error was that "the front door in the EDAG design lacked adequate system engineering for the door swing (creating interference with the front fender)." (BYTON Resp. and Cross-Claims at 6.) Mr. Twohig asserted that a custom hinge was required due to interferences in the door swing. (RT 759:10-20, 959:17-960:15, 995:15-21.)

EDAG submitted evidence that there was, indeed, a problem with the door swing, but the problem was caused by the lower section of the fender. (RT 875:23-876:2, 960:16-961:23, 995:22-24.) EDAG corrected the issue for approximately $6,000 and BYTON signed off on the cost without complaint. (RT 961:24-962:1, 995:25-996:3.) EDAG's engineering expert, Mr. McLellan, reviewed the documentation and determined that there was interference with the fender in EDAG's design, EDAG proposed a solution, and the solution resolved the problem. (RT 1065:20-1066:21.) BYTON confirmed that at the time EDAG stopped the project, the EDAG design did not have deficiencies in the front door. (RT 875:14-17.)

The fifth error raised by BYTON was that "the front of the vehicle in the EDAG design lacked adequate system engineering to achieve the documented targets between PedPro and other system performance requirements;" BYTON asserts that EDAG should have used a steel hood

instead of an aluminum hood. (BYTON Resp. and Cross-Claims at 6.)  EDAG submitted evidence that it originally proposed that BYTON use a steel hood, but EDAG changed the hood to aluminum, at BYTON's request, so that the M-BYTE would achieve a Five Star rating for its Pedestrian Protection system. (RT 398:6-13, 925:1-23, 925:1-23, 927:17-928:13, 1060:23-1062:1.) Mr. Amelung testified that the hood was ultimately changed to steel because of requirements from BYTON's styling department. (RT 558:5-8, 702:18-703:2, 996:13-997:21.) In any event, the evidence indicates that hood deficiencies were corrected by the time the project was terminated. (RT 873:2-7.)

The sixth claimed error is that the front and rear bumper systems lacked adequate system engineering to achieve targets between low-speed bumper compliance and other system performance requirements.  (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that changes to bumper compliance were due to conflicting requirements from BYTON's styling department and the legal safety requirements; low-speed bumper compliance creates a stiffer bumper, whereas pedestrian protection requires a softer bumper system. (RT 998:1-1000:3, 1069:3-16.) BYTON failed to produce evidence that changes to bumper compliance caused BYTON to incur additional costs due to late tooling. (RT 998:1-1000:3.)

The seventh error claimed by BYTON is that the M-BYTE's lift gate system design was inefficient and could not meet entry-level luxury vehicle appearance requirements. (BYTON Resp. and Cross-Claims at 6.) EDAG submitted evidence that changes to the lift gate system design were the result of competing requirements from BYTON's styling and engineering departments (BYTON's styling department wanted a heavier lift gate than did engineering.)  (RT 1000:8-1002:13.)

EDAG also submitted evidence that BYTON requested styling of the tailgate created an over slam issue on the tailgate to body interface. (RT 1069:17-1071:9.) BYTON utilized spot welding, which is less expensive than laser welding, and which resulted in a bigger gap between

the tailgate and the body of the vehicle. (RT 1002:14-1003:2, 1069:17-1071:9.) The evidence indicates that the over slam issue was not the result of an engineering error, but a result of decisions BYTON made when they styled the car. (RT1071:10-1072:3.)  Regardless, BYTON signed off on the final lift gate. (RT 1003:3-6.)

The eighth error raised by BYTON is that the front and rear center console system in the EDAG design were inefficient and infeasible to manufacture, leading to a late design "freeze." (BYTON Resp. and Cross-Claims at 6.) The evidence indicated that EDAG's design of the center console required high strength steel to make the console stiff enough so that the customer could not move it. (RT 1003:22-1005:15, 1120:4-9.). BYTON was unhappy with the costs and changed the specifications, lowering the stiffness requirement, so that high-strength steel would not be required. (RT 1003:22-1005:15.) BYTON also changed suppliers and added more features and components, which required further design. (*Id.*) EDAG submitted evidence that it worked with the new supplier and successfully redesigned the center console to BYTON's new requirements. (*Id.*) Mr. Slovesko's testified that the center console issue was addressed with EDAG at the time he raised it or shortly thereafter. (RT 743:4-11; *see also* Ex. 196.) Mr. Slovesko also testified that the center console was not tooled prior to the project's termination. (RT 757:5-16.)

### c.  *Impact of Alleged Defects on EDAG's Performance*

As detailed above, EDAG was required to provide design components to BYTON under the TDLA for a fixed cost of €50,448,045 Euros. If there were errors or other issues with EDAG's deliverables, the TDLA set forth procedures under which BYTON could reject the deliverables and require EDAG to cure the defects. BYTON admitted that it never availed itself of those procedures. BYTON never issued any "Error Notices" and never rejected EDAG's invoices. Additionally, in the only communications between the parties that were admitted into the record, BYTON repeatedly admitted that it owed EDGA the remaining amounts due under the TDLA and that the only reason it did not pay was because BYTON lacked the funds. There is no evidence that

BYTON ever raised the issue of EDAG engineering errors as a justification for reducing the amounts BYTON owed to EDAG.

BYTON admits that it never issued any "formal" Error Notices to EDAG but asserts that its failure to do so does not mean that BYTON accepted EDAG's deliverables. Because EDAG's deliverables were "soft" intellectual property, BYTON maintains that it could not finally accept any deliverable until it had been fully vetting via validation testing. The project was terminated before validation testing occurred, however, and thus, according to BYTON's logic, it would *never* be able to finally "accept" EDAG's deliverables. (RT 820:20-821:2.)

Under §4.2 of the TDLA, BYTON was required to "promptly notify" EDAG "in writing of BYTON's acceptance or rejection" of a deliverable. (Ex. 3, p. 5.) Upon receipt of a rejection notice from BYTON, EDAG was obligated to create an Error Correction within three (3) workdays or provide BYTON with a "written plan to correct the identified Error." (*Id*.) Before BYTON had the right to deem any error "a material breach" of the TDLA and demand a refund of "any fees that have been paid" the defective item, BYTON was required to allow EDAG an opportunity to implement an Error Correction or to work with BYTON to develop a "Correction Plan." (*Id*.) BYTON's admission that it never implemented the "Acceptance Procedures" under §4.2 for any of the eight errors it raised indicates that BYTON cannot rely upon these errors as evidence that EDAG did not substantially perform under the TDLA.

Because BYTON failed to comply with the rejection procedures set forth under §4.2 of the TDLA, BYTON failed to demonstrate that EDAG failed to perform under the TDLA.

### 2.   *BYTON's Breach and EDAG's Resulting Damages*

There is no dispute that BYTON failed to pay the full amount due to EDAG under the TDLA.

EDAG seeks payment of its overdue invoices as stated in the August 23, 20129 payment plan (€ 19,779,825.21) plus total amounts due under four outstanding invoices issued thereafter

(€4,151,073), or €23,446,649.00. EDAG further requests statutory prejudgment interest of 10% compounded annual as of August 23, 2019. The total amount of interest-related damages sought by EDAG is €2,719,367.00.

### a.   BYTON's Request for Off-Set

BYTON seeks to offset EDAG's damages by $31 million to account for BYTON's claimed damages resulting from EDAG's purported failure to deliver an acceptable front compartment/engine bay.

As discussed above, BYTON's damages for rejected deliverables, if BYTON had triggered §4.2 of the TDLA, would be limited to the right to a cure from EDAG or the right to a refund of fees paid for defective deliverables. BYTON does not request a refund of the fees EDAG charged for the front engine compartment. BYTON requests that EDAG pay for *BYTON's* costs to design an alternative front engine bay compartment. Even if BYTON had properly invoked the "Acceptance Procedure" under §4.2 in response to the alleged defects in the front compartment, BYTON would not have the right to obtain the damages it claims.

Even if the TDLA could be interpreted as allowing BYTON to recover its costs to redesign defective components, BYTON failed to submit evidence sufficient to prove that BYTON did, in fact, incur $31 million in such costs.

Damages must be proved "with a reasonable degree of certainty." (*Automatic Poultry Feeder Co. v. Wedel*, 213 Cal. App. 2d 509, 516 (1963).)  "[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." (*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1132 (2012) (quoting *Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (Ct. App. 1963)); *see also* Civ. Code § 3301 ("No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.").)

Mr. Twohig, BYTON's sole expert on "costs," testified that it would be "pure speculation" for him to offer testimony on the cost of any errors aside from the engine bay. (RT 571:19-572:4, 655:11-16.) With regard to the costs incurred to redesign the engine bay, the only document BYTON produced in support of its claimed costs is a chart created by Mr. Twohig in which he estimates, or provides an approximate guess, as to the costs BYTON incurred.[2] (Ex. 206; RT 877:23-878:1.) No other BYTON witness could substantiate or support Mr. Twohig's estimate. (*See, e.g.,* RT 770:21-24 (could not opine on accuracy of $31 million damages estimate), 877:11-18 (not personally involved in creation of damages estimate).)

BYTON did not provide any underlying documents to support Mr. Twohig's one-page damages estimate. BYTON's most qualified witness on damages, Mr. Kameswaran, did not know which documents were used to pull together Mr. Twohig's estimate. (RT 880:25-881:12.)

BYTON also asserted that EDAG's engineering errors caused BYTON to be delayed in getting the M-BYTE to market, but BYTON offered no testimony or documents to quantify the delay attributable to the purportedly defective engineering errors. (RT 799:24-801:15, 870:1-17 (M-BYTE delayed due to "perfect storm" of factors having nothing to do with EDAG).)

BYTON failed to prove that it was entitled to a $31 million offset of EDAG's damages.

### b.   *EDAG's Request for Compound Interest as of August 23, 2019*

California Code of Civil Procedure §3287(a) states that a "person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." If a party "is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated," that party may "also recover interest thereon from a

---

[2] BYTON conceded it has no evidence of any amount of damages for five of its eight claimed engineering errors in the following areas: errors in the high-voltage battery/floor systems interfaces, the A-pillar, the system engineering of the front door, the system engineering of the front and rear bumper systems, and the design of the lift gate system. (*See* RT 558:9-12, 656:22-657:4, 567:7-12, 569:11-15, 571:11-18, 860:13-21, 861:8-12, 862:11-15, 863:22-864:1, 864:18-22, 865:14-25, 866:13-19, 874:14-19.)

19

date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." Cal. Code of Civ. Proc. §3287(b). The test for determining "certainty" is whether the defendant knows the amount owed or could have computed the amount from reasonably available information. (*Wisper Corp. v. California Commerce Bank,* 49 Cal.App.4th 948, 960 (1996).) However, where the amount of damages is in dispute (*e.g.*, cannot be resolved except by verdict or judgment), an award of prejudgment interest is inappropriate. (*Id.*) In *Iverson v. Spang Industries*, 45 Cal.App.3d 303 (1975), a landlord sued a former tenant for damages to the rented premises. (*Id.* at 306-307.) The tenant disputed the cost of repair. (*Id.*) The court ruled that the landlord was entitled to damages as of the date of judgment because the amount owed by the tenant was not certain until the court determined the parties' dispute over the costs of the repairs:

> It is established that under section 3287 of the Civil Code, "... interest cannot be awarded prior to judgment when the amount of damages cannot be ascertained except on conflicting evidence. [Citations.] The rationale of such rule is that where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it.

*(Id.* at 311.)

The amount BYTON owed under the TDLA was uncertain until the Arbitrator determined the parties' dispute over EDAG's deliverables under the TDLA. Thus, EDAG is entitled to recover statutory interest at of the date of the issuance of this Interim Award.

BYTON contends that EDAG is entitled to interest of 6%, not 10%, because the parties agreed to a 6% interest rate for payments under the proposed payment plan of August 23, 2019. But EDAG did not sue to enforce the payment plan. EDAG sued to enforce the TDLA, which does not specify an interest rate for prejudgment interest. Therefore, Code of Civil Procedure §3287 applies and EDAG is entitled to the statutory rate of 10%.

Lastly EDAG seeks compound interest. Code of Civil Procedure §3287 provides for simple interest and EDAG has demonstrated no reasonable basis for its request to obtain 10% interest under §3287 that is compounded as of the date of the proposed August 23, 2019 payment plan.

EDAG is entitled to simple interest at the rate of 10% as of the date of this Interim Award.

### B. EDAG's Claim for Breach of the Covenant of Good Faith and Fair Dealing

To prevail on its claim for breach of the covenant of good faith and fair dealing, EDAG must prove: (1) BYTON and EDAG entered into a contract; (2) EDAG did all, or substantively all the significant things that the contract required or that EDAG was excused from having to perform certain other requirements due to BYTON's failure to pay; (3) all conditions for BYTON's performance occurred; (4) BYTON frustrated EDAG from receiving the benefits due under the contract; (5) by doing so, BYTON did not act fairly and in good faith; and (6) EDAG was harmed by BYTON's conduct. (*See*, CACI 325.)

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." (*Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 349-350 (2000).) The "covenant . . . requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes." (*Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013).) "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." (*Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 291 (2019), *reh'g denied* (Sept. 26, 2019).)

As discussed above, there is no dispute that the parties entered into the TDLA and although EDAG's performance was not without issue, the weight of the evidence indicates that EDAG substantially performed under the TDLA.

EDAG argues that BYTON frustrated EDAG's ability to obtain its benefits under the TDLA because when BYTON failed to pay EDAG, BYTON praised EDAG's work and promised to make

payment as soon as additional funding came through. EDAG argues that BYTON enticed EDAG to continue to perform and forgo exercising its right to terminate the agreement. BYTON's behavior was egregious, according to EDAG, because even after promising that it would pay EDAG whatever sums it could, BYTON failed to pay EDAG $1.5 million in 2019 when BYTON had sufficient cash on hand to do so. (*See* Ex. 172.)

Lastly, EDAG maintains that BYTON's defense in this proceeding demonstrates BYTON's bad faith. BYTON claims that EDAG's deliverables contained such significant errors that BYTON was forced to spend more than half the amount BYTON owed EDAG under the TDLA to remedy the defects. BYTON also claims that it was aware of these defects as early as 2018, but BYTON never implement the procedures under the TDLA to notify EDAG of the errors. Although BYTON claims that it discussed the errors with EDAG in oral communications, these significant engineering errors were never mentioned in written correspondence or in documented in-person meetings. As late as January and February of 2020, after BYTON filed its counterclaims, BYTON had still not informed EDAG that it believed BYTON was owed an offset for the alleged engineering errors.

EDAG seeks its attorney fees incurred to collect on the amounts BYTON owes under the TDLA as an appropriate measure of the harm EDAG suffered from BYTON's breach of the covenant of good faith and fair dealing.

A close examination of the communications between the parties indicates that EDAG cannot meet its burden of proving BTYON promises to pay under the TDLA constitute bad faith, or that BYTON misled EDAG into continuing to perform under the TDLA. As early as first quarter 2019, BYTON informed EDAG that it could not pay contractual installments because it needed more funding. (*See*, Ex. 131 ("We sincerely apologize for our delay in payments and fully intend to catch up and return to normal payment conditions as soon as we close our C-round of funding.")) BTYON clearly communicated that the future of the project was dependent on whether BYTON succeeded in obtaining more funding. On April 30, 2019, in response to EDAG's demand

that BYTON pay €1 million per week to catch up on amounts in arrears, BYTON's Tom Wessner responded:

> I wish that we were able to respond favorably to your request, however, Byton's present cash position has only worsened since our last proposal. Frankly speaking, until the C-Round is closed and funded, it is very unlikely that Byton will even be able to make the US$500k per week payment plan that we proposed to EDAG on April 13th.

(Ex. 132.) On September 1, 2019, BTYON informed EDAG that BYTON had:

> . . . put a moratorium on issuing new POs due to Byton's present financial situation. When the C-round closes, and additional funding comes in, we will get back to regular business practices and we will be able to then issue POs. This is the present situation.

(Ex. 166.)

Although BYTON expressed optimism to EDAG regarding its ultimate ability to obtain C-Round funding and pay amounts owed, BYTON made it clear to EDAG that its ability to continue with the M-BYTE project was contingent on whether BYTON's financial condition improved. (*See, e.g.*, Ex. 166 (*emphasis added*), "[w]e will get the money, as we have a superb product, but we all need a lot of patience now. We will keep you informed through September and believe me, you will know *if and when* we have good news.") As a large, sophisticated, multinational organization, EDAG knew or should have known that its decision to continue working with BYTON carried a significant risk. BYTON acknowledged the difficult choice that EDAG had to make with regards to EDAG's participation on the project, informing EDAG that it did "not fault EDAG for managing its risk." (Ex 146.) In early September of 2019, Mr. Twohig told EDAG to:

> Do whatever you need to do as a business to protect yourselves - if you need to pull out the whole team we will fully understand. If you can see your way clear to leaving a 'skeleton crew' to help out Shawn in particular, we will consider that a great bonus and a great help.

(Ex. 166.)

EDAG's objection that BYTON did not pay EDAG $1.5 million in 2019 also fails to demonstrate bad faith as BYTON had other obligations, including payroll expenses to employees, competing for its limited funds. Although BYTON's defense in this arbitration is inconsistent with

BYTON's behavior prior to EDAG's initiation of this proceeding, EDAG terminated the TDLA in October of 2019 and cannot rely upon BYTON's actions occurring after the contract was no longer operational to support its claim that BYTON performed under the TDLA in bad faith.

EDAG failed to prove that BYTON breached the implied covenant of good faith and fair dealing.

## IV.  EDAG's REQUEST FOR COSTS AND ATTORNEY FEES.

### A.  Introduction.

First of all, the Arbitrator finds that EDAG is the prevailing party in this arbitration proceeding.

Second, the TDLA does not provide for an award of attorney fees to a prevailing party in a dispute over the agreement and therefore each party is required to pay its own attorney fees. *See* California Code of Civil Procedure §1021.

### B.  EDAG's Request for Costs.

EDAG, in its closing brief, sought costs pursuant to California Code of Civil Procedure §§ 1032 and 1033 for the following items:

- $ 145,600.00 for the JAMS deposit;

- $ 1,500.00, EDAG's filing fees;

- $ 4,500.00, JAMS hearing fees for discovery disputes;

- $ 6,270.00, interpreter fees for hearing witnesses;

- $ 35,604.00, arbitration hearing court reporter fees, including transcript fees;

- $ 33,494.43, deposition costs;

- $ 645.75, service of process costs;

- $ 20,000.00, costs of EDAG's electronically presented demonstratives;

- $ 1,530.00, costs of technical time to hyperlink evidence in EDAG's opening/closing briefs (as reasonably helpful to aid the trier of fact)

### C.  Byton's Objection to the Arbitrator Relying on the CCP in Awarding Costs Is Sustained.

In his Interim Award the Arbitrator erroneously awarded $249,144.18 in costs.  As is pointed out by Byton's May 11, 2021, letter, the Arbitrator in his Interim Ruling erred in that he awarded costs under the CCP and failed to follow the terms of the parties' arbitration contract.  In that regard, Byton's objection raised in its May 18, 2021, letter regarding the use of the CCP in awarding costs is SUSTAINED.

In this Final Arbitration Award the arbitrator will rely on JAMS Rules and Section 14.4(b) of the TDLA which reads as follows:

> b. <u>Arbitration.</u>  Any dispute between the parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration. * * * *Each party will bear its own costs in the arbitration,* * * * The Arbitrator will not have any right or authority: * * * (3) to modify the terms of this Agreement.

### D.  Analysis of Costs Under Sec. 14.4(b) and JAMS Rules

In its May 18, 2021, letter EBAG recognizes that the Interim Award failed to take into account Sec. 14.4(b) and it requests the Arbitrator to be awarded the costs it advanced Byton and all those expenses of which it paid more than its fair share.  What follows are the items requested in its Conclusion of its letter.  Only those items are discussed below and the other items requested in EDAG's closing brief and listed in the Interim Award are DENIED.

#### 1.  JAMS Hearing fees.

Section 14.4(b) requires that each party shall bear their own costs in the arbitration.  In its May 15, 2021, letter EDAG submitted evidence that it paid $72,800 for its share of the arbitration fees.  It concedes that it must bear those costs.

However, Byton did not pay its share of the JAMS hearing fees, EDAG advanced $72,800 on Byton's behalf.  Byton is responsible to pay its own costs under the TDLA and under JAMS Rule 6(c) the Arbitrator may allocate the non-paying Party's share of the costs.

Therefore, the Arbitrator awards $72,800.00 to EDAG to reimburse it for the fees it paid on behalf of Byton.

### 2. Interpreter Fees.

EDAG requests that it be awarded $3,135.00 for Byton's share of the interpreter who helped during the hearing.  That seems reasonable because everyone benefited from the use of the court reporter and EDAG should not be responsible for Byton's use of the reporter.

Therefore, pursuant to JAMS Rule 24(c) the Arbitrator awards EDAG $3,135.00 to reimburse it for the Byton's use of the interpreter.

### 3. Court Reporter and Transcript Fees.

EDAG seeks reimbursement of $17,802.00 for Byton's share of the Arbitration Hearing Court Reporter.  Byton objects on the ground that the arbitrator did not order a court reporter, it did not have a role in choosing the court reporter and CCP Sec 1033.5(b)(5) prohibits recovery of court reporter costs not ordered by the court.

The Arbitrator did not specifically order the parties to engage a court reporter to transcribe the hearing testimony, but the arbitrator and all parties benefited from the transcript.  EDAG informed Byton it was going to engage a court reporter and if Byton did not share in the costs EDAG would seek reimbursement (Ex. B to EDAG's May 18 letter).  Apparently, Byton chose not to ask for a reporter.

All parties and the arbitrator found value in having a court reporter transcript available, but because it was not ordered by the arbitrator, the CCP would prohibit awarding these fees if we were in court.  JAMS Rule 24(c) permits an arbitrator to grant any remedies within the scope of the parties' agreement, but Sec.14.4(b) requires each side to bear their own costs.  These fees are not incurred by Byton and are EDAG's costs.  Therefore, the Arbitrator will DENY EDAG's request for reimbursement of the reporter fees.

### 4.  Mr. Slovesko and Mr. Twohig Deposition Costs.

Byton submitted Mr. Slovesko's and Mr. Twohig's deposition transcripts in place of in person testimony at the hearing.  It is "just and equitable" that the costs incurred for those depositions be borne by Byton and the Arbitrator orders that Byton be responsible for the $13,507.85 incurred in those depositions (JAMS Rule 24(c))[3].

In addition, Byton had an extra day of deposition per the Arbitrator's Order when certain questions were not answered during an earlier deposition.

### 5.  PMQ Deposition Costs.

The Arbitrator issued an order requiring this deposition (Ex. F. to EDAG's May 15 letter), and EDAG requests it be awarded $3,144.10 pursuant to JAMS Rule 6(c).  EDAG's request is DENIED, this was a deposition it conducted at its request and the fact that the Arbitrator ordered it does not mean it's not a EDAG cost and under Sec. 14.4(b) it cannot be awarded to EDAG.

---

[3]  Twohig Deposition cost: $7,159.25.  Slovesko Deposition cost: $6,348.60.  (See EDAG Ex. A.4 to EDAG's May 15, 2021, letter for Veritext invoices)

FINAL ARBITRATION AWARD, JAMS CASE NO. 1100107291

### 6. JAMS fees for Discovery Disputes

EDAG's May 18, 2021, letter does not explain in detail what this request relates to and the invoice attached as Ex.A.1 does not give any further detail.  Therefore, EDAG's request to be awarded $4,500 for Hearing Fees for Discovery Disputes is DENIED.

### 7. Summary of Costs Awarded.

A.  JAMS Hearing fees:  $72,800.00

B.  Interpreter Fees:      $ 3,135.00

C.  Depositions:          $13,507.85

      TOTAL          $89,442.85

These costs are awarded under the TDLA and JAMS Rules and were reasonable and necessary incurred by EDAG.

### E. Final Arbitration Award.

1.  EDAG is awarded €23,446,649 (or the equivocal in U.S. dollars, calculated by the then exchange rate as of the date of the final order) on its breach of contract claim and simple interest of 10% as of the date of this Final Arbitration Award.

2.  EDAG is awarded $89,442.85 in costs pursuant to the TDLA and JAMS Rules.

3.  BYTON shall recover nothing on its claims for breach of contract and negligence.


IT IS SO ORDERED.

Dated:  June 2, 2021

                          Hon. William J. Cahill (Ret.)
                          Arbitrator

FINAL ARBITRATION AWARD, JAMS CASE NO. 1100107291

## **PROOF OF SERVICE BY E-Mail**

Re: EDAG Engineering GmbH vs. BYTON North America Corporation
Reference No. 1100107291

I, Scott Schreiber, not a party to the within action, hereby declare that on  June 3, 2021, I served the

attached Final Arbitration Award on the parties in the within action by electronic mail at San Francisco,

CALIFORNIA, addressed as follows:


Evangeline Burbidge Esq.
Marc R. Lewis Esq.
Mr. Brad Estes
Lewis & Llewellyn LLP
601 Montgomery Street
Suite 2000
San Francisco, CA   94111
Phone: 415-800-0590
eburbidge@lewisllewellyn.com
mlewis@lewisllewellyn.com
bestes@lewisllewellyn.com
    Parties Represented:
    EDAG Engineering GmbH

Keith A. Sipprelle Esq.
David B. Van Etten Esq.
Van Etten Sipprelle LLP
2945 Townsgate Road
Suite 200
Westlake Village, CA   91361
Phone: 805-719-4900
ksipprelle@vstriallaw.com
dvanetten@vstriallaw.com
    Parties Represented:
    BYTON North America Corporation

Ms. Lillian Xu
Evelyn Shimazaki Esq.
BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA   95054
lillian.xu@byton.com
evelyn.shimazaki@byton.com
    Parties Represented:
    BYTON North America Corporation

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,

CALIFORNIA on  June 3, 2021.


//s// Scott Schreiber

_____
Scott Schreiber
JAMS
sschreiber@jamsadr.com

EXHIBIT B

| | |
|---|---|
| **From:** | Keith A. Sipprelle |
| **To:** | Evangeline A.Z. Burbidge |
| **Cc:** | Marc R. Lewis; Brad Estes |
| **Subject:** | RE: EDAG v. BYTON, JAMS Ref. No. 1100107291 / BYTON Document Production |
| **Date:** | Tuesday, November 10, 2020 11:04:52 AM |
| **Attachments:** | image001.png |

Evan: Byton has undertaken a reasonable and good faith search, and has produced the relevant documents it has been able to locate. As I believe you are aware, Byton North America has largely ceased operations and has only a skeletal staff remaining. Much of the institutional knowledge has been lost as a result of the mass departures of personnel.  Current personnel have attempted to locate additional EDAG-related documents, but have not been able to locate any additional materials.  There is simply nothing further that can be produced at this point.

Regards,

Keith A. Sipprelle
Partner

**VAN ETTEN SIPPRELLE**
T R I A L   L A W Y E R S

2945 Townsgate Road, Suite 200
Westlake Village, CA 91361

805.719.4904 Direct
805.719.4900 Main
805.719.4950 Fax
ksipprelle@vstriallaw.com
www.vstriallaw.com

===============================================================================

In compliance with IRS and other applicable tax practice standards, any advice in this message (including attachments) is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties or for the purpose of promoting, marketing or recommending to another party any tax-related matters.

Additionally, the contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or Van Etten Sipprelle LLP at Tel: 805-719-4900, immediately by telephone or by return e-mail and delete this message, along with any attachments, from your computer. Thank you.
===============================================================================

Non-Relevant

EXHIBIT C

| | |
|---|---|
| **From:** | Keith A. Sipprelle |
| **To:** | Evangeline A.Z. Burbidge; Scott Schreiber |
| **Cc:** | Marc R. Lewis; Brad Estes |
| **Subject:** | RE: EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291 / Third Party Subpoenas |
| **Date:** | Friday, November 20, 2020 3:22:22 PM |
| **Attachments:** | image001.png |

Evan and Scott: I have just been informed that the remaining IT employee at Byton has access to JIRA and Confluence, and that there may be some relevant documents that may exist on these databases that can be accessed. Byton will be undertaking a search of these databases for relevant documents as soon as it reasonably can. Thus, EDAG's request for issuance of subpoenas to JIRA and Confluence is moot.

As to JAMA, Byton no longer has access to this cloud-based storage platform. (Byton's access was terminated many months ago due to non-payment, and Byton lacks the funds to reinstate the service.) Byton has no objection to the issuance of a subpoena to JAMA. However, the subpoena should make clear that any documents produced by JAMA will be covered by the protective order.

Regards,

Keith A. Sipprelle
Partner

**VAN ETTEN SIPPRELLE**
T R I A L  L A W Y E R S

2945 Townsgate Road, Suite 200
Westlake Village, CA 91361

805.719.4904 Direct
805.719.4900 Main
805.719.4950 Fax
ksipprelle@vstriallaw.com
www.vstriallaw.com



Non-Relevant

# EXHIBIT D

```
 1                  IN ARBITRATION PROCEEDINGS OF

 2      JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC.

 3

 4    EDAG Engineering GmbH,

 5                     Claimant,

 6        vs.                          JAMS No. 1100107291

 7    Byton North America Corp.,

 8                     Respondent.
      _____/

 9

10                   *** CONFIDENTIAL ***

11               DEPOSITION OF SADHA KAMESWARAN

12           Person Most Qualified witness for

13                 Byton North America Corp.

14        appearing remotely at Menlo Park, California

15                 Tuesday, November 17, 2020

16

17

18

19

20

21

22    Job No. 4290795

23    Reported by:

      Natalie Y. Botelho

24    CSR No. 9897

25    Pages:  1 - 248

                                              Page 1
```

| | | |
|---|---|---|
| 1 | A.       We're aware of delays in some payments | 14:32:19 |
| 2 | between June and December of 2018 because of delays | 14:32:22 |
| 3 | in our incoming funding. | 14:32:25 |
| 4 | Q.       And then a payment was made in December of | 14:32:28 |
| 5 | 2018, you mentioned? | 14:32:30 |
| 6 | A.       Correct.  Correct. | 14:32:38 |
| 7 | Q.       And then in 2019, Byton stopped paying | 14:32:41 |
| 8 | EDAG again, correct? | 14:32:43 |
| 9 | A.       Don't have the entirety dates in front of | 14:32:56 |
| 10 | me here, but I would say that there were some token | 14:33:00 |
| 11 | payments made in 2019. | 14:33:04 |
| 12 | Q.       And eventually -- | 14:33:07 |
| 13 | A.       It was not like we completely stopped.  We | 14:33:13 |
| 14 | made an effort to pay some token payments where we | 14:33:16 |
| 15 | could. | 14:33:21 |
| 16 | Q.       Was there a point in 2019 when Byton | 14:33:22 |
| 17 | completely stopped paying EDAG? | 14:33:25 |
| 18 | A.       Yes, that would be correct. | 14:33:33 |
| 19 | Q.       Byton only made token payments in 2019 and | 14:33:36 |
| 20 | eventually stopped paying EDAG because Byton did not | 14:33:39 |
| 21 | have enough money? | 14:33:42 |
| 22 | A.       That is correct. | 14:33:47 |
| 23 | MR. ESTES:  I'll mark this as the next | 14:33:47 |
| 24 | exhibit in line, which I think is 60.  It's a | 14:33:49 |
| 25 | document with the first page Bates stamped | 14:33:52 |

Page 159

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | correct? | 14:43:22 |
| 2 | A.        Correct. | 14:43:25 |
| 3 | Q.        Has Byton paid any other creditors since | 14:43:25 |
| 4 | signing the July 28th, 2019 letter of confirmation? | 14:43:27 |
| 5 | A.        That would be Byton North America or Byton | 14:43:51 |
| 6 | globally? | 14:43:54 |
| 7 | Q.        Byton North America Corporation. | 14:43:55 |
| 8 | A.        As far as I can recall, nothing other than | 14:44:03 |
| 9 | the fundamental site operational cost and payroll | 14:44:05 |
| 10 | cost. | 14:44:11 |
| 11 | Q.        Are site operational costs things like | 14:44:14 |
| 12 | rent and like utility bills?   Is that what you mean? | 14:44:18 |
| 13 | A.        Correct. | 14:44:21 |
| 14 | Q.        When Byton signed the July 28th, 2019 | 14:44:27 |
| 15 | confirmation of payment, it did not include a | 14:44:31 |
| 16 | statement that Byton was refusing to pay due to | 14:44:33 |
| 17 | deficiencies in EDAG's work product, correct? | 14:44:35 |
| 18 | MR. SIPPRELLE:  Objection; argumentative, | 14:44:40 |
| 19 | document speaks for itself.  You can answer about | 14:44:41 |
| 20 | what the document says or doesn't say. | 14:44:52 |
| 21 | THE WITNESS:  The document says that we'll | 14:45:04 |
| 22 | make a payment by August 18th, and we were unable to | 14:45:05 |
| 23 | make the payment. | 14:45:11 |
| 24 | MR. ESTES:  Q.  The document does not say | 14:45:12 |
| 25 | anything about EDAG Engineering errors, correct? | 14:45:14 |

Page 166

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | at the arbitration in February -- from February 8th | 17:26:23 |
| 2 | to 19th, 2021? | 17:26:27 |
| 3 | A.      I will not be able to confirm that now. | 17:26:32 |
| 4 | Sorry. | 17:26:34 |
| 5 | Q.      Why not? | 17:26:35 |
| 6 | A.      Because I don't know what my schedule is. | 17:26:37 |
| 7 | Q.      But you can't think of any conflicts, | 17:26:39 |
| 8 | sitting here right now, correct? | 17:26:40 |
| 9 | A.      I cannot think of -- I cannot think of | 17:26:50 |
| 10 | anything, correct. | 17:26:53 |
| 11 | MR. ESTES:  Thank you.  Those are all my | 17:26:54 |
| 12 | questions.  Thank you for your time today, sir.  Do | 17:26:55 |
| 13 | you have any? | 17:26:57 |
| 14 | EXAMINATION BY MR. SIPPRELLE | 17:26:58 |
| 15 | MR. SIPPRELLE:  Q.  Yeah, I have a couple | 17:26:58 |
| 16 | of follow-up questions, Mr. Kameswaran.  I wanted to | 17:27:00 |
| 17 | clarify a little bit on your testimony about | 17:27:03 |
| 18 | document retention and what is available to Byton. | 17:27:07 |
| 19 | To your knowledge, has Byton in this case produced | 17:27:14 |
| 20 | the documents relating to the EDAG relationship that | 17:27:17 |
| 21 | it has access to? | 17:27:23 |
| 22 | A.      That's my understanding.  Everything that | 17:27:27 |
| 23 | was accessible has been provided. | 17:27:29 |
| 24 | Q.      Okay.  Now, are there -- is it your | 17:27:33 |
| 25 | understanding that there may be some documents | 17:27:36 |

Page 242

1    relating to the EDAG relationship that Byton -- that          17:27:39

2    may exist, but that Byton does not have access to?            17:27:44

3    A.        It is quite possible that there are                 17:27:50

4    documents that are not accessible because we do have          17:27:53

5    access issues on some portals that we are locked out          17:27:58

6    because of payment issues.                                    17:28:02

7    Q.        Okay.   Can you -- just so counsel                  17:28:04

8    understands what you're talking about, can you                17:28:07

9    explain these -- what these portals are and why               17:28:09

10   Byton does not have access to them?                           17:28:13

11   A.        So the cloud-based platforms that I                 17:28:16

12   mentioned previously, obviously those are                     17:28:19

13   pay-as-you-go service on a quarterly/half-yearly              17:28:25

14   basis, and we have not -- just like we have not made          17:28:30

15   payments to a number of suppliers, we have not made           17:28:33

16   payments to those, and their patience ran out, and            17:28:35

17   they stopped access to those services.                        17:28:43

18   Q.        And so would it be fair to say that Byton           17:28:47

19   cannot access those portals to see what may be                17:28:49

20   available on those cloud-based servers at the                 17:28:53

21   present time?                                                 17:28:57

22   A.        That would be correct.                              17:28:59

23   Q.        And would those portals, to your                    17:29:01

24   knowledge, include things like project circle                 17:29:03

25   reports, engineering, release authorizations, and             17:29:05

Page  243

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | the other types of documents that Counsel asked you | 17:29:11 |
| 2 | about earlier? | 17:29:14 |
| 3 | A.        That's correct. | 17:29:16 |
| 4 | Q.        Thank you.  I have no further questions. | 17:29:18 |
| 5 | Actually, let me just ask one follow-up question. | 17:29:20 |
| 6 | For Byton to be able to access those portals, what | 17:29:24 |
| 7 | kind of money are we talking about that Byton would | 17:29:30 |
| 8 | have to come up with to be able to get back onto | 17:29:32 |
| 9 | those drives? | 17:29:36 |
| 10 | A.        I don't -- | 17:29:40 |
| 11 | Q.        Do you have an estimate? | 17:29:42 |
| 12 | A.        I do not know the exact amount, but I'll | 17:29:42 |
| 13 | estimate it to be somewhere around half a million | 17:29:45 |
| 14 | dollars minimum. | 17:29:49 |
| 15 | Q.        Does Byton have anywhere near that kind of | 17:29:50 |
| 16 | money to be able to come current with those vendors? | 17:29:53 |
| 17 | A.        No. | 17:29:59 |
| 18 | MR. SIPPRELLE:  All right.  Thank you, | 17:30:00 |
| 19 | sir.  Nothing further. | 17:30:00 |
| 20 | FURTHER EXAMINATION BY MR. ESTES | 17:30:02 |
| 21 | MR. ESTES:  Q.  I just have a couple quick | 17:30:03 |
| 22 | follow-up questions based on that.  Sir, could you | 17:30:04 |
| 23 | give me the names of the vendors that Byton owes | 17:30:09 |
| 24 | money to that is preventing access to these portals? | 17:30:14 |
| 25 | A.        I do not know the names of the actual | 17:30:25 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | vendors because these are through like service | 17:30:28 |
| 2 | providers.  Yeah, so I wouldn't know the names of | 17:30:34 |
| 3 | the vendors specifically. | 17:30:38 |
| 4 | Q.        Who are the service providers? | 17:30:40 |
| 5 | A.        Sorry.  Could you repeat that, please? | 17:30:48 |
| 6 | Q.        Who are the service providers, then? | 17:30:49 |
| 7 | A.        Yeah, those are the vendors I'm saying | 17:30:55 |
| 8 | that I wouldn't know the names of.  There is names | 17:30:56 |
| 9 | of the software, but I don't know who the service | 17:31:03 |
| 10 | providers were. | 17:31:05 |
| 11 | Q.        Could you give me the names of the | 17:31:06 |
| 12 | software you're aware of? | 17:31:07 |
| 13 | A.        There was one system called Jama, J-A-M-A. | 17:31:11 |
| 14 | There was another system, Confluence.  And -- and | 17:31:19 |
| 15 | Jira, J-I-R-A. | 17:31:29 |
| 16 | Q.        And when approximately was Byton's access | 17:31:35 |
| 17 | revoked from these systems? | 17:31:38 |
| 18 | A.        I would say late last year or early this | 17:31:51 |
| 19 | year.  Don't know exact dates. | 17:31:53 |
| 20 | Q.        Late 2019 or early 2020? | 17:31:57 |
| 21 | A.        That would be correct. | 17:32:01 |
| 22 | Q.        And who would be the person most qualified | 17:32:04 |
| 23 | at Byton -- strike that. | 17:32:08 |
| 24 |           Who would be the person most qualified to | 17:32:11 |
| 25 | testify regarding Byton's access being revoked from | 17:32:13 |

Page 245

CONFIDENTIAL

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby

6   certify;

7          That the foregoing proceedings were taken

8   before me at the time and place herein set forth;

9   that any witnesses in the foregoing proceedings,

10  prior to testifying, were placed under oath; that a

11  verbatim record of the proceedings was made by me

12  using machine shorthand which was thereafter

13  transcribed under my direction; further, that the

14  foregoing is an accurate transcription thereof.

15          I further certify that I am neither

16  financially interested in the action nor a relative

17  or employee of any attorney or any of the parties.

18          IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:  November 30, 2020

22

23

24  _____

            NATALIE Y. BOTELHO

25          CSR No. 9897

                                        Page  248

EXHIBIT E

CONFIDENTIAL

```
 1              IN ARBITRATION PROCEEDINGS OF
 2     JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC.
 3
 4   EDAG Engineering GmbH,
 5                    Claimant,
 6       vs.                          JAMS No. 1100107291
 7   Byton North America Corp.,
 8                    Respondent.
     _____/
 9
10                  *** CONFIDENTIAL ***
11            DEPOSITION OF SADHA KAMESWARAN
12                 (personal capacity)
13       appearing remotely at Menlo Park, California
14             Wednesday, November 18, 2020
15
16
17
18
19
20
21
22   Job No. 4300026
23   Reported by:
     Natalie Y. Botelho
24   CSR No. 9897
25   Pages:  1 - 187
```

Page 1

```
 1    A.        Correct.                              14:08:24

 2    Q.        Did you speak with anyone else while we   14:08:25

 3    were off the record?                             14:08:27

 4    A.        No.                                   14:08:28

 5    Q.        Sitting here today, what is your best   14:08:30

 6    estimate of how much cash Byton has on hand?     14:08:32

 7              MR. SIPPRELLE:  All right.  So let me   14:08:38

 8    again interpose objections.  This is outside the   14:08:39

 9    scope of permissible discovery.  You are seeking   14:08:42

10    information regarding the current financial      14:08:48

11    condition of Byton.  Financial condition discovery   14:08:51

12    is only permitted under California law during -- in   14:08:56

13    cases in which there is a claim for punitive     14:09:01

14    damages, and you would need to get a court order, or   14:09:03

15    in this case an arbitrator's order, to permit that   14:09:07

16    discovery.                                       14:09:10

17              There is no such order.  There could not   14:09:12

18    be any such order because there's no punitive damage   14:09:13

19    claim.  So it's outside the scope of what you are   14:09:16

20    permitted to inquire into or obtain from Byton.   14:09:23

21              Subject to those objections,          14:09:27

22    Mr. Kameswaran will provide a response, which    14:09:31

23    we'll -- I'm going to let him do now.  Go ahead,   14:09:37

24    sir.                                             14:09:39

25              THE WITNESS:  So the money that we have is   14:09:44
```

Page 131

| | | |
|---|---|---|
| 1 | barely enough to cover our next payroll coming next | 14:09:47 |
| 2 | week, the end of November payroll. | 14:09:51 |
| 3 | MR. ESTES:  Q.  How much is the end of | 14:10:04 |
| 4 | November payroll? | 14:10:05 |
| 5 | MR. SIPPRELLE:  Same objections.  He has | 14:10:09 |
| 6 | provided what he's going to provide in response to | 14:10:12 |
| 7 | that question.  There will be no further details | 14:10:15 |
| 8 | provided regarding Byton's current financial | 14:10:19 |
| 9 | condition. | 14:10:23 |
| 10 | MR. ESTES:  Just to be clear, you're | 14:10:25 |
| 11 | instructing him not to answer? | 14:10:26 |
| 12 | MR. SIPPRELLE:  I've instructed him to | 14:10:29 |
| 13 | answer in the way he has answered, and I would -- | 14:10:30 |
| 14 | yes, I'm instructing him not to provide further | 14:10:34 |
| 15 | details regarding Byton's financial condition in | 14:10:37 |
| 16 | response to your question. | 14:10:40 |
| 17 | MR. ESTES:  And for the record, EDAG's | 14:10:43 |
| 18 | position is this information is directly relevant, | 14:10:45 |
| 19 | and EDAG is entitled to it because yesterday Byton's | 14:10:47 |
| 20 | most qualified witness testified that the reason | 14:10:50 |
| 21 | Byton can't produce the documents requested by EDAG | 14:10:53 |
| 22 | is because Byton lacks the $500,000 it needs to pay | 14:10:55 |
| 23 | its vendors that possess that document. | 14:10:59 |
| 24 | This also goes directly to EDAG's ability | 14:11:01 |
| 25 | to recover the $19 million that's still open in | 14:11:04 |

Page 132

| | | |
|---|---|---|
| 1 | approved invoices Byton has not paid, and we'll keep | 14:11:07 |
| 2 | this deposition open and reserve our right to go to | 14:11:10 |
| 3 | the Arbitrator and get an order that these questions | 14:11:11 |
| 4 | be answered and that it be done so at Byton's | 14:11:11 |
| 5 | expense.  This is now the second deposition where | 14:11:16 |
| 6 | you've improperly instructed a witness not to | 14:11:18 |
| 7 | answer. | 14:11:21 |
| 8 | MR. SIPPRELLE:  Mr. Kameswaran, let me ask | 14:11:22 |
| 9 | you this in response to Counsel's statement.  Does | 14:11:24 |
| 10 | Byton have enough money at the present time to come | 14:11:29 |
| 11 | current with the outside document vendors to allow | 14:11:33 |
| 12 | it to access those -- those network or cloud drives | 14:11:39 |
| 13 | where documents are being stored? | 14:11:46 |
| 14 | THE WITNESS:  No.  As I mentioned before, | 14:11:51 |
| 15 | the money is barely adequate to cover payroll, not | 14:11:53 |
| 16 | even any of the operational costs. | 14:11:58 |
| 17 | MR. SIPPRELLE:  Thank you. | 14:12:01 |
| 18 | THE WITNESS:  Referring to other things. | 14:12:03 |
| 19 | MR. SIPPRELLE:  Thank you.  Go ahead, | 14:12:06 |
| 20 | Counsel. | 14:12:06 |
| 21 | MR. ESTES:  Q.  What will happen if Byton | 14:12:07 |
| 22 | can't cover payroll? | 14:12:08 |
| 23 | MR. SIPPRELLE:  Objection; relevance, | 14:12:12 |
| 24 | calls for a legal -- you're asking him -- besides | 14:12:16 |
| 25 | getting sued by employees who aren't paid?  I mean, | 14:12:20 |

Page 133

CONFIDENTIAL

1

2

3

4          I, the undersigned, a Certified Shorthand

5     Reporter of the State of California, do hereby

6     certify;

7          That the foregoing proceedings were taken

8     before me at the time and place herein set forth;

9     that any witnesses in the foregoing proceedings,

10    prior to testifying, were placed under oath; that a

11    verbatim record of the proceedings was made by me

12    using machine shorthand which was thereafter

13    transcribed under my direction; further, that the

14    foregoing is an accurate transcription thereof.

15          I further certify that I am neither

16    financially interested in the action nor a relative

17    or employee of any attorney or any of the parties.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated:  November 30, 2020

22

23

24    _____

          NATALIE Y. BOTELHO

25        CSR No. 9897

                                        Page 187

# EXHIBIT F

| From: | Keith A. Sipprelle |
|---|---|
| To: | Jessica Llamas |
| Cc: | Kristin Orrantia; Charlotte Hayward; Evangeline A.Z. Burbidge; Marc R. Lewis; Brad Estes |
| Subject: | RE: EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291 |
| Date: | Thursday, December 10, 2020 2:40:30 PM |
| Attachments: | image002.png |
| | image003.png |

Hello, Jessica.  Unfortunately, my client BYTON North America is not in a position to make its deposit at this time.

Regards,

Keith A. Sipprelle
Partner

**VAN ETTEN SIPPRELLE**
T R I A L   L A W Y E R S
2945 Townsgate Road, Suite 200
Westlake Village, CA 91361

805.719.4904 Direct
805.719.4900 Main
805.719.4950 Fax
ksipprelle@vstriallaw.com
www.vstriallaw.com

================================================================================

In compliance with IRS and other applicable tax practice standards, any advice in this message (including attachments) is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties or for the purpose of promoting, marketing or recommending to another party any tax-related matters.

Additionally, the contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or Van Etten Sipprelle LLP at Tel: 805-719-4900, immediately by telephone or by return e-mail and delete this message, along with any attachments, from your computer. Thank you.
================================================================================

**From:** Jessica Llamas [mailto:JLlamas@jamsadr.com]
**Sent:** Tuesday, December 8, 2020 3:29 PM
**To:** eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com; Keith A. Sipprelle <ksipprelle@vstriallaw.com>; lillian.xu@byton.com; evelyn.shimazaki@byton.com; bestes@lewisllewellyn.com
**Cc:** korrantia@lewisllewellyn.com; chayward@lewisllewellyn.com; Shirley Cervantes <scervantes@vstriallaw.com>; Scott Schreiber <sschreiber@jamsadr.com>; Brian Palencia <BPalencia@jamsadr.com>
**Subject:** EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Good Afternoon Everyone,

**\*apologies, I had the wrong day listed on the email sent prior, please see corrected email below\***

This is a friendly reminder that the last day to cancel or continue this matter & <mark>all fees are due on</mark> <mark>**Thursday.**</mark> <mark>**12/10/20**</mark>.

In light of the circumstances related to COVID-19, JAMS associates are working remotely and are unable to provide U.S. Mail service at this time.  This will be served via email only.

Please let me know if there is anything further I can assist with at this time.

Kindly,
Jess



**Jessica Llamas** (she/her)
Case Coordinator

**JAMS - *Local Solutions. Global Reach.*<sup>TM</sup>**
2 Embarcadero Center | #1500| San Francisco, CA 94111
P: 415-982-5267   | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

Manage your case anytime, anywhere. **Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Jessica Llamas
**Sent:** Tuesday, December 8, 2020 3:26 PM
**To:** 'eburbidge@lewisllewellyn.com' <eburbidge@lewisllewellyn.com>; 'mlewis@lewisllewellyn.com' <mlewis@lewisllewellyn.com>; 'ksipprelle@vstriallaw.com' <ksipprelle@vstriallaw.com>; 'lillian.xu@byton.com' <lillian.xu@byton.com>; 'evelyn.shimazaki@byton.com' <evelyn.shimazaki@byton.com>; 'bestes@lewisllewellyn.com' <bestes@lewisllewellyn.com>
**Cc:** 'korrantia@lewisllewellyn.com' <korrantia@lewisllewellyn.com>; 'chayward@lewisllewellyn.com' <chayward@lewisllewellyn.com>; 'scervantes@vstriallaw.com' <scervantes@vstriallaw.com>; Scott Schreiber <sschreiber@jamsadr.com>; Brian Palencia <BPalencia@jamsadr.com>
**Subject:** EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Good Afternoon Everyone,

This is a friendly reminder that the last day to cancel or continue this matter & <mark>all fees are due on</mark> <mark>**Friday.**</mark> <mark>**12/10/20**</mark>.

In light of the circumstances related to COVID-19, JAMS associates are working remotely and are unable to provide U.S. Mail service at this time.  This will be served via email only.

Please let me know if there is anything further I can assist with at this time.

Kindly,
Jess



**Jessica Llamas** (she/her)
Case Coordinator

**JAMS** - *Local Solutions. Global Reach.*<sup>TM</sup>
2 Embarcadero Center | #1500| San Francisco, CA 94111
P: 415-982-5267   | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

Manage your case anytime, anywhere. **Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Jessica Llamas
**Sent:** Tuesday, December 1, 2020 3:24 PM
**To:** 'eburbidge@lewisllewellyn.com' <eburbidge@lewisllewellyn.com>; 'mlewis@lewisllewellyn.com' <mlewis@lewisllewellyn.com>; 'ksipprelle@vstriallaw.com' <ksipprelle@vstriallaw.com>; 'lillian.xu@byton.com' <lillian.xu@byton.com>; 'evelyn.shimazaki@byton.com' <evelyn.shimazaki@byton.com>; 'bestes@lewisllewellyn.com' <bestes@lewisllewellyn.com>
**Cc:** 'korrantia@lewisllewellyn.com' <korrantia@lewisllewellyn.com>; 'chayward@lewisllewellyn.com' <chayward@lewisllewellyn.com>; 'scervantes@vstriallaw.com' <scervantes@vstriallaw.com>; Scott Schreiber <sschreiber@jamsadr.com>
**Subject:** RE: EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Good Afternoon Everyone,

This is a friendly reminder that the last day to cancel or continue this matter & all fees are due on **12/10/20**.

In light of the circumstances related to COVID-19, JAMS associates are working remotely and are unable to provide U.S. Mail service at this time.  This will be served via email only.

Please let me know if there is anything further I can assist with at this time.

Kindly,
Jess



**Jessica Llamas** (she/her)
Case Coordinator

**JAMS** - *Local Solutions. Global Reach.*<sup>TM</sup>
2 Embarcadero Center | #1500| San Francisco, CA 94111

P: 415-982-5267   | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

Manage your case anytime, anywhere. **Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Jessica Llamas
**Sent:** Monday, November 16, 2020 1:51 PM
**To:** eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com; ksipprelle@vstriallaw.com;
lillian.xu@byton.com; evelyn.shimazaki@byton.com; bestes@lewisllewellyn.com
**Cc:** korrantia@lewisllewellyn.com; chayward@lewisllewellyn.com; scervantes@vstriallaw.com; Scott
Schreiber <sschreiber@jamsadr.com>
**Subject:** RE: EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Good Afternoon Everyone,

This is a friendly reminder that the last day to cancel or continue this matter & all fees are due on
**12/10/20**.

In light of the circumstances related to COVID-19, JAMS associates are working remotely and are unable to
provide U.S. Mail service at this time.  This will be served via email only.

Please let me know if there is anything further I can assist with at this time.

Kindly,
Jess



**Jessica Llamas** (she/her)
Case Coordinator

**JAMS -** *Local Solutions. Global Reach.*^TM
2 Embarcadero Center | #1500| San Francisco, CA 94111
P: 415-982-5267   | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

Manage your case anytime, anywhere. **Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Jessica Llamas
**Sent:** Monday, November 2, 2020 11:21 AM
**To:** 'eburbidge@lewisllewellyn.com' <eburbidge@lewisllewellyn.com>; 'mlewis@lewisllewellyn.com'

<mlewis@lewisllewellyn.com>; 'ksipprelle@vstriallaw.com' <ksipprelle@vstriallaw.com>;
'lillian.xu@byton.com' <lillian.xu@byton.com>; 'evelyn.shimazaki@byton.com'
<evelyn.shimazaki@byton.com>; 'bestes@lewisllewellyn.com' <bestes@lewisllewellyn.com>
**Cc:** 'korrantia@lewisllewellyn.com' <korrantia@lewisllewellyn.com>; 'chayward@lewisllewellyn.com'
<chayward@lewisllewellyn.com>; 'scervantes@vstriallaw.com' <scervantes@vstriallaw.com>; Scott
Schreiber <sschreiber@jamsadr.com>
**Subject:** EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Good Morning Everyone,

This is a friendly reminder that the last day to cancel or continue this matter & all fees are due on
**12/10/20**.

In light of the circumstances related to COVID-19, JAMS associates are working remotely and are unable to
provide U.S. Mail service at this time.  This will be served via email only.

Please let me know if there is anything further I can assist with at this time.

Kindly,
Jess



**Jessica Llamas**
Case Coordinator

**JAMS - Local Solutions. Global Reach.**$^{TM}$
2 Embarcadero Center | #1500| San Francisco, CA 94111
P: 415-982-5267   | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

Manage your case anytime, anywhere. **Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

---

**From:** Jessica Llamas
**Sent:** Monday, October 12, 2020 5:02 PM
**To:** eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com; ksipprelle@vstriallaw.com;
lillian.xu@byton.com; evelyn.shimazaki@byton.com; bestes@lewisllewellyn.com
**Cc:** korrantia@lewisllewellyn.com; chayward@lewisllewellyn.com; scervantes@vstriallaw.com; Scott
Schreiber <sschreiber@jamsadr.com>
**Subject:** EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Good Afternoon Everyone,

Please find the attached Notice of Hearing & corresponding deposit requests in regards to this arbitration
with Judge Cahill. The last day to cancel or continue this matter & all fees are due on **12/10/20**.

In light of the circumstances related to COVID-19, JAMS associates are working remotely and are unable to provide U.S. Mail service at this time.  This will be served via email only.

Please let me know if there is anything further I can assist with at this time.

Kindly,
Jess



**Jessica Llamas**
Case Coordinator

**JAMS - *Local Solutions. Global Reach.*** *TM*
2 Embarcadero Center | #1500| San Francisco, CA 94111
P: 415-982-5267   | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

Manage your case anytime, anywhere. **Register now for JAMS Access**.
Follow us on **LinkedIn** and **Twitter**.

# EXHIBIT G

1                    JAMS ARBITRATION

2

3

4    EDAG ENGINEERING GMBH,              )
                                         )
5                    Claimant,           )
                                         )
6    v.                                  ) JAMS Reference No.
                                         )    1100107291
7    BYTON NORTH AMERICA CORPORATION,  )
                                         )
8                    Respondent.         )
     _____)
9                                        )
     BYTON NORTH AMERICA CORPORATION,  )
10                                       )
                     Counter-Claimant,  )
11                                       )
     v.                                  )
12                                       )
     EDAG ENGINEERING GMBH,              )
13                                       )
                     Counter-Respondent.)
14   _____)

15

16            C O N F I D E N T I A L

17

18     REPORTER'S TRANSCRIPT OF ARBITRATION PROCEEDINGS

19         ALL PARTIES APPEARING REMOTELY VIA ZOOM

20                  FEBRUARY 17, 2021

21        ARBITRATOR:  HON. WILLIAM J. CAHILL (RET.)

22

23

24   VOLUME VII              REPORTED BY:

25   PAGES 788 TO 936        SUSAN E. LANSING, CSR NO. 6355

                                       Page 788

1    through a financial distress and it was every supplier

2    had the same issue as EDAG.  And we needed the key

3    suppliers like EDAG to help us get to the finish line.

4    That is our only way of generating revenue.

5        Q.   So my statement was correct that Byton was

6    interested in EDAG's work but Byton couldn't pay for it?

7        A.   Yes, Byton was interested in EDAG's work.

8    EDAG's support.

9        Q.   And Byton couldn't pay for it?

10       A.   Yes, Byton could not pay as per those payment

11   plans that were provided to EDAG.

12       Q.   And we agree that it was only after EDAG

13   stopped working did Byton claim EDAG owed Byton

14   $31 million due to engineering errors; right?

15            MR. SIPPRELLE:  Object; argumentative.

16            THE ARBITRATOR:  I think you've established

17   that, but go ahead.  Overruled.

18            THE WITNESS:  From my understanding, there were

19   a number of discussions between our Purchasing Team and

20   EDAG about engineering errors and, and what it is

21   costing Byton, maybe not specified the exact numbers at

22   the time.  And when the relationship broke, Byton took

23   on the task of analyzing the losses and damages and

24   consolidated debt.

25       Q.   BY MR. ESTES:  If we go to the first page of

CONFIDENTIAL

```
1    STATE OF CALIFORNIA        )

                                )  ss.

2    COUNTY OF VENTURA          )

3

4         I, SUSAN E. LANSING, a Certified Shorthand Reporter

5    for the State of California, do hereby certify:

6         That the foregoing proceedings were taken down by

7    me in shorthand at the time and place therein named, via

8    Zoom, and thereafter reduced to typewriting under my

9    direction, and the same is a true and correct and

10   complete transcript of said proceedings;

11        I further certify that I am neither counsel for nor

12   related to any party to said action nor in any way

13   interested in the outcome thereof.

14        WITNESS my hand this 22nd day of February, 2021.

15

16

17

18

19

20

21

22

23

24

25        SUSAN E. LANSING, CSR NO. 6355
```

Page 936

# EXHIBIT H

| | |
|---|---|
| **From:** | Keith A. Sipprelle |
| **To:** | Scott Schreiber |
| **Cc:** | Kristin Orrantia; Jayli Miller; Evangeline A.Z. Burbidge; Marc R. Lewis; Brad Estes |
| **Subject:** | RE: EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291 |
| **Date:** | Wednesday, September 22, 2021 1:52:07 PM |
| **Attachments:** | image002.png |
| | image003.png |

Hi, Scott. Unfortunately, my client is not in a position to pay JAMS anything in connection with this matter. Presumably, EDAG will cover the full cost (which would be appropriate in any event as EDAG has brought this matter to Judge Cahill for resolution).

Regards,

Keith A. Sipprelle
Partner

**VAN ETTEN SIPPRELLE**
T R I A L   L A W Y E R S

2945 Townsgate Road, Suite 200
Westlake Village, CA 91361

805.719.4904 Direct
805.719.4900 Main
805.719.4950 Fax
ksipprelle@vstriallaw.com
www.vstriallaw.com

=================================================================================

In compliance with IRS and other applicable tax practice standards, any advice in this message (including attachments) is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties or for the purpose of promoting, marketing or recommending to another party any tax-related matters.

Additionally, the contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or Van Etten Sipprelle LLP at Tel: 805-719-4900, immediately by telephone or by return e-mail and delete this message, along with any attachments, from your computer. Thank you.
=================================================================================

**From:** Scott Schreiber [mailto:sschreiber@jamsadr.com]
**Sent:** Wednesday, September 22, 2021 11:19 AM
**To:** eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com; Keith A. Sipprelle
<ksipprelle@vstriallaw.com>; lillian.xu@byton.com; evelyn.shimazaki@byton.com;
bestes@lewisllewellyn.com; David B. Van Etten <dvanetten@vstriallaw.com>
**Cc:** korrantia@lewisllewellyn.com; Shirley Cervantes <scervantes@vstriallaw.com>; Jayli Miller
<JMiller@jamsadr.com>
**Subject:** RE: EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Dear Counsel,

Please disregard the last email transmission that included the deposit request for this matter as it was sent in error.  The attached deposit requests are split 50/50 and are due upon receipt.  Please note Judge Cahill will not be able to issue any rulings until payment is received.

Thank you,
Scott



**Scott Schreiber**
Senior Case Manager

**JAMS -** *Local Solutions. Global Reach.*^TM
2 Embarcadero Center, Suite 1500
San Francisco, CA 94111
P: 415-774-2615  F:  415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn**, **Facebook** and **Twitter**.

**Our Moderators Make Remote and Hybrid Sessions Seamless**
*Your case management team includes a JAMS Virtual ADR Moderator. **Learn more about our moderators***.

---

**From:** Scott Schreiber
**Sent:** Tuesday, September 21, 2021 4:04 PM
**To:** eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com; ksipprelle@vstriallaw.com; lillian.xu@byton.com; evelyn.shimazaki@byton.com; bestes@lewisllewellyn.com; dvanetten@vstriallaw.com
**Cc:** korrantia@lewisllewellyn.com; scervantes@vstriallaw.com; Jayli Miller <JMiller@JAMSADR.com>
**Subject:** EDAG Engineering GmbH vs. BYTON North America Corporation - JAMS Ref No. 1100107291

Dear Counsel,

Please see attached Order signed by Judge Cahill.  It will be served via email only.

Also attached is a retainer addressed to EDAG to cover the Judge Cahill's time in this matter.

Thank you,
Scott



**Scott Schreiber**
Senior Case Manager

**JAMS -** *Local Solutions. Global Reach.*^TM
2 Embarcadero Center, Suite 1500
San Francisco, CA  94111
P: 415-774-2615 | F: 415-982-5287
**www.jamsadr.com**

Follow us on **LinkedIn** and **Twitter**.

**Successfully Resolve Your Case Remotely**
**Check Out the JAMS Videoconferencing Page to Get Started**

LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (Bar No. 266966)
eburbidge@lewisllewellyn.com
Marc R. Lewis (Bar No. 233306)
mlewis@lewisllewellyn.com
Bradley E. Estes (Bar No. 298766)
bestes@lewisllewellyn.com
Kenneth M. Walczak (Bar No. 247389)
kwalczak@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:      (415) 800-0590
Facsimile:      (415) 390-2127

Attorneys for Claimant
EDAG Engineering GmbH

JAMS REFERENCE NO. 1100107291

IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

| | |
|---|---|
| EDAG Engineering GmbH, | **CASE NO: 3:21-cv-04736-EMC** |
| Claimant, | **DECLARATION OF VOLKER AMELUNG IN SUPPORT OF PLAINTIFF EDAG'S MOTION FOR PRELIMINARY INJUNCTION SE** |
| v. | |
| BYTON North America Corporation, | |
| Respondent. | Hon. William J. Cahill (ret.) |
| | Arbitration:  February 8, 2021 |
| AND RELATED CROSS-CLAIM. | |

LEWIS + LLEWELLYN LLP

I, Volker Amelung, declare as follows:

1. I am over the age of eighteen. This declaration is based on my own personal knowledge, unless where stated on information and belief, and if called to do so, I could and would testify competently to those matters stated herein.

2. In 1988, I obtained the German equivalent of Bachelors of Science in Mechanical Engineering, majoring in Vehicle Engineering & Concepts and minoring in Structures and Durability, at the University of Applied Science in Hamburg, Germany.

3. I am a Mechanical Engineer and have worked in the field for over 30 years.

4. I am currently employed by EDAG Engineering GmbH and work in Fulda, Germany.

5. I have worked at EDAG for 28 years and my current title is Project Director in the of Product Development department at EDAG. During my time at EDAG, I have held multiple titles, including Design Engineer, Team Leader, and Director of Product Engineering, among others. I was promoted to CEO of EDAG North America from 2006 to 2010 and then, after leaving to work at an electric car start-up, returned to EDAG in 2014 to the Product Director role.

6. I have helped engineer 25 to 30 cars during my career as a Mechanical Engineer and have designed at least five cars from scratch, including the Hummer H2, Hummer H3, Saturn L and Volkswagen Sharan among others.

7. I personally helped negotiate the contract at issue between EDAG and BYTON North America Corporation. A true and correct copy of the full contract, the Technology Development and License Agreement ("TDLA"), is attached as **Exhibit A.**

8. A true and correct copy of the Technology Development and License Agreement without its confidential schedules is attached as **Exhibit B.**

9. I also was in charge of the day-to-day operations and management of EDAG's work for BYTON under the TDLA and have personal knowledge of the working relationship between the companies.

10. I testified under oath for several days during the February 8 to 19, 2021 arbitration regarding both the contract and the relationship, as both a lay witness and an industry expert.

1

AMELUNG DECLARATION ISO EDAG'S MOTION FOR PI
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

11.     When the relationship between EDAG and BYTON began in 2016, BYTON was called "Future Mobility Corporation" or "FMC."  To the best of my knowledge, BYTON's parent company or companies are based in China and may retain the "FMC" name.

12.     Under the TDLA, EDAG was hired to design, from scratch, the M-BYTE electric vehicle for BYTON.  In exchange, EDAG was to receive payment of 50.6 Million Euro.  This was a fixed price contract and EDAG did all the work required to design these parts of the car without an increase in payments, even if the part required multiple redesigns.

13.     I was personally involved in the design and redesign of M-BYTE components and the invoicing process.  Based on my personal knowledge, BYTON would not approve an EDAG invoice unless it accepted the work EDAG had done designing the car component.  The components EDAG was hired to design are detailed in Schedule A to the TDLA, which is included in Exhibit A.

14.     I personally helped create a demonstrative of the parts of the car that EDAG was hired to design under the TDLA.  A true and correct version of that demonstrative is attached as **Exhibit C**.

15.     During my time working on the M-BYTE project with BYTON, I spent approximately four years and thousands of hours planning, designing, reviewing, re-designing, adjusting and working on the M-BYTE car.  I have detailed knowledge of the car, its design, and the intellectual property EDAG created.

16.     While working on this project, I became very familiar with the various technical systems used by BYTON, including Jama Software.  Jama Software hosts data on the cloud and was used by BYTON for managing all requirements and specifications of the M-BYTE vehicle and systems, including the test procedures and reports.  To the best of my knowledge, BYTON still uses Jama Software for this purpose with regard to the M-BYTE.  During my time working with BYTON, all system and validation engineers—including myself and my EDAG colleagues—had access to the Jama Software system and participated in uploading and maintaining all BYTON's specifications and requirements for the M-BYTE vehicle to this system.

17.     Based on my personal knowledge of EDAG's work on the M-BYTE, all the

2

LEWIS +
LLEWELLYN
LLP

1   intellectual property created by EDAG under the TDLA related to requirements and specifications

2   was uploaded to and stored on the cloud maintained by Jama.

3       18.     On September 13, 2021, I was asked to compare pictures of a rumored M-BYTE

4   prototype being driven in China, as reported by CarNews China.com, against the M-BYTE that

5   EDAG helped design.  A true and correct copy of the article that I accessed online on September 13,

6   2021 is attached as **Exhibit D.**

7       19.     I compared the CAD data on our systems for the parts of the M-BYTE that EDAG

8   designed to the images reported by CarNewsChina.com.  I spent approximately 2 days comparing

9   the designs.  A true and correct copy of the comparison I created is attached as **Exhibit E.**

10      20.     In my opinion, based on my years of experience in the field and the thousands of

11  hours working on the M-BYTE vehicle, I have no doubt that the vehicle depicted in the photographs

12  is the M-BYTE, containing the intellectual property created by EDAG, including but not limited to

13  the Body, Exterior, Interior, Passive Safety items depicted in Exhibit C.

14      I declare under the penalty of perjury under the law of the state of California that the

15  foregoing is true and correct.

16      Executed on September 17, 2021 in Fulda, Germany.

17

18  _____

19  Volker Amelung,
    Project Director of PD/Project

20  Management
    EDAG Engineering GmbH

21

22

23

24

25

26

27

28

AMELUNG DECLARATION ISO EDAG'S MOTION FOR PI
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

# EXHIBIT A

## TECHNOLOGY DEVELOPMENT AND
## LICENSE AGREEMENT

This Technology Development and License Agreement (the "Agreement") is effective as of the 1st day of June, 2017 (the "Effective Date") and is made this 20th day of October, 2018 by and among BYTON North America Corporation, a Delaware corporation with offices at 4201 Burton Drive, Santa Clara, California, 95054, on behalf of itself and its Affiliates (collectively, "BYTON") and EDAG Engineering GmbH ("Supplier"), located at Kreuzberger Ring 40, 65205 Germany (BYTON and Supplier are individually a "Party" and collectively, "Parties").

### WITNESETH

WHEREAS, BYTON is in the business of designing, developing, manufacturing, and delivering electric vehicles, which will be initially manufactured and sold in China, and thereafter in the United States, Europe and other countries, and requires certain services and support; and

WHEREAS, Supplier is able to provide such services and support, and both BYTON and Supplier now desire to memorialize the terms and conditions relating thereto;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### 1.0 DEFINITIONS

When used herein, the following terms shall be defined as follows:

1.1 "Acceptance Requirements" means the Specifications, the acceptance criteria relative to the Deliverables, and the plan and associated test environment against which BYTON will test conformance of the Deliverables in accordance with the documents set forth in a Statement of Work or as otherwise agreed by the parties in writing.

1.2 "Affiliates" shall mean with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity. For purposes of the Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

1.3 "Background Technology" means all Technology that (i) is owned or otherwise controlled by Supplier and (ii) is either (1) in existence on or prior to the Effective Date or (2) conceived, created, developed, reduced to practice or made by or on behalf of Supplier after the Effective Date independently of the activities contemplated by this Agreement.

1.4 "BYTON Product(s)" means any product(s) made by or for BYTON that incorporates or is distributed for use in conjunction with the Deliverables or a portion thereof.

1.5 "Confidential Information" means information which if disclosed (i) in tangible form, is clearly marked as "confidential" or "proprietary" at the time of disclosure, or (ii) in intangible form (such as orally or visually), the disclosing Party clearly identifies as "confidential" or "proprietary" at the time of disclosure and summarizes in writing and delivers to the receiving Party within thirty (30) days of disclosure.

1.6 "Deliverables" means the specific deliverables which Supplier is to provide to BYTON under a Statement of Work

1/15                                                                 C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**EXHIBIT**

**3**

kf

EDG-0035531

3-001

and such other Background Technology which Supplier provides to or makes available to BYTON in connection with a Statement of Work.

1.7 "Derivative Matter" means any work or invention, new material, information or data which is based in whole or in part upon the Background Technology and Foreground Technology, (including, if applicable, any BYTON Products) and any Intellectual Property Rights associated therewith, including any derivative work, improvement, extension, revision, modification, translation, abridgment, condensation, expansion, collection, compilation, Error Correction, or any other form in which the Background Technology and Foreground Technology may be recast, transformed or adapted, including any changes thereto or that is an implementation of the functionality described in any Specifications or similar documentation developed by or for BYTON pursuant to this Agreement.

1.8 "Documentation" means collectively the technical documentation, training materials, support materials, and end-user documentation associated with the Deliverables.

1.9 "Error" means with respect to the Deliverables, a failure to meet the Acceptance Requirements, including any defect or deficiency or failure to conform to the then-current functional, operational and performance Specifications and Documentation. It is not an Error when the functional, operational and performance Specifications and Documentation are met but the Specifications prove to be erroneous or dysfunctional or when target adjustments have to be made during the development process.

1.10 "Error Correction" means a modification, addition or procedure to correct an Error.

1.11 "Foreground Technology" means all Technology which is created, developed, or otherwise generated by Supplier under this Agreement.

1.12 "Intellectual Property Rights" means worldwide common law and statutory rights associated with (i) patents and patent applications; (ii) works of authorship, including mask work rights, copyrights, copyright applications, copyright registrations and "moral" rights; (iii) the protection of trade and industrial secrets and confidential information; (iv) other proprietary rights relating to intangible intellectual property (specifically excluding trademarks, tradenames and service marks); (v) analogous rights to those set forth above; and (vi) divisions, continuations, renewals, reissuances and extensions of the foregoing (as applicable) now existing or hereafter filed, issued or acquired.

1.13 "Services" means any task performed, such as consultancy services, to complete the project in accordance with the agreed responsibilities pursuant to a Statement of Work.

1.14 "Source Code" means program code in high-level computer language readable by humans skilled in the language, and includes available related Documentation and tools, including comments, internal development tools and build environments.

1.15 "Specifications" means the functional, operational and performance requirements for the Deliverables.

1.16 "Statement of Work" means the development plan, including deliverables and associated milestones, and the development schedule set forth in a written document. The Parties may enter into multiple individual Statements of Work under this Agreement. Each Statement of Work entered into by the Parties shall be part of the Agreement, as defined.

1.17 "Technology" means inventions, business, marketing, engineering, technical and manufacturing information, know-how and materials, including technology, software, instrumentation, specifications, designs, devices, data, compositions, formulas, , assays, reagents, constructs, compounds, discoveries, procedures, processes, practices,

C_BYTON_BDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER  EDG-0035532

3-002

protocols, methods, techniques, results of experimentation or testing, knowledge, trade secrets, skill and experience, in each case whether or not patentable or copyrightable; the foregoing may be in both tangible and intangible form.

## 2.0 DEVELOPMENT

2.1 Development Undertaking. Supplier will design, develop and create the Deliverables and perform all Services, conforming to the Acceptance Requirements and in accordance with the applicable Statement of Work created under this Agreement. For the avoidance of doubt, Supplier will not be an exclusive supplier of the services regarding the project as a whole, but only with respect to the agreed Deliverables and Services pursuant to this contract. BYTON carries the overall responsibility for the Project as a whole.
Should the development process show that target adjustments are necessary in order to achieve the overall target of a functional vehicle fit for homologation in the jurisdiction of the European Union, the United States of America and China, these target adjustments are not considered erroneous.

2.2 Obligations in Support of Development. To ensure the timely and satisfactory completion of Supplier's development work under the Statement of Work, Supplier will deploy throughout the development sufficient and qualified personnel, equipment and other necessary resources to complete Supplier's development work. BYTON will provide all necessary data and perform all duties in accordance with FPDP Gate Deliverables Full Checklist to enable Supplier's performance. For all of Supplier's development work and provision of Services, Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement. Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement. Supplier may employ individual independent contractors as part of its workforce but shall not be permitted to delegate or subcontract the performance of its duties and obligations to any third party without the prior written consent of BYTON. Supplier remains responsible for compliance with the terms and conditions of the Agreement whether performed by Supplier or an authorized third party.

For Supplier personnel who are visiting and onsite at BYTON facilities, the additional obligations set forth in Section 13 below shall apply.

2.3 Status Reports. Supplier will provide to BYTON written engineering status reports, on an every-other-week basis (or as requested basis) detailing the status of the development work described in the Statement of Work. Supplier shall provide more frequent updates and status reports upon BYTON's request.

2.4 Change Requests. Some evolution of the Specifications and the Statement of Work based upon interaction between the Parties is expected and minor modifications which will not impact full compliance with the Statement of Work (including milestones) or fees due under this Agreement may be mutually agreed to by the Parties and need not be achieved by a formal change mechanism. However, changes impacting full compliance with the Statement of Work or fees payable are only valid if implemented in accordance with the following change request procedure. BYTON may request any change to the Specifications or the Statement of Work by setting forth the proposed change in reasonable detail in a writing (including email) submitted to Supplier ("Change Request"). Supplier shall respond in writing to Change Requests within three (3) workdays of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, the impact on the Statement of Work and any additional fees which Supplier would require in order to make the requested change ("Change Response"). BYTON shall respond promptly informing Supplier whether it agrees with Supplier's description of the anticipated impact and additional terms, if any, proposed in the Change Response. Once an authorized representative of BYTON agrees in writing to the terms and conditions outlined in the Change Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Change Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance

3/15                                               C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

with previous agreed terms during these 48 hours as time is of essence.

2.5 Enhancements. BYTON, at its option, may request enhancements to the Deliverables by setting forth the proposed change in reasonable detail (including email) submitted to Supplier ("Enhancement Request"). Supplier shall respond in writing to Enhancement Requests within ten (10) days of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, any additional fees which Supplier would require in order to make the requested change ("Enhancement Request Response"). BYTON shall respond promptly within 48 hours, informing Supplier whether it agrees with Supplier's additional terms, if any, proposed in the Enhancement Request Response. Once an authorized representative of BYTON agrees in writing to the Enhancement Request Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Enhancement Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance with previous agreed terms during these 48 hours as time is of essence.

2.6 BYTON's and Supplier's Obligations. In furtherance of this Agreement, BYTON and Supplier shall (a) cooperate and work together in all matters relating to the services provided hereunder; (b) respond promptly to a Party's request to provide direction, information, approvals, authorizations or decisions that are reasonably necessary for or related to a Statement of Work in a timely manner.

## 3.0 TRANSFER AND DELIVERY

3.1 Background Technology. If required under a Statement of Work in accordance with 1.5, Supplier will deliver to BYTON the Background Technology (including without limitation Documentation thereto) within five (5) days if feasible, or as otherwise agreed to by the parties if not feasible, after payment pursuant to the agreed payment schedule.

3.2 Deliverables and the Developed Technology. Supplier will deliver to BYTON each Deliverable (including the Foreground Technology therein and related Documentation), in the form(s) set forth in a Statement of Work, not later than the date set forth therein for testing in accordance with the Acceptance Requirements. In addition, Supplier will provide to BYTON such technical documentation as may be reasonably required to enable BYTON to install and test each Deliverable as anticipated by the Acceptance Requirements.

3.3 Delays. TIME IS OF THE ESSENCE. Supplier's delivery to BYTON of the Deliverables in accordance with this Section 3.0 ("Transfer and Delivery") and Supplier's completion of all Deliverables, Foreground Technology and Documentation thereto in accordance with the schedule set forth in the Statement of Work are key to the success of the BYTON Product(s). BYTON will provide all necessary information and perform all duties in a timely fashion to enable Supplier performing in accordance with the master timing.

3.4 Means of Delivery. All deliveries to BYTON shall be made DDP Destination (INCO Terms, 2010) and pursuant to BYTON's written instructions with respect to form (physical or electronic) and location. For the delivery of any physical items, taxes or duties, fees, charges, stamp taxes, etc. of any kind are borne by BYTON. Supplier agrees to support BYTON where possible and is entitled to charge these services in accordance with its offer.

## 4.0 TESTING AND ACCEPTANCE

4.1 Test Method. The Deliverables requiring machine execution will be tested in the test environment described in the Acceptance Requirements. The Foreground Technology and Deliverables not requiring machine execution will be compared to the requirements of the Acceptance Requirements.

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                                    **EDG-0035534**

**3-004**

4.2 Acceptance Procedure.

    a.  BYTON may, in BYTON's sole discretion, reject the Deliverables or any component thereof, if it contains any Error. BYTON will promptly notify Supplier in writing of BYTON's acceptance or rejection ("Error Notice"). In each Error Notice, BYTON will set forth, in reasonable detail, the reason for the rejection.

    b.  Upon rejection of the Deliverables, Supplier shall either (i) create and implement an Error Correction for each identified Error and resubmit the relevant portion of the Deliverable to BYTON for retesting within three (3) workdays of BYTON's Error Notice, or (ii) if it is impracticable to provide an Error Correction in such three (3) workday period, within three (3)workdays of BYTON's Error Notice, provide to BYTON a written plan to correct the identified Error(s), including a schedule therefor ("Correction Plan").

Failure of the Deliverables to pass BYTON's acceptance tests following implementation of Error Correction(s) as contemplated above, or failure of Supplier and BYTON to agree upon a Correction Plan within three (3) days after Supplier provides such Correction Plan to BYTON or Supplier's failure to fully comply with an agreed upon Correction Plan, will entitle BYTON, in BYTON's sole discretion, to (i) require Supplier to again undertake creation and implementation of an Error Correction for resubmission and testing pursuant to this Section; (ii) accept the relevant portion of the Deliverables and correct the Error itself offsetting its reasonable costs against any associated fees; (iii) accept the relevant portion of the Deliverables, reserving BYTON's rights to require Supplier to correct the Error; or (iv) deem such event a material breach of this Agreement which cannot be cured, immediately terminate this Agreement in accordance with Section 9.2 ("Breach and Termination"), and Supplier shall refund any fees that have been paid (for any noncompliant Deliverables) under the Statement of Work in Question for this particular item.

## 5.0 LICENSE GRANTS AND RESTRICTIONS

5.1 Supplier's License Grants and Restrictions.

    a.  Background Technology License.  Supplier hereby grants to BYTON, a royalty-free, fully paid up, non-exclusive, perpetual, irrevocable and worldwide license under Supplier's Intellectual Property Rights to, in any fashion BYTON may choose (including, but not limited to, community source and/or open source licensing), (i) use, reproduce, modify,  prepare Derivative Matter of, compile, publicly perform, publicly display, demonstrate, Background Technology and Derivative Matter thereof (including in Source Code or object code form) on any media or via any electronic or other method now known or later discovered; (ii) make, have made, use, sell, offer to sell, import and otherwise exploit the Background Technology and Derivative Matter thereof (including in Source Code or object code form) in any manner and on any media or via any electronic or other method now known or later discovered; (iii) disclose, distribute and otherwise exploit the Background Technology and Derivative Matter and (iv) sublicense the foregoing rights to third parties through multiple tiers of sublicensees or other licensing mechanisms at BYTON's option for Background Technology and Derivative Matters necessary for the Project.

    b.  Third Party Licenses.  Supplier shall not incorporate any third-party materials, information or intellectual property, including without limitation, any open source software (Source Code or object code form) made generally available to the public under open source licenses (collectively, "Third Party Materials") into any of the Deliverables unless Supplier has obtained for BYTON license rights consistent with the rights mentioned under Section 5.1(a) herein. Supplier shall identify and disclose to BYTON, all Third Party Materials to be incorporated into the Deliverables, prior to doing so, and the Parties shall discuss the same if necessary.

5.2 BYTON's License Grant and Restrictions.

C_BYTON_EDAG_V10_20_18

$\nu\rho$

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035535

**3-005**

a. Licence Grant. Subject to the terms and conditions of this Agreement, BYTON grants Supplier a personal, non-exclusive, non-transferable, limited license to internally use the Foreground Technology and prepare and use Derivative Matter thereof, solely for the purpose of performing maintenance and support services to BYTON in accordance with the terms of this Agreement.

b. Restrictions. Supplier shall have no right to use the Foreground Technology for productive or commercial uses. Supplier may not sell, rent, loan or otherwise encumber or transfer the Foreground Technology, in whole or in part, to any third party. No right, title or interest in or to any trademark, service mark, logo or trade name of BYTON or its Suppliers is granted under this Agreement.

## 6.0 OWNERSHIP AND PROPRIETARY NOTICES

6.1 Background Technology. Supplier asserts that Supplier and/or Supplier's suppliers own the Background Technology and associated Intellectual Property Rights or owns the proper non-exclusive licenses. BYTON agrees that, to the extent Supplier owns the Background Technology and associated Intellectual Property Rights, Supplier will retain such ownership. Except as expressly stated in this Agreement, nothing herein shall be deemed a transfer or license by BYTON of any Intellectual Property Rights that BYTON may now possess or acquire in the future which may cover any aspect of the Deliverables.

6.2 Deliverables; Foreground Technology.

a. Foreground Technology; Deliverables. BYTON retains all right, title and interest in and to: (i) the BYTON Products; (ii) Deliverables except to the extent such Deliverables constitutes Background Technology; and (iii) Foreground Technology.

b. Assignment of Rights. Subject to Supplier's underlying Intellectual Property Rights in the Background Technology and in exchange for the fees set forth in section 4 of SOW, Supplier shall and does hereby assign to BYTON, Supplier's entire right, title and interest in and to the Deliverables created for BYTON, the Foreground Technology, and all associated Intellectual Property Rights therein. The Parties hereby agree that all development work performed by Supplier hereunder shall be deemed works made for hire. Before any employee or contractor of Supplier ("Personnel") performs development work hereunder, such Personnel and Supplier must enter into a written agreement expressly for the benefit of BYTON and containing provisions substantially equivalent to this Section 6.2 ("Deliverables; Foreground Technology") and Section 10 ("Confidential Information") or enter into an agreement as close as legally possible to it under the laws of the country in which task is performed. Supplier (i) may only use the Foreground Technology in accordance with Section 5.2 ("BYTON's License Grant and Restrictions"), and (ii) agrees not to challenge the validity of BYTON's ownership in the Foreground Technology. In addition, BYTON shall own all Derivative Matter and associated Intellectual Property Rights. BYTON may register the copyright in the Deliverables and Foreground Technology in its own name, identifying Supplier's interest in the Background Technology as required by applicable Copyright Office rules and regulations.

c. Cooperation in Perfecting Rights. Supplier agrees to cooperate with BYTON and cause Supplier's employees to cooperate with BYTON and to perform all acts, at BYTON's request on reasonable notice, as reasonably necessary to facilitate the preparation, filing, prosecution and enforcement of the Intellectual Property Rights associated with the Deliverables and Foreground Technology. In addition, Supplier shall, upon BYTON's request and at BYTON's costs, enter into any assignments, waivers or licenses of the Deliverables, Foreground Technology or the Intellectual Property Rights related to any of the foregoing as BYTON deems necessary and appropriate. In the event that BYTON is unable for any reason to secure Supplier's signature to any document required to apply for or execute any patent, copyright, trademark registration or other application with respect to the Deliverables and Foreground Technology, Supplier hereby irrevocably designates and appoints BYTON and

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035536

3-006

its duly authorized officers and agents as Supplier's agents and attorneys-in-fact to act for and on Supplier's behalf and instead of Supplier, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, trademarks or other rights thereon with the same legal force and effect as if executed by Supplier.

6.3 Moral Rights. Supplier agrees that with respect to any "moral" or equivalent rights (including, without limitation, rights of attribution, integrity, disclosure, and withdrawal) Supplier hereby: (i) assigns such rights to BYTON as described above, (ii) waives such rights and (iii) agrees and covenants never to assert, either during or following the term of this Agreement, such rights or to institute or maintain any action against BYTON relative to any such rights in the Foreground Technology or Derivative Matter. To the extent that such rights cannot be assigned or waived by operation of law, Supplier grants to BYTON, a royalty-free, fully paid-up, perpetual, irrevocable and worldwide license to fully exercise all such rights, with rights to sublicense through multiple levels of sublicensees and further, Supplier consents to BYTON's use sufficient to allow BYTON to exercise the rights granted in this Agreement.

## 7.0 PAYMENTS, INSURANCE AND ACCOUNTING

7.1 Fees. BYTON shall pay Supplier the fees set forth in Section 4 in SOW accordance with the schedule and requirements set forth therein and, in the case of fees due in connection with the Deliverables, upon acceptance of Deliverable by BYTON in accordance with Section 4.2 ("Acceptance Procedure"). Following such acceptance, Supplier shall provide a correct invoice to BYTON, and such invoice will be due, in Euro, within either sixty (60) days following BYTON's receipt of such invoice. BYTON sent per the agreed payment schedule highlighted in the Statement Work to this Agreement.

7.2 Taxes. All prices quoted by Supplier are exclusive of any taxes. Supplier shall include on its invoices the actual taxes payable for the services provided to BYTON. However, Supplier shall pay all taxes, levies or duties associated with fees and royalties payable by BYTON hereunder, whether based on gross revenue or otherwise; and any business, occupational or similar taxes relating to its general business activities. Supplier shall also be responsible for all employer related taxes relating to its Personnel including employee taxes, workers compensation, and unemployment insurance.

7.3 Insurance. Supplier will be insured pursuant to laws in Germany and provide a copy of the certificate of insurance and will maintain such insurance for the time of the Agreement.

## 8.0 MAINTENANCE AND SUPPORT SERVICES

8.1 Supplier shall provide to BYTON the maintenance and support services, as set forth in a Statement of Work, or if thereafter subsequently requested by BYTON as subsequently, mutually agreed by the parties.

## 9.0 TERM AND TERMINATION

9.1 Term of Agreement. The term of this Agreement begins on the Effective Date and continues for a period of seven (7) years (but in no event earlier than the expiration or earlier termination of the last Statement of Work created hereunder), unless this Agreement is earlier terminated sooner in accordance herewith.

9.2 Breach and Termination. If either Party fails to comply with any material term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such notice, all breaches specified therein are remedied. If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall

7/15                                                                 C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

undertake reasonable, diligent and good faith efforts to promptly remedy the breach. If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement. If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice. Notwithstanding anything to the contrary herein, BYTON may immediately terminate this Agreement, without a cure period, if Supplier fails to comply with any of its obligations under Sections 3.3 ("Delays") or 4.2 ("Acceptance Procedure").

9.3 Supplier's Insolvency. In the event Supplier becomes insolvent, enters into voluntary or involuntary bankruptcy, ceases to conduct business or assigns its interests in this Agreement to a third party creditor, (i) BYTON may immediately terminate this Agreement; or (ii) BYTON may (a) continue to exercise the license rights granted to BYTON hereunder, and (b) reserve all rights in the Background Technology and related materials to protect BYTON's interests therein pursuant to Section 365(n) (and any amendment thereto) of the U.S. Bankruptcy Code, or equivalent legislation in other applicable jurisdictions. The parties acknowledge that the Background Technology and Foreground Technology are "intellectual property" for purposes of Section 365(n) of the U.S. Bankruptcy Code and that BYTON will have the right to exercise all rights provided by Section 365(n) with respect to the Background Technology and Foreground Technology. In the event that the Supplier materially breaches any provision under this Agreement, BYTON will have the right to require the delivery by Supplier (or in the event of a filing of bankruptcy by or against Supplier, by the trustee) to BYTON of all Background Technology and Deliverables (including all embodiments thereof).

9.4 BYTON Termination. BYTON, at BYTON's sole option, prior to acceptance of the final deliverable, shall be permitted to terminate this Agreement, a Statement of Work or any part thereof, without cause upon 30 (30) days prior written notice to Supplier. In such an event, BYTON shall pay the applicable fees through the next milestone following notice of such termination or as otherwise agreed between the Parties. If BYTON terminates this Agreement or a Statement of Work (in whole or in part) pursuant to this Section 9.4, then the Parties shall promptly discuss what transition of work, if any, may occur, the plans for accomplishing such, and the proposed timetable, among other things ("Transition Plan"), which will include a transition period for employees of the Supplier allocated for on this project. Based on BYTON's plans and objectives and under consideration of Supplier's allocations with respect to this Agreement, the Parties shall cooperate and mutually agree on a Transition Plan, which shall be completed within sixty (60) days after the Parties reach agreement.

9.5 Effect of Termination or Expiration. Neither party will be liable for any damages arising out of the expiration of this Agreement. Termination as a result of a breach of this Agreement will not affect any right to recover damages sustained by reason of breach; or any payments which may be owing in respect of this Agreement. Subject to Supplier making best efforts to mitigate any costs and payments, Supplier is entitled to all payments in accordance with agreed payment plans/fee schedule for already initiated work at the time Supplier received the notice from BYTON to terminate for convenience. This includes payments for costs incurred with respect to subsequent milestones (such as e.g. visa fees, contractual obligations to employees traveling abroad, testing facilities rented, etc.).

9.6 Survival. Sections 1.0 ("Definitions"), 3.0 ("Transfer and Delivery"), 5.1 ("Supplier's License Grants and Restrictions"), 5.2(b) ("Restrictions"), 6.0 ("Ownership and Proprietary Notices"), 8.0 ("Maintenance and Support Services"), 9.0 ("Term and Termination"), 10.0 ("Confidential Information"), 11.0 ("Warranties and Disclaimer of Warranty"), 12.0 ("Indemnification"), and 13.0 ("Miscellaneous") of this Agreement shall survive any termination or expiration of the Agreement.

## 10.0 CONFIDENTIAL INFORMATION

10.1 Obligation. Except as provided in this Agreement, neither Party may use, reproduce, distribute or disclose Confidential Information it receives from the other Party under this Agreement, without the prior written authorization

C_BYTON_EDAG_VI0_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035538

3-008

of the disclosing Party. Each Party must hold in confidence Confidential Information received from the other Party and must protect the confidentiality thereof with the same degree of care that it exercises with respect to its own information of like importance, but in no event less than reasonable care, during the term of this Agreement and for a period of three (3) years after the expiration or earlier termination of this Agreement. Neither Party shall be liable for any inadvertent or unauthorized disclosure of Confidential Information, provided that it exercises at least the standard of care set forth above to prevent disclosure and takes reasonable steps to mitigate any damage and prevent further disclosure. For purposes of this Section, use, reproduction, distribution or disclosure by BYTON of the Background Technology or Foreground Technology thereof under a community source or open source licensing model, pursuant to the license granted by Supplier herein, will not be a breach of this Agreement.

10.2 Exceptions. Section 10.1 ("Obligation") does not apply to any portion of the Confidential Information which the receiving Party can demonstrate:

   a. is now, or hereafter becomes, through no act or failure to act on the part of the receiving Party, generally known in the automobile industry;

   b. was possessed by the receiving Party without an obligation of confidentiality at the time of receiving such Confidential Information;

   c. is rightfully obtained by the receiving Party without restriction on disclosure; or

   d. is independently developed by the receiving Party not in breach of this Agreement.

10.3 Employee Access. Each Party must inform its employees and contractors having access to the other Party's Confidential Information of restrictions under this Agreement and shall contractually require such contractors to comply with the requirements of this Section 10.0 ("Confidential Information") and Section 6.0 ("Ownership and Proprietary Notices").

10.4 Legally Compelled Disclosure. In the event that either Party is requested or becomes legally compelled (including without limitation, pursuant to securities laws and regulations) to disclose the existence or any of the terms of this Agreement, in contravention of the provisions of this Section 10, such Party (the "Disclosing Party") shall provide the other Party (the "Non-Disclosing Party") with prompt written notice of that fact before such disclosure and will use reasonable efforts to fully cooperate with the Non-Disclosing Party to seek a protective order, confidential treatment, or other appropriate remedy with respect to the disclosure. In the case of disclosure in connection with rules or regulations of any entity regulating securities ("SEC"), if confidential treatment is requested by the Non-Disclosing Party, the Disclosing Party agrees to use reasonable efforts to file such a request on the Non-Disclosing Party's behalf and to respond to any SEC comments to pursue assurance that confidential treatment will be granted, in both cases fully informing the Non-Disclosing Party of any such comments and cooperating with the reasonable requests of the Non-Disclosing Party.

10.5 Independent Development. Each Party understands that the other Party may develop or receive information similar to the Confidential Information. Subject to copyrights and patent rights of each Party, (i) either Party may develop or acquire technology or products, for itself or others, that are similar to or competitive with the technology or products of the disclosing Party, and (ii) each Party is free to use and disclose information which may be retained in the unaided memory of the receiving Party's employees or contractors who have had access to the Confidential Information of the other Party disclosed hereunder.

10.6 Publicity. Neither Party shall disclose the existence or the terms and conditions of this Agreement to any third Party, except as may be required (i) to implement or enforce the terms of this Agreement; or (ii) by an existing or

$k\ell$

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035539

3-009

potential investor, acquiring company, bank or other financial institution, under appropriate non-disclosure terms in connection with a merger, acquisition, financing, loan agreement or similar corporate transaction. Supplier shall not, without first obtaining the prior written consent of BYTON, announce this Agreement. Once the written consent is obtained, Supplier may mention BYTON publicly as reference.

## 11.0 WARRANTIES AND DISCLAIMER OF WARRANTY

11.1 Ownership. Supplier represents and warrants that (i) the Background Technology, Foreground Technology and Deliverables will not infringe or misappropriate any Intellectual Property Rights or trademarks of any third Party; (ii) Supplier has the right and power to enter into this Agreement and grant the assignment and the licenses set forth herein; (iii) the Deliverables will be free from defects in design, material and workmanship and in accordance with the Specifications agreed upon by the parties; (iv) the Deliverables will conform to all applicable laws of the United States, European Union, and China, including those applicable to the design and engineering of vehicles in such countries and regions to achieve homologation; (v) and all services provided will be provided in a professional and workmanlike manner, using qualified personnel with appropriate training, education and experience to perform the services as required hereunder.

11.2 Conformance. Supplier represents and warrants that following the date of acceptance, the Background Technology, Foreground Technology and Deliverables will continue to conform to the Acceptance Requirements without degradation.

11.3 Virus. Supplier represents and warrants that the Background Technology, Foreground Technology and Deliverables and associated media contain no computer instructions designed to (i) disrupt, damage or interfere with use of computer or telecommunications equipment or facilities, or (ii) disrupt or corrupt the use, operation or results of any computer program to the (technical) extent it can be reasonably expected.

11.4 Additional Remedies. In the event of a material breach by Supplier of any representation or warranty herein, BYTON shall have, in addition to and without limitation of any other right or remedy available to BYTON at law or in equity, the right, in BYTON's sole discretion, to take any and all actions reasonably necessary to mitigate BYTON's damages and/or any damages to BYTON's customers arising from such breach, including but not limited to: (i) modifying any form of the Background Technology, Foreground Technology and Deliverables ; (ii) requiring Supplier to fix any necessary form of the Background Technology, Foreground Technology and Deliverables ; (iii) contracting with others to modify any necessary form of the Background Technology, Foreground Technology and Deliverables ; and (iv) distributing to BYTON's customers any such modification, up to an amount equal to greater of: a. EUR15,000,000.00; or b. amounts payable under insurance coverage available to Supplier. Any additional insurance requests by BYTON will be charged to BYTON. This includes BYTON's right to charge to Supplier and Supplier shall be obligated to pay to BYTON all direct costs and expenses, excluding legal fees of any kind, incurred by BYTON in connection with any such mitigation efforts.

11.5 Disclaimer. EXCEPT AS PROVIDED IN THIS AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF DESIGN, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

## 12.0 INDEMNIFICATION

12.1 Obligation to Indemnify.

C_BYTON_BDAC_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035540

3-010

a.  Supplier's Obligation to Indemnify BYTON. Supplier will indemnify, defend and hold harmless BYTON from and against any and all claims, demands, or actions ("Claims"), and all liabilities, settlements, costs, damages and fees (including reasonable attorneys' fees and costs) ("Losses") incurred or suffered by BYTON arising out of any Claim which arises from: (a) any gross negligent or intentional act or omission of Supplier or its employees, agents or representatives in providing the services under a Statement of Work; (b) Supplier's breach of its obligations under the Agreement; (c) any Claim by or on behalf of Supplier Personnel and their family and relatives against BYTON arising out of the services performed by Supplier Personnel under the Agreement unless they are related to local, hazardous work conditions at a BYTON facility; (d) a Claim that Background Technology, Foreground Technology or Deliverable provided by Supplier hereunder infringes or misappropriates the Intellectual Property Rights of unaffiliated third party. Supplier is not responsible for background technology, foreground technology or deliverables provided by BYTON for the purpose of this Agreement.

b.  In the event of any third person or Governmental Body claim ("Third Party Claim"), action or suit against BYTON as to which BYTON seeks indemnification against Supplier hereunder, and BYTON fails to notify Supplier within a reasonable timeframe of the claim or acknowledges its obligation in writing and elects to defend against, compromise, or, settle any Third Party Claim which relates to any Losses indemnified by this agreement without seeking permission of Supplier beforehand, BYTON accepts to be solely liable for all claims, losses, expenses including legal expenses regardless of actual liability for this claim. Neither Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or consent to entry of any judgment unless the claimant or claimants and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim.

12.2 Remedies.  Should the Deliverables become, or in Supplier's reasonable opinion be likely to become, the subject of a claim of infringement or misappropriation of any Intellectual Property Rights in accordance with 12.1, Supplier shall, at its sole expense, either (i) procure for BYTON the right to continue to use the Deliverables, or (ii) replace or modify the Deliverables to make it non-infringing, provided that the same functions are performed by the replaced or modified Deliverables.

## 13.0 SUPPLIER PERSONNEL

13.1   General Requirements for Supplier Personnel.

a.  Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement. Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement. Supplier is responsible for validating the identity of and ensuring that Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) be subject and conform to all applicable BYTON policies, rules and procedures with respect to personal and professional conduct (including the wearing of an identification badge; use of computer systems; and adhering to general safety, dress, behavior, and security practices).

b.  Supplier is the employer of the Personnel and shall be responsible for all compensation and benefits payable to them; Personnel are not employees of BYTON and are not entitled to any compensation or benefits which are provided to its employees, including without limitation health insurance; paid vacation; sick leave; or retirement benefits. Supplier shall also be responsible for complying with all tax laws applicable to Personnel, including withholding taxes for all compensation payable; and for complying with all applicable labor and employment requirements including worker's compensation insurance requirements, and immigration and work visa requirements.

13.2   Key Supplier Positions.  "Key Supplier Positions" means those positions designated as such in the applicable SOW. Supplier will cause each of the Supplier Personnel filling the Key Supplier Positions to devote substantially full time and effort to the provision of the Services during the period of assignment.

11/15                                         C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13.3     Approval and Removal of Supplier Personnel. BYTON may approve all Personnel assigned to perform Services, and may require Supplier to replace any Personnel whose performance, in BYTON's reasonable judgment, has been unsatisfactory.

## 14.0 MISCELLANEOUS

14.1 Force Majeure. Neither Party shall be liable for any failure or delay in performance of this Agreement a. to the extent the failure or delay is caused by fire, flood, earthquake or other acts of God or nature; civil disorder, war, riots; or any other similar cause or event beyond the reasonable control of a party; and b. provided the non-performing Party is without fault in causing such failure or delay, and it could not have been prevented by reasonable precautions or other alternative means. If the foregoing failures or delays occur which prevent performance of a Party's obligations under this Agreement, the affected Party shall promptly discuss the impact of such failure or delay, the period of time such may continue for, and the plans for a work around solution, among other things; the affected Party shall update the non-affected Party and keep them apprised of the situation. The affected Party's obligations of the Parties shall be suspended for so long as the events mean that performance of the agreement is impossible. If the failure or delay continues for more than twenty (20) work days, then the non-affected Party may terminate the specific SOW under this Agreement.

14.2 Severability. In the event that any part of this Agreement is found to be unenforceable, the remainder shall continue in effect, to the extent permissible by law and consistent with the intent of the parties as of the Effective Date of this Agreement.

14.3 Relationship of the Parties. This Agreement does not create a partnership, franchise, joint venture, agency, or fiduciary or employment relationship. Neither Party may bind the other Party by contract or otherwise to any obligation or act in a manner which expresses or implies a relationship other than that of independent contractor.

14.4 Governing Law.
a.     Disputes; Governing Law & amicable settlement. If there is a dispute between the Parties which cannot be resolved through good faith negotiations, then a Party may request escalation to discussions with senior management of both Parties. Within five (5) days of a Party's request, a meeting or telephone call shall be held with such senior management in an attempt to resolve such dispute. If the Parties cannot resolve such dispute within a reasonable time period, then the Parties retain all rights hereunder, including pursuing arbitration as below stated. Any action related to this Agreement will be governed by the laws of the State of California (except that body of law controlling conflict of laws) and the United Nations Convention on the International Sale of Goods will not apply).

b.     Arbitration.  Any dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS"). The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, if the Parties cannot agree, an arbitrator appointed in accordance with the JAMS rules who shall be experienced in the type of dispute at issue. The Parties, their representatives, the arbitrator, and other participants shall keep confidential the existence, content, and result of the arbitration. Any demand for arbitration and any counterclaim must specify in reasonable detail the facts and legal grounds forming the basis for the claimant's claims and include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant. The arbitration will be conducted in the English language; the location of such arbitration shall be in San Francisco, California. Each Party will bear its own costs in the arbitration, The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the provisions of the agreement documents and to fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (1) in excess of the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (2) to award damages in excess of the types and limitation of

12/15                                                       C_BYTON_EDAG_V10_20_18

VE

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035542

3-012

damages found in the Agreement; or (3) to modify the terms of this Agreement. The arbitrator shall issue an award within 30 days after completion of the hearing and any post-hearing briefing. The award must be in writing and must state the reasoning on which the award is based. Judgment upon the award may be entered in any court of competent jurisdiction. Notwithstanding the agreement to arbitrate, each Party may apply at any time to a court of competent jurisdiction for appropriate injunctive relief or for other interim or conservatory measures, and by doing so will not breach or waive the agreement to arbitrate or impair the powers of the arbitrator.

14.5 Import and Export Laws. The Background Technology, Foreground Technology and Deliverables, including without limitation, technical data, may be subject to U.S. export controls or to export or import regulations of other countries. The Parties agree to comply with all such regulations and acknowledge that they have the responsibility to obtain such licenses to export, re-export or import the Background Technology, Foreground Technology and Deliverables as may be required.

14.6 Notices. All notices required hereunder must be in writing, sent to the Party's address set forth below and receipt must be confirmed. Notices required with respect to Sections 9.0 ("Term and Termination") and 12.0 ("Indemnification") must be provided by express courier.

BYTON:

BYTON North America Corporation
4201 Burton Drive
Santa Clara, California, 95054

Attn: General Counsel

Supplier:
Supplier's Name: EDAG Engineering GmbH
Supplier's Address: Kreuzberger Ring 40
65205 Wiesbaden
Germany

14.7 No Exclusive Remedy. Unless specifically designated, nothing in this Agreement shall be construed as an exclusive remedy.

14.8 Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one agreement.

14.9 Construction; Order of Precedence. This Agreement has been negotiated by the parties and their respective counsel. This Agreement will be interpreted without any strict construction in favor of or against either Party. The original of this Agreement has been written in English, and such version shall be the governing version of the Agreement. To the extent permitted under applicable law, Supplier waives any right it may have, if any, under any law or regulation to have this Agreement written in a language other than English. In the event of a conflict between this Agreement and any other document that references this Agreement, the order of precedence shall be: (i) the most recent written document signed by the Parties amending the subject Statement of Work; (ii) the Statement of Work; (iii) any other exhibits or attachments to, or documents referenced by the Statement of Work; and (iv) this Agreement.

14.10 Amendment and Waiver. Unless otherwise provided herein, this Agreement may not be modified unless in writing and signed by an authorized representative of each Party. Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14.11 Assignment. Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement (whether by operation of law, merger, change of control, or otherwise), without the prior written consent of the other Party, (i) to an Affiliate, or (ii) in the event of a merger, acquisition or sale of all or substantially all of the assets of a Party or a business unit. Any assignment or transfer in breach of this Section shall be void.

14.12 No Rights in Third Parties. This Agreement is made for the benefit of the Parties and not for the benefit of any third party.

14.13 Entire Agreement. This Agreement, including all Attachments hereto, constitutes the Parties' entire agreement with respect to its subject matter, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. No terms in any Supplier or BYTON documents (including purchase orders, acknowledgments, emails, or documents incorporated by reference (including but not limited to EDAG's or BYTON's General Terms and Conditions) which vary from, add to, modify or eliminate any terms herein, are expressly rejected and are not part of this Agreement or any Statement of Work.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives.

BYTON NORTH AMERICA CORPORATION

By: _David A. Twohig_

Name: **DAVID TWOHIG**
(print)

Title: **VP/CHIEF VEHICLE ENGINEER**

Date: **2019-1-9**

EDAG Engineering GmbH

By: _____

Name: Cosimo De Carlo
(print)

Title: CEO

Date: 2018-12-18

By: _ppa____

Name: Harald Keller

Title: Executive Vice President
Vehicle Development

Date: 2018-12-18

14/15                                C_BYTON_EDAG_V10_20_18

Lf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

**EDG-0035544**

## ATTACHMENT 1
## STATEMENT OF WORK No. 1

1) **Introduction.** This Statement of Work ("SOW") is issued under the Technology Development and License Agreement by and between BYTON and Supplier. The term of this SOW shall be from June 1ˢᵗ, 2017 ("SOW Effective Date") until terminated by either Party pursuant to section 9.0 of this Agreement.

2) **Scope and nature of development work to be performed.**

   - EDAG_191610D000_Project Description FMC_SAV_CTC-PS (Exhibit A)
   - RFQ for CTC Gateway to SOP plus 90 days (Exhibit B)
   - Timing Overview for RFQ 20170706 (Exhibit C)
   - FPDP_Gate_Deliverables_Full_Checklist 20170701 (Exhibit D)

3) **Description of Deliverables.**

   - EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
   - RFQ for CTC Gateway to SOP plus 90 days
   - Timing Overview for RFQ 20170706
   - FPDP_Gate_Deliverables_Full_Checklist 20170701

4) **Development fees and Charges.**

   - Per page 74 of the 19610D000 Project Description
   - Travel will be billed at cost + 6%

5) **Schedule for Development and Deliverables.** Supplier shall perform the following development work and deliver the following deliverables by the dates set forth below.

   - Per EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
   - Per the following PO's agreed to by the Parties:

| Byton PO | Topic | Order Value | SOW | BYTON Lead |
|---|---|---|---|---|
| 665 | Interim PO for Enf Services Aug 2018 | 1,850,000 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 761 | Interim PO for Enf Services Sep 2018 | 1,850,000 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 806 | Material Cards Creation (5) | 170,198 € | 188264A000_Proposal creation of material cards_20170505 | Antonio |
| 942 | Engineering Services CTC-PS | 45,460,677 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 943 | Blanket Travel PO CTC-PS | 732,260 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 1512 | Battery Pack Design Sep-Dec 2017 | 137,244 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DELI | Dirk |
| 1810 | Drop tower tests Steering Column | 30,000 € | 198677A000 Steering Column Testing | Shawn |
| 1930 | EuroNCAP 2020 Study | 27,782 € | 198676A001 Investigation EuroNCAP 2020 | Paul |
| 2082 | Battery Pack Design Jan/Feb 2018 | 149,864 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DELI | Dirk |

50,448,045 €

15/15                                      C_BYTON_EDAG_V10_20_18

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**                    **EDG-0035545**

3-015

6) Acceptance Criteria and Acceptance Test Plan for the Foreground Technology and Deliverables.

 • As agreed between the parties in the Proposal or otherwise as agreed in writing.

**BYTON NORTH AMERICA CORPORATION**

By: _~Daml A. Drohy~_

Name: **DAVID TWOHIG**
　　　　(print)

Title: **VP/CHIEF VEHICLE ENGINEER**

Date: **2019-1-9**

**EDAG Engineering GmbH**

By: _____

Name: Cosimo De Carlo
　　　　　　　(print)

Title: CEO

Date: 2018-12-18

By: ppa. _____

Name: Harald Keller

Title: Executive Vice President
　　　　Vehicle Development

Date: 2018-12-18

16/15

C_BYTON_EDAG_V10_20_18

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

**EDG-0035546**

# EXHIBIT A



# FMC SAV Project – Engineering work CTC to PS

Project Description                          191610D000



Fulda, October 2, 2017

## Revision table



| No. | Proposal Revision No. | Description | Date |
|-----|----------------------|-------------|------|
| 0 | 191610A000 | First Release | 31.07.2017 |
| 1 | 191610B000 | Section 4 'Cost Breakdown & Capacity Planning' updated after review of initial proposal with FMC Purchasing | 18.08.2017 |
| 2 | 191610C000 | - Section 4 'Cost Breakdown & Capacity Planning' updated after second review with FMC Supply Chain<br>- Text on page 11 modified | 15.09.2017 |
| 3 | 191610D000 | - Section 4 'Cost Breakdown & Capacity Planning' updated after 3rd review with FMC | 02.10.2017 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## Content



**1** **Preamble and Executive Summary**
Work included & excluded, RASI, Timing, Supplier levels

**2** Project Description, General Assumptions, RASIC, Timing

**3** Statement of work, Organization, Deliverables, Assumptions

**4** Cost Breakdown & Capacity Planning

 © Copyright 2016 EDAG Engineering GmbH. All rights reserved.    191610D000 Confidential,   V. Amelung, Project Management, Oct 2017

3-020

## Preamble



- This Proposal of the FMC SAV Engineering project form CTC to PS is based on EDAG's current work in the feasibility and concept phase until CTC.

- It takes considerations reflected in the RFQ received July 10, 2017 into the response, especially where additional management activities are requested for which FMC may not have own resources yet in place, e.g. vehicle architecture.

- In the course of this proposal EDAG will identify which of the required tasks EDAG will do in house and which tasks EDAG sees to be performed at the system/component supply base.

- It is understood that FMC will staff according to the needs of such program within the realm of its responsibilities. EDAG will identify in the course of this proposal which responsibilities it sees with the FMC organization. In case such responsibilities cannot be performed by FMC due to lack of own resources, EDAG expects that FMC will inform EDAG ahead of time of such problem. EDAG will investigate if it can support with resources, e.g. supplier quality engineering/assurance.

- In the course of this proposal EDAG will make assumptions based on the information at hand up to the submission of the proposal. Such assumptions are subject to change when more detailed information becomes available to EDAG which further defines the project requirements set forth by FMC.

- The program development logic follows the high level PDP submitted by FMC with the RFQ on July 10, 2017.

- EDAG is making assumptions on the level of supplier integration into this program. The specific sections will highlight such assumptions. These integration levels are subject to change by either a proposal from EDAG or a request from FMC. At request from FMC, EDAG would require an analysis first about inhouse capabilities before committing to a change in supplier level to build to print. In the other case, EDAG would propose a change to a full service supplier if the overall quality would be increased for the affected component and is achievable in the allotted timeframe. In such case EDAG would reduce its cost for the allocated amount.

## Preamble



- The cost for the specific development efforts required by the system/component suppliers are not quoted by EDAG in this proposal.
- However, full vehicle integration planning remains the responsibility of EDAG. EDAG will integrate the system/component suppliers in such a way that the overall program targets will be achieved.
- EDAG will plan its resources in such a way that engineering and administrative support is present in all requested location FMC is asking for in the RFQ from July 10, 2017.
- The cost for all physical testing is not considered in this proposal. However, EDAG will include test & validation resources to manage prototypes, testing activities, reports and convergence support.
- The cost for all mules and prototype builds is not considered in this proposal. However, build coordinators assisting in the availability of components, build issue capturing and resolution, reports and convergence support will be included in the proposal.
- The rate structure reflects a mix of EU, US and China resources.

## Executive Summary -  High level work scope



- This proposal describes the scope of work and the related cost for the content EDAG can provide to the development and the industrialization of the FMC SAV EC001 under consideration of a platform also suitable for a Sedan and an MPV.

- EDAG's scope of work is concentrating on:
    - Project Management of all EDAG content
    - Development of Engineering Specifications and support for FMC purchasing support for supplier RFQ and SOR
    - Selection Recommendations for Prototype and Production Suppliers
    - Evaluation of system and component suppliers
    - Engineering, Design and Development of the vehicle systems in conjunction with system suppliers based on the Vehicle Systems Matrix and the Engineering Task Matrix enclosed in this proposal:
        - Body Structure
        - Closures
        - Exterior & Lighting
        - Interior & Seats
        - Passive Safety systems
    - Technical supplier Integration & Management for prototype and production suppliers
    - Vehicle integration activities including DV and PV Test Planning for the responsible systems
    - Design Quality, FMEAs, Target deployment for the responsible areas
    - Feasibility for all joining methods, stampings, plastic components under build-to-print classification
    - Component feasibility until production supplier takes over this work, estimated at Prototype Release

# Executive Summary – Not included work

EDAG

- Not in EDAG's scope for the purpose of this proposal are:
  - Development of Chassis, Powertrain, Electric/Electronic (HV, LV), Functional Safety, Autonomous Driving and UI/UX
  - Mule builds, DV and PV prototype build, this is with FMC
  - Component testing, this is with the suppliers
  - Full vehicle testing, this is with FMC
  - Sourcing of system and component suppliers, this is with FMC
  - Supplier quality engineering, this is with FMC. EDAG can support this activity if requested.
  - Industrialization for body shop, paint, general assembly, factory planning, quality and logistics is with FMC. EDAG can quote for this content if requested in a separate proposal.
  - Design and build of production equipment, this is with the line builders sourced by FMC later in the program. EDAG can quote for supporting this scope in a separate proposal.

# Executive Summary – High level RASIC



| Task | | EDAG | ESS 2 | FMC | Supplier |
|---|---|---|---|---|---|
| Overall Program Management | | S | S | R | S |
| Supplier Strategy & Integration | Supplier Selection & Cost definition | S | S | R | S |
| | Supplier Management | R* | R* | R*,A | I |
| | Supplier Process Check & Evaluation | R* | R* | A,S | I |
| Styling | Styling, Renderings, DNA | S | | R | S |
| | Surfacing | S | | R | S |
| | Studio Engineering | S | S | R | S |
| | Packaging & Ergonomics | R | S | A | S |
| | Clay Modelling, Hard models | I | | R | I |
| Engineering & Design | Concept Design | R* | R* | R*,A | R** |
| | Attribute Management | R* | R* | R*,A | I |
| | Detail Design | R* | R* | R*,A | R** |
| | Component & System Specifications | R* | R* | R*,A | R** |
| | Vehicle Specifications | S | S | R | S |
| | Design Quality | R* | R* | R* | R** |
| Mules & Prototypes | Mule builds | I | R | I | S |
| | Prototype Builds (DV) | S | S | R | S |
| | Prototype Builds (PV) | S | S | R | S |
| Test planning | System/Components | R* | R* | R* | R** |
| | Full vehicle | S | R | A | S |
| | Passive Safety | R | S | A | R** |
| Testing & Validation | Full Vehicle DVP&R | S | R | S | S |
| | System DVP&R | R* | R* | R* | R** |
| | Component DVP&R | S | S | S | R |
| | System/Component Testing | S | S | S | R |
| | Full vehicle Testing, Durability, Hot/Cold Weather Testing | S | S | R | S |
| | Passive Safety Testing | S | S | R | S |
| | Autonomous Functions, Active Safety | S | S | R | S |
| Manufacturing Engineering | Component Feasibility | R* | R* | R* | R** |
| | Process Engineering Bodyshop | | | R | |
| | Process Engineering Paint | | | R | |
| | Process Engineering G/ Assembly | | | R | |
| | Process Engineering Logistics | | | R | |
| | Production Quality | | | R | |

R* = Responsible for the assigned systems
R** = Responsible when Supplier level 2, 3

## Executive Summary – Supplier level definition, Detailed RASI



- **The following detailed RASI Charts are included in the proposal:**

| | |
|---|---|
| - System RASI by Supplier level<br><br>   - A supplier integration level is applied to each system/component<br><br>   - Defines the design responsibility and links it to the integration cadence of the vehicle | - Deliverables RASI by Engineering Task<br><br>   - Defines the engineering tasks to the supplier integration level |
| <br><br>System RASI | <br><br>Engineering Task RASI |

- **Definition Supplier Integration Level**

    *Level 1:* EDAG has full responsibility for the Engineering of the parts. Suppliers manufacture parts according to specifications (" Build to print")

    *Level 2:* Supplier has full responsibility for the engineering and the manufacturing of components.   EDAG integrates components into subsystems and the subsystems into the vehicle

    *Level 3:* Supplier has full responsibility for the engineering and the manufacturing of subsystems  including the integration of components into the subsystems. EDAG integrates subsystems into the vehicle.

- :

## Executive Summary - Timing



■ Timing Plan in the RFQ from 10.07.2017 with the major milestones NDRC, VP and SOP



■ The timing will be evolved further to a detail level in the various PDT/SETs for each system under
consideration of the major master timing milestones. See the corresponding section within this proposal.

3-027

## Executive Summary - Timing



- The FMC Master Timing contains considerable risk. EDAG will support FMC and its suppliers in a consolidated effort to mitigate such risks. The trade-offs which may have to be considered will be supported by all parties after such decisions have been made.
- Out of todays assessment the major risks are:
  - Not enough validation timing for NDRC prototypes. Potentially not fully tested vehicles will be handed to NDRC for testing to achieve the needed license. EDAG will make a proposal of how to mitigate this risk.
  - The program relies heavily on good simulation correlation to the material which will ultimately be used in production. This material will mostly be procured in China. To achieve good correlation, material cards reflecting the intended materials should be established. EDAG will create such material cards upon the direction of FMC. The specific cost for this are not quoted with this proposal and can be quickly added as soon as FMC advises so. Samples of such materials can be solicited from the material manufacturers.
  - Production tooling lead times are shorter than typical to achieve premium quality targets and the scheduled SOP. This risk will also be tracked very closely in an ongoing fashion and may require a quality driven start up process.
  - The ADAS and UI/UX systems are behind in their development. Any changes to the release schedule of EDAG parts or any expedited effort to mitigate the effect or catch up to the schedule which requires unforeseen resources at EDAG will be quoted utilizing the FMC proposed change management process.

## Executive Summary – FMC Interaction





## Executive Summary - Locations



**EDAG Team Germany**
- Project Co-Leadership
- Main CAD resources to PR
- Styling convergence
- Main ME resources
- Coordination of international Activities

**EDAG Team Nanjing**
- Daily interface to FMC ME
- Coordination of ME requirements
- Main CAD resources after PR/FC until SOP
- Coordination with EDAG Project Leadership
- Coordination of Communication to FMC/EDAG

**EDAG Team Troy**
- CAE Support
- Engineering/CAD support Body
- Vehicle Integration Support

**EDAG Team Santa Clara**
- Project Leadership
- VI Lead
- Daily interface to FMC Engineering Leadership
- Supplier coordination together with FMC
- Coordination with EDAG Project locations & teams

**EDAG Team Shanghai**
- CAD support
- ME support
- Coordination with EDAG Project Leadership

3-030

## Content



**1** Preamble and Executive Summary

**2** Project Description, General Assumptions, RASIC, Timing

**3** Statement of work, Organization, Deliverables, Assumptions

**4** Cost Breakdown & Capacity Planning

 © Copyright 2016 EDAG Engineering GmbH. All rights reserved.   191610D000 Confidential.   V. Amelung, Project Management, Oct 2017

3-031

## Project Description



- Building on the results of the project achieved at the CTC gate on July 27, 2017 the vehicle systems Body structure, Interior, Exterior and Passive Safety have to be developed to production until the gate deliverables of PS have been met.

- The work scope included in this proposal covers the activities necessary to achieve a high quality product meeting the agreed target architecture defined with the CTC gate.

- Following activities are considered

  - Styling Support:      Further develop styling criteria to support the creation and feasibility of the styling for the exterior and interior for the vehicle.

  - Packaging:      Ensure all legal aspects are achieved, the vehicle systems are packaged and the desired dimensional attributes are met.

  - Attributes:      Further develop, maintain and balance the target catalog for the responsible attribute areas utilizing the PALS provided by FMC

  - Design & Engineering:      Develop the Vehicle systems under responsibility, create the CAD data, the required specifications and validations plans, validate the Designs following the milestone plan

  - Design Quality:      Establish the Dimensional Technical Specification (DTS), conduct FMEAs and establish KPCs, support the creation of control plans

  - Test & Validation:      Create DVP&Rs for all responsible systems, establish a test plan ans s upport FMC in vetting test facilities ans suppliers in China to perform the testing. Support the supplier component testing during the components validation phase.

## Project Description



- Following Activities are considered (cont.)

    - Passive Safety:      Plan and develop the Passive Safety system, test & validate the vehicle to meet the established safety targets together with the designated safety system supplier.

    - CAE:      conduct a virtual development for the attributes under responsibility

    - Supplier Management:      Integrate all prototype and production suppliers related to the responsible systems

    - Manufacturing Feasibility:      Part and sub-assembly feasibility for sheet-metal, plastics and joining methods for the systems under responsibility

    - Platform structure:      Develop a lower dominant structure of the underbody, front end, dash and rear end suitable as a platform for the SAV (Job 1) and a following Sedan and an MPV. SAV and Sedan are priorities, the MPV ranks lower and detrimental sacrifices to the SAV and Sedan should not be considered on behalf of the MPV.



# Project Work Split Structure



**3-034**

## Project Assumptions



- Program Management
  - The project progress will be reported on a regular basis utilizing an FMC reporting system (to be defined and agreed)
  - The reporting cadence will be defined and mutually agreed at start of the project
  - The cooperation model with FMC, other engineering suppliers and system suppliers has to be defined at the start of the project.
  - A Program Operating Plan (POP) will be implemented including an organization structure, a meeting structure, an escalation process, a decision process, a documentation process and a change management process to run the program. The POP will be communicated by FMC to all parties involved in the engineering & development of the vehicle.

- Program Timing
  - The proposal is based on the master timing outline submitted by FMC with the RFQ from 10.07.2017 regarding milestones, especially SOP. In order to keep this SOP-milestone, EDAG delivers timing proposal, including main boundary conditions, which have to be confirmed by FMC
  - Project starts on Aug 1, 2017 and ends with PS on January 31, 2020 with an SOP on October 1, 2019
  - The detailed system level timing plan for each responsible vehicle system will be maintained and improved throughout the program in conjunction with FMC and the supply base.
  - Any changes in timing which results in an extension or a reduction of the timeline, requiring an extraordinary effort will be investigated if it can be achieved without a cost increase at EDAG. If negative, EDAG will quote this work as an extension of the program.

## Project Assumptions



- Program Content
  - The content of the project is based on the continuation of EDAG's current involvement in the project and extended in areas where FMC has specifically requested in the RFQ and in EDAG's own judgement of what support would additionally be needed to have a successful program.
  - Chassis and Functional Safety has not been included in this proposal due to EDAG having not sufficient resources available to support these activities during the timeframe of the program. However, if such resources become unexpectedly available, EDAG will inform FMC.
  - In case the work content demanded from FMC during the course of the project still exceeds the scope described in this proposal, EDAG will claim additional cost and will work on such items after the cost has been negotiated.
  - The Premium SAV (job1) is the lead vehicle for the program and serves as the learning vehicle for subsequent system utilization in the other vehicles, Sedan and MPV.

- Engineering, Design & Development
  - EDAG is allowed to use its designated partners or subcontractors within the scope of the program.
  - Partners and subcontractors will be discussed with FMC prior to any input.
  - EDAG ensures the compatibility and has complete responsibility of these partners or subcontractors.

- Development Scenario
  - EDAG applies a Virtual Development Concept utilizing CAE for structure verification and safeguarding in the Integration phase of the program
  - Design validation will be done on AP Prototypes build under FMC responsibility
  - The full validation of the vehicle will be performed in the PV Phase with VP prototypes built in the assembly plant in Nanjing, China.

## Project Assumptions



- Data Management
  - For the purpose of this proposal the calculated cost are based on the utilization of CATIA V5 R24.
  - In case the CATIA versions are changing the resulting cost effect has to be re-evaluated and will be quoted once the actual cost effect is known.
  - EDAG has proposed to utilize PDTec as an interim PDM for the program. FMC has accepted this proposal. EDAG will run and maintain PDTec up to the point the FMC system is online. EDAG will organize the process of signing all defined CAD users of FMC and its suppliers into PDTec and conduct the needed training.
  - For any cost increases in this context exceeding the assumptions in this proposal, EDAG has the right to re-quote accordingly


- Testing & Validation, Certification
  - EDAG assumes responsibility to perform DV and PV testing planning on the EDAG responsible content only it is assumed that this testing is done in Europe with partners of EDAG's choosing.
  - EDAG activities for Homologation is the preparation of homologation supporting documents, the execution of the homologation with the proper authorities is under responsibility of FMC.
  - Type approval for all parts / components is under responsibility of the appropriate supplier, controlled and managed by EDAG.
  - For this program, all full vehicle verification and validation tests are conducted by FMC

3-037

## Project Assumptions



- Purchasing
  - Supplier selection process: all critical suppliers have to be nominated or cooperating within 4 weeks of the start of this program phase.
  - Supplier Quality Engineering (SQE) is an FMC responsibility. It is assumed that such personnel will engage in the project at the appropriate time. IF needed, EDAG can support this activity either by itself or with a partner if FMC desires so. The cost for this activity can be provided upon request.
  - For all purchased components in EDAG responsibility EDAG will complete the technical requirements. The final SOR will be mutually agreed between the EDAG Design Release Engineer (DRE) and the appropriate FMC Purchasing representative.

- Documentation & Specification
  - FMC will provide a data and document system which will be utilized for this program. FMC will provide the appropriate training to EDAG staff at no charge to EDAG. This is also the case for product change management.
  - All necessary information, CAx data (e.g. CAD / CAE data of platform & carry over parts, PS documentation, lessons learned, test specifications on component and vehicle level, target definitions and test reports from base vehicle etc.… ), if any,  will be provided to EDAG at the beginning of this phase of the program

- Miscellaneous
  - The project language is English. Any translation into Chinese or back is the responsibility of FMC.
  - FMC will implement a project team which will cover the major interfaces to EDAG
  - On site support for BIW, Exterior, Interior, Prototype management, Passive safety and vehicle integration in the production plant has been considered and is part of this quotation.

Content



**1** Preamble and Executive Summary

**2** Project Description, General Assumptions, RASIC, Timing

**3** Statement of work, Organization, Deliverables, Assumptions

**4** Cost Breakdown & Capacity Planning

© Copyright 2016 EDAG Engineering GmbH. All rights reserved.
191610D000 Confidential.   V. Amelung, Project Management, Oct 2017

3-039

## Project Management - Scope and Responsibilities



- Project Management
  - A dedicated Project Manager for the overall EDAG responsibility
  - Balancing of EDAG resources to meet the Project Requirements
  - Single point of contact for all commercial issues
  - Escalation point for all technical issues
  - Issue Resolution for overall project related issues
  - Change Management
  - 1 Chief Engineer will be responsible for the SE development team
  - 1 Vehicle Engineering Lead Engineer will be responsible for the Vehicle Integration content

- Timing/Controlling/Reporting
  - Tracking and reporting of the Master Timing
  - Tracking and reporting of the Engineering Budget (EDAG content)
  - Assemble the required Project reporting needs and prepare appropriate documentation
  - Support Change management activities

- Weight / Bill of Material / Product Cost
  - Management of Weight / BOM / Product Cost & Investment
  - Follow up with the Product Development Teams (PDT, SET) regarding target deviations and recovery plans

## Project Management - Scope and Responsibilities



- Issue Resolution / Target tracking
  - Lead and assist in the technical issue resolution process
  - Support the Product Development Teams with procedural issues regarding issue resolution
  - Track and report on the issue summaries and timely execution of the issue process

- Data Management
  - Support all Data Management requirements and actions between EDAG and FMC and the supplier base
  - Manage the PDTec PDM to support a single valid DMU structure for this program until FMC takes over with its own PLM system

- Design Quality
  - To ensure the correct grade of maturity EDAG will conduct the appropriate development quality activities
  - Risk Analysis at project start for identification of the major risks
  - Planning of the Quality Management activities based on the results of  the risk analysis (System FMEA Product, Interface FMEA's and Supplier FMEA Reviews)
  - Support of the supplier management utilizing the APQP process
  - Any required changes and adjustments to components from suppliers will be organized by the FMC SQE under support and release authority of the EDAG DRE
  - Create and manage a global dimensioning and tolerance plan, dimensional technical specifications utilizing 3DCS software
  - Assist is creating a robust design and assembly process
  - Create a datum and locating strategy aiding a robust assembly process

## Project Management - Scope and Responsibilities



- Design Verification
  - Resolve data quality issues
  - Drawing checks and data Q-checker
  - train process and CAD quality related items
  - Carry over parts data interface management
  - Supplier data coordination

- Perceived Quality and Craftsmanship
  - EDAG will organize and manage required events and activities for perceived quality buy offs.
  - Perceived Quality events will also be scheduled within program management Styling studio events
  - Establish a detailed gap, flush and radii plan aiding in the sensory perception of the vehicle
  - Assist in the creation of a robust design and assembly process
  - Assist in the application of materials and surfaces aiding in the sensory perception of the vehicle
  - Benchmarking activities to establish key priorities against a competitor set in a PALS style analysis
  - Definition of clear PQ items need established in all sensory categorizations. i.e. visual, touch, sound and smell.

## Project Management - General Overview Orga Structure





## Design Quality



## EDAG Generic Quality Timing (synchronised to OEM PEP)

- Application of Q-modules in reference to the generic project timing



3-044

## Dimensional Management



- Development of a robust design and assembly process to meet pre-established, dimensionally related build requirements based on realistic piece part, assembly and fixture tolerances
  - The production orientated solutions will be found at the concept phase with the help of modern simulation tools and proven engineering methods
    - By coordination between different development partners and suppliers the optimized solutions will be implemented to the development process



# Body Engineering – Content





Body Structure

Closures

Exterior & Glazing

Seats

Lighting

Instrument Panel and Interior Trim

## Body Engineering – General Assumptions



- EDAG will manage the development of the body structure, closures, the interior and the exterior of the SAV body engineering requirements.
- EDAG will release the CAD data (3D + 2D) for body structure, closures, exterior and interior according project milestone deliverables. The methodology for data release still needs to be defined with FMC.
- For each system the responsibilities and work load between EDAG and the system/component supplier needs to be finally defined within the supplier sourcing of this project. For the purpose of this proposal EDAG assumes that  the body engineering content follows the System RASI included in this proposal.
- EDAG assumes that the engineering deliverables follow the Engineering Task RASI included in this proposal.
- The selected carry over parts don't require any redesigns. It is assumed that all locks and mechanisms are either carry over or designed by the supplier (level 2 or 3 supplier)
- EDAG will co-operate with FMC production engineering to implement methods and requirements from manufacturing as they are presented to EDAG.
- The manufacturing feasibility of the single parts will be ensured during the development by EDAG Production Solutions (see Manufacturing section of this proposal). This will be supported until the designated production supplier takes over this responsibility.
- EDAG is responsible for Dimensional Engineering (Locator definition, tolerance simulations and measurement points)
- Target for body development is to have one body to fit all markets. Variants are only LHD/RHD
- Suppliers with the level 2 and level 3 designation need to be nominated or cooperative per the required timeline created by the PDTs for Body, Closures, Exterior and Interior.

## Body Engineering – General Assumptions



- 3D CAD will be created to industry standards. 2D Drawings will be made only for Prototype and Production Release utilizing a simplified drawing approach typical for a math based process. The 3D CAD model is the master. See an example of a production simplified drawing attached to this proposal

- Concept work after CTC which changes the current concept released with CTC will be supported until Prototype Release.



Simplified
Drawing Example

## Body Engineering – Platform & Body structure system development 

- Scope and Deliverables
  - Design, engineer and develop a platform understructure suitable for the SAV, a Sedan and an MPV
  - Design, Engineer & Develop a Top Hat structure for the SAV in line with the project descriptions and design targets (light weight, target performance, styling targets)
  - Management of design to cost and design to weight prerequisites from FMC
  - Lead the target deployment, attribute management and validation for the Module Body Structure
  - Identification of problems, support for problem processing
  - Prepare release documentation (e.g. Engineering Work Orders) to FMC for the release of the Module Body Structure
  - Support the tooling process, the PPAP and the launch of the vehicle representing the Module Body Structure up to the PS milestone
  - Support for the preparation of acceptance and transfer protocols to FMC

- Premises
  - All steel body utilizing high strength steel applications is design of record, alternative material may be proposed for specific applications
  - Body manufacturing assembly process will be provided by FMC

# Body Engineering – Platform & Body structure system development



## High Level PDT Plan for Upper Body & Platform



## Body Engineering – Closures system development



- Scope and Deliverables
  - Design, engineer and develop the side doors, tailgate and hood of the SAV in line with the project descriptions and design targets (light weight, target performance, styling targets)
  - Management of design to cost and design to weight prerequisites from FMC
  - Manage the level 2 and 3 suppliers as per program engineering requirements highlighted in the Engineering Deliverables RASI included in this proposal
  - Lead the target deployment, attribute management and validation for the module Closures
  - Identification of problems, support for problem processing
  - Prepare release documentation (e.g. Engineering Work orders) to FMC for the release of the module Closures
  - Support the tooling process, the PPAP and the launch of the vehicle representing the module Closures up to the PS milestone
  - Support for the preparation of acceptance and transfer protocols to FMC

- Premises
  - Design of record is an aluminum closure system, alternative material may be proposed for specific applications
  - For all hardware parts (e.g. door latches, hinges, regulators,...) the supplier will be design responsible (Level 2, 3)

# Body Engineering – Closures system development



## High Level PDT Plan for Closures



## Body Engineering – Interior system development



- Scope and Deliverables
  - Design, engineer and develop the Interior system as per the System RASIC included in this proposal
  - Manage the level 2 and 3 suppliers as per program engineering requirements highlighted in the Engineering Deliverables RASI included in this proposal
  - Management of Design to cost and Design to weight prerequisites from FMC
  - Lead the target deployment, attribute management and validation for the module Interior
  - Identification of problems, support for problem processing
  - Prepare release documentation (e.g. Engineering Work orders) to FMC for the release of the module Interior
  - Implement FMC Manufacturing strategies (e.g. Cockpit Module)
  - Support the tooling process, the PPAP and the launch of the vehicle representing the module Interior up to the PS milestone
  - Support for the preparation of acceptance and transfer protocols to FMC

- Premises
  - The responsibility split highlighted in the System RASIC included in this proposal applies

# Body Engineering – Interior system development



## High Level PDT Plan for Interior



3-054

## Body Engineering – Exterior system development



- Scope and Deliverables
    - Design, engineer and develop the Exterior system as per the System RASIC included in this proposal
    - Manage the level 2 and 3 suppliers as per program engineering requirements highlighted in the Engineering Deliverables RASI included in this proposal
    - Management of design to cost and design to weight prerequisites from FMC
    - Lead the target deployment, attribute management and validation for the module Exterior
    - Identification of problems, support for problem processing
    - Prepare release documentation (e.g. Engineering Work orders) to FMC for the release of the module Exterior
    - Support the tooling process, the PPAP and the launch of the vehicle representing the module Exterior up to the PS milestone
    - Support for the preparation of acceptance and transfer protocols to FMC

- Premises
    - The responsibility split highlighted in the System RASIC included in this proposal

# Body Engineering – Exterior system development



## High Level PDT Plan for Exterior



# Vehicle Engineering – Content





CAE

Package Engineering

Passive Safety

NVH, Acoustics, operational strength

Durability

Corrosion

Test planning & support

## Vehicle Engineering – Vehicle Architecture, Package & Regulations 

- Scope of work
  - Vehicle Architecture
    - Implementation of all Legal Requirements for the designated markets China, US, EU
    - Develop the occupant package in conjunction with the vehicle targets, styling and general vehicle and system requirements
    - Systems and component package and balancing from a total vehicle perspective. All system requirements have to be provided by the system responsible organization, either at FMC, other EDAG modules or the suppliers.
    - Run Vehicle Architecture Meetings and drive the Architecture Issue Resolution Process
  - Ergonomics
    - Implement typical ergonomic requirements either by industry standard or by PALS definition and communicate to all affected parties
    - Evaluate the comfort and ergonomics utilizing RAMSIS
    - Report on comfort & ergonomics items within the styling process, vehicle architecture and customer usage profiles and provide solutions in case of conflicts.
  - Legal & Regulations
    - Report on legal items with the styling process and the vehicle architecture and provide solutions in case of conflicting requirements
  - DMU
    - Regular updates of a static full vehicle Digital mock Up with the latest CAD data based on a defined weekly CAD update by all designing parties
    - Run DMU for dynamic collisions incl. manufacturing assembly of the FMC assembly and disassembly strategy
    - Run regular DMU meetings by vehicle compartment and report on all collision items

## Vehicle Engineering – CAE & Simulation



- Scope of work
  - Meshing and modelling of parts under EDAG design responsibility
  - Status simulation for all required milestones
  - Continuously optimization between the milestones
  - Vehicle level activities:
    - Crash simulations
    - Pedestrian protection
    - Occupant safety
    - Durability simulation
    - NVH simulation (except chassis, powertrain)
  - System level activities:
    - Stiffness/strength simulation for BiW, doors, hood, tailgate
    - Stiffness/strength/safety simulation for door trim, pillar trim, headliner, IP & console, cross car beam, front/rear bumper. All additional interior, exterior parts will be supported
  - EDAG will support FMC to create a Material database
    - Planned, undertake the testing (at ATC Fulda or other companies), analyze and build the material cards
    - FMC has to provide the materials for testing
  - System suppliers (for airbag, belts, seat, lamps, … => Systems for which EDAG is not design responsible will develop their systems under usage of CAE by their own.
    They will deliver their CAE models for all required solvers on a regular basis and in addition to the virtual gates to EDAG. EDAG will do the integration of those systems in the vehicle.
  - Road load data will be provided by FMC

## Vehicle Engineering – CAE & Simulation Tools



| Category | Fields | Software | Company |
|---|---|---|---|
| Pre processing | All | Ansa | BETA |
| | FMVSS201 / Pedpro | Generator | GNS |
| | Dummy positioning | Primer | Oasys |
| | | | |
| Post processing | Crash / NVH / Stiffness | Animator | GNS |
| | FMVSS201 / Pedpro | Generator | GNS |
| | Strength | Meta | BETA |
| | Occupant Safety / NVH | HyperGraph | Altair |
| | | | |
| Solver | Crash / FMVSS201 / PedPro | LSDyna | LSTC |
| | NVH / Stiffness | Nastran | MSC software |
| | Optimization | Optistruct | Altair |
| | Strength | Abaqus | Dassault systems |
| | Durability | Femfat | Magna |
| | Stamping | AutoForm | AutoForm |

## Vehicle Engineering – Vehicle Attributes



- Scope of work
  - Continue to review and manage the PALS for the responsible area and transfer to PAP documents
  - Continue to develop and populate the PAP documents with benchmark information and targets for the SAV following the FMC milestone requirements and upload to JAMA
  - Cascading of vehicle attributes to system specifications utilizing surrogate data from competitor vehicles or other available benchmark data
  - Attribute Leaders engage with the development teams to ensure targets are pursued and systems are developed towards the target attributes
  - Assist in the balancing of attributes to achieve an optimal solution for the SAV
  - Support FMC in the creation of the Vehicle Technical Specification (VTS)
  - Vehicle Technical Specification (VTS) and the Subsystem Technical Specifications (SSTS) will be regularly reviewed and updated where required and agreed upon.

- Premises
  - The regular meeting cadence and escalation levels will be defined within the Program Operating Plan

## Vehicle Engineering – Test & Validation



- Scope of work
  - Creation of the DVP&R test planning and documentation for the responsible systems
  - Planning and supervision of the integration tests for the responsible vehicle systems as per the Program DVP
  - Verification of the compliance with the specification requirements.
  - Support FMC in the coordination and organisation of the different test laboratories
  - Detailed tuning of the test conditions and possible weaknesses by the simulation
  - Further refine the surrogate test procedures to establish a test catalogue for FMC
  - Active support of the testing procedure (acceptance test setup, interim-/ final evaluation)
  - Create/ request a test report with appropriate rating
  - Monitoring of testing at the suppliers
  - Verification and validation according to test cataloque
  - Problem resolution, solution finding
  - Evaluation and documentation of tests, test report
  - Participation in winter and summer testing, and special tests such as hot climate area test
  - Repatriation and presentation of the test results
  - Documentation of the test results with test reports
  - Review of the test results with the persons responsible for the components
  - Tracking of problems from test results

## Vehicle Engineering – Test & Validation



- Premises
  - Component DVP&R are the responsibility of the component supplier. EDAG will assist the component supplier and work on issue resolution to establish clarity in test procedures and requirements since FMC does not have validated test procedures and catalogues yet.
  - The suppliers adhere to the Engineering Task RASIC included in this proposal
  - System Supplier delivers verifiable components (pre-tests of the components have been conducted by System Supplier)

## Vehicle Engineering – Passive Safety Pedestrian Protection



- Pedestrian Protection:
  - Passive bonnet is assumed
  - 1 headlamp variant
  - 1 bumper variant

- Targets:
  - Legal requirement
  - ChinaNCAP
  - USNCAP
  - IIHS
  - EuroNCAP
  - 5* rating

- Tasks:
  - Support sensor application → impactor testing, no driving misuse
  - Certification → testing and documentation of test results
  - Preparation of China NCAP, USNCAP, EuroNCAP assessment → prediction will be done by EDAG

- Not included:
  - Sensing development → to be done by system supplier
  - USNCAP new with Oblique test and THOR-Dummy
  - EuroNCAP 2020 with THOR-Dummy

## Vehicle Engineering – Passive Safety Crash Testing



- Premises
  - EDAG assumes that a restraint system supplier will be engaged in the program with CTC for all system and component development
  - For the development and testing one ride height is considered
  - Restraints Control Module (RCS), Vehicle specific parametric settings assumed to be RCS system supplier's scope of work
  - No manpower planned for
    - Whiplash related development – assumed to be in seat system supplier's scope of work
    - OoP related development – assumed to be in airbag system supplier's scope of work

- Not included:
  - No execution of physical tests are included

# Vehicle Engineering – Passive Safety Plan





3-066

## Vehicle Engineering – Integration areas



### NVH

- Activities:
    - Vehicle testing specification – EDAG target quality table document adjusted with FMC
    - Load case definition for all sub-attributes > definition of objective physical target figures
    - Structural dynamics, static / dynamic simulation (virtual contact area analysis) and test planning:
        - modal analysis BIW and trimmed body, photogrammetric local investigations
        - Complete vehicle response during driving and on four post servo hydraulic shaker
    - Noise Quality during driving and idle condition
        - Acoustic tightness and aero acoustics including sealing
        - Squeak & Rattle prevention – CREST (Combined road and environment shaker test) evaluation

### Thermal

- Scope of work:
    - Assist and support the interior thermal management, body air outlets, Air ducts and humidity sensor work conducted by FMC or its designated partner
    - Implement the findings of simulation and balancing of the Interior HVAC requirements into the Interior System

- Premises
    - The Thermal/HVAC system work is done by FMC and/or its designated supplier(s)
    - Any simulation results will be presented to EDAG for implementation by FMC

## Vehicle Engineering – Integration areas



- **Aerodynamics**
- Scope of work
  - EDAG will implement agreed solutions into the overall aero kit design to achieve program targets
  - Permanent supervision of the design data with respect to the aerodynamic performance.
  - Wind tunnel tests will be prepared, organized and performed by EDAG
  - The wind tunnel experiments are performed at the FKFS of the University of Stuttgart, Germany
  - Aero models will be manufactured by EDAG and modified according to test results
- Note: Access to wind tunnels is limited and only verification of the design using the aero model with limited change possibilities may be possible in physical testing. Reliance on analysis done by FMC is mostly required.
- Not included
  - Further windtunnel testing after the initial model test at FKFS in September 2017.

- **Durability**
- Activities:
  - Establish Vehicle testing specification, has to be adjusted with FMC
  - Problem resolution, solution finding
  - Evaluation and documentation of tests, test report
  - Implementation of findings into the design of the vehicle
- Assumption:
  - Durability test performed by FMC or other supplier

## Vehicle Engineering – Integration areas



- **Corrosion Protection**
- Activities:
    - Engineering corrosion protection
        - The design of structural corrosion protection requirements by EDAG are based on the corrosion protection targets mutually defined by EDAG and FMC
    - Corrosion protection documentation (Seam sealing, underbody protection, wax)
        - EDAG creates the corrosion protection documentation according to FMC standard and directions, such directions my be mutually created using industry standards
    - Corrosion validation:
        - Engineering for corrosion protection & validation is included in the proposal

- Assumption:
    - corrosion test performed by FMC or other supplier

- **Security**
- Scope of work
    - Engineering for theft protection is included for the EDAG responsible content (i.e. safety brackets to avoid access to harness, locks etc.) based on theft protection strategy formulated by FMC

- Premises
    - Theft protection testing is conducted by the theft protection device supplier (e.g. Thatcham)

Vehicle Engineering – Integration areas



- **Environmental**
- Scope of work
  - Planning and execution of testing according to the Draft DVP included in the proposal
  - Tracking of all environmental testing which will be done at part and component level at the suppliers for the responsible content
  - Planning and tracking of contamination and hazardous material according to target

- Premises
  - EU material standards and a standard material library will be respected, no new materials or material mixes are budgeted
  - No additional contamination activities currently planned

## Vehicle Engineering – Prototype Management



- Scope of work
  - Planning and integration of specific prototype suppliers to provide prototype parts to NDRC and AP build for level 1 components
  - Identification and evaluation of such suppliers to FMC supply chain
  - Create and follow prototype BOM
  - Engage with the prototype suppliers and integrate system engineering into the quality process
  - Ensure quality builds at the supplier or the plant
  - Identify and track build issues, follow through to resolution
  - Support the creation of a vehicle usage plan o optimize hardware usage
  - Provide vehicle build support and coordination in the workshop
  - Inspection and organization support for the final release of prototype vehicle for testing
  - Track and monitor the prototype vehicles usage
  - Support FMC in the logistics of the prototype vehicles

- Assumptions
  - The prototype vehicles will be assembled at the FMC assembly plant in Nanjing
  - The bodies will be build first at the prototype supplier and later in the FMC assembly plant in Nanjing

## Manufacturing Engineering – General



- EDAG Production Solutions offers Simultaneous Engineering Support for the final customer FMC from CTC to Production Release or until the production supplier takes over this work
  - Feasibility BIW press parts BIW
  - Manufacturability BIW assemblies and subassemblies
  - BIW joining methods
  - Interior and Exterior assembly feasibility

- Main scope and goal of the project is:
  - Assurance of the technical feasibility / manufacturability for the above mentioned scope
  - Support and Simultaneous Engineering activities for all Product Development related activities for single parts, assemblies, interior and exterior parts
    - It is assumed that the development is a prototype free development phase, therefore no support for hardware
    - prototyping is considered
    - Project start is considered for the 1th August 2017. End of the project is Production Release, planned at 04.06.2018.
    - Process planning support through the development and realization phases is not considered in this proposal but can be offered optional
    - Project and documentation language is English

## Manufacturing Engineering – BIW Single Parts
## Series Development Phase (CTC to PR)



- Scope and Deliverables
  - Participation SE-Meetings
  - Create (Concept-)method plan for all top hat parts in 2D
  - Create die designer draw form and simulations in Autoform R6
  - Create draw form and finish forming in Catia V5 in special cases if for feasibility necessary
  - Support RPS concept definition
  - Support in design finding
  - Surface analysis for outer panels after FC-milestone and final checking to C-sample-milestone
  - Support to find best component partitions
  - Design investigations for verification of tooling operations
  - Spring back simulation for high strength steel

  Optional:
  - Feasibility Studies for 16 Plastic Parts with Moldflow Simulations with one base calculation and one iteration loop.
  - Create one cost-calculation for 200 press parts and press tools
    - Create a cost estimate (budget)
      - Press toll costs with basic of new press toll standard
      - Press part costs on the basis for a Tier 1- Press Shop
      - Estimation of checking fixture
      - The Cost calculations must be ordered by September 2017, since otherwise it is not possible to deliver the calculations until June 2018.)







## Manufacturing Engineering – BIW Single Parts Series Development Phase (CTC to PR)



- Premises
  - 200 parts are considered
  - Spring back simulation only where necessary
  - After nomination of tool or part suppliers the further development work will also be done from the supplier
  - Latest award of supplier for Long-Lead Parts to C-sample milestone
  - Assumed parts for C-sample-milestone: side panel outer, hood inner/outer, door front and rear inner/outer, roof Inner/outer, tailgate outer/inner
  - The time schedule is very tight, assumption that there is a Long-Lead Release in February 2018 to C-sample-milestone
  - No participating in method reviews and die design reviews with suppliers after supplier nomination
  - Press shop information are provided by FMC
  - Values for cost evaluation are provided by FMC







## Manufacturing Engineering BIW Assembly –
## Series Development Phase (CTC to PR)



- Scope of supply and deliverables
  - Product data analysis (completeness, applicability, etc.)
  - Development and/or update of part joining sequence
  - Geometric product verification (e.g. fitting analyses, tolerance compensation possibilities)
  - Material verification for joining technology (sheet thicknesses, used materials, gaps between sheets, flange widths, margin distances, juncture distances, etc.)
  - Accessibility check of junctures (e.g. weld spots)
  - Support of definition of clamping and locating concept (RPS)
  - Evaluation of recommendations and proposals for solving product issues and product optimizations incl. tracking of the implementation



- Premises / Assumptions / Input data
  - Standards and guidelines to be taken into consideration to be provided
  - All relevant production premises (cycle time, vertical integration, automation concept, etc. ) to be provided
  - Tool catalogues to be provided if available
  - All process and factory planning related activities are optional





# Manufacturing Engineering Interior / Exterior – Series Development Phase (CTC to PR)



- Scope of supply
    - The serial phase is part of the digital product validation.
    - At the end of the serial phase, all deviations have to be confirmed/changed, the relevant parts must have a complete documentation in the BOM.
    - All manufacturing requirements will be checked and verified
    - Joints and fixations will be confirmed, assembly paths and connections will be confirmed
    - EDAG PS uses a SE serial check list, broken down on part level, to verify the manufacturing requirements of the relevant parts
    - Additional dynamic simulation tools are in use to verify assembly paths, ergonomics and accesses for parts/operator
    - The processes will be verified

- Deliverables
    - A complete verified EDAG PS SE checklist
    - Dynamic simulations of relevant processes
    - A documentation of all deviations
    - BOP (Level 2)

## Manufacturing Engineering Interior / Exterior



- SE-Support Interior/Exterior
  - The EDAG-PS Competence Process is the base of the SE support
  - All relevant check list and processes are documented in the data base



## Manufacturing Engineering Interior / Exterior



- SE-Support Interior/Exterior
  - In the EDAG-PS Competence Process all tools to settle the tasks of the project are consigned



## Manufacturing Engineering Interior / Exterior



- SE-Support Interior/Exterior
  - For the product validation, all deviation will be documented
  - Vital for the documentation of the deviation is, beside the problem description
  - to document all relevant information as release status, drawing status, variants, control models, etc.



## Manufacturing Engineering Interior / Exterior



- SE-Support Interior/Exterior
  - According to the EDAG PS competence process, checking and documenting the process steps according to the relevant check list
  - Deviations are documented
  - The EDAG PS manufacturing engineer reconciles the deviation in meetings with the relevant partners
  - A common status will be defined



## Manufacturing Engineering Interior / Exterior



- SE-Support Interior/Exterior
  - The status of the issue affect the further steps



3-081

Content



**1**   Preamble and Executive Summary

**2**   Project Description, General Assumptions, RASIC, Timing

**3**   Statement of work, Organization; Deliverables, Assumptions

**4**   Cost Breakdown & Capacity Planning

© Copyright 2016 EDAG Engineering GmbH. All rights reserved.
191610D000 Confidential,   V. Amelung, Project Management, Oct 2017

3-082

# Cost Summary – Total Cost Summary



| Subject | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| **Project Management** | **355.285 €** | **925.678 €** | **757.376 €** | **47.148 €** | **2.085.487 €** |
| Project Management | 257.388 € | 572.241 € | 521.601 € | 42.380 € | 1.393.609 € |
| BOM & Datamangement | 97.897 € | 353.437 € | 235.775 € | 4.769 € | 691.878 € |
| **Development Quality** | **755.959 €** | **1.932.780 €** | **687.867 €** | **33.150 €** | **3.409.755 €** |
| Design Quality/ FMEA | 379.734 € | 952.278 € | 482.797 € | 24.452 € | 1.839.260 € |
| Dimensional Engineering | 376.225 € | 980.502 € | 205.070 € | 8.698 € | 1.570.495 € |
| **Systems Engineering** | **5.320.948 €** | **8.899.630 €** | **3.789.490 €** | **174.100 €** | **18.184.168 €** |
| Upper Body | 729.794 € | 1.312.131 € | 629.486 € | 35.188 € | 2.706.599 € |
| Platform | 581.857 € | 1.085.418 € | 426.864 € | 18.775 € | 2.112.914 € |
| Closures | 997.867 € | 1.714.485 € | 785.260 € | 20.494 € | 3.518.107 € |
| Exterior | 1.601.062 € | 2.640.231 € | 1.142.080 € | 47.384 € | 5.430.757 € |
| Interior | 1.410.368 € | 2.147.365 € | 805.800 € | 52.258 € | 4.415.791 € |
| **Vehicle Engineering** | **3.538.341 €** | **8.877.236 €** | **5.197.093 €** | **97.631 €** | **17.710.300 €** |
| Vehicle Architecture/Package | 459.503 € | 657.035 € | 204.689 € | 8.124 € | 1.329.351 € |
| DMU | 208.752 € | 391.411 € | 132.210 € | 7.828 € | 740.201 € |
| Vehicle Integration, Attributes | 324.788 € | 919.094 € | 458.099 € | 12.473 € | 1.714.453 € |
| Passive Safety | 233.917 € | 896.013 € | 772.933 € | 5.189 € | 1.908.052 € |
| CAE & Simulation | 1.973.180 € | 4.682.794 € | 2.415.577 € | - € | 9.071.551 € |
| Test & Validation | 215.021 € | 935.255 € | 1.081.708 € | 64.016 € | 2.295.999 € |
| Prototype Management | 123.180 € | 395.635 € | 131.878 € | - € | 650.693 € |
| **Subtotal Product Engineering** | **9.970.533 €** | **20.635.322 €** | **10.431.826 €** | **352.029 €** | **41.389.710 €** |
| | | | | | |
| **Subtotal Santa Clara Support** | **505.086 €** | **1.848.837 €** | **1.023.948 €** | **44.219 €** | **3.422.090 €** |
| Project Management | 91.515 € | 414.697 € | 192.821 € | 7.524 € | 706.556 € |
| Vehicle Integration | 47.656 € | 190.626 € | 111.198 € | 3.971 € | 353.452 € |
| Systems Engineering | 306.416 € | 1.017.421 € | 589.033 € | 26.774 € | 1.939.644 € |
| Package/DMU | 59.498 € | 226.093 € | 130.896 € | 5.950 € | 422.438 € |
| CAE & Simulation | - € | - € | - € | - € | - € |
| | | | | | |
| **Subtotal Manufacturing Engineering** | **1.575.728 €** | **1.518.029 €** | **- €** | **- €** | **3.093.757 €** |
| Single parts feasibilty BIW/Closures | 830.203 € | 674.540 € | - € | - € | 1.504.743 € |
| Assembly feasibility BIW/Closures | 392.689 € | 428.388 € | - € | - € | 821.076 € |
| Single parts feasibility Interior/Exterior | 352.836 € | 415.102 € | - € | - € | 767.938 € |
| **Total** | **12.051.346 €** | **24.002.188 €** | **11.455.774 €** | **396.248 €** | **47.905.557 €** |

* CAE & Simulation contains 1.747.000 € cost for Cluster and Dummies

## Cost Summary – Total Cost Summary by FMC Cost Center



|  | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| Body Engineering | 7.566.363 € | 12.939.472 € | 5.066.390 € | 234.024 € | 25.806.248 € |
| Vehicle Integration | 3.645.496 € | 9.293.954 € | 5.439.188 € | 107.552 € | 18.486.189 € |
| Manufacturing Engineering | 392.689 € | 428.388 € | - € | - € | 821.076 € |
| Project Management | 446.800 € | 1.340.375 € | 950.197 € | 54.672 € | 2.792.044 € |
|  | 12.051.346 € | 24.002.188 € | 11.455.774 € | 396.248 € | 47.905.557 € |

3-084

# Cost Summary – Total Headcount Product Engineering





# Cost Summary – Total Headcount Permanent Santa Clara





# Cost Summary – Total Headcount Manufacturing Feasibility





# Cost Summary – Calculation Basis

EDAG

| Class. | Project Role | Calculation Rate | Average Headcount | Total Hours |
|---|---|---|---|---|
| 1 | Sr. Project Manager | 126,00 € | 1,42 | 6.138 |
| 2 | Chief Engineer | 110,00 € | 1,74 | 7.546 |
| 3 | Lead Engineer/Module Leader | 82,40 € | 23,18 | 100.403 |
| 4 | Sr. Engineer/Sr. Designer | 71,86 € | 44,09 | 191.015 |
| 5 | Engineer/Designer | 60,23 € | 81,59 | 353.459 |
| 6 | Jr. Engineer | 47,61 € | 7,02 | 30.413 |
| | Calculatory Average Rate | 67,26 € | 159,03 | 688.974 |

## Cost Summary – Travel Budget Assumptions



- EDAG people traveling to US or China
  - Assumptions per Head:
    - Average duration – 2 weeks per month
    - Flights          1200 €/flight
    - Lodging          10 days @ 150 € = 1.500 €
    - Transportation 10 days @ 60 € = 600 €
    - Allowance       10 days @ 50 € = 500 €
  - Total Monthly cost per Head = **3.800 €**

- EDAG Expat permanent in Santa Clara
  - Assumptions per Head:
    - 2 home flights per year = 6 flight total x 1200 € = 7200 € / 30 month = 240 €/month
    - Lodging = furnished apartment = 2.5600 €/month
    - Utility, other lodging cost = 400 €/month
    - Transportation = 450 €/month
    - Allowance = 500 €/month
  - Total monthly cost per Head = **4.640 €**

# Cost Summary – Travel & Expat Budget Summary



| | Engineering & Design Travel Headcount/month | Manufacturing Travel Headcount/month | Total Head traveling Headcount per month | Subtotal Travelcost | Santa Clara permanent Expat Headcount | Cost per month Expat | Total Travel & Expat Cost |
|---|---|---|---|---|---|---|---|
| Aug 17 | 1,5 | 0 | 1,5 | 5.700 | 0 | 0 | 5.700 |
| Sep 17 | 4 | 1 | 5 | 19.000 | 3 | 13.920 | 32.920 |
| Okt 17 | 4,8 | 1,5 | 6,3 | 23.940 | 9 | 41.760 | 65.700 |
| Nov 17 | 4,8 | 1,5 | 6,3 | 23.940 | 15 | 69.600 | 93.540 |
| Dez 17 | 6,4 | 2 | 8,4 | 31.920 | 15 | 69.600 | 101.520 |
| Jan 18 | 6,4 | 2 | 8,4 | 31.920 | 15 | 69.600 | 101.520 |
| Feb 18 | 6,4 | 2 | 8,4 | 31.920 | 15 | 69.600 | 101.520 |
| Mrz 18 | 6,4 | 2 | 8,4 | 31.920 | 15 | 69.600 | 101.520 |
| Apr 18 | 6,4 | 3 | 9,4 | 35.720 | 15 | 69.600 | 105.320 |
| Mai 18 | 6,4 | 3 | 9,4 | 35.720 | 15 | 69.600 | 105.320 |
| Jun 18 | 6,4 | 3 | 9,4 | 35.720 | 15 | 69.600 | 105.320 |
| Jul 18 | 6,4 | 3 | 9,4 | 35.720 | 15 | 69.600 | 105.320 |
| Aug 18 | 8 | | 8 | 30.400 | 8 | 37.120 | 67.520 |
| Sep 18 | 8 | | 8 | 30.400 | 8 | 37.120 | 67.520 |
| Okt 18 | 8 | | 8 | 30.400 | 8 | 37.120 | 67.520 |
| Nov 18 | 8 | | 8 | 30.400 | 8 | 37.120 | 67.520 |
| Dez 18 | 8 | | 8 | 30.400 | 8 | 37.120 | 67.520 |
| Jan 19 | 9,6 | | 9,6 | 36.480 | 8 | 37.120 | 73.600 |
| Feb 19 | 4,8 | | 4,8 | 18.240 | 8 | 37.120 | 55.360 |
| Mrz 19 | 4,8 | | 4,8 | 18.240 | 8 | 37.120 | 55.360 |
| Apr 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Mai 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Jun 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Jul 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Aug 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Sep 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Okt 19 | 4,8 | | 4,8 | 18.240 | 7 | 32.480 | 50.720 |
| Nov 19 | 3,2 | | 3,2 | 12.160 | 3,5 | 16.240 | 28.400 |
| Dez 19 | 3,2 | | 3,2 | 12.160 | 3,5 | 16.240 | 28.400 |
| Jan 20 | 3,2 | | 3,2 | 12.160 | 3,5 | 16.240 | 28.400 |
| | | | | **732.260 €** | | **1.255.120 €** | **1.987.380 €** |

# Cost Summary - Payment Schedule Engineering Work



| Payment # | Payment Schedule | Payment Amount | Running Payment | Comment |
|---|---|---|---|---|
| 1 | Down payment | 2.200.000 € | 2.200.000 € | 4,592% |
| 2 | Aug 17 | 1.850.000 € | 3.976.300 € | Aug 17 already Contracted and invoiced |
| 3 | Sep 17 | 1.850.000 € | 6.262.399 € | Sep 17 already Contracted and invoiced |
| 4 | Okt 17 | 2.893.575 € | 8.793.575 € | |
| 5 | Nov 17 | 2.578.899 € | 11.372.474 € | |
| 6 | Dez 17 | 2.325.430 € | 13.697.904 € | |
| 7 | Jan 18 | 2.450.976 € | 16.148.880 € | |
| 8 | Feb 18 | 2.410.188 € | 18.559.068 € | |
| 9 | Mrz 18 | 2.313.986 € | 20.873.055 € | |
| 10 | Apr 18 | 2.298.280 € | 23.171.335 € | |
| 11 | Mai 18 | 2.234.138 € | 25.405.473 € | |
| 12 | Jun 18 | 1.958.689 € | 27.364.162 € | |
| 13 | Jul 18 | 1.857.282 € | 29.221.445 € | |
| 14 | Aug 18 | 1.475.413 € | 30.696.858 € | |
| 15 | Sep 18 | 1.482.695 € | 32.179.553 € | |
| 16 | Okt 18 | 1.475.491 € | 33.655.045 € | |
| 17 | Nov 18 | 1.476.977 € | 35.132.021 € | |
| 18 | Dez 18 | 1.465.802 € | 36.597.823 € | |
| 19 | Jan 19 | 1.334.885 € | 37.932.709 € | |
| 20 | Feb 19 | 1.186.413 € | 39.119.121 € | |
| 21 | Mrz 19 | 1.158.641 € | 40.277.762 € | |
| 22 | Apr 19 | 1.146.917 € | 41.424.679 € | |
| 23 | Mai 19 | 1.000.084 € | 42.424.763 € | |
| 24 | Jun 19 | 941.355 € | 43.366.119 € | |
| 25 | Jul 19 | 886.871 € | 44.252.990 € | |
| 26 | Aug 19 | 860.195 € | 45.113.185 € | |
| 27 | Sep 19 | 829.147 € | 45.942.331 € | |
| 28 | Okt 19 | 687.954 € | 46.630.286 € | |
| 29 | Nov 19 | 448.610 € | 47.078.896 € | |
| 30 | Dez 19 | 448.610 € | 47.527.506 € | |
| 31 | Jan 20 | 378.051 € | 47.905.557 € | |

Travel Cost will be invoiced on a monthly basis upon occurrence at cost plus 8% in addition to the payment schedule for the engineering work.

# EXHIBIT B

# CONTENTS

| | | |
|---|---|---|
| 1. | Introduction | 1 |
| 2. | Programme Information | 1 |
| | 2.1 Timing | 1 |
| | 2.2 Virtual Series | 1 |
| | 2.3 Physical Prototype Phases | 1 |
| | 2.4 Data Release to Suppliers | 2 |
| | 2.5 Location of Development Activities | 2 |
| | 2.6 Leadership and Programme Management | 2 |
| | 2.7 Flexibility To Transfer In-House | 2 |
| | 2.8 Proposal Model | 2 |
| 3. | Technical Scope of Work | 3 |
| | 3.1 Vehicle Integration | 3 |
| | 3.1.1 Vehicle Targets | 3 |
| | 3.1.2 Architecture and Package | 3 |
| | 3.1.3 Prototype Build and Test | 3 |
| | 3.1.4 BOM and Mass Management | 3 |
| | 3.1.5 Functional Safety | 4 |
| | 3.2 Vehicle Engineering | 5 |
| | 3.2.1 Chassis Design and Engineering | 5 |
| | 3.2.2 Body Structures, Closures and Exterior | 6 |
| | 3.2.3 Body Interior | 6 |
| | 3.2.4 Exclusions | 7 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# RFQ for CTC Gateway to SOP plus 90 days

## 1. Introduction

Future Mobility Corporation (FMC) is engineering an electric autonomous vehicle for sale in China, Europe and the US. FMC invites Engineering Service Supplier (ESS – replace with name) to quote for the work packages described in Section x – Scope of Work from Concept Target Confirmation (CTC) Gateway to Start Of Production (SOP) plus 90 days.

It is anticipated and expected that some questions will arise from the RFQ and FMC will support the ESS with additional information as requested. All additional information will be made available to all parties bidding for the work.

## 2. Programme Information

### 2.1 Timing

An overview of the programme timing is given in the appendices; SOP is 1st October 2019. The detailed Master Schedule is currently undergoing an evolution and the ESS is expected to work with FMC and other supplier partners to develop the detailed timing to meet the business requirements. The proposal should quote for work up to SOP plus 90 days. The ESS will be required to define what activities are required in order to meet the required timing with an acceptable level of risk. Where risk is considered to be excessively high, formal risk management should be initiated to the defined FMC process, or to industry best practice if the process is not yet defined.

### 2.2 Virtual Series

The Programme will run various loops of simulation activity for the duration of the programme. The ESS will be expected to commit to appropriate input data freezes to support stability in these simulation loops and is required to quote for all appropriate simulation for the design and development of the areas under their remit. Please list what CAE and simulation will be undertaken and define the toolset to be used in each case.

### 2.3 Physical Prototype Phases

Three whole vehicle prototype phases at FMC are expected:

1) Mule – timing TBC – build location TBC

Attribute Prototype – including build of 25 vehicles for delivery to NDRC on July 1st 2017 to meet Chinese licensing requirements and build of 30 to 50 Attribute Prototypes immediately following NDRC vehicles to undertake a full Design Verification Plan (DVP). All Attribute Prototypes to be off soft-tooling and where possible from the production intent supplier. Location of build of both

the BIWs and the whole vehicles is still to be confirmed and could be USA, Europe or China, but is most likely to be China.

Validation Prototype – number of vehicles TBC – exact build timing TBC but expected to start in May or June 2019. Location of build will be Nanjing, China.

In addition to the above the ESS is required to define and support all sub-system and system testing. It is expected that the majority of component testing will be undertaken by the component supplier but all assumed exceptions should be listed in the proposal.

The ESS should also be aware that FMC will have multiple "labcars" and electrical test benches/rigs. The ESS is not expected to be involved in the electrical content of these rigs and labcars.

## 2.4  DATA RELEASE TO SUPPLIERS

The ESS is responsible for timely release of data to suppliers to ensure supply of prototype parts to meet "Material Required Dates" for build phases. The ESS is expected to liaise with the suppliers with regard to tooling and part supply lead-times and is responsible for developing and maintaining an Engineering Timing Release Schedule (ETRS) based on those lead-times. Real (not generic) risks to the required release dates must be raised no less then weekly to the FMC Engineering representative and the Programme Manager in a specific and tangible manner, supported by documentation and hard facts.

## 2.5  LOCATION OF DEVELOPMENT ACTIVITIES

FMC has locations in Hong Kong, Nanjing, Munich and Santa Clara. The ESS will need to commit to providing substantial resource in any or all of these areas, plus global test locations, supplier premises (both component and development) and new facilities that FMC may set up in other regions. Initially, the main Engineering location will be Santa Clara. The proposal should clearly define the level and timing of possible support in the context of the above requirements.

## 2.6  LEADERSHIP AND PROGRAMME MANAGEMENT

What is known as "heavy-weight" programme and technical leadership is required for this project; Programme Management is not expected to be purely an admin and reporting role. The leaders are expected to represent FMC requirements on a day to day basis ensuring the quality and timing of the delivery in line with FMC expectations. FMC will not provide resource to monitor and drive progress or quality of delivery on a daily basis; this is the responsibility of the ESS. The ESS should also ensure internal approval of all formal reporting material (e.g. Gateway reports) prior to submission to FMC to reduce time spent by FMC correcting poor quality and errors before further circulation.

## 2.7  FLEXIBILITY TO TRANSFER IN-HOUSE

As FMC grows, increasing numbers of activities will be transferred in-house and away from the Engineering Service Suppliers. This migration is difficult to schedule precisely; it may be possible to transfer some areas quite soon e.g. BOM Management, whereas others may not be transferrable for the duration of this programme. A freeze date for any transfer should be agreed;

3

i.e. after a certain point in the programme it will be too high risk to transfer any package and this should be agreed up front.

## 2.8 PROPOSAL MODEL

This project is deliverable based. That said, in your pricing proposal, you will need to provide a detailed breakdown of your cost components & assumptions, which includes:

1) Total cost proposal: *(enter total cost)*
2) Detail cost components/assumptions:

| Engineering Role | # of Headcount | Expected Wkly Hrs per person | Hourly Labor Rate (USD) |
|---|---|---|---|
| (1) Chief/Lead Eng | *(enter #)* | *(enter #)* | *($ value)* |
| (2) Sr Eng | *(enter #)* | *(enter #)* | *($ value)* |
| (3) Eng | *(enter #)* | *(enter #)* | *($ value)* |
| (4) Jr Eng | *(enter #)* | *(enter #)* | *($ value)* |

| Other Expenses *(if applicable)*: | | |
|---|---|---|
| 1) | Travel | *($ value)* |
| 2) | *(enter other expense type)* | *($ value)* |
| 3) | *(enter other expense type)* | *($ value)* |
| 4) | *(enter other expense type)* | *($ value)* |

# 1. TECHNICAL SCOPE OF WORK

The scope of work is split into two major sections: Vehicle Integration (also referred to as Complete Vehicle) and Vehicle Engineering (typically covering component and system engineering within Chassis, Body, Powertrain and Electrical). Each of these major sections is then split into sub-sections.

## 3.1 VEHICLE INTEGRATION

### 3.1.1 Vehicle Targets

FMC have defined Brand-level subjective vehicle attribute targets, which the ESS will translate into objective targets and then cascade to a system, sub-system and component level. A full list of Level 1, Level 2 and Level 3 attributes will be provided in the Appendices.

A subjective drive appraisal of ride, handling and NVH attributes has taken place.

Focused objective benchmarking will take place prior to CTC for NVH, PED, vehicle dynamics and thermal systems. Specific cars and testing still to be agreed with FMC (Tesla Model X, BMW X3, BMW I3, Audi Q5, Mercedes GLC and Lexus RX450H for main consideration).

Vehicle target development, monitoring of contributing systems and components, attribute target trading and issue resolution is an ongoing activity throughout the Programme to SOP. The ESS is expected to continue to manage this process until FMC is able to develop internal resource to take this activity in-house.

4

### 3.1.2 Architecture and Package

The ESS that is successful in winning the Body Engineering work package will also be responsible for the whole vehicle package. They will be responsible for obtaining fit-for-purpose package data from FMC component suppliers, maintaining a whole vehicle "digital mock-up" (DMU), tracking and managing issues to resolution in a timely manner, running bumper-to-bumper reviews and supporting virtual series and Programme Gateway timing. This ESS should behave as a Vehicle Architect for the time that FMC does not have this role filled.

### 3.1.3 Prototype Build and Test

Prototype Build and Test activities are expected to be led by FMC, supported by the ESS from a complete vehicle perspective where necessary. The initial Design Verification Plan (DVP) for both Attribute Prototypes and Validation Prototypes will be made available at CTC and the ESS will be responsible for the ongoing management and evolution of this plan, the specification of the test fleet

### 3.1.4 BOM and Mass Management

A BOM exists and is expected to develop further over the course of the project, to reflect the assemblies, sub-systems and components.

Each ESS is to be responsible for the BoM information related to those systems and components it owns (as per system ownership table). In addition to this, the ESS who is successfully in winning the Vehicle Targets work package will also be responsible for the status and reporting of the complete BOM and vehicle mass (by variant and to include all options packs).

This ESS will also be responsible for creating the specific vehicle BOMs for all vehicle build phases, including at least Mule, NDRC vehicles, Attribute Prototypes and Validation Prototypes.

The planned PLM system (Enovia) will be implemented and commissioned during the project and the Supplier will be expected to integrate to this system at that time. In the meantime, this task must be managed using the ESS systems and/or Excel, to be approved by FMC.

Mass and cost to be added where available. Where not yet available, estimates to be used and replaced as and when but with a clear plan to replacement of all estimated data and reporting of status against that plan (dashboard metrics expected).

As the CAD data develops, CAE further optimizes the design and feedback from testing causes change, the BOM and mass will need to be managed via a formal change management process. The ESS should include this continuing work in the proposal and will undertake it until FMC recruit resource to take it in-house.

phase of the project until the detailed drawing release stage provides the most accurate weight data before off-tool sample inspection)

### 3.1.5 Functional Safety

The ESS should recommend whether support from a human interface expert as well as a cyber-security expert is required in addition to Supplier activity. It is assumed that the functional safety assessments will be conducted by a third party. The functional safety activities to be conducted in accordance with ISO 26262:2011. Highest ASIL of the application expected to be ASIL D

#### 3.1.5.1     Objectives

i.     Finalization of the definition of safety goals and ASIL

5

    ii.    Safety case: update with re. to safety goals
   iii.    Definition of the Functional safety concept
   iv.    Item definition specification for identified systems (finalization)
    v.    Planning of the verification (at vehicle level) and validation activities
   vi.    Initiation of the technical safety concepts with the relevant system suppliers (planning of activities)

### 3.1.5.2    *Technical developments activity*
    i.    Finalize the HARA: confirmation of all applicable safety goals and associated ASILs
    ii.    Development of the Functional safety concept:
       1)  Identification of the cause of violation of safety goals (FTA for each safety goal)
       2)  Review of system FMEA(s)
       3)  Identification of possible risk mitigation strategies for each safety goal
       4)  Discuss the feasibility of the solution with the relevant system suppliers
       5)  Finalization of the functional safety concept
   iii.    Development of the Verification and Validation plans
       1)  Agreement with system suppliers on the split of FSRs verification activities, i.e. which verification can be conducted by system supplier, which verification has to be conducted by FMC/Supplier
       2)  Specification of verification test procedures for FSRs to be verified by FMC/Supplier; this constitutes the verification plan
       3)  Specification of the test procedures for the safety goals validation; this constitutes the validation plan
   iv.    Initiation of technical safety concepts (TSCs)
       1)  Agreement with relevant system suppliers on the development of the TSC or sub-parts (HW or SW): agreement will be reflected in the DIA developed with each system supplier
       2)  Review of impact analyses conducted by system suppliers and related safety plan
    v.    Update of the item definition specification
       1)  Update with hazards, safety goals and FSRs relevant to the system under consideration
       2)  Update description of the system (functionalities, interfaces, applicable standards, etc.)

### 3.1.5.3    *Project functional safety management activities*
    i.    Safety plan management: update, in particular re. the management of system suppliers and partners
    ii.    Functional safety assessment (third party)
   iii.    Functional safety audit of selected system suppliers
   iv.    Update of safety case wrt HARA, safety goals, FSC and V&V plans

### 3.1.5.4    *Generic Functional safety management activities*
    i.    Finalization of 3(or 4) party DIA with FMC, Supplier, B&T partner and other relevant system suppliers
    ii.    Initiation of 3 party DIA with sub-suppliers of safety-related systems under the responsibility of Supplier
   iii.    Quality management, evidence of competence and company processes demonstration: completion of audit with FMC
   iv.    Project safety management (reporting, configuration & change management)

## 3.2   VEHICLE ENGINEERING

### 3.2.1 Chassis Design and Engineering
A Concept will be made available. The ESS will need to take the concept and undertake detailed engineering work, including CAE, 2D and 3D CAD, supplier liaison and integration with all other

6

EDG-0051737

required areas. All virtual and physical prototype builds and testing will need to be supported with data, parts and resource where applicable.

The ESS should produce sub-system technical specification (SSTS) documents and component DCS documents (for components within those systems) required to support the procurement process, which is led by FMC, but also to support the component suppliers who will begin working on serial design imminently.

The ESS should manage the overall Chassis Engineering activity through prototype and production release and supply ensuring that parts supplied are to engineering specifications, managing rectification activities and overseeing the build for their activity.

Testing will need to be supported, results analysed and issues resolution and change management undertaken to work towards final production designs. Supplier liaison is also expected throughout the programme to SOP plus 90 days.

### 3.2.2 Body Structures, Closures and Exterior

Concepts should be finalized at CTC Gateway. The ESS will need to undertake the detailed engineering work, including CAE, 2D and 3D CAD, supplier liaison and integration with all other required areas. All virtual and physical prototype builds and testing will need to be support with data, parts and resource where applicable.

The ESS should manage the overall Body Engineering activity through prototype and production release and supply ensuring that parts supplied are to engineering specifications, managing rectification activities and overseeing the build for their activity. Dimensional engineering (gap, flush, tolerance stacks, etc.) to be undertaken to FMC requirements and to industry best practice where FMC requirements are not yet defined.

Testing (managed by Vehicle Integration) will need to be supported, results analysed and issues resolution and change management undertaken to work towards final production designs. Supplier liaison is also expected throughout the programme to SOP plus 90 days.

### 3.2.3 Body Interior

Concepts should be finalized at CTC Gateway. The ESS will need to undertake the detailed engineering work, including CAE, 2D and 3D CAD, supplier liaison and integration with all other required areas. All virtual and physical prototype builds and testing will need to be support with data, parts and resource where applicable.

The ETRS should be marked up with supplier types (Full Service, Co-Design and Build-To-Print) with the responsibility split between all parties (RASIC) defined for each type. This should be aligned with FMC as part of the bidding process.

The ESS should manage the overall Interiors Engineering activity through prototype and production release and supply ensuring that parts supplied are to engineering specifications, managing rectification activities and overseeing the build for their activity. Dimensional engineering (gap, flush, tolerance stacks, etc.) to be undertaken to FMC requirements and to industry best practice where FMC requirements are not yet defined.

Testing (managed by Vehicle Integration) will need to be supported, results analysed and issues resolution and change management undertaken to work towards final production designs. Supplier liaison is also expected throughout the programme to SOP plus 90 days.

7

### 3.2.4 Exclusions

No Powertrain, HVAC system, Electrical, Connectivity, Autonomy, ADAS or UI/UX content is included in this RFQ and should not be included in the proposal. (other than Functional Safety of these items).

These excluded packages may be sent as an addendum to the RFQ, in which case they should be quoted both (1) as a stand-alone piece of work and as (2) as an addition to the main scope of work, where utilization of efficiencies is expected to result in a lower overall cost than in case (1).

8

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

# EXHIBIT C









# EXHIBIT D

MAGNA STEYR **MSDS Gate Deliverables Checklist**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | **Gate:** **PV** | | **Product Vision: Innovation and strategy phase is c** |
| 3 | | | | | | |
| 4 | | | | 1.0 | | **Program Management** |
| 5 | | | | 1.1 | | Master Timing |
| 6 | | | | 1.1.1 | | Detailed Timing |
| 7 | | | | 1.1.2 | | DVP Review |
| 8 | | | | 1.2 | | Gateway Review |
| 9 | | | | 1.2.1 | | Major Issues and Risks |
| 10 | | | | 1.2.2 | | Red/Yellow Grren |
| 11 | | | | 1.2.3 | | Recovery Plans |
| 12 | | | | 1.3 | | Processes / Methods |
| 13 | | | | 1.3.1 | | Product Development Process |
| 14 | | | | 1.3.2 | | Meeting Schedule |
| 15 | | | | 1.3.3 | | Change Management |
| 16 | | | | 1.3.4 | | Outsourced Engineering |
| 17 | | | | 1.4 | | Team Organization |
| 18 | | | | 1.4.1 | | Program Organisation |
| 19 | | | | 1.5 | | Contract Management |
| 20 | | | | 1.5.1 | | Contract update |
| 21 | | | | 1.6 | | Knowledge Management |
| 22 | | | | 1.6.1 | | Transfer of Experience |
| 23 | | | | 1.6.2 | | Reflection of Experience (Lessons Learned) |
| 24 | | | | 1.7 | | Configuration Management |
| 25 | | | | 1.7.1 | | Program target requirements |
| 26 | | | | 1.7.2 | | Module target framework |
| 27 | | | | 1.7.3 | | Change request status - complete vehicle |

This document is assigned to G10250. 010250-101-c

# MAGNA STEYR MSDS Gate Deliverables Checklist

| | G | H | | I | J |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | complete. An adequate description of the program / project is available | | | | |
| 3 | | **Responsible Role** | | **Responsible Organisation** | **Responsible Name** |
| 4 | | **FMC-PM** | | | |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | | FMC | |
| 6 | ►Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | | ESS | |
| 7 | DVP including test timing and vehicle fleet reviewed and algined with Master Timing and Budget | Timing Manager Cost Controller | | ESS Vehicle Attributes | |
| 8 | | Program Manager | | FMC | |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | | ESS | |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | | ESS | |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | | ESS | |
| 12 | | Program Manager | | FMC | |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | | FMC | |
| 14 | Meeting schedule issued | Program Manager | | FMC | |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | | FMC | |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | | FMC | |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication..) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | | FMC | |
| 18 | ►Program organisation and teamwork functioning according to planning ►Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | | ESS | |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | | FMC | |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | | FMC | |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | | FMC | |
| 22 | ►Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | | |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | | ESS | |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | | FMC | |
| 25 | ►Status of program requirements available ►Changes to program targets transferred to change management for tracking | Configuration Manager | | FMC | |
| 26 | ►Module target breakdown confirmed for all areas | Configuration Manager | | FMC | |
| 27 | ►Change requests to achieve VTS targets realised ►Risks for non-implementation of changes highlighted and documented | Configuration Manager | | FMC | |

# MAGNA STEYR MSDS Gate Deliverables Checklist

|  | K | L | M |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Customer (Approval) | Status: CWxxx | Forecast: CWxxx |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |

This document is assigned to G10250. 010250-101-c

# MAGNA STEYR MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |
| 29 | | | **2.0** | | **Marketing** | |
| 30 | | | 2.1 | | Product Definition | |
| 31 | | | 2.1.1 | | | Target customers |
| 32 | | | 2.1.2 | | | Benchmark |
| 33 | | | 2.1.3 | | | Series and optional features |
| 34 | | | 2.2 | | Sales and Marketing | |
| 35 | | | 2.2.1 | | | Target markets |
| 36 | | | 2.2.2 | | | Price range |
| 37 | | | **3.0** | | **Styling** | |
| 38 | | | 3.1 | | Styling status | |
| 39 | | | 3.1.1 | | | Styling status |
| 40 | | | 3.1.2 | | | Styling Briefing |
| 41 | | | 3.1.3 | | | 2D & 3D Styling |
| 42 | | | 3.1.4 | | | Theme Reduction |
| 43 | | | 3.1.5 | | | Go for hardware model |
| 44 | | | 3.1.6 | | | Colour & Trim |
| 45 | | | **4.0** | | **Product Development** | |
| 46 | | | 4.1 | | Product Development Targets | |
| 47 | | | 4.1.1 | | | Development strategy |
| 48 | | | 4.1.2 | | | Innovations |
| 49 | | | 4.1.3 | | | Complete vehicle targets |

# MAGNA STEYR MSDS Gate Deliverables Checklist

| | | | | |
|---|---|---|---|---|
| 28 | ▶ Change requests to achieve module targets realised<br>▶ Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | | **OEM-M** | | |
| 30 | Customer Market Profile available, initial proposal for benchmark vehicles available | OEM-M | | |
| 31 | ▶ Customer Market Profile available including requirements derived from analysis of competitors<br>▶ Potential innovation fields defined<br>▶ Key product characteristics proposed | | | |
| 32 | ▶ Proposal for core competitors<br>▶ Benchmark vehicles for key product characteristics proposed | | | |
| 33 | ▶ Proposal for series / optional features and USPs available<br>▶ Initial sales forecast by market<br>▶ Platform commonality proposal available | | | |
| 34 | Initial estimate of markets and volumes available | | | |
| 35 | ▶ Target markets proposal available<br>▶ Proposal for market specific requirements available | | | |
| 36 | ▶ Proposal for target selling price by market and model | | | |
| 37 | | **PgR-St** | | |
| 38 | Current styling status available. Process steps to support program agreed | PgR-St | | |
| 39 | ▶ Major decision points determined<br>▶ Assessment of current status<br>▶ Plan and methods for reduction to a single theme approved<br>▶ Measures defined and decisions documented to achieve project goals | | | |
| 40 | ▶ Kick-off idea generation process done<br>▶ Specification Book with major vehicle dimensions and variants available<br>▶ Customer Market Profile: Customer target group defined<br>▶ Description of styling philosophy available | | | |
| 41 | ▶ Sketching and rendering program is defined<br>▶ Documentation theme development process 2D<br>▶ Renderings to continue in 3D selected<br>▶ Data model and numerical surface description | | | |
| 42 | ▶ Intermediate evaluation of styling proposals (e.g. from 5 to 3 themes)<br>▶ Display models of exterior and interior | | | |
| 43 | ▶ Visual virtual presentation of CAS-Models on power wall<br>▶ Exterior and interior definition in 3D + visualization | | | |
| 44 | ▶ Sample book with material proposals available<br>▶ Hand samples: Preselected materials and colours<br>▶ Draft angle analysis approved and specifications according to styling requirements are defined | | | |
| 45 | | **PM-E** | | |
| 46 | Initial development strategy defined. Customer Market Profile available and benchmark vehicles proposed. | | | |
| 47 | ▶ Development approach and sequence proposed<br>▶ Proposal to achieve technical development requirements within the specified timeframe | | | |
| 48 | ▶ Potential product innovations considered within scope of proposed feasibility phase | | | |
| 49 | ▶ Marketing requirements allocated to technical targets<br>▶ Complete vehicle targets for the feasibility phase determined from product technical targets<br>▶ Major development issues and top targets for the feasibility phase have been defined and agreed<br>▶ Acceptance criteria for feasibility phase defined and agreed<br>▶ Initial assessment of potential target conflicts available | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 50 | | | 4.2 | | Function / Complete vehicle | |
| 51 | | | 4.2.1 | | | Complete Vehicle development strategy |
| 52 | | | 4.2.2 | | | I-Team strategy |
| 53 | | | 4.2.3 | | | Design Verification |
| 54 | | | 4.3 | | Functional Safety | |
| 55 | | | 4.3.1 | | | Implementation of functional safety |
| 56 | | | 4.4 | | Engineering Modules | |
| 57 | | | 4.4.1 | | | Development strategy |
| 58 | | | 4.5 | | Vehicle Architecture | |
| 59 | | | 4.5.1 | | | Target development |
| 60 | | | 4.5.2 | | | Dimensional concept |
| 61 | | | 4.5.3 | | | Vehicle package |
| 62 | | | 4.6 | | Styling Technical Convergence | |
| 63 | | | 4.6.1 | | | STC Status Check |
| 64 | | | 4.7 | | Data Management | |
| 65 | | | 4.7.1 | | | Product Documentation |
| 66 | | | 4.7.2 | | | CAx and Product Data Management |
| 67 | | | 4.7.3 | | | Weight tracking |
| 68 | | | 4.7.4 | | | Component cost tracking |
| 69 | | | 4.7.5 | | | Engineering information and data management requirements |
| 70 | | | 4.7.6 | | | Product module structure |
| 71 | | | 4.8 | | Product Quality Assurance | |
| 72 | | | 4.8.1 | | | Q-Planning Product |
| 73 | | | 4.8.2 | | | Perceived Quality (Virtual / Physical) |

| | G | H | I | J |
|---|---|---|---|---|
| 50 | Major functional targets for the feasibility phase defined based on Customer Market Profile and agreed with customer (OEM) | ER-CV | | |
| 51 | ►Initial assessment and determination of vehicle functional targets to be achieved within the feasibility phase<br>►Development strategy proposal for achieving required targets | | | |
| 52 | ►Development strategy proposal per I-Team to achieve vehicle functional targets in the feasibility phase based on proposed scope of development<br>►Cost / timing commitments available from each I-Team for the feasibility phase with prognosis for concept and series development | | | |
| 53 | ►Initial indication of hardware requirements and required simulation loops based on defined scope of work | | | |
| 54 | Functional safety plan available | ER-FuSa | | |
| 55 | ►Plan for implementation of functional safety available<br>►Status of functional safety plan implementation | | | |
| 56 | Initial development strategy for modules based on scope of work | ER-MG | | |
| 57 | ►Proposal for milestones and timing based on overall development strategy<br>►Initial definition of test and verification methods<br>►Initial definition of hardware strategy (mules, prototypes, mock ups...)<br>►Development location defined based on overall development strategy | | | |
| 58 | Vehicle profile description, marketing drawing, Confirmation of an initial feature list, BOM and styling sketches. Verification of essential legal requirements and critical vehicle targets. Proposal and verifiation of concept package (Powertrain Storage......) | ER-VA | | |
| 59 | ►Vehicle Profile Description (VPD)<br>►Confirmation of a rough feature list, BOM<br>►Verification of critical vehicle targets | | | |
| 60 | ►Marketing Drawing<br>►TOP 10 dimensions in VPD defined | | | |
| 61 | ►Verification of essential legal requirements<br>►Proposal and verifiation of concept package (powertrain storage......) | | | |
| 62 | Vehicle profile and styling status aligned | ER-STC | | |
| 63 | ►Vehicle profile and styling status aligned and confirmed. No target conflicts identified. | | | |
| 64 | Information and communication, CAx and product data management requirements to support feasibility phase defined and implemented | ER-DM | | |
| 65 | ►Basic requirements for information & communication (process, method, system) in the feasibility phase agreed; solutions planned and/or realized<br>►Supply of data and documents arranged for feasibility phase<br>►Methods of documentation inclusive of allocation of part numbers specified for feasibillity phase | | | |
| 66 | ►CAD system and design method specified; project settings established<br>►Demand for training evaluated<br>►Training completed or plan to meet program and project requirements and timing available<br>►Provision for monitoring within technical data management system established | | | |
| 67 | ►Method for documentation of weight specified for the feasibility phase | | | |
| 68 | ►Cost tracking process defined and responsibilities determined | | | |
| 69 | ►Requirements agreed with Data Management for complete vehicle and engineering module groups | | | |
| 70 | ►Initial visualisation of scope of work based on explo-BOM<br>►Proposal for new/carry-over components available for the feasibility phase | | | |
| 71 | Initial product quality assurance planning based on scope of work available | ER-Q | | |
| 72 | ►Draft of methods use plan considered and documented within QM Plan | | | |
| 73 | ►Market positioning for product audit available and documented<br>►Benchmark agreed | | | |

# MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 74 | | | **5.0** | | | **Production** |
| 75 | | | 5.1 | | Production Planning | |
| 76 | | | 5.1.1 | | | Feasibility |
| 77 | | | 5.2 | | Layout | |
| 78 | | | 5.3 | | Process & Equipment | |
| 79 | | | 5.3.1 | | | Production benchmark |
| 80 | | | 5.4 | | Investment | |
| 81 | | | 5.4.1 | | | Required investment |
| 82 | | | 5.5 | | Production Quality Assurance | |
| 83 | | | 5.5.1 | | | Q-Planning Production |
| 84 | | | **6.0** | | | **Supply Chain Management** |
| 85 | | | 6.1 | | General Planning & Organisation | |
| 86 | | | 6.2 | | Purchase | |
| 87 | | | 6.3 | | Supplier Quality Assurance | |
| 88 | | | 6.4 | | Logistics | |
| 89 | | | **7.0** | | | **Quality Management** |
| 90 | | | 7.1 | | Requirements and quality targets | |
| 91 | | | 7.2 | | Quality planning and controlling | |
| 92 | | | 7.3 | | Materials Engineering | |
| 93 | | | 7.4 | | Geometrical Measurement | |
| 94 | | | **8.0** | | | **Information Management** |
| 95 | | | 8.1 | | Strategy / Concept | |
| 96 | | | 8.1.1 | | | Initial concept |
| 97 | | | 8.2 | | IT Infrastructure | |
| 98 | | | 8.2.2 | | | Project set up |
| 99 | | | **9.0** | | | **Costs / Finance** |
| 100 | | | 9.1 | | Business case and program costs | |
| 101 | | | 9.1.1 | | | Business case calculation |

| | G | H | I | J |
|---|---|---|---|---|
| 74 | | **PM-P** | | |
| 75 | Initial assessment of requirements available | PM-P | | |
| 76 | ▶Initial alignment of customer (OEM) requirements with potentials for achieving production targets<br>▶Initial determination of target values from a technology viewpoint regarding timing, quality, costs and manufacturability | | | |
| 77 | NO REQUIREMENT FOR PV | | | |
| 78 | Production process benchmarks available | | | |
| 79 | ▶Vehicle study compared with available competitor and reference products | | | |
| 80 | Initial estimate of investment requirements available | | | |
| 81 | ▶Initial cost estimates to achieve desired production targets | | | |
| 82 | Production quality assurance planning based on scope of work considered within QM Plan | | | |
| 83 | ▶Quality planning for production considered and documented within the Quality Management (QM) Plan | | | |
| 84 | | **PM-SCM** | | |
| 85 | NO REQUIREMENT FOR PV | | | |
| 86 | NO REQUIREMENT FOR PV | | | |
| 87 | NO REQUIREMENT FOR PV | | | |
| 88 | NO REQUIREMENT FOR PV | | | |
| 89 | | **PgR-Q** | | |
| 90 | NO REQUIREMENT FOR PV | | | |
| 91 | NO REQUIREMENT FOR PV | | | |
| 92 | NO REQUIREMENT FOR PV | | | |
| 93 | NO REQUIREMENT FOR PV | | | |
| 94 | | **PgR-IM** | | |
| 95 | Information Management initial concept | PgR-IM | | |
| 96 | ▶Assumptions available regarding:<br>-program / project partners<br>-program / project locations<br>-number of employees per partner and location<br>▶Office IT support requirements for the feasibility phase defined and agreed<br>▶IT support requirements for product design in the feasibility phase defined and agreed | | | |
| 97 | IT infrastructure to support the feasibility phase is ready for implementation | | | |
| 98 | ▶IT infrastructure to support the feasibility phase available:<br>-Office IT at required locations<br>-Communication between sites defined and ready for implementation<br>-Infrastructure to meet product design requirements in the feasibility phase available | | | |
| 99 | | **PgM** | | |
| 100 | Initial estimate of program costs, (non-recurring and part costs) and program finance plan available. Business Plan created based on initial cost estimates | PgM | | |
| 101 | ▶Initial estimate of costs for the business case complete<br>▶Assumptions for the business case defined (location, production figures, costs structure, grants/subsidies,...)<br>▶Scenarios agreed with customer (OEM) have been commercially assessed | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 102 | | | 9.1.2 | | | Benchmarking available |
| 103 | | | 9.1.3 | | | Initial target framework defined |
| 104 | | | 9.1.4 | | | Product costs |
| 105 | | | 9.1.5 | | | (Detailed) Budgets for feasibility defined |
| 106 | | | 9.2 | | Cost controlling | |
| 107 | | | 9.2.1 | | | Cost controlling system |
| 108 | | | 9.2.2 | | | Project accounting |
| 109 | | | 10.0 | After Sales | | |
| 110 | | | 10.1 | Strategy | | |
| 111 | | | 10.2 | Warranty / Service | | |
| 112 | | | 10.3 | Accessories / Spare parts | | |
| 113 | | | | | | |
| 114 | | | | | | |
| 115 | | | | | | |
| 116 | | | | | | |
| 117 | | | | | | |
| 118 | | | | | | |
| 119 | | | | | | |
| 120 | | | | | | |
| 121 | | | | | | |
| 122 | | | | | | |
| 123 | | | | | | |
| 124 | | | | | | |
| 125 | | | | | | |
| 126 | | | | | | |
| 127 | | | | | | |
| 128 | | | | | | |
| 129 | | | | | | |
| 130 | | | | | | |
| 131 | | | | | | |
| 132 | | | | | | |
| 133 | | | | | | |
| 134 | | | | | | |
| 135 | | | | | | |

# MSDS Gate Deliverables Checklist

| | G | H | I | J |
|---|---|---|---|---|
| 102 | ▶ Values from experience regarding actual costs and quotations for comparable vehicles available<br>▶ Values checked and compared with current program/project | | | |
| 103 | ▶ Initial target costs distributed at module group level according to the cost structure | | | |
| 104 | ▶ Cost targets for the module group broken down to module level<br>▶ Allocation of modules to module group checked with simultaneous engineering team | | | |
| 105 | ▶ Cost estimate for conducting the feasibility phase available<br>▶ Cost comparison made with contracted sum and cost targets agreed with responsible departments<br>▶ Deviations to cost targets documented with explanations / justifications and potential measures for minimisation | | | |
| 106 | Project financial controlling sytsem implemented for the feasibility phase and agreed budgets are available. Current program cost status available | PgM | | |
| 107 | ▶ Cost controlling system available for the feasibility phase<br>▶ Format and structure of documents for monitoring and reporting has been agreed internally and externally regarding program / project financial requirements | | | |
| 108 | ▶ Distribution of budgets and accounts according to departments' scope of work defined and available for booking<br>▶ Budget availability confirmed (either contracted by customer or from acquisition budget up to placement of order<br>▶ Comparison of planned costs against actual is possible at project level | | | |
| 109 | | **PgR-AS** | | |
| 110 | NO REQUIREMENT FOR PV | | | |
| 111 | NO REQUIREMENT FOR PV | | | |
| 112 | NO REQUIREMENT FOR PV | | | |
| 113 | | | | |
| 114 | | | | |
| 115 | | | | |
| 116 | | | | |
| 117 | | | | |
| 118 | | | | |
| 119 | | | | |
| 120 | | | | |
| 121 | | | | |
| 122 | | | | |
| 123 | | | | |
| 124 | | | | |
| 125 | | | | |
| 126 | | | | |
| 127 | | | | |
| 128 | | | | |
| 129 | | | | |
| 130 | | | | |
| 131 | | | | |
| 132 | | | | |
| 133 | | | | |
| 134 | | | | |
| 135 | | | | |

# MSDS - Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | **Gate:** **PPS** | | | **Preliminary Product Specification: Feasibility phase achievable and potential solutions evaluated.** |
| 3 | | | | | | |
| 4 | | | 1.0 | | | **Program Management** |
| 5 | | | 1.1 | | | Master Timing |
| 6 | | | 1.1.1 | | | Detailed Timing |
| 7 | | | 1.1.2 | | | DVP Review |
| 8 | | | 1.2 | | | Gateway Review |
| 9 | | | 1.2.1 | | | Major Issues and Risks |
| 10 | | | 1.2.2 | | | Red/Yellow Grren |
| 11 | | | 1.2.3 | | | Recovery Plans |
| 12 | | | 1.3 | | | Processes / Methods |
| 13 | | | 1.3.1 | | | Product Development Process |
| 14 | | | 1.3.2 | | | Meeting Schedule |
| 15 | | | 1.3.3 | | | Change Management |
| 16 | | | 1.3.4 | | | Outsourced Engineering |
| 17 | | | 1.4 | | | Team Organization |
| 18 | | | 1.4.1 | | | Program Organisation |
| 19 | | | 1.5 | | | Contract Management |
| 20 | | | 1.5.1 | | | Contract update |
| 21 | | | 1.6 | | | Knowledge Management |
| 22 | | | 1.6.1 | | | Transfer of Experience |
| 23 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 24 | | | 1.7 | | | Configuration Management |
| 25 | | | 1.7.1 | | | Program target requirements |
| 26 | | | 1.7.2 | | | Module target framework |
| 27 | | | 1.7.3 | | | Change request status - complete vehicle |



|  | G | H | I | J |
|---|---|---|---|---|
| 1 | | | | |
| 2 | se is complete. Technical, economic and timing targets for the program / project are | | | |
| 3 | | Responsible Role | Responsible Organisation | Responsible Name |
| 4 | | **FMC-PM** | | |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | **FMC** | |
| 6 | ▶ Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | **ESS** | |
| 7 | DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | **ESS Vehicle Attributes** | |
| 8 | | Program Manager | **FMC** | |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | **ESS** | |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | **ESS** | |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | **ESS** | |
| 12 | | Program Manager | **FMC** | |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | **FMC** | |
| 14 | Meeting schedule issued | Program Manager | **FMC** | |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | **FMC** | |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | **FMC** | |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | **FMC** | |
| 18 | ▶ Program organisation and teamwork functioning according to planning ▶ Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | **ESS** | |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | **FMC** | |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | **FMC** | |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | **FMC** | |
| 22 | ▶ Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | **ESS** | |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | **FMC** | |
| 25 | ▶ Status of program requirements available ▶ Changes to program targets transferred to change management for tracking | Configuration Manager | **FMC** | |
| 26 | ▶ Module target breakdown confirmed for all areas | Configuration Manager | **FMC** | |
| 27 | ▶ Change requests to achieve VTS targets realised ▶ Risks for non-implementation of changes highlighted and documented | Configuration Manager | **FMC** | |

# MAGNA STEYR MSDS Gate Deliverables Checklist

|   | K | L | M |
|---|---|---|---|
| 1 |  |  |  |
| 2 |  |  |  |
| 3 | **Customer (Approval)** | **Status: CWxxx** | **Forecast: CWxxx** |
| 4 |  |  |  |
| 5 |  |  |  |
| 6 |  |  |  |
| 7 |  |  |  |
| 8 |  |  |  |
| 9 |  |  |  |
| 10 |  |  |  |
| 11 |  |  |  |
| 12 |  |  |  |
| 13 |  |  |  |
| 14 |  |  |  |
| 15 |  |  |  |
| 16 |  |  |  |
| 17 |  |  |  |
| 18 |  |  |  |
| 19 |  |  |  |
| 20 |  |  |  |
| 21 |  |  |  |
| 22 |  |  |  |
| 23 |  |  |  |
| 24 |  |  |  |
| 25 |  |  |  |
| 26 |  |  |  |
| 27 |  |  |  |

This document is assigned to G10250. 010230-101-c

| | | | | |
|---|---|---|---|---|
| 28 | 1.7.4 | | Change request status - engineering module groups |
| 29 | **2.0** | **Marketing** | |
| 30 | 2.1 | Product Definition | |
| 31 | 2.1.1 | | Product positioning |
| 32 | 2.1.2 | | Benchmark |
| 33 | 2.1.3 | | Sales Volumes |
| 34 | 2.1.4 | | Characteristics |
| 35 | 2.1.5 | | Series and optional features |
| 36 | 2.2 | Sales and Marketing | |
| 37 | 2.2.1 | | Communication strategy |
| 38 | 2.2.2 | | Target markets |
| 39 | 2.2.3 | | Price range |
| 40 | **3.0** | **Styling** | |
| 41 | 3.1 | Styling status | |
| 42 | 3.1.1 | | Styling status |
| 43 | 3.1.2 | | Theme Selection (Go with One) |
| 44 | 3.1.3 | | 3D Styling |
| 45 | 3.1.4 | | Hardware model |
| 46 | 3.1.5 | | Colour & Trim |
| 47 | **4.0** | **Product Development** | |
| 48 | 4.1 | Product Development Targets | |

This document is assigned to G10250. 010250-101-c



| | G | H | I | J |
|---|---|---|---|---|
| 28 | ▶Change requests to achieve module targets realised<br>▶Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | | **OEM-M** | | |
| 30 | Product positioning (Customer Market Profiles) and price / volumes confirmed | | | |
| 31 | ▶Product vision available<br>▶Product positioning confirmed<br>▶Customer Market Profile available<br>▶Target customer requirements (content/market) defined | | | |
| 32 | ▶Core competitors confirmed<br>▶Benchmarks for required product characteristics defined | | | |
| 33 | ▶Sales volume plan by model and market over lifecycle available | | | |
| 34 | ▶Target values for characteristics (subjective / objective) available<br>▶Product relevant innovations decided | | | |
| 35 | ▶Series / optional features and USPs defined<br>▶Initial sales forecast for features by market<br>▶Platform commonality proposal available | | | |
| 36 | Communication strategy defined and specific requirements for target markets are available | | | |
| 37 | ▶Draft dealer and marketing strategy for innovations and USPs | | | |
| 38 | ▶Target markets defined<br>▶Market specific requirements detailed | | | |
| 39 | ▶Initial draft of target selling price by market and model | | | |
| 40 | | **PgR-St** | | |
| 41 | Current styling status available. Agreement reached to have only one variant for exterior C-Class and one variant for interior C-Class. | | | |
| 42 | ▶Assessment of current status<br>▶Reworked clay models + updated CAS available<br>▶Measures defined and decisions documented to achieve project goals | | | |
| 43 | ▶Approval of reduction of variants to one main theme | | | |
| 44 | ▶Iniaital styling of exterior and interior described by 2D-Renderings and 3D-CAS (Alias surfaces)<br>▶Refinement: Data model and numerical surface description updated | | | |
| 45 | ▶Description of shape (exterior and interior) available<br>▶Scale 1:1 first styling model available<br>▶Model appearance decision (painted / not painted; clay / foam) | | | |
| 46 | ▶Detailed modelling and design samples according to automotive requirments available<br>▶Grain and colour concept for a homogeneous interior is approved<br>▶Strengths and weaknesses are specified<br>▶Feasibility assessment is done and confirmed<br>▶Cost estimation complete | | | |
| 47 | | **PM-E** | | |
| 48 | Engineering development strategy confirmed. Targets from the Customer Market Profile have been converted into measurable targets. Initial prognosis as to the achieveability of targets available. Technical inputs (target list) to Preliminary Product Specification Book available | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 49 | | | 4.1.1 | | | Development strategy confirmed |
| 50 | | | 4.1.2 | | | Platform suitability |
| 51 | | | 4.1.3 | | | Project target requirements |
| 52 | | | 4.1.4 | | | Technical target framework |
| 53 | | | 4.1.5 | | | Complete Vehicle targets |
| 54 | | | 4.1.6 | | | Technical Input for Preliminary Product Specification - Engineering project |
| 55 | | | 4.1.7 | | | Technical Input for Preliminary Product Specification - Complete Vehicle |
| 56 | | | 4.1.8 | | | Technical Input for Preliminary Product Specification - Engineering Module Group |
| 57 | | | 4.1.9 | | | Benchmarking |
| 58 | | | 4.1.10 | | MS Int | Innovations |
| 59 | | | 4.1.11 | | | Patent research |
| 60 | | | 4.2 | | | Function / Complete vehicle |
| 61 | | | 4.2.1 | | | Complete Vehicle development strategy |
| 62 | | | 4.2.2 | | | I-Team status |
| 63 | | | 4.2.3 | | | Design Verification Plan |
| 64 | | | 4.2.4 | | | VPT Status |
| 65 | | | 4.2.5 | | | Vehicle test and hardware planning |
| 66 | | | 4.3 | | | Functional Safety |

This document is assigned to G10250. 010250.101-c


| | G | H | I | J |
|---|---|---|---|---|
| 49 | ► Development approach and sequence defined<br>► Hardware agreements for development scope of works available<br>► Confirmation of technical development within the specified timeframe<br>► Technical implementation of defined measures agreed<br>► Technical risks defined and measures for risk minimisation agreed | | | |
| 50 | ► Existing platform - assessed for suitability to achieve targets within the defined scope of work<br>► New platform - proposed concepts assessed and facilitate the achievement of targets within the defined scope of work | | | |
| 51 | ► Project technical targets assessed and potential target conflicts indicated<br>► Plans and measures for target achievement available | | | |
| 52 | ► End customer and subjective targets from Customer Market Profile translated into technical targets<br>► Draft technical target framework broken down to complete vehicle and module level<br>► Engineering contribution to Preliminary Product Specification available | | | |
| 53 | ► Target achievement, test status and risk assessment from feasibility phase at I-Team level<br>► Achievement of complete vehicle targets for feasibility phase confirmed<br>► Targets and acceptance criteria for concept phase defined and agreed<br>► Known conflicts documented and measures defined | | | |
| 54 | ► Standard content for Preliminary Product Specification clarified and defined | | | |
| 55 | ► Technical issues for inclusion in PPS defined and available | | | |
| 56 | ► Technical issues for inclusion in PPS defined and available | | | |
| 57 | ► Benchmarking vehicles confirmed<br>► Benchmarks for main product characteristics available | | | |
| 58 | ► Potential product innovations considered within existing concepts | | | |
| 59 | ► Initial patent research for feasibility proposals conducted<br>► Potential patent conflicts and infringements indicated | | | |
| 60 | Development strategy for each I-Team defined and available for the concept phase. Initial complete vehicle virtual status for functions and/or assessment based on expertise is available. DVP and test plan for the concept phase have been created and agreed. First draft DVP and vehicle list for series development phase created and available | | | |
| 61 | ► Development strategy for each I-Team according to scope of work<br>► Technical risks defined with agreed measures for target achievement<br>► Target alignment status all I-Teams<br>► Draft target breakdown to module level available<br>► Opportunities for improvements highlighted<br>► Input to PPS available | | | |
| 62 | ► Target alignment status of individual I-Teams<br>► Strategy for target achievement agreed and available for each I-Team<br>► Draft target breakdown to module level available<br>► Input to PPS available for each I-Team | | | |
| 63 | ► DVP (virtual and physical testing) for complete vehicle scope of work in the concept phase<br>► Detailed test plan for hardware tests in the concept phase<br>► Draft DVP for series development | | | |
| 64 | ► Results of simulations / expert assessments from VPT-PPS (virtual prototype) according to DVP for the feasibility phase available<br>► Initial results from the feasibility phase assessed and action plan defined for individual I-Teams | | | |
| 65 | ► Initial estimate of hardware requirements (mock ups, prototypes, PTO vehicles) to meet verification needs according to proposed development strategy | | | |
| 66 | Functional safety plan implementation status | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 67 | | | 4.3.1 | | | Implementation of functional safety |
| 68 | | | 4.4 | | Engineering Modules | |
| 69 | | | 4.4.1 | | | Module group status |
| 70 | | | 4.5 | | Vehicle Architecture | |
| 71 | | | 4.5.1 | | | Target development |
| 72 | | | 4.5.2 | | | Dimensional concept |
| 73 | | | 4.5.3 | | | Vehicle package |
| 74 | | | 4.6 | | Styling Technical Convergence | |
| 75 | | | 4.6.1 | | | Styling technical convergence process |
| 76 | | | 4.6.2 | | | Packaging requirements |
| 77 | | | 4.6.3 | | | C-Class: Styling definition |
| 78 | | | 4.6.4 | | | Gap & Step |
| 79 | | | 4.7 | | Data Management | |
| 80 | | | 4.7.1 | | | Product documentation method |
| 81 | | | 4.7.2 | | | CAx and product data management |
| 82 | | | 4.7.3 | | | DMU data management |
| 83 | | | 4.7.4 | | | Data and document supply |
| 84 | | | 4.7.5 | | | Weight tracking |
| 85 | | | 4.7.6 | | | Component cost tracking |



| | | G | H | I | J |
|---|---|---|---|---|---|
| | ► Functional safety plan agreed | | | | |
| | ► Status of functional safety plan implementation | | | | |
| 67 | ► Measures for known issues determined and allocated | | | | |
| 68 | Current status available for all module groups | | | | |
| | ► Results from feasibility phase | | | | |
| | ► Open issues documented | | | | |
| 69 | ► Action plan / next steps defined and agreed | | | | |
| | Customer Market Profile targets converted into objective targets. Dimensional concept defined and major dimensions available. | | | | |
| 70 | Critical package, ergonomic and legal topics verified. | | | | |
| | ► Targets from the Customer Market Profile have been converted into measurable targets. | | | | |
| 71 | ► TOP 30 Dimensions are defined | | | | |
| | ► Dimensional concept available. | | | | |
| 72 | ► TOP 30 dimensions defined | | | | |
| | ► Critical package issues verified | | | | |
| | ► Ergonomic issues determined | | | | |
| 73 | ► Legal issues and requirements verified | | | | |
| | Styling technical convergence process has been agreed within the project and current | | | | |
| 74 | status is available | | | | |
| | ► Process for STC to achieve production surfaces agreed, including timing and working methods | | | | |
| | ► Surface definitions and deliverables agreed for C/B/A class | | | | |
| | ► Exterior/interior surface readiness assessed | | | | |
| 75 | | | | | |
| | ► Styling proposals evaluated against packaging requirements for all styling models | | | | |
| | ► Vehicle properties and master sections are frozen as engineering criteria. | | | | |
| 76 | ► Conflicts identified and actions defined | | | | |
| | ► Styling surface definition and selection for first Engineering Data Freeze (VPT-TA) | | | | |
| | ► Vehicle layout generation for 3D CAD | | | | |
| 77 | ► Data for body structural layout and exterior / interior available | | | | |
| 78 | ► Quality characteristics defined as overview for exterior and interior | | | | |
| | Base IT requirements, CAx and product data management requirements defined, | | | | |
| 79 | implemented and training conducted. | | | | |
| | ► Method and format for technical product documentation during the concept phase agreed | | | | |
| 80 | ► Part number allocation determined | | | | |
| | ► Requirements for the concept phase defined and implemented | | | | |
| | ► Training requirements fulfilled | | | | |
| 81 | ► Implementation status documentation agreed | | | | |
| | ► Work instruction for DMU data management available | | | | |
| 82 | ► System for DMU data management in the concept phase defined and implemented | | | | |
| | ► Supply of required data and documentation agreed | | | | |
| 83 | | | | | |
| 84 | ► Method for documenting component weight status in the concept phase agreed | | | | |
| 85 | ► Method for documenting component costs in the concept phase agreed | | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 86 | | | 4.7.7 | | | Engineering information and data management requirements |
| 87 | | | 4.7.8 | | | Engineering information and data management requirements for complete vehicle |
| 88 | | | 4.7.9 | | | Engineering information and data management requirements for module groups |
| 89 | | | 4.7.10 | | | Product module structure |
| 90 | | | 4.8 | | | Product Quality Assurance |
| 91 | | | 4.8.1 | | | Product Quality Assurance |
| 92 | | | 4.8.2 | | | Q-Planning Product |
| 93 | | | 4.8.3 | | | Risk Filter Product |
| 94 | | | 4.8.4 | | | Perceived Quality (Virtual / Physical) |
| 95 | | | 4.8.5 | | | QM-Release Product |
| 96 | | | **5.0** | | | **Production** |
| 97 | | | 5.1 | | | Production Planning |
| 98 | | | 5.1.1 | | | Production strategy |


Case 3:21-cv-04736-EMC  Document 134-1 Filed 03/23/22  Page 260 of 611

| | G | H | I | J |
|---|---|---|---|---|
| 86 | ▶Requirements agreed with Data Management for complete vehicle and engineering module groups<br>▶Individual requirements of module groups and complete vehicle balanced and agreed<br>▶Work packages clarified<br>- CAx and product data management<br>- Change management<br>- Claims management<br>- DMU data management<br>- Supplier data management<br>- Weight management<br>- Cost tracking<br>- Monitoring | | | |
| 87 | ▶Requirements agreed with Data Management for complete vehicle<br>▶Work packages clarified<br>- CAx and product data management<br>- DMU data management<br>- Weight management<br>- Monitoring | | | |
| 88 | ▶Requirements agreed with Data Management for engineering module groups<br>▶Work packages clarified<br>- CAx and product data management<br>- Change management<br>- DMU data management<br>- Supplier data management<br>- Weight management<br>- Monitoring | | | |
| 89 | ▶Module structure defined for scope of work and evaluated at the purchased parts level for defined reporting vehicle<br>▶Weight mangagement at module level available within BOM<br>▶Inputs to BOM confirmed | | | |
| 90 | Product quality planning and risk assessment available to meet product targets | | | |
| 91 | ▶Product quality assurance planning  based on scope of work available<br>▶Risk assessment status available<br>▶Benchmark vehicle reports and perceived quality risk list available | | | |
| 92 | ▶Progress status for product quality planning available | | | |
| 93 | ▶Risk judgment status assessed | | | |
| 94 | ▶Perceived quality process agreed for whole program<br>▶Perceived quality risk list available | | | |
| 95 | ▶Preliminary scope and checks of the QM-Release Product available | | | |
| 96 | **PM-P** | | | |
| 97 | Initial feasibility studies conducted. Production target framework agreed and available based on program requirements | | | |
| 98 | ▶Production development approach defined<br>▶Confirmation of technical implementation within the specified timeframe<br>▶Technical implementation of defined measures outlined<br>▶Risks defined and measures for risk minimisation agreed | | | |

MAGNA STEYR **MSDS - Gate Deliverables** Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 99 | | | 5.1.2 | | | Feasibility study |
| 100 | | | 5.1.3 | | | Production target framework |
| 101 | | | 5.1.4 | | | Local Authority requirements |
| 102 | | | 5.2 | | Layout | |
| 103 | | | 5.2.1 | | | Production layout plan |
| 104 | | | 5.3 | | Process & Equipment | |
| 105 | | | 5.3.1 | | | Assembly sequence and equipment list |
| 106 | | | 5.3.2 | | | Process simulation (virtual process week) |
| 107 | | | 5.4 | | Investment | |
| 108 | | | 5.4.1 | | | Required investment |
| 109 | | | 5.4.2 | | | Supplier List for production and facility requirements |
| 110 | | | 5.5 | | Production Quality Assurance | |
| 111 | | | 5.5.1 | | | Q-Planning Production |
| 112 | | | **6.0** | | **Supply Chain Management** | |
| 113 | | | 6.1 | | General Planning & Organisation | |
| 114 | | | 6.1.1 | | | SCM strategy |
| 115 | | | 6.2 | | Purchase | |
| 116 | | | 6.2.1 | | | Long lead part definition |
| 117 | | | 6.2.2 | | | Supplier selection |
| 118 | | | 6.3 | | Supplier Quality Assurance | |
| 119 | | | 6.3.1 | | | Technical Readiness |
| 120 | | | 6.3.2 | | | Innovation assessment for series development |
| 121 | | | 6.4 | | Logistics | |
| 122 | | | 6.4.1 | | | Logistic concept |
| 123 | | | **7.0** | | **Quality Management** | |


| | G | H | I | J |
|---|---|---|---|---|
| | ► Organisational implementation in production | | | |
| | ► Economic feasibility (cost constraints) | | | |
| | ► Technical feasibility (manufacturability) | | | |
| | ► Production realisation appraisal, including required timeframe | | | |
| | ► Resources and their availability (equipment, production zones,...) | | | |
| | ► Timing implementation (manufacturing times, schedule) | | | |
| 99 | ► Initial quotation for the implementation is available | | | |
| 100 | ► Production target system agreed with customer (OEM) on the basis of program requirements | | | |
| 101 | ► Legal requirements identified with regard to Local Authority authorisations ► Supply and waste disposal, etc. Plan for compliance available | | | |
| 102 | Area utilization plan and production concept available | | | |
| 103 | ► Area utilisation plan ► Logistics concept for supply and waste removal | | | |
| 104 | Initial equipment list available | | | |
| 105 | ► Preliminary assembly sequence defined ► Preliminary equipment list available | | | |
| 106 | ► Production processes for body, paint and general assesmbly simulated according to the maturity of the available data ► Identified issues documented, responsibility determined and measures agreed | | | |
| 107 | Plan for required investments available | | | |
| 108 | ► Required production investment identified ► Investment planning available | | | |
| 109 | ► Capital expenditure for scope of supply has been compiled ► Potential supplier list for production and facility requirements complied | | | |
| 110 | Initial quality planning for production and QM release process available | | | |
| 111 | ► Quality planning and feasabilty checked ► Preliminary scope and checks of the QM-Release process available | | | |
| 112 | | **PM-SCM** | | |
| 113 | Supply chain development strategy defined and feasible | | | |
| 114 | ► Supply Chain Management development approach defined ► Proposal for strategy implementation within the specified timeframe (Master timing) ► Risks defined and measures for risk minimisation agreed | | | |
| 115 | List of potential suppliers agreed. Long lead parts identified and sourcing strategy available. Technical concepts agreed for critical parts | | | |
| 116 | ► Initial planning for sourcing of critical items ► Preliminary information for critical part tooling lead times | | | |
| 117 | ► List of potential suppliers capable of meeting supply requirements for scope of work in Concept Phase available ► Identification of potential critical suppliers for series development for defined scope of work | | | |
| 118 | SQA source evaluation planning agreed and available for critical parts | | | |
| 119 | ► Draft source evaluation ► Technical concepts agreed for critical parts | | | |
| 120 | ► Innovations within the vehicle with regards to implementation have been assessed (manufacturability, timing, costs...) ► Potential suppliers for innovations assessed regarding level of risk for scope of supply | | | |
| 121 | Customer requirements agreed | | | |
| 122 | ► Customer (OEM) requirements defined ► Preliminary logistic concept available ► Status of target alignment | | | |
| 123 | | **PgR-Q** | | |

MSDS Gate Deliverables Checklist

MAGNA STEYR

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 124 | | | 7.1 | | | Requirements and quality targets |
| 125 | | | 7.1.1 | | | Quality requirements |
| 126 | | | 7.1.2 | | | Quality targets |
| 127 | | | 7.2 | | | Quality planning and controlling |
| 128 | | | 7.2.1 | | | Quality planning |
| 129 | | | 7.2.2 | | | Quality controlling |
| 130 | | | 7.3 | | | Materials Engineering |
| 131 | | | 7.4 | | | Geometrical Measurement |
| 132 | | | 7.4.1 | | | Matching Geometry |
| 133 | | | 7.4.2 | | | Body in White - quality control geometry |
| 134 | | | **8.0** | | | **Information Management** |
| 135 | | | 8.1 | | Strategy / Concept | |
| 136 | | | 8.1.1 | | | Office IT concept |
| 137 | | | 8.1.2 | | | IT system concept for design and product verification |
| 138 | | | 8.2 | | IT Infrastructure | |
| 139 | | | 8.2.2 | | | Office IT infrastructure |
| 140 | | | 8.2.3 | | | IT infrastructure for design and product verification |
| 141 | | | **9.0** | | | **Costs / Finance** |
| 142 | | | 9.1 | | Business Case and Program Costs | |
| 143 | | | 9.1.1 | | | Business plan |
| 144 | | | 9.1.2 | | | Economic feasibility |



| | | G | H | I | J |
|---|---|---|---|---|---|
| 124 | Quality planning and requirements documented to meet program requirements at PPS | | | | |
| 125 | ► Customer quality strategy and requirements available | | | | |
| 126 | ► Preliminary Quality Targets defined, eg.<br>- Perceived Quality<br>- J.D. Power<br>- APEAL/IQS<br>- Product audit<br>- Warranty<br>- Road assistance report<br>- Quality durability test... | | | | |
| 127 | QM Plan agreed for program | | | | |
| 128 | ► Quality Management (QM)-Plan agreed with customer (OEM) and program<br>► QM Plan report; implementation status meets program requirements at PPS | | | | |
| 129 | ► Status report on all quality requirements, including but not limited to:<br>- Knowledge management<br>- Risk management<br>- Issue management<br>- quality checks... | | | | |
| 130 | NO REQUIREMENT FOR PPS | | | | |
| 131 | Matching strategy and measurement planning available | | | | |
| 132 | ► Initial definition of matching strategy available (cubing, master buck,...)<br>► Initial RFQs with key project information for matching equipment sent to suppliers | | | | |
| 133 | ► Initial planning of infrastructure and measurement equipment available | | | | |
| 134 | | **PgR-IM** | | | |
| 135 | IT concept for the concept phase ready and agreed in the Program | | | | |
| 136 | ► IT concept for servicing of office space implemented for the concept phase<br>► Concept for communication between locations agreed | | | | |
| 137 | ► IT system concept for product design in concept phase agreed<br>► Supply of data for product design and verification ensured | | | | |
| 138 | IT infrastructure is ready for implementation | | | | |
| 139 | ► Project offices supplied with required infrastructure and equipment<br>► Office IT systems technically configured at all locations<br>► Communication between locations implemented | | | | |
| 140 | ► IT systems for product design and verification in the concept phase technically configured at all locations<br>► Communication between locations implemented | | | | |
| 141 | | **PgM** | | | |
| 142 | Business plan checked against current values and business case status is available.<br>Program cost estimates, planning (non-recurring and part costs) and program finance plan available | | | | |
| 143 | ► Business plan checked against currently available values<br>► Business plan status update available | | | | |
| 144 | ► Assumptions regarding locations, production figures, parts structure, grants and subsidies defined for the business case<br>► Scenario agreed with customer (OEM) commercially evaluated<br>► Draft targets assigned to modules within the parts structure | | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 145 | | | 9.1.3 | | | Cost estimate for program |
| 146 | | | 9.1.4 | | | Cost estimate for engineering project |
| 147 | | | 9.1.5 | | | Cost estimate for the production project |
| 148 | | | 9.1.6 | | | Cost estimate for supply chain |
| 149 | | | 9.2 | | Cost controlling | |
| 150 | | | 9.2.1 | | | Cost controlling system |
| 151 | | | 9.2.2 | | | Budgets |
| 152 | | | 9.2.3 | | | Payment plan |
| 153 | | | 9.2.4 | | | Cost drivers |
| 154 | | | 9.2.5 | | | Parts cost status |
| 155 | | | 9.2.6 | | | Product Costs |
| 156 | | | 9.2.7 | | | Production costs (assembly fee) |
| 157 | | | 10.0 | **After Sales** | | |
| 158 | | | 10.1 | Strategy | | |
| 159 | | | 10.1.1 | | | After Sales concept |
| 160 | | | 10.2 | Warranty / Service | | |
| 161 | | | 10.2.1 | | | Maintenance concept |
| 162 | | | 10.2.2 | | | Serviceability concept |
| 163 | | | 10.2.3 | | | Insurance classification rate |
| 164 | | | 10.2.4 | | | Diagnostics concept |
| 165 | | | 10.3 | Accessories / Spare parts | | |
| 166 | | | 10.3.1 | | | Spare parts / accessories procurement concept |



MAGNA STEYR **MSDS Gate Deliverables Checklist**

| | G | H | I | J |
|---|---|---|---|---|
| | ▶ Overall estimate of planned program costs | | | |
| | ▶ Overview of non-recurring costs | | | |
| | ▶ Overview of recurring costs | | | |
| 145 | ▶ Finance plan based on financial targets | | | |
| | ▶ Estimate of planned engineering costs | | | |
| | ▶ Overview of non-recurring costs | | | |
| 146 | ▶ Finance plan based on financial targets | | | |
| | ▶ Estimate of planned production project costs | | | |
| | ▶ Overview of non-recurring costs | | | |
| | ▶ Overview of recurring costs | | | |
| 147 | ▶ Finance plan based on financial targets | | | |
| | ▶ Estimate of planned supply chain management project costs | | | |
| | ▶ Overview of non-recurring costs | | | |
| | ▶ Overview of recurring costs | | | |
| 148 | ▶ Finance plan based on financial targets | | | |
| | Project financial controlling sytsem implemented for the Concept Phase . Detailed budgets have been distributed | | | |
| 149 | Current program cost status (non-recurring and part costs) available | | | |
| | ▶ Cost controlling system adapted to program structure | | | |
| 150 | ▶ Cost monitoring analysis available | | | |
| | ▶ Detailed budgets created for each area of responsibility in the concept phase | | | |
| 151 | ▶ Budget agreements documented | | | |
| | ▶ Payment plan defined for the concept phase based on master timing and conditions to be fulfilled | | | |
| | ▶ Draft payment / expenditure plan for series development available | | | |
| 152 | | | | |
| | ▶ Change management issues from modules assessed | | | |
| 153 | ▶ Major cost drivers identified and agreed | | | |
| | ▶ Carry over parts within concept parts structure | | | |
| | -part costs estimate | | | |
| | -required investment | | | |
| | ▶ New / modified parts within concept parts structure | | | |
| | -part costs estimate | | | |
| 154 | -required investment | | | |
| | ▶ Plausibility check of non-recurring costs | | | |
| | ▶ Plausibility check of piece price | | | |
| 155 | ▶ Status for scope of work of plan versus actual, with deviations highlighted | | | |
| | ▶ Overall status for scope of work of plan versus actual with, deviations highlighted | | | |
| | - Capacity reservation charge | | | |
| | - fixed costs | | | |
| | - variable costs | | | |
| 156 | ▶ Forecast based on defined measures for target achievement | | | |
| 157 | **PgR-AS** | | | |
| 158 | After Sales concept feasible | | | |
| 159 | ▶ After Sales concept checked and feasible | | | |
| 160 | Serviceability and diagnostics concept feasible | | | |
| 161 | ▶ Maintenance concept checked and feasible | | | |
| 162 | ▶ Serviceability concept checked and feasible | | | |
| 163 | ▶ Insurance classification rate concept checked and feasible | | | |
| 164 | ▶ Draft diagnostics concept checked and feasible | | | |
| 165 | Spare parts procurement concept feasible | | | |
| 166 | ▶ Spare parts / accessories procurement concept checked and feasible | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | **Gate:** **CTC** | | | **Concept Target Confirmation: Concept phase is** bee |
| 3 | | | | | | |
| 4 | | | **1.0** | | | **Program Management** |
| 5 | | | 1.1 | | Master Timing | |
| 6 | | | 1.1.1 | | | Detailed Timing |
| 7 | | | 1.1.2 | | | DVP Review |
| 8 | | | 1.2 | | Gateway Review | |
| 9 | | | 1.2.1 | | | Major Issues and Risks |
| 10 | | | 1.2.2 | | | Red/Yellow Grren |
| 11 | | | 1.2.3 | | | Recovery Plans |
| 12 | | | 1.3 | | Processes / Methods | |
| 13 | | | 1.3.1 | | | Product Development Process |
| 14 | | | 1.3.2 | | | Meeting Schedule |
| 15 | | | 1.3.3 | | | Change Management |
| 16 | | | 1.3.4 | | | Outsourced Engineering |
| 17 | | | 1.4 | | Team Organization | |
| 18 | | | 1.4.1 | | | Program Organisation |
| 19 | | | 1.5 | | Contract Management | |
| 20 | | | 1.5.1 | | | Contract update |
| 21 | | | 1.6 | | Knowledge Management | |
| 22 | | | 1.6.1 | | | Transfer of Experience |
| 23 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 24 | | | 1.7 | | Configuration Management | |
| 25 | | | 1.7.1 | | | Program target requirements |
| 26 | | | 1.7.2 | | | Module target framework |
| 27 | | | 1.7.3 | | | Change request status - complete vehicle |
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |

This document is assigned to G10250. 010250-101-c



Case 3:21-cv-04736-EMC Document 123 Filed 03/23/21 Page 268 of 611

| | | Responsible Department | Responsible Organisation | Responsible Name |
|---|---|---|---|---|
| 2 | complete. The technical, economic and timing targets for the program / project have en assessed as achievable and agreed. | | | |
| 4 | | **FMC-PM** | | |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | FMC | |
| 6 | ► Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | ESS | |
| 7 | DVP including test timing and vehicle fleet reviewed and aligined with Master Timing and Budget | Timing Manager Cost Controller | ESS Vehicle Attributes | |
| 8 | | Program Manager | FMC | |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution. | Program Manager | ESS | |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | ESS | |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | ESS | |
| 12 | | Program Manager | FMC | |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | FMC | |
| 14 | Meeting schedule issued | Program Manager | FMC | |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | FMC | |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | FMC | |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | FMC | |
| 18 | ► Program organisation and teamwork functioning according to planning ► Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | ESS | |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | FMC | |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | FMC | |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | FMC | |
| 22 | ► Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | ESS | |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | FMC | |
| 25 | ► Status of program requirements available ► Changes to program targets transferred to change management for tracking | Configuration Manager | FMC | |
| 26 | ► Module target breakdown confirmed for all areas | Configuration Manager | FMC | |
| 27 | ► Change requests to achieve VTS targets realised ► Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 28 | ► Change requests to achieve module targets realised ► Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |

MAGNA STEYR MSDS Gate Deliverables Checklist

| | Customer (Approval) | Status: CWxxx | Forecast: CWxxx | |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | Customer (Approval) | Status: CWxxx | Forecast: CWxxx | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

This document is assigned to G10250. 010250-101-e

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 29 | | | 1.11.1 | | | Definition of responsibilities – Program |
| 30 | | | 1.11.2 | | | Definition of responsibilities – Engineering Development |
| 31 | | | 1.11.3 | | | Definition of responsibilities – Module Group |
| 32 | | | 1.11.4 | | | Definition of responsibilities – Complete Vehicle |
| 33 | | | 1.11.5 | | | Definition of responsibilities – Engineering Module Group |
| 34 | | | 1.11.6 | | | Definition of responsibilities – Data Management |
| 35 | | | 1.11.7 | | | Definition of responsibilities – Production |
| 36 | | | 1.11.8 | | | Definition of responsibilities – Supply Chain |
| 37 | | | 1.11.9 | | | Definition of responsibilities – Quality |
| 38 | | | 1.11.10 | | | Definition of responsibilities – Information Management |
| 39 | | | 1.11.11 | | | Definition of responsibilities – Finance |
| 40 | | | 1.11.12 | | | Definition of responsibilities – After Sales |
| 41 | | | 1.11.13 | | | Reporting - Program |
| 42 | | | 1.11.14 | | | Reporting - Engineering Project |
| 43 | | | 1.11.15 | | | Communication infrastructure - Program |
| 44 | | | 1.11.16 | | | Communication infrastructure – Engineering project |
| 45 | | | 1.11.17 | | | Communication Strategy |
| 46 | | | 1.11.18 | | | Communication Strategy |
| 47 | | | 1.11.19 | | | Communication Strategy |
| 48 | | | 1.11.20 | | | Communication Strategy |
| 49 | | | 1.11.21 | | | Communication Strategy |
| 50 | | | 1.11.22 | | | Communication Strategy |
| 51 | | | 1.11.23 | | | Communication Strategy |
| 52 | | | 1.11.24 | | | Communication Strategy |
| 53 | | | 1.11.25 | | | Communication Strategy |
| 54 | | | 1.11.26 | | | Communication Strategy |
| 55 | | | 1.11.27 | | | Communication Strategy |


| | | G | H | I | J |
|---|---|---|---|---|---|
| 29 | ▶RASI for the series development phase activities at program level agreed | | | |
| 30 | ▶RASI for the series development phase activities for engineering scope of work agreed | | | |
| 31 | ▶RASI for the series development phase activities for module group scope of work agreed | | | |
| 32 | ▶RASI for the series development phase activities for complete vehicle scope of work agreed | | | |
| 33 | ▶RASI for the series development phase activities for Engineering Module Group scope of work agreed | | | |
| 34 | ▶RASI for the series development phase activities for Data Management scope of work agreed | | | |
| 35 | ▶RASI for the series development phase activities for Production scope of work agreed | | | |
| 36 | ▶RASI for the series development phase activities for Supply Chain Management scope of work agreed | | | |
| 37 | ▶RASI for the series development phase activities for Quality Management scope of work agreed | | | |
| 38 | ▶RASI for the series development phase activities for IT Management scope of work agreed | | | |
| 39 | ▶RASI for the series development phase activities for Finance and Controlling scope of work agreed | | | |
| 40 | ▶RASI for the series development phase activities for Finance and Controlling scope of work agreed | | | |
| 41 | ▶Standard reporting templates (e.g., minutes of meeting, reports, decision matrix, presentations, one-pager...) for the serial development phase agreed with PgM / OEM ▶Templates communicated to team and available for use | | | |
| 42 | ▶Standard reporting templates (e.g., minutes of meeting, reports, decision matrix, presentations, one-pager...) for the serial development phase agreed with PM-E / OEM ▶Templates communicated to team and available for use | | | |
| 43 | ▶File structure agreed for the serial development phase ▶Access rights defined, implemented and team members informed | | | |
| 44 | ▶File structure agreed the serial development phase ▶Access rights defined, implemented and team members informed | | | |
| 45 | ▶Meetings at Program level (e.g., (Magna Steyr internal, customer OEM) suppliers, partners...).for series development phase agreed ▶Meeting participants selected and informed ▶Meetings aligned to optimise information flow | | | |
| 46 | ▶Meetings in module group scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 47 | ▶Meetings at Engineering project level (e.g., (Magna Steyr internal, customer OEM) suppliers, partners...).for the series development phase agreed ▶Meetings aligned with program structure | | | |
| 48 | ▶Meetings in Complete Vehicle scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 49 | ▶Meetings in engineering module group scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 50 | ▶Meetings in Data Management scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 51 | ▶Meetings in Change Management scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 52 | ▶Meetings in Production scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 53 | ▶Meetings in Supply Chain scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 54 | ▶Meetings in Quality Management scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |
| 55 | ▶Meetings in IT scope for the series development phase agreed ▶Meetings aligned with program and Engineering project structure | | | |

# MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 56 | | | 1.11.28 | | | Communication Strategy |
| 57 | | | **2.0** | | **Marketing and Sales** | |
| 58 | | | 2.1 | | Product Definition | |
| 59 | | | 2.1.1 | | | Product positioning |
| 60 | | | 2.1.2 | | | Benchmark |
| 61 | | | 2.1.3 | | | Sales Volumes |
| 62 | | | 2.1.4 | | | Characteristics |
| 63 | | | 2.1.5 | | | Series and optional features |
| 64 | | | 2.2 | | Sales and Marketing | |
| 65 | | | 2.2.1 | | | Communication strategy |
| 66 | | | 2.2.2 | | | Target markets |
| 67 | | | 2.2.3 | | | Price range |
| 68 | | | **10.0** | | **After Sales** | |
| 69 | | | 10.1 | | Strategy | |
| 70 | | | 10.1.1 | | | After Sales Targets |
| 71 | | | 10.1.2 | | | Overall timing |
| 72 | | | 10.2 | | Warranty / Service | |
| 73 | | | 10.2.1 | | | Maintainance concept |
| 74 | | | 10.2.2 | | | Serviceability concept |
| 75 | | | 10.2.3 | | | Insurance classification |
| 76 | | | 10.2.4 | | | Diagnostics concept |
| 77 | | | 10.3 | | Accessories / Spare parts | |
| 78 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 79 | | | **3.0** | | **Design (Styling)** | |
| 80 | | | 3.1 | | Styling status | |
| 81 | | | 3.1.1 | | | 3D Styling refinement |
| 82 | | | 3.1.2 | | | Styling Freeze |
| 83 | | | 3.1.3 | | | Styling Verification |
| 84 | | | 3.1.4 | | | Hardware model |


| | | | H | I | J |
|---|---|---|---|---|---|
| | ►Meetings in After Sales scope for the series development phase agreed | | | | |
| 56 | ►Meetings aligned with program and Engineering project structure | | | | |
| 57 | | | **FMC-MS** | | |
| 58 | Product positioning (Customer Market Profile), product features and volumes confirmed. Core competitors are confirmed. Target customer requirements and product contribution to the brand are defined | | | | |
| 59 | ►Customer clinics confirm Customer Market Profile<br>►Program for each market defined<br>►Selling price determned based on world markets<br>►Cost of ownership determined | | | | |
| 60 | ►All core competitors and benchmark values confirmed | | | | |
| 61 | ►Sales volume plan by model and market over lifecycle updated | | | | |
| 62 | ►Target values for characteristics (subjective / objective) available<br>►Product relevant innovations decided | | | | |
| 63 | ►Series / optional features and USPs confirmed<br>►Sales forecast for optional features by market updated | | | | |
| 64 | Customer targets confirmed (country-specific as required), target selling price determined | | | | |
| 65 | ►Draft dealer and marketing strategy for innovations and USPs | | | | |
| 66 | ►Target markets defined<br>►Market specific requirements detailed | | | | |
| 67 | ►Initial draft of target selling price by market and model | | | | |
| 68 | | | **FMC-AS** | | |
| 69 | Timing and After Sales concept are agreed | | | | |
| 70 | ►After Sales targets are agreed and implemented in specifications | | | | |
| 71 | ►After Sales overall timing is agreed and timeplan is available | | | | |
| 72 | Timing and serviceability, insurance classification rate and diagnostics concept are agreed and requirements have been transfered to each module group | | | | |
| 73 | ►Target agreement for maintenance external / internal<br>►Targets available in written form and implemented in specifications | | | | |
| 74 | ►Target agreement for serviceability external / internal<br>►Targets available in written form and implemented in specifications | | | | |
| 75 | ►Target agreement for insurance classsification external / Internal<br>►Targets available in written form and implemented in specifications | | | | |
| 76 | ►Target agreement for diagnostics external / Internal<br>►Targets available in written form and implemented in specifications | | | | |
| 77 | Timing and spare parts procurement concept are agreed  and requirements have been transfered to each module group | | | | |
| 78 | ►Target agreement for spare parts / accessories external / Internal<br>►Targets available in written form and implemented in specifications | | | | |
| 79 | | | **FMC-D** | | |
| 80 | Styling freeze complete, actual styling status available | | | | |
| 81 | ►Styling database and CAS model (Alias) updated | | | | |
| 82 | ►Styling shape approved and frozen | | | | |
| 83 | ►Technical requirements for C-->B Class incorporated into surfacing loops | | | | |
| 84 | ►Milling, rework and finish of clay model, incorporating technical input<br>►Full scale clay model (exterior and interior) painted and coated in required finish<br>►Optimised clay model (exterior and interior) approved and documented | | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 85 | | | 3.1.5 | | | Colour & Trim |
| 86 | | | 4.6 | | | **Styling Technical Convergence** |
| 87 | | | 4.6.1 | | | Styling confirmation |
| 88 | | | 4.6.2 | | | C-Class: Styling Surface |
| 89 | | | 4.6.3 | | | B-Class: Styling Surface for VPT-TA |
| 90 | | | 4.6.4 | | | Gap & Step |
| 91 | | | **4.0** | | | **Vehicle Integration** |
| 92 | | | 4.1 | | | **Product Development Targets** |
| 93 | | | 4.1.1 | | | Presentation of concepts |
| 94 | | | 4.1.2 | | | Technical target framework |
| 95 | | | 4.1.3 | | | Complete vehicle targets |
| 96 | | | 4.1.4 | | | Module targets - engineering |
| 97 | | | 4.1.5 | | | Definition of digital vehicles |
| 98 | | | 4.1.6 | | | Test standards |
| 99 | | | 4.1.7 | | | Benchmarking |
| 100 | | | 4.1.8 | | | Patent research |


| | G | H | I | J |
|---|---|---|---|---|
| | ► Materials, colours and trim concept defined | | | |
| 85 | ► Process to supply material samples from production process implemented | | | |
| 86 | Styling frozen. Project requirements are implemented in styling and maturity level achieved that supports serial development according to Master Timing. | | | |
| 87 | ► Major Styling evaluation is done.<br>► Styling Freeze model is available and approved | | | |
| 88 | ► Exterior and interior styling surface based on Theme Selection (TS)<br>► Part volumes / split lines defined<br>► Confirmation of surface deviation < +/- 2,5 mm<br>► Confirmation of surface quality < 0,02 mm | | | |
| 89 | ► Surface definition based on data and information from Styling Freeze<br>► Part component definition based on the maturity of TIS-B (Technical input stop-B class) (VPT-TA Simulation Loop).<br>► Feasibility check with available suppliers done.<br>► Surface Quality < 0,02 mm and gaps are defined | | | |
| 90 | ► Quality characteristics defined as single section and nominal value target have been verified and confirmed. | | | |
| 91 | | **FMC-VI** | | |
| 92 | Product target catalogue is specified and agreed for serial development. Targets have been cascaded to module level.Technical inputs to Vehicle Product Specification book available and complete | | | |
| 93 | ► Presentation of results of concept phase from individual technical areas available | | | |
| 94 | ► The target catalogue with technical targets at vehicle level has been checked and released<br>► The target catalogue with technical targets at module level has been checked and released<br>► Engineering specific contribution to Vehicle Product Specification has been agreed with the customer (OEM) and is released<br>► List of open issues with defined counter measures is available | | | |
| 95 | ► Targets from the Customer Market Profile have been converted into the Vehicle Technical Specification (VTS).<br>► Target achievement, test status and risk assessment for complete vehicle area of responsibility have been summarised based on individual I-Team status, checked for plausibility and documented<br>► Achievement of complete vehicle targets for the concept phase confirmed<br>► Known target conflicts and high risks (assessed as R or Y) highlighted and documented<br>► Rough part/system recomendation based on achievability of VTS targets done<br>-COP vs. innovative part/plattform vs. modified part<br>► Function list completed; responsibilities defined | | | |
| 96 | ► Complete vehicle technical product targets are structured, consistent with full vehicle targets, broken down and assigned module groups<br>► Module group targets agreed and released<br>► Release recommendation available for (pre-)SSTS and (pre-)nominated supplier | | | |
| 97 | ► Required digital vehicle specifications (base vehicle configuration for reporting) defined and available as basis for structure data management and data availability | | | |
| 98 | ► Agreement on standards to be used for virtual and physical testing available<br>► Test locations for serial development defined and agreed with customer (OEM). ► Open issues highlighted. | | | |
| 99 | ► Objective and subjective benchmarking of choosen product characteristics is complete and documented | | | |
| 100 | ► Patent research for chosen concepts conducted<br>► Potential patent conflicts and infringements indicated | | | |

| | | C | D | E | F |
|---|---|---|---|---|---|
| 101 | | 4.2 | | | Function / Complete vehicle |
| 102 | | 4.2.1 | | | Development strategy - I-Teams |
| 103 | | 4.2.2 | | | I-Team status |
| 104 | | 4.2.3 | | | Design Verification Plan |
| 105 | | 4.2.4 | | | VPT Status |
| 106 | | 4.2.5 | | | Data Freeze |
| 107 | | 4.2.6 | | | Vehicle Test and Hardware Planning |
| 108 | | 4.2.7 | | | Vehicle verification and validation test plan |
| 109 | | 4.3 | | Functional Safety | |
| 110 | | 4.3.1 | | | Implementation of functional safety |
| 111 | | 4.5 | | Vehicle Architecture | |
| 112 | | 4.5.1 | | | Target development |
| 113 | | 4.5.2 | | | Dimensional concept |
| 114 | | 4.5.3 | | | Vehicle package |
| 115 | | **4.0** | | **Vehicle Engineering** | |
| 116 | | 4.4 | | Engineering Modules | |

This document is assigned to G10250. 010250-101-c


| | G | H | I | J |
|---|---|---|---|---|
| 101 | Vehicle functional targets agreed and cascaded to module level. Development strategy for each I-Team confirmed and available for the serial development phase. Complete vehicle virtual status for functions and/or assessment based on simulation loop VPT-TA is available. DVP for the Serial Development Phase has been created and agreed. | | | |
| 102 | ►Development strategies for individual I-Teams confirmed ►Individual I-Team strategies, inclusive of risks and opportunities, are available and have been documented | | | |
| 103 | ►Target setting status of individual I-Teams ►Status of target achievement available and agreed for each I-Team ►Draft target breakdown to module level confirmed ►Input to VTS available for each I-Team | | | |
| 104 | ►Complete vehicle DVP (virtual and physical) available and agreed | | | |
| 105 | ►Results of simulations / expert assessments from VPT-TA (virtual prototype) according to DVP for the concept phase available ►Results from the concept phase assessed and action plans defined for individual I-Teams | | | |
| 106 | ►The dates for the freeze and visual data checks of the engineering design data are agreed and confirmed by module groups and PM-E ►Input Freeze and required data for VPT for the modules is defined and agreed | | | |
| 107 | ►Detailed development vehicle / hardware requirements for pre-prototype / prototype phase based on agreed complete vehicle DVP and FRS (Functional release steps) ►Detailed configuration of development vehicles / hardware in the pre-prototype / prototype phase ►Definition of the number of vehicles / hardware necessary for development requirements in the validation phase ►Broad definition of vehicle use in the validation phase (PTO) based on agreed complete vehicle DVP ►Cross check with module DVPs carried out, requirements considered ►Rough procedure for road releases planned | | | |
| 108 | ►Detailed pre-prototype and prototype planning and timing agreed and coherent with releases and virtual milestones ►All required physical tests have been allocated to vehicles / hardware ►Initial development vehicle planning for PTO / headline tests for PP | | | |
| 109 | Functional safety plan implementation status | | | |
| 110 | ►Status of functional safety plan implementation ►Measures for known issues determined and allocated | | | |
| 111 | Achievement of dimensional targets agreed. Dimensional concept coherent with target system. Ergonomic targets defined and considered in package & styling.Package based on concept available. | | | |
| 112 | ►Dimensional targets agreed for complete vehicle ►Ergonomic targets defined and agreed for complete vehicle | | | |
| 113 | ►Vehicle dimensional concept documented and compatible with overall vehicle targets ►Issues documented, measures defined and agreed | | | |
| 114 | ►Vehicle package based on agreed concepts available ►Ergonomic targets coherent with package and styling requirements ►Issues documented, measures defined and agreed | | | |
| 115 | | **FMC-VE** | | |
| 116 | Concepts have been developed to ensure achieveability of vehicle targets for the defined scope of work | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 117 | | | 4.4.1 | | | Target definition - Engineering Module Group |
| 118 | | | 4.4.2 | | | Hardware Planning |
| 119 | | | 4.4.3 | | | Concept freeze: modules |
| 120 | | | 4.4.4 | | | Component Specifications |
| 121 | | | 4.7 | | Data Management | |
| 122 | | | 4.7.1 | | | Data Management start up - series development |
| 123 | | | 4.7.2 | | | Data provision |
| 124 | | | 4.7.3 | | | Data management - work packages |
| 125 | | | 4.7.4 | | | PDM specification book |



| | G | H | I | J |
|---|---|---|---|---|
| 117 | ▶Requirements and technical targets defined for the module group and agreed with customer (OEM), e.g.,<br>- functional requirements<br>- technical properties<br>- quality requirements<br>- test and assembly requirements for components and complete vehicle<br>- customer service requirements... | | | |
| 118 | ▶Detailed development requirements of components / hardware for pre-prototype / prototype phase based on agreed module / component DVP<br>▶Initial definition of vehicles / hardware for development requirements in the validation phase based on agreed module / component DVP | | | |
| 119 | ▶Initial design data according to data maturity requirements based on styling C Class data and technical guidelines for chosen concepts<br>- concepts aligned<br>- joining technology definition<br>- material guidelines<br>- surface requirements<br>- component naming, part number designation and revision<br>- variant table for basic data based on main structural components | | | |
| 120 | ▶Component technical specifications available for supplier RFQs, to include but not limited to:<br>- basic project data<br>- required timing<br>- supplier requirements (work split, location, system connections, etc.)<br>- functional requirements<br>- quality requirements<br>- technical and material properties<br>- test and assembly requirements (component and complete vehicle)<br>- customer service requirements... | | | |
| 121 | System availability and functionality (processes, methods and systems) assured for project. | | | |
| 122 | ▶Concept and implementation plan for data management available, agreed and communicated within the program<br>▶Requirements of PDM functions agreed with program team (content, timing...)<br>▶Commitments for following processes available:<br>- basic IT provisions<br>- data and information security<br>- design data management (data provision concept)<br>- technical product documentation<br>- release management<br>- change management (system)<br>- issue management (system)<br>- prototype configuration and management<br>- supplier data management<br>- document management (non-CAx)<br>- monitoring and tracking of design engineering, release mgmt<br>- training<br>▶Agreed product data management functions (processes, systems and methods detailed above) are available for the serial development. | | | |
| 123 | ▶Data provision agreement is established and agreed between data supplier and data user (for geometric data and functional data related to the project milestones). | | | |
| 124 | ▶Detailed work packages to meet program requirements agreed and available for data management start up<br>▶Work packages aligned with Master Timing Plan | | | |
| 125 | ▶PDM specification books are released, standards available for distribution | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 126 | | | 4.7.5 | | | Data management - training |
| 127 | | | 4.7.6 | | | Concept freeze |
| 128 | | | 4.7.7 | | | Parts list |
| 129 | | | 4.7.8 | | | Bill of Material |
| 130 | | | 4.7.9 | | | CAx models and structure |
| 131 | | | 4.7.10 | | | Part by part planning |
| 132 | | | 4.7.11 | | | Digital prototype |
| 133 | | | 4.7.12 | | | Change documentation |
| 134 | | | 4.7.13 | | | Engineering information and data management requirements for complete vehicle |
| 135 | | | 4.7.14 | | | Engineering information and data management requirements for module groups |
| 136 | | | 4.7.15 | | | Bill of Material - Engineering module group |
| 137 | | | 4.7.16 | | | Prototype requirements |
| 138 | | | 4.7.17 | | | Part by part planning – BOM |
| 139 | | | 4.7.18 | | | Part by part planning - Engineering module group |

This document is assigned to G10250. 010020.101-c

| | G | H | I | J |
|---|---|---|---|---|
| 126 | ▶Planned PDM training of required customer processes, project processes, systems and work methods for serial development have been executed | | | |
| 127 | ▶Product data from the concept phase (concept BoM, design data, specification documents, ...) frozen, stored as "read only" and available for the serial development. | | | |
| 128 | ▶Parts list available in the PDM system<br>▶Part numbers defined<br>▶BOM structure agreed | | | |
| 129 | ▶The transition process from concept BoM to serial development BoM is defined and agreed.<br>▶The BoM documentation for Serial development is defined and agreed.<br>▶Initial fill of BOM complete (based on concept module BOM) including COP, modified and unique parts | | | |
| 130 | ▶Initial fill of CAx-models finished including COP, modified and unique parts<br>▶item numbers are definded + CAx commitment aligned, CAx structure agreed | | | |
| 131 | ▶All parts in the master BoM have been scheduled in the part by part planning system<br>▶Confirmation of long lead parts is available | | | |
| 132 | ▶Parts list and aligned geometrical data is available for defined reporting vehicles<br>▶VPT-TA data freeze finished<br>▶VPT-TA available and checked<br>▶VPT-CC preparation for data freeze planned and agreed with project team | | | |
| 133 | ▶Documentation format agreed with customer (OEM) | | | |
| 134 | ▶Requirements agreed with Data Management and module groups for complete vehicle<br>▶Work packages clarified<br>- CAx and product data management<br>- DMU data management<br>- Weight management<br>- Monitoring | | | |
| 135 | ▶Requirements agreed with Data Management for engineering module groups<br>▶Work packages clarified<br>- CAx and product data management<br>- Technical product documentation<br>- Change Management<br>- Claims managememt<br>- DMU data management<br>- Supplier data management<br>- Weight management<br>- Cost monitoring<br>- Prototype configuration and prototype management | | | |
| 136 | ▶Preliminary component designation (according to naming convention) available<br>▶Preliminary part number assigned<br>▶All parts assigned to modules<br>▶Material proposals, quantity and use defined | | | |
| 137 | ▶Overview of parts to be ordered (internal and external) to meet test requirements for pre-prototype / prototype phase<br>▶Build and delivery plan for for pre-prototype / prototype phase | | | |
| 138 | ▶Detailed part for part planning (including required release and material required dates) for pre-prototype / prototype phase<br>▶Initial part for part planning (including required release and material required dates) for validation phase | | | |
| 139 | ▶Relevant dates for engineering activities defined and included in part for part planning<br>▶Deviations and risks available with agreed measures | | | |

This document is assigned to G10250. 010250.101.c

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 140 | | | 4.7.19 | | | Part by part planning – Purchase |
| 141 | | | 4.7.20 | | | Part by part planning – SQA |
| 142 | | | 4.8 | | Product Quality Assurance | |
| 143 | | | 4.8.1 | | | Product Quality Assurance |
| 144 | | | 4.8.2 | | | Q-Planning Product |
| 145 | | | 4.8.3 | | | Risk Filter Product |
| 146 | | | 4.8.4 | | | System FMEA |
| 147 | | | 4.8.5 | | | Design FMEA |
| 148 | | | 4.8.6 | | | Key Product Characteristics (KPC) |
| 149 | | | 4.8.7 | | | Perceived Quality (virtual / physical) |
| 150 | | | 4.8.8 | | | QM-Release Product |
| 151 | | | 5.0 | | **Manufacturing** | |
| 152 | | | 5.1 | | Production Planning | |
| 153 | | | 5.1.1 | | | Production strategy |
| 154 | | | 5.1.2 | | | Target framework specified (internally and externally); conflicts of objectives solved; detailed targets defined |



| | G | H | I | J |
|---|---|---|---|---|
| 140 | ▶ Procurement specific part by part planning available, <br>- Carry over / new part decisions available <br>- Long lead parts confirmed: <br>- Information regarding tool lead times, release due date and latest allowable date for tooling orders for long lead parts exist. <br>▶ Carry over parts confirmed for procurement <br>▶ Deviations and risks available with agreed measures | | | |
| 141 | ▶ Relevant dates for SQA activities defined and included in part for part planning <br>▶ Deviations and risks available with agreed measures | | | |
| 142 | Risk filter status available, SFMEA finished for defined components, perceived quality forecast available | | | |
| 143 | ▶ Risk Filter Product 1st loop finished and risk status on component level reported <br>▶ System-FMEA 1st loop for defined components finished <br>▶ Perceived Quality forecast based on virtual audit available | | | |
| 144 | ▶ Updates of methods use plan considered within QM Plan have been documented <br>▶ Progress status for product quality planning available | | | |
| 145 | ▶ Risk Filter Product 1st Loop complete <br>▶ First Product Risk Level status available for each component <br>▶ Required additional risk management methods selected and documented <br>▶ Preventive measures detemined and agreed | | | |
| 146 | ▶ Definition of functional structure and targets on complete product level completed and documented <br>▶ Definition of interfaces within the product structure for relevant systems and components available <br>▶ Maior failure modes and effects for defined systems and components identified, evaluated and considered for target agreement as well as within the design verification plan | | | |
| 147 | ▶ Design FMEA planning derived from Risk Filter Product finished | | | |
| 148 | ▶ Key Product Characteristics Process agreed with customer (OEM) <br>▶ Tracking list for Supplier KPCs available | | | |
| 149 | ▶ Perceived quality audit reports (1st virtual loop) available <br>▶ Perceived quality one-pager and decision paper for all identified risks available and tracked within agreed issue management tool <br>▶ Perceived quality forecast documented <br>▶ Final agreement of Perceived Quality Targets with customer (OEM) and Program Manager | | | |
| 150 | ▶ Scope and checks of the QM-Release Product agreed with customer (OEM) and program | | | |
| 151 | **FMC-M** | | | |
| 152 | Targets for production are confirmed with module groups based on program requirements. Initial ramp-up planning (timing & quantity) for series preparation phase is available | | | |
| 153 | ▶ Production concept available and agreed for the proposed production volumes <br>- assembly sequence <br>- station layout <br>- plant equipment, fixtures and fittings <br>- test and measurement requirements | | | |
| 154 | ▶ Customer (OEM) requirements aligned with potential for achieving targets (scenario planning) <br>▶ Targets determined based on implementable technology (timing, cost, quality, manufacturability...) | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 155 | | | 5.1.3 | | | Ramp up planning |
| 156 | | | 5.1.4 | | | Hardware planning |
| 157 | | | 5.2 | | Layout | |
| 158 | | | 5.2.1 | | | Production layout plan |
| 159 | | | 5.3 | | Process & Equipment | |
| 160 | | | 5.3.1 | | | Assembly technology |
| 161 | | | 5.3.2 | | | Process simulation (virtual process week) |
| 162 | | | 5.4 | | Investment | |
| 163 | | | 5.4.1 | | | Investment requirements |
| 164 | | | 5.5 | | | Production Quality Assurance |
| 165 | | | 5.5.1 | | | Q-Planning Production |
| 166 | | | 5.5.2 | | | Process FMEA |
| 167 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 168 | | | 5.5.4 | | | Product Audit |
| 169 | | | 5.5.5 | | | QM-Release Process |
| 170 | | | 6.0 | | **Supply Chain** | |
| 171 | | | 6.1 | | General Planning & Organisation | |
| 172 | | | 6.1.1 | | | SCM strategy |
| 173 | | | 6.1.2 | | | Cost down |
| 174 | | | 6.2 | | Purchase | |
| 175 | | | 6.2.1 | | | Screening of potential suppliers |


| | G | H | I | J |
|---|---|---|---|---|
| 155 | ▶ Initial plan for ramp up curve for body, paint and final assembly<br>- personnel requirements for technologies, incl. quality, logistics, IT, maintenance...<br>- Estimate of floor space requirements and costs<br>- Estimate of material costs for library parts required for fixture and process development<br>- Vehicle generations defined, inclusive of parts requirements<br>▶ Training strategy created | | | |
| 156 | ▶ Overview of all parts to be ordered to meet test requirements in the validation phase (Engineering, Production, Sales, After Sales, Quality...) | | | |
| 157 | Floor space utilization plan and production concept defined and agreed, Compliance with legal requirements (supply, waste disposal, Local Authority authorisations...) assured. | | | |
| 158 | ▶ Production layout concept available and agreed<br>▶ Concepts for supply and waste removal created<br>▶ Local authority confirmation of concepts available<br>▶ Floor space utilisation plan updated | | | |
| 159 | Process simulation based on concept data complete | | | |
| 160 | ▶ Assembly sequence, process flow and joining technologies determined for each manufacturing area | | | |
| 161 | ▶ Production processes for body, paint and general assesmbly simulated according to the maturity of the available data at DF-VPT-TA<br>▶ Identified issues documented, responsibility determined and measures agreed | | | |
| 162 | Required investment for realisation of program defined and agreed | | | |
| 163 | ▶ Required investments in infrastructure for program realisation identified and agreed | | | |
| 164 | Product audit targets defined for each phase, production planning status report against targets available | | | |
| 165 | ▶ Quality planning and feasabilty for technical test equipment available | | | |
| 166 | ▶ Process FMEA status report against plan | | | |
| 167 | ▶ Plan for implementation of KCC checks in production available | | | |
| 168 | ▶ Product Audit target for each phase defined<br>▶ Glidepath defined and documented | | | |
| 169 | ▶ Scope and checks of the QM-Release Process agreed with customer (OEM) and program | | | |
| 170 | | **FMC-SC** | | |
| 171 | Supply chain development strategy agreed | | | |
| 172 | ▶ Supply Chain Management development approach agreed for Purchase, SQA and Logistics<br>▶ Confirmation of strategy implementation within the specified timeframe (coherent with master timing)<br>▶ Measures for risk minimisation implemented or agreed | | | |
| 173 | ▶ Cost down potentials from SCM on part level basis<br>- part design<br>- part function<br>- material specification<br>- supplier production process... | | | |
| 174 | Source evaluation of potential suppliers completed.<br>Suppliers for long lead parts and facilities have been selected.<br>All systems/modules in BOM have a preferred / pre-selected supplier.<br>Key suppliers selected | | | |
| 175 | ▶ Purchasing strategy implemented for each commodity<br>▶ Market research for potential suppliers complete with financial assessment regarding suitability complete<br>▶ Workshops with customer (OEM) to identify common bidders list organised | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 176 | | | 6.2.2 | | | Sourcing Process |
| 177 | | | 6.2.3 | | | Request for Quotation |
| 178 | | | 6.2.4 | | | Cost Engieneering Process |
| 179 | | | 6.3 | | Supplier Quality Assurance | |
| 180 | | | 6.3.1 | | | Supplier source evaluation |
| 181 | | | 6.3.2 | | | APQP |
| 182 | | | 6.4 | | Logistics | |
| 183 | | | 6.4.1 | | | Logistics planning |
| 184 | | | 6.4.2 | | | Vehicle Order Management |
| 185 | | | 6.4.3 | | | Transportation concept |
| 186 | | | 6.4.4 | | | Packaging concept |
| 187 | | | **7.0** | | **Quality** | |
| 188 | | | 7.1 | | Requirements and quality targets | |
| 189 | | | 7.1.1 | | | Requirements |
| 190 | | | 7.1.2 | | | Quality Targets |
| 191 | | | 7.2 | | Quality planning and controlling | |
| 192 | | | 7.2.1 | | | Quality Planning |
| 193 | | | 7.2.2 | | | Quality controlling |
| 194 | | | 7.3 | | Materials Engineering | |
| 195 | | | 7.3.1 | | | Material Testing |
| 196 | | | 7.4 | | Geometrical Measurement | |

This document is assigned to G10250. 010250-101-c



| | G | H | I | J |
|---|---|---|---|---|
| | ► Selection of system suppliers (reduction to 1 supplier) done | | | |
| 176 | ► Feasibility confirmed | | | |
| | ► RFQ package prepared and approved. Aggregation of documents for the request for quotation to include, but not limited to:<br>- Component description (provided by SE/Module leader)<br>- Legal requirements<br>- Logistic requirements<br>- Quality requirements<br>- Feasibility commitment | | | |
| 177 | ► RFQ-packages transmitted to potential suppliers. | | | |
| 178 | ► Initial cost break down analysis for purchased parts | | | |
| 179 | SQA source evaluation planning agreed and available | | | |
| | ► Evaluation of potential suppliers regarding:<br>- Management system (certification,…)<br>- Processes and capability | | | |
| 180 | ► Status of planned assessments against actual assessment conducted | | | |
| | ► Status of APQP | | | |
| 181 | ► Corrective actions defined | | | |
| 182 | Description of required logistic services available | | | |
| | ► Specification of logistical services complete<br>► Detailed logistics cost estimate for series development agreed | | | |
| 183 | ► Part by part planning, logistic relevant dates are defined and available | | | |
| | ► End customer order process agreed with OEM<br>► Detailed production ramp up planning agreed<br>► Type codes for series production have been created | | | |
| 184 | ► Specification of production relevant data (VPD), agreed with customer (OEM) | | | |
| | ► Transportation concept planned and documented | | | |
| 185 | ► Outbound vehicle concept agreed with customer (OEM) | | | |
| | ► Initial concept for packaging planned and documented | | | |
| 186 | ► Coordination of carry-over parts confirmed, load carrier (bins, stillages…) information available | | | |
| 187 | | | | |
| 188 | Strategy and reqirements incorpotated into quality targets; inputs for system and component specifications available | | | |
| 189 | ► Customer (OEM) quality strategy and requirements incorporated into quality targets for program<br>► QM-Release checklist available | | | |
| 190 | ► Quality targets agreed with customer (OEM) and program according to defined responsibilities<br>► Quality target inputs to system and component specifications available | | | |
| 191 | Quality planning and requirements documented to meet program requirements at TA | | | |
| 192 | ► QM-Plan positioned within target agreement and contract according to agreements<br>► Status documented and reported | | | |
| 193 | ► Status report on all quality requirements according to planning, including but not limited to:<br>- knowledge management<br>- risk management<br>- issue management<br>- quality checks… | | | |
| 194 | Activities planned, scope of colour and trim matching agreed, | | | |
| 195 | ► QM-Plan activities positioned within target agreement and contract as agreed<br>► Status of activities according to planning to meet program requiements.<br>► Scope of colour and trim matching agreed with customer (OEM) | | | |
| 196 | Matching strategy and relevant parts defined | | | |

| | | | | |
|---|---|---|---|---|
| 7.4.1 | | | Matching Geometry | |
| 7.4.2 | | | Body in White - Quality Control Geometry | |
| **8.0** | | | **Information Technology** | |
| 8.1 | | Strategy / Concept | | |
| 8.1.1 | | | IT system concept | |
| 8.2 | | IT Infrastructure | | |
| 8.2.2 | | | IT Systems | |
| **9.0** | | | **Finance** | |
| 9.1 | | Business Case and Program Costs | | |
| 9.1.1 | | | Business plan | |
| 9.1.2 | | | Program / Project definition | |
| 9.1.3 | | MS Int | Program costs | |
| 9.1.4 | | | Cost estimate for program | |
| 9.1.5 | | | Cost estimate for engineering project | |
| 9.1.6 | | | Cost estimate for the production project | |
| 9.1.7 | | | Cost estimate for Supply Chain | |
| 9.1.8 | | | IT costs for vehicle production development | |
| 9.2 | | Cost controlling | | |
| 9.2.1 | | | Cost estimate for program | |


|  | G | H | I | J |
|---|---|---|---|---|
|  | ► Matching strategy defined | | | |
|  | ► Matching process timing confirmed | | | |
|  | ► Matching relevant parts defined | | | |
| 197 | ► 2nd round RFQ (matching equipment) sent to potential suppliers | | | |
|  | ► Status of measurement fixture planning available | | | |
| 198 | ► Testing and measurement process of BIW defined | | | |
| 199 | | **FMC-IT** | | |
| 200 | IT concept for the serial development phase available and agreed within the Program | | | |
| 201 | ► IT system concept to support series development agreed and documented | | | |
| 202 | IT-Infrastructure defined and implemented for series development. | | | |
| 203 | ► Systems technically configured to support series development and available for designated users<br>► Technical configuration of systems for product development data transport; systems available<br>► IT systems available for designated users and required training has been conducted | | | |
| 204 | | **FMC-F** | | |
| 205 | Business Plan checked against current values and is achievable.<br>Program cost estimates, planning  (non-recurring and part costs) and program finance plan available | | | |
|  | ► MS Business plan checked against currently available values | | | |
| 206 | ► MS Business plan status update available | | | |
|  | ► Project definition and ordering requirements for release available. | | | |
| 207 | ► Project accounts available and released according to requirements | | | |
|  | ► Overall estimate of series development costs | | | |
|  | ► Development costs compared to final value of the order | | | |
| 208 | ► Targets defined and agreed with responsible roles | | | |
|  | ► Agreed targets for program costs in series development available | | | |
|  | ► Overview of non-recurring costs | | | |
|  | ► Overview of recurring costs | | | |
| 209 | ► Finance plan based on financial targets | | | |
|  | ► Agreed targets for engineering costs in series development available | | | |
| 210 | ► Finance plan based on financial targets | | | |
|  | ► Agreed targets for production costs in series development available | | | |
|  | ► Overview of non-recurring costs | | | |
|  | ► Overview of recurring costs | | | |
| 211 | ► Finance plan based on financial targets | | | |
|  | ► Agreed targets for supply chain management costs in series development available | | | |
|  | ► Overview of non-recurring costs | | | |
|  | ► Overview of recurring costs | | | |
| 212 | ► Finance plan based on financial targets | | | |
|  | ► IT cost estimates (recurring and non-recurring) available for series development | | | |
| 213 | ► IT cost estimates agreed with supplying department and documented | | | |
| 214 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. Program financial controlling system implemented for the serial development phase. Detailed budgets have been distributed. | | | |
|  | ► Overall estimate of planned program costs | | | |
|  | ► Overview of non-recurring costs | | | |
|  | ► Overview of recurring costs | | | |
| 215 | ► MSF Finance plan based on financial targets | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 216 | | | 9.2.2 | | | Cost controlling system |
| 217 | | | 9.2.3 | | | Budget targets |
| 218 | | | 9.2.4 | | | Cost reporting |
| 219 | | | 9.2.5 | | MS Int | Release of financial resources |



| | G | H | I | J |
|---|---|---|---|---|
| 216 | ► Project cost controlling system implemented<br>► Cost monitoring available for:<br>- non-recurring costs (current cost monitoring)<br>- production costs (part costs, manufacturing costs, logistics...) | | | |
| 217 | ► Target cost values distributed for program at module level according to cost structure<br>► Targets agreed and documented | | | |
| 218 | ► Status for scope of work of plan versus actual<br>► Deviations from plan costs highlighted | | | |
| 219 | ► Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process.<br>► Financial resources available for program responsibilities according to agreed budgets<br>► Release of invoices confirmed | | | |

# MSDS Gate Deliverables Checklist

| | | | | | Programme Target Compatibility: Industrialisation timing targets confirmed. |
|---|---|---|---|---|---|
| | | **Gate:** **PTC** | | | Programme Target Compatibility: Industrialisation timing targets confirmed. |
| | **1.0** | | | **Program Management** | |
| | 1.1 | | Master Timing | | |
| | 1.1.1 | | | Detailed Timing | |
| | 1.1.2 | | | DVP Review | |
| | 1.2 | | Gateway Review | | |
| | 1.2.1 | | | Major Issues and Risks | |
| | 1.2.2 | | | Red/Yellow Grren | |
| | 1.2.3 | | | Recovery Plans | |
| | 1.3 | | Processes / Methods | | |
| | 1.3.1 | | | Product Development Process | |
| | 1.3.2 | | | Meeting Schedule | |
| | 1.3.3 | | | Change Management | |
| | 1.3.4 | | | Outsourced Engineering | |
| | 1.4 | | Team Organization | | |
| | 1.4.1 | | | Program Organisation | |
| | 1.5 | | Contract Management | | |
| | 1.5.1 | | | Contract update | |
| | 1.6 | | Knowledge Management | | |
| | 1.6.1 | | | Transfer of Experience | |
| | 1.6.2 | | | Reflection of Experience (Lessons Learned) | |
| | 1.7 | | Configuration Management | | |
| | 1.7.1 | | | Program target requirements | |
| | 1.7.2 | | | Module target framework | |
| | 1.7.3 | | | Change request status - complete vehicle | |


| | Responsible Role | Responsible Organisation | Responsible Name |
|---|---|---|---|
| | **FMC-PM** | | |
| Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | FMC | |
| ▶ Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | ESS | |
| DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | ESS Vehicle Attributes | |
| | Program Manager | FMC | |
| Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | ESS | |
| Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | ESS | |
| Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | ESS | |
| | Program Manager | FMC | |
| Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | FMC | |
| Meeting schedule issued | Program Manager | FMC | |
| Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | FMC | |
| Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | FMC | |
| Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | FMC | |
| ▶ Program organisation and teamwork functioning according to planning ▶ Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | ESS | |
| Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | FMC | |
| Contracts with all Engineering Service Suppliers in place | Program Manager | FMC | |
| Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | FMC | |
| ▶ Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | ESS | |
| Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | FMC | |
| ▶ Status of program requirements available ▶ Changes to program targets transferred to change management for tracking | Configuration Manager | FMC | |
| ▶ Module target breakdown confirmed for all areas | Configuration Manager | FMC | |
| ▶ Change requests to achieve VTS targets realised ▶ Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |

This document is assigned to G10250. 010250-101-e

PTC
Page #P of 159

3-160

MAGNA STEYR MSDS Gate Deliverables Checklist

| | Customer (Approval) | Status: CWxxx | Forecast: CWxxx | |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

MAGNA STEYR

# MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 29 | | | 1.7.4 | | | Change request status - engineering module groups |
| 30 | | | **2.0** | | | **Marketing and Sales** |
| 31 | | | 2.1 | | | Product Definition |
| 32 | | | 2.1.1 | | | Product positioning |
| 33 | | | 2.1.2 | | | Sales volumes |
| 34 | | | 2.1.3 | | | Series and optional features |
| 35 | | | 2.2 | | | Sales and Marketing |
| 36 | | | 2.2.1 | | | Communication strategy |
| 37 | | | 2.2.2 | | | Target markets |
| 38 | | | 2.2.3 | | | Price range |
| 39 | | | **3.0** | | | **After Sales** |
| 40 | | | 3.1 | | | Strategy |
| 41 | | | 3.1.1 | | | After Sales Targets |
| 42 | | | 3.1.2 | | | Overall timing |
| 43 | | | 3.2 | | | Warranty / Service |
| 44 | | | 3.2.1 | | | Maintainance concept |
| 45 | | | 3.2.2 | | | Serviceability concept |
| 46 | | | 3.2.3 | | | Insurance classification |
| 47 | | | 3.2.4 | | | Diagnostics concept |
| 48 | | | 3.3 | | | Accessories / Spare parts |
| 49 | | | 3.3.1 | | | Spare parts / accessories procurement concept |
| 50 | | | **4.0** | | | **Design (Styling)** |
| 51 | | | 4.1 | | | Styling status |
| 52 | | | 4.1.1 | | | Styling verification |
| 53 | | | 4.1.2 | | | Hardware model |
| 54 | | | 4.1.3 | | | Colour & trim |
| 55 | | | 4.2 | | | Styling Technical Convergence |


|    | G | H | I | J |
|----|---|---|---|---|
|    | ►Change requests to achieve module targets realised | Configuration Manager | **FMC** | |
| 29 | ►Risks for non-implementation of changes highlighted and documented | | **FMC** | |
| 30 | | **FMC-MS** | **FMC** | |
| 31 | Cost of ownership commitment. Special features and equipment updated.  Target customer requirements and product contribution to the brand are confirmed | TBC | **FMC** | |
|    | ►Customer clinics confirm Customer Market Profile | TBC | | |
|    | ►Product branding confirmed | | | |
|    | ►Program for each market confirmed | | | |
| 32 | ►Cost of ownership confirmed | | **FMC** | |
| 33 | ►Sales volume plan by model and market over lifecycle updated | TBC | **FMC** | |
| 34 | ►Sales forecast for optional features by market updated | TBC | **FMC** | |
| 35 | Update volumes based latest market information | TBC | **FMC** | |
| 36 | ►Marketing concept updated based on market intelligence | TBC | **FMC** | |
| 37 | ►Target markets confirmed / ►Market specific requirements confirmed | TBC | **FMC** | |
| 38 | ►Target selling price by market and model updated | TBC | **FMC** | |
| 39 | | **FMC-AS** | **FMC** | |
| 40 | Timing and After Sales concept are confirmed. | TBC | **FMC** | |
| 41 | ►Fulfillment of After Sales targets according to specifications confirmed with chosen concepts | TBC | **FMC** | |
| 42 | ►After Sales overall timing according to timeplan and is achievable with agreed targets | TBC | **FMC** | |
| 43 | Serviceability, insurance classification rate and diagnostics concept are confirmed. Target deviations are known and measures defined. | TBC | **FMC** | |
|    | ►DMU investigations executed | TBC | | |
|    | ►Confirmation that vehicle concept fulfills maintainability specifications | | | |
| 44 | ►After Sales confirmation available in written form | | **FMC** | |
|    | ►DMU investigations executed | TBC | | |
|    | ►Target deviations are known and measures defined. | | | |
|    | ►Repair concept confirmed. | | | |
| 45 | ►After Sales confirmation available in written form | | **FMC** | |
|    | ►Insurance classification confirmed. | TBC | | |
|    | ►Target deviations are known and measures defined. | | | |
| 46 | ►Confirmation / risks available in written form | | **FMC** | |
| 47 | ►Diagnostic concept is available and confirmed. / ►Confirmation / risks available in written form | TBC | **FMC** | |
| 48 | Achieveability of spare parts management targets are confirmed. Risks are identified. | TBC | **FMC** | |
|    | ►Achieveability of spare parts management targets are confirmed. | TBC | | |
|    | ►Risks have been identified. | | | |
| 49 | ►Confirmation / risks available in written form | | **FMC** | |
| 50 | | **FMC-D** | **FMC** | |
| 51 | All technical inputs to A Class incorporated | TBC | **FMC** | |
| 52 | ►Technical requirements for A Class incorporated into surfacing loops | TBC | **FMC** | |
| 53 | ►Milling loop for surfacing and styling verification | TBC | **FMC** | |
|    | ►Materials, colours and trim concept confirmed | TBC | **FMC** | |
|    | ►Material samples out of production process confirmed and documented | | | |
|    | ►Draft angle for injection moulded parts defined | | | |
| 54 | ►Process to begin virtual grain mapping implemented | | | |
| 55 | First A Class surfaces available and confirmed | SE Manager | **FMC** | |

Case 3:21-cv-04736-EMC Document 134-6 Filed 03/23/21 Page 297 of 611

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 56 | | | 4.2.1 | | | A-Class: Final surface for procurement release (PR) |
| 57 | | | 4.2.2 | | | Gap & flush confirmed |
| 58 | | | **5.0** | | | **Vehicle Integration** |
| 59 | | | 5.1 | | | Product Development Targets |
| 60 | | | 5.1.1 | | | Technical target framework |
| 61 | | | 5.1.2 | | | Complete vehicle targets |
| 62 | | | 5.1.3 | | | Module targets |
| 63 | | | 5.1.4 | | | Patent research |
| 64 | | | 5.2 | | | Function / Complete vehicle |
| 65 | | | 5.2.1 | | | Functional requirements - complete vehicle |
| 66 | | | 5.2.2 | | | Attribute Team status |
| 67 | | | 5.2.3 | | | Design Verification Plan |
| 68 | | | 5.2.4 | | | VPT status |
| 69 | | | 5.2.5 | | | Data freeze |
| 70 | | | 5.2.6 | | | Vehicle test and hardware planning |
| 71 | | | 5.2.7 | | | Vehicle verification and validation test plan |



| G | H | I | J |
|---|---|---|---|
| ▶Final Surfaces for data control model process --> Styling Confirmation (SC)<br>▶100% surface release for procurement release (PR)<br>▶Surface quality approved by Styling<br>▶Technical and economical feasabilty confirmation from suppliers and production<br>56 ▶Surface for use in Class A tooling (visible surfaces) | SE Manager | FMC | |
| ▶Q-characteristics defined as single section and nominal value confirmed.<br>▶Tolerance management status available<br>57 ▶Open issues documented and measures defined and agreed | SE Manager | FMC | |
| 58 | **FMC-VI** | | |
| Target system confirmed and targets verified.<br>59 | VPM | ESS<br>Vehicle Attributes | |
| ▶Achievement of vehicle technical targets within the agreed target catalogue confirmed<br>▶Achievement of module technical targets within the agreed target catalogue confirmed<br>60 ▶List of open issues with defined counter measures is available | VPM | ESS<br>Vehicle Attributes | |
| ▶Complete vehicle targets confirmed by simulation or engineering judgement<br>▶Target achievement, test status and risk assessment for complete vehicle have been summarised<br>61 based on individual I-Team status | VPM | ESS<br>Vehicle Attributes | |
| ▶Status regarding fullfillment of module targets is available<br>62 ▶Deviations to module targets detected and measures agreed | Atrribute Leader | ESS<br>Vehicle Attributes | |
| ▶Check for patent conflicts and infringements<br>63 ▶Changes for previously identified patent infringements implemented | Patent Expert | ESS - All | |
| Vehicle functional targets confirmed.<br>Complete vehicle virtual status for functions and/or assessment based on simulation loop<br>VPT-CC is available.<br>64 DVP for the series development phase is confirmed. | VPM | ESS<br>Vehicle Attributes | |
| ▶Complete vehicle functions confirmed for current level of data maturity based on available<br>physical and virtual test results with regards to:<br>- vehicle technical specification requirements<br>- assembly<br>65 - geometrical integration | VPM | ESS<br>Vehicle Attributes | |
| ▶Confirmation that individual Attribute Team strategies and concepts meet targets<br>66 ▶Status of target achievement available for each I-Team | VPM | ESS<br>Vehicle Attributes | |
| ▶Complete vehicle DVP completion status<br>▶Further verification planned according to test results<br>67 ▶Requirements for PTO confirmed | DVP Manager | ESS<br>Vehicle Attributes | |
| ▶Results of simulations / expert assessments from VPT-CC (virtual prototype) according to DVP<br>available<br>68 ▶Results from VPT-CC assessed and action plans defined for individual I-Teams | VPM | ESS<br>Vehicle Attributes | |
| ▶The dates for the freeze and visual data checks of the engineering design data are agreed and<br>confirmed by module groups<br>69 ▶Input freeze and required data for VPT for the modules defined and agreed | VPM | ESS<br>Body & GI | |
| ▶Test planning coherent with development strategy, with agreed key tests to be completed prior to<br>releases<br>▶Tests planned or not in time have been assessed concerning alternatives and risks; measures<br>planned and agreed<br>70 ▶Confirmation of hardware configuration requirements for prototype and PTO vehicles | DVP Manager | ESS<br>Vehicle Attributes | |
| ▶Detailed prototype planning and timing agreed and coherent with releases and virtual milestones<br>▶All required physical tests have been allocated to vehicles<br>▶Development vehicle planning for PTO agreed, all tests required by DVP planned.<br>▶PP testing planned<br>71 | DVP Manager | ESS<br>Vehicle Attributes | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 72 | | | 5.3 | | Functional Safety | |
| 73 | | | 5.3.1 | | | Implementation of functional safety |
| 74 | | | 5.4 | | Vehicle Architecture | |
| 75 | | | 5.4.1 | | | Target development |
| 76 | | | 5.4.2 | | | Dimensional concept |
| 77 | | | 5.4.3 | | | Vehicle package |
| 78 | | | **6.0** | | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ |
| 79 | | | 6.1 | | Engineering Modules | |
| 80 | | | 6.1.1 | | | Target definition - Engineering Module Group |
| 81 | | | 6.1.2 | | | Functional requirements - module |
| 82 | | | 6.1.3 | | | Product documentation |
| 83 | | | 6.2 | | Data Management | |

This document is assigned to G10250. 010250-101-c


| | G | H | I | J |
|---|---|---|---|---|
| 72 | Functional safety plan implementation status | FuSa Manager | **ESS**<br>**FuSa** | |
| 73 | ►Status of functional safety plan implementation<br>►Measures for known issues determined and allocated | FuSa Manager | **ESS**<br>**FuSa** | |
| 74 | Achievement of dimensions and ergonomic targets confirmed with customer. Package layout available. Package has planning release status based on B-class styling. | Vehicle Architect | **ESS**<br>**Body & GI** | |
| 75 | ►Achievement of dimensional targets documented and confirmed<br>►Achievement of ergonomic targets documented and confirmed | Vehicle Architect | **ESS**<br>**Body & GI** | |
| 76 | ►Dimensional concept confirmation available<br>►Issues documented, measures defined and agreed | Vehicle Architect | **ESS**<br>**Body & GI** | |
| 77 | ►Requirements of B-class styling integrated into vehicle package<br>►Package layout available and updated to conform with planning release status<br>►Issues documented, measures defined and agreed | Vehicle Architect | **ESS**<br>**Body & GI** | |
| 78 | **UI/UX/Connectivity/Autonomous Driving)** | **FMC-VE** | | |
| 79 | Concepts have been developed to ensure achieveability of vehicle targets for the defined scope of work | Module Leader | **ESS** | |
| 80 | ►Results of engineering judgement, virtual and physical tests according to module / component DVP available<br>►Component technical specification released and confirmed by supplier<br>►Confirmation of achieveability of targets at module level (component technical specification requirements) based on complete vehicle target catalogue available and documented<br>►Issues documented, measures defined and agreed | Module Leader | **ESS** | |
| 81 | ►Component / module functions confirmed for current level of data maturity based on available physical and virtual test results with regards to:<br>- component technical specification requirements<br>- assembly<br>- geometrical integration | Module Leader | **ESS** | |
| 82 | ►CAD data stand updated based on measures agreed from simulation loop VPT-CC and technical requirements from B class data incorporated into design, includes as appropriate:<br>- alignment concept<br>- tolerance requirements<br>- material requirements<br>- surface requirements<br>- component naming convention<br>- part numbers and revision history<br>- list of variants<br>- reference drawings... | Module Leader | **ESS** | |
| 83 | Continued system availability ensured. All data from Planning Release available and updated within the system.<br>Required training for procurement release process complete. | Module Leader | **ESS** | |

This document is assigned to G10250. 010250-101-c

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 84 | | | 6.2.1 | | | Data Management start up - series development |
| 85 | | | 6.2.2 | | | Digital prototype |
| 86 | | | 6.2.3 | | | Design data |
| 87 | | | 6.2.4 | | | Technical product data |
| 88 | | | 6.2.5 | | | Documentation of changes |
| 89 | | | 6.2.6 | | | BOM update - modules |
| 90 | | | 6.2.7 | | | Part by part planning |
| 91 | | | 6.2.8 | | | Part by part planning - Purchase |
| 92 | | | 6.2.9 | | | Part by part planning - SQA |
| 93 | | | 6.2.10 | | | Part by part planning - Logistics |
| 94 | | | 6.3 | | | Product Quality Assurance |
| 95 | | | 6.3.1 | | | Product Quality Assurance |
| 96 | | | 6.3.2 | | | Q-Planning Product |
| 97 | | | 6.3.3 | | | Risk Filter Product |
| 98 | | | 6.3.4 | | | System FMEA |
| 99 | | | 6.3.5 | | | Design FMEA |
| 100 | | | 6.3.6 | | | Key Product Characteristics (KPC) |
| 101 | | | 6.3.7 | | | Perceived Quality (Virtual / Physical) |


| G | | H | I | J |
|---|---|---|---|---|
| | ▶ Data management systems up and running | Module Leader | | |
| | - IT provisions | | | |
| | - data and information security | | | |
| | - design data management (data provision concept) | | | |
| | - technical product documentation | | | |
| | - release management | | | |
| | - change management | | | |
| | - issue management | | | |
| | - prototype configuration and management | | | |
| | - supplier data management | | | |
| | - document management (non CAx) | | | |
| 84 | - monitoring and tracking of design engineering, change management, release management | | ESS | |
| | ▶ VPT-PTC data freeze finished | Module Leader | | |
| 85 | ▶ VPT-FC preparation for data freeze planned and agreed with project team | | ESS | |
| | ▶ All design data frozen in designated data management system based on inputs from styling and | Module Leader | | |
| 86 | technical guidelines (B-class stand) | | ESS | |
| 87 | ▶ Technical product data, including test reports, available for all components | Module Leader | ESS | |
| 88 | ▶ Documentation of all implemented changes confirmed within the agreed system | Module Leader | ESS | |
| 89 | ▶ Parts list complete and updated based on supplier information and confirmation of concept | Module Leader | ESS | |
| | ▶ Release planning for BoM relevant part numbers available | Module Leader | | |
| 90 | ▶ Planning of all parts to respective MRD dates available and support program requirements | | ESS | |
| | ▶ Procurement specific part by part planning complete | Module Leader | | |
| | - tool lead times | | | |
| | - tool release dates | | | |
| | - latest permitted tooling order dates | | | |
| 91 | ▶ Deviations and risks available with agreed measures | | ESS | |
| | ▶ SQA part by part planning available | Module Leader | | |
| 92 | ▶ Deviations and risks available with agreed measures | | ESS | |
| | ▶ Logistics part by part planning available | Module Leader | | |
| 93 | ▶ Deviations and risks available with agreed measures | | ESS | |
| | DFMEA 1st loop complete for defined components, initial draft of KPCs and perceived | Module Leader | | |
| 94 | quality reports available | | ESS | |
| | ▶ Design-FMEA 1st loop for defined components finished | Module Leader | | |
| | ▶ Status of supplier Design-FMEAs available | | | |
| 95 | ▶ Initial KPCs available | | ESS | |
| | ▶ Updates of methods use plan considered within QM Plan have been documented | Module Leader | | |
| 96 | ▶ Progress status for product quality planning available | | ESS | |
| | ▶ Risk Filter Product reviewed | Module Leader | | |
| | ▶ Actual product risk level status available for each component | | | |
| 97 | ▶ Preventive measures status, planning and implementation meets program requirements | | ESS | |
| | ▶ First Loop System FMEAs complete | Module Leader | | |
| | ▶ Specific System FMEAs reviewed and considered for procurement release | | | |
| 98 | ▶ Documentation of relevant identified issues from verification | | ESS | |
| | ▶ Design FMEAs 1st Loop completed for defined components at the development responsible | Module Leader | | |
| | organization (in-house for build to print suppliers, at supplier for system development suppliers) | | | |
| 99 | ▶ Design FMEAs from supplier checked, planning and implementation meets program requirements | | ESS | |
| | ▶ First Draft of integration KPCs available | Module Leader | | |
| | ▶ First Draft of build to print KPCs available | | | |
| 100 | ▶ Evaluation of first draft of supplier KPCs for system development suppliers available | | ESS | |
| | ▶ Perceived quality audit reports (2nd virtual loop) available | Module Leader | | |
| | ▶ Perceived quality one-pager and decision paper for all identified risks available and tracked within | | | |
| | agreed issue management tool | | | |
| 101 | ▶ Perceived quality forecast documented | | ESS | |

| | | | | |
|---|---|---|---|---|
| 102 | **7.0** | **Manufacturing** | | |
| 103 | 7.1 | Production Planning | | |
| 104 | 7.1.1 | | | Production strategy |
| 105 | 7.1.2 | | | Assessment of requirements |
| 106 | 7.2 | Layout | | |
| 107 | 7.2.1 | | | Production layout plan |
| 108 | 7.3 | Process & Equipment | | |
| 109 | 7.3.1 | | | Process simulation (virtual process week) |
| 110 | 7.4 | Investment | | |
| 111 | 7.4.1 | | | Allocation of scope of supply |
| 112 | 7.5 | Production Quality Assurance | | |
| 113 | 7.5.1 | | | Q-Planning Production |
| 114 | 7.5.2 | | | Process FMEA |
| 115 | 7.5.3 | | | Key Control Characteristics (KCC) |
| 116 | **8.0** | **Supply Chain** | | |
| 117 | 8.1 | General Planning & Organisation | | |
| 118 | 8.1.1 | | | SCM strategy |
| 119 | 8.2 | Purchase | | |
| 120 | 8.2.1 | | | Sourcing process |

This document is assigned to G10250. 010250-101-c



| | | H | I | J |
|---|---|---|---|---|
| **102** | | **FMC-M** | | |
| 103 | Production concept defined. Assessment of infrastructure, environment and employee safety available, (supply, waste disposal, Local Authority authorisations…) Current status of achieveability of production targets available | TBC | FMC | |
| 104 | ▶ Production concept confirmed for the proposed production volumes <br> - process flow <br> - assembly timing <br> - assembly sequence <br> - statrion layout <br> - plant equipment, fixtures and fittings <br> - test and measurement requirements | TBC | FMC | |
| 105 | ▶ Status of achieveability of production targets <br> ▶ Planned infrastructure assessed and documented for emissions, imissions, environment, legal requirements and employee safety, | TBC | FMC | |
| 106 | Detailed concepts (including infrastructure and outdoor facilities) available. | TBC | FMC | |
| 107 | ▶ Detailed production layout plan available at station level, not including equipment and fixtures <br> ▶ Building infrastructure and outdoor facility planning available <br> ▶ Open issue list available with timing and responsibilities defined | TBC | FMC | |
| 108 | Process simulation based on VPT-CC data complete | TBC | FMC | |
| 109 | ▶ Production processes for body, paint and general assesmbly simulated according to the maturity of the available data at DF-VPT-CC <br> ▶ Identified issues documented, responsibility determined and measures agreed | TBC | FMC | |
| 110 | Supplier quotations for manufacturing equipment, fixtures and fittings available. | TBC | FMC | |
| 111 | ▶ Indiviaual work packages within the scope of production supply have been defined and allocated to suppliers <br> ▶ Initial quotations have been obtained and relevant contracts awarded to ensure achievment of timing targets | TBC | FMC | |
| 112 | First draft of KCCs available; Process FMEA status according to planning to meet program requirements | TBC | FMC | |
| 113 | ▶ Quality planning and feasabilty for technical test equipment; status update against planning | TBC | FMC | |
| 114 | ▶ Process FMEA planning finished (defined list of P-FMEAs) <br> ▶ Process FMEA 1st loop status available | TBC | FMC | |
| 115 | ▶ First draft of KCCs available | TBC | FMC | |
| **116** | | **FMC-M** | FMC | |
| 117 | Supply chain development strategy confirmed | TBC | FMC | |
| 118 | ▶ Supply Chain development concept confirmed for Purchase, SQA and Logistics <br> ▶ Confirmation of strategy implementation within the specified timeframe (master timing) <br> ▶ Measures for risk minimisation implemented or agreed | TBC | FMC | |
| 119 | Suppliers selected according project requirements. <br> All system suppliers decided and agreements completed. | TBC | FMC | |
| 120 | ▶ All suppliers selected, with the exception of pre-selected system suppliers (up to 2 suppliers per system/module) <br> ▶ Selection of build to print suppliers complete <br> ▶ Technical content of RFQ documentation verified (confirmation from Engineering) <br> ▶ Offer / tender comparison complete <br> ▶ Cost plausibility check carried out (Quaotation Analysis) <br> ▶ Tooling and supply lead times confirmed <br> ▶ Legal and commercial terms of quotations verified | TBC | FMC | |

This document is assigned to G10250. 010250-101-c

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 121 | | | 8.2.2 | | | Ordering process |
| 122 | | | 8.3 | | | Supplier Quality Assurance |
| 123 | | | 8.3.1 | | | APQP |
| 124 | | | 8.4 | | Logistics | |
| 125 | | | 8.4.1 | | | Materials planning |
| 126 | | | 8.4.2 | | | Vehicle order management |
| 127 | | | 8.4.3 | | | Transportation planning |
| 128 | | | 8.4.4 | | | Packaging planning |
| 129 | | | 9.0 | | **Quality** | |
| 130 | | | 9.1 | | | Requirements and quality targets |
| 131 | | | 9.1.1 | | | Quality targets |
| 132 | | | 9.2 | | | Quality planning and controlling |
| 133 | | | 9.2.1 | | | Quality planning |
| 134 | | | 9.2.2 | | | Quality controlling |
| 135 | | | 9.3 | | | Materials Engineering |
| 136 | | | 9.3.1 | | | Material engineering and testing |
| 137 | | | 9.4 | | | Geometrical Measurement |
| 138 | | | 9.4.1 | | | Control of monitoring and measuring equipment |
| 139 | | | 9.4.2 | | | Matching geometry |
| 140 | | | 9.4.3 | | | Body in White - quality control geometry |
| 141 | | | 10.0 | | **Information Technology** | |
| 142 | | | 10.1 | | Strategy / Concept | |
| 143 | | | 10.1.1 | | | IT targets for series production |
| 144 | | | 10.1.2 | | | IT Specifications |
| 145 | | | 10.1.3 | | | IT targets / specifications - Production |
| 146 | | | 10.1.4 | | | IT targets / specifications - Finance |



MAGNA STEYR MSDLS Gate Deliverables Checklist

| | G | H | I | J |
|---|---|---|---|---|
| | ▶Pre-prototype / prototype parts ordered at suppliers | TBC | | |
| 121 | ▶Availability of prototype parts confirmed according to protoype part for part timing plan and quality requirements | | FMC | |
| 122 | Quality planning of suppliers completed | TBC | FMC | |
| 123 | ▶Supplier quality planning complete according to requirements<br>▶Status of APQP<br>▶Corrective actions defined and / or implemented according to plan | TBC | FMC | |
| 124 | Logistic concept for facilities and manufacturing defined and evaluated.<br>Supply concept available at potential suppliers.<br>Concept for vehicle management evaluated and determined. | TBC | FMC | |
| 125 | ▶Logistics specification sheet created<br>▶Materials sequencing concept available<br>▶Line feed and supply concept defined<br>▶JIS (just in sequence) concept coordinated with suppliers | TBC | FMC | |
| 126 | ▶Vehicle order management objectives verified regarding;<br>- process for planning / ordering<br>- adherence to schedules / flexibility<br>- order lead times | TBC | FMC | |
| 127 | ▶Transportation concept for production plant detailed and documened<br>▶Concept for vehicle outbound logistics agreed | TBC | FMC | |
| 128 | ▶Packaging concept for production plant detailed and documented<br>▶Matching packaging type + JIS definition | TBC | FMC | |
| 129 | | | | |
| 130 | Quality target prognosis available and measures defined | TBC | FMC | |
| 131 | ▶Quality targets prognosis available and documented<br>▶Measures to meet program requirements agreed and decisions documented | TBC | FMC | |
| 132 | Quality planning and requirements documented to meet program requirements at CC | TBC | ESS | |
| 133 | ▶Status report on QM-Plan<br>▶Known issues documented and measures for implementation agreed | TBC | ESS | |
| 134 | ▶Status report on all quality requirements according to planning, including but not limited to:<br>- Knowledge management<br>- Risk management<br>- Issue management<br>- quality checks... | TBC | ESS | |
| 135 | Materials testing requirements defined | TBC | ESS | |
| 136 | ▶Initial definition of material testing requirements with program and suppliers | TBC | ESS | |
| 137 | Matching and measurement supplier requirements defined | TBC | ESS | |
| 138 | ▶Geometrical measurement set up defined | TBC | ESS | |
| 139 | ▶Matching equipment supplier defined | TBC | ESS | |
| 140 | ▶Measurement fixtures planned and ordered | TBC | ESS | |
| 141 | **FMC-IT** | | | |
| 142 | IT targets for serial production agreed within the Program.<br>IT system concepts for Product Master Data management available | TBC | FMC | |
| 143 | ▶IT specification and targets agreed and documented for series-production | TBC | FMC | |
| 144 | ▶Individual specifications collated and documented in a complete IT specification<br>▶Specifications checked against IT cost estimates | TBC | FMC | |
| 145 | ▶Production IT specification for series production available | TBC | FMC | |
| 146 | ▶Finance IT specification for series production available | TBC | FMC | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 147 | | | 10.1.5 | | | IT targets / specifications- Quality |
| 148 | | | 10.1.6 | | | IT targets / specifications- After Sales |
| 149 | | | 10.1.7 | | IT Infrastructure | |
| 150 | | | 10.1.8 | | | IT Systems |
| 151 | | | **11.0** | | **Finance** | |
| 152 | | | 11.1 | | Business Case and Program Costs | |
| 153 | | | 11.1.1 | | | Business plan |
| 154 | | | 11.1.2 | | | Production costs - module group |
| 155 | | | 11.1.3 | | | Logistic costs |
| 156 | | | 11.2 | | Cost controlling | |
| 157 | | | 11.2.1 | | | Cost estimate for program |
| 158 | | | 11.2.2 | | | Evaluation of vehicle costs |
| 159 | | | 11.2.3 | | | Cost reporting |
| 160 | | | 11.2.4 | | | Release of financial resources |
| 161 | | | 11.2.5 | | | Development costs settled |

This document is assigned to G10250. 010250-101-c


| | | G | H | I | J |
|---|---|---|---|---|---|
| 147 | ▶ Quality IT specification for series production available | | TBC | FMC | |
| 148 | ▶ After Sales IT specification for series production available | | TBC | FMC | |
| 149 | IT infrastructure technically configured according to agreed planning | | TBC | FMC | |
| 150 | ▶ Systems technically configured according to agreed IT concept and available for designated users<br>▶ Technical configuration of systems for production data transport; systems available for designated users | | TBC | FMC | |
| 151 | | **FMC-F** | | | |
| 152 | Business Plan checked against current values and is achievable.<br>Program cost estimates, planning  (non-recurring and part costs) and program finance plan available | | TBC | FMC | |
| 153 | ▶ MS Business plan status update available | | TBC | FMC | |
| 154 | ▶ Cost categories assigned to production have been broken down to module level and agreed with module groups<br>▶ Deviations from plan costs highlighted and documented | | TBC | FMC | |
| 155 | ▶ Detailed logistic cost estimate for series available | | TBC | FMC | |
| 156 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. | | TBC | FMC | |
| 157 | ▶ Status of planned program costs<br>▶ Overview of non-recurring costs<br>▶ Overview of recurring costs | | TBC | FMC | |
| 158 | ▶ Current status of vehicle cost (based on available material costs)<br>▶ Deviations from plan costs highlighted and documented | | TBC | FMC | |
| 159 | ▶ Status for scope of work of plan versus actual<br>▶ Deviations from plan costs highlighted and analysed | | TBC | FMC | |
| 160 | ▶ Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process.<br>▶ Release of invoices confirmed | | TBC | FMC | |
| 161 | ▶ Invoice schedules agreed | | TBC | FMC | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | Gate:<br>**FC** | | **Functional Confirmation: Simulations based on rel<br>integration of modules and systems within the veh** |
| 3 | | | | | | |
| 4 | | | **1.0** | | | **Program Management** |
| 5 | | | 1.1 | | Master Timing | |
| 6 | | | 1.1.1 | | | Detailed Timing |
| 7 | | | 1.1.2 | | | DVP Review |
| 8 | | | 1.2 | | Gateway Review | |
| 9 | | | 1.2.1 | | | Major Issues and Risks |
| 10 | | | 1.2.2 | | | Red/Yellow Grren |
| 11 | | | 1.2.3 | | | Recovery Plans |
| 12 | | | 1.3 | | Processes / Methods | |
| 13 | | | 1.3.1 | | | Product Development Process |
| 14 | | | 1.3.2 | | | Meeting Schedule |
| 15 | | | 1.3.3 | | | Change Management |
| 16 | | | 1.3.4 | | | Outsourced Engineering |
| 17 | | | 1.4 | | Team Organization | |
| 18 | | | 1.4.1 | | | Program Organisation |
| 19 | | | 1.5 | | Contract Management | |
| 20 | | | 1.5.1 | | | Contract update |
| 21 | | | 1.6 | | Knowledge Management | |
| 22 | | | 1.6.1 | | | Transfer of Experience |
| 23 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 24 | | | 1.7 | | Configuration Management | |
| 25 | | | 1.7.1 | | | Program target requirements |
| 26 | | | 1.7.2 | | | Module target framework |
| 27 | | | 1.7.3 | | | Change request status - complete vehicle |

This document is assigned to G10250. 010250-101-c



| | G | H | I | J |
|---|---|---|---|---|
| 1 | | | | |
| 2 | leased data and planned verification hardware tests concluded. Functional hicle has been confirmed. Production process has been verified. | | | |
| 3 | | Responsible Role | Responsible Organisation | Responsible Name |
| 4 | | **FMC-PM** | | |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | FMC | |
| 6 | ▶ Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | ESS | |
| 7 | DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | ESS Vehicle Attributes | |
| 8 | | Program Manager | FMC | |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | ESS | |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | ESS | |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | ESS | |
| 12 | | Program Manager | FMC | |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | FMC | |
| 14 | Meeting schedule issued | Program Manager | FMC | |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | FMC | |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | FMC | |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | FMC | |
| 18 | ▶ Program organisation and teamwork functioning according to planning ▶ Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | ESS | |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | FMC | |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | FMC | |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | FMC | |
| 22 | ▶ Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | ESS | |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | FMC | |
| 25 | ▶ Status of program requirements available ▶ Changes to program targets transferred to change management for tracking | Configuration Manager | FMC | |
| 26 | ▶ Module target breakdown confirmed for all areas | Configuration Manager | FMC | |
| 27 | ▶ Change requests to achieve VTS targets realised ▶ Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |

MAGNA STEYR **MSDS Gate Deliverables Checklist**



| | K | L | M |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Customer (Approval) | Status: CWxxx | Forecast: CWxxx |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |

**3-178**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |
| 29 | | | **2.0** | | | **Marketing and Sales** |
| 30 | | | 2.1 | | | Product Definition |
| 31 | | | 2.1.1 | | | Product positioning |
| 32 | | | 2.1.2 | | | Sales volumes |
| 33 | | | 2.1.3 | | | Series and optional features |
| 34 | | | 2.2 | | | Sales and Marketing |
| 35 | | | 2.2.1 | | | Communication strategy |
| 36 | | | 2.2.2 | | | Target markets |
| 37 | | | 2.2.3 | | | Price range |
| 38 | | | **10.0** | | | **After Sales** |
| 39 | | | 10.1 | | | Strategy |
| 40 | | | 10.1.1 | | | After Sales targets |
| 41 | | | 10.1.2 | | | Overall timing |
| 42 | | | 10.2 | | | Warranty / Service |
| 43 | | | 10.2.1 | | | Maintainance concept |
| 44 | | | 10.2.2 | | | Serviceability concept |
| 45 | | | 10.2.3 | | | Diagnostics concept |
| 46 | | | 10.3 | | | Accessories / Spare parts |
| 47 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 48 | | | **3.0** | | | **Design (Styling)** |
| 49 | | | 3.1 | | | Styling status |
| 50 | | | 3.1.1 | | | Styling verification |
| 51 | | | 3.1.2 | | | Colour & trim |
| 52 | | | 4.6 | | | Styling Technical Convergence |
| 53 | | | 4.6.1 | | | Styling concept confirmed and released by Management |
| 54 | | | 4.6.2 | | | Verification Model approved |

Case 3:21-cv-04736-EMC   Document 134   Filed 03/23/22   Page ... of ...

MAGNA STEYR   MSDS Gate Deliverables Checklist



| | G | H | I | J |
|---|---|---|---|---|
| 28 | ►Change requests to achieve module targets realised<br>►Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | **FMC-MS** | | | |
| 30 | Special features and equipment updated. Update volumes based on latest market information. | | | |
| 31 | ►Competitor information assessed<br>►Equipment portfolio per market frozen | | | |
| 32 | ►Volume assumptions updated by model and market over lifecycle | | | |
| 33 | ►Sales forecast for optional features by market updated | | | |
| 34 | Central marketing plan confirmed, launch planning available | | | |
| 35 | ►Marketing concept complete | | | |
| 36 | ►Launch planning including branding and distribution available | | | |
| 37 | ►Selling price based on world markets determined | | | |
| 38 | **FMC-AS** | | | |
| 39 | Fulfillment of After Sales concept is confirmed. Risks are identified. | | | |
| 40 | ►Fulfillment of After Sales targets according to specifications confirmed with chosen concepts.<br>►Risks are defined and documented | | | |
| 41 | ►After Sales overall timing according to timeplan and is achievable with agreed targets | | | |
| 42 | Achieveability of service targets and function diagnostic concept is confirmed, actual risks are identified and measures are defined. | | | |
| 43 | ►DMU investigations executed.<br>►Risks are identified.<br>►Fulfillment of maintainability targets is confirmed.<br>►Confirmation available in written form | | | |
| 44 | ►DMU investigations executed.<br>►Actual risks identified and measures defined.<br>►Achieveability of service targets is confirmed,<br>►Confirmation available in written form | | | |
| 45 | ►Diagnostic tests done<br>►Function diagnostic concept is confirmed<br>►Confirmation available in written form | | | |
| 46 | Specification of complete spare parts including accessories assortment is done. Complete spare parts assortment is established in the Engineering Data Base. | | | |
| 47 | ►Specification of complete spare parts including accessories assortment is done.<br>►Complete spare parts assortment is established in the Engineering Data Base parts list<br>►Output available in written form / Engineering data base. | | | |
| 48 | **FMC-D** | | | |
| 49 | Final styling confirmation; master samples available | | | |
| 50 | ►All open issues closed | | | |
| 51 | ►Master samples of long lead parts available (to Milestone PR)<br>►All master samples defined and available<br>►Legend list and specification book for suppliers available | | | |
| 52 | Final A Class to support all releases complete, based on agreed approval process (virtual and/or physical data control model presentation) | | | |
| 53 | ►Final surface data are completed and meet all agreed criteria<br>►Styling confirmed by milled cubing model (hardware and 3D renderings) | | | |
| 54 | ►Verification Model approved and A-class confirmed.<br>►Tolerance concept for production confirmed. | | | |

# MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 55 | | | **4.0** | | **Vehicle Integration** | |
| 56 | | | 4.1 | | Product Development Targets | |
| 57 | | | 4.1.1 | | | Complete vehicle targets |
| 58 | | | 4.1.2 | | | Module targets |
| 59 | | | 4.2 | | Function / Complete vehicle | |
| 60 | | | 4.2.1 | | | Functional requirements - complete vehicle |
| 61 | | | 4.2.2 | | | I-Team status |
| 62 | | | 4.2.3 | | | Design Verification Plan |
| 63 | | | 4.2.4 | | | VPT status |
| 64 | | | 4.2.5 | | | Vehicle test and hardware planning |
| 65 | | | 4.2.6 | | | Vehicle verification and validation test plan |
| 66 | | | 4.3 | | Functional Safety | |
| 67 | | | 4.3.1 | | | Implementation of functional safety |
| 68 | | | 4.5 | | Vehicle Architecture | |
| 69 | | | 4.5.1 | | | Vehicle package |
| 70 | | | **4.0** | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ | |
| 71 | | | 4.4 | | Engineering Modules | |
| 72 | | | 4.4.1 | | | Procurement Release - components |
| 73 | | | 4.4.2 | | | Functional requirements – module |
| 74 | | | 4.7 | | Data Management | |
| 75 | | | 4.7.1 | | | Procurement release |



MAGNA STEYR

| | | G | H | I | J |
|---|---|---|---|---|---|
| 55 | | | **FMC-VI** | | |
| 56 | Achievement of critical functional targets verfied and test results available based on agreed virtual and physical verification plan. | | | | |
| 57 | ▶ Complete vehicle targets confirmed by simulation or physical testing<br>▶ Target achievement, test status and risk assessment for complete vehicle have been summarised based on individual I-Team status<br>▶ Deviations to targets detected and measures agreed | | | | |
| 58 | ▶ Status regarding fullfillment of module targets is available<br>▶ Deviations to module targets detected and measures agreed | | | | |
| 59 | Critical vehicle functional targets verified.<br>Complete vehicle status for functions and/or assessment based on simulation loop VPT-FC and/or physical testing is available.<br>DVP for the validation phase is confirmed. | | | | |
| 60 | ▶ Complete vehicle functions confirmed based on PR released data and physical and virtual test results with regards to:<br>- vehicle technical specification requirements<br>- assembly<br>- geometrical integration | | | | |
| 61 | ▶ Individual I-Team status reports available<br>▶ Measures for known issues determined and allocated | | | | |
| 62 | ▶ Complete vehicle DVP completion status<br>▶ Further verification planned according to test results<br>▶ DVP content for the validation phase confirmed | | | | |
| 63 | ▶ Results of simulations / expert assessments from VPT-FC (virtual prototype) according to DVP available<br>▶ Results from VPT-FC assessed and action plans defined for individual I-Teams | | | | |
| 64 | ▶ Test planning for PTO finalised<br>▶ Confirmation of hardware configuration requirements for PTO vehicles | | | | |
| 65 | ▶ Detailed PTO planning and timing agreed<br>▶ All required physical tests have been allocated to vehicles<br>▶ PP testing agreed | | | | |
| 66 | Functional safety plan implementation status | | | | |
| 67 | ▶ Status of functional safety plan implementation<br>▶ Measures for known issues determined and allocated | | | | |
| 68 | Package release recommendations and package layout based on PR-release available.<br>Ergonomic requirements confirmed in PR-release. | | | | |
| 69 | ▶ Package layout based on PR release available<br>▶ Release recommendations for package relevant issues available and documented<br>▶ Ergonomic requirements confirmed and documented<br>▶ Issues documented, measures defined and agreed | | | | |
| 70 | **UIUX/Connectivity/Autonomous Driving)** | | **FMC-VE** | | |
| 71 | Status of module groups available.<br>Data records corresponding to module maturity level available | | | | |
| 72 | ▶ Procurement release for serial tooling of components / modules meet release planning<br>▶ Data records updated | | | | |
| 73 | ▶ Results of  virtual and physical testing available and analysed.<br>▶ Fulfilment of functionality requirements within vehicle technical specifications confirmed | | | | |
| 74 | All released data according to part for part planning schedule available within the agreed system. | | | | |
| 75 | ▶ Data management administration of Purchase Release for all long lead parts complete<br>▶ Part by part planning schedule updated | | | | |

# MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 76 | | | 4.7.2 | | | Digital prototype |
| 77 | | | 4.7.3 | | | Documentation of changes |
| 78 | | | 4.7.4 | | | Technical product data |
| 79 | | | 4.7.5 | | | Parts list - module |
| 80 | | | 4.7.6 | | | Part by part planning - Purchase |
| 81 | | | 4.7.7 | | | Part by part planning – SQA |
| 82 | | | 4.7.8 | | | Part by part planning - Logistics |
| 83 | | | 4.8 | | | Product Quality Assurance |
| 84 | | | 4.8.1 | | | Product quality assurance |
| 85 | | | 4.8.2 | | | Q-Planning Product |
| 86 | | | 4.8.3 | | | Risk Filter Product |
| 87 | | | 4.8.4 | | | System FMEA |
| 88 | | | 4.8.5 | | | Design FMEA |
| 89 | | | 4.8.6 | | | Key Product Characteristics (KPC) |
| 90 | | | 4.8.7 | | | Perceived quality (virtual / physical) |
| 91 | | | **5.0** | | | **Manufacturing** |
| 92 | | | 5.1 | | | Production Planning |
| 93 | | | 5.1.1 | | | Ramp up planning |
| 94 | | | 5.1.2 | | | Tolerances study for functional dimensions concept |
| 95 | | | 5.1.3 | | | Processability analysis |
| 96 | | | 5.1.4 | | | Production staff training |
| 97 | | | 5.2 | | Layout | |
| 98 | | | 5.2.1 | | | Production layout plan |



| | | H | I | J |
|---|---|---|---|---|
| 76 | ►VPT-FC data freeze finished, data check complete | | | |
| 77 | ►Documentation of all implemented changes confirmed within the agreed system | | | |
| 78 | ►Technical product data at Procurement Release status (for use in VPT-FC) available within agreed data management system | | | |
| 79 | ►Parts list for module group frozen ►Confirmation that all parts, including variants are available | | | |
| 80 | ►Procurement status part by part planning ►Measures for deviations agreed | | | |
| 81 | ►SQA status part by part planning ►Measures for deviations agreed | | | |
| 82 | ►Logistic status part by part planning ►Measures for deviations agreed | | | |
| 83 | Risk filter, SFMEA / DFMEA updated, KPCs and perceived quality status available | | | |
| 84 | ►No component with risk status "high" released at procurement release ►KPCs available for procurement releases | | | |
| 85 | ►Updates of methods use plan considered within QM Plan have been documented ►Progress status for product quality planning available | | | |
| 86 | ►Risk Filter Product reviewed ►Actual product risk level status available for each component ►Preventive measures status, planning and implementation meets program requirements | | | |
| 87 | ►System FMEAs reviewed and considered for procurement release ►Documentation of relevant identified issues from verification | | | |
| 88 | ►Design FMEAs for defined components reviewed and considered for procurement release ►Documentation of relevant identified issues from verification | | | |
| 89 | ►Initial serial status of integration KPCs for procurement release available ►Initial serial status of build to print KPCs for procurement release available ►Initial serial status of supplier KPCs for procurement release checked | | | |
| 90 | ►Perceived quality audit reports (3rd virtual loop) available ►Perceived quality one-pager and decision paper for all identified risks available and tracked within agreed issue management tool ►Perceived quality forecast documented | | | |
| 91 | | **FMC-M** | | |
| 92 | Detailed ramp-up planning available.. Achieveability and implementation of all required production techniques confirmed. | | | |
| 93 | ►Ramp up curve for body, paint and final assembly agreed, frozen and released ►Personnel requirements for technologies, incl. quality, logistics, IT, maintenance, inclusive of personnel costs for direct and indirect areas fixed ►Floor space requirements confirmed ►Procurement and delivery of library parts agreed with Purchase dept. ►Vehicle specifications available according to build generation (PTO to SOP) | | | |
| 94 | ►Tolerance concept verified regarding whole vehicle requirements ►Tolerance calculations completed and documented based on input parameters ►Documentation created for functional dimensions catalogue, tolerance data sheets ►Method for hardware verification on measured vehicles on the basis of tolerance calculations | | | |
| 95 | ►Knowledge from P-FMEAs and process simulations integrated into production process ►Identified issues documented, responsibility determined and measures agreed | | | |
| 96 | ►Training strategy inclusive of detailed planning and training measures has been defined | | | |
| 97 | Detailed production layout available | | | |
| 98 | ►Detailed production layout plan available at station level, including major equipment and fixtures ►Detailed building infrastructure and outdoor facility planning agreed ►Open issue list available with timing and responsibilities defined | | | |

This document is assigned to G10250. 010250-101-c

FC
Page #P of 159

**3-184**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 99 | | | 5.3 | | Process & Equipment | |
| 100 | | | 5.3.1 | | | Production techniques |
| 101 | | | 5.4 | | Investment | |
| 102 | | | 5.4.1 | | | Plant and equipment |
| 103 | | | 5.4.2 | | | Spare parts production |
| 104 | | | 5.5 | | Production Quality Assurance | |
| 105 | | | 5.5.1 | | | Q-Planning Production |
| 106 | | | 5.5.2 | | | Process FMEA |
| 107 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 108 | | | 5.5.4 | | | Conformity of Production planning |
| 109 | | | **6.0** | | **Supply Chain** | |
| 110 | | | 6.1 | | General Planning & Organisation | |
| 111 | | | 6.2 | | Purchase | |
| 112 | | | 6.2.1 | | | Sourcing |
| 113 | | | 6.3 | | Supplier Quality Assurance | |
| 114 | | | 6.3.1 | | | Supplier process planning |
| 115 | | | 6.3.2 | | | APQP |
| 116 | | | 6.4 | | Logistics | |
| 117 | | | 6.4.1 | | | Materials planning |
| 118 | | | 6.4.2 | | | Vehicle order management |
| 119 | | | 6.4.3 | | | Transportation planning |
| 120 | | | 6.4.4 | | | Packaging planning |


| | G | H | I | J |
|---|---|---|---|---|
| 99 | Process capability analysis available. Production capability for all vehicle variants confirmed. | | | |
| 100 | ► Process flow and assembly sequence available for all product variants<br>► Technical implementation of all operations confirmed<br>► Controllability of product variants confirmed | | | |
| 101 | Planning and ordering of manufacturing equipment, fixtures and fittings complete. Technical specification for spare part production available. | | | |
| 102 | ► Orders for all required investments placed<br>► Plant and equipment required for PTO installed and functioning according to requirements | | | |
| 103 | ► Technical specifications for plant and equipment required for manufacture of spare parts available | | | |
| 104 | Process FMEA status according to planning to meet program requirements and implementation plan for KCCs available | | | |
| 105 | ► Planning of work instructions for Q-testing available | | | |
| 106 | ► Status Process FMEA against planning | | | |
| 107 | ► Status of KCC definition against planning available<br>► Implementation plan for KCCs in modules available | | | |
| 108 | ► Initial draft Conformity of Production plan for components and production for each traffic authority available | | | |
| 109 | | **FMC-SC** | | |
| 110 | NO REQUIREMENT FOR FC | | | |
| 111 | Suppliers decided and agreements completed according to agreed planning | | | |
| 112 | ► Supplier nomination for all production parts complete | | | |
| 113 | Process planning with suppliers finished. | | | |
| 114 | ► Supplier planning for control of product development process finished | | | |
| 115 | ► Status of APQP<br>► Corrective actions defined and implemented according to plan | | | |
| 116 | Supplier EDI (electronic data interface) integrated. Interface Engineering / Operations realised. Customs concept is agreed. | | | |
| 117 | ► Process and responsibility planning complete<br>► Logistic part specification sheet finalised<br>► Logistics layout defined with respect to: e.g.,<br>- storage structure<br>- space requirement<br>- receiving areas<br>- material flow<br>- empty container storage<br>- battery charging locations...<br>► Parts assigned to storage locations<br>► Logistics status of part by part planning<br>► JIS concept and supply chain agreed with suppliers<br>► Reclamation process concept complete<br>► Supplier EDI integrated and suppliers connected to production site | | | |
| 118 | ► Vehicle order management process evaluated and agreed with customer (OEM)<br>► Data transfer of orders, coding and plausibility routine interfaces aligned with customer (OEM) and IT systems<br>► Interfaces installed for ordering pre-series vehicles | | | |
| 119 | ► Transportation and network planning defined and aligned with customs concept | | | |
| 120 | ► Specification sheet for packaging designed and agreed<br>► Packaging requirements and costs available<br>► Packaging studies (internal and external) complete | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 121 | | | **7.0** | | **Quality** | |
| 122 | | | 7.1 | | Requirements and quality targets | |
| 123 | | | 7.1.1 | | | Quality targets |
| 124 | | | 7.2 | | Quality planning and controlling | |
| 125 | | | 7.2.1 | | | Quality planning |
| 126 | | | 7.2.2 | | | Quality controlling |
| 127 | | | 7.3 | | Materials Engineering | |
| 128 | | | 7.3.1 | | | Material engineering and testing |
| 129 | | | 7.4 | | Geometrical Measurement | |
| 130 | | | 7.4.1 | | | Control of monitoring and measuring equipment |
| 131 | | | 7.4.2 | | | Matching geometry |
| 132 | | | 7.4.3 | | | Body in White - quality control geometry |
| 133 | | | **8.0** | | **Information Technology** | |
| 134 | | | 8.1 | | Strategy / Concept | |
| 135 | | | 8.1.1 | | | IT system concept (vehicle order management) |
| 136 | | | 8.2 | | IT Infrastructure | |
| 137 | | | 8.2.2 | | | Series production IT |
| 138 | | | **9.0** | | **Finance** | |
| 139 | | | 9.1 | | Business Case and Program Costs | |
| 140 | | | 9.1.1 | | | Business plan |
| 141 | | | 9.1.2 | | | IT costs for series production |
| 142 | | | 9.2 | | Cost controlling | |
| 143 | | | 9.2.1 | | | Cost estimate for program |
| 144 | | | 9.2.2 | | | Evaluation of vehicle costs |
| 145 | | | 9.2.3 | | | Cost reporting |

This document is assigned to G10250. 010250-101-e



| | G | H | I | J |
|---|---|---|---|---|
| 121 | | | | |
| 122 | Quality target achievement prognosis available with planned measures | | | |
| 123 | ► Quality targets prognosis for FC available and documented<br>► Measures to meet program requirements agreed and decisions documented | | | |
| 124 | Quality planning and requirements documented to meet program requirements at FC | | | |
| 125 | ► Status report on QM-Plan<br>► Known issues documented and measures for implementation agreed | | | |
| 126 | ► Status report on all quality requirements according to planning, including but not limited to:<br>- Knowledge management<br>- Risk management<br>- Issue management<br>- quality checks… | | | |
| 127 | Materials testing requirements defined and colour and trim matching samples available for long lead items | | | |
| 128 | ► Definition of material testing requirements with program and suppliers complete<br>► Specifications and master samples for long lead part colour and trim matching available | | | |
| 129 | Device concept defined, matching equipment and parts ordered according to planning to support program requirements | | | |
| 130 | ► Test equipment set up and registration status available<br>► Jigs and fixtures device concept defined | | | |
| 131 | ► Matching equipment ordering according to planning to meet program requirements<br>► Matching parts (carry over)  to build up the CUBE ordered<br>► Part by part planing of matching activities complete<br>► Required additional parts for matching process ordered | | | |
| 132 | ► Measurement plan available<br>► Functional concept definied<br>► Planning, ordering and assembly of measurement fixtures finished | | | |
| 133 | **FMC-IT** | | | |
| 134 | IT system concept for vehicle order management | | | |
| 135 | ► IT system concept for vehicle order management has been formulated and is available<br>► Agreements with Production and Logistics documented and available | | | |
| 136 | IT infrastructure for series production agreed and confirmed | | | |
| 137 | ► IT infrastructure requirements to support series production defined<br>► IT systems available for designated users and required training has been conducted | | | |
| 138 | **FMC-F** | | | |
| 139 | Business Plan updated and agreed. Overall program cost estimate updated. | | | |
| 140 | ► MS business plan status update available | | | |
| 141 | ► IT cost estimates (recurring and non-recurring) available for series production<br>► IT cost estimates agreed with supplying department and documented | | | |
| 142 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. Actual cost status  (non-recurring costs / part costs) updated. | | | |
| 143 | ► Status of planned program costs<br>► Overview of non-recurring costs<br>► Overview of recurring costs<br>► MS finance plan based on financial targets | | | |
| 144 | ► Current status of vehicle cost (based on available material costs)<br>► Deviations from plan costs highlighted and documented | | | |
| 145 | ► Status for scope of work of plan versus actual<br>► Deviations from plan costs highlighted and analysed | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 146 | | | 9.2.4 | | | Release of financial resources |
| 147 | | | 9.2.5 | | | Development costs settled |

This document is assigned to G10250. 010250-101-c



| | G | H | I | J |
|---|---|---|---|---|
| | ▶ Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process. | | | |
| 146 | ▶ Release of invoices confirmed | | | |
| 147 | ▶ Customer (OEM) invoiced according to the payment plan, based on compliance with agreed conditions | | | |

This document is assigned to G10250. 010250-101-c

# MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | Gate: **PTO** | | | **Production Try-out: The first PTO vehicle has bee** planning and the target date for market entry confi |
| 3 | | | | | | |
| 4 | | | 1.0 | | | **Program Management** |
| 5 | | | 1.1 | | Master Timing | |
| 6 | | | 1.1.1 | | | Detailed Timing |
| 7 | | | 1.1.2 | | | DVP Review |
| 8 | | | 1.2 | | Gateway Review | |
| 9 | | | 1.2.1 | | | Major Issues and Risks |
| 10 | | | 1.2.2 | | | Red/Yellow Grren |
| 11 | | | 1.2.3 | | | Recovery Plans |
| 12 | | | 1.3 | | Processes / Methods | |
| 13 | | | 1.3.1 | | | Product Development Process |
| 14 | | | 1.3.2 | | | Meeting Schedule |
| 15 | | | 1.3.3 | | | Change Management |
| 16 | | | 1.3.4 | | | Outsourced Engineering |
| 17 | | | 1.4 | | Team Organization | |
| 18 | | | 1.4.1 | | | Program Organisation |
| 19 | | | 1.5 | | Contract Management | |
| 20 | | | 1.5.1 | | | Contract update |
| 21 | | | 1.6 | | Knowledge Management | |
| 22 | | | 1.6.1 | | | Transfer of Experience |
| 23 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 24 | | | 1.7 | | Configuration Management | |
| 25 | | | 1.7.1 | | | Program target requirements |
| 26 | | | 1.7.2 | | | Module target framework |
| 27 | | | 1.7.3 | | | Change request status - complete vehicle |


|  | G | H | I | J |
|---|---|---|---|---|
| 1 |  |  |  |  |
| 2 | painted, assembled on the volume production line and commissioned. Launch rmed. |  |  |  |
| 3 |  | Responsible Role | Responsible Organisation | Responsible Name |
| 4 |  | **FMC-PM** |  |  |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | **FMC** |  |
| 6 | ► Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | **ESS** |  |
| 7 | DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | **ESS** **Vehicle Attributes** |  |
| 8 |  | Program Manager | **FMC** |  |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | **ESS** |  |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | **ESS** |  |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | **ESS** |  |
| 12 |  | Program Manager | **FMC** |  |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | **FMC** |  |
| 14 | Meeting schedule issued | Program Manager | **FMC** |  |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | **FMC** |  |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | **FMC** |  |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | **FMC** |  |
| 18 | ► Program organisation and teamwork functioning according to planning ► Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | **ESS** |  |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | **FMC** |  |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | **FMC** |  |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | **FMC** |  |
| 22 | ► Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program |  |  |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | **ESS** |  |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | **FMC** |  |
| 25 | ► Status of program requirements available ► Changes to program targets transferred to change management for tracking | Configuration Manager | **FMC** |  |
| 26 | ► Module target breakdown confirmed for all areas | Configuration Manager | **FMC** |  |
| 27 | ► Change requests to achieve VTS targets realised ► Risks for non-implementation of changes highlighted and documented | Configuration Manager | **FMC** |  |

# MAGNA STEYR MSDS Gate Deliverables Checklist

|  | K | L | M |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Customer (Approval) | Status: CWxxx | Forecast: CWxxx |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |

This document is assigned to G102.50. 010230-101-c

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |
| 29 | | | **2.0** | | | **Marketing and Sales** |
| 30 | | | 2.1 | | Product Definition | |
| 31 | | | 2.1.1 | | | Sales Volumes |
| 32 | | | 2.1.2 | | | Series and optional features |
| 33 | | | 2.2 | | Sales and Marketing | |
| 34 | | | 2.2.1 | | | Communication strategy |
| 35 | | | 2.2.2 | | | Target markets |
| 36 | | | 2.2.3 | | | Price range |
| 37 | | | **10.0** | | | **After Sales** |
| 38 | | | 10.1 | | Strategy | |
| 39 | | | 10.1.1 | | | After Sales Targets |
| 40 | | | 10.1.2 | | | Overall timing |
| 41 | | | 10.2 | | Warranty / Service | |
| 42 | | | 10.2.1 | | | Maintainance concept |
| 43 | | | 10.2.2 | | | Serviceability concept |
| 44 | | | 10.2.3 | | | Diagnostics concept |
| 45 | | | 10.3 | | Accessories / Spare parts | |
| 46 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 47 | | | **3.0** | | | **Design (Styling)** |
| 48 | | | 3.1 | | Styling status | |
| 49 | | | 3.1.1 | | | Colour & Trim |
| 50 | | | 4.6 | | Styling Technical Convergence | |
| 51 | | | 4.1 | | Product Development Targets | |
| 52 | | | 4.1.1 | | | Complete vehicle targets |
| 53 | | | 4.1.2 | | | Module targets |


| | G | H | I | J |
|---|---|---|---|---|
| 28 | ►Change requests to achieve module targets realised<br>►Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | **FMC-MS** | | | |
| 30 | Update volumes based latest market information. | | | |
| 31 | ►Volumes per variant fixed | | | |
| 32 | ►Sales forecast for optional features by market updated | | | |
| 33 | Marketing package finalised, market entry date confirmed. Activities for market introduction in selected countries available and confirmed.  Life-cycle management model available | | | |
| 34 | ►Marketing activities for introduction in selected countries confirmed<br>►Market entry date confirmed<br>►Lifecycle management model available<br>►Press / photo vehicle planning available | | | |
| 35 | ►Launch planning including branding and distribution confirmed | | | |
| 36 | ►Selling price based on world markets updated | | | |
| 37 | **FMC-AS** | | | |
| 38 | After Sales concept incorporated within program | | | |
| 39 | ►After Sales strategy incorporated into program | | | |
| 40 | ►After Sales overall timing according to timeplan and is achievable with agreed targets | | | |
| 41 | Repair and service targets confirmed, actual risks identified and countermeasures defined<br>Diagnosis requests are realised and evaluated.<br>Maintainability targets confirmed. | | | |
| 42 | ►Hardware investigations planed.<br>►Maintainability targets are confirmed.<br>►Confirmation available in written form | | | |
| 43 | ►Hardware investigations planed.<br>►Serviceability targets are confirmed.<br>►Confirmation available in written form | | | |
| 44 | ►Diagnostic requests are realized<br>►Diagnostic tests valitated,<br>►Confirmation available in written form | | | |
| 45 | Complete spare parts assortment is established and aligned with the module groups | | | |
| 46 | ►Complete spare parts assortment is established in the Engineering Data Base parts list.<br>►Output available in system.<br>►IT interface to Procurement established. | | | |
| 47 | **FMC-D** | | | |
| 48 | Process and requirements to enable colour matching in PPAP implemented | | | |
| 49 | ►Process for parts validation in PPAP implemented<br>►Grain mapping process of moulded parts implemented | | | |
| 50 | NO REQUIREMENT FOR PTO | | | |
| 51 | Functional targets achieved and test results available based on agreed virtual and physical verification plan.<br>Software Freeze (regarding functionality) carried out. | | | |
| 52 | ►Software freeze for PTO vehicles<br>►Deviations to targets detected and measures agreed | | | |
| 53 | ►The PTO vehicles fulfil the module targets<br>►Deviation to module targets are detected and agreed | | | |

MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 54 | | | 4.1.3 | | | Complete vehicle prototype test results |
| 55 | | | 4.1.4 | | | Component prototype test results |
| 56 | | | 4.1.5 | | | Functional targets of complete vehicle |
| 57 | | | 4.2 | | Function / Complete vehicle | |
| 58 | | | 4.2.1 | | | I-Team status |
| 59 | | | 4.2.2 | | | Design Verification Plan |
| 60 | | | 4.2.3 | | | Assembly of components / modules |
| 61 | | | 4.2.4 | | | Vehicle Test and Hardware Planning |
| 62 | | | 4.2.5 | | | Vehicle verification and validation test plan |
| 63 | | | 4.3 | | Functional Safety | |
| 64 | | | 4.3.1 | | | Implementation of functional safety |
| 65 | | | 4.5 | | Vehicle Architecture | |
| 66 | | | 4.5.1 | | | Vehicle package |
| 67 | | | **4.0** | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ | |
| 68 | | | 4.4 | | Engineering Modules | |
| 69 | | | 4.4.1 | | | Component / module functional confirmation |
| 70 | | | 4.4.2 | | | Procurement Release - components |
| 71 | | | | | | |
| 72 | | | 4.7 | | Data Management | |
| 73 | | | 4.7.1 | | | Documentation status |
| 74 | | | 4.7.2 | | | Documentation of changes |
| 75 | | | 4.7.3 | | | Module / component data records |
| 76 | | | 4.7.4 | | | Part by part planning - Purchase |
| 77 | | | 4.7.5 | | | Part by part planning - SQA |
| 78 | | | 4.7.6 | | | Part by part planning - Logistics |
| 79 | | | 4.8 | | Product Quality Assurance | |
| 80 | | | 4.8.1 | | | Q-Planning Product |


| | G | H | I | J |
|---|---|---|---|---|
| 54 | ► Results of complete vehicle tests available according to DVP<br>► Comparison of virtual and physical test results available | | | |
| 55 | ► Results of component tests and installation try-outs available according to DVP<br>► Comparison of virtual and physical test results available | | | |
| 56 | ► Confirmation of achievement of complete vehicle functional targets based on available virtual and physical testing | | | |
| 57 | Verification testing (virtual and physical) completed according to agreed DVP schedule. Validation testing schedule with PTO vehicles confirmed. | | | |
| 58 | ► Individual I-Team status reports available<br>► Measures for known issues determined and allocated | | | |
| 59 | ► Complete vehicle DVP completion status | | | |
| 60 | ► Assembly of components and modules in series production confirmed | | | |
| 61 | ► Test planning and vehicle availability for PTO confirmed | | | |
| 62 | ► Detailed PTO planning and timing of tests coherent with vehicle availability<br>► All required physical tests have been allocated to vehicles<br>► PP testing confirmed | | | |
| 63 | Functional safety plan implementation status | | | |
| 64 | ► Status of functional safety plan implementation<br>► Measures for known issues determined and allocated | | | |
| 65 | All changes completed, ergonomic targets validated on PTO hardware | | | |
| 66 | ► Package layout based on PR release available<br>► Release recommendations for package relevant issues available and documented<br>► Ergonomic requirements confirmed and documented<br>► Issues documented, measures defined and agreed | | | |
| 67 | UIUX/Connectivity/Autonomous Driving) | **FMC-VE** | | |
| 68 | Status of module groups available.<br>Data records corresponding to module maturity level available | | | |
| 69 | ► Virtual and physical testing required for module verification available and documented<br>► Modules meet the requirements of complete vehicle technical specification<br>► Achievement of module functional targets according to specification confirmed, based on released data | | | |
| 70 | ► Procurement release for serial tooling of all components / modules complete<br>► Data records updated | | | |
| 71 | | | | |
| 72 | Engineering data from previous phase updated and available. Part by part planning for production support updated. | | | |
| 73 | ► Engineering data updated from previous phase | | | |
| 74 | ► Complete documentation of the PTO build confirmed | | | |
| 75 | ► Design data for all components within modules has been checked for completeness and data maturity at PTO confirmed<br>► Design data for PTO frozen and verification status available | | | |
| 76 | ► Procurement status part by part planning<br>► Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 77 | ► SQA status part by part planning<br>► Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 78 | ► Logistics status part by part planning<br>► Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 79 | SFMEA, DFMEA reviewed, KPCs reviewed according to change management requirements; perceived quality audit report available | | | |
| 80 | ► Progress status for product quality planning available | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 81 | | | 4.8.2 | | | Risk Filter Product |
| 82 | | | 4.8.3 | | | System FMEA |
| 83 | | | 4.8.4 | | | Design FMEA |
| 84 | | | 4.8.5 | | | Key Product Characteristics (KPC) |
| 85 | | | 4.8.6 | | | Perceived Quality (Virtual / Physical) |
| 86 | | | 4.8.7 | | | QM-Release Product |
| 87 | | | 5.0 | | | **Manufacturing** |
| 88 | | | 5.1 | | | Production Planning |
| 89 | | | 5.1.1 | | | Target achievement |
| 90 | | | 5.1.2 | | | Non-production material |
| 91 | | | 5.1.3 | | | Installation of new systems / modifications |
| 92 | | | 5.1.4 | | | Production staff training |
| 93 | | | 5.2 | | Layout | |
| 94 | | | 5.2.1 | | | Production layout plan |
| 95 | | | 5.3 | | | Process & Equipment |
| 96 | | | 5.3.1 | | | Process simulation (virtual process week) |

This document is assigned to G10250. 010250.101-c

3-198


| | G | H | I | J |
|---|---|---|---|---|
| | ► Actual product risk level status available for each component | | | |
| | ► No components at Procurement Release with risk level "high" | | | |
| 81 | ► Preventive measures status, planning and implementation meets program requirements | | | |
| 82 | ► Relevant identified issues from product validation documented | | | |
| 83 | ► Relevant identified issues from product validation documented | | | |
| | ► Review of integration KPCs according to change management available | | | |
| | ► Review of build to print KPCs according to change management available | | | |
| | ► Review of Supplier KPCs according to change management checked | | | |
| 84 | ► Handover to production for implementation in the control plan complete | | | |
| | ► Perceived quality audit reports (prototype loop, if applicable) available | | | |
| | ► Perceived quality one-pager and decision paper for all identified risks available and tracked within agreed Issue Management Tool | | | |
| 85 | ► Perceived quality forecast documented | | | |
| 86 | ► Test program for QM-Release Product released | | | |
| 87 | | **FMC-M** | | |
| 88 | Start up of serial production line at serial production location done. Training of series production staff started. Status / prognosis of achievability of production targets available. Ramp-up planning (timing & quantity) for PTO, PP, LS and SOP is confirmed. | | | |
| 89 | ► First PTO vehicle produced ► Planned values for timing, costs, quality and manufacturability compared with actual values from production at PTO and documented ► Ramp up planning confirmed ► Forecast available for effectiveness of defined measures / adjustment of target values to next production milestone | | | |
| 90 | ► Non-production material determined and checked by material laboratory, with focus on the following: - paint (e-coat, fillers, uindercoat and top coats) - colour charts - pvc, wax, foam - repair materials - testing requirements, methods and frequency (stone chipping, condensation...) | | | |
| 91 | ► New plant and equipment has been integrated into the production line ► Existing equipment has been modified according to requirements and integrated into the production line | | | |
| 92 | ► Training of start team complete ► Training of additional production staff planned | | | |
| 93 | Detailed layout for PTO updated. Compliance with legal requirements (operating approval) available. | | | |
| 94 | ► Detailed production layout plan refined and updated at station level, including major equipment and fixtures ► Refined and updated building infrastructure and outdoor facility planning available ► Local authority confirmation of compliance ► Open issue list available with timeing and responsibilities defined | | | |
| 95 | Production process defined and analysis of processability done. Process simulation (virtual process week for material flow and assembly sequence) done | | | |
| 96 | ► Production processes for body, paint and general assembly simulated according to the maturity of the available data at DF-VPT-FC ► Identified issues documented, responsibility determined and measures agreed | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 97 | | | 5.3.2 | | | Production process |
| 98 | | | 5.3.3 | | | Material flow |
| 99 | | | 5.3.4 | | | Instability simulation |
| 100 | | | 5.4 | | Investment | |
| 101 | | | 5.4.1 | | | Supplier pre-acceptance |
| 102 | | | 5.4.2 | | | Plant and equipment |
| 103 | | | 5.4.3 | | | System impplementation |
| 104 | | | | | | Production Quality Assurance |
| 105 | | | 5.5.1 | | | Q-Planning Production |
| 106 | | | 5.5.2 | | | Process FMEA |
| 107 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 108 | | | 5.5.4 | | | Process audit |
| 109 | | | 5.5.5 | | | Product audit |
| 110 | | | 5.5.6 | | | Conformity of Production Planning |
| 111 | | | 5.5.7 | | | Conformity of Production Execution |
| 112 | | | 5.5.8 | | | QM-Release Process |
| 113 | | | 6.0 | | | **Supply Chain** |
| 114 | | | 6.1 | | | General Planning & Organisation |


| | G | H | I | J |
|---|---|---|---|---|
| 97 | ► Process flow and assembly sequence available in production documentation tool<br>► Work station documentation available in production documentation tool according to level of maturity at PTO<br>- module timing<br>- cycle time management<br>- control plans<br>► Confirmation that the available ducumentation provides the basis for orderly series change management | | | |
| 98 | ► Material flow simulation for production, inclusive of potential disruptive factors has been completed, based on vehicle manufacturing flow and synthetic order data<br>► Buffer size requirements for body, paint and general assembly defined<br>► Layout for packaging stillages and transport racks defined | | | |
| 99 | ► Assembly simulation completed<br>► Inspection of work stations carried out, results available<br>► Ergonomic assessment of work stations carried out, results available<br>► Assembly sequence verified<br>► Operating equipment available<br>► Body simulation complete<br>► Welding gun operation, joining technique and access verified<br>► Station layout defined and confirmed | | | |
| 100 | Installation of manufacturing equipment, fixtures and fittings done and infrastructure available | | | |
| 101 | ► Contractually agreed plant and equipment installed at suppliers according to defined specifications and timing<br>► Pre-acceptance tests carried out for function, conformance to specification and scope of supply<br>► Identified issues documented, responsibility determined and measures agreed | | | |
| 102 | ► RFQ documentation sent to potential supliers<br>► Supplier quotations received for tendered scope of supply<br>► Quotes compared (technical and commercial) and results available<br>► Suppliers selected and orders placed<br>► Handling of spare parts agreed | | | |
| 103 | ► Plant and production equipment commissioned in-situ at the production location<br>► Operation in semi-automatic mode confirmed by commissioning personnel (supplier) | | | |
| 104 | Process FMEA first loop complete, conformity of production plan finalised; product and process audit for PTO conducted | | | |
| 105 | ► Results of quality tests available<br>► Issues documented and necessary measures agreed | | | |
| 106 | ► Process FMEA 1st loop complete | | | |
| 107 | ► Status of KCC definition against planning available<br>► Status of KCC checks performed in production | | | |
| 108 | ► Station readiness for PTO achieved | | | |
| 109 | ► Product audit targets for PTO achieved and documented<br>► Required measures / decisions agreed and documented | | | |
| 110 | ► Conformity of Production plan for each traffic authority finalised | | | |
| 111 | ► Conformity of Production inspections considered in control plan<br>► Required tooling and equipment defined | | | |
| 112 | ► Test program for QM-Release Process released | | | |
| 113 | | **FMC-SC** | | |
| 114 | NO REQUIREMENT FOR PTO | | | |

MAGNA STEYR **MSDS State Deliverables Checklist**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 115 | | | 6.2 | | Purchase | |
| 116 | | | 6.2.1 | | | Ordering Process |
| 117 | | | 6.3 | | Supplier Quality Assurance | |
| 118 | | | 6.3.1 | | | Product and Process Development |
| 119 | | | 6.3.2 | | | APQP |
| 120 | | | 6.4 | | Logistics | |
| 121 | | | 6.4.1 | | | Materials planning |
| 122 | | | 6.4.2 | | | Scheduling |
| 123 | | | 6.4.3 | | | Vehicle order management |
| 124 | | | 6.4.4 | | | Transportation planning |
| 125 | | | 6.4.5 | | | Packaging Planning |
| 126 | | | 7.0 | | **Quality** | |
| 127 | | | 7.1 | | Requirements and quality targets | |



| # | G | H | I | J |
|---|---|---|---|---|
| 115 | Process development and optimisation for supply of production parts finished  PR-Releases finished, serial tools ordered and serial contracts with all suppliers compiled | | | |
| 116 | ▶ Procurement release of all components complete  ▶ Production of series tools and gauges is complete  ▶ Contracts for production parts compiled  ▶ PTO contracts finalised  ▶ Contracts for series are available and sent to suppliers | | | |
| 117 | Degree of parts quality according to PTO requirements (see Part Quality Status Targets table) available | | | |
| 118 | ▶ Supplier Quality Assurance, product und process development and optimisation complete | | | |
| 119 | ▶ Status of APQP  ▶ Corrective actions defined and implemented according to plan | | | |
| 120 | Logistic layout and transport planning defined.  Logistic equipment and carriers for PTO and PP procured.  Production BOM created and transfered to vehicle level.  PTO order according customer order process in system done. | | | |
| 121 | ▶ Process description (legal compliance) complete  ▶ Logistics layout planning complete  ▶ Required layout changes implemented  ▶ Part positioning in production storage complete  ▶ Logistical systems / equipment procured and available to support production at PTO  - tugs, forklifts, etc  - storage shelves  - battery charging stations...  ▶ Spare parts and accessories for ramp up determined | | | |
| 122 | ▶ Material scheduling parameters defined  ▶ Delivery schedules to support production quantities dispatched  ▶ JIS process for PTO implemented  ▶ Electronic data interface to suppliers implemented  ▶ Non-conformance reporting system installed | | | |
| 123 | ▶ First customer order entered into system and scheduled  ▶ PAB proces (process test run with suppliers) implemented  ▶ Vehicle order management system implemented | | | |
| 124 | ▶ Transport concept available for pilot production  - Routing instructions dispatched to suppliers and transport contractors  - Routing data entered into ERP system for delivery schedule calculation  ▶ Transport purchase for pilot production complete  ▶ Freight services selected and ordered  ▶ Internal material logistics plan available for pre-series. Parts supply defined for  - just in time / just in sequence  - back-up stock  - supply frequency  - supply concept  - return transport of empty containers | | | |
| 125 | ▶ Planning of prototypes for part carriers and containers complete  ▶ Prototype parts carriers / containers available  ▶ Part carriers and containers available to support PTO  ▶ Release for procurement of parts carriers / containers for series production done  ▶ Allocation of parts carriers / containers to part numbers complete | | | |
| 126 | | | | |
| 127 | Status of achievement of quality targets | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 128 | | | 7.1.1 | | | Quality targets |
| 129 | | | 7.2 | | Quality planning and controlling | |
| 130 | | | 7.2.1 | | | Quality planning |
| 131 | | | 7.2.2 | | | Quality controlling |
| 132 | | | 7.3 | | Materials Engineering | |
| 133 | | | 7.3.1 | | | Material engineering and testing |
| 134 | | | 7.4 | | Geometrical Measurement | |
| 135 | | | 7.4.1 | | | Control of monitoring and measuring equipment |
| 136 | | | 7.4.2 | | | Measurement system analysis |
| 137 | | | 7.4.3 | | | Jigs & fixtures |
| 138 | | | 7.4.4 | | | Matching geometry |
| 139 | | | 7.4.5 | | | Body in White - quality control geometry |
| 140 | | | **8.0** | | **Information Technology** | |
| 141 | | | 8.1 | | Strategy / Concept | |
| 142 | | | 8.1.1 | | | IT system concept - production implementation |
| 143 | | | 8.2 | | IT Infrastructure | |
| 144 | | | 8.2.2 | | | IT Support for PTO |
| 145 | | | **9.0** | | **Finance** | |
| 146 | | | 9.1 | | Business Case and Program Costs | |
| 147 | | | 9.1.1 | | | Business plan |
| 148 | | | 9.1.2 | | | Project integrated into division business plan |
| 149 | | | 9.1.3 | | | Cost centre planning |
| 150 | | | 9.2 | | Cost controlling | |


| | G | H | I | J |
|---|---|---|---|---|
| | ► Quality targets for PTO achieved and documented | | | |
| 128 | ► Measures to meet program requirements agreed and decisions documented | | | |
| 129 | Quality planning and requirements documented to meet program requirements at PTO | | | |
| 130 | ► Status report on QM-Plan<br>► Known issues documented and measures for implementation agreed | | | |
| 131 | ► Status report on all quality requirements according to planning, including but not limited to:<br>- Knowledge management<br>- Risk management<br>- Issue management<br>- quality checks… | | | |
| 132 | Materials testing status to support program requirements at PTO | | | |
| 133 | ► Material testing status on production parts and samples according to planning, report available | | | |
| 134 | Fixtures and parts available; set up for measurement and matching available | | | |
| 135 | ► Test equipment set up and registration status available | | | |
| 136 | ► Status of definition of measurement equipment in control plan, report available | | | |
| 137 | ► BIW fixtures available (shimable, validation for geometrical adjustment on nominal position) | | | |
| 138 | ► Matching equipment released<br>► Matching equipment available in matching department<br>► Set up of matching database complete<br>► Required parts for matching process available<br>► Part by part planning including timing of matching activities confirmed by suppliers | | | |
| 139 | ► Measurement department set up and equipment available<br>► Definition of measurement programms completed<br>► GeMA -sheets (visualisation of measurement results) completed<br>► Dimensional targets comfirmed<br>► Measurement fixtures completed | | | |
| 140 | **FMC-IT** | | | |
| 141 | System concept implementation for production | | | |
| 142 | ► Implementation of IT system concept to support production confirmed and documented | | | |
| 143 | IT infrastructure technically configured (order / production processing) | | | |
| 144 | ► System availability in accordance with IT concept and planning confirmed<br>► IT Infrastructure for data transport, vehicle order management and forecast of demand available and configured<br>► Designated users trained and competent in system use for processing of PTO builds; IT support available on demand | | | |
| 145 | **FMC-F** | | | |
| 146 | Business Plan updated. Overall program cost estimate updated | | | |
| 147 | ► MSF Business plan status update available | | | |
| 148 | ► Cash flows represented in business unit accounting<br>► Project scope incorporated into business unit budget and forecast | | | |
| 149 | ► Product calculation fixed<br>► Cost centre booking available<br>► Product calculation determined<br>► Organisational structure transferred into cost accounting | | | |
| 150 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. Actual cost status (non-recurring costs / part costs) updated. | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 151 | | | 9.2.1 | | | PTO costs |
| 152 | | | 9.2.2 | | | Cost reporting |
| 153 | | | 9.2.3 | | | Release of financial resources |
| 154 | | | 9.2.4 | | | Development cost invoicing |
| 155 | | | 9.2.5 | | | First cost accounting (product) |
| 156 | | | 9.2.6 | | | Processing of complaints |
| 157 | | | 9.2.7 | | | Invoice / part payment for vehicle |
| 158 | | | 9.2.8 | | | Tracking of build deviation costs |
| 159 | | | 9.2.9 | | | Project accounting Integration |

This document is assigned to G10250. 010250.101-c



| | G | H | I | J |
|---|---|---|---|---|
| 151 | ► Status of PTO build costs<br>► Overview of non-recurring costs<br>► Overview of recurring costs<br>► MS finance plan based on financial targets | | | |
| 152 | ► Status for scope of work of plan versus actual<br>► Deviations from plan costs highlighted and analysed | | | |
| 153 | ► Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process.<br>► Release of invoices confirmed | | | |
| 154 | ► Customer (OEM) invoiced according to the payment plan, based on compliance with agreed conditions | | | |
| 155 | ► System for the determination of operational performance ensured - charging of cost of activities (direct and overhead) according to cost centre / cost bearing unit | | | |
| 156 | ► Process for systematic handling of complaints implemented (incl. cost by cause, with agreed cost rates) | | | |
| 157 | ► System implementation for automatic invoicing / credit note generation for vehicles (inclusive cost allocation per vehicle) ensured | | | |
| 158 | ► System available for tracking of build deviations<br>► Allocation of additional costs and distribution to cost bearing organisational units is ascertainable<br>► Method of monitoring for customer (OEM) and suppliers is defined | | | |
| 159 | ► Project data transferred to the profit and loss accounting of affected divisions | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | **Gate:**<br>**PP** | | **Pilot Production: The first pilot vehicle meeting de<br>volume production conditions.** |
| 3 | | | | | | |
| 4 | | | **1.0** | | | **Program Management** |
| 5 | | | 1.1 | | Master Timing | |
| 6 | | | 1.1.1 | | | Detailed Timing |
| 7 | | | 1.1.2 | | | DVP Review |
| 8 | | | 1.2 | | Gateway Review | |
| 9 | | | 1.2.1 | | | Major Issues and Risks |
| 10 | | | 1.2.2 | | | Red/Yellow Grren |
| 11 | | | 1.2.3 | | | Recovery Plans |
| 12 | | | 1.3 | | Processes / Methods | |
| 13 | | | 1.3.1 | | | Product Development Process |
| 14 | | | 1.3.2 | | | Meeting Schedule |
| 15 | | | 1.3.3 | | | Change Management |
| 16 | | | 1.3.4 | | | Outsourced Engineering |
| 17 | | | 1.4 | | Team Organization | |
| 18 | | | 1.4.1 | | | Program Organisation |
| 19 | | | 1.5 | | Contract Management | |
| 20 | | | 1.5.1 | | | Contract update |
| 21 | | | 1.6 | | Knowledge Management | |
| 22 | | | 1.6.1 | | | Transfer of Experience |
| 23 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 24 | | | 1.7 | | Configuration Management | |
| 25 | | | 1.7.1 | | | Program target requirements |
| 26 | | | 1.7.2 | | | Module target framework |
| 27 | | | 1.7.3 | | | Change request status - complete vehicle |


| | | Responsible Role | Responsible Organisation | Responsible Name |
|---|---|---|---|---|
| 1 | | | | |
| 2 | fined component and production quality requirements has been manufactured under | | | |
| 3 | | Responsible Role | Responsible Organisation | Responsible Name |
| 4 | | **FMC-PM** | | |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | FMC | |
| 6 | ► Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | ESS | |
| 7 | DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | ESS Vehicle Attributes | |
| 8 | | Program Manager | FMC | |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | ESS | |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | ESS | |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | ESS | |
| 12 | | Program Manager | FMC | |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | FMC | |
| 14 | Meeting schedule issued | Program Manager | FMC | |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | FMC | |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | FMC | |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | FMC | |
| 18 | ► Program organisation and teamwork functioning according to planning ► Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | ESS | |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | FMC | |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | FMC | |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | FMC | |
| 22 | ► Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | ESS | |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | FMC | |
| 25 | ► Status of program requirements available ► Changes to program targets transferred to change management for tracking | Configuration Manager | FMC | |
| 26 | ► Module target breakdown confirmed for all areas | Configuration Manager | FMC | |
| 27 | ► Change requests to achieve VTS targets realised ► Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |

# MAGNA STEYR MSDS Gate Deliverables Checklist

| | K | L | M |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Customer (Approval) | Status: CWxxx | Forecast: CWxxx |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |
| 29 | | | **2.0** | **Marketing and Sales** | | |
| 30 | | | 2.1 | Product Definition | | |
| 31 | | | 2.2 | Sales and Marketing | | |
| 32 | | | 2.2.1 | | | Communication strategy |
| 33 | | | 2.2.2 | | | Price range |
| 34 | | | **10.0** | **After Sales** | | |
| 35 | | | 10.1 | Strategy | | |
| 36 | | | 10.2 | Warranty / Service | | |
| 37 | | | 10.2.1 | | | Insurance classification |
| 38 | | | 10.3 | Accessories / Spare parts | | |
| 39 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 40 | | | **3.0** | **Design (Styling)** | | |
| 41 | | | 3.1 | Styling status | | |
| 42 | | | 3.1.1 | | Colour & Trim | |
| 43 | | | 4.6 | Styling Technical Convergence | | |
| 44 | | | **4.0** | **Vehicle Integration** | | |
| 45 | | | 4.1 | Product Development Targets | | |
| 46 | | | 4.1.1 | | | Technical target framework |
| 47 | | | 4.1.2 | | | Complete vehicle test results |
| 48 | | | 4.1.3 | | | Module targets |
| 49 | | | 4.2 | Function / Complete vehicle | | |
| 50 | | | 4.2.1 | | | I-Team status |
| 51 | | | 4.2.2 | | | Design Verification Plan |

This document is assigned to G10250. 010250-101-c



Case 3:21-cv-04736-EMC  Document 134-1 Filed 03/23/22  Page 145 of 161

| | G | H | I | J |
|---|---|---|---|---|
| 28 | ▶Change requests to achieve module targets realised<br>▶Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | **FMC-MS** | | | |
| 30 | NO REQUIREMENT FOR PP | | | |
| 31 | Activities for market introduction in selected countries available and confirmed; volumes and prices per market updated and aligned. Central marketing plan confirmed | | | |
| 32 | ▶Initial draft dealer training documentation available<br>▶Initial draft press information available<br>▶Press / photo vehicle planning finalised<br>▶Lifecycle management model updated | | | |
| 33 | ▶Selling price per market and variant complete | | | |
| 34 | **FMC-AS** | | | |
| 35 | NO REQUIREMENT FOR PP | | | |
| 36 | Insurance classification rate confirmed by hardware tryout | | | |
| 37 | ▶Hardware try-out done.<br>▶Risks identified and measures defined. | | | |
| 38 | List for primary spare parts storage available. | | | |
| 39 | ▶Proposal for initial stock available.<br>▶List for primary spare parts storing available | | | |
| 40 | **FMC-D** | | | |
| 41 | Colour and trim approval loop for PPAP | | | |
| 42 | ▶First approval loop of parts for PPAP (to MS Standard) complete | | | |
| 43 | NO REQUIREMENT FOR PP | | | |
| 44 | **FMC-VI** | | | |
| 45 | Homologation testing of all vehicle variants for first SOP is complete and conformity of production (COP) is secured.<br>Proof of flashability and codeability of the electronic control units on the assembly line available. PTO test results (Prio 1) available. | | | |
| 46 | ▶The achievement of technical targets within the complete vehicle target catalogue reviewed<br>▶The achievement of technical targets within the module target catalogues reviewed<br>▶List of incomplete and open issues with defined counter measures is available | | | |
| 47 | ▶Results of complete vehicle tests available according to DVP<br>▶Comparison of virtual and physical test results available<br>▶Homologation testing confirmed for first SOP<br>▶Flashability and codeability of ECUs on production line proved | | | |
| 48 | ▶The PP builds fullfill the module targets<br>▶Deviation to module targets are detected, agreed and documented | | | |
| 49 | PTO testing completed according to test schedule and DVP updated.<br>Complete vehicle target achievement confirmed with PTO vehicles. | | | |
| 50 | ▶Individual I-Team status reports available<br>▶Measures for known issues determined and allocated | | | |
| 51 | ▶Complete vehicle DVP completion status | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 52 | | | 4.2.3 | | | Validation results series production - modules |
| 53 | | | 4.3 | | Functional Safety | |
| 54 | | | 4.3.1 | | | Implementation of functional safety |
| 55 | | | **4.0** | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ | |
| 56 | | | 4.4 | | Engineering Modules | |
| 57 | | | 4.4.1 | | | Release for production |
| 58 | | | 4.5 | | Vehicle Architecture | |
| 59 | | | 4.7 | | Data Management | |
| 60 | | | 4.7.1 | | | Documentation status |
| 61 | | | 4.7.2 | | | Documentation of changes |
| 62 | | | 4.7.3 | | | Module / component data records |
| 63 | | | 4.7.4 | | | Part by part planning – Purchase |
| 64 | | | 4.7.5 | | | Part by part planning – SQA |
| 65 | | | 4.7.6 | | | Part by part planning - Logistics |
| 66 | | | 4.8 | | Product Quality Assurance | |
| 67 | | | 4.8.1 | | | Q-Planning Product |
| 68 | | | 4.8.2 | | | Risk Filter Product |
| 69 | | | 4.8.3 | | | System FMEA |
| 70 | | | 4.8.4 | | | Design FMEA |
| 71 | | | 4.8.5 | | | Key Product Characteristics (KPC) |
| 72 | | | 4.8.6 | | | Perceived quality (Virtual / Physical) |
| 73 | | | 4.8.7 | | | QM-Release Product |
| 74 | | | **5.0** | | **Manufacturing** | |


| | G | H | I | J |
|---|---|---|---|---|
| | ►Results of priority 1 tests available according to defined development strategy for: | | | |
| | - components / modules | | | |
| | - performance according to specification in complete vehicle | | | |
| | - in-vehicle assembly tests | | | |
| 52 | ►Comparison of virtual and pyhsical test results available | | | |
| 53 | Functional safety plan implementation status | | | |
| | ►Status of functional safety plan implementation | | | |
| 54 | ►Measures for known issues determined and allocated | | | |
| 55 | **UI/UX/Connectivity/Autonomous Driving)** | **FMC-VE** | | |
| | Status of module groups available. | | | |
| 56 | Data records corresponding to module maturity level available | | | |
| | ►Completed design data released for production | | | |
| | - alignment concept | | | |
| | - tolerance requirements | | | |
| | - material requirements | | | |
| | - surface requirements | | | |
| | - component naming convention | | | |
| | - part numbers and revision history | | | |
| | - list of variants | | | |
| 57 | - reference drawings… | | | |
| 58 | NO REQUIREMENT FOR PP | | | |
| 59 | Engineering data from previous phase updated and available. Part by part planning for production support updated | | | |
| 60 | ►Engineering data updated from previous phase | | | |
| 61 | ►Compete documentation of the PP build confirmed | | | |
| | ►Design data for all components within modules has been checked for completeness | | | |
| | ►Design data from PTO updated, PP data frozen. Verification complete | | | |
| 62 | ►Data maturity at PP confirmed | | | |
| | ►Purchasing status part by part planning | | | |
| 63 | ►Measures for deviations agreed and / or implemented according to agreed planning | | | |
| | ►SQA status part by part planning | | | |
| 64 | ►Measures for deviations agreed and / or implemented according to agreed planning | | | |
| | ►Logistics status part by part planning | | | |
| 65 | ►Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 66 | Perceived quality audit reports available, planning for product QM release | | | |
| 67 | ►Progress status for product quality planning available | | | |
| | ►Actual product risk level status available for each component | | | |
| 68 | ► Preventive measures status, planning and implementation meets program requirements | | | |
| 69 | ►Relevant identified issues from product validation documented | | | |
| 70 | ►Relevant identified issues from product validation documented | | | |
| 71 | ►Information provided to production for necessary modifications from change management | | | |
| | ►Perceived quality audit reports (1st hardware loop) available | | | |
| | ►Perceived quality one-pager and decision paper for all identified risks available and tracked within agreed issue management tool | | | |
| 72 | ►Perceived quality forecast documented | | | |
| 73 | ►Vehicles for QM-Release Product included in production program | | | |
| 74 | | **FMC-M** | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 75 | | | 5.1 | | | Production Planning |
| 76 | | | 5.1.1 | | | Target achievement |
| 77 | | | 5.1.2 | | | Spare part production |
| 78 | | | 5.1.3 | | | Production staff training |
| 79 | | | 5.2 | | Layout | |
| 80 | | | 5.2.1 | | | Production layout plan |
| 81 | | | 5.3 | | | Process & Equipment |
| 82 | | | 5.3.1 | | | Production preparation |
| 83 | | | 5.4 | | Investment | |
| 84 | | | 5.4.1 | | | Machine capability analysis |
| 85 | | | 5.4.2 | | | System implementation |
| 86 | | | 5.5 | | | Production Quality Assurance |
| 87 | | | 5.5.1 | | | Q-Planning Production |
| 88 | | | 5.5.2 | | | Process FMEA |
| 89 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 90 | | | 5.5.4 | | | Process Audit |
| 91 | | | 5.5.5 | | | Product Audit |
| 92 | | | 5.5.6 | | | Conformity of Production Planning |
| 93 | | | 5.5.7 | | | Conformity of Production Execution |
| 94 | | | 5.5.8 | | | QM-Release Process |
| 95 | | | **6.0** | | | **Supply Chain** |
| 96 | | | 6.1 | | | General Planning & Organisation |



# MAGNA STEYR MSDS Gate Deliverables Checklist

| | G | H | I | J |
|---|---|---|---|---|
| 75 | All systems for series production implemented or ready for implementation. Training of series production staff according to plan. Status / prognosis of achievability of production targets available. Detailed launch planning (timing & quantity) for PP, LS and SOP is confirmed. | | | |
| 76 | ► Planned values for timing, costs, quality and manufacturability compared with actual values from production at PP and documented<br>► Forecast available for effectiveness of defined measures / adjustment of target values to next production milestone | | | |
| 77 | ► Production of initial samples of designated spare parts according to production process<br>► Commissioning of equipment and fixtures and handover according to equipment planning completed | | | |
| 78 | ► Status of training of production staff | | | |
| 79 | Measures for issues resulting from PTO implemented | | | |
| 80 | ► Open issues and optimisations from PTO builds implemented or planned | | | |
| 81 | Production process refined and analysis of processability done. Measures for open issues defined. | | | |
| 82 | ► Preparations for operations in close to production conditions and production ramp up complete<br>- production documentation available<br>- production systems are operational<br>- automated equipment is operational<br>- part maturity, quality and availability confirmed<br>► Open issue list available with timing and responsibilities defined | | | |
| 83 | Installation and commissioning of all production equipment completed and infrastructure available at production location | | | |
| 84 | ► Statistical sampling of machine capability under pre-determined conditions for production of:<br>- individual parts<br>- sub-assemblies<br>- complete vehicle<br>► Check of product against specification (laboratory, measurement fixtures, audit, torque check, proof of manufacturer's machine capability...)<br>► Open issues available with timing and responsibilities defined | | | |
| 85 | ► Plant and production equipment commissioned in-situ at the production location<br>► Operation in full automatic mode confirmed by commissioning personnel (supplier)<br>► Handover, acceptance and operation by production personnel executed | | | |
| 86 | Definition of KCCs complete; product and process audit for PP conducted. Conformity of Production Plan submitted | | | |
| 87 | ► Results of quality tests available<br>► Issues documented and necessary measures agreed | | | |
| 88 | ► Relevant identified issues from validation documented | | | |
| 89 | ► KCC definition finished<br>► Status of KCC checks performed in production | | | |
| 90 | ► Station readiness for PP achieved | | | |
| 91 | ► Product audit targets for PP achieved and documented<br>► Necessary measures / decision agreed | | | |
| 92 | ► Conformity of Production plan submitted to each traffic authority as part of homologation requirements | | | |
| 93 | ► Conformity of Production inspections implemented | | | |
| 94 | ► Vehicles for QM-Release Process included in production program | | | |
| 95 | | **FMC-SC** | | |
| 96 | NO REQUIREMENT FOR PP | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 97 | | | 6.2 | | Purchase | |
| 98 | | | 6.2.1 | | | Production parts ordering |
| 99 | | | 6.2.2 | | | Production and facility requirements |
| 100 | | | 6.3 | | Supplier Quality Assurance | |
| 101 | | | 6.3.1 | | | APQP |
| 102 | | | 6.3.2 | | | Q-Loop documentation |
| 103 | | | 6.4 | | Logistics | |
| 104 | | | 6.4.1 | | | Material planning |
| 105 | | | 6.4.2 | | | Vehicle order management |
| 106 | | | 6.4.3 | | | Transportation planning |
| 107 | | | 6.4.4 | | | Packaging planning |
| 108 | | | 7.0 | | **Quality** | |
| 109 | | | 7.1 | | Requirements and quality targets | |
| 110 | | | 7.1.1 | | | Quality targets |
| 111 | | | 7.2 | | Quality planning and controlling | |
| 112 | | | 7.2.1 | | | Quality planning |
| 113 | | | 7.2.2 | | | Quality controlling |
| 114 | | | 7.3 | | Materials Engineering | |
| 115 | | | 7.3.1 | | | Material engineering and testing |
| 116 | | | 7.4 | | Geometrical Measurement | |
| 117 | | | 7.4.1 | | | Control of monitoring and measuring equipment |
| 118 | | | 7.4.2 | | | Measurement system analysis |
| 119 | | | 7.4.3 | | | Jigs & fixtures |
| 120 | | | 7.4.4 | | | Matching geometry |
| 121 | | | 7.4.5 | | | Body in White - quality control geometry |



| | G | H | I | J |
|---|---|---|---|---|
| 97 | Sales order processing interface to suppliers, handling of deviations agreed | | | |
| | ▶ Parts availability status for PP builds | | | |
| 98 | ▶ Measures for missing parts / deviations agreed with suppliers | | | |
| 99 | ▶ Facility and production items ordered and available to support production requirements at PP | | | |
| 100 | Degree of quality maturity according to PP requirements (see Part Quality Status Targets table) available. Process Sign off status | | | |
| | ▶ Status of APQP | | | |
| 101 | ▶ Corrective actions defined and implemented according to plan | | | |
| | ▶ Check that required changes have no negative effect on engineering target | | | |
| 102 | ▶ Required measures incorporated into engineering documentation | | | |
| 103 | Material flow planning detailed and available for each work station. Transport purchasing for start up and serial production finished Interfaces to OEM for customer order processing aligned and interface implemented | | | |
| 104 | ▶ Parts allocation to assembly stations and route planning (parts from stores to assembly station) complete ▶ JIS supply concept optimisation complete ▶ Required layout changes implemented ▶ Internal materials management confirmed | | | |
| 105 | ▶ Vehicle order processing implemented according to specifications / interface agreement | | | |
| 106 | ▶ Selection and ordering of transport services for production complete ▶ Transportation concept for series production finalised ▶ Routing instructions sent to transportation suppliers | | | |
| 107 | ▶ Parts carriers / containers to support PP supply available | | | |
| 108 | | **FMC-Q** | | |
| 109 | Status of achievement of quality targets according to requirements at PP | | | |
| 110 | ▶ Quality targets for PP achieved and documented ▶ Measures to meet program requirements agreed and decisions documented | | | |
| 111 | Quality planning and requirements documented to meet program requirements at PP | | | |
| 112 | ▶ Status report on QM-Plan ▶ Known issues documented and measures for implementation agreed | | | |
| 113 | ▶ Status report on all quality requirements according to planning, including but not limited to: - Knowledge management - Risk management - Issue management - quality checks… | | | |
| 114 | Materials testing status to support program requirements at PP | | | |
| 115 | ▶ Material testing status on production parts and samples according to planning; report available | | | |
| 116 | Part matching and measurement status meets quality requirements at PP, equipment updates to latest status carried out | | | |
| 117 | ▶ Test equipment inspection set-up status, planning to meet program requirements at PP ▶ Status of registration of test equipment, report available | | | |
| 118 | ▶ Status of definition of measurement equipment in control plan, report available | | | |
| 119 | ▶ BIW fixtures updated to latest status ▶ Modifications to meet geometrical targets defined and implemented | | | |
| 120 | ▶ Matching process status report available ▶ Change management of matching equipment status available | | | |
| 121 | ▶ Measurment programms updated on latest part status (if needed) ▶ GeMA -sheets (visualisation of measurement results) updated ▶ Measurement fixtures updated to latest part status | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 122 | | | **8.0** | | **Information Technology** | |
| 123 | | | 8.1 | | Strategy / Concept | |
| 124 | | | 8.1.1 | | | IT system concept - production implementation |
| 125 | | | 8.2 | | IT Infrastructure | |
| 126 | | | 8.2.2 | | | IT Support for PP build |
| 127 | | | **9.0** | | **Finance** | |
| 128 | | | 9.1 | | Business Case and Program Costs | |
| 129 | | | 9.1.1 | | | Business plan |
| 130 | | | 9.2 | | Cost controlling | |
| 131 | | | 9.2.1 | | | PP costs |
| 132 | | | 9.2.2 | | | Cost reporting |
| 133 | | | 9.2.3 | | | Release of financial resources |
| 134 | | | 9.2.4 | | | Development cost invoicing |



| | | FMC-IT | | |
|---|---|---|---|---|
| 122 | | | | |
| 123 | System concept for warranty processing available | | | |
| 124 | ► IT system concept for warranty processing available and agreed with customer (OEM) | | | |
| 125 | IT infrastructure configured technically (supplier controls, invoice / customs processes) | | | |
| 126 | ► System availability in accordance with agreed IT concept and planning to support PP builds confirmed<br>► Issues from PTO build phase addressed and adaptations implemented | | | |
| 127 | | FMC-F | | |
| 128 | Business Plan updated. Overall program cost estimate updated | | | |
| 129 | ► MS Business plan status update available | | | |
| 130 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. Actual cost status  (non-recurring costs / part costs) updated. | | | |
| 131 | ► Status of PP build costs<br>► Overview of non-recurring costs<br>► Overview of recurring costs<br>► MS finance plan based on financial targets | | | |
| 132 | ► Status for scope of work of plan versus actual<br>► Deviations from plan costs highlighted and analysed | | | |
| 133 | ► Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process.<br>► Release of invoices confirmed | | | |
| 134 | ► Customer (OEM) invoiced according to the payment plan, based on compliance with agreed conditions | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | Gate:<br>**LS** | | **Launch Sign-off: Performance tests (run@rate) for customer vehicle under the predetermined volume suppliers confirmed.** |
| 3 | | | | | | |
| 4 | | | 1.0 | | | **Program Management** |
| 5 | | | 1.1 | | Master Timing | |
| 6 | | | 1.1.1 | | | Detailed Timing |
| 7 | | | 1.1.2 | | | DVP Review |
| 8 | | | 1.2 | | Gateway Review | |
| 9 | | | 1.2.1 | | | Major Issues and Risks |
| 10 | | | 1.2.2 | | | Red/Yellow Grren |
| 11 | | | 1.2.3 | | | Recovery Plans |
| 12 | | | 1.3 | | Processes / Methods | |
| 13 | | | 1.3.1 | | | Product Development Process |
| 14 | | | 1.3.2 | | | Meeting Schedule |
| 15 | | | 1.3.3 | | | Change Management |
| 16 | | | 1.3.4 | | | Outsourced Engineering |
| 17 | | | 1.4 | | Team Organization | |
| 18 | | | 1.4.1 | | | Program Organisation |
| 19 | | | 1.5 | | Contract Management | |
| 20 | | | 1.5.1 | | | Contract update |
| 21 | | | 1.6 | | Knowledge Management | |
| 22 | | | 1.6.1 | | | Transfer of Experience |
| 23 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 24 | | | 1.7 | | Configuration Management | |
| 25 | | | 1.7.1 | | | Program target requirements |
| 26 | | | 1.7.2 | | | Module target framework |
| 27 | | | 1.7.3 | | | Change request status - complete vehicle |


| | Responsible Role | Responsible Organisation | Responsible Name |
|---|---|---|---|
| components and vehicles have been completed. Manufacturability of an end production conditions and at the specified cycle times at production site and at | | | |
| | **FMC-PM** | | |
| Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | FMC | |
| ▶ Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | ESS | |
| DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager / Cost Controller | ESS / Vehicle Attributes | |
| | Program Manager | FMC | |
| Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | ESS | |
| Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | ESS | |
| Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | ESS | |
| | Program Manager | FMC | |
| Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | FMC | |
| Meeting schedule issued | Program Manager | FMC | |
| Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | FMC | |
| Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | FMC | |
| Teamwork and cooperation between all departments implemented and functioning (information and communication…) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | FMC | |
| ▶ Program organisation and teamwork functioning according to planning ▶ Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | ESS | |
| Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | FMC | |
| Contracts with all Engineering Service Suppliers in place | Program Manager | FMC | |
| Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | FMC | |
| ▶ Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | ESS | |
| Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | FMC | |
| ▶ Status of program requirements available ▶ Changes to program targets transferred to change management for tracking | Configuration Manager | FMC | |
| ▶ Module target breakdown confirmed for all areas | Configuration Manager | FMC | |
| ▶ Change requests to achieve VTS targets realised ▶ Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |

| | Customer (Approval) | Status: CWxxx | Forecast: CWxxx | | |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |
| 29 | | | **2.0** | | **Marketing and Sales** | |
| 30 | | | 2.1 | | Product Definition | |
| 31 | | | 2.2 | | Sales and Marketing | |
| 32 | | | 2.2.1 | | | Communication strategy |
| 33 | | | 2.2.2 | | | Price range |
| 34 | | | **10.0** | | **After Sales** | |
| 35 | | | 10.1 | | Strategy | |
| 36 | | | 10.2 | | Warranty / Service | |
| 37 | | | 10.2.1 | | | Maintainance concept |
| 38 | | | 10.2.2 | | | Serviceability concept |
| 39 | | | 10.2.3 | | | Insurance classification |



| # | G | H | I | J |
|---|---|---|---|---|
| 28 | ►Change requests to achieve module targets realised<br>►Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | **FMC-MS** | | | |
| 30 | NO REQUIREMENT FOR LS | | | |
| 31 | Volumes and prices per market aligned and confirmed<br>Activities for market introduction in selected countries available and confirmed. Car clinics completed | | | |
| 32 | ►Car clinics complete<br>►Dealer training documentation finalised<br>►Press information finalised<br>►Press / photo vehicles available from PP builds<br>►Lifecycle management model updated | | | |
| 33 | ►Volumes and price per market and variant aligned | | | |
| 34 | **FMC-AS** | | | |
| 35 | NO REQUIREMENT FOR LS | | | |
| 36 | Insurance class categorization is scheduled; repairability and maintainability is confirmed and risks are identified. Validation is finalized, deviation approval available if required. Support of quality try-out vehicles is secured. | | | |
| 37 | ►Maintainance is confirmed and risks are identified.<br>►Validation finalized, deviation approval exists if required | | | |
| 38 | ►Serviceability is confirmed and risks are identified.<br>►Validation finalized, deviation approval exists if required | | | |
| 39 | ►Insurance class categorization is scheduled.<br>►Validation finalized, deviation approval exists if required | | | |

This document is assigned to G10250. 010250-101-e

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 40 | | | 10.3 | | Accessories / Spare parts | |
| 41 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 42 | | | **3.0** | | **Design (Styling)** | |
| 43 | | | 3.1 | | Styling status | |
| 44 | | | 3.1.1 | | | Colour & Trim |
| 45 | | | 4.6 | | Styling Technical Convergence | |
| 46 | | | 4.1 | | Product Development Targets | |
| 47 | | | 4.1.1 | | | Technical target framework |
| 48 | | | 4.1.2 | | | I-Team status |
| 49 | | | 4.1.3 | | | Complete vehicle test results |
| 50 | | | 4.1.4 | | | Module targets |
| 51 | | | 4.2 | | Function / Complete vehicle | |
| 52 | | | 4.2.1 | | | Design verification plan |
| 53 | | | 4.2.2 | | | Validation results series production - modules |
| 54 | | | 4.3 | | Functional Safety | |
| 55 | | | 4.3.1 | | | Implementation of functional safety |
| 56 | | | 4.5 | | Vehicle Architecture | |
| 57 | | | **4.0** | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ | |
| 58 | | | 4.4 | | Engineering Modules | |
| 59 | | | 4.4.1 | | | Status - Engineering module group |
| 60 | | | 4.4.2 | | | Documentation of Q-loops |
| 61 | | | | | | |
| 62 | | | 4.7 | | Data Management | |
| 63 | | | 4.7.1 | | | Documentation status |
| 64 | | | 4.7.2 | | | Documentation of changes |



Case 3:21-cv-04736-EMC Document 134 Filed 03/23/22 Page 360 of 611

| | G | H | I | J |
|---|---|---|---|---|
| 40 | Spare parts distribution targets are confirmed. Spare part prices available and logistic process is established. | | | |
| 41 | ►Spare parts distribution targets are confirmed,<br>►Risks have been identified and measures defined.<br>►Spare part prices available and logistic process is established. | | | |
| 42 | | **FMC-D** | | |
| 43 | Colour and trim matching status for PPAP | | | |
| 44 | ►Status report colour matching process (PPAP)<br>►Open issues available, with measures defined and agreed | | | |
| 45 | NO REQUIREMENT FOR LS | | | |
| 46 | Whole Vehicle Type Approval available.<br>Development targets (customer targets catalogue) are validated with vehicles produced under volume production conditions. DVP sign off complete. | | | |
| 47 | ►The achievement of technical targets within the complete vehicle target catalogue reviewed<br>►The achievement of technical targets within the module target catalogues reviewed<br>►DVP completion status<br>►List of incomplete and open issues with defined counter measures is available | | | |
| 48 | ►Final individual I-Team status reports available | | | |
| 49 | ►Results of complete vehicle tests available according to DVP<br>►Confirmation of target achievement with validation vehicles | | | |
| 50 | ►The LS builds fullfil the module targets<br>►Deviation to module targets are detected, agreed and documented | | | |
| 51 | PP testing according to DVP schedule done.<br>Complete vehicle targets achieved, validation complete. | | | |
| 52 | ►Complete vehicle DVP testing completed<br>►Positive test results confirmed and reports available | | | |
| 53 | ►Results of tests available according to defined development strategy for:<br>- components / modules<br>- performance according to specification in complete vehicle<br>- in-vehicle assembly tests<br>►Comparison of virtual and pyhsical test results available | | | |
| 54 | Functional safety plan implementation status | | | |
| 55 | ►Status of functional safety plan implementation<br>►Measures for known issues determined and allocated | | | |
| 56 | NO REQUIREMENT FOR LS | | | |
| 57 | UIUX/Connectivity/Autonomous Driving) | **FMC-VE** | | |
| 58 | Status of module groups available.<br>Data records corresponding to module maturity level available. Quality loops documented and released. | | | |
| 59 | ►Overall status report of engineering works within the module group available | | | |
| 60 | ►Changes required to achieve quality targets have been incorporated into designs<br>►Confirmation that required changes have no negative effect on engineering or project targets is available<br>►Engineering release for Q-loops confirmed | | | |
| 61 | | | | |
| 62 | Engineering data changes from previous phase updated and available. | | | |
| 63 | ►Engineering data updated from previous phase | | | |
| 64 | ►Compete documentation of the LS build confirmed | | | |

MAGNA STEYR MSDS Gate Deliverables Checklist

| | K | L | M | N | O |
|---|---|---|---|---|---|
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | Produktionsfr eigabe????? |
| 47 | | | | | |
| 48 | | | | | |
| 49 | | | | | |
| 50 | | | | | |
| 51 | | | | | |
| 52 | | | | | |
| 53 | | | | | |
| 54 | | | | | |
| 55 | | | | | |
| 56 | | | | | |
| 57 | | | | | |
| 58 | | | | | |
| 59 | | | | | |
| 60 | | | | | |
| 61 | | | | | |
| 62 | | | | | |
| 63 | | | | | |
| 64 | | | | | |

MSDS

| | | C | D | E | F |
|---|---|---|---|---|---|
| 65 | | 4.7.3 | | | Engineering data records |
| 66 | | 4.7.4 | | | Part by part planning – Purchase |
| 67 | | 4.7.5 | | | Part by part planning – SQA |
| 68 | | 4.7.6 | | | Part by part planning – Logistics |
| 69 | | 4.8 | | | Product Quality Assurance |
| 70 | | 4.8.1 | | | Q-Planning Product |
| 71 | | 4.8.2 | | | Risk Filter Product |
| 72 | | 4.8.3 | | | System FMEA |
| 73 | | 4.8.4 | | | Design FMEA |
| 74 | | 4.8.5 | | | Key Product Characteristics (KPC) |
| 75 | | 4.8.6 | | | Perceived Quality (Virtual / Physical) |
| 76 | | 4.8.7 | | | QM-Release Product |
| 77 | | **5.0** | | | **Manufacturing** |
| 78 | | 5.1 | | | Production Planning |
| 79 | | 5.1.1 | | | Target achievement |
| 80 | | 5.1.2 | | | Maintenance plan |
| 81 | | 5.2 | | Layout | |
| 82 | | 5.2.1 | | | Production layout plan |
| 83 | | 5.3 | | | Process & Equipment |
| 84 | | 5.3.1 | | | IT and vehicle control |
| 85 | | 5.3.2 | | | Technology cooperation |
| 86 | | 5.4 | | Investment | |


| | G | H | I | J |
|---|---|---|---|---|
| | ▶ Assessment of the level of maturity of components in each module available | | | |
| | ▶ All designs confirmed, data sets are complete | | | |
| | ▶ Functionality at component level validated and confirmed | | | |
| | ▶ Functionality within complete vehicle confirmed | | | |
| | ▶ All procurement released design data frozen | | | |
| 65 | ▶ Records for PTO vehicles frozen, validation is complete | | | |
| | ▶ Purchasing status part by part planning | | | |
| 66 | ▶ Measures for deviations agreed and / or implemented according to agreed planning | | | |
| | ▶ SQA status part by part planning | | | |
| 67 | ▶ Measures for deviations agreed and / or implemented according to agreed planning | | | |
| | ▶ Logistics status part by part planning | | | |
| 68 | ▶ Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 69 | Perceived quality audit reports available; documentation for product QM release | | | |
| 70 | ▶ Progress status for product quality planning available | | | |
| | ▶ Actual product risk level status available for each component | | | |
| 71 | ▶ Preventive measures status, planning and implementation meets program requirements | | | |
| 72 | ▶ Relevant identified issues from product validation documented | | | |
| 73 | ▶ Relevant identified issues from product validation documented | | | |
| 74 | ▶ Information provided to production for necessary modifications from change management | | | |
| | ▶ Perceived quality audit reports (2nd hardware loop) available | | | |
| | ▶ Perceived quality one-pager and decision paper for all identified risks available and tracked within agreed issue management tool | | | |
| 75 | ▶ Perceived quality forecast documented | | | |
| 76 | ▶ Documentation to initiate QM-Release Product according specification available | | | |
| 77 | | **FMC-M** | | |
| 78 | Maintenance plan created and released. IT and production systems verified. Training of series production staff according to plan. Status / prognosis of achievability of production targets available. Detailed launch planning (timing & quantity) for LS and SOP is confirmed. | | | |
| 79 | ▶ Planned values for timing, costs, quality and manufacturability compared with actual values from production at PP and documented ▶ Forecast available for effectiveness of defined measures / adjustment of target values to next production milestone ▶ First-time check of the efficiency of the total system (run at rate) completed | | | |
| 80 | ▶ Preventative maintenance plans defined together with plant and equipment manufacturers and released ▶ Spare parts for plant and manufacturing equipment available in SAP system | | | |
| 81 | Final layout confirmation | | | |
| 82 | ▶ Layout plan confirmed | | | |
| 83 | Release of production process (Process Sign-Off / PSO) available. Process stability analysed. Measures for open issues defined. | | | |
| 84 | ▶ Interaction of series production systems checked and verified - production systems (e.g., MMS, AVI, WPP…) - logistic systems, (e.g., SAM, SAP…) - development systems (e.g., EDB…) - change management systems (e.g., EDB, ICM…) ▶ Identified issues documented, responsibility determined and measures agreed | | | |
| 85 | ▶ Interdisciplinary cooperation verified during run at rate tests for the complete production process chain | | | |
| 86 | Approval of manufacturing equipment available. | | | |



| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 87 | | | 5.4.1 | | | System impplemention |
| 88 | | | 5.5 | | | Production Quality Assurance |
| 89 | | | 5.5.1 | | | Q-Planning Production |
| 90 | | | 5.5.2 | | | Process FMEA |
| 91 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 92 | | | 5.5.4 | | | Process Audit |
| 93 | | | 5.5.5 | | | Product Audit |
| 94 | | | 5.5.6 | | | Conformity of Production Execution |
| 95 | | | 5.5.7 | | | QM-Release Process |
| 96 | | | 6.0 | | | **Supply Chain** |
| 97 | | | 6.1 | | | General Planning & Organisation |
| 98 | | | 6.2 | | Purchase | |
| 99 | | | 6.2.1 | | | Production parts ordering |
| 100 | | | 6.2.2 | | | Production and facility requirements |
| 101 | | | 6.3 | | | Supplier Quality Assurance |
| 102 | | | 6.3.1 | | | Process sign off |
| 103 | | | 6.3.2 | | | APQP |
| 104 | | | 6.4 | | Logistics | |
| 105 | | | 6.4.1 | | | Materials Planning |
| 106 | | | 6.4.2 | | | Scheduling |
| 107 | | | 6.4.3 | | | Transport planning |
| 108 | | | 6.4.4 | | | Packaging Planning |


| | G | H | I | J |
|---|---|---|---|---|
| 87 | ▶ Confirmation that all plant and manufacturing equipment has been commissioned and handed over at production site<br>▶ Handover documentation available<br>▶ All production equipment is operated by designated production personnel<br>▶ Identified issues documented, responsibility determined and measures agreed | | | |
| 88 | Process FMEA review and product and process audit for PP conducted; batch and hold process initiated | | | |
| 89 | ▶ Results of quality tests available<br>▶ Issues documented and necessary measures agreed | | | |
| 90 | ▶ Process FMEA review<br>▶ Relevant identified issues from process validation documented | | | |
| 91 | ▶ Performance of KCC checks in production carried out | | | |
| 92 | ▶ Station readiness for run at rate achieved | | | |
| 93 | ▶ Product audit targets for PP achieved and documented<br>▶ Necessary measures / decision agreed<br>▶ Batch & hold process initiated in production | | | |
| 94 | ▶ Conformity of Production plan executed and documented | | | |
| 95 | ▶ QM-Release process initiated and documented according to specification | | | |
| 96 | **FMC-SC** | | | |
| 97 | NO REQUIREMENT FOR LS | | | |
| 98 | All supplier data for parts supply confirmed. Parts availability confirmation to support production | | | |
| 99 | ▶ Parts availability status for LS builds<br>▶ Measures for missing parts / deviations agreed with suppliers<br>▶ Status of series supply contracts | | | |
| 100 | ▶ Facility and production items ordered and available to support production requirements at LS | | | |
| 101 | Process Sign-Off and performance tests at suppliers finished. Degree of quality maturity according to LS requirements (see Part Quality Status Targets table) available. Start PPAP | | | |
| 102 | ▶ Process sign off at suppliers | | | |
| 103 | ▶ Status of APQP<br>▶ Corrective actions defined and implemented according to plan | | | |
| 104 | Suppliers linked to component transport control system (racks, stillages, etc,...) Part supply for volume production confirmed. All logistics equipment (fork lift, trolleys, etc.,) available | | | |
| 105 | ▶ All equipment required for logistical support for production procured according to plan<br>▶ Logistics layout review complete<br>▶ Layout changes confirmed | | | |
| 106 | ▶ Delivery schedules for all suppliers confirmed<br>▶ JIS implementation 100% complete | | | |
| 107 | ▶ 100% of suppliers connected to transport control system<br>▶ Control of parts carriers / containers implemented<br>▶ Supplier accounts established<br>▶ Customs tariff per part number defined and integrated into IT system<br>▶ All routing instructions (RI) sent to suppliers | | | |
| 108 | ▶ All serial packaging ordered and availability confirmed according to planning | | | |

| | K | L | M | N | O |
|---|---|---|---|---|---|
| 87 | | | | | |
| 88 | | | | | |
| 89 | | | | | |
| 90 | | | | | |
| 91 | | | | | |
| 92 | | | | | |
| 93 | | | | | |
| 94 | | | | | |
| 95 | | | | | |
| 96 | | | | | |
| 97 | | | | | |
| 98 | | | | | |
| 99 | | | | | |
| 100 | | | | | |
| 101 | | | | | PPAP (yellow, green wann? Warum start mit LS laut MSDS *ALT?*) |
| 102 | | | | | |
| 103 | | | | | |
| 104 | | | | | Produktionsfreigabe |
| 105 | | | | | |
| 106 | | | | | |
| 107 | | | | | |
| 108 | | | | | |

# MSDS Gate Deliverables Checklist

| | | | | |
|---|---|---|---|---|
| 109 | **7.0** | **Quality** | | |
| 110 | 7.1 | Requirements and quality targets | | |
| 111 | 7.1.1 | | Quality targets | |
| 112 | 7.2 | Quality planning and controlling | | |
| 113 | 7.2.1 | | Quality planning | |
| 114 | 7.2.2 | | Quality controlling | |
| 115 | 7.3 | Materials Engineering | | |
| 116 | 7.3.1 | | Material engineering and testing | |
| 117 | 7.4 | Geometrical Measurement | | |
| 118 | 7.4.1 | | Control of monitoring and measuring equipment | |
| 119 | 7.4.2 | | Measurement system analysis | |
| 120 | 7.4.3 | | Jigs & fixtures | |
| 121 | 7.4.4 | | Matching geometry | |
| 122 | 7.4.5 | | Body in White – quality control geometry | |
| 123 | **8.0** | **Information Tehnology** | | |
| 124 | 8.1 | Strategy / Concept | | |
| 125 | 8.2 | IT Infrastructure | | |
| 126 | 8.2.2 | | IT support for LS build | |
| 127 | **9.0** | **Finance** | | |
| 128 | 9.1 | Business Case and Program Costs | | |
| 129 | 9.1.1 | | Business plan | |
| 130 | 9.2 | Cost controlling | | |
| 131 | 9.2.1 | | Costs of the programm | |
| 132 | 9.2.2 | | Cost reporting | |
| 133 | 9.2.3 | | Cost controlling series production | |



MAGNA STEYR **MSDS Gate Deliverables Checklist**

| | | G | H | I | J |
|---|---|---|---|---|---|
| 109 | | | | | |
| 110 | Status of achievement of quality targets | | | | |
| | ▶ Quality targets for LS achieved and documented | | | | |
| 111 | ▶ Measures to meet program requirements agreed and decisions documented | | | | |
| 112 | Quality planning and requirements documented to meet program requirements at LS | | | | |
| | ▶ Status report on QM-Plan | | | | |
| 113 | ▶ Known issues documented and measures for implementation agreed | | | | |
| | ▶ Status report on all quality requirements according to planning, including but not limited to: | | | | |
| | - Knowledge management | | | | |
| | - Risk management | | | | |
| | - Issue management | | | | |
| 114 | - quality checks… | | | | |
| 115 | Materials testing status to support program requirements at LS | | | | |
| 116 | ▶ Material testing status on production parts and samples according to planning, report available | | | | |
| 117 | Part matching and measurement status meets quality requirements at LS, equipment updates to latest status carried out | | | | |
| 118 | ▶ Test equipment inspection set up status; planning to meet program requirements at PP<br>▶ Status of registration of test equipment, report available | | | | |
| 119 | ▶ Status of definition of measurement equipment in control plan, report available | | | | |
| 120 | ▶ BIW fixtures updated to latest status<br>▶ Modifications to meet geometrical targets defined and implemented | | | | |
| 121 | ▶ Matching process status report available<br>▶ Change management of matching equipment status available | | | | |
| 122 | ▶ Measurment programms updated on latest part status (if needed)<br>▶ GeMA -sheets (visualisation of measurement results) updated<br>▶ Dimensional status of BIW accepted according to defined requirements<br>▶ Measurement fixtures updated to latest part status | | | | |
| 123 | | **FMC-IT** | | | |
| 124 | NO REQUIREMENT FOR LS | | | | |
| 125 | All production IT systems configured and available for designated users. Warranty processing system configured | | | | |
| 126 | ▶ System availability in accordance with agreed IT concept and planning to support LS builds confirmed<br>▶ Issues from PP build phase addressed and adaptations implemented | | | | |
| 127 | | **FMC-F** | | | |
| 128 | Business Plan updated. Overall program cost estimate updated | | | | |
| 129 | ▶ MS Business plan status update available | | | | |
| 130 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. Actual cost status  (non-recurring costs / part costs) updated. | | | | |
| 131 | ▶ Cost Status of LS<br>▶ Overview of non-recurring costs<br>▶ Overview of recurring costs<br>▶ MS Finance plan based on financial targets | | | | |
| 132 | ▶ Status for scope of work of plan versus actual<br>▶ Deviations from plan costs highlighted and analysed | | | | |
| 133 | ▶ Material consumption per vehicle for non-productive material (NPM) and indirect productive material (IPM) determined and requirements passed to purchase and logistics. | | | | |

This document is assigned to G10250. 010250-101-e

LS
Page #P of 159

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 134 | | | 9.2.4 | | | Release of financial resources |
| 135 | | | 9.2.5 | | | Development cost invoicing |

This document is assigned to G102.50. 010250-101-c


| | G | | H | | J |
|---|---|---|---|---|---|
| 134 | ► Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process.<br>► Release of invoices confirmed | | | | |
| 135 | ► Customer (OEM) invoiced according to the payment plan, based on compliance with agreed conditions | | | | |

| | Gate: **SOP** | Start of Production: First vehicle for the end custo quality requirements |
|---|---|---|

| **1.0** | **Program Management** | |
|---|---|---|
| 1.1 | Master Timing | |
| 1.1.1 | | Detailed Timing |
| 1.1.2 | | DVP Review |
| 1.2 | Gateway Review | |
| 1.2.1 | | Major Issues and Risks |
| 1.2.2 | | Red/Yellow Grren |
| 1.2.3 | | Recovery Plans |
| 1.3 | Processes / Methods | |
| 1.3.1 | | Product Development Process |
| 1.3.2 | | Meeting Schedule |
| 1.3.3 | | Change Management |
| 1.3.4 | | Outsourced Engineering |
| 1.4 | Team Organization | |
| 1.4.1 | | Program Organisation |
| 1.5 | Contract Management | |
| 1.5.1 | | Contract update |
| 1.6 | Knowledge Management | |
| 1.6.1 | | Transfer of Experience |
| 1.6.2 | | Reflection of Experience (Lessons Learned) |
| 1.7 | Configuration Management | |
| 1.7.1 | | Program target requirements |
| 1.7.2 | | Module target framework |
| 1.7.3 | | Change request status - complete vehicle |



MAGNA STEYR MSDS Gate Deliverables Checklist

MAGNA STEYR G

|   | | Responsible Role | Responsible Organisation | Responsible Name |
|---|---|---|---|---|
| 1 | | | | |
| 2 | ...mer has been produced and is ready for distribution. End-customer vehicles fulfill | | | |
| 3 | | **Responsible Role** | **Responsible Organisation** | **Responsible Name** |
| 4 | | **FMC-PM** | | |
| 5 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | **FMC** | |
| 6 | ►Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | **ESS** | |
| 7 | DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | **ESS** **Vehicle Attributes** | |
| 8 | | Program Manager | **FMC** | |
| 9 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | **ESS** | |
| 10 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | **ESS** | |
| 11 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | **ESS** | |
| 12 | | Program Manager | **FMC** | |
| 13 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | **FMC** | |
| 14 | Meeting schedule issued | Program Manager | **FMC** | |
| 15 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | **FMC** | |
| 16 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | **FMC** | |
| 17 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | **FMC** | |
| 18 | ►Program organisation and teamwork functioning according to planning ►Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | **ESS** | |
| 19 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | **FMC** | |
| 20 | Contracts with all Engineering Service Suppliers in place | Program Manager | **FMC** | |
| 21 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | **FMC** | |
| 22 | ►Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| 23 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | **ESS** | |
| 24 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | **FMC** | |
| 25 | ►Status of program requirements available ►Changes to program targets transferred to change management for tracking | Configuration Manager | **FMC** | |
| 26 | ►Module target breakdown confirmed for all areas | Configuration Manager | **FMC** | |
| 27 | ►Change requests to achieve VTS targets realised ►Risks for non-implementation of changes highlighted and documented | Configuration Manager | **FMC** | |

MAGNA STEYR **MSDS Gate Deliverables Checklist**

| | K | L | M |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | **Customer (Approval)** | **Status: CWxxx** | **Forecast: CWxxx** |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |

MAGNA STEYR **MSDS Gate Deliverables** Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 28 | | | 1.7.4 | | | Change request status - engineering module groups |
| 29 | | | **2.0** | | **Marketing and Sales** | |
| 30 | | | 2.1 | | Product Definition | |
| 31 | | | 2.2 | | Sales and Marketing | |
| 32 | | | 2.2.1 | | | Communication strategy |
| 33 | | | 2.2.2 | | | Price range |
| 34 | | | **10.0** | | **After Sales** | |
| 35 | | | 10.1 | | Strategy | |
| 36 | | | 10.2 | | Warranty / Service | |
| 37 | | | 10.2.1 | | | Maintainance concept |
| 38 | | | 10.2.2 | | | Serviceability concept |
| 39 | | | 10.2.3 | | | Diagnostics concept |
| 40 | | | 10.3 | | Accessories / Spare parts | |
| 41 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 42 | | | **3.0** | | **Design (Styling)** | |
| 43 | | | 3.1 | | Styling status | |
| 44 | | | 3.1.1 | | | Colour & Trim |
| 45 | | | 4.6 | | Styling Technical Convergence | |
| 46 | | | **4.0** | | **Vehicle Integration** | |
| 47 | | | 4.1 | | Product Development Targets | |
| 48 | | | 4.1.1 | | | Complete vehicle targets |
| 49 | | | 4.1.2 | | | Module targets |
| 50 | | | 4.2 | | Function / Complete vehicle | |
| 51 | | | 4.2.1 | | | Complete vehicle functional targets |
| 52 | | | 4.3 | | Functional Safety | |
| 53 | | | 4.3.1 | | | Implementation of functional safety |
| 54 | | | 4.5 | | Vehicle Architecture | |
| 55 | | | **4.0** | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ | |


| | G | H | I | J |
|---|---|---|---|---|
| 28 | ►Change requests to achieve module targets realised<br>►Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 29 | | **FMC-MS** | | |
| 30 | NO REQUIREMENT FOR SOP | | | |
| 31 | Volumes and prices per market aligned and confirmed.<br>Launch program finalised, market entry confirmed | | | |
| 32 | ►Dealer training documentation available<br>►Media placement finalised<br>►Motor show introduction<br>►Market launch confirmed<br>►Lifecycle management model updated | | | |
| 33 | ►Selling price per market and variant complete | | | |
| 34 | | **FMC-AS** | | |
| 35 | NO REQUIREMENT FOR SOP | | | |
| 36 | All activities for After Sales after market entry completed. Diagnostics available at selected dealers; service processes and systems implemented within dealer organisation. | | | |
| 37 | ►After Sales market launch activities are finalized.<br>►Confirmation from Customer (OEM), open issues documented | | | |
| 38 | ►Service processes and systems are implemented in dealer organisation.<br>►Confirmation from Customer (OEM), open issues documented | | | |
| 39 | ►Diagnostics are available in dealer organization.<br>►Confirmation from Customer (OEM), open issues documented | | | |
| 40 | Spare parts distribution targets are confirmed, risks identified and measures defined. Spare part prices available and logistic process is established. | | | |
| 41 | ►Change Management process for service parts exists<br>►Change management for spare parts assortment is implemented in the System. | | | |
| 42 | | **FMC-D** | | |
| 43 | All colour and trim issues resolved | | | |
| 44 | ►All open issues closed | | | |
| 45 | NO REQUIREMENT FOR SOP | | | |
| 46 | | **FMC-VI** | | |
| 47 | All development targets (customer target catalogue) verified with vehicles produced under volume production conditions. Preliminary QM release. | | | |
| 48 | ►Target achievement of agreed development targets confirmed | | | |
| 49 | ►The SOP vehicles fulfill the module targets<br>►Deviation of module targets are detected, agreed and documented | | | |
| 50 | Functional target achievement confirmed on customer-ready vehicles (acceptance of performance) | | | |
| 51 | ►Target achievement of agreed functional targets confirmed on vehicles produced under volume production conditions | | | |
| 52 | Functional safety plan implementation status | | | |
| 53 | ►Status of functional safety plan implementation<br>►Measures for known issues determined and allocated | | | |
| 54 | NO REQUIREMENT FOR SOP | | | |
| 55 | UIUX/Connectivity/Autonomous Driving) | **FMC-VE** | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 56 | | | 4.4 | | | Engineering Modules |
| 57 | | | 4.4.1 | | | Status - Engineering module group |
| 58 | | | 4.4.2 | | | Liability disclaimer |
| 59 | | | 4.7 | | Data Management | |
| 60 | | | 4.7.1 | | | Documentation status |
| 61 | | | 4.7.2 | | | Access management |
| 62 | | | 4.7.3 | | | Documentation of changes |
| 63 | | | 4.7.4 | | | Data records |
| 64 | | | 4.7.5 | | | Part by part planning - Purchase |
| 65 | | | 4.7.6 | | | Part by part planning - SQA |
| 66 | | | 4.7.7 | | | Part by part planning - Logistics |
| 67 | | | 4.8 | | | Product Quality Assurance |
| 68 | | | 4.8.1 | | | Q-Planning Product |
| 69 | | | 4.8.2 | | | Risk Filter Product |
| 70 | | | 4.8.3 | | | System FMEA |
| 71 | | | 4.8.4 | | | Design FMEA |
| 72 | | | 4.8.5 | | | Key Product Characteristics (KPC) |
| 73 | | | 4.8.6 | | | Perceived Quality (Virtual / Physical) |
| 74 | | | 4.8.7 | | | QM-Release Product |
| 75 | | | 5.0 | | **Manufacturing** | |
| 76 | | | 5.1 | | Production Planning | |
| 77 | | | 5.1.1 | | | Station readiness |
| 78 | | | 5.1.2 | | | Process capability analysis |
| 79 | | | 5.1.3 | | | Production staff training |

This document is assigned to G10250. 010250-101-c



# MSDS Gate Deliverables Checklist

| | G | H | I | J |
|---|---|---|---|---|
| | Status of module groups available. | | | |
| 56 | Data records corresponding to module maturity level available | | | |
| 57 | ► Overall status report of engineering works within the module group available | | | |
| | ► Positive status reports handed over to customer (OEM), including but not limited to:<br>- component test reports<br>- overview of completed change management regarding functional targets<br>- completed DVP&R on module and component level | | | |
| 58 | ► Provisional liability disclaimer from customer (OEM) available | | | |
| 59 | Continued system availability assured. Engineering data changes from previous phase updated and available. | | | |
| 60 | ► Engineering data updated from previous phase<br>► Plan for supply of final data (parts list, CAx data) to customer (OEM) agreed<br>► Subsequent activities / processes agreed with customer (OEM)<br>► Data clean up agreed with customer (OEM) in contract has been planned and agreed within the project | | | |
| 61 | ► Review of access rights to data and project systems agreed and implemented | | | |
| 62 | ► Compete documentation of the SOP build confirmed | | | |
| 63 | ► Assessment of the required design data maturity for all components within modules carried out<br>► Data records confirmed as being complete for each phase within the verification and validation process according to requirements | | | |
| 64 | ► Purchasing status part by part planning<br>► Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 65 | ► SQA status part by part planning<br>► Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 66 | ► Logistics status part by part planning<br>► Measures for deviations agreed and / or implemented according to agreed planning | | | |
| 67 | Preliminary QM Release for the product available | | | |
| 68 | ► Progress status for product quality planning available | | | |
| 69 | ► Actual product risk level status available for each component<br>► Preventive measures status, planning and implementation meets program requirements | | | |
| 70 | ► Relevant identified issues from product validation documented | | | |
| 71 | ► Relevant identified issues from product validation documented | | | |
| 72 | ► Information provided to production for necessary modifications from change management | | | |
| 73 | ► Perceived quality audit reports (3rd hardware loop) available<br>► Perceived quality one-pager and decision paper for all identified risks available and tracked within agreed issue management tool<br>► Verification and confirmation of target achievement | | | |
| 74 | ► Preliminary QM-Release Product | | | |
| 75 | | **FMC-M** | | |
| 76 | Station evaluation and readiness confirmed. Training of series production staff according to plan. Status / prognosis of achievability of production targets available, ramp up capability confirmed, detailed launch planning (timing & quantity) confirmed. | | | |
| 77 | ► Station evaluation and station readiness check complete<br>- station documentation<br>- station facilities<br>- safety aspects… | | | |
| 78 | ► Analysis of process capability complete. Experiences from PTO, PP, LS incorporated into production processes | | | |
| 79 | ► Training plans and training matrix set up for production staff per technical area. Training implemented | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 80 | | | 5.2 | | Layout | |
| 81 | | | 5.2.1 | | | Production layout plan |
| 82 | | | 5.3 | | Process & Equipment | |
| 83 | | | 5.3.1 | | | Production process |
| 84 | | | 5.3.2 | | | Production process |
| 85 | | | 5.4 | | Investment | |
| 86 | | | 5.4.1 | | | Machine capability analysis |
| 87 | | | 5.5 | | Production Quality Assurance | |
| 88 | | | 5.5.1 | | | Q-Planning Production |
| 89 | | | 5.5.2 | | | Process FMEA |
| 90 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 91 | | | 5.5.4 | | | Process Audit |
| 92 | | | 5.5.5 | | | Product Audit |
| 93 | | | 5.5.6 | | | Conformity of Production Execution |
| 94 | | | 5.5.7 | | | QM-Release Process |
| 95 | | | **6.0** | | **Supply Chain** | |
| 96 | | | 6.1 | | General Planning & Organisation | |
| 97 | | | 6.2 | | Purchase | |
| 98 | | | 6.2.1 | | | Production parts ordering |
| 99 | | | 6.3 | | Supplier Quality Assurance | |
| 100 | | | 6.3.1 | | | Product Sign off |
| 101 | | | 6.4 | | Logistics | |
| 102 | | | 6.4.1 | | | Materials Planning |



| | | G | H | I | J |
|---|---|---|---|---|---|
| 80 | All layout issues implemented, change loops completed | | | | |
| 81 | ►Change loops completed, layout changes implemented<br>►Detailed layout of all production plant and equipment updated | | | | |
| 82 | Process capability confirmed. Effectiveness of measures from run@rate performance tests confirmed. | | | | |
| 83 | ►Analysis of process ability complete. Experiences from PTO, PP, LS incorporated int production processes<br>►Process descriptions and required workplace documentation updated according to results from PTO, PP, LS and available in agreed tool<br>►Change management for updating of documents in production ensured | | | | |
| 84 | ►Process chain evaluation at LT for interaction of SCM and production functional depts. carried out<br>►Experiences from performance tests (LT) documented and measures determined for all issues<br>►Measures from LT analysis implemented and effectiveness confirmed | | | | |
| 85 | Manufacturing equipment capability confirmed | | | | |
| 86 | ►Appraisal of machine capability under pre-determined conditions carried out<br>►Results from performance tests analysed including but not limited to:<br>- measurement fixtures<br>- laboratory<br>- audit<br>- torque checks<br>- manufacturer certification of performance…<br>►Identified issues documented, responsibility determined and measures agreed | | | | |
| 87 | Series control plan approved; product and process audit for SOP conducted; batch and hold finalised | | | | |
| 88 | ►Results of quality tests available<br>►Issues documented and necessary measures agreed | | | | |
| 89 | ►Relevant identified issues from process validation documented | | | | |
| 90 | ► KCC checks performed in production | | | | |
| 91 | ►Process audit results to SOP available and documented | | | | |
| 92 | ►Product audit target achieved and documented<br>►Batch & hold finalized | | | | |
| 93 | ► Conformity of Production plan executed and documented | | | | |
| 94 | ►Preliminary QM-Release Process carried out | | | | |
| 95 | | **FMC-SC** | | | |
| 96 | NO REQUIREMENT FOR SOP | | | | |
| 97 | All supply contracts finalised, parts supply to production confirmed | | | | |
| 98 | ►All contracts for SOP finalised<br>►Provision of parts and supply to production site completed | | | | |
| 99 | Degree of quality maturity according to SOP requirements (see Part Quality Status Targets table), (PPAP yellow with approved non-conformance). | | | | |
| 100 | ►Product sign off (PPAP, PPF) complete<br>►Process and product release complete | | | | |
| 101 | Production line supply for SOP complete. All component transport (racks, stillages, etc..) for series production available. | | | | |
| 102 | ►Logistics change management for series production operational, including cost evaluations and cost updates<br>►Layout changes implemented | | | | |

MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 103 | | | 6.4.2 | | | Scheduling |
| 104 | | | 6.4.3 | | | Packaging Planning |
| 105 | | | **7.0** | | | **Quality** |
| 106 | | | 7.1 | | | Requirements and quality targets |
| 107 | | | 7.1.1 | | | Requirements |
| 108 | | | 7.1.2 | | | Quality Targets |
| 109 | | | 7.2 | | | Quality planning and controlling |
| 110 | | | 7.2.1 | | | Quality Planning |
| 111 | | | 7.2.2 | | | Quality controlling |
| 112 | | | 7.3 | | | Materials Engineering |
| 113 | | | 7.3.1 | | | Material engineering and testing |
| 114 | | | 7.4 | | | Geometrical Measurement |
| 115 | | | 7.4.1 | | | Control of monitoring and measuring equipment |
| 116 | | | 7.4.2 | | | Measurement system analysis |
| 117 | | | 7.4.3 | | | Jigs & fixtures |
| 118 | | | 7.4.4 | | | Matching geometry |
| 119 | | | 7.4.5 | | | Body in White - quality control geometry |
| 120 | | | **8.0** | | | **Information Technology** |
| 121 | | | 8.1 | | | Strategy / Concept |
| 122 | | | 8.2 | | | IT Infrastructure |
| 123 | | | 8.2.2 | | | IT Support for SOP |
| 124 | | | **9.0** | | | **Finance** |
| 125 | | | 9.1 | | | Business Case and Program Costs |
| 126 | | | 9.1.1 | | | Business plan |



| | | G | H | I | J |
|---|---|---|---|---|---|
| | ► Parts availability and scheduling to meet production ramp up confirmed | | | | |
| | ► Reclamation system implementation assured, issues transferred | | | | |
| 103 | ► Deviations documented, measures defined and implemented | | | | |
| 104 | ► All serial packaging available to support production ramp up | | | | |
| 105 | | | | | |
| 106 | Preliminary QM release for product available | | | | |
| 107 | ► Preliminary QM-Release approved by customer (OEM) | | | | |
| | ► Quality target achievement for preliminary QM-Release | | | | |
| 108 | ► Measures to meet program requirements agreed and decisions documented | | | | |
| 109 | Quality planning and requirements documented to meet program requirements at SOP | | | | |
| | ► Status report on QM-Plan | | | | |
| 110 | ► Known issues documented and measures for implementation agreed | | | | |
| | ► Status report on all quality requirements according to planning, including but not limited to:<br>- Knowledge management<br>- Risk management<br>- Issue management | | | | |
| 111 | - quality checks… | | | | |
| 112 | Materials testing status to support program requirements at SOP | | | | |
| | ► Material testing status on production parts and samples according to planning, report available | | | | |
| | ► Apperance approvals completed | | | | |
| 113 | | | | | |
| 114 | Part matching and measurement status meets quality requirements at SOP, equipment updates to latest status carried out | | | | |
| | ► Test equipment set up inspection complete | | | | |
| | ► All measurement equipment registered in database | | | | |
| 115 | ► Status of registration of test equipment, report available | | | | |
| 116 | ► Status of definition of measurement equipment in control plan, report available | | | | |
| 117 | ► Fixtures checked and acceptance documented according to requirements | | | | |
| | ► Matching status meets defined requirements (0 parts with status red, max. 10% status yellow) | | | | |
| | ► Change management of matching equipment finished | | | | |
| 118 | | | | | |
| | ► Dimensional status of BIW meets defined requirements for SOP | | | | |
| 119 | ► Geometrical modifications implemented as required to achieve targets | | | | |
| 120 | | **FMC-IT** | | | |
| 121 | NO REQUIREMENT FOR SOP | | | | |
| 122 | All users trained in use of production IT systems. System support for series production available and implemented. | | | | |
| | ► System availability in accordance with IT concept and planning to support SOP and ramp up confirmed<br>► Issues from LS build phase addressed and adaptations implemented<br>► Full system capability and performance confirmed<br>► Data transport for order processing, supplier control, invoicing, customs and warranty configured and implemented<br>► Designated users required in ramp up phase trained and competent in system use for processing | | | | |
| 123 | of builds; IT support available on demand | | | | |
| 124 | | **FMC-F** | | | |
| 125 | Business Plan updated. Overall program cost estimate updated | | | | |
| 126 | ► MS Business plan status update available | | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 127 | | | 9.2 | | | Cost controlling |
| 128 | | | 9.2.1 | | | SOP costs |
| 129 | | | 9.2.2 | | | Cost reporting |
| 130 | | | 9.2.3 | | | Cost controlling series production |
| 131 | | | 9.2.4 | | | IT costs |
| 132 | | | 9.2.5 | | | Release of financial resources |
| 133 | | | 9.2.6 | | | Development cost invoicing |

This document is assigned to G10250. 010250-101-c


| | G | H | I | J |
|---|---|---|---|---|
| 127 | Achievement of program cost targets (non-recurring costs / part costs) confirmed. Actual cost status  (non-recurring costs / part costs) updated. | | | |
| 128 | ► Status of SOP build costs<br>► Overview of non-recurring costs<br>► Overview of recurring costs<br>► MS Finance plan based on financial targets | | | |
| 129 | ► Status for scope of work of plan versus actual<br>► Deviations from plan costs highlighted and analysed | | | |
| 130 | ► Work schedules with associated capacities created (direct labour costs, plant utilisation)<br>► Manufacturing structure was drafted and included in the plan, (overhead: Team Leader, skilled labour…)<br>► Costs for IPM (indirect productive material) and NPM (non-productive material) per vehicle defined | | | |
| 131 | ► IT running costs updated based on actual performance | | | |
| 132 | ► Correctness of values, amounts, responsibility and account assignment checked against company guidelines and quotations obtained according to agreed process.<br>► Release of invoices confirmed | | | |
| 133 | ► Customer (OEM) invoiced according to the payment plan, based on compliance with agreed conditions | | | |

MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | Gate:<br>**PS** | | **Process Stability: Process conformity of selected** |
| 4 | | | | | | |
| 5 | | | **1.0** | | | **Program Management** |
| 6 | | | 1.1 | | Master Timing | |
| 7 | | | 1.1.1 | | | Detailed Timing |
| 8 | | | 1.1.2 | | | DVP Review |
| 9 | | | 1.2 | | Gateway Review | |
| 10 | | | 1.2.1 | | | Major Issues and Risks |
| 11 | | | 1.2.2 | | | Red/Yellow Grren |
| 12 | | | 1.2.3 | | | Recovery Plans |
| 13 | | | 1.3 | | Processes / Methods | |
| 14 | | | 1.3.1 | | | Product Development Process |
| 15 | | | 1.3.2 | | | Meeting Schedule |
| 16 | | | 1.3.3 | | | Change Management |
| 17 | | | 1.3.4 | | | Outsourced Engineering |
| 18 | | | 1.4 | | Team Organization | |
| 19 | | | 1.4.1 | | | Program Organisation |
| 20 | | | 1.5 | | Contract Management | |
| 21 | | | 1.5.1 | | | Contract update |
| 22 | | | 1.6 | | Knowledge Management | |
| 23 | | | 1.6.1 | | | Transfer of Experience |
| 24 | | | 1.6.2 | | | Reflection of Experience (Lessons Learned) |
| 25 | | | 1.7 | | Configuration Management | |
| 26 | | | 1.7.1 | | | Program target requirements |
| 27 | | | 1.7.2 | | | Module target framework |
| 28 | | | 1.7.3 | | | Change request status - complete vehicle |

| | | Responsible Role | Responsible Organisation | Responsible Name |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | criteria has been achieved and documented. Final approval by customer (OEM). | | | |
| 4 | | **Responsible Role** | **Responsible Organisation** | **Responsible Name** |
| 5 | | **FMC-PM** | | |
| 6 | Program master timing schedule to SOP defined, agreed and confirmed by all departments. PTO production planning and PTO testing schedule agreed within program team. | Timing Manager | FMC | |
| 7 | ►Detailed timing plan from all departments and Module Teams reviewed for compatability with Program Timing | Timing Manager | ESS | |
| 8 | DVP including test timing and vehicle fleet reviewed and aligned with Master Timing and Budget | Timing Manager Cost Controller | ESS Vehicle Attributes | |
| 9 | | Program Manager | FMC | |
| 10 | Major issues and risks from each department collated, assessed and filtered for Executive Reporting. All issues and risks assigned to owners with due dates for resolution | Program Manager | ESS | |
| 11 | Summary Red/Yellow/Green status for all areas reviewed and agreed for Executive Reporting | Program Manager | ESS | |
| 12 | Recovery plans for all Yellow items reviewd and agreed for Executive Reporting | Program Manager | ESS | |
| 13 | | Program Manager | FMC | |
| 14 | Product Development Process available and deliverables for next Gateway agreed with all areas | Program Manager | FMC | |
| 15 | Meeting schedule issued | Program Manager | FMC | |
| 16 | Change Management Proces in place. Infrstructure, monitoring and meetings in place to control chagne | Change Manager | FMC | |
| 17 | Outsourcing strategy in place and agreed. Outsourced Engineering companies under contract. Outsourced resource, RASIC and org structure agreed. | Program Manager | FMC | |
| 18 | Teamwork and cooperation between all departments implemented and functioning (information and communication...) Manpower planning available and agreed for next program phase. Long term planning for program available | Program Manager | FMC | |
| 19 | ►Program organisation and teamwork functioning according to planning ►Manpower planning for the next phase for all departments reviews and confirmed | Program Manager | ESS | |
| 20 | Confirmation that all parties accept the terms of contract. Inconsistencies within contract clarified and changes implemented | Program Manager | FMC | |
| 21 | Contracts with all Engineering Service Suppliers in place | Program Manager | FMC | |
| 22 | Lessons Learned workshop for the phase to CC planned. Experiences from former programs / projects for the phase CC to FC have been prepared and adapted to the program. | Program Manager | FMC | |
| 23 | ►Relevant experiences from previous / current programs and projects for the phase PTC-FC prepared and available | N/A This Program | | |
| 24 | Lessons Learned from all departments sumarised and documented for the next Program | Program Manager | ESS | |
| 25 | Program targets confirmed and measures for target achievement defined. Manufacturing concept available. | Configuration Manager | FMC | |
| 26 | ►Status of program requirements available ►Changes to program targets transferred to change management for tracking | Configuration Manager | FMC | |
| 27 | ►Module target breakdown confirmed for all areas | Configuration Manager | FMC | |
| 28 | ►Change requests to achieve VTS targets realised ►Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |

# MAGNA STEYR MSDS Gate Deliverables Checklist

| | K | L | M |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | **Customer (Approval)** | **Status: CWxxx** | **Forecast: CWxxx** |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 29 | | | 1.7.4 | | | Change request status - engineering module groups |
| 30 | | | **2.0** | | | **Marketing and Sales** |
| 31 | | | 2.1 | | Product Definition | |
| 32 | | | 2.2 | | Sales and Marketing | |
| 33 | | | 2.2.1 | | | Communication strategy |
| 34 | | | **10.0** | | **After Sales** | |
| 35 | | | 10.1 | | Strategy | |
| 36 | | | 10.2 | | Warranty / Service | |
| 37 | | | 10.2.1 | | | Maintainance concept |
| 38 | | | 10.2.2 | | | Serviceability concept |
| 39 | | | 10.2.3 | | | Insurance classification |
| 40 | | | 10.2.4 | | | Diagnostics concept |
| 41 | | | 10.3 | | Accessories / Spare parts | |
| 42 | | | 10.3.1 | | | Spare parts / accessories procurement concept |
| 43 | | | **3.0** | | **Design (Styling)** | |
| 44 | | | 3.1 | | Styling status | |
| 45 | | | 4.6 | | Styling Technical Convergence | |
| 46 | | | **4.0** | | **Vehicle Integration** | |
| 47 | | | 4.1 | | Product Development Targets | |
| 48 | | | 4.1.1 | | | Complete vehicle targets |
| 49 | | | 4.1.2 | | | Module targets |
| 50 | | | 4.2 | | Function / Complete vehicle | |
| 51 | | | 4.2.1 | | | Complete vehicle functional targets |
| 52 | | | 4.3 | | Functional Safety | |
| 53 | | | 4.3.1 | | | Implementation of functional safety |
| 54 | | | 4.5 | | Vehicle Architecture | |
| 55 | | | **4.0** | | **Vehicle Engineering** (Body/Chassis/EE/Powertrain/ | |
| 56 | | | 4.4 | | Engineering Modules | |
| 57 | | | 4.4.1 | | | Status - Engineering module group |
| 58 | | | 4.7 | | Data Management | |
| 59 | | | 4.7.1 | | | Documentation status |
| 60 | | | 4.7.2 | | | Documentation of changes |



| | G | H | I | J |
|---|---|---|---|---|
| 29 | ▶Change requests to achieve module targets realised<br>▶Risks for non-implementation of changes highlighted and documented | Configuration Manager | FMC | |
| 30 | | **FMC-MS** | | |
| 31 | NO REQUIREMENT FOR PS | OEM-M | | |
| 32 | Market launch confirmed | OEM-M | | |
| 33 | ▶Dealer and regional training for market launch complete<br>▶Advertising placement for market launch done<br>▶Market launch confirmed<br>▶Lifecycle management model updated | OEM-M | | |
| 34 | | **FMC-AS** | | |
| 35 | NO REQUIREMENT FOR PS | PgR-AS | | |
| 36 | Handover to production | PgR-AS | | |
| 37 | ▶Final approval of all activities and handover to serial support.<br>▶Final acceptance in written form, | PgR-AS | | |
| 38 | ▶Final approval of all activities and handover to serial support.<br>▶Final acceptance in written form | PgR-AS | | |
| 39 | ▶Final approval of all activities and handover to serial support.<br>▶Final acceptance in written form | PgR-AS | | |
| 40 | ▶Final approval of all activities and handover to serial support.<br>▶Final acceptance in written form | PgR-AS | | |
| 41 | Stable production of spare parts confirmed | PgR-AS | | |
| 42 | ▶Final approval of all activities and handover to serial support.<br>▶Final acceptance in written form | PgR-AS | | |
| 43 | | **FMC-D** | | |
| 44 | NO REQUIREMENT FOR PS | PgR-ST | | |
| 45 | NO REQUIREMENT FOR PS | ER-STC | | |
| 46 | | **FMC-VI** | | |
| 47 | Final customer acceptance confirmed | PM-E | | |
| 48 | ▶Final customer acceptance confirmed and documented | PM-E | | |
| 49 | ▶Completion of all activities confirmed by customer (OEM)<br>▶Timing and solutions of deviations from the activity confirmation are agreed and handed over to production support | MGL | | |
| 50 | Final customer acceptance confirmed | ER-CV | | |
| 51 | ▶Final customer acceptance confirmed and documented | ER-CV | | |
| 52 | Functional safety plan implementation status | ER-FuSa | | |
| 53 | ▶Status of functional safety plan implementation<br>▶Known issues transferred to production | ER-FuSa | | |
| 54 | NO REQUIREMENT FOR PS | ER-VA | | |
| 55 | UIUX/Connectivity/Autonomous Driving) | **FMC-VE** | | |
| 56 | Final customer acceptance confirmed | ER-MG | | |
| 57 | ▶Final approval of all activities available from customer (OEM)<br>▶Final acceptance available in written form, | ER-MG | | |
| 58 | Data handover and archiving complete | ER-DM | | |
| 59 | ▶Handover of all data completed | ER-DM | | |
| 60 | ▶Compete documentation of the program until PS confirmed in PDM system | PgR-CM | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 61 | | | 4.8 | | | Product Quality Assurance |
| 62 | | | 4.8.1 | | | Q-Planning Product |
| 63 | | | 4.8.2 | | | Risk Filter Product |
| 64 | | | 4.8.3 | | | System FMEA |
| 65 | | | 4.8.4 | | | Design FMEA |
| 66 | | | 4.8.5 | | | Key Product Characteristics (KPC) |
| 67 | | | 4.8.6 | | | QM-Release Product |
| 68 | | | **5.0** | | | **Manufacturing** |
| 69 | | | 5.1 | | | Production Planning |
| 70 | | | 5.1.1 | | | Production ramp up |
| 71 | | | 5.1.2 | | | Spare parts production |
| 72 | | | 5.1.3 | | | Production staff training |
| 73 | | | 5.2 | | Layout | |
| 74 | | | 5.3 | | Process & Equipment | |
| 75 | | | 5.3.1 | | | Process simulation (virtual process week) |
| 76 | | | 5.4 | | Investment | |
| 77 | | | 5.4.1 | | | Systems / facilities and resources |
| 78 | | | 5.5 | | | Production Quality Assurance |
| 79 | | | 5.5.1 | | | Q-Planning Production |
| 80 | | | 5.5.2 | | | Process FMEA |
| 81 | | | 5.5.3 | | | Key Control Characteristics (KCC) |
| 82 | | | 5.5.4 | | | Process Audit |
| 83 | | | 5.5.5 | | | Product Audit |
| 84 | | | 5.5.6 | | | Conformity of Production Execution |
| 85 | | | 5.5.7 | | | QM-Release Process |
| 86 | | | **6.0** | | | **Supply Chain** |
| 87 | | | 6.1 | | General Planning & Organisation | |
| 88 | | | 6.2 | | Purchase | |
| 89 | | | 6.2.1 | | | Ordering Process |
| 90 | | | 6.3 | | Supplier Quality Assurance | |
| 91 | | | 6.3.1 | | | Process Stability |
| 92 | | | 6.3.2 | | | Supplier Quality Management |
| 93 | | | 6.3.3 | | | APQP |



|  | | G | H | I | J |
|---|---|---|---|---|---|
| 61 | Final QM release Product available | | ER-Q | | |
| 62 | ▶ Progress status available | | ER-Q | | |
| 63 | ▶ Actual product risk level status available for each component ▶ Preventive measures on track ▶ Hand over to serial production completed | | ER-Q | | |
| 64 | ▶ Relevant identified issues from product validation documented ▶ Hand over to serial production completed | | ER-Q | | |
| 65 | ▶ Relevant identified issues from procuct validation documented ▶ Hand over to serial production completed | | ER-Q | | |
| 66 | ▶ Information provided to Production for necessary modifications from change management | | ER-Q | | |
| 67 | ▶ Final QM-Release Product | | ER-Q | | |
| 68 | | | **FMC-M** | | |
| 69 | Production ramp up achieved. Training of series production staff complete | | PM-P | | |
| 70 | ▶ Production ramp up achieved according to the prescribed production curve ▶ Stable production at highest predicted rate of production per shift confirmed ▶ Effectiveness of the process and supply chain confirmed | | PM-P | | |
| 71 | ▶ Spare part production targets achieved according to agreements ▶ Effectiveness of the process and supply chain confirmed | | PM-P | | |
| 72 | ▶ Training of production staff complete | | PM-P | | |
| 73 | NO REQUIREMENT FOR PS | | PM-P | | |
| 74 | Virtual process simulation reflection complete | | PM-P | | |
| 75 | ▶ Lessons learned workshop for virtual process simulation has been carried out and results documented ▶ Measures for process optimisation determined and transferred | | PM-P | | |
| 76 | Final acceptance of production equipment | | PM-P | | |
| 77 | ▶ Final commissioning of all plant and equipment confirmed ▶ Issues raised during commissioning have been resolved and documented ▶ Warranty / guarantee period confirmed and documented | | PM-P | | |
| 78 | Status of series product and process audits available, handover to production complete | | PgR-Q | | |
| 79 | ▶ Results of quality tests available ▶ Issues documented and necessary measures agreed | | PgR-Q | | |
| 80 | ▶ Relevant identified issues from process validation documented ▶ Hand over to serial production complete | | PgR-Q | | |
| 81 | ▶ KCC checks in Production performed | | PgR-Q | | |
| 82 | ▶ Serial process audit status | | PgR-Q | | |
| 83 | ▶ Serial product Audit status | | PgR-Q | | |
| 84 | ▶ Conformity of Production Plan executed and documented | | PgR-Q | | |
| 85 | ▶ Final QM-Release Process | | PgR-Q | | |
| 86 | | | **FMC-M** | | |
| 87 | NO REQUIREMENT FOR PS | | PM-SCM | | |
| 88 | Cost engineering process established for series | | PM-SCM | | |
| 89 | Cost engieneering process, established, change management support available | | PuR | | |
| 90 | Long term process capability assessments complete | | PM-SCM | | |
| 91 | ▶ Process capability assessments at suppliers complete ▶ Long term process stability achieved at suppliers and documented | | SQAR | | |
| 92 | ▶ Agreed level of quality management activities implemented at suppliers ▶ Identified issues assigned and supported by measures | | SQAR | | |
| 93 | ▶ Final APQP status for development project | | SQAR | | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 94 | | | 6.4 | | Logistics | |
| 95 | | | 6.4.1 | | | Material Handling |
| 96 | | | 6.4.2 | | | Scheduling |
| 97 | | | 6.4.3 | | | Packaging Planning |
| 98 | | | **7.0** | | **Quality** | |
| 99 | | | 7.1 | | Requirements and quality targets | |
| 100 | | | 7.1.1 | | | Requirements |
| 101 | | | 7.1.2 | | | Quality Targets |
| 102 | | | 7.2 | | Quality planning and controlling | |
| 103 | | | 7.2.1 | | | Quality Planning |
| 104 | | | 7.2.2 | | | Quality controlling |
| 105 | | | 7.3 | | Materials Engineering | |
| 106 | | | 7.3.1 | | | Material engineering and testing |
| 107 | | | 7.4 | | Geometrical Measurement | |
| 108 | | | 7.4.1 | | | Control of monitoring and measuring equipment |
| 109 | | | 7.4.2 | | | Measurement System Analysis |
| 110 | | | 7.4.3 | | | Jigs & Fixtures |
| 111 | | | 7.4.4 | | | Matching Geometry |
| 112 | | | 7.4.5 | | | Body in White - quality control geometry |
| 113 | | | **8.0** | | **Information Technology** | |
| 114 | | | 8.1 | | Strategy / Concept | |
| 115 | | | 8.2 | | IT Infrastructure | |
| 116 | | | 8.2.2 | | | Series production IT |
| 117 | | | **9.0** | | **Finance** | |
| 118 | | | 9.1 | | Business Case and Program Costs | |
| 119 | | | 9.2 | | Cost controlling | |
| 120 | | | 9.2.1 | | | Program costs |



| # | Description | G | H | I | J |
|---|---|---|---|---|---|
| 94 | Confirmation of material handling and parts supply for series production | PM-SCM | | | |
| 95 | ►Material receiving, storage and line feed confirmed ►Logistic equipment and facilities handover to production complete ►Logistics change management for series production operational, including cost evaluations and cost updates | LoR | | | |
| 96 | ►Parts availability to meet production schedules confirmed ►Reclamation system operational ►Customer (OEM) process goals achieved ►Deviations documented, measures defined and implemented | LoR | | | |
| 97 | ►Confirmation that containers available in sufficient quantities to meet all production requirements | LoR | | | |
| 98 | | | | | |
| 99 | Quality targets achieved, final QM release | PgR-Q | | | |
| 100 | ►Final QM-Release approved by customer | PgR-Q | | | |
| 101 | ►Quality target achievement part of final QM-Release | PgR-Q | | | |
| 102 | Final report on program quality requirements | PgR-Q | | | |
| 103 | ►Status report on QM-Plan ►Known issues documented and measures for implementation agreed | PgR-Q | | | |
| 104 | ►Final report on all quality requirements according to planning, including but not limited to: - Knowledge management - Risk management - Issue management - quality checks… | PgR-Q | | | |
| 105 | Materials testing status to support program requirements at PS | PgR-Q | | | |
| 106 | ►Material testing status on production parts and samples according to planning, report available | PgR-Q | | | |
| 107 | Quality requirements at ramp up achieved, handover to series production complete | PgR-Q | | | |
| 108 | ►Review of test equipment, handover to production complete | PgR-Q | | | |
| 109 | ►Definition of measurement equipments in control plan complete | PgR-Q | | | |
| 110 | ►Fixtures checked according to specified requirements, handover to production complete | PgR-Q | | | |
| 111 | ►Matching status meets defined requirements (0 parts with status red, max. 5% status yellow) | PgR-Q | | | |
| 112 | ►Dimensional status of BIW meets defined requirements for PS ►Geometrical modifications implemented as required | PgR-Q | | | |
| 113 | **FMC-IT** | | | | |
| 114 | NO REQUIREMENT FOR PS | PgR-IM | | | |
| 115 | IT systems available to run at full capacity | PgR-IM | | | |
| 116 | ►System capability confirmation at full production capacity ►Data transport for order processing, supplier control, invoicing, customs and warranty optimised ►Confirmation of capability of designated users | PgR-IM | | | |
| 117 | **FMC-F** | | | | |
| 118 | NO REQUIREMENT FOR PS | PgM | | | |
| 119 | Final cost status available | PgM | | | |
| 120 | ►Overall program costs ►Non-recurring costs ►Recurring costs ►Result of the MS Finance plan | PgM | | | |

This document is assigned to G10250. 010250-101-c

MSDS Gate Deliverables Checklist

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 121 | | | 9.2.2 | | | Cost reporting |
| 122 | | | 9.2.3 | | MS Int | Final release of resources / final calculation |
| 123 | | | 9.2.4 | | MS Int | Vehicle calculation |



| | G | H | I | J |
|---|---|---|---|---|
| | ► Status for scope of work of plan versus actual | PgR-Co | | |
| 121 | ► Deviations from plan costs highlighted and analysed | | | |
| | ► Payment of supplier accounts (conditional on technical acceptance) | PgR-Co | | |
| 122 | ► Final calculation prepared for customer (OEM) (conditional on technical acceptance) | | | |
| | ► System for recalculation of vehicle costs (actual costs) is available | PgR-Co | | |
| 123 | ► Current price for purchased parts available with implementation dates | | | |



|   | A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | |
| 2 | | AS | After-Sales | | | | | | | | | | |
| 3 | | D | Design (Styling) | | | | | | | | | | |
| 4 | | ESS | Engineering Service Supplier | | | | | | | | | | |
| 5 | | F | Finance | | | | | | | | | | |
| 6 | | FMC | Future Mobility Corporation | | | | | | | | | | |
| 7 | | FuSa | Functional Safety | | | | | | | | | | |
| 8 | | GI | Geometrical Integration | | | | | | | | | | |
| 9 | | M | Manufacturing | | | | | | | | | | |
| 10 | | MS | Marketing and Sales | | | | | | | | | | |
| 11 | | PM | Program Management | | | | | | | | | | |
| 12 | | SC | Supply Chain | | | | | | | | | | |
| 13 | | SE | Studio Engineering | | | | | | | | | | |
| 14 | | VE | Vehicle Engineering | Includes Body, Chassis, E/E, Powertrain, UI/UX, Connectivity and Autonomous Driving | | | | | | | | | |
| 15 | | VI | Vehicle Integration | Includes Vehicle Targets, Attributes, Geometrical Integration, Vehicle Architecture, Virtual Prototypes (VPT), Protoype B | | | | | | | | | |
| 16 | | VPT | Virtual Prototype | | | | | | | | | | |

Abbreviations

# EXHIBIT B

## TECHNOLOGY DEVELOPMENT AND
## LICENSE AGREEMENT

This Technology Development and License Agreement (the "Agreement") is effective as of the 1st day of June, 2017 (the "Effective Date") and is made this 20th day of October, 2018  by and among BYTON North America Corporation, a Delaware corporation with offices at 4201 Burton Drive, Santa Clara, California, 95054, on behalf of itself and its Affiliates (collectively, "BYTON") and EDAG Engineering GmbH ("Supplier"), located at Kreuzberger Ring 40, 65205 Germany (BYTON and Supplier are individually a "Party" and collectively, "Parties").

### WITNEESETH

WHEREAS, BYTON is in the business of designing, developing, manufacturing, and delivering electric vehicles, which will be initially manufactured and sold in China, and thereafter in the United States, Europe and other countries, and requires certain services and support; and

WHEREAS, Supplier is able to provide such services and support, and both BYTON and Supplier now desire to memorialize the terms and conditions relating thereto;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### 1.0 DEFINITIONS

When used herein, the following terms shall be defined as follows:

1.1 "Acceptance Requirements" means the Specifications, the acceptance criteria relative to the Deliverables, and the plan and associated test environment against which BYTON will test conformance of the Deliverables in accordance with the documents set forth in a Statement of Work or as otherwise agreed by the parties in writing.

1.2 "Affiliates" shall mean with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity. For purposes of the Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

1.3 "Background Technology" means all Technology that (i) is owned or otherwise controlled by Supplier and (ii) is either (1) in existence on or prior to the Effective Date or (2) conceived, created, developed, reduced to practice or made by or on behalf of Supplier after the Effective Date independently of the activities contemplated by this Agreement.

1.4 "BYTON Product(s)" means any product(s) made by or for BYTON that incorporates or is distributed for use in conjunction with the Deliverables or a portion thereof.

1.5 "Confidential Information" means information which if disclosed (i) in tangible form, is clearly marked as "confidential" or "proprietary" at the time of disclosure, or (ii) in intangible form (such as orally or visually), the disclosing Party clearly identifies as "confidential" or "proprietary" at the time of disclosure and summarizes in writing and delivers to the receiving Party within thirty (30) days of disclosure.

1.6 "Deliverables" means the specific deliverables which Supplier is to provide to BYTON under a Statement of Work

1/15                                                                                           C_BYTON_EDAG_V10_20_18

**EXHIBIT**

**3**

EDG-0035531

3-001

and such other Background Technology which Supplier provides to or makes available to BYTON in connection with a Statement of Work.

1.7 "Derivative Matter" means any work or invention, new material, information or data which is based in whole or in part upon the Background Technology and Foreground Technology, (including, if applicable, any BYTON Products) and any Intellectual Property Rights associated therewith, including any derivative work, improvement, extension, revision, modification, translation, abridgment, condensation, expansion, collection, compilation, Error Correction, or any other form in which the Background Technology and Foreground Technology may be recast, transformed or adapted, including any changes thereto or that is an implementation of the functionality described in any Specifications or similar documentation developed by or for BYTON pursuant to this Agreement.

1.8 "Documentation" means collectively the technical documentation, training materials, support materials, and end-user documentation associated with the Deliverables.

1.9 "Error" means with respect to the Deliverables, a failure to meet the Acceptance Requirements, including any defect or deficiency or failure to conform to the then-current functional, operational and performance Specifications and Documentation. It is not an Error when the functional, operational and performance Specifications and Documentation are met but the Specifications prove to be erroneous or dysfunctional or when target adjustments have to be made during the development process.

1.10 "Error Correction" means a modification, addition or procedure to correct an Error.

1.11 "Foreground Technology" means all Technology which is created, developed, or otherwise generated by Supplier under this Agreement.

1.12 "Intellectual Property Rights" means worldwide common law and statutory rights associated with (i) patents and patent applications; (ii) works of authorship, including mask work rights, copyrights, copyright applications, copyright registrations and "moral" rights; (iii) the protection of trade and industrial secrets and confidential information; (iv) other proprietary rights relating to intangible Intellectual property (specifically excluding trademarks, tradenames and service marks); (v) analogous rights to those set forth above; and (vi) divisions, continuations, renewals, reissuances and extensions of the foregoing (as applicable) now existing or hereafter filed, issued or acquired.

1.13 "Services" means any task performed, such as consultancy services, to complete the project in accordance with the agreed responsibilities pursuant to a Statement of Work.

1.14 "Source Code" means program code in high-level computer language readable by humans skilled in the language, and includes available related Documentation and tools, including comments, internal development tools and build environments.

1.15 "Specifications" means the functional, operational and performance requirements for the Deliverables.

1.16 "Statement of Work" means the development plan, including deliverables and associated milestones, and the development schedule set forth in a written document. The Parties may enter into multiple individual Statements of Work under this Agreement. Each Statement of Work entered into by the Parties shall be part of the Agreement, as defined.

1.17 "Technology" means inventions, business, marketing, engineering, technical and manufacturing information, know-how and materials, including technology, software, instrumentation, specifications, designs, devices, data, compositions, formulas, , assays, reagents, constructs, compounds, discoveries, procedures, processes, practices,

2/15 C_BYTON_FDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

protocols, methods, techniques, results of experimentation or testing, knowledge, trade secrets, skill and experience, in each case whether or not patentable or copyrightable; the foregoing may be in both tangible and intangible form.

## 2.0 DEVELOPMENT

2.1 Development Undertaking. Supplier will design, develop and create the Deliverables and perform all Services, conforming to the Acceptance Requirements and in accordance with the applicable Statement of Work created under this Agreement. For the avoidance of doubt, Supplier will not be an exclusive supplier of the services regarding the project as a whole, but only with respect to the agreed Deliverables and Services pursuant to this contract. BYTON carries the overall responsibility for the Project as a whole.

Should the development process show that target adjustments are necessary in order to achieve the overall target of a functional vehicle fit for homologation in the jurisdiction of the European Union, the United States of America and China, these target adjustments are not considered erroneous.

2.2 Obligations in Support of Development. To ensure the timely and satisfactory completion of Supplier's development work under the Statement of Work, Supplier will deploy throughout the development sufficient and qualified personnel, equipment and other necessary resources to complete Supplier's development work. BYTON will provide all necessary data and perform all duties in accordance with FPDP Gate Deliverables Full Checklist to enable Supplier's performance. For all of Supplier's development work and provision of Services, Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement. Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement. Supplier may employ individual independent contractors as part of its workforce but shall not be permitted to delegate or subcontract the performance of its duties and obligations to any third party without the prior written consent of BYTON. Supplier remains responsible for compliance with the terms and conditions of the Agreement whether performed by Supplier or an authorized third party.

For Supplier personnel who are visiting and onsite at BYTON facilities, the additional obligations set forth in Section 13 below shall apply.

2.3 Status Reports. Supplier will provide to BYTON written engineering status reports, on an every-other-week basis (or as requested basis) detailing the status of the development work described in the Statement of Work. Supplier shall provide more frequent updates and status reports upon BYTON's request.

2.4 Change Requests. Some evolution of the Specifications and the Statement of Work based upon interaction between the Parties is expected and minor modifications which will not impact full compliance with the Statement of Work (including milestones) or fees due under this Agreement may be mutually agreed to by the Parties and need not be achieved by a formal change mechanism. However, changes impacting full compliance with the Statement of Work or fees payable are only valid if implemented in accordance with the following change request procedure. BYTON may request any change to the Specifications or the Statement of Work by setting forth the proposed change in reasonable detail in a writing (including email) submitted to Supplier ("Change Request"). Supplier shall respond in writing to Change Requests within three (3) workdays of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, the impact on the Statement of Work and any additional fees which Supplier would require in order to make the requested change ("Change Response"). BYTON shall respond promptly informing Supplier whether it agrees with Supplier's description of the anticipated impact and additional terms, if any, proposed in the Change Response. Once an authorized representative of BYTON agrees in writing to the terms and conditions outlined in the Change Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Change Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance

3/15                                                       C_BYTON_EDAG_V10_20_18

with previous agreed terms during these 48 hours as time is of essence.

2.5 Enhancements. BYTON, at its option, may request enhancements to the Deliverables by setting forth the proposed change in reasonable detail (including email) submitted to Supplier ("Enhancement Request"). Supplier shall respond in writing to Enhancement Requests within ten (10) days of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, any additional fees which Supplier would require in order to make the requested change ("Enhancement Request Response"). BYTON shall respond promptly within 48 hours, informing Supplier whether it agrees with Supplier's additional terms, if any, proposed in the Enhancement Request Response. Once an authorized representative of BYTON agrees in writing to the Enhancement Request Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Enhancement Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance with previous agreed terms during these 48 hours as time is of essence.

2.6 BYTON's and Supplier's Obligations. In furtherance of this Agreement, BYTON and Supplier shall (a) cooperate and work together in all matters relating to the services provided hereunder; (b) respond promptly to a Party's request to provide direction, information, approvals, authorizations or decisions that are reasonably necessary for or related to a Statement of Work in a timely manner.

**3.0 TRANSFER AND DELIVERY**

3.1 Background Technology. If required under a Statement of Work in accordance with 1.5, Supplier will deliver to BYTON the Background Technology (including without limitation Documentation thereto) within five (5) days if feasible, or as otherwise agreed to by the parties if not feasible, after payment pursuant to the agreed payment schedule.

3.2 Deliverables and the Developed Technology. Supplier will deliver to BYTON each Deliverable (including the Foreground Technology therein and related Documentation), in the form(s) set forth in a Statement of Work, not later than the date set forth therein for testing in accordance with the Acceptance Requirements. In addition, Supplier will provide to BYTON such technical documentation as may be reasonably required to enable BYTON to install and test each Deliverable as anticipated by the Acceptance Requirements.

3.3 Delays. TIME IS OF THE ESSENCE. Supplier's delivery to BYTON of the Deliverables in accordance with this Section 3.0 ("Transfer and Delivery") and Supplier's completion of all Deliverables, Foreground Technology and Documentation thereto in accordance with the schedule set forth in the Statement of Work are key to the success of the BYTON Product(s). BYTON will provide all necessary information and perform all duties in a timely fashion to enable Supplier performing in accordance with the master timing.

3.4 Means of Delivery. All deliveries to BYTON shall be made DDP Destination (INCO Terms, 2010) and pursuant to BYTON's written instructions with respect to form (physical or electronic) and location. For the delivery of any physical items, taxes or duties, fees, charges, stamp taxes, etc. of any kind are borne by BYTON. Supplier agrees to support BYTON where possible and is entitled to charge these services in accordance with its offer.

**4.0 TESTING AND ACCEPTANCE**

4.1 Test Method. The Deliverables requiring machine execution will be tested in the test environment described in the Acceptance Requirements. The Foreground Technology and Deliverables not requiring machine execution will be compared to the requirements of the Acceptance Requirements.

C_BYTON_EDAG_V10_20_18

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

EDG-0035534

3-004

4.2 Acceptance Procedure.

    a.  BYTON may, in BYTON's sole discretion, reject the Deliverables or any component thereof, if it contains any Error. BYTON will promptly notify Supplier in writing of BYTON's acceptance or rejection ("Error Notice"). In each Error Notice, BYTON will set forth, in reasonable detail, the reason for the rejection.

    b.  Upon rejection of the Deliverables, Supplier shall either (i) create and implement an Error Correction for each identified Error and resubmit the relevant portion of the Deliverable to BYTON for retesting within three (3) workdays of BYTON's Error Notice, or (ii) if it is impracticable to provide an Error Correction in such three (3) workday period, within three (3)workdays of BYTON's Error Notice, provide to BYTON a written plan to correct the identified Error(s), including a schedule therefor ("Correction Plan").

Failure of the Deliverables to pass BYTON's acceptance tests following implementation of Error Correction(s) as contemplated above, or failure of Supplier and BYTON to agree upon a Correction Plan within three (3) days after Supplier provides such Correction Plan to BYTON or Supplier's failure to fully comply with an agreed upon Correction Plan, will entitle BYTON, in BYTON's sole discretion, to (i) require Supplier to again undertake creation and implementation of an Error Correction for resubmission and testing pursuant to this Section; (ii) accept the relevant portion of the Deliverables and correct the Error itself offsetting its reasonable costs against any associated fees; (iii) accept the relevant portion of the Deliverables, reserving BYTON's rights to require Supplier to correct the Error; or (iv) deem such event a material breach of this Agreement which cannot be cured, immediately terminate this Agreement in accordance with Section 9.2 ("Breach and Termination"), and Supplier shall refund any fees that have been paid (for any noncompliant Deliverables) under the Statement of Work in Question for this particular item.

## 5.0 LICENSE GRANTS AND RESTRICTIONS

5.1 Supplier's License Grants and Restrictions.

    a.  Background Technology License.  Supplier hereby grants to BYTON, a royalty-free, fully paid up, non-exclusive, perpetual, irrevocable and worldwide license under Supplier's Intellectual Property Rights to, in any fashion BYTON may choose (including, but not limited to, community source and/or open source licensing), (i) use, reproduce, modify, prepare Derivative Matter of, compile, publicly perform, publicly display, demonstrate, Background Technology and Derivative Matter thereof (including in Source Code or object code form) on any media or via any electronic or other method now known or later discovered; (ii) make, have made, use, sell, offer to sell, import and otherwise exploit the Background Technology and Derivative Matter thereof (including in Source Code or object code form) in any manner and on any media or via any electronic or other method now known or later discovered; (iii) disclose, distribute and otherwise exploit the Background Technology and Derivative Matter and (iv) sublicense the foregoing rights to third parties through multiple tiers of sublicensees or other licensing mechanisms at BYTON's option for Background Technology and Derivative Matters necessary for the Project.

    b.  Third Party Licenses.  Supplier shall not incorporate any third-party materials, information or intellectual property, including without limitation, any open source software (Source Code or object code form) made generally available to the public under open source licenses (collectively, "Third Party Materials") into any of the Deliverables unless Supplier has obtained for BYTON license rights consistent with the rights mentioned under Section 5.1(a) herein. Supplier shall identify and disclose to BYTON, all Third Party Materials to be incorporated into the Deliverables, prior to doing so, and the Parties shall discuss the same if necessary.

5.2 BYTON's License Grant and Restrictions.

C_BYTON_EDAG_V10_20_18

$\nu \rho$

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

**EDG-0035535**

**3-005**

a. <u>License Grant</u>. Subject to the terms and conditions of this Agreement, BYTON grants Supplier a personal, non-exclusive, non-transferable, limited license to internally use the Foreground Technology and prepare and use Derivative Matter thereof, solely for the purpose of performing maintenance and support services to BYTON in accordance with the terms of this Agreement.

b. <u>Restrictions</u>. Supplier shall have no right to use the Foreground Technology for productive or commercial uses. Supplier may not sell, rent, loan or otherwise encumber or transfer the Foreground Technology, in whole or in part, to any third party. No right, title or interest in or to any trademark, service mark, logo or trade name of BYTON or its Suppliers is granted under this Agreement.

## 6.0 OWNERSHIP AND PROPRIETARY NOTICES

6.1 <u>Background Technology</u>. Supplier asserts that Supplier and/or Supplier's suppliers own the Background Technology and associated Intellectual Property Rights or owns the proper non-exclusive licenses. BYTON agrees that, to the extent Supplier owns the Background Technology and associated Intellectual Property Rights, Supplier will retain such ownership. Except as expressly stated in this Agreement, nothing herein shall be deemed a transfer or license by BYTON of any Intellectual Property Rights that BYTON may now possess or acquire in the future which may cover any aspect of the Deliverables.

6.2 <u>Deliverables; Foreground Technology</u>.

a. <u>Foreground Technology; Deliverables</u>. BYTON retains all right, title and interest in and to: (i) the BYTON Products; (ii) Deliverables except to the extent such Deliverables constitutes Background Technology; and (iii) Foreground Technology.

b. <u>Assignment of Rights</u>. Subject to Supplier's underlying Intellectual Property Rights in the Background Technology and in exchange for the fees set forth in section 4 of SOW, Supplier shall and does hereby assign to BYTON, Supplier's entire right, title and interest in and to the Deliverables created for BYTON, the Foreground Technology, and all associated Intellectual Property Rights therein. The Parties hereby agree that all development work performed by Supplier hereunder shall be deemed works made for hire. Before any employee or contractor of Supplier ("Personnel") performs development work hereunder, such Personnel and Supplier must enter into a written agreement expressly for the benefit of BYTON and containing provisions substantially equivalent to this Section 6.2 ("Deliverables; Foreground Technology") and Section 10 ("Confidential Information") or enter into an agreement as close as legally possible to it under the laws of the country in which task is performed. Supplier (i) may only use the Foreground Technology in accordance with Section 5.2 ("BYTON's License Grant and Restrictions"), and (ii) agrees not to challenge the validity of BYTON's ownership in the Foreground Technology. In addition, BYTON shall own all Derivative Matter and associated Intellectual Property Rights. BYTON may register the copyright in the Deliverables and Foreground Technology in its own name, identifying Supplier's interest in the Background Technology as required by applicable Copyright Office rules and regulations.

c. <u>Cooperation in Perfecting Rights</u>. Supplier agrees to cooperate with BYTON and cause Supplier's employees to cooperate with BYTON and to perform all acts, at BYTON's request on reasonable notice, as reasonably necessary to facilitate the preparation, filing, prosecution and enforcement of the Intellectual Property Rights associated with the Deliverables and Foreground Technology. In addition, Supplier shall, upon BYTON's request and at BYTON's costs, enter into any assignments, waivers or licenses of the Deliverables, Foreground Technology or the Intellectual Property Rights related to any of the foregoing as BYTON deems necessary and appropriate. In the event that BYTON is unable for any reason to secure Supplier's signature to any document required to apply for or execute any patent, copyright, trademark registration or other application with respect to the Deliverables and Foreground Technology, Supplier hereby irrevocably designates and appoints BYTON and

6/15                                        C_BYTON_EDAG_V10_20_18

**EDG-0035536**

**3-006**

its duly authorized officers and agents as Supplier's agents and attorneys-in-fact to act for and on Supplier's behalf and instead of Supplier, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, trademarks or other rights thereon with the same legal force and effect as if executed by Supplier.

6.3 Moral Rights. Supplier agrees that with respect to any "moral" or equivalent rights (including, without limitation, rights of attribution, integrity, disclosure, and withdrawal) Supplier hereby: (i) assigns such rights to BYTON as described above, (ii) waives such rights and (iii) agrees and covenants never to assert, either during or following the term of this Agreement, such rights or to institute or maintain any action against BYTON relative to any such rights in the Foreground Technology or Derivative Matter. To the extent that such rights cannot be assigned or waived by operation of law, Supplier grants to BYTON, a royalty-free, fully paid-up, perpetual, irrevocable and worldwide license to fully exercise all such rights, with rights to sublicense through multiple levels of sublicensees and further, Supplier consents to BYTON's use sufficient to allow BYTON to exercise the rights granted in this Agreement.

## 7.0 PAYMENTS, INSURANCE AND ACCOUNTING

7.1 Fees. BYTON shall pay Supplier the fees set forth in Section 4 in SOW accordance with the schedule and requirements set forth therein and, in the case of fees due in connection with the Deliverables, upon acceptance of Deliverable by BYTON in accordance with Section 4.2 ("Acceptance Procedure"). Following such acceptance, Supplier shall provide a correct invoice to BYTON, and such invoice will be due, in Euro, within either sixty (60) days following BYTON's receipt of such invoice. BYTON sent per the agreed payment schedule highlighted in the Statement Work to this Agreement.

7.2 Taxes. All prices quoted by Supplier are exclusive of any taxes. Supplier shall include on its invoices the actual taxes payable for the services provided to BYTON. However, Supplier shall pay all taxes, levies or duties associated with fees and royalties payable by BYTON hereunder, whether based on gross revenue or otherwise; and any business, occupational or similar taxes relating to its general business activities. Supplier shall also be responsible for all employer related taxes relating to its Personnel including employee taxes, workers compensation, and unemployment insurance.

7.3 Insurance. Supplier will be insured pursuant to laws in Germany and provide a copy of the certificate of insurance and will maintain such insurance for the time of the Agreement.

## 8.0 MAINTENANCE AND SUPPORT SERVICES

8.1 Supplier shall provide to BYTON the maintenance and support services, as set forth in a Statement of Work, or if thereafter subsequently requested by BYTON as subsequently, mutually agreed by the parties.

## 9.0 TERM AND TERMINATION

9.1 Term of Agreement. The term of this Agreement begins on the Effective Date and continues for a period of seven (7) years (but in no event earlier than the expiration or earlier termination of the last Statement of Work created hereunder), unless this Agreement is earlier terminated sooner in accordance herewith.

9.2 Breach and Termination. If either Party fails to comply with any material term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such notice, all breaches specified therein are remedied. If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall

7/15                                                                    C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035537

3-007

undertake reasonable, diligent and good faith efforts to promptly remedy the breach. If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement. If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice. Notwithstanding anything to the contrary herein, BYTON may immediately terminate this Agreement, without a cure period, if Supplier fails to comply with any of its obligations under Sections 3.3 ("Delays") or 4.2 ("Acceptance Procedure").

9.3 Supplier's Insolvency. In the event Supplier becomes insolvent, enters into voluntary or involuntary bankruptcy, ceases to conduct business or assigns its interests in this Agreement to a third party creditor, (i) BYTON may immediately terminate this Agreement; or (ii) BYTON may (a) continue to exercise the license rights granted to BYTON hereunder, and (b) reserve all rights in the Background Technology and related materials to protect BYTON's interests therein pursuant to Section 365(n) (and any amendment thereto) of the U.S. Bankruptcy Code, or equivalent legislation in other applicable jurisdictions. The parties acknowledge that the Background Technology and Foreground Technology are "intellectual property" for purposes of Section 365(n) of the U.S. Bankruptcy Code and that BYTON will have the right to exercise all rights provided by Section 365(n) with respect to the Background Technology and Foreground Technology. In the event that the Supplier materially breaches any provision under this Agreement, BYTON will have the right to require the delivery by Supplier (or in the event of a filing of bankruptcy by or against Supplier, by the trustee) to BYTON of all Background Technology and Deliverables (including all embodiments thereof).

9.4 BYTON Termination. BYTON, at BYTON's sole option, prior to acceptance of the final deliverable, shall be permitted to terminate this Agreement, a Statement of Work or any part thereof, without cause upon 30 (30) days prior written notice to Supplier. In such an event, BYTON shall pay the applicable fees through the next milestone following notice of such termination or as otherwise agreed between the Parties. If BYTON terminates this Agreement or a Statement of Work (in whole or in part) pursuant to this Section 9.4, then the Parties shall promptly discuss what transition of work, if any, may occur, the plans for accomplishing such, and the proposed timetable, among other things ("Transition Plan"), which will include a transition period for employees of the Supplier allocated for on this project. Based on BYTON's plans and objectives and under consideration of Supplier's allocations with respect to this Agreement, the Parties shall cooperate and mutually agree on a Transition Plan, which shall be completed within sixty (60) days after the Parties reach agreement.

9.5 Effect of Termination or Expiration. Neither party will be liable for any damages arising out of the expiration of this Agreement. Termination as a result of a breach of this Agreement will not affect any right to recover damages sustained by reason of breach; or any payments which may be owing in respect of this Agreement. Subject to Supplier making best efforts to mitigate any costs and payments, Supplier is entitled to all payments in accordance with agreed payment plans/fee schedule for already initiated work at the time Supplier received the notice from BYTON to terminate for convenience. This includes payments for costs incurred with respect to subsequent milestones (such as e.g. visa fees, contractual obligations to employees traveling abroad, testing facilities rented, etc.).

9.6 Survival. Sections 1.0 ("Definitions"), 3.0 ("Transfer and Delivery"), 5.1 ("Supplier's License Grants and Restrictions"), 5.2(b) ("Restrictions"), 6.0 ("Ownership and Proprietary Notices"), 8.0 ("Maintenance and Support Services"), 9.0 ("Term and Termination"), 10.0 ("Confidential Information"), 11.0 ("Warranties and Disclaimer of Warranty"), 12.0 ("Indemnification"), and 13.0 ("Miscellaneous") of this Agreement shall survive any termination or expiration of the Agreement.

## 10.0 CONFIDENTIAL INFORMATION

10.1 Obligation. Except as provided in this Agreement, neither Party may use, reproduce, distribute or disclose Confidential Information it receives from the other Party under this Agreement, without the prior written authorization

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035538

3-008

of the disclosing Party. Each Party must hold in confidence Confidential Information received from the other Party and must protect the confidentiality thereof with the same degree of care that it exercises with respect to its own information of like importance, but in no event less than reasonable care, during the term of this Agreement and for a period of three (3) years after the expiration or earlier termination of this Agreement. Neither Party shall be liable for any inadvertent or unauthorized disclosure of Confidential Information, provided that it exercises at least the standard of care set forth above to prevent disclosure and takes reasonable steps to mitigate any damage and prevent further disclosure. For purposes of this Section, use, reproduction, distribution or disclosure by BYTON of the Background Technology or Foreground Technology thereof under a community source or open source licensing model, pursuant to the license granted by Supplier herein, will not be a breach of this Agreement.

10.2 Exceptions. Section 10.1 ("Obligation") does not apply to any portion of the Confidential Information which the receiving Party can demonstrate:

  a. is now, or hereafter becomes, through no act or failure to act on the part of the receiving Party, generally known in the automobile industry;

  b. was possessed by the receiving Party without an obligation of confidentiality at the time of receiving such Confidential Information;

  c. is rightfully obtained by the receiving Party without restriction on disclosure; or

  d. is independently developed by the receiving Party not in breach of this Agreement.

10.3 Employee Access. Each Party must inform its employees and contractors having access to the other Party's Confidential Information of restrictions under this Agreement and shall contractually require such contractors to comply with the requirements of this Section 10.0 ("Confidential Information") and Section 6.0 ("Ownership and Proprietary Notices").

10.4 Legally Compelled Disclosure. In the event that either Party is requested or becomes legally compelled (including without limitation, pursuant to securities laws and regulations) to disclose the existence or any of the terms of this Agreement, in contravention of the provisions of this Section 10, such Party (the "Disclosing Party") shall provide the other Party (the "Non-Disclosing Party") with prompt written notice of that fact before such disclosure and will use reasonable efforts to fully cooperate with the Non-Disclosing Party to seek a protective order, confidential treatment, or other appropriate remedy with respect to the disclosure. In the case of disclosure in connection with rules or regulations of any entity regulating securities ("SEC"), if confidential treatment is requested by the Non-Disclosing Party, the Disclosing Party agrees to use reasonable efforts to file such a request on the Non-Disclosing Party's behalf and to respond to any SEC comments to pursue assurance that confidential treatment will be granted, in both cases fully informing the Non-Disclosing Party of any such comments and cooperating with the reasonable requests of the Non-Disclosing Party.

10.5 Independent Development. Each Party understands that the other Party may develop or receive information similar to the Confidential Information. Subject to copyrights and patent rights of each Party, (i) either Party may develop or acquire technology or products, for itself or others, that are similar to or competitive with the technology or products of the disclosing Party, and (ii) each Party is free to use and disclose information which may be retained in the unaided memory of the receiving Party's employees or contractors who have had access to the Confidential Information of the other Party disclosed hereunder.

10.6 Publicity. Neither Party shall disclose the existence or the terms and conditions of this Agreement to any third Party, except as may be required (i) to implement or enforce the terms of this Agreement; or (ii) by an existing or

9/15                                                         C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

potential investor, acquiring company, bank or other financial institution, under appropriate non-disclosure terms in connection with a merger, acquisition, financing, loan agreement or similar corporate transaction. Supplier shall not, without first obtaining the prior written consent of BYTON, announce this Agreement. Once the written consent is obtained, Supplier may mention BYTON publicly as reference.

## 11.0 WARRANTIES AND DISCLAIMER OF WARRANTY

11.1 Ownership. Supplier represents and warrants that (i) the Background Technology, Foreground Technology and Deliverables will not infringe or misappropriate any Intellectual Property Rights or trademarks of any third Party; (ii) Supplier has the right and power to enter into this Agreement and grant the assignment and the licenses set forth herein; (iii) the Deliverables will be free from defects in design, material and workmanship and in accordance with the Specifications agreed upon by the parties; (iv) the Deliverables will conform to all applicable laws of the United States, European Union, and China, including those applicable to the design and engineering of vehicles in such countries and regions to achieve homologation; (v) and all services provided will be provided in a professional and workmanlike manner, using qualified personnel with appropriate training, education and experience to perform the services as required hereunder.

11.2 Conformance. Supplier represents and warrants that following the date of acceptance, the Background Technology, Foreground Technology and Deliverables will continue to conform to the Acceptance Requirements without degradation.

11.3 Virus. Supplier represents and warrants that the Background Technology, Foreground Technology and Deliverables and associated media contain no computer instructions designed to (i) disrupt, damage or interfere with use of computer or telecommunications equipment or facilities, or (ii) disrupt or corrupt the use, operation or results of any computer program to the (technical) extent it can be reasonably expected.

11.4 Additional Remedies. In the event of a material breach by Supplier of any representation or warranty herein, BYTON shall have, in addition to and without limitation of any other right or remedy available to BYTON at law or in equity, the right, in BYTON's sole discretion, to take any and all actions reasonably necessary to mitigate BYTON's damages and/or any damages to BYTON's customers arising from such breach, including but not limited to: (i) modifying any form of the Background Technology, Foreground Technology and Deliverables ; (ii) requiring Supplier to fix any necessary form of the Background Technology, Foreground Technology and Deliverables ; (iii) contracting with others to modify any necessary form of the Background Technology, Foreground Technology and Deliverables ; and (iv) distributing to BYTON's customers any such modification, up to an amount equal to greater of: a. EUR15,000,000.00; or b. amounts payable under insurance coverage available to Supplier. Any additional insurance requests by BYTON will be charged to BYTON. This includes BYTON's right to charge to Supplier and Supplier shall be obligated to pay to BYTON all direct costs and expenses, excluding legal fees of any kind, incurred by BYTON in connection with any such mitigation efforts.

11.5 Disclaimer. EXCEPT AS PROVIDED IN THIS AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF DESIGN, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

## 12.0 INDEMNIFICATION

12.1 Obligation to Indemnify.

C_BYTON_BDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035540

3-010

a.   Supplier's Obligation to Indemnify BYTON.  Supplier will indemnify, defend and hold harmless BYTON from and against any and all claims, demands, or actions ("Claims"), and all liabilities, settlements, costs, damages and fees (including reasonable attorneys' fees and costs) ("Losses") incurred or suffered by BYTON arising out of any Claim which arises from: (a) any gross negligent or intentional act or omission of Supplier or its employees, agents or representatives in providing the services under a Statement of Work; (b) Supplier's breach of its obligations under the Agreement; (c) any Claim by or on behalf of Supplier Personnel and their family and relatives against BYTON arising out of the services performed by Supplier Personnel under the Agreement unless they are related to local, hazardous work conditions at a BYTON facility; (d) a Claim that Background Technology, Foreground Technology or Deliverable provided by Supplier hereunder infringes or misappropriates the Intellectual Property Rights of unaffiliated third party. Supplier is not responsible for background technology, foreground technology or deliverables provided by BYTON for the purpose of this Agreement.

b.   In the event of any third person or Governmental Body claim ("Third Party Claim"), action or suit against BYTON as to which BYTON seeks indemnification against Supplier hereunder, and BYTON fails to notify Supplier within a reasonable timeframe of the claim or  acknowledges its obligation in writing and elects to defend against, compromise, or, settle any Third Party Claim which relates to any Losses indemnified by this agreement without seeking permission of Supplier beforehand, BYTON accepts to be solely liable for all claims, losses, expenses including legal expenses regardless of actual liability for this claim. Neither Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or consent to entry of any judgment unless the claimant or claimants and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim.

12.2 Remedies.  Should the Deliverables become, or in Supplier's reasonable opinion be likely to become, the subject of a claim of infringement or misappropriation of any Intellectual Property Rights in accordance with 12.1, Supplier shall, at its sole expense, either (i) procure for BYTON the right to continue to use the Deliverables, or (ii) replace or modify the Deliverables to make it non-infringing, provided that the same functions are performed by the replaced or modified Deliverables.

**13.0 SUPPLIER PERSONNEL**

13.1   General Requirements for Supplier Personnel.

a.   Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement.  Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement.  Supplier is responsible for validating the identity of and ensuring that Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) be subject and conform to all applicable BYTON policies, rules and procedures with respect to personal and professional conduct (including the wearing of an identification badge; use of computer systems; and adhering to general safety, dress, behavior, and security practices).

b.   Supplier is the employer of the Personnel and shall be responsible for all compensation and benefits payable to them; Personnel are not employees of BYTON and are not entitled to any compensation or benefits which are provided to its employees, including without limitation health insurance; paid vacation; sick leave; or retirement benefits.  Supplier shall also be responsible for complying with all tax laws applicable to Personnel, including withholding taxes for all compensation payable; and for complying with all applicable labor and employment requirements including worker's compensation insurance requirements, and immigration and work visa requirements.

13.2   Key Supplier Positions.  "Key Supplier Positions" means those positions designated as such in the applicable SOW.  Supplier will cause each of the Supplier Personnel filling the Key Supplier Positions to devote substantially full time and effort to the provision of the Services during the period of assignment.

11/15                                                                                                   C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035541

3-011

13.3    Approval and Removal of Supplier Personnel. BYTON may approve all Personnel assigned to perform Services, and may require Supplier to replace any Personnel whose performance, in BYTON's reasonable judgment, has been unsatisfactory.

## 14.0 MISCELLANEOUS

14.1 Force Majeure. Neither Party shall be liable for any failure or delay in performance of this Agreement a. to the extent the failure or delay is caused by fire, flood, earthquake or other acts of God or nature; civil disorder, war, riots; or any other similar cause or event beyond the reasonable control of a party; and b. provided the non-performing Party is without fault in causing such failure or delay, and it could not have been prevented by reasonable precautions or other alternative means. If the foregoing failures or delays occur which prevent performance of a Party's obligations under this Agreement, the affected Party shall promptly discuss the impact of such failure or delay, the period of time such may continue for, and the plans for a work around solution, among other things; the affected Party shall update the non-affected Party and keep them apprised of the situation. The affected Party's obligations of the Parties shall be suspended for so long as the events mean that performance of the agreement is impossible. If the failure or delay continues for more than twenty (20) work days, then the non-affected Party may terminate the specific SOW under this Agreement.

14.2 Severability. In the event that any part of this Agreement is found to be unenforceable, the remainder shall continue in effect, to the extent permissible by law and consistent with the intent of the parties as of the Effective Date of this Agreement.

14.3 Relationship of the Parties. This Agreement does not create a partnership, franchise, joint venture, agency, or fiduciary or employment relationship. Neither Party may bind the other Party by contract or otherwise to any obligation or act in a manner which expresses or implies a relationship other than that of independent contractor.

14.4 Governing Law.
a.    Disputes; Governing Law & amicable settlement. If there is a dispute between the Parties which cannot be resolved through good faith negotiations, then a Party may request escalation to discussions with senior management of both Parties. Within five (5) days of a Party's request, a meeting or telephone call shall be held with such senior management in an attempt to resolve such dispute. If the Parties cannot resolve such dispute within a reasonable time period, then the Parties retain all rights hereunder, including pursuing arbitration as below stated. Any action related to this Agreement will be governed by the laws of the State of California (except that body of law controlling conflict of laws) and the United Nations Convention on the International Sale of Goods will not apply).

b.    Arbitration. Any dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS"). The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, if the Parties cannot agree, an arbitrator appointed in accordance with the JAMS rules who shall be experienced in the type of dispute at issue. The Parties, their representatives, the arbitrator, and other participants shall keep confidential the existence, content, and result of the arbitration. Any demand for arbitration and any counterclaim must specify in reasonable detail the facts and legal grounds forming the basis for the claimant's claims and include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant. The arbitration will be conducted in the English language; the location of such arbitration shall be in San Francisco, California. Each Party will bear its own costs in the arbitration, The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the provisions of the agreement documents and to fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (1) in excess of the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (2) to award damages in excess of the types and limitation of

12/15                                                                                          C_BYTON_EDAG_V10_20_18

damages found in the Agreement; or (3) to modify the terms of this Agreement. The arbitrator shall issue an award within 30 days after completion of the hearing and any post-hearing briefing. The award must be in writing and must state the reasoning on which the award is based. Judgment upon the award may be entered in any court of competent jurisdiction. Notwithstanding the agreement to arbitrate, each Party may apply at any time to a court of competent jurisdiction for appropriate injunctive relief or for other interim or conservatory measures, and by doing so will not breach or waive the agreement to arbitrate or impair the powers of the arbitrator.

14.5 Import and Export Laws. The Background Technology, Foreground Technology and Deliverables, including without limitation, technical data, may be subject to U.S. export controls or to export or import regulations of other countries. The Parties agree to comply with all such regulations and acknowledge that they have the responsibility to obtain such licenses to export, re-export or import the Background Technology, Foreground Technology and Deliverables as may be required.

14.6 Notices. All notices required hereunder must be in writing, sent to the Party's address set forth below and receipt must be confirmed. Notices required with respect to Sections 9.0 ("Term and Termination") and 12.0 ("Indemnification") must be provided by express courier.

BYTON:

BYTON North America Corporation
4201 Burton Drive
Santa Clara, California, 95054

Attn: General Counsel

Supplier:
Supplier's Name:     EDAG Engineering GmbH
Supplier's Address:   Kreuzberger Ring 40
                      65205 Wiesbaden
                      Germany

14.7 No Exclusive Remedy. Unless specifically designated, nothing in this Agreement shall be construed as an exclusive remedy.

14.8 Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one agreement.

14.9 Construction; Order of Precedence. This Agreement has been negotiated by the parties and their respective counsel. This Agreement will be interpreted without any strict construction in favor of or against either Party. The original of this Agreement has been written in English, and such version shall be the governing version of the Agreement. To the extent permitted under applicable law, Supplier waives any right it may have, if any, under any law or regulation to have this Agreement written in a language other than English. In the event of a conflict between this Agreement and any other document that references this Agreement, the order of precedence shall be: (i) the most recent written document signed by the Parties amending the subject Statement of Work; (ii) the Statement of Work; (iii) any other exhibits or attachments to, or documents referenced by the Statement of Work; and (iv) this Agreement.

14.10 Amendment and Waiver. Unless otherwise provided herein, this Agreement may not be modified unless in writing and signed by an authorized representative of each Party. Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

13/15                                                                C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

EDG-0035543

3-013

14.11 Assignment. Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement (whether by operation of law, merger, change of control, or otherwise), without the prior written consent of the other Party, (i) to an Affiliate, or (ii) in the event of a merger, acquisition or sale of all or substantially all of the assets of a Party or a business unit. Any assignment or transfer in breach of this Section shall be void.

14.12 No Rights in Third Parties. This Agreement is made for the benefit of the Parties and not for the benefit of any third party.

14.13 Entire Agreement. This Agreement, including all Attachments hereto, constitutes the Parties' entire agreement with respect to its subject matter, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. No terms in any Supplier or BYTON documents (including purchase orders, acknowledgments, emails, or documents incorporated by reference (including but not limited to EDAG's or BYTON's General Terms and Conditions) which vary from, add to, modify or eliminate any terms herein, are expressly rejected and are not part of this Agreement or any Statement of Work.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives.

BYTON NORTH AMERICA CORPORATION

By: _David A. Twohig_

Name: **DAVID TWOHIG**
(print)

Title: **VP/CHIEF VEHICLE ENGINEER**

Date: **2019 - 1 - 9**

EDAG Engineering GmbH

By: _____

Name: _Cosimo De Carlo_
(print)

Title: **CEO**

Date: **2018 - 12 - 18**

By: _____

Name: Harald Keller

Title: Executive Vice President
Vehicle Development

Date: 2018 - 12 - 18

14/15                    C_BYTON_EDAG_V10_20_18

Lf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

ATTACHMENT 1
STATEMENT OF WORK No. 1

1) Introduction. This Statement of Work ("SOW") is issued under the Technology Development and License Agreement by and between BYTON and Supplier. The term of this SOW shall be from June 1ˢᵗ, 2017 ("SOW Effective Date") until terminated by either Party pursuant to section 9.0 of this Agreement.

2) Scope and nature of development work to be performed.

- EDAG_191610D000_Project Description FMC_SAV_CTC-PS (Exhibit A)
- RFQ for CTC Gateway to SOP plus 90 days (Exhibit B)
- Timing Overview for RFQ 20170706 (Exhibit C)
- FPDP_Gate_Deliverables_Full_Checklist 20170701 (Exhibit D)

3) Description of Deliverables.

- EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
- RFQ for CTC Gateway to SOP plus 90 days
- Timing Overview for RFQ 20170706
- FPDP_Gate_Deliverables_Full_Checklist 20170701

4) Development fees and Charges.

- Per page 74 of the 19610D000 Project Description
- Travel will be billed at cost + 6%

5) Schedule for Development and Deliverables. Supplier shall perform the following development work and deliver the following deliverables by the dates set forth below.

- Per EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
- Per the following PO's agreed to by the Parties:

| Byton PO | Topic | Order Value | SOW | BYTON Lead |
|---|---|---|---|---|
| 665 | Interim PO for Enf Services Aug 2018 | 1,850,000 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 761 | Interim PO for Enf Services Sep 2018 | 1,850,000 E | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 806 | Material Cards Creation (S) | 170,198 € | 188264A000_Proposal creation of material cards_20170505 | Antonio |
| 942 | Engineering Services CTC-PS | 45,460,677 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 943 | Blanket Travel PO CTC-PS | 732,260 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 1512 | Battery Pack Design Sep-Dec 2017 | 137,244 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |
| 1810 | Drop tower tests Steering Column | 30,000 € | 198677A000 Steering Column Testing | Shawn |
| 1930 | EuroNCAP 2020 Study | 77,782 € | 198676A001 Investigation EuroNCAP 2020 | Paul |
| 2082 | Battery Pack Design Jan/Feb 2018 | 149,884 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |

50,448,045 €

15/15

C_BYTON_EDAG_V10_20_18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

6) Acceptance Criteria and Acceptance Test Plan for the Foreground Technology and Deliverables.

• As agreed between the parties in the Proposal or otherwise as agreed in writing.

**BYTON NORTH AMERICA CORPORATION**

By: _Zaml A. Duoly_

Name: DAVID TWOHIG
(print)

Title: VP/CHIEF VEHICLE ENGINEER

Date: 2019-1-9

**EDAG Engineering GmbH**

By: _____

Name: Cosimo De Carlo
(print)

Title: CEO

Date: 2018-12-18

By: ppa. _____

Name: Harald Keller

Title: Executive Vice President
Vehicle Development

Date: 2018-12-18

16/15

C_BYTON_EDAG_V10_20_18

Lf

# EXHIBIT C

# EDAG's Design Responsibilities in M-Byte Development

EXHIBIT 218

## BODY STRUCTURE

*(Concept/Production)*

## BUMPER BEAM & CRASH BOX

*(Concept/Production)*

## DOOR TRIM

*(Concept)*

## EXTERIOR

*(Concept/Production)*

## FRONTEND CARRIER

*(Concept)*

## HEADLINER SYSTEM

*(Concept)*

## HOOD, SIDE DOORS, TAILGATE

*(Concept/Production)*

## INSTRUMENT PANEL, COCKPIT

*(Concept)*

## INTERIOR TRIM

*(Concept/Production)*

## LIGHTING, BUMPER FASCIAS

*(Concept)*

## SEAT BELT, AIRBAGS

*(Concept)*

## SEATS

*(Concept)*

# EXHIBIT D

9/14/21, 12:41 PM
Byton is alive! M-Byte EV was spotted in the wild for the first time [Spy Photos] - CarNewsChina.com

Case 3:21-cv-04736-EMC Document 143-1 Filed 03/22/22 Page 418 of 611

ARTICLE   EV   INDUSTRY

## Byton is alive! M-Byte EV was spotted in the wild for the first time [Spy Photos]

Jiri Opletal August 20, 2021



*Byton M-Byte spy photos*

If you are among those who thought Byton would never produce a car, you are not alone. Byton is a Chinese automotive soap opera – 5 years of bankruptcies, reorganizations, politics, 8.4 billion yuan burned ($1.3 billion), and still no car in mass production.

Today CNC received the set of spy photos taken in Hainan by our friend Bob. Despite the heavy camouflage, we can tell it is the Byton M-Byte concept. Bob almost got in a fight with the Byton test crew while making the pictures. Thanks to his bravery, we can now see electric SUV M-Byte is not dead and undergoing road tests.



Byton was founded in 2016 by a team of mostly German [edit – they deleted the webpage with team members] executives who mostly used to work for BMW. M-Byte was introduced in 2018 at CES in Las Vegas. Mass production was supposed to start in 2019, but Byton has kept silent since then. Upon launch, Byton claimed it is SUV and SIV, which stands for Smart Intuitive Vehicle. We assumed it was because of lots of technology Byton planned to stuff inside.



The company was headquartered in Nanjing with offices in Beijing, Shanghai, Hong Kong, San Jose (US), and Munich (Germany). The Byton's subsidiary operating Munich branch was sent into insolvency on April 2021 after not paying salaries to its employees for several months. Both co-founders, together with most of the German team located in China, also left the company. First was Carsten Breitfeld in 2019, who later claimed he quit because of Chinese

9/14/21, 12:41 PM
Case 3:21-cv-04736-EMC Document 143-1 Filed 03/22/22 Page 420 of 611
Byton is alive: M-Byte EV was spotted in the wild for the first time [spy photos] - CarNewsChina.com

government interferences. The largest Byton investor was state-owned automaker First Auto Works (FAW).

**Exodus of founders**

According to The Verge, Breitfeld said he *didn't realize enough* what it meant to take investment from a state-owned automaker like FAW. He also claimed FAW took away his responsibilities.

A year later, in 2020, the second co-founder Daniel Kirchert left Byton. His new destination was Evergrande Auto, where he worked as Vice Executive President. For Mr. Kirchert, it was the second job for the automaker that didn't produce a car. And while Byton might yet succeed, Evergrande's fate seems a bit darker.

In 2019 Evergrande announced it plans to invest $6.4 billion over the next three years into its EV unit.  In August 2020, they announced six new cars under the Hengchi brand (Hengchi 1-6). Backstage, we heard many rumors about their struggle to put cars into production. Finally, Reuters reported that Evergrande is in talks with Xiaomi to sell their EV unit this week. The original business of Evergrande is real estate.

**FAW taking control of Byton, pushing Foxconn away**

Back to Byton. Despite the ups and downs, it got some powerful backers, including FAW, Tencent, and Foxconn, which signed a strategic partnership in January 2021. Foxconn bet a lot on EV, aiming to copy-paste its business model with smartphone vendors and provide manufacturing services to EV startups. However, FAW, the biggest Byton creditor, started taking management control of Byton and installing its people into high management positions, Bloomberg reported in July this year.

The reorganization resulted in Chinese state-owned automaker FAW being heavily involved in the project, reportedly leading to conflicts with Foxconn. According to TechTaiwan, Foxconn confirmed that its team had left Byton plants, and further cooperation would depend on the outcome of Byton's reorganization.

**M-Byte EV**

According to previous information, the SIV SUV will be 4800 mm long and have a wheelbase of 2950 mm. Upon launch, the Byton SIV will be equipped for level 3 (L3) autonomous driving, including Lidar and millimeter-wave radar. There will be two battery packs available: 60 kWh for a 350 km range and 90 kWh for a 500-kilometer range. 0-100 will take "5 to 6" seconds.

Case 3:21-cv-04736-EMC Document 143-1 Filed 03/22/22 Page 421 of 611



Byton M-Byte Concept from 2018

It's nice to see M-Byte is still alive, and chances we might see it in mass production are getting
higher. We will keep an eye on that.

# EXHIBIT E

| Side View | |
|---|---|
| CarNewsChina.com | CAD data March 2018 |

 

| Analysis |
|---|

**1** The side doors lower shape in topology and in styling lines including the split line between Front and Rear Door are the same between the News picture and the CAD data

**2** The side doors upper contour line is in the way it runs from front to back the same. In addition, the position of the door handles is exactly the same as the CAD data in location and its flush design

**3** The upper rear quarter section is shape and dimensions the same as the CAD data (spoiler size and location, extension of the door belt line, side window size and shape, tailgate split line and connection to the spoiler and side glass.)

**4** The lower rear quarter section is shape and dimensions the same as the CAD data (rear lighting arrangement, splitline tail--gate to bodyside, lower bumper area and lower rear lights)

**5** The fender to hood splitline and the connection to the front lighting extension between fender and hood are the same as the CAD data

| Front View | |
|---|---|
| CarNewsChina.com | CAD data March 2018 |
|  |  |

| Analysis |
|---|

⑥ The front headlight, and especially visible on the daillight running lights are identical to the CAD data

⑦ The lower bumper corner section is in topology, styling lines and proportions exactly the same as the CAD data

| Front View | |
| --- | --- |
| CarNewsChina.com | CAD data March 2018 |
|  |  |
| Analysis | |

**8** The top rear lighting on the tailgate and on the bodyside are in shape, splitlines, location and design exactly the same as the CAD data

**9** The lower rear lighting on the bumper and the lower edge of the tailgate are exactly the same as the CAD data

General statement:
All items from 1 to 9, the overall proportions of the vehicle, the appearance, the stance, the sizing and the dimensions of the vehicle identifies it as the as the M-Byte designed by EDAG. It matches the CAD data perfectly.

1   LEWIS & LLEWELLYN LLP
    Evangeline A.Z. Burbidge (Bar No. 266966)
2   eburbidge@lewisllewellyn.com
    Marc R. Lewis (Bar No. 233306)
3   mlewis@lewisllewellyn.com
    Kenneth M. Walczak (Bar No. 247389)
4   kwalczak@lewisllewellyn.com
    Bradley E. Estes (Bar No. 298766)
5   bestes@lewisllewellyn.com
    601 Montgomery Street, Suite 2000
6   San Francisco, California 94111
    Telephone:  (415) 800-0590
7   Facsimile:   (415) 390-2127
8
9   Attorneys for Claimant
    EDAG Engineering GmbH
10

11              JAMS REFERENCE NO. 1100107291

12          IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

13

14  EDAG Engineering GmbH,                  **[PROPOSED] ORDER GRANTING**
                                            **CLAIMANT EDAG'S MOTION FOR**
15          Claimant,                       **PRELIMINARY INJUNCTION**

16          v.

17  BYTON North America Corporation,        Hon. William J. Cahill (ret.)

18          Respondent.                     Arbitration:  February 8, 2021

19  ─────────────────────────────

20  AND RELATED CROSS-CLAIM

21

22

23

24

25

26

27

28

LEWIS +
LLEWELLYN
LLP

**INTRODUCTION**

The undersigned arbitrator, Judge William J. Cahill (Ret.) of JAMS, was appointed as arbitrator to this proceeding in accordance with paragraph 14.4b of the parties' agreement to arbitrate "[a]ny dispute between the Parties that is not resolved through negotiation," made October 20th, 2018.  *See* Scheduling Order No. 7 ("SO No. 7"), ¶ 4.

On June 25, 2021, the Arbitrator issued a Final Arbitration Award ("AA"), finding in favor of the breach of contract claim by Claimant EDAG Engineering GmbH ("EDAG"), and awarding EDAG the sum of €23,446,649, plus 10% statutory interest and costs.  EDAG has moved for an order entering judgment pursuant to that Award, in the Federal District Court for the Northern District of California.

On September 24, 2021, EDAG filed a motion for preliminary injunction.  The Arbitrator has considered that motion, BYTON's response, and all other relevant pleadings, testimony, and exhibits, and makes the following findings of facts and law.  Any disparity between the Arbitrator's findings and the position of the parties is the result of the Arbitrator's evaluation of the credibility, relevance, and weight of the evidence.

I find that I have the authority to rule on EDAG's motion, and to grant the relief sought, if warranted.

The agreement between EDAG and Respondent BYTON North America Corporation ("BYTON"), known as the Technology and Development Licensing Agreement ("TDLA") provides: "The arbitrator will have full power and authority to … fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief)." TDLA ¶ 14.4b.  That authority extends as far as "the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement." *Id*.  And the district court with jurisdiction over the parties "may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process—provided, of course, that the requirements for granting injunctive relief are otherwise satisfied." *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) ("*Toyo*") (citations

/ / /

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN

1  omitted)[1].

2    Based on that authority, if EDAG meets the relevant standard, I am authorized to issue an

3  injunction "to ensure [the] arbitration award is not rendered ineffectual." *Smagin v. Yegiazaryan*,

4  No. CV 14-9764-R, 2015 WL 13757706, *2 (C.D. Cal. Sept. 28, 2015) ("*Smagin*") (affirming

5  injunction freezing assets of Respondent who "regularly conceals the true ownership of his assets

6  through the use of shell corporations in offshore jurisdictions and through the use of nominees who

7  hold assets on his behalf and act according to his discretion" in action where Petitioner had received

8  an arbitration award).  "This is not the beginning stage of a breach of contract claim, but instead the

9  end stages of a protracted arbitration in which the merits of all claims and defenses have been fully

10  presented and adjudicated." *Smagin*, 2015 WL 13757706 at *1, citing *Toyo* (additional citation

11  omitted).

12                              **BACKGROUND**

13    **A.  EDAG's Work For BYTON.**

14    From 2016 to 2019, EDAG provided engineering services to BYTON as part of BYTON's

15  project to design and manufacture the all-electric M-BYTE vehicle.  AA 6-7.  In 2018, BYTON

16  stopped paying EDAG's invoices, forcing EDAG to initiate the underlying arbitration pursuant to

17  the parties' contract.  AA 7.

18    **B.  Arbitration Proceedings.**

19    On October 22, 2019, EDAG initiated arbitration proceedings against BYTON.  I conducted

20  an evidentiary hearing between February 8-12 and 16-19, 2021.

21    On June 25, 2021, I found in favor of EDAG's breach of contract claim and awarded EDAG

22  the sum of €23,446,649, plus 10% statutory interest and costs.  AA 28.  Throughout the proceedings

23  leading up to my Award, BYTON repeatedly represented that it lacks the money to pay EDAG.  *See,*

24  *e.g.,* AA 3, 7-10.

25    On June 23, 2021, EDAG petitioned the Court to confirm the Arbitrator's Award and enter

26  judgment in its favor.  On July 16, 2021, BYTON filed a reply indicating that it intends to challenge

27

28  _____

[1] My authority to grant injunctive relief is a question is a procedural issue, to which federal law
applies.  *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1066–67 (9th Cir. 2010).

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN

the Final Award.

**C. BYTON's Misuse of EDAG's Intellectual Property.**

Paragraph 6.2b of the TDLA requires EDAG to give BYTON all associated intellectual property rights for EDAG's deliverables, in exchange for BYTON's obligation to pay certain fees. BYTON breached the parties' agreement when it failed to pay those fees. BYTON owes EDAG over 23 million Euros in unpaid fees. AA 7-21, 28.

BYTON's intellectual property for the M-BYTE vehicle is currently in the possession, custody, and control of Jama Software ("Jama"). BYTON used Jama's browser-based database to store all of BYTON data's and build BYTON's product, *i.e.* the M-BYTE vehicle.

BYTON's corporate witness previously testified that BYTON owed Jama Software (among other vendors) money for use of its cloud-based platform, and that Jama had shut off BYTON's access to that platform. Nov. 17, 2020, BYTON Most Qualified Witness Dep. at 242:24-245:21. BYTON's corporate witness further testified that BYTON could not muster the roughly $500,000 it owed to its various cloud-based providers. *Id*. at 244:4-17. Before, during, and after the arbitration hearing, BYTON's witnesses and counsel represented that BYTON did not have any money to pay what it owed EDAG.

Nonetheless, EDAG has produced evidence that BYTON and a Chinese affiliate have spent the last nine months attempting to regain access to the Jama database and the intellectual property EDAG created. On September 1, 2021, EDAG learned that BYTON had paid all past due invoices to Jama several months earlier. By paying for a year of access to Jama's services, BYTON obtained access to EDAG's data.

Thus, BYTON has managed to circumvent to the TDLA, which expressly states that BYTON may only to receive intellectual property rights by paying EDAG. BYTON now has improper access to intellectual property it does not own, and for which it has not paid.

Moreover, BYTON appears to be transferring or attempting to transfer its operations and its assets of value to Chinese affiliate companies, which operate outside the reach of United States courts. On August 20, 2021, automotive journalists reported that BYTON's M-BYTE was photographed undergoing road tests in Hainan, China, despite BYTON's efforts to hide those tests.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS + LLEWELLYN

EDAG produced ample evidence that the test vehicle is the car that EDAG designed and that it contains the work that EDAG performed, and for which EDAG has not been paid.

On September 15, 2021, EDAG also learned that BYTON and a Chinese affiliate had been actively working to transfer the IP for the M-BYTE—possibly the only thing of value left at BYTON North America—from a U.S.-based cloud storage facility to a China-only server.

If BYTON is successful in moving its assets overseas, it could load up the U.S. entity with all of its debt, declare bankruptcy, and allow its Chinese affiliate to use the IP that EDAG built without paying a cent of the €23.4 million that EDAG is currently owed.

**ANALYSIS**

EDAG seeks a preliminary injunction based on the above facts.

To obtain injunctive relief, EDAG "must establish (1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest. *Toyo*, 609 F.3d at 982. *See also Butt v. State of California* (1992) 4 Cal.4th 668, 677-678 (under state law, a preliminary injunction is proper where moving party proves (1) likelihood of success and (2) that the relative interim harm to the parties from issuance of the injunction weighs in its favor).

A party that satisfies the latter three elements may obtain preliminary injunctive relief by showing the existence of "serious questions going to the merits" rather than a likelihood of success on the merits. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131–32 (9th Cir. 2011).

EDAG has satisfied all four elements.

**I.      EDAG IS LIKELY TO SUCCEED ON THE MERITS.**

EDAG has already successfully proved its claim for breach of contract.  The Arbitrator's award found that: BYTON agreed to pay EDAG a flat fee of €50,448,045, AA 11; EDAG performed its obligations to BYTON under the TDLA, for which it properly invoiced BYTON, *id*. 11-17; and BYTON failed to pay invoices totaling €23,446,649. *Id*. 11, 17-18.

I find that the Court is likely to confirm that Award, and EDAG is very likely to prevail in the litigation as a whole.

BYTON has stated it will move to vacate the Arbitrator's decision, but the standard is highly

LEWIS +
LLEWELLYN LLP

deferential and BYTON is likely to fail.  The FAA "gives federal courts only limited authority to review arbitration decisions, because broad judicial review would diminish the benefits of arbitration."  *SMC Promotions, Inc. v. SMC Promotions*, No. CV047107JFWVBKX, 2006 WL 6219155, at *1 (C.D. Cal. Jan. 19, 2006) (*"SMC"*), quoting *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004), citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003) (*en banc*).  "Confirmation is required even in the face of erroneous findings of fact or misinterpretations of law."  *Ibid.*, quoting *French v. Merrill Lynch*, 784 F.2d 902, 906 (9th Cir. 1986) (additional quotations and internal quotation marks omitted).

In fact, "[i]t is not even enough that the [arbitrator] may have failed to understand or apply the law.  An arbitrator's decision must be upheld unless it is completely irrational or it constitutes a manifest disregard for law."  *Ibid.*, quoting *G.C. and K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th Cir. 2003) (additional citation omitted).

> Therefore, the federal district court's role in an arbitration confirmation proceeding is severely limited, and for the most part, the court defers to the arbitrator's determination of the award. Furthermore, "[a] claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrator's act."

*Ibid.*, quoting *Ficek v. S. Pac. Co., 338* F.2d 655, 657 (9th Cir. 1964), *cert. denied*, 380 U.S. 988 (1965) (additional citation omitted).  Even so, during the pendency of any such motion, the Arbitrator's authority and rulings remain binding and in effect.  *See, e.g., id.*

## II.     EDAG WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

I find that EDAG has proved that it has a direct and immediate need for relief, to enjoin BYTON from improperly accessing and transferring EDAG's data and intellectual property. BYTON has no right to the intellectual property in question, because BYTON breached its obligation to pay EDAG for it.  AA 17-18.

In the absence of an injunction, BYTON would be free to complete the scheme detailed above.  As evidenced by its actions to date, BYTON will access the intellectual property held by Jama, and transfer that valuable asset to its affiliate in China.  It would be free to remove any vestige of that intellectual property from the United States—as it appears to have already attempted—

5

LEWIS +
LLEWELLYN

1  making it impossible for EDAG to recover.  Having obtained the benefit of its bargain with EDAG

2  without making payments totaling more than 20 million Euros, BYTON would have no remaining

3  incentive to comply with the Arbitrator's order or the resulting judgment.  BYTON may already be

4  making use of EDAG's proprietary technology overseas.

5       I find that the loss of the ability to monetize EDAG's work product, and the associated

6  inability to recover a judgment from BYTON, constitutes irreparable harm.  *See eBay, Inc. v.*

7  *Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1066 (N.D.Cal.2000) ("*eBay*") ("Harm resulting from lost

8  profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily

9  compensable and is therefore an appropriate basis for injunctive relief."); *MCA Recs., Inc. v.*

10 *Newton-John*, 90 Cal. App. 3d 18, 23 (1979).  As in *eBay*, BYTON's unauthorized access and

11 transfer of EDAG's property constitutes a form of trespass, for which there is no adequate monetary

12 compensation.  As in *eBay*, BYTON would deprive EDAG "of the ability to use [a] portion of its

13 personal property for its own purposes.  The law recognizes no such right to use another's personal

14 property.  Accordingly, [BYTON]'s actions appear to have caused injury to [EDAG] and appear

15 likely to continue to cause injury to [EDAG]." *Id*. at 1071.

16      Moreover, the inability to collect on a judgment of this size imperils EDAG's continued

17 viability as a business.  Irreparable harm exists "where the conduct of [Respondent] threatens the

18 existence of the [Petitioner's] business itself." *Optinrealbig.com, LLC v. Ironport Sys., Inc*., 323 F.

19 Supp. 2d 1037, 1051 (N.D. Cal. 2004).  The "threat of being driven out of business is sufficient to

20 establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474

21 (9th Cir. 1985); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[S]ubstantial loss of

22 business and perhaps even bankruptcy" constitutes irreparable harm.); *Bullock v. City & Cty. of San*

23 *Francisco*, 221 Cal.App.3d (1990) (plaintiff who filed for bankruptcy during pending proceeding

24 suffered irreparable harm).

**III.    THE BALANCE OF EQUITIES STRONGLY FAVORS EDAG.**

26      In the absence of an injunction, EDAG will suffer the harms to its property, its reputation,

27 and its bottom line detailed in the preceding section.  Whereas maintaining the status quo will do no

28 cognizable harm to BYTON.  BYTON's only de facto injury would result from the cessation of its

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

1  unauthorized and illegitimate scheme to misappropriate EDAG's intellectual property and avoid

2  complying with the Arbitrator's Award or paying a judgment.

3  As a matter of law, that harm does not count. "Defendants cannot complain of the harm that

4  will befall them when properly forced to desist from their infringing activities." *Warner Bros. Ent.*

5  *Inc. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1014–15 (C.D. Cal. 2011), quoting *Triad Systems Corp.*

6  *v. Southeastern Exp. Co.,* 64 F.3d 1330, 1338 (9th Cir.1995) (quotation and alteration marks

7  removed). "Where the only hardship that the defendant will suffer is lost profits from an activity

8  which has been shown likely to be infringing, such an argument in defense merits little equitable

9  consideration[.]" *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997)

10 (citation omitted; quotation and alteration marks removed). *See also Napa Valley Publ'g Co. v. City*

11 *of Calistoga*, 225 F.Supp.2d 1176, 1180 (N.D. Cal. 2002) (granting injunction to "preserve the status

12 quo" and "prevent irreparable loss of rights prior to final disposition of the litigation"); *Arauyo v.*

13 *Loc. 13*, No. CV 97-6574 ABC(RNBX), 1997 WL 912927, at *4 n.4 (C.D. Cal. Nov. 22, 1997)

14 (injunctive relief would be proper under "traditional equitable criteria" because "the proposed

15 injunction will maintain the status quo and will not impose any affirmative duty on Respondents or

16 prohibit Respondents from actions that they are entitled to undertake.").

17 EDAG has demonstrated that it is entitled to entry of an injunction, to preserve the status quo

18 without imposing any affirmative duty on BYTON or prohibiting BYTON from any action it is

19 entitled to undertake.

20 **IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.**

21 The public has an interest in compliance with the law and enforcement of federal court

22 judgments. *Small v. Avanti Health Sys.*, LLC, 661 F.3d 1180, 1197 (9th Cir. 2011) ("the public

23 interest favors applying federal law correctly"); *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113

24 (9th Cir.2010) ("[I]t is obvious that compliance with the law is in the public interest."); *DISH*

25 *Network L.L.C. v. Fineman*, No. CV 16-3488-R, 2017 WL 2060010, at *3 (C.D. Cal. Mar. 22, 2017)

26 ("the public interest will be served by a permanent injunction because it will ensure compliance with

27 federal law").

28 I find that enjoining BYTON's scheme to misappropriate EDAG's intellectual property and

1    avoid U.S. jurisdiction (as well as compliance with the Arbitrator's Award and any subsequent

2    judgment) serves the public interest.

3    **V.     NO BOND IS NECESSARY**.

4            I find "there is no realistic likelihood of harm to the defendant from enjoining his or her

5    conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). *See also Fid. Brokerage*

6    *Servs. LLC v. McNamara*, 2011 WL 2117546, at *8 (S.D. Cal. May 27, 2011) (declining to issue

7    bond requested by defendants).

8            Preserving the status quo until satisfaction of a judgment in EDAG's favor poses no realistic

9    likelihood of harm to BYTON.  As discussed above, BYTON has no protectable interest in being

10   permitted to misappropriate EDAG's intellectual property.  And BYTON will not be able to prove

11   that it suffered compensable harm from entry of an order requiring it to refrain from using EDAG's

12   work to complete the M-BYTE until EDAG has been compensated for that work.

13   **VI.    THE TDLA REQUIRES THE PARTIES TO SPLIT ARBITRATION FEES.**

14           The TDLA provides that "[e]ach party will bear its own costs in the arbitration."  TDLA ¶

15   14.4(b), Amelung Decl. Ex. B at 12.  That provision is clear and unambiguous.  There is no

16   provision modifying it, and none requiring a party who brings a motion to pay any greater share or

17   additional amount.

18           EDAG submitted evidence that it paid $8,400 for its share of the fees associated with entry

19   of this order.  It concedes that it must bear those costs.

20           However, BYTON did not pay its share of the JAMS fees.  EDAG advanced $8,400 on

21   BYTON's behalf.  BYTON must pay its own costs under the TDLA; under JAMS Rule 6(c), the

22   Arbitrator may allocate the non-paying Party's share of the costs.

23           Therefore, the Arbitrator awards $8,400 to EDAG to reimburse it for the fees it paid on

24   behalf of BYTON.

25   / / /

26   / / /

27   / / /

28   / / /

8

LEWIS +
LLEWELLYN
LLP

# [PROPOSED] ORDER

1.      EDAG has demonstrated that it meets the applicable standard for entry of a preliminary injunction.

2.      Effective immediately, BYTON, and each and every one of its employees, agents, representatives, affiliates, funds, investment vehicles, licensees, consultants, officers, directors, stockholders, attorneys, trustors, trustees, beneficiaries, successors, affiliates, parent companies, subsidiaries, assigns, heirs, personal representatives and executors, is hereby ENJOINED and PROHIBITED from:

   a.      Accessing, modifying, transferring, or deleting any intellectual property created by EDAG, or any of its employees, agents, representatives, affiliates, licensees, consultants, officers, directors, successors, affiliates, parent companies, or assigns;

   b.      Taking any step to transfer, conceal, reduce, encumber, or otherwise make unavailable—either personally or through instructions to another—any assets up to the value owed to EDAG under the Arbitrator's Award.

3.      Within five (5) days of this Order, BYTON shall pay EDAG the sum of $8,400, as reimbursement for JAMS fees advanced by EDAG.

4.      No bond is required for this Order to take effect.

IT IS SO ORDERED

Dated: _____, 2021

                                        _____

                                        Hon. William J. Cahill (Ret.)
                                        Arbitrator

9

LEWIS +
LLEWELLYN

EXHIBIT E

1  **VAN ETTEN SIPPRELLE LLP**
   KEITH A. SIPPRELLE (SBN 143358)
2  2945 Townsgate Road, Suite 200
   Westlake Village, California 91361
3  Telephone: (805) 719-4900
   Facsimile: (805) 719-4950
4  ksipprelle@vstriallaw.com

5
   Attorneys for Respondent and Cross-Claimant
6  BYTON NORTH AMERICA CORPORATION

7

8              **JUDICIAL ARBITRATION AND MEDIATION SERVICES**

9                    **SAN FRANCISCO, CALIFORNIA OFFICE**

10

11

12 EDAG ENGINEERING GMBH,              JAMS Reference No. 1100107291

13           Claimant,                 **BYTON NORTH AMERICA**
                                        **CORPORATION'S MEMORANDUM OF**
14      vs.                            **POINTS AND AUTHORITIES IN**
                                        **OPPOSITION TO CLAIMANT EDAG**
15 BYTON NORTH AMERICA                 **ENGINEERING GMBH'S MOTION FOR**
   CORPORATION,                        **PRELIMINARY INJUNCTION**
16
                                        *[SUPPORTING DECLARATION OF*
17         Respondent.                  *KEITH A. SIPPRELLE AND*
                                        *EVIDENTIARY OBJECTIONS*
18                                      *SUBMITTED CONCURRENTLY*
                                        *HEREWITH]*
19

20

21                                      Arbitrator: Hon. William J. Cahill (Ret.)

22                                      Final Award Issued: June 2, 2021
                                        Final Award Served: June 3, 2021
23

24
                                        Hearing Date: October 14, 2021
25                                      Hearing Time: 10:00 a.m. (Zoom)

26 AND RELATED CROSS-CLAIM.

27

28

---

# TABLE OF CONTENTS

I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................................ 2

II.    THE ARBITRATOR LACKS JURISDICTION TO ADDRESS THE MERITS OF
       THE MOTION. .................................................................................................................. 4

       A.     The Motion Constitutes A Disguised, And Untimely, Application To
              Correct The Final Award .................................................................................. 5

       B.     The Arbitrator's Jurisdiction In This Matter Has Expired Under The
              Doctrine Of *Functus Officio* ............................................................................ 6

III.   THE MOTION SHOULD BE DENIED ON THE MERITS ............................................... 7

       A.     A Pre-Judgment Asset Freeze Is Not Authorized By California or Federal
              Law. ...................................................................................................................... 7

       B.     EDAG's Motion Also Fails Because EDAG Will Not Suffer Irreparable
              Injury Absent Injunctive Relief. ..................................................................... 14

       C.     EDAG's Motion Also Fails Because It Is Based On Inadmissible Evidence. ........ 17

IV.    CONCLUSION. ................................................................................................................ 18

# TABLE OF AUTHORITIES

## Cases

*Archuleta v. Grand Lodge etc. of Machinists*
    (1968) 262 Cal. App. 2d 202 ........................................................... 17

*Cooper v. Lavely & Singer Professional Corp.*
    (2014) 230 Cal.App.4th 1 ........................................................... 7

*Donahue Schriber Realty Group, Inc. v. NU Creation Outreach*
    (2014) 232 Cal.App.4th 1171 ........................................................... 14

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund*
    (1998) 527 U.S. 308 ........................................................... 12, 13

*Heimlich v. Shivji*
    (2019) 7 Cal. 5th 350 ........................................................... 6

*Hot Rods, LLC v. Northrop Grumman Systems Corp.*
    (2015) 242 Cal.App.4th 1166 ........................................................... 17

*Intel Corp. v. Hamidi*
    (2003) 30 Cal.4th 1342 ........................................................... 14

*International Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv.*
    (9th Cir., 1997) 109 F.3d 1409 ........................................................... 6

*Jacobs v. Locatelli*
    (2017) 8 Cal.App.5th 317 ........................................................... 17

*Korean Philadelphia Presbyterian Church v. California Presbytery*
    (2000) 77 Cal.App.4th 1069 ........................................................... 14

*McMillin Albany LLC v. Superior Court*
    (2018) 4 Cal.5th 241 ........................................................... 6

*Moshonov v. Walsh*
    (2000) 22 Cal. 4th 771 ........................................................... 6

*O'Connell v. Superior Court*
    (2006)141 Cal.App.4th 1452 ........................................................... 14

## Rules

*Civil Code § 1636* ........................................................... 16

*Civil Code § 1639* ........................................................... 17

*Civil Code §1638* ........................................................... 17

*Civil Code §1643* ........................................................... 17

*Code of Civil Procedure § 1284* ........................................................... 5

*Code of Civil Procedure §§ 1280 –1294.2* ........................................................................ 6

*Code of Civil Procedure §§ 481.010* ............................................................................ 11

*Federal Rule of Civil Procedure 64* ............................................................................ 13

1    BYTON NORTH AMERICA CORPORATION ("Byton") hereby respectfully opposes the

2  Motion for Preliminary Injunction ("Motion") of EDAG ENGINEERING GMBH ("EDAG").

3    **I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY.**[1]

4    This arbitration proceeding was commenced on October 22, 2019 by EDAG submitting a

5  Demand for Arbitration ("Demand") to JAMS.  The Demand asserted claims against Byton for

6  breach of contract and breach of the covenant of good faith and fair dealing premised upon

7  Byton's purported failure to pay EDAG amounts allegedly owed pursuant to the terms of the

8  parties' Technology Development and License Agreement (the "TDLA").[2]

9    On November 19, 2019, Byton submitted a response to the Demand, and also asserted

10  counterclaims against EDAG for breach of contract and negligence.  (Exhibit "2" to the Sipprelle

11  Declaration.)

12    On December 16, 2019, EDAG submitted a response and affirmative defenses to Byton's

13  cross-claims. (Exhibit "3" to the Sipprelle Declaration.)

14    Subsequently, Judge William J. Cahill (Ret.) of JAMS was appointed as arbitrator in this

15  matter (the "Arbitrator"), in accordance with paragraph 14.4b of the TDLA.[3]

16    The TDLA is governed by California law.  (TDLA, paragraph 14.4a.)  In addition, the

17  arbitration proceeding was/is governed by "[t]he substantive law of California and the California

18  Arbitration Act together with the JAMS Comprehensive Arbitration Rules  . . .."[4]

19    The case was tried to the Arbitrator between February 8 and 19, 2021. (AA, p. 1.)

20  The Final Arbitration Award was issued on June 2, 2021 and served on the parties on June 3,

21

22

23    [1] Unless otherwise indicated, the factual statements in this Memorandum are supported by
the Declaration of Keith A. Sipprelle submitted concurrently herewith ("Sipprelle Declaration"),
including the exhibits thereto.

24    [2] The Demand is attached as Exhibit "1" to Sipprelle Declaration.  The TDLA, which was
25  marked and entered as Exhibits "2" and "3" at the arbitration hearing, is attached as Exhibit "A" to
the Demand.

26    [3] See p. 2, ¶ 1 of the Final Arbitration Award ("AA"), which is attached as Exhibit "A" to
27  the Declaration of Evangeline A.Z. Burbidge submitted by EDAG in support of the Motion.

28    [4] See Scheduling Order No. 7 attached as Exhibit "4" to the Sipprelle Declaration, at ¶ 6.

2

BYTON NORTH AMERICA CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR
PRELIMINARY INJUNCTION, JAMS Reference No. 1100107291

1  2021.  (See AA, pp. 28, 29.)  The Final Arbitration Award addressed and resolved all issues raised

2  by the parties in their pleadings and otherwise.[5]

3        On June 23, 2021, EDAG filed a petition to confirm the Final Arbitration Award in the

4  United States District Court for the Northern District of California.  (Exhibit "5" to the Sipprelle

5  Declaration.)  The U.S. District Court action is pending.

6        On Sept 17, 2021, EDAG delivered a "letter brief" to the Arbitrator requesting that the

7  Arbitrator hear, on shortened time, EDAG's motion for issuance of a TRO and Preliminary

8  Injunction against Byton.  EDAG subsequently submitted its fully briefed Motion, wherein EDAG

9  makes the following assertions:

10      EDAG has recently learned that BYTON, which has not paid one cent of the over €23.4
million Final Award, has paid other vendors so that it and a related Chinese entity (which
11      BYTON has referred to as "BYTON China") can access EDAG's intellectual property and
spend resources building its M-BYTE vehicle in China.  Based on the evidence, it appears
12      that BYTON is engaged in a scheme to transfer assets—including EDAG's intellectual
property—overseas and out of the reach of U.S. authorities.  BYTON has no right to do so;
13      under the express terms of the parties' contract, its failure to pay means EDAG still owns all
of the intellectual property EDAG created.  BYTON has no right to access, let alone
14      transfer, said property, which may be the only asset of value in its possession.

15

16  (Motion at 6:9-9:17.)

17        On the basis of EDAG's specious claim that Byton is transferring intellectual property

18  purportedly owned by EDAG,[6] EDAG has requested that the arbitrator issue a remarkable pre-

19  judgment preliminary injunction that would bar Byton from "[t]aking any step to transfer, conceal,

20  reduce, encumber, or otherwise make unavailable—either personally or through instructions to

21  another—any assets up to the value owed to EDAG under the Arbitrator's Award."  (See EDAG's

22  proposed Order at p. 9.)  In short, EDAG effectively seeks a pre-judgment "freeze" on all of

23

24  _____

25      [5] See AA at p. 2, ¶2: "The Arbitrator has considered *all* pleadings, testimony, and exhibits
26  and makes the following findings of facts and law."  (Emphasis supplied.)

27      [6] As discussed *infra*, the intellectual property at issue is owned by *Byton*, not EDAG.
Thus, the central premise of the Motion (that the intellectual property at issue is owned by EDAG)
28  is false.

BYTON NORTH AMERICA CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR
PRELIMINARY INJUNCTION, JAMS Reference No. 1100107291

1   Byton's assets.  Such a remedy does not exist under California law.[7]

2       However, the merits of EDAG's preposterous Motion need not be reached, as the Arbitrator

3   lacks jurisdiction to address the merits of the Motion.  The Motion should be denied on that basis

4   alone.

5       **II.     <u>THE ARBITRATOR LACKS JURISDICTION TO ADDRESS THE MERITS</u>**

6            **<u>OF THE MOTION.</u>**

7       On Sept 17, 2021, EDAG delivered a "letter brief" to the Arbitrator asking if the Arbitrator

8   believed he still retained jurisdiction in this matter so that he could hear, on shortened time,

9   EDAG's motion for issuance of a Temporary Restraining Order and Preliminary Injunction

10  against Byton.

11      On September 19, 2021, the Arbitrator responded as follows:

12      The answer to EDAG's question is "I don't know".  This is an issue of first
        impression to me and before I opine, I want to at least get briefing from Byton on
13      the jurisdictional question.

14      The question is when does an arbitrator's jurisdiction end?  Does it end when the
        Final Award is issued (June 3, 2021) or a party files in Federal Court a motion to
15      approve the Award (June 23, 2021), or does the arbitrator's jurisdiction to issue
        interim rulings extend until the Trial court grants the motion (indefinite)?  And
16      does the Arbitrator still have jurisdiction if the trial court's decision is appealed.
        What about overturned?
17

18      In order to resolve the TRO issue jurisdiction must exist and if so we can decide the
        TRO motion. I believe that both issues can be briefed and decided by the arbitrator
19      in one hearing.

20
    (Exhibit "7" to the Sipprelle Declaration.)
21

22      EDAG's opening brief submitted on September 24, 2021 largely ignores the central question

23
    _____

24
        [7] In seeking a prejudgment "freeze" on Byton's assets, EDAG is improperly attempting to
25  relitigate an issue already decided against it. In its closing brief and during closing arguments,
    EDAG requested that the Arbitrator's Final Award include a preliminary injunction freezing
26  Byton's assets (due to EDAG's purported concerns about Byton transferring intellectual property).
    This request was rejected by the Arbitrator and was not included in the Final Award.  See
27  transcript of April 7, 2021 closing arguments at 9:10-15:10.  (Exhibit "6" to the Sipprelle
    Declaration.)
28

of jurisdiction that the Arbitrator directed the parties to address.  Instead, EDAG cites to inapplicable federal (rather than California) authority for the proposition that an arbitrator has the *authority* to provide *interim* relief (*e.g.*, temporary restraining orders, preliminary injunctions) if such authority is provided by the parties' arbitration agreement.  However, the issue of an arbitrator's authority provided by the terms of an arbitration agreement is distinct from whether an arbitrator has *jurisdiction* to order the provisional remedy sought by EDAG months after the Arbitrator has issued his final award and a motion for confirmation of the award is pending in a federal district court.  It is hardly surprising that EDAG has sidestepped this issue, because California law is clear that the Arbitrator has no jurisdiction to order the provisional remedy sought by EDAG.

   A.  **The Motion Constitutes A Disguised, And Untimely, Application To Correct The Final Award.**

     In seeking a prejudgment "freeze" on Byton's assets premised on Byton's purportedly improper efforts to transfer intellectual property, EDAG is improperly attempting to relitigate an issue already decided against it.

     In its closing brief and during closing arguments, EDAG requested that the Arbitrator's Final Award include a preliminary injunction freezing Byton's assets due to purported concerns about Byton transferring intellectual property.  This request was considered and rejected by the Arbitrator, and the Final Award did not include the preliminary injunction sought by EDAG.  (See Transcript of April 7, 2021 closing arguments (Exhibit "7" to the Sipprelle Declaration) at 9:10-15:10.)   Thus, in effect, EDAG's Motion constitutes a disguised application for correction of the Final Award.  Of course, the deadline for correction of the Final Award under *Code of Civil Procedure* § 1284 (10 days after service of a signed copy of the award on the applicant) has long since passed.  The Arbitrator has no jurisdiction at this point to consider EDAG's request to correct the Final Award.

**B.** **The Arbitrator's Jurisdiction In This Matter Has Expired Under The Doctrine Of *Functus Officio.***

At common law, the issuance of an arbitration award was treated as *functus officio*, an act that terminates the actor's authority.

> It is [a] fundamental common law principle that once an arbitrator has made and published a final award his authority is exhausted and he is *functus officio* and can do nothing more in regard to the subject matter of the arbitration. The policy which lies behind this is an unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which he has already rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion.

*International Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv.* (9th Cir., 1997) 109 F.3d 1409, 1411.

The *functus officio* doctrine has been recognized and adopted in California. *See, e.g.*, *Heimlich v. Shivji* (2019) 7 Cal. 5th 350, 362-364; *Moshonov v. Walsh* (2000) 22 Cal. 4th 771, 780, fn. 1. The *functus officio* doctrine comes into play once an arbitrator's duties have been fully discharged. *Heimlich v. Shivji*, *supra*, 7 Cal. 5th at 364, fn. 5.

The common law rule of *functus officio* is subject to legislative revision. *Heimlich v. Shivji*, *supra*, 7 Cal. 5th at 363. However, in deciding whether a statutory scheme alters or displaces the common law, one must begin with the presumption that the Legislature did not so intend. *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249.

The California Arbitration Act (*Code of Civil Procedure* §§ 1280 –1294.2) governs private arbitration. Section 1284 expressly vests arbitrators with continuing jurisdiction for a *brief* period following a final award: "The arbitrators, upon written application of a party to the arbitration, may correct the award upon any of the grounds set forth in subdivisions (a) and (c) of Section 1286.6 *not later than 30 days* after service of a signed copy of the award on the applicant. [¶] Application for such correction shall be made not later than 10 days after service of a signed copy of the award on the applicant." (Emphasis supplied.) Section 1288.4 protects this arbitral jurisdiction; it bars parties from filing petitions in superior court to vacate or confirm an award "until at least 10 days after service of the signed copy of the award on the petitioner." These

6

1  provisions ensure that an arbitrator retains jurisdiction to modify an award for at least 10 and as

2  many as 30 days after its filing and service.  If no application for correction is filed within 10 days,

3  jurisdiction expires and a petition to vacate or confirm may be filed in superior court.  If an

4  application is filed, the arbitrator retains jurisdiction for up to 30 days after the award was filed.

5  Section 1284.  *See Cooper v. Lavely & Singer Professional Corp.* (2014) 230 Cal.App.4th 1, 18 19.

6  Here, the Final Arbitration Award was issued on June 2, 2021 and served on the parties on

7  June 3, 2021.  The Final Arbitration Award addressed and resolved all issues raised by the parties

8  in their pleadings and otherwise. (AA at p. 2, ¶ 2.)  Under the *functus officio* doctrine (as modified

9  by the California Legislature in the California Arbitration Act), the Arbitrator's jurisdiction

10  expired 10 days after service of a signed copy of the Final Arbitration Award (June 14, 2021), as

11  no party made a timely application to correct the award.  As such, the Arbitrator has no

12  jurisdiction to entertain the merits of the Motion, and the Motion should be denied on that basis

13  alone.

14  **III.   THE MOTION SHOULD BE DENIED ON THE MERITS.**

15  Even assuming *arguendo* that the Arbitrator has jurisdiction to entertain the merits of the

16  Motion, the Motion nevertheless should be denied on the following grounds: (1) a pre-judgment

17  asset freeze is not authorized by California or federal law; (2) EDAG cannot show the existence of

18  irreparable harm if a preliminary injunction is not issued, as the intellectual property at issue is

19  owned by Byton, not EDAG; and (3) the Motion is based on inadmissible evidence.

20  **A.   A Pre-Judgment Asset Freeze Is Not Authorized By California or Federal Law.**

21  EDAG's motion seeks an Order that would preclude Byton from:

22  a. Accessing, modifying, transferring, or deleting any intellectual property

23  created by EDAG, or any of its employees, agents, representatives, affiliates,

24  licensees, consultants, officers, directors, successors, affiliates, parent

25  companies, or assigns;

26  b. *Taking any step to transfer, conceal, reduce, encumber, or otherwise make*

27  *unavailable—either personally or through instructions to another—any assets*

28  *up to the value owed to EDAG under the Arbitrator's Award.*

7

1   (See EDAG's proposed Order at p. 9; emphasis supplied.)

2       In short, EDAG effectively seeks a pre-judgment "freeze" on all of Byton's assets (not just

3   the intellectual property created by EDAG for Byton) up to the amount of €23,446,649, plus

4   interest (*i.e.*, the amount awarded to EDAG by the Arbitrator).

5       EDAG's Motion is nothing more than a recycled request for a remedy that the Arbitrator

6   previously considered and rejected.

7       In its closing brief and during closing arguments held on April 7, 2021, EDAG requested

8   that the Arbitrator's Final Award include a preliminary injunction freezing Byton's assets due to

9   purported concerns about Byton transferring intellectual property.  This request was considered

10  and rejected by the Arbitrator, and was not included in the Final Award:

11          MS. BURBIDGE:  So then, your next question, Your Honor, was
            with regard to *Question 12, with regard to EDAG's request for an*
12          *injunction.  And you had asked if you had authority to issue an*
            *injunction.* So the TDLA here, which you see on the screen,
13          explicitly provides you that authorization under Section 14.4.  It
            states that you have full power and authority to fashion appropriate
14          remedies, including temporary, preliminary, interim, or permanent
            injunctive relief.
15

16          And JAMS 24C also provides that authorization in conjunction with
            the agreement between the parties.  So, as we set out in our brief,
17          *EDAG is asking for temporary injunctive relief.*  It's not interested in
            the permanent injunction. But as the evidence in the case made
18          clear, BYTON does not have cash, but does have assets, namely, the
            IP that EDAG created.  And given, you know, the recent articles that
19          we cited in our brief, we're very concerned that BYTON might
            transfer those assets to avoid paying any judgment.  So we would
20          request an injunction be issued.
21

22          THE ARBITRATOR:  Let me hear what Mr. Sipprelle says about
            that in this current time here.  Can you tell me about that, Mr.
23          Sipprelle?

24          MR. SIPPRELLE:  Yes, I can, Your Honor. Thank you. We
            certainly -- BYTON certainly objects to this request for -- basically
25          to freeze -- it's essentially a request to freeze BYTON's assets, which
            would put BYTON essentially out of business. I mean, as they
26          phrased it, that would even preclude BYTON from making payroll
            because that would be a transfer of BYTON asset to somebody else.
27          And I think it's very clear that there is no authority, either under the
28

8

1    arbitration agreement or under applicable law, for that kind of
2    request.

3    If we look at Section 14.4B of the TDLA -- and I think it's up there,
     but I can't -- I don't know if you can make that a little larger.  I can
4    barely see that.

5    MS. BURBIDGE:  I can try.  If you want to share your screen, Keith
     --
6
7    MR. SIPPRELLE:  Okay.  I guess --

8    MS. BURBIDGE:  There you go.  Is that --

9    MR. SIPPRELLE:  I can put mine.  Okay. So what they've
10   highlighted is -- it says the arbitrator will have full power and
     authority to determine issues of arbitrability and to fashion
11   appropriate remedies. They didn't read the next portion, which says
     "provided that the arbitrator will not have any right or authority;
12   one, in excess of the authority that a court having jurisdiction over
     the parties in the dispute would have absent this arbitration
13   agreement.  Or to award damages," et cetera.

14   But I think the key provision is that, one -- sub-1, which is:  Your
15   Honor doesn't have authority in excess of the authority that a court
     would have if there was not an arbitration agreement.
16
     And this -- the TDLA is governed by California law.  That's in
17   Section 14.4A.  There is no authority under California law or under
     federal law for an asset freeze -- a prejudgment or even a post-
18   judgment asset freeze.

19   California has, as Your Honor, I'm sure, is aware, prejudgment writ
20   of attachment process that's very detailed, very specific.  That's in
     Code of Civil Procedures sections 481.010 and following.  And
21   that's a very specific prejudgment attachment remedy. You have to
     go through a lot of hoops.  And even if you get the attachment, all
22   the attachment allows you to do is to try to attach assets, specific
     assets, that you can locate.  It is not a prophylactic asset freeze.
23
24   That doesn't exist under California law, what they're asking for.
     What they're asking for also doesn't exist under federal law.  And, in
25   fact, this issue was addressed by the US Supreme Court in 1999.
     There's a case called Grupo Mexicano de Desarrollo SA.  It's 527
26   U.S. 308.  And in that case, the Supreme Court held that federal
     courts lack the inherent power to issue injunctions or asset freezes in
27   money damages cases like this one.

28

9

1
2
3

So what they are asking for is not authorized under California law, under federal law. And the arbitration agreement is very clear that Your Honor can't issue orders in excess of what a court could do if this case was pending in court. So it's not authorized.

4
5
6

THE ARBITRATOR: Okay. I certainly can't do more than a court can do. Well, maybe I could, but I'm not inclined to do that. That's the first time I've heard about this. Mr. Sipprelle, did you know that they were asking for this before you saw their brief?

7
8
9
10
11
12

MR. SIPPRELLE: I did not. I was, I have to say, quite surprised at what they -- and there's no authority in their brief. They cite no legal authority for this, and there isn't any. It's not authorized by law, and that basically would -- number 1, it would -- they're trying to jump to the head of the line of BYTON's creditors. And number 2, it would essentially put BYTON out of business because we couldn't even pay our employees if that kind of an order was in place. They have their remedies. If they get a judgment and the remedies are what the law provides, they can try to collect if they get a judgment. But they can't get an asset freeze.

13
14

THE ARBITRATOR: I bet Ms. Burbidge would say you can pay your employees -- I could exclude that from the injunction.

15
16
17
18
19
20
21

MS. BURBIDGE: Yeah. I think, Your Honor, that, as we indicated in our briefing -- and this is something that was a concern that came to light subsequently, right, was the concern that there would be an asset transfer to avoid any relief. Right? And that there are these talks about selling the actual car on the market but doing it without using BYTON North America so as to avoid those creditors that BYTON owes money to. *So there's a real concern that the IP that EDAG created, which has great value, would be shifted to another entity that would make money. And that's something that obviously came to light at the – after the conclusion of the hearing. So that's why it was something we raised in our briefing.*

22
23
24

THE ARBITRATOR: Okay. I understand that. I'm worried that I don't have jurisdiction to do this even if I wanted to. But I understand your concern. But Mr. Sipprelle says you'd be ahead of other creditors. If they go into bankruptcy, this will be an issue, whether it's even enforceable or not.

25

MS. BURBIDGE: Yes, Your Honor.

26
27

THE ARBITRATOR: I understand your concern. I understand you, but this is a concern of everybody's got owed money, I think.

28

MS. BURBIDGE: I don't have a sense of how many other folks

1    BYTON owes money to, Your Honor. If you are interested in some
     sort of brief, additional submission on this point today to try to keep
2    things expedited, we'd be happy to provide that to you.  But I
     simultaneously do not want to draw this out. Obviously, you know,
3    EDAG is very interested in a resolution, and an expedited one, if
     possible.
4

5    THE ARBITRATOR:  Well, let me do this.  Let me just tell you
     where I'm going to come out on that.  *I'm going to not give you an*
6    *injunction.  Okay?*

7    MS. BURBIDGE:  Okay, Your Honor.  Understood.
8
     THE ARBITRATOR:  Just so we don't have to worry about it
9    anymore.

10   MS. BURBIDGE:  Okay.
11
     THE ARBITRATOR:  Okay.  Great.
12
     MS. BURBIDGE:  Those were the only questions directed to
13   EDAG, Your Honor.  So I'm happy to turn it over to Mr. Sipprelle.
     And then I can jump in and respond, or I will let Your Honor know
14   that I'm going to save a sort of a joint rebuttal response.

15   THE ARBITRATOR:  No problem.  All right. Thank you. *So we're*
     *clear on that.  No injunction.* Okay.  Next.
16

17   (Emphasis supplied.)  See Transcript of April 7, 2021 closing arguments at 9:10-15:10.  (Exhibit

18   "6" to the Sipprelle Declaration.)

19       As is clear from the above exchange, EDAG's current Motion raises precisely the same

20   issue that the Arbitrator previously considered and rejected: whether EDAG is entitled a pre-

21   judgment freeze of Byton's assets due to EDAG's purported concern that intellectual property that

22   EDAG created for Byton would be transferred to another entity.  However, as was pointed out by

23   Byton's counsel during closing arguments on April 7, 2021, California law does not authorize a

24   pre-judgment asset freeze.[8]

25

26   _____

27       [8] California law *does* authorize the issuance of a pre-judgment writ of attachment in
     appropriate circumstances.  *See Code of Civil Procedure* §§ 481.010, *et seq*.  EDAG has never
28   sought a writ of attachment, however.

1    EDAG has cited to several federal decisions (including several unpublished and hence

2 uncitable District Court orders) that purportedly support EDAG's request for issuance of a pre-

3 judgment asset freeze.  Of course, these decisions are irrelevant, as this arbitration proceeding is

4 governed by California law.  (See Scheduling Order No. 7 attached as Exhibit "4" to the Sipprelle

5 Declaration, at ¶ 6.)  In any event, none of these decisions stands for the proposition that an

6 arbitrator or court is authorized to issue a pre-judgment preliminary injunction freezing a

7 defendant's assets.

8    Moreover, even if federal law applied here, the United States Supreme Court ruled more

9 than 20 years ago that federal law does not permit the issuance of a pre-judgment preliminary

10 injunction freezing all or any portion of a defendant's assets in suits for money damages.  *Grupo*

11 *Mexicano De Desarrollo v. Alliance Bond Fund* (1998) 527 U.S. 308.

12    In *Grupo Mexicano De Desarrollo*, creditors of a Mexican holding company that had

13 defaulted on its debts filed suit for the amount due in the United States District Court for the

14 Southern District of New York.  The Complaint alleged that the Mexican holding company, Grupo

15 Mexicano De Desarrollo ("GMD"), was at risk of insolvency, if not insolvent already; that GMD

16 was dissipating its most significant asset (certain Toll Road Notes), and was preferring its

17 Mexican creditors by its planned allocation of Toll Road Notes to the payment of their claims, and

18 by its transfer to them of Toll Road Receivables; and that these actions would "frustrate any

19 judgment" the American creditors could obtain.   In their lawsuit, the American creditors sought

20 breach of contract damages of $ 80.9 million, and requested a preliminary injunction restraining

21 GMD from transferring the Toll Road Notes or other receivables.

22    The District Court issued a preliminary injunction in which it found that "GMD is at risk of

23 insolvency if not already insolvent;" that the Toll Road Notes were GMD's "only substantial

24 asset;" that GMD planned to use the Toll Road Notes "to satisfy its Mexican creditors to the

25 exclusion of [the American creditors] and other holders of the Notes;" that "in light of [GMD's]

26 financial condition and dissipation of assets, any judgment [the American creditors] obtain in this

27 action will be frustrated;" that the American creditors had demonstrated irreparable injury; and

28 that it was "almost certain" that the American creditors would succeed on the merits of their claim.

12

The District Court preliminarily enjoined GMD "from dissipating, disbursing, transferring, conveying, encumbering  or otherwise distributing or affecting any [of the American creditors'] right to, interest in, title to or right to receive or retain, any of the [Toll Road Notes]." *Id*. at 312, 313.  The order was affirmed by the Second Circuit Court of Appeal.

The United States Supreme Court granted *certiorari* and reversed, affirming the "historical principle that before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor." *Id*. at 330.

> The requirement that the creditor obtain a prior judgment is a fundamental protection in debtor-creditor law -- rendered all the more important in our federal system by the debtor's right to a jury trial on the legal claim. There are other factors which likewise give us pause: The remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?  More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws -- including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a "race to the courthouse" in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor.
>
> * * *
>
> Because such a remedy was historically unavailable from a court of equity, we hold that the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages. We reverse the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

*Id*. at 330-331; 339-340

*Grupo Mexicano* bars precisely the relief that EDAG is seeking here.

In short, EDAG's request for issuance of a pre-judgment preliminary injunction freezing Byton's assets up to the amount of up to the amount of €23,446,649 (plus interest) is not authorized by either California or federal law.  EDAG's recycled and untimely request for a preliminary injunction must be denied.

**B.  EDAG's Motion Also Fails Because EDAG Will Not Suffer Irreparable Injury Absent Injunctive Relief.**

Even if the Arbitrator had the legal authority and jurisdiction to issue a pre-judgment preliminary injunction, EDAG would only be entitled to such an order if it could establish all of the elements necessary to support the issuance of a preliminary injunction.  *See O'Connell v. Superior Court* (2006)141 Cal.App.4th 1452, 1481 ("[T]he burden was on plaintiffs, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction.").  One of these elements is that the moving party would suffer irreparable harm absent injunctive relief.  *Donahue Schriber Realty Group, Inc. v. NU Creation Outreach* (2014) 232 Cal.App.4th 1171, 1184.  A showing of "irreparable harm" requires the moving party to demonstrate that the non-moving party's *wrongful acts* threaten to cause irreparable injuries; *i.e.*, injuries that cannot be adequately compensated in damages.  *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1352.  Moreover, an injunction must be supported by evidence that there is a realistic prospect that the party enjoined intends to engage in "prohibited activity."  *Korean Philadelphia Presbyterian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069, 1084.

Byton's purported wrongful act/prohibited activity upon which EDAG's claim of irreparable injury is based is Byton "*improperly accessing and transferring EDAG's data and intellectual property overseas.*" (Motion at 14:19-20.)  In other words, the central premise of EDAG's claim of irreparable injury (and indeed, of EDAG's entire Motion) is that the work product that EDAG created for Byton and for which Byton paid EDAG approximately €27 million[9] belongs to EDAG because Byton failed to pay EDAG the full amount owed under the TDLA.  (*See, e.g.*, Motion at 8:28-9:2: "*BYTON has managed to circumvent to [sic] the TDLA, which expressly states that BYTON may only to [sic] receive intellectual property rights by paying EDAG.  BYTON now has improper access to intellectual property it does not own, and for which it has not paid;*" Motion at

---

[9] As set forth in the AA, the approximate value of the TDLA was €50,448,045.  (AA at pp. 11, 16.)  Of this amount, Byton ultimately was unable to pay €23,446,649.00.  (AA at p. 18, 28.)  Thus, Byton paid EDAG more than €27 million.

1  14:20-21: *BYTON has no right to the intellectual property in question, because BYTON breached*

2  *its obligation to pay EDAG for it*;"[10] Motion at 17:5-6: "*EDAG moves to enjoin a scheme to*

3  *misappropriate its intellectual property . . ..*"

4      EDAG's assertion that it (rather than Byton) owns the work product that EDAG created for

5  Byton and for which Byton paid EDAG approximately €27 million is based upon a tortured

6  interpretation of the relevant provision of the TDLA (Section 6.2b).  EDAG's convoluted

7  interpretation of section 6.2b of the TLDA was not litigated during the course of the arbitration

8  and is not addressed in the Final Arbitration Award.  Presumably, if EDAG truly believed that its

9  interpretation of 6.2b is the correct one, it would have asked the Arbitrator to make a finding that

10  EDAG owns the work product/intellectual property at issue.

11      Moreover, during the April 7, 2021 closing arguments, EDAG's counsel virtually conceded

12  that the intellectual property at issue is owned by Byton rather than EDAG:

13          MS. BURBIDGE:  So then, your next question, Your Honor, was
            with regard to Question 12, with regard to EDAG's request for an
14          injunction.  And you had asked if you had authority to issue an
            injunction. So the TDLA here, which you see on the screen,
15          explicitly provides you that authorization under Section 14.4.  It
            states that you have full power and authority to fashion appropriate
16          remedies, including temporary, preliminary, interim, or permanent
            injunctive relief.
17

18          And JAMS 24C also provides that authorization in conjunction with
            the agreement between the parties.  So, as we set out in our brief,
19          EDAG is asking for temporary injunctive relief.  It's not interested in
            the permanent injunction. But as the evidence in the case made
20          clear, **BYTON does not have cash, but does have assets, namely,
            the IP that EDAG created.**  And given, you know, the recent
21          articles that we cited in our brief, we're very concerned that BYTON
            **might transfer those assets** to avoid paying any judgment.  So we
22          would request an injunction be issued.
23

24  (Emphasis supplied.  See Transcript of April 7, 2021 closing arguments at 9:10-10:6.  (Exhibit "6"

25  _____

26      [10] EDAG cites to pages 17-18 of the AA as support for this assertion that Byton does not
    own the intellectual property created by EDAG for Byton.  However, nowhere in the AA did the
27  Arbitrator make a finding that the work product that EDAG created for Byton belongs to EDAG
    because Byton failed to pay EDAG the full amount owed under the TDLA.
28

15

1    to the Sipprelle Declaration.))

2         Section 6.2b of the TDLA provides in relevant part as follows:

3         <u>Assignment of Rights.</u> Subject to Supplier's underlying Intellectual Property Rights
          in the background technology and in exchange for the fees set forth in Section 4 of
4         SOW, *Supplier shall and does hereby assign to BYTON, Supplier's entire right,
          title and interest in and to the Deliverables created for BYTON, the Foreground
5         Technology, and all associated Intellectual Property rights therein*. . . .   Supplier
          (i) may you only use the Foreground Technology in accordance with Section 5.2
6         ("BYTON's License Grant and Restrictions"), and (ii) agrees not to challenge the
          validity of BYTON's ownership in the Foreground Technology.  *In addition,
7         BYTON shall own all Derivative Matter and associated Intellectual Property
          Rights. BYTON may register the copyright in the Deliverables and Foreground
8         Technology in its own name*, identifying Supplier's interest in the Background
          Technology as required by applicable Copyright Office rules and regulations.

9

10        Although section 6.2b provides that Byton's ownership of the Deliverables and associated

11   Intellectual Property Rights was "in exchange for the fees set forth in Section 4 of the SOW,"

12   nowhere in section 6.2b (or elsewhere in the TDLA) did the parties agree that EDAG retained

13   ownership of the Deliverables and associated Intellectual Property Rights until such time as Byton

14   had made payment of *all* amounts owed under the TLDA.  Indeed, the very structure of Section

15   6.2b undermines EDAG's belated and self-serving interpretation of this section of the TDLA.

16   Section 6.2b provides that Byton would take *immediate* ownership of the Deliverables and

17   associated Intellectual Property Rights and would have the right to immediately register those

18   items in its own name with the Copyright Office.   Surely, if EDAG believed when the TDLA was

19   entered into that it would continue to own the intellectual property until such time as Byton had

20   made full payment under the TDLA, EDAG would never have agreed that Byton could

21   immediately register its ownership in the Intellectual Property with the Copyright Office.

22        In short, the plain language of Section 6.2b makes clear that the mutual intent of the parties

23   at the time the TLDA was entered into was as follows:[11] (a) Byton would immediately take

24   ownership of the Deliverables created for Byton by EDAG, including the Foreground Technology,

25

26   _____

27        [11] *See* California *Civil Code* § 1636 ("A contract must be so interpreted as to give effect to
     the mutual intention of the parties as it existed at the time of contracting, so far as the same is
28   ascertainable and lawful.")

and all associated Intellectual Property rights therein; (b) Byton would be obligated to pay EDAG the amounts due under the TDLA; and (c) if Byton failed to make full payment to EDAG, EDAG could pursue the legal remedies provided in Section 14.4 of the TDLA to obtain full payment (which is precisely what EDAG has done). However, Byton would retain ownership of the Deliverables created for Byton by EDAG (including the Foreground Technology and all associated Intellectual Property rights therein). In short, EDAG's tortured and belated interpretation of Section 6.2b of the TDLA is unreasonable and should be rejected.[12]

Byton contends that the intent of the parties with respect to the ownership of the intellectual property at issue can be gleaned from the four corners of Section 6.2b of the TDLA.[13] However, even assuming *arguendo* that Section 6.2b is ambiguous with respect to the ownership of the Deliverables and associated Intellectual Property in a circumstance (such as here) in which less than full payment has been made, resolution of this ambiguity would require the examination of extrinsic evidence.[14] At this point, months after the close of evidence and submission of the Final Arbitration Award, it is far too late for EDAG to inject an issue of contract interpretation into the long-concluded proceedings. *See Archuleta v. Grand Lodge etc. of Machinists* (1968) 262 Cal. App. 2d 202, 208 (arbitrators' decision is final and binding on the parties and precludes further litigation of the controversy on the merits when the arbitration award fully adjudicates dispute).

## C. **EDAG's Motion Also Fails Because It Is Based On Inadmissible Evidence.**

Finally, the Motion must be denied because EDAG's central basis for the Motion (that Byton purportedly is attempting to transfer intellectual property to China) is based upon

---

[12] *See* California *Civil Code* §1643 ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.")

[13] *See* California *Civil Code* §1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.") *See also* California *Civil Code* § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.")

[14] *See, e.g., Jacobs v. Locatelli* (2017) 8 Cal.App.5th 317, 325; *Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, 1175-1176.

---

BYTON NORTH AMERICA CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR
PRELIMINARY INJUNCTION, JAMS Reference No. 1100107291

1  declarations that are replete with inadmissible hearsay statements and statements lacking personal

2  knowledge.  (See Byton's evidentiary objections submitted concurrently herewith.)  It is

3  fundamental that any motion, particularly a motion seeking an extraordinary remedy like a

4  preliminary injunction, must be based on admissible evidence.

5  **IV.  <u>CONCLUSION.</u>**

6  For all of the foregoing reasons, the Motion should be denied.

7  Respectfully Submitted,

8
   Dated:  October 4, 2021                     VAN ETTEN SIPPRELLE LLP
9

10  By:  *Keith A. Sipprelle*

11       Keith A. Sipprelle

12       Attorneys for Respondent and Cross-Claimant
         BYTON NORTH AMERICA CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BYTON NORTH AMERICA CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR
PRELIMINARY INJUNCTION, JAMS Reference No. 1100107291

1   **VAN ETTEN SIPPRELLE LLP**
    KEITH A. SIPPRELLE (SBN 143358)
2   2945 Townsgate Road, Suite 200
    Westlake Village, California 91361
3   Telephone: (805) 719-4900
    Facsimile: (805) 719-4950
4   ksipprelle@vstriallaw.com
5
    Attorneys for Respondent and Cross-Claimant
6   BYTON NORTH AMERICA CORPORATION
7
8                 **JUDICIAL ARBITRATION AND MEDIATION SERVICES**
9
                      **SAN FRANCISCO, CALIFORNIA OFFICE**
10
11
12  EDAG ENGINEERING GMBH,                    JAMS Reference No. 1100107291
13          Claimant,                         **DECLARATION OF KEITH A.
                                              SIPPRELLE IN SUPPORT OF BYTON
14      vs.                                   NORTH AMERICA CORPORATION'S
                                              OPPOSITION TO CLAIMANT EDAG
15  BYTON NORTH AMERICA                       ENGINEERING GMBH'S MOTION FOR
    CORPORATION,                              PRELIMINARY INJUNCTION**
16
17          Respondent.
                                              Arbitrator: Hon. William J. Cahill (Ret.)
18
                                              Final Award Issued: June 2, 2021
19                                            Final Award Served: June 3, 2021
20
21                                            Hearing Date: October 14, 2021
                                              Hearing Time: 10:00 a.m. (Zoom)
22  ─────────────────────────────
23  AND RELATED CROSS-CLAIM.
24
25
26
27
28
    ─────────────────────────────────────────────────────────────
    DECLARATION OF KEITH A. SIPPRELLE IN SUPPORT OF BYTON NORTH AMERICA
    CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR PRELIMINARY INJUNCTION,
    JAMS Reference No. 1100107291

1    I, KEITH A. SIPPRELLE, declare as follows:

2    1.    I am an attorney at law duly licensed to practice law in the state of California.  I am

3    counsel for BYTON NORTH AMERICA CORPORATION ("Byton") in this action. I have been

4    the attorney principally responsible for the representation of Byton in this matter from its inception.

5    I have personal knowledge of the facts stated in this declaration, and would testify to them if called

6    upon to do so.

7    2.    This arbitration proceeding was commenced on October 22, 2019 by EDAG

8    Engineering GMBH ("EDAG") submitting a Demand for Arbitration ("Demand") to JAMS.  The

9    Demand asserted claims against Byton for breach of contract and breach of the covenant of good

10    faith and fair dealing premised upon Byton's purported failure to pay EDAG amounts allegedly

11    owed pursuant to the terms of the parties' Technology Development and License Agreement (the

12    "TDLA").   A true and correct copy of the Demand is attached hereto as Exhibit "1."  The TDLA,

13    which was marked and entered as Exhibits "2" and "3" at the arbitration hearing, is attached as

14    Exhibit "A" to the Demand.

15    3.    On November 19, 2019, Byton submitted a response to the Demand, and also

16    asserted counterclaims against EDAG for breach of contract and negligence.  A true and correct

17    copy of Byton's response to the Demand and counterclaims is attached hereto as Exhibit "2."

18    4.    On December 16, 2019, EDAG submitted a response and affirmative defenses to

19    Byton's cross-claims.  A true and correct copy of EDAG's response and affirmative defenses to

20    Byton's cross-claims is attached hereto as Exhibit "3."

21    5.    Subsequently, Judge William J. Cahill (Ret.) of JAMS was appointed as arbitrator in

22    this matter (the "Arbitrator").

23    6.    Attached hereto as Exhibit "4" is a true and correct copy of Scheduling Order No. 7

24    in this action.  This document was jointly drafted and agreed to by the parties, and signed by the

25    Arbitrator.

26    7.    On June 23, 2021, EDAG filed a petition to confirm the Final Arbitration Award in

27    the United States District Court for the Northern District of California.  A true and correct copy of

28    2

DECLARATION OF KEITH A. SIPPRELLE IN SUPPORT OF BYTON NORTH AMERICA
CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR PRELIMINARY INJUNCTION,
JAMS Reference No. 1100107291

1   EDAG's petition is attached hereto as Exhibit "5."  The U.S. District Court action is pending.

2       8.      Attached hereto as Exhibit "6" is a true and correct copy of the transcript of the April

3   7, 2021 closing arguments in this matter.

4       9.      Attached hereto as Exhibit "7" is a true and correct copy of a September 19, 2021

5   email from the Arbitrator.

6       I declare under penalty of perjury that the foregoing is true and correct, and that this

7   declaration was executed on  October 3, 2021 at Thousand Oaks, California.

8

9                                       _Keith A. Sipprelle_
10                                          Keith A. Sipprelle

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KEITH A. SIPPRELLE IN SUPPORT OF BYTON NORTH AMERICA
CORPORATION'S OPPOSITION TO EDAG'S MOTION FOR PRELIMINARY INJUNCTION,
JAMS Reference No. 1100107291

# Exhibit 1

# Demand for Arbitration Form
Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 **1-800-352-JAMS**
🖳 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,500. For matters involving three or more parties, the filing fee is $2,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,500 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.*
- *A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

**RESPONDENT NAME** BYTON North America Corporation

**ADDRESS** 4201 Burton Drive

**CITY** Santa Clara    **STATE** CA    **ZIP** 95054

**PHONE**    **FAX**    **EMAIL**

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY** Matt Barter; Jonathan Ye

**FIRM/COMPANY** BYTON North America Corporation

**ADDRESS** 401 Burton Drive

**CITY** Santa Clara    **STATE** CA    **ZIP** 95054

**PHONE**    **FAX**    **EMAIL** matt.barter@byton.com; jonathan.ye@byton.com

## FROM CLAIMANT

Add more claimants on **page 7**.

**CLAIMANT NAME** EDAG Engineering GmbH

**ADDRESS** Kreuzberger Ring 40

**CITY** 65205 Wiesbaden    **STATE** Germany    **ZIP**

**PHONE**    **FAX**    **EMAIL**

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY** Evangeline Burbidge; Marc Lewis; Nathalie Fayad

**FIRM/COMPANY** Lewis & Llewellyn LLP

**ADDRESS** 505 Montgomery Street, Suite 1300

**CITY** San Francisco    **STATE** CA    **ZIP** 94111

**PHONE** (415) 762-0908    **FAX** (415) 390-2127    **EMAIL** eburbidge@lewisllewellyn.com; mlewis@lewisllewellyn.com



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

 If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

On June 1, 2017, EDAG Engineering GmbH ("EDAG") and BYTON North America Corporation ("BYTON") entered into a Technology and License Agreement ("Agreement"), attached as Exhibit A. Under the Agreement, BYTON agreed to pay EDAG over $50 million USD in exchange for deliverables and services, as set forth in Attachment 1 of the Agreement, Statement of Work ("SOW").

To date, EDAG has performed under the contract and there has been no dispute that BYTON received EDAG's deliverables and services. In return, however, BYTON has failed to pay (see Exhibit B). In acknowledgment of BYTON's failure, the parties entered into a payment plan in August 2019, attached as Exhibit C.

Even with this grant of additional time, BYTON has still failed to pay EDAG what it is owed. In fact, despite repeated attempts by EDAG's management to contact BYTON and resolve this issue, BYTON has remained substantively silent. This has left EDAG with no choice but to file this arbitration demand.

To date, BYTON has an outstanding balance of 19,799,805.04 Euros, which amounts up to estimated $22.5 million USD, owed pursuant to the August 2019 payment plan entered into between EDAG and BYTON. This amount does not yet include the fees for September 2019, nor any termination fees or other expenses to be covered under the Agreement, which will add up to at least 25,807,650.74 Euros (resulting into approximately $28.5 million USD).

As a result of the above, BYTON is liable to EDAG for (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing. Pursuant to these claims, EDAG is entitled to compensatory damages, pre-judgment and post-judgment interest under California law, and such other relief as the arbitrator may deem just and proper.

We look forward to JAMS' assistance in resolving this matter.

AMOUNT IN CONTROVERSY (US DOLLARS)   at least $28.5 million USD

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach _two copies_ of entire agreement.**

> **ARBITRATION PROVISION LOCATION**
>
> This demand is being made pursuant to an arbitration provision in the Technology Development and License Agreement executed by all parties and effective June 1, 2017. See Exhibit A § 14.4.b.

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with _two copies_ to JAMS.**

## REQUEST FOR HEARING

> **REQUESTED LOCATION**    San Francisco, CA

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

_See: **Comprehensive Rule 16.1**_

☑ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | _Eva B_ | DATE | 10/22/2019 |
| --- | --- | --- | --- |

| NAME (PRINT/TYPED) | Evangeline A.Z. Burbidge |
| --- | --- |

# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

**Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:**

☐ **YES**, this **is** a CONSUMER ARBITRATION.

☑ **NO**, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

In addition, JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS
**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ **Less than $100,000**      ☐ **$100,000 to $250,000**      ☐ **More than $250,000**      ☐ **Decline to State**

## WAIVER OF ARBITRATION FEES
**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

 # Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | | | |
|---|---|---|---|

| FIRM/ COMPANY | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | | | |
|---|---|---|---|

| FIRM/ COMPANY | | | |
|---|---|---|---|

| ADDRESS | | | |
|---|---|---|---|

| CITY | | STATE | ZIP |
|---|---|---|---|

| PHONE | FAX | EMAIL | |
|---|---|---|---|

# Exhibit A

## TECHNOLOGY DEVELOPMENT AND
## LICENSE AGREEMENT

This Technology Development and License Agreement (the "Agreement") is effective as of the 1st day of June, 2017 (the "Effective Date") and is made this 20th day of October, 2018  by and among BYTON North America Corporation, a Delaware corporation with offices at 4201 Burton Drive, Santa Clara, California, 95054, on behalf of itself and its Affiliates (collectively, "BYTON") and EDAG Engineering GmbH ("Supplier"), located at Kreuzberger Ring 40, 65205 Germany (BYTON and Supplier are individually a "Party" and collectively, "Parties").

WITNEESETH

WHEREAS, BYTON is in the business of designing, developing, manufacturing, and delivering electric vehicles, which will be initially manufactured and sold in China, and thereafter in the United States, Europe and other countries, and requires certain services and support; and

WHEREAS, Supplier is able to provide such services and support, and both BYTON and Supplier now desire to memorialize the terms and conditions relating thereto;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.0 DEFINITIONS

When used herein, the following terms shall be defined as follows:

1.1 "Acceptance Requirements" means the Specifications, the acceptance criteria relative to the Deliverables, and the plan and associated test environment against which BYTON will test conformance of the Deliverables in accordance with the documents set forth in a Statement of Work or as otherwise agreed by the parties in writing.

1.2 "Affiliates" shall mean with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity. For purposes of the Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

1.3 "Background Technology" means all Technology that (i) is owned or otherwise controlled by Supplier and (ii) is either (1) in existence on or prior to the Effective Date or (2) conceived, created, developed, reduced to practice or made by or on behalf of Supplier after the Effective Date independently of the activities contemplated by this Agreement.

1.4 "BYTON Product(s)" means any product(s) made by or for BYTON that incorporates or is distributed for use in conjunction with the Deliverables or a portion thereof.

1.5 "Confidential Information" means information which if disclosed (i) in tangible form, is clearly marked as "confidential" or "proprietary" at the time of disclosure, or (ii) in intangible form (such as orally or visually), the disclosing Party clearly identifies as "confidential" or "proprietary" at the time of disclosure and summarizes in writing and delivers to the receiving Party within thirty (30) days of disclosure.

1.6 "Deliverables" means the specific deliverables which Supplier is to provide to BYTON under a Statement of Work

C_BYTON_EDAG_V10_20_18



and such other Background Technology which Supplier provides to or makes available to BYTON in connection with a Statement of Work.

1.7 "Derivative Matter" means any work or invention, new material, information or data which is based in whole or in part upon the Background Technology and Foreground Technology, (including, if applicable, any BYTON Products) and any Intellectual Property Rights associated therewith, including any derivative work, improvement, extension, revision, modification, translation, abridgment, condensation, expansion, collection, compilation, Error Correction, or any other form in which the Background Technology and Foreground Technology may be recast, transformed or adapted, including any changes thereto or that is an implementation of the functionality described in any Specifications or similar documentation developed by or for BYTON pursuant to this Agreement.

1.8 "Documentation" means collectively the technical documentation, training materials, support materials, and end-user documentation associated with the Deliverables.

1.9 "Error" means with respect to the Deliverables, a failure to meet the Acceptance Requirements, including any defect or deficiency or failure to conform to the then-current functional, operational and performance Specifications and Documentation. It is not an Error when the functional, operational and performance Specifications and Documentation are met but the Specifications prove to be erroneous or dysfunctional or when target adjustments have to be made during the development process.

1.10 "Error Correction" means a modification, addition or procedure to correct an Error.

1.11 "Foreground Technology" means all Technology which is created, developed, or otherwise generated by Supplier under this Agreement.

1.12 "Intellectual Property Rights" means worldwide common law and statutory rights associated with (i) patents and patent applications; (ii) works of authorship, including mask work rights, copyrights, copyright applications, copyright registrations and "moral" rights; (iii) the protection of trade and industrial secrets and confidential information; (iv) other proprietary rights relating to intangible intellectual property (specifically excluding trademarks, tradenames and service marks); (v) analogous rights to those set forth above; and (vi) divisions, continuations, renewals, reissuances and extensions of the foregoing (as applicable) now existing or hereafter filed, issued or acquired.

1.13 "Services" means any task performed, such as consultancy services, to complete the project in accordance with the agreed responsibilities pursuant to a Statement of Work.

1.14 "Source Code" means program code in high-level computer language readable by humans skilled in the language, and includes available related Documentation and tools, including comments, internal development tools and build environments.

1.15 "Specifications" means the functional, operational and performance requirements for the Deliverables.

1.16 "Statement of Work" means the development plan, including deliverables and associated milestones, and the development schedule set forth in a written document. The Parties may enter into multiple individual Statements of Work under this Agreement. Each Statement of Work entered into by the Parties shall be part of the Agreement, as defined.

1.17 "Technology" means inventions, business, marketing, engineering, technical and manufacturing information, know-how and materials, including technology, software, instrumentation, specifications, designs, devices, data, compositions, formulas, , assays, reagents, constructs, compounds, discoveries, procedures, processes, practices,

protocols, methods, techniques, results of experimentation or testing, knowledge, trade secrets, skill and experience, in each case whether or not patentable or copyrightable; the foregoing may be in both tangible and intangible form.

## 2.0 DEVELOPMENT

2.1 Development Undertaking.  Supplier will design, develop and create the Deliverables and perform all Services, conforming to the Acceptance Requirements and in accordance with the applicable Statement of Work created under this Agreement. For the avoidance of doubt, Supplier will not be an exclusive supplier of the services regarding the project as a whole, but only with respect to the agreed Deliverables and Services pursuant to this contract. BYTON carries the overall responsibility for the Project as a whole.
Should the development process show that target adjustments are necessary in order to achieve the overall target of a functional vehicle fit for homologation in the jurisdiction of the European Union, the United States of America and China, these target adjustments are not considered erroneous.

2.2 Obligations in Support of Development.  To ensure the timely and satisfactory completion of Supplier's development work under the Statement of Work, Supplier will deploy throughout the development sufficient and qualified personnel, equipment and other necessary resources to complete Supplier's development work. BYTON will provide all necessary data and perform all duties in accordance with FPDP Gate Deliverables Full Checklist to enable Supplier's performance.  For all of Supplier's development work and provision of Services, Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement.  Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement.  Supplier may employ individual independent contractors as part of its workforce but shall not be permitted to delegate or subcontract the performance of its duties and obligations to any third party without the prior written consent of BYTON.  Supplier remains responsible for compliance with the terms and conditions of the Agreement whether performed by Supplier or an authorized third party.

For Supplier personnel who are visiting and onsite at BYTON facilities, the additional obligations set forth in Section 13 below shall apply.

2.3 Status Reports.  Supplier will provide to BYTON written engineering status reports, on an every-other-week basis (or as requested basis) detailing the status of the development work described in the Statement of Work.  Supplier shall provide more frequent updates and status reports upon BYTON's request.

2.4 Change Requests.  Some evolution of the Specifications and the Statement of Work based upon interaction between the Parties is expected and minor modifications which will not impact full compliance with the Statement of Work (including milestones) or fees due under this Agreement may be mutually agreed to by the Parties and need not be achieved by a formal change mechanism. However, changes impacting full compliance with the Statement of Work or fees payable are only valid if implemented in accordance with the following change request procedure.  BYTON may request any change to the Specifications or the Statement of Work by setting forth the proposed change in reasonable detail in a writing (including email) submitted to Supplier ("Change Request").  Supplier shall respond in writing to Change Requests within three (3) workdays of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, the impact on the Statement of Work and any additional fees which Supplier would require in order to make the requested change ("Change Response").  BYTON shall respond promptly informing Supplier whether it agrees with Supplier's description of the anticipated impact and additional terms, if any, proposed in the Change Response.  Once an authorized representative of BYTON agrees in writing to the terms and conditions outlined in the Change Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Change Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance

C_BYTON_EDAG_V10_20_18

with previous agreed terms during these 48 hours as time is of essence.

2.5 Enhancements.  BYTON, at its option, may request enhancements to the Deliverables by setting forth the proposed change in reasonable detail (including email) submitted to Supplier ("Enhancement Request").  Supplier shall respond in writing to Enhancement Requests within ten (10) days of receipt, in each case, setting forth the expected effect of incorporating the requested change, including, as appropriate, any additional fees which Supplier would require in order to make the requested change ("Enhancement Request Response").  BYTON shall respond promptly within 48 hours, informing Supplier whether it agrees with Supplier's additional terms, if any, proposed in the Enhancement Request Response.  Once an authorized representative of BYTON agrees in writing to the Enhancement Request Response, Supplier shall promptly begin to implement the agreed changes. In the light of the tight schedule, BYTON agrees to commit to the new terms after the Enhancement Response within 48 hours. Should BYTON not agree within that timeframe, Supplier is entitled to perform service or deliver/ conduct task as previously agreed. For the avoidance of doubt: Supplier may continue to work in accordance with previous agreed terms during these 48 hours as time is of essence.

2.6 BYTON's and Supplier's Obligations.  In furtherance of this Agreement, BYTON and Supplier shall (a) cooperate and work together in all matters relating to the services provided hereunder; (b) respond promptly to a Party's request to provide direction, information, approvals, authorizations or decisions that are reasonably necessary for or related to a Statement of Work in a timely manner.

## 3.0 TRANSFER AND DELIVERY

3.1 Background Technology.  If required under a Statement of Work in accordance with 1.5, Supplier will deliver to BYTON the Background Technology (including without limitation Documentation thereto) within five (5) days if feasible, or as otherwise agreed to by the parties if not feasible,  after payment pursuant to the agreed payment schedule.

3.2 Deliverables and the Developed Technology.  Supplier will deliver to BYTON each Deliverable (including the Foreground Technology therein and related Documentation), in the form(s) set forth in a Statement of Work, not later than the date set forth therein for testing in accordance with the Acceptance Requirements. In addition, Supplier will provide to BYTON such technical documentation as may be reasonably required to enable BYTON to install and test each Deliverable as anticipated by the Acceptance Requirements.

3.3 Delays.  TIME IS OF THE ESSENCE. Supplier's delivery to BYTON of the Deliverables in accordance with this Section 3.0 ("Transfer and Delivery") and Supplier's completion of all Deliverables, Foreground Technology and Documentation thereto in accordance with the schedule set forth in the Statement of Work are key to the success of the BYTON Product(s).  BYTON will provide all necessary information and perform all duties in a timely fashion to enable Supplier performing in accordance with the master timing.

3.4 Means of Delivery.  All deliveries to BYTON shall be made DDP Destination (INCO Terms, 2010) and pursuant to BYTON's written instructions with respect to form (physical or electronic) and location.  For the delivery of any physical items, taxes or duties, fees, charges, stamp taxes, etc. of any kind are borne by BYTON. Supplier agrees to support BYTON where possible and is entitled to charge these services in accordance with its offer.

## 4.0 TESTING AND ACCEPTANCE

4.1 Test Method.  The Deliverables requiring machine execution will be tested in the test environment described in the Acceptance Requirements.  The Foreground Technology and Deliverables not requiring machine execution will be compared to the requirements of the Acceptance Requirements.

C_BYTON_EDAG_V10_20_18



4.2 <u>Acceptance Procedure</u>.

    a.  BYTON may, in BYTON's sole discretion, reject the Deliverables or any component thereof, if it contains any Error. BYTON will promptly notify Supplier in writing of BYTON's acceptance or rejection ("Error Notice"). In each Error Notice, BYTON will set forth, in reasonable detail, the reason for the rejection.

    b.  Upon rejection of the Deliverables, Supplier shall either (i) create and implement an Error Correction for each identified Error and resubmit the relevant portion of the Deliverable to BYTON for retesting within three (3) workdays of BYTON's Error Notice, or (ii) if it is impracticable to provide an Error Correction in such three (3) workday period, within three (3) workdays of BYTON's Error Notice, provide to BYTON a written plan to correct the identified Error(s), including a schedule therefor ("Correction Plan").

Failure of the Deliverables to pass BYTON's acceptance tests following implementation of Error Correction(s) as contemplated above, or failure of Supplier and BYTON to agree upon a Correction Plan within three (3) days after Supplier provides such Correction Plan to BYTON or Supplier's failure to fully comply with an agreed upon Correction Plan, will entitle BYTON, in BYTON's sole discretion, to (i) require Supplier to again undertake creation and implementation of an Error Correction for resubmission and testing pursuant to this Section; (ii) accept the relevant portion of the Deliverables and correct the Error itself offsetting its reasonable costs against any associated fees; (iii) accept the relevant portion of the Deliverables, reserving BYTON's rights to require Supplier to correct the Error; or (iv) deem such event a material breach of this Agreement which cannot be cured, immediately terminate this Agreement in accordance with Section 9.2 ("Breach and Termination"), and Supplier shall refund any fees that have been paid (for any noncompliant Deliverables) under the Statement of Work in Question for this particular item.

**5.0 LICENSE GRANTS AND RESTRICTIONS**

5.1 <u>Supplier's License Grants and Restrictions</u>.

    a.  <u>Background Technology License</u>.  Supplier hereby grants to BYTON, a royalty-free, fully paid up, non-exclusive, perpetual, irrevocable and worldwide license under Supplier's Intellectual Property Rights to, in any fashion BYTON may choose (including, but not limited to, community source and/or open source licensing), (i) use, reproduce, modify, prepare Derivative Matter of, compile, publicly perform, publicly display, demonstrate, Background Technology and Derivative Matter thereof (including in Source Code or object code form) on any media or via any electronic or other method now known or later discovered; (ii) make, have made, use, sell, offer to sell, import and otherwise exploit the Background Technology and Derivative Matter thereof (including in Source Code or object code form) in any manner and on any media or via any electronic or other method now known or later discovered; (iii) disclose, distribute and otherwise exploit the Background Technology and Derivative Matter and (iv) sublicense the foregoing rights to third parties through multiple tiers of sublicensees or other licensing mechanisms at BYTON's option for Background Technology and Derivative Matters necessary for the Project.

    b.  <u>Third Party Licenses</u>.  Supplier shall not incorporate any third-party materials, information or intellectual property, including without limitation, any open source software (Source Code or object code form) made generally available to the public under open source licenses (collectively, "Third Party Materials") into any of the Deliverables unless Supplier has obtained for BYTON license rights consistent with the rights mentioned under Section 5.1(a) herein.  Supplier shall identify and disclose to BYTON, all Third Party Materials to be incorporated into the Deliverables, prior to doing so, and the Parties shall discuss the same if necessary.

5.2 <u>BYTON's License Grant and Restrictions</u>.

a.  <u>License Grant</u>.  Subject to the terms and conditions of this Agreement, BYTON grants Supplier a personal, non-exclusive, non-transferable, limited license to internally use the Foreground Technology and prepare and use Derivative Matter thereof, solely for the purpose of performing maintenance and support services to BYTON in accordance with the terms of this Agreement.

b.  <u>Restrictions</u>.  Supplier shall have no right to use the Foreground Technology for productive or commercial uses.  Supplier may not sell, rent, loan or otherwise encumber or transfer the Foreground Technology, in whole or in part, to any third party.  No right, title or interest in or to any trademark, service mark, logo or trade name of BYTON or its Suppliers is granted under this Agreement.

## 6.0 OWNERSHIP AND PROPRIETARY NOTICES

6.1 <u>Background Technology</u>.  Supplier asserts that Supplier and/or Supplier's suppliers own the Background Technology and associated Intellectual Property Rights or owns the proper non-exclusive licenses.  BYTON agrees that, to the extent Supplier owns the Background Technology and associated Intellectual Property Rights, Supplier will retain such ownership. Except as expressly stated in this Agreement, nothing herein shall be deemed a transfer or license by BYTON of any Intellectual Property Rights that BYTON may now possess or acquire in the future which may cover any aspect of the Deliverables.

6.2 <u>Deliverables; Foreground Technology</u>.

a.  <u>Foreground Technology; Deliverables</u>.  BYTON retains all right, title and interest in and to: (i) the BYTON Products; (ii) Deliverables except to the extent such Deliverables constitutes Background Technology; and (iii) Foreground Technology.

b.  <u>Assignment of Rights</u>.  Subject to Supplier's underlying Intellectual Property Rights in the Background Technology and in exchange for the fees set forth in section 4 of SOW, Supplier shall and does hereby assign to BYTON, Supplier's entire right, title and interest in and to the Deliverables created for BYTON, the Foreground Technology, and all associated Intellectual Property Rights therein.  The Parties hereby agree that all development work performed by Supplier hereunder shall be deemed works made for hire.  Before any employee or contractor of Supplier ("Personnel") performs development work hereunder, such Personnel and Supplier must enter into a written agreement expressly for the benefit of BYTON and containing provisions substantially equivalent to this Section 6.2 ("Deliverables; Foreground Technology") and Section 10 ("Confidential Information") or enter into an agreement as close as legally possible to it under the laws of the country in which task is performed. Supplier (i) may only use the Foreground Technology in accordance with Section 5.2 ("BYTON's License Grant and Restrictions"), and (ii) agrees not to challenge the validity of BYTON's ownership in the Foreground Technology. In addition, BYTON shall own all Derivative Matter and associated Intellectual Property Rights.  BYTON may register the copyright in the Deliverables and Foreground Technology in its own name, identifying Supplier's interest in the Background Technology as required by applicable Copyright Office rules and regulations.

c.  <u>Cooperation in Perfecting Rights</u>.  Supplier agrees to cooperate with BYTON and cause Supplier's employees to cooperate with BYTON and to perform all acts, at BYTON's request on reasonable notice, as reasonably necessary to facilitate the preparation, filing, prosecution and enforcement of the Intellectual Property Rights associated with the Deliverables and Foreground Technology. In addition, Supplier shall, upon BYTON's request and at BYTON's costs, enter into any assignments, waivers or licenses of the Deliverables, Foreground Technology or the Intellectual Property Rights related to any of the foregoing as BYTON deems necessary and appropriate.  In the event that BYTON is unable for any reason to secure Supplier's signature to any document required to apply for or execute any patent, copyright, trademark registration or other application with respect to the Deliverables and Foreground Technology, Supplier hereby irrevocably designates and appoints BYTON and

C_BYTON_EDAG_V10_20_18

its duly authorized officers and agents as Supplier's agents and attorneys-in-fact to act for and on Supplier's behalf and instead of Supplier, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, trademarks or other rights thereon with the same legal force and effect as if executed by Supplier.

6.3 Moral Rights. Supplier agrees that with respect to any "moral" or equivalent rights (including, without limitation, rights of attribution, integrity, disclosure, and withdrawal) Supplier hereby: (i) assigns such rights to BYTON as described above, (ii) waives such rights and (iii) agrees and covenants never to assert, either during or following the term of this Agreement, such rights or to institute or maintain any action against BYTON relative to any such rights in the Foreground Technology or Derivative Matter.  To the extent that such rights cannot be assigned or waived by operation of law, Supplier grants to BYTON, a royalty-free, fully paid-up, perpetual, irrevocable and worldwide license to fully exercise all such rights, with rights to sublicense through multiple levels of sublicensees and further, Supplier consents to BYTON's use sufficient to allow BYTON to exercise the rights granted in this Agreement.

## 7.0 PAYMENTS, INSURANCE AND ACCOUNTING

7.1 Fees. BYTON shall pay Supplier the fees set forth in Section 4 in SOW accordance with the schedule and requirements set forth therein and, in the case of fees due in connection with the Deliverables, upon acceptance of Deliverable by BYTON in accordance with Section 4.2 ("Acceptance Procedure").  Following such acceptance, Supplier shall provide a correct invoice to BYTON, and such invoice will be due, in Euro, within either sixty (60) days following BYTON's receipt of such invoice.  BYTON sent per the agreed payment schedule highlighted in the Statement Work to this Agreement.

7.2 Taxes.  All prices quoted by Supplier are exclusive of any taxes.  Supplier shall include on its invoices the actual taxes payable for the services provided to BYTON.  However, Supplier shall pay all taxes, levies or duties associated with fees and royalties payable by BYTON hereunder, whether based on gross revenue or otherwise; and any business, occupational or similar taxes relating to its general business activities.   Supplier shall also be responsible for all employer related taxes relating to its Personnel including employee taxes, workers compensation, and unemployment insurance.

7.3 Insurance. Supplier will be insured pursuant to laws in Germany and provide a copy of the certificate of insurance and will maintain such insurance for the time of the Agreement.

## 8.0 MAINTENANCE AND SUPPORT SERVICES

8.1 Supplier shall provide to BYTON the maintenance and support services, as set forth in a Statement of Work, or if thereafter subsequently requested by BYTON as subsequently, mutually agreed by the parties.

## 9.0 TERM AND TERMINATION

9.1 Term of Agreement.  The term of this Agreement begins on the Effective Date and continues for a period of seven (7) years (but in no event earlier than the expiration or earlier termination of the last Statement of Work created hereunder), unless this Agreement is earlier terminated sooner in accordance herewith.

9.2 Breach and Termination.  If either Party fails to comply with any material term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such notice, all breaches specified therein are remedied.  If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall

undertake reasonable, diligent and good faith efforts to promptly remedy the breach. If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement. If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice. Notwithstanding anything to the contrary herein, BYTON may immediately terminate this Agreement, without a cure period, if Supplier fails to comply with any of its obligations under Sections 3.3 ("Delays") or 4.2 ("Acceptance Procedure").

9.3 Supplier's Insolvency. In the event Supplier becomes insolvent, enters into voluntary or involuntary bankruptcy, ceases to conduct business or assigns its interests in this Agreement to a third party creditor, (i) BYTON may immediately terminate this Agreement; or (ii) BYTON may (a) continue to exercise the license rights granted to BYTON hereunder, and (b) reserve all rights in the Background Technology and related materials to protect BYTON's interests therein pursuant to Section 365(n) (and any amendment thereto) of the U.S. Bankruptcy Code, or equivalent legislation in other applicable jurisdictions. The parties acknowledge that the Background Technology and Foreground Technology are "intellectual property" for purposes of Section 365(n) of the U.S. Bankruptcy Code and that BYTON will have the right to exercise all rights provided by Section 365(n) with respect to the Background Technology and Foreground Technology. In the event that the Supplier materially breaches any provision under this Agreement, BYTON will have the right to require the delivery by Supplier (or in the event of a filing of bankruptcy by or against Supplier, by the trustee) to BYTON of all Background Technology and Deliverables (including all embodiments thereof).

9.4 BYTON Termination. BYTON, at BYTON's sole option, prior to acceptance of the final deliverable, shall be permitted to terminate this Agreement, a Statement of Work or any part thereof, without cause upon 30 (30) days prior written notice to Supplier. In such an event, BYTON shall pay the applicable fees through the next milestone following notice of such termination or as otherwise agreed between the Parties. If BYTON terminates this Agreement or a Statement of Work (in whole or in part) pursuant to this Section 9.4, then the Parties shall promptly discuss what transition of work, if any, may occur, the plans for accomplishing such, and the proposed timetable, among other things ("Transition Plan"), which will include a transition period for employees of the Supplier allocated for on this project. Based on BYTON's plans and objectives and under consideration of Supplier's allocations with respect to this Agreement, the Parties shall cooperate and mutually agree on a Transition Plan, which shall be completed within sixty (60) days after the Parties reach agreement.

9.5 Effect of Termination or Expiration. Neither party will be liable for any damages arising out of the expiration of this Agreement. Termination as a result of a breach of this Agreement will not affect any right to recover damages sustained by reason of breach; or any payments which may be owing in respect of this Agreement. Subject to Supplier making best efforts to mitigate any costs and payments, Supplier is entitled to all payments in accordance with agreed payment plans/fee schedule for already initiated work at the time Supplier received the notice from BYTON to terminate for convenience. This includes payments for costs incurred with respect to subsequent milestones (such as e.g. visa fees, contractual obligations to employees traveling abroad, testing facilities rented, etc.).

9.6 Survival. Sections 1.0 ("Definitions"), 3.0 ("Transfer and Delivery"), 5.1 ("Supplier's License Grants and Restrictions"), 5.2(b) ("Restrictions"), 6.0 ("Ownership and Proprietary Notices"), 8.0 ("Maintenance and Support Services"), 9.0 ("Term and Termination"), 10.0 ("Confidential Information"), 11.0 ("Warranties and Disclaimer of Warranty"), 12.0 ("Indemnification"), and 13.0 ("Miscellaneous") of this Agreement shall survive any termination or expiration of the Agreement.

## 10.0 CONFIDENTIAL INFORMATION

10.1 Obligation. Except as provided in this Agreement, neither Party may use, reproduce, distribute or disclose Confidential Information it receives from the other Party under this Agreement, without the prior written authorization

C_BYTON_EDAG_V10_20_18

of the disclosing Party. Each Party must hold in confidence Confidential Information received from the other Party and must protect the confidentiality thereof with the same degree of care that it exercises with respect to its own information of like importance, but in no event less than reasonable care, during the term of this Agreement and for a period of three (3) years after the expiration or earlier termination of this Agreement. Neither Party shall be liable for any inadvertent or unauthorized disclosure of Confidential Information, provided that it exercises at least the standard of care set forth above to prevent disclosure and takes reasonable steps to mitigate any damage and prevent further disclosure. For purposes of this Section, use, reproduction, distribution or disclosure by BYTON of the Background Technology or Foreground Technology thereof under a community source or open source licensing model, pursuant to the license granted by Supplier herein, will not be a breach of this Agreement.

10.2 Exceptions. Section 10.1 ("Obligation") does not apply to any portion of the Confidential Information which the receiving Party can demonstrate:

    a.  is now, or hereafter becomes, through no act or failure to act on the part of the receiving Party, generally known in the automobile industry;

    b.  was possessed by the receiving Party without an obligation of confidentiality at the time of receiving such Confidential Information;

    c.  is rightfully obtained by the receiving Party without restriction on disclosure; or

    d.  is independently developed by the receiving Party not in breach of this Agreement.

10.3 Employee Access. Each Party must inform its employees and contractors having access to the other Party's Confidential Information of restrictions under this Agreement and shall contractually require such contractors to comply with the requirements of this Section 10.0 ("Confidential Information") and Section 6.0 ("Ownership and Proprietary Notices").

10.4 Legally Compelled Disclosure.  In the event that either Party is requested or becomes legally compelled (including without limitation, pursuant to securities laws and regulations) to disclose the existence or any of the terms of this Agreement, in contravention of the provisions of this Section 10, such Party (the "Disclosing Party") shall provide the other Party (the "Non-Disclosing Party") with prompt written notice of that fact before such disclosure and will use reasonable efforts to fully cooperate with the Non-Disclosing Party to seek a protective order, confidential treatment, or other appropriate remedy with respect to the disclosure. In the case of disclosure in connection with rules or regulations of any entity regulating securities ("SEC"), if confidential treatment is requested by the Non-Disclosing Party, the Disclosing Party agrees to use reasonable efforts to file such a request on the Non-Disclosing Party's behalf and to respond to any SEC comments to pursue assurance that confidential treatment will be granted, in both cases fully informing the Non-Disclosing Party of any such comments and cooperating with the reasonable requests of the Non-Disclosing Party.

10.5 Independent Development. Each Party understands that the other Party may develop or receive information similar to the Confidential Information. Subject to copyrights and patent rights of each Party, (i) either Party may develop or acquire technology or products, for itself or others, that are similar to or competitive with the technology or products of the disclosing Party, and (ii) each Party is free to use and disclose information which may be retained in the unaided memory of the receiving Party's employees or contractors who have had access to the Confidential Information of the other Party disclosed hereunder.

10.6 Publicity. Neither Party shall disclose the existence or the terms and conditions of this Agreement to any third Party, except as may be required (i) to implement or enforce the terms of this Agreement; or (ii) by an existing or

C_BYTON_EDAG_V10_20_18

potential investor, acquiring company, bank or other financial institution, under appropriate non-disclosure terms in connection with a merger, acquisition, financing, loan agreement or similar corporate transaction. Supplier shall not, without first obtaining the prior written consent of BYTON, announce this Agreement. Once the written consent is obtained, Supplier may mention BYTON publicly as reference.

## 11.0 WARRANTIES AND DISCLAIMER OF WARRANTY

11.1 Ownership. Supplier represents and warrants that (i) the Background Technology, Foreground Technology and Deliverables will not infringe or misappropriate any Intellectual Property Rights or trademarks of any third Party; (ii) Supplier has the right and power to enter into this Agreement and grant the assignment and the licenses set forth herein; (iii) the Deliverables will be free from defects in design, material and workmanship and in accordance with the Specifications agreed upon by the parties; (iv) the Deliverables will conform to all applicable laws of the United States, European Union, and China, including those applicable to the design and engineering of vehicles in such countries and regions to achieve homologation; (v) and all services provided will be provided in a professional and workmanlike manner, using qualified personnel with appropriate training, education and experience to perform the services as required hereunder.

11.2 Conformance. Supplier represents and warrants that following the date of acceptance, the Background Technology, Foreground Technology and Deliverables will continue to conform to the Acceptance Requirements without degradation.

11.3 Virus. Supplier represents and warrants that the Background Technology, Foreground Technology and Deliverables and associated media contain no computer instructions designed to (i) disrupt, damage or interfere with use of computer or telecommunications equipment or facilities, or (ii) disrupt or corrupt the use, operation or results of any computer program to the (technical) extent it can be reasonably expected.

11.4 Additional Remedies. In the event of a material breach by Supplier of any representation or warranty herein, BYTON shall have, in addition to and without limitation of any other right or remedy available to BYTON at law or in equity, the right, in BYTON's sole discretion, to take any and all actions reasonably necessary to mitigate BYTON's damages and/or any damages to BYTON's customers arising from such breach, including but not limited to: (i) modifying any form of the Background Technology, Foreground Technology and Deliverables ; (ii) requiring Supplier to fix any necessary form of the Background Technology, Foreground Technology and Deliverables ; (iii) contracting with others to modify any necessary form of the Background Technology, Foreground Technology and Deliverables ; and (iv) distributing to BYTON's customers any such modification, up to an amount equal to greater of: a. EUR15,000,000.00; or b. amounts payable under insurance coverage available to Supplier. Any additional insurance requests by BYTON will be charged to BYTON. This includes BYTON's right to charge to Supplier and Supplier shall be obligated to pay to BYTON all direct costs and expenses, excluding legal fees of any kind, incurred by BYTON in connection with any such mitigation efforts.

11.5 Disclaimer. EXCEPT AS PROVIDED IN THIS AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF DESIGN, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

## 12.0 INDEMNIFICATION

12.1 Obligation to Indemnify.

C_BYTON_EDAG_V10_20_18

a.  Supplier's Obligation to Indemnify BYTON.  Supplier will indemnify, defend and hold harmless BYTON from and against any and all claims, demands, or actions ("Claims"), and all liabilities, settlements, costs, damages and fees (including reasonable attorneys' fees and costs) ("Losses") incurred or suffered by BYTON arising out of any Claim which arises from: (a) any gross negligent or intentional act or omission of Supplier or its employees, agents or representatives in providing the services under a Statement of Work; (b) Supplier's breach of its obligations under the Agreement; (c) any Claim by or on behalf of Supplier Personnel and their family and relatives against BYTON arising out of the services performed by Supplier Personnel under the Agreement unless they are related to local, hazardous work conditions at a BYTON facility; (d) a Claim that Background Technology, Foreground Technology or Deliverable provided by Supplier hereunder infringes or misappropriates the Intellectual Property Rights of unaffiliated third party. Supplier is not responsible for background technology, foreground technology or deliverables provided by BYTON for the purpose of this Agreement.

b.  In the event of any third person or Governmental Body claim ("Third Party Claim"), action or suit against BYTON as to which BYTON seeks indemnification against Supplier hereunder, and BYTON fails to notify Supplier within a reasonable timeframe of the claim or  acknowledges its obligation in writing and elects to defend against, compromise, or, settle any Third Party Claim which relates to any Losses indemnified by this agreement without seeking permission of Supplier beforehand, BYTON accepts to be solely liable for all claims, losses, expenses including legal expenses regardless of actual liability for this claim. Neither Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or consent to entry of any judgment unless the claimant or claimants and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim.

12.2 Remedies.  Should the Deliverables become, or in Supplier's reasonable opinion be likely to become, the subject of a claim of infringement or misappropriation of any Intellectual Property Rights in accordance with 12.1, Supplier shall, at its sole expense, either (i) procure for BYTON the right to continue to use the Deliverables, or (ii) replace or modify the Deliverables to make it non-infringing, provided that the same functions are performed by the replaced or modified Deliverables.

## 13.0 SUPPLIER PERSONNEL

13.1    General Requirements for Supplier Personnel.

a.  Supplier will manage, supervise and provide direction to its Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement.  Supplier is responsible for the acts and omissions of Personnel under or relating to each Agreement.  Supplier is responsible for validating the identity of and ensuring that Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) be subject and conform to all applicable BYTON policies, rules and procedures with respect to personal and professional conduct (including the wearing of an identification badge; use of computer systems; and adhering to general safety, dress, behavior, and security practices).

b.  Supplier is the employer of the Personnel and shall be responsible for all compensation and benefits payable to them; Personnel are not employees of BYTON and are not entitled to any compensation or benefits which are provided to its employees, including without limitation health insurance; paid vacation; sick leave; or retirement benefits.  Supplier shall also be responsible for complying with all tax laws applicable to Personnel, including withholding taxes for all compensation payable; and for complying with all applicable labor and employment requirements including worker's compensation insurance requirements, and immigration and work visa requirements.

13.2    Key Supplier Positions. "Key Supplier Positions" means those positions designated as such in the applicable SOW.  Supplier will cause each of the Supplier Personnel filling the Key Supplier Positions to devote substantially full time and effort to the provision of the Services during the period of assignment.

C_BYTON_EDAG_V10_20_18

13.3   Approval and Removal of Supplier Personnel.  BYTON may approve all Personnel assigned to perform Services, and may require Supplier to replace any Personnel whose performance, in BYTON's reasonable judgment, has been unsatisfactory.

## 14.0 MISCELLANEOUS

14.1 Force Majeure.   Neither Party shall be liable for any failure or delay in performance of this Agreement a. to the extent the failure or delay is caused by fire, flood, earthquake or other acts of God or nature; civil disorder, war, riots; or any other similar cause or event beyond the reasonable control of a party; and b. provided the non-performing Party is without fault in causing such failure or delay, and it could not have been prevented by reasonable precautions or other alternative means.  If the foregoing failures or delays occur which prevent performance of a Party's obligations under this Agreement, the affected Party shall promptly discuss the impact of such failure or delay, the period of time such may continue for, and the plans for a work around solution, among other things; the affected Party shall update the non-affected Party and keep them apprised of the situation. The affected Party's obligations of the Parties shall be suspended for so long as the events mean that performance of the agreement is impossible.  If the failure or delay continues for more than twenty (20) work days, then the non-affected Party may terminate the specific SOW under this Agreement.

14.2 Severability.  In the event that any part of this Agreement is found to be unenforceable, the remainder shall continue in effect, to the extent permissible by law and consistent with the intent of the parties as of the Effective Date of this Agreement.

14.3 Relationship of the Parties.  This Agreement does not create a partnership, franchise, joint venture, agency, or fiduciary or employment relationship.  Neither Party may bind the other Party by contract or otherwise to any obligation or act in a manner which expresses or implies a relationship other than that of independent contractor.

14.4 Governing Law.
a.   Disputes; Governing Law & amicable settlement.  If there is a dispute between the Parties which cannot be resolved through good faith negotiations, then a Party may request escalation to discussions with senior management of both Parties.  Within five (5) days of a Party's request, a meeting or telephone call shall be held with such senior management in an attempt to resolve such dispute.  If the Parties cannot resolve such dispute within a reasonable time period, then the Parties retain all rights hereunder, including pursuing arbitration as below stated.  Any action related to this Agreement will be governed by the laws of the State of California (except that body of law controlling conflict of laws) and the United Nations Convention on the International Sale of Goods will not apply).

b.   Arbitration.   Any dispute between the Parties that is not resolved through negotiation will be resolved exclusively by final and binding arbitration conducted in accordance with the then-current Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS").  The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, if the Parties cannot agree, an arbitrator appointed in accordance with the JAMS rules who shall be experienced in the type of dispute at issue.  The Parties, their representatives, the arbitrator, and other participants shall keep confidential the existence, content, and result of the arbitration. Any demand for arbitration and any counterclaim must specify in reasonable detail the facts and legal grounds forming the basis for the claimant's claims and include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant. The arbitration will be conducted in the English language; the location of such arbitration shall be in San Francisco, California. Each Party will bear its own costs in the arbitration, The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the provisions of the agreement documents and to fashion appropriate remedies (including temporary, preliminary, interim, or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (1) in excess of the authority that a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (2) to award damages in excess of the types and limitation of

C_BYTON_EDAG_V10_20_18

damages found in the Agreement; or (3) to modify the terms of this Agreement. The arbitrator shall issue an award within 30 days after completion of the hearing and any post-hearing briefing. The award must be in writing and must state the reasoning on which the award is based. Judgment upon the award may be entered in any court of competent jurisdiction. Notwithstanding the agreement to arbitrate, each Party may apply at any time to a court of competent jurisdiction for appropriate injunctive relief or for other interim or conservatory measures, and by doing so will not breach or waive the agreement to arbitrate or impair the powers of the arbitrator.

14.5 Import and Export Laws. The Background Technology, Foreground Technology and Deliverables, including without limitation, technical data, may be subject to U.S. export controls or to export or import regulations of other countries. The Parties agree to comply with all such regulations and acknowledge that they have the responsibility to obtain such licenses to export, re-export or import the Background Technology, Foreground Technology and Deliverables as may be required.

14.6 Notices. All notices required hereunder must be in writing, sent to the Party's address set forth below and receipt must be confirmed. Notices required with respect to Sections 9.0 ("Term and Termination") and 12.0 ("Indemnification") must be provided by express courier.

BYTON:

BYTON North America Corporation
4201 Burton Drive
Santa Clara, California, 95054

Attn: General Counsel

Supplier:
Supplier's Name:      EDAG Engineering GmbH
Supplier's Address:   Kreuzberger Ring 40
                      65205 Wiesbaden
                      Germany

14.7 No Exclusive Remedy. Unless specifically designated, nothing in this Agreement shall be construed as an exclusive remedy.

14.8 Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one agreement.

14.9 Construction; Order of Precedence. This Agreement has been negotiated by the parties and their respective counsel. This Agreement will be interpreted without any strict construction in favor of or against either Party. The original of this Agreement has been written in English, and such version shall be the governing version of the Agreement. To the extent permitted under applicable law, Supplier waives any right it may have, if any, under any law or regulation to have this Agreement written in a language other than English. In the event of a conflict between this Agreement and any other document that references this Agreement, the order of precedence shall be: (i) the most recent written document signed by the Parties amending the subject Statement of Work; (ii) the Statement of Work; (iii) any other exhibits or attachments to, or documents referenced by the Statement of Work; and (iv) this Agreement.

14.10 Amendment and Waiver. Unless otherwise provided herein, this Agreement may not be modified unless in writing and signed by an authorized representative of each Party. Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

14.11 <u>Assignment</u>.  Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement (whether by operation of law, merger, change of control, or otherwise), without the prior written consent of the other Party, (i) to an Affiliate, or (ii) in the event of a merger, acquisition or sale of all or substantially all of the assets of a Party or a business unit. Any assignment or transfer in breach of this Section shall be void.

14.12 <u>No Rights in Third Parties</u>.  This Agreement is made for the benefit of the Parties and not for the benefit of any third party.

14.13 <u>Entire Agreement</u>.  This Agreement, including all Attachments hereto, constitutes the Parties' entire agreement with respect to its subject matter, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  No terms in any Supplier or BYTON documents (including purchase orders, acknowledgments, emails, or documents incorporated by reference (including but not limited to EDAG's or BYTON's General Terms and Conditions) which vary from, add to, modify or eliminate any terms herein, are expressly rejected and are not part of this Agreement or any Statement of Work.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives.

**BYTON NORTH AMERICA CORPORATION**

By: _David A. Twohig_

Name: DAVID TWOHIG
(print)

Title: VP/CHIEF VEHICLE ENGINEER

Date: 2019-1-9

**EDAG Engineering GmbH**

By: _____

Name: Cosimo De Carlo
(print)

Title: CEO

Date: 2018-12-18

By: ppa. _Keller_

Name: Harald Keller

Title: Executive Vice President
Vehicle Development

Date: 2018-12-18

C_BYTON_EDAG_V10_20_18

ATTACHMENT 1
STATEMENT OF WORK No. 1

1) Introduction. This Statement of Work ("SOW") is issued under the Technology Development and License Agreement by and between BYTON and Supplier. The term of this SOW shall be from June 1st, 2017 ("SOW Effective Date") until terminated by either Party pursuant to section 9.0 of this Agreement.

2) Scope and nature of development work to be performed.

   - EDAG_191610D000_Project Description FMC_SAV_CTC-PS (Exhibit A)
   - RFQ for CTC Gateway to SOP plus 90 days (Exhibit B)
   - Timing Overview for RFQ 20170706 (Exhibit C)
   - FPDP_Gate_Deliverables_Full_Checklist 20170701 (Exhibit D)

3) Description of Deliverables.

   - EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
   - RFQ for CTC Gateway to SOP plus 90 days
   - Timing Overview for RFQ 20170706
   - FPDP_Gate_Deliverables_Full_Checklist 20170701

4) Development fees and Charges.

   - Per page 74 of the 19610D000 Project Description
   - Travel will be billed at cost + 6%

5) Schedule for Development and Deliverables. Supplier shall perform the following development work and deliver the following deliverables by the dates set forth below.

   - Per EDAG_19610D000_Project Description_BYTON_SAV_CTC-PS
   - Per the following PO's agreed to by the Parties:

| Byton PO | Topic | Order Value | SOW | BYTON Lead |
|---|---|---|---|---|
| 665 | Interim PO for Enf Services Aug 2018 | 1,850,000 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 761 | Interim PO for Enf Services Sep 2018 | 1,850,000 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 866 | Material Cards Creation (5) | 170,198 € | 18826A000_Proposal creation of material cards_20170505 | Antonio |
| 942 | Engineering Services CTC-PS | 45,460,677 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 943 | Blanket Travel PO CTC-PS | 732,260 € | 191610D000_Project description FMC SAV CTC-PS | Shawn / Paul |
| 1512 | Battery Pack Design Sep-Dec 2017 | 137,244 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |
| 1810 | Drop tower tests Steering Column | 20,000 € | 198677A000 Steering Column Testing | Shawn |
| 1930 | EuroNCAP 2020 Study | 77,782 € | 198676A001 Investigation EuroNCAP 2020 | Paul |
| 2082 | Battery Pack Design Jan/Feb 2018 | 149,884 € | EDAG_Quotation_196742A000_Byton_Dev_HV_AP-Battery-System_V1_DEU | Dirk |

50,448,045 €

C_BYTON_EDAG_V10_20_18

6) <u>Acceptance Criteria and Acceptance Test Plan for the Foreground Technology and Deliverables.</u>

  ∘ As agreed between the parties in the Proposal or otherwise as agreed in writing.

**BYTON NORTH AMERICA CORPORATION**

By: _David A. Twohig_

Name: _DAVID TWOHIG_
      (print)

Title: _VP/CHIEF VEHICLE ENGINEER_

Date: _2019-1-9_

**EDAG Engineering GmbH**

By: _____

Name: _Cosimo De Carlo_
      (print)

Title: _CEO_

Date: _2018-12-18_

By: _ppa. _____

Name: Harald Keller

Title: Executive Vice President
       Vehicle Development

Date: 2018-12-18

C_BYTON_EDAG_V10_20_18

# Exhibit B

BYTON

BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA 95054

July 28, 2019

To:
**EDAG Engineering GmbH**
Att. Mr. Holger Merz
Kreuzberger Ring 40
65205 Wiesbaden
Germany

Via Email to: holger.merz@edag.com

**Letter of Confirmation**

Dear Mr. Merz:

Byton North America Corporation, Inc. ("Byton") herewith confirms the maturity and legality of the (over-) due receivables as attached hereto.

Byton herewith confirms that these dues are to be paid in full as soon as the "bridging loan" is accomplished and the funds have been received by Byton. Byton confirms it will fulfill this payment amounting to EUR 19,779,825.21 (overdues until August 17th, 2019, interests included) before other creditors are paid. Byton plans on fulfilling this payment latest August 18th, 2019.

Best regards,

Teresa Shi
Vice president of Finance

Tom Wessner
Senior Vice President Global Supply Chain

Attachment: Overdues to EDAG Engineering GmbH

# Exhibit C



To:

**EDAG Engineering GmbH**
Att. Mr. Cosimo De Carlo
Kreuzberger Ring 40
65205 Wiesbaden
Germany

Via Email to: cosimo.de.carlo@edag.com

Santa Clara, August 26, 2019

<u>**Payment Plan Confirmation**</u>

Dear Mr. De Carlo,

Thank you for taking the time to discuss our payment plan and investment status with me today. Below is a record of what we discussed:

1.) Byton and FAW have signed C-round SPA (share purchasing agreement) today. FAW's new investment in Byton is 150M USD.

2.) Byton is also in advanced stage of finalizing agreements with other C-round investors, including Jiangsu provincial government, Nanjing city government, and some other co-investors. We will close C-round for more than 400M USD in total.

3.) The money will hit Byton account in the second half of September.

I also look forward to meeting you at the IAA in Frankfurt and staying in close contact on these matters.

Best regards

_____
Dr. Daniel Kirchert
Chief Executive Officer, Byton



To:

**EDAG Engineering GmbH**
Att. Mr. Holger Merz
Kreuzberger Ring 40
65205 Wiesbaden
Germany

Via Email to: holger.merz@edag.com

Santa Clara, August 23, 2019

**Payment Plan Confirmation**

Dear Mr. Merz,
Byton North America Corporation, Inc. ("Byton") herewith confirms the attached payment plan.
Basis for the payment plan is the signed letter of confirmation about the maturity and legality of
the (over-) due receivables from July 28, 2019.

**Payment Plan:**

| Payment Date | EUR | USD |
|---|---|---|
| Sep 20th | 1,769,911.50 | 2,000,000.00 |
| Oct 4th | 5,309,734.51 | 6,000,000.00 |
| Oct 18th | 12,700,179.19 | 14,351,202.49 |
| **Total** | **19,779,825.21** | **22,351,202.49** |

Byton commits to do everything in its power to pay whatever more it can prior to these dates;
but for planning purposes, this is the most-likely proposal.

Best regards

Dr. Daniel Kirchert
Chief Executive Officer

Tom Wessner
Senior Vice President Global Supply Chain

## **PROOF OF SERVICE**

I, the undersigned, am employed in the City and County of San Francisco, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Lewis & Llewellyn LLP, 505 Montgomery Street, Suite 1300, San Francisco, CA  94111.  I am familiar with the office practice of Lewis & Llewellyn LLP for collecting and processing documents for delivery.

On the date provided below, in accordance with the office practices of Lewis & Llewellyn LLP, I served a true copy of the following document(s):

### **DEMAND FOR ARBITRATION**

The foregoing document(s) were served by the following means:

☒  (**By Overnight Mail Delivery**)  I deposited the document(s) listed above in a collection box, or else they were picked up at of the offices of Lewis & Llewellyn LLP, for overnight mail delivery, with delivery fees thereon fully prepaid.

> C T Corporation System
> 818 West Seventh Street, Suite 930
> Los Angeles, CA 90017

☒  (**By Electronic Mail**)  I emailed courtesy copies of the document(s) listed above to the electronic mail address(es) shown below.

> Matt Barter                           Jonathan Ye
> matt.barter@byton.com        jonathan.ye@byton.com

☒  (**By Hand Delivery**)  I caused a copy of the document(s) to be hand delivered to the address(es) shown below.

> JAMS San Francisco Resolution Center
> Two Embarcadero Center
> Suite 1500
> San Francisco, CA 94111
> Tel: (415) 982-5267
> Fax: (415) 982-5287

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.  Executed on **October 22, 2019** at San Francisco, California.

*Charlotte Hayward*
Charlotte Hayward

Exhibit 2

1   **VAN ETTEN SIPPRELLE LLP**
     KEITH A. SIPPRELLE #143358
2   2945 Townsgate Road, Suite 200
     Westlake Village, California 91361
3   Telephone: (805) 719-4900
     Facsimile: (805) 719-4950
4   ksipprelle@vstriallaw.com

5
     Attorneys for Respondent and Cross-Claimant
6   BYTON NORTH AMERICA CORPORATION

7

8                   **JUDICIAL ARBITRATION AND MEDIATION SERVICES**

9                        **SAN FRANCISCO, CALIFORNIA OFFICE**

10

11

12   EDAG ENGINEERING GMBH,                     JAMS Reference No. 1100107291

13              Claimant,                        **RESPONDENT BYTON NORTH
                                                  AMERICA CORPORATION'S
14       vs.                                      RESPONSE TO DEMAND FOR
                                                  ARBITRATION**
15   BYTON NORTH AMERICA
     CORPORATION,                                **CROSS-CLAIMS OF BYTON NORTH
16                                                AMERICA CORPORATION AGAINST
              Respondent.                         EDAG ENGINEERING GMBH FOR:**
17
18                                               **1.      BREACH OF CONTRACT
                                                 2.      NEGLIGENCE**
19

20

21   BYTON NORTH AMERICA
     CORPORATION,
22
              Cross-Claimant,
23
         vs.
24
25   EDAG ENGINEERING GMBH,
26            Cross-Respondent.
27

28
                                            1
     **BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR
                         ARBITRATION; CROSS-CLAIMS**

1    BYTON NORTH AMERICA CORPORATION ("BYTON") hereby responds to the

2  October 22, 2019 Demand for Arbitration before JAMS ("Demand") by Claimant EDAG

3  ENGINEERING GMBH ("EDAG") as follows:

**GENERAL DENIAL**

5    BYTON denies, generally and specifically, each and every allegation, statement, matter

6  and purported cause of action contained in the Demand, and the whole thereof, and without

7  limiting the generality of the foregoing, denies that EDAG has been damaged in the manner or

8  sums alleged, or in any way at all, as the result of any alleged wrongful act or omission on the part

9  of BYTON.

10    BYTON further alleges, on information and belief, the following additional and

11  affirmative defenses to the Demand:

**FIRST AFFIRMATIVE DEFENSE**

(Failure to State a Cause of Action)

14    1.    The Demand, and each of every purported cause of action therein, fails to state a

15  cause of action against BYTON.

**SECOND AFFIRMATIVE DEFENSE**

(Comparative Fault)

18    2.    At all times herein mentioned, EDAG was guilty of fault or negligence which

19  proximately caused or contributed to the damages alleged by EDAG.

**THIRD AFFIRMATIVE DEFENSE**

(Damages)

22    3.    EDAG has not suffered damages in the amounts claimed in the Demand.

**FOURTH AFFIRMATIVE DEFENSE**

(Failure to Mitigate)

25    4.    EDAG has failed to mitigate or minimize its alleged damages (if any were in fact

26  suffered), and to the extent of such failure to mitigate, any damages awarded should be reduced

27  accordingly.

28

**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR ARBITRATION; CROSS-CLAIMS**

**FIFTH AFFIRMATIVE DEFENSE**

(Laches)

5.      The Demand is barred in whole or part by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

(Waiver and Estoppel)

6.      EDAG's claims are barred by the doctrines of waiver and estoppel.

**SEVENTH AFFIRMATIVE DEFENSE**

(Unclean Hands)

7.      EDAG's claims are barred by the doctrine of unclean hands.

**EIGHTH AFFIRMATIVE DEFENSE**

(Material Breach Excusing Performance)

8.      The Demand is barred on the ground that as to each and every contract alleged therein, EDAG materially breached the terms thereof, which breach has excused further performance by BYTON.

**NINTH AFFIRMATIVE DEFENSE**

(Condition Precedent/Subsequent)

9.      The Demand is barred by the failure of a condition precedent and/or a condition subsequent.

**TENTH AFFIRMATIVE DEFENSE**

(Performance/Satisfaction/Discharge)

10.      Any duty or obligation, contractual or otherwise, which EDAG claims is owed to it by BYTON, has been fully performed, satisfied and/or discharged.

**ELEVENTH AFFIRMATIVE DEFENSE**

(Failure of Consideration/Performance)

11.      The Demand is barred due to a failure of EDAG's consideration and/or performance.

1

**TWELFTH AFFIRMATIVE DEFENSE**

2

(Reservation of Rights)

3      12.      BYTON presently has insufficient knowledge or information on which to form a

4   belief as to whether it may have additional defenses to the Demand available.  As such, BYTON

5   reserves the right to assert additional defenses in the event discovery or investigation indicates

6   they would be appropriate.

7

8      WHEREFORE, BYTON prays for an award in its favor as follows:

9      1.      That EDAG takes nothing by way of its Demand;

10      2.      That the Demand be dismissed in its entirety with prejudice;

11      3.      That EDAG be denied each and every request, demand and prayer for relief made

12   in the Demand;

13      4.      That BYTON recover its costs incurred in the arbitration;

14      5.      For such other and further relief as the arbitrator deems just and proper.

15   Dated:  November 19, 2019

16                                 VAN ETTEN SIPPRELLE LLP

17

18                  By:  *Keith A. Sipprelle*

19                        Keith A. Sipprelle

20                        Attorneys for Respondent and Cross-Claimant
                          BYTON NORTH AMERICA CORPORATION

21

22

23

24

25

26

27

28

---

4

**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR
ARBITRATION; CROSS-CLAIMS**

**CROSS-CLAIM**

BYTON hereby cross-claims against EDAG as follows:

**GENERAL ALLEGATIONS**

1.      BYTON is in the business of designing, developing, manufacturing and delivering electric automobiles for the consumer market.

2.      EDAG is an engineering company based in Wiesbaden, Germany.  EDAG is part of the EDAG Group, one of the world's largest independent development partners to the automotive industry.  EDAG represents on its website that:

> **We are experts in the development of vehicles, production plants and the optimisation of your processes. When it comes to automobile development, you need someone with a fully integrated approach to the question of mobility and a passion for development. That's us.  Our expertise includes the integrated development and optimisation of vehicles, production facilities, derivatives and modules. This has made us what we are today: the acknowledged, independent engineering experts for the automotive industry and your business contact for the mobility of the future!**

3.      In or around early 2017, and in reliance on EDAG's claimed expertise in the area of automobile development, BYTON hired EDAG to lead and manage all engineering aspects of BYTON's electric automobile development.  At the time, BYTON, was a start-up company with limited internal engineering resources, and therefore selected EDAG as a well-known and reputable global "ESS" (engineering services supplier) that claimed to have "full-vehicle" development capabilities suitable to support a start-up car company (*i.e.*, that EDAG would provide a "turn key" solution for BYTON with respect to all engineering aspects of BYTON's electric vehicle development).  EDAG agreed to exercise reasonable care, skill and diligence in its role as leader and manager of the engineering aspects of BYTON's electric automobile development (hereafter, the "Agreement").

4.      EDAG failed to exercise reasonable care, skill and diligence in designing an electric vehicle for BYTON.  Specifically, EDAG made the following engineering errors in its

design of an electric vehicle for BYTON:

(a)     The initial EDAG design of the "under hood" area of the vehicle was inadequate, with fundamental items not correctly packaged (most notably, the design lacked a front motor that was required for the all-wheel drive version of the vehicle).

(b)     The EDAG design contained some fundamental errors in the high-voltage battery/floor systems interfaces.

(c)     The A-pillar in the EDAG design did not meet basic legal vision requirements.

(d)     The front door in the EDAG design lacked adequate system engineering for the door swing (creating interference with the front fender).

(e)     The front of the vehicle in the EDAG design lacked adequate system engineering to achieve the documented targets between pedestrian protection/safety and other system performance requirements.

(f)     The front and rear bumper systems in the EDAG design lacked adequate system engineering to achieve the documented targets between low speed bumper compliance and other system performance requirements (such as component variation complexity).

(g)     The design of the lift gate system in the EDAG design was inefficient and inadequate to meet the entry-level luxury vehicle appearance requirements.

(h)     The front and rear center console systems in the EDAG design were inefficient and not feasible to manufacture by the sourced supplier, leading to a late design "freeze" and a need to retool.

5.     As a result of the foregoing deficiencies in the EDAG design, BYTON was required to extensively redesign the vehicle, resulting in substantial engineering and retooling expense for BYTON in an amount according to proof but presently believed to run into the multiple millions of dollars.  Additionally, the need for BYTON to re-engineer and re-tool due to the deficiencies in the EDAG design have caused delays in BYTON getting its vehicle to the market, thereby causing BYTON to incur additional substantial losses in an amount according to proof.

**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR ARBITRATION; CROSS-CLAIMS**

**FIRST CAUSE OF ACTION**

(Breach of Contract)

6.      BYTON repeats, realleges, and incorporates herein by reference each and every paragraph of this Cross-Claim set forth above as though fully set forth herein.

7.      EDAG has materially breached the Agreement by failing to exercise reasonable care, skill and diligence in designing an electric vehicle for BYTON.  Specifically, EDAG provided BYTON with a vehicle design that was rife with engineering defects.

8.      BYTON has performed all of its obligations under the Agreement, except for any obligations that were excused or prevented.

9.      As a direct and proximate result of EDAG's material breaches of the Agreement, BYTON has been damaged in an amount according to proof but presently believed to run into the multiple millions of dollars.

**SECOND CAUSE OF ACTION**

(Negligence Against EDAG)

10.      BYTON repeats, realleges, and incorporates herein by reference each and every paragraph of this Cross-Claim set forth above as though fully set forth herein.

11.      EDAG failed to exercise reasonable care, skill and diligence in designing an electric vehicle for BYTON.  Specifically, EDAG provided BYTON with a vehicle design that was rife with engineering defects.

12.      As a direct and proximate result of EDAG's negligence, BYTON has been damaged in an amount according to proof but presently believed to run into the multiple millions of dollars.

WHEREFORE, BYTON prays for judgment on its Cross-Claims as follows:

1.      For an award of damages against EDAG for breach of contract in an amount according to proof.

2.      For an award of damages against EDAG for negligence in an amount according to proof.

3.      For an award of its costs incurred in the arbitration;

**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR ARBITRATION; CROSS-CLAIMS**

1          4.      For such other and further relief as the arbitrator deems just and proper.

2     Dated:  November 19, 2019

3                                                VAN ETTEN SIPPRELLE LLP

4

5                                       By:  _Keith A. Sipprelle_____

6                                            Keith A. Sipprelle
                                             Attorneys for Respondent and Cross-Claimant
7                                            BYTON NORTH AMERICA CORPORATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        8
**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR
ARBITRATION; CROSS-CLAIMS**

<div align="center">

**PROOF OF SERVICE**

</div>

**STATE OF CALIFORNIA, COUNTY OF VENTURA**

I am employed in the County of Ventura, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 2945 Townsgate Road, Suite 200, Westlake Village, California 91361.

On November 19, 2019, I served the following document described as **RESPONDENT BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR ARBITRATION; CROSS-CLAIMS OF BYTON NORTH AMERICA CORPORATION AGAINST EDAG ENGINEERING GMBH** on the interested parties in this action as follows:

<div align="center">

**SEE ATTACHED SERVICE LIST**

</div>

☐    **BY MAIL:**  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Westlake Village, California, on that same day following ordinary business practices.  (C.C.P. § 1013 (a) and 1013a(3))

☒    **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on an agreement of the parties to accept service by e-mail or electronic transmission, I personally sent the document from e-mail address scervantes@vstriallaw.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 19, 2019 at Westlake Village, California.

*Keith A. Sipprelle*
Keith A. Sipprelle

<div align="center">

9

**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR ARBITRATION; CROSS-CLAIMS**

</div>

1

## <u>SERVICE LIST</u>

2

Marc Lewis, Esq.                                    Attorneys for EDAG Engineering GmbH

3

Evangeline Burbidge, Esq.

Lewis & Llewellyn LLP

4

505 Montgomery Street, Suite 1300

San Francisco, Ca 94111

5

Email #1: mlewis@lewisllewellyn.com

6

Email #2: eburbidge@lewisllewellyn.com

Email #3: ymehta@lewisllewellyn.com

7

Email #4: chayward@lewisllewellyn.com

8

9

Ms. Darcy English                                    JAMS Case Manager

ADR Specialist

10

JAMS

Two Embarcadero Center, Suite 1500

11

San Francisco, CA 94111

Email: denglish@jamsadr.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BYTON NORTH AMERICA CORPORATION'S RESPONSE TO DEMAND FOR ARBITRATION; CROSS-CLAIMS**

Exhibit 3

1    LEWIS & LLEWELLYN LLP
     Marc R. Lewis (Bar No. 233306)
2    mlewis@lewisllewellyn.com
     Evangeline A.Z. Burbidge (Bar No. 266966)
3    eburbidge@lewisllewellyn.com
     Nathalie Fayad (Bar No. 312619)
4    nfayad@lewisllewellyn.com
     601 Montgomery Street, Suite 2000
5    San Francisco, California 94111
     Telephone: (415) 800-0590
6    Facsimile:  (415) 390-2127

7    Attorneys for Claimant and Cross-Respondent
     EDAG ENGINEERING GMBH
8

9              JUDICIAL ARBITRATION AND MEDIATION SERVICES

10                  SAN FRANCISCO, CALIFORNIA OFFICE

11

12

13
     EDAG ENGINEERING GMBH,              JAMS Reference No. 1100107291
14
                 Claimant,              **CLAIMANT EDAG ENGINEERING
15   v.                                 GMBH'S RESPONSE AND
                                        AFFIRMATIVE DEFENSES TO BYTON
16   BYTON NORTH AMERICA CORPORATION,   NORTH AMERICA CORPORATION'S
                                        CROSS-CLAIMS**
17               Respondent.

18

19

20

21

22

23

24

25

26

27

28

EDAG ENGINEERING GMBH'S RESPONSE TO BYTON NORTH AMERICA
CORPORATION'S CROSS-CLAIMS; JAMS REFERENCE NUMBER 1100107291

1    EDAG ENGINEERING GMBH ("EDAG") hereby responds to the Cross-Claims asserted by

2    Respondent and Cross-Claimant BYTON NORTH AMERICA CORPORATION ("BYTON") as

3    follows:

4    **BYTON'S CROSS-CLAIMS ARE CONTRACTUALLY PROHIBITED**

5    **AND MUST BE DISMISSED**

6    In responding to EDAG's arbitration demand, BYTON raises—for the first time—a litany of

7    complaints regarding the quality of EDAG's work and alleges that, as a result, EDAG materially

8    breached the Agreement between the parties.  Specifically, it alleges that EDAG provided BYTON

9    with "a vehicle design that was rife with engineering defects."  (Answer at 6-7.)  BYTON also

10   claims that it has performed all of its obligations under the Agreement (*id.*), although it does not

11   deny that it conceded in writing—multiple times—that it owed EDAG money and has yet to pay the

12   overdue funds.

13   BYTON's counterclaims are a sham.  BYTON never raised any complaints about EDAG's

14   work to EDAG's management.  BYTON only raises them now to try to avoid liability under the

15   Agreement.

16   But BYTON cannot do so.  As a simple matter of common sense, BYTON's failure to raise

17   any of these "complaints" until arbitration proves that the complaints are not legitimate.  And

18   legally, under the Agreement, BYTON cannot raise these allegations for the first time now.  Under

19   Section 9.2, in the event of a material breach "which, by its nature, cannot be fully remedied in thirty

20   (30) days the Parties *shall* cooperate to prepare a mutually acceptable plan to cure the breach within

21   such thirty (30) day period and then pursuant to which, the breaching Party shall undertake

22   reasonable, diligent and good faith efforts to promptly remedy the breach" (emphasis added).  By

23   failing to provide EDAG with notice of any of the allegedly "material" complaints detailed in the

24   counter-claims—making it clear that BYTON only raises them as a last-ditch attempt to minimize

25   the money it indisputably owes—BYTON is estopped from now arguing that EDAG has violated

26   the terms of the Agreement.

27   Further, pursuant to Section 9.4 of the Agreement, at its "sole option," BYTON "shall be

28

1

LEWIS +
LLEWELLYN
LLP

1    permitted to terminate this Agreement, a Statement of Work or any part thereof, without cause upon

2    30 (30) [sic] days prior written notice to Supplier."  However, "[i]n such an event, BYTON ***shall***

3    ***pay the applicable fees through the next milestone*** following notice of such termination or as

4    otherwise agreed between the Parties."  Agreement at Section 9.4 (emphasis added).  Therefore,

5    even if EDAG's design contained defects, which it did not, EDAG would ***still*** be entitled to payment

6    under the Agreement, nullifying any claims for damages by BYTON.

7           Therefore, BYTON's counterclaims should be dismissed and EDAG formally requests the

8    opportunity to brief the Arbitrator on this issue.

9                                      **GENERAL DENIAL**

10          EDAG denies, generally and specifically, each and every allegation, statement, matter and

11   purported cause of action contained in the Cross-Complaint, and without limiting the generality of

12   the foregoing, denies that BYTON has been damaged in the manner or amounts alleged, or in any

13   way at all, as the result of any alleged wrongful act or omission on the part of EDAG.

14          EDAG further alleges, on information and belief, the following additional and affirmative

15   defenses to the Cross-Complaint:

16                                **FIRST AFFIRMATIVE DEFENSE**

17                              (Failure to State a Cause of Action)

18          1.     The Cross-Complaint, and each of every purported cause of action therein, fails to

19   state a cause of action against EDAG.

20                              **SECOND AFFIRMATIVE DEFENSE**

21                                   (Comparative Fault)

22          2.     At all times herein mentioned, BYTON was guilty of fault or negligence which

23   proximately caused or contributed to the damages alleged by BYTON.

24                               **THIRD AFFIRMATIVE DEFENSE**

25                                       (Damages)

26          3.     BYTON has not suffered damages, at all or in the amounts claimed in the Cross-

27   Complaint.

28   //

**FOURTH AFFIRMATIVE DEFENSE**

(Failure to Mitigate)

4.      BYTON has failed to mitigate or minimize its alleged damages (if any were in fact suffered) and, to the extent of such failure to mitigate, any damages awarded should be reduced accordingly.

**FIFTH AFFIRMATIVE DEFENSE**

(Laches)

5.      The Cross-Complaint is barred in whole or part by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

(Waiver and Estoppel)

6.      BYTON's claims are barred by the doctrines of waiver and estoppel.

**SEVENTH AFFIRMATIVE DEFENSE**

(Unclean Hands)

7.      BYTON's claims are barred by the doctrine of unclean hands.

**EIGHTH AFFIRMATIVE DEFENSE**

(Material Breach Excusing Performance)

8.      The Cross-Complaint is barred on the ground that as to the contract alleged therein, BYTON materially breached the terms thereof, which breach has excused further performance by EDAG.

**NINTH AFFIRMATIVE DEFENSE**

(Condition Precedent/Subsequent)

9.      The Cross-Complaint is barred by the failure of a condition precedent and/or a condition subsequent.

**TENTH AFFIRMATIVE DEFENSE**

(Performance/Satisfaction/Discharge)

10.     Any duty or obligation, contractual or otherwise, which BYTON claims is owed to it by EDAG, has been fully performed, satisfied and/or discharged.

//

LEWIS +
LLEWELLYN LLP

## ELEVENTH AFFIRMATIVE DEFENSE

(Failure of Consideration/Performance)

11.     The Cross-Complaint is barred due to a failure of BYTON's consideration and/or performance.

## TWELFTH AFFIRMATIVE DEFENSE

(Reservation of Rights)

12.     EDAG presently has insufficient knowledge or information on which to form a belief as to whether it may have additional defenses to the Cross-Complaint available.  As such, EDAG reserves the right to assert additional defenses in the event discovery or investigation indicates they would be appropriate.

WHEREFORE, EDAG prays for an award in its favor as follows:

1.     That BYTON takes nothing by way of its Cross-Claims;

2.     That the Cross-Claims be dismissed in their entirety with prejudice;

3.     That BYTON be denied each and every request, demand and prayer for relief in the Cross-Claim;

4.     That EDAG recover its costs incurred in the arbitration;

5.     For such other and further relief as the arbitrator deems just and proper.


Dated: December 16, 2019                    Respectfully submitted,

LEWIS & LLEWELLYN LLP



By: _____

     Evangeline A.Z. Burbidge
     Attorneys for Claimant and Cross-Respondent
     EDAG ENGINEERING GMBH

EDAG ENGINEERING GMBH'S RESPONSE TO BYTON NORTH AMERICA
CORPORATION'S CROSS-CLAIMS; JAMS REFERENCE NUMBER 1100107291

# Exhibit 4

**Hon. William J. Cahill (Ret.)**
**JAMS**
**Two Embarcadero Center, Suite 1500**
**San Francisco, CA  94111**
**Phone: 415-774-2615**
**Fax: 415-982-5287**
**Email:  sschreiber@jamsadr.com**

## JAMS REFERENCE NO. 1100107291

| | |
|---|---|
| **EDAG Engineering GmbH,**<br><br>    **Claimant,**<br><br>          **v.**<br><br>**BYTON North America Corporation,**<br><br>    **Respondent.** | **SCHEDULING ORDER NO. 7** |
| **BYTON North America Corporation,**<br><br>    **Counter-Claimant**<br><br>          **v.**<br><br>**EDAG Engineering GmbH,**<br><br>    **Counter-Respondent.** | |

The following Scheduling Order No. 7 is made respecting the conduct of this arbitration. This Scheduling Order No. 6 supersedes Scheduling Order No. 1 dated February 3, 2020, Scheduling Order No. 2 dated April 8, 2020, Scheduling Oder No. 3 dated June 26, 2020, Scheduling Order No. 4 dated September 28, 2020, Scheduling Order No. 5 dated October 14, 2020, and  Scheduling Order No. 6 dated October 30, 2020.

1.  <u>Parties and Counsel</u>.  The parties to this arbitration are identified in the caption and are represented as follows:

| | |
|---|---|
| Evangeline Burbidge, Esq. | Keith A. Sipprelle, Esq. |
| Marc R. Lewis, Esq. | David B. Van Etten, Esq. |
| Brad Estes, Esq. | Van Etten Sipprelle LLP |
| Lewis & Llewellyn | 2945 Townsgate Rd. |
| 505 Montgomery St. | Suite 200 |
| Suite 1300 | Westlake Village, CA  91361 |
| San Francisco, CA  94111 | 805-719-4900 |
| 415-800-0590 | |
| | Counsel for Respondent and Counter- |
| Counsel for Claimant and | Claimant BYTON North America |
| Counter-Respondent | Corporation |
| EDAG Engineering GmbH | |
| | Lillian Xu, Esq. |
| | Evelyn Shimazaki, Esq. |
| | BYTON North America Corporation |
| | 4201 Burton Dr. |
| | Santa Clara, CA  95054 |

2.   <u>Arbitrator</u>.  The arbitrator in this matter is:

Hon. William Cahill (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111

3.   <u>Arbitrator's Staff</u>:

(a)      JAMS Case Manager:

Scott Schreiber
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Tel: 415-774-2615
Email:  sschreiber@jamsadr.com

(b)     The Arbitrator works with a staff attorney, Jayli Miller.  The Arbitrator's case manager will provide Ms. Miller's resume to the parties upon request.

4.  <u>Agreement to Arbitrate</u>.  The Technology Development and License Agreement ("Agreement"), which is at issue in this arbitration, provides in paragraph 14.4b that any dispute between the parties shall be submitted to JAMS, Inc. for confidential, final and binding arbitration under and in accordance with its JAMS Comprehensive Arbitration Rules.  Pursuant to this section, the parties selected Judge Cahill as arbitrator for this matter.

5.  <u>Pleadings and Arbitrability</u>.  The claims in this matter are set forth in EDAG's Demand for Arbitration dated October 22, 2019 and BYTON's Cross-Claim dated November 19, 2019.  The claims are arbitrable.

6.  <u>Applicable Law and Rules</u>.  The substantive law of California and the California Arbitration Act together with the JAMS Comprehensive Arbitration Rules ("Rules") shall apply in this proceeding.

7.  <u>Motions Challenging the Parties' Claims</u>.  Each party may, but shall not be required to, file a motion challenging as a matter of law the claims asserted by the opposing party/parties no later than June 1, 2020.  The parties shall agree to a briefing schedule for any such motions; in the absence of agreement the Arbitrator shall set a briefing schedule.

8.  <u>Discovery and Exchange of Information</u>.

(a)     During the preliminary hearing in this matter held on January 23, 2020, the parties agreed to meet and confer regarding discovery deadlines and other procedural issues.

(b)     The parties shall attempt to resolve any discovery disputes informally.  Any discovery disputes not resolved informally between the parties may be presented, via short letter brief, to the Arbitrator.  A hearing on the issue will be conducted telephonic, unless otherwise requested or ordered.  The parties may agree to forgo a hearing on any dispute and submit on the filings.

(c)     The parties have completed their Rule 17 disclosures.

(d)     The parties have agreed to complete document production by July 30, 2020.

(e)     The parties have agreed to a total of five non-expert depositions per side, unless the parties agree otherwise.  Any deposition conducted in this arbitration shall commence at 9:30 a.m. and conclude at 5:30 p.m., with an hour for lunch, unless otherwise agreed to by the parties.  The Arbitrator may resolve any disputes over the depositions as would be resolved in civil litigation.  Non-expert depositions shall be completed by November 18, 2020.

(f)      The parties have further agreed that experts shall be disclosed on or before November 30, 2020.  Rebuttal experts shall be disclosed on or before December 4, 2020. Expert reports of no more than 10 pages, not including exhibits, shall be exchanged before December 14, 2020.  Rebuttal expert reports of no more than 10 pages, not including exhibits, shall be exchanged before December 30, 2020.  Expert depositions shall be completed by January 8, 2021.

(g)      The parties shall electronically exchange exhibit lists and all documentary evidence they intend to offer at the hearing, including reports of any experts intended to be offered during the hearing, no later than February 1, 2021.  Documents not so exchanged shall not be admitted without a showing of good cause.

(h)      Counsel shall identify all non-rebuttal percipient and expert witnesses expected to testify at the hearing and shall indicate the manner in which each witness is expected to testify (e.g., in-person, telephonically or by affidavit or declaration), no later than February 1, 2021. Counsel may supplement the designation of witnesses no later than February 3, 2021.  Witnesses not so identified shall not be permitted to testify at the hearing without a showing of good cause.

9.   Dispositive Motions:  Any party that wants to file a dispositive motion must request leave from the arbitrator by summarizing, in less than five pages, the *undisputed* material facts and the grounds to be asserted. Within three court days, the opposing party may file a letter brief of less than five pages identifying the *disputed* material facts.  If the arbitrator is convinced that the facts supporting an issue subject to summary judgment may be undisputed, the arbitrator will issue an order permitting the filing of a summary judgment motion. All motions for leave for dispositive motions must be filed no later than December 4, 2020.  All pre-hearing dispositive motions must be heard no later than 31 days before the arbitration.  The parties shall agree to a briefing schedule for any such motions; in the absence of agreement the Arbitrator shall set a briefing schedule.

10.  Hearing Procedure

(a)      The hearing in this matter shall be conducted on the following days:  February 8-19, 2021 beginning at 8:30 am each day and concluding by 1:00 p.m. (PST) unless the parties agree or the arbitrator orders otherwise.  The hearing shall be conducted remotely.

(b)      Prehearing arbitration briefs shall be submitted to the Arbitrator no later than February 3, 2021 in electronic format.

(c)      Trial exhibits shall be pre-marked with consecutive Arabic numerals (without any indication of the party offering same) and a joint exhibit list shall be prepared and delivered electronically to the Arbitrator no later than February 3, 2021.  The parties shall indicate any objection to the introduction of any exhibit.  Exhibits not objected to shall be deemed admitted at the commencement of the hearing unless otherwise ordered by the arbitrator. One set of exhibits shall be prepared for the arbitrator and one for the witnesses, in addition to copies for counsel. Hard copies of exhibits shall be delivered to

the hearing location on the first day of hearing. Electronic copies of exhibits (on thumb drives) shall be delivered to the Arbitrator's Case Manager, Scott Schreiber, at 2 Embarcadero Center, Suite 1500, San Francisco, CA, 94111.  All exhibits will be discarded 60 days after the issuance of the final award unless a party requests, in writing, that the exhibits be retained or returned.

(d)      The parties are encouraged to execute a stipulation of undisputed facts and to submit that document to the Arbitrator at the hearing no later than February 3, 2021

(e)      If either party intends to use the services of a court reporter during the hearing, that party shall notify the other party within five court days of the start of the hearing.

(f)      The Arbitrator shall prepare an Interim Arbitration Award in writing, within 30 days after the matter is submitted for decision. The Interim Award shall specify the reasoning for the decision and any calculations necessary to explain the award.  The Interim Award will set deadlines for further submissions, if any.  After the filing of further submissions, if any, the record will be closed and, within 30 days, a Final Award in writing shall be issued.

11. Miscellaneous.

(a)      Documents shall be served by email if less than 50 pages in length.  Any document more than 50 pages shall be served by hard copy on the Arbitrator through the Case Manager, with an additional copy for the Arbitrator's staff attorney.

(b)      Cancellation fee of the Arbitrator:  The parties will be requested to deposit fees sufficient to compensate the Arbitrator for the scheduled hearing dates 60 days in advance of the commencement of the hearing.  If the hearing is cancelled or continued for any reason within 60 days of the commencement of the hearing, the deposit for the cancelled day(s) shall be deemed a cancellation fee and shall be immediately payable to JAMS.  The Arbitrators may refund fees for any hearing day which is rebooked to the extent of fees earned on that day.

(c)      All deadlines herein shall be strictly enforced unless otherwise stated.  This Order shall continue in effect unless and until amended by subsequent order of the arbitrator.

Dated: _1/29/2021_                         _William Cahill_
                                           Hon. William J. Cahill (Ret.)
                                           Arbitrator

## PROOF OF SERVICE BY E-Mail

Re: EDAG Engineering GmbH vs. BYTON North America Corporation
Reference No. 1100107291

I, Scott Schreiber, not a party to the within action, hereby declare that on  January 29, 2021, I served

the attached Scheduling Order No 7 on the parties in the within action by electronic mail at San Francisco,

CALIFORNIA, addressed as follows:

Evangeline Burbidge Esq.
Marc R. Lewis Esq.
Mr. Brad Estes
Lewis & Llewellyn LLP
601 Montgomery Street
Suite 2000
San Francisco, CA   94111
Phone: 415-800-0590
eburbidge@lewisllewellyn.com
mlewis@lewisllewellyn.com
bestes@lewisllewellyn.com
    Parties Represented:
    EDAG Engineering GmbH

Keith A. Sipprelle Esq.
Van Etten Sipprelle LLP
2945 Townsgate Road
Suite 200
Westlake Village, CA   91361
Phone: 805-719-4900
ksipprelle@vstriallaw.com
    Parties Represented:
    BYTON North America Corporation

Ms. Lillian Xu
Evelyn Shimazaki Esq.
BYTON North America Corporation
4201 Burton Drive
Santa Clara, CA   95054
lillian.xu@byton.com
evelyn.shimazaki@byton.com
    Parties Represented:
    BYTON North America Corporation

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,

CALIFORNIA on  January 29, 2021.

//s// Scott Schreiber

_____
Scott Schreiber
JAMS
sschreiber@jamsadr.com

Exhibit 5

RECEIVED

JUN 21 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1 LEWIS & LLEWELLYN LLP
Evangeline A.Z. Burbidge (Bar No. 266966)
2 eburbidge@lewisllewellyn.com
Marc R. Lewis (Bar No. 233306)
3 mlewis@lewisllewellyn.com
Bradley E. Estes (Bar No. 298766)
4 bestes@lewisllewellyn.com
601 Montgomery Street, Suite 2000
5 San Francisco, California 94111
Telephone: (415) 800-0590
6 Facsimile: (415) 390-2127

7 Attorneys for Petitioner
EDAG Engineering GmbH
8

FILED

JUN 23 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

9 UNITED STATES DISTRICT COURT

10 NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11

12 EDAG Engineering GmbH,

CV 21 CASE NO: 4736

13 Petitioner,

**PETITION TO CONFIRM
ARBITRATION AWARD AND FOR
ENTRY OF JUDGMENT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

[9 U.S.C. §1 *et seq.*]

14 v.

15 BYTON North America Corporation,

16 Respondent.

17

18

19

20 FILED UNDER SEAL

21

22

23

24

25

26

27

28

1

**PETITION**

2      Petitioner EDAG Engineering GmbH ("EDAG" or "Petitioner") by its undersigned counsel,

3 respectfully submit this Petition for an order (a) confirming, in its entirety, the final arbitration

4 award dated June 2, 2021 (the "Award"), and (b) entering final judgment on the Award. The Award

5 was in favor of Petitioner as the prevailing party and was issued by Hon. William J. Cahill (Ret.) of

6 JAMS San Francisco. Notice was provided to both parties on or about the date of the issuance of the

7 Award and was also conveyed to the parties with the issuance of an Interim Award on May 4, 2021.

8      This Petition is made based on the following facts:

9      1.      On October 20, 2018, Petitioner EDAG and Respondent BYTON North America

10 Corporation ("BYTON" or "Respondent") entered into a Technology Development and License

11 Agreement (the "TDLA") without exhibits. Declaration of Bradley E. Estes ("Estes Decl."), ¶ 3.

12      2.      The TDLA, in paragraph 14.4b, contained the following arbitration provision:

13      Arbitration.  Any dispute between the Parties that is not resolved through
       negotiation will be resolved exclusively by final and binding arbitration
14      conducted in accordance with the then-current Comprehensive Arbitration Rules
       & Procedures of the Judicial Arbitration and Mediation Services ("JAMS"). The
15      arbitration will be conducted by a single arbitrator selected by agreement of the
       Parties or, if the Parties cannot agree, an arbitrator appointed in accordance with
16      the JAMS rules who shall be experienced in the type of dispute at issue.  The
       Parties, their representatives, the arbitrator, and other participants shalt keep
17      confidential the existence, content, and result of the arbitration.  Any demand for
       arbitration and any counterclaim must specify in reasonable detail the facts and
18      legal grounds forming the basis for the claimant's claims and include a statement
       of the total amount of damages claimed, if any, and any other remedy sought by
19      the claimant.  The arbitration will be conducted in the English language; the
       location of such arbitration shall be in San Francisco, California. Each Party will
20      bear its own costs in the arbitration, The arbitrator will have full power and
       authority to determine issues of arbitrability and to interpret or construe the
21      provisions of the agreement documents and to fashion appropriate remedies
       (including temporary, preliminary, interim, or permanent injunctive relief);
22      provided that the arbitrator will not have any right or authority: (1) in excess of
       the authority that a court having jurisdiction over the Parties and the dispute
23      would have absent this arbitration agreement; (2) to award damages in excess of
       the types and limitation of damages found in the Agreement; or (3) to modify the
24      terms of this Agreement.  The arbitrator shall issue an award within 30 days after
       completion of the hearing and any post-hearing briefing.  The award must be in
25      writing and must state the reasoning on which the award is based. Judgment upon
       the award may be entered in any court of competent jurisdiction.
26      Notwithstanding the agreement to arbitrate, each Party may apply at any time to

27

28

LEWIS +
LLEWELLYN LLP

1    a court of competent jurisdiction for appropriate injunctive relief or for other
2    interim or conservatory measures, and by doing so will not breach or waive the
     agreement to arbitrate or impair the powers of the arbitrator.

3    (*See* Estes Decl. ¶ 4 & Ex. A.)

4        3.    On October 22, 2019, EDAG initiated arbitration proceedings against BYTON[1] with

5    JAMS in San Francisco, California. BYTON brought counterclaims. The parties agreed to have the

6    matter arbitrated by Hon. William J. Cahill (Ret.) (the "Arbitrator").

7        4.    On February 3, 2020, JAMS San Francisco confirmed the selection of the Arbitrator

8    and set the evidentiary hearing to commence on November 30, 2020. A copy of the confirmation is

9    attached as Exhibit B to the Estes Declaration. There were ultimately six total scheduling orders.

10   The hearing was moved to February 8-19, 2021. Copies of Scheduling Orders Nos. 1-7 are attached

11   as Exhibits C-I to the Estes Declaration.

12       5.    Between February 8-12, 2021 and February 16-19, 2021, the evidentiary hearing was

13   held virtually over Zoom due to the COVID-19 pandemic.

14       6.    The Arbitrator rendered a written Final Arbitration Award (the "Award") on June 2,

15   2021 in favor of EDAG as the prevailing party, a copy of which is attached as Exhibit J to the Estes

16   Declaration.

17       7.    The Award provides that BYTON is required to pay EDAG €23,446,649 on its

18   breach of contract claim, as well as simple interest of 10% starting on June 2, 2021, the date of the

19   Final Award. Interest will continue to accrue per day until the amount is paid in full. The Award also

20   provides that BYTON is required to pay EDAG $89,442.85 in costs. The Award provides that

21   BYTON is not entitled to any recovery based on any of the causes of action it asserted against

22   EDAG.

23       8.    JAMS served a signed copy of the Award on both parties on June 2, 2021.

24       9.    The Arbitrator's Award was made in accordance with the terms and provisions of the

25   TDLA and is in all respects proper.

26       10.   As of the date of this Petition, no application has been made to the Arbitrator to

---

[1] In the underlying arbitration proceedings, EDAG was the "Claimant" and "Cross-Respondent" and
BYTON was the "Respondent" and "Cross-Claimant." In this Petition to Confirm the Award, the
Petitioner is EDAG and the Respondent is BYTON. This is stated for clarity of the record.

3

PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

1    modify, correct or vacate the Award.

2         11.    BYTON has not voluntarily made any payment on the Award to date.

3         WHEREFORE EDAG prays for an order confirming the Award for entry of judgment in

4    conformity therewith, and for costs and such other relief as the Court may deem proper.

5                                        Respectfully submitted,

6    Dated:  June 21, 2021                LEWIS & LLEWELLYN LLP
                                           Evangeline A.Z. Burbidge
7                                          Marc R. Lewis
                                           Bradley E. Estes
8

9                                        By:
10                                          Evangeline A.Z. Burbidge
                                           Attorneys for Petitioner EDAG Engineering
                                           GmbH
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            4
                     PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

Petitioner EDAG Engineering GmbH ("EDAG" or "Petitioner") requests that the Court enter

4 an order confirming the Arbitrator's Final Award in the arbitration between EDAG and BYTON

5 North America Corporation ("BYTON"), JAMS ref. no. 1100107291 (the "Arbitration"). A true

6 and correct copy of the Arbitrator's Final Award is attached as Exhibit J to the Declaration of

7 Bradley E. Estes ("Estes Decl.") filed concurrently with this Petition.

8

After proper submittal of proof, the Final Arbitration Award (the "Award") was issued on

9 June 2, 2021 and served on all parties by the duly appointed Arbitrator Hon. William J. Cahill (Ret.).

10 (Estes Decl., Exhibit J). BYTON has not paid any portion of the Award. (*Id.* ¶ 10.) Accordingly,

11 EDAG seeks an order confirming the Award and entering judgment.

12

**II.    THE PARTIES**

13

Founded in 1969 in Germany, EDAG, the claimant and cross-respondent in the underlying

14 arbitration, is a leading global independent engineering services provider for the automotive

15 industries. Some of the most well-known car makers in the world—BMW, Audi, GM—hire EDAG

16 to engineer and design vehicles and have done so for over 50 years. EDAG is headquartered in

17 Arbon, Switzerland.

18

BYTON, the respondent and cross-claimant in the underlying arbitration, is a start-up formed

19 in 2016 to design and manufacture all-electric vehicles. BYTON is headquartered in Santa Clara,

20 California.[2] BYTON's parent company is located in China.

21

**III.    JURISDICTION AND VENUE**

22

This Court has original jurisdiction over this action pursuant to 28 U.S.C. section 1332

23 because Petitioner is a subject of a foreign state and Respondent is a citizen of the state of California

24 and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. In the

25 underlying proceedings, EDAG filed its arbitration seeking over €23,000,000 (approximately

26 ///

27

28

[2] In the underlying arbitration proceedings, EDAG was the "Claimant" and "Cross-Respondent" and BYTON was the "Respondent" and "Cross-Claimant." In this Petition to Confirm the Award, the Petitioner is EDAG and the Respondent is BYTON.

PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

LEWIS +
LLEWELLYN
LLP

1    $28,000,000 USD) for unpaid invoices, and BYTON filed cross-claims alleging approximately

2    $31,000,000 USD in damages. (Estes Decl. ¶ 5.)

3           The Court has personal jurisdiction over both Petitioner and Respondent because they agreed

4    to conduct arbitration proceedings in this Judicial District.

5           Venue is proper in this district under 28 U.S.C. section 1391(a) and 9 U.S.C. section 9 of the

6    Federal Arbitration Act because the subject arbitration agreement states that "[j]udgment upon the

7    award may be entered in any court of competent jurisdiction."

8    IV.    INTRADISTRICT ASSIGNMENT

9           This case is appropriate for assignment to the San Francisco Division pursuant to Civil Local

10   Rule 3-2(d) because the subject arbitration agreement required the location of the arbitration to be in

11   the County of San Francisco. The arbitration was conducted by JAMS-San Francisco and would

12   have been held in San Francisco but for the COVID-19 pandemic, which required the proceedings to

13   be held over Zoom. (Estes Decl. ¶ 8.)

14   V.     BACKGROUND OF ARBITRATED DISPUTE

15          As noted, EDAG is an engineering services provider for the automotive industry. EDAG

16   does not manufacture or sell the actual vehicles. BYTON was one such automobile manufacturer

17   that sought out EDAG's expertise to assist with BYTON's ambitious goal of building an all-electric

18   vehicle from scratch (called the M-BYTE) in in three years.

19          In 2016, BYTON and EDAG began working together on smaller projects connected to the

20   M-BYTE electric vehicle, focused on feasibility and preliminary designs. After some initial

21   contracts were completed, the parties embarked on a larger arrangement. After negotiations, the

22   parties executed the Technology and License Development Agreement ("TDLA" or "Agreement"),

23   which took effect June 1, 2017. This agreement contains the subject arbitration clause. Under the

24   TDLA, EDAG would provide select engineering services and BYTON would pay EDAG just over

25   €50,000,000.

26          At first, the project proceeded smoothly. EDAG provided services and deliverables to

27   BYTON, invoiced BYTON for the services and deliverables, BYTON approved the invoices, and

28   BYTON paid EDAG. However, plan to simultaneously grow the company and develop the car

LEWIS +
LLEWELLYN LLP

6

PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

1  proved to be too ambitious. BYTON lacked institutional knowledge, a clear chain of command, and

2  it did not have suppliers lined up, as a more established car manufacturer would. By late 2018,

3  BYTON owed EDAG millions of dollars in unpaid invoices. EDAG continued to work on the

4  project in reliance of BYTON's approval of EDAG's invoices and assurances that payment was

5  forthcoming. By July 2019, BYTON owed EDAG over €19,000,000 and its senior executives

6  subsequently executed two letter agreements promising to pay EDAG those overdue amounts.

7  Despite these two written promises to pay, first in July 2019 and then again in August 2019,

8  BYTON failed to make further payments.

9        On October 22, 2019, EDAG initiated the underlying arbitration pursuant to section 14.4b of

10  the TDLA, asserting claims for breach contract and breached the covenant of good faith and fair

11  dealing.

12        In response, on November 19, 2019, BYTON filed its crossclaims, alleging for the first time

13  in the entirety of the parties' relationship that EDAG committed approximately $31,000,000 in

14  engineering errors, bringing claims for breach of contract and negligence.

15  **VI.  THE ARBITRATION PROCEEDINGS**

16        On October 22, 2019, EDAG submitted a Demand for Arbitration to JAMS ADR Services

17  pursuant to the terms of the Arbitration clause in the Settlement Agreement. (Estes Decl. ¶ 5.) On

18  November 19, 2019, BYTON submitted its Response to EDAG's Arbitration Demand and Cross-

19  Claims. (*Id.*) The parties agreed to the appointment of Arbitrator William J. Cahill (the

20  "Arbitrator") of JAMS-San Francisco. (*Id.*, Ex. B.) The parties agreed that JAMS Comprehensive

21  Rules and Procedures would apply to this proceeding, as was required by the TDLA. (*Id.* ¶ 4.)

22        On February 3, 2020, the Arbitrator issued Scheduling Order No. 1 in the Arbitration setting

23  out the timing and location of the arbitration hearing, the schedule for pre-hearing submissions, and

24  other procedural matters. The hearing was ultimately set in Scheduling Order No. 3 to occur

25  February 8-19, 2021. (Estes Decl. ¶ 7.) There were a total of 7 scheduling orders in this matter.

26        From February 8-12 and 16-19, 2021, the parties presented testimony and other evidence

27  virtually over Zoom via JAMS-San Francisco.

28        The Arbitrator actively participated in the hearing, questioning the respective counsel for the

LEWIS +
LLEWELLYN

1    parties as well as some of the witnesses. The Arbitrator considered all of the evidence and

2    argument. On June 2, 2021, the Arbitrator found in favor of EDAG's breach of contract claim, and

3    awarded EDAG €23,446,649 on its breach of contract claim, as well as simple interest of 10% as of

4    the date of the Arbitrator's Final Award, June 2, 2021. (*See* Estes Decl., Ex. J, p. 28.) Interest will

5    continue to accrue per day until the amount is paid in full. The Final Award also provides that BYTON

6    is required to pay EDAG $89,442.85 (€73,235.77) in costs. (*See id.*) The Arbitrator found that

7    BYTON was not entitled to any recovery based on any of the causes of action it asserted against

8    EDAG. (*See id.*)

9         Paragraph 14.4b of the TDLA provides that "[j]udgment upon the award may be entered in

10   any court of competent jurisdiction." (*See* Estes Decl. ¶ 4.) BYTON has failed to voluntarily satisfy

11   the Award in the time since it was made. (*See id.* ¶ 10.) BYTON's witnesses testified, and counsel

12   represented, over and over that BYTON had no money to pay what it owed, including the basic

13   costs of the arbitration. (*See id.* ¶ 11.) A judgment on the Award is needed to permit EDAG to

14   enforce it. A confirmation order and a conforming judgment are therefore authorized by the terms

15   of the arbitration agreement and section 9 of the Federal Arbitration Act.

16   **VII.    LEGAL ARGUMENT**

17        **A.    Confirmation of the Arbitration Award is Mandatory Under 9 U.S.C. § 9**

18        Pursuant to 9 U.S.C. § 9, "[i]f no court is specified in the agreement of the parties, then such

19   application may be made to the United States court in and for the district within such award was

20   made." Paragraph 14.4b of the TDLA provides that "[j]udgment upon the award may be entered in

21   any court of competent jurisdiction." (*See* Estes Decl. ¶ 4.) The Award in this case should be

22   confirmed because no application to modify, correct, or vacate has been filed and none of the

23   grounds for refusal of recognition or enforcement exist.

24        **B.    Entry of Judgment for EDAG is Mandatory**

25        As there are no grounds to refuse or defer recognition or enforcement of the Award, it must

26   be confirmed. 9 U.S.C. § 9. Upon confirmation of the Award, entry of judgment is warranted and

27   such judgment shall have the same force and effect as any other civil judgment and may be enforced

28   accordingly. 9 U.S.C. § 13.

LEWIS +
LLEWELLYN

1    **VIII. CONCLUSION**

2    Petitioner requests that the Court:

3      A.    Enter an Order confirming the Arbitrator's June 2, 2021 Award;

4      B.    Enter judgment against Respondent in conformity therewith and ordering

5        Respondent's compliance with the Award;

6      C.    Award Petitioner its costs incurred and interest;

7      D.    Retain jurisdiction for the purposes of further proceedings necessary to enforce this

8        Court's judgment; and

9      E.    Grant such other and further relief as this Court deems appropriate.

10                          Respectfully submitted,

11 Dated: June 21, 2021           LEWIS & LLEWELLYN LLP
                                Evangeline A.Z. Burbidge

12                              Marc R. Lewis
                             Bradley E. Estes

13

14                      By: _____

15                           Evangeline A.Z. Burbidge

16                      Attorney for Petitioner
                     EDAG Engineering GmbH

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 6

EDAG Engineering GMBH v  BYTON North America Corporation        Reporter's Transcript of Proceedings        4/7/2021

## Page 1

```
 1           JUDICIAL ARBITRATION AND MEDIATION SERVICES
 2               SAN FRANCISCO, CALIFORNIA OFFICE
 3
 4   EDAG ENGINEERING GMBH,              )
                                        )
 5             Claimant,                )
                                        )
 6         vs.                          ) JAMS Reference
                                        ) No. 1100107291
 7   BYTON NORTH AMERICA                )
     CORPORATION,                       )
 8                                      )
               Respondent.              )
 9   _____)
                                        )
10   BYTON NORTH AMERICA                )
     CORPORATION,                       )
11                                      )
             Cross-Claimant,            )
12                                      )
           vs.                          )
13                                      )
     EDAG ENGINEERING GMBH,             )
14                                      )
           Cross-Respondent.            )
15   _____)
                                        )
16
17
18
19       Reporter's Transcript of Remote Proceedings, taken on
20   behalf of the Respondent/Cross-Respondent, commencing at
21   10:37 a.m., on Wednesday, April 7, 2021, before Jean Kim,
22   CSR No. 13555, RPR.
23
24
25
```

## Page 2

```
 1   REMOTE APPEARANCES:
 2   BEFORE:
         JAMS
 3       BY:  HON. WILLIAM J. CAHILL (Ret.)
         Two Embarcadero Center
 4       Suite 1500
         San Francisco, California  94111
 5       415.774.2615
         sschreiber@jamsadr.com
 6
 7   FOR CLAIMANT / CROSS-RESPONDENT:
     LEWIS & LLEWELLYN
 8       BY:  EVANGELINE A.Z. BURBIDGE
              BRADLEY E. ESTES
 9            Attorneys at Law
         601 Montgomery Street
10       Suite 2000
         San Francisco, California  94111
11       415.800.0590
         eburbidge@lewisllewellyn.com
12       bestes@lewisllewellyn.com
13
14   FOR RESPONDENT / CROSS-CLAIMANT:
     VAN ETTEN SIPPRELLE, LLP
15       BY:  KEITH A. SIPPRELLE
              Attorney at Law
16       2945 Townsgate Road
         Suite 200
17       Westlake Village, California  91361
         805.719.4900
18       ksipprelle@vstriallaw.com
19   ALSO PRESENT:
20       RICHARD CHEN, BYTON North America
         SADHA KAMESWARAN, BYTON North America
21       LILLIAN XU, BYTON North America
22
23
24
25
```

## Page 3

```
 1                 Wednesday, April 7, 2021;
 2                      10:37 a.m.
 3
 4          THE ARBITRATOR:  All right.  Well, thank you.
 5   This is our last time together before I do what I've got
 6   to do.
 7          So you guys got my questions I sent out
 8   yesterday?
 9          MS. BURBIDGE:  Yes, Your Honor.
10          MR. SIPPRELLE:  Yes, we did.  Thank you.
11          THE ARBITRATOR:  Yeah.  I got them in a little
12   late.  I thought you'd be able to have enough time to do
13   them, but I should have got them out earlier.  But okay.
14          There's enough questions there to last us
15   forever, I think.  So why don't we -- which wants to go
16   first?  Everybody's got a complaint here.  So we can, I
17   guess -- Ms. Burbidge, is your -- you started all this.
18   So -- why don't you start with your oral argument here.
19          MS. BURBIDGE:  Sure, Your Honor.  And I'm happy
20   to do that.  Let me -- give me just a moment.  And while
21   I'm getting all of this ready, what we will be doing
22   here --
23          As you know, we're obviously prepared to answer
24   any questions that Your Honor has.  But our intent today
25   is to focus on the questions that Your Honor asked.  And
```

## Page 4

```
 1   so if there are any additional questions that you have,
 2   please let us know.  But otherwise, everything is covered
 3   pretty thoroughly in our post-hearing briefing.  So --
 4          THE ARBITRATOR:  Yeah.  You guys did a good job
 5   on that.  Yeah.  So those are my questions.
 6          MS. BURBIDGE:  So --
 7          THE ARBITRATOR:  I know you want to focus on
 8   those, which is a good idea, but if you have anything
 9   else to do, go ahead and do it.  I didn't want to -- mean
10   to limit you to that.  But if you think I got something
11   plain wrong, that's fine.  Okay.
12          MS. BURBIDGE:  Thank you, Your Honor.  No.
13          What I'm going to do is I'm going to address
14   your questions, and then I will reserve the remainder of
15   my time for rebuttal.  So if there are issues that are
16   addressed by BYTON that EDAG needs clarification, we'll
17   address them at that point.  But there were, I think,
18   three questions that were addressed to EDAG.  So I'll go
19   ahead and answer those for Your Honor.
20          THE ARBITRATOR:  Oh, okay.  All right.
21          MS. BURBIDGE:  Thank you, Your Honor.
22          So the first question that you had that was
23   directed at EDAG was question number 2, and that question
24   was:  Is it undisputed that, in December 2018, BYTON had
25   paid EDAG all existing invoices?
```

Abrams, Mah & Kahn Reporting Service
800 622 0226

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings          4/7/2021

---

Page 5

1    So the facts actually are that BYTON had paid
2    all of the past due invoices through December 2018.
3    There were a couple invoices that were issued in November
4    and December of 2018 that weren't yet due.  And so those
5    ones weren't yet paid.
6    If Your Honor cares to later -- Mr. Zoltowski's
7    report -- expert report in Schedule 3.1A sets out the
8    date the invoices were issued, when they were paid, as
9    well as the corresponding purchase orders.  So that has a
10   table that outlines all of that.
11   And Mr. Metz's correspondence -- that's the COO
12   of EDAG -- which is contained in Exhibit 147, also has a
13   column that lays that out as well.  The dates that the
14   invoices were issued, when they were due, and then when
15   they were paid.
16   THE ARBITRATOR:  Okay.
17   MR. SIPPRELLE:  Your Honor.  Mr. Sipprelle.
18   If I could just make a suggestion.  On some of
19   these -- for example, number 2 -- it might be more
20   productive, after Ms. Burbidge says what she's going to
21   say, if I can just -- some of these are not going to be
22   disputed, and we can just put them to rest, I think.  And
23   if --
24   THE ARBITRATOR:  Okay.
25   MR. SIPPRELLE:  I can just respond very quickly

---

Page 6

1    on some of these, and we can get them out of the way, if
2    Your Honor would prefer to do that.
3    THE ARBITRATOR:  Whatever works best for you
4    guys is okay with me.
5    What do you think, Ms. Burbidge?
6    MS. BURBIDGE:  I mean, with regard to number 2,
7    if Mr. Sipprelle wants to jump in, that's just fine with
8    me.  On some of these -- we can take that approach and
9    see how it goes.
10   Some of the media questions, I may want a moment
11   to process what Mr. Sipprelle has said, and then I'll
12   perhaps let Your Honor know that I'll save a response for
13   a rebuttal.
14   But at this point, Mr. Sipprelle, if you want to
15   jump in, that's just fine.
16   MR. SIPPRELLE:  Okay.  So, Your Honor, yes.
17   On number 2, I think the evidence is that all of
18   the invoices --
19   THE ARBITRATOR:  Can you hold on one second.  I
20   thought I had something here organized, and I don't quite
21   have it yet.  So let me -- do this right here.  Sorry.
22   MS. BURBIDGE:  Oh, no problem.
23   MR. SIPPRELLE:  No worries, Your Honor.
24   THE ARBITRATOR:  One more second here.
25   Okay.  Number 2.  Let's go.

---

Page 7

1    MR. SIPPRELLE:  Yes.  So just to follow up on
2    what Ms. Burbidge said.  I think the evidence is that
3    BYTON was current on its invoices -- on its payments as
4    of the end of December 2018.  There were a few invoices
5    that had been issued in 2018 that had not yet been paid,
6    but those were not due yet because there was a 60-day --
7    MS. BURBIDGE:  That's right.
8    MR. SIPPRELLE:  -- payment period.  So I think
9    we're in agreement that BYTON was basically current as of
10   the end of 2018.
11   MS. BURBIDGE:  Yes.  So just to -- so that the
12   question -- it's correct that BYTON has paid EDAG all due
13   invoices for question number 2, but not all existing
14   invoices, I think, is the clarification.
15   MR. SIPPRELLE:  Right.
16   THE ARBITRATOR:  Okay.  Okay.  Good.
17   MS. BURBIDGE:  Okay.  So then the next question
18   has to do with EDAG's damages.  So -- and it's number 5,
19   which is regard to the interest calculation here.  So
20   this is just a side of EDAG's damages that it's seeking.
21   This is outlined in our post-hearing briefing,
22   Your Honor.
23   And with regard to this statutory interest,
24   right, under California Civil Code Section 3289(b),
25   right, it's set at 10 percent.  And your question was

---

Page 8

1    about the compound interest.  So --
2    THE ARBITRATOR:  Right.  Right.  I don't see the
3    statute saying compound interest.  And I've done it other
4    times -- you know, this has been in my life for a long
5    time, and I always thought it was going to be a simple
6    interest, but I could be wrong.
7    MS. BURBIDGE:  Yes, Your Honor.  So there are
8    cases that go both ways.  In particular, there's a case
9    that is called Michelson -- hold on just a moment.  Let
10   me see if I can pull this up here.  Just a second --
11   Michelson v. Hamada, 29 Cal.App.4th 1566, that does
12   state -- the Court of Appeal held it was proper to award
13   compound interest for a matter that included contract
14   damages.
15   That said, Your Honor, we recognize that there
16   are a large number of cases that speak towards simple
17   interest.  And our expert, Mr. Zoltowski, felt that
18   compound interest, in this case, made sense.  But
19   recognizing the split, he included both calculations in
20   his report.
21   And Schedule 5 of his report does a comparison.
22   And Schedule 11 sets out the simple-interest-only
23   calculation.  And there's actually -- given the date of
24   the breaches, there is actually not a very large
25   difference between a simple-interest calculation and a

---

EDAG Engineering GMBH v  BYTON North America Corporation    Reporter's Transcript of Proceedings    4/7/2021

---

Page 9

1    compound-interest calculation.  So EDAG defers to
2    Your Honor, obviously, on whatever you're comfortable
3    with --
4          THE ARBITRATOR:  Well --
5          MS. BURBIDGE:  -- in this instance.
6          THE ARBITRATOR:  Good.  I'm comfortable with
7    simple interest.
8          MS. BURBIDGE:  Okay.  We understand.
9          THE ARBITRATOR:  All right.  Good.
10         MS. BURBIDGE:  So then, your next question,
11   Your Honor, was with regard to Question 12, with regard
12   to EDAG's request for an injunction.  And you had asked
13   if you had authority to issue an injunction.
14         So the TDLA here, which you see on the screen,
15   explicitly provides you that authorization under
16   Section 14.4.  It states that you have full power and
17   authority to fashion appropriate remedies, including
18   temporary, preliminary, interim, or permanent injunctive
19   relief.
20         And JAMS 24C also provides that authorization in
21   conjunction with the agreement between the parties.  So,
22   as we set out in our brief, EDAG is asking for temporary
23   injunctive relief.  It's not interested in the permanent
24   injunction.
25         But as the evidence in the case made clear,

---

Page 10

1    BYTON does not have cash, but does have assets, namely,
2    the IP that EDAG created.  And given, you know, the
3    recent articles that we cited in our brief, we're very
4    concerned that BYTON might transfer those assets to avoid
5    paying any judgment.  So we would request an injunction
6    be issued.
7          THE ARBITRATOR:  Let me hear what Mr. Sipprelle
8    says about that in this current time here.
9          Can you tell me about that, Mr. Sipprelle?
10         MR. SIPPRELLE:  Yes, I can, Your Honor.
11   Thank you.
12         We certainly -- BYTON certainly objects to this
13   request for -- basically to freeze -- it's essentially a
14   request to freeze BYTON's assets, which would put BYTON
15   essentially out of business.
16         I mean, as they phrased it, that would even
17   preclude BYTON from making payroll because that would be
18   a transfer of BYTON asset to somebody else.  And I think
19   it's very clear that there is no authority, either under
20   the arbitration agreement or under applicable law, for
21   that kind of request.
22         If we look at Section 14.4B of the TDLA -- and I
23   think it's up there, but I can't -- I don't know if you
24   can make that a little larger.  I can barely see that.
25         MS. BURBIDGE:  I can try.  If you want to share

---

Page 11

1    your screen, Keith --
2          MR. SIPPRELLE:  Okay.  I guess --
3          MS. BURBIDGE:  There you go.  Is that --
4          MR. SIPPRELLE:  I can put mine.  Okay.
5          So what they've highlighted is -- it says the
6    arbitrator will have full power and authority to
7    determine issues of arbitrability and to fashion
8    appropriate remedies.
9          They didn't read the next portion, which says
10   "provided that the arbitrator will not have any right or
11   authority; one, in excess of the authority that a court
12   having jurisdiction over the parties in the dispute would
13   have absent this arbitration agreement.  Or to award
14   damages," et cetera.
15         But I think the key provision is that, one --
16   sub-1, which is:  Your Honor doesn't have authority in
17   excess of the authority that a court would have if there
18   was not an arbitration agreement.
19         And this -- the TDLA is governed by California
20   law.  That's in Section 14.4A.  There is no authority
21   under California law or under federal law for an asset
22   freeze -- a prejudgment or even a post-judgment asset
23   freeze.
24         California has, as Your Honor, I'm sure, is
25   aware, prejudgment writ of attachment process that's very

---

Page 12

1    detailed, very specific.  That's in Code of Civil
2    Procedures sections 481.010 and following.  And that's a
3    very specific prejudgment attachment remedy.
4          You have to go through a lot of hoops.  And even
5    if you get the attachment, all the attachment allows you
6    to do is to try to attach assets, specific assets, that
7    you can locate.  It is not a prophylactic asset freeze.
8    That doesn't exist under California law, what they're
9    asking for.
10         What they're asking for also doesn't exist under
11   federal law.  And, in fact, this issue was addressed by
12   the US Supreme Court in 1999.  There's a case called
13   Grupo Mexicano de Desarrollo SA.  It's 527 U.S. 308.  And
14   in that case, the Supreme Court held that federal courts
15   lack the inherent power to issue injunctions or asset
16   freezes in money damages cases like this one.
17         So what they are asking for is not authorized
18   under California law, under federal law.  And the
19   arbitration agreement is very clear that Your Honor can't
20   issue orders in excess of what a court could do if this
21   case was pending in court.
22         So it's not authorized.
23         THE ARBITRATOR:  Okay.  I certainly can't do
24   more than a court can do.  Well, maybe I could, but I'm
25   not inclined to do that.  That's the first time I've

---

Abrams, Mah & Kahn Reporting Service
800 622 0226

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings                                    4/7/2021

---

Page 13

1   heard about this.
2            Mr. Sipprelle, did you know that they were
3   asking for this before you saw their brief?
4            MR. SIPPRELLE:  I did not.  I was, I have to
5   say, quite surprised at what they -- and there's no
6   authority in their brief.  They cite no legal authority
7   for this, and there isn't any.
8            It's not authorized by law, and that basically
9   would -- number 1, it would -- they're trying to jump to
10   the head of the line of BYTON's creditors.  And,
11   number 2, it would essentially put BYTON out of business
12   because we couldn't even pay our employees if that kind
13   of an order was in place.
14            They have their remedies.  If they get a
15   judgment and the remedies are what the law provides, they
16   can try to collect if they get a judgment.  But they
17   can't get an asset freeze.
18            THE ARBITRATOR:  I bet Ms. Burbidge would say
19   you can pay your employees -- I could exclude that from
20   the injunction.
21            MS. BURBIDGE:  Yeah.  I think, Your Honor, that,
22   as we indicated in our briefing -- and this is something
23   that was a concern that came to light subsequently,
24   right, was the concern that there would be an asset
25   transfer to avoid any relief.  Right?  And that there are

---

Page 14

1   these talks about selling the actual car on the market
2   but doing it without using BYTON North America so as to
3   avoid those creditors that BYTON owes money to.
4            So there's a real concern that the IP that EDAG
5   created, which has great value, would be shifted to
6   another entity that would make money.  And that's
7   something that obviously came to light at the -- after
8   the conclusion of the hearing.  So that's why it was
9   something we raised in our briefing.
10            THE ARBITRATOR:  Okay.  I understand that.  I'm
11   worried that I don't have jurisdiction to do this even if
12   I wanted to.  But I understand your concern.  But
13   Mr. Sipprelle says you'd be ahead of other creditors.  If
14   they go into bankruptcy, this will be an issue, whether
15   it's even enforceable or not.
16            MS. BURBIDGE:  Yes, Your Honor.
17            THE ARBITRATOR:  I understand your concern.  I
18   understand you, but this is a concern of everybody's got
19   owed money, I think.
20            MS. BURBIDGE:  I don't have a sense of how many
21   other folks BYTON owes money to, Your Honor.
22            If you are interested in some sort of brief,
23   additional submission on this point today to try to keep
24   things expedited, we'd be happy to provide that to you.
25   But I simultaneously do not want to draw this out.

---

Page 15

1   Obviously, you know, EDAG is very interested in a
2   resolution, and an expedited one, if possible.
3            THE ARBITRATOR:  Well, let me do this.  Let me
4   just tell you where I'm going to come out on that.  I'm
5   going to not give you an injunction.  Okay?
6            MS. BURBIDGE:  Okay, Your Honor.  Understood.
7            THE ARBITRATOR:  Just so we don't have to worry
8   about it anymore.
9            MS. BURBIDGE:  Okay.
10            THE ARBITRATOR:  Okay.  Great.
11            MS. BURBIDGE:  Those were the only questions
12   directed to EDAG, Your Honor.  So I'm happy to turn it
13   over to Mr. Sipprelle.  And then I can jump in and
14   respond, or I will let Your Honor know that I'm going to
15   save a sort of a joint rebuttal response.
16            THE ARBITRATOR:  No problem.  All right.
17   Thank you.
18            So we're clear on that.  No injunction.
19            Okay.  Next.
20            Mr. Sipprelle, you're on there with your --
21            MR. SIPPRELLE:  Yes, Your Honor.  Yes.
22   Thank you.
23            So what I plan to do is I plan to address the
24   questions that Your Honor directed to BYTON, and, as
25   appropriate, I guess, Ms. Burbidge can respond or defer

---

Page 16

1   her response.  But I'll just start at the beginning.
2            Question number 1, Your Honor asked about the
3   amount of the -- I guess undisputed amounts owed.  And
4   there's a figure, Your Honor, put out of $26,407,397.
5            I guess I wouldn't couch -- I guess what I would
6   say is that BYTON doesn't dispute that the base amount of
7   the unpaid EDAG invoices is actually 23,446,649 euro.
8   I mean, the TDLA was in terms of euro.  So I think that
9   is the amount of the undisputed unpaid invoices.  I
10   wouldn't characterize that as we owe any money.  We don't
11   think we owe money for reasons I'll discuss --
12            THE ARBITRATOR:  I know you're saying you don't
13   owe money --
14            MS. BURBIDGE:  I'm sorry, Your Honor.  Someone
15   has called in, and there's some typing noise in the
16   background.  And I don't see a name associated.
17            THE ARBITRATOR:  Who just came in?  Who is that?
18            MR. CHEN:  This is Chen from BYTON.  I'm the
19   IP director.  Just listening in.
20            MR. SIPPRELLE:  Hi, Richard.  You'll need to
21   mute yourself so we can't hear you.
22            MR. CHEN:  Yup.
23            MS. XU:  Chen, can you please mute yourself on
24   mute.
25            MR. CHEN:  I thought I did.

---

4 (Pages 13 to 16)

Page 17

1    THE ARBITRATOR:  Well, you're not now.  So -- I
2 can mute you.  You're muted.  All right.  You're gone.
3 You're muted.
4    MS. XU:  Thank you, Your Honor.
5    MS. BURBIDGE:  Keith, I'm sorry.  Could you
6 repeat that number in euros again?
7    MR. SIPPRELLE:  Yeah.  23,446,649.
8    MS. BURBIDGE:  Your Honor, just to jump in, that
9 is the same number that we have in our briefs, and the
10 number that you've provided is the US equivalent of that
11 number.
12    THE ARBITRATOR:  Okay.  Good.  That's where I
13 got it from.
14    So you're saying you want -- you say you owe no
15 money because errors exceed the amount of owed.  But just
16 starting from there -- so I got the 26 million is the
17 right number.  Okay.  Got it.
18    MR. SIPPRELLE:  Yes, Your Honor.
19    And number 2, we dealt with.  That was directed
20 to EDAG.
21    Number 3, Your Honor asked:  Does BYTON contend
22 that it ever promptly rejected any EDAG deliverable?  If
23 so, when?
24    THE ARBITRATOR:  I got that promptly from the
25 contracts.  So --

Page 18

1    MR. SIPPRELLE:  Yes.  So the way I would respond
2 to that -- and I think this came out in the hearing -- is
3 BYTON never put anything in writing to EDAG stating
4 expressly it was rejecting or accepting a deliverable.
5    There was nothing ever expressed in writing
6 saying either acceptance or rejection.  But BYTON
7 certainly made EDAG aware on many, many occasions during
8 the course of the relationship that it was unhappy,
9 concerned, dissatisfied with EDAG's work product.  And
10 the references to the evidence are in Footnote 12 in our
11 brief.  I mean, I don't want to have to go through all
12 those, but it's in Footnote 12.
13    What I would say, Your Honor, is with respect to
14 rejection, BYTON actually, in effect, did reject two of
15 EDAG's deliverables.  The key one was the front-end
16 packaging work, which EDAG -- basically, BYTON took that
17 over in 2018 because EDAG was not able to fix the
18 problems with the initial design in a timely manner.  And
19 that was testified to by David Twohig during day five.
20    So the references there would be page 518, 2
21 through 17; 519, 19 through 520, 19.  And then
22 Mr. Kameswaran testified to that at page 823, line 1,
23 through 825, line 17.  So, effectively, BYTON rejected
24 the EDAG design of the front end by taking it over in
25 2018.  And that front-end design or redesign, that's the

Page 19

1 engineering error on which BYTON's $31 million
2 counterclaim is premised.
3    THE ARBITRATOR:  Sure.  But when you do a
4 rejection, you follow the contract.  They get a chance to
5 fix it because they have a fixed-price contract.  They're
6 going to build it until it works for whatever total
7 amount of the contract was.
8    So you didn't formally object it and set in that
9 process.  You are saying, "I did reject -- you had design
10 defects, and I did reject it."
11    Okay.  I got it.  All right.
12    MR. SIPPRELLE:  Yes.  And the reason we did that
13 is they couldn't fix it, and we were on a schedule, and
14 we were trying to get, you know, the vehicle out and
15 so -- BYTON made a decision.  "We're going to have to
16 take this over.  We don't have time" --
17    THE ARBITRATOR:  I understand your argument
18 there.  But you did not -- the evidence will have some
19 reference to they tried to fix it?
20    MR. SIPPRELLE:  Yes.
21    THE ARBITRATOR:  You went back to them and told
22 them --
23    Yes?  Okay --
24    MR. SIPPRELLE:  Yes.  There were two -- there
25 were basically two --

Page 20

1    THE ARBITRATOR:  I know you took it over.  I
2 don't remember if you gave them an opportunity to fix
3 it --
4    MR. SIPPRELLE:  So that's -- the evidence I just
5 referenced from Mr. Twohig and Mr. Kameswaran --
6 basically, EDAG was given multiple chances to redesign
7 the front-end.  They couldn't do it, and so BYTON had to
8 take it over.
9    THE ARBITRATOR:  Okay.
10    MR. SIPPRELLE:  So we view that, essentially, as
11 a rejection of the design.  And then --
12    THE ARBITRATOR:  That's in your brief.  I saw
13 that.  I just didn't see where -- okay.  I understand
14 what happened there.  You didn't use the formal process.
15 You didn't really reject anything in writing, but when
16 you took it over, that was the implied rejection.
17    MR. SIPPRELLE:  Right.
18    THE ARBITRATOR:  Okay.
19    MR. SIPPRELLE:  Correct.  And then the other one
20 was the center console.  And Mr. Slovesko testified about
21 this at page 686, 14, through and 689, 9.  And that one
22 was another one.  We had to take away the design of the
23 center console from EDAG to another supplier because EDAG
24 couldn't correct the design.  And we had to stay on
25 schedule if we were going to get this vehicle out.

**Page 21**

1   So those two, I -- BYTON's position is,
2  effectively, they were rejections of the EDAG design.
3      THE ARBITRATOR:  Okay.  I got it.  All right.
4   So I'm going to ask you, Ms. Burbidge, to --
5  when you get a chance to talk:  Do you agree with him
6  that you got a chance to fix these problems before they
7  went to someone else?  And you don't have to do that now.
8  I just wanted to make sure --
9      MS. BURBIDGE:  No.  I'm happy to just briefly
10  address these, Your Honor.  I think, Your Honor, that
11  they are addressed in detail in our brief, with multiple
12  citations.
13      So I will just say at a high level that, here,
14  BYTON concedes that it never formally followed the
15  contract and issued a rejection notice.  This was a
16  provision, Section 4.2, that explicitly required them to
17  promptly accept and reject.
18      We would very clearly argue that the acceptance
19  could be seen in multiple places.  This is in our
20  briefing, right, in the signing of the invoices, the
21  signing of the performance documentation, the engineering
22  authorization releases that BYTON signed off on.  You
23  know, almost a dozen BYTON individuals approving the
24  designs.
25      So we would argue that this was done in writing.

**Page 22**

1   They did accept in writing.  And they tooled that car as
2  well.  And then there are no written rejections.
3      And then to address these two constructive
4  rejections that BYTON now claims it made -- Mr. Twohig's
5  "inheritive" about the front-end packaging has been
6  disputed completely by all of EDAG' witnesses, and, in
7  fact, by Mr. Slovesko himself.  He said that some of
8  Mr. Twohig's claims about the lack of a front engine, for
9  example, were untrue.
10      And so I think the idea that they took it over
11  because EDAG wasn't doing a good job actually is not
12  supported by any facts.  And there are no documents,
13  internal to BYTON or otherwise, that have been introduced
14  into this case to indicate that's why they started
15  working on a front-engine packaging as opposed to what
16  EDAG's witnesses explained, which was:  This was always
17  intended to become BYTON's project.
18      And the center console story here -- I think
19  there are two important things to keep in mind.  The
20  first is that there are no damages associated with the
21  center console rework.  So taking their allegations at
22  face value -- okay.  They're saying that they did this,
23  but there are no damages that they can substantiate.
24      And, additionally, Kai-Uwe Salzmann testified
25  extensively that that story that Mr. Sipprelle just

**Page 23**

1  conveyed is not actually what happened with regard to the
2  center console.  BYTON had control of it.  It was unable
3  to design the center console; so it brought in EDAG to
4  help, under BYTON's control.
5      EDAG created a design that the first
6  manufacturer could tool, and it was at a price that BYTON
7  did not want.  So BYTON picked a different manufacturer.
8      Regardless, there's no evidence, right, of any
9  written rejection, under the contract or otherwise.
10  Instead, there's, you know, I think -- conveniently,
11  after EDAG finally tried to get paid for its overdue
12  invoices, which BYTON admits it owes, they raise these
13  issues.  They didn't follow the terms of the contract
14  with regard to either of those alleged rejections would
15  be --
16      THE ARBITRATOR:  I think Mr. Sipprelle agrees
17  with that.  He's just making his argument.
18      I have a question that I thought about last
19  night after I sent all these questions.
20      BYTON says that you're not going to get a
21  rejection -- the only time -- let's see.  There's no
22  formal rejection at all until such time as it doesn't
23  work in the eventual automobile.
24      Now, if it turns out that one of your designs --
25  even though everybody paid for it, put it on the invoice,

**Page 24**

1  all that else happened -- and it goes into the car and
2  the car doesn't work because of that problem, it's under
3  your obligation to fix it at that time still; right?
4      MS. BURBIDGE:  So --
5      THE ARBITRATOR:  Because you're supposed to
6  design everything until the end until you get a car.
7      MS. BURBIDGE:  Yes.  So, Your Honor, I think --
8  so this is an argument that --
9      THE ARBITRATOR:  Because they still could reject
10  it if it doesn't work.
11      MS. BURBIDGE:  Yeah.  So, Your Honor, I think
12  there's a bit of a conflation here that BYTON is making
13  in what is called the validation phase of the program and
14  the validation process for EDAG's work.  So I'm happy to
15  explain that now if Your Honor would like.
16      THE ARBITRATOR:  Well, if it's in response to my
17  question, sure.  I don't want to -- if it's something
18  new --
19      MS. BURBIDGE:  I'm just making sure.  I don't --
20  I know Mr. Sipprelle's plan --
21      THE ARBITRATOR:  No, no.
22      MS. BURBIDGE:  So the validation phase, right,
23  is the final phase of the program that's confirming the
24  vehicle passes, you know, supplier readiness; it's ready
25  to be sent out from a delivery point of view.

6  (Pages 21 to 24)

Page 25

1    The way that the virtual data works for a car --
2  and Mr. Amelung testified about this at length, and it's
3  also in our briefing.  So, from a pure engineering
4  standpoint, the engineering designs have already been
5  validated and tested before you tool that car.  And
6  Mr. Slovesko even talked about this in detail; right?  So
7  the reason -- and Mr. Twohig as well.
8    The reason that there's so many signature on
9  that authorization release, the engineering authorization
10 release, is because it's his job -- all of these
11 individuals at BYTON's job -- to look at the design, to
12 review the design, to make sure it passes the necessary
13 validation testing before you build that tool and before
14 you build that car.
15    So the only adjustments that would need to be
16 made after the tooling of the car are minor ones.  And
17 EDAG was certainly on board to help assist those,
18 but it's just not the case in the current engineering
19 world, given how advanced CAD data is and so on, that you
20 have no idea if the car's going to work, right, before
21 you build those tools.
22    That's why Mr. Kattola, for example -- who is
23 not an EDAG employee, who's worked for a number of other
24 automotive companies -- you know, he testified that this
25 was the most comprehensive process, review process, at

Page 26

1  BYTON that he had seen before the part was tooled.
2    So it was a very comprehensive review before
3  they built those parts.
4    THE ARBITRATOR:  But they still -- BYTON still
5  has the ability to reject your design if it doesn't work
6  in a car.  And you have to fix it, then, under this
7  contract.
8    MS. BURBIDGE:  So they could -- so the way that
9  it would -- I think the way that Mr. Amelung would
10 explain it, Your Honor, is that they wouldn't actually be
11 able, at that point, to reject the entire design.  Right?
12 They couldn't say at the end, "We're not going to pay
13 for" --
14    THE ARBITRATOR:  Oh, I don't mean the design.
15 You're not going to pay for the doorknobs or something.
16 I mean, they could reject part of it, couldn't they?
17    MS. BURBIDGE:  So what I think what happened,
18 given the nature of the contract, right, is that there
19 are parts that -- EDAG is creating this virtual data
20 that's being tested and put into place.  Right?  And so
21 that is tested in a very sophisticated virtual world
22 before the part is tooled.  And what Mr. Amelung, I
23 think, explained is that, when it is tooled, there are
24 minor adjustments that are made.
25    And one of the reasons why Mr. Slovesko sent

Page 27

1  that e-mail in August praising EDAG's work on these
2  early-level versions of the tool, right, was because you
3  make -- and Mr. Salzmann testified about this as well --
4  you make different versions of the tool to kind of refine
5  it along the way.
6    So there isn't all of a sudden a car that's
7  going to consumers that has some giant problem.  This is
8  part of the iterative process.  Of course, if there were
9  an element, a minor element, that needed adjustment, the
10 contract allows BYTON to say formally that there's an
11 error.
12    But what EDAG's witnesses would explain and, I
13 think, did explain, is that that would happen much
14 earlier in the process.  And the reason there's a formal
15 error notice is because BYTON can ask EDAG to reduce the
16 amount of money it receives.  Right?
17    Under the error notice process, one of the
18 options for BYTON is to ask EDAG to write off costs.  So
19 that's why it's formal and written.
20    THE ARBITRATOR:  So the answer to my question
21 is:  Yes, you would have to fix it, but there's so many
22 checks and balances before you can do that procedure,
23 it's really unlikely that it's going to happen.  And if
24 it does happen, you guys will -- yeah.  If it does
25 happen, you're under the obligation to fix it, but it's

Page 28

1  just there's so many things that are done before that
2  that you're never going to get there.  Right?
3    MS. BURBIDGE:  Yes, Your Honor.
4    And I would actually, for example, direct your
5  attention later, if you would like, to trial Exhibit 7 or
6  8.  Those are examples of presentations that were given
7  during the course of this relationship where they show
8  the progress of the various components.
9    BYTON and EDAG have meetings where they show
10 where things are going, and it's indicated by color
11 lights -- is it red, yellow, or green -- right, along the
12 process.  And these are very frequent meetings because of
13 the complexity of the design and the complexity of the
14 vehicle.
15    It isn't the case that EDAG goes off and does
16 its own thing.  It's a constant communication with BYTON.
17 And obviously had 18 to -- you know, employees embedded
18 in the BYTON facility in Santa Clara.  So they're
19 constantly approving the design along the way.
20    THE ARBITRATOR:  Okay.  And so this is -- their
21 argument that you can't reject it until the validation
22 phase is -- you just addressed that in a different way;
23 right?
24    That can't make any sense because of all this
25 stuff that's happened; right?

EDAG Engineering GMBH v BYTON North America Corporation          Reporter's Transcript of Proceedings          4/7/2021

---

Page 29

1          MS. BURBIDGE: Yes, Your Honor. That's right.
2     And -- go ahead.
3          THE ARBITRATOR: No. I'm fine.
4          MR. SIPPRELLE: And, Your Honor, just to respond
5     to that -- our position is you cannot fully and finally
6     either accept or reject until after validation for all of
7     the reasons that were discussed at the hearing.
8          And Mr. Salzmann, their own witness, basically
9     conceded that. And this is -- that was on day nine of
10    the hearing at page 1144, 7 through 1145, 10. I asked
11    him that, if BYTON found an error in EDAG's virtual data
12    during the validation testing, what would happen? Would
13    BYTON have no remedy?
14         And he said, "Well, yeah. Basically, BYTON
15    would have a remedy." So --
16         THE ARBITRATOR: I think she's agreeing with
17    that too. I think she's just saying it's really
18    unlikely.
19         MR. SIPPRELLE: Well, it may or it may not be,
20    but I think that just makes our point that you cannot
21    really accept or reject something definitively until
22    after the validation testing.
23         But, you know, I think it's probably not that
24    significant anyway, at least with respect to the
25    cross-complaint, because the one error that is the

---

Page 30

1     subject of our counterclaim or cross-complaint, the
2     front-end, the front-end packaging, we did effectively
3     reject that before we got to the validation testing.
4          THE ARBITRATOR: All right. So we'll -- okay.
5     That makes sense to me.
6          MS. BURBIDGE: The one other point that I would
7     simply add -- and then we can, I think, move on to the
8     next question that Mr. Sipprelle's going to address -- is
9     the testimony regarding the validation testing process.
10         I would just mention to Your Honor that BYTON's
11    only witness who put forward this position was
12    Mr. Kameswaran, who is a finance expert. And he is not
13    an engineer. And he testified that he would defer to
14    Mr. Amelung, you know -- Mr. Kattola, Mr. Twohig,
15    Mr. Slovesko regarding engineering issues and that EDAG's
16    witnesses, who are engineers and who are body engineering
17    experts, testified that this is not how it's done in the
18    field. And that this is not -- it is not the case that
19    you wait until the very end to reject a part.
20         THE ARBITRATOR: Okay. Well, I think I
21    understand the difference now.
22         Mr. Sipprelle, you want to go ahead?
23         MR. SIPPRELLE: Yes. I'll go ahead. I just
24    want to respond to that.
25         Mr. Kameswaran is an engineer. That was the

---

Page 31

1     testimony.
2          THE ARBITRATOR: Okay. Well, he's listening to
3     us. He'll --
4          MR. SIPPRELLE: Yes. He would be offended if I
5     didn't make that point. Okay.
6          THE ARBITRATOR: You don't want to offend a
7     client. That's not a good move.
8          MR. SIPPRELLE: Not a good move at all.
9          Moving on to question number 4, which was "Does
10    BYTON believe that EDAG ever issued an invoice before the
11    deliverable was accepted." And Your Honor referenced
12    TDLA Section 7.1.
13         And BYTON's position is: Of course. Every --
14    as we just discussed, you can't really have full and
15    final acceptance until after the validation testing.
16         So every invoice that EDAG issued before was
17    before BYTON actually accepted, made full acceptance of
18    the deliverable.
19         THE ARBITRATOR: But in the contract, you never
20    objected if they were issuing -- I guess what you're
21    saying is they issued all these invoices prematurely and
22    you never objected to that during the project; right?
23    You just -- if everything worked out the way everybody
24    thought it was going to work out; right?
25         MR. SIPPRELLE: Okay. Well, our position -- and

---

Page 32

1     the evidence from our side, I think, was pretty clear on
2     this -- is that simply accepting an invoice is an
3     acceptance or an acknowledgment that the work reflected
4     in the invoice was actually performed, not that any
5     particular deliverable was adequate.
6          We wouldn't know if the deliverable actually was
7     adequate until validation tested. With those two
8     exceptions of the deliverables, we effectively rejected,
9     when we took over the work, the front end design and the
10    center console. Those, we did effectively reject. But
11    the others, we wouldn't know until validation testing
12    whether they actually were acceptable.
13         THE ARBITRATOR: I think Ms. Burbidge's argument
14    is that this latest argument about acceptance is
15    something that's developed as a defense in this case
16    that, all during the process itself, it never was
17    discussed at all. This was kind of a surprise to them
18    when this case happened.
19         Is she correct about -- not your motives, but is
20    it a fact that it never was brought up -- this whole
21    issue was never brought up during the contract? They
22    would issue an invoice after the work was performed, and
23    you weren't guaranteed the work was done right? Is
24    that --
25         MR. SIPPRELLE: We wouldn't know. Yeah,

---

Abrams, Mah & Kahn Reporting Service
800 622 0226

Page 33

1    Your Honor, I understand what --
2          THE ARBITRATOR:  This was a new issue that came
3    up during the arbitration; right?
4          MR. SIPPRELLE:  Well, I don't know if it was a
5    new issue.
6          We were certainly making them aware throughout
7    the relationship when we had issues or concerns or
8    disappointments with their work product.  You know, that
9    was communicated on a regular basis.  And there is a
10   mountain of evidence in the record about that.
11         THE ARBITRATOR:  Well, yeah.  But they fixed
12   that.  They worked on stuff.  I understand that.
13         MR. SIPPRELLE:  Well, except for those two items
14   where we had to take it over, you know.
15         But we wouldn't -- you know, even though certain
16   things were addressed when we raised them, we wouldn't
17   definitively know if this CAD design would work in the
18   real world until the end of the process.
19         And that's why the evidence is -- it's
20   undisputed from both sides that BYTON and EDAG were to
21   maintain this relationship for 90 days after the start of
22   production.  It was for that very reason.  We wanted to
23   make sure this actually worked in the real world and that
24   EDAG was around to fix it if it didn't.
25         So I think that testimony simply underscores

Page 34

1    that we couldn't really have accepted anything until
2    right at the end of the process when things went through
3    the validation process.  That's why we needed EDAG around
4    for startup production plus 90 days.  And both sides
5    agree.
6          THE ARBITRATOR:  Yeah.  That's -- yeah.  I think
7    that's probably right.  But --
8          MR. SIPPRELLE:  The other point I wanted to make
9    on this question.
10         Your Honor referenced TDLA Section 7.1.  And I
11   think what Your Honor was referring to there was -- let
12   me see if I can share my screen here.  Bear with me for a
13   moment.
14         7.1, I think Your Honor was referencing the
15   second portion of the first sentence, where it says:
16         "And in the case of fees due in connection with
17         the deliverables upon acceptance of the
18         deliverable by BYTON in accordance with
19         Section 4.2."
20         But the reality is that there were no fees due
21   in connection with the deliverables.
22         Actually, all of the fees were due under this
23   arrangement in the first part of the sentence.  It says:
24         "BYTON shall pay supplier the fees set forth in
25         Section 4 in SOW in accordance with the schedule

Page 35

1          and requirements set forth therein."
2          So if we look at Section 4 of the SOW, which is
3    the statement of work -- and that's Attachment 1 to the
4    TDLA.
5          So Section 4, if you can see that, says
6    "Development Fees and Charges."
7          And then the first bullet point per page 74 of
8    the project description.  Okay?
9          What that is -- that, page 74 of the project
10   description, is page -- so there were these attachments
11   to the TDLA.  And that was page, I believe, 93.  Let me
12   find that.
13         Right here.  Page 91.  Which is actually
14   page 4 -- 74 of the attachment.  So that's what's
15   referenced as page 4 in the statement of work.
16         This is the payment schedule that was agreed
17   upon.  There's no reference to payments tied to any
18   deliverables.  It was simply a flat 31-month agreed-upon
19   payment schedule.  You know, over 31 months.
20         So there was no payment tied to the completion
21   and delivery of the deliverable.
22         THE ARBITRATOR:  Wasn't it because there was a
23   cash-flow issue and everybody agreed on a payment
24   schedule?
25         MR. SIPPRELLE:  I think the testimony was, from

Page 36

1    Mr. Kameswaran, that this was a way of leveling out the
2    payments so that things were paid over time.  We didn't
3    have to pay in a lump sum.
4          And it also provided EDAG with a monthly cash
5    flow to cover expenses for its employees, engineers who
6    were on site and so forth.  That was the payment
7    arrangement.  There was no payment tied to any
8    deliverable.
9          THE ARBITRATOR:  Okay.
10         MR. SIPPRELLE:  So this second part of
11   Section 7.1 that talks about payments due in connection
12   with deliverables, that was not the arrangement.  That
13   language is in there, but that was not the payment
14   arrangement between the parties.
15         And that would not have made any sense anyway
16   because invoices generally were not tied to any
17   deliverable.  You could have work on a deliverable over
18   many, many, many invoices over many months.  Mr. Amelung
19   testified to that.  Page 326 through page 329.
20         So it wouldn't have made sense to tie payments
21   to completion and deliverables.  And that was not the
22   arrangement.
23         THE ARBITRATOR:  But the invoice was issued
24   after you guys confirmed the work listed in the invoice
25   was completed.

9  (Pages 33 to 36)

Page 37

1    MR. SIPPRELLE:  Correct.  Yes.  So what we did
2    is we looked at the work described in the invoice.
3    Confirmed that the work was actually done.  Sometimes
4    there were some adjustments where you had some question.
5    "Was this work actually done or not?"
6        Once we confirmed the work was done, then the
7    invoice was approved.  But it wasn't tied to delivery of
8    a deliverable or acceptance of a deliverable.
9        THE ARBITRATOR:  Okay.  I understand your
10   argument.
11       MR. SIPPRELLE:  Okay.
12       MS. BURBIDGE:  Let me -- Keith, that's questions
13   4 and 5.  Can I just jump in and respond?
14       Do you mind not sharing your screen anymore,
15   Mr. Sipprelle.
16       MR. SIPPRELLE:  I can take that down.
17       MS. BURBIDGE:  Thank you.
18       THE ARBITRATOR:  You guys get along well for
19   opposing counsel.  Geez.
20       MR. SIPPRELLE:  Go ahead.
21       MS. BURBIDGE:  We're still seeing your
22   background there.  You have to stop the share screen --
23   all right.
24       Your Honor, our brief really deals with this in
25   detail; so I don't want to rehash that too much here.

Page 38

1        I think that there are a couple key points.
2        The first is, no, there are no documents to show
3    or suggest that the contract's terms were not to be taken
4    at face value.  Right?  There's no correspondence from
5    BYTON.  They have produced no documents to suggest that,
6    when they were approving the invoices and the performance
7    documentation, that they weren't performing EDAG's
8    underlying work as well.
9        And I think, as our brief cites -- numerous
10   examples.
11       BYTON'S Mr. Slovesko would review these invoices
12   and the performance documentation in detail.  He would
13   review them with numerous other individuals to make sure
14   the work was done.  He would reject them if the work
15   hadn't been done appropriately.  So the idea that this is
16   just some sort of cash advance really is a trial-borne
17   understanding of the contract.
18       I'd also just note that there's testimony from
19   Mr. Amelung, who helped negotiate this contract regarding
20   the meaning of this provision.  Mr. Kameswaran did not
21   help negotiate those parts of the contract.
22       Those are the main things that I would point to
23   is that the weight of the evidence very clearly supports
24   EDAG's interpretation of the contract and what the
25   approval of the invoices meant.

Page 39

1        THE ARBITRATOR:  Okay.  All right.  So number 5.
2    What evidence or record supports BYTON's position --
3        I think you've explained that, Mr. Sipprelle,
4    haven't you?
5        MR. SIPPRELLE:  Yeah.  I think we just covered
6    that.  It would be the payment schedule.  We talked about
7    Exhibit 3-091, which shows it's not tied -- payments are
8    not tied to completion and delivery of a deliverable.
9        There's Mr. Amelung's testimony that work on a
10   particular deliverable could carry through multiple
11   invoices.
12       There's a mountain of evidence from the BYTON
13   side that explains that all we were doing was approving
14   that the work had been done, not acceptance of the
15   deliverable.
16       And then all of the testimony we've talked about
17   about how we can't really accept the deliverable until
18   validation testing.  So --
19       THE ARBITRATOR:  Okay.
20       MR. SIPPRELLE:  That would be the evidence.  And
21   I think we've talked about that.
22       THE ARBITRATOR:  Good job.  I'm glad I asked the
23   question, and I'm glad I got the answer.  Right.
24       MR. SIPPRELLE:  On number 6, Your Honor asked
25   "Is it undisputed that the first time BYTON notified EDAG

Page 40

1    of what it believed the engineering errors was on
2    November 20, 2019," which I think Your Honor was
3    indicating -- I mean, that's when BYTON, I believe, filed
4    its counterclaim.
5        And the evidence is absolutely not.  I mean, we
6    put in a mountain of evidence that BYTON made EDAG aware
7    on many, many occasions during the relationship of
8    unhappiness, concern, dissatisfaction with EDAG's work
9    product, and all of that evidence is referenced in
10   Footnote 12 in our closing brief.
11       But I just want to highlight one aspect of this.
12       David Twohig, he joined BYTON in early 2018 --
13   so this is a year and a half before the litigation.  And
14   his testimony is that, virtually, from day one after he
15   joined, he was raising issues about problems with EDAG's
16   engineering work.
17       And Your Honor can look at, for example,
18   page 515, line 6 through 21; page 548, line 4, through
19   549, line 11 -- Mr. Twohig essentially testified in those
20   areas that, within a couple of weeks of him joining the
21   company, he was raising engineering concerns with EDAG.
22       And there is lots of other --
23       So the answer is absolutely not.  This was not
24   some Johnny-come-lately, you know, raising it only after
25   we got sued.  We were raising engineering errors very

10   (Pages 37 to 40)

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings                                    4/7/2021

---

Page 41

1    early on with EDAG.
2          THE ARBITRATOR:  I may have asked the question
3    badly.  And I also see now I've got some typos in my
4    numbers.  Great.  But -- all right.
5          So I think this came about where you say that
6    all these design errors were -- what I meant by this
7    question was:  So you're saying that you got design
8    errors that are so massive that it's over $31 million.
9          When did that first come up, the 31 -- let me
10   just say this.
11         When did they know there was a $31 million
12   counterclaim?  The first time anybody discussed that was
13   at the cross-complaint?  I think that's what
14   Ms. Burbidge's client is saying.
15         MR. SIPPRELLE:  Okay.  So let me break that out.
16   So the $31 million issue is the front engine
17   compartment design or redesign issue.  And our evidence
18   is we made them aware of that in 2018, and, in fact, we
19   had to take that over in 2018.  So --
20         THE ARBITRATOR:  Did you ever say you were going
21   to backcharge them for it or --
22         MR. SIPPRELLE:  No.  Well, we didn't -- so the
23   evidence is no.
24         During the course of the relationship, we were
25   not telling them, "Okay.  We're going to backcharge you

---

Page 42

1    $31 million because we had to redesign the front."  No.
2          We're trying to work with EDAG to get the
3    vehicle to completion.  No.  Of course we're not going to
4    tell them, while we're working with them, trying to get
5    this vehicle done, "Hey, you owe us $31 million."  No.
6          Yes.  We did not tell them that.  We're trying
7    to maintain this relationship.
8          But once they sue us, once the relationship is
9    sunder by them pulling out and them initiating the
10   arbitration, then okay.  Now we're going to have to go
11   back and figure out the damage that was done, and we did.
12   Mr. Twohig did the calculation, and he calculated it was
13   $31 million to get a redesign.
14         THE ARBITRATOR:  That makes sense.
15         Okay.  And you can argue that Ms. Burbidge's
16   argument that this is all made up for arbitration is just
17   not right.  It's just, when the relationship got severed,
18   then -- I guess you would have worked this out in the
19   future or sometime.  I don't know.
20         MR. SIPPRELLE:  Right.  We would have --
21         THE ARBITRATOR:  We weren't arguing about it
22   because they wanted to stay friends.  Okay.
23         MR. SIPPRELLE:  Right.  Right.  The hope was we
24   were going to get the vehicle to production and EDAG
25   would still be part of the relationship.  That was the

---

Page 43

1    contemplation.  You know, start of production plus
2    90 days.
3          And then, at the end, the vehicle's in
4    production.  We'll sit down with EDAG and figure out, you
5    know, what an appropriate offset might be or
6    reimbursement or whatever.  That was what we were
7    planning.
8          But once the relationship is over and they're
9    suing us, well, okay.  Now we have to figure out what the
10   damage is.  And that's what we did.
11         THE ARBITRATOR:  All right.  I understand.
12         Ms. Burbidge, did you want to say anything about
13   that?
14         MS. BURBIDGE:  I will try to be brief about
15   this, Your Honor, again, because I think we address it
16   pretty thoroughly in our post-hearing briefing.
17         THE ARBITRATOR:  Oh, you did.  That's why I'm
18   asking a number of questions.
19         MS. BURBIDGE:  So, Your Honor, I think we set it
20   out very, very clearly here.
21         This theory that is offered, right, just simply
22   does not comport with the way business is done in the
23   real world.
24         The idea that EDAG would accumulate, you know,
25   24 million euro worth of invoices and BYTON would never

---

Page 44

1    say, "Hey, you actually owe us money," at any point --
2          Even after the litigation was filed, right, they
3    continued to promise EDAG at the CES meeting in
4    January 2020, that CEO-to-CEO meeting in February --
5    their outside auditors called EDAG and said, "Hey,
6    BYTON's told us they owe you 24 million euro.  Is that
7    true?"
8          That they would never approach EDAG and try to
9    write down a single invoice even after Mr. Twohig
10   allegedly finds these egregious errors just does not
11   comport with the way that the relationship worked.
12         And, additionally, the contract itself was
13   written to allow BYTON these write-offs.  That's what the
14   error notice process was all about.
15         And I won't go, at this point, into great detail
16   about Mr. Twohig's credibility.  I think we address it,
17   again, pretty thoroughly.
18         So, you know, he didn't read the agreement.  He
19   didn't do his research before writing that declaration,
20   and we provided a lot of evidence that proved that quite
21   definitively beyond the testimony of Mr. Amelung.
22         And BYTON has not produced any documents to
23   substantiate these serious claims, and the e-mails they
24   have produced are minor errors or issues or parts of the
25   iterative process, I should say, as opposed to --

---

11  (Pages 41 to 44)

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings          4/7/2021

Page 45

1    So, you know, that's our position on it.  I
2  don't want to rehash it.
3    THE ARBITRATOR:  And that's why you're arguing
4  there's a breach of the covenant of the good faith and
5  fair dealing and why you should get attorneys' fees and
6  all that stuff because you were misrepresented.
7    MS. BURBIDGE:  That's right, Your Honor.
8    THE ARBITRATOR:  Okay.
9    MR. SIPPRELLE:  Your Honor, if I can just
10  briefly --
11    THE ARBITRATOR:  This one doesn't deal with the
12  breach of contract case, though.  Their offset case --
13    MS. BURBIDGE:  Yes, Your Honor.  It has to do
14  with the --
15    THE ARBITRATOR:  Okay.  I got it.  I got it.
16  All right.
17    Mr. Sipprelle?  Sorry.
18    MR. SIPPRELLE:  Yeah.  I just wanted to make one
19  response.
20    The CES meeting in February "2019," that was a
21  settlement discussion between -- at a senior level.
22    MS. BURBIDGE:  I think you're conflating two
23  different meetings, Mr. Sipprelle.  There was a CES
24  meeting with the -- in January, and then there was a
25  CEO-to-CEO call in February of 2020.

Page 46

1    MR. SIPPRELLE:  Right.  In 2020.  Yeah.
2    MS. BURBIDGE:  Which one do you mean?
3    MR. SIPPRELLE:  I'm talking about the one in
4  2020.
5    MS. BURBIDGE:  There were two.
6    MR. SIPPRELLE:  There was a call, and then there
7  was a meeting.  Okay?
8    MS. BURBIDGE:  Yeah.
9    MR. SIPPRELLE:  And these were settlement --
10    THE ARBITRATOR:  Okay.  Hold on.  You were
11  talking about a February 2019 meeting.  That's how it
12  started.  Did you change your meeting, Mr. Sipprelle?
13    MR. SIPPRELLE:  I'm sorry.  So -- I mean,
14  they're both the same.  There was a call, and then there
15  was a meeting at CES in February 2020.
16    THE ARBITRATOR:  2020.
17    MR. SIPPRELLE:  These were settlement
18  discussions where EDAG and BYTON are trying to resolve
19  their dispute.  And for counsel to take a settlement
20  discussion and twist that into, well, this was -- first
21  of all, I don't think, you know, what was said should
22  probably even be admissible because it was a settlement
23  discussion.  But to then twist that into, well, this was
24  an acknowledgement that money was owed and that, because
25  we weren't talking about our counterclaim, that that

Page 47

1  somehow is an admission that it wasn't valid -- I just
2  think that's inappropriate.
3    These were settlement discussions, and the
4  parties are trying to work things out, and I think it's
5  just inappropriate to try to use those as evidence of
6  anything.  And that's why settlement discussions are not
7  admissible.
8    THE ARBITRATOR:  No.  I understand why they're
9  not admissible, and I never admit them.
10    But if these are not settlement discussions,
11  this is the basis for their claim of breach of the
12  covenant of the good faith and fair dealings.  These
13  meetings that you say are settlement discussions are not
14  admissible; right?
15    MR. SIPPRELLE:  Well, I'm going to address
16  their -- and that's one of the issues I'm going to
17  address at the end, the covenant of good faith and fair
18  dealing claim.
19    I don't know if they're relying on those for
20  that claim or not.  But these were simply settlement
21  discussions.  And I think it's inappropriate to use them
22  for anything.
23    THE ARBITRATOR:  Okay.  I got it.
24    Let's keep going.
25    MR. SIPPRELLE:  All right.  Your Honor,

Page 48

1  number 6.  Your Honor asked about the simple interest.
2  6 percent simple instead of 10 percent simple.
3    And the reason we think that's appropriate is
4  the evidence is that that's what was agreed upon between
5  EDAG and BYTON.  Mr. "Keller" testified to that at
6  page 185, 16, through 188, 2.
7    THE ARBITRATOR:  185, 16?  Okay.
8    MS. BURBIDGE:  I'm sorry.  Who's Mr. Keller,
9  Mr. Sipprelle?
10    MR. SIPPRELLE:  Oh, I'm sorry.  Mr. Mertz.  I'm
11  not sure where I got Mr. Keller.  Mr. Mertz.
12    MS. BURBIDGE:  Thank you.
13    MR. SIPPRELLE:  Mr. Mertz.
14    So it's at 185, 16, through 188, 2.
15    EDAG's own exhibit, which is 175, page 001,
16  references a 6 percent interest rate.
17    And Mr. Zoltowski, their accountant, testified
18  that he was told by Mr. Amelung that that was the
19  agreed-upon interest rate on unpaid invoices.  And that
20  was at 422, 14, through 22; 443, 4, through 444, 24.
21    So that's why we think 6 percent is -- if there
22  is going to be interest awarded, if there is going to be
23  an award for EDAG, it should be 6 percent simple interest
24  rather than 10 percent.
25    THE ARBITRATOR:  Okay.

12  (Pages 45 to 48)

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings                              4/7/2021

Page 49

1          MS. BURBIDGE:  And may I briefly --
2          THE ARBITRATOR:  Ms. Burbidge.  Sure.
3          MS. BURBIDGE:  So, Your Honor, I think the
4    testimony actually does not exactly say that.
5          What the testimony indicates is that there was a
6    payment plan that was entered into for the overdue
7    invoices, right, that the CEOs of the companies entered
8    into and that they negotiated between themselves an
9    interest rate for those invoices that had not yet been
10   paid.  Right?
11         And when that payment plan was breached, that's
12   when the statutory interest kicks in.  And then that's
13   the statutory interest that kicks in on the additional
14   invoices that were issued after the payment plan as well.
15   Right?
16         So there's nothing in writing that explicitly
17   says the TDLA is modified to require a 6 percent interest
18   rate.  So the statutory interest under California law
19   would apply here.
20         And particularly with regard to those invoices
21   that were issued after the payment plan, there's nothing
22   that would cover them.
23         So that would be our argument, and I think that
24   we addressed that in our briefing as well.
25         THE ARBITRATOR:  Do you have, in your briefs,

Page 50

1    the timing of when the payment plan expired?
2          MS. BURBIDGE:  Yes.
3          THE ARBITRATOR:  So it would have the 6 percent
4    for some times, and --
5          MS. BURBIDGE:  Yes, Your Honor.
6          THE ARBITRATOR:  You think it should be
7    10 percent all along, but it would 6 percent and then
8    10 percent.  Okay.
9          MS. BURBIDGE:  Yes, Your Honor.  That's right.
10         And if you look at Mr. Zoltowski's report as
11   well.  That's set out in detail there too.
12         MR. SIPPRELLE:  And our position is there was an
13   agreement, which is in the record, an agreement on
14   6 percent on unpaid invoices without any duration or time
15   limit.  It was just 6 percent simple interest on unpaid
16   invoices.  So that should apply, you know --
17         MS. BURBIDGE:  And our argument would be --
18         MR. SIPPRELLE:  For time immemorial.
19         MS. BURBIDGE:  Your Honor, our argument would be
20   that the contract that this lawsuit is moving forward
21   under is the TDLA, and that's what controls under
22   Section 3289.
23         THE ARBITRATOR:  Okay.  I have enough
24   information so I can figure this out now.  Okay.  Good.
25   But it's -- okay.  So it's going to be simple interest,

Page 51

1    6 percent or 10 percent.  Is it 10 percent for all the
2    unpaid invoices or 10 percent for all invoices issued
3    after the agreement was made and --
4          Okay.  I got it.  I think I do.  I've got enough
5    to -- for good work.
6          All right.  Let's go.  What's next?
7          MR. SIPPRELLE:  Question number 7, Your Honor.
8          THE ARBITRATOR:  We've talked about that a lot.
9          MR. SIPPRELLE:  And I think we've more or less
10   talked about this.  So --
11         MS. BURBIDGE:  Yeah.  I think so too.
12         MR. SIPPRELLE:  We can probably move on.  I
13   think we've beaten that one to death.
14         THE ARBITRATOR:  It's not dead yet.
15         MR. SIPPRELLE:  Oh, okay.  As far as counsel is
16   concerned, maybe you've heard enough.
17         THE ARBITRATOR:  Okay.
18         MR. SIPPRELLE:  Number 8.  Your Honor asked "if
19   there will not be final testing, does it mean" --
20         THE ARBITRATOR:  So you're not going to build a
21   car anymore; right?
22         MR. SIPPRELLE:  Well, we don't know.  There's no
23   evidence in the record one way or the other about whether
24   that's going to happen.
25         I think, with respect to -- you know, if it

Page 52

1    happens, you know, I believe BYTON would have a remedy
2    against EDAG for any work that it's found not to perform
3    in the real world, and I think Mr. Salzmann of EDAG
4    basically confirmed that in his testimony.
5          But, for purposes of our counterclaim, our
6    position is we rejected the front end design.  We didn't
7    need to wait until final validation testing.  We actually
8    rejected that, took that work over, and we believe that
9    cost us $31 million.
10         So, on that one, which is the basis of our
11   counterclaim, we did reject that.  And we're asking for
12   an offset.
13         THE ARBITRATOR:  Okay.  I know you're asking for
14   an offset.
15         But absent an offset, you're going to have to
16   pay all the outstanding invoices because, even under your
17   theory, there's no way you can reject this work product
18   unless you build the car and the car's -- and you got
19   four employees left; so you're probably not going to
20   build a car.
21         MR. SIPPRELLE:  Hard to say.  But absent --
22         Yeah.  We're not disputing the amount of the
23   unpaid invoices.
24         But we do believe we're entitled to an offset
25   because we did reject the front end design and had to

13 (Pages 49 to 52)

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings                                        4/7/2021

Page 53

1    rework it.  And that's the offset.
2         THE ARBITRATOR:  I have to distinguish in my
3    mind the two things.  There's the actual -- what invoices
4    are due.  You're not going to argue about that.
5         And there's no way to reject them now, under
6    your theory, because the car's not going to be built.
7    And you're saying, "That may be right, Judge, but we've
8    got a $31 million counterclaim.  So we don't owe
9    anything."
10        MR. SIPPRELLE:  Correct.  That's right.
11        THE ARBITRATOR:  All right.
12        MR. SIPPRELLE:  On number 10, with respect to --
13        THE ARBITRATOR:  You're skipping number 9?
14        MR. SIPPRELLE:  I'm sorry.  Number 9 -- oh,
15   okay.  So that was the "as of the date of the
16   arbitration, no timely error notice."
17        THE ARBITRATOR:  Yeah.  That answers that.  Yes.
18        MS. BURBIDGE:  Yeah.  I think you answered that
19   one already.
20        MR. SIPPRELLE:  We effectively issued an error
21   notice with respect to the front end design and the
22   center console by taking that work over.  But, yes, there
23   was no written formal document saying, "Here's an error
24   notice."
25        THE ARBITRATOR:  Okay.  On 10, I read your

Page 54

1    brief, and I said okay.  It could be a parrot, but is it
2    wrong?  You know, a parrot can say things that are right.
3    It's not always wrong.
4         MR. SIPPRELLE:  I guess what I was getting at
5    with the parrot comment is Mr. McLellan's testimony
6    doesn't add anything to what Mr. Amelung at EDAG
7    testified to about the engineering errors.  I mean, he
8    basically just --
9         THE ARBITRATOR:  It doesn't add anything.  Okay.
10        MR. SIPPRELLE:  It doesn't add anything, and,
11   yes, we believe both Mr. McLellan and Mr. Amelung are
12   wrong with respect to their opinions about no engineering
13   errors on most of these issues, particularly the front
14   end packaging.
15        And we have Mr. Twohig, who provided tremendous
16   detail regarding the engineering errors, particularly the
17   front end redesign.
18        We have Mr. Slovesko, who testified -- he was
19   the head of body engineering for BYTON.  He testified
20   that he agreed with Mr. Twohig's opinions regarding the
21   engineering errors.  That's at page 709, 24, through
22   710, 12.
23        And we have Mr. Kameswaran, who, although,
24   you know, he doesn't have the level of engineering
25   expertise of Mr. Twohig and Mr. Slovesko, also testified

Page 55

1    about the engineering errors.
2         So, yes, we believe Mr. McLellan's opinions are
3    wrong with respect to, you know -- or highly disputed by
4    the BYTON people who testified regarding these errors.
5         THE ARBITRATOR:  Okay.  So they're disputed, and
6    that's why you think they're wrong, not that you can't --
7         MR. SIPPRELLE:  Correct.
8         THE ARBITRATOR:  You can't say just -- other
9    then conflicting expert testimony, you think they're
10   wrong.
11        All right.  I got that.
12        MR. SIPPRELLE:  Yeah.  And I would also point
13   out -- I mean, you know, Mr. McLellan really didn't do
14   any independent work.  He didn't read any of the
15   depositions of the BYTON people.  But, yes, there
16   even identify who Mr. Slovesko was.  He thought
17   Mr. Slovesko worked for EDAG.  So --
18        THE ARBITRATOR:  Well, okay.  All right.
19        MR. SIPPRELLE:  He's simply restated what
20   Mr. Amelung --
21        THE ARBITRATOR:  That's what you say he said.
22        Okay.  You understand my question and --
23        MR. SIPPRELLE:  Yes, I do.  I do, Your Honor.
24        Ms. Burbidge, do you have anything else to say
25   about that?

Page 56

1         MS. BURBIDGE:  I'll just briefly --
2         THE ARBITRATOR:  Briefly.
3         MS. BURBIDGE:  Yes, Your Honor.
4         You know, Mr. McLellan may have spoken
5    extensively with Mr. Amelung, but he absolutely came to
6    his own conclusions, as I think the testimony makes
7    clear.  And his report speaks for itself, and he is
8    someone who has spent many, many decades working in the
9    industry.
10        And he looked closely at the declaration of
11   Mr. Twohig.  There's no dispute about that.  And he found
12   the allegations regarding the engineering errors in that
13   declaration to be inaccurate.  And his conclusions,
14   therefore, should be given weight.
15        THE ARBITRATOR:  Okay.  So it's just a normal
16   dispute among experts.
17        MS. BURBIDGE:  Yeah.  Normal.  Yup.
18        THE ARBITRATOR:  All right.
19        Now, how do you get to 31 million,
20   Mr. Sipprelle?
21        MR. SIPPRELLE:  Okay.  So that's question 11.
22   Your Honor asked about the standard of care and then the
23   31 million.
24        The standard of care was testified to by
25   Mr. Twohig.  And I'll focus just specifically on the

14  (Pages 53 to 56)

Page 57

1  front-end redesign, the front-end bay, the front
2  packaging, which is the subject of the 31 million.
3      And Mr. Twohig testified --
4      THE ARBITRATOR:  Just so I'm clear -- so the
5  control panel is interesting, but it's not really a
6  damage issue; right?
7      MR. SIPPRELLE:  It is not because we didn't
8  quantify that, the damage caused by the control panel.
9      THE ARBITRATOR:  All right.  Even when I was
10 sitting in the arbitration listening to you guys, I was
11 thinking, "Where's the expert who's going to tell me how
12 you made the 31 million up?"  Not "made it up."  That was
13 the wrong saying.  "How did you calculate the
14 31 million?"
15     So that's the purpose of this question.
16     How can I -- where is the evidence that supports
17 that 31 million?
18     MR. SIPPRELLE:  Okay.  So let me start with the
19 standard of care.
20     So Mr. Twohig testified, through his deposition,
21 which was read into the record -- and that's page 583, 5,
22 through 584, 3 -- that, in his opinion, EDAG failed to
23 meet the engineering standard of care with respect to the
24 design of the front-end engine bay.  And Mr. Slovesko
25 testified that he agreed with Mr. Twohig regarding the

Page 58

1  engineering.  So that addresses the standard of care.
2      With respect to the 31 million, Mr. Twohig
3  testified extensively about -- in his deposition, which
4  was read into the record -- how he calculated the
5  31 million.  And the record references are 521, line 22,
6  through 525, 15.  526, 24 through 528, 25, and then trial
7  Exhibit 206, which was -- let me pull that up.
8      That was the top-down estimate of the -- so this
9  is the document that Mr. Twohig testified to in his
10 deposition, which was read into the record -- and this is
11 trial Exhibit 206 -- and you'll see highlighted
12 31 million.  That's 31 million caused by poor engineering
13 of the initial engine.
14     THE ARBITRATOR:  That's an approximation of
15 rework costs.  Approximation of rework costs.
16     MR. SIPPRELLE:  Right.
17     THE ARBITRATOR:  Usually, when I have a
18 $31 million number, I have more detail than that.
19     So you got more detail than that?
20     MR. SIPPRELLE:  I mean, he testified to how he
21 calculated that number.  I mean, our position is damages
22 don't have to be calculated with precision.  This was --
23 what he testified to and what Mr. Kameswaran testified to
24 is this was a conservative figure.  That the real figure
25 was probably higher, but we went with 31 million.  And he

Page 59

1  explained how he calculated that 31 million.
2      THE ARBITRATOR:  Okay.  So Exhibit 206.
3  What page is this on?
4      MR. SIPPRELLE:  So that was --
5      THE ARBITRATOR:  It looks like the first page.
6      MS. BURBIDGE:  It's one page, Your Honor.
7      MR. SIPPRELLE:  It's a one-page exhibit that was
8  introduced into the record as part of Mr. Twohig's
9  testimony.  And the testimony on this is as I referenced
10 during day five of the deposition.
11     THE ARBITRATOR:  So I didn't write that down,
12 but I -- we see we have a court reporter here.  I'm going
13 to get a copy of that so I won't need to write it down.
14 I could look it up when I get my record.  Okay.  Good.
15     MR. SIPPRELLE:  Correct.  Yes, Your Honor.
16     THE ARBITRATOR:  This is the extent of your
17 $31 million written calculation; right?
18     MR. SIPPRELLE:  That's correct.  It's
19 Mr. Twohig's testimony and this exhibit.
20     THE ARBITRATOR:  All right.
21     MR. SIPPRELLE:  Okay.  I don't know if
22 Ms. Burbidge has anything on that.
23     MS. BURBIDGE:  Yeah.  I do briefly, Keith, if
24 you want to stop sharing your screen.
25     MR. SIPPRELLE:  Sure.  All right.

Page 60

1      I want the judge to keep looking at that.
2      MS. BURBIDGE:  I know you do --
3      MR. SIPPRELLE:  It's an important exhibit.
4  Very, very important.
5      MS. BURBIDGE:  I figured that was what was going
6  on.
7      THE ARBITRATOR:  You leave that exhibit up so
8  the jury can watch it for hours.
9      MS. BURBIDGE:  I know that trick, Keith.  I'm
10 just joking.
11     So, Your Honor, with regard to the standard of
12 care, I think that there is a substantial amount of
13 evidence speaking to Mr. Twohig's lack of body
14 engineering expertise, which goes to the weight of his
15 testimony on this issue.
16     THE ARBITRATOR:  In your brief, you go so far as
17 there is no evidence to the breach of standard of care.
18 You go further than that.
19     MS. BURBIDGE:  Yes, Your Honor.  Yes.  That's
20 correct.
21     THE ARBITRATOR:  There is some evidence; right?
22     MS. BURBIDGE:  Well, I think, Your Honor, what
23 our -- what our experts in this field, Mr. Amelung and
24 Mr. McLellan, say is that there are -- I believe it's two
25 instances of minor errors, but they were corrected

Page 61

1    without any cost incurred by -- to BYTON and that they
2    are also not considered substantial enough to be a breach
3    of the standard of care in the industry, given the scale
4    of the project and the way that car design works.  That
5    would be my response to that.
6         But --
7         THE ARBITRATOR:  So you don't think there is a
8    breach of the standard of care that caused the
9    $31 million damage?
10        MS. BURBIDGE:  No, Your Honor.
11        THE ARBITRATOR:  Okay.  There is evidence that
12   there is some breach of standard of care presented by
13   Mr. Sipprelle.
14        MS. BURBIDGE:  Which piece of evidence are you
15   referring to specifically, Your Honor?  The allegation
16   that they took over the front engine design?
17        THE ARBITRATOR:  I don't think an allegation
18   makes a difference.  But they did take it over.  So they
19   must -- and I guess they're implying that the reason they
20   took it over is because you guys couldn't do it.
21        MS. BURBIDGE:  Yes, Your Honor.
22        And the weight of the evidence which, I think,
23   is outlined in our brief, is that that's not what
24   happened.  EDAG continued to work on the front engine
25   until it was meant to hand it over to BYTON, which is

Page 62

1    what it did.  And then it was asked to assist with
2    additional parts of the front engine design after that,
3    and that's all outlined, I think, in Mr. Amelung's
4    testimony as well.
5         And there was -- all EDAG received throughout
6    the course of this relationship, obviously, was -- the
7    majority of the feedback it received was high praise as
8    well.  So there's no written indication that it was below
9    the standard of care -- or any attempt to offset any of
10   EDAG's work or invoices, excuse me, for the work
11   performed.
12        And then, you know, with regard to the damages
13   calculation, obviously, BYTON has produced no document
14   beyond the one that Your Honor just looked at to support
15   that $31 million number.  And Mr. Kameswaran testified
16   that he was unaware of a single thing specifically that
17   Mr. Twohig looked at.
18        And Mr. Twohig testified that he's not an
19   accountant.  He's not a financial expert.  And
20   Mr. Amelung, I think, explained in detail why this
21   approach is not an appropriate way to estimate damages
22   and what would be needed to actually figure out this
23   number.  And, again, you know, EDAG was not afforded the
24   opportunity to check any documentation, to even
25   understand how this number was, you know, arrived upon

Page 63

1    beyond Mr. Twohig's deposition.
2         THE ARBITRATOR:  Okay.  Anything else,
3    Mr. Sipprelle?
4         MR. SIPPRELLE:  You know, I would just refer
5    Your Honor to those record references and the testimony
6    of Mr. Twohig regarding how he calculated his 31 million.
7    And it's very extensive.  He discusses what he did, what
8    he looked at, how he made that calculation.
9         THE ARBITRATOR:  Okay.  I can do that.
10        MR. SIPPRELLE:  I would rely on that.
11        THE ARBITRATOR:  All right.
12        So anything else anybody wants to talk about?
13        MR. SIPPRELLE:  Your Honor, I want to -- I
14   simply -- the next question related to the asset freeze.
15   We talked about that --
16        MS. BURBIDGE:  I think we finished all the
17   questions, Your Honor.
18        Is that --
19        THE ARBITRATOR:  Yeah.  We did.
20        Because I said there's no injunction.  So we're
21   not going to be doing an injunction.  I guess -- okay.
22        MR. SIPPRELLE:  The one remaining issue I did
23   want to address is this breach of the covenant claim --
24        THE ARBITRATOR:  Okay.
25        MR. SIPPRELLE:  -- and Your Honor has referenced

Page 64

1    that.
2         So as I understand it, what EDAG is suggesting
3    is that BYTON acted in bad faith by making false promises
4    in pay and that EDAG relied on those to allegedly
5    continue working.  But I think that allegation is
6    directly contradicted by the evidence in the record.
7         So the evidence of the record is BYTON was
8    basically current up through the end of 2018.  So what
9    we're talking about is the work that EDAG did in 2019,
10   which is the money it's seeking to recover in this
11   lawsuit.
12        And Mr. Amelung, EDAG's own witness, basically
13   testified that EDAG was made well aware by BYTON in 2019
14   that it could not pay until it got its next round of
15   financing -- C round of financing.  And Mr. "EDAG"
16   testified that BYTON was very transparent about that and
17   that he understood that EDAG was not going to get paid on
18   this work it was doing in 2019 until BYTON got the
19   financing.  And BYTON never got the financing.
20        So there was no bad faith.  There was no false
21   promise.
22        Mr. Amelung testified -- and I would refer
23   Your Honor to the testimony that's at page 283,19 --
24   line 19 -- through 288, line 19.  So those five pages.
25   Mr. Amelung testified in detail on those pages that he

16 (Pages 61 to 64)

Page 65

1    had no doubt that BYTON intended to pay if it had the
2    money, and he didn't think that BYTON was lying about its
3    intention to pay.
4        So where is the bad faith?  Where is the false
5    promise?  And I would direct Your Honor's attention
6    particularly to page 284 -- 283, line 24 -- starting at
7    line 24.  And let me read this into the record.
8        "Question:  Isn't it true, Mr. Amelung, that you
9        were told in 2018 and 2019 that BYTON would pay
10       the invoices when its next level of C funding
11       came through?
12       "Answer:  There were actually two elements that
13       counsel asked.  And to the one is:  Any
14       agreement to the TDLA, was it ever mentioned
15       that BYTON would make payments based on their
16       financial ability?  And that answer was clearly
17       said no.
18       "It was not mentioned and no conditions made in
19       the contract that there is such a thing.  And
20       later in the process, when it became clear that
21       BYTON failed on making payments -- which is
22       their obligation of the contract, you know --
23       then it came, well, how are we handling this?
24       Are we stopping the program right away, or do we
25       trust going forward with the payments?

Page 66

1        And in the course of this action, you know, it
2        was said, yes, we understand that you can only
3        pay us when funds are there, and we will
4        continue working on this until we could not do
5        it anymore."
6        So it is very clear that EDAG understood in 2019
7    that it was not going to get paid until the funding came
8    through.  It continued to work kind of -- you know, on
9    spec, on the hope that the funding would come through.
10   BYTON certainly hoped the funding would come through.
11   But the funding never came through.
12       There was no bad faith.  There was no false
13   promise.  BYTON intended to pay, and Mr. Amelung
14   testified that he knew that BYTON intended to pay if the
15   money came through.  The money simply never came through.
16   So there was no breach of the covenant.  There was no bad
17   faith.
18       It's simply:  EDAG continued to work, hoping the
19   money would come through, and it never came through.  So
20   I think that claim is directly undermined by the evidence
21   and the lack of -- by EDAG's own witness.
22       THE ARBITRATOR:  Okay.
23       Ms. Burbidge, why is he wrong?
24       MS. BURBIDGE:  Well, Your Honor, Mr. Amelung's
25   subjective belief at the time does not indicate whether

Page 67

1    or not BYTON was acting in bad faith.  What indicates
2    that is BYTON's actions.  We've cited dozens of examples
3    in our post-hearing brief of BYTON promising to pay --
4    promising to pay and failing to do so.
5        The most egregious -- or one of the most
6    egregious is Exhibit 172, which is this e-mail from
7    Teresa Shi in September 23, 2019.  And BYTON, at this
8    point, had promised to make payments under the payment
9    plan to EDAG.  And two days after it had -- a payment
10   plan deadline had come and gone, Ms. Xi admits that BYTON
11   has money to pay EDAG, but doesn't -- but they didn't do
12   so.  Right?
13       So it's very clear that they had money.  They
14   had the ability to pay EDAG, but they just chose not to.
15   And then they continued to tell EDAG, "Hey, we'll get you
16   the money.  We'll get you the money."
17       So that is a very clear example of bad faith.
18   Of leaving -- leading EDAG on.
19       THE ARBITRATOR:  But isn't Mr. Sipprelle right
20   that everybody knew that they couldn't pay all these --
21   all this money until the Chinese loan came through?
22       MS. BURBIDGE:  Well, I think the indication here
23   was that they were waiting on funding but that they would
24   be paying EDAG as they could, right, throughout this
25   period of time.  And instead what happened is, because

Page 68

1    EDAG trusted BYTON, they continued to sort of drag EDAG
2    along.
3        And I think, you know, there were some -- I
4    think Mr. Kameswaran testified -- token payments that
5    were made, but they were very small even though they had
6    the ability to pay more.  And that may simply be because
7    EDAG was too trusting.  So maybe there were other
8    creditors who were loud or were knocking down their door.
9    But EDAG wasn't.
10       THE ARBITRATOR:  We don't know that.
11       MS. BURBIDGE:  I understand that, Your Honor.
12   And, you know, I think, in addition to, to right, there
13   was -- you know, BYTON had the ability to tell EDAG that
14   it was going to write down what EDAG was owed.  I mean,
15   it was well aware of EDAG's publicly-traded company.
16       And it could have said at any time, "You made
17   very serious engineering errors, and we do not owe you
18   this full amount."
19       But it never did so, which also, you know -- is
20   improper under the contract and is a sign of, you know,
21   leading EDAG along in bad faith.  So I think our brief
22   details this and --
23       THE ARBITRATOR:  Okay.  All right.
24       MS. BURBIDGE:  -- with the necessary
25   specificity.

17 (Pages 65 to 68)

Page 69

1    THE ARBITRATOR:  Now, in order for you to get
2  attorneys' fees here, it would be -- you would need to --
3  so, what?  There's no contract, these attorneys' fees.
4    And you sure you can get attorneys' fees if
5  there's a finding in the breach of the covenant in good
6  faith and fair dealing?  That's new to me.  It doesn't
7  mean I don't know it.  I don't know all law, but it -- I
8  was kind of surprised when I read that.
9    MS. BURBIDGE:  Understood, Your Honor.
10    I believe the -- what the case law says is it's
11  foreseeable costs.  So our position is this is
12  foreseeable as a result of that breach.
13    THE ARBITRATOR:  Okay.
14    MR. SIPPRELLE:  And, Your Honor, the breach of a
15  covenant claim is a contract-based claim.  You can't get
16  attorneys' fees for breach of a contract or a contractual
17  theory unless there's an attorneys' fees provision in a
18  contract.  And there is no contract --
19    MS. BURBIDGE:  I would argue the contract is
20  silent.  Which is distinct --
21    THE ARBITRATOR:  Well, the contract is silent,
22  but if I remember my law right, unless you have -- it's
23  the American rule.  I've heard that since law school,
24  that everybody is responsible for your own fees.
25    Okay.  That would be the one theory you get

Page 70

1  attorneys' fees.  Was there another theory that you could
2  get it?  By the attorney general or something?
3    MS. BURBIDGE:  I don't think that was mentioned.
4    THE ARBITRATOR:  Just one theory.  That was just
5  for attorneys' fees.  Okay.
6    MS. BURBIDGE:  Yes, Your Honor.
7    THE ARBITRATOR:  Okay.  So in my interim ruling,
8  I'll say whether there's -- I think there's any right to
9  attorneys' fees at all.  If there's no right, then we
10  don't worry about it.
11    But we're going to have to have another -- you
12  don't have -- neither one of you provided me with costs
13  that might be awarded if you win.
14    MS. BURBIDGE:  We did, Your Honor.
15    THE ARBITRATOR:  You did?
16    MS. BURBIDGE:  Yes, Your Honor.  We advanced --
17  EDAG --
18    THE ARBITRATOR:  You advanced a lot of money.  I
19  understand that.
20    MS. BURBIDGE:  Yes.  No.  On behalf of -- we
21  advanced BYTON's costs to proceed with our arbitration.
22    THE ARBITRATOR:  Yeah.  I know.
23    MR. SIPPRELLE:  Not all of the costs.
24    MS. BURBIDGE:  Well, we didn't pay for you,
25  Mr. Sipprelle.  But -- we had to advance a number of

Page 71

1  costs, which are all detailed in our brief.
2    THE ARBITRATOR:  We'll deal with that.  That's
3  what the costs are.
4    MS. BURBIDGE:  Yes, Your Honor.
5    THE ARBITRATOR:  So you've given me enough
6  stuff.  You think I can rule on the costs now?
7    MS. BURBIDGE:  Yes.
8    THE ARBITRATOR:  Except I haven't got
9  Mr. Sipprelle's opposition to your costs.  So maybe I
10  won't be able to.
11    MR. SIPPRELLE:  I guess it depends how you rule,
12  Your Honor.
13    THE ARBITRATOR:  I know, I know.  Well, I mean,
14  to do due process.  So if I rule, you get costs.  You get
15  a turn, as the opposition.
16    Anything else?  I think that's it.  Attorneys'
17  fees, costs -- that's all it would be.  Okay.
18    MS. BURBIDGE:  I think that -- oh, go ahead,
19  Your Honor.
20    THE ARBITRATOR:  No.  I'm done.  Go ahead.
21    MS. BURBIDGE:  I was just going to say, as I
22  mentioned earlier, EDAG would just request a ruling from
23  Your Honor as soon as possible.  I think that the
24  contract requires a minimum --
25    THE ARBITRATOR:  Yes.  I understand.

Page 72

1    MS. BURBIDGE:  -- at the most, it's 30 days from
2  the final hearing.
3    THE ARBITRATOR:  Yeah.  No.  Well, I can get
4  it -- I got time to do it now.
5    Okay.  So, Mr. Sipprelle, you want to add
6  anything?
7    MR. SIPPRELLE:  No.  Other than to thank
8  Your Honor for your hard work and --
9    MS. BURBIDGE:  Yes.
10    MR. SIPPRELLE:  -- I appreciate your efforts.
11    THE ARBITRATOR:  One of you will hate me, and
12  the other one like me.  And hate will last forever and
13  the liking will only go to the next case.
14    MS. BURBIDGE:  Yes.  Thank you very much,
15  Your Honor.
16    And, Keith, as always, it's nice to see you and
17  that sunset behind you.  I will miss seeing that.
18    MR. SIPPRELLE:  Ah, yes.  All right.
19    THE ARBITRATOR:  Well, this has been fun.  I
20  hope to see you again in another case someday.  I love
21  professional lawyers.  They're just joys compared to the
22  next arbitration I have, where the lawyers are bozos.
23    (Ending time:  12:03 p.m.)
24
25

EDAG Engineering GMBH v  BYTON North America Corporation          Reporter's Transcript of Proceedings          4/7/2021

Page 73

1          C E R T I F I C A T E
2
3
4          I, Jean Kim, CSR 13555, a Certified Shorthand
5     Reporter in and for the State of California, do hereby
6     certify:
7          That said proceedings were taken by me in
8     shorthand at the time and place herein named and were
9     thereafter transcribed into typewriting under my
10    direction, said transcript being a true and correct
11    transcription of my shorthand notes.
12         I further certify that I have no interest in the
13    outcome of this action.
14
15
16
17
18
19         _____
          Jean Kim
20        CSR No. 13555
21
22
23
24
25

19 (Page 73)

Exhibit 7

| | |
|---|---|
| **From:** | William Cahill |
| **To:** | From: Kristin Orrantia; Scott Schreiber; jaylimiller@gmail.com; Keith A. Sipprelle; David B. Van Etten; Evangeline A.Z. Burbidge; Marc R. Lewis; Brad Estes; Kenneth M. Walczak |
| **Subject:** | EDAG v. Byton Response to EDAG"s Request to File TRO |
| **Date:** | Sunday, September 19, 2021 4:49:42 PM |

Counsel,

On Sept 17, 2021, Claimant EDAG, delivered a "letter brief" to the Arbitrator asking if the Arbitrator believed he still retained jurisdiction over the parties in this arbitration so that he can hear, on shortened time, a EDAG motion for issuance of a TR0 and Preliminary Injunction against Byton.

The answer to EDAG's question is "I don't know".  This is an issue of first impression to me and before I opine, I want to at least get briefing from Byton on the jurisdictional question.

The question is when does an arbitrator's jurisdiction end?  Does it end when the Final Award is issued (June 3, 2021) or a party files in Federal Court a motion to approve the Award (June 23, 2021), or does the arbitrator's jurisdiction to issue interim rulings extend until the Trial court grants the motion (indefinite)?  And does the Arbitrator still have jurisdiction if the trial court's decision is appealed.  What about overturned?

In order to resolve the TRO issue jurisdiction must exist and if so we can decide the TRO motion. I believe that both issues can be briefed and decided by the arbitrator in one hearing.

<u>ARBITRATOR PROPOSED STIPULATION FOR RESOLUTION.</u>

1. EDAG agrees that its TRO motion is filed and served by the close of business, September 24, 2021.
2. In those moving papers, EDAG is to add, if it chooses, any futher argument or legal authority supporting its statement in its "letter brief" that it "believes Your Honor has full authority to grant the relief sought."
3. Byton files its opposition to the TRO and the Jurisdictional argruments by October 4, 2021.
4. EDAG files its Reply by October 6, and hearing on October 8.

The arbitrator will initially decide the jurisdictional issues.  Then he will rule on the TRO.

Obviously, all this is very tentative.  If you all can meet and confer and get a schedule that works better for everyone, its going to be approved.

But if the parties can't agree, my office will set up a call either Tues or Wednesday to sort stuff out.

EDAG has asked me a jurisdictional question that I can answer only after briefing,


Bill

_____

**Hon. William Cahill (Ret.)**
JAMS San Francisco, Ca
Cell:  415-845-6564

**Scott Schreiber**, Sr. Case Mgr.
Direct: 415.774.2615

- Chambers *USA* ranked as a *National Mediator*, 2017-2021
- California SuperLawyers in the *ADR Category*, 2006-2021
- Top *500 Leading Judges in America* by Lawdragon Magazine, 2006
- Mediation Article, Learning from My Mediator mistakes:  https://abtl.org/report/nc/abtlnorcalvol25no3.pdf
- https://www.jamsadr.com/cahill/

**VAN ETTEN SIPPRELLE LLP**
KEITH A. SIPPRELLE (SBN 143358)
2945 Townsgate Road, Suite 200
Westlake Village, California 91361
Telephone: (805) 719-4900
Facsimile: (805) 719-4950
ksipprelle@vstriallaw.com

Attorneys for Respondent and Cross-Claimant
BYTON NORTH AMERICA CORPORATION

## JUDICIAL ARBITRATION AND MEDIATION SERVICES

## SAN FRANCISCO, CALIFORNIA OFFICE

| | |
|---|---|
| EDAG ENGINEERING GMBH, | JAMS Reference No. 1100107291 |
| Claimant, | **BYTON NORTH AMERICA CORPORATION'S EVIDENTIARY OBJECTIONS IN OPPOSITION TO CLAIMANT EDAG ENGINEERING GMBH'S MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| BYTON NORTH AMERICA CORPORATION, | |
| Respondent. | |
| | Arbitrator: Hon. William J. Cahill (Ret.) |
| | Final Award Issued: June 2, 2021 <br> Final Award Served: June 3, 2021 |
| AND RELATED CROSS-CLAIM. | Hearing Date: October 14, 2021 <br> Hearing Time: 10:00 a.m. (Zoom) |

BYTON NORTH AMERICA CORPORATION'S EVIDENTIARY OBJECTIONS IN
OPPOSITION TO EDAG'S MOTION FOR PRELIMINARY INJUNCTION, JAMS Reference
No. 1100107291

BYTON NORTH AMERICA CORPORATION ("Byton") hereby respectfully submits the following evidentiary objections in opposition to the Motion for Preliminary Injunction ("Motion") of EDAG ENGINEERING GMBH ("EDAG").

**A.  OBJECTIONS TO THE DECLARATION OF VOLKER AMELUNG.**

**Objection No. 1**

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| ¶ 11, page 2, line 2-3: *"To the best of my knowledge, BYTON's parent company or companies are based in China and may retain the "FMC" name."* | Lacks foundation; lacks personal knowledge. |

**Objection No. 2**

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| ¶ 16, page 2, lines 22-23: *"To the best of my knowledge, BYTON still uses Jama Software for this purpose with regard to the M-BYTE."* | Lacks foundation; lacks personal knowledge. |

**B.  OBJECTIONS TO THE DECLARATION OF EVANGELINE A.Z. BURBIDGE.**

**Objection No. 3**

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| ¶ 7 in its entirety, page 3, lines 10-14: *"On August 20, 2021, automotive journalists reported that BYTON's M-BYTE was photographed undergoing road tests in Hainan, China, despite BYTON's efforts to hide the tests.  See Byton is alive! M-Byte EV was spotted in the wild for the first time [Spy Photos], China Car News, https://carnewschina.com/2021/08/20/byton-is-alive-m-byte-ev-was-spotted-in-the-wild-for-the-first-time-spy-photos/ (Accessed Sept. 14, 2021)."* | Hearsay (*Evidence Code* § 1200). |

2

1

**Objection No. 4**

2

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|

3

4

¶ 8, page 3, lines 15-17: *"Jama Software ("Jama") is a company that provides solutions for requirements, risk, and test management. See Jama Connect, https://www.jamasoftware.com/platform/jama-connect/ (Accessed Sept. 15, 2021)."*

Lacks foundation; lacks personal knowledge; hearsay (*Evidence Code* § 1200).

5

6

7

**Objection No. 5**

8

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|

9

10

¶ 8, page 3, lines 17-18: *"BYTON used Jama's browser-based database to store all BYTON build BYTON's product, i.e. the M-BYTE vehicle."*

Lacks foundation; lacks personal knowledge.

11

12

13

**Objection No. 6**

14

15

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|

16

17

¶ 8(e), page 4, lines 2-8: *"She stated that Jama holds design and intellectual property information for BYTON. She further informed me that a non-U.S. company claiming to be a related entity to BYTON wanted to obtain access to Jama's system and the data held by BYTON North America. She further stated that Jama asked for documentation permitting this request and did not receive it. She informed me that Jama would institute a litigation hold, preserving the BYTON data which was the subject of the third-party subpoena."*

Hearsay (*Evidence Code* § 1200).

18

19

20

21

22

23

24

**Objection No. 7**

25

26

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|

27

28

¶ 8(f), page 4, lines 2-8: *"She informed me that BYTON North America, in coordination with a*

Hearsay (*Evidence Code* § 1200).

3

1   *China-based BYTON entity, had paid all past*
2   *due invoices to Jama in May 2021, so Jama*
    *reinstated BYTON North America's account*
3   *on the cloud. She also explained that BYTON*
    *now had active access to the requirements*
4   *database and the intellectual property for the*
    *M-BYTE vehicle."*
5

6                                   **Objection No. 8**

7   **Material Objected to:**                    **Grounds for Objection:**

8   ¶ 8(g), page 3, lines 15-22: "*On September 15,*     Hearsay (*Evidence Code* § 1200).
    *2021, Jama's Counsel stated that from August*
9   *2020 to May 2021, a Chinese company*
    *claiming to be a related entity to BYTON,*
10  *referred to as*
    *"BYTON China," had repeatedly asked for*
11  *access to Jama's system and, specifically,*
    *BYTON North America's data. She stated that*
12  *BYTON China asked to open a new account,*
13  *held on the ground in China instead of in the*
    *cloud, and wanted Jama to migrate the data*
14  *from BYTON North America to this Chinese-*
    *only based account. She explained that this*
15  *would mean no one in the United States—*
    *including Jama itself—could access the data.*
16  *This migration ultimately did not happen."*
17

18  Dated:  October 3, 2021
19
                              Respectfully Submitted,
20
                              VAN ETTEN SIPPRELLE LLP
21

22                            By:  *Keith A. Sipprelle*
                                   _____
23                                 Keith A. Sipprelle
                                   Attorneys for Respondent and Cross-Claimant
24                                 BYTON NORTH AMERICA CORPORATION

25

26

27

28
                                        4
    BYTON NORTH AMERICA CORPORATION'S EVIDENTIARY OBJECTIONS IN
    OPPOSITION TO EDAG'S MOTION FOR PRELIMINARY INJUNCTION, JAMS Reference
    No. 1100107291

# EXHIBIT F

1    LEWIS & LLEWELLYN LLP
     Evangeline A.Z. Burbidge (Bar No. 266966)
2    eburbidge@lewisllewellyn.com
     Marc R. Lewis (Bar No. 233306)
3    mlewis@lewisllewellyn.com
     Kenneth M. Walczak (Bar No. 247389)
4    kwalczak@lewisllewellyn.com
     Bradley E. Estes (Bar No. 298766)
5    bestes@lewisllewellyn.com
     601 Montgomery Street, Suite 2000
6    San Francisco, California 94111
     Telephone:  (415) 800-0590
7    Facsimile:   (415) 390-2127
8
9    Attorneys for Claimant
     EDAG Engineering GmbH
10

11              JAMS REFERENCE NO. 1100107291

12          IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

13

14   EDAG Engineering GmbH,                    **CLAIMANT EDAG'S REPLY IN
                                                SUPPORT OF ITS MOTION
15          Claimant,                          FOR PRELIMINARY
                                                INJUNCTION**
16          v.
17   BYTON North America Corporation,          Hon. William J. Cahill (ret.)
                                                Arbitration:  February 8, 2021
18          Respondent.                        Final Judgment: June 3, 2021
19
20   AND RELATED CROSS-CLAIM
21
22
23
24
25
26
27
28

LEWIS +
LLEWELLYN
LLP

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 6

ARGUMENT ............................................................................................................ 7

I.    BYTON'S PROCEDURAL OBJECTIONS FAIL. .......................................... 7

    A.    Federal Law Sets the "Rules for Arbitration." ...................................... 7

    B.    The Parties' Agreement Confers Jurisdiction to Enter an Injunction....................................... 8

    C.    Your Honor Can and Should Prevent BYTON's Fraudulent Asset Transfer. ...................... 10

    D.    New Facts Necessitated EDAG's Motion. ......................................... 11

II.   BYTON'S SCANT ARGUMENTS ON THE MERITS FAIL............................. 12

    A.    BYTON Does Not Own EDAG's Intellectual Property............................ 13

    B.    BYTON May Not Transfer Its Few Remaining Assets to Avoid a Judgment. ............ 14

    C.    BYTON Does Not Dispute or Contradict EDAG's Factual Showing. ................. 14

III.  BYTON'S EVIDENTIARY CHALLENGES FAIL............................................. 15

CONCLUSION ....................................................................................................... 16

REPLY ISO EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

1

**TABLE OF AUTHORITIES**

2

Page

3

**Cases**

4

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*
5
    119 F.Supp.3d 1177 (C.D. Cal. 2015) ............................................................................ 16

6

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*
    750 F.2d 1470 (9th Cir. 1985) ...................................................................................... 14
7

*Bank Leumi, USA v. Miramax Distribution Servs., LLC*
8
    No. 2:18-CV-07574-SVW-KS, 2018 WL 7568361 (C.D. Cal. Dec. 27, 2018) .............. 9

9

*Bank of Hemet v. Open Sols., Inc.*
    No. CV 10-692 CAS (OPx), 2011 WL 486572 (C.D. Cal. Feb. 3, 2011) ...................... 9
10

11

*Bullock v. City & Cty. of San Francisco*
    221 Cal.App.3d (1990) ................................................................................................ 14
12

*Butt v. State of California*
13
    4 Cal.4th 668 (1992) ................................................................................................... 13

14

*Cronus Investments, Inc. v. Concierge Services*
15
    35 Cal.4th 376 (2005) ................................................................................................... 7

16

*DHL Info. Servs. (Americas), Inc. v. Infinite Software Corp.*
    502 F.Supp.2d 1082 (C.D. Cal. 2007) ....................................................................... 8, 9
17

*Disney Enterprises, Inc. v. VidAngel, Inc.*
18
    224 F. Supp. 3d 957 (C.D. Cal. 2016) ........................................................................ 15

19

*Disney Enterprises, Inc. v. VidAngel, Inc.*
20
    869 F.3d 848 (9th Cir. 2017) ...................................................................................... 15

21

*Doran v. Salem Inn, Inc.*
    422 U.S. 922 (1975) .................................................................................................... 14
22

*Fidelity Federal Bank, FSB v. Durga Ma Corp.*
23
    386 F.3d 1306 (9th Cir. 2004) ....................................................................................... 8

24

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*
    527 U.S. 308 (1998) ............................................................................................... 10, 11
25

26

*Impex Enterprises Ltd. v. Sony Pictures Worldwide Acquisitions, Inc.*
    777 F. App'x 236 (9th Cir. 2019) ................................................................................ 13
27

*Impex Enterprises Ltd. v. Sony Pictures Worldwide Acquisitions, Inc.*
28
    No. CV2171044SJOSKX, 2018 WL 1413089 (C.D. Cal. Jan. 9, 2018) ........................ 13

REPLY ISO EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

*In re Focus Media Inc.*
  387 F.3d 1077 (9th Cir. 2004) ................................................................................ 10, 11

*Johnson v. Couturier*
  572 F.3d 1067 (9th Cir. 2009) ........................................................................................ 16

*Johnson v. Gruma Corp.*
  614 F.3d 1062 (9th Cir. 2010) ...................................................................................... 7, 8

*Mastrobuono v. Shearson Lehman Hutton, Inc.*
  514 U.S. 52 (1995) ............................................................................................................ 7

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*
  473 U.S. 614 (1985) .......................................................................................................... 7

*NextEngine, Inc. v. Bigfoot Ventures Ltd.*
  No. CV 17-1960 PA (PLAX), 2017 WL 5643168 (C.D. Cal. Mar. 20, 2017) ............................. 12

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*
  323 F. Supp. 2d 1037 (N.D. Cal. 2004) ........................................................................... 14

*People v. Uber Techs., Inc.*
  56 Cal.App.5th 266 (2020) ............................................................................................. 13

*R.J. Kuhl Corp. v. Sullivan*
  13 Cal.App.4th 1589 (1993) ........................................................................................... 13

*S. California Stroke Rehab. Assocs., Inc., v. Nautilus, Inc.*
  782 F.Supp.2d 1096 (S.D. Cal. 2011) ............................................................................. 11

*Simula, Inc. v. Autoliv, Inc.*
  175 F.3d 716 (9th Cir. 1999) ........................................................................................ 8, 9

*Smagin v. Yegiazaryan*
  No. CV 14-9764-R, 2015 WL 13757706 (C.D. Cal. Sept. 28, 2015) ............................. 11

*Sovak v. Chugai Pharm. Co.*
  280 F.3d 1266 (9th Cir.2002) ...................................................................................... 7, 8

*Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*
  609 F.3d 975 (9th Cir. 2010) .................................................................................... 11, 14

*Tresemer v. Barke*
  86 Cal.App.3d 656 (1978) .............................................................................................. 15

*U.S. Golf Ass'n v. Arroyo Software Corp.*
  69 Cal.App.4th 607, 81 Cal.Rptr.2d 708 (1999) ........................................................... 11

REPLY ISO EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

*Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*
   231 Cal.App.4th 134 (2014) ............................................................................ 12

*United States v. Oncology Assocs., P.C.*
   198 F.3d 489 (4th Cir.1999) ............................................................................ 10

*Univ. of Texas v. Camenisch*
   451 U.S. 390 (1981) ........................................................................................ 15

*Walczak v. EPL Prolong, Inc.*
   198 F.3d 725 (9th Cir. 1999) .......................................................................... 11

*Warren-Guthrie v. Health Net*
   84 Cal.App.4th 804 (2000) ............................................................................... 7

**Statutes**

California Code of Civil Procedure 1280 ............................................................... 7

UNIFORM FRAUDULENT TRANSFER ACT (1984), § 4 ........................................... 10

**Rules**

FRAP, Rule 32.1 ..................................................................................................... 9

FRCP, Rule 18 ...................................................................................................... 10

JAMS Rule 22 ...................................................................................................... 15

Ninth Circuit Court of Appeals Rule 36-3 ............................................................. 9

LEWIS +
LLEWELLYN
LLP

**INTRODUCTION**

BYTON North America Corporation ("BYTON") does not dispute that it has accessed and attempted to transfer intellectual property created by EDAG Engineering GmbH ("EDAG").

BYTON does not contend that it has paid EDAG the sum of more than 23 million Euros, which BYTON owes EDAG for the creation of said intellectual property, namely proprietary technology for BYTON's prototype automobile.  Your Honor ordered BYTON to pay EDAG that sum in a thorough and well-reasoned Final Award.

Nor does BYTON dispute that its plan to access and transfer EDAG's valuable intellectual property is part of a larger scheme to move anything of value in BYTON's possession away from the reach of United States courts, leaving BYTON's North American subsidiary with nothing but debt, defeating any effort by EDAG to collect the money BYTON owes, and eviscerating the Final Award.

Because these facts are not in dispute, EDAG has established that a preliminary injunction is necessary to maintain the status quo pending confirmation of the Final Award, and that EDAG will suffer irreparable harm in the absence of injunctive relief.

The tangential arguments in BYTON's Opposition Brief ("Opp.") are unavailing.  Because Your Honor's jurisdiction and authority to enter injunctive relief are procedural questions, federal law applies—and federal law explicitly allows an Arbitrator to grant such relief where necessary to preserve the enforceability of an award.  EDAG properly raises the issue now because new facts have emerged; facts demonstrating the urgent need for an injunction to protect the enforceability of the Final Award and eventual judgment—namely, BYTON's efforts to empty its North American subsidiary of all valuable assets and its use of EDAG's property in a vehicle prototype spotted in China.

Applicable law explicitly supports EDAG's request for an order impeding BYTON's ability to fraudulently transfer assets with the aim of both defeating the Court and the Arbitrator's jurisdiction and preventing meaningful relief for EDAG.  And BYTON's efforts to challenge EDAG's evidence (instead of producing any contrary evidence of its own) are a red herring: a party seeking a preliminary injunction need not prove its entire case or limit itself to admissible evidence,

REPLY ISO EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

1    as would be required at trial, and any evidentiary issues go to weight, not admissibility.  EDAG's

2    showing more than meets that standard.  A preliminary injunction should issue.

3                                           **ARGUMENT**

4    **I.    BYTON'S PROCEDURAL OBJECTIONS FAIL.**

5         **A.    Federal Law Sets the "Rules for Arbitration."**

6         BYTON insists that Your Honor look to California law to answer the question: "when does

7    an arbitrator's jurisdiction end?"  Opp. 4:14-15, 5:1-10.  BYTON cites no authority for the

8    proposition that California law applies.

9         In fact, federal courts and California courts have reached the same conclusion: the Federal

10   Arbitration Act applies to an arbitration clause in a contract that evidences a transaction involving

11   interstate commerce.  *See Johnson v. Gruma Corp.*, 614 F.3d 1062 (9th Cir. 2010) ("*Johnson*") at

12   1066 (FAA governed agreement between food company and delivery drivers that specified

13   arbitration be "conducted and subject to enforcement pursuant to the provisions of California Code

14   of Civil Procedure sections 1280 through 1295, or other applicable law"); *Warren-Guthrie v. Health*

15   *Net*, 84 Cal.App.4th 804, 810 (2000) (FAA controlled arbitrability analysis where agreements

16   specified arbitration "shall be conducted in accordance with the California Code of Civil Procedure,

17   commencing with Section 1280") *disapproved on other grounds by Cronus Investments, Inc. v.*

18   *Concierge Services*, 35 Cal.4th 376, 393 n. 8 (2005).  *See also Mitsubishi Motors Corp. v. Soler*

19   *Chrysler–Plymouth, Inc.* 473 U.S. 614, 631 (1985)  (FAA's presumption in favor of arbitration

20   "applies with special force in the field of international commerce").

21        Where, as here, the parties agree to be "governed by the laws of the State of California,"

22   TDLA ¶ 14.4a, the Arbitrator must apply California substantive law and ***federal*** procedural rules.  In

23   other words: "the FAA, not state law, supplies the rules for arbitration."  *Johnson*, 614 F.3d at 1066,

24   *quoting Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266 (9th Cir.2002) ("*Sovak*") at 1269.  "Rules for

25   arbitration include principles that affect the allocation of power between alternative tribunals."

26   *Sovak*, 280 F.3d at 1270, *quoting Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60

27   (1995) (quotation marks omitted).

28        To overcome the "strong default presumption" in favor of federal procedural rules, *Sovak*,

                                                     7

LEWIS +
LLEWELLYN
LLP

1  280 F.3d at 1269, BYTON would need to "evidence a clear intent" by the parties "to incorporate

2  state law rules for arbitration."  *Fidelity Federal Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306 (9th

3  Cir. 2004) ("*Fidelity Federal Bank*") at  1311, *quoting Sovak*, 280 F.3d at 1269.

4        BYTON makes no such attempt; again, it cites nothing at all for its argument that California

5  procedural law applies.  Whereas EDAG's papers cite *Johnson*, in which the Ninth Circuit listed

6  several choice-of-law provisions just like the one in Section 14.4a of TDLA ¶ 14.4a and all of which

7  were insufficient to overcome the presumption that federal law applies.  *See* 614 F.3d at 1066-67.

8  For example, in *Fidelity Federal Bank*, the parties agreed that any disputes would be resolved "by

9  binding arbitration in accordance with the laws of the State of California and the rules of [AAA],"

10  federal procedural law applied.  386 F.3d 1306.  The same is true here.

11        **B.    The Parties' Agreement Confers Jurisdiction to Enter an Injunction.**

12        Again citing no authority, BYTON argues that "the issue of an arbitrator's authority … is

13  distinct from whether an arbitrator has *jurisdiction* to order the provisional remedy sought by EDAG

14  … [while] confirmation of the award is pending in a federal district court."  Opp. 5:4-8.

15        BYTON is wrong.  Because an arbitrator's jurisdiction derives from the parties' agreement

16  to confer arbitral authority, courts use the terms "jurisdiction" and "authority" interchangeably.  For

17  example, in *DHL Info. Servs. (Americas), Inc. v. Infinite Software Corp.*, 502 F.Supp.2d 1082 (C.D.

18  Cal. 2007) ("*DHL*"), cited on pages 7-8 of EDAG's MPAs, the court held that an arbitrator should

19  decide whether to issue injunctive relief.  502 F.Supp.2d at 1083-84.  The court based that decision

20  on the parties' agreement to give the arbitrator ***authority*** to grant interim relief, *id*. at 1083, and on

21  the Ninth Circuit's decision in *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ("*Simula*")

22  to defer to an arbitral tribunal "***authorized*** to grant the equivalent of an injunction pendente lite[.]"

23  502 F.Supp.2d at 1084, quoting 175 F.3d at 726 (emphasis added).  Neither the *DHL* court nor the

24  *Simula* Court used the term "jurisdiction"—yet when the Central District faced the same issue again

25  in 2018, it summarized the state of the law as follows:

26        Moreover, whether interim relief is appropriate is properly for the
27        arbitrator to decide pursuant to the parties' adoption of the AAA rules
           in Section 10.2(a) of the Interparty Agreement. AAA Commercial
28        Arbitration Rule 37(a) states that "[t]he arbitrator may take whatever

1
2
3
4
5
6
7
8

interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods." …. Just as the incorporation of the AAA rules into the Interparty Agreement by reference constitutes "clear and unmistakable evidence" of an intent for the arbitrator to decide questions of arbitrability, so too does the Interparty Agreement provide the arbitrator with *jurisdiction* to impose interim relief measures such as Plaintiff's writ of attachment. *See Bank of Hemet v. Open Sols., Inc.*, No. CV 10-692 CAS (OPx), 2011 WL 486572, at *3 (C.D. Cal. Feb. 3, 2011) ("[B]y incorporating the rules of the American Arbitration Association into the arbitration provision of the Master Services Agreement, the parties have agreed that requests for injunctive relief could be decided in arbitration.").

9
10
11
12
13
14
15
16
17
18
19

Plaintiff correctly notes that AAA Commercial Arbitration Rule 37(c) *authorizes* parties to seek interim relief in court without being incompatible with the arbitration agreement. … However, the Ninth Circuit has cautioned that, where the district court concludes that all of a plaintiff's claims are arbitrable and that the arbitrator is *authorized* to grant interim relief, "it would [be] inappropriate for the court to grant preliminary injunctive relief." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999).  Courts accordingly decline requests for injunctive relief when the arbitrator has *jurisdiction* over interim relief measures under a binding arbitration agreement, even if the court has *authority* to issue such relief on its own. *See, e.g., DHL Info. Servs. (Americas), Inc. v. Infinite Software Corp.*, 502 F. Supp. 2d 1082, 1083-84 (C.D. Cal. 2007) (denying motion for preliminary injunction because "it is best not to carve out interim relief from the issues the arbitrator will decide, even though Rule [37(c) ] of the AAA Rules would allow this Court to do so"); *Bank of Hemet*, 2011 WL 486572, at *3 (granting motion to compel arbitration, including arbitration of the plaintiff's requests for injunctive relief, because the arbitration agreement adopted the AAA rules).

20
21

*Bank Leumi, USA v. Miramax Distribution Servs., LLC*, No. 2:18-CV-07574-SVW-KS, 2018 WL 7568361, at *8 (C.D. Cal. Dec. 27, 2018) ("*Bank Leumi*") (emphasis added).[1]

22
23
24

    *Bank Leumi* also models the correct approach here.  The parties in *Bank Leumi* incorporated AAA rules into their arbitration agreement; EDAG and BYTON incorporated the JAMS Rules & Procedures.  TLDA ¶ 14.4b.  The AAA rules specified that an arbitrator may grant injunctive relief;

25
26
27
28

---

[1] BYTON remarks in passing that "unpublished District Court orders" like the opinion in *Bank Leumi* are "uncitable"—again citing no authority.  This, too, is wrong. *See* Fed. R. App. P. 32.1 (federal courts may not "prohibit or restrict" the citation of written "unpublished" decisions issued on or after January 1, 2007); Ninth Circuit Court of Appeals Rule 36-3(b) (adopting same rule for courts of the Ninth Circuit).

REPLY ISO EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

1    EDAG and BYTON explicitly conferred "full power and authority to … fashion appropriate

2    remedies (including temporary, preliminary, interim, or permanent injunctive relief)."  TDLA ¶

3    14.4b.

4        **C.      Your Honor Can and Should Prevent BYTON's Fraudulent Asset Transfer.**

5        Citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1998)

6    ("*Grupo Mexicano*"), BYTON contends that "federal law does not permit the issuance of a pre-

7    judgment preliminary injunction freezing all or any portion of a defendant's assets in suits for

8    money damages."  Opp. 12:9-11.  BYTON is wrong for substantive and procedural reasons.

9        Substantively: by its own terms, *Grupo Mexicano* does not prevent a party from acting to

10   prevent a fraudulent conveyance, as EDAG seeks to do here.  *Compare* 527 U.S. at 1970 (Court's

11   decision does not affect "[t]he law of fraudulent conveyances") *with* National Conference of

12   Commissioners on Uniform State Laws, UNIFORM FRAUDULENT TRANSFER ACT (1984), § 4

13   (defining a "fraudulent conveyance" as one made "with actual intent to hinder, delay, or defraud any

14   creditor of the debtor").  *See also* Fed. R. Civ. P. 18 (b) ("a plaintiff may state a claim for money and

15   a claim to set aside a conveyance that is fraudulent as to that plaintiff, without first obtaining a

16   judgment for the money.")  *Grupo Mexicano* also does not apply because EDAG has demonstrated a

17   "nexus between the assets sought to be frozen through an interim order and the ultimate relief

18   requested in the lawsuit[.]"  *In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir. 2004) ("*Focus Media*")

19   at 1085, *quoting United States v. Oncology Assocs., P.C.*, 198 F.3d 489 (4th Cir.1999) ("*Oncology*

20   *Assocs.*") at 496-97.  In *Focus Media*, the Ninth Circuit specifically distinguished *Grupo Mexicano*

21   and endorsed the Fourth Circuit's approach:

22          [W]hen the plaintiff creditor asserts a cognizable claim to specific assets
            of the defendant or seeks a remedy involving those assets, a court may
23          in the interim invoke equity to preserve the status quo pending judgment
24          where the legal remedy might prove inadequate and the preliminary
            relief furthers the court's ability to grant the final relief requested.
25

26   *Focus Media*, 387 F.3d at 1085, *quoting Oncology Assocs.*, 198 F.3d at 496-97.  Finally, *Grupo*

27   *Mexicano* does not preclude an order prohibiting EDAG from liquidating specific assets, *i.e.*, those

28   necessary to effectuate the entry and enforcement of the Final Arbitration Award.  *See Walczak v.*

                                         10

LEWIS +
LLEWELLYN
LLP

1  *EPL Prolong, Inc.*, 198 F.3d 725, 730 (9th Cir. 1999) (distinguishing *Grupo Mexicano* and

2  upholding injunction that "appropriately preserved the status quo and prevented the irreparable loss

3  of rights before judgment").

4          Procedurally: *Grupo Mexicano* turned on the effect of a general "asset freeze" entered at the

5  beginning of a breach of contract action, when litigation was likely to continue for months or even

6  years after the injunction was entered. *See, e.g.,* 527 U.S. at 312 (plaintiff filed suit on December

7  12, 1997; district court entered injunction on December 23). BYTON will not suffer comparable

8  harm from a targeted restriction on its ability to conduct fraudulent asset transfers during the short

9  time between now and the entry of judgment in the Northern District of California.

10              [U]nlike the pending litigation in *Grupo Mexicano*, the Petitioner in this
11              case has … received an arbitration award[.] … **This is not the**
                **beginning stage of a breach of contract claim, but instead the end**
12              **stages of a protracted arbitration in which the merits of all claims**
                **and defenses have been fully presented and adjudicated.**
13

14  *Smagin v. Yegiazaryan*, No. CV 14-9764-R, 2015 WL 13757706, at *1 (C.D. Cal. Sept. 28, 2015),

15  citing *Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975 (9th Cir.

16  2010); *Focus Media*, 387 F.3d at 1085.

17          **D.     New Facts Necessitated EDAG's Motion.**

18          BYTON would have Your Honor deny an order preserving the status quo because EDAG

19  sought an injunction during its closing arguments. Opp. 4 n.7, 5:16-25, 8:5-11:24. That amounts to

20  an issue preclusion (or collateral estoppel) argument: BYTON argues that EDAG is precluded from

21  raising an issue Your Honor has heard and resolved.

22          But "issue preclusion does not apply where there are changed conditions or new facts which

23  did not exist at the time of the prior judgment[.]" *S. California Stroke Rehab. Assocs., Inc., v.*

24  *Nautilus, Inc.*, 782 F.Supp.2d 1096, 1108 (S.D. Cal. 2011) (applying California law), *quoting U.S.*

25  *Golf Ass'n v. Arroyo Software Corp.*, 69 Cal.App.4th 607, 81 Cal.Rptr.2d 708, 713 (1999)

26  (quotation marks omitted).

27  / / /

28  / / /

LEWIS +
LLEWELLYN
LLP

> Collateral estoppel does not bar a later claim if new facts or changed circumstances have occurred since the prior decision. Neither res judicata nor collateral estoppel were ever intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which have altered the legal rights or relations of the litigants.

*NextEngine, Inc. v. Bigfoot Ventures Ltd.,* No. CV 17-1960 PA (PLAX), 2017 WL 5643168, at *3 (C.D. Cal. Mar. 20, 2017), *quoting Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal.App.4th 134, 179-80 (2014) (internal citation and quotations omitted).

Here, the long swath of hearing testimony BYTON quotes makes it clear that EDAG's previous request stemmed from its "concern[ ] that BYTON might transfer [its] assets to avoid paying any judgment." Opp. 8:19-21.

That concern has now ripened into certainty. There is no longer any question that BYTON is attempting to transfer assets, including EDAG's valuable intellectual property, to eviscerate the Final Award and avoid paying an eventual judgment. *See* Burbidge Decl. ¶ 6; Amelung Decl. ¶¶ 16-20.

With this Reply, EDAG submits the sworn declaration of Allyson Keo, Corporate Counsel for Jama Software.[2] Ms. Keo testifies that, "a Chinese company claiming to be a related entity to BYTON," repeatedly asked Jama to "open a new account, held on the ground in China instead of in the cloud[.]" *Id.* ¶ 5. That entity, "BYTON China … wanted to migrate the data from BYTON North America to this Chinese-only based account. This would mean no one in the United States—including Jama—could access the data." *Id.*

In light of these new facts, EDAG had no choice but to seek an injunction.

## II. BYTON'S SCANT ARGUMENTS ON THE MERITS FAIL.

EDAG demonstrated the need for a preliminary injunction under the well-known standard, beginning with a showing that EDAG is extremely likely to prevail on the merits. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("MPAs"), 10:20-11:23.

---

[2] This declaration bolsters the statements in Ms. Burbidge's declaration and undercuts BYTON's procedurally improper hearsay objections. *See* Argument III, below.

LEWIS + LLEWELLYN LLP

1    BYTON does not engage with EDAG's argument, address any of the cases EDAG cites, or

2    even argue that the district court is unlikely to confirm the Final Award or that EDAG is otherwise

3    unlikely to prevail.

4    Thus, BYTON concedes a key element of the analysis.  "[W]hen considering a request for a

5    preliminary injunction, the trial court weighs two interrelated factors. The first is the likelihood the

6    party seeking relief will prevail on the merits, and the second is the relative interim harm to the

7    parties if the preliminary injunction is granted or denied." *People v. Uber Techs., Inc.*, 56

8    Cal.App.5th 266, 283 (2020), *as modified on denial of reh'g* (Nov. 20, 2020), *review denied* (Feb.

9    10, 2021), *citing Butt v. State of California*, 4 Cal.4th 668, 677-678 (1992).  "The goal is to

10   minimize the harm that an erroneous interim decision would cause."  *Ibid*. (citation omitted).

11   Instead of arguing that it will ultimately prevail, BYTON focuses on relitigating the

12   interpretation of the TDLA, to contend that it (BYTON) owns the intellectual property EDAG

13   created.  Opp. 14:1-17:7.

14   **A.    BYTON Does Not Own EDAG's Intellectual Property.**

15   BYTON's tortured reading of TDLA ¶ 6.2b (under which BYTON asserts permission to

16   access and control EDAG's intellectual property, and even remove it from U.S. jurisdiction—*see*

17   Opp. 16:2-17:7) runs afoul of the law governing conditions precedent in contracts.

18   BYTON does not have the right to access EDAG's property because payment is a ***condition***

19   ***precedent*** to delivery.  "Performance of a duty subject to a condition cannot become due unless the

20   condition occurs or its non-occurrence is excused."  *Impex Enterprises Ltd. v. Sony Pictures*

21   *Worldwide Acquisitions, Inc.*, No. CV2171044SJOSKX, 2018 WL 1413089, at *4 (C.D. Cal. Jan. 9,

22   2018), *aff'd*, 777 F. App'x 236 (9th Cir. 2019), *quoting R.J. Kuhl Corp. v. Sullivan*, 13 Cal.App.4th

23   1589, 1601 (1993).  The condition, BYTON's payment, did not occur and its non-occurrence was

24   not excused (hence Your Honor's Final Award).  Therefore, EDAG's has no duty to transfer the

25   rights to the intellectual property.

26   Moreover, by focusing solely on the intellectual property, BYTON ignores EDAG's

27   assertion that simply being unable to collect on a judgment of more than 20 million Euros imperils

28   EDAG's continued viability as a business.  *See* MPAs 12:23-13:4; *Optinrealbig.com, LLC v.*

1    *Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) (irreparable harm exists "where the

2    conduct of [Respondent] threatens the existence of the [Petitioner's] business itself"); *Am. Passage*

3    *Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("threat of being driven

4    out of business is sufficient to establish irreparable harm"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922,

5    932 (1975) ("substantial loss of business and perhaps even bankruptcy" constitutes irreparable

6    harm); *Bullock v. City & Cty. of San Francisco*, 221 Cal.App.3d (1990) (plaintiff who filed for

7    bankruptcy during pending proceeding suffered irreparable harm).

8          **B.      BYTON May Not Transfer Its Few Remaining Assets to Avoid a Judgment.**

9          The purpose of EDAG's motion is twofold: to stop BYTON from accessing and transferring

10   the intellectual property in question, and to prevent BYTON from draining the assets from its North

11   American division, thereby preserving the status quo pending entry of judgment.

12         Even assuming (purely *arguendo*) that BYTON's interpretation of the contract is correct, and

13   that BYTON owns the information on the Jama servers, EDAG has still demonstrated the need for

14   BYTON to preserve that information, as one of its few assets (if not its <u>only</u> asset) of value.  *See*

15   MPAs 5:13-22, Burbidge Decl. ¶¶ 6, 8 & Exh.D (BYTON repeatedly asserted that it has no money);

16   Amelung Decl. ¶¶ 16-20;  *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d

17   975, 981 (9th Cir. 2010) (an injunction should issue where necessary "to preserve the status quo and

18   the meaningfulness of the arbitration process").

19         **C.      BYTON Does Not Dispute or Contradict EDAG's Factual Showing.**

20         Most importantly, BYTON offers no substantive evidence to contradict the EDAG's factual

21   assertions and sworn declarations.

22         BYTON is the party with the most direct knowledge concerning its efforts to access the Jama

23   servers and EDAG's intellectual property.  BYTON offers no declaration, testimony, or statement

24   denying that it has accessed those servers for the improper purpose of transferring EDAG's property

25   to a China-only server.

26         BYTON is the party with the most direct knowledge concerning its use of EDAG's

27   technology in an M-BYTE prototype.  BYTON offers no declaration, testimony, or statement

28   refuting the BBC news article supplied by EDAG or the conclusions of EDAG's expert that the

LEWIS + LLEWELLYN LLP

prototype photographed makes use of EDAG's technology.

BYTON is the party with the most direct knowledge concerning the scheme to pauper its North American division in an effort to avoid a judgment. BYTON offers no declaration, testimony, or statement denying that it is engaging in that scheme. BYTON does not even assert that it has, or intends to retain, the funds necessary to pay the €23,446,649, plus 10% statutory interest and costs, Your Honor ordered it to pay.

"[I]t is settled that an opponent's failure to file counteraffidavits [or declarations] admits the truth of the movant's affidavit[s or declarations]." *Tresemer v. Barke*, 86 Cal.App.3d 656, 668 (1978).

## III.    BYTON'S EVIDENTIARY CHALLENGES FAIL.

BYTON proffers a set of "Evidentiary Objections" to EDAG's declarations in support of its motion. Those Objections are misplaced.

BYTON's approach assumes that EDAG is required to support its motion with evidence sufficient to prove the merits of its claims at trial. Not so.

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). Under federal procedural law, which applies here (*see* Argument I-A, above), Your Honor "is permitted to consider inadmissible evidence in deciding a motion for a preliminary injunction. … This flexibility exists because the urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (citation, quotation marks, and alteration omitted). *See also* JAMS Rule 22(d) ("Strict conformity to the rules of evidence is not required, except that the Arbitrator

15

LEWIS +
LLEWELLYN
LLP

1  shall apply applicable law relating to privileges and work product. The Arbitrator shall consider
2  evidence that he or she finds relevant and material to the dispute, giving the evidence such weight as
3  is appropriate.").

4          For example, hearsay is admissible in support of a motion to preserve the status quo.
5  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may ... consider
6  hearsay in deciding whether to issue a preliminary injunction.").  At most, BYTON's cavils about
7  the admissibility of EDAG's evidence "go to weight rather than admissibility." *Am. Hotel &*
8  *Lodging Ass'n v. City of Los Angeles*, 119 F.Supp.3d 1177, 1185 (C.D. Cal. 2015).  Since BYTON
9  offers no evidence of its own, even with diminished weight EDAG's evidence would suffice to
10  demonstrate the need for injunctive relief.

11                              **CONCLUSION**

12          BYTON fails to refute EDAG's showing that the Arbitrator has both jurisdiction and authority
13  to issue a preliminary injunction, and that injunctive relief is necessary to preserve the status quo
14  pending entry of judgment.  Indeed, BYTON supplies no counter-narrative and no fact evidence of
15  its own.

16          For the foregoing reasons, EDAG respectfully request that this Court issue a preliminary
17  injunction, and order BYTON to pay its portion of the costs associated with this hearing, in
18  accordance with the [Proposed] Order submitted with EDAG's motion papers.

19                                      Respectfully submitted,

20  Dated:  October 6, 2021            LEWIS & LLEWELLYN LLP

21

22                                  By:   */s/ Evangeline A.Z. Burbidge*

23                                      Evangeline A.Z. Burbidge
                                        Marc R. Lewis
24                                      Kenneth M. Walczak

25                                      Attorneys for Petitioner EDAG
26                                      ENGINEERING GMBH

27

28

REPLY ISO EDAG'S MOTION FOR PRELIMINARY INJUNCTION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

1   LEWIS & LLEWELLYN LLP
    Evangeline A.Z. Burbidge (Bar No. 266966)
2   eburbidge@lewisllewellyn.com
    Marc R. Lewis (Bar No. 233306)
3   mlewis@lewisllewellyn.com
    Bradley E. Estes (Bar No. 298766)
4   bestes@lewisllewellyn.com
    Kenneth M. Walczak (Bar No. 247389)
5   kwalczak@lewisllewellyn.com
    601 Montgomery Street, Suite 2000
6   San Francisco, California 94111
    Telephone: (415) 800-0590
7   Facsimile:  (415) 390-2127

8   Attorneys for Claimant
    EDAG Engineering GmbH
9

10                  JAMS REFERENCE NO. 1100107291

11          IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

12

13

14  EDAG Engineering GmbH,              **DECLARATION OF ALLYSON KEO ON**
                                        **BEHALF OF JAMA SOFTWARE**
15          Claimant,                   **REGARDING EDAG'S REQUEST FOR**
                                        **A PRELIMINARY INJUNCTION**
16          v.

17  BYTON North America Corporation,    Hon. William J. Cahill (ret.)

18          Respondent.                 Arbitration:  February 8, 2021

19
    ─────────────────────────────────
20  AND RELATED CROSS-CLAIM

21

22

23

24

25

26

27

28

LEWIS +
LLEWELLYN
LLP

I, Allyson Keo, declare as follows:

1.      I am over 18 years of age.  I am employed by Jama Software ("Jama") and my official title is Corporate Counsel.  I have worked at the company for 3 years.  I am authorized to submit this declaration on behalf of Jama and have personal knowledge concerning the contents of this declaration.

2.      Jama is a company that provides solutions for requirements, risk, and test management.  See Jama Connect®, https://www.jamasoftware.com/platform/jama-connect/ (Accessed Oct. 5, 2021).

3.      BYTON North America Corporation ("BYTON North America") is a Jama customer and has been for a few years.  It uses Jama's browser-based software in connection with its design and intellectual property information.

4.      On or around November 2020, EDAG Engineering GmbH ("EDAG") issued a subpoena to Jama requesting documents related EDAG's claims against BYTON North America. Following the issuance of this subpoena, I spoke with EDAG's counsel regarding Jama's discovery obligations.  During that call, I explained that Jama holds product requirements and intellectual property information for BYTON.

5.      From August 2020 to May 2021, a Chinese company claiming to be a related entity to BYTON, referred to as "BYTON China" and "Shengteng" contacted us through an authorized reseller and repeatedly asked for access to Jama's system and, specifically, the data held by Jama for BYTON North America. "BYTON China" asked to open a new account, held on the ground in China instead of in the cloud, and wanted to migrate the data from BYTON North America to this Chinese-only based account. This would mean no one in the United States—including Jama—could access the data. This migration ultimately did not happen.

6.      Because "BYTON China" was not a customer of Jama's, I instructed our sales director that Jama had to deal with someone authorized to act on behalf of BYTON North America. I directed BYTON China to BYTON North America's attorney, Keith Sipprelle, regarding a contact at BYTON North America.

LEWIS +
LLEWELLYN

7.      I negotiated with Mr. Sipprelle, who represented BYTON North America, on or around May 2021, and Jama and BYTON resolved the unpaid invoices.  Jama then reinstated BYTON North America's access to Jama Connect and BYTON's intellectual property.

8.      BYTON North America's Jama Connect account remains active.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 6th day of October, 2021 at Portland, Oregon.

*Allyson Keo*

_____

Allyson Keo

JAMA DECLARATION
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

1    LEWIS & LLEWELLYN LLP
     Evangeline A.Z. Burbidge (Bar No. 266966)
2    eburbidge@lewisllewellyn.com
     Marc R. Lewis (Bar No. 233306)
3    mlewis@lewisllewellyn.com
     Kenneth M. Walczak (Bar No. 247389)
4    kwalczak@lewisllewellyn.com
     Bradley E. Estes (Bar No. 298766)
5    bestes@lewisllewellyn.com
     601 Montgomery Street, Suite 2000
6    San Francisco, California 94111
     Telephone:  (415) 800-0590
7    Facsimile:   (415) 390-2127
8
9    Attorneys for Claimant
     EDAG Engineering GmbH
10

11              JAMS REFERENCE NO. 1100107291

12        IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

13

14   EDAG Engineering GmbH,                    **CLAIMANT EDAG ENGINEERING**
                                               **GMBH'S RESPONSES TO BYTON**
15        Claimant,                            **NORTH AMERICA CORPORATION'S**
                                               **EVIDENTIARY OBJECTIONS**
16        v.

17   BYTON North America Corporation,          Hon. William J. Cahill (ret.)

18        Respondent.                          Arbitration:  February 8, 2021

19
   ──────────────────────────────
20   AND RELATED CROSS-CLAIM

21

22

23

24

25

26

27

28

LEWIS +
LLEWELLYN
LLP

## A. **EDAG'S GENERAL RESPONSE TO BYTON'S OBJECTIONS.**

BYTON's "Evidentiary Objections" to EDAG's declarations in support of its motion are misplaced.  BYTON assumes that EDAG is required to support its motion with evidence sufficient to prove the merits of its claims at trial.  That assumption is erroneous.

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a decisionmaker can determine the merits (of, in this case, EDAG's petition to confirm its arbitration award).  Thus aparty is not required to prove his case in full at a preliminary injunction hearing. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted).

Under federal procedural law, which applies here,[1] the arbitrator "is permitted to consider inadmissible evidence in deciding a motion for a preliminary injunction. … This flexibility exists because the urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (citation, quotation marks, and alteration omitted).

> The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.

*Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984).  "Indeed, district courts have considerable discretion to consider otherwise inadmissible evidence when ruling on the merits of an application for a preliminary injunction."  *Garcia v. Green Fleet Sys.*, LLC, No. CV 14–6220 PSG (JEMx), 2014 WL 5343814, *5 (C.D.Cal. Oct. 10, 2014) (citing *Flynt*, 734 F.2d at 1394; *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir.1988) (rules of evidence do not strictly apply to preliminary injunction proceedings)).  The JAMS Rules also support this position.  *See* JAMS Rule 22(d) ("Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product. The Arbitrator shall

---

[1] *See* EDAG's Reply in Support of Its Motion for a Preliminary Injunction ("Reply") (2:5-3:10).

LEWIS +
LLEWELLYN LLP

1  consider evidence that he or she finds relevant and material to the dispute, giving the evidence such

2  weight as is appropriate.").

3       Hearsay is specifically admissible in support of a motion to preserve the status quo.  "A

4  district court may … consider hearsay in deciding whether to issue a preliminary injunction."

5  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

6       Given the guidance from the courts and JAMS, at most BYTON's evidentiary objections

7  regarding EDAG's evidence "go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v.*

8  *City of Los Angeles*, 119 F.Supp.3d 1177, 1185 (C.D. Cal. 2015).

9       Therefore, the Arbitrator need not rule on any of the evidentiary objections made below and

10  may, instead, evaluate EDAG's proffered evidence when coming to a decision.

11  ### B.  OBJECTIONS TO THE DECLARATION OF VOLKER AMELUNG.

12  #### Objection No. 1

13  | **Material Objected to:** | **Grounds for Objection:** |
| --- | --- |
| ¶ 11, page 2, line 2-3: *"To the best of my knowledge, BYTON's parent company or companies are based in China and may retain the "FMC" name."* | Lacks foundation; lacks personal knowledge. |

17  **EDAG'S Response to Objection No. 1**

18  EDAG incorporates by references the General Response stated above.  Further, Mr. Amelung's declaration establishes his foundation and personal knowledge of BYTON's corporate structure based on his many years working with the company.

20  #### Objection No. 2

21  | **Material Objected to:** | **Grounds for Objection:** |
| --- | --- |
| ¶ 16, page 2, lines 22-23: *"To the best of my knowledge, BYTON still uses Jama Software for this purpose with regard to the M-BYTE."* | Lacks foundation; lacks personal knowledge. |

25  **EDAG'S Response to Objection No. 2**

26  EDAG incorporates by references the General Response stated above.  Further, Mr. Amelung's declaration establishes his foundation and personal knowledge of BYTON's use of the Jama Software system.

28

LEWIS +
LLEWELLYN
LLP

## C.  **OBJECTIONS TO THE DECLARATION OF EVANGELINE A.Z. BURBIDGE.**

### Objection No. 3

**Material Objected to:**

¶ 7 in its entirety, page 3, lines 10-14: "*On August 20, 2021, automotive journalists reported that BYTON's M-BYTE was photographed undergoing road tests in Hainan, China, despite BYTON's efforts to hide the tests.  See Byton is alive! M-Byte EV was spotted in the wild for the first time [Spy Photos], China Car News, https://carnewschina.com/2021/08/20/byton-is-alive-m-byte-ev-was-spotted-in-the-wild-for-the-first-time-spy-photos/ (Accessed Sept. 14, 2021).*"

**Grounds for Objection:**

Hearsay (*Evidence Code* § 1200).

### EDAG'S Response to Objection No. 3

EDAG incorporates by references the General Response stated above.  This document has already been introduced without objection through Mr. Amelung's declaration as Exhibit D, so this objection has been waived.

Even if hearsay, as an expert, Mr. Amelung is permitted to rely on it to form his opinions.  Fed. R. Evid. 703; Cal. Evid. Code § 802. [2]

### Objection No. 4

**Material Objected to:**

¶ 8, page 3, lines 15-17: "*Jama Software ("Jama") is a company that provides solutions for requirements, risk, and test management. See Jama Connect, https://www.jamasoftware.com/platform/jama-connect/ (Accessed Sept. 15, 2021).*"

**Grounds for Objection:**

Lacks foundation; lacks personal knowledge; hearsay (*Evidence Code* § 1200).

/ / /

/ / /

/ / /

---

[2] EDAG cites both rules of evidence but maintains that the Federal Rules govern this procedural question.

1    **EDAG'S Response to Objection No. 4**

2
3    EDAG incorporates by references the General Response stated above.  EDAG does not offer this website for the truth of the matter, but rather as a representation of what Jama purports to do. Jama Systems also offers sworn testimony regarding this fact.  *See, e.g.,* Keo Decl.

4                                **Objection No. 5**

5    | **Material Objected to:** | **Grounds for Objection:** |
|---|---|
6    | ¶ 8, page 3, lines 17-18: "*BYTON used Jama's browser-based database to store all BYTON build BYTON's product, i.e. the M-BYTE vehicle.*" | Lacks foundation; lacks personal knowledge. |

7

8

9    **EDAG'S Response to Objection No. 5**

10
11   EDAG incorporates by references the General Response stated above.  Mr. Amelung offered sworn testimony regarding this fact without objection.  *See, e.g.,* Amelung Decl. ¶¶ 16-17.  Jama Systems also offers sworn testimony regarding this facs.  *See, e.g.,* Keo Decl.

12                               **Objection No. 6**

13   | **Material Objected to:** | **Grounds for Objection:** |
|---|---|
14   | ¶ 8(e), page 4, lines 2-8: "*She stated that Jama holds design and intellectual property information for BYTON. She further informed me that a non-U.S. company claiming to be a related entity to BYTON wanted to obtain access to Jama's system and the data held by BYTON North America.  She further stated that Jama asked for documentation permitting this request and did not receive it. She informed me that Jama would institute a litigation hold, preserving the BYTON data which was the subject of the third-party subpoena.*" | Hearsay (*Evidence Code* § 1200). |

15

16

17

18

19

20

21

22   **EDAG'S Response to Objection No. 6**

23
24   EDAG incorporates by references the General Response stated above.  Jama Systems also offers sworn testimony regarding these facts.  *See, e.g.,* Keo Decl.

25   ///

26   ///

27   ///

28   ///

LEWIS +
LLEWELLYN
LLP

## Objection No. 7

**Material Objected to:**

¶ 8(f), page 4, lines 2-8: "*She informed me that BYTON North America, in coordination with a China-based BYTON entity, had paid all past due invoices to Jama in May 2021, so Jama reinstated BYTON North America's account on the cloud. She also explained that BYTON now had active access to the requirements database and the intellectual property for the M-BYTE vehicle.*"

**Grounds for Objection:**

Hearsay (*Evidence Code* § 1200).

### EDAG'S Response to Objection No. 7

EDAG incorporates by references the General Response stated above.  Jama Systems also offers sworn testimony regarding these facts.  *See, e.g.*, Keo Decl.

## Objection No. 8

**Material Objected to:**

¶ 8(g), page 3, lines 15-22: "*On September 15, 2021, Jama's Counsel stated that from August 2020 to May 2021, a Chinese company claiming to be a related entity to BYTON, referred to as "BYTON China," had repeatedly asked for access to Jama's system and, specifically, BYTON North America's data. She stated that BYTON China asked to open a new account, held on the ground in China instead of in the cloud, and wanted Jama to migrate the data from BYTON North America to this Chinese- only based account. She explained that this would mean no one in the United States— including Jama itself— could access the data. This migration ultimately did not happen.*"

**Grounds for Objection:**

Hearsay (*Evidence Code* § 1200).

/ / /

/ / /

/ / /

/ / /

/ / /

EDAG'S RESPONSES TO EVIDENTIARY OBJECTIONS
JAMS REF. NO. 1100107291

LEWIS +
LLEWELLYN
LLP

**EDAG'S Response to Objection No. 8**

EDAG incorporates by references the General Response stated above.  Jama Systems also offers sworn testimony regarding these facts.  *See, e.g.,* Keo Decl.

Respectfully submitted,

Dated:  October 6, 2021                                LEWIS & LLEWELLYN LLP

By: _____

Evangeline A.Z. Burbidge
Marc R. Lewis
Kenneth M. Walczak

Attorneys for Petitioner EDAG
ENGINEERING GMBH

EDAG'S RESPONSES TO EVIDENTIARY OBJECTIONS
JAMS REF. NO. 1100107291

1   LEWIS & LLEWELLYN LLP
    Marc R. Lewis (Bar No. 233306)
2   mlewis@lewisllewellyn.com
    Evangeline A.Z. Burbidge (Bar No. 266966)
3   eburbidge@lewisllewellyn.com
    Brad Estes (Bar No. 298766)
4   bestes@lewisllewellyn.com
    Kenneth M. Walczak (Bar No. 247389)
5   kwalczak@lewisllewellyn.com
    601 Montgomery Street, Suite 2000
6   San Francisco, California 94111
    Telephone: (415) 800-0590
7   Facsimile:  (415) 390-2127

8   Attorneys for Claimant
    EDAG Engineering GmbH
9

10                    JAMS REFERENCE NO. 1100107291

11            IN THE MATTER OF THE JAMS ARBITRATION BETWEEN

12

13   EDAG Engineering GmbH,                 **PROOF OF SERVICE**

14            Claimant,

15       v.                                 Hon. William J. Cahill (ret.)

16   BYTON North America Corporation,       Arbitration:  February 8, 2021

17            Respondent,

18

19
     AND RELATED CROSS-CLAIM.
20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, the undersigned, am employed in the City and County of San Francisco, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Lewis & Llewellyn LLP, 601 Montgomery Street, Suite 2000, San Francisco, CA  94111.  I am familiar with the office practice of Lewis & Llewellyn LLP for collecting and processing documents for delivery.

On the date provided below, in accordance with the office practices of Lewis & Llewellyn LLP, I served a true copy of the following document(s):

1. **CLAIMANT EDAG'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**
2. **DECLARATION OF ALLYSON KEO ON BEHALF OF JAMA SOFTWARE REGARDING EDAG'S REQUEST FOR A PRELIMINARY INJUNCTION**
3. **CLAIMANT EDAG ENGINEERING GMBH'S RESPONSES TO BYTON NORTH AMERICA CORPORATION'S EVIDENTIARY OBJECTIONS**

The foregoing document(s) were served by the following means:

☒   (**By Electronic Mail**)  I emailed the document(s) listed above to the electronic mail address(es) shown below.

The document(s) listed above were sent to the following address(es):

| | |
|---|---|
| Keith Sipprelle<br>David Van Etten<br>VAN ETTEN SIPPRELLE<br>2945 Townsgate Road, Suite 200<br>Westlake Village, CA 91361 | ***Attorneys for Respondent and Cross-Claimant BYTON North America Corp.***<br><br>805.719.4904 Direct<br>805.719.4900 Main<br>805.719.4950 Fax<br>ksipprelle@vstriallaw.com<br>dvanetten@vstriallaw.com |

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.  Executed on **October 6, 2021** at San Francisco, California.



Kristin Orrantia

EXHIBIT G

Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

```
EDAG ENGINEERING GmbH,          )
                                )
            Plaintiff,          )
                                )
  VS.                           ) NO. 21-cv-04736-EMC
                                )
BYTON NORTH AMERICA CORPORATION,)
                                )  San Francisco, California
            Defendant.          )
                                )  Thursday,
_____)  December 9, 2021
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**: (By Zoom Webinar)

For Plaintiff:
                    COOK COLLECTION ATTORNEYS, PLC
                    165 Fell Street
                    Post Office Box 270
                    San Francisco, California  94104
            BY: **DAVID J. COOK, ESQ.**

                    LEWIS & LLEWELLYN, LLP
                    601 Montgomery Street
                    Suite 2000
                    San Francisco, California  94111
            BY: **EVANGELINE ZIMMERMAN BURBIDGE, ESQ.**
                **KENNITH MICHAEL WALCZAK, ESQ.**

For Defendant:
                    VAN ETTEN SIPPRELLE LLP
                    2945 Townsgate Road
                    Suite 200
                    Westlake Village, California  91361
            BY: **KEITH A. SIPPRELLE, ESQ.**


Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
                Official Reporter, U.S. District Court

| | |
|---|---|
| 1 | **Thursday - December 9, 2021**                                    **1:36 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **THE COURTROOM DEPUTY:**  Calling Civil Action 21-4736, |
| 4 | EDAG Engineering versus Byton North America Corporation. |
| 5 | Counsel, please state your appearances for the record, |
| 6 | beginning with counsel for plaintiff. |
| 7 | **MR. WALCZYK:**  Good afternoon, Your Honor this is |
| 8 | Kenneth Walczyk.  I'm here on behalf of petitioner EDAG. |
| 9 | **MS. BURBIDGE:**  And this is Evangeline Burbidge.  I'm |
| 10 | also from Lewis & Llewellyn with Mr. Walczyk, on behalf of |
| 11 | EDAG. |
| 12 | **THE COURT:**  Good afternoon, Ms. Burbidge. |
| 13 | **MR. COOK:**  David Cook on behalf of EDAG likewise, the |
| 14 | petitioner. |
| 15 | **THE COURT:**  All right, thank you. |
| 16 | **MR. SIPPRELLE:**  Good afternoon -- |
| 17 | **THE COURT:**  Is that Mr. Sipprelle?  I think we have |
| 18 | lost contact. |
| 19 | **MR. SIPPRELLE:**  Good afternoon. |
| 20 | **THE COURT:**  Okay can you hear us?  Is that |
| 21 | Mr. Sipprelle? |
| 22 | **MR. SIPPRELLE:**  Yes, it is, Your Honor.  Can you hear |
| 23 | me okay?  I'm having -- I am have an issue with my connection |
| 24 | here. |
| 25 | **THE COURT:**  Okay.  We can't see you, but that's okay |

1   -- oh, now we can see you.  The main thing, your audio was

2   cutting out.  But now I can hear and see you, so I hope you're

3   okay.

4          **MR. SIPPRELLE:**  Thank you, Your Honor.  Hopefully

5   this will work.  I'm having a little connection problem.

6          **THE COURT:**  All right.  So as I understand it, you

7   had the original final arbitration award, which was rendered

8   in June.  There's been -- there was a petition to confirm the

9   award.  There's been, no, as I see it, opposition to that

10  award.

11         But then there was, after that, a -- I guess what's called

12  a preliminary injunction, signed off by the arbitrator in

13  November that is now complicating things because, as I

14  understand it, EDAG wants that preliminary -- the terms of the

15  preliminary injunction to be sort of incorporated now into the

16  confirmation of the initial award, or the final arbitration

17  award.

18         And as I understand it, Byton is saying:  Well, if you do

19  that, that starts the clock again, and we get our 90 days or

20  three months to file an opposition.

21         And I frankly don't see why -- seems like we're

22  conflating, or the parties are wanting to conflate these two

23  orders.  One is a final arbitration order that was issued, and

24  then there was a followup injunction.  And it seems to me that

25  those are two separate matters.

1    The -- the June 20th, 2021, final arbitration award is

2 subject to confirmation.  The clock has run.  That's the basis,

3 that's the meat of the matter.

4    I understand that there's -- now seeking some preliminary

5 injunctive relief, but that wasn't issued until November.  And

6 if we treat that as a separate order of the arbitrator, that is

7 subject to the 90-day objection or the three-month objection

8 rule.

9    So why aren't we treating these two things separately?  I

10 guess that's my question.

11    And I'll let anybody answer that, because you're both kind

12 of in the middle here.

13        **MR. WALCZYK:**  So Your Honor, this --

14        **MR. SIPPRELLE:**  I'm happy to address this --

15        **MR. WALCZYK:**  I'm not sure --

16        **MR. SIPPRELLE:**  This is Mr. Sipprelle.  I mean, I

17  guess that would solve the problem.  I mean, if it would

18  simply -- we were simply dealing with the original award and

19  the motion to confirm the final arbitration award in June, I'm

20  not sure Byton would have much to talk about, because yes, we

21  agree that time has run on that, and probably would be

22  appropriate for the award to be conferred.

23    But as Your Honor noted, this preliminary injunction from

24 November, which they now -- EDAG wants to now weave into the

25 final judgment, which includes, you know, not just an

injunction, but findings on ownership of intellectual property,
things that were never part of the underlying arbitration
proceeding, I mean, we need a chance to contest all of that.
We think that was an inappropriate ruling.  And we need our 90
days to contest it.

So if -- you know, what EDAG is trying to do is weave
those two together, conflate them, as Your Honor has indicated.
And that is not fair -- that doesn't give Byton an opportunity
to respond and contest the November 8th arbitrator's ruling.
So I think we -- we are entitled to do that.  And we would
respectfully ask that we be entitled to do that.

The original award, I agree, the time has run on that.
But this thing from November, we need our 90 days to -- and we
intend to move to contest that, that rule.

THE COURT:  All right.  So let me hear from EDAG.

And I should roll into this discussion, because I think I
know what you're going to say, is that you're concerned about
dissipation, the transfer and all sort of stuff.  But tied with
that is a question about relief from the automatic stay.

If I were to, based on your showing, grant that relief so
you can commence enforcement without the aid of this special
preliminary injunction, wouldn't that -- would that still
present a problem if I treated the two as two separate awards,
two separate clocks, but enforced -- gave final confirmation to
the FAA, the final arbitration award, give relief from the

```
 1    automatic stay?

 2        Why wouldn't that be enough?

 3            MS. BURBIDGE:  Um --

 4            MR. WALCZYK:  I'm happy to address that, Your Honor.

 5            THE COURT:  I'll toss it to one of you, so --

 6            MS. BURBIDGE:  Many faces in the crowd.  Your Honor,

 7     my colleague Mr. Walczyk will take this one.

 8            THE COURT:  All right.  Mr. Walczyk?

 9            MR. WALCZYK:  Sorry about that.  I didn't realize I

10     was talking over people.  I'm happy to address that,

11     Your Honor.

12        I think that the two prongs that you've suggested

13     confirming the arbitrator's final award and granting relief

14     from the Rule 62(a) stay would be almost enough.

15        I think it's really three things that the judgment would

16     need to include, in order for us to preserve any ability to

17     collect any amount of the assets that are still remaining from

18     Byton towards the more than $30 million that is concededly owed

19     to EDAG.  Right?

20        And so those three components are confirming the judgment

21     -- confirming judgment, including our interest in the

22     intellectual property; granting relief from the Rule 62(a)

23     stay; and granting the relief that our colleague Mr. Cook just

24     asked the Court for, which allows us to proceed with collection

25     in other states.
```

1      That particular element of the relief is necessary because

2  the intellectual property is on a server in Portland.  And so

3  we need the ability to collect in other jurisdictions besides

4  California.

5      As far as decoupling the two orders, I would just like to

6  point out that it simply isn't true that there's anything new

7  or different in the injunctive relief order.  The injunctive

8  relief order from the arbitrator just confirms what he found in

9  his original analysis, which is that the intellectual property

10 belongs to EDAG, until Byton has fully paid for it.  That isn't

11 a new finding; it's simply confirmation of something the

12 arbitrator believed and ruled on, all along.

13     You know, the arbitrator, Judge Cahill, Your Honor, sat

14 with this case for more than 18 months.  And he presided over a

15 full trial-like proceeding.  And he issued a very thorough

16 final award after a two-week trial-like hearing.

17     So at the conclusion of that proceeding, he made this

18 decision.  We simply asked him to reaffirm it, once it became

19 clear that Byton was transferring assets out of the

20 jurisdiction.

21     And so, you know, if Mr. Sipprelle and Byton were to be

22 given a new clock to challenge these provisions, right, it

23 would be rewarding them for their effort to make themselves

24 judgment-proof.  Right?

25     In other words, we went to the arbitrator, and we did what

1    the law asks us to do.  We said, with eyes wide open:  Please

2    rule on the best way for us to pursue relief, now that we know

3    Byton is trying to transfer assets, including impermissibly

4    trying to access our intellectual property.

5         The arbitrator had us brief jurisdiction on the matter.

6    Relied on the cases saying that the way to preserve the

7    status quo, pending entry of judgment by Your Honor, was to

8    issue this sort of injunctive relief.  And found that

9    injunctive relief was proper.

10        So it's simply an order preserving the status quo and

11   reflecting the original findings.  There's nothing new or

12   different in it for Byton to challenge, if we were to start a

13   new clock.

14        And I would just suggest that the rule cannot be that once

15   you catch a party trying to dissipate assets, that they will be

16   rewarded for those actions by getting a new 90-day clock in

17   which to dissipate more assets.

18        **MS. BURBIDGE:**  And Your Honor, if I may, just

19    briefly -- and I want to make sure that our co-counsel

20    Mr. Cook has a moment to chime in.

21        But, to come back to your initial question, yes,

22   confirmation of the arbitration award, we absolutely would ask

23   Your Honor to do that, today.  And there's just no dispute

24   about that.

25        I think that the second question here is how to insure

1   that our client is able to collect, particularly in light of

2   the evidence that there is a dissipation of assets.

3        And, you know, if the injunction is giving Your Honor

4   heartburn, we'll, you know, forego the injunction.  What we're

5   seeking here is the confirmation that this is EDAG's -- our

6   client's -- IP that they were not paid for.  That they've not

7   been paid for by Byton.

8        And in terms of the collection piece, I would ask Mr. Cook

9   to respond to your question of:  Is this enough, with regard to

10  the Rule 62 motion and the additional motion he filed, because

11  he is the expert there.

12       **THE COURT:**  Let me ask you an additional question.

13  Obviously, you are seeking some form of ancillary relief.

14  Because otherwise, you won't have asked for it, and the

15  arbitrator wouldn't have gone through that.

16       **MS. BURBIDGE:**  Yes.  That's right.

17       **THE COURT:**  So the question is, you know, under the

18  arbitration laws, when -- when either ancillary relief is

19  awarded or there is, in effect, kind of an amendment of an

20  order, an arbitration order, under what circumstances does the

21  clock run?

22       Is it -- is it -- is the test one of materiality?  Is it

23  one that's looking at it, mechanically?  I didn't see much --

24  didn't hear much case law on when the clock runs and when it

25  doesn't run.

 1        And then another question I ask is:  Does this Court have

 2   power, other than to just confirm the award, to -- to issue

 3   some kind of -- I don't know, injunctive relief, without having

 4   -- having to go through the confirmation of an arbitrator going

 5   through?

 6        Does this Court have sort of almost like, you know, the

 7   great writ, the ancillary powers to enforce, you know, inherent

 8   -- protect its orders.  Like the All Writs Act kind of a thing.

 9   Does that exist?

10        MS. BURBIDGE:  So I want to turn it over to my

11    colleague, Mr. Walczyk, Your Honor, briefly.

12        I would say that, you know, I think, you know, he's going

13   to point out what the arbitrator is allowed to do -- and the

14   case law is clear -- is to preserve the status quo so that the

15   arbitrator's order can be enforced.  And that doesn't restart

16   the clock, right?

17        It's the idea that if you were to catch someone

18   dissipating assets, they're not rewarded by getting 90 more

19   days to dissipate more assets.  Right?

20        THE COURT:  What is the effect of the preliminary

21    injunction order issued by -- as we sit here right now.  The

22    finding?

23        MS. BURBIDGE:  So the effect of the preliminary

24    injunction -- as a practical matter, right, what happened was

25    EDAG saw the car that it helped design, that it was not paid

1    for, in the news.  Right?  In China.

2         And it discovered then by speaking to -- we have a

3    declaration from counsel for this third party, JAMA.  JAMA had

4    the IP for this car.  And in speaking with this counsel at

5    JAMA, EDAG learned that Byton had been trying to move that IP

6    to a server located solely in China, outside the reach --

7         **THE COURT:**  Yeah, no, I understand the basis.  I'm

8     asking a more simple question.

9         Is the arbitrator's order of November enforceable as --

10   does it have force and effect, as we sit here right now, of its

11   own accord?

12        **MS. BURBIDGE:**  So, Mr. Walczyk, do you want me to

13    turn it over to you to talk about the case law as regards to

14    that?

15        **MR. WALCZYK:**  Mr. Sipprelle would say no, Your Honor,

16    that that -- it has to be confirmed by Your Honor; it has to

17    be an order of this Court.  And as I indicated before, we need

18    an opportunity to contest that.

19        That entire ruling was based on the premise that EDAG owns

20   this intellectual property, which we contest.  That was not an

21   issue in the arbitration.  And it was a ruling made by the

22   arbitrator months after the arbitration was closed, and the

23   final award was issued.

24        **THE COURT:**  All right.  But what about the transfer

25    of assets to liquefy -- I'm not saying this happened, but what

 1   is a creditor to do who has the benefit of a judgment or an

 2   order that's been confirmed, but then has since learned that

 3   there's been some dissipation.  Your typical, you know,

 4   fraudulent-transfer situation.

 5       What can a creditor do in an arbitration situation?  You

 6   go back to the arbitrator, get an ancillary award saying:

 7   Don't transfer the stuff, keep it status quo.  But, under your

 8   theory, that's -- that order is only like a tentative ruling,

 9   has no force and effect until it is confirmed by a court at

10   least 90 days thereafter.

11       What can a creditor do to get expedited relief, if there's

12   something like -- I'm not saying there's something ongoing.

13   But if there were fraudulent transfers going on, what could a

14   creditor do in that situation?

15           MR. SIPPRELLE:  Well, the creditor could have -- and

16   should have in this case, in my view -- simply gotten their

17   judgment, the order or ruling confirmed, and moved to enforce

18   and collect on the judgment.  That's what they should have

19   done, months ago.

20       You know, we, of course, dispute that there's any kind of

21   fraudulent transfer going on.  I mean, if they want to pursue

22   that at a later date, you know, a fraudulent transfer, that's a

23   separate action.  I suppose they can pursue a fraudulent

24   conveyance action, if they think they have some basis for that.

25       But I think what the -- the approach that  have would have

1    taken is simply get this final arbitration award confirmed, and

2    then move to collect on the monetary award.

3            THE COURT:  Is that the only remedy?  There's no

4    ancillary remedy -- other than going through the mechanics of

5    the rather elongated process of getting an ancillary award

6    from the arbitrator, and then seeking enforcement of that

7    through the confirmation proceeding, there's no -- like, like

8    an injunction pending appeal kind of thing.  There's no --

9            MR. SIPPRELLE:  Oh, there is, Your Honor, under

10   California law, and federal courts do this all the time.  You

11   can get a pre-judgment writ of attachment.  You get the

12   attachment from the court.  And then you go and you start

13   serving the attachment notice on banks or where -- wherever.

14       So they could have done that.  They could have done that

15   at the beginning of this arbitration proceeding.

16           THE COURT:  So enforcement of the Court's judgment

17   can proceed without going back to the arbitrator.  In other

18   words, getting, for instance, provisional remedies like a writ

19   of attachment.

20           MR. SIPPRELLE:  Sure.  Sure.  Absolutely, that could

21   be done.

22           THE COURT:  Let me now turn the ball back to you,

23   Mr. Walczyk.

24       Why isn't that enough?  If I confirm today the final

25   arbitration award, I also waive the -- the automatic stay.  And

 1   if you want to seek enforcement mechanisms like garnishment,

 2   attachments, et cetera, like any other judgment, you can do

 3   that.

 4          **MR. WALCZYK:**  Sure, Your Honor.  I'll just respond to

 5    Mr. Sipprelle's contentions.

 6        You know I think, first of all, it's not up to the party

 7   who -- first of all, there's no question that the asset

 8   dissipation's going on.  We know that that's happening.  We

 9   supplied proof, and they haven't controverted it.  To the

10   contrary, they've put in a sworn declaration saying that they

11   are, as a matter of course, transferring patents from North

12   America to China, without consideration.  The hallmarks of a

13   fraudulent transfer.

14        More to the point, it shouldn't be up to the party who has

15   been caught dissipating assets to choose the remedy that the

16   other party which has the benefit of a judgment in its favor

17   can seek.  It isn't Byton's call as to which remedy we choose.

18        Secondly, we did exactly what the statutes require,

19   exactly what the case law requires.  We went to the arbitrator

20   first.  And we asked the arbitrator for an order preserving the

21   status quo.  And the arbitrator said:  Quite frankly, I don't

22   know what the right procedure is; please brief the issue to me.

23        So we briefed the issue.  Byton, which now says that it

24   should have an opportunity to start some new clock based on

25   this order, argued that the arbitrator had no jurisdiction to

1    enter an order at all.

2         The arbitrator disagreed with that.  The arbitrator cited

3    the case law that we provided, saying that the Northern

4    District and the Ninth Circuit have a preference in favor of

5    pursuing provisional relief in front of the arbitrator, instead

6    of front of Your Honor.

7         That just flows from the principle that the arbitrator is

8    the person best acquainted with the facts and the case, and

9    that the idea of the FAA is to keep these sorts of complicated

10   matters off of Your Honor's docket.

11        So the arbitrator said:  The appropriate thing to do is

12   for me to issue an order preserving the status quo until the

13   Court rules on it and confirms the award.  So we did that.  We

14   did everything in lockstep with the law, and with the statute.

15        On the other side of things, Mr. Sipprelle and Byton have

16   supplied no cases, whatsoever, in which an order along these

17   lines has been held to restart a clock.  There simply isn't any

18   of those cases.  In fact, the cases that Mr. Sipprelle points

19   to support us.

20        And because Your Honor asked a few minutes ago about case

21   law, I would direct the Court to the *Fradella* case -- Fradella

22   with a D -- which Mr. Sipprelle cited in his opposition.  It's

23   a case from the First Circuit.  And that's a case in which the

24   arbitrator, like in this case, issued a final award, and then

25   went back and decided there were some errors of law in it.

1        The arbitrator went back and decided:  Well, you know,

2    New York law doesn't apply, so I'm going to delete some

3    references to New York law.  Did that some time later.

4        And just like Mr. Sipprelle, with the provisional relief

5    that the arbitrator ordered here, the party against whom the

6    arbitrator ruled went to the court and said:  That's a new

7    order.  That's a new order.  It's a whole new finding.  We get

8    a new clock.  We get a new 90-day clock.  Just as Byton is

9    arguing here.

10       And the First Circuit rejected that.  The First Circuit

11   said: Look, if that were the case, if the limitations period in

12   FAA Section 12 were subject to suspension just because an

13   arbitrator later takes some action to correct it, even though

14   the arbitrator originally intended to resolve all submitted

15   claims, then an unsuccessful party could preclude the

16   commencement or suspend the running of the limitations period

17   simply by alleging error.

18       Right?  The idea is you can't preclude the running of the

19   period, or suspend it, or restart a clock just by alleging that

20   the arbitrator did something new that you don't like.  Whether

21   that's the leading reference as to New York law or whether

22   that's just issuing an order protecting the enforceability of

23   the arbitrator's award and the Court's eventual judgment.

24       So the case that Mr. Sipprelle dug up from federal

25   appellate law supports us here.  And it discusses this exact

1   principle.  That a final award is final; provisional relief is

2   different.

3        And all we're asking Your Honor to do is to exercise the

4   inherent powers of the Court to protect our ability to recover

5   on the judgment, so we all agree --

6        **THE COURT:**  Let me ask you about the inherent powers.

7        Do you agree that if -- once I -- if I confirm the final

8   arbitration award, you've got a judgment.  Right?

9        **MR. WALCZYK:**  (Nods head)

10       **THE COURT:**  And enforcement of the judgment would

11   then, under the Federal Rules of Civil Procedure, default to

12   state procedures.  Correct?

13   Do you --

14       **MR. WALCZYK:**  That's correct.  Of course Mister --

15       **THE COURT:**  You would have the entire panoply of

16   enforcement mechanisms at your disposal.

17       **MR. WALCZYK:**  That's correct, Your Honor.  And, and

18   obviously, we've started down that path already.  You've seen

19   our *ex parte* motions to that effect, and the Court has already

20   granted a couple of those, and we appreciate that.

21       That's why we're asking, certainly, for relief from

22   Rule 62(a).  I think everybody agrees that Your Honor has the

23   power to do that today, to suspend the post-judgment today.

24   Right?  And then it's just a question of how best to allow us

25   to proceed with collections.

1        So my point is just that -- and Mr. Cook can speak in more

2    detail to what is necessary to allow collection in other

3    states.  We certainly need that component of the relief.  And

4    then, there's also our interest in the intellectual property.

5        And all we're asking the Court to do along those lines is

6    to --

7        **THE COURT:**  Well, the interest in the intellectual

8     property is either covered by the final arbitration order, or

9     not.  Right?

10       I mean, if I confirm it's in there, if it's fairly

11   inferred from there, you know, I'm not going to opine on that.

12   I just confirm it.  I don't elaborate on it.

13       **MR. WALCZYK:**  I think that's right, Your Honor.  I

14    think it (Inaudible) --

15       (Reporter interruption)

16       **THE COURT:**  Hold on, the court reporter.

17       (Reporter interruption)

18       **MR. WALCZYK:**  Certainly.  I apologize.

19       I agree with you, Your Honor, that if you confirm the

20   final award, its provisions regarding the intellectual property

21   will be confirmed along with the rest of the arbitrator's

22   findings.  So, so we believe that it flows from the final award

23   that this property remains in the hands of EDAG until Byton

24   makes full payment for it.

25       And as Ms. Burbidge pointed out earlier, if it is

1    essential to getting this concluded today, to take the

2    provisions that look like injunctive relief provisions out of

3    our proposed order and remove the writ of possession for that

4    intellectual property, we would accept that.

5         But the arguments we would make is that those provisions

6    follow directly from the first order, and not from the

7    injunctive relief order, which is simply a provisional measure

8    intended to preserve the status quo.

9              **MS. BURBIDGE:**  If I may, Your Honor, I'd actually

10   like to turn it over just briefly to our co-counsel, Mr. Cook,

11   who really is the collections expert on this.  And I would

12   like to offer his opinion as to that piece that you've asked

13   about, because he is going to be able to articulate that, I

14   think, most succinctly for Your Honor

15             **THE COURT:**  All right.  Mr. Cook?

16             **MR. COOK:**  Thank Your Honor.

17        So, to make it simple, we need -- we need the Court to

18   lift the stay under 62(a).  That follows the ex parte under

19   Section 1963, so I would be able to cross lines and go to

20   Oregon or whatever it would be, and enforce my judgment,

21   notwithstanding the 30 days from the date of entry.

22        I don't think there's -- we've gotten no meaningful

23   opposition to it.  And both of those would follow the 4.1(a)

24   order which the Court granted, and the 1702(a) relief.

25        So, that being said, we've got pictures of the premises

1    here.  And as the Court knows, the debtor has fled California.

2    The place is empty.  Its agent for service of process has

3    resigned, and there's no replacement.  And the only officer we

4    found is now in Hong Kong, we believe, and certainly not here.

5         The only person that we know of locally is a Mr. Gong

6    Chen, who is an attorney, California attorney.  But we have

7    determined, we think, that he has sold his home in

8    San Francisco.  We say with a little uncertainty here, so if

9    that's not the case, it's my best judgment here.

10        The appropriate remedy here, I will tell you, because

11   counsel -- counsel will learn this really quickly, is there are

12   20 patents which have been transferred by the debtor, being --

13   we call BNA -- over the period of time of the arbitration, and

14   has been transferred to Byton, Ltd., who is in the -- we don't

15   call it "China," we call it "The People's Republic of China,"

16   "PRC" -- which is now in the hands of the PRC.

17        That is an absolute fraudulent conveyance of which

18   Mr. Chen, on behalf of the debtor and the assignee, admit as

19   such, saying that there was a transfer without any

20   consideration --

21            THE COURT:  All right, but that raises an issue that

22   -- you're presenting that to me, almost *de novo*.  And you want

23   me to make -- you say it is absolutely clear.  And maybe it

24   will be.

25        But unless that's been adjudicated by the arbitrator, that

1    feels like a substantive finding that is subject to the FAA

2    framework.

3              **MR. COOK:**  No, absolutely not.  Zero.  What I'm

4    saying is that -- that's our remedy here.  I think I have a

5    winner on this remedy, working with some experience, is I'm

6    preparing, sitting here literally, to file a motion for

7    appointment of a receiver here --

8              **MS. BURBIDGE:**  Mr. Cook, if I may, just briefly, I

9    think what Mr. Chen (sic) wants to know is if it will be

10   sufficient for him to issue the Rule 62 order in addition to

11   the other order that we filed, in addition to -- while

12   confirming the arbitration award.

13             **MR. COOK:**  What -- I need six -- if you're going to

14   confirm the award under 62(a), we need the stay lifted, as we

15   will promptly enforce this judgment.  That's what we're asking

16   for.

17             **THE COURT:**  Okay.  Well, and that's what I assume,

18   that once I confirm the award, lift the stay, you then have,

19   like any other judgment, a judgment of the Court --

20             **MR. COOK:**  That's correct.

21             **THE COURT:**  -- and you can then enforce whatever

22   remedies are available under the law.  And some of those may

23   be expedited, some of those -- you know, whatever it is.

24   Seems to me that's a proper thing.

25         And frankly, I think there's been enough of a showing here

1   for me to left the automatic stay.  I haven't heard any good

2   reason why I should not, or any unfair prejudice in that

3   regard.  And I've heard some evidence suggesting it's

4   necessary.  So my intent at this point is to enforce the award.

5        But I would not include, you know, sort of language that's

6   not already -- I'm not going to embellish it; I'm just going to

7   enforce -- declare that the arbitration award that was issued

8   in -- in June be confirmed by this Court.  It will be a

9   judgment, as such.  And the stay is lifted.

10       If you then seek, pursuant to judgment enforcement law --

11  I guess we're governed by California law at that point, as I

12  understand it, as I recall.  You know, if you need some court

13  orders, if there's other stuff, you know, you can seek that, as

14  any creditor would, at that point.  And some of that may be

15  expedited type stuff.

16       But I am a little hesitant to say that the gist of the --

17  even though one could say it's sort of folded in and ancillary,

18  you know, really not a big deal, to -- I am inclined to treat

19  that injunction, the preliminary injunction, as a separate FAA

20  -- or a separate arbitration order.  But it may be that that is

21  largely mooted by the relief that I'm granting.  So that's what

22  I intend to do.

23            MR. SIPPRELLE:  Your Honor, Mr. Sipprelle.  Just to

24   clarify, I just want to make sure.  And I appreciate what

25   Your Honor just indicated.

1    The original proposed order that was submitted by EDAG

2    just prior to the arbitrator's November 8 ruling -- and that's

3    Document 19-5 -- was simply an order and judgment confirming

4    the arbitration award of June.  And entering a judgment on the

5    money award.

6        And, and as I indicated at the outset, if that's all they

7    were seeking to confirm, then I'm not sure Byton would have

8    much of an argument.  But we do have all of this concern about

9    all this intellectual property findings and the -- the

10   injunction and all of that.

11       So, as I understand what Your Honor is saying, you are

12   looking then at the original proposed order --

13           THE COURT:  I'm looking at the original proposal, a

14   clean confirmation of the award.  So you have it in hand, it

15   becomes a judgment, and it will be fully enforceable

16   immediately, because I'm going to lift the stay, under

17   Rule 62.

18           MR. SIPPRELLE:  Okay.

19           MS. BURBIDGE:  And --

20           THE COURT:  And there are a lot of self-help remedies

21   that a creditor has.  And if you need help on some of those,

22   unless I'm convinced otherwise, those are the kinds of things

23   that any judgment creditor can seek and employ at that point.

24           MS. BURBIDGE:  Your Honor, if I may, Proposed Order

25   31-1 contains some of the language that I know would be

stricken.  But I did want to point you to Section 3, because

it has the updated calculation of interest --

     **THE COURT:**  Okay.

     **MS. BURBIDGE:**  -- in it.  So that would actually be

the more accurate order, given time that has passed.

     **THE COURT:**  All right.  That's fair.

     **MR. SIPPRELLE:**  Except the 31-1 has all of this

objectionable language.

     **THE COURT:**  Yeah, no, I know.  She's just talking

about Section 3 that has --

     **MS. BURBIDGE:**  Yes.

     **THE COURT:**  -- calculates the interest.

     **MS. BURBIDGE:**  Yes.

     **THE COURT:**  This is a straight kind of monetary, --

     **MS. BURBIDGE:**  Yes.

     **THE COURT:**  -- you know, thing that you can now take

-- I won't say "to the bank," but to wherever we take it.

     **MS. BURBIDGE:**  Yes, Your Honor.  It sets out the

interest quite clearly, as of the date of today's hearing.

     **THE COURT:**  Yeah.  All right.  Well, that's what I'm

going to do.  I'll issue that order, and I'm going to lift the

stay, so it's immediately gong to be enforceable.

     **UNIDENTIFIED MAN:**  (Inaudible) Your Honor --

     **THE COURT:**  Back to the preliminary injunction, I'm

going to treat that as a separate order, subject to the

1     confirmation process.  But that does not preclude whatever

2     rights that the judgment creditor -- to have.  And it may be

3     that, you know, there are rights that are going to moot out

4     that -- largely moot out that injunction order, that

5     preliminary injunction order.

6         I don't know.  I mean, you guys are the experts.  But I'm

7     going to leave it to the law on that.

8              **MR. WALCZYK:**  Let me --

9              **MR. COOK:**  Your Honor --

10              **MR. WALCZYK:**  Let me add the following.

11              **THE COURT:**  One at a time.  I guess Mr. Walczyk has

12      something to say.

13              **MR. WALCZYK:**  (Nods head)  Sorry, David.

14         Docket No. 31-1 includes language on lifting the

15     Rule 62(a) stay.  So we would propose, I think, Your Honor,

16     that you start from Docket 31-1.  And if we're striking the

17     injunctive relief language that Your Honor is finding, part of

18     a separate order, that would just be in Roman numeral II of the

19     proposed judgment.  So you can strike that --

20              **THE COURT:**  I'll look at that.  I understand.

21              **MS. BURBIDGE:**  Thank you, Your Honor.

22              **THE COURT:**  Okay.

23              **MR. COOK:**  Let me have my two cents, as we say.

24         We're looking for the Court to rule favorably for us on

25     the 1963, since we may end up being in Oregon.  That's the 28

1   -- because I may need to take my California -- or this judgment

2   here, and then register it potentially in the District of

3   Oregon.  That's what --

4        THE COURT:  So what are you asking the Court to do,

5   specifically?

6        MR. COOK:  I'm asking the Court to, for good cause,

7   raise -- lift the implicit stay in attempting to take a

8   judgment in this district and then move it into another

9   district, which would be Oregon.  That's called a 1963.

10        THE COURT:  Is that addressed in your 31-1,

11  somewhere?

12        MS. BURBIDGE:  No, Your Honor.  It's Docket Item 42.

13        MR. COOK:  1963 --

14        THE COURT:  You want me to look -- okay, I'm -- I'm

15  sorry --

16        MR. SIPPRELLE:  They filed an *ex parte* on that,

17  Your Honor -- this is Mr. Sipprelle -- which we objected to,

18  but Your Honor has --

19        THE COURT:  All right, so that's a pure enforcement

20  mechanism.

21        MS. BURBIDGE:  Yes, Your Honor.  Yes, Your Honor.

22        MR. COOK:  And the issue here, as I've had with a

23  much larger case, is once judgment is entered and I have to go

24  to another district, I'm stuck by the 30 days.  Either the 30

25  days for --

1      **THE COURT:**  Okay, I understand.  I understand.

2  That's -- yeah.

3      **MR. COOK:**  Wait.  I got one more here.

4      **THE COURT:**  Okay.

5      **MR. COOK:**  Seeing how the Court is going to rule

6  here -- we are proceeding with our receivership, and time

7  doesn't help us -- is we'd like the Court to consider

8  providing us for an order shortening time for my hearing on

9  the appointment of a receiver.

10      **THE COURT:**  Okay, what --

11      **MR. COOK:**  Instead of, like, 35 days, it would be a

12  much shorter period of time as we can get a motion out, and

13  it -- many of these facts we have here are not in dispute, so

14  this is something that the Court would be able to --

15      **THE COURT:**  Have you already filed your motion for

16  appointment of receiver?  Is that in the --

17      **MR. COOK:**  No, but it will be filed -- as soon as

18  this Court grants it, we're talking about getting it filed by

19  Monday.

20      **THE COURT:**  Then you should ask when you file that

21  for an order shortening time, that an accelerated briefing

22  schedule -- consistent with due process, got to give

23  Mr. Sipprelle's client at least a fair chance to respond.

24      If you want to save time, skip the reply stuff, and ask

25  for the Court for an expedited hearing.

1          MR. COOK:  I'll file the motion; I'll file them

2     together.

3          THE COURT:  All right, thank you.

4          MR. COOK:  Thank you.

5          THE COURT:  Thank you very much, everyone.  I

6     appreciate it.

7          MS. BURBIDGE:  Thank Your Honor.

8          MR. COOK:  Thank you very much.

9        (Proceedings concluded)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States
Court, Northern District of California, hereby certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, March 14, 2022