**David J. Cook (SBN 60859)**
**COOK COLLECTION ATTORNEYS, PLC**
ATTORNEYS AT LAW
165 Fell Street
San Francisco, CA 94102
Telephone: (415) 989-4730
Facsimile: (415) 989-0491
Cook@CookCollectionAttorneys.com

**LEWIS & LLEWELLYN LLP**
**Evangeline A.Z. Burbidge (Bar No. 266966)**
eburbidge@lewisllewellyn.com
**Marc R. Lewis (**Bar No. 233306)
mlewis@lewisllewellyn.com
**Kenneth M. Walczak** (Bar No. 247389)
kwalczak@lewisllewellyn.com
**Bradley E. Estes** (Bar No. 298766)
bestes@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:  (415) 800-0590
Facsimile:   (415) 390-2127

Attorneys for Petitioner EDAG Engineering GmbH,
a corporation organized and existing under the laws
of the Republic of Germany

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| EDAG Engineering GmbH,<br><br>    Petitioner,<br><br>v.<br><br>BYTON North America Corporation,<br><br>    Respondent | Case No. 3:21-cv-04736-EMC<br>**EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000.00 PURSUANT TO C.C.P. SECTION 699.040(a)&(b)& (B) TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA**<br><br>Judge:  Honorable Edward M. Chen [Video-ZOOM hearing)<br><br>Petition Filed: June 23, 2021 |

TO BYTON NORTH AMERICA CORPORATION, a Delaware corporation, ("BNA"), FMC CAYMAN, BYTON LIMITED, AND ZHANG YING, AND EACH OF THEM AND THEIR ATTORNEYS OF RECORD:

EDAG ENGINEERING GMBH, a corporation organized and existing under the law of the Republic of Germany, ("EDAG"), hereby moves this court under California Code of Civil Procedure Section 699.040(a) & (b) for the following relief:

A.     Order Directing BNA, FMC CAYMAN, BYTON LIMITED, and ZHANG YING, jointly, severally, and each of them, AND ALL PERSONS UNDER ITS CONTROL, DIRECTIONS, SURROGATES THEREOF, ASSIGNEES THEREOF, OR THOSE IN POSSESSION THEREOF (collectively "BYTON ENTITIES") to turn and hand over the BNA Investors Funds in the sum of $143,000,000,000 or $167,139,906.00  ("Investor Funds"), or such funds to pay the judgment, to the United States Marshal, Northern District of California, as described in the records of the of the Silicon Valley Bank, (SVB) which consist of payments of BNA of $117,000,000 (January 8, 2019) and $26,000,000 (December 21, 2018) or $167,139,906.00, which are Investor Funds, owed to, and owned by and in favor of BNA, and that FMC Cayman, Byton Limited and Zhang Ying, and each of them, held and hold in trust for the benefit of BNA and EDAG of $143,000,000.00 or $167,139,906.00 or  the amount due to EDAG..

FMC Cayman, Byton Limited, and Zhang Ying, and each of them have no right, title or interest thereof, and hold all funds for the benefit of BNA and its creditors and are in total control of BNA and subject to the turnover pursuant to C.C.P. Section 699.040(a)(1)&(2)(b) and as follows:

| Silicon Valley Bank ((Doc. # 133-1, *Exhibits "A," "B,"* and *"C"*)) | $117,000,000.00 |
|---|---|
| | (January 8, 2019 |
| | $27,000,000 |
| | (December 21, 2018) |
| Total | $143,000,000 |

[INVESTOR FUNDS OR GREATER SUM OF $167,139,906.00]

| The status of any records of BNA in the United States: | ZERO. |
|---|---|
| The number of employees who have any knowledge of the records: | ZERO. |
| Records available in the United States: | ZERO. |
| IDENTITY OF INVESTORS: | ZERO. |
| RECORDS FOR THE TRANSACTIONS FOR THE INVESTORS: | |
| | ZERO. |

RECORDS FOR AGREEMENT BETWEEN BNA AND FMC CAYMAN
INVESTORS:                                                                  ZERO.

THE RECORDS FOR $143,000,000 OR $167,139,906.00:
                                                                  ZERO.

The above summaries, charts, calculations, and compilations are based on FRE 1006: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court. Counsel was provided with all subpoena records from the above SVB."  Counsel was provided copies of bank records obtained by way of Rule 45 Subpoenas ("SDT").

B.      Turnover all documentary evidence to title the Investor Funds owed to the BNA that is sought to be levied upon which consists of, harbors, retains, is held or kept, in a bank account, with third parties, whoever they are pursuant to C.C.P. Section 699.040(b).

C.      Alternatively, the court would appoint a receiver to take possession of the turnover of the Investor Funds pursuant to C.C.P. Section 699.070(a).

The basis of this Ex Parte Motion for a Turnover under Section 699.040(a)&(b) and Section 708.205(a) that the Investors handed their funds ("Investor Funds") over to BNA who deposited the BNA investor's funds in its Silicon Valley Bank ("SVB") of $143,000,000.00 or $167,139,906.00, that BNA under the direction of Sadha Kameswaran (employee of BNA) directed the spiriting of the BNA Investor Funds to Byton Limited, [Byton GmbH], and/or FMC Cayman (i.e., the "BYTON ENTITIES"), that BNA remitted and spirited its own Investor Funds to the BYTON ENTITIES $143,000,000 or $167,139,906.00, or any one of them, that BNA and BYTON ENTITIES engaged in suspicious trafficking of money, that BNA or any BYTON ENTITIES disavowed  any records of the BNA Investor transactions, never kept any records, destroyed the records between the parties including BNA, FMC Cayman, Byton Limited or identity of the Investors. The transfers of BNA Investors Funds of $143,000,000 or $167,139,906.00 and in the hands of  FMC Cayman, Byton Limited, Zhang Ying for the sole purpose of putting money in the hands of third parties and outside the reach of the EDAG.  The sum of BNA Investor funds of $143,000,000 or $167,139,906.00 which are held by FMC Cayman, Byton Limited, and Zhang Ying and therefore are held in actual or constructive trust and therefore holds the funds for the benefit of EDAG.

The basis of the Application for the Turnover of $143,000,000 or $167,139,906.00 due EDAG from BNA, FMC Cayman, Byton Limited, Zhang Ying, and each of them is their failure and refusal to comply with the Discovery Order (Doc. # 96) and turn over items #4 which were due on March 24, 2022, which is deemed to be contempt of court and an admission that the BNA has absconded with the assets and all records thereof for the purpose preventing, inhibiting, hindering, delaying, and defrauding EDAG herein by the filing of Respondent Byton North America Corporation's Ex Parte Application for Entry of Protective Order, Supporting Declaration of Keith A. Sipprelle (Doc.# 144 seq.)[1]  Spiriting all records out of the jurisdiction, and in contempt (#4 of Doc. # 127) is an admission that FMC Cayman, Byton Limited and Zhang Ying have zero proof of ownership of the Investor funds and hence the Investor Funds belong to BNA and thus is within the sphere of *Nagel.*

EDAG, the holder of the judgments seeks a turnover order under C.C.P. Section 699.040(a) (1) & (2) & (b), that BNA, FMC Cayman, Byton Limited, and Zhang Ying, and each of them, (BYTON ENTITIES) turnover to the U.S. Marshal, United States District of North California the sum of $143,000,000.00  or $167,139,906.00,  (Doc. # 133-1, *Exhibits "A," "B,"* and *"C"*) or such other funds that the court find as property of BNA and therefore subject to relief under Section 699.040(a)(1)&(2)&(b).

This motion is based on this Notice herein, the Memorandum of Points and Authorities, Declaration of David J. Cook, Esq., (Doc. # 133-1, *Exhibits "A," "B,"* and *"C* ") Declaration of Zhang Ying, the two Meet and Confer transcripts, the deposition transcripts of Sadha Kameswaran, the transcript of the examination of Sadha Kameswaran of March 11, 2022, bank records of Silicon Valley Bank, JPMORGAN Chase Bank, HSBC BANK USA, all matters which the court may take judicial notice thereof of FRE 201, all matters on file herein, all papers, pleadings, and other matters on file herein, and all oral and written evidence and argument at the hearing hereof.

Dated:  March 31, 2022                                  Respectfully submitted,

COOK COLLECTION ATTORNEYS PLC

By:____/s/ David J. Cook_____

David J. Cook, Esq.
Attorneys for Petitioner EDAG ENGINEERING

---

[1]   BNA in fact turnover documents but none of them consisted of the #4 per Discovery Order Doc # 127), page 2, lines 6-7, and  lines 22-24)

EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000.00 PURSUANT TO C.C.P. SECTION 699.040(a)&(b)& (B) TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA

**TABLE OF CONTENTS**

*I.   RELIEF SOUGHT PURSUANT TO FRCP 69(a)(1) &(2) AND SECTION 708.205(a)*............. *1*

A. STATUS OF THE CASE ............................................................................................ 1

B.   STATUS OF BNA .................................................................................................. 1

C.   BNA IS IN CONTEMPT OF COURT FOR THE FAILURE TO TURN OVER THE #4 [RECORDS] OF THE SUBPOENA ("SDT") DUE ON MARCH 24, 2022...................................... 1

D.   UNDISPUTED FACTS THAT BNA SPIRITED $143,000,000.00 or $167,139,906.00, (Doc. # 133-1, Exhibits "A," "B," and "C") WITHOUT A SCRATCH OF PAPER AND WITHOUT ANY RIGHT, TITLE, OR INTEREST BY FMC CAYMAN, BYTON LIMITED, OR ZHANG YING ................................................................................................................. 2

1. BNA WILL NEVER PRODUCE RECORDS  (# 4 OF DOC. # 127) . ............................... 2

2. BNA, FMC CAYMAN, BYTON LIMITED AND ZHANG YING SPIRTED ALL DOCUMENTS................................................................................................................. 3

3. BNA AND RELATED PARTIES MADE AN ELECTION TO SPIRIT THE MONEY AND ANY RECORDS AWAY (#4: Doc. #127) ............................................................... 15

*II.   THE RELIEF SOUGHT UNDER C.C.P. SECTION 699.040(a)&(b)* ...................................... *20*

A.    TURNOVER ORDER DIRECTING BNA TO TURN OVER FUNDS TO THE U.S. MARSHAL UNDER C.C.P. SECTION 699.040(a)&(b).............................................................. 20

B.   TURNOVER ORDER DIRECTING BNA TO TURN OVER FUNDS TO THE U.S. MARSHAL BECAUSE THE MONEY UNDER SECTION 695.010(a).................................. 21

1.  THE COURT HAS PLENARY JURISDICTION IN ORDERING THE TURNOVER OF ASSETS PURSUANT TO C.C.P.  SECTI0N 695.010 and 703.02(a)(a)................................ 21

2.    EDAG HAS A LIEN UPON INVESTOR'S CONTRIBUTIONS DUE BNA IN THE NAME OF FMC CAYMAN, BYTON LIMITED, ZHANG YING UNDER SECTION 708.110(d)  (Doc. # 96) ............................................................................................... 22

3. NO STANDING OF THE THIRD PARTY TO THE INVESTORS FUNDS AND THEREFORE NO PREJUDICE.......................................................................................... 23

*III.    CERTIFICATE OF NOTICE UNDER RULE 7-10* ............................................................. *24*

*IV.    EDAG IS ENTITLED TO THE INVESTORS FUNDS RECEIVED BY FMC CAYMAN AND BYTON LIMITED* ......................................................................................................... *24*

*V.   EDAG DOES NOT NEED TO NAME FMC CAYMAN, BYTON LIMITED OR ZHANG YING IN ORDER TO TURN OVER THE INVESTOR'S FUNDS*........................................................... *25*

*VI.    CONCLUSION*.............................................................................................................. *25*

**TABLE OF AUTHORITIES**

**Cases**

*A&M Records Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 556; *In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1171...................................................................................... 17

*Credit Suisse First Bos. Mortg. Cap., LLC v. Danning, Gill, Diamond & Kollitz*, 178 Cal. App. 4th 1290, 1293 (2009)...................................................................................................................... 22

*Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 282 (2d Cir. 1997) ...................... 18

*Fall v. Eastin*, 215 U.S. 1, 8 (1909), 30 S.Ct. 3, 54 L.Ed. 65,.......................................................... 24

*Global Money Management v. McDonnold*, 2009 WL 3352574 (S.D.Cal.)..................................... 24

*Golden v. Stein,* 481 F. Supp. 3d 843, 857 (S.D. Iowa 2019) .................................................. 19, 20

*Goldman v. Simpson* 160 Cal.App.4th 255, 262 (2008) ................................................................. 25

*In re Burns*, 291 B.R. 846, 851 (B.A.P. 9th Cir. 2003) .................................................................. 23

*In re Franchise Pictures LLC,* 389 B.R. 131, 141–42 (Bankr. C.D. Cal. 2008)  ("OEX LIEN")...... 23

*Nagel v. Westen***,** *59* Cal. App. 5th 740, 749, 274 Cal. Rptr. 3d 21, 27 (2021), (Feb. 1, 2021).......... 25

*Nebel v. Sulak*, 73 Cal. App. 4th 1363, 1368–69 (1999) ................................................................... 3

*Roam v. Koop*, 41 Cal.App.3d 1035, 1040 (1974),................................................................... 17, 18

*TMS, Inc. v. Aihara, supra,* 71 Cal.App.4th 377, 83 Cal.Rptr.2d 834........................................ 17, 18

*Troy v. Superior Court* (1986) 186 Cal.App.3d 1006, 1014 ............................................................. 2

**Statutes**

28 USC Sec.1963.................................................................................................................................. 1

C.C.P Section 680.010 ……………………………………………………………………………… 1

C.C.P Section 699.040(a)&(b) ................................................................... 1, 2, 20, 21,24, 26

C.C.P. Section 695.010 ...................................................................................................................... 21

C.C.P Section 703.020(a)................................................................................................................... 22

C.C.P. Section 708.110(d)............................................................................................................ 22, 23

**Rules**

FRCP 62(a)............................................................................................................................................ 1

FRCP 69(a)(1)……………………………………………………………………………………….. 1

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION 699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA**

**I.      RELIEF SOUGHT PURSUANT TO FRCP 69(a)(1) &(2) AND SECTION 708.205(a)**

**A.  STATUS OF THE CASE**

EDAG ENGINEERING GMBH ("EDAG") has recovered judgment against BYTON North America Corporation ("BNA") on December 13, 2021 in the amount of $30,231,689.48 (Doc. # 49). The court has lifted the stay under FRCP 62(a) and the stay registering the judgment in other Districts under 28 USC Sec.1963. EDAG seeks to enforce the judgment pursuant to FRCP 69(a)(1) and (2) and C.C.P. Section 680.010 *seq.* (Enforcement of Judgments Law [EJL]).

**B.      STATUS OF BNA**

BYTON NORTH AMERICA CORPORATION ("BNA") is the named judgment debtor (Doc. # 49) but as stated below, is now defunct, and BNA has no records in the United States.  Any records, allegedly located in China, admittedly are nonexistent at this time and are described by its own counsel as "a mess," and "it does not appear that the BNA documents that were backed up to the cloud-based server were backed-up in any organized fashion,"  [Doc. # 116-3, P. 16, lines 3-6] "This is proving to be a cumbersome and time-consuming task, particularly without clear direction as to what should be searched for." (Doc. #116, P. 4)." Based on the admissions, the purported but unknown records, if any, are allegedly domiciled in China in the Cloud, that the records are tampered, chaotic, incomplete, damaged, if not destroyed, a mess, inaccessible, admittedly in shambles," [Doc. # 116-3, P. 16, lines 3-6]  and claimed in part to be held by unknown individuals. BNA allegedly domiciled its records in the cloud warehouse by an unknown server which is an act of tampering of the records.

BNA engaged in mass movement of $143,000,000.00 or $167,139,906.00, (Doc. # 133-1, ***Exhibits "A," "B,"*** and ***"C"***) for the benefit of FMC Cayman, Byton Limited, Zhang Ying, and Byton GmbH.

**C.      BNA IS IN CONTEMPT OF COURT FOR THE FAILURE TO TURN OVER THE #4 [RECORDS] OF THE SUBPOENA ("SDT") DUE ON MARCH 24, 2022.**

The court issued Discovery Order (Doc. #127, P. 2, lines 6-7 and 22-25) that ordered BNA to produce records in response to the following requests:

"4.   Any and all financial statements, whether audited or unaudited, ledgers, journals, internal financial statements., credit reports, credit applications, outside or inside financial statements, representation of the financial conditions of BNA, any financial records generated from a third party of BNA, notes, narrative, chronicles, or histories of BNA account commencing on January I, 2018 to date hereof."

BNA was obligated to turn over the records on March 24, 2022 (i.e., 30 days from February 22, 2022) ("Document Order" Doc. # 127) as follows**:**

"The Court now orders BYTON to produce documents responsive to RFPs 4 and 15 within 30 days. . . . . .  [AND]

Accordingly, the Court grants EDAG's motion to compel as to RFPs 4 and 15 and orders BYTON to produce responsive documents within 30 days. The Court denies EDAG's motion to compel as to RFP 13." (Doc. # 127, P. 2 lines 6 to 24)

These documents (#4, Doc. # 127) have not been provided. Notwithstanding the protective order (Doc. # 150), the BNA remained bound to comply with the Discovery Order to produce records (Doc. # 127), as follows: "EDAG's second objection that BYTON will not produce documents does not seem to have anything to do with the protective order issue." (Doc. # 150, P. 2, lines 8 to 9).

Nothing in the Protective Order (Doc. # 150) excuses BNA from not producing the records listed in #4 (Doc. #127) when Sadha Kameswaran of BNA had control:

"So -- so let's -- let's go back to, say, 2021? Is it a fair statement that you are based --  you were in control of BNA because nobody else was there? Is that a fair statement? **A. I was responsible for managing the operational  activities of BNA.** Q. Did you ever, say, in 2021 -- make sure I get  this correctly." (**Block # 27  (P. 117) (and Blocks #: 35, 36 and 37)**

**D.     UNDISPUTED FACTS THAT BNA SPIRITED $143,000,000.00 or $167,139,906.00,  (Doc. # 133-1, Exhibits "A," "B," and "C") WITHOUT A SCRATCH OF PAPER AND WITHOUT ANY RIGHT, TITLE, OR INTEREST BY FMC CAYMAN, BYTON LIMITED, OR ZHANG YING**

**1. BNA WILL NEVER PRODUCE RECORDS  (# 4 OF DOC. # 127) .**

EDAG examined Sadha Kameswaran pursuant to C.C.P. Section 708.110(a) ("OEX") which offers EDAG sworn testimony for the following purpose: *Troy v. Superior Court* (1986) 186 Cal.App.3d 1006, 1014 (the purpose of the examination is "to leave no stone unturned in the search for assets which might be used to satisfy the judgment."). The transcript of the OEX is filed.  (Doc. # 142). An OEX is not a deposition, but rather a public proceeding before the court,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION 699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA

" . . . We believe that the public has an interest, in *all* civil cases, in observing and ssessing the performance of its public judicial system, and that interest strongly supports a general right of access in ordinary civil cases." *Nebel v. Sulak*, 73 Cal. App. 4th 1363, 1368–69 (1999)

Sadha Kameswaran was in charge of the finances of BNA and arranged for the transfer of BNA Investor Funds from BNA to FMC Cayman, Byton Limited and Zhang Ying.  Block # 27, 35, 36 and 37.

Under direction of Sadha Kameswaran, BNA spirited the Investors Money of BNA the sum of $26,000,000 on December 21, 2018 and $117,000,000 (January 8, 2019) ($143,000,000) or more. (Doc. # 133-1, *Exhibits "A," "B,"* and *"C*) to BYTON Entities, i.e., FMC CAYMAN, BYTON LIMITED and/or Zhang Ying from the Silicon Valley Bank ("SVB") or a total of $143,000,000 or $167,139.906.

Block #1 to Block # 48 proves that BNA came in to a total, but refused to account, for $143,000,000 or $167,139.906.00 and **"spirited these documents away"** of every scratch of paper, beyond Document [grouping] # 4 Doc. # 127) as follows:

(Block # 45).  Q. Yeah? Byton North -- did somebody at BNA have access to the company financials? [Full Transcript, Doc. # 142]  THE WITNESS: **No.** BY MR. COOK: Q. Does that include everybody, including who the CA- --- CEO was; is that correct? [Full Transcript, Doc. # 142] THE WITNESS: **Yes.**  (P. 211)

BNA was obligated to turn over the records on March 24, 2022 (i.e., 30 days from February 22, 2022)  ("Document Order" Doc. # 127) as follows**:** "The Court now orders BYTON to produce documents responsive to RFPs 4 and 15 within 30 days.  . . . . .   [AND]  Accordingly, the Court grants EDAG's motion to compel as to RFPs 4 and 15 and orders BYTON to produce responsive documents within 30 days. The Court denies EDAG's motion to compel as to RFP 13.  (Doc. # 127, P. 2 lines 6 to 24)"  On its face, the Document Order (Doc. # 127), twice, ordered BNA to "produce the documents responsive to RFPs 4 and 15 days" and ". . .order to produce responsive documents within 30 days."  The Document Order  (Doc. # 127) requires production of the records on March 24, 2022.  No documents were produced and will ever be produced.

In addition the court orders BNA to turnover Document [grouping] #4 (Doc. # 127) and warned BNA as follows:

"If BYTON **has spirited these documents away** and truly is not able to produce them, then either the undersigned or Judge Chen will need to determine what consequences flow from that. However, the first step is this order compelling production."  (Doc. # 127, P. 2 lines 10-12)

## 2.  BNA,  FMC  CAYMAN,  BYTON  LIMITED  AND  ZHANG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**YING SPIRTED ALL DOCUMENTS**

Block # 1 through Block # 48 that BNA **"spirited these documents away"** of every scratch of paper, beyond Document [grouping ] # 4 Doc. # 127) and along with the documents of $143,000,000,000 or $167,139,906.00  ("Investor Funds").

Given scope of the OEX, here is a chart by "Block" number, which are attached to the page number.  This chart provides summary of the block and the assisting  by bold highlights:

No knowledge of Investors and records:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, & 32.

No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, & 47.

No access to BNA records:

Blocks #: 41, 42, 43, 44, 45, 46, & 48.

No Employees of BNA:

Blocks #: 15 & 16.

Vice President of Finance and signed documents but not employees or bona fide VP of BNA

Blocks #: 17, 18, 19, &39

No access of the BNA Document

Block #: 20.

 Sadha Kameswaran executed BNA IRS Tax return for 2020 which includes Schedule L.

Blocks #: 21, 22, 23 & 24.

Documents not "mess" or otherwise damaged

Blocks #: 25 & 26.

 Sadha Kameswaran in Control of Finances

Blocks #: 27, 35, 36, & 37.

Sadha Kameswaran did not know ZHANG YING

Block #: 28.

Zhang Ying did not receive any BNA records

Blocks #: 28, 29 & 30.

FMC did not get documents from BNA

Blocks #: 31 & 33.

Byton entities imposed restriction in disclosing financial

Blocks #: 41, 42, 43, 44, & 45.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION 699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA

**Block # 1**

Q. Maybe you can explain to me why, between 2018 to 2019, that -- to make sure I understand this, that BNA sent to FMC Cayman 167,139,906? Any explanation for that? [Full Transcript, Doc. # 142] **P. 65  THE WITNESS: So from what I can recall, the B-down funding that we went through -- some of the funding was received in U.S. dollars, because, at that time, as I mentioned before, it was really difficult to get money transferred between China and -- and the U.S. And so we wanted to get some of the funding in U.S. dollars. And the B-down investors put some of the money in U.S. dollars, and -- and Byton North America was justify facilitating the receipt of that money in U.S. and transferring it to the FMC entity where the money is due to go to. And -- and if you -- I think if you're referring to probably one side of the book in the bank transactions where the money has gone out to FMC Cayman, but you're probably missing the fact that there is money that has come into Byton North America before that from investors**. BY MR. COOK:
Q. I -- I'm -- I'm sorry. I'm not understanding that 167,139,000 of money belonging to BNA -- **A. No. That's --** [Full Transcript, Doc. # 142] THE WITNESS: **I'm sorry.** Full Transcript, Doc. # 142] **(P. 66)**

**Block # 2**

[. . .answer.]
BY MR. COOK: Q. Which says it was money of BNA and resent to FMC Cayman. And I'm not sure why? I don't understand. Was it money sent for -- to buy something or to do what? I don't understand. [Full Transcript, Doc. # 142] MR. COOK: Explain that. [Full Transcript, Doc. # 142] **THE WITNESS: Yeah. As -- as for my prior statement, the money never belonged to BNA in the first place. The money was being received to facilitate a transfer to FMC because we did -- we wanted to avoid some of the transfer of -- or the conversion of money from Chinese Renminbi to U.S. dollars. So we facilitated the investors to put the money in U.S. dollars into a U.S. bank account so that (Page 67)**

**Bock # 3**
**FMC could have the money in U.S dollars and make it a little bit easier for future payments. BY MR. COOK:** Q. But the -- **A. The money never belonged to FM- -- BNA in the first place.** Q. But the money was BNA's money; isn't that correct? **A. That's incorrect.** [Full Transcript, Doc. # 142] BY MR. COOK: Q. Whose -- whose money was 167,000 - 167,000,000? Who was that? **A. FMC's money.** Q. So it was FMC's money in -- in the bank account of BNA; is that correct? [Full Transcript, Doc. # 142] THE WITNESS**: Yeah**. [Full Transcript, Doc. # 142] THE WITNESS: As -- BY MR. COOK: Q. Explain it again? **A. As I mentioned before, before, BNA was just (P. 68) . . . (carry over to Block #4)**

**Block # 4**

Q. So, originally, the money belonged to FMC; is that correct? **A. Correct. The investors investing money in FMC.** Q. So the money -- the money -- this $167,000,000 never belonged to BNA? It belonged to FMC; is that correct? But it ended up in the BNA bank account; is that correct? [Full Transcript, Doc. # 142].THE WITNESS: **The money did not belong to BNA.**
The money belonged to FMC, the investors depositing the money through an account in the U.S. to ensure that money is coming in U.S. dollars to make it easier for future transactions.

1    /// BY MR. COOK: Q. To make sure you understand, this is money 117,000,000 [sic] went from a -
- a bank account of BNA ((Page 69) **(carry over to Block #5)**

2    **Block # 5**

3    to FMC Cayman, and 117- -- 117,000,000 [sic] didn't --was not -- didn't belong to BNA, but
belonged to FMC Cayman; is that correct? That's the whole deal? [Full Transcript, Doc. # 142]. BY
4    MR. COOK: Q. Is that correct? **A. That is correct. The money belonged to FMC.** Q. Why did it
get in the hands of BNA, to begin with? MR. SIPPRELLE: Object. Asked and answered at least
5    three or four times, but go ahead. Apparently, Mr. Cook doesn't understand or -- MR. COOK:
Explain --[Full Transcript, Doc. # 142].. BY MR. COOK: Q. How did it end up there to begin with?
6    **A. So these are investors that who willing to pay the money in U.S. dollars to avoid some of the
transactional issues of transferring money between China and the U.S. due to the trade issues
7    and everything at  that time.**  (P. 70)

8

9    **Block # 6**

10    **. . . .So we requested the investors to deposit the money in U.S. dollars in a U.S. bank
account, which appened to be BNA's account. And -- and the money was, accordingly,
11    transferred to FMC because it belonged to FMC in the first place.** Q. So the -- to make sure I --
I get this here? Originally, this FMC money was Chinese money? [Full Transcript, Doc. # 142].
12    **THE WITNESS: Well, I don't know who the investors were. Whether they were Chinese
money or U.S. investors, I don't know the details, or I don't recollect the details of the
13    investors.** BY MR. COOK: Q. Well, you're saying, originally, the money was FMC Cayman. And
I'm trying to figure out: What's the origin of that money? Was it in China or some other
14    place? [Full Transcript, Doc. # 142]  BY MR. COOK: Q. Well, that -- that's saying investors?
(P. 71)
15

16    **Block #7**

17    What banks? **A. I don't --** [Full Transcript, Doc. # 142] **THE WITNESS: I -- I wouldn't
know, Mr. Cook, where the investors were.** BY MR. COOK: Q. Well, was it offshore? THE
18    WITNESS: **I -- I don't know.** BY MR. COOK: Q. How do you know any of this information? Who
told you? **A. These -- like, during this time, I was still overseeing the monies that were coming
19    into the account and going into the account and actually approving the transfer of those
monies, and there was nothing illegal that was done under my watch, as far as I know.** Q. Well,
20    as far as you know; is that correct? [Full Transcript, Doc. # 142] BY MR. COOK: Q. By the way,
the money -- was the money for the 117, was that money belonging to FMC Cayman's, or was that
21    to investors? Which one? (P. 72)

22

23    **Block # 8**

[Full Transcript, Doc. # 142] You can explain, again, your recollection. THE WITNESS:
24    **That was money that the investors were putting into the FMC entity. They were investing in
the company, and they were paying for their investment in U.S. dollars.** BY MR. COOK:
25    Q. Why -- who are those investors? Do you know who they were? [Full Transcript, Doc. # 142]
THE WITNESS: **I'm sorry, Mr. Cook. I wouldn't know who the investors were at that time.**
26    BY MR. COOK: Q. Well, did -- did somebody tell you that this was money from an investor?
**A. I'm -- I'm sure there were correspondence between FMC and -- also at that time to
27    facilitate this.** Q. So tell me, there must be some e-mail traffic concerning all of these transactions;

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR
ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION
699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA

1   isn't that correct? You must have been e-mailing somebody? **[**Full Transcript, Doc. # 142**] THE WITNESS: Yeah -- yes, there would have been e-mail correspondence. (**P. 73)

2       **Block #9**

3       BY MR. COOK: 2 Q. And so where's the e-mail traffic for all of 3 the -- all of these transactions here? [Full Transcript, Doc. # 142]  THE WITNESS: **I -- I wouldn't know. I wouldn't**

4   **have access to those e-mails, Mr. Cook.** BY MR. COOK: 8 Q. Well, these are the e-mails that you were writing; isn't that correct? [Full Transcript, Doc. # 142] .  THE WITNESS**: I may have**

5   **responded to a request by e-mail from FMC to facilitate this transfer, but I do not have access to my Byton e-mails anymore. left the company last year.** BY MR. COOK:  Q. As -- as you're

6   telling me? But where are those -- are those e-mails in, like -- are they accessible here, or are they in China? [Full Transcript, Doc. # 142] THE WITNESS: **The e-mail server was a**

7   **23 Cloud-based server. I -- I don't know where it is. Not that savvy with the IT stuff.**

8   25 BY MR. COOK:  (P. 74)

9       **Block # 10**

10      Well, we've been informed that all of the -- all of the e-mails are in a Cloud server somewhere in 3 China? Is that a correct statement? [Full Transcript, Doc. # 142] BY MR. COOK:

11  Q. You can answer that question, sir? **A. I don't know where the server resides.** Q. Well, I'm -- I seem to be having some confusion here. You're -- we're getting information here that all of the

12  records of BNA is somewhere in the server, which is a mess, by somebody, and that there are no records here in the United States. So what I want to know is: Is all of your  traffic dealing with,

13  apparently, half a billion dollars, that all of those records are now somewhere in  China; is that correct?[Full Transcript, Doc. # 142]  ( P. 75)

14

15      **Block #11**

16       BY MR. COOK:  Q. You can answer that? [Full Transcript, Doc. # **142]. THE WITNESS: It -- it -- they're in a Cloud  server. I don't know where the server is.** BY MR. COOK: Q. Well,

17  what do you mean you don't know where it is? [Full Transcript, Doc. # 142] .  BY MR. COOK: Q. You can -- you can answer the question? [Full Transcript, Doc. # 142] Mr. Cook? BY MR.

18  COOK: Q. Where's the ser- -- a server is a piece of hardware.  Is it somewhere in California? **A. It's not a --** [Full Transcript, Doc. # 142]  MR. COOK: Let the witness answer his -- the

19  question to him.  (P. 76)

20      **Block #12**

21      [Full Transcript, Doc. # 142] questions - - MR. COOK: Well -- [Full Transcript, Doc. # 142] THE WITNESS**: It's -- it's a Cloud server.  It's not a physical server.** BY MR. COOK:

22  Q. And who's managing that Cloud server? Is that in China? [Full Transcript, Doc. # 142] . BY MR. COOK: Q. If you know? **A. It's managed by the IT group in China.** Q. Okay. That --

23  that's what I want to know.  So if I wanted to figure out what's going on  with a half a billion dollars, I have to get the  information from Nanjing, the corporate finance people;

24   isn't that correct? [Full Transcript, Doc. # 142] (P. 77)

25      **Block # 13**

26      THE WITNESS: **I don't know. I don't know what  to say. A 2018 document --** [Full Transcript, Doc. # 142].  THE WITNESS: **I'm sorry. I'm not going to answer that.**

27   BY MR. COOK:  Q. Why not? Isn't it true that all of the records dealing with a half billion dollars is in some type of Cloud in China somewhere; isn't that correct? [Full Transcript, Doc. # 142]   BY

28

MR. COOK:  Q. You can answer that? **A. As I said, it's a Cloud server. I don't know where the server is. It's -- it's not a physical server. So it's -- it's truly in the Cloud, so I don't know which company manages that. And I -- I wouldn't know.**  Q. All right. But it's -- you don't have control over it; isn't that correct? **A. I never had.**  Q. Okay. And it is fair to say that the  corporate finance team has control over it?[Full Transcript, Doc. # 142]   (P. 78)

**Block  # 14**

THE WITNESS: **Yeah. There will be contractual documents for -- for the work that was done by Byton North America.** BY MR. COOK: Q. Where's -- where's the contracts? [Full Transcript, Doc. # 142]  MR. COOK: No. He said the contracts.  BY MR. COOK:  Q. Where are the contracts? That's what you said -- [Full Transcript, Doc. # 142] BY MR. COOK: Q. -- under oath. That's what you're telling us under oath. So tell me where the contracts are, and the invoices -- [Full Transcript, Doc. # 142]   BY MR. COOK: Q. -- and everything else. That's what I expect from you, sir? [Full Transcript, Doc. # 142] (P. 81)

**Block # 15**

THE WITNESS: No. I -- I wouldn't know where those documents are. But I know that -- that there were documents that existed. BY MR. COOK: Q. And they are somewhere in the Cloud; is that right? [Full Transcript, Doc. # 142] BY MR. COOK: Q. Is that correct? **A. They -- yeah, Byton typically used digital  storage of documents, so yeah. I wouldn't know where those are.** Q. Well, who -- who can I contact who might be able to help me and find out where those documents are?  Can you tell me where? [Full Transcript, Doc. # 142] **THE WITNESS: Sorry, Mr. Cook. I -- I don't  know which employees are still left in the company in the different locations, so I wouldn't be able to name a  person.** BY MR. COOK: Q. Where is Eidee, E-i-d-e-e; Zhou, Z-h-o-u?  (P. 82)

**Block #16**

[Full Transcript, Doc. # 142] **THE WITNESS: No. I -- I wouldn't know where those documents are. But I know that -- that there were documents that existed.** BY MR. COOK: Q. And they are somewhere in the Cloud; is that right? [Full Transcript, Doc. # 142] BY MR. COOK: Q. Is that correct? **A. They -- yeah, Byton typically used digital  storage of documents, so yeah. I wouldn't know where those are.** Q. Well, who -- who can I contact who might be able to help me and find out where those documents are? Can you tell me where? [Full Transcript, Doc. # 142] **THE WITNESS: Sorry, Mr. Cook. I -- I don't know which employees are still left in the company in the different locations, so I wouldn't be able to name a person.** BY MR. COOK: Q. Where is Eidee, E-i-d-e-e; Zhou, Z-h-o-u? (**P. 83**)

**Block # 17**

Who's that person?  **A. She's a former employee of one of our entities** in **China.** Q. But she is not a senior manager of treasury or finance of BNA; isn't that correct, too? **A. No. She -- she was not an employee of BNA. Q. Okay. And one more time, Teresa Shi, she is, likewise, not an -- not a person holding a title to HSBC; is that correct?** [Full Transcript, Doc. # 142] BY MR. COOK: Q. Can you answer that question? **A. Sorry. Could you restate that question --** Q. Okay? **A. -- please.** Q. She -- her name's Teresa, T-e-r-e-s-a; Shi, S-h-i. She's listed as a VP of finance in the business deposit account agreement?  And all I want to know is: Is she a VP of  finance of BNA? It's a "yes" or "no."  **A. No.** Q. Okay. So if she's not why, did she sign the  "Business Deposit Account Agreement" when her title is VP of finance? Do you know why?  **A. I wouldn't know. (P. 84)**

**Block # 18**

Q. When did you find out that her name appeared as VP of finance?  **A. I knew that she was a VP of finance. Her** title **was VP of finance, but not VP of finance with BNA.**  Q. Did you remember going over this topic when   you were deposed? [Full Transcript, Doc. # 142] BY MR. COOK:  Q. If you remember?  No?  **A. We may have.**  Q. We're going to -- so let's go change a little bit here.  **(P. 85)**

**Block # 19**

Q. So who was in charge of the finances of BNA for 2020 going forward?  **A. 2020 until the end of 2021, I was responsible for that.  (P. 103)**

**Block # 20**

Q. Okay. Aside from that -- aside from that, was there anybody in, say, 2020 who had unfettered -- unfettered access to the finances kept by the corporate -- the corporate finance team? **I -- I don't know. As I said, I don't control  the accesses, so I don't know. (P. 104)**

**Block # 21**

Q. So it's true, then, that the corporate finance team would be, every year, filling out a Schedule L; isn't that correct? [Full Transcript, Doc. # 142] **BY MR. COOK: Q. Correct?  (P. 110)**

**Block # 22**

**A. If it was a tax filing requirement, they would have provided the necessary documents.** Q. And you're the one that signed off on the tax return; isn't that correct? [Full Transcript, Doc. # 142] **THE WITNESS: I only signed off for 2020 tax return.** BY MR. COOK: Q. Okay. For 2020, you signed off? Did you read the tax return?  **At that time, I would -- I would have read the  tax return.  (P. 111)**

**Block # 23**

You signed the tax return; isn't that correct? For the 2020 tax return; isn't that correct? [Full Transcript, Doc. # 142] **THE WITNESS: Yes.** BY MR. COOK: **Q**. Okay. And you've relied on the corporate finance team that they gave you accurate information, including -- including Schedule L and everything that followed it; isn't that correct? [Full Transcript, Doc. # 142] Q. You can answer that question? **A. Yes, I signed the tax return.  (P. 112)**

**Block # 24**

**Q**. Okay. And you've relied on the corporate finance team that they gave you accurate information, including -- including Schedule L and everything that followed it; isn't that correct? [Full Transcript, Doc. # 142] Q. You can answer that question? **A. Yes, I signed the tax return.** Q. Okay. Did -- did anybody inform you that the records somewhere in the Cloud were chaotic, a mess, difficult to determine? [Full Transcript, Doc. # 142] (P. 112)

**Block # 25**

BY MR. COOK: You can answer that question? **A. No, no one specifically told me that the**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION 699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA

**information was vague or a mess or anything like that.** Q. So as far as you knew, for the schedule -- for the 20-- 2020 tax return, you believe that it was accurate and well done before you signed your name; isn't that correct? [Full Transcript, Doc. # 142] Q. You can answer the question? **A. The information was prepared by our CPA who's been doing the work for us for a few years, and so I trusted the work done by them and -- and signed the document at the request of power of attorney because I didn't have even authorization to sign the document.** Q. Did the CPA tell you that the records were a mess? [Full Transcript, Doc. # 142] **THE WITNESS: The CPA didn't say anything  (P. 113)**

**Block # 26**

**about the records being a mess.**  BY MR. COOK: Q. Did any of these people say that -- that --  the -- that there was something wrong with the Cloud, that they -- that it was very difficult to find the information? Did they ever tell you that? [Full Transcript, Doc. # 142]
**THE WITNESS: No.  (P. 114)**

**Block # 27**

So -- so let's -- let's go back to, say, 2021? Is it a fair statement that you are based --  you were in control of BNA because nobody else was there? Is that a fair statement? **A. I was responsible for managing the operational  activities of BNA.** Q. Did you ever, say, in 2021 -- make sure I get  this correctly.  **(P. 117)**

**Block # 28**

Q. Did you ever, say, in 2021 -- make sure I get this correctly. P. 117 Did you have any decisions with a Zhang Ying concerning the corporate documents and records of BNI [sic]? **A. No.** Q. Do you know of anybody who told you that they were in contact with Zhang Ying concerning the -- the finances of BNA?  **A. No.** Q. Now, let's deal with what's called "my review  of corporate documents and records?" During the year, say, of '20, did you turn  over any records to Zhang Ying? **A. I do not even know the person, Mr. Cook.** Q. For the year 2021, did you know of the turnover of any records to Zhang Ying? And that is turning over corporate documents and records. Did you do that? **A. No.** Q. Did anybody, whoever it would be, ask you, while you were in charge for the corporate record -- the corporate documents and records of BNI [sic]? Anybody ask you? **A. No.** Q. Okay. Do you have access yourself -- well,**actually, the year of '21, nobody asked you for correct also?  (P. 118)**

**Block # 29**

**A. So I'm sort of trying to understanding what is  your reference regarding corporate documents.** Q. Well, I'm just reading what Mr. Zhang -- Mr. Zhang is saying, that he has -- quote -- "my review of the corporate documents and records?" And, let's say, for 2021, do you know whether or not you gave him or somebody on his behalf of -- quote -- "corporate documents and records of BNA"? **A. I did not personally provide it, but I don't know if anyone else did.** Q. During the years of, say, '20 and '21, in fact, the records you -- pardon me -- the records you have were related to some type of restriction; isn't that correct? [Full Transcript, Doc. # 142] THE WITNESS: Um -- [Full Transcript, Doc. # 142] Mr. Cook. THE WITNESS: **Could -- could you please repeat that. (P. 119)**

**Block # 30**

**MR. COOK:** Q. During the year of 2021 -- make it really easy -- did you -- make it one at a time? Did you provide anybody information regarding corporate documents and records of BNA --

1   make it that simple -- to anybody? [Full Transcript, Doc. # 142] THE WITNESS: Yeah. [Full

2   Transcript, Doc. # 142] **THE WITNESS: Again, the term "corporate documents" is very broad and vague for me. So my answer is no.** BY MR. COOK: Q. No, that you didn't turn these records

3   over? Is that a fair statement here? [Full Transcript, Doc. # 142] **THE WITNESS: No, I did not.**
    BY MR. COOK: Q. Okay. Let's move on here? That -- do you know -- is there anybody else

4   **(P. 120)**

5       **Block # 31**

6       Now, isn't it true that BNA was getting funds from investors? Isn't that correct?  **A. Sorry, Mr. Cook. BNA was not getting funds** from **the investors. BNA was doing the work for the**

7   **China entity. The investors were investing in FMC Cayman.** Q. I'm -- I'm sorry.  Did BNA seek
    money from investors? **A. No.** Q. Did FMC Cayman get money from investors? **A. Correct.** Q.

8   And was that done publicly? [Full Transcript, Doc. # 142]  **THE WITNESS: Yeah. What do you mean, "publicly" ?BY MR. COOK:** Q. Well, in other words, you -- you'd put it with a broker.

9   You would have advertising. You would put it on the web. Whatever it would be? **A. It was done through normal -- I don't know what process was followed by FMC, but it was not -- I mean, if**

10  **your question was, was it a public place, it was not a public place. It was individual companies**
    **(P. 126)**

11

12      **Block # 32**
        **[It was individual companies].investing as private investors.**  Q. Okay. Well, these

13  investors would be U.S.  investors or from where?  [Full Transcript, Doc. # 142]  THE WITNESS:
    **Could have been from anywhere in the world. I wouldn't know**.  BY MR. COOK:  Q. Let's go

14  backwards here. That -- the person who was -- that was FMC Caymans, that was the entity which
    was soliciting for investors; is that correct? **A. Correct.**  Q. And what -- what does FMC Caymans

15  do, by the way?  **A. FMC Cayman is the holding company for the group.**  Q. Okay. And one of
    the groups was BNA; isn't  that correct?  **A. BNA was not part of FMC. BNA was a part of -- so**

16  **Byton -- Byton Limited was a part of FMC.** Q. I'm sorry? Could you repeat that.  **A. Byton**
    **Limited was a part of the -- FMC was the holding company for the whole Byton group.** Q.

17  Which -- which entity was the entities? Which **(P. 127)**

18
        **Block #33**

19      [Which--which entity was the entities? which ] was soliciting investors? Which one was it?
    [Full Transcript, Doc. # 142] THE WITNESS: **FMC**. BY MR. COOK: Q. FMC Cayman; is that

20  correct? **A. Correct.** Q. And people would be  investing their money into that entity; is that correct?
    **A. That's my understanding.** Q. And FMC -- what's the address of that company? **A. I wouldn't**

21  **know off the top of my head.**Q. And, well, did you BNA provide its finance  statement to FMC for the
    benefit of the -- of the investors? [Full Transcript, Doc. # 142]  THE WITNESS: **BNA did  not**

22  **directly provide finance statements to FMC**  BY MR. COOK:  Q. But did FMC provide final
    statements to its  investors? [Full Transcript, Doc. # 142]  **(P. 128)**

23

24      **Block # 34**

25      **THE WITNESS: FMC used to share information through their regular board meetings,**
    **as any corporation would do.** BY MR. COOK: Q. Sorry. Can you repeat that? So they -- I want to

26  know: How did they communicate that to third parties, like investors? ? [Full Transcript, Doc. #
    142]. **THE WITNESS: Through -- through the board meetings.** BY MR. COOK: Q. And what --

27  through the board meetings, what was said there? Was that -- the purpose of that to providing a
    finance statement of BNA or that there was no financial statement or no records or nothing?  ? [Full

28

                                            11

1    Transcript, Doc. # 142] BY MR. COOK: Q. You can answer that question? **A. Sorry, Mr.**

2    **Kameswaran. Well above my pay grade. I did not know what was shared in these board**
     **meetings. (P. 129)**

3        **Block #35**

4        **THE WITNESS: If you're asking me whether I was responsible for Byton North**
     **American finance operations at that time for dealing with the EDAG payments, the answer**

5    **was yes.** BY MR. COOK: Q. EDAG -- the EDAG payments?  **A. The answer is yes.**Q. What? The
     answer is "yes"? **A. Yes. Yes, as for my testimony.  (P. 142)**

6        **Block # 36**

7        Okay. Let me ask -- the question here is on  (P. 143) "Sir, who is the most qualified

8    witness to testify regarding Byton's payment to suppliers?" And your response is, "I am, as the
     responsible person for Finance North America." Was that a correct statement, sir, at the

9    time? **A. You said you're reading from a prior testimony.** Q. Absolutely? [Full Transcript, Doc. #
     142] [Full Transcript, Doc. # 142] MR. COOK: You attended it. The date of the deposition was

10   November 17, 2020. [Full Transcript, Doc. # 142]  MR. COOK: That's fine **THE WITNESS: Yes,**
     **it was accurate as of that date, yes.** BY MR. COOK:  Q. Thank you. And then on P. 62 -- make

11   sure we have everything here, "How did your work on the M" -- M as in  Mary -- "dash, Byte" -- B-
     y-t-e -- "project prepare you  to testify as the most qualified witness at Byton. **(P. 144)**

12

13       **Block # 37**

14       regarding Byton's use of suppliers on the project"? Answer: "As the most qualified current
     employee -- current employee and as my investment in the finance operations and business

15   operations." Is that true as of November 2020? **A. Yes, sir.** Q. Thank you? Now -- then at P. 63 --
     hold on. It starts **(P. 145)**

16

17       **Block # 38**
         Mr. Cook:      Q. As of -- oh, I'm sorry. Hold on. Bear with me? As of January 8th, 2000- --

18   2021, your deposition was taken, and then they asked you -- and you -- "It is correct that you -- you
     do not know what, if any, search terms were used to -- to search Carsten Breifeld's e-mail account?"

19   Answer: "Correct." Question: "Teresa Shi is still employed Byton; correct?" Answer: "Correct. Well,
     was Ms. Shi, as of January 2021, an employee of BNA? [Full Transcript, Doc. # 142]  THE

20   WITNESS: **I -- I -- I know she left the business at some time**, Mr. Cook. But I'm not aware of the
     exact timing of when she left. And if my testimony at that time was yes, she was an employee, then

21   maybe she was an employee at that time. I do not know the exact time when she left.  You're trying
     to ask me to recall something from 15  months back.  **(P. 200)**

22

23       **Block # 39**

24       BY MR. COOK: Q. He asked you is -- was she an employee of BNA at that time? **A. She**
     **was never an employee of BNA.** Q. Let's take a look at No. 301. "But when you say 'they,' who

25   asked you for specific documents related to invoices?" Answer: "Internal counsels. No, no not from
     my -- not my e-mails, you but from the department repository -- but from the finance department

26   repository hard copies and so on." So what's the finance department repository?  **A. The finance**
     **department's repository was digital locations for storing the documents as for some  physical**

27   **filing cabinets where we had copies of supply invoices and so on.** Q. I'm looking at the word --
     your words, "finance department repository?" Is that electronic, or is that paper? **A. It's both.**

28

1   Okay. So was it -- was that in the computer system that you had in Santa Clara, or was that in
2   China? **A. As I said, I do not know the location of the Cloud servers to where they were. Whether they were in (P. 201)**

3   **Block #40**
4   **China or India or the Philippines or -- I -- I do not  know.** Q. Well, it says "repository?" What's "repository" mean? **A repository means a location where the documents are stored.**
5   Q. Well, that would be paper documents; is that correct? **A. It could be.** [Full Transcript, Doc. # 142] THE WITNESS: **These are paper documents.** BY MR. COOK: Q. It says, "But the finance
6   department repository, hard copies and so on?" So where are the copies of the finance department repository? [Full Transcript, Doc. # 142]  THE WITNESS: **It's stored both digitally and -- and**
7   **physically. That -- that's what I've said twice -- twice now.**  BY MR. COOK: Q. It says, "and hard copies on?"  **(P. 202)**

8

9   **Block # 41**
10   . . . . surprised your client hasn't given you those documents. BY MR. COOK: Q. What is an s-drive? **A. An s-drive is a drive that is -- a drive name that is in one of the servers.** Q. What was
11   in the s drive? **A. An s-drive -- "s" just stand for shared drive, so all kinds of documents would be an s-drive.** Q. Would the s-drive include the financial records on behalf of BNA? **A. I cannot**
12   **recollect whether the finance documents reside on an s-drive or -- or another drive. I cannot remember.** Q. Well, let me -- I'll read this to you. It says, "What kind of documents are
13   stored on the s-drive?" Answer: "Some of the company's financial details and so on, which has restricted access, company finances, which has restricted access." So does that refresh your
14   recollection sitting here that, in fact, the s-drive did include company financial details and so on? **A. Okay. That may be correct.** Q. Okay? **A. Yeah.  (P. 207)**

15

16   **Block # 42**
17   Q. Okay. And then it says, "Which has restricted access?" What's "restricted access"? **A. So, again, as for my prior statement, there was some directories that we had access to in Byton North America, and there were some directories that we did not. That is what it means by**
18   **restricted access.** Q. I'm sorry. Could you -- I'm sorry? The restricted access means that -- did you have access to the -- to these records here? It says, "Some of the company's financial details and so
19   on, which has restricted access --company financials which has restricted access." Is that -- did I get that correctly? **A. No. What I mentioned is there are various documents stored in s-drive. There**
20   **are certain folders that we have access to or certain people have access to. And there are certain folders that are restricted in terms of access.** Q. But I'm looking at this short sentence. It
21   says, "Company financials, which has restricted access?" Does that means that -- that the -- that there was restricted access to you that you didn't have access to company financials?
22   [Full Transcript, Doc. # 142]  **(P. 208)**

23

24   **Block # 43**
25   Explained repeatedly throughout the depo- -- throughout the testimony. Go ahead, Mr. Kameswaran. I guess you can explain it to him again. THE WITNESS: **That's correct that I did**
26   **not have access to all the company's financials. I had access to -- only to certain folders, which was required for me to do the job. Company financial information is confidential. and it was**
27   **only available to some very senior leadership people in the finance team. And I don't know even whether the CEO had access.** BY MR. COOK: Q. I'm sorry? The CEO didn't even have
28   access to the company's financials? Is that what you're telling me? [Full Transcript, Doc. # 142]

1

2

MR.. COOK: Oh, I'm sorry.  THE WITNESS: **Yes. These -- these folders were confidential -- contained confidential information, so the access was restricted to very few people in the company.** Q. The company's BNA; is that correct?  **(P. 209)**

3

4

5

6

7

8

9

10

**Block # 44**
**A. Sorry.**
Q. You said -- you said, restricted to the people in the company? "The company" being BNA; isn't that correct? **A. The shared drive is a global shared drive. It's not a BNA specific shared drive.  So corporate finance documents that are stored in there had restricted access and was accessible to only to very few people in the company for confidentiality reasons.** Q. I'm looking at the words "Company financials?" Who's the company? That's what it says on P. 304, Line 19. It says, "Company financials." Who is "the company"? **A. The -- the different entities of FMC Cayman.** Q. That would be who? **A. That would be Byton North America and Byton Hong Kong, Nanjing New Energy entities. I don't remember the names of all the entities.** Q. Well, did -- whoever was the, you know, running BNA, was he blocked out of access to the company financials called "restricted access"? [Full Transcript, Doc. # 142]  THE WITNESS: **What do you mean by "who was  running?  (P. 210)**

11

12

13

14

15

**Block # 45**
BY MR. COOK:. Well, who -- who -- who -- let's -- let's just deal with January -- of thousand -- January 2021, and maybe you can tell me who was running the company? [Full Transcript, Doc. # 142]  MR. COOK: (Inaudible.) [Full Transcript, Doc. # 142]. THE WITNESS: **Yes, Mr. Cook, are you talking about Byton North America?** BY MR. COOK: Q. Yeah? Byton North -- did somebody at BNA have access to the company financials? [Full Transcript, Doc. # 142] THE WITNESS: **No.** BY MR. COOK: Q. Does that include everybody, including who the CA- -- CEO was; is that correct? [Full Transcript, Doc. # 142]  THE WITNESS: **Yes.  (P. 211)**

16

17

18

19

20

21

22

**Block # 46**
BY MR. COOK: Q. What's your answer, sir? **. I -- I can't remember who had access. A CEO would not -- yeah. A CEO would not be going into the company financial information himself or herself. They would be requesting the information from the corporation finance team to present the information to them. So I -- I do not know.** Q. Okay. And then this says, "Does the s-drive itself have restricted access or certain files have or folders have restricted access?" And your answer is: "Most of the s-drive has restricted access. And that restriction would include BNA." Is that a fair statement, sir? **A. That's correct.** Q. Okay. And -- okay. And then it says, "So the s-drive was not searched to identify relevant documents for this litigation?" And the answer is: "No." So we got that right? Is that correct? Do you want me to reread it to you, sir? **A. Are you reading -- I mean, that's based on my testimony from --  (P. 212)**

23

24

25

26

27

**Block # 47**
Q. Yes. That's correct?  **A. It was right at that time.** Q. Hold on. Bear with me. What is an HR team, by the way? **A. What is an HR team.** Q. Yeah. It says -- it says, "So the I-team would have an asset register of what IT equipment issued to the employee. The HR team, when they get notified of the person living, would notify IT and get access to that particular asset and detail. And as part of the checklist, they would make -- they would make sure that the employee returns those assets back to Byton." That's a correct statement, sir? **A. Yes, that's a correct statement.** Q. Then it says, "So you testified as Byton's most qualified witness previously that Byton -- Byton China's

28

corporation finance team stored the electronic version of EDAG invoices; is that correct?" The answer's correct? Is that -- is that correct? **A. Yes.** Q. Okay. And then it says, "And then you testified as Byton's most-qualified witness that the signed copies as you just mentioned would be in the U.S. **(P. 213)²**

**Block # 48**
Q. Well, did he -- is it working for another of the Byton group of companies? [Full Transcript, Doc. # 142] **THE WITNESS: Sorry, sir. I wouldn't know.** BY MR. COOK: Q. Okay. Well, apparently, these three people have access at some time towards -- quote -- "A review of corporate records?" Is there anybody else you can share with me who would have access to the corporate records and statements from statements and former employees? Who -- tell me who else. **[Full Transcript, Doc. # 142] THE WITNESS: "Corporate records" is a very open statement. I mean, so I wouldn't know who else would have access to corporate records. I don't -- or I never did control any of those accesses. I wouldn't know. (P. 225)**

### 3. BNA AND RELATED PARTIES MADE AN ELECTION TO SPIRIT THE MONEY AND ANY RECORDS AWAY (#4: Doc. #127)

BNA elected to spirit away all records (save bank records, which originated from the EDAG subpoena) and has no intention of turning over any records to BNA. (Doc. # 127)  BNA has had a fair warning of consequences:" If BYTON has spirited these documents away and truly is not able to produce them, then either the undersigned or Judge Chen will need to determine what consequences flow from that. However, the first step is this order compelling production." (Doc. # 127, l. 10 - 12).

While BNA makes all sorts of claim of ownership of the Funds, BNA admits that records are not available even though Sadha Kameswaran has control over the funds as follows:

" What banks? **A. I don't --** [Full Transcript, Doc. # 142] **THE WITNESS: I -- I wouldn't know, Mr. Cook, where the investors were.** BY MR. COOK: Q. Well, was it offshore? THE WITNESS: I **-- I don't know.** BY MR. COOK: Q. How do you know any of this information? Who told you? **A. These -- like, during this time, I was still overseeing the monies that were coming into the account and going into the account and actually approving the transfer of those monies, and there was nothing illegal that was done under my watch, as far as I know.** Q. Well, as far as you know; is that correct? [Full Transcript, Doc. # 142] BY MR. COOK: Q. By the way, the money -- was the money for the 117, was that money belonging to FMC Cayman's, or was that to investors? Which one? (P. 72)  **(Block # 7)**

However, Sadha Kameswaran declines to offer any information about the investors:

---

² My apology to the court in the formatting but I have attempted to put in front of the court the key issues.  Also our apology for failing to offer tables, even though tables are required by the rule of court.  Will follow up if needed.

**". . . .So we requested the investors to deposit the money in U.S. dollars in a U.S. bank account, which appened to be BNA's account. And -- and the money was, accordingly, transferred to FMC because it belonged to FMC in the first place.** Q. So the -- to make sure I -- I get this here? Originally, this FMC money was Chinese money? [Full Transcript, Doc. # 142]. **THE WITNESS: Well, I don't know who the investors were. Whether they were Chinese money or U.S. investors, I don't know the details, or I don't recollect the details of the investors.** BY MR. COOK: Q. Well, you're saying, originally, the money was FMC Cayman. And I'm trying to figure out: What's the origin of that money? Was it in China or some other place? [Full Transcript, Doc. # 142]  BY MR. COOK: Q. Well, that -- that's saying investors?" (P. 71)  (Block # 6 )

"THE WITNESS: **I -- I wouldn't know, Mr. Cook, where the investors were**." (P.72, Block # 7)

This is the classic election of remedies.

(1)     BNA refused to turnover financial records as required by the Discovery (#4, Doc. # 127) due on March 24, 2022.  No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20, 39, 40, 41, 42, 43, and 44, and 47.  No access to  BNA records: Blocks #: 41,  42, 43, 44, 45, 46, 48.

(2)     BNA refused to provide any information of the "Investors," or if they exist at all or No knowledge of Investors and related records:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14,  16, and 32

(3)     BNA admits that BNA has no access to its own financials, and No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, and 47. No access to  BNA records:  Blocks #: 41, 42, 43, 44, 45, 46, and 48.

(4)     BNA admits that BNA that the Byton Entities has restrict access to all financial records.  Blocks #: 41, 42, 43, 44, 45.

This is the case of "spiriting records" out of the United States (i.e., Records #1 to #4) which irretrievably makes all Records inaccessible to EDAG, much less to all creditors of BNA.  The Pacific Ocean, if nothing else, is a permanent moat which bars EDAG and all other creditors from access to the records and potential payment due EDAG.

BNA and its surrogates elected to reject the turnover of all information (i.e., Record #1 to #4, above) under the orders of the court i.e., the OEX of Doc. # 96 and #4 of Doc. # 127.  The Surrogates are FMC Cayman, Byton Limited and Zhang Ying. Upon making the election to spirit, if not abscond, with the records and money, BNA (and surrogates) forfeited any claims that FMC Cayman, Byton Limited, and Zhang Ying have any right, title, and interest to the money that came

16

to BNA's hands or better known as "You can't have your cake and eat it too."  No doubt, BNA (and surrogates) will claim that EDAG, if EDAG wants to get paid, has to domesticate FMC Cayman, Byton Limited and ZHANG YING, in the China's Court and start chasing everyone around.  But this will never work, because the records are in the Cloud and never to be found.  No knowledge of Investors and related records:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, and 32.  No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, and 47. No access to BNA records:  Blocks #: 41, 42, 43, 44, 45, 46, and 48.

BNA bears the consequences of spirited any both records and money and flaunting two (2) court orders (#4 Doc. # 127 and OEX, Doc. # 96)  BNA bears those consequences of spiriting money and records in making the election in the personal hand of Sadha K  (Block # 6, 7,  and 8). This court has jurisdiction over FMC Cayman, Byton Limited, when Zhang Ying and Sadha spirited the money and spirited away the documents.

Election of remedies are common.  *Roam v. Koop*, 41 Cal.App.3d 1035, 1040 (1974), in which the court held that the pursuit of a writ of attachment waived the claim for an action in tort, ostensibly supporting a claim for punitive damages.  The court stated, as follows:

" . . . . . However, the mere pleading of inconsistent causes of action did not constitute a binding election of remedies since inconsistent counts are permissible. [Citation omitted] but Roam obtained a writ of attachment available solely under his contract action. [Citations omitted] Obtaining an attachment constituted a positive act in pursuit of his contractual remedy.  By levying under the writ, Koop was deprived of the use of his property and plaintiff obtained an advantage over him. [Citation omitted]"

The alternative is the "running hot or cold."  The courts have held that a party cannot blow "hot and cold," at the same time, and must make a choice. *See Dwyer v. Crocker National Bank* (1987) 194 Cal.App.3d 1418, 1432; *A&M Records Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 556; *In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1171.  ("*A&M*")

Either BNA turnover over the records and money, which will never happen or the court finds that the BNA (and related parties) spirited the records and money out of the US.

From the most simplistic platform is disentitlement which enables the court to dismiss an appeal, or like sanction, when the judgment debtor (or Defendant) flees the jurisdiction. Directly on point is:

**"B. Application of Disentitlement Doctrine**
In this case, defendants, as had the appellants in *TMS, Inc. v. Aihara, supra,* 71 Cal.App.4th 377, 83 Cal.Rptr.2d 834, have been ordered by a trial court to respond to a postjudgment discovery designed to obtain information to aid in the enforcement of the judgment being appealed. In addition,

they have been found to be in contempt of that order. Their conduct "demonstrates a deliberate effort to achieve a stay of execution of the money judgment against [them] without complying with legal procedures." (*Stone v. Bach, supra,* 80 Cal.App.3d at p. 448, 145 Cal.Rptr. 599.) Such willful disobedience and obstruction of presumptively valid orders can, and in this case does, provide a basis upon which to dismiss the appeal under the disentitlement doctrine." *Stoltenberg v. Ampton Invs.*, Inc., 215 Cal. App. 4th 1225, 1232, 159 Cal. Rptr. 3d 1, 6 (2013), *as modified (*May 6, 2013), *as modified on denial of reh'g* (June 5, 2013). ("*Stoltenberg*" and "*TMS*")

*Stoltenberg* and *TMS* dismissed appeal, when the judgment debtor refused to comply with post judgment discovery.  In *Stoltenberg*  the judgment debtor refused to comply with a subpoena, just like BNA refusing to comply with the #4 Doc. # 127).  In *TMS,* the judgment debtor refused to comply with post judgment to discovery to locate asset, just like BNA refused to complaint with the #4, Doc. #127. Here BNA admitted that BNA spirited all of the records and allegedly left the records in the "Clouds."

Federal Court likewise imposed disentitlement under the same circumstance, i.e., that the judgment with money fled the jurisdiction:

"The Court in *Degen* was concerned that a fugitive not suffer disentitlement absent some great prejudice to others. Here, Empire has been prejudiced—perhaps irrevocably—by the defendants' absence. The district court has found that the defendants knowingly and wilfully made themselves unavailable for service of process and post-trial depositions, and that this absence has rendered the judgment unenforceable. In short, *Degen* merely limits our discretion to employ the fugitive disentitlement doctrine. As so limited, we exercise our discretion here to dismiss this appeal for the reasons stated*." Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 282 (2d Cir. 1997) ("*Empire*"):

In this case, BNA is without any employees, that the records (if they exist) are spirited to the "cloud" somewhere in China, that the alleged records are inaccessible to BNA and " . . . that this absence [records] has rendered the judgment unenforceable."

Given that  Roam's "election of remedies," or  A&M's ," . . . running hot or cold" or the *Empire" "*  . . absence has rendered the judgment unenforceable,"  likewise BNA spirits the money and records which renders the judgment unenforceable.

### (1)    ZHANG YING AND FMC CAYMAN HAVE MADE THEIR APPEARANCE

On behalf of BNA, Byton Limited and FMC Cayman, Zhang Ying has made an appearance, without demand by EDAG, as the agent for, surrogate for the agent of, and person in control of BNA and Byton Limited as follows

"I [ZHANG YING] am a resident and citizen of the People's Republic of Chain, and the Chairman of the Board of Director of FMC Cayman.  I am responsible for the management of the operations of FMC Cayman.  FMC Cayman owns 100% of the shares of Byton Limited (Hong Kong).  Byton Limited owns 100% of the shares of Byton North America Corporation ("Byton

NA").  As Chairman of the board of Directors of FMA Cayman, I have acquired personal knowledge of the history, structure and operators of Byton Limited and Byton NA based on my review of corporate documents and records as well as discussions with other individuals with personal knowledge."  (Doc. #85-1, P. 1, Paragraph 1, lines 3 to 11).

Zhang Ying provided a "line by line" explanation of the relationship between BNA and Byton Limited, and business workings of BNA, and status of records, bank accounts, location of BNA and Byton Limited, and the alleged separateness of BNA and Byton Limited.  (Doc. 85-1 (Paragraph #2 to #24 inclusive)).

**(2)     ZHANG YING IS THE EXPERT WITNESS FOR BNA AND BYTON LIMITED AND RECIPIENTS OF $143,000,000.00 or $167,139,906.00.**

ZHANG YING claims expertise for the following: "As Chairman of the board of Directors of FMC Cayman, I have acquired personal knowledge of the history, structure and operators of Byton Limited and Byton NA based on my review of corporate documents and records as well as discussions with other individuals with personal knowledge."  (Doc. # 85-1, P. 1, Par. 1, lines 3-11).  ZHANG YING claims second hand (i.e., total inadmissible hearsay and claims of inadmissible) personal inspection of US premises, personal view of the actual records (if any) of BNA  and the business transactions of BNA and Byton Limited.  (Doc. 85-1, P. 1-4. Para 2-22) ZHANG YING claims his purported expert witness on the financials, records, business affairs, etc. and with local laws and the separateness, if any, between BNA and Byton Limited.  (Blocks #: 28-33, 41 to 45).

**(3)     THE COURT HAS JURISDICTION OVER FMC CAYMAN AND ZHANG AND YING AND THEREFORE SUBJECT TO THE TURNOVER ORDER**

*Golden vs. Stein* 481 F. 3rd. 843, 856 (USDC, S.D.) (2019) lays down specific jurisdiction for an expert witness. Zhang Ying and FMC Cayman made themselves as are expert witnesses in the management, transactions, and operation of BNA and BYTON Limited (Doc. #85 -1, P. 1 to 4, Paragraphs 2 to 22). *Golden v. Stein*, 481 F. Supp. 3d 843, 856 (S.D. Iowa 2019) for special jurisdiction for expert witness.  This is the case where Zhang Ying and FMC Cayman own Byton Limited who in turn owns BNA Limited and likewise who owns BNA.  Ying claims:

"As Chairman of the board of Directors of FMA Cayman, I have acquired personal knowledge of the history, structure and operators of Byton Limited and Byton NA based on my review of corporate documents and records as well as discussions with other individuals with personal knowledge."  (Doc. 85-1, P.s 1, Par. 1, lines 3-11)

In this case, EDAG can demonstrate specific jurisdiction when ZHANG YING claims to be an expert witness but received $143,000,000.00 or $167,139,906.00 where all BNA records

19

disappeared. (Blocks # 1, 2, 3, 4, 5, 6, 8, and 9), but is hiding them. (Blocks # 7 to 16, 20, 39 to 44 and 47, Blocks# 41 to 46, and 48) FMC, Byton Limited and Zhang Ying are under the Court's jurisdiction when Sadha K personally managed, controlled and spirited $143,000,000 or $167,139,906.00 from BNA (Silicon Valley Bank) to FMC Cayman. (Blocks# 6, 7, and 8) Sadha Kameswaran directed this money to FMC Cayman, Byton Limited and Zhang Ying. (Blocks# 6, 7, and 8,)

The relationship between FMC CAYMAN, Byton Limited and ZHANG YING who are in control and management of BNA are bound tightly when FMC Cayman and Zhang Ying took and received, without any explanation or shred of any records of $143,000,000 . (*Ibid*)  The fact that FMC Cayman and ZHANG YING did this as expert witnesses is a sufficient contact as follows:

"Here, the entry of White Zuckerman into the state did not involve an agent physically entering the state, where Dr. Luna did not testify at deposition or trial in this state, but it did involve agreement to provide expert services for legal proceedings in this forum, so "it is the defendant's conduct that ... form[s] the ... connection with the forum State." [Citation omitted] The contract to provide services in the state is clearly not as substantial a contact as a contract to establish a business with a corporation in the state, *cf. Aly*, 864 F.3d at 849, but it is not a trivial contact." *Golden v. Stein,* 481 F. Supp. 3d 843, 857 (S.D. Iowa 2019)

The fact of ". . .  but it did involve agreement to provide expert services for legal proceedings in this forum, so "it is the defendant's conduct that ... form[s] the ... connection with the forum State . ." is a sufficient contact with the state and subject to the court's jurisdiction, where FMC Cayman and ZHANG YING would appear.  In *Golden vs. Stein, supra*, the standards are a minimum contact as follows:

"That contractual term cannot override the reality of where White Zuckerman might have been required to appear for deposition or trial or the consequences in this forum of failure to fulfill the terms of the agreement.
Thus, White Zuckerman had sufficient "minimum contacts" for the court to consider, further, whether due process requirements for personal jurisdiction over White Zuckerman are met." *Golden v. Stein,* 481 F. Supp. 3d 843, 858 (S.D. Iowa 2019)

The court has jurisdiction over FMC Cayman, Byton Limited, and Zhang Ying because Sadha Kameswaran spirits out of his hands $143,000,000 or $167,139,906.00  and buried the records in the "clouds," somewhere in China.  BNA cements this claim when BNA refused to turn over any records (#4, Doc. # 127) or provide any straight answers. (Doc. # 96)

**II.     THE RELIEF SOUGHT UNDER C.C.P. SECTION 699.040(a)&(b)**
**A.     TURNOVER ORDER DIRECTING BNA TO TURN OVER FUNDS TO THE U.S. MARSHAL UNDER C.C.P. SECTION 699.040(a)&(b)**

Section 699.040(a) & (b) provides for an order directed at the Judgment Debtor to turnover over leviable property to the levying officer as follows:

"(a) If a writ of execution is issued, the judgment creditor may apply to the court ex parte, or on noticed motion if the court so directs or a court rule so requires, for an order directing the judgment debtor to transfer to the levying officer either or both of the following:
(1) Possession of the property sought to be levied upon if the property is sought to be levied upon by taking it into custody.
(2) Possession of documentary evidence of title to property of or a debt owed to the judgment debtor that is sought to be levied upon. An order pursuant to this paragraph may be served when the property or debt is levied upon or thereafter.
(b) The court may issue an order pursuant to this section upon a showing of need for the order.
(c) The order shall be personally served on the judgment debtor and shall contain a notice to the judgment debtor that failure to comply with the order may subject the judgment debtor to arrest and punishment for contempt of court." Cal. Civ. Proc. Code § 699.040 (West)

The order is directed solely against the Judgment Debtor, and not third parties, and the recipient is solely the levying officer, and not the judgment creditor.

EDAG is entitled to ex parte relief. "If a writ of execution is issued, the judgment creditor may apply to the court **ex parte,** or on noticed motion if the court so directs or a court rule so requires, for an order directing the judgment debtor to transfer to the levying officer either or both of the following . . . ." No doubt, *Enforcing Judgment and Debts* (Judge Alan Ahart) offers the best explanation of relief under Section 699.040:

"***PRACTICE POINTER:*** It may be difficult for a levying officer to effect such levies where the judgment debtor is uncooperative. All the levying officer can do is demand possession of the instrument, etc. from the judgment debtor. If the debtor refuses or denies having possession, the levying officer cannot proceed further. The judgment creditor would then have to seek a court order directing the debtor to deliver the asset to the levying officer. (In the meantime, of course, the judgment debtor may be able to transfer or sell the instrument—frustrating the judgment creditor's attempts to reach it.) . . . . . Accordingly, if you know the judgment debtor has such assets and you can specifically describe them, the best way of reaching them is to *seek a "turnover" order at the outset*—even before attempting to effect a levy (see CCP § 699.040, ¶ *6:359*). 4. [6:449] Levy on Specific Property:, Cal. Prac. Guide Enf. J. & Debt Ch. 6D-4

**B.    TURNOVER ORDER DIRECTING BNA TO TURN OVER FUNDS TO THE U.S. MARSHAL BECAUSE THE MONEY UNDER SECTION 695.010(a)**
**1.  THE COURT HAS PLENARY JURISDICTION IN ORDERING THE TURNOVER OF ASSETS PURSUANT TO C.C.P.  SECTI0N 695.010 and 703.02(a)(a)**

All assets of BNA are subject to enforcement which are the investor' contributions due to BNA are subject to enforcement under C.C.P. Section 695.010  which includes the FUNDS, sought by this Turnover order  as follows:

"(a) Except as otherwise provided by law, all property of the judgment debtor is subject to enforcement of a money judgment.

(b) If property of the judgment debtor was attached in the action but was transferred before entry of the money judgment in favor of the judgment creditor, the property is subject to enforcement of the money judgment so long as the attachment lien remains effective."

Corporations are not entitled to any exemptions under Section 703.020(a).

**2.     EDAG HAS A LIEN UPON INVESTOR'S CONTRIBUTIONS DUE BNA IN THE NAME OF FMC CAYMAN, BYTON LIMITED, ZHANG YING UNDER SECTION 708.110(d)  (Doc. # 96)**

The court has issued, and EDAG has served an "OEX" (Examination of Debtor) which provides for a lien under C.C.P. Section 708.110(d) as follows:

"(d)     . . .Service of the order creates a lien on the personal property of the judgment debtor for a period of one year from the date of the order unless extended or sooner terminated by the court.

The Section 708.110(d) reaches all property without any description:

"Under subdivision (d) of section 708.110, service of the notice to appear created a lien on the personal property of the judgment debtor, Anson.[3] As one court has explained the rule, "[u]nder the debtor examination statute, the lien upon all nonexempt property is created at the time the judgment debtor is served with notice of the examination. [Citations.] Unlike the third party examination case where the property must be adequately identified for the lien to attach, the lien on the judgment debtor's property attaches whether or not the property is described in the notice in sufficient detail to be reasonably identifiable." [Citation omitted] *Credit Suisse First Bos. Mortg. Cap., LLC v. Danning, Gill, Diamond & Kollitz,* 178 Cal. App. 4th 1290, 1293 (2009)

The OEX lien includes all personal property including property not in the custody of the judgment debtor and even property outside the jurisdiction as follow:

"Section 708.110 does not specify which personal property is thereby encumbered, or whether the judgment debtor must have custody and control of the property, but it does provide that "the lien on the judgment debtor's property attaches whether or not the property is described in the notice in sufficient detail to be reasonably identifiable." *Imperial Bank,* 33 Cal.App.4th at 553, 39 Cal.Rptr.2d at 441 (citing 16 *Cal. Law Rev. Comm'n Rep., supra,* at 1127).
Judge Ahart, in his treatise on California law, states that the CCP § 708.110(d) lien creates a lien on "*all* of the debtor's *nonexempt personal property*" and "*may"* extend to personal property outside California, but he does not state whether such property may also be beyond the judgment debtor's control. *See* Ahart, *supra,* §§ 6:1272, 6:1302 (emphasis in original). *See also Imperial Bank,* 33 Cal.App.4th at 552–53, 39 Cal.Rptr.2d at 441 (stating that "the lien upon *all* nonexempt property is created at the time the judgment debtor is served with notice of the examination") (emphasis added).
Nonetheless, the plain language of CCP § 708.110 does not limit, in any way, the property which is subject to the lien, other than it must be the debtor's nonexempt personal property. We affirm, therefore, the bankruptcy court's holding that service of the ORAP created a lien on Burns'

acknowledged but unpaid interest in the settlement money because that interest was the nonexempt personal property of Burns on the date the ORAP was served." *In re Burns*, 291 B.R. 846, 851 (B.A.P. 9th Cir. 2003)

*Burns* holds that the OEX lien encumbers the of $143,000,000.00 or $167,139,906.00 of "Investor Funds," no matter where the funds are located or in the hands of third parties.  "The lien also attaches to the judgment debtor's interest in property under a third person's possession and control. CCP § 708.110(d); [Citation omitted]," *Big Oak Golf Design, Inc. v. De Ubago*, No. C 08-80107-SBA, 2009 WL 839087, at *2 (N.D. Cal. Mar. 30, 2009).  BNA "spirited" both Document [grouping] #4 and the $143,000,000.00  or $167,139,906.00,  (Doc. # 133-1, *Exhibits "A," "B,"* and *"C*) of the "Investor Funds."

### 3.   NO STANDING OF THE THIRD PARTY TO THE INVESTORS FUNDS AND THEREFORE NO PREJUDICE

EDAG's OEX lien is the equivalent of a levy under writ of execution:

**"**Under California Code of Civil Procedure § 708.110(d), service of the ORAP "creates a lien on the personal property of the judgment debtor...." Service of the ORAP alone would create an enforceable lien in Franchise's property, even without a levy on any property. [Citation omitted]. The property does not have to be described in detail.[Citation omitted]. It is specifically allowed to be, in effect, a "secret" lien as it is not recorded or published. "Other creditors are able to discover the lien only if they know about the creditor's judgment and review the court file." [Citation omitted]. The lien may be lost upon transfer of the property to certain persons such a bona fide purchasers in the ordinary course of business. *Id.* at § 6:1305, citing CCP §§ 697.740, 697.910, 697.920.*" In re Franchise Pictures LLC*, 389 B.R. 131, 141–42 (Bankr. C.D. Cal. 2008)  ("OEX LIEN")

BNA eschewed any claim BNA was the owner of the $143,000,000.00 or $167,139,906.00 but the Investor Funds belong to BNA as follows:

**"So from what I can recall, the B-down funding that we went through -- some of the funding was received in U.S. dollars, because, at that time, as I mentioned before, it was really difficult to get money transferred between China and -- and the U.S. And so we wanted to get some of the funding in U.S. dollars. And the B-down <span style="color:red">investors</span> put some of the money in U.S. dollars, and -- and Byton North America was justify facilitating the receipt of that money in U.S. and transferring it to the FMC entity where the money is due to go to. And -- and if you -- I think if you're  referring to probably one side of the book in the bank transactions where the money has gone out to FMC Cayman, but you're probably missing the fact that there is money that has come into Byton North America before that from <span style="color:red">investors</span>"  (Block # 1)**

**"A. So these are <span style="color:red">investors</span> that who willing to pay the money in U.S. dollars to avoid some of the transactional issues of transferring money between China and the U.S. due to the trade issues and everything at  that time.  (P. 70)  (Block # 5)**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION 699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA

1   " . . . .So we requested **the investors** to deposit the money in U.S. dollars in a U.S. bank
account, which appened to be BNA's account. And -- and the money was, accordingly,
2   transferred to FMC because it belonged to FMC in the first place. Q. So the -- to make sure I --
I get this here? Originally, this FMC money was Chinese money? [Full Transcript, Doc. # 142].
3   THE WITNESS: Well, I don't know who the investors were. Whether they were **Chinese
money or U.S. investors,** I don't know the details, or I don't recollect the details of the
4   investors`` (Block # 6)

5   Q. Why -- who are **those investors?** Do you know who they were? [Full Transcript, Doc. #
142] THE WITNESS: **I'm sorry, Mr. Cook. I wouldn't know who the investors were at that
6   time.   (Block # 9)**

7

8   BNA, through Sadha Kameswaran, or some other entity, " **I don't know who the investors
were. Whether they were Chinese money or U.S. investors,** I don't know the details, or I don't
9
recollect the details of the investors."  (Block # 6).  Aside from the admitted lack of any records
10
for the "investor's" and the concealment of the identity of the "investors," the sole conclusion is that
11
the "investors' own **$143,000,000.00  or $167,139,906.00** and to be deposited in the BNA account.

12   Given that property of BNA is subject to OEX Lien, BNA lacks any standing to oppose,

13   hinder, or delay, much less defraud, the turnover of the FUNDS.

14   **III.   CERTIFICATE OF NOTICE UNDER RULE 7-10**

15   EDAG has provided all relevant parties with notice of the ex parte application in seeking an

16   order under C.C.P. Section 699.040(a)&(b) based on the fact that BNA is admittedly defunct.

17   **IV.   EDAG IS ENTITLED TO THE INVESTORS FUNDS RECEIVED BY FMC
CAYMAN AND BYTON LIMITED**

18   Turnover Orders are identical to Assignment Orders.  In federal cases, the court made it clear

19   that an assignment order reaches out-of-state property. The court stated in ***Global Money***

***Management v. McDonnold***, 2009 WL 3352574 (S.D.Cal.) (P. 4), the following:

20   ". . . Because the Court has personal jurisdiction over Defendant in this matter, the
Court has "the power to affect out-of-state property by means of decree, based on
21   personal jurisdiction over the parties, which determines the parties' personal rights or
equities in that property." UMG Recordings, Inc. v. BCD Music Group, Inc., 2009
22   WL 2213678, at * 4 (C.D.Cal. July 9, 2009 .. . . .

23   In ***Fall v. Eastin***, 215 U.S. 1, 8 (1909), 30 S.Ct. 3, 54 L.Ed. 65, the U.S. Supreme Court held

24   that if the court has jurisdiction over a party, the court can order the turnover of the property, even

25   though the court may lack jurisdiction over the property itself.  The court stated as follows:

26   " . . . . In *French, Trustee v. Hay,* 22 Wall. 250, 252, this Court said that a court of
equity, having jurisdiction *in personam,* has power to require a defendant to do or to
27   refrain from doing anything beyond the limits of its territorial jurisdiction which it
might have required to be done or omitted within the limits of such territory."

28

24

1  The court has jurisdiction over BNA and Zhang Ying.

2  This has been resolved by **Goldman v. Simpson** 160 Cal.App.4th 255, 262 (2008), in which the

court held that the court keeps and maintains continuing jurisdiction over the judgment debtor.

3
4  **V.   EDAG DOES NOT NEED TO NAME FMC CAYMAN, BYTON LIMITED OR ZHANG YING IN ORDER TO TURN OVER THE INVESTOR'S FUNDS**

5      BNA therefore reposed the money in the hands of the FMC Cayman, Byton Limited, and

6  Byton GmbH, and each of them. Given the fact that the funds belong to investors, and hold the sums

7  for the benefit of BNA, BNA is this party because these three parties never took title. The fact that

8  debtor seeks to alter the form, name, title, or possession is a fraudulent conveyance without a

transferee as the following:

9      " . . . . We hold that under the UVTA, physically relocating personal property and

10  transmitting or transporting sale proceeds out of state, then transmuting them into a different legal

11  form, may constitute a direct or indirect mode of parting with assets or one's interest in those assets.
As such, Nagel adequately alleged a "transfer" under the UVTA. In this posture the trier of fact must

12  now determine if grantor's title is but, "a mere cloak under which is hidden the hideous skeleton of
deceit ...."[6] *Nagel v. Westen,* 59 Cal. App. 5th 740, 749, 274 Cal. Rptr. 3d 21, 27 (2021), <u>as</u>

13  *modified on denial of reh'g* (Feb. 1, 2021) ("*Nagel*")

14  *Nagel* fact tracts this case where the Debtor spirited assets and records out of California which

15  would render arbitration claim or judgment *Empire* "judgment unenforceable." *Nagel, Empire*, and

16  now BNA (and related parties) fled the jurisdiction. *Nagel* disputes the necessity of an

"indispensable party" when BNA spirited money and records where the assets and record are

17  "Investors Funds." The court denied a UVTA claim [Doc. #89, lines 19-23] based on "indispensable

18  party" based on an executed USPTO assignment in favor of Byton Limited and contract (Doc. #85-

19  1&2).  Here, BNA spirited any proof that FMC Cayman, Byton Limited, Zhang Ying had any right,

20  title, or interest of the Investor Funds based on a contract or agreement.  The spiriting of funds and

21  records is a *Nagel* change of form, possession, or title when the Investor's Funds belong to BNA.

22  Blocks No #: 6-16, 32, 7 to 16, 20, 39 to 44 and 47.  Spiriting all records out of the jurisdiction, and

in contempt (#4 Doc. # 127), is an admission that FMC Cayman, Byton Limited, and Zhang Ying

23  have zero proof of ownership of the Investor Funds and hence the Investor Funds belong to BNA

24  and are within the sphere of *Nagel* and subject to the turnover order.

25  **VI.      CONCLUSION**

26      BNA did not leave one piece of paper at the Santa Clara doorstep to explain how

27  $143,000,000.00 or $167,139,906.00, (Doc. # 133-1, **Exhibits "A," "B,"** and **"C")** of money

28

disappeared. ZERO. Everyone is gone. The "records" are floating in the Clouds in China.  BNA drove this campaign to the penny.  The consequences of the election are that BNA came into **$143,000,000.00 or $167,139,906.00** but BNA intentionally berefted the explanation.  Without an explanation by design, EDAG makes proof that BNA is in possession of $143,000,000.00 or $167,139,906.00 and BNA is entitled to the turnover order under Section 699.040(a)&(b).

Dated:   March 31, 2022

COOK COLLECTION ATTORNEYS PLC

_____/s/ David J. Cook_____
DAVID J. COOK, Esq.
Attorney for EDAG Engineering GmbH

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ISSUANCE OF THE FOLLOWING: (A) TURNOVER OF $143,000,000 PURSUANT TO C.C.P. SECTION 699.040(a) & (b) (B) TURNOVER TO THE US MARSHAL OF THE NORTHERN DISTRICT OF CALIFORNIA