1   **David J. Cook (SBN 60859)**
    **COOK COLLECTION ATTORNEYS, PLC**
2   ATTORNEYS AT LAW
3   165 Fell Street
    San Francisco, CA 94102
4   Telephone: (415) 989-4730
    Facsimile: (415) 989-0491
5   Cook@CookCollectionAttorneys.com

6   **LEWIS & LLEWELLYN LLP**
7   Evangeline A.Z. Burbidge (Bar No. 266966)
    eburbidge@lewisllewellyn.com
8   **Marc R. Lewis (**Bar No. 233306)
    mlewis@lewisllewellyn.com
9   **Kenneth M. Walczak** (Bar No. 247389)
    kwalczak@lewisllewellyn.com
10  **Bradley E. Estes** (Bar No. 298766)
11  bestes@lewisllewellyn.com
    601 Montgomery Street, Suite 2000
12  San Francisco, California 94111
    Telephone:  (415) 800-0590
13  Facsimile:   (415) 390-2127

14
    Attorneys for Petitioner EDAG Engineering GmbH,
15  a corporation organized and existing under the laws
    of the Republic of Germany

16              UNITED STATES DISTRICT COURT

17      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

18

19  EDAG Engineering GmbH,                  Case No. 3:21-cv-04736-EMC

20          Petitioner,                     **TRANSCRIPT FOR PROCEEDINGS**
                                            **HELD ON MARCH 31, 2022**
21          v.

22  BYTON North America Corporation,        **\*TRANSCRIPT ATTACHED**

23          Respondent.                     ____/s/ David J. Cook_____
                                            **David J. Cook Esq.**
24
                                            Petition Filed: June 23, 2021
25

26

27

28

1                     UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
2                        SAN FRANCISCO DIVISION

3

4   EDAG Engineering GmbH,            )  Case No.  21-cv-04736-EMC
                                      )
5                                     )  San Francisco, California
                 Plaintiff,           )  Thursday, March 31, 2022
6                                     )
         v.                           )  ZOOM WEBINAR PROCEEDINGS
7                                     )
    BYTON North America Corporation,  )
8                                     )
                 Defendant.           )
9   _____ )

10

11                  TRANSCRIPT OF DISCOVERY HEARING
                BEFORE THE HONORABLE THOMAS S. HIXSON
12                 UNITED STATES MAGISTRATE JUDGE

13

14  APPEARANCES:  (Via Zoom Webinar)

15  For Plaintiff:            DAVID J. COOK, ESQ.
                              Cook Collection Attorneys, PLC
16                            165 Fell Street
                              San Francisco, California 94102
17                            (415) 989-4730

18  For Defendant:            DAVID B. VAN ETTEN, ESQ.
                              Van Etten Sipprelle LLP
19                            2945 Townsgate Road, Suite 200
                              Westlake Village, California 91361
20                            (805) 719-4901

21  Transcription Service:    Peggy Schuerger
                              Ad Hoc Reporting
22                            2220 Otay Lakes Road, Suite 502-85
                              Chula Vista, California 91915
23                            (619) 236-9325

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

1    SAN FRANCISCO, CALIFORNIA  THURSDAY, MARCH 31, 2022  10:40 A.M.

2                             --oOo--

3         (Call to order of the Court.)

4              THE CLERK:  Okay.  Good morning, everyone.  We are here

5    in Civil Action 21-4736, EDAG Engineering GmbH v. BYTON North

6    America Corporation, the Honorable Thomas S. Hixson, presiding.

7         Counsel, please state your appearances for the record and

8    let's start with Plaintiff's counsel.

9              MR. COOK:  David Cook on behalf of EDAG Engineering

10   GmbH.  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. COOK:  Thank you, sir.

13             MR. VAN ETTEN:  Good morning, Your Honor.  This is David

14   Van Etten.  I'm covering for Keith Sipprelle, partner, on behalf

15   of BYTON North America.

16             THE COURT:  Good morning.  I have the parties' joint

17   discovery letter brief in front of me raising a number of issues.

18   I'd like to start with No. 3, meaning the parties have numbered

19   discovery disputes in question.

20        And, Mr. Cook, my question to you is how is Item No. 3 -- how

21   is that seeking relevant judgment debtor discovery?

22             MR. COOK:  It is quite -- our motion to amend, which

23   goes on June 30th, is to demonstrate that these are all one in the

24   same entities.  How's that?  And since the emails, letters, or

25   whatever between these entities would demonstrate that these

1   entities are all one in the same, meaning that directions or

2   instructions as to the arbitration and thereafter might have

3   originated from BYTON Ltd. and/or FMC Cayman.

4        So when I start seeing particularly like an email, it's like,

5   "Oh, what do we do here" or "This is what you need to do," you

6   know, whatever the communication is.   That would be part and

7   parcel of a Section 187 case.

8        And more importantly is that in the -- one of the issues here

9   in control is, well, who's in control -- and let's make it easy

10  here -- and obviously communications would tell them.   I mean,

11  what are you doing?

12       It also would be helpful to determine that all of the

13  instructions were always coming from BYTON -- by the BYTON

14  Entities wherever they are located.

15       At this point here, as the Court is aware, we have no

16  records.   The only records that I have here that I received a

17  couple days ago were the bank records of which those are the bank

18  records I acquired -- I acquired through subpoenas here.   Beyond

19  that, I have nothing, zero, other than the communication between

20  my -- my client here and BNA, you know -- BYTON North America --

21  I'm sorry.

22             THE COURT:   RFP No. 3 seems to ask for BYTON's

23  communications with anyone about anything.

24             MR. COOK:   Well, I can -- we can cut that down to

25  between this and just limited to BYTON Ltd. and/or to FMC Cayman

1  Islands.  That will make everybody happy and reduce it.

2          THE COURT:  Isn't that what you were supposed to do in

3  meet and confer?  I did order you to meet and confer about these,

4  and you came back and didn't know your request in any way.

5          MR. COOK:  Well, I -- yes.  No, no.  I'm not here

6  bickering with the Court.  So I don't want to think that it would

7  be anything like that.  But I don't know what else there is there,

8  and if that's what it would be, that's what it would be.  I don't

9  think it would reduce the amount, although it may not reduce the

10  amount.

11          THE COURT:  All righty.  For No. 5, in my previous

12  discovery order, I granted your motion to compel with respect to

13  Item No. 4, and that was financial statements and related

14  financial reports.  In light of my previous grant of that RFP,

15  what additional is RFP No. 5 seeking that -- why should I enforce

16  RFP No. 5?

17          MR. COOK:  Well, it is different because it's one thing

18  to have in No. 4, which is their stack of financial documents here

19  through Zoom.  However, what is stated here to third parties could

20  be very much different here.  And given some of my experience,

21  it's one thing for somebody having a financial statement of their

22  own in the right hand and another one which they say it is

23  somebody else.  That is a big difference, particularly when

24  they're seeking money and they have to fill out a financial

25  statement.

1    So this one -- this is the financial which sought to

2  complete, dah, dah, dah, dah -- file statements, internal notes,

3  financial conditions of third parties.  If they have them, they

4  have them.  If they don't, they don't.  But they very well may be

5  different.

6    And, in fact, what they give to third parties might be

7  different than No. 4 because obviously I haven't gotten anything

8  from No. 4 and, therefore, theoretically I would have No. 5

9  because that's what they email to a third party, we're going to

10  presume, which goes back to No. 3.  I have no idea.  Because if

11  they went to borrow money, as we all do, they're going to --

12  they're going to send all their finances there and either I'm

13  going to find them in No. 3 or I'm going to find them in No. 5.

14         THE COURT:  Well, No. 4 is not just internal financial

15  statements.  It's credit applications.

16         MR. COOK:  That's correct.  That is correct, but I get

17  all the requests.  Yes, I have to tell you it's clear that I

18  duplicate things, so I don't want you to think that I'm not aware

19  of that.

20         THE COURT:  I see.  Okay.  For 8, 9, 10, and 11, are

21  these overbroad by time frame?

22         MR. COOK:  They -- hold on.

23         THE COURT:  If your theory -- maybe it's more than a

24  theory -- is that they used to have people in the U.S. and then

25  once this judgment came down, they shut everything down in an

1   attempt to avoid paying it, it would seem like maybe that's a more

2   recent time frame that would be relevant.

3           MR. COOK:  Okay.  That -- I would -- it's difficult for

4   me to argue with Your Honor, but --

5           THE COURT:  You're supposed to.  I'm giving you a

6   tentative, so if you think I'm all wet, you should tell me that.

7           MR. COOK:  Well, I think we -- for that, I think we're

8   entitled to go back because I have a very strong sentiment here

9   that they acquired product from us and then they stopped acquiring

10  product sometime early in 2018 and that would be indicative that

11  this entity was always a shell.  And if I got as such, say PG&E

12  bills or any bills or redacted payroll bills, we all might find

13  that there was nobody working for this company back in 2018 and

14  2019 because they stopped paying us.

15          THE COURT:  Oh, so you think -- when do you think they

16  were divesting themselves of assets to make them judgment-proof?

17  When do you think that started?

18          MR. COOK:  I'm fairly certain that it started sometime

19  in -- two times.  One would be in 20- -- early 2019 when they

20  admitted in a deposition -- they said, "Yeah, we stopped paying

21  our vendors," right.  That's what they said.  It was no big -- no

22  big deal.  Said, "Yep, that's right.  We're not paying you.  We're

23  not paying anybody."  And there you go.  Obviously, if you're not

24  paying, then all the vendors are not paid.  Therefore, they can't

25  do anything because they don't have product there.  And to that

1  extent, their not paying anybody would be indicative that they're

2  going out of business or went out of business.  That would be very

3  interesting here.  That would -- that would be telling me that

4  this was a scam at all times, and then would buttress our 20- --

5  our -- pardon me -- C.C.P. 187 motion.

6         THE COURT:  All right.  Mr. Van Etten, can you please

7  respond about -- I'm focusing on RFPs 8, 9, 10, and 11, and in

8  particular I am focused on the time frame and whether that is

9  relevant judgment debtor discovery.  Your thoughts, please.

10        MR. VAN ETTEN:  Yes -- excuse me -- yes, Your Honor.

11  Yes, it is overbroad certainly as to 2018 because BYTON North

12  America was completely current on its payment of invoices to EDAG

13  in 2018.  Their financial difficulties began I believe in the

14  first quarter of 2019.  So it's certainly overbroad as to that.

15    Counsel's statements suggest that this was a scam from the

16  beginning.  I mean, it's silly to any idea that there were maybe

17  no employees, which they seem to be indicating.  That's silly

18  because EDAG I anticipated, Your Honor, in the --

19        THE COURT:  I'm having a little difficulty understanding

20  you.  Can you turn up the volume or maybe speak close to the

21  microphone?  That would be helpful.

22        MR. COOK:  I was going to say the same thing, Your

23  Honor.

24        MR. VAN ETTEN:  Can you hear me better now?

25        THE COURT:  I can.  Thank you.

8

1      MR. COOK:  Thank you.

2      MR. VAN ETTEN:  So in 2018, EDAG had a number of
3  employees who were present at BYTON North America's offices in the
4  Silicon Valley.  They knew there were hundreds of employees there.
5  So it's really silly to say, We think it's a scam from the
6  beginning.  They were intimately involved in building the product,
7  working closely with EDAG Engineering, and at some point they ran
8  into funding issues and that's -- that's when they began to have
9  problems in paying invoices and that was in 2019.  So certainly to
10 that extent, it is overbroad.  Anything from 2018 isn't relevant.

11     THE COURT:  But you do agree that starting in 2019,
12 BYTON's financial condition began to deteriorate; is that correct?

13     MR. VAN ETTEN:  That is correct.  And as far as
14 employees are concerned, that was -- the number of employees began
15 to be reduced so the progressive basis began in 2018 (inaudible).

16   I don't know if you want to hear it now, Your Honor, but I
17 do have other comments about those four requests.

18     THE COURT:  Now is the perfect time.

19     MR. VAN ETTEN:  Okay.  So, Your Honor, with respect to
20 payroll records, that is -- that is (inaudible).

21     MR. COOK:  I can barely hear you.  I'm having a really
22 difficult time.

23     MR. VAN ETTEN:  I apologize.  I can see if I can turn
24 this up.  Does that help at all?

25     THE COURT:  It does.

1          MR. COOK:  Yes.  Speak as loud as possible, sir.

2          MR. VAN ETTEN:  Okay.  With respect to payroll records,

3   there were as many as 500 employees in place.  And so the purpose

4   of reducing all payroll records dating back to 2018, I don't see

5   any -- it's grossly overbroad.  It violates the constitutional

6   right of privacy of moving forward.  It's probably a nearly

7   impossible task given BYTON's situation, in addition to that.  But

8   I think it's just completely irrelevant to the assets or ability

9   to collect this judgment in 2022.

10      The same is true with respect to the utility bills in No. 9

11   and No. 10.  No. 10 is also difficult to understand exactly what

12   is being sought here, but I guess it's essentially all bills that

13   were paid or not paid dating back to 2018.

14          And then lawsuits, arbitrations, and so on, there have been

15   no other lawsuits or arbitrations that have gone to judgment so

16   there have been no other collection actions other than this one.

17   Any liens on employees -- again, I don't see how any of this has

18   any relevance to evidence that would assist EDAG in collecting

19   this judgment.

20          THE COURT:  Well, I think the issue is that they've

21   obtained a judgment and so now the question is did BYTON spirit

22   away all of its assets beyond the reach of the Court.  And if I

23   understand correctly, the Defense theory is, no, the company

24   simply had funding issues and in due course wound down, and of

25   course your opponent sees a more sinister motive in there.  And

1  the issue is whether this discovery could shed light on that.

2  MR. VAN ETTEN:  I understand that, Your Honor.  But even

3  if you assume that assets were spirited away, I don't see how

4  every utility bill paid by the company over the last four years

5  would shed any light on it.  The same with respect to payments and

6  other (inaudible).  I don't see how that assists anyone in any

7  way.

8  THE COURT:  All right.  What would be the burden on

9  BYTON of producing this?  Is it possible?  Is it impossible?

10  MR. VAN ETTEN:  It's impossible, Your Honor.  These

11  records are in some kind of a hard server back in China.  The

12  employees who would have to -- the employees I guess of the entity

13  -- and I want to be careful about what I say because I haven't

14  been involved in this on a day-to-day basis, but my understanding

15  is that BYTON Ltd.'s employees who would try to assist in locating

16  records are in virtual lockdown in China now because of COVID and

17  it's probably (inaudible).  And I'm fairly certain --

18  MR. COOK:  Your Honor -- sorry.

19  MR. VAN ETTEN:  Yeah, so I mean, it's going to be --

20  it's going to be very difficult and the employees are working from

21  home, so there would be like a (inaudible) server and stuff and

22  (inaudible) type thing.

23  MR. COOK:  Can I be heard?

24  THE COURT:  Hold on.  Let him keep going.  Let me -- so,

25  Mr. Cook, let me -- I'll give you the two basic options that we

1  have here.  One is I can just rule on the dispute as it's been

2  presented to me and I know -- I think, as you've acknowledged, you

3  asked for a lot and you asked for everything.  You know, you want

4  every last garbage bill for the last four years.  And I have to

5  decide is that relevant and proportional.  And, you know, I might

6  say no, that that's just way overbroad.  And especially for 8, 9,

7  10, and 11.  That's just so much, as much as possible, and does it

8  really need to be every payroll record.  What about employee

9  privacy?  Why not documents sufficient to show -- I am of the view

10 that parties should ask -- should write their own discovery

11 requests and ask for what you want and then during meet and

12 confer, if you want to narrow it, you can.  But I don't think it's

13 my job to rewrite your RFP to ask for something that's more

14 focused, that's less invasive of privacy.

15      And so the two paths are I can say these are still way

16 overbroad and you should go meet and confer with the other side

17 and then submit another joint discovery letter brief, and we can

18 set a deadline so this doesn't drag out forever.  Or I can just

19 rule.  I can rule.  I can read your RFPs and say, Do I think this

20 is appropriately narrowed or not, and then you can be stuck with

21 that decision.

22      So you're the party seeking this discovery.  Do you want

23 another swing where you can come back and not ask for every single

24 water bill for the last four years and force me to decide if I

25 think that's focused discovery?

1          MR. COOK:  Accept.

2          THE COURT:  Okay.  And --

3          MR. COOK:  I say accept, but it's I accept.

4          THE COURT:  I understand.  All right.  Then what I'm

5    going to do is I'm going to order the parties to meet and confer

6    further in an attempt to narrow these RFPs to something that's

7    more appropriate.   And -- and if certain of these RFPs are

8    duplicative of RFP No. 4 or any of the others that were already

9    ordered to compel, then I want you to think about whether there's

10   really a lot of dispute here, and then we need to set a deadline

11   for when another discovery letter brief can be filed.

12       Mr. Cook, you're the party seeking discovery.  What do you

13   think? -- 14 days?

14         MR. COOK:  Yes.  That's what the Court gave previously

15   and that sounds fine.

16         THE COURT:  Mr. Van Etten, does 14 days give you enough

17   time to meet and confer with your opponent, figure out what you

18   can agree on and what you might disagree on and need to brief?

19         MR. VAN ETTEN:  Yes, Your Honor.

20         THE COURT:  Okay.  All righty.  I'm going to issue a

21   brief written order saying that I have ordered the parties to meet

22   and confer further.   And within 14 days, if they still have a

23   dispute, to file a further joint discovery letter brief.

24       Now, let me ask -- I know that there was kind of a kerfuffle

25   recently about an ex parte motion and then I issued an order and

1 issued a protective order.  Is there, Mr. Cook, any status update

2 on that, or is -- has that been resolved?

3   MR. COOK:  I'm sorry, Your Honor.  Let me tell you my --

4 there are a lot of issues.  The -- the protective order here has

5 ultimately circled around the banking records.  How's that?

6 That's all that I have.  There must be 6,000 pages here  I believe

7 all of them came from me.  How's that?  "Me" meaning they were my

8 subpoenas to Silicon Valley Bank, JP Morgan Chase, and HSBC.  I

9 hope I got that correctly, okay?  And that's what I have.

10  I had a -- I did -- when I looked at it and I said to myself

11 two things.  Number one, they really came from me.  Number two,

12 which became a real problem, is I still don't have any records

13 pursuant to the Court's prior order here for No. 4 and No. -- and

14 No. 14.  No. 14 were the bank records and I think we've gotten

15 most of that, but No. 4 I've not gotten anything here.

16  And when I look at the Court's order here -- if the

17 Court would be ever so kind -- is the Court addressed that -- oh,

18 here.  I think what I got is when the Court's order -- and it

19 said, "EDAG's second objection that BYTON will not produce

20 documents does not seem to have anything to do with the protective

21 order."  And, therefore, what struck me or is concerning me is

22 that I would end up dealing with protective orders when actually

23 I'm not getting any records at all and they're now -- as to Item

24 No. 4, they're in default of the March 24th turnover order.  We

25 haven't got anything, zero.

1    I did the OEX for Sadha -- and I cannot pronounce his last
2  name, and I'm not being unkind -- just I can't.  And that
3  transcript is in the court right now and I just filed a motion
4  with all of the key portions there.  And I'm just telling you that
5  there are no records I'm ever going to receive, period, once you
6  read it.  So I want to be able that -- to prosecute the fact that
7  Item No. 4 has not been met, that there is contempt.

8    And then in the prior order of this Court here, which said
9  words to the effect, If people do not comply, then the Court will
10 -- "the Court," so to speak -- either you or Judge Chen -- will
11 take appropriate action.

12    And right now, I'm sitting here with the most basic materials
13 which are financial statements.  I've got nothing here.  And the
14 Court already ordered.  So I want to make sure that I'm going on
15 the same track not, you know, distracted and worrying about a
16 protective order, whatever this protective order.  They're still
17 obligated to turn over everything.  And I'm not getting it.

18          THE COURT:  Mr. Van Etten, can you -- what is the state
19 of document production?

20          MR. VAN ETTEN:  I was advised by Mr. Sipprelle that he
21 produced over 5,000 pages of documents in response to Requests No.
22 4 and 15.  I took that to mean that he had produced everything
23 they were able to locate by -- again, I wasn't prepared really to
24 address this issue -- but that's the only information I have, is
25 that last week he produced I think 53- or 5600 pages in response

1    to Requests No. 4 and 15.

2                MR. COOK:  I can -- I have the 5600 pages -- I want to

3    tell the Court.  I have them.  Okay.  They're sitting here in my

4    office here.  We went through them and they're bank records.

5    They're not their records.  They're my records.  So as to that,

6    they're bank records, whatever it would be.

7        So -- but I don't have what I wanted in No. 4 which are

8    different.  And the reason why No. 4, it is part and parcel of the

9    movement of $167,000,000 which left from BNA to FMC.  So that

10   becomes, as we're talking about the word "spirited" here, is

11   spirited $167,000,000 and the records -- and I just filed -- and

12   I'm not attempting to litigate this -- I filed a turnover order

13   this morning --

14               THE COURT:  I saw it.  Yes.

15               MR. COOK:  No, no.  I -- it's tough not to -- it's tough

16   to miss, how's that, just for a sense of humor here.  But I'm

17   looking at that and say, Well, we've got $167,000,000.  At least

18   I'd see some paperwork here.  But you read what these folks say,

19   Hey, we're not talking to you.  We don't know where these records

20   are.  We don't even know -- beats us.  And that's a big deal.  So

21   that's what I want to prosecute and I don't want to get sandbagged

22   by saying, Oh, there's a protective order.  If there is, there is,

23   and I appreciate that.  I've had protective orders in this court,

24   you know, not recently, but many years ago in (indiscernible).

25               THE COURT:  So the protective order does not relieve

1  anybody of the obligation to produce documents.  To the contrary:

2  It should sweep aside objections to producing documents on the

3  ground that they're confidential or whatever.  And the protective

4  order says, Well, that doesn't matter.  Designate them as

5  confidential.  But then you have to produce them.  It's intended

6  to remove an objection to producing documents.  So it doesn't

7  limit anyone's obligation to produce documents.

8      If you think that BYTON has not produced documents as I have

9  ordered them to do so, then you have all the remedies under Rule

10 37 available to you.  And if you think they're in contempt of

11 court -- if you think they've violated my order in contempt of

12 court, then you should ask me to issue an R&R on that issue.  If

13 you think they violated an order from Judge Chen, then of course

14 you would ask him for contempt of court.  Just bear in mind that

15 since I'm issuing discovery orders, what you would have to prove

16 is that they do in fact have possession, custody, or control over

17 something and they didn't turn it over to you.  That's where it

18 would be the violation of court order.

19      MR. COOK:  Let me respond to that since we're all

20 here -- for a second.  In reading -- I did the Order of

21 Examination before this Court and -- and we had it transcribed for

22 the Court, by the way, from outside.  So I will tell you what it

23 says in a few words.  It's basically saying, Well, these records,

24 whatever they are, they're not here in the United States.  They're

25 in the hands of somebody -- of course, we don't know where they

1   are.  So if I file today or whatever it being, you know, order to

2   show cause re blah, blah, blah.  You didn't turn over the records,

3   I can tell you what they'll say, which Sadha -- forgive me for the

4   name -- said, I don't have it.  I don't know who has it.  It's

5   somewhere in the clouds, and I don't know where it is.  That's

6   what he's going to say.  That's what he told me in seven hours for

7   -- it wasn't a surprise.

8        My view of that is if there's contempt, it's not that they

9   didn't get it, that they intentionally -- that they spirited it

10  out and then ultimately the Court would make a finding here that

11  as a result of this, and they have done this for the purpose of

12  essentially spiriting all of the money and spiriting the

13  records -- which is part and parcel of my pending turnover -- and

14  ultimately the motion to amend.

15       So if I'm asking you, you know -- so you know what I know is

16  is are they going to say they have them?  No.  It's no big deal.

17  However, the reason why is because they spirited whatever it is

18  and they don't ever want to give us a piece of paper and they'll

19  take that risk.

20       THE COURT:  I see.  Well, then I guess my tentative

21  thought is maybe this all leads up to your motion before Judge

22  Chen on joinder.

23       MR. COOK:  You know, I thought about that and I -- and

24  I thought to myself, yeah, but I have a turnover order and, you

25  know, you did put it up there, I guess, but I think I'd need to

1  file some type of motion to incorporate everything I had because

2  when I filed my motion to amend, you know, three months -- three

3  months ago, whatever the heck it would be, now there's just all of

4  this stuff here which would be part and parcel of that.

5              THE COURT:  All right.  Anyway --

6              MR. COOK:  Let me think about that.  How's that?

7              THE COURT:  You do what you need to do to protect your

8  client's interests.

9              MR. COOK:  Yes, sir.

10             THE COURT:  Just before you file a motion for contempt

11 or sanctions in front of me, just remember I'm your discovery

12 judge.  So if I tell someone to produce something, they're only in

13 violation of my order if they have it and they didn't produce it.

14             MR. COOK:  Well, I think here it's not in dispute.

15 There -- you ordered it would be on the 24th.  I don't have it.

16 That's -- we all know that.  And it's no surprise because that's

17 what they said in the Order of Examination.  They don't have it.

18 "I don't know where it is."

19             THE COURT:  All righty.  Mr. Van Etten, anything you'd

20 like to say in response?

21             MR. VAN ETTEN:  Not anything beyond what I said before.

22 I can't (inaudible) --

23             THE COURT:  We can't hear you at all.

24             MR. VAN ETTEN:  Okay.  I believe we have produced what

25 we have in response to (inaudible) 4 and 15.  (Inaudible).  I will

19

1   certainly revisit that issue with Mr. Sipprelle and make sure that

2   is the case.  But beyond that, I would (inaudible).

3            THE COURT:  Okay.  All right.  Well, I think I've heard

4   all I need.  I'm going to order the parties to meet and confer.

5            MR. COOK:  Thank you.

6            THE COURT:  If they can't resolve the pending disputes,

7   then to file another joint discovery letter brief within 14 days

8   and we'll take it from there.  The matter's submitted.

9            MR. COOK:  That would be the entirety of what we've had

10  before, the whole --

11           THE COURT:  I mean what's covered in the second joint

12  discovery letter brief.

13           MR. COOK:  That's my -- thank you very much.  That's my

14  error here.

15           THE COURT:  Okay.

16           MR. COOK:  Thank you.

17           MR. VAN ETTEN:  Thank you, sir.

18           THE COURT:  All right.  Thank you.  We're adjourned.

19           MR. COOK:  Thank you, sir.

20           THE CLERK:  Thank you, everyone.  We're off the record

21  in this matter.

22  //

23  //

24  //

25  //

1          (Proceedings adjourned at 11:10 a.m.)

2

3               I,  Peggy  Schuerger,  certify  that  the  foregoing  is  a

4     correct  transcript  from  the  official  electronic  sound  recording

5     provided  to  me  of  the  proceedings  in  the  above-entitled  matter.

6

7     _____        April 1, 2022
      Signature of Approved Transcriber        Date

8
      Peggy Schuerger
9     *Ad Hoc Reporting*
      Approved Transcription Provider
10    for the U.S. District Court,
      Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25