**David J. Cook (SBN 60859)**
**COOK COLLECTION ATTORNEYS, PLC**
ATTORNEYS AT LAW
165 Fell Street
San Francisco, CA 94102
Telephone: (415) 989-4730
Facsimile: (415) 989-0491
Cook@CookCollectionAttorneys.com

**LEWIS & LLEWELLYN LLP**
**Evangeline A.Z. Burbidge (Bar No. 266966)**
eburbidge@lewisllewellyn.com
**Marc R. Lewis (**Bar No. 233306)
mlewis@lewisllewellyn.com
**Kenneth M. Walczak** (Bar No. 247389)
kwalczak@lewisllewellyn.com
**Bradley E. Estes** (Bar No. 298766)
bestes@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:  (415) 800-0590
Facsimile:   (415) 390-2127

Attorneys for Petitioner EDAG Engineering GmbH,
a corporation organized and existing under the laws
of the Republic of Germany

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| EDAG Engineering GmbH,<br><br>    Petitioner,<br><br>v.<br><br>BYTON North America Corporation,<br><br>    Respondent | Case No. 3:21-cv-04736-EMC<br>**NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FRCP 37(b)(2)(A)(vii) and RULE 37(e)(2)(C) FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4/#127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION (#4, DOC. 127) AND ALL LEDGERS, JOURNAL AND NOTES OF BNA CLAIMED TO BE IN THE "CLOUD"**<br><br>Judge:  Honorable Edward M. Chen [Video-ZOOM hearing)<br>Petition Filed: June 23, 2021 |

1

2

TO BYTON NORTH AMERICA CORPORATION, a Delaware corporation, ("BNA")

ATTORNEYS OF RECORD:

3

4

5

Please take notice on the 19th day of  May, 2022, at the hour of 1:30 p.m., or as soon

thereafter, the before Honorable Edward M. Chen, Judge of the United State District Court, to be

heard via ZOOM/Other electronic means, EDAG Engineering GmbH ("EDAG") moves this court

for the following relief as follows:

6

7

8

1.      Enter a Default Judgment for the pending Motion to Amend for BNA and Byton

Limited ("By-Limited"), each of them, jointly and severely, for the total of the judgment of

$30,231,689.48 (Doc. # 49), pursuant to Rule 37(b)(2)(A)(vi)(Doc. # 71 & 72) for the failure to

comply with the order to turnover any and all ledgers, journal and notes (#4, Doc.# 127) [RFP # 4].

9

10

11

12

13

2.      Enter a Default Judgment for the pending Motion to Amend that BNA and By-

Limited are the same and jointly and severally liable for the judgment (Doc. # 49) pursuant Rule 37

(e)(2)(C) for the failure to comply with "If electronically stored information that should have been

preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable

steps to preserve it, and it cannot be restored or replaced through additional discovery, the court . . ".

14

15

16

The basis of this motion is the following:

(A)      EDAG served a SDT which sought the production of any and all ledgers, journals,

and notes # 4 which was never produced, despite the order thereof (Doc. # 127) and thirty days

thereof, as of March 24, 2022:

17

18

19

"4.   Any and all financial statements, whether audited or unaudited, ledgers, journals,
internal financial statements., credit reports, credit applications, outside or inside financial
statements, representation of the financial conditions of BNA, any financial records generated from
a third party of BNA, notes, narrative, chronicles, or histories of BNA account commencing on
January I, 2018 to date hereof." (#4, Doc. 127)  [RFP # 4)

20

21

BNA was ordered to turn over any and all ledgers, journal,s and notes on March 24, 2022 (i.e., 30

days from February 22, 2022)  ("Document Order"# 4, Doc. # 127) as follows:

22

23

"The Court now orders BYTON to produce documents responsive to RFPs 4 and 15 within
30 days.  . . . . .  [AND]

24

25

 Accordingly, the Court grants EDAG's motion to compel as to RFPs 4 and 15 and orders
BYTON to produce responsive documents within 30 days. The Court denies EDAG's motion to
compel as to RFP 13." (Doc.  # 127, P. 2 lines 6 to 24)

26

27

Any and all ledgers, journals and notes #4, Doc. #127 ["#4/#127"]  have not been provided

on March 24, 2022.  Notwithstanding the protective order (Doc. # 150), the BNA remained ordered

28

NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FRCP 37(b)(2)(A)(i) to (vii) and RULE 37(e)(2)(C)
FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4,
DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION (#4, DOC. 127) AND
ALL LEDGERS, JOURNAL AND NOTES OF BNA CLAIMED TO BE IN THE "CLOUD"

to comply with the Discovery Order to produce records (Doc. # 127), as follows: "EDAG's second objection that BYTON will not produce documents does not seem to have anything to do with the protective order issue." (Doc. # 150, P. 2, lines 8 to 9).

At the hearing of March 31, 2022, BNA did not produce any and all ledgers, journals, and notes consistent with #4/#127 and without any rationale and hence liability for consequences under Rule 37(b)(2)(A)(vi). Nothing in the Protective Order (Doc. # 150) excuses BNA from not producing  any and all ledgers, journals, and notes listed (#4/#127) when Sadha controlled:

 "So -- so let's -- let's go back to, say, 2021? Is it a fair statement that you are based --  you were in control of BNA because nobody else was there? Is that a fair statement? **A. I was responsible for managing the operational activities of BNA.** Q. Did you ever, say, in 2021 -- make sure I get this correctly." (**Block # 27 (P. 117) (and Blocks ##: 35, 36 and 37)**

B.      BNA (and its surrogates or participates there) failed to preserve electronically stored information only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: "**(C)** dismiss the action or enter a default judgment. Rule 37(e)(2)(C) i.e., ledgers, journal and notes" when the "records" are in the Clouds (India, China or Philippines) and completely inaccessible.

BNA and its surrogates intended to render the alleged "records" inaccessible, chaotic, destroyed, lost among unknown individuals, tampered, admitted a "mess," impossible to reconstruct, in the hands of the "cloud," somewhere in the India, Philippines or China (or nowhere) as follows [1]:

No knowledge of Investors and any and all ledgers, journals and notes:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, & 32. No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, & 47. No access to BNA any and all ledgers, journals and notes:  Blocks #: 41, 42, 43, 44, 45, 46, & 48.  No Employees of BNA:  Blocks #: 15 & 16. Vice President of Finance and signed documents but not employees or bona fide VP of BNA Blocks #: 17, 18, 19, & 39, No access of the BNA Document Block #: 20. Sadha Kameswaran [2] did not know ZHANG YING. Block #: 28. Zhang Ying did not receive any BNA any and all ledgers, journals and notes Blocks #: 28, 29 & 30. FMC did not get documents from BNA. Blocks #: 31 & 33. Byton entities imposed restriction in disclosing financial. Blocks #: 41, 42, 43, 44, & 45. (Blocks ##9, 10, 11, 12, 13, 16, 39 & 40).

The failure to produce any and all ledgers, journals, and notes is the failure to meet the

---

[1] Records in the Cloud in China, India or Philippines: Blocks # 39 & 40

[2] Here after, addressed as "Sadha" given page limits.

NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FRCP 37(b)(2)(A)(i) to (vii) and RULE 37(e)(2)(C) FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION (#4, DOC. 127) AND ALL LEDGERS, JOURNAL AND NOTES OF BNA CLAIMED TO BE IN THE "CLOUD"

1  standing of "should have been preserved in the anticipation or conduct of litigation is lost because a

2  party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through

3  additional discovery." Rule 37(e)(2)(C)  Ledgers, journal and notes compose the entirety of a

   financial statement as every financial statements is a snap shot at the moment.

4       But, in the end, Plaintiff will demonstrate that the "financial statements," (if they exist) are

5  fakes, and the ledgers, journals, and notes are nonexistent and because: "BNA did not sell product to

6  any external customers. The only work BNA was doing was R&D work for the -- the sister entity in

7  China and getting paid for it. So BNA did not have any other revenue stream, other than getting paid

8  for the work that was being done by the -- the R&D engineers. Q. Any -- any income for the year of

   2018? A. Again, it would be whatever work was done, we were getting paid for. I wouldn't

9  remember the exact numbers for any one of the years, for that matter."  (Block #49-#51)

10      This motion is based on this Notice herein, the Memorandum of Points and Authorities,

11  Declaration of David J. Cook, Esq., (Doc. # 133-1, *Ex's: "A," "B,"* and *"C"* ) Declaration of

12  Zhang Ying, the two Meet and Confer transcripts, the deposition transcripts of Sadha [3], the

13  transcript of the examination of Sadha of March 11, 2022, bank records of Silicon Valley Bank,

14  JPMORGAN Chase Bank, HSBC BANK USA, all matters which the court may take judicial notice

   thereof of FRE 201, all matters on file herein, all papers, pleadings, and other matters on file herein,

15  and all oral and written evidence and argument at the hearing hereof.

16  Dated:  April 12, 2022                              Respectfully submitted,

17                                                      COOK COLLECTION ATTORNEYS PLC

18
                                                        By:___/s/ David J. Cook_____
19
                                                        David J. Cook, Esq.
20                                                      Attorneys for Petitioner EDAG ENGINEERING

21

22

23

24

25

26

27  _____
    [3]   The name is shortened given the page length.
28                                                  4
    NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FRCP 37(b)(2)(A)(i) to (vii) and RULE 37(e)(2)(C)
    FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4,
    DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION (#4, DOC. 127) AND
    ALL LEDGERS, JOURNAL AND NOTES OF BNA CLAIMED TO BE IN THE "CLOUD"

**TABLE OF CONTENTS**

*I.*   *STATUS OF THE CASE* ................................................................................................. *1*

   A.   INTRODUCTION ................................................................................................. 1

   B.   BNA IS IN CONTEMPT OF COURT FOR THE FAILURE TO TURN OVER THE #4 [ANY AND ALL LEDGERS, JOURNALS AND NOTES DUE ON MARCH 24, 2022................................................. 4

   C.  BNA CLAIMS THAT ANY AND ALL LEDGERS, JOURNALS AND NOTES ARE IN THE CLOUD, MYTHICAL OR TRASHED BY BNA (Block # 9, 10, 11, 12, 13, 16, 39 & 40),........................ 5

      1. BNA AND SURROGATE SPIRITED ALL RECORDS................................................................6

      2.   BNA SPIRITED ANY ALL LEDGERS, JOURNAL AND NOTES OR DON'T EXIST............................17

      3.   PROOF OF MYTH AND FAKE LEDGERS, JOURNAL AND NOTES. ...................................17

*II.*   *REMEDIES AVAILABLE RULE 37(b)(2)(A)(vi) AND RULE 37(e)(2) and (C).* ..................... *20*

   A.   RELIEF UNDER RULE 37(b)(2)(A)(vi).............................................................................20

      1.   EDAG likewise Seeks Relief under Rule 37(e)(2)(C) ....................................................21

      2.   INTENT INFERRED FOR THE FAILURE TO TAKE MEASURES TO PRESERVE RELEVANT EVIDENCE AND INCRIMINATING OF EVIDENCE OF CORRUPTION.........................................................23

      3.   HIDING ANY AND ALL LEDGERS, JOURNALS AND NOTES IS PROOF OF GUILT .......................23

      4.   BALANCING FACTORS ..........................................................................................24

*III.*   *FAILURE TO COMPLY WITH AN ORDER TO PRODUCE ANY AND ALL LEDGERS, JOURNALS AND NOTES RESULTS IN A DEFAULT JUDGMENT*................................................. *24*

*IV.*     *FAKE RECORDS OR RECORDS SCATTERED HITHER AND YONG*............................. *25*

**TABLE OF AUTHORITIES**

**Cases**

*Cty. of San Bernardino,* [part committed] 2020 WL 1496444, at *3 (C.D. Cal. Feb. 27, 2020) ....... 21

*Acosta v. Austin Elec. Servs. LLC,* 324 F.R.D. 210, 211–12 (D. Ariz. 2017) .................................... 2

*Boeing Co. v. KB Yuzhnoye*, 2016 WL 2851297 at *15 (C.D. Cal. May 13, 2016) ........................... 2

*In re Chemours Company Securities Litigation*  United States District Court, D. Delaware. February 24, 2022 Slip Copy2022 WL 610671 Page 9,( Fed. Sec. L. Rep. P 101,330 ) ............................... 3

*Mfg. Automation & Software Sys., Inc. v. Hughes*, WL 2059839, at *4 (C.D. Cal. Apr. 30, 2018) .................................................................................................................... 24

*Piedmont Plastics, Inc. v. Mize Co.,* 58 N.C. App. 135, 138–39, 293 S.E.2d 219, 222 (1982) ........... 2

*S. New England Tel. Co. v. Glob. NAPs, Inc.,* 251 F.R.D. 82, 90–91 (D. Conn. 2008), aff'd, 624 F.3d 123 (2d Cir. 2010) ................................................................................................................ 25

*United States v. Catabran*, 836 F.2d 453, 456–57 (9th Cir. 1988) ................................................. 2

**Rules**

FRCP 37(b) ............................................................................................................. 2, 3, 20, 24

Rule 37(b)(2)(A)(vi) ...................................................................................................... 2, 3, 20

FRCP 37(e) ............................................................................................................................. 24

FRCP 37(e)(2)(C) ................................................................................................................... 20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF UNDER FRCP 37(b)(2)(A)(vii) and RULE 37(E)(2)(A)-(C) FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4/Doc. #127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION (#4, DOC. #127) AND ALL ANY AND ALL LEDGERS, JOURNALS AND NOTES OF BNA CLAIMED TO BE IN THE "CLOUD"

## I.     STATUS OF THE CASE

### A.     INTRODUCTION

BNA has not produced "Any and all . . ." "ledgers," "journal," and "notes" which are ordered (# 4, Doc. #127[4]) as follows:

"4.   **Any and all** financial statements, whether audited or unaudited, **ledgers, journals**, internal financial statements., credit reports, credit applications, outside or inside financial statements, representation of the financial conditions of BNA, any financial records generated from a third party of BNA**, notes,** narrative, chronicles, or histories of BNA account commencing on January I, 2018 to date hereof." (#4/#127)."

BNA is ordered to produce the following: any and all ledgers, journals, and notes ( #4/#127). Without any and all ledgers, journals, and notes, the bona fide financial statements and profit and loss statements are fabrications because any bona fide financial statements and profit and loss statements are compilations, aggregations, accumulations and representations as follows:[5]

"Despite Defendants' alleged confusion regarding the definition of a "general ledger," there is no question of what is requested. "**The general ledger is nothing more than a summary of your business activities. Every asset, liability, net worth, income, cost, and expense account is listed here.**" MICHAEL C. THOMSETT, BUILDER'S GUIDE TO ACCOUNTING 278 (2001); *see also* ULRIC J. GELINAS ET AL., ACCOUNTING INFORMATION SYSTEMS 589 (6th ed. 2005) **(explaining general ledgers represent an accumulation of data from different company accounts);** KATE MOONEY, THE ES SENTIAL DICTIONARY OF ACCOUNTING 179 (2004) (explaining general ledgers are "[a]n accounting device for collecting all the increases and decreases to each account in the chart of accounts"). And, though most cases discuss "general ledgers" without defining them, those cases detailing the term have not characterized it as an "income statement," but recognized it contains significant information from various sources. *See United States v. Catabran*, 836 F.2d 453, 456 (9th Cir. 1988) (noting a general ledger contained "inventory, payroll, and other accounting data"); *Boeing Co. v. KB Yuzhnoye*, No. CV1300730ABAJWX, 2016 WL 2851297, at *15 (C.D. Cal. May 13, 2016) **(noting a company's "general ledgers and financial receipt records" showed "all payments that are made in and out of the company, all income and expense accruals, and all assets and liabilities and related transactions").** The Court understands Defendants' general ledger may be extensive, but this is not grounds for refusing to produce it. *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 621 (C.D. Cal. 2013) (recognizing "Skechers'

---

[4]  Abbreviated to be #4/#127.

[5]  Other descriptions of ledgers and journals are *Johnson vs. Charps Welding and Fabrication, Inc.,* 2016 WL 11709313 (USDC Min.) *4

general ledger contained 4,944,684 rows of data for the years 2007 through 2010 and up to thirteen fields of data"). *Acosta v. Austin Elec. Servs. LLC,* 324 F.R.D. 210, 211–12 (D. Ariz. 2017)

"A 'ledger' is the principal book of accounts of a business establishment in which all the transactions of each day are entered under appropriate heads so as to show at a glance the debits and credits of each account." *Black's Law Dictionary* 802 (rev. 5th ed. 1979). It is generally true that a ledger is regularly checked for accuracy and the ledger keeper thereby becomes trained in habits of precision, thus justifying a conclusion that the ledger is sufficiently trustworthy.[Citation omitted]. There is no evidence here, however, regarding the business function of the tally sheet, or its method of compilation, which would suggest the likelihood of accuracy. The argued analogy of the tally sheet to ledger sheets is therefore inapposite, and admission of the tally sheet was not required by the cases regarding admission of ledger sheets."  *Piedmont Plastics, Inc. v. Mize Co.,* 58 N.C. App. 135, 138–39, 293 S.E.2d 219, 222 (1982)

"Ms. Ronnau and Logistics' accounting staff also prepare and maintain separate general ledgers and financial receipt ledgers and journals for ELUS showing all payments that are made in and out of the company, all income and expense accruals, and all assets and liabilities and related transactions. " *Boeing Co. v. KB Yuzhnoye*, 2016 WL 2851297 at *15 (C.D. Cal. May 13, 2016)

"Catabran contends that the computer printouts constituted a summary and were inadmissible under Fed.R.Evid. 1006 because the government failed to produce the underlying documents. His argument is without merit. The computer printouts were the company's general ledgers. They contained inventory, payroll, and other accounting data put into the computer by Bedder Nights' bookkeepers on a monthly basis." *United States v. Catabran*, 836 F.2d 453, 456–57 (9th Cir. 1988)

Journals:

"The so-called "books" in which these transactions are recorded will naturally vary physically with the type and size of the enterprise. But whether the books are loose-leaf or computerized, they are in essence always the same. Transactions are recorded in journals as they take place. The journal entries are then "posted" in a ledger where transactions are grouped by subject matter under appropriate "account" headings. The more complex the business, the more specialized the books of original entry become (e.g., sales journal, cash receipts books). Cross-references between journals and ledgers make possible verification of alleged posting or source, respectively, of each transaction.

Periodically, usually at the end of every month, both sides of each ledger account are "footed" (conventionally in small, penciled figures beneath the last amount recorded). These ledger footings make possible the preparation of a trial balance.  At the end of every fiscal period the books are then "closed" by transferring to the income statement the balances in the "nominal" accounts (income and expense accounts) and by correlative adjustment of the "real" accounts (assets, liabilities, and owners' equity). Computerization of accounting ledgers and journals has changed the form, but not the substance of the foregoing analysis." § 33:12. Elements of double-entry bookkeeping, 6 Ia. *Prac., Business Organizations § 33:12*

"Under a double-entry system, business transactions are accounted for in journals and ledgers. A journal is a book where each business transaction is listed. A ledger is a book that

**contains the totals from all of a business's journals.   It is organized into different accounts. Separate journals are sometimes kept for types of transactions that occur frequently. Although journals and ledgers are referred to as "books," they often take the form of electronic data."**

**"Ledger accounts show income, expenses, assets, liabilities, and net worth. Income and expense accounts are closed at the end of each tax year. Asset, liability, and net worth accounts remain open permanently."  § 33:4. Ledgers and journals to be retained—Income tax— Record-keeping systems, 2 *Ledgers and journals Retention* § 33:4.**

**Notes are integral to financial statements:**

" . . . . . . The maximum remediation disclosures at issue here were included in the challenged SEC reports' notes to financial statements, all of which were prepared in accordance with GAAP. D.I. 43-6 at 24; Chemours, Quarterly Report (Form 10-Q), at 30 (Aug. 3, 2018); Chemours, Quarterly Report (Form 10-Q), at 30 (Nov. 2, 2018); D.I. 43-10 at F-46; D.I. 43-13 at 25. Consistent with SEC filing norms, the challenged SEC reports repeatedly refer to the notes in question as "notes *to* the financial statements." **But the notes are undoubtedly part of the financial statement**s. *See* Disclosure Update and Simplification, 81 Fed. Reg. 51,608, 51,623-26 (Aug. 4, 2016) (**repeating seven times that "disclosures in the notes to the financial statements** ... are not subject to safe harbor protections under the PSLRA Statement of Financial Accounting Concepts No. 8: Conceptual Framework for Financial Reporting, at 1–2, Fin. Accounting Standards Bd. (Dec. 2021), https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176179245223 (discussing importance of notes to financial statements); *cf. United States v. Denedo*, 556 U.S. 904, 921 (2009) (Roberts, C.J.) (concurring) (noting that "footnotes are part of an opinion"). **Indeed, Defendants themselves expressly stated in the two most recent challenged SEC reports that the "notes are an integral part of [Chemours's] ... financial statements."** D.I. 43-10 at F-10; D.I. 43-13 at 7. Accordingly, the disclosures set forth in the notes to the financial statements are excluded from safe-harbor protection under § 78u–5(b)(2)(A). *In re Chemours Company Securities Litigation* ✄ United States District Court, D. Delaware. February 24, 2022 Slip Copy2022 WL 610671 P. 9,( Fed. Sec. L. Rep. P 101,330 )

Without any and all ledgers, journals, and notes, financial statements are fabrications, artifices, and concoctions (and default of #4/#127). Any claimed financial statement and profit and loss statement lacks the compilations, aggregations, accumulations and representations that are required.

## 1.  BNA'S CONCEALMENT IS EVIDENCE OF GUILT AND FRAUD

Hiding evidence is admission of guilt:

"Ramos, as a former DA, is a sophisticated party who had the assistance of experienced civil litigation counsel, as least as of March 14, 2018. His explanations that he was unaware of these obligations to retain the emails and text messages that could be relevant and material to litigation he was embroiled in are unconvincing. This is even more so because Ramos, as an experienced

criminal practitioner in the California state courts, should be familiar with Cal. Crim 371, which provides:

> If the defendant tried to hide evidence or discourage someone from testifying against (him/her), that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.       However, evidence of such an attempt cannot prove guilt by itself.

Judicial Council Of California Criminal Jury Instruction 371. The language in this proposed instruction is similar to the type of instruction that may be sought in a federal civil case when potentially relevant evidence is destroyed. *Colonies Partners, L.P. v. Cty. of San Bernardino*, [part omitted] 2020 WL 1496444, at *10 (C.D. Cal. Feb. 27, 2020) [part omitted]

BNA executes endless concealment, forced ignorance, lies, and creates misleading statements. BNA lacks legitimate financial records, i.e., ledgers, journals and notes do not exist:

Block #D & # E "THE WITNESS: Yes, Mr. Cook, are you talking about Byton North America? BY MR. COOK: Q. Yeah? Byton North -- did somebody at BNA have access to the company financials? [Full Trans., #142]   THE WITNESS**: No**. BY MR. COOK: Q. Does that include everybody, including who the CA- -- CEO was; is that correct? [Full Trans., #142]  THE WITNESS: **Yes**. (P. 211)  BLOCK #E: BY MR. COOK: Q. What's your answer, sir? A. I -- I can't remember who had access. A CEO would not -- yeah. A CEO would not be going into the company financial information himself or herself. They would be requesting the information from  the corporation finance team to present the information to them. So I -- I do not know. Q. Okay. And then this says, "Does the s-drive itself have restricted access or certain files have or folders have restricted access?" And your answer is: "Most of the s-drive has restricted access. And that restriction would include  BNA." Is that a fair statement, sir? A. **That's correct." (P. 212)**

**Block # C "The Witness: "That's correct that I did not have access to all the company's financials. I had access to -- only to certain folders, which was required for me to do the job. Company financial information is confidential, and it was only available to some very senior leadership people in the finance team. And I don't know even whether the CEO had access."** (P. 209)

and Block 39-40: " See Block # 39-40 " **A. As I said, I do not know the location of the Cloud servers to where they were. Whether they were in (P. 201) Block #40:  China or India or the Philippines or -- I -- I do not  know.** Q. Well, it says "repository?"What's "repository" mean?  **A repository means a location where the documents are stored.**

**B.      BNA IS IN CONTEMPT OF COURT FOR THE FAILURE TO TURN OVER THE #4 [ANY AND ALL LEDGERS, JOURNALS AND NOTES DUE ON MARCH 24, 2022.**

The court issued Discovery Order (Doc. #127, P. 2, lines 6-7 and 22-25) that ordered BNA to produce any and all ledgers, journals, and notes.  (#4/#127).  BNA was ordered to turn over any and all ledgers, journals, and notes on March 24, 2022 (i.e., 30 days from February 22, 2022) which have not been turned over ("Document Order"  Doc. #127) as follows**:** "The Court now orders BYTON to produce documents responsive to RFPs 4 and 15 within 30 days…Accordingly, the Court grants

EDAG's motion to compel as to RFPs 4 and 15 and orders BYTON to produce responsive documents within 30 days. (Doc. # 127, P. 2 lines 6 to 24)

BNA remained ordered to comply with the Discovery Order to produce any and all ledgers, journals, and notes (Doc. # 127), as follows: "EDAG's second objection that BYTON will not produce documents does not seem to have anything to do with the protective order issue." (Doc. # 150, P. 2, lines 8 to 9)."   BNA spirited out all of any and all ledgers, journals, and notes, or they are just a myth including #4/#127 as follows:

(Block # 39) . . .  Q . . . . I'm looking at the word -- your words, "finance department repository?" Is that electronic, or is that paper? **A. It's both.**   Okay. So was it -- was that in the computer system that you had in Santa Clara, or was that in China? **A. As I said, I do not know the location of the Cloud servers to where they were. Whether they were in (P. 201) Block #40 China or India or the Philippines or -- I -- I do not** know. Q. Well, it says "repository?" What's "repository" mean? **A repository means a location where the documents are stored.**

BNA conceded that any and all ledgers, journals, and notes (#4/#127) have been spirited or are non-existent without the slightest excuse or reason because they have not been produced or they are mythical. Nothing in the Protective Order (Doc. # 150) excuses BNA from not producing any and all ledgers, journals, and notes listed in #4 (Doc. #127) when Sadha of BNA had control and offers no excuse for the lack of the presence of any and all ledgers, journals and notes:

 "So -- so let's -- let's go back to, say, 2021? Is it a fair statement that you are based --  you were in control of BNA because nobody else was there? Is that a fair statement? **A. I was responsible for managing the operational  activities of BNA.** Q. Did you ever, say, in 2021 -- make sure I get this correctly." (**Block # 27 (P. 117) (and Blocks #: 35, 36 and 37),** and **Block # 19:    Q. So who was in charge of the finances of BNA for 2020 going forward? A. 2020 until the end of 2021, I was responsible for that.  (P. 103)**

Given that Sadha is "responsible for managing the operational activities of BNA," and "2020 until the end of 2021, I was responsible for that [finances of BNA]," and intimates "records" are domiciled in Cloud "servers" (but they are not "physical server") in "China or India or the Philippines," and ledgers, journal and notes have not been produced (despite #4/#127), the conclusions are that any and all ledgers, journals and notes are either destroyed, mythical, do not exist or never existed, that BNA refused to turn over the ledgers, journals, and notes, and any financial statements and profit and loss statements are fabrications, artifices, and concoctions.

**C.  BNA CLAIMS THAT ANY AND ALL LEDGERS, JOURNALS AND NOTES ARE IN THE CLOUD, MYTHICAL OR TRASHED BY BNA (Block # 9, 10, 11, 12, 13, 16, 39 & 40),.**

Nobody had access to company financials, which would include ledgers, journal and notes:
(Block # 45).  "Q. Yeah? Byton North -- did somebody at BNA have access to the company financials? [Full Trans., #142]  THE WITNESS: **No.** BY MR. COOK: Q. Does that include

1    everybody, including who the CA- -- CEO was; is that correct? [Full Trans., #142]  THE
     WITNESS: **Yes.**  (P. 211)

2

3        Without the ledgers, journals, and notes, the financial statement would be a myth and

4    fabrication.  As Sadha stated: "**I was responsible for managing the operational activities of

     BNA," "** Q. So who was in charge of the finances of BNA for 2020 going forward? A. 2020 until

5    the end of 2021, I was responsible for that." (*supra*)

6        BNA was ordered to turn over any and all ledgers, journals and notes on March 24, 2022

7    (i.e., 30 days from February 22, 2022) ("Document Order:"  Doc. # 127) as follows**:** "The Court now

8    orders BYTON to produce documents responsive to RFPs 4 and 15 within 30 days… [AND]

     Accordingly, the Court grants EDAG's motion to compel as to RFPs 4 and 15 and orders BYTON

9    to produce responsive documents within 30 days. The Court denies EDAG's motion to compel as to

10   RFP 13.  (Doc. # 127, P. 2 lines 6 to 24)"  On its face, the Document Order (Doc. # 127), twice,

11   ordered BNA to "produce the documents responsive to RFPs 4 and 15 days" and ". . .order to

12   produce responsive documents within 30 days."  The Discovery Order (Doc. # 127) requires

13   production of any and all ledgers, journals and notes on March 24, 2022.  No any and all ledgers,

14   journals, and notes were ever produced.  The court ordered BNA to turnover #4/#127 and warned

     BNA as follows:

15
         "If BYTON **has spirited these documents away** and truly is not able to produce them, then
16   either the undersigned or Judge Chen will need to determine what consequences flow from that.
     However, the first step is this order compelling production."  (Doc. # 127, P. 2 lines 10-12)
17

18                    **1. BNA AND SURROGATE SPIRITED ALL RECORDS**

19       Block # 1 through Block # 53 demonstrates that BNA "**spirited these documents away**" of

20   any and all ledgers, journals and notes.  Given scope of the OEX, here is a chart by "Block" number,

     which is attached to the page number as follows:

21
         No knowledge of Investors and records:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, & 32.
22
         No documents are accessible, i.e., does not exist, no produced and lodged somewhere in

23   China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, & 47.

24       No access to BNA records: Blocks #: 41, 42, 43, 44, 45, 46, & 48.

25       No Employees of BNA:  Blocks #: 15 & 16.

26       Vice President of Finance and signed documents but not employees or bona fide VP of BNA

     Blocks #: 17, 18, 19, &39
27
         No access of the BNA Document:     Block #: 20.
28

Sadha executed BNA IRS Tax return for 2020 which includes Schedule L.

Blocks #: 21, 22, 23 & 24.

Documents not "mess" or otherwise damaged: Blocks #: 25 & 26.

Sadha in Control of Finances:  Blocks #: 27, 35, 36, & 37.

Sadha did not know ZHANG YING:  Block #: 28.

Zhang Ying did not receive any BNA records:  Blocks #: 28, 29 & 30.

FMC did not get documents from BNA: Blocks #: 31 & 33.

Byton entities imposed restriction in disclosing financial:    Blocks #: 41, 42, 43, 44, & 45.

Records in the Cloud in China, India or Philippines: Blocks # 39 & 40.

**Block # 1:**      Q. Maybe you can explain to me why, between 2018 to 2019, that -- to make sure I understand this, that BNA sent to FMC Cayman 167,139,906? Any explanation for that? [Full Trans., #142].[6] **P. 65 THE WITNESS: So from what I can recall, the B-down funding that we went through -- some of the funding was received in U.S. dollars, because, at that time, as I mentioned before, it was really difficult to get money transferred between China and -- and the U.S. And so we wanted to get some of the funding in U.S. dollars. And the B-down** investors **put some of the money in U.S. dollars, and -- and Byton North America was justify facilitating the receipt of that money in U.S. and transferring it to the FMC entity where the money is due to go to. And -- and if you -- I think if you're referring to probably one side of the book in the bank transactions where the money has gone out to FMC Cayman, but you're probably missing the fact that there is money that has come into Byton North America before that from** investors. BY MR. COOK: Q. I -- I'm -- I'm sorry. I'm not understanding  that 167,139,000 of money belonging to BNA -- **A. No. That's --** [Full Trans., #142] THE WITNESS: **I'm sorry.** Full Trans., #142] **(P. 66)**

**Block # 2:**  [. . .answer.]  BY MR. COOK: Q. Which says it was money of BNA and resent to FMC Cayman. And I'm not sure why? I don't understand. Was it money sent for -- to buy something or to do what? I don't understand. [Full Trans., #142] MR. COOK: Explain that. [Full Trans., #142]  **THE WITNESS: Yeah. As -- as for my prior statement, the money never belonged to BNA in the first place. The money was being received to facilitate a transfer to FMC because we did -- we wanted to avoid some of the transfer of -- or the conversion of money from Chinese Renminbi to U.S. dollars. So we facilitated the investors to put the money in U.S. dollars into a U.S. bank account so that (P. 67)**

**Bock # 3:       FMC could have the money in U.S dollars and make it a little bit easier for future payments. BY MR. COOK:** Q. But the -- A. The money never belonged to FM- -- **BNA in the first place.** Q. But the money was BNA's money; isn't that correct? **A. That's incorrect.** [Full Trans., #142] BY MR. COOK: Q. Whose -- whose money was 167,000 - 167,000,000? Who was that? **A. FMC's money.** Q. So it was FMC's money in -- in the bank account of BNA; is that correct? [Full Trans., #142] THE WITNESS**: Yeah.** [Full Trans., #142] THE WITNESS: As -- BY MR. COOK: Q. Explain it again? **A. As I mentioned before, before, BNA was just (P. 68) . . . (carry over to Block #4)**

---

[6] Doc. #142 is abbreviated into #142.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

1

2
    **Block # 4:**  Q. So, originally, the money belonged to FMC; is that correct? **A. Correct. The**
    **investors investing money in FMC.** Q. So the money -- the money -- this $167,000,000 never

3
    belonged to BNA? It belonged to FMC; is that correct? But it ended up in the BNA bank account; is
    that correct? **[**Full Trans., #142].THE WITNESS: **The money did not belong to BNA.** The money

4
    belonged to FMC, the investors depositing the money through an account in the U.S. to ensure that
    money is coming in U.S. dollars to make it easier for future transactions.  /// BY MR. COOK: Q. To

5
    make sure you understand, this is money 117,000,000 [sic] went from a -- a bank account of BNA
    ((P.  69)  **(carry over to Block #5)**

6

7
    **Block # 5:**      to FMC Cayman, and 117- -- 117,000,000 [sic] didn't --was not -- didn't
    belong to BNA, but belonged to FMC Cayman; is that correct? That's the whole deal? **[**Full Trans.,

8
    #142]. BY MR. COOK: Q. Is that correct? **A. That is correct. The money belonged to FMC.** Q.
    Why did it get in the hands of BNA, to begin with? MR. SIPPRELLE: Object. Asked and answered

9
    at least three or four times, but go ahead. Apparently, Mr. Cook doesn't understand or -- MR.
    COOK: Explain --**[**Full Trans., #142].. BY MR. COOK: Q. How did it end up there to begin with?

10
    **A. So these are investors that who willing to pay the money in U.S. dollars to avoid some of the**
    **transactional issues of transferring money between China and the U.S. due to the trade issues**

11
    **and everything at  that time.**  (P. 70)

12

13
    **Block # 6:**      . . . .So we requested the investors to deposit the money in U.S. dollars in
    **a U.S. bank account, which appened to be BNA's account. And -- and the money was,**

14
    **accordingly, transferred to FMC because it belonged to FMC in the first place.** Q. So the -- to
    make sure I -- I get this here? Originally, this FMC money was Chinese money? **[**Full Trans., #142].

15
    **THE WITNESS: Well, I don't know who the investors were. Whether they were Chinese**
    **money or U.S. investors, I don't know the details, or I don't recollect the details of the**

16
    **investors.** BY MR. COOK: Q. Well, you're saying, originally, the money was FMC Cayman. And
    I'm trying to figure out: What's the origin of that money? Was it in China or some other

17
    place? **[**Full Trans., #142]  BY MR. COOK: Q. Well, that -- that's saying investors?
    (P. 71)

18
    **Block #7:**      What banks? **A. I don't --** [Full Trans., #142] **THE WITNESS: I -- I**
    **wouldn't know, Mr. Cook, where the investors were.** BY MR. COOK: Q. Well, was it offshore?

19
    THE WITNESS: **I -- I don't know.** BY MR. COOK: Q. How do you know any of this information?
    Who told you? **A. These -- like, during this time, I was still overseeing the monies that were**

20
    **coming into the account and going into the account and actually approving the transfer of**
    **those monies, and there was nothing illegal that was done under my watch, as far as I know.** Q.

21
    Well, as far as you know; is that correct? [Full Trans., #142] BY MR. COOK: Q. By the way, the
    money -- was the money for the 117, was that money belonging to FMC Cayman's, or was that to

22
    investors? Which one? (P. 72)

23

24
    **Block # 8:**     [Full Trans., #142] You can explain, again, your recollection. THE
    WITNESS: **That was money that the investors were putting into the FMC entity. They were**

25
    **investing in the company, and they were paying for their investment in U.S. dollars.** BY MR.
    COOK: Q. Why -- who are those investors? Do you know who they were? **[**Full Trans., #142]  THE

26
    WITNESS: **I'm sorry, Mr. Cook. I wouldn't know who the investors were at that time.** BY MR.
    COOK: Q. Well, did -- did somebody tell you that this was money from an investor? **A. I'm -- I'm**

27
    **sure there were correspondence between FMC and -- also at that time to facilitate this.** Q. So
    tell me, there must be some e-mail traffic concerning all of these transactions; isn't that correct? You

28

8

1    must have been e-mailing somebody? [Full Trans., #142] **THE WITNESS: Yeah -- yes, there**
**would have been e-mail correspondence. (**P. 73)

2

3    **Block #9:**   BY MR. COOK: 2 Q. And so where's the e-mail traffic for all of 3 the -- all of
these transactions here? [Full Trans., #142]  THE WITNESS: **I -- I wouldn't know. I wouldn't**

4    **have access to those e-mails, Mr. Cook.** BY MR. COOK: 8 Q. Well, these are the e-mails that you
were writing; isn't that correct? [Full Trans., #142] .  THE WITNESS**: I may have responded to a**

5    **request by e-mail from FMC to facilitate this transfer, but I do not have access to my Byton e-**
**mails anymore. left the company last year.** BY MR. COOK: Q. As -- as you're telling me? But

6    where are those -- are those e-mails in, like -- are they accessible here, or are they in China? [Full
Trans., #142] THE WITNESS: **The e-mail server was a 23 Cloud-based server. I -- I don't know**

7    **where it is. Not that savvy with the IT stuff.** 25 BY MR. COOK:  (P. 74)

8    **Block # 10:**   Well, we've been informed that all of the -- all of the e-mails are in a Cloud
server somewhere in 3 China? Is that a correct statement? [Full Trans., #142] BY MR. COOK: Q.

9    You can answer that question, sir? **A. I don't know where the server resides.** Q. Well, I'm -- I

10   seem to be having some confusion here. You're -- we're getting information here that all of the
records of BNA is somewhere in the server, which is a mess, by somebody, and that there are no

11   records here in the United States. So what I want to know is: Is all of your  traffic dealing with,
apparently, half a billion dollars, that all of those records are now somewhere in  China; is that

12   correct?[Full Trans., #142]  ( P. 75)

13   **Block #11:** BY MR. COOK:  Q. You can answer that? [Full Trans., #142]**. HE WITNESS:**

14   **It -- it -- they're in a Cloud  server. I don't know where the server is.** BY MR. COOK: Q. Well,
what do you mean you don't know where it is? [Full Trans., #142] .  BY MR. COOK: Q. You can --

15   you can answer the question? [Full Trans., #142] Mr. Cook? BY MR. COOK: Q. Where's the ser- --
a server is a piece of hardware.  Is it somewhere in California?  **A. It's not a --** [Full Trans., #142]

16   MR. COOK: Let the witness answer his -- the  question to him.  (P. 76)

17   **Block #12:**  [Full Trans., #142] questions - - MR. COOK: Well -- [Full Trans., #142]   THE

18   WITNESS**: It's -- it's a Cloud server.  It's not a physical server.** BY MR. COOK: Q. And who's
managing that Cloud server? Is that in China? [Full Trans., #142]. BY MR. COOK: Q. If you know?

19   **A. It's managed by the IT group in China.** Q. Okay. That -- that's what I want to know.  So if I
wanted to figure out what's going on  with a half a billion dollars, I have to get the  information from

20   Nanjing, the corporate finance people; isn't that correct? [Full Trans., #142]  (P. 77)

21   **Block # 13:**    THE WITNESS**: I don't know. I don't know what  to say. A 2018**

22   **document --** [Full Trans., #142].  THE WITNESS**: I'm sorry. I'm not going to answer that.**  BY
MR. COOK:  Q. Why not? Isn't it true that all of the records dealing with a half billion dollars is in

23   some type of Cloud in China somewhere; isn't that correct? [Full Trans., #142]   BY MR. COOK:
Q. You can answer that? **A. As I said, it's a Cloud server. I don't know where the server is. It's -**

24   **- it's not a physical server. So it's -- it's truly in the Cloud, so I don't know which company**
**manages that. And I -- I wouldn't know.**  Q. All right. But it's -- you don't have control  over it;

25   isn't that correct? **A. I never had.**  Q. Okay. And it is fair to say that the  corporate finance team has

26   control over it?[Full Trans., #142]   (P. 78)

27   **Block  # 14:**    THE WITNESS: **Yeah. There will be contractual documents for -- for the**

28   **work that was done by Byton North America.** BY MR. COOK: Q. Where's -- where's the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR
RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND
NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

contracts? [Full Trans., #142]  MR. COOK: No. He said the contracts. BY MR. COOK: Q. Where are the contracts? That's what you said -- **[**Full Trans., #142] BY MR. COOK: Q. -- under oath. That's what you're telling us under oath. So tell me where the contracts are, and the invoices -- **[**Full Trans., #142]   BY MR. COOK: Q. -- and everything else. That's what I expect from you, sir? **[**Full Trans., #142] (P. 81)

**Block # 15:**   THE WITNESS: No. I -- I wouldn't know where those documents are. But I know that -- that there were documents that existed. BY MR. COOK: Q. And they are somewhere in the Cloud; is that right? [Full Trans., #142] BY MR. COOK: Q. Is that correct? **A. They -- yeah, Byton typically used digital  storage of documents, so yeah. I wouldn't know where those are.** Q. Well, who -- who can I contact who might be able to help me and find out where those documents are?  Can you tell me where? [Full Trans., #142] **THE WITNESS: Sorry, Mr. Cook. I -- I don't  know which employees are still left in the company in the different locations, so I wouldn't be able to name a  person.**  BY MR. COOK:  Q. Where is Eidee, E-i-d-e-e; Zhou, Z-h-o-u?  (P. 82)

**Block #16:**  [Full Trans., #142] **THE WITNESS: No. I -- I wouldn't know where those documents are. But I know that -- that there were documents that existed.** BY MR. COOK: Q. And they are somewhere in the Cloud; is that right? [Full Trans., #142] BY MR. COOK: Q. Is that correct? **A. They -- yeah, Byton typically used digital  storage of documents, so yeah. I wouldn't know where those are.** Q. Well, who -- who can I contact who might be able to help me and find out where those documents are? Can you tell me where? **[**Full Trans., #142] **THE WITNESS: Sorry, Mr. Cook. I -- I don't know which employees are still left in the company in the different locations, so I wouldn't be able to name a person.** BY MR. COOK: Q. Where is Eidee, E-i-d-e-e; Zhou, Z-h-o-u? **(P. 83)**

**Block # 17:**  Who's that person? **A. She's a former employee of one of our entities** in **China.** Q. But she is not a senior manager of treasury or finance of BNA; isn't that correct, too? **A. No. She -- she was not an employee of BNA. Q. Okay. And one more time, Teresa Shi, she is, likewise, not an -- not a person holding a title to HSBC; is that correct?** [Full Trans., #142] BY MR. COOK:  Q. Can you answer that question? **A. Sorry. Could you restate that question --**  Q. Okay? **A. -- please.**  Q. She -- her name's Teresa, T-e-r-e-s-a; Shi,  **S-h-i. She's listed as a VP of finance in the business deposit account agreement?  And all I want to know is: Is she a VP of finance of BNA? It's a "yes" or "no." A. No.**  Okay. So if she's not why, did she sign the "Business Deposit Account Agreement" when her title is VP of finance? Do you know why? **A. I wouldn't know. (P. 84)**

**Block # 18:**  Q. When did you find out that her name appeared as VP of finance? **A. I knew that she was a VP of finance. Her** title **was VP of finance, but not VP of finance with BNA.** Q. Did you remember going over this topic when   you were deposed? [Full Trans., #142] BY MR. COOK:  Q. If you remember?  No?  **A. We may have.** Q. We're going to -- so let's go change a little bit here.  **(P. 85)**

**Block # 19:**    Q. So who was in charge of the finances of BNA for 2020 going forward? **A. 2020 until the end of 2021,  I was responsible for that.  (P. 103)**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

**Block # 20:**    Q. Okay. Aside from that -- aside from that, was there anybody in, say, 2020 who had unfettered -- unfettered access to the finances kept by the corporate -- the corporate finance team?  A.  **I -- I don't know. As I said, I don't control the accesses, so I don't know. (P. 104)**\

**Block # 21:**   Q. So it's true, then, that the corporate finance team would be, every year, filling out a Schedule L; isn't that correct? [Full Trans., #142] **BY MR. COOK: Q. Correct?  (P. 110)**

**Block # 22:  A. If it was a tax filing requirement, they would have provided the necessary documents.** Q. And you're the one that signed off on the tax return; isn't that correct? [Full Trans., #142] **THE WITNESS: I only signed off for 2020 tax return.** BY MR. COOK: Q. Okay. For 2020, you signed off? Did you read the tax return?  **At that time, I would -- I would have read the  tax return.  (P. 111)**

**Block # 23:**   You signed the tax return; isn't that correct? For the 2020 tax return; isn't that correct? [Full Trans., #142] **THE WITNESS: Yes.** BY MR. COOK: **Q**. Okay. And you've relied on the corporate finance team that they gave you accurate information, including -- including Schedule L and everything that followed it; isn't that correct? [Full Trans., #142] Q. You can answer that question? **A. Yes, I signed the tax return.  (P. 112)**

**Block # 24:**    **Q**. Okay. And you've relied on the corporate finance team that they gave you accurate information, including -- including Schedule L and everything that followed it; isn't that correct?  [Full Trans., #142] Q. You can answer that question? **A. Yes, I signed the tax return.** Q. Okay. Did -- did anybody inform you that the records somewhere in the Cloud were chaotic, a mess, difficult to determine? [Full Trans., #142] (P. 112)

**Block # 25:**    BY MR. COOK: You can answer that question? **A. No, no one specifically told me that the information was vague or a mess or anything like that.** Q. So as far as you knew, for the schedule -- for the 20-- 2020 tax return, you believe that it was accurate and well done before you signed your name; isn't that correct? [Full Trans., #142] Q. You can answer the question? **A. The information was prepared by our CPA who's been doing the work for us for a few years, and so I trusted the work done by them and -- and signed the document at the request of power of attorney because I didn't have even authorization to sign the document.** Q. Did the CPA tell you that the records were a mess? [Full Trans., #142] **THE WITNESS: The CPA didn't say anything  (P. 113)**

**Block # 26: about the records being a mess.**  BY MR. COOK: Q. Did any of these people say that -- that --  the -- that there was something wrong with the Cloud, that they -- that it was very difficult to find the information? Did they ever tell you that? [Full Trans., #142] **THE WITNESS: No.  (P. 114)**

**Block # 27:**   So -- so let's -- let's go back to, say, 2021? Is it a fair statement that you are based --  you were in control of BNA because nobody else was there? Is that a fair statement? **A. I was responsible for managing the operational activities of BNA.** Q. Did you ever, say, in 2021 -- make sure I get this correctly.  **(P. 117)**

**Block # 28:**   Q. Did you ever, say, in 2021 -- make sure I get this correctly. P. 117 Did you have any decisions with a Zhang Ying concerning the corporate documents and records of BNI

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

[sic]? **A. No.** Q. Do you know of anybody who told you that they were in contact with Zhang Ying concerning the -- the finances of BNA? **A. No.** Q. Now, let's deal with what's called "my review of corporate documents and records?" During the year, say, of '20, did you turn over any records to Zhang Ying? **A. I do not even know the person, Mr. Cook.** Q. For the year 2021, did you know of the turnover of any records to Zhang Ying? And that is turning over corporate documents and records. Did you do that? **A. No.** Q. Did anybody, whoever it would be, ask you, while you were in charge for the corporate record -- the corporate documents and records of BNI [sic]? Anybody ask you? **A. No.** Q. Okay. Do you have access yourself -- well, **actually, the year of '21, nobody asked you for correct also?   (P. 118)**

**Block # 29:   A. So I'm sort of trying to understanding what is  your reference regarding corporate documents.** Q. Well, I'm just reading what Mr. Zhang -- Mr. Zhang is saying, that he has -- quote -- "my review of the corporate documents and records?" And, let's say, for 2021, do you know whether or not you gave him or somebody on his behalf of -- quote -- "corporate documents and records of BNA"? **A. I did not personally provide it, but I don't know if anyone else did.** Q. During the years of, say, '20 and '21, in fact, the records you -- pardon me -- the records you have were related to some type of restriction; isn't that correct? [Full Trans., #142] THE WITNESS: Um - [Full Trans., #142] Mr. Cook. THE WITNESS: **Could -- could you please repeat that.  (P. 119)**

**Block # 30:   MR. COOK:** Q. During the year of 2021 -- make it really easy -- did you -- make it one at a time? Did you provide anybody information regarding corporate documents and records of BNA -- make it that simple -- to anybody? [Full Trans., #142] THE WITNESS: Yeah. [Full Trans., #142] **THE WITNESS: Again, the term "corporate documents" is very broad and vague for me. So my answer is no.** BY MR. COOK: Q. No, that you didn't turn these records over? Is that a fair statement here? [Full Trans., #142] **THE WITNESS: No, I did not.** BY MR. COOK: Q. Okay. Let's move on here? That -- do you know -- is there anybody else.  **(P. 120)**

**Block # 31:    Now, isn't it true that BNA was getting funds from investors? Isn't that correct? A. Sorry, Mr. Cook. BNA was not getting funds** from **the investors. BNA was doing the work for the  China entity. The investors were investing in FMC Cayman.** Q. I'm -- I'm sorry.  Did BNA seek money from investors? **A. No.** Q. Did FMC Cayman get money from investors? **A. Correct.** Q. And was that done publicly? [Full Trans., #142] **THE WITNESS: Yeah. What do you mean, "publicly" ?BY MR. COOK:** Q. Well, in other words, you -- you'd put it with a broker. You would have advertising. You would put it on the web. Whatever it would be? **A. It was done through normal -- I don't know what process was followed by FMC, but it was not -- I mean, if your question was, was it a public place, it was not a public place. It was individual companies (P. 126)**

**Block # 32:    [It was individual companies].investing as private investors.** Q. Okay. Well, these investors would be U.S.  investors or from where?  [Full Trans., #142] THE WITNESS: **Could have been from anywhere in the world. I wouldn't know.** BY MR. COOK: Q. Let's go backwards here. That -- the person who was -- that was FMC Caymans, that was the entity which was soliciting for investors; is that correct? **A. Correct.** Q. And what -- what does FMC Caymans do, by the way? **A. FMC Cayman is the holding company for the group.** Q. Okay. And one of the groups was BNA; isn't  that correct? **A. BNA was not part of FMC. BNA was a part of -- so Byton -- Byton Limited was a part of FMC.** Q. I'm sorry? Could you repeat that? **A. Byton Limited was a part of the -- FMC was the holding company for the whole Byton group.** Q. Which -- which entity was the entities? Which **(P. 127)**

**Block #33:**   Which--which entity was the entities? which ] was soliciting investors? Which one was it? [Full Trans., #142] THE WITNESS: **FMC**. BY MR. COOK: Q. FMC Cayman; is that correct? **A. Correct.** Q. And people would be  investing their money into that entity; is that correct? **A. That's my understanding.** Q. And FMC -- what's the address of that company? **A. I wouldn't know off the top of my head.** Q. Well, did you BNA provide its finance  statement to FMC for the benefit of the -- of the investors? [Full Trans., #142]  THE WITNESS: **BNA did  not directly provide finance statements to FMC**  BY MR. COOK:  Q. But did FMC provide final statements to its  investors? [Full Trans., #142]  (**P. 128**)

**Block # 34:  THE WITNESS: FMC used to share information through their regular board meetings, as any corporation would do.** BY MR. COOK: Q. Sorry. Can you repeat that? So they -- I want to know: How did they communicate that to third parties, like investors? ? [Full Trans., #142]. **THE WITNESS: Through -- through the board meetings.** BY MR. COOK: Q. And what -- through the board meetings, what was said there? Was that -- the purpose of that to providing the finance statement of BNA or that there was no financial statement or no records or nothing?  ? [Full Trans., #142] BY MR. COOK: Q. You can answer that question? **A. Sorry, Mr. Kameswaran. Well above my pay grade. I did not know what was shared in these board meetings. (P. 129)**

**Block #35:   THE WITNESS: If you're asking me whether I was responsible for Byton North American finance operations at that time for dealing with the EDAG payments, the answer was yes.** BY MR. COOK: Q. EDAG -- the EDAG payments?  **A. The answer is yes.** Q. What? The answer is "yes"? **A. Yes. Yes, as for my testimony.  (P. 142)**

**Block # 36:**  Okay. Let me ask -- the question here is on  (**P. 143**) "Sir, who is the most qualified witness to testify regarding Byton's payment to suppliers?" And your response is, "I am, as the responsible person for Finance North America." Was that a correct statement, sir, at the time? **A. You said you're reading from a prior testimony.** Q. Absolutely? [Full Trans., #142] [Full Trans., #142] MR. COOK: You attended it. The date of the deposition was November 17, 2020. [Full Trans., #142]  MR. COOK: That's fine **THE WITNESS: Yes, it was accurate as of that date, yes.** BY MR. COOK:  Q. Thank you. And then on P. 62 -- make sure we have everything here, "How did your work on the M" -- M as in  Mary -- "dash, Byte" -- B-y-t-e -- "project prepare you  to testify as the most qualified witness at Byton. **(P. 144)**

**Block # 37:**    regarding Byton's use of suppliers on the project"? Answer: "As the most qualified current employee -- current employee and as my investment in the finance operations and business operations." Is that true as of November 2020? **A. Yes, sir.** Q. Thank you? Now -- then at P. 63 -- hold on. It starts **(P. 145)**

**Block # 38:**  Mr. Cook:         Q. As of -- oh, I'm sorry. Hold on. Bear with me? As of January 8th, 2000- -- 2021, your deposition was taken, and then they asked you -- and you -- "It is correct that you -- you do not know what, if any, search terms were used to -- to search Carsten Breifeld's e-mail account?" Answer: "Correct." Question: "Teresa Shi is still employed Byton; correct?" Answer: "Correct. Well, was Ms. Shi, as of January 2021, an employee of BNA? [Full Trans., #142]  THE WITNESS: **I -- I -- I know she left the business at some time**, Mr. Cook. But I'm not aware of the exact timing of when she left. And if my testimony at that time was yes, she

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

1    was an employee, then maybe she was an employee at that time. I do not know the exact time when
     she left.  You're trying to ask me to recall something from 15 months back.  **(P. 200)**

2

3    **Block # 39:**    BY MR. COOK: Q. He asked you is -- was she an employee of BNA at that
     time? **A. She was never an employee of BNA.** Q. Let's take a look at No. 301. "But when you say
4    'they,' who asked you for specific documents related to invoices?" Answer: "Internal counsels. No,
     no not from my -- not my e-mails, you but from the department repository -- but from the finance
5    department repository hard copies and so on." So what's the finance department repository?  **A. The**
     **finance department's repository was digital locations for storing the documents as for some**
6    **physical filing cabinets where we had copies of supply invoices and so on.** Q. I'm looking at the
     word -- your words, "finance department repository?" Is that electronic, or is that paper? **A. It's**
7    **both.** Q.  Okay. So was it -- was that in the computer system that you had in Santa Clara, or was that
     in China? **A. As I said, I do not know the location of the Cloud servers to where they were.**
8    **Whether they were in (P. 201)**

9
     **Block #40:     China or India or the Philippines or -- I -- I do not  know.** Q. Well, it says
10   "repository?"What's "repository" mean?  **A repository means a location where the documents are**
     **stored.** Q. Well, that would be paper documents; is that correct? **A. It could be.** [Full Trans., #142]
11   THE WITNESS: **These are paper documents**. BY MR. COOK: Q. It says, "But the finance
     department repository, hard copies and so on?" So where are the copies of the finance department
12   repository? [Full Trans., #142]  THE WITNESS: **It's stored both digitally and -- and physically.**
     **That -- that's what I've said twice -- twice now.**  BY MR. COOK: Q. It says, "and hard copies
13   on?" **(P. 202)**

14
     **Block # 41:**  . . . . surprised your client hasn't given you those documents. BY MR. COOK:
15   Q. What is an s-drive? **A. An s-drive is a drive that is -- a drive name that is in one of the**
     **servers.** Q. What was in the s drive? **A. An s-drive -- "s" just stand for shared drive, so all kinds**
16   **of documents would be an s-drive.** Q. Would the s-drive include the financial records on behalf of
     BNA? **A. I cannot recollect whether the finance documents reside on an s-drive or -- or**
17   **another drive. I cannot remember.** Q. Well, let me -- I'll read this to you. It says, "What kind of
     documents are stored on the s-drive?" Answer: **"Some of the company's financial details and so**
18   **on, which has restricted access, company finances, which has restricted access."** So does that
     refresh your recollection sitting here that, in fact, the s-drive did include company financial details
19   and so on? **A. Okay. That may be correct.** Q. Okay? **A. Yeah.  (P. 207)**

20
     **Block # 42:**    Q. Okay. And then it says, "Which has restricted access?" What's "restricted
21   access"? **A. So, again, as for my prior statement, there was some directories that we had access**
     **to in Byton North America, and there were some directories that we did not. That is what it**
22   **means by restricted access.** Q. I'm sorry. Could you -- I'm sorry? The restricted access means that -
     - did you have access to the -- to these records here? It says, "Some of the company's financial
23   details and so on, which has restricted access --company financials which has restricted access." Is
     that -- did I get that correctly? **A. No. What I mentioned is there are various documents stored in**
24   **s-drive. There are certain folders that we have access to or certain people have access to. And**
     **there are certain folders that are restricted in terms of access.** Q. But I'm looking at this short
25   sentence. It says, "Company financials, which has restricted access?" Does that means that -- that the
     -- that there was restricted access to you that you didn't have access to company financials?
26   [Full Trans., #142]  **(P. 208)**

27

28
                                                    14

**Block # 43:** Explained repeatedly throughout the depo- -- throughout the testimony. Go ahead, Mr. Kameswaran. I guess you can explain it to him again. THE WITNESS: **That's correct that I did not have access to all the company's financials. I had access to -- only to certain folders, which was required for me to do the job. Company financial information is confidential. and it was only available to some very senior leadership people in the finance team. And I don't know even whether the CEO had access.** BY MR. COOK: Q. I'm sorry? The CEO didn't even have access to the company's financials? Is that what you're telling me? [Full Trans., #142] MR.. COOK: Oh, I'm sorry. THE WITNESS: **Yes. These -- these folders were confidential -- contained confidential information, so the access was restricted to very few people in the company.** Q. The company's BNA; is that correct? **(P. 209)**

**Block # 44: A. Sorry.** Q. You said -- you said, restricted to the people in the company? "The company" being BNA; isn't that correct? **A. The shared drive is a global shared drive. It's not a BNA specific shared drive. So corporate finance documents that are stored in there had restricted access and was accessible to only to very few people in the company for confidentiality reasons.** Q. I'm looking at the words "Company financials?" Who's the company? That's what it says on P. 304, Line 19. It says, "Company financials." Who is "the company"? **A. The -- the different entities of FMC Cayman.** Q. That would be who? **A. That would be Byton North America and Byton Hong Kong, Nanjing New Energy entities. I don't remember the names of all the entities.** Q. Well, did -- whoever was the, you know, running BNA, was he blocked out of access to the company financials called "restricted access"? [Full Trans., #142] THE WITNESS: **What do you mean by "who was running? (P. 210)**

**Block # 45:** BY MR. COOK:. Well, who -- who -- who -- let's -- let's just deal with January -- of thousand -- January 2021, and maybe you can tell me who was running the company? [Full Trans., #142] MR. COOK: (Inaudible.) [Full Trans., #142]. THE WITNESS: **Yes, Mr. Cook, are you talking about Byton North America?** BY MR. COOK: Q. Yeah? Byton North -- did somebody at BNA have access to the company financials? [Full Trans., #142] THE WITNESS: **No.** BY MR. COOK: Q. Does that include everybody, including who the CA- -- CEO was; is that correct? [Full Trans., #142] THE WITNESS: **Yes. (P. 211)**

**Block # 46:** BY MR. COOK: Q. What's your answer, sir? **. I -- I can't remember who had access. A CEO would not -- yeah. A CEO would not be going into the company financial information himself or herself. They would be requesting the information from the corporation finance team to present the information to them. So I -- I do not know.** Q. Okay. And then this says, "Does the s-drive itself have restricted access or certain files have or folders have restricted access?" And your answer is: "Most of the s-drive has restricted access. And that restriction would include BNA." Is that a fair statement, sir? **A. That's correct.** Q. Okay. And -- okay. And then it says, "So the s-drive was not searched to identify relevant documents for this litigation?" And the answer is: "No." So we got that right? Is that correct? Do you want me to reread it to you, sir? **A. Are you reading -- I mean, that's based on my testimony from -- (P. 212)**

**Block # 47:** Q. Yes. That's correct? **A. It was right at that time.** Q. Hold on. Bear with me. What is an HR team, by the way? **A. What is an HR team.** Q. Yeah. It says -- it says, "So the I-team would have an asset register of what IT equipment issued to the employee. The HR team, when they get notified of the person living, would notify IT and get access to that particular asset and detail. And as part of the checklist, they would make -- they would make sure that the employee returns those assets back to Byton." That's a correct statement, sir? **A. Yes, that's a correct**

1  **statement.** Q. Then it says, "So you testified as Byton's most qualified witness previously that
2  Byton -- Byton China's corporation finance team stored the electronic version of EDAG invoices; is
   that correct?" The answer's correct? Is that -- is that correct? **A. Yes.** Q.  **(P. 213)**

3       **Block # 48:** Q. Well, did he -- is it working for another of the Byton group of companies?
4  [Full Trans., #142] **THE WITNESS: Sorry, sir. I wouldn't know.** BY MR. COOK: Q. Okay.
   Well, apparently, these three people have access at some time towards -- quote -- "A review of
5  corporate records?" Is there anybody else you can share with me who would have access to the
   corporate records and statements from statements and former employees? Who -- tell me who else.
6  **[Full Trans., #142] THE WITNESS: "Corporate records" is a very open statement. I mean, so
   I wouldn't know who else would have access to corporate records. I don't -- or I  never did
7  control any of those accesses. I wouldn't  know. (P. 225)**

8       **Block #49:**  Q. Well, since -- there seems to be somewhere 2 about $300 million?  So, tell
   me, what was the sales for BNA for 2017? **A. BNA did not sell product to any external
9  customers. The only work BNA was doing was R&D work for the -- the sister entity in China
   and getting paid for it. So BNA did not have any other revenue stream, other than getting paid
10 for the work that was being done by the -- the R&D engineers.** Q. Any -- any income for the year
   of 2018? **A. Again, it would be whatever work was done, we were getting paid for. I wouldn't
11 remember the exact numbers for any one of the years, for that matter.** Q. So how about 2019?
   Was any income due from -- due to BNA? **A. There -- there was work that was happening still
12 2019 until the later part of 2019 when things had to be -- a lot of the work had to be slowed
   down and stopped.** Q. Okay. Well, was there any income? **A. So 2019 there have been some
13 payments for the work that was done during 2019.** Q. Okay. Well, was this -  **P.  43**) - was there
14 a -- was it

15      **Block # 50:**  only between these related entities, or was it to the person walking up and down
16 the street? Was a sale to a non-Byton entity? That's my question, to make it really easy for you.  **A. I
   cannot recollect any sale to any non-Byton entities -- when -- (inaudible) -- time (inaudible.)** Q.
17 Of the --[Full Trans., #142]." THE COURT REPORTER: Thank you so much. BY MR. COOK: Q.
   How about 2021? Were there any sales to -- other than sales to other related entities? **A. 2021, there
18 -- there was virtually no engineering work done from memory.** Q. So did -- did BNA send out a
   1099 to the other entities? Do you know that? **A. The other entities are not U.S. registered
19 entities, so I'm not aware of any requirement to send a 1099. They are not U.S. tax paying
   entities, so I'm not aware of any -- sending out any 1099s to other  (P. 44);  Block # 51:
20 entities.**

21      **Block # 51:**  BY MR. COOK: Did the BNA take any efforts to raise money to payoff
22 EDAG, if you know?  **A. As I said, BNA is an R&D company. It does not sell products or
   anything else. So why would anyone invest in a company that doesn't ultimately sell a product
23 and generate revenue? Knowing this, still would be willing to invest money into Byton North
   America, which is pure R&D service provider.** Q. So you can read. Now, answer my question?
24 [Full Trans., Doc. #42]. THE WITNESS: **I --**  [Full Trans., Doc. #42]. -  THE WITNESS: **I did**.
25 [Full Trans., Doc. #42]. MR. COOK: No. No. The answers just go round and round and round. [Full
   Trans., Doc. #42]. BY MR. COOK: Q. No. Answer my question?  [Full Trans., Doc. #42]. THE
26 WITNESS: **Why did --**      [Full Trans., Doc. #42].( P.  166)

27

28
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR
RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND
NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

**Block #52:**     THE WITNESS: **BNA did not make any effort to raise funds**. BY MR. COOK: Q. Okay. And all the -- and -- an I'm sure, in all the letters that was sent by BNA said that; is that  correct, sir? [Full Trans., Doc. #42]. BY MR. COOK: Q. No. You can answer the question? **A. Sorry. I couldn't hear the last bit.** Q. Oh, you -- I'm sure that the letters that were sent out by BNA all said, "We're not paying you." That's -- that's what I should look for? "We're not paying" -- [Full Trans., Doc. #42].  BY MR. COOK:  Q. -- "you"? That's what -- that's what --[Full Trans., Doc. #42]. BY MR. COOK:Q. -- it said? Am I correct? [Full Trans., Doc. #42].  BY MR. COOK: Q. You can answer that one. I want to make sure, when I go through the letters again that, my goodness,  (P.  167)

**Block # 53:**  Q. So in your many years, did you ever get ahold of, say, the balance sheet for BNA?  Ever see one of those? **A. Like -- as I said, I was more managing the operational finance, and I was not involved in the corporate finance activities.** Q. Okay. And did you ever see a profit and loss sheet -- profit and loss sheet for BNA between 2017 to the end of 2021? **A. No. I would not have.** Q. Did the company ever keep and maintain a balance sheet? [Full Trans., Doc. #42]. THE WITNESS: **Obviously, we -- we were filing taxes, so those details have to be maintained as a corporate enti**ty. BY MR. COOK: Q. And I presume that BNA did, in fact, complete a tax return for -- to the IRS for 2017, 2018, 2019, 2020 and 2021; is that correct? [Full Trans., Doc. #42]. WITNESS: **I'm aware that the taxes were (P.  45)**

## 2.   BNA SPIRITED ANY ALL LEDGERS, JOURNAL AND NOTES OR DON'T EXIST

" . . .Service Provider shall maintain at its principal place of business full, complete and accurate books of account and records of its activities under this Agreement in accordance with U.S. GAAP." (Doc. 85-2, p.4, Par. 4.5.)" but ledgers, journals and notes are intentionally gone, non-existent, or fake. "If BYTON has spirited these documents away and truly is not able to produce them, then either the undersigned or Judge Chen will need to determine what consequences flow from that. However, the first step is this order compelling production." (Doc. # 127, l. 10 - 12).

Any and all ledgers, journals and notes claimed to be in the Cloud and never to be found.  No knowledge of Investors and related any and all ledgers, journals and notes:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, & 32.  No documents are accessible, i.e., does not exist, not produced and lodged somewhere in China:  Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, & 47. No access to BNA records: Blocks #: 41, 42, 43, 44, 45, 46, & 48.

BNA bears the consequences of spiriting  the records  and flaunting two (2) court orders (#4/ #127 & OEX, Doc. # 96) when scatting ledgers, journals and notes to hither and yon.  BNA bears those consequences of rendering any financial statement void of any information  (Hands of Sadha (Block # 6, 7, & 8). or Block# 49-51 or fakes financial statements for fake businesses.

## 3.   PROOF OF MYTH AND FAKE LEDGERS, JOURNAL AND NOTES.

**HIDING  CORPORATE OFFICERS, AGENTS, OR EMPLOYEES (Block # 54)** Q. Okay. So since I have you here, I'm going to read into the record that, "Byton NA does not currently have any officers, directors, managing agents or employees who are familiar with Byton N/A's profit and debts? " That's -- that's a reasonably accurate  statement, sir? [Full Trans., #142]  BY MR. COOK: Q. Can you answer that question, sir? **A. There are no current employees in Byton North America.**  Q. Okay. Well, does BNA have a current officer,  (P. 11, lines 10 to 25) any officers at this time, if you know? **A. Sorry. I do not know. P.11, lines 25, and P. 12, lines 1-2.**  Okay. And Mr. Kirsch left some time in -- what was it? -- the third month of 2020, something like that? Does that sound about right? **A. I do not know the exact dates, sir. (P. 12, lines 14-17)**  Q. Well, who are -- there -- was there a replacement corporate officer, such as the president, if you know?  23 **A. Not that I know of.  (P. 12, lines 20-22** [Full Trans., #142] BY MR. COOK: Q. You can answer that question, sir? **A. There were -- there were no senior leadership team here in -- in North America that was actually running the -- running the operation.  (P. 14, limes 1-5)**

**HIDING ANY AND ALL LEDGERS, JOURNALS AND NOTES OF BNA (Block # 55):**  Q. Okay  [Full Trans., #142]  Where are those records, as we sit here today?  [Full Trans., #142]  6 THE WITNESS**: So the records for the profit and loss and balance sheet would be with the corporate finance group in -- in China**. [Full Trans., #142] BY MR. COOK: Q. Are they in some way that I can ask for and    deliver all of the finance records of BNA? Can that be done easily? [Full Trans., #142] THE WITNESS: **I'm not aware of how documents are stored in the -- in the China entity so it's difficult for me to comment. when BNA never produced records.**  (P. 37, lines 1-24)

**HIDING THE NAME OF THE COMPANY ACCOUNTANT (Block # 56):**  Q. By the way, what's the name of the accountant who did the tax returns? **A. It --** [Full Trans., #142] THE WITNESS: **Sorry, Mr. Cook. I cannot recollect.**  (P. 46, lines 4-10)

**HIDING THE NAME OF THE LEGAL TEAM (Block # 57):**  Q. Let's talk about 20- -- 2020?  Did you sign the tax return, sir? **A. For 2020, I signed the -- the tax return at the inception of -- with the -- with the power of attorney that was given to me to sign it.**  Q. Who gave you the power of attorney? **A. The -- the legal team.** Q. Who in the legal team? **A. Um --** [Full Trans., #142]  P. 47, lines 12-25.  BY MR. COOK: Q. Let me rephrase it? Who signed the power of attorney? **A. I -- I wouldn't know, Mr. Cook.  . . . A. It -- it was signed in Chinese with a Chinese stamp, and I wouldn't know who that person was.** [Full Trans., #142]  **. . . A. As I mentioned, it was signed by someone from -- or organized through our legal team. Someone in China signed it. I wouldn't know who that person was.** P. 48

**HIDING ALL ANY AND ALL LEDGERS, JOURNALS AND NOTES BECAUSE THE CLOUD SERVER IS NOT A PHYSICAL SERVER  OR SERVER** OR TO BE FOUND **( Block # 60)**:  Where's the ser- -- a server is a piece of hardware. Is it somewhere in California? **A. It's not a --** [Full Trans., #142]   . . .   P. 76, lines 18- 25;  [Full Trans., #142] -  MR. COOK: Well -- [Full Trans., #142]. THE  WITNESS: **It's -- it's a Cloud server. It's not a physical server.** (P. 77, lines 1 to 11); Q. Why not? Isn't it true that all of the records dealing with a half billion dollars is in some type of Cloud in China somewhere; isn't that correct? [Full Trans., #142]  BY MR. COOK: Q. You can answer that? **A. As I said, it's a Cloud server. I don't know where the server is. It's -- it's not a physical server. So it's -- it's truly in the Cloud, so I don't know which company manages that. And I -- I wouldn't know.** Q. All right. But it's -- you don't have control over it; isn't that correct? **A. I never had. P. 78, lines 8-22); Block #49 to 53: No sales, no revenue, payment.**

18

**HIDING THE CLOUD IN NOWHERE:  "As I said, I do not know the location of the Cloud servers to where they were. Whether they were in (P. 201) (Block #40) China or India or the Philippines or -- I -- I do not** know**. (P.  202).**"  (Block # 41)**

**HIDING THE NAMES OF BOARD OF DIRECTORS (Block # 62)**:  Q. . . Do you know the names of any of the board of directors of FMC Cayman? **A. No, sir, I wouldn't. P. 135, lines 13-19**

**ABANDONMENT OF PRESERVATION (Block # 63):**  Would that include electronic conservation of those documents? **A. The -- the electronic conservation of the documents, Mr. Cook, as I testified before, they are on various Cloud servers, so I wouldn't -- or portals, so I wouldn't know what was sitting where.** Q. How about the finance records, including e-mails of BNA? Was -- to the extent it was electronic, did you do anything to preserve those records? THE WITNESS: **Not my responsibility**. BY MR. COOK: Q. What? **A. Not my responsibility to store or preserve those documents.**  (P. 184, line 10 to 24)  BNA never accounting for the Any and all ledgers, journals and notes nor produced .

**HIDING $467,000,000, AND HIDING THE CLOUD SERVER AND, HIDING THE COMPANY MANAGER AND DONT' KNOWN WHICH COMPANY MANAGER (Block # 64):  ". . . . . .** BY MR. COOK: Q. Why not? Isn't it true that all of the records dealing with a half billion dollars is in some type of Cloud in China somewhere; isn't that correct? [Full Trans., #142] BY MR. COOK: Q. You can answer that? **A. As I said, it's a Cloud server. I don't know where the server is. It's -- it's not a physical server. So it's -- it's truly in the Cloud, so I don't know which company manages that. And I -- I wouldn't know.** Q. All right. But it's -- you don't have control over it; isn't that correct? **A. I never had  (P. 78, 1-22)** Q. Okay. And it is fair to say that the corporate finance team has control over it? [Full Trans., #142]. THE WITNESS: **I -- I don't know how much access they have of the archives.**  (P. 79 lines 1-3) ** Okay. And how about any-any type of contract, any such contracts regarding the movement of $467,000,000, almost -- almost half a billion? Do you have any of that paperwork?  [Full Trans., #142]  (P. 80, lines 20-25) THE WITNESS: **Yeah. There will be contractual documents for -- for the work that was done by Byton North America**. Q BY MR. COOK: Where's -- where's the contracts? [Full Trans., #142] ....THE WITNESS: **No. I -- I wouldn't know where those documents are. But I know that -- that there were documents that existed.** BY MR. COOK: Q. And they are somewhere in the Cloud; is that right? [Full Trans., #142]  BY MR. COOK:  Q. Is that correct? **A. They -- yeah, Byton typically used digital storage of documents, so yeah. I wouldn't know where those are.** Q. Well, who -- who can I contact who might be able to help me and find out where those documents are? Can you tell me where? [Full Trans., #142]  THE WITNESS: **Sorry, Mr. Cook. I -- I don't know which employees are still left in the company in the different locations, so I wouldn't be able to name a person. (P. 83, lines1 to 23)**

Adding up all of these statements from Sadha, the ledgers, journal, and notes which consist of the core of any financial statement is gone, whether a myth, lost, or completely inaccessible.  BNA is hiding behind myth after myth for Byton Entities:

**"The shared drive is a global shared drive. It's not a BNA specific shared drive.  So corporate finance documents that are stored in there had restricted access and was accessible to only to very few people in the company for confidentiality reasons"** (Block # 44). **"Company financial information is confidential. and it was only available to some very senior leadership**

1
2

**people in the finance team. And I don't know even whether the CEO had access**. . ... THE WITNESS: **Yes. These -- these folders were confidential -- contained confidential information, so the access was restricted to very few people in the company . . .**" (Block #43).

3
4
5
6
7
8
9
10

If the "shared drive is a global shared drive," all of the Byton Entities are a single entity and shielded by "confidential" and "restricted." The fact that the "shared drive" is impenetrable and therefore "IMPOSSIBLE" or "RESTRICTED" (or both) is therefore a myth. But, BNA  has not provided any and all ledgers, journals and notes because "The only work BNA was doing was R&D work for the -- the sister entity in China and getting paid for it. So BNA did not have any other revenue stream, other than getting paid for the work that was being done by the -- the R&D engineers. . . . A. Again, it would be whatever work was done, we were getting paid for." (Block # 49 etc) **"A. As I said, BNA is an R&D company. It does not sell products or anything else." (Block # 51). Ledgers, journals, notes, and financial statements are fake, i.e., someone else owns the place.

11

**II.      REMEDIES AVAILABLE RULE 37(b)(2)(A)(vi) AND RULE 37(e)(2) and (C).**

12

      **A.      RELIEF UNDER RULE 37(b)(2)(A)(vi)**

13
14
15

BNA disobeyed #4/ # 127, which consisted of any and all ledgers, journals and notes, due on March 24, 2022 when no any and all ledgers, journals and notes were provided and no excuses under Rule 37(b)(2)(A)(vi) as follow:

16
17
18

      . . . . . (A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:  (vi) rendering a default judgment against the disobedient party; or

19
20
21
22
23
24
25
26

EDAG is entitled to an order under Rule 37(b)(2)(A)(vi) because BNA spirited (or scattered) any and all ledgers, journals and notes, (#4/# 127) hither and yon. EDAG seeks the default of the Motion to Amend per C.C.P. Section 187 (Doc. # 71 & #72)  when in fact the purpose of any and all ledgers, journals and notes, if revealed, would support EDAG's motion that the entities are one unity, i.e., one entity for making "goods," with "no any and all ledgers, journals and notes," with no access to any and all ledgers, journals and notes and no money (Block # 49 to #52).  The refusal to comply with #4/#127, and the entry of the order (*Ibid*) are the (1) goal of obstruction of EDAG in prosecuting the Motion to Amend (Doc. #71 and #72), (2) obstruct EDAG in locating assets or adding more parties to the judgment or locating assets and (3) obstruct preservation of records.

27
28

The refusal to comply with the #4/# 127 order tracks in parallel with Rule 37(e)(2)(C) campaign of  "should have been preserved in the anticipation or conduct of litigation is lost because

a party failed to take reasonable steps to preserve it" but refused to preserve the any and all ledgers, journals and notes or destroyed any and all ledgers, journals and notes when the BNA admitted any and all ledgers, journals and notes are: "**A. As I said, I do not know the location of the Cloud servers to where they were. Whether they were in (P. 201) (Block #40) China or India or the Philippines or -- I -- I do not know.** (P.202).  Defining #4/#127 is the same as "preserved in the anticipation" of records when defiance of the order is the destruction of preservation of records.

### 1.   EDAG likewise Seeks Relief under Rule 37(e)(2)(C)
(1) **Preponderance:**

EDAG bears the preponderance to "should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it" as follows:

"But at least one district court within the Ninth Circuit applying the amended version of Rule 37(e) has indicated that "[t]he applicable standard of proof for spoliation motions in the Ninth Circuit is the preponderance of evidence." [Citation omitted]  The Court therefore concludes that the preponderance-of-the-evidence standard continues to apply." *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, [part omitted]  2019 WL 6527951, at *10 (S.D. Cal. Dec. 4, 2019);

"The applicable standard of proof for spoliation in the Ninth Circuit appears to be by a preponderance of the evidence.' [Citation omitted]  *Colonies Partners, L.P. v. Cty. of San Bernardino,* [part committed] 2020 WL 1496444, at *3 (C.D. Cal. Feb. 27, 2020), *report and recommendation adopted,* [part omitted] 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020)

EDAG seeks a default of the Motion To Amend (Doc. # 71 & #72) by adding Byton Limited as a judgment pursuant to Rule 37(e)(2)(C)

" If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:  . . . . **(2)**; or **(C)** dismiss the action or enter a default judgment."

The OEX Transcripts demonstrates the failure to take reasonable steps to preserve any and all ledgers, journals and notes requires by Rule 37(e)(2)(C) because BNA (1) has not produced any and all ledgers, journals and notes, and (2) admits that the ledgers, journal, and notes are a myth because alleged ledgers, journal and notes are in the Cloud. (Block # 9, 10, 11, 12, 13, 16, 39 & 40).

BNA, FMC CAYMAN, Byton Limited, and Zhang Ying were acted as an unified entity, where BNA provided "products" only to the Byton entities and no third party revenue[7]  whoever

---

[7]   Claimed sales only to other Byton Entities and no revenue from third parties other Byton Entities: Blocks # 49 & 51.  BNA did not any effort to raise funds: Block # 52.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

they were, that BNA has ZERO any and all ledgers, journals and notes[8] and no access to any and all ledgers, journals and notes or raise funds,[9] including profit and loss[10] and that Sadha has no ledgers, journals and notes for the operation of BNA, [11]  zero money (Doc. # 133-1, **_Ex's: "A," "B,"_** and **_"C"_** ), and ZERO employees[12], no revenue stream to anyone,[13] the cloud is in China, India, or Philippines,[14] denial of management of any financial matter.[15]  In addition to the absence of revenue, customer, any and all ledgers, journals and notes, any rational explanation for the spiriting of $143,000,000.00 or $167,139,906.00 (Doc. # 133-1, **_Ex's: "A," "B,"_** and **_"C"_** ), the absence of financial information, the lack of any and all ledgers, journals and notes, or access, BNA defaulted on #4/#127, and the claim that any and all ledgers, journals and notes are somewhere in the clouds, somewhere and under the control of unknown persons. [16]  BNA offers no rationale why BNA failed to comply with #4/#127, and why BNA's ledgers, journals and notes have been spirited to China (or scattered), warehoused in "Clouds" or do not exist or BNA does not exist. Blocks #49 to # 51.

BNA does not justify why BNA's ledgers, journals and notes are somewhere in the Cloud: "Block 39: [Line 21: Q. Okay. So was it -- was that in the computer Line 22 system that you had in Santa Clara, or was that in23 China?] "**A. As I said, I do not know the location of the Cloud**

---

[8]  No knowledge of Investors and records:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, & 32. No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China: Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, & 47. No access to BNA records: Blocks #: 41, 42, 43, 44, 45, 46, & 48.

[9] No access to BNA records: Blocks #: 41, 42, 43, 44, 45, 46, & 48. No Employees of BNA: Blocks #: 15 & 16. Vice President of Finance and signed documents but not employees or bona fide VP of BNA:  Blocks #: 17, 18, 19, &39. No access of the BNA Document: Block #: 20.   Sadha Kameswaran in Control of Finances:  Blocks #: 27, 35, 36, & 37. Sadha Kameswaran did not know ZHANG YING:  Block #: 28. Zhang Ying did not receive any BNA records:  Blocks #: 28, 29 & 30. FMC did not get documents from BNA: Blocks #: 31 & 33. Byton entities imposed restriction in disclosing financial records. Blocks #: 41, 42, 43, 44, & 45. BNA did not any effort to raise funds: Block # 52.

[10]  Never saw a profit and loss sheet between 2017 to the end of 2021: Block #53

[11] No access to BNA records: Blocks #: 41, 42, 43, 44, 45, 46, & 48. No Employees of BNA: Blocks #: 15 & 16.

[12] No Employees of BNA:  Blocks #: 15 & 16.

[13]   No revenue stream to anyone, other than payment from other Byton Entities: Blocks # 49, & 51.

[14]   Records in the Cloud in China, India or Philippines: Blocks # 39 & 40 & #9, 10, 11, 12, 13, 16.

[15]  Denial of management of financials: Block # 53.

[16] No knowledge of Investors and records:  Blocks No #: 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, & 32. No documents are accessible, i.e., does not exist, no produced and lodged somewhere in China: Blocks #: 7, 8, 9, 10, 11, 11, 12, 13, 14, 15, 16, 20 39, 40, 41, 42, 43, and 44, & 47. No access to BNA records: Blocks #: 41, 42, 43, 44, 45, 46, & 48.

22

servers to where they were. **Whether they were in (P. 201) (Block #40) China or India or the**

**Philippines or -- I -- I do not know.** "(P. 202).  BNA did everything to spirit any and all ledgers,

journals and notes: No access to BNA any and all ledgers, journals and notes: Blocks #: 41, 42, 43,

44, 45, 46, & 48. No Employees of BNA: Blocks #: 15 & 16. Vice President of Finance and signed

documents but not employees or bona fide VP of BNA Blocks #: 17, 18, 19, &39. No access of the

BNA Document Block #: 20. The totality of facts is that BNA and its surrogates removed everything

and anything from the United States (i.e., money, any and all ledgers, journals and notes, digital

information, memory of former employees, and even employees) to make sure that EDAG will

never collect or add new parties.  Clouds are found in Blocks # 9, 10, 11, 12, 13, 16, 39 & 40.

## 2. INTENT INFERRED FOR THE FAILURE TO TAKE MEASURES TO PRESERVE RELEVANT EVIDENCE AND INCRIMINATING OF EVIDENCE OF CORRUPTION

Plaintiff is not required to prove "prejudice" as follows:

"Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information.  *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, [Part omitted] 2019 WL 6527951, at *12 (S.D. Cal. Dec. 4, 2019)

EDAG can prove that that the intent as inferred:

"Intent may be inferred if a party is on notice that documents were potentially relevant and fails to take measures to preserve relevant evidence, or otherwise seeks to "keep incriminating facts out of evidence." [*Colonies Partners, L.P. v. Cty. of San Bernardino*, [part omitted] 2020 WL 1496444, at *9–10 (C.D. Cal. Feb. 27, 2020), [part omitted]"

## 3. HIDING ANY AND ALL LEDGERS, JOURNALS AND NOTES IS PROOF OF GUILT

BNA has failed to provide any rationale for spiriting any and all ledgers, journals and

notes of any type assuming that they exist or scattered or in the Cloud.(Blocks ##9, 10, 11, 12, 13,

16, 39 & 40).  BNA sought to hide and conceal all evidence, whether it be evidence of helpful

witnesses such as accountants and attorneys and any and all ledgers, journals and notes which would

unwind contracts, trade and transfers and unwinding some $467,000,000 as follows:

"Totality destroyed evidence to avoid litigation obligations. "To issue harsh sanctions, such as dismissal, under Rule 37(e), a court must find that "the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). "[C]ourts have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer, that [the] party purposefully destroyed evidence to avoid its litigation obligations." ...  The Court finds that the totality of the circumstances indicate that AllRide's spoliation was intentional. The Court will issue terminating sanctions against AllRide pursuant to

1   Rule 37(e)(2)(C)." *WeRide Corp. v. Kun Huang*, [part omitted] WL 1967209, at *12 (N.D. Cal. Apr.

2   24, 2020)

3          **4.    BALANCING FACTORS**

           Here the balancing factors:

4          "Moreover, a court adjudicating a request for terminating sanctions pursuant to Rule

5   37(e)(2)(C) must consider the following factors: (1) the public's interest in expeditious resolution of

6   litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking

    sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability

7   of less drastic sanctions. [Citation omitted]." <u>Mfg. Automation & Software Sys., Inc. v. Hughes</u>,

    [part citation] WL 2059839, at *4 (C.D. Cal. Apr. 30, 2018)

8          Enforcement is usually the end to litigation based on Rule 37(b)(A)(2)(A)(iv) & Rule

9   37(e)(2)(C)  based on the post judgment order to turn over any and all ledgers, journals and notes

10  and thwart collection of $30 mil judgment.  The court would seek to advance the docket which

11  would match the request to seek a default of BYTON Limited as the corporate parent in the pending

12  Motion to Amend (Doc. #71 & 72). The risk of prejudice is minimal given that BNA is subject to a

    final judgment and order (#4/#127).  Public policy is given that BNA has done everything to thwart

13  justice by shipping out $143,000,000.00 or $167,139,906.00 (Doc. # 133-1, ***Ex's: "A," "B,"*** and

14  ***"C"***) and scattering the record offshore: Blocks #9, 10, 11, 12, 13, 16, 39 & 40).  Plaintiff has

15  therefore met the burden of proof under Rule 37(e)(2)(C) where BNA has hid everything, i.e., 100%

16  and the including the ledgers, journal, and notes which are the bones of any financial statement and

    profit and loss statement.  Financial and profit and loss statements are compilations, aggregations,

17  accumulations, and representations whose foundation is ledgers, journals, and notes which BNA

18  never produced, Less sanctions are not available when BNA's business is in the clouds. (Blocks #9,

19  10, 11, 12, 13, 16, 39 & 40)

20  **III.    FAILURE TO COMPLY WITH AN ORDER TO PRODUCE ANY AND ALL
            LEDGERS, JOURNALS AND NOTES RESULTS IN A DEFAULT JUDGMENT**

21

22         Failure to comply with an order to produce any and all ledgers, journals and notes and

23  implicitly Rule 37(b)(2)(A)(vi):  results in a default judgment as follows:

24         "Defendants have failed to produce their general ledger or ledgers in violation of the court's

25  May 31, 2007 Order. The court's May 31, 2007 Order specifically required defendants to produce

    "balance sheets, cash statements, registers, journals, ledgers." [part omitted], and from the excerpts

26  of the  general ledger produced by defendants' tax accountants Nardella & Taylor, *see* general ledger

27  excerpts, Ex. A to Pl.'s Suppl. Mem., that defendants possess or have possessed at some point during

    this litigation a general ledger. Defendants have offered no plausible explanation for why these

28

business records have not been produced and, as such, the court finds that defendants have willfully violated the court's May 31, 2007 Order to produce general ledgers." *S. New England Tel. Co. v. Glob. NAPs, Inc.,* 251 F.R.D. 82, 90–91 (D. Conn. 2008), *aff'd,* 624 F.3d 123 (2d Cir. 2010)

The court found that the Defendants willfully violated the court's order to turn as follows:

"The court finds that all defendants have willfully violated the court's discovery orders by failing to turn over their general ledgers and other business records, lying to the court about the inability to obtain documents from third parties, and destroying and withholding documents that were within the scope of the discovery requests and Orders. These defendants have committed a fraud upon this court. These willful violations have prejudiced, indeed likely destroyed, SNET's ability to prove its case, and have squandered judicial resources by dragging the court into frequent policing of discovery disputes over an inordinate period of time. In light of the defendants' history of violations, and the explicit warning that failure to comply would result in a default judgment entering, the court finds that lesser sanctions would not deter the defendants from further delaying discovery in this case. Indeed, the court has little confidence that the discovery sought continues to exist" *S. New England Tel. Co. v. Glob. NAPs, Inc., supra*, p 96.

## IV.     FAKE RECORDS OR RECORDS SCATTERED HITHER AND YONG

Case law and professionals and academic articles all state that ledgers, journal and notes are the bones of the financial statement which is only a **snap shot of the** compilations, aggregations, accumulations and representations, which keeps tract (ledgers and journal) and explains line items (notes) of the financial statement. A financial statement is obligated to be thorough and an accurate snap shot reflection of the ledgers, journals and the notes at snap shot of the time, but nothing more. Without the ledgers, journal and notes at hand, the financial statement is an empty, if not fraudulent, representation of BNA. If they exist (unlikely), BNA scattered the ledgers, journal and notes hither and yon ("Clouds" of India, China and Philippines) and the financial statement with all fabricated line items. Likewise BNA intentionally failed to meet the standard of FRCP 37(e)(2)(C) when BNA stated repeatedly that the "records" were warehoused in the Cloud by no name and somewhere "India, China or Philippines" or nowhere.  Plaintiff seeks from the court an order granting the relief as sought, i.e., the granting of Rule 37(b) (b)(2)(A)(vii) and Rule 37(e)(2)(C) and declares a default of the Motion to Amend by adding Byton-Limited. (Doc. # 71 and #72). But, the punch line is also easy: "BNA did not sell product to any external customers. The only work BNA was doing was R&D work for the -- the sister entity in China and getting paid for it. So BNA did not have any other revenue stream, other than getting paid for the work that was being done by the -- the R&D engineers. Q. Any -- any income for the year of 2018? A. Again, it would be whatever work was done, we were getting paid for. I wouldn't remember the exact  numbers for any one of the years, for that matter."  Block # 49 through #51. "It does not sell products or anything else."  BNA's ledgers,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION

journals and notes never existed, and the financial statements are a fake.


**Dated:  April 12, 2022**                                    COOK COLLECTION ATTORNEYS PLC


                                                            _____/s/ David J. Cook_____
                                                            DAVID J. COOK, Esq.
                                                            Attorney for EDAG Engineering GmbH

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR
RELIEF FOR THE FAILURE AND REFUSAL TO TURN OVER ANY AND ALL LEDGERS, JOURNALS AND
NOTES (#4, DOC. # 127) AND FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION